IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.:   20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,

2. MIKELL REEVE FRIES,

3. SCOTT JAMES BRADY,

4. ROGER BORN AUSTIN,

    Defendants.

## INDICTMENT

The Grand Jury charges that:

## COUNT 1

(Conspiracy to Restrain Trade)

1. Beginning at least as early as 2012 and continuing through at least early 2017, the exact dates being unknown to the Grand Jury, in the State and District of Colorado and elsewhere, JAYSON PENN, MIKELL FRIES, SCOTT BRADY, and ROGER AUSTIN ("Defendants"), together with co-conspirators known and unknown to the Grand Jury, entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by the Defendants and co-conspirators was a *per se*

unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States.

## I. BACKGROUND

3. Broiler chickens are chickens raised to provide meat for human consumption. Several companies ("Suppliers") produced broiler chicken products in the United States for sale either directly or indirectly such as through a distributor and a distribution center ("DC") to restaurants, grocery retailers, and others. During the time period of the conspiracy alleged in this Indictment, those Suppliers included, but were not limited to, Supplier-1, Supplier-2, Supplier-3, Supplier-4, Supplier-5, Supplier-6, and Supplier-7.

4. Restaurants, grocery retailers, and others who purchased large volumes of broiler chicken products generally received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly or, in the case of some fast-food restaurants, also known as quick-service restaurants ("QSRs"), having many independent franchisees, through a centralized buying cooperative.

5. Some purchasers of broiler chicken products used a "cost-plus" pricing model for 8-piece bone-in broiler chicken products (alternatively called "8-piece COB" for 8-piece chicken-on-the-bone) that varied month-to-month or period-to-period

depending on the price of chicken feed and that also provided Suppliers with a per-pound margin and an "adjustment" that was effectively an additional per-pound margin. 8-piece COB consisted of two breasts, two wings, two thighs, and two drumsticks.

6. The price of 8-piece COB often served as a base price for other broiler chicken products. Dark meat was often priced at a certain number of cents per pound less than, or "back" from, the price per pound of 8-piece COB. As a result, a smaller number of cents back translated into a higher price for dark meat compared to a greater number of cents back. For example, "30 back" was a higher price for dark meat than "31 back."

7. Prices for broiler chicken products were sometimes tied to a market index, such as the Urner-Barry Index ("UB"), as an alternative. For example, cases of wings sold in bulk were sometimes priced at the UB per-pound price ("market") and cases of pre-counted wings were sometimes priced at the UB per-pound price plus a specified number of cents per pound ("market plus").

8. Bidding and negotiations usually occurred annually toward the end of the calendar year and established prices and other price-related terms, including discount levels, for the following calendar year. In some instances, however, bidding and negotiation toward the end of the calendar year established prices and other price-related terms, including discount levels, for multiple calendar years. In yet other instances, bidding and negotiations occurred throughout the year and sometimes established prices and other price-related terms, including promotional discounts, for discrete periods of time.

9. Bidding and negotiations often involved weekly volume commitments

between Suppliers and their respective customers. If, in a given week, a Supplier could not meet its volume commitment to a customer, the Supplier could often buy broiler chicken products from another Supplier to cover the shortfall. Alternatively, the Supplier could "short" the customer by not fulfilling its volume commitment that week.

## II. DEFENDANTS AND OTHERS

10. JAYSON PENN was an executive vice president at Supplier-1—located in Greeley, Colorado—starting in approximately January 2012. PENN became the President and Chief Executive Officer of Supplier-1 in approximately March 2019.

11. ROGER AUSTIN was a vice president at Supplier-1 starting in approximately February 2007.

12. MIKELL FRIES was a sales manager at Supplier-2—which was headquartered in the State of Georgia— starting in approximately 2004. In approximately 2012, FRIES was appointed to Supplier-2's board of directors. In approximately 2016, FRIES became the President of Supplier-2.

13. SCOTT BRADY was a vice president at Supplier-1 starting in approximately 1999, and a vice president at Supplier-2 starting in approximately August 2012.

14. Supplier-1-Employee-1 was Supplier-1's President and Chief Executive Officer starting in approximately January 2011 until approximately March 2019. Supplier-1-Employee-1 supervised PENN.

