**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No.: 20-CR-152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  JAYSON JEFFREY PENN,

2.  MIKELL REEVE FRIES,

3.  SCOTT JAMES BRADY,

4.  ROGER BORN AUSTIN,

5.  TIMOTHY R. MULRENIN,

6.  WILLIAM VINCENT KANTOLA,

7.  JIMMIE LEE LITTLE,

8.  WILLIAM WADE LOVETTE,

9.  GARY BRIAN ROBERTS,

10. RICKIE PATTERSON BLAKE,

      Defendants.

---

## SUPERSEDING INDICTMENT

---

The Grand Jury charges that:

## <u>COUNT 1</u>

(Conspiracy to Restrain Trade)

1.     Beginning at least as early as 2012 and continuing through at least early

2019, the exact dates being unknown to the Grand Jury, in the State and District of

Colorado and elsewhere, JAYSON JEFFREY PENN, MIKELL REEVE FRIES, SCOTT JAMES BRADY, ROGER BORN AUSTIN, TIMOTHY R. MULRENIN, WILLIAM VINCENT KANTOLA, JIMMIE LEE LITTLE, WILLIAM WADE LOVETTE, GARY BRIAN ROBERTS, and RICKIE PATTERSON BLAKE ("Defendants"), together with co-conspirators known and unknown to the Grand Jury, entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by the Defendants and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the Defendants and co-conspirators, the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States.

## I.   BACKGROUND

3.      Broiler chickens are chickens raised to provide meat for human consumption. Several companies ("Suppliers") produced broiler chicken products in the United States for sale either directly or indirectly such as through a distributor and a distribution center ("DC") to restaurants, grocery retailers, and others. During the time period of the conspiracy alleged in this Indictment, those Suppliers included, but were not limited to, Supplier-1, Supplier-2, Supplier-3, Supplier-4, Supplier-5, Supplier-6, Supplier-7, Supplier-8, Supplier-9, and Supplier-10.

4.       Restaurants, grocery retailers, and others who purchased large volumes of broiler chicken products, generally received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly or, in the case of some fast-food restaurants, also known as quick-service restaurants ("QSRs"), having many independent franchisees, through a centralized buying cooperative.

5.       Some purchasers of broiler chicken products used a "cost-plus" pricing model for 8-piece bone-in broiler chicken products (alternatively called "8-piece COB" for 8-piece chicken-on-the-bone) that varied month-to-month or period-to-period depending on the price of chicken feed and that also provided Suppliers with a per-pound margin and an adjustment that was effectively an additional per-pound margin. 8-piece COB consisted of two breasts, two wings, two thighs, and two drumsticks.

6.       The price of 8-piece COB often served as a base price for other broiler chicken products. Dark meat was often priced at a certain number of cents per pound less than, or "back" from, the price per pound of 8-piece COB. As a result, a smaller number of cents back translated into a higher price for dark meat compared to a greater number of cents back. For example, "30 back" was a higher price for dark meat than "31 back."

7.       Prices for broiler chicken products were sometimes tied to a market index, such as the Urner-Barry Index ("UB"), as an alternative. For example, cases of wings sold in bulk were sometimes priced at the UB per-pound price ("market") and cases of pre-counted wings were sometimes priced at the UB per-pound price plus a specified number of cents per pound ("market plus").

8.      Bidding and negotiations usually occurred annually toward the end of the calendar year and established prices and other price-related terms, including discount levels, for the following calendar year. In some instances, however, bidding and negotiation toward the end of the calendar year established prices and other price-related terms, including discount levels, for multiple calendar years. In yet other instances, bidding and negotiations occurred throughout the year and sometimes established prices and other price-related terms, including promotional discounts, for discrete periods of time.

9.      Bidding and negotiations often involved weekly volume commitments between Suppliers and their respective customers. If, in a given week, a Supplier could not meet its volume commitment to a customer, the Supplier could often buy broiler chicken products from another Supplier to cover the shortfall. Alternatively, the Supplier could "short" the customer by not fulfilling its volume commitment that week.

10.     Some purchasers of broiler chicken products also purchased boneless broiler chicken products from Suppliers, including boneless and skinless chicken breast butterflies with rib meat. Often, such products were packaged using a controlled vacuum packaging process known as "CVP".

11.     Distributors and customers who purchased broiler chicken products from Suppliers often had lines of credit with the Suppliers. Often a negotiable aspect of a line of credit was the term, *i.e.*, the number of days for a distributor/customer to pay a Supplier for broiler chicken products purchased using a line of credit. A line-of-credit term was related to price. A longer term was generally more favorable to the distributor/customer, whereas a shorter term was generally more favorable to the

Supplier.

## II.    DEFENDANTS AND OTHERS

12.    PENN was an executive vice president at Supplier-1—located in Greeley, Colorado—starting in approximately January 2012. PENN became the President and Chief Executive Officer of Supplier-1 in approximately March 2019.

13.    AUSTIN was a vice president at Supplier-1 starting in approximately February 2007. AUSTIN was supervised by PENN.

14.    FRIES was a sales manager at Supplier-2—which was headquartered in the State of Georgia—starting in approximately 2004. In approximately 2012, FRIES was appointed to Supplier-2's board of directors. In approximately 2016, FRIES became the President of Supplier-2.

15.    BRADY was a vice president at Supplier-1 starting in approximately 1999, and a vice president at Supplier-2 starting in approximately August 2012. BRADY was supervised by FRIES.

16.    MULRENIN was a sales executive at Supplier-3—which was headquartered in the State of Arkansas—starting in approximately 2000, and a sales executive at Supplier-8—which was headquartered in the State of Maryland—starting in approximately July 2018.

17.    KANTOLA was a sales executive at Supplier-5—which was headquartered in the State of Illinois—starting in approximately October 2010.

18.    LITTLE was a sales director at Supplier-1. LITTLE started with the company in approximately 2000.

19.     LOVETTE was Supplier-1's President and Chief Executive Officer starting in approximately January 2011 until approximately March 2019. LOVETTE supervised PENN.

20.     ROBERTS was a manager and director at Supplier-3 starting in approximately 2012, and an employee of Supplier-4—which was headquartered in the State of North Carolina—starting in approximately 2016. ROBERTS supervised MULRENIN.

21.     BLAKE was a director and manager at Supplier-6, which was headquartered in the State of Arkansas.

22.     Supplier-1-Employee-2 was a director and manager at Supplier-1 from approximately September 2012 until approximately May 2015, and a vice president at Supplier-1 from approximately March 2015 until approximately May 2016.

23.     Supplier-1-Employee-3 was a director and manager at Supplier-1 starting in approximately March 2010.

24.     Supplier-1-Employee-4 was a sales manager at Supplier-1 starting in approximately September 2012.

25.     Supplier-1-Employee-6 was a sales manager and director at Supplier-1 starting in approximately 2006.

26.     Supplier-1-Employee-7 was a regional sales manager at Supplier-1 starting in approximately 2013.

27.     Supplier-3-Employee-1 was an employee of Supplier-3 starting in approximately January 1988.

28.     Supplier-3-Employee-2 was a manager and director at Supplier-3 starting in approximately 2009.

29.     Supplier-4-Employee-1 was an employee of Supplier-4.

30.     Supplier-5-Employee-1 was an owner of Supplier-5 and supervised KANTOLA.

31.     Supplier-6-Employee-2 was an employee of Supplier-6.

32.     Supplier-7-Employee-1, Supplier-7-Employee-2, Supplier-7-Employee-3, and Supplier-7-Employee-4 were employees of Supplier-7, which was headquartered in the State of Georgia.

33.     Supplier-8-Employee-1 and Supplier-8-Employee-2 were employees of Supplier-8, which was headquartered in the State of Maryland.

34.     Supplier-9 was a Supplier purchased by Supplier-7 in 2014.

35.     Supplier-10 was a Supplier headquartered in the State of Mississippi.

36.     QSR-1 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-1. Cooperative-1-Employee-1 was an employee of Cooperative-1 from approximately June 2008 until approximately May 2014. Cooperative-1-Employee-2 was an employee of Cooperative-1 from approximately August 2004 until approximately February 2017. Cooperative-1-Employee-3 was an employee of Cooperative-1 from approximately May 2014 until approximately December 2014. Cooperative-1-Employee-4 was an employee of Cooperative-1 in 2014.

37.     QSR-2 was a nationwide restaurant franchise that negotiated with Suppliers through a centralized buying cooperative, Cooperative-2. Cooperative-2-Employee-1 was an employee of Cooperative-2 starting in approximately July 2008.

38.     QSR-3 was a nationwide restaurant franchise that negotiated directly with Suppliers. QSR-3-Employee-1 was an employee of QSR-3 starting in approximately September 2001.

39.     QSR-4 was a nationwide restaurant franchise that negotiated directly with Suppliers. QSR-4-Employee-1 was an employee of QSR-4 starting in approximately 2011.

40.     QSR-5 was a nationwide restaurant franchise that negotiated directly with Suppliers.

41.     Grocer-1 was a nationwide grocery-store chain operating under various brand names in various geographical areas that negotiated directly with Suppliers. Grocer-1-Brand-1 was a grocery-store brand owned by Grocer-1. Grocer-1-Brand-1 operated multiple stores in the State and District of Colorado.

42.     Grocer-2 was a nationwide grocery-store chain.

43.     Brand-1 purchased boneless broiler chicken products from Suppliers that were sold in branded packaging in grocery-store chains, including Grocer-2.

44.     Distributor-1 was a nationwide food distributor.

45.     Others not made Defendants in this Indictment participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance of the conspiracy.

46.     Whenever in this Indictment reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

III.     <u>MEANS AND METHODS OF THE CONSPIRACY</u>

47.     It was part of the conspiracy that PENN, FRIES, BRADY, AUSTIN, MULRENIN, KANTOLA, LITTLE, LOVETTE, ROBERTS, and BLAKE, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

48.     It was further part of the conspiracy that PENN, FRIES, BRADY, AUSTIN, MULRENIN, KANTOLA, LITTLE, LOVETTE, ROBERTS, and BLAKE, together with their co-conspirators, in the State and District of Colorado and elsewhere, utilized that continuing network:

a.     to reach agreements and understandings to submit aligned—though not necessarily identical—bids and to offer aligned—though not necessarily identical—prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

b.      to participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

c.      to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by Suppliers and co-conspirators for broiler chicken products sold in the United States.

49.      It was further part of the conspiracy that PENN, FRIES, BRADY, AUSTIN, MULRENIN, KANTOLA, LITTLE, LOVETTE, ROBERTS, and BLAKE, together with their co-conspirators, in the State and District of Colorado and elsewhere, discussed protecting, and thereafter acted to protect, the purpose and effectiveness of the conspiracy.

50.      It was further part of the conspiracy that PENN, FRIES, BRADY, AUSTIN, MULRENIN, KANTOLA, LITTLE, LOVETTE, ROBERTS, and BLAKE, together with their co-conspirators, in the State and District of Colorado and elsewhere, sold and accepted payment for broiler chicken products that are the subject of the allegations in this Indictment in the United States through until at least approximately early 2019.

### QSR-1's Dark Meat, Wings, and 8-Piece COB Supply for 2013

51.      In approximately the autumn of 2012, Cooperative-1 was negotiating prices with Suppliers for dark meat, wings, and 8-piece COB supply for calendar year 2013.

52.     It was further part of the conspiracy that in or around October 10, 2012:

a.     AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back from the 8-piece price.

b.     Supplier-6-Employee-2 submitted Supplier-6's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .28 back from the 8-piece price.

53.     It was further part of the conspiracy that in or around October 2012, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2013 at .30 back.

54.     On or about October 26, 2012, Cooperative-1-Employee-1 told AUSTIN that because some Suppliers had bid dark meat at .30 back and other Suppliers had bid dark meat at .32 back, Cooperative-1-Employee-1 planned to ask all Suppliers to change their bids to .31 back.

55.     On November 8, 2012, Supplier-6-Employee-2 created an electronic image of meeting notes that included the following notation: "Dark → were @ 30 went to 28 – [Cooperative-1-Employee-1] wants → .31".

56.     It was further part of the conspiracy that on November 13, 2012, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 4:17 p.m. | BLAKE | BRADY | *Phone Call:* Approx. 5 min. |
| 4:22 p.m. | BRADY | FRIES | *Text Msg:* "[Supplier-6] is .30 back on dark meat." |
| 4:23 p.m. | AUSTIN | BRADY | *Phone Call:* Approx. 13 min. |

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 4:34 p.m. | BRADY | FRIES | *Text Msg:* "[Supplier-1] is .30 back and [Supplier-3] is 31 back." |
| 4:36 p.m. | FRIES | BRADY | *Text Msg:* "OI [Cooperative-1-Employee-1]! He bluffing hard!" |
| 4:37 p.m. | BRADY | FRIES | *Text Msg:* "I talked to roger [AUSTIN] and this month he is .03 higher than us on 8 piece." |
| 4:43 p.m. | FRIES | BRADY | *Text Msg:* "Hmmm" |
| 4:45 p.m. | BRADY | FRIES | *Text Msg:* "He [AUSTIN] said to raise our prices, on wings he is market and market plus .10" |
| 4:45 p.m. | FRIES | BRADY | *Text Msg:* "Tell him we are trying!" |
| 4:58 p.m. | AUSTIN | Cooperative-1 | *Email:* Bid submission with dark meat at .30 back and bulk wings and pre-counted wings at "UB Mkt previous month average" and "UB Mkt previous month average + .10." |
| 5:00 p.m. | BRADY | FRIES | *Text Msg:* "Will do" |

57.     It was further part of the conspiracy that on November 14, 2012, the

following communication occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 10:15 a.m. | BRADY | Cooperative-1 | *Email:* Bid submission with dark meat at .30 back and "[o]n the wings we would like to be at market for the bulk packed and market plus .10 on the precounted." |

58.     It was further part of the conspiracy that on or about November 28, 2012, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 10:07 a.m. | AUSTIN | PENN | *Email:* "We . . . had the semi final round call yesterday with [Cooperative-1-Employee-1] and his team . . . . I am going to try and have a one on one with [Cooperative-1-Employee-1] today but he has these calls all day. I will also be having some other discussions today to get the pulse." |
| 10:35 a.m. | BLAKE | AUSTIN | *Phone Call:* Approx. 8 min. |
| 1:29 p.m. | AUSTIN | BRADY | *Phone Call:* Approx. 15 min. |
| 1:44 p.m. | AUSTIN | KANTOLA | *Phone Call:* Approx. 11 min. |
| 5:09 p.m. | PENN | AUSTIN | *Email:* "What will we giving up in dollars on 8 piece and dark YoY if we do lower the pricing to your recommended number? Can you do a spreadsheet similar to last year?" |
| 9:59 p.m. | AUSTIN | PENN | *Email:* "I don't have computer with me but for 1 cent decrease it is 1.5 million on cob pounds. I will call you tomorrow around lunch time I have some better information." |

59.     It was further part of the conspiracy that on or about November 29, 2012, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 12:32 p.m | AUSTIN | Supplier-1-Employee-4 | *Phone Call:* Approx. 7 min. |

| Approx. Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 2:31 p.m. | Supplier-1-Employee-4 | AUSTIN | *Email*: "This is crude but does it show what we need it to?" and attaching a spreadsheet containing the following table: <table><tr><td>**8 Piece Quotes**</td><td></td></tr><tr><td>Good Guys</td><td>$0.9770</td></tr><tr><td>[Supplier-6]</td><td>$0.9632</td></tr><tr><td>[Supplier-2]</td><td>$0.9620</td></tr><tr><td>[Supplier-5]</td><td>$0.9561</td></tr></table> |
| 4:53 p.m. | AUSTIN | Supplier-1-Employee-4 | *Email:* "You can put [Supplier-9] in at 96.60 <br> Then send to Jayson [PENN]." |
| 9:12 p.m. | Supplier-1-Employee-4 | PENN & AUSTIN | *Email*: Attaching a spreadsheet containing the following table: <table><tr><td>**8 Piece Quotes**</td><td></td></tr><tr><td>Good Guys</td><td>$0.9770</td></tr><tr><td>[Supplier-9]</td><td>$0.9660</td></tr><tr><td>[Supplier-6]</td><td>$0.9632</td></tr><tr><td>[Supplier-2]</td><td>$0.9620</td></tr><tr><td>[Supplier-5]</td><td>$0.9561</td></tr></table> |

60.     It was further part of the conspiracy that on or about November 30, 2012, PENN emailed LOVETTE a spreadsheet containing the following chart:

| 8 Piece Quotes | |
|---|---|
| Good Guys | $0.9770 |
| [Supplier-9] | $0.9660 |
| [Supplier-6] | $0.9632 |
| [Supplier-2] | $0.9620 |
| [Supplier-5] | $0.9561 |

61.     It was further part of the conspiracy that on or about December 7, 2012, Supplier-6-Employee-2 signed an agreement on behalf of Supplier-6 that the price of 8-piece COB would be $.9622/lb. and the price of dark meat would be .30 back in calendar year 2013.

62.     It was further part of the conspiracy that on or about December 17 2012, PENN and Cooperative-1-Employee-1 signed an agreement that the price of 8-piece COB would be $.9703/lb. and the price of dark meat would be .30 back in calendar year 2013.

63.     It was further part of the conspiracy that on or about December 17, 2012, BRADY and Cooperative-1-Employee-1 signed an agreement that the price of 8-piece COB would be $.9625/lb. and the price of dark meat would be .305 back in calendar year 2013.

### QSR-1's 2013 Request to Supply Reduced-Weight Product

64.     On or about March 5, 2013, Cooperative-1-Employee-1 asked various Suppliers and co-conspirators to provide a quote to supply QSR-1 with a reduced-weight 8-piece COB product.

65.     It was further part of the conspiracy that on or about March 8, 2013, the following communications occurred:

| Approx. Time (EST) | Initiator | Recipient | Communication |
| --- | --- | --- | --- |
| 2:45 p.m. | AUSTIN | BRADY | *Phone Call:* Approx. 1 min. |
| 2:48 p.m. | BRADY | AUSTIN | *Phone Call:* Approx. 8 min. |
| 3:44 p.m. | BRADY | FRIES | *Text Msg:* "I talked to roger [AUSTIN] about the [QSR-1] sizes and he is in agreement with us." |

### QSR-4's 2013 Freezing Charge

66.     In approximately 2013, QSR-4 began requiring its distributors to maintain inventories of frozen 8-piece COB and dark meat to satisfy demand in the event of a supply disruption.

67.     On or about May 31, 2013, QSR-4-Employee-1 emailed LITTLE: "In terms of pricing, traditionally [Supplier-1] has based the frozen dark meat price the same as the fresh dark meat. Will that still be the case? Also, what are you thinking in terms of price for the frozen 8pc?" On the same day, at approximately 2:14 p.m. (EDT), QSR-4-Employee-1 asked Supplier-3-Employee-1 for prices to supply QSR-4 with frozen 8-piece COB and dark meat: "In terms of pricing, what are you thinking on both items?"

68.     It was further part of the conspiracy that on or about May 31, 2013:

a.      The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 2:20 p.m. | Supplier-3-Employee-1 | KANTOLA | 1 |
| 2:24 p.m. | Supplier-3-Employee-1 | LITTLE | 2 |
| 2:40 p.m. | Supplier-3-Employee-1 | LITTLE | 8 |

b.      At approximately 2:49 p.m. (EDT), LITTLE told QSR-4-Employee-1 that "Their will need to be a freezing charge for both."

c.      At approximately 3:38 p.m. (EDT), Supplier-3-Employee-1 forwarded QSR-4-Employee-1's inquiry to MULRENIN and ROBERTS and said: "[Supplier-1] told me they would be around .025 to .03 on 8pc & dark meat and [Supplier-5] told me they were .025 on 8pc and at this time was not charging for dark but would probably change to .025 for next year."

69.     It was further part of the conspiracy that on or about June 3, 2013, in response to Supplier-3-Employee-1's May 31 email, ROBERTS told MULRENIN and Supplier-3-Employee-1: "I want to discuss this before we submit. I want to understand what the storage expectation is."

70.     It was further part of the conspiracy that on or about June 4, 2013, Supplier-3-Employee-1, copying MULRENIN, emailed QSR-4-Employee-1 with pricing for frozen 8-piece and dark meat at $0.03/lb. over the regular cost-plus pricing.

### QSR-1's Dark Meat Supply for 2014

71.     In approximately autumn of 2013, Cooperative-1 was negotiating with Suppliers for dark meat supply for calendar year 2014.

72.     It was further part of the conspiracy that in or about October 2013, AUSTIN submitted Supplier-1's bid to Cooperative-1 to supply QSR-1 dark meat for calendar year 2014 at .30 back.

73.     It was further part of the conspiracy that in or about October 2013, BRADY submitted Supplier-2's bid to Cooperative-1 to supply QSR-1 with dark meat for calendar year 2014 at .305 back.

74.     It was further part of the conspiracy that on or about November 19, 2013:

a.     At approximately 1:27 p.m. (EST), BRADY called AUSTIN. The duration of the call was approximately 3 minutes.

b.     At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back." FRIES responded, "K. Can do .31 if want."

c.     At approximately 1:31 p.m. (EST), BRADY texted FRIES: "Roger [AUSTIN] is at .30 back and not moving." At approximately 1:33 p.m. (EST), FRIES responded, "Stay .305 then[.]"

75.     It was further part of the conspiracy that in or about December 2013, PENN and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

76.     It was further part of the conspiracy that in or about December 2013, BRADY and Cooperative-1-Employee-1 signed an agreement that the price for dark meat would be .305 back in calendar year 2014.

### QSR-4's Quality Assurance Costs for 2014

77.     In approximately 2013, QSR-4 implemented new quality assurance ("QA") requirements to take effect the following year that required Suppliers to take additional measures to ensure the broiler chicken products met enhanced standards.

78.     On or about December 20, 2013, an employee of QSR-4 sent QSR-4's "new QA requirements for 2014" to an employee of Supplier-3. On or about December 23, 2013, an employee of QSR-4 sent the requirements to KANTOLA.

79.     It was further part of the conspiracy that on or about December 21, 2013:

a.     The employee of Supplier-3 forwarded the requirements to Supplier-3-Employee-1, saying: "It would have been nice to have been forewarned. Wonder how the other suppliers will react?"

b.     Supplier-3-Employee-1 responded, copying MULRENIN: "I would be surprised if they don't say something. Might call a couple of them and ask[.]"

80.     It was further part of the conspiracy that on or about December 23, 2013, at approximately 10:45 a.m. (EST), Supplier-3-Employee-1 called LITTLE. The duration of the call was approximately 5 minutes.

81.     It was further part of the conspiracy that on or about December 24, 2013:

a.     At approximately 12:57 p.m. (EST), LITTLE called KANTOLA. The duration of the call was approximately 3 minutes.

b.     At approximately 1:10 p.m. (EST), KANTOLA sent an email to another employee at Supplier-5 stating "here's why [Supplier-3] is so popular with [QSR-4]" and listing FOB pricing for January for Supplier-3, Supplier-1, and Supplier-5.

c.     At approximately 1:32 p.m. (EST), LITTLE sent an email to Supplier-1-Employee-2 and another employee at Supplier-1 stating "FYI… I did find out [Supplier-3's] fob price is $0.025 lower than ours in 2014!"

82.     It was further part of the conspiracy that on or about December 26, 2013, Supplier-3-Employee-1 told MULRENIN and ROBERTS: "Talked to Jimmy Little [LITTLE] and he said they were planning on adding to their cost to do this. They also didn't like it just showing up also."

83.     It was further part of the conspiracy that on or about January 26, 2014, Supplier-3-Employee-1 sent Supplier-3's February 2014 pricing to QSR-4 and included a quality assurance audit cost of $0.0009/lb.

### QSR-5's 2014 Conversion to Antibiotic-Free Broiler Chicken Meat

84.     On or about February 11, 2014, QSR-5 announced plans to serve antibiotic-free ("ABF") broiler chicken meat at all of its restaurants within the following five years.

85.    It was further part of the conspiracy that on or about April 1, 2014:

a.    The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:14 a.m. | Supplier-1-Employee-6 | BRADY | 6 |
| 9:39 a.m. | Supplier-1-Employee-6 | BRADY | 2 |
| 9:51 a.m. | BRADY | Supplier-8-Employee-1 | 21 |
| 10:18 a.m. | BRADY | Supplier-1-Employee-6 | 12 |
| 10:51 a.m. | BRADY | Supplier-8-Employee-1 | 21 |

b.    At approximately 11:33 a.m. (EDT), Supplier-8-Employee-1 emailed Supplier-8-Employee-2: "I also found out that [Supplier-1] is going to upcharge approx. $.3124/lb on the ABF product. [Supplier-2] will be around the same cost." Supplier-8-Employee-2 responded: "Great info."

86.    It was further part of the conspiracy that on or about April 18, 2014:

a.    At approximately 9:38 a.m. (EDT), MULRENIN called BRADY. The duration of the call was approximately 12 minutes.

b.    The following text messages were sent:

| Approx. Time (EDT) | Sender | Recipient | Content |
|---|---|---|---|
| 12:02 p.m. | BRADY | FRIES | "I talked to Tim [MULRENIN] today at [Supplier-3] and for ABF they are at .02 per lb live weight. He said they are supposed to give a number to [QSR-5] today. I told him we were .31 to .32 per lb on finished product." |
| 1:37 p.m. | FRIES | BRADY | "Did he say what there finished increase would be?" |
| 1:40 p.m. | BRADY | FRIES | "Work in progress. I told him what we were doing, [Supplier-8] and [Supplier-1]." |

### QSR-1's 8-Piece COB Supply for 2015

87.     Beginning approximately in the summer of 2014, Cooperative-1 was negotiating with Suppliers for 8-piece COB prices to take effect in approximately 2015. One of the price terms negotiated was each Supplier's increased margin for 8-piece COB above their respective margins for calendar year 2014.

88.     The Suppliers' prices for 8-piece COB sold directly or indirectly to QSR-1 franchisees in calendar year 2014 included the following margins:

| Supplier | CY 2014 Margin |
|----------|----------------|
| Supplier-1 | $.1175/lb. |
| Supplier-2 | $.0673/lb. |
| Supplier-3 | $.0750/lb. |
| Supplier-4 | $.1100/lb. |
| Supplier-5 | $.0900/lb. |
| Supplier-6 | $.0967/lb. |
| Supplier-7 | $.0900/lb. |

89.     There were multiple rounds of negotiations between Cooperative-1 and Suppliers.

### Round One of Negotiations

90.     On or about August 2014, Cooperative-1-Employee-3 instructed Suppliers to submit a proposed cost-plus pricing model by on or about August 19, 2014.

91.     It was further part of the conspiracy that on or about August 11, 2014, the following communications occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|--------------------|-----------|-----------|---------------|
| 3:52 p.m. | ROBERTS | BRADY | *Phone Call:* Approx. 20 min. |
| 5:22 p.m. | ROBERTS | Cooperative-1-Employee-4 | *Email:* Supplier-3's proposed cost-plus pricing model sent to Cooperative-1-Employee-4 |

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 6:13 p.m. | Cooperative-1-Employee-4 | ROBERTS | *Email:* "You trying to get me fired before I even move here??" |

92.     It was further part of the conspiracy that on or about August 14, 2014, MULRENIN promised to call Cooperative-1-Employee-4 about Supplier-3's recently submitted cost model on August 15, 2014.

93.     It was further part of the conspiracy that on or about August 15, 2014, the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 11:34 a.m. | MULRENIN | ROBERTS | 0.5 |
| 11:35 a.m. | ROBERTS | BRADY | 4 |
| 11:42 a.m. | ROBERTS | MULRENIN | 9 |
| 3:27 p.m. | ROBERTS | MULRENIN | 22 |
| 3:50 p.m. | ROBERTS | PENN | 0.5 |
| 3:52 p.m. | PENN | ROBERTS | 16 |
| 4:11 p.m. | MULRENIN | ROBERTS | 2 |

94.     It was further part of the conspiracy that on or about August 18, 2014:

a.     The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:41 a.m. | LITTLE | KANTOLA | 7 |
| 10:34 a.m. | LITTLE | AUSTIN | 6 |
| 12:04 p.m. | AUSTIN | BRADY | 24 |
| 1:25 p.m. | LITTLE | AUSTIN | 11 |
| 1:52 p.m. | AUSTIN | Supplier-6 | 2 |
| 2:03 p.m. | PENN | AUSTIN | 6 |
| 2:41 p.m. | LITTLE | Supplier-3-Employee-1 | 11 |
| 2:58 p.m. | Supplier-1-Employee-6 | BRADY | 14 |
| 3:21 p.m. | AUSTIN | LITTLE | 17 |
| 5:56 p.m. | Supplier-1-Employee-2 | AUSTIN | 2 |

b.      At approximately 6:01 p.m. (EDT), Supplier-1-Employee-2 emailed

a spreadsheet to PENN containing the following chart:

|  | Current M | New Marg |
|---|---|---|
| [Supplier-5] | 0.09 | 0.22 |
| [Supplier-4] | 0.11 | 0.22 |
| [Supplier-2] | 0.0675 | 0.22 |
| [Supplier-6] |  | .15-.18 inc |
| [Supplier-7] | 0.1 | 0.23 |

c.      At approximately 6:46 p.m. (EDT), Supplier-1-Employee-2 emailed

PENN:

i.   Supplier-1-Employee-2 said: "Roger [AUSTIN] did some checking

around today and I included the below regarding the range of the

total increases (margin and costs) folks are going in with," and then

reported the numbers to PENN: Supplier-2 at .14-.16/lb., Supplier-4

at .13-.15/lb., Supplier-5 at .14-.16/lb., Supplier-6 at .15-.17/lb., and

Supplier-7 at .14-.16/lb.

ii.  Supplier-1-Employee-2 also said: "Considering the numbers above

and the fact that we wanted to be the leader this would put us in at

.1616/lb increase (.06 in cost and .10 in margin) which would

equate to about $400k in additional revenue on equal volume from

this year."

d.      PENN responded to Supplier-1-Employee-2's email saying "Will

review with Bill [LOVETTE] in am. Will advise." and asking "2.5 M lbs X. 16 =$400k per

week is the math?"

95.     It was further part of the conspiracy that on or about August 19, 2014:

a.     At approximately 11:55 a.m. (EDT), KANTOLA submitted Supplier-5's proposed cost-plus pricing model to Cooperative-1.

b.     The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 2:18 p.m. | AUSTIN | BRADY | 4 |
| 2:33 p.m. | BRADY | KANTOLA | 0.2 |
| 2:34 p.m. | BRADY | KANTOLA | 0.5 |
| 3:22 p.m. | KANTOLA | BRADY | 20 |

c.     At approximately 4:48 p.m. (EDT), BRADY submitted Supplier-2's proposed cost-plus pricing model to Cooperative-1.

96.     It was further part of the conspiracy that by on or about August 20, 2014, Suppliers submitted proposed cost-plus pricing models to Cooperative-1 with the following proposed margins and effective margins:

| Supplier | CY 2014 Margin | Proposed Margin |
|---|---|---|
| Supplier-1 | $.1175/lb. | $.2175/lb. |
| Supplier-2 | $.0673/lb. | $.2200/lb. |
| Supplier-3 | $.0750/lb. | $.1600/lb. |
| Supplier-4 | $.1100/lb. | -- |
| Supplier-5 | $.0900/lb. | $.2200/lb. |
| Supplier-6 | $.0967/lb. | $.2070-$.2174/lb. |
| Supplier-7 | $.0900/lb. | $.2300/lb. |

97.     It was further part of the conspiracy that on or about August 20, 2014, the following email exchange occurred:

| Email Initiator | Email Recipient | Content |
|---|---|---|
| Supplier-1-Employee-2 | AUSTIN | "Any word from them on our proposal?" |
| AUSTIN | Supplier-1-Employee-2 | "I heard they made a couple of calls and were surprised." |
| Supplier-1- | AUSTIN | "Surprised like how much higher |

| Email Initiator | Email Recipient | Content |
|---|---|---|
| Employee-2 | | everyone else was?" |
| AUSTIN | Supplier-1-Employee-2 | "Yes" |

*Round Two of Negotiations*

98.     It was further part of the conspiracy that on or about August 22, 2014, ROBERTS emailed Supplier-3's proposed cost-plus pricing model to Cooperative-1-Employee-4 with a margin of $.1900/lb. Cooperative-1-Employee-4 responded to ROBERTS' email saying "Looks like to me you want about 15.5 cents increase in costs and margin?"

99.     It was further part of the conspiracy that on or about August 26, 2014:

a.     At approximately 9:31 a.m. (EDT), AUSTIN emailed PENN and explained that Cooperative-1-Employee-2 had asked Supplier-1 to reduce its proposed price increase by approximately one half. AUSTIN also said he planned to call Cooperative-1 to hold firm on the increase. PENN responded that he agreed with AUSTIN's plan.

b.     The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 1:31 p.m. | Cooperative-1 | AUSTIN | 17 |
| 1:48 p.m. | AUSTIN | PENN | 2 |
| 1:58 p.m. | LOVETTE | AUSTIN | 15 |
| 2:52 p.m. | AUSTIN | BRADY | 14 |

c.     At approximately 5:11 p.m. (EDT), BRADY texted FRIES: "I talked to roger [AUSTIN] about [QSR-1] and Greeley, [Colorado] told him not to come down on price. He called [Cooperative-1-Employee-3] today and told him." At approximately 5:31 p.m. (EDT), FRIES responded: "Wow!"

100.    It was further part of the conspiracy that on August 27, 2014, the following communications occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:46 a.m. | FRIES | Supplier-7-Employee-2 | *Phone Call:* Approx. 2 min. |
| 10:02 a.m. | BRADY | KANTOLA | *Phone Call:* Approx. 15 min. |
| 10:33 a.m. | BRADY | FRIES | *Text Msg:* "[Supplier-5] is not moving either" |
| 10:34 a.m. | FRIES | BRADY | *Text Msg:* "[Supplier-7-Employee-2] is [meeting with Cooperative-1] at 11. They are agreeing to anything today, just listening." |

101.    It was further part of the conspiracy that on or about August 29, 2014, the following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:50 a.m. | Supplier-7 | PENN | 19 |
| 10:38 a.m. | FRIES | Supplier-7-Employee-1 | 19 |

102.    It was further part of the conspiracy that on a piece of paper with a handwritten notation "8-29-14" Supplier-7-Employee-1 wrote:

a.    "Talked to [Supplier-4-Employee-1]. They are up .19 & holding."

b.    "[Supplier-3] 1.0976 per [Supplier-7-Employee-4]"

c.    "Talked to Jason Penn [PENN] +8 cost +11 margin"

d.    "[Supplier-2] 1.1099 up 18.35"

103.    On or about August 29, 2014, Cooperative-1-Employee-3 sent an email to Suppliers requesting final pricing by on or about September 2, 2014, or September 3, 2014.

26

104.    On or about September 3, 2014, Cooperative-1-Employee-2 sent ROBERTS a telephonic-meeting invitation for later that day at 1:30 p.m. (EDT). The invitation's subject line was "COB [Supplier-3]" and included an "Agenda" with 5 items:

a.    "[Supplier-3] wants a ridiculous price for COB"

b.    "[Cooperative-1] says NO"

c.    "[Cooperative-1] shamefully tells [Supplier-3] that we have bought poultry at ridiculous price from others"

d.    "[Supplier-3] informs [Cooperative-1] – Really, YOU ARE SCREWED"

e.    "GO from there."

105.    It was further part of the conspiracy that on or about September 3, 2014:

a.    The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 9:38 a.m. | BRADY | Cooperative-1-Employee-3 | 2 |
| 9:41 a.m. | BRADY | KANTOLA | 1 |
| 9:42 a.m. | BRADY | AUSTIN | 16 |
| 10:00 a.m. | BRADY | KANTOLA | 1 |
| 10:02 a.m. | KANTOLA | BRADY | 11 |
| 10:17 a.m. | BRADY | FRIES | 1 |
| 10:22 a.m. | FRIES | BRADY | 7 |
| 11:10 a.m. | BRADY | Cooperative-1-Employee-3 | 2 |
| 11:24 a.m. | Cooperative-1 | BRADY | 5 |
| 11:37 a.m. | BRADY | MULRENIN | 1 |
| 11:45 a.m. | BRADY | MULRENIN | 2 |
| 1:15 p.m. | BRADY | MULRENIN | 17 |
| 1:31 p.m. | BRADY | AUSTIN | 19 |
| 2:01 p.m. | BLAKE | AUSTIN | 8 |
| 2:03 p.m. | BRADY | KANTOLA | 7 |
| 2:10 p.m. | BRADY | FRIES | 20 |
| 3:39 p.m. | BRADY | Cooperative-1-Employee-3 | 15 |

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 4:24 p.m. | AUSTIN | BRADY | 8 |
| 4:54 p.m. | BRADY | KANTOLA | 4 |

b.      At approximately 5:15 p.m. (EDT), BRADY texted FRIES: "Told [Cooperative-1-Employee-3] we would go down .02 he said someone moved down .04 it has to be [Supplier-6] or he is bluffing. Roger [AUSTIN] and bill [KANTOLA] are not moving."

106.   It was further part of the conspiracy that by on or about December 24, 2014, Suppliers had signed cost-plus pricing agreements for calendar year 2015 with Cooperative-1 with the following margins and effective margins:

| Supplier | CY 2014 Margin | Proposed Margin | CY 2015 Margin |
|---|---|---|---|
| Supplier-1 | $.1175/lb. | $.2175/lb. | $.2175/lb. |
| Supplier-2 | $.0673/lb. | $.2200/lb. | $.1940/lb. |
| Supplier-3 | $.0750/lb. | $.1600/lb. | $.1931/lb. |
| Supplier-4 | $.1100/lb. | -- | $.2161/lb. |
| Supplier-5 | $.0900/lb. | $.2200/lb. | $.2200/lb. |
| Supplier-6 | $.0967/lb. | $.2070-$.2174/lb. | $.1798/lb. |
| Supplier-7 | $.0900/lb. | $.2300/lb. | $.2300/lb. |

107.   It was further part of the conspiracy that in calendar year 2015, including as late as approximately December 26, 2015, Supplier-1 sold and accepted payment for 8-piece COB through a distributor to QSR-1 franchisees in the United States at a margin of $.2175.

### QSR-3's 8-Piece COB Supply for 2015

108.   In approximately the autumn of 2014, QSR-3 was negotiating with Suppliers for its 2015 8-piece COB pricing.

109.   It was further part of the conspiracy that on or about October 17, 2014, the following text message exchange occurred between PENN and Supplier-1-Employee-3:

28

| PENN | "Who is negotiating with [QSR-3]?" |
|---|---|
| Supplier-1-Employee-3 | "[Supplier-1-Employee-4] and Roger [AUSTIN]" |
| PENN | "Ok. Thanks" |
| Supplier-1-Employee-3 | "We know [Supplier-7], their biggest supplier is 0.02 higher than us and they are not going to negotiate." |
| PENN | "Good deal. Last time they did cave a cent or two with [QSR-1]" |
| Supplier-1-Employee-3 | "They are listening to my direction" |
| PENN | "Who is they?" |
| PENN | "If they is illegal don't tell me" |
| Supplier-1-Employee-3 | "Was referring to roger [AUSTIN] listening. Sorry, thought you were referring to roger [AUSTIN] caving. Got you on [Supplier-7] caving on [QSR-1]. [Supplier-7] might cave but I wouldn't think for our volume and their current." |
| PENN | "[Supplier-3] does the west. Hearing rumors out of them?" |
| Supplier-1-Employee-3 | "Buyer said we were .07 high so that must be [Supplier-3's] price…" |
| PENN | "They are morons" |
| Supplier-1-Employee-3 | ".07 back is in line with where we have priced everybody else but they did not add anything for the cost of doing business with [QSR-3] like us and [Supplier-7] did" |
| PENN | "[Supplier-7] is a solid competitor." |

110.    It was further part of the conspiracy that on or about November 7, 2014,

Supplier-1-Employee-3 told PENN: "[QSR-3] just called back...came up on price. Would

net somewhere around 1.00 and we went in at 1.04/1.08."

111.    It was further part of the conspiracy that on or about November 9, 2014,

PENN told LOVETTE: "I raised [QSR-3] 15c per lb" and "[QSR-3-Employee-1] and his

crew will pay market price plus the special A-Hole Premium."

112.    It was further part of the conspiracy that on or about November 10, 2014

at approximately 10:49 a.m. (EST), Supplier-1-Employee-3 emailed Supplier-1-

Employee-4 and AUSTIN: "I do not really want to get into a pricing war with [Supplier-7]

over those two DCs."

### *Brand-1's Boneless Supply for 2015*

113.   Toward the end of 2014, Brand-1 was negotiating with Suppliers for Brand-1's supply of boneless and skinless chicken breast butterflies with rib meat for calendar year 2015.

114.   It was further part of the conspiracy that on or before approximately November 12, 2014, Supplier-1-Employee-7 met with negotiators employed by Brand-1 to discuss pricing for the RFP.

115.   It was further part of the conspiracy that on or about November 12, 2014, Supplier-1-Employee-7 emailed LOVETTE a "Recap" of the meeting and also wrote the following under the heading "Additional Notes Direct from [Supplier-10]":

   a.   "Flat pricing target is 1.45 and only being offered out of 1 plant; their worst one which is [a Supplier-10 plant in Mississippi]"

   b.   "Flat pricing is only being offered to Industrial Accounts"

   c.   "No Floor and Ceilings are being offered this year"

   d.   "Looking to flat price a total of 30 loads per week"

   e.   "Texas plant will be used for West Coast industrial and distributor business"

   f.   "CVP [Controlled Vacuum Sealing] business is being quoted at UB-.18 to UB-.20"

116.   It was further part of the conspiracy that LOVETTE responded: "Thanks [Supplier-1-Employee-7]."

### *Protecting the Purpose and Effectiveness of the Conspiracy*

117.    It was further part of the conspiracy that on or about November 24, 2014, after Supplier-3 asked to purchase broiler chicken products from Supplier-1 to cover a shortfall to Grocer-1-Brand-1 for approximately $.05/lb. more than the price Supplier-1 had negotiated with Grocer-1, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

a.    "[Supplier-3] should pay for being short. It costs money for them to fill orders for which they don't have the chickens. They have been adding market share and still trying to do – selling cheap chicken and being short. Doesn't make sense. We are enabling the town drunk by giving him beer for Thanksgiving instead of walking him into an AA meeting."

b.    "[Supplier-3] is not shorting [Grocer-2]. Note [Supplier-3] just added market share and distribution to [Grocer-2]. They took our business on price. Should we allow [Supplier-3] to not pay for poor decision making?"

c.    "They need to pay so they start acting appropriately. How do they pay? Their customers need to feel the pain. By not feeling the pain – [Supplier-3] keeps marching along and the customers to blindly with them."

d.    PENN forwarded his emails to LOVETTE and said: "Thoughts on deli strategy to [Grocer-1-Brand-1]? We are covering [Supplier-3] shortages. Continue and let [Grocer-1-Brand-1] know we are helping or start have [Supplier-3] feel the pain across their system so they can start making decisions commensurate with a profitable venture and not a philanthropic organization?"

e.      LOVETTE responded: "No question in my mind. [Supplier-3] should have to live with the decision they made. We made ours and are dealing with it. Why should it be any different for them? We SHOULD NOT HELP THEM ONE MICRON."

f.      PENN responded: "I agree. We are just allowing our competitor to continue their idiotic ways."

118.    It was further part of the conspiracy that on or about November 26, 2014, PENN said in a series of emails to one or more co-conspirators employed by Supplier-1:

a.      "Our competition is offering lower margins on this item. Our competition is also currently shorting [QSR-2], [Grocer-1], and [another customer]. All of which we have been asked to cover this week in very slow markets. So in essence they are cheap and to add insult to injury are short product."

b.      "They are calling us – three tines this week – to help them cover loads on small birds to their new customers – their new customers with whom they just increased distribution at cheap prices. So – for Thanksgiving should we give Otis a bottle of Crown (aka loads of chicken) or take him to AA (aka make him face the shortage music)?"

c.      "We are straight up taking Otis to AA. No juice for Otis. Otis must face the music for his misguided actions. Selling cheap in a short market – no bailout for you."

d.      "In other words we are not covering the loads for which [Supplier-3] is asking for help."

119.    It was further part of the conspiracy that on or about December 22, 2014, PENN told LOVETTE: "[Supplier-3] took this strategy of not worrying about what the competition is doing and it led to the unraveling on a competitive advantage. Have to keep our enemies close and ensure that we are not zigging when the competition is successfully zagging."

### QSR-2's 2015 Bone-In Promotional Discount

120.    It was QSR-2's practice to periodically offer promotional pricing to its customers on certain broiler chicken products for limited periods of time, often for a particular month such as September.

121.    On or about March 25, 2015, Cooperative-2-Employee-1 asked Suppliers if QSR-2 could get "some type of discount" for a promotion in approximately September 2015 "[d]ue to the increases we incurred this year."

122.    It was further part of the conspiracy that on or about March 26, 2015:

a.    The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 1:41 p.m. | Supplier-3-Employee-1 | BRADY | 2 |
| 1:43 p.m. | Supplier-3-Employee-1 | BLAKE | 0.5 |
| 1:45 p.m. | Supplier-3-Employee-1 | Supplier-1-Employee-4 | 0.5 |

b.    At approximately 8:22 p.m. (EDT), Supplier-3-Employee-1 forwarded Cooperative-2-Employee-1's email to Supplier-3-Employee-2, saying: "I have talked to a couple company's and they are thinking .02lb for September" and "Only bad thing is everyone else does it, it will be hard not to do it."

123.    It was further part of the conspiracy that on or about March 27, 2015:

a.    At approximately 10:30 a.m. (EDT), Supplier-3-Employee-2 told Supplier-3-Employee-1: "We discussed this morning, and we agree to offer the $0.02/lb. for the month of September."

b.    At approximately 10:40 a.m. (EDT), Supplier-3-Employee-1 sent a text message to BRADY.

c.    At approximately 10:42 a.m. (EDT), BLAKE called Supplier-3-Employee-1. The duration of the call was approximately 3 minutes and 15 seconds.

124.    On or about March 27, 2015, Cooperative-2-Employee-1 told Supplier-1-Employee-6: "[Supplier-3], [Supplier-6], [Supplier-4] and [Supplier-2] all $.02[.] I'm waiting on you[,] [Supplier-5] and [Supplier-7]."

125.    It was further part of the conspiracy that on or about March 31, 2015, Supplier-1-Employee-3 told PENN: "[QSR-2] is looking to get a $0.02/lb discount from all suppliers for a September promotion. [Supplier-3], [Supplier-5], [Supplier-4], [Supplier-7], [Supplier-6], and [Supplier-2] have already agreed to the discount."

126.    It was further part of the conspiracy that on or about April 1, 2015:

a.    At approximately 12:22 p.m. (EDT), KANTOLA emailed Cooperative-2-Employee-1 and said Supplier-5 would give a $.02/lb. discount.

b.    PENN approved providing QSR-2 with a $.02/lb. discount.

### *Distributor-1's Line-of-Credit Term*

127.    In approximately 2016, Distributor-1 contacted Supplier-1 and Supplier-5 individually to negotiate longer terms for their respective lines of credit.

128.   On or about May 1, 2016, the following email exchange occurred:

| Email Sender | Email Recipient | Content |
|---|---|---|
| Supplier-5-Employee-1 | LOVETTE | "Have you herd that [Distributor-1] is going to 65 day terms with their supplies?" |
| LOVETTE | Supplier-5-Employee-1 | "Yes, we told them NO!" |
| Supplier-5-Employee-1 | LOVETTE | "Ok. Then I am 100 percent on board. If that changes can you please tell me?" |
| LOVETTE | Supplier-5-Employee-1 | "Will do, they must be following [Grocer-2]. Told them same." |
| Supplier-5-Employee-1 | LOVETTE | "Somebody must have written this as an MBA class project. We are getting there request from various customers including people like [another customer]" |

### QSR-1's Broiler Chicken Products for 2018

129.   In or around January 2017, Cooperative-1 was negotiating with Suppliers for 2018 broiler chicken products.

130.   It was further part of the conspiracy that on or about Monday, January 16, 2017, between approximately 2:40 p.m. (EST) and approximately 4:51 p.m. (EST), there were at least 5 phone calls between BRADY and AUSTIN. The cumulative duration of the calls was approximately 15 minutes.

131.   It was further part of the conspiracy that on or about Tuesday, January 17, 2017:

a.   At approximately 10:11 a.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 2 minutes.

b.   At approximately 5:54 p.m. (EST), AUSTIN told Supplier-1-Employee-4, "[Supplier-2] meets with [Cooperative-1] in Thursday and i will get a blow

35

by blow Friday morning. [Supplier-5] meets with [Cooperative-1] in Friday."

132.    It was further part of the conspiracy that on or about Wednesday, January 18, 2017, at approximately 2:45 p.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 1 minute.

133.    It was further part of the conspiracy that on or about Thursday, January 19, 2017, Supplier-2 met with Cooperative-1.

134.    It was further part of the conspiracy that on or about Friday, January 20, 2017, at approximately 3:12 p.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 7 minutes.

135.    It was further part of the conspiracy that on or about January 27, 2017, Supplier-1 met with Cooperative-1.

### QSR-2's 8-Piece COB Supply for 2018 and 2019

136.    In approximately 2017, Cooperative-2 was negotiating 8-piece COB prices with Suppliers for calendar years 2018 and 2019, and sought to lower the 8-piece COB prices QSR-2 paid for calendar year 2017.

137.    On or about August 16, 2017, Cooperative-2-Employee-1 sent an email blind copying various Suppliers—including at least Supplier-3, Supplier-6, and Supplier-7—to solicit bids for QSR-2's 2018 8-piece COB. In the email, Cooperative-2-Employee-1 told Suppliers: "I am aware of what went on with Brand X and in fact the change took place during the current agreement year. I would also like you to keep that in mind while submitting your bid. Instead of a big cut next year I would entertain a two year price adjustment. Let me see what you can come up with." Cooperative-2-Employee-1 asked for price proposals to be submitted by September 5, 2017.

138.   It was further part of the conspiracy that on or about August 16, 2017, Supplier-3-Employee-1 forwarded the solicitation to MULRENIN, asking "You get this?" MULRENIN responded: "Ouch. I did not. Definitely appears he's under the impression we all dropped prices more than we did."

139.   It was further part of the conspiracy that on or about August 18, 2017, Supplier-3-Employee-1 told MULRENIN: "[Cooperative-2-Employee-1] heard as much as .05lb. I told them that was probably because they were so far out of line now with pricing they had to do something to get close. I think realistically he is thinking .02-.03."

140.   It was further part of the conspiracy that on or about August 22, 2017, MULRENIN said to Supplier-3-Employee-2: "He's aware suppliers came down for [QSR-1] and expecting some movement from us."

141.   It was further part of the conspiracy that on or about September 5, 2017:

a.   The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
|---|---|---|---|
| 10:27 a.m. | Supplier-1-Employee-6 | BRADY | 11 |
| 11:32 a.m. | Supplier-3-Employee-1 | BRADY | 10 |
| 2:30 p.m. | Supplier-1-Employee-6 | BRADY | 4 |

b.   An employee of Supplier-6 sent Cooperative-2-Employee-1 a proposal to reduce the 2018 8-piece COB by $.0075/lb. and the 2019 price of 8-piece COB by $.0150/lb.

c.   Supplier-1-Employee-6 sent Cooperative-2-Employee-1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. and the 2019 price of 8-piece COB by $.01/lb.

d.      BRADY sent Cooperative-2-Employee-1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb.

142.    It was further part of the conspiracy that on or about September 6, 2017, the following events occurred:

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:07 a.m. | Cooperative-2-Employee-1 | Supplier-3-Employee-1 | *Email:* "I did not receive your bid?" |
| 9:37 a.m. | Supplier-3-Employee-1 | BLAKE | *Phone Call:* Approx. 10 min. |
| 9:48 a.m. | Supplier-3-Employee-1 | MULRENIN | *Phone Call:* Approx. 0 min. |
| 9:48 a.m. | Supplier-3-Employee-1 | MULRENIN | *Text Msg:* "U with your customers" |
| 11:33 a.m. | MULRENIN | Supplier-3-Employee-1 | *Text Msg:* "Yes. What's up?" |
| 11:34 a.m. | Supplier-3-Employee-1 | MULRENIN | *Text Msg:* "[QSR-3] proposal" |
| 11:34 a.m. | Supplier-3-Employee-1 | MULRENIN | *Text Msg:* "Got a general idea what [Supplier-6] is doing" |
| 11:34 a.m. | MULRENIN | Supplier-3-Employee-1 | *Text Msg:* "Ok. Call [Supplier-3-Employee-2]. I will call you as soon as I can" |
| 11:44 a.m. | Supplier-3-Employee-1 | MULRENIN | *Text Msg:* "Called [Supplier-3-Employee-2] and told him what I heard [Supplier-6] was doing & also told him about [Supplier-7]. Said would get back with me this afternoon" |
| 11:54 a.m. | MULRENIN | Supplier-3-Employee-1 | *Text Msg:* "Thanks!" |
| 1:41 p.m. | Cooperative-2-Employee-1 | Supplier-3-Employee-1 | *Phone Call:* Approx. 5 min. |
| 1:49 p.m. | Supplier-3-Employee-1 | MULRENIN | *Text Msg:* "Just got some info from [QSR-3]. Everyone seems to be doing 2 years and spreading it out. I was told everyone is coming in at 2 1/4-2 1/2 over 2 years. All other billing weights are at least 1 1/2 less than us except for what I told |

| Approx. Time (EDT) | Initiator | Recipient | Communication |
|---|---|---|---|
| | | | you [Supplier-7] was but they are around .0165 less than us." |

143.    It was further part of the conspiracy that on or about September 7, 2017, Supplier-3-Employee-1 sent Cooperative-2-Employee-1 an email, copying MULRENIN, with a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. and the 2019 price of 8-piece COB by an additional $.01/lb.

## IV.    TRADE AND COMMERCE

144.    During the period covered by this Indictment, the Defendants and their co-conspirators shipped substantial quantities of broiler chicken products by truck in a continuous and uninterrupted flow of interstate trade and commerce to companies located in states outside the place of origin of the shipments.

145.    During the period covered by this Indictment, the business activities of the Defendants and their co-conspirators in connection with the sale of broiler chicken products were within the flow of, and substantially affected, interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

## COUNT 2

(False Statements)

146.    The Grand Jury incorporates and re-alleges Paragraphs 3-145 of Count 1 as if fully set forth herein.

147.    On or about August 31, 2020, in Fort Worth, Texas, in the Northern District of Texas and elsewhere, LITTLE knowingly and willfully made false statements to

federal law enforcement agents. These false statements were material to a matter within the jurisdiction of the executive branch of the United States Government. Specifically, in connection with an investigation conducted in the District of Colorado and elsewhere by the United States Department of Commerce Office of Inspector General, the Federal Bureau of Investigation, and the United States Department of Agriculture Office of Inspector General, LITTLE was interviewed by special agents of the United States Department of Commerce and the Federal Bureau of Investigation.

148.    During that interview, LITTLE stated words to the effect that:

a.    he had no contact with individuals at competing Suppliers outside of speaking to the individuals at industry trade shows; and

b.    he had not called–or sent text messages to–any individuals at competing Suppliers.

149.    The statements were false. As LITTLE then and there knew, he indeed had contact with individuals at competing Suppliers outside of trade shows, and had called and sent text messages to individuals at competing Suppliers.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1001.

## COUNT 3

(Obstruction of Justice)

150.    The Grand Jury incorporates and re-alleges Paragraphs 3-145 of Count 1, and Paragraphs 146-149 of Count 2.

151.    On or about August 31, 2020, LITTLE corruptly obstructed, influenced, and impeded official proceedings, and corruptly attempted to obstruct, influence, and impede official proceedings, pending and about to be instituted in the District of

Colorado, *to wit*, the pending grand jury investigation of price fixing in the broiler chicken industry, the pending prosecution of four individuals for conspiring to fix prices in the broiler chicken industry, and the then-about-to-be-instituted prosecution of LITTLE for conspiring to fix prices in the broiler chicken industry.  LITTLE was contacted by special agents of the United States Department of Commerce and the Federal Bureau of Investigation. At the time of the contact with the special agents, LITTLE was aware of the investigation, its ongoing nature, and that other employees of Supplier-1 had been charged by indictment. The special agents' contact with LITTLE occurred prior to planned grand-jury testimony by one of those agents and the planned swearing of an affidavit to support a criminal complaint charging LITTLE for his role in a conspiracy in violation Section 1 of the Sherman Act. After contact by these special agents, but before the grand-jury testimony and affidavit swearing, LITTLE stated false or misleading information to the special agents.

   ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1512(c)(2).


A TRUE BILL:


Ink signature on file in Clerk's Office
FOREPERSON

s/Makan Delrahim
MAKAN DELRAHIM
Assistant Attorney General
BERNARD A. NIGRO JR.
Principal Deputy Assistant Attorney
General

s/James J. Fredericks
JAMES J. FREDRICKS
Chief, Washington Criminal II Office

s/Richard A. Powers
RICHARD A. POWERS
Deputy Assistant Attorney General
MARVIN N. PRICE JR.
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

s/Michael T. Koenig
MICHAEL T. KOENIG
HEATHER D. CALL
CAROLYN M. SWEENEY
PAUL J. TORZILLI
JILLIAN M. ROGOWSKI
LAURA J. BUTTE
Trial Attorneys

Antitrust Division
U.S. Department of Justice
Washington Criminal II Office
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2165
Michael.Koenig@usdoj.gov