IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   **SCOTT JAMES BRADY,**
4.   ROGER BORN AUSTIN,
5.   TIMOTHY R. MULRENIN,
6.   WILLIAM VINCENT KANTOLA,
7.   JIMMIE LEE LITTLE
8.   WILLIAM WADE LOVETTE,
9.   GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,

    Defendants.

## DEFENDANT SCOTT BRADY'S TRIAL BRIEF

Defendant Scott Brady hereby submits his Trial Brief, pursuant to this Court's Criminal Practice Standards and Dkt. No. 631 to address evidentiary issues and legal issues likely to arise at trial.

### A.   Mr. Brady Has No Final Pricing Authority

Mr. Brady joined Norman W. Fries, Inc. d/b/a Claxton Poultry Farms ("Claxton") in the summer of 2012 as National Account Sales. Claxton is based in Georgia, about an hour west of Savannah. During the relevant time period of the charged conspiracy, Mr. Brady split his time between his home office in northern Alabama, the plant in Claxton, Georgia, and traveling to visit

1

customers. Although the superseding indictment states that he is a Vice President at Claxton, Mr. Brady has never been a Vice President or any officer at Claxton.

As National Account Sales, Mr. Brady is responsible for, among other things, negotiating the sale of fresh chicken on the bone broiler chicken products to certain of Claxton's national accounts, including KFC, Chick-fil-A, and Popeye's. Mr. Brady has always reported to Mikell Fries and although Mr. Brady primarily handles the negotiations for his accounts, Mr. Brady does not and has never had final pricing authority for Claxton.

The fact that Mr. Brady lacks final pricing authority for his accounts weakens the government's position that he could enter into an agreement with anyone to rig bids or fix, maintain, or raise prices on these accounts. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368-69 (3d Cir. 2004) ("price discussion among low level sales people has little probative weight"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment"). And, in fact, he did not enter into any such agreement.

### B. Verizon Phone Records for Mr. Brady's Cell Phone are Susceptible to Prejudicial Misinterpretation

Mr. Brady is also responsible for addressing quality issues, handling shipping and trucking delays, and selling excess chicken, including covering loads for other suppliers. These duties often require him to contact buyers, distributors, and other suppliers, sometimes multiple times in one day. And whether he is working from home or on the road, Mr. Brady conducts almost all of his business for Claxton on the phone. The telephone records are, thus, an important piece of evidence in this case for Mr. Brady.

During the relevant period, Mr. Brady's used a Verizon mobile phone, telephone number (678) 640-1622, for business. As reflected in the Verizon telephone bills, and confirmed by the

Verizon representatives interviewed by the government, Verizon rounds all calls up to the nearest whole minute. As such, the government has no way to determine from the face of the Verizon telephone bills the actual duration of any call less than one minute. The government is going to ask the jury to infer that many of the calls between the defendants and other alleged co-conspirators were calls in furtherance of the alleged price fixing conspiracy based on the time and length of the call, but, given that Verizon rounds all calls up to nearest whole minute, it is impossible to tell for many of these calls exactly how long Mr. Brady spoke to anyone or whether he simply left a voicemail.[1]

These issues regarding call duration and time zone are particularly important for Mr. Brady, who used a Verizon cell phone during the alleged conspiracy period, lives in the Central Time Zone, communicates with co-workers and colleagues located in the Eastern Time Zone, and travels often between the two, all on a Verizon cell phone with a bill that does not always accurately reflect the duration of the call. The government should be precluded from inviting the jury to improperly speculate regarding what is *not* precisely reflected in Mr. Brady's telephone records.

### C. Agent Testimony Requires an Offer of Proof in Advance of Trial

While the government sometimes calls an agent witness either to preview the evidence for the jury (an overview witness) or summarize the admitted evidence at the end of its case (a summary witness), counsel has not found a case where, as here, it resorts to both in the same trial. In this case both Special Agent ("SA") Taylor and SA Koppenhaver are each scheduled to testify

---

[1] Further, determining accurate time zones and times for when calls were made and received are problematic for Mr. Brady given that his office is located in the Central Time Zone and Claxton's plant is located in the Eastern Time Zone. According to the Verizon representative, time zones are accurate to the billing area, but if the customer was close to a different time zone, the bill could reflect a different time zone. Another Verizon representative interviewed by the government said that the call time on the bill is based on where the device was at the time call was made or received.

3

on direct for two trial days which is unsurprising given the government has no percipient witness to testify about the charged conspiracy. But such testimony is fraught with peril.

The Tenth Circuit has observed that "[c]ourts generally allow overview testimony to the extent it concerns how an investigation began, the law enforcement agencies involved, or the investigative techniques used." *United States v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2011). The court in *Brooks* then went on to describe the mischief an overview or summary agent witness could visit on a jury's ability to independently conduct its factfinding:

> But overview testimony is susceptible to abuse. It can stray into matters that are reserved for the jury, such as opinions about a defendant's guilt or a witness's credibility. An overview witness, for example, might express opinions about the defendant's truthfulness at certain times or his likelihood of being involved in a scheme or crime, thus usurping the jury's role in making fact findings based on the credibility and demeanor of witnesses with personal knowledge. Other potential problems include the government's ability (1) to spin the evidence in its favor before it is admitted (assuming it is ever admitted), (2) to give its official imprimatur to certain evidence, and (3) to allow its witnesses (usually law enforcement) to testify on matters about which they have no personal knowledge or that are based on hearsay.

*Id.* citing *United States v. Moore*, 651 F.3d 30, 56 (D.C. Cir. 2011).[2]

Based on the voluminous post-indictment production from the government, it appears that the bulk of its investigation occurred *after* the charges were already brought. So agent testimony about how the investigation started, the techniques used (there appear to have been no wiretaps and fewer than 10 telephone recordings), and the agencies involved are not probative of any fact in issue.

---

[2] *See also United States v. Smith*, 640 F.3d 358, 367 (D.C. Cir. 2011) ("[h]earsay does not become admissible merely because it is provided by a government agent in the form of an overview of the evidence." (citation omitted), collecting cases from First, Second, and Fifth Circuits): *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005) ("it is generally viewed as 'improper ... for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury'" quoting *Weinstein's Federal Evidence*).

Certainly, the Court's October 7 Order [Dkt. No. 604], precluding agent testimony about the existence of the conspiracy, whether a defendant joined or participated, and the "meaning of a defendant's conduct or communications," is clear guidance to the government as to the acceptable testimony an agent may offer. However, Mr. Brady is concerned that the government may seek to do an end run around the October 7 Order by asking its agents to testify about the meaning of the "jargon" and related speculative conclusions extensively referred to in the testimony of SA Taylor during the *James* hearing. Specifically, SA Taylor's conclusions that Defendants' and coconspirators' use of otherwise common, legitimate business terms such as "intel," "holding firm," "due diligence," and "friendly/good competitor," were indicative of an antitrust conspiracy, lack evidentiary support.[3]

Neither SA Taylor nor SA Koppenhaver were identified as expert witnesses under Fed. R. Evid. 702 – nor could they have been, as there is no basis to conclude that either possesses the requisite "scientific, technical, or other specialized knowledge" in the context of this case. *James* Hearing (Sept. 2, 2021) pp. 105-06. The only other possible basis for their anticipated opinion trial testimony would be as Lay Expert Witnesses under Fed. R. Evid. 701. Based on the current record and specifically SA Taylor's own testimony, he and SA Koppenhaver also fail to qualify under that Rule as well.

Rule 701 requires proof of "personal perception" by the offered lay expert. Neither SA Taylor nor SA Koppenhaver personally perceived the hatching, development, or execution of the charged conspiracy or any Defendant's conduct in purportedly joining and implementing it. This lack of perception is disqualifying under 701.

---

[3] Once the jury hears the agents' opinions that suggest that such testimony is typically used in furtherance of an antitrust conspiracy, it will be impossible to "un-ring" that bell, even if the jury is given corrective instructions.

In *United States v. Garcia,* 413 F.3d 201, 213 (2d Cir. 2005), the court stated:

> because Rule 701 limits the admissibility of lay opinions at trial to those based only on personal perceptions, an opinion such as Agent Klemick's, which appears to have been based on the totality of information gathered by various persons in the course of an investigation, was not admissible before a jury.

Responding to the district court's allowance of the agent's testimony that the defendant was a culpable member of the conspiracy based on: 1) his experience as a DEA agent; and 2) "the total investigation of the charged crimes," the Second Circuit quoted from the Advisory Committee Notes on 1972 Proposed Rules, Fed. R. Evid. 701(a) in disallowing the agent's testimony:

> Such an opinion cannot be equated with that of an undercover officer who, in testifying to his *direct dealings* with a group of persons, may offer an opinion as to what the words and actions witnessed conveyed about the relative relationships of the participants. The latter opinion helps the jury gain "an accurate reproduction of the event" *actually witnessed by the agent*.
>
> \* \* \* \* \*
>
> [I]f such broadly based opinion testimony as to culpability were admissible under Rule 701, "there would be no need for the trial jury to review personally any evidence at all." The opinion witness could merely tell the jury what result to reach. (citation omitted)
>
> \* \* \* \* \*
>
> The law already provides an adequate vehicle for the government to "help" the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement.

*Garcia,* 413 F.3d at 213-14 (emphasis added).

Mr. Brady respectfully requests that the Court direct the government to make offers of proof under Fed. R. Evid. 103(c), (d), regarding the anticipated testimony of SA Koppenhaver and SA Taylor, each of whom is estimated to testify for 6.5 hours, more than twice as long as every other "fact" witness except Robert Bryant, who is scheduled for 5 hours. Because the agent witnesses could testify for 13 hours (or more), Mr. Brady believes that it would assist the parties and the Court for there to be a preliminary assessment of the nature of the subject matter to be covered by these agent witnesses.

### D.      Non-*James* Emails Are Not Business Records Under Rule 803(6)

The government's motions regarding authentication of thousands of pages of documents [Dkt. Nos. 546, 622, 623, 653], including email communications make clear the government intends to rely on the exception to the rule against hearsay for records of regularly conducted activity or the busines records exception to admit the majority of the documents in its case. Fed. R. Evid. 803(6). In order to make use of the business records exception, the government must establish that the document "must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; . . . (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant; and (4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness." *United States v. Gwathney*, 465 F.3d 1133, 1140-41 (10th Cir. 2006) (internal citations omitted); *see also* Fed. R. Evid. 803(6)(A)-(E). "Of course, the proponent of the document must lay a proper foundation for its admission." *Id.* at 1041 (citing *United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999)).

"Not every item of business correspondence constitutes a business record." *Id.* (citing *Echo Acceptance Corp. v. Household Retail Svcs., Inc*., 267 F.3d 1068, 1091 (10th Cir. 2001)). "[B]usiness records are potentially fraught with double hearsay." *Id.* (citation omitted). "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *Id.* (citing *Wilson v. Zapata Off-Shore Co*., 939 F.2d 260, 271 (10th Cir. 1991)). "Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." *Id*.

Courts accept that email "is typically a more casual form of communication than other records usually kept in the course of business," and thus "present unique problems of recent vintage

7

in the context of the business records [hearsay] exception." *United States v. Cone*, 714 F.3d 197, 200 (4th Cir. 2013) (citation omitted). The Sixth Circuit has recognized that "[a]n email is not a business record for purposes of the relevant hearsay exception simply because it was sent between two employees in a company or because employees regularly conduct business through emails; such evidence alone is insufficient to show that the email is a record, made as 'a regular practice of the company, Fed. R. Evid. 803(6)(C), and that 'the record was kept in the course of a regularly conducted activity of a business,' *id*. at 803(6)(B)." *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019). "[I]t would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then ergo all those e-mails are business records falling with the ambit of Rule 803(6)(B)." *Id.* (quoting *Cone*, 714 F.3d at 220). As the Sixth Circuit correctly concluded in *Daneshvar*, "[i]f that were the case, then every single email sent within any company would fall within the exception. This result would obviate the entire purpose of the business records exception, which is designed for a limited category of records—namely those that are regularly produced as a part of a company's business activities." *Id.* In *Daneshvar*, a prosecution against a doctor for conspiracy to commit Medicare fraud, the Sixth Circuit affirmed the district court's conclusion that "the email 'was not a business record [admissible under Rule 803(6)], but rather a form of conversation'—that is, a one-time discussion regarding what to tell doctors . . . ." *Id.*

Respectfully submitted this 18th day of October 2021.

*/s/ Bryan B. Lavine*
Bryan B. Lavine
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3170
bryan.lavine@troutman.com
Attorney for Defendant Scott James Brady

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October, 2021, I electronically filed the foregoing **DEFENDANT SCOTT BRADY'S TRIAL BRIEF** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*/s/ Bryan Lavine*
Bryan Lavine