**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
**3. SCOTT JAMES BRADY,**
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

    Defendants.

Criminal Case No. 20-cr-00152-PAB

## DEFENDANT SCOTT BRADY'S MOTION FOR JUDGMENT OF ACQUITTAL

No reasonable jury could find that Mr. Brady entered into an agreement to rig bids or fix prices. The government charged Mr. Brady with violating section 1 of the Sherman Act, 15 U.S.C. § 1, and was required to prove beyond a reasonable doubt "(1) that two or more persons agreed to violate the law, (2) that [Mr. Brady] knew at least the essential objectives of the conspiracy, (3) that [Mr. Brady] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008); *see also United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006). The government failed to meet its burden as to each of these elements. The government failed to put forth any evidence of any agreement between Mr. Brady and *anyone* to rig bids or fix prices, much less of

*with whom* he agreed to violate the law or whether Mr. Brady had *knowledge of the objectives* of the alleged conspiracy.

In its opening statement, the government described to the jury a conspiracy involving competitors putting up a unified front, coordinating stories and not budging during pricing negotiations with customers. The government promised the jury they would hear testimony from stonewalled customers who, unable to negotiate, were forced into historic price increases in 2014 for the 2015 contracts as a result of a coordinated effort by competitors to raise prices. Further, according to the government's opening statement, while 2014 was the conspiracy in overdrive, the government led the jury to believe it would see a consistent pattern of coordination between the competitors among the various other pricing events starting in 2012 and continuing for the better part of a decade.

But what the government actually presented to the jurors fell far short of what was promised. The government's alleged insider – Robert Bryant – testified about a conspiracy where the competitors agreed to not undercut each other on volume or offer concessions on prices. Yet, the customers – the purported victims of the conspiracy – described negotiations where Claxton and other suppliers listened to directional guidance and reduced initial pricing offers, in addition to requesting and receiving additional volume, often at the expense of other suppliers, such as Pilgrim's, who lost volume as other suppliers gained more loads. Moreover, almost every witness testified about never-seen-before market conditions in the summer of 2014 which resulted in the so-called historic price increases, rather than any coordinated effort by the suppliers to drive up pricing. And with respect to Mr. Brady, not one witness testified they had any knowledge that Mr. Brady was involved in any conspiracy to rig bids, fix prices or maintain prices – including Mr. Bryant.

The government failed to produce evidence sufficient to prove that Mr. Brady knowingly and intentionally entered into an agreement with anyone with the objective of rigging bids, fixing or raising prices. Notably, despite an investigation by the government over the course of two years that is still on-going today, multiple interviews of every witness who testified in this case and the review of over 14 million documents, not a single piece of direct evidence exists demonstrating that Mr. Brady knowingly and intentionally entered into an agreement to rig bids or fix prices. The government tries to overcome this deficiency by attempting to characterize every routine business interaction among competitors and their customers as in furtherance of the conspiracy, and by attempting to draw inferences from text messages and phone conversations where none is warranted. While at the same time, the government's alleged insider – who admitted to participating in a conspiracy – testified that he had no knowledge that Mr. Brady ever entered into an agreement with anyone to rig bids or fix prices. When the government is unable to produce evidence demonstrating beyond a reasonable doubt that Mr. Brady did anything other than, on less than a handful of occasions over eight years, receive pricing information from competitors and participate in phone calls with his competitors that lack context and content, the government has failed to meet its burden of proof.

The government failed to provide any evidence that Mr. Brady entered into an agreement to fix prices or rig bids and. no inference can be drawn to prove that Mr. Brady knowingly participated in a conspiracy to rig bids or fix prices. Accordingly, no reasonable jury could find Mr. Brady guilty of Count One, and this Court should enter judgment of an acquittal pursuant to Fed.R.Crim.P. 29.

## LEGAL STANDARD

When a defendant moves for judgment of acquittal under Federal Rule of Criminal Procedure 29, a district court "must enter judgment of acquittal for any offense in which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a motion for judgment of acquittal, the Court views the evidence "in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine[s] whether that evidence, if believed, would establish each element of the crime." *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (quotations omitted). A conviction cannot be obtained, however, "by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (citing *United States v. James*, 44 F.3d 860, 865 (10th Cir. 1995)). Here, the evidence provided to the jury plainly fails to meet that standard as to Mr. Brady, and judgment of acquittal must be entered.

## ARGUMENT

**The government has failed to produce sufficient evidence that a reasonable juror could find beyond a reasonable doubt that Mr. Brady conspired to commit a violation of the Sherman Act.**

The government must prove that Mr. Brady was personally aware of, entered into, and participated in the charged conspiracy. His individual guilt, as well as the guilt of each individual defendant, must be shown. *See United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (for a conspiracy, it is "essential to determine that kind of agreement or understanding existed *as to each defendant*") (quotation omitted; emphasis added). The Tenth Circuit is "mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing

4

involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991); *see also United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985) (neither knowledge alone nor mere association with conspirators enough to convict of conspiracy). The evidence "supporting the conviction [of Mr. Brady] must be substantial and do more than raise a suspicion of guilt." *Valadez-Gallegos*, 162 F.3d at 1262.

No direct evidence exists that Mr. Brady was involved in a conspiracy to rig bids or fix prices. The government has not presented any witness with any actual knowledge that Mr. Brady entered into an agreement with anyone in violation of the Sherman Act. And as discussed further below, the purported circumstantial evidence of Mr. Brady's participation in the alleged conspiracy is equally lacking.

**A.     The government offered no direct evidence of guilt against Mr. Brady.**

**1.     The government's alleged "insider" had no personal knowledge of Mr. Brady's involvement in any conspiracy.**

Robert Bryant—the government's sole alleged "insider"—offered no testimony implicating Mr. Brady in the charged conspiracy. Mr. Bryant testified that he did not enter into an agreement with Mr. Brady to rig bids or fix prices and he never spoke to Mr. Brady about pricing or volume. (11/02 Tr. at 404:14-405:6, Dkt. No. 861.) In fact, Mr. Bryant admitted he had no direct knowledge that Mr. Brady or anyone at Claxton was actually involved in the conspiracy in which Mr. Bryant participated.[1] (11/02 Tr. at 413:13-23, Dkt. No. 861). Further, Mr. Bryant

---

[1] Mr. Bryant testified that his "understanding" that there was an agreement among competitors was the result of Jason McGuire telling him that other competitors also received a large price increase for the 2015 contracts. (11/01 Tr. at 89:8-10, Dkt. No. 860.) Mr. McGuire, however, never told Mr. Bryant who those competitors were or that the price increase was a result of any actual agreement among the competitors. Moreover, Mr. Bryant acknowledged that the market conditions in 2014 leading to the large price increase were well known; that "[e]veryone in the business [should have known], that prices were going to go up." (11/02 Tr. at 248:21-251:1, Dkt. No. 861.)

5

acknowledged that he had no knowledge of Claxton's intentions regarding pricing, that he never spoke to anyone at Claxton about pricing negotiations, and that he knew nothing about Claxton's internal process of setting its prices. (11/02 Tr. at 407:10-408:25, Dkt. No. 861.)

Mr. Bryant's specific testimony about Mr. Brady, with whom he had not spoken since at least 2012, was extremely limited. When asked his basis for saying that Mr. Brady participated in the price-fixing activities, Mr. Bryant testified that it was "[i]nformation relayed to me from Roger Austin and overhearing a phone call during the KFC bid in 2014." (11/01 Tr. at 76:15-77:4, Dkt. No. 860.) Mr. Bryant provided scant additional details as to what information, if any, was relayed to him from Mr. Austin specific to Mr. Brady,[2] and his recollection of the phone call was similarly void of any details. (11/02 Tr. at 399:19-401:3, Dkt. No. 861.) Specifically, Mr. Bryant admitted that the only thing he recalled overhearing Mr. Austin say on the call was the "price is the price," and "I just need to know how many loads they want at that price,"[3] that he did not hear anything Mr. Brady said on the call, and that he was not even present for the entire conversation, as he was walking in and out of the room during the call. (11/02 Tr. at 213:19-215:1; 399:19-401:3, Dkt. No. 861.) He also acknowledged that Mr. Austin did not ask Mr. Brady on that call to agree with Mr. Austin on anything and no discussion about future prices occurred. (11/02 Tr. at 244:21-23; 399:19-401:3, Dkt. No. 861.)

---

Mr. Bryant also believed, incorrectly, that there were no pricing concessions offered by the competitors in 2014. (11/02 Tr. at 212:21-23, Dkt. No. 861.)

[2] Mr. Bryant suggested that Mr. Austin received information from Mr. Brady including specification changes, bird weights, bid prices—"whatever the customer has asked for or feedback at that time"—but provided no actual instances of the exchange of this information. (11/01 Tr. at 70:4-11, Dkt. No. 860.) Mr. Bryant also testified that before July 2014, he had never heard Mr. Austin talk about competitor pricing. (11/01 Tr. at 164:17-19, Dkt. No. 860). Mr. Bryant also never provided any detail as to what information he allegedly received from Mr. Austin that originally came from Mr. Brady.

[3] Mr. Bryant understood the phrase, "the price is the price" to mean Pilgrim's position with KFC and Pilgrim's refusal to negotiate in 2014. (11/02 Tr. at 215:2-6, Dkt No. 861).

Mr. Bryant also testified about negotiations in 2017 for the 2018-2020 KFC contract. He was shown an internal Pilgrim's email dated January 17, 2017 (Exhibit GX-1882), wherein Mr. Austin wrote to several Pilgrim's colleagues that "Claxton meets with them [RSCS] in [sic] Thursday and I will get a blow by blow Friday morning." (GX-1882; *see also* 11/01 Tr. at 95:2-3, Dkt. No. 860.) Mr. Bryant explained that Claxton had a meeting with KFC that Thursday, January 19th and his understanding of the email was that Mr. Austin and Mr. Brady would talk on Friday morning and Mr. Austin would provide Mr. Bryant with the details of the outcome of that meeting. (11/01 Tr. at 95:15-20, Dkt. No. 860). Given the opportunity to explain what "blow by blow" meant, Mr. Bryant explained that it meant the details of the meeting between Claxton and KFC. (11/01 Tr. at 96:15-20, Dkt. No. 860). Mr. Bryant said that information would help Pilgrim's in preparation with its meeting with KFC, including whether RSCS offered additional loads to Claxton, and other questions that could come from that meeting. (11/01 Tr. at 96:11-15, Dkt. No. 860). Mr. Bryant did not testify that he was aware that Mr. Austin and Mr. Brady spoke or that Mr. Austin received a "blow by blow" from Mr. Brady after the meeting. And Mr. Bryant did not testify that this "blow by blow" included the exchange of any pricing information or was any type of agreement with respect to the negotiations for the 2018-2020 KFC contract.

During this same time period, Mr. Bryant also testified about a comment that his Pilgrim's colleague Tim Stiller made, after a meeting Pilgrim's had with KFC, that Mr. Austin should "tell the industry" that Pilgrim's was going to hold; that is, Pilgrim's was not going to concede on price but rather hold on its original bid submission. (11/01 Tr. at 142:25-143:3, Dkt No. 860.) Mr. Bryant admitted that he had no personal knowledge that this message was ever conveyed to Mr. Brady. (11/02 Tr. at 403:15-20, Dkt. No. 861.) Importantly, Mr. Bryant conceded that while his belief was that competitors discussed and knew what each was doing, there was no agreement in place that

7

would prevent a supplier from arriving at whatever price point it independently determined made the most economic sense for that supplier. (11/02 Tr. at 225:19-226:4, Dkt. No. 861.)

### 2. None of the government's other witnesses had any knowledge of Mr. Brady's involvement in any conspiracy.

Similarly, the government's other witnesses failed to implicate Mr. Brady in any wrongdoing. The government's purported victims at RSCS—Michael Ledford, Robert Lewis, and Sara Fisher—also had no personal knowledge of Mr. Brady's or anyone at Claxton's participation in any agreement to rig bids or fix prices. (11/03 Tr. at 216:23-217:8; 11/10 Tr. at 37:18-25; 11/05 Tr. at 24:9-13.[4]) Instead, their testimony regarding Claxton's (i) willingness to negotiate, (ii) competitively low prices, (iii) practice of taking directional price guidance from RSCS to reduce prices, and (iv) willingness to take additional volume all tend to exculpate Mr. Brady *and* run afoul of the nature of the alleged agreement testified to by Mr. Bryant. (*See* 11/01 Tr. at 21:12-25, Dkt. No. 860 (Bryant testimony regarding nature of alleged conspiracy regarding volume).) No other witness called by the government testified differently.[5]

---

[4] Citations to the testimony of Mr. Ledford, Mr. Lewis, Ms. Fisher, James Olson, Melissa Hoyt, Telly Smith and Meyer Skalak are to the daily transcripts that have been provided by the court reporter. Given their draft status, Mr. Brady defers to the Court's recollection if it differs from the drafts in any way.

[5] The government's other victim witnesses – Joseph Brink, Melissa Hoyt, Meyer Skalak and Telly Smith – either did not negotiate with Mr. Brady, did not sell to Claxton or lacked any knowledge of purported facts they were there to testify about. (11/17 Tr. at 48:4-6, 48:18-21, 11/23 Tr. at 173:6-14, 11/15 Tr. at 69:6-70:1, 91:6-9, 109:10-23.) Mr. Skalak, who was called by the government to testify about what the government characterized in opening as a conspiracy to raise prices when CFA wanted to switch to antibiotic-free chicken, was not even asked during direct examination about any of the pricing or cost proposals submitted by the suppliers for antibiotic-free chicken for CFA. Given his utter lack of knowledge about the negotiations, the pricing proposals or what the suppliers were told during the negotiations by the individuals actually responsible for the negotiations that lack of questioning was not surprising. (11/15 Tr. at 67:2-9; 68:18-23; 69:6-13; 106-116.)

More specifically, Mr. Lewis testified that all of the suppliers were willing to negotiate during the 2014 negotiations for the 2015-2017 KFC contract (11/03 Tr. at 203:11), and that Claxton's final number came down over four cents from its initial bid proposal to its final contract price. (11/03 Tr. at 209:13-22.) This downward movement by Claxton directly contravenes both Mr. Bryant's testimony that as part of the conspiracy the suppliers were not offering any pricing concessions and the government's description of the conspiracy to the jury in its opening statement that the suppliers were unwilling to negotiate. Further, Mr. Lewis admitted that he would have expected the prices for the 2015 KFC contract to be closer if they were set by agreement. (11/03 Tr. 212:11-213:2.) Mr. Lewis also testified regarding the market conditions in 2014 leading up to the negotiations for the 2015 contract, including the state of near panic that existed in the summer of 2014 for those responsible for purchasing chicken because of the supply issues and that restaurants were concerned they would not be able to meet demand. (11/03 Tr. at 181:4-19.) Mr. Lewis acknowledged that, for the first time in many years, demand was much greater than supply shifting the negotiating power against the buyers. (11/03 Tr. at 184:4-18.) He also testified that the industry was shifting to bigger bird sizes and the bird size that KFC used was becoming less readily available.[6] (11/03 Tr. at Tr. 187:19-23).

Moreover, Mr. Ledford testified that the 2012 negotiations for the 2013 contracts were very successful for RSCS (11/09 Tr. at 241:10-13) and that Claxton was even rewarded with additional

---

[6] Mr. Olson similarly testified regarding his view of the market and industry in the summer and fall of 2014: (i) based on his experience, there was a higher margin in big birds; (ii) consulting firm McKinsey had also informed him that supply had been shrinking because big birds were more profitable; (iii) he knew that the number of small bird plants had decreased substantially from 40 to 30 during the time of 2005 to 2014; and, (iv) he acknowledged that McKinsey had informed the RSCS Board that the supply of small birds had been shrinking and that demand for small birds had been going up and the supply of small birds had been going down. (10/27 Tr. at 116:19-22, 180:10-15, 158:24-159:1, 182:20-183:25.)

volume for the contract because it was one of the top three lowest priced suppliers (11/09 Tr. at 242:15-20). And during the 2013 negotiations for the 2014 contracts, Mr. Ledford testified that, based on his directional guidance, Claxton's eight-piece price came down almost four cents from the original proposal. (11/10 Tr. at 22:15-18.)

Ms. Fisher admitted that she was surprised to learn during the 2017 negotiations that the suppliers had more volume than she expected, which was a positive development for RSCS, that RSCS was able to negotiate prices down that year and were happy with the prices that RSCS received, that Claxton reduced its pricing round after round when negotiating with RSCS, and that Claxton agreed to RSCS's offer regarding price decreases over a three-year contractual period, resulting in approximately a 10 cent reduction over three years. (11/04 Tr. at 207:19-23, 208:2-9, 215:23-216:2; 220:23-221:3, 222:3-5.) Ms. Fisher also testified that Claxton asked for increased volume during the 2017 negotiations, to include four additional truckloads of eight-piece and one additional truckload of dark meat a week. (*Id.* at 209:2-6.)

Again, the evidence of what actually happened during the negotiations with RSCS belies the pattern Mr. Bryant testified about that underscored his understanding of the alleged conspiracy. The government's direct evidence of Mr. Brady's participation in the charged conspiracy is non-existent.

> **B.    The conduct charged in response to Mr. Ledford's request for what it would take to produce a reduced weight broiler chicken is not *per se* illegal and was not proven to constitute a Rule of Reason violation of the Sherman Act.**

Mr. Ledford testified that he reached out to suppliers to see what it would take to get the suppliers to supply a 2 pound 4 ounce bird to KFC. At the time, RSCS was currently purchasing a 2 pound 8 ounce bird for KFC but, at the request of PriceWaterhouseCoopers, Mr. Ledford inquired of the suppliers regarding a smaller bird size, knowing supply for a 2 pound 4 ounce bird

10

was short and there was not any currently available for KFC. (11/09 Tr. at 165:7-166:7.) Mr. Ledford acknowledged that he was basically asking the suppliers to shift their entire bell curve to the left. (11/09 Tr. at 166:9-20, 167:4-5.) Not only was the request laughable, but it was, more importantly, not a request to enter into a contract. (11/09 Tr. at 167:15-21.) Not surprisingly to Mr. Ledford, he was told by the suppliers, including Mr. Brady, that his request could not be done.[7] (11/09 Tr. at 111:4l 174:17-176:9; GX 1601.) Mr. Brady never provided Mr. Ledford with a price for the two pound 4 ounce bird, no price was negotiated and the request eventually died. (11/09 Tr. at 176:10-14.) In the absence of a price being exchanged or negotiated, it is difficult to see how this information request, initiated by the buyer, could advance a conspiracy whose alleged objective is to rig bids or fix prices for broiler chicken products.[8]

### C. The government's circumstantial case against Mr. Brady requires impermissible inferences be drawn from legal conduct.

Having no direct evidence against Mr. Brady, the government's case relies almost exclusively on the leaps and inferences it wants the jury to make regarding text, email communications, and phone records contained in summary charts admitted through the testimony of Rachel Evans. As a threshold matter, the mere exchange of competitor information, in the

---

[7] Further, Mr. Ledford had received the same response from Mr. Austin the week prior, in response to a similar request. (11/10 Tr. at 43:21-46:2.) And while the government would have the jury infer the existence of an agreement from the text message exchange between Mr. Brady and Mr. Fries on March 8, 2013 (GX 1615), a plain reading of this exchange indicates that Mr. Brady was merely conveying to Mr. Fries that Mr. Austin and Pilgrim's had reached a similar conclusion that Claxton had reached regarding the impossibility and implausibility of the bird *size* adjustment request from Mr. Ledford, which itself had nothing to do with a proposed contract price or contract proposal.
[8] Because the government was not well informed about the context and specific request of Mr. Ledford with respect to the reduced weight bird, it prematurely misconstrued Messrs. Austin and Brady's shared opinion as an actionable Sherman Act agreement. (*See* GX 1615 ("he [Mr. Austin] is in agreement with us.").) As a consequence, the government failed to make the threshold determination of analyzing the nature of the purported restraint that was the subject of the "agreement." Lacking this critical analysis, it was impossible to determine whether the assumed horizontal activity was actionable civilly, criminally, or at all.

11

absence of an agreement, does not constitute a *per se* violation of the Sherman Act. *See, e.g.*, *United States v. United States Gypsum Co.,* 438 U.S. 442, 441 n. 16 (1978) ("The exchange of price data and other information among competitors … do not constitute *a per se* violation of the Sherman Act."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990) ("it is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or discuss common aims or objectives or exchange information on independently derived prices."); *United States v. B&H Maint. & Constr., Inc.*, 07-cr-90 (D. Colo. June 19, 2008), Doc. 319-10, at 7 ("It is not illegal to obtain information about a competitor's bid or to exchange bid information without more. It is only where such acts are done pursuant to an agreement between two or more competitors to rig bids that a violation of the law occurs. The mere exchange of information about a competitor's bid without more is not illegal."). And, more importantly, none of these emails, texts, or phone communications constitute evidence of an agreement to rig bids or fix prices. Rather, the government curated a few emails and text messages, and coupled them with some phone calls in summary charts, all lacking substance and context, to try to convert otherwise legitimate business communications into anticompetitive, conspiratorial conduct.

At best, with no actual evidence that Mr. Brady entered into an agreement with anyone to rig bids or fix prices, the government's case boils down to the fact that, over an eight-year period, Mr. Brady participated in phone calls with certain competitors and exchanged a handful of text

12

messages with Mikell Fries that contained competitors' pricing and other information.[9] Mr. Brady is permitted to obtain competitors' pricing and share that pricing with Mr. Fries as long as the information is not shared pursuant to an agreement to fix prices or rig bids. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) (describing conscious parallelism—reacting to pricing without an agreement to do anything—which does not violate the Sherman Act).

Further, phone calls among competitors are not evidence of a conspiracy when no proof exists regarding what was discussed during those calls. There is even less room to draw an inference of a conspiracy based on phone calls that occurred over an eight-year-period among competitors who were also customers routinely buying and selling to one another to cover shortages for their common customers. Both Mr. Ledford and Mr. Skalak testified as to many legitimate reasons that suppliers had for communicating with one another, including improving product specifications and sharing best practices, covering product shortages, purchasing ingredients, as well as quality decisions, product consistency, specifications, and other myriad logistical issues. (11/10 Tr. at 35:14-37:1;191-6-8; 11/12 Tr. 232:9-11; 11/15 Tr. at 91:10-92:10). An inference of the existence of a conspiracy cannot be drawn from evidence of communications among companies with a legitimate reason for their contacts. *See Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938-939 (7th Cir. 2018) ("That [20 calls were made in the days around

---

[9] With respect to the pricing information contained in the text messages and emails, Mr. Ledford testified that in order to know the actual price of dark meat you would need to know the 8-piece price; that is, you are not able to discern the price of the dark meat if all you know is that a supplier is .30 back. (11/09 Tr. 215:4-12; 216:11-18; 217:11-218:15; *see* GX 1427, 1734.) He also testified that knowing current or period pricing would not have any impact on the competitiveness of the negotiation because the period price fluctuates throughout the year. (11/10 Tr. at 112:12-113:7; *see* GX 6047.) And in fact, Mr. Skalak acknowledged that CFA shared competitor pricing with suppliers to negotiate a lower price. (11/15 Tr. 71:22-72:2.)

a price increase] is not enough. We cannot put much stock in the frequency of contacts, given the amount of trading that was taking place among the firms [and] we hesitate to impugn the companies' intentions solely from the timing of the contacts"); *id.* at 938 ("having the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*. Especially when companies have legitimate business reasons for their contacts[.]").

The Supreme Court has cautioned against the range of permissible conclusions that can be drawn from otherwise circumstantial and ambiguous evidence in price-fixing or bid-rigging cases. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596 (1986); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179–80 (10th Cir. 2019) ("The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial.") (citing multiple cases). In particular, it is impermissible to infer a price-fixing or bid-rigging conspiracy if a defendant's "conduct is consistent with other, equally plausible explanations" such as rational, unilateral business behavior outside of an illegal agreement. *Matsushita*, 475 U.S. at 596. This is particularly important in the criminal context where the government must prove its case beyond a reasonable doubt, meaning that jurors may not convict on the basis of ambiguous evidence. *See Gypsum*, 438 U.S. at 441.

Courts recognize the "considerable danger" that allowing inferences of conspiracy from circumstantial evidence in price-fixing or bid-rigging cases "could deter or penalize perfectly legitimate conduct." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *United States v. Summers*, 414 F.3d 1287, 1295–96 (10th Cir. 2005) (piling "inference upon inference" "insufficient to permit a reasonable inference of . . . willful participation in the conspiracy"). That is why "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588.

14

The government's purported evidence against Mr. Brady consists of phone calls with competitors which could be about anything as none of the calls have any substance and the overwhelming majority of the calls have no context, and a handful of text messages and emails. The considerable danger of this evidence is that it amounts to nothing more than the legal business practice of obtaining market intelligence; that is, pricing information. The government failed to prove Mr. Brady's agreement with anyone to rig bids or fix prices, and the government's key co-conspirator witness admitted that he had no knowledge that Mr. Brady was involved in any conspiracy.

There is no conflict between the testimony of the government's witnesses, including Mr. Bryant, and the text and email communications offered by the government. Simply because the communications involve exchanges of pricing information does not permit an inference that a conspiracy existed or that Mr. Brady agreed with anyone to rig bids or fix prices. Accordingly, no reasonable jury could find Mr. Brady guilty of Count One.

## **CONCLUSION**

Accordingly, Defendant Scott Brady respectfully requests that a judgement of acquittal be granted as to Count One.

Dated: November 29, 2021                           Respectfully submitted,

*s/ Bryan Lavine*
Bryan Lavine
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3170
bryan.lavine@troutman.com

Attorney for Scott Brady

## CERTIFICATE OF SERVICE

   I hereby certify that on this 29th day of November, 2021, I electronically filed the foregoing **DEFENDANT SCOTT BRADY'S MOTION FOR JUDGMENT OF ACQUITTAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*/s/ Bryan Lavine*
Bryan Lavine

16