1            IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12     Defendants
   _____
13
                  REPORTER'S TRANSCRIPT
14              Excerpt of Trial to Jury
               Testimony of Brandon Campbell
15 _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 10:35 a.m., on the 6th day of December,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6            Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washingon, DC 20006, appearing for Defendant Penn.
11            David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16             Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19            Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1            APPEARANCES (Continued)
 2            Laura F. Carwile of Reichman, Jorgensen, Lehman,
 3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
 4  CA 94065; appearing for Defendant Austin.
 5            Elizabeth B. Prewitt of Latham & Watkins, LLP,
 6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;
 7            Marci Gilligan LaBranche of Stimson, Stancil,
 8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO
 9  80218, appearing for Defendant Mulrenin.
10            James A. Backstrom, Counselor at Law, 1515 Market
11  Street, Suite 1200, Philadelphia, PA 19102-1932;
12            Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,
13  Bethesda, MD 20814, appearing for Defendant Kantola.
14            Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth
15  Street, Suite 1100, Los Angeles, CA 90017;
16            Dennis J. Canty, Canty Law Corporation,
17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,
18  appearing for Defendant Little.
19            John Anderson Fagg, Jr. and James McLoughlin of
20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.
22
23
24
25
```

```
1                    APPEARANCES (Continued)

2            Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5            Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16        THE COURT:  Mr. Gillen, did you have a witness to

17   call?

18        MR. GILLEN:  Yes, Your Honor.  We would call Brandon

19   Campbell.

20     (Brandon Campbell was sworn.)

21        THE WITNESS:  Yes, I do.

22        COURT DEPUTY CLERK:  Please state your name and spell

23   your first and last name for the record.

24        THE WITNESS:  My name is Brandon Campbell.  It's

25   B-R-A-N-D-O-N; Campbell is C-A-M-P-B-E-L-L.
```

1    **DIRECT EXAMINATION**

2    *BY MR. GILLEN:*

3    *Q.*  Good morning, Mr. Campbell.  How are you?

4    *A.*  Good morning.  Doing well, thank you.

5    *Q.*  I don't believe we have met, have we?

6    *A.*  No, we have not.

7    *Q.*  My name is Craig Gillen and I represent Brian Roberts.  I

8    have some questions for you today.

9    *A.*  Okay.

10   *Q.*  First of all, tell the jury where do you currently work?

11   *A.*  I am currently employed by Tyson Foods.

12   *Q.*  And how long have you worked there at Tyson Foods?

13   *A.*  I have worked at Tyson Foods since 2005.

14   *Q.*  How many roles have you had at Tyson, the different roles

15   that you have had there at Tyson?

16   *A.*  I can't remember the exact number, but in excess of five

17   roles for sure.

18   *Q.*  Have you had any roles involving the pricing of chicken

19   products?

20   *A.*  Yes, I have.

21   *Q.*  Well, tell us about that.  Tell us a little bit about which

22   chicken products you have been involved with in terms of

23   pricing.

24   *A.*  Yes.  So I priced what we call our small bird products,

25   whole bird and bone-in and also dark meat, so I was responsible

Brandon Campbell - Direct

1    for those in our pricing group.

2    Q.  I couldn't -- your last statement sort of fell off a bit.

3    A.  I am sorry, and dark meat, so small bird, bone-in products

4    and dark meat.

5    Q.  Now, what role, if any, do you play in the margin

6    management in pricing unit at Tyson?

7    A.  What did I play?

8    Q.  Yeah.

9    A.  I was responsible for -- in the 2014 period I was

10   responsible for creating the pricing models and updating the

11   pricing to submit to our customers.

12   Q.  How long had you been there in that particular position in

13   2014?

14   A.  I don't remember the exact time, but it was around a year

15   or so in that specific role.

16   Q.  And what specifically was your role there in that pricing

17   unit regarding pricing?

18   A.  So my role was to actually create and update the pricing

19   models and to work with the business units on setting those

20   pricing strategies and what the pricing was to be able to

21   submit to customers.

22   Q.  So let's break this down a little bit.

23   A.  Sure.

24   Q.  So you mentioned the pricing unit.  That's where you

25   worked, correct?

Brandon Campbell - Direct

1   A.   Yes, that is correct.

2   Q.   And then you mentioned the business unit.  Could you tell

3   us what that is, please?

4   A.   Sure.  The small bird business unit was the business unit

5   that was responsible for the profitability of the business, so

6   they actually in the end whenever somebody was accountable for

7   whether or not the business was successful and profitable, that

8   was the business that was held accountable for that.

9   Q.   What role -- how did you interact with the business unit in

10   your capacity of setting prices for chicken products?

11   A.   Sure.  So my role was to set the pricing, but it was in

12   alignment with the strategy from the business unit.  So the

13   business unit would set the margin goals of what they were

14   trying to accomplish from a total business standpoint.  My job

15   was to create the models and to look at what we believed fair

16   market value was, create the pricing, but in the end ultimately

17   the business unit had the final approval on the pricing model

18   because it impacted the P and L directly that they had

19   responsibility for.

20   Q.   So break down a couple things there.  You gave us a lot of

21   information and I appreciate that.

22        You mention margins.  Tell the jury what you mean when

23   you talk about margins in your pricing unit.

24   A.   Yes.  So our business unit would set margin goals around

25   what level profitability that they were trying to accomplish

Brandon Campbell - Direct

1    for the total business, and within that there is different size

2    of birds.  And so there would be margin goals associated with

3    the different size of birds based upon the availability.  So

4    the business unit would set those goals because they were the

5    ones who were setting the financial goals for the year and were

6    ultimately held accountable for the performance of the

7    business, so they would be the ones that set those goals.

8            My job would be to try to understand -- to create the

9    pricing model, look at external markets and set the pricing

10   strategy, but it was in alignment with what the overall goals

11   were that were set by the business unit because in the end they

12   had the ultimate decision rights around whether or not -- what

13   the pricing was.

14   Q.  Do you know what a QSR is?

15   A.  Yes, I am familiar with that term, a quick-service

16   restaurant.

17   Q.  And give us some examples of companies that would fall into

18   the quick-service restaurant, the QSR label.

19   A.  Sure.  Some QSRs that we worked with would be KFC,

20   Popeye's, Church's, customers or clients like that.

21   Q.  Okay.  And would that fall into the area that you had

22   described to us in terms of your responsibility for pricing

23   within the pricing unit?

24   A.  Yes, that was my responsibility to price those accounts for

25   small bird products.

Brandon Campbell - Direct

1   *Q.*  Now, you mentioned when you were describing the pricing

2   unit and the business unit, were those the units within Tyson

3   responsible for pricing chicken products for QSRs or places

4   like Kentucky Fried Chicken and Church's and Popeye's?

5   *A.*  Yes.  The pricing unit along with the business unit were

6   the groups that were responsible for setting the pricing.

7   *Q.*  Who would you communicate with within the business unit to

8   sort of get your marching orders, if that's the fair assessment

9   of what happened?

10  *A.*  Yes, and that is a fair assessment.  And it would be the

11  senior vice-president that was responsible for the business

12  unit.  And then he had a margin management team that was

13  responsible for different groups of products within him.  So it

14  was -- I would work directly with the margin manager for that

15  category, but ultimately the senior vice-president had the

16  ultimate authority on what the pricing was.

17  *Q.*  Okay.  Now, explain to the jury how you went about -- the

18  process of creating pricing models to be submitted to these

19  places like KFC.

20  *A.*  Sure.  So KFC is an example, if I can just walk through

21  that as an example.

22  *Q.*  Sure.

23  *A.*  KFC had a cost-plus model.  And so I would get the request

24  from the sales team that we were going to need to update the

25  model.  I would go in and I would pull -- work with our

Brandon Campbell - Direct

1    accounting team to get the actual cost for the cost-plus model.

2    I would also work with our business unit to understand what

3    those margin goals were that they had for the business.  And

4    then I would also look at external market factors, the

5    Urner-Barry, Georgia Dock, and kind of triangulate, if you

6    will, between here is what the business unit goals were for the

7    profitability.  Here is where we believe the market is.  And

8    then together I put that information together and build a

9    pricing model and update it.

10   Q.  Let's break it down so we can discuss it in a little more

11   detail.

12       So you mentioned the business unit would tell you what

13   the margin goals were; is that right?

14   A.  Yes, correct.

15   Q.  Is that profit margin?  Is that a fair term to use?

16   A.  Yes, profit margin would be a fair term.

17   Q.  So is that step No. 1 that the business unit would then on

18   a specific potential bid like KFC or proposal like KFC would

19   give you a profit margin that they wanted you to hit?

20   A.  They would not give a specific profit margin for that exact

21   customer, but they would give a profit margin goal for their

22   business and for the bird sizes, if you will.  So if a customer

23   fell into that bird size, there would be a correlation between

24   that profit margin knowing that that customer is pulling from

25   that pool of birds, if that makes sense.

Brandon Campbell - Direct

1   Q.  Let's break that down a little bit too.  So you mentioned

2   that the profit margin would apply to particular bird sizes.

3   Is that what you're saying?

4   A.  Yes, correct.

5   Q.  Explain to the jury what you mean when you talk about bird

6   sizes, if you would, please.

7   A.  Sure.  So whenever we target a live weight to grow for --

8   out of a particular complex, the live weights will follow a

9   normal distribution, a normal distribution.  And so depending

10  on where the size is of the bird -- we would usually look at

11  4-ounce increments of bird sizes.  And depending on the

12  availability of that 4-ounce increment in that bell curve would

13  let us know how much supply availability.  So if it was -- on

14  the bell curve if it was a size that didn't have as much

15  availability, there would be a higher profit margin expectation

16  than a bird size where there was more availability on that

17  normal distribution.

18  Q.  Okay.  So this bell curve, would that -- you get a bell

19  curve for, say, for example, small birds; is that fair?

20  A.  Yes.  So you would target a live weight and then there

21  would be a normal distribution or bell curve of the live

22  weights that would come with that bird.

23  Q.  So you mentioned you're going to get some information from

24  the business unit about a profit margin that they want you to

25  hit, right?

Brandon Campbell - Direct

1    A.  Yes, correct.

2    Q.  You mentioned that you would factor in other things other

3    than that.  And you went kind of fast.  Can you tell us some of

4    the things that you're going to be factoring in when you're

5    doing your magic there in the pricing unit?

6    A.  Sure.  So there was the business unit margin goals.  There

7    was also external markets, quoted markets.  Urner-Barry was one

8    of those that we would utilize.  Georgia Dock was another

9    quoted market we would utilize.

10   Q.  Let me pause right there because you mentioned two.

11          So tell the jury what you mean when you're talking

12   about those two entities and how they factored into what you

13   did.

14   A.  Okay.  So there was two quoted markets.  The Urner-Barry

15   was a publicly -- or a quoted market that we would get that had

16   different parts of the bird and it had the market value

17   associated with those.  It would be updated daily.  And the

18   Georgia Dock was similar except for it would be the whole bird

19   or the WOG, and it would be what is the market value.  And I

20   don't remember the frequency it was updated, if it was weekly

21   or monthly, but those are two quoted markets that we would use

22   to have a sense of is the market increasing or is the market

23   decreasing on the commodity market.

24   Q.  So you would take that information.  You mentioned two

25   things now.  You mentioned the profit margin you got from the

Brandon Campbell - Direct

1    business unit, correct?

2    A.  Yes, correct.

3    Q.  Then you have information that you were getting from the

4    outside community or from other sources outside of Tyson about

5    the marketplace itself, correct?

6    A.  Yes, that's correct.

7    Q.  And what other things factored into your analysis for when

8    you end up with your pricing model?

9    A.  The third component would be our track record of wins and

10   losses on previous bids.  And so you take a certain level of

11   pricing you are trying to get for a certain group of products.

12   And then if you were to win that bid or you lose that bid, you

13   use that as a database of information to -- as a third leg to

14   help you understand market value.  So if you continue to take

15   price increases and you are losing every bid, then that tells

16   us that we are too aggressive and that we're pricing our

17   products too high for the market.  So that would be kind of the

18   third component is the track record of wins and losses on bids

19   of other business.

20   Q.  Well, did the sales team tell you what price that you

21   should set for bids to places like KFC?

22   A.  No, the sales team didn't give us the prices.  It was the

23   pricing group's responsibility along with the business unit's

24   responsibility to set the pricing goals.

25   Q.  Once you got the pricing goals after you did your work in

1    the pricing unit in conjunction with the business unit, what

2    did you do then with that information?

3    A.  So once we came up with the information, we would sit down

4    with our sales team and walk through the pricing model or the

5    changes in the price, what's the reason for the price, to

6    prepare them to have the conversation with the customer because

7    the sales team was -- their responsibility was to communicate

8    to the customer and to manage that relationship.

9    Q.  So you mentioned that you would meet with the sales team,

10   and their job was to manage the relationship.  What do you mean

11   by that?

12   A.  So they are the ones who are calling directly on the

13   customer or they're the ones who are going out and visiting the

14   customer's office, having a relationship with them, where they

15   are a trusted partner to the customer was what their role is

16   supposed to be.

17   Q.  Well, let's talk about what the role wasn't supposed to be

18   or wasn't.

19   A.  Okay.

20   Q.  Was their job to set pricing for KFC?

21   A.  No.  The sales team's job was not to set pricing.

22   Q.  Okay.  Now, let's talk a little bit about the KFC matter.

23   And I am going to be focusing questions to you that deal with

24   the year 2014 regarding the KFC bid, okay?

25   A.  Okay.

15

Brandon Campbell - Direct

1   Q.  So we're going to talk about that specifically, that

2   particular matter.

3           What role did the pricing unit have in developing the

4   KFC 2015 pricing model in the summer of 2014?

5   A.  It was the pricing team which was my responsibility to

6   create the pricing model for the KFC in the summer of 2014.

7   Q.  Now, was there someone working with you or were you the

8   individual who was responsible for working up that pricing

9   model in -- for the 2015 KFC contracts?

10  A.  No, it was myself.  I created, updated the model and did

11  all the work associated with the model.  That was my

12  responsibility.

13  Q.  Okay.  When you worked that up, to whom did you communicate

14  on the KFC matter within the business unit?

15  A.  So once I worked up the pricing model in alignment with the

16  BU's margin goals, then I worked with the business unit

17  leaders, which at the time would have been Charlie Solomon,

18  Steven Cullen and Darrell Bowlin.

19  Q.  You mentioned Charlie Solomon.  Who is Charlie Solomon?

20  A.  Charlie Solomon was the senior vice-president of the small

21  bird business unit.

22  Q.  And what was his role in developing the pricing model for

23  KFC?

24  A.  Charlie Solomon was ultimately responsible for the profit

25  and margin, so he had to approve the pricing model that was to

1    be submitted to KFC.  He had the final authority and final say.

2    Q.  So you are the guy who created the model and did the

3    numbers on the model, right?

4    A.  Yes, that is correct.

5    Q.  You then send it to Mr. Solomon for approval?

6    A.  Yes, review it with Mr. Solomon and his team for approval.

7    Q.  And after that approval did that approval come down based

8    upon what your pricing model was for the KFC 2015 contract?

9    A.  Yes.  Mr. Solomon and team approved that pricing model to

10   be submitted.

11   Q.  You say "and team."  Were there others on Mr. Solomon's

12   team involved in that process?

13   A.  Yes.  There was Steven Cullen.  He was responsible for the

14   margin management team within Charlie Solomon's group.  And

15   Darrell Bowlin was the product manager or margin manager

16   specifically responsible for the KFC business, the birds that

17   would have been used for the KFC business.

18   Q.  So you mentioned Mr. Bowlin, correct?

19   A.  Yes, correct.

20   Q.  And you said that he was responsible for the birds that

21   would have been within the KFC contract?

22   A.  Yes, correct.

23   Q.  What do you mean by that?

24   A.  So within Charlie's team he had his team broken up into

25   part responsibilities, so breast meat, dark meat and whole

Brandon Campbell - Direct

1    birds.  So Mr. Bowlin had responsibility for the whole bird

2    products, which is what KFC utilized primarily.

3    Q.   Now, who is Andy Lubert?

4    A.   In this time frame Andy Lubert was a lead for our food

5    service commercial sales.

6    Q.   And who was Joey White?

7    A.   Joey White was my supervisor.  He led the pricing group.

8    Q.   So he was your supervisor.

9    A.   Yes, correct.

10   Q.   Now, what role, if any, did Mr. Bowlin play in developing

11   the pricing model for the KFC bid which took place in 2014?

12   A.   He was responsible -- Mr. Bowlin was responsible for the

13   margin goals of what they were trying to accomplish as a

14   business.  I was responsible for actually creating the model

15   itself.

16   Q.   Do you remember what the target profit margin was for the

17   KFC contract in the early summer of 2014?

18   A.   I do not remember the specific margin target, no.

19   Q.   Now, when you -- you mentioned the profit margin would be

20   determined by -- are you given the profit margin?

21   A.   No.  I am given a margin percentage.

22   Q.   Now, in this pricing model what, if any, role did sales

23   play?  Did they tell you what the profit margin should be or

24   what the price should be?

25   A.   No, the sales did not provide that information.  That was

Brandon Campbell - Direct

1  my responsibility along with the business unit.

2  Q.  I want to show you what has been --

3          MR. GILLEN:  Your Honor, may I approach the witness?

4          THE COURT:  Yes, absolutely.  Ms. Grimm will hand it

5  up.

6          MR. GILLEN:  And if we could see and not to be shown

7  to the jury at this time G-624, if we could put that up,

8  please.

9  BY MR. GILLEN:

10  Q.  Do you have 624 in front of you?

11  A.  Yes, I do.

12  Q.  Now, do you recognize this document?

13          MS. JOHNSON:  I apologize, our screen is not working.

14  If we could see the document.

15          THE COURT:  Yes.

16          MR. LAVINE:  Your Honor, our screen is not working

17  either.

18          THE COURT:  Let's see if Mr. Fronzaglia can problem

19  solve.  We will work on it over lunch with IT.

20          Go ahead, Mr. Gillen.

21          MR. GILLEN:  Thank you, Your Honor.

22  BY MR. GILLEN:

23  Q.  Now, the document in 624, do you recognize that document,

24  Mr. Campbell?

25  A.  Yes, I recognize it.

Brandon Campbell - Direct

1   Q.  Is this a document that was created by you?

2   A.  Yes, this is a document that would have been created by me.

3   Q.  And I want to -- without getting into the contents, I am

4   going to ask you whether or not this was a document created in

5   June of 2014.

6   A.  Yes, this was a document that would have been created in

7   June of 2014.

8   Q.  When you created this document, was this document made at

9   or near the time that it purports to have been made?

10  A.  Yes.  This document would be consistent with the time

11  reflected.

12  Q.  Now, did you personally create this document?

13  A.  Yes, I did personally create this document.

14  Q.  Is this a document that you had -- the information

15  contained herein that you had personal knowledge of?

16  A.  Yes, I have knowledge of the information in this document.

17  Q.  In your capacity in working in the pricing unit, did you

18  have a business duty to convey financial information or pricing

19  models to others within Tyson?

20  A.  To other groups within Tyson?

21  Q.  To other individuals within Tyson.

22  A.  The pricing model I would communicate to both the business

23  unit and to the sales team to communicate to the customer.

24  Q.  So the answer would be yes?

25  A.  The answer would be yes.  Yes, I would have those

20

Brandon Campbell - Direct

1   responsibilities.

2   Q.  And in terms of your communication of that sort of

3   information, was it your habit or practice to communicate such

4   business information electronically through e-mails?

5   A.  Yes.  That was a standard practice to communicate through

6   e-mails.

7   Q.  And the e-mails that you created, the information contained

8   in there, were they accurate to the best of your knowledge?

9   A.  To the best of my knowledge, they were accurate, yes.

10  Q.  This or e-mails generated by you in your capacity within

11  the pricing unit, were they documents that were kept in the

12  normal course of conducted business there at Tyson?

13  A.  Yes.  It was the standard practice for Tyson to retain the

14  e-mails.

15  Q.  And are these the types of information or the type of

16  information that you generated and created in G-624, is that

17  the sort of information that the business of Tyson would rely

18  upon in the conduct of its business activities?

19  A.  Yes.  This is a standard process that we would use to

20  manage our business.

21  Q.  And for the purpose of memorializing or keeping access of

22  the records of how you conducted business, is this the sort of

23  document that you would keep electronically at Tyson for the

24  purpose of conducting Tyson's business?

25  A.  Yes.  These are the types of documents we would keep as a

 1  historical record of conversations regarding pricing or

 2  business.

 3  Q.  And these documents to your knowledge are kept in the

 4  regular course of Tyson's business, correct?

 5  A.  Yes.  To my knowledge they are retained by Tyson.

 6  Q.  And based upon what you see here in the document, would you

 7  say that -- the document's contents and substance and other

 8  distinctive characteristics, would you say that it's fair and

 9  accurate about what you conveyed to others within Tyson back in

10  June of 2014?

11  A.  Yes.  This is a fair representation of what I communicated.

12          MR. GILLEN:  Your Honor, I tender Defendants' 624.

13          THE COURT:  All right.  Any objection to the admission

14  of G-624?

15          MS. CALL:  Hearsay.

16          THE COURT:  Objection will be overruled.  G-624 will

17  be admitted.

18          MR. GILLEN:  Thank you, Your Honor.

19          If we may publish to the jury?

20          THE COURT:  You may.

21  BY MR. GILLEN:

22  Q.  I am going to walk you through this document, Mr. Campbell.

23  Referring to G-624, it is an e-mail -- and that is an e-mail

24  from you; is that accurate?

25  A.  Yes, that's correct.  It's an e-mail from me.

Brandon Campbell - Direct

1   *Q.*  It indicates that it was sent -- well, the top would be

2   June the 9th, 2014; is that correct?

3   *A.*  Yes, that is correct.

4   *Q.*  Are you forwarding an e-mail that you had sent on June the

5   5th of 2014?

6   *A.*  Yes.  I am forwarding a previously sent e-mail on June 5th

7   on June 9th.

8   *Q.*  Now, the information that you are forwarding, it indicates

9   the subject is KFC 2015 Pricing Model.  Is that what this is?

10  *A.*  Yes, that is correct.

11  *Q.*  Is this an accurate description of what this document

12  contains?

13  *A.*  Yes.  That is representative of what the document contains.

14  *Q.*  And it is sent to a number of individuals.  You mentioned

15  Mr. Andy Lubert, correct?

16  *A.*  Yes, correct.

17  *Q.*  And his position at Tyson at that time was what?

18  *A.*  He was over the food service commercial sales.

19  *Q.*  And Mr. Brian Roberts?

20  *A.*  He reported to Mr. Lubert in sales.

21  *Q.*  Charlie Solomon?

22  *A.*  Charlie Solomon was responsible for the small bird business

23  unit.

24  *Q.*  Steven Cullen?

25  *A.*  He reported to Charlie Solomon in the business unit.

 1   Q.   And you've got Joey White?

 2   A.   Joey White was my supervisor in pricing.

 3   Q.   And Mr. Darrell Bowlin?

 4   A.   He was the margin manager on Steven Cullen's team.

 5   Q.   I am going to ask you about some of the information here

 6   and what you meant.  It indicates, "The attached model would be

 7   the proposed model for KFC for 2015 with the following

 8   assumptions:  This equates to $0.19/lb price increase when you

 9   do an 'apples-to-apples' comparison."

10        Is that a correct reading?

11   A.   Yes, that is correct.

12   Q.   And is the 19 cents the profit margin that you were

13   shooting for here?

14   A.   From this I can't speak to what the profit margin is, but

15   that's the increase in price that we were asking for.

16   Q.   Now, this was generated by whom?

17   A.   This document was generated by me.

18   Q.   And the purpose of your sending it to all these other

19   gentlemen is what reason?

20   A.   It is communicating the pricing model that I worked up and

21   that we were going to be submitting out to KFC.

22   Q.   Okay.  Now, at this stage had you already received the

23   approval from the business unit regarding this model?

24   A.   I do not remember the timing on whether or not I already

25   had approval at this point, but it is fair to say that I would

Brandon Campbell - Direct

1   not have communicated this model out to this team without the

2   business unit's approval.

3   Q.  Now, when we say the 19 cents, when we talk about an

4   increase, do you remember why there was going to be an increase

5   in the price to KFC?

6   A.  Yes.  The small bird business unit was not a profitable

7   business, so the entire business was looking to change the

8   profit level of the small bird business unit.  So the request

9   or the direction from the business unit was to expand our

10  margins on our small bird business unit to be able to get to a

11  more sustainable profit margin.

12  Q.  This document was created by you in June of 2014, correct?

13  A.  Yes, that is correct.

14  Q.  Now, at that time was there even a request by RSCS on

15  behalf of KFC for any sort of proposal for the 2015 contracts,

16  if you know?

17  A.  I don't remember if there had been any conversations with

18  RSCS or not at that time.

19  Q.  But what we do know is that you in June of 2014 created

20  this model, correct?

21  A.  Yes, that is correct.

22  Q.  You say that there are following assumptions.  Can you

23  explain to us what you mean by these following assumptions?

24  A.  Sure.  Just walk through those?

25  Q.  Yes, please.

Brandon Campbell - Direct

1   A.  So the bird size is the size of the WOG or without giblets,

2   the size of the bird we would be using to fulfill the KFC

3   volume.  The marination profile to the right of it is the

4   product.  25119-928, that's the product code that we were using

5   to represent what the marination profile and cost would look

6   like.  The marination level is the amount of marination that

7   would be injected into the bird up to 12 percent.  No moisture

8   drain-back tare and no marination tare was a change in the

9   model where we were requesting to no longer tare out the

10  moisture or marination in the proposed model.

11  Q.  Let's break that down and explain to the jury what we mean

12  by some of these terms.

13  A.  Okay.

14  Q.  When you are talking about the marination level, tell the

15  jury what we mean by that.

16  A.  Okay.  So you have a -- just a base chicken, a WOG, that

17  has -- you know, it's been processed and there is nothing else

18  that's been done to it.  Whenever you inject it with

19  marination, it's how much marination pickup is allowed in that

20  product.  So each customer would have a level of how much

21  marination that you were able to put into the product.  So up

22  to 12 percent was KFC's requirement around how much marination

23  they expected to be injected into the product.

24  Q.  Is marination something that Tyson wanted to get paid for

25  or not?

Brandon Campbell - Direct

1  *A.*  As a general statement, Tyson would want to be paid for

2  marination for all of our products.

3  *Q.*  Why?

4  *A.*  It's part of the profit margin.  It increases the bird size

5  and the case weight, so in turn it increases the profit margin.

6  *Q.*  Marinated bird, weighs more, more money.

7  *A.*  Yes, that is correct.

8  *Q.*  You have down here "No moisture drain-back tare."  Could

9  you explain to the jury what you meant by no moisture

10  drain-back tare, please.

11  *A.*  Yes.  So -- and I can't go into the specific details

12  because I don't remember, but I can speak at a high level.  The

13  moisture drain-back tare was a process of whenever a WOG or a

14  bird goes through a chiller, which is when they are being

15  cooled down, they gain moisture through that process because

16  they're being cleansed in a big vat of water.  In that process

17  they gain moisture.  And then there is a period of time where

18  that moisture retention will come back out of the bird.  And so

19  what KFC had was a drain-back tare where they would ask for a

20  certain amount of product weight to be tared out to account for

21  that drain-back out of the moisture pickup through the chilling

22  process.

23  *Q.*  Is the term "tare" just a fancy word for saying that they

24  want to subtract from the weight in the box so that they are

25  going to end up paying less for that box?

Brandon Campbell - Direct

1   A.   Yes.   It subtracts the amount of weight in the box that

2   they would be paying for.

3   Q.   And did Tyson want to be paid for the weight in the box or

4   not the weight of the moisture in the box?

5   A.   Tyson would like to or desire to be paid for the moisture

6   in the box.

7   Q.   So this is what you did in June.   And do you remember how

8   you came up with the 19 cents?

9   A.   No, I do not remember the specific details.

10  Q.   I would like to show you without showing the jury what you

11  have in front of you as G-521, please.

12          Do you recognize that document?

13  A.   Yes, I recognize the document.

14  Q.   Is this a document that was created by you?

15  A.   Yes, this is a document that I created.

16  Q.   Is there a date on this document?

17  A.   Yes, there is a date on the document.

18  Q.   When you generated or created this document, did you do so

19  on the date that is reflected on the document, 521?

20  A.   Yes, the date reflects the time that it was created.

21  Q.   Was this document made at or near the time it purports to

22  have been made, which would be June the 19th, 2014 at 20:40?

23  A.   Yes, that would be a correct representation of when it was

24  created.

25  Q.   Now, you mentioned this document was a document created by

Brandon Campbell - Direct

1   you, correct?

2   *A.*   Yes, that is correct.

3   *Q.*   Is this a mechanism of wherein you would electronically

4   seek to give direction to individuals within Tyson about taking

5   certain matters or taking certain business actions reflective

6   of your work in the business model?

7   *A.*   Yes.  This is a means of communication around what the

8   expectations were coming out of my work.

9   *Q.*   And in your capacity in the pricing unit, did you have a

10  business duty to generate electronic directions to others

11  within Tyson in order that they may carry out the business of

12  Tyson effectively?

13  *A.*   Yes.  That was my responsibility.

14  *Q.*   Now, did you -- your means of communication with others

15  within Tyson, was that solely or principally through electronic

16  e-mails and other electronic data communication?

17  *A.*   Electronic data communication was one method of

18  communication.  It was not the only method.

19  *Q.*   Now, here, is this the sort of document that would be kept

20  within Tyson in the regular course of Tyson's business?

21  *A.*   Yes, it is.

22  *Q.*   And be relied upon by others within Tyson to effectuate the

23  business duty of carrying on Tyson's -- the work and business

24  of Tyson?

25  *A.*   Yes, that is correct.

Brandon Campbell - Direct

1    Q.  And was this e-mail generated as a communication that was

2    kept in the general practice of Tyson's regularly conducted

3    businesses activities?

4    A.  Yes, it was.

5    Q.  And are these documents such as this maintained and

6    shared -- excuse me, stored and maintained at Tyson?

7    A.  Yes, they are.

8    Q.  And based upon this, the contents that you have observed

9    here in your creation of this, does this document accurately

10   reflect directions that you gave to others concerning this

11   business model?

12   A.  Yes, it is accurate.

13        MR. GILLEN:  Your Honor, I would move for the

14   admission of G-521.

15        THE COURT:  Any objection to the admission of G-521?

16        MS. CALL:  Hearsay, and at the least certainly not a

17   business record.

18        THE COURT:  The objections will be overruled.  G-521

19   will be admitted.

20        MR. GILLEN:  Thank you, Your Honor.

21        If we could publish G-521, please.

22        THE COURT:  You may.

23   BY MR. GILLEN:

24   Q.  Now, again this is an e-mail, is it not, Mr. Campbell?

25   A.  Yes, that is correct.

Brandon Campbell - Direct

1  Q.  Generated by you?

2  A.  Yes, that is correct.

3  Q.  On June the 19th, 2014.

4  A.  Yes, that is correct.

5  Q.  Did you send this to Brian Roberts?

6  A.  Yes.

7  Q.  What was the subject matter of this e-mail communication?

8  A.  It was the KFC 2015 Pricing Model.

9  Q.  "And I want to ask you what you meant reading from 521,

10  Brian, this is where we want to be with KFC for next year.  Let

11  me know if you have any questions, or would like to discuss

12  further.  Thanks, Brandon."

13        Correct?

14  A.  Correct.

15  Q.  That was an e-mail to Mr. Roberts on the sales team,

16  correct?

17  A.  Yes, that is correct.

18  Q.  Are you telling him in this e-mail that this model that you

19  have forwarded to him is where Tyson wanted to be with KFC for

20  the 2015 KFC contract?

21  A.  Yes, it is.

22  Q.  Now, when you're generating or you're communicating this

23  information to sales, are you asking them or are you telling

24  them, "This is the model.  If you got any questions, give me a

25  call"?

Brandon Campbell - Direct

1   *A.*   No, I am telling them.

2   *Q.*   You are telling them, right?

3   *A.*   Yes, that is correct.

4   *Q.*   And you told Mr. Roberts that this is where Tyson needed to

5   be or wanted to be on the KFC contract for 2015.

6          *MS. CALL:*   Objection, hearsay and leading.

7          *THE COURT:*   Sustained as to leading.

8   *BY MR. GILLEN:*

9   *Q.*   So again the purpose of your telling -- or sending this to

10  Mr. Roberts was what?

11  *A.*   The purpose of me sending this to Mr. Roberts was to

12  communicate what the pricing model was for 2015 and what the

13  expectations were for him to communicate to the customer.

14  *Q.*   Now, I would like to have you look at what has been marked

15  as G-824, please.

16          Do you have 824 in front of you?

17  *A.*   Yes, I do.

18  *Q.*   I would like to focus you on the middle of 824 and ask you

19  if you recognize that e-mail.

20  *A.*   Yes, I do.

21  *Q.*   Was this e-mail generated by you?

22  *A.*   Yes, it was generated by me.

23  *Q.*   Was it generated by you in the normal course of your

24  business within the pricing unit?

25  *A.*   Yes, it was.

Brandon Campbell - Direct

1   Q.  Is there a date on the date in which you sent or generated

2   the e-mail in the middle of 824?

3   A.  Yes, July 9th.  There is a date.

4   Q.  And it is being sent to individuals within Tyson; is that

5   correct?

6   A.  Yes, that is correct.

7   Q.  Now, when you generated this, did you generate this

8   information in response to any inquiry from individuals within

9   the business unit about the KFC offer or the KFC proposal?

10  A.  Yes.  This was a response from a request from Charlie

11  Solomon.

12  Q.  Now, your e-mail was sent in response to a business e-mail

13  that you got from someone else?

14  A.  Yes, that is correct.

15  Q.  And who was that?

16  A.  It was from Charlie Solomon.

17  Q.  Earlier you told the jury who Charlie Solomon was as it

18  relates to the KFC 2015 proposal.  Could you remind us again

19  who he is?

20  A.  Sure.  So Charlie Solomon is the senior vice-president over

21  the small bird business unit.  He was responsible for that

22  business.

23  Q.  Now, this communication that you received from Mr. Solomon

24  and that you responded to Mr. Solomon, is that the sort of

25  electronic communications within Tyson that you had a business

Brandon Campbell - Direct

1   duty to conduct in order to communicate effectively about

2   information for Tyson to carry on its business?

3   A.  Yes.  This is how we would -- a method we would use to

4   communicate.

5   Q.  And was this the typical way in which you would communicate

6   and respond to electronic communications from Mr. Solomon in

7   the business unit?

8   A.  Yes.  This was typical.

9   Q.  Was this 824 an example of something that was typically

10  created by employees at Tyson to communicate effectively

11  electronically about Tyson's business?

12  A.  Yes, it is.

13  Q.  Was this document, 824, kept in the normal course of

14  Tyson's regularly conducted business activities?

15  A.  Yes.

16  Q.  And were the e-mails generated as a regular business

17  practice of Tyson in terms of its business activities?

18  A.  Yes.

19  Q.  Are these communications stored and maintained by Tyson as

20  business records?

21  A.  Yes, they are.

22  Q.  And based upon this document's contents and substance,

23  would you say that this document appears to be what -- is what

24  it appears to be?

25  A.  Yes.  It looks to be reflective of what the content is.

1          MR. GILLEN:  Your Honor, I would tender G-824, please.

2          THE COURT:  Any objection to the admission of G-824?

3          MS. CALL:  Yes, Your Honor, hearsay.  There is three

4    different people's statements here, not a business record, and

5    the top e-mail at least, I don't see an exception to that.

6          THE COURT:  Response?

7          MR. GILLEN:  Your Honor, it is a business record in

8    that there is a business inquiry to the witness, Mr. Campbell,

9    and he is responding to that specific inquiry.  So we would

10   submit that it is a business record and all of it should be a

11   business record.  If the Court believes that the top e-mail,

12   which is a one-sentence response by Mr. Solomon, that's not

13   really why I am introducing it.  I think the whole thing is a

14   business record.  I would ask that it all be cut in, but I

15   don't really have much heartburn over redacting that top

16   sentence.

17         THE COURT:  All right.  The objection will be

18   sustained in part.  The White e-mail that begins this is

19   clearly hearsay information and would have been to be redacted.

20   The next e-mail from Mr. Solomon which requests information

21   is -- can be admitted, but not for the truth of the matter

22   asserted, but rather for the effect on the listener.

23   Mr. Campbell's response to that, I overrule the objection.

24   It's not hearsay.  He has got personal knowledge.  The Solomon

25   e-mail at the very top is also hearsay and would have to be

Brandon Campbell - Direct

1   redacted.

2           MR. GILLEN:  Are we electronically capable of doing

3   the redaction the Court has directed as it relates to the top

4   of G-824 so that we may publish it now?

5           THE COURT:  And just to be clear, Mr. Solomon's e-mail

6   that Mr. Campbell is responding to is admissible, but not for

7   the truth of the matter asserted.  It was just whited out.  No,

8   that's too much.  And then the next page.  So that one page as

9   shown right now on the screen is admissible, but not

10  Mr. Solomon's e-mail for the truth of the matter asserted.

11          Is that what you want to tender, Mr. Gillen?

12          MR. GILLEN:  Yes, that's fine.  And if I understand

13  the Court's direction, we would then redact out the top, the

14  one sentence that is right at the top?

15          THE COURT:  Yes, as well as the header too.  As

16  currently it's fine right now as you are showing it to the

17  Court on the screen.  And the second page would need to go as

18  well.

19          MR. GILLEN:  So the second page of 824 is out and is

20  not a part of the admitted --

21          THE COURT:  That's correct.

22          MR. GILLEN:  Thank you, Your Honor.

23          THE COURT:  And as admitted, that may be displayed to

24  the jury.

25          Ladies and gentlemen, as you'll see in just a second,

Brandon Campbell - Direct

1    the statement of Mr. Solomon, the e-mail from Mr. Solomon can

2    be considered, but not for the truth of the matter asserted,

3    but rather just for the effect on Mr. Campbell who responds to

4    it.

5         MR. GILLEN:  Thank you.  If we may publish to the

6    jury, and then I have some questions to ask you about the

7    e-mail.

8         THE COURT:  You may.

9    BY MR. GILLEN:

10   Q.  I want to ask you to what you responded from Mr. Solomon.

11   Do you see there where it says, "I need your help on a report"?

12   A.  Yes, I see that.

13   Q.  Again, Mr. Solomon is within the business unit; is that

14   correct?

15   A.  Yes, that is correct.

16   Q.  "Need a brief description of our pricing proposal to KFC,"

17   correct?

18   A.  Correct.

19   Q.  Is that a reference to the KFC proposal that you had been

20   telling us about earlier concerning the bid for the 2015

21   contract?

22   A.  Yes.  This would be in reference to that.

23   Q.  2. "Need to show margin current vs. planned with new

24   increase."  Do you see that?

25   A.  Yes, I see that.

Brandon Campbell - Direct

1   *Q.*  Again, margin is the profit margin, correct?

2   *A.*  That is correct.

3   *Q.*  "Need a revised priorities report that shows two columns,

4   current and future with new KFC pricing in place.  Keep all

5   other customer pricing as is." And then, "Need by noon if

6   possible."

7          Correct?

8   *A.*  Yes, that is correct.

9   *Q.*  Mr. Solomon kind of put a little time pressure on you,

10   didn't he?

11   *A.*  He did.

12   *Q.*  Let's go up to where you respond.  And this takes place on

13   July the 9th, 2014.  Is that the date that's generated, is that

14   an accurate date that was generated on this e-mail?

15   *A.*  Yes, that is correct.

16   *Q.*  Again you say, "Attached is the new priority spreadsheet

17   (NTGW only)."  What does NTGW mean?

18   *A.*  NTGW stands for net green weight.  It was a way we looked

19   at an apples-to-apples comparison around the price of like

20   items across other customers.

21   *Q.*  Okay.  Let's go down to the second paragraph here.  You

22   have, "KFC's pricing proposal is," and then it's got,

23   "$0.045/lb increase on a per pound basis. However, we are

24   requiring KFC to pay for all of the product in the case which

25   means that we will no longer apply a moisture or marination" --

1    is that pronounced "tare"?

2    *A.*   Tare, yes.

3    *Q.*   That's the part about subtracting out, right?

4    *A.*   Yes, that is correct.

5    *Q.*   "When you take into account the 7.5" -- is that 7.5 cents?

6    *A.*   7.5-pound.

7    *Q.*   7.5 cents per pound?

8    *A.*   No.  It says, "7.5 lb case weight increase."

9    *Q.*   Okay, "increase per case that we will be invoicing for

10   (with the same head)," and then it says, "the true price

11   increase is $0.19."  Do you see that.

12   *A.*   Yes, I see that.

13   *Q.*   So when you say in the phrase that you have here "the true

14   price increase," what do you mean -- tell the jury what you

15   mean by, the true price increase is $0.19."

16   *A.*   So KFC paid for their product by the case and so there was

17   two components of the price increase.  There was a per-pound

18   price increase, which is the approximate 4-1/2 cent per-pound

19   increase, but then there was also a request to increase the

20   case weight.  So the per pound with the increased case weight

21   would take the entire price up.  If you compared it apples to

22   apples, it would be a 19-cent per pound effective increase that

23   they would be getting because they were not only paying for

24   more per pound, they would be paying for more actual product in

25   the box as well.

39

Brandon Campbell - Direct

 1   *Q.*  So did you meet your noon deadline on that?

 2   *A.*  Looks like I missed it by six minutes.

 3   *Q.*  Six minutes.  Anyway, you did a good job.  Let's now move

 4   on.

 5        So this was you sending -- responding to Mr. Solomon

 6   in the business unit, right?

 7   *A.*  Yes, that is correct.

 8   *Q.*  Now I want to move forward and I want to move into August

 9   of 2014.  And I want to show you some documents that have

10   already been admitted into evidence.

11        MR. GILLEN:  Your Honor, I will be showing the witness

12   1190 and 1191.

13        THE COURT:  Yes.  And both have been admitted and may

14   be published.

15        MR. GILLEN:  If we could publish 1190.

16   BY MR. GILLEN:

17   *Q.*  1190 is an e-mail from Mr. Roberts to Mr. Eddington on

18   August the 11th, 2014.  Do you see that?

19   *A.*  Yes, I see that.

20   *Q.*  It says, "I think this is the model you need for

21   comparison.  What do you think the possibility is that we can

22   get some level of commitment on what you want to do by the end

23   of the week?"

24        Do you see that?

25   *A.*  Yes, I see that.

Brandon Campbell - Direct

1   Q.  Now if you will turn to 1191 and I'd ask you to examine

2   this model that was sent and confirm that that was a model

3   generated by you or your pricing unit.

4   A.  Yes, this is a model that would have been generated by me

5   in the pricing group.

6   Q.  Is this sort of the model that you had been working on back

7   in June of 2014?

8   A.  Yes.  This is an iteration of that model.

9   Q.  Okay.  So again this model wasn't generated or created by

10  Brian Roberts, was it?

11  A.  No.  This model would have been created from me in the

12  pricing group.

13  Q.  And the pricing group sends these models to Mr. Roberts and

14  tells him to deliver the message to KFC, right?

15          MS. CALL:  Objection, leading.

16          THE COURT:  Sustained.

17  BY MR. GILLEN:

18  Q.  What role, if any, once the model is generated does someone

19  from sales have regarding communicating the model to KFC

20  through RSCS?

21  A.  The responsibility of sales was to take the model and to

22  communicate it to RSCS.

23  Q.  Now, I want to ask you a little bit about this model

24  because in this model we have a -- on Page 2 we've got margin

25  of 16 cents; is that right?

Brandon Campbell - Direct

1   A.   Yes, that's correct.

2   Q.   In your model that you sent in, does your model contain the

3   marination that Tyson wanted and the subtraction from the --

4   not putting in the subtraction on the moisture, the 48-hour

5   tare?

6   A.   Yes.  It included the removal of the 48-hour tare, as well

7   as 110 percent marination yield.

8   Q.   So we've got that, but under your model the money that KFC

9   would be paying would be a little bit more because you are

10   going to have the marination and you are not going to be

11   subtracting for the moisture, right?

12         MS. CALL:  Objection, leading.

13         THE COURT:  Overruled.  He can answer if he

14   understands.

15   A.   Could you restate the question?

16   BY MR. GILLEN:

17   Q.   I'll do my best.

18   A.   I'm sorry.  I am just trying to make sure I understand the

19   question properly.

20   Q.   This model that you had sent to KFC, this model would have

21   Tyson being paid for the extra weight of the marinated chicken,

22   right?

23   A.   Yes, that is correct.

24   Q.   And would it -- and what you also indicated earlier is

25   there wouldn't be any subtraction for the moisture that -- the

42

Brandon Campbell - Direct

1    48-hour moisture tare; is that true?

2    A.   It would be asking -- the proposal that we were looking at

3    is asking to include the marination and it's asking to remove

4    the drain-back tare, so both of those components would have

5    been factors in this model.

6    Q.   So would that have Tyson being paid more money for chicken

7    than without the marination and without subtracting from the

8    48-hour tare?

9    A.   Yes, yes.  It would result in the case weight being higher

10   which would result in a higher price for the case.

11   Q.   Now, I am going to ask you, you know, whether your

12   recollection is whether KFC through RSCS, whether they accepted

13   that unique model or that model that you had created regarding

14   the 48-hour tare and the marination.  Did they accept that?

15   A.   No, KFC did not accept it.

16   Q.   So KFC says no.  Is that your recollection?

17   A.   Yes, that is correct.

18   Q.   Now, does the sales group come back to the pricing unit and

19   the business unit to figure out what to do next?

20   A.   The sales team comes back to the pricing group to give the

21   customer's response that no, KFC won't accept it.  So then

22   myself and the business unit have to restructure the pricing

23   model to be able to account for that change that KFC won't

24   accept.

25   Q.   Okay.  And so I want you to take a look, if you would, at

Brandon Campbell - Direct

1    Tab G-570.  I am going to ask you to focus on the middle of the

2    document, G-570, and ask you if you recognize that e-mail.

3    A.   Yes, I recognize it.

4    Q.   Is that an e-mail that was generated by you?

5    A.   The bottom portion of the e-mail was generated by me.

6    Q.   And the date of the e-mail is August the 21st.  Is that

7    when you generated this e-mail?  Is that the time that you

8    generated it?

9    A.   Yes, that is.

10   Q.   And so your e-mail was generated or was it generated at or

11   near the time it purports to have been made?

12   A.   Yes.

13   Q.   Are you the individual who created this document?

14   A.   The bottom portion, yes.

15   Q.   Yeah.  And in your capacity that you described to us as in

16   the pricing unit, was it your business duty to convey to others

17   what the offer would be to KFC after their declination on the

18   marination and the 48-hour tare?

19   A.   Yes.

20   Q.   I am sorry, I couldn't hear.

21   A.   Yes.

22   Q.   In that respect was it your business duty to communicate

23   the Tyson position regarding the response to KFC on the 2015

24   proposal?

25   A.   Could you restate the question?

Brandon Campbell - Direct

1    *Q.*  I will redo it.

2          Was it your job to then respond back to individuals

3    within the sales unit to tell them what would need to be done

4    in response to the KFC denial of the marination and the 48-hour

5    tare?

6    *A.*  Yes.  That was my responsibility to come back with a

7    revised model around what we would need from a pricing

8    standpoint in response to KFC's request.

9    *Q.*  Was it a part of your business duty in conducting Tyson's

10   daily business opportunities to generate such directions to

11   other members of Tyson such as the sales unit?

12   *A.*  Yes, it was.

13   *Q.*  Was this sort of e-mail something that was kept in the

14   normal course of Tyson's business?

15   *A.*  Yes.

16   *Q.*  And is it something that Tyson, you and others at Tyson

17   would rely upon in the conducting of Tyson's everyday business

18   activities?

19   *A.*  Yes.

20          *MR. GILLEN:*  Your Honor, I would tender G-570.

21          *THE COURT:*  Any objection to the admission of G-570?

22          *MS. CALL:*  Just that the top e-mail is hearsay.

23          *THE COURT:*  Response?

24          *MR. GILLEN:*  Your Honor, we would indicate or we would

25   argue that the top portion of 570 should be admitted as well

Brandon Campbell - Direct

1    because it is reflective of the state of mind of the individual

2    who sent that e-mail, and therefore it should be admitted in

3    that respect.  It shows the state of mind of the sender of the

4    response back from Mr. Campbell when he sent out the directive.

5              THE COURT:  The government's objection will be

6    sustained.  It does not show state of mind, but Mr. Campbell's

7    e-mail which constitutes the lower half of the document is

8    admissible.  So if the document is redacted to remove

9    Mr. Roberts' e-mail, G-570 will be admitted.

10             Mr. Gillen, did you want to do that?  Did you want to

11   offer it in that fashion?

12             MR. GILLEN:  Yes, I do.  I offer 570 in that redacted

13   form pursuant to the Court's directions.

14             THE COURT:  That is admitted and it may be displayed.

15             MR. GILLEN:  Thank you, Your Honor.

16   BY MR. GILLEN:

17   Q.  Now, 570, Mr. Campbell, is this an e-mail sent by you?

18   A.  Yes, it is.

19   Q.  And to whom was it sent?

20   A.  It was sent to Brian Roberts and Tim Mulrenin.

21   Q.  Were others copied on this e-mail?

22   A.  Yes, Charlie Solomon, Steven Cullen, Darrell Bowlin and Tim

23   Scheiderer.

24   Q.  I believe you have identified for the jury all of the

25   individuals with the exception I am not sure that you did Tim

Brandon Campbell - Direct

1   Scheiderer.  Who is he?

2   A.  Tim Scheiderer was on the sales team.  He was a support to

3   the commercial team that he would help with bid requests and

4   customer requests, so he was support to the sales team.

5   Q.  So what you're saying here, Subject:  KFC Pricing Updated.

6   What did you mean by pricing updated?

7   A.  It would have been updated based on the latest changes in

8   the model.

9   Q.  So is this a situation where back it goes to you and you

10  take in the factors of the rejection from KFC on the proposal

11  from Tyson on the marination and the 48-hour tare, and you

12  generate another model?

13  A.  Yes, that is correct.

14  Q.  And did you do that in this case?

15  A.  Yes, I did.

16  Q.  And did you send the information to the sales team in order

17  for them to follow through or carry out the directives of Tyson

18  in response to making the proposal to KFC?

19         MS. CALL:  Objection, leading.

20         THE COURT:  Sustained.

21  BY MR. GILLEN:

22  Q.  What was the purpose in your sending this e-mail to

23  Mr. Roberts?

24  A.  I sent the e-mail to Mr. Roberts and Mr. Mulrenin for them

25  to communicate to KFC.

47

Brandon Campbell - Direct

1   Q.  So you wanted this to go to KFC, correct?

2   A.  This was the updated pricing model, yes.

3   Q.  Let's read what it says.  "Attached is the updated pricing

4   model for KFC which accounts for leaving the current marination

5   tare in place."

6         Again, we've gone over this a little bit, but just

7   explain that sentence.  What are you saying here?

8   A.  It is continuing to tare out the marination so that would

9   drop the case weight rather than the proposed case weight

10  increase.

11  Q.  And then "The marination percentage has been dropped to

12  100 percent," correct?

13  A.  Yes, correct.

14  Q.  What do you mean by that, dropping it to 100 percent?

15  A.  That would have the same effect.  It's dropping the case

16  weight.  You are taring out that moisture percentage or the

17  marination percentage.

18  Q.  Did the earlier model that you had have marination at

19  110 percent?

20  A.  Yes, that is correct.

21  Q.  So here it's going back to 100 percent.  In addition, the

22  margin has been increased to 19 cents per pound, correct?

23  A.  Yes, correct.

24  Q.  And that's the profit margin correct?

25  A.  Yes, profit margin.

Brandon Campbell - Direct

1    Q.  Which delivers the same case price as was originally

2    presented, correct?

3    A.  Yes, correct.

4    Q.  What do you mean when you say this delivers the same case

5    price which was originally presented?

6    A.  It is going in and from the original model we had to change

7    the mechanics of the model because of the marination change and

8    the moisture drain-back change, but the actual case price is

9    the same case price that KFC would be requested to pay.

10   Q.  So this margin of 19 percent is kind of where you started

11   out at the beginning, but now you're back to it after the

12   change, right?

13   A.  Yes, just in a different format in the model.

14   Q.  If you could look at G-467.  And I'll ask you if you

15   recognize the document in G-467.

16   A.  Yes, I do.

17   Q.  This was a document that was generated or created by you?

18   A.  Yes, it was.

19   Q.  Is the date on the document an accurate date on the date --

20   on or about the date that you generated this document?

21   A.  Yes, it is.

22   Q.  Is this an e-mail that was generated by you in the normal

23   course of activity for Tyson?

24   A.  Yes.

25   Q.  Was this generated, this e-mail, generated as part of your

Brandon Campbell - Direct

1   business duties to convey information regarding the pricing

2   model on KFC?

3   *A.*   Yes.

4   *Q.*   And was it generated to others within Tyson so that they

5   would have knowledge of where we were on the KFC model for

6   2015?

7   *A.*   Yes.

8   *Q.*   Was this e-mail something that was kept in the ordinary

9   course of Tyson's business?

10  *A.*   Yes, it was.

11  *Q.*   And was it generated, this e-mail generated in the regular

12  practice that you had within the pricing unit to conduct as a

13  business duty your activities on behalf of Tyson and their

14  business activities?

15  *A.*   Yes, this was.

16          *MR. GILLEN:*   Your Honor, we would tender G-467.

17          *THE COURT:*   Any objection to the admission of G-467?

18          *MS. CALL:*   No.

19          *THE COURT:*   G-467 will be admitted.

20          *MR. GILLEN:*   If we could publish this, please.

21          *THE COURT:*   You may.

22  *BY MR. GILLEN:*

23  *Q.*   Is this an e-mail you sent on September the 25th of 2014?

24  *A.*   Yes, it is.

25  *Q.*   And there are a number of people you sent it to.  Tim

50

Brandon Campbell - Direct

1   Scheiderer I believe you have identified, correct?

2   A.   Yes, correct.

3   Q.   Mr. Bowlin, correct?

4   A.   Correct.

5   Q.   Mr. Cullen, correct?

6   A.   Correct.

7   Q.   Mr. Mulrenin, correct?

8   A.   Correct.

9   Q.   Mr. Pepper?

10  A.   Correct.

11  Q.   Mr. Roberts?

12  A.   Correct.

13  Q.   Charlie Solomon?

14  A.   Correct.

15  Q.   Amanda Craig, I don't believe you identified her.  What was

16  her role there at Tyson?

17  A.   She was in margin management under Steven Cullen.

18  Q.   And in this document you indicate that, "Attached is the

19  final KFC pricing model which includes segment pricing" and

20  "Here are a few highlights of the pricing changes."

21          Did you generate this and write this up?

22  A.   Yes, I generated this.

23  Q.   The first bullet says, "Increased margin from $0.1681 to

24  $0.1931."  Do you see that?

25  A.   I see that, yes.

1    *Q.*  And is that a reference to the profit margin that would be

2    increased up to 19 cents -- 19.31 cents?

3    *A.*  Yes.  It's a reference to the profit margin, yes.

4    *Q.*  And so you indicated in the last e-mail that we discussed

5    on the 19-cent margin that essentially here it's a tad bit more

6    than the 19-cent margin by .31 cents, right?

7    *A.*  Yes, yes.  It's .1931 versus the .19.

8    *Q.*  And this was the direction -- or excuse me, strike that.

9         Was this e-mail your direction to the individuals

10   involved in the KFC -- the proposal of what the final Tyson

11   price would be?

12   *A.*  Yes.  This was submitting what is the final pricing model

13   for KFC.

14        *MR. GILLEN:*  And then I believe we have -- If we can

15   have 10-4.  I think what I am looking for is 10-4.

16   *BY MR. GILLEN:*

17   *Q.*  And this is a spreadsheet.  It's not in your binder.

18   Sorry, Mr. Campbell.

19        Indicated here do you see there where it says that the

20   margin for the 2015 for Tyson is .1931?

21   *A.*  Yes, I see that.

22        *MR. GILLEN:*  I am sorry, Your Honor.  Can we publish

23   it to the jury?  10-4 is in evidence.

24        *THE COURT:*  Everyone agree?  I didn't have that marked

25   down, but okay, yes, you may.

Brandon Campbell - Direct

1   *BY MR. GILLEN:*

2   *Q.* And here we see, Mr. Campbell, on this government exhibit

3   that the margin for Tyson for the final 2015 contract price is

4   .1931, correct?

5   *A.* Correct.

6   *Q.* Which is the number that you had in your last e-mail that

7   we went over, right?

8   *A.* Yes, that is correct.

9   *Q.* One quick question I had. We are going to move away from

10  the KFC 2015 for just a second.

11          Were you involved at all in the Chick-fil-A never

12  antibiotics ever, NAE?

13  *A.* I was involved in the conversations. I didn't have direct

14  responsibility for the model, but I was involved in the

15  conversations.

16  *Q.* Was that -- the pricing or whatever that was proposed to

17  Chick-fil-A, was that done by the pricing unit or was it done

18  by the sales unit?

19  *A.* It was done by the pricing team, my partner in pricing.

20          *MR. GILLEN:* Your Honor, if I may have just a moment.

21          *THE COURT:* Yes, you may.

22          *MR. GILLEN:* Thank you. Whenever you ask whether

23  there is a few more questions, there always is. Just a few

24  more.

25  *BY MR. GILLEN:*

Brandon Campbell - Direct

1   Q.  We have never met before, have we?

2   A.  No, not before today.

3   Q.  First time I spoke to you is when I began asking you

4   questions earlier, correct?

5   A.  Yes, that is correct.

6   Q.  But you have spoken with the government, haven't you?

7   A.  Yes, I have.

8           MS. CALL:  Objection, leading.

9           THE COURT:  Overruled.

10  BY MR. GILLEN:

11  Q.  You have spoken with the government, haven't you?

12  A.  Yes, I have.

13  Q.  And you spoke with them on how many occasions?

14  A.  Two occasions that I can remember.

15  Q.  Okay.  One back in 2020?

16  A.  Yes, that is correct.

17  Q.  And the other when?

18  A.  Yesterday.

19  Q.  Now, one additional question.  In terms of communication, I

20  think you mentioned location earlier.  Was Mr. Roberts and

21  Mr. Mulrenin and Mr. Pepper, were they working in the same

22  office or did they have different offices?

23  A.  They had different offices.

24  Q.  Did they work in the same state or did they work in

25  different states?

Brandon Campbell - Cross

1   A.   Different states.

2   Q.   Did they work in actually different regions of the country?

3   A.   Yes, different regions.

4        MR. GILLEN:   That's all I have.   Thank you.

5        THE COURT:   Thank you, Mr. Gillen.

6        Cross-examination by defendants, other defendants?

7        All right.   Cross-examination by the United States?

8                         **CROSS-EXAMINATION**

9   BY MS. CALL:

10  Q.   Good morning, Mr. Campbell.

11  A.   Good morning.

12  Q.   All right.   So you testified on direct, Mr. Campbell, that

13  you were in the pricing unit at Tyson Foods, correct?

14  A.   Yes, correct.

15  Q.   And in that role you developed the pricing model for

16  certain customers?

17  A.   Yes, that is correct.

18  Q.   And those pricing models, they eventually make it into the

19  bids that get submitted to the customers?

20  A.   Yes, those pricing models are what are submitted to the

21  customers, yes.

22  Q.   Now, I believe you testified about kind of the interplay

23  between the three units, the business unit, the pricing unit

24  and the sales team, correct?

25  A.   Correct.

Brandon Campbell - Cross

1    Q.  Is it correct that you would have meetings involving all

2    three of those groups when determining pricing?

3    A.  When communicating pricing, yes.  If you can maybe clarify

4    by the word determining.

5    Q.  When developing your pricing models, would you meet with

6    sales?

7    A.  I would meet with sales once we had the model created, yes.

8    Q.  And then when you were receiving feedback regarding how the

9    customer reacted, would you meet with sales as well?

10   A.  Yes.

11   Q.  And in those meetings would sales convey their

12   understanding of how -- I guess whether the customer would

13   accept the pricing that you proposed?

14   A.  Yes, they would communicate whether the customer accepted

15   or not.

16   Q.  And their role, is it correct, was to convey the pricing to

17   the customer?

18   A.  Yes, that is correct.

19   Q.  And did you at times provide sales with a range of pricing

20   in which they could negotiate with the customer?

21   A.  At times, yes.  We would give a floor price, so there would

22   be a range that they could work with them, but they didn't have

23   the authority to drop below that floor.

24   Q.  Let's talk about some other factors that you considered in

25   developing your pricing models.  Did you consider the pricing

Brandon Campbell - Cross

1  of feed in developing your pricing models?

2  A.   In pricing models in general, yes.

3  Q.   And let's talk about KFC as an example.

4  A.   Okay.

5  Q.   Was feed a component of their pricing model?

6  A.   Yes, it was.

7  Q.   When I say feed, would that include corn?

8  A.   Yes, it would.

9  Q.   Would it include soybean?

10  A.   Soybean meal.

11  Q.   Soybean meal?

12  A.   Meal, yes.

13  Q.   So if other factors stayed the same, if feed prices went

14  down, what would happen to the price of chicken?

15  A.   If all the components were the same and feed dropped, the

16  price would drop with it.

17  Q.   All right.  And would you agree that feed was a relatively

18  large component in that cost model for KFC?

19  A.   Yes.  It was 25 to 30 percent of the model.

20  Q.   And then in fact on a monthly basis the price would

21  actually fluctuate based on that feed component, correct?

22  A.   Yes, that is correct.

23  Q.   Now, let's move on to another factor you considered.  In

24  setting the prices and developing those pricing models, you

25  also would consider the risk of losing business to the

Brandon Campbell - Cross

1    competition, correct?

2    *A.*   Yes, that is correct.

3    *Q.*   And so generally speaking if Tyson raised their prices,

4    they risked being undercut by competitors.

5    *A.*   Yes, that's a correct assumption.

6    *Q.*   And when that happened the risk would be that they would

7    lose business, correct?

8    *A.*   Yes.  If their price was higher than the competitors, there

9    was a risk that they would lose business, yes.

10   *Q.*   That's basically competition, correct?

11   *A.*   Yes, competition.

12   *Q.*   And that was -- competition was something that you

13   considered when developing your pricing models?

14   *A.*   Yes.  I considered whether or not we thought that we would

15   lose the business as a total in pricing models, yes.

16   *Q.*   As a matter of common sense, would you agree with me that

17   if Tyson and its competitors were all raising their prices,

18   that there would be less of a risk that you would lose

19   business?

20   *A.*   If everybody had higher prices, yes, there would be less

21   risk of losing business.

22   *Q.*   I want to talk about some of the other considerations in

23   developing your pricing models.  I think on direct examination

24   you mentioned the Urner-Barry and the Georgia Dock, correct?

25   *A.*   Yes, correct.

Brandon Campbell - Cross

1    *Q.* Let's talk about those in turn.  The Urner-Barry, did that

2    provide you competitors' bids for upcoming KFC business?

3    *A.* No, it did not.

4    *Q.* Did it tell you competitors' margins for upcoming KFC

5    business?

6    *A.* No, it did not.

7    *Q.* Did it tell you your competitors' current pricing for KFC

8    business?

9    *A.* No, it did not.

10   *Q.* Okay.  Now, same for Georgia Dock.  In looking at the

11   Georgia Dock, did that tell you your competitors' bids for

12   upcoming KFC business?

13   *A.* No, it did not.

14   *Q.* Did it tell you your competitors' margin for their KFC

15   business?

16   *A.* No, it did not.

17   *Q.* Did it tell you your competitors' current pricing for KFC

18   business?

19   *A.* No, it did not.

20   *Q.* All right.  One more source I want to ask you about and

21   that's something called AgriStats.  Are you familiar with

22   AgriStats?

23   *A.* I am familiar with AgriStats, yes.

24   *Q.* Did you have access to AgriStats reports?

25   *A.* I did have access to AgriStat reports.

Brandon Campbell - Cross

1   *Q.* And did other folks at Tyson involved in the pricing

2   process have access to AgriStats?

3   *A.* Yes.  The business unit had access.

4   *Q.* Now, would AgriStats tell you your competitors' bids for

5   upcoming KFC business?

6   *A.* Not that I'm aware of, no.

7   *Q.* Would AgriStats tell you your competitors' margins for KFC

8   business?

9   *A.* Not that I'm aware of, no.

10  *Q.* And would AgriStats tell you your competitors' current

11  pricing for KFC business?

12  *A.* No, not that I'm aware of.

13  *Q.* Are you aware of any industry source that would tell you

14  your competitors' upcoming bids?

15  *A.* Can you be more specific on upcoming bids?

16  *Q.* So let's say their bids for KFC, did you have any way of

17  determining those that you were familiar with?

18  *A.* The values?

19  *Q.* The actual price numbers.

20  *A.* No.

21  *Q.* Now, I want to ask you briefly about shortages.  Are you

22  familiar at a high level with Tyson buying and selling product

23  from its competitors?

24  *A.* Yes.

25  *Q.* And from your understanding of that process, did that give

Brandon Campbell - Cross

1    you knowledge of your competitors' bids?

2            *MR. GILLEN:*  Objection, outside the scope, Your Honor.

3            *THE COURT:*  Sustained.

4    *BY MS. CALL:*

5    *Q.*  I want to --

6            *THE COURT:*  Ms. Call, we are almost at noon.  If you

7    have a few more questions, that's fine.  I just wanted to give

8    you the heads-up.

9            *MS. CALL:*  Maybe five more minutes.  Would we prefer

10   to break now?

11           *THE COURT:*  I think we will break at noon, but if you

12   want to break now, we can now too.

13           *MS. CALL:*  I think now is a good time.

14           *THE COURT:*  Ladies and gentlemen, we will go ahead and

15   break for lunch.  Keep the admonitions in mind.  It's a little

16   bit colder outside today, so if you go outside, try to keep

17   those yellow juror buttons visible.  And keep the admonitions

18   in mind.  Don't start talking about the case amongst

19   yourselves, of course.  The jury is excused.  We will reconvene

20   at 1:30.

21           (Jury excused.)

22           Mr. Campbell, you are excused until 1:30.  Thank you

23   very much.

24           All right.  My law clerk, Ms. Butler, will pass out

25   the draft of the jury instructions.  I have two copies for each

Brandon Campbell - Cross

1    party, so those will be distributed.  Keep in mind the

2    following.  If you see words in brackets and bold within a

3    given instruction, it doesn't mean that we're going to give

4    that to the jury in that form.  Rather, it just simply means

5    it's something that we need to determine whether it happens or

6    not and therefore is a reminder to change it to conform to

7    whatever the evidence is.

8            Also keep in mind that the headings will not go back

9    to the jury.  The headings will be excluded, as well as the

10   footnotes.  The footnotes won't go back to the jury, of course,

11   either, all right?  So as I said, we will talk about these

12   tonight, but I wanted to give them to you so at least you might

13   have a chance to look over them during the lunch hour.

14           Anything else that we should take up at this time

15   before we break?

16           Mr. Tubach.

17           *MR. TUBACH:*  Very briefly, Your Honor, what is the

18   Court thinking in terms of timing for closing arguments as well

19   as the length of time we might have?

20           *THE COURT:*  Those are all things that are coming up

21   now.  I didn't really have a chance to think it through because

22   I didn't know how long the government's rebuttal case may last

23   and I am not sure how -- to what extent we are on track for the

24   defense case ending today, but we obviously need to make sure

25   that the jury instructions are finalized.

Brandon Campbell - Cross

1    So one thing that you should think about is how long

2    you think that process may last.  We aren't going to stay

3    particularly late tonight because the security guards basically

4    want us out of here, so one possibility would be if the

5    evidence all concludes but we haven't finalized the jury

6    instructions, we may need to tell the jurors not to come back

7    first thing or dismiss them early or something like that.  Then

8    we will get a much better sense of when everything is done and

9    if the jury instructions are done when we can start closings.

10   And then depending on how much time we have, we can figure out

11   how much time for closings.

12       So I am not sure if people have had an opportunity to

13   think about that yet, but it's something that we should think

14   about.  Obviously, doing the math -- this is what I was talking

15   about with the openings -- if we have half an hour and 10

16   defendants, we have five straight hours of openings.  And

17   depending on what the request is for closings, that multiple is

18   a lot.  So it's something to think about.  I don't know if

19   you've had a chance to talk among the other defendants,

20   Mr. Tubach, on what your proposal is, but I would be interested

21   in that at this time if you have a suggestion.

22       MR. TUBACH:  I do, Your Honor.  We have discussed it

23   and I think we collectively would ask for 45 minutes each.

24       THE COURT:  And Mr. Pollack, usually Mr. Tubach is the

25   one that hands up the note to someone.

1          MR. TUBACH:  But I have a prerogative not to respond

2      to this one.

3          MR. POLLACK:  There is no math involved here, so I

4      didn't have to defer to Mr. Tubach.

5          MR. TUBACH:  We do think 45 minutes, Your Honor.

6          THE COURT:  Government's reaction to that?

7          MS. CALL:  I think that sounds fine, Your Honor.  In

8      terms of the government's time, I think we would estimate, and

9      obviously we have closing and rebuttal, but probably a total of

10     five.  And that would be in response to the eight, I think,

11     hours of defense closing, so I think probably the split would

12     be about four hours of closing and up to an hour of rebuttal --

13     sorry, not rebuttal -- yeah, rebuttal, but likely not that

14     long.

15         THE COURT:  I didn't quite understand that.  So

16     collectively how much time is the government asking for?

17         MS. CALL:  Five hours.

18         THE COURT:  Five hours?

19         MS. CALL:  Uh-huh.

20         THE COURT:  That seems grossly excessive I hate to

21     tell you.  That's a long, long, long time.  I will take it into

22     account and go ahead with what you think.

23         MS. CALL:  Respectfully, Your Honor, if the defendants

24     each take 45 minutes, the government does have to address the

25     case as to each particular defendant which will take some time,

1  so I think that a four-hour closing which then followed by

2  eight hours of defense closing does seem like an appropriate

3  balance.

4       THE COURT:  We don't have to kick this around too much

5  more, but Ms. Prewitt, I will let you get in a quick word and

6  then I will hear from Mr. Byrne.  Go ahead.

7       MS. PREWITT:  The government made a choice not to put

8  on substantive witnesses in this case.  And what they are

9  trying to do is what they are doing with the summary charts,

10  which is an end run around that at a point where we can't

11  confront it.  That is exactly what they are trying to do here.

12  It's excessive in terms of time, but it really speaks to how

13  they presented this case.  To have that amount of time in

14  argument, they could have done it through witnesses.  They

15  could have done it through evidence, and they chose not to.

16       THE COURT:  Mr. Byrne?

17       MR. BYRNE:  Mine was more of a mathematical thing.  If

18  they do get more time -- we were actually thinking they would

19  get an hour and a half hour for rebuttal, but I think we would

20  want more time if they got -- more time than the 45 minutes,

21  but I don't know if I am speaking for everyone.

22       THE COURT:  Let me just warn everyone, there is

23  definitely a cost benefit to this.  I guarantee you the jury --

24  this is not that -- now, there are some moving parts and there

25  is no doubt about that and everyone will want to put things in

Brandon Campbell - Cross

1    perspective, but, you know, you'll have people day dreaming if

2    it goes on for too long, you really will.  So I will take it

3    into account.  We will talk about it later.

4          Right now, though, we will break for lunch until 1:30,

5    all right?

6       (Recess at 12:06 p.m.)

7       (Reconvened at 1:32 p.m.)

8       *THE COURT:*  All right.  Maybe we can get our witness

9    back.  And in the meantime we can go ahead and get the jury.

10         Mr. Campbell, if you don't mind, you can just go back

11   up by the witness stand.  The jury will be in in just a moment.

12         Go ahead, Ms. Call.

13      *MS. CALL:*  Thank you.

14   *BY MS. CALL:*

15   *Q.*  Good afternoon, Mr. Campbell.

16   *A.*  Good afternoon.

17   *Q.*  I think just before we broke for lunch we very briefly

18   mentioned shortages.  Let me just ask you this.  In your

19   pricing role at Tyson --

20      *MR. GILLEN:*  Objection, Your Honor, outside the scope.

21   I think we already had a ruling on that.

22      *THE COURT:*  Let's hear the question first.  Go ahead.

23   *BY MS. CALL:*

24   *Q.*  In your pricing role at Tyson, you didn't use information

25   gathered from your sales to competitors to determine your

Brandon Campbell - Cross

1   pricing, did you?

2         *MR. GILLEN:*  It's outside the scope, Your Honor.  She

3   began the question with shortages which was not part of the

4   direct.

5         *THE COURT:*  Overruled.

6   *BY MS. CALL:*

7   *Q.*  You can answer, Mr. Campbell.

8   *A.*  Did I consider shortages in my pricing?  I want to make

9   sure I understand that question properly.

10  *Q.*  Did you consider information learned from those shortages?

11  *A.*  No, I did not.

12  *Q.*  Thank you.  If we could go back to that negotiation process

13  for a customer like KFC.  So once you finalize the pricing

14  model, that would get sent to the sales team, correct?

15  *A.*  Yes.  Once the pricing model was finalized, it would be

16  sent to the sales team, correct.

17  *Q.*  And Defendant Mulrenin, he was in the sales team?

18  *A.*  Mulrenin was on the sales team, correct.

19  *Q.*  And Defendant Brian Roberts was in the sale team?

20  *A.*  Yes, Brian Roberts was in the sales team.

21  *Q.*  Was there a man named Carl Pepper in the sales team as

22  well?

23  *A.*  Yes, Carl Pepper was part of the sales team.

24  *Q.*  So the three of them, they were in the same group?

25  *A.*  Yes, they were.

Brandon Campbell - Cross

1    Q.  Was Brian Roberts a supervisor in that group?

2    A.  Yes, he was a supervisor.

3    Q.  And Timothy Mulrenin, did he hold a higher position than

4    Carl Pepper in that group?

5    A.  Yes, he held a higher role than Carl.

6    Q.  Now, back to the actual negotiations that we've talked

7    about roles.  Sales, they were the ones interfacing with the

8    customer, correct?

9    A.  Yes, that's correct.

10   Q.  You weren't in meetings with the customer, correct?

11   A.  Not to my knowledge.  I don't remember any meetings that I

12   was in with the customer.

13   Q.  And you weren't on -- take a moment if you need it.

14   A.  Sorry.  Excuse me.

15   Q.  You weren't on calls between the sales team and the

16   customers?

17   A.  No, I was not.

18   Q.  All right.  So when you came up with a pricing model, sales

19   would take that and go out and get that price.  That was their

20   job?

21   A.  Yes.  Their job was to communicate that pricing model and

22   secure it with the customer.

23   Q.  And for a customer like KFC, that process usually involves

24   several rounds of negotiations, correct?

25   A.  Yes, that is correct.

Brandon Campbell - Cross

1   Q.  And in that process would you agree with me that a customer

2   like KFC, that they would typically ask to lower pricing during

3   negotiations?

4   A.  In most -- yes.  In most instances that I can remember the

5   customer would always want to come back and lower the price to

6   some extent.

7   Q.  Can you remember any instance where they asked to increase

8   the price?

9   A.  Not to my knowledge, I can't remember of any.

10  Q.  And would you agree with me that sales' role in this

11  process was to get as high a price as possible as they could

12  for Tyson Foods; is that correct?

13  A.  Their role was to achieve the pricing that was given to

14  them, to accomplish that price.

15  Q.  Okay.  So was that a yes?

16  A.  Well, the way you worded it, said the highest price

17  possible.  I just want to clarify the price that was given to

18  them is what they were trying to get, yes.

19  Q.  Okay.  Thank you.  Now, is it also your understanding that

20  the sales team, that their performance was tied to the volume

21  that they could get with those customers?

22  A.  That's my understanding.  I wasn't directly responsible for

23  their performance, but volume is what the overall sentiment in

24  the group was, if they accomplished it or not.

25  Q.  But like we said, in those negotiations you weren't in

Brandon Campbell - Cross

1   their interactions with the customers.

2   *A.*   That's correct.

3   *Q.*   And you didn't even work at the same campus as Mr. Brian

4   Roberts or Mr. Mulrenin, did you?

5   *A.*   No, I did not.

6   *Q.*   And when they had calls with their competitors, you weren't

7   on those phone calls, were you?

8   *A.*   I am not aware of those phone calls taking place, but I

9   wasn't on any phone call like that.

10   *Q.*   Okay.  Let's talk specifically about 2014.  On direct

11   examination you testified a bit about the price increases that

12   Tyson achieved with fast-food customers in 2014?

13   *A.*   Yes.

14   *Q.*   And those price increases, they were fairly significant; is

15   that correct?

16   *A.*   Yes, I would say they were significant increases.

17   *Q.*   And because they were significant, would you agree with me

18   that there was a risk that Tyson would lose business to its

19   competitors?

20   *A.*   Yes, that was a risk with that large of a price increase.

21   *Q.*   And you testified on direct about a 19-cent increase that

22   you proposed back in June of 2014; is that right?

23   *A.*   Yes, that is correct.

24   *Q.*   All right.  And then all the way -- months later into

25   September, I think you were shown a document showing a 19-cent

Brandon Campbell - Cross

1  increase around that time period as well?

2  A.  Yes, that's correct.

3  Q.  So in those multiple rounds of negotiations with KFC, the

4  increase Tyson was proposing stayed just about the same, right?

5  A.  Yes, that's correct.

6  Q.  All right.  Now, I think we talked about calls with

7  customers, calls with competitors.  You weren't there for any

8  face-to-face meetings that Defendant Brian Roberts had with

9  competitors, were you?

10  A.  I am not aware of those meetings taking place, but if they

11  did take place, no, I was not a part of those.

12  Q.  And so kind of to recap your testimony, so from June to

13  September in 2014, Tyson got that exact 19-cent price increase

14  that you first proposed after rounds of negotiations, right?

15  A.  I think the numbers were 19.31 versus 19, but yes, fairly

16  close.

17  Q.  And at the end of the day, you really just don't know

18  exactly what steps Defendant Brian and Defendant Roberts took

19  to make sure that they could get that price increase from the

20  customer; is that correct?

21  A.  I was not involved in those communications directly to the

22  customer, so I can't speak to those.

23        MS. CALL:  Thank you.  No further questions.

24        THE COURT:  Thank you.

25        Redirect?

1              **REDIRECT EXAMINATION**

2  *BY MR. GILLEN:*

3  *Q.*  A few follow-up questions.

4              You were asked on cross-examination whether or not

5  there were occasions when you would meet with sales.  And I

6  believe you indicated after your model was created by you, you

7  would meet with sales, correct?

8  *A.*  After I had met with the business unit, yes.

9  *Q.*  So after the business unit and the pricing unit agreed on

10  the model and the price, that's when you met with sales,

11  correct?

12              *MS. CALL:*  Objection, leading.

13              *THE COURT:*  Overruled.

14  *A.*  Yes.  It's whenever we would engage with sales once we

15  already had the model created and we knew what we were trying

16  to accomplish as a business.

17  *BY MR. GILLEN:*

18  *Q.*  And you indicated on cross-examination you were asked

19  whether there were occasions when you would give the sales team

20  a range, a small range.  Do you remember that on

21  cross-examination?

22  *A.*  Yes, I do.

23  *Q.*  That didn't happen with the KFC contract and negotiations

24  in 2014, did it?

25              *MS. CALL:*  Objection, leading.

72

Brandon Campbell - Redirect

1          *THE COURT:*  Overruled.

2     *A.*  No, that did not.

3     *BY MR. GILLEN:*

4     *Q.*  You gave them exactly what the pricing unit wanted and the

5     business unit wanted, correct?

6     *A.*  Yes, that is correct.

7     *Q.*  And their job was to go to KFC and to present it in a way

8     that it could try to close the deal, right?

9     *A.*  Yes.  It was their job to take that and to communicate it

10    and to close the deal to secure the price increase.

11    *Q.*  Any push-back from KFC would ultimately come back to you;

12    is that correct?

13    *A.*  Yes, that is correct.

14    *Q.*  And then if there were -- so when counsel just asked you

15    about negotiations, were the sales team really involved in

16    negotiations or in message passing back to you from KFC if that

17    were the case?

18    *A.*  KFC specifically?

19    *Q.*  Yes, KFC.

20    *A.*  KFC specifically, no, they would communicate the message

21    back to me and to the business unit.

22    *Q.*  So they weren't in the job of negotiating.  They were in

23    the job of message delivering, right?

24    *A.*  They were delivering the message.  And as KFC or a customer

25    would push back, then they would come back with that

1  information that we would then regroup between the business

2  unit and the pricing group.

3  Q.  And you were discussing about the job that the sales team

4  had and that they were to get the price given to them; is that

5  right?

6  A.  Yes.  Their job was to accomplish the price increase that

7  was given.

8  Q.  And that price in the KFC negotiations, that was formulated

9  by you with the business unit and given to sales to deliver the

10  message, right?

11  A.  Yes, that is correct.

12       MR. GILLEN:  No further questions, Your Honor.

13       THE COURT:  All right.  Thank you.

14       Is Mr. Campbell subject to recall?

15       MS. CALL:  No, Your Honor.

16       THE COURT:  Okay.  Thank you very much.  You are

17  excused.

18       THE WITNESS:  Thank you.

19

20

21

22

23

24

25

1                                    INDEX

2     WITNESSES

3         Brandon Campbell

4              Direct Examination By Mr. Gillen              5

5              Cross-examination By Ms. Call               54

6              Redirect Examination By Mr. Gillen          71

7                                  EXHIBITS

8     Exhibit         Offered   Received   Refused   Reserved   Withdrawn

9     G-467                       49

10    G-521                       29

11    G-570                       45

12    G-824                       35

13                          REPORTER'S CERTIFICATE

14        I certify that the foregoing is a correct transcript from

15    the record of proceedings in the above-entitled matter.   Dated

16    at Denver, Colorado, this 8th day of December, 2021.

17

18                              S/Janet M. Coppock

19

20

21

22

23

24

25