15. Supplier-1-Employee-2 was a director and manager at Supplier-1 from approximately September 2012 until approximately May 2015, and a vice president at Supplier-1 from approximately March 2015 until approximately May 2016.

16.     Supplier-1-Employee-3 was a director and manager at Supplier-1 starting in approximately March 2010.

17.     Supplier-1-Employee-4 was an employee of Supplier-1 starting at least as early as approximately September 2012.

18.     Supplier-3-Employee-1 was an employee of Supplier-3 starting in approximately January 1988.

19.     Supplier-3-Employee-2 was a manager and director at Supplier-3 starting in approximately 2009.

20.     Supplier-6-Employee-1 was an employee of Supplier-6.

21.     QSR-1 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-1.  Cooperative-1-Employee-1 was an employee of Cooperative-1 from approximately June 2008 until approximately May 2014.  Cooperative-1-Employee-2 was an employee of Cooperative-1 from approximately August 2004 until approximately February 2017.  Cooperative-1-Employee-3 was an employee of Cooperative-1 from approximately May 2014 until approximately December 2014.  Cooperative-1-Employee-4 was an employee of Cooperative-1 in 2014.

22.     QSR-2 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-2.  Cooperative-2-Employee-1 was an employee of Cooperative-2 starting in approximately July 2008.

23.     QSR-3 was a nationwide restaurant franchise that negotiated directly with Suppliers.  QSR-3-Employee-1 was an employee of QSR-3 starting in approximately September 2001.

24. Grocer-1 was a nationwide grocery-store chain operating under various brand names in various geographical areas that negotiated directly with Suppliers. Grocer-1-Brand-1 was a grocery-store brand owned by Grocer-1. Grocer-1-Brand-1 operated multiple stores in the State and District of Colorado.

25. Grocer-2 was a nationwide grocery-store chain.

26. Others not made Defendants in this Indictment participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance of the conspiracy.

27. Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

### III.  MEANS AND METHODS OF THE CONSPIRACY

28. It was part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

29. It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado and elsewhere, utilized that continuing network:

a. to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

b. to participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States;

c. to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States.

30. It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado, and elsewhere, discussed protecting, and thereafter acted to protect, the purpose and effectiveness of the conspiracy.

31. It was further part of the conspiracy that PENN, FRIES, BRADY, and AUSTIN, together with their co-conspirators, in the State and District of Colorado, and elsewhere, sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately December 2015.

### *QSR-1's Dark Meat and Wings Supply for 2013*

32. In approximately the autumn of 2012, Cooperative-1 was negotiating prices with Suppliers for dark meat and wings supply for calendar year 2013.

33. It was further part of the conspiracy that in or around October 10, 2012, AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back of the 8-piece price.

34. It was further part of the conspiracy that in or around October 2012, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back.

35. It was further part of the conspiracy that, after, Cooperative-1-Employee-1 told AUSTIN on or about October 26, 2012, that because some Suppliers had bid dark meat at .30 back and other Suppliers had bid dark meat at .32 back, Cooperative-1-Employee-1 planned to ask all Suppliers to change their bids to .31 back:

    a. On November 13, 2012, at approximately 4:17 p.m. (EST), Supplier-6-Employee-1 called BRADY. The duration of the call was approximately 5 minutes.

    b. On November 13, 2012, at approximately 4:22 p.m. (EST), BRADY texted FRIES: "[Supplier-6] is .30 back on dark meat."

    c. On November 13, 2012, at approximately 4:23 p.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 13 minutes.

    d. On November 13, 2012, at approximately 4:34 p.m. (EST), BRADY texted FRIES: "[Supplier-1] is .30 back and [Supplier-3] is 31 back," to which FRIES responded "Ol [Cooperative-1-Employee-1]! He bluffing hard!"

  e. On November 13, 2012, at approximately 4:37 p.m. (EST), BRADY texted FRIES: "I talked to roger [AUSTIN] and this month he is .03 higher than us on 8 piece."

  f. On November 13, 2012, at approximately 4:45 p.m. (EST), BRADY texted FRIES: "he [AUSTIN] said to raise our prices, on wings he is market and market plus .10[.]"  FRIES responded, "Tell him we are trying!"  BRADY responded, "Will do[.]"

  g. On November 13, 2012, at approximately 4:58 p.m. (EST), AUSTIN sent Supplier-1's second-round bid to Cooperative-1 with dark meat at .30 back, and bulk wings and pre-counted wings at "UB Mkt previous month average" and "UB Mkt previous month average + .10."

36. It was further part of the conspiracy that on or about November 14, 2012, BRADY submitted Supplier-2's second-round bid with dark meat at .30 back.  In a cover email accompanying the second-round bid, BRADY stated, "[o]n the wings we would like to be at market for the bulk packed and market plus .10 on the precounted."

37. It was further part of the conspiracy that on or about November 30, 2012, PENN sent Supplier-1-Employee-1 a spreadsheet containing the 8-piece COB quotes that Supplier-2, Supplier-5, and Supplier-6 had proposed to Cooperative-1.

38. It was further part of the conspiracy that in or about December 2012, PENN and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .30 back in calendar year 2013.

39. It was further part of the conspiracy that in or about December 2012, BRADY and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .3050 back in calendar year 2013.

### *QSR-1's 2013 Request to Supply Reduced-Weight Product*

40. On or about March 5, 2013, Cooperative-1-Employee-1 asked various Suppliers and co-conspirators to provide a quote to supply QSR-1 with a reduced-weight 8-piece COB product.

41. It was further part of the conspiracy that on or about March 8, 2013:

    a. At approximately 2:45 p.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 1 minute.

    b. At approximately 2:48 p.m. (EST), BRADY called AUSTIN back. The duration of the call was approximately 8 minutes.

    c. At approximately 3:44 p.m. (EST), BRADY told FRIES, "I talked to roger [AUSTIN] about the [QSR-1] sizes and he is in agreement with us."

### *QSR-1's Dark Meat Supply for 2014*

42. In approximately autumn of 2013, Cooperative-1 was negotiating with Suppliers for dark meat supply for calendar year 2014.

43. It was further part of the conspiracy that in or about October 2013, AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 dark meat for calendar year 2014 at .30 back.

44. It was further part of the conspiracy that in or about October 2013, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2014 at .305 back.

45. It was further part of the conspiracy that on or about November 19, 2013:

    a. At approximately 1:27 p.m. (EST), BRADY called AUSTIN. The duration of the call was approximately 3 minutes.

  b. At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back." FRIES responded, "K.  Can do .31 if want."

  c. At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Roger [AUSTIN] is at .30 back and not moving." FRIES responded, "Stay .305 then[.]"

  46. It was further part of the conspiracy that in or about December 2013, PENN and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

  47. It was further part of the conspiracy that in or about December 2013, BRADY and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

### *QSR-1's 8-Piece COB Supply for 2015*

  48. Beginning approximately in the summer of 2014, Cooperative-1 was negotiating with Suppliers for 8-piece COB prices to take effect in approximately 2015.

  49. Supplier-1's price for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included a margin of $.1175/lb.

  50. Supplier-2's price for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included a margin of $.0673/lb.

  51. It was further part of the conspiracy that on or about August 18, 2014:

  a. At approximately 12:04 p.m. (EDT) AUSTIN called BRADY.  The duration of the call was approximately 24 minutes.

  b. At approximately 6:46 p.m. (EDT) Supplier-1-Employee-2 told PENN that "Roger [AUSTIN] did some checking around today and I included the below

regarding the range of the total increases (margin and costs) folks are going in with," and then reported the numbers to PENN: Supplier-2 at .14-.16/lb., Supplier-4 at .13-.15/lb., Supplier-5 at .14-.16/lb., Supplier-6 at .15-.17/lb., and Supplier-7 at .14-.16/lb.

        c.      Supplier-1-Employee-2 told PENN, "Considering the numbers above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin) which would equate to about $400k in additional revenue on equal volume from this year."

        d.      Supplier-1-Employee-2 emailed PENN a price proposal with a margin of $.2175/lb. Supplier-1-Employee-2's email included current 2014 margins and contemplated 2015 margins for Supplier-2, Supplier-4, Supplier-5, and Supplier-7.

52.     It was further part of the conspiracy that on or about August 19, 2014, PENN responded to Supplier-1-Employee-2's email from the previous day, asking "2.5 M lbs X. 16 =$400k per week is the math?"

53.     It was further part of the conspiracy that on or about August 26, 2014:

        a.      AUSTIN told PENN that Cooperative-1-Employee-2 asked if Supplier-1 would reduce its proposed increase. PENN told AUSTIN to hold firm.

        b.      At approximately 2:52 p.m. (EDT), AUSTIN called BRADY. The duration of the call was approximately 14 minutes.

        c.      At approximately 5:11 p.m. (EDT), BRADY texted FRIES: "I talked to roger [AUSTIN] about [QSR-1] and Greeley[, Colorado] told him not to come down on price. He called [Cooperative-1-Employee-3] today and told him."

54.     BRADY then texted FRIES: "[Supplier-5] is not moving either" to which FRIES replied that Supplier-7 was not "agreeing to anything today, just listening."

12

55. It was further part of the conspiracy that on or about October 3, 2014, FRIES and Cooperative-1-Employee-4 signed an agreement that Supplier-2's effective margin for 8-piece COB would be $.1940/lb. in calendar year 2015.

56. It was further part of the conspiracy that on or about October 31, 2014, AUSTIN and Cooperative-1-Employee-4 signed an agreement that Supplier-1's margin for 8-piece COB would be $.2175/lb. in calendar year 2015.

57. It was further part of the conspiracy that in calendar year 2015, including as late as approximately December 26, 2015, Supplier-1 sold and accepted payment for 8-piece COB through a distributor to QSR-1 franchises in the United States at a margin of $.2175.

### *QSR-3's 8-Piece COB Supply for 2015*

58. In approximately the autumn of 2014, QSR-3 was negotiating with Suppliers for its 2015 8-piece COB pricing.

59. It was further part of the conspiracy that on or about October 17, 2014, the following text message exchange occurred between PENN and Supplier-1-Employee-3:

| PENN | "Who is negotiating with [QSR-3]?" |
|---|---|
| Supplier-1-Employee-3 | "[Supplier-1-Employee-4] and Roger [AUSTIN]" |
| PENN | "Ok.  Thanks" |
| Supplier-1-Employee-3 | "We know [Supplier-7], their biggest supplier is 0.02 higher than us and they are not going to negotiate." |
| PENN | "Good deal.  Last time they did cave a cent or two with [QSR-1]" |
| Supplier-1-Employee-3 | "They are listening to my direction" |
| PENN | "Who is they?" |
| PENN | "If they is illegal don't tell me" |
| Supplier-1-Employee-3 | "Was referring to roger [AUSTIN] listening.  Sorry, thought you were referring to roger [AUSTIN] caving.  Got you on [Supplier-7] caving on [QSR-1].  [Supplier-7] might cave but I wouldn't think for our volume and their current." |

13

| PENN | "[Supplier-3] does the west.  Hearing rumors out of them?" |
| --- | --- |
| Supplier-1-Employee-3 | "Buyer said we were .07 high so that must be [Supplier-3's] price…" |
| PENN | "They are morons" |
| Supplier-1-Employee-3 | ".07 back is in line with where we have priced everybody else but they did not add anything for the cost of doing business with [QSR-3] like us and [Supplier-7] did" |
| PENN | "[Supplier-7] is a solid competitor." |

60. It was further part of the conspiracy that on or about November 7, 2014, Supplier-1-Employee-3 told PENN: "[QSR-3] just called back...came up on price.  Would net somewhere around 1.00 and we went in at 1.04/1.08."

61. It was further part of the conspiracy that on or about November 9, 2014, PENN told Supplier-1-Employee-1: "I raised [QSR-3] 15c per lb" and "[QSR-3-Employee-1] and his crew will pay market price plus the special A-Hole Premium."

62. It was further part of the conspiracy that on or about November 10, 2014, Supplier-1-Employee-3 emailed Supplier-1-Employee-4 and AUSTIN: "I do not really want to get into a pricing war with [Supplier-7] over those two DCs."

### *Protecting the Purpose and Effectiveness of the Conspiracy*

63. It was further part of the conspiracy that on or about November 24, 2014, after Supplier-3 asked to purchase broiler chicken products from Supplier-1 to cover a shortfall to Grocer-1-Brand-1 for approximately $.05/lb. more than the price Supplier-1 had negotiated with Grocer-1, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

    a. "[Supplier-3] should pay for being short.  It costs money for them to fill orders for which they don't have the chickens.  They have been adding market share and still trying to do – selling cheap chicken and being short.  Doesn't make sense.  We

14

are enabling the town drunk by giving him beer for Thanksgiving instead of walking him into an AA meeting."

        b.      "[Supplier-3] is not shorting [Grocer-2].  Note [Supplier-3] just added market share and distribution to [Grocer-2].  They took our business on price.  Should we allow [Supplier-3] to not pay for poor decision making?"

        c.      "They need to pay so they start acting appropriately.  How do they pay?  Their customers need to feel the pain.  By not feeling the pain – [Supplier-3] keeps marching along and the customers to [sic] blindly with them."

        d.      PENN forwarded his emails to Supplier-1-Employee-1 and said: "Thoughts on deli strategy to [Grocer-1-Brand-1]?  We are covering [Supplier-3] shortages.  Continue and let [Grocer-1-Brand-1] know we are helping or start have [Supplier-3] feel the pain across their system so they can start making decisions commensurate with a profitable venture and not a philanthropic organization?"

        e.      Supplier-1-Employee-1 responded: "No question in my mind.  [Supplier-3] should have to live with the decision they made.  We made ours and are dealing with it.  Why should it be any different for them?  We SHOULD NOT HELP THEM ONE MICRON."

        f.      PENN responded: "I agree.  We are just allowing our competitor to continue their idiotic ways."

    64.    It was further part of the conspiracy that on or about November 26, 2014, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

        a.      "Our competition is offering lower margins on this item.  Our competition is also currently shorting [QSR-2], [Grocer-1], and [another customer].  All

of which we have been asked to cover this week in very slow markets. So in essence they are cheap and to add insult to injury are short product."

      b.    "They are calling us – three tines [sic] this week – to help them cover loads on small birds to their new customers – their new customers with whom they just increased distribution at cheap prices. So – for Thanksgiving should we give Otis a bottle of Crown (aka loads of chicken) or take him to AA (aka make him face the shortage music)?"

      c.    "We are straight up taking Otis to AA. No juice for Otis. Otis must face the music for his misguided actions. Selling cheap in a short market – no bailout for you."

      d.    "In other words we are not covering the loads for which [Supplier-3] is asking for help."

65.    It was further part of the conspiracy that on or about December 22, 2014, PENN told Supplier-1-Employee-1: "[Supplier-3] took this strategy of not worrying about what the competition is doing and it led to the unraveling on a competitive advantage. Have to keep our enemies close and ensure that we are not zigging when the competition is successfully zagging."

### *QSR-2's 2015 Bone-In Promotional Discount*

66.    On or about March 25, 2015, Cooperative-2-Employee-1 asked Suppliers if QSR-2 could get "some type of discount" for a promotion in approximately September 2015 "[d]ue to the increases we incurred this year."

67.    It was further part of the conspiracy that on or about March 26, 2015:

      a.    At approximately 1:41 p.m. (EDT), Supplier-3-Employee-1 called

16

BRADY.  The duration of the call was approximately 2 minutes.

        b.     At approximately 1:43 p.m. (EDT), Supplier-3-Employee-1 called Supplier-6-Employee-1.  The duration of the call was approximately 25 seconds.

        c.     At approximately 1:45 p.m. (EDT), Supplier-3-Employee-1 called Supplier-1-Employee-4.  The duration of the call was approximately 33 seconds.

        d.     At approximately 8:22 p.m. (EDT), Supplier-3-Employee-1 told Supplier-3-Employee-2, "I have talked to a couple company's [sic] and they are thinking .02lb for September" and "Only bad thing is everyone else does it, it will be hard not to do it."

68.     It was further part of the conspiracy that on or about March 27, 2015:

        a.     At approximately 10:30 a.m. (EDT), Supplier-3-Employee-2 told Supplier-3-Employee-1: "We discussed this morning, and we agree to offer the $0.02/lb. for the month of September."

        b.     At approximately 10:40 a.m. (EDT), Supplier-3-Employee-1 sent a text message to BRADY.

        c.     At approximately 10:42 a.m. (EDT), Supplier-6-Employee-1 called Supplier-3-Employee-1.  The duration of the call was approximately 3 minutes and 15 seconds.

69.     It was further part of the conspiracy that on or about March 31, 2015, Supplier-1-Employee-3 told PENN: "[QSR-2] is looking to get a $0.02/lb discount from all suppliers for a September promotion.  [Supplier-3], [Supplier-5], [Supplier-4], [Supplier-7], [Supplier-6], and [Supplier-2] have already agreed to the discount."

70.     It was further part of the conspiracy that on or about April 1, 2015, PENN

approved providing QSR-2 with a $.0200/lb. discount.

### *QSR-1's Broiler Chicken Products for 2018*

71.     In or around January 2017, Cooperative-1 was negotiating with Suppliers for 2018 broiler chicken products.

72.     It was further part of the conspiracy that, for example, on or about Monday, January 16, 2017, between approximately 2:40 p.m. (EST) and approximately 4:51 p.m. (EST), there were at least 5 phone calls between BRADY and AUSTIN.  The cumulative duration of the calls was approximately 15 minutes.

73.     It was further part of the conspiracy that on or about Tuesday, January 17, 2017:

      a.     At approximately 10:11 a.m. (EST), AUSTIN called BRADY.  The duration of the call was approximately 2 minutes.

      b.     At approximately 5:54 p.m. (EST) AUSTIN told Supplier-1-Employee-4, "[Supplier-2] meets with [Cooperative-1] in [sic] Thursday and i will get a blow by blow Friday morning.  [Supplier-5] meets with [Cooperative-1] in [sic] Friday."

74.     It was further part of the conspiracy that on or about Wednesday, January 18, 2017, at approximately 2:45 pm (EST), AUSTIN called BRADY.  The duration of the call was approximately 1 minute.

75.     It was further part of the conspiracy that on or about Thursday, January 19, 2017, Supplier-2 met with Cooperative-1.

76.     It was further part of the conspiracy that on or about Friday, January 20, 2017, at approximately 3:12 pm (EST), AUSTIN called BRADY.  The duration of the call was approximately 7 minutes.

77. It was further part of the conspiracy that on or about January 27, 2017, Supplier-1 met with Cooperative-1.

## IV. TRADE AND COMMERCE

78. During the period covered by this Indictment, the Defendants and their co-conspirators shipped substantial quantities of broiler chicken products by truck in a continuous and uninterrupted flow of interstate trade and commerce to companies located in states outside the place of origin of the shipments.

79. During the period covered by this Indictment, the business activities of the Defendants and their co-conspirators in connection with the sale of broiler chicken products were within the flow of, and substantially affected, interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

A TRUE BILL:

<u>Ink signature on file in Clerk's Office</u>
FOREPERSON

*[signature]*
MAKAN DELRAHIM
Assistant Attorney General

*[signature]*
BERNARD A. NIGRO JR.
Principal Deputy Assistant Attorney General

*[signature: Richard A. Powers with permission by HSD]*
RICHARD A. POWERS
Deputy Assistant Attorney General
MARVIN N. PRICE JR.
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

*[signature]*
JAMES J. FREDRICKS
Chief, Washington Criminal II Office

*[signature]*
MICHAEL T. KOENIG
HEATHER D. CALL
CAROLYN M. SWEENEY
PAUL J. TORZILLI
JILLIAN M. ROGOWSKI
LAURA J. BUTTE
Trial Attorneys

Antitrust Division
U.S. Department of Justice
Washington Criminal II Office
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2165
Michael.Koenig@usdoj.gov

20