IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  JAYSON JEFFREY PENN,
2.  MIKELL REEVE FRIES,
3.  SCOTT JAMES BRADY,
4.  ROGER BORN AUSTIN,
5.  TIMOTHY R. MULRENIN,
6.  WILLIAM VINCENT KANTOLA,
7.  JIMMIE LEE LITTLE,
8.  WILLIAM WADE LOVETTE,
9.  GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

      Defendants.

---

## ORDER

---

This matter comes before the Court on defendants' motions for judgment of acquittal. Docket Nos. 874-82, 884. Each defendant moves the Court for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. *See id.* The government filed a consolidated response. Docket No. 900.

## I.  BACKGROUND

Each defendant has been charged with violating 15 U.S.C. § 1 by conspiring to rig bids and fix prices in the broiler chicken industry. Docket No. 101 at 1-2. Trial began on October 25, 2021. On November 24, 2021, the government rested. *See* Docket No. 871 at 2. At that time, each defendant orally moved for a judgment of

acquittal, pursuant to the Court's order that they could file supplemental written Rule 29 motions on or before November 29, 2021. *Id.* On November 29, 2021, each defendant filed a written motion. Docket Nos. 874-82, 884. On December 6, 2021, the government filed a consolidated response. Docket No. 900. On December 6, 2021, at the close of defendants' case, each defendant orally renewed his motion for a judgment of acquittal under Rule 29. Docket No. 901 at 4. On December 9, 2021, the case was submitted to the jury. Docket No. 907 at 3. On December 16, 2021, the Court declared a mistrial due to the jury's inability to reach a verdict as to any defendant. Docket No. 920 at 2.

## II. LEGAL STANDARD

### A. Rule 29

Rule 29 states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 29(b) allows a court to reserve ruling on a motion until "after [the jury] returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

In this case, defendants made Rule 29 motions at the end of the government's case, which the Court reserved ruling on. The jury was discharged without returning a verdict. Docket No. 920 at 2. However, each defendant orally renewed his motion for acquittal at the close of all the evidence. Docket No. 901 at 4. Accordingly, the Court may also consider the defendants' evidence. *United States v. Khanu*, 675 F. Supp. 2d

55, 61 (D.D.C. 2009) (stating that, although a court should consider the evidence at the time ruling was reserved, "because Defendant also renewed his motion for acquittal at the close of all of the evidence and after the jury returned a verdict, the Court shall also separately consider whether, based on the evidence presented by Defendant, the Government has provided sufficient evidence to prove the elements of tax evasion beyond a reasonable doubt.").

In evaluating a Rule 29 motion, a court "ask[s] if, 'viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021) (quoting *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012)).  The court "consider[s] both circumstantial and direct evidence, 'but [] do[es] not weigh the evidence or consider the credibility of witnesses.'" *United States v. Otuonye*, 995 F.3d 1191, 1209 (10th Cir. 2021) (quoting *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019)).  The court evaluates the sufficiency of the evidence by "considering the collective inferences to be drawn from the evidence as a whole," rather than examining the evidence in "bits and pieces."  *Tennison*, 13 F.4th at 1059 (quoting *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004)).  A court may enter a judgment of acquittal "only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (citation omitted). The sufficiency of the evidence standard is the same regardless of whether the jury returns a conviction or the Court declares a mistrial due to the jury's inability to reach a

verdict.  *See United States v. Nimapoo*, 2008 WL 11384038, at *1 (N.D. Ga. Apr. 11, 2008) (collecting cases).

### B.  Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints of trade."  *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (internal quotations marks omitted).  Certain restraints are unreasonable per se "because they 'always or almost always tend to restrict competition and decrease output.'"  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).  One such restraint is a price-fixing agreement.  *See United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150, 218 (1940).  Such restraints are "horizontal restraints" in that they are "imposed by agreement between competitors," and, as a result, are per se unreasonable.  *See Sharp*, 485 U.S. at 730.

The jury in this case was instructed that, in order to find a defendant guilty, it

> must be convinced that the government has proved each of the following elements against him beyond a reasonable doubt:
> *First*: that the charged price-fixing and bid-rigging conspiracy existed at or about the times alleged;
> *Second*: that the defendant knowingly–that is, voluntarily and intentionally–became a member of the conspiracy charged in the indictment, knowing of its goal and intending to help accomplish it; and,
> *Third*: that the conspiracy affected interstate commerce.

4

Docket No. 921 at 16.

As to the first element, "[a] conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *United States v. Metropolitan Enters., Inc.*, 728 F.2d 444, 450 (10th Cir. 1984). Co-conspirators "need not know of the existence or identity of the other members" and the agreement to join a conspiracy "need not be shown to have been explicit." *Id.* at 451 (citations omitted). No formal agreement or words or writing is necessary – there are no magic words that demonstrate a conspiracy. *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990). Rather, "[i]t is sufficient to show that [co-conspirators] tacitly came to a mutual understanding." *Id.* The second element "[is] satisfied by showing that [a defendant] knowingly joined and participated in a conspiracy to rig bids." *Metropolitan*, 728 F.2d at 449-50. The third element is satisfied by proof that "the conspiracy charged in the indictment either occurred in the flow of interstate commerce or had a substantial effect on interstate commerce."[1] Docket No. 921 at 26.

The act of conspiring is itself the illegal conduct; there is no requirement that defendants engaged in an overt act to further the conspiracy. *See Nash v. United States*, 229 U.S. 373, 378 (1913) ("Coming next to the objection that no overt act is laid, the answer is that the Sherman act punishes the conspiracies at which it is aimed on the common-law footing,[–]that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability."); *United States v. Fishman*, 645 F.3d

---

[1] No defendant argues that this element was not proved. *See generally* Docket Nos. 874-82, 884.

1175, 1186 (10th Cir. 2011) (noting that conspiracy statutes modeled after the Sherman Act, 15 U.S.C. § 1, do not require proof of an overt act to obtain a conviction); *United States v. Miller*, 771 F.2d 1219, 1226 (9th Cir. 1985) ("Because the Sherman Act punishes the mere act of conspiring, overt acts in furtherance of the conspiracy need not be alleged.").

## III. ANALYSIS

Each defendant argues that there is insufficient evidence to sustain a conviction as to him.  Docket Nos. 874-82, 884.  Some defendants additionally make arguments regarding legal deficiencies in the case.  The Court will first determine whether there is sufficient evidence for a reasonable jury to find that the charged conspiracy existed and then determine whether there is sufficient evidence for a reasonable jury to conclude that each defendant knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it.

### A.  Existence of the Charged Conspiracy

The testimony of government witness Robbie Bryant, a Pilgrim's Pride ("Pilgrim's") employee, is sufficient to support a finding beyond a reasonable doubt that a conspiracy existed between Pilgrim's, Koch Foods ("Koch"), Claxton Poultry ("Claxton"), Tyson Foods ("Tyson"), Mar-Jac Poultry ("Mar-Jac"), and George's Inc. ("George's") to rig bids and fix prices.  Docket No. 860 at 15-23; 95-107.  Mr. Bryant testified that he "received competitor pricing and used that pricing to submit bids to customers and asked others to retrieve competitor pricing."  *Id.* at 15.  He also testified to obtaining competitors' bid pricing.  *Id.* at 16.  He stated that the purpose of obtaining competitor pricing information "was either to increase prices or limit a decrease in

price." *Id.*  Mr. Bryant testified that Tyson, George's, Koch, Claxton, and Mar-Jac, who were Pilgrim's competitors, submitted bids in the 2014 Restaurant Supply Chain Solutions ("RSCS") negotiations.[2]  *Id.* at 19-20.  Mr. Bryant witnessed phone calls that Roger Austin, a Pilgrim's employee, had with Scott Brady of Claxton and Bill Kantola of Koch.  *Id.* at 18.  Mr. Bryant also witnessed Jason McGuire, a Pilgrim's employee, instructing Mr. Austin to provide Pilgrim's pricing information to competitors.  *Id.* at 19.  Mr. Bryant said that the result of this information sharing was a price increase for chicken suppliers in the RSCS 2014 negotiations for the entire industry.  *Id.* at 17-19.  Mr. Bryant testified that competitors exchanged prices for the purpose of either raising prices or limiting a decrease in price.  *Id.* at 22.  Mr. Bryant testified that, in his understanding, there was an agreement between Pilgrim's, Tyson, Mar-Jac, Koch, Claxton, and George's in the 2014 RSCS negotiations to raise prices together.  Docket No. 861 at 34-37.

What Mr. Bryant learned in the 2014 negotiations informed Mr. Bryant's decision making during the 2017 RSCS negotiations.  Docket No. 860 at 17.  When asked if he had an understanding as to why competitors gave pricing information to Pilgrim's, Mr. Bryant stated that the basis for that understanding was what he had witnessed in 2014.  *Id.*  Specifically, he testified that "there was some significant price increases that were – that we received in 2014.  And I witnessed phone calls between people at Pilgrim's and competitors and I seen [sic] the results of those phone calls transition into increased

---

[2] References to the 2014 RSCS negotiations are to the negotiations that took place in 2014 for the three year contracts that covered 2015, 2016, and 2017.  The 2017 RSCS negotiations similarly refer to the negotiations that took place in 2017 for the three year contracts covering 2018, 2019, and 2020.

prices." *Id.*  Mr. Bryant testified that he was not concerned that Pilgrim's would be undercut on price or that a competitor would take volume away from Pilgrim's in the bidding process.  *Id.* at 21-22.  In the 2017 RSCS contract negotiations, Mr. Bryant testified that the goal of the conspiracy was to limit the price decrease that was expected.  *Id.* at 98.

Mr. Bryant stated that Pilgrim's, Tyson, George's, Koch, Claxton, and Mar-Jac shared prices in order to either raise the price on RSCS in 2014, or reduce the expected decrease in the 2017 contract with RSCS.  Because the Court "do[es] not weigh the evidence or consider the credibility of witnesses," *Otuonye*, 995 F.3d at 1209, the Court accepts Mr. Bryant's testimony as true and finds that it is sufficient to support a finding that the charged conspiracy existed between Pilgrim's, Koch, Claxton, Tyson, Mar-Jac, and George's to fix prices and rig bids.  Accordingly, the Court considers each defendants' motion within the context that the charged conspiracy existed.

### B.  Jayson Penn

Mr. Penn argues that there is insufficient evidence against him to support a finding that he knowingly joined the alleged conspiracy.[3]  Docket No. 880 at 1-2.  Mr. Penn argues that neither the testimony of Mr. Bryant, the toll records, nor the emails or texts are sufficient for a reasonable jury to base a conviction on.  *Id.* at 4-6.  The Court disagrees.

---

[3] Mr. Penn incorporates by reference Mr. Kantola's arguments that the government failed to prove (i) any conspiracy existed, but particularly the overarching conspiracy charged, (ii) any unreasonable restraint of trade, and (iii) any violation under the rule of reason.  Docket No. 880 at 2 n.1.  The Court addresses each of these arguments in the section of this Order that pertains to Mr. Kantola.

The evidence establishes that in August 2012 Mr. Penn forwarded an email to Mr. McGuire at Pilgrim's from a subordinate, Brenda Ray, indicating that she had received a call from a friendly competitor that it was "all over the market that Pilgrim's is taking contract pricing up." GX-3037. Mr. Penn's email to Mr. McGuire states, "FYI. Do not fwd. [N]ot exactly a legal conversation." *Id.*[4] In January 2013, Mr. Penn and Mr. Austin had an email conversation wherein Mr. Austin informed Mr. Penn that Case Foods, another chicken supplier, was ".90 lower than us on 8 piece and 32 back on dark meat verses [sic] our 30."[5] GX-1722 at 1. Mr. Penn responded, "Figured they would be lower due to their need to gain access. What about rest of players?" *Id.* Mr. Austin replied, "Right now we are the highest but barely over a couple others and Claxton is the lowest with Case and Tyson right there with them. The spread between top and bottom is 1 cent. I am still trying to find out where everyone went on dark meat. It is a mixed bag ranging from 30 to 32 back. I should have them all in the next few days." *Id.* Mr. Penn responded "Thanks," and then asked Mr. Austin about case weights. *Id.*

On August 7, 2014, Mr. Penn emailed Mr. McGuire that, "[i]n 2013 I had a few owners of small bird companies thank us via me for getting our act together. I guess it will happen again…good work. Forward…" GX-1056 (ellipses in original). On August

---

[4] When GX-3037 was admitted on November 8, 2021, the Court instructed the jury that Ms. Ray's email was admissible to prove the existence of the conspiracy but not as to whether any defendant was a member of the conspiracy. However, Mr. Penn's email to Mr. McGuire did not have a limiting instruction.

[5] The amount a price is "back" refers to the price of dark meat relative to the eight-piece chicken price. If a supplier is "30 back" that means that the price of dark meat is 30 cents per pound below the price of eight-piece. Docket No. 860 at 129-30.

18, 2014, Mr. McGuire sent Mr. Penn an email containing the price ranges for Koch, Case Foods, Claxton, George's, and Mar-Jac.  GX-1058.  Mr. McGuire's email said that "Roger did some checking around today and [Mr. McGuire] included the [competitor information] regarding the range of the total increases[ ](margin and costs) folks are going in with."  *Id.*  Mr. Penn replied to the email, stating that he "[w]ill review with Bill[6] in am" and "[w]ill advise."  GX-1074.  This evidence shows that Mr. Penn was aware of competitor price information and, taken with the "collective inferences to be drawn from the evidence as a whole," *Tennison*, 13 F.4th at 1059 (quoting *Nelson*, 383 F.3d at 1229), and in the light most favorable to the government, is sufficient to support a finding that Mr. Penn knowingly joined the conspiracy to rig bids and fix prices in the broiler chicken industry by August 2012, knowing of its goals and intending to advance them.  Accordingly, the Court will deny Mr. Penn's motion for judgment of acquittal.

### C.  Mikell Fries

Mr. Fries argues that no reasonable jury could find that the evidence is sufficient to convict him of violating § 1 of the Sherman Act.  Docket No. 875 at 1.  First, Mr. Fries claims that none of the testimony established that he joined the conspiracy and, second, maintains that "[t]he government relies on text messages and emails from Mr. Brady to Fries engaging in the legal practice of passing along mostly historical price information of competitors."  *Id.* at 8.

The majority of Mr. Fries' arguments focus on the assertion that, no matter what any texts or emails say about holding firm on prices, Claxton actually reduced prices so

---

[6] A reasonable jury could conclude that Mr. Lovette is the "Bill" Mr. Penn refers to, as Mr. Lovette was his boss and goes by Bill.

it could not have been part of the conspiracy.  *See id.* at 8-11.  However, that is not the

law.  Success of the conspiracy is not a requirement; the mere agreement to conspire is

the illegal conduct.  *See Miller*, 771 F.2d at 1226 ("Because the Sherman Act punishes

the mere act of conspiring, overt acts in furtherance of the conspiracy need not be

alleged.").

Exhibit 1427 is a text message conversation between Mr. Fries and Mr. Brady

from November 13, 2012.  GX-1427.  The conversation states:

> Mr. Brady: George's is .30 back on dark meat
> Mr. Brady: Pilgrim's is .30 back and Tyson is 31 back
> Mr. Fries: Ol [M]ike [Ledford]![7]  He bluffing hard!
> Mr. Brady: I talked to [R]oger [Austin] and this month he is .03 higher than us on
> 8 piece and his case weight is 50.5
> Mr. Fries: Hmmm
> Mr. Brady: He said to raise our prices, on wings he is market and market plus .10
> Mr. Fries: Tell him we are trying!
> Mr. Brady: Will do

GX-1427.  As noted earlier, the testimony of Mr. Bryant is sufficient to support a

reasonable jury finding that Claxton was a member of the conspiracy.  Moreover, a

reasonable jury could find that Exhibit 1427 proves that Mr. Fries had knowingly joined

the conspiracy by November 13, 2012, knowing of the conspiracy's goal and intending

to help accomplish it.  Accordingly, the Court will deny Mr. Fries' motion.

### D.  Scott Brady

Mr. Brady argues that there is insufficient evidence against him to sustain a

conviction.  *See generally* Docket No. 878.  Based on the testimony of Mr. Bryant,

combined with evidence in the record, the Court rejects this argument.

---

[7] Mr. Ledford was the senior director of protein purchasing at RSCS at this time.
Docket No. 890 at 8.

Mr. Bryant testified that he witnessed telephone calls between Mr. Austin of Pilgrim's and Mr. Brady of Claxton for the 2014 RSCS bidding process and that the results of these phone calls was increased prices.  Docket No. 860 at 96-97.  Mr. Bryant testified that Mr. Brady was involved in helping competitors in the broiler chicken industry increase prices or limit a decrease in prices.  *Id.* at 69-70; *see also id.* at 96. Mr. Bryant based this understanding on information relayed to him from Mr. Austin between 2014 and 2017, where Mr. Austin and Mr. Brady discussed Pilgrim's position for RSCS bids and various other information, including price.  *Id.*  In addition, a reasonable jury could interpret Exhibit 1427 to support an inference that Mr. Brady was in contact with competitors for the purpose of raising prices.  Accordingly, the Court finds that the evidence, viewed in a light most favorable to the government, is sufficient to find that Mr. Brady knowingly joined the alleged conspiracy by November 2012, knowing of its goal and intending to help accomplish it.  The Court will deny Mr. Brady's motion.

### E.  Roger Austin

Mr. Austin argues that the government failed to prove that he knowingly entered into an agreement to fix prices and rig bids with the knowledge of the goal and intent to advance it.  *See generally* Docket No. 874.  Mr. Austin also argues that the government failed to prove the existence of an agreement.[8]  *Id.* at 3.

---

[8] Mr. Austin joins the portions of Mr. Kantola's motion that argue that the government failed to prove an undue restraint of trade and that there has been an improper variance.  Docket No. 874 at 3 n.1.  The Court addresses these arguments in the section of this Order that pertains to Mr. Kantola.

Mr. Bryant's testimony is sufficient for a reasonable jury to find that Mr. Austin knowingly joined the alleged conspiracy by 2014 with the goal of advancing its goals. Mr. Bryant testified that he witnessed phone calls between Mr. Austin and Mr. Brady of Claxton and Mr. Kantola of Koch in 2014.  Docket No. 860 at 18.  Mr. Bryant also witnessed Mr. McGuire instructing Mr. Austin to provide Pilgrim's pricing information to competitors.  *Id.* at 19.  Mr. Bryant testified that the result of this information sharing was a price increase for chicken suppliers in the RSCS 2014 negotiations for the entire broiler chicken industry.  *Id.* at 17-19.  Mr. Bryant said that he received competitor pricing information for the 2017 RSCS negotiations from Mr. Austin and used this information either to increase prices or to limit a price decrease.  *Id.* at 15-16.  Mr. Bryant testified that, when he asked Mr. Austin for competitor price information to assist Pilgrim's in developing its 2017 RSCS bid, his "expectation was that [Mr. Austin] would use his contacts at other companies that I mentioned before like Carl Pepper and Bill Kantola and Scott Brady and come back to me with pricing guidance on where our bid needed to be to be No. 2 in price."  *Id.* at 99. The testimony of Mr. Bryant is sufficient, viewed in the light most favorable to the government, for a reasonable jury to conclude that Mr. Austin joined the charged conspiracy by the 2014 RSCS negotiations and participated in the conspiracy through the 2017 RSCS negotiations.

The exhibits bolster this conclusion.  Exhibit 1822 is a January 2017 email conversation between Mr. Bryant and Mr. Austin.  GX-1822.  Mr. Austin responds to Mr. Bryant's notes regarding a meeting with KFC.[9]  Mr. Austin states that "Claxton meets

---

[9] While the subject of the email is KFC, GX-1822, RSCS is the purchasing co-operative for KFC.  Docket No. 890 at 8.

with them [o]n Thursday and [I] will get a blow by blow Friday morning.  Koch meets with them [o]n Friday."  *Id.*  Mr. Bryant's understanding of this email was that "Roger [Austin] and Scott Brady would talk on Friday morning and he would give – provide me with the details of the outcome of that meeting."  Docket No. 860 at 95.  Mr. Bryant was interested in the outcome of the Claxton meeting with RSCS because, "Whatever information we could gain from that, it would help in our preparation with KFC."  *Id.* at 96.  Mr. Bryant also testified that he asked Mr. Austin if he could find out what price Pilgrim's needed to be in order to submit the bid for the second highest price in 2017.  *Id.* at 99; GX-1882.  Mr. Bryant testified that this was the first time he recalled asking someone to obtain this information and was unsure "how to go about it, but I understood the expectation for the bid. . . . [was that he] needed to have pricing information prior to submitting the bid."  Docket No. 860 at 100-01.  The basis of this understanding was what Mr. Bryant observed in 2014.  *Id.* at 101.

Mr. Austin argues that the evidence at trial of supplier prices shows the absence of an agreement.  Docket No. 874 at 5-7.  Because success of the conspiracy is not an element of the crime, mere evidence of different prices is insufficient for the Court to grant Mr. Austin's motion.  The testimony of Mr. Bryant in combination with the exhibits is sufficient, viewed in the light most favorable to the government, for a reasonable jury to conclude that Mr. Austin joined the charged conspiracy by the 2014 RSCS negotiations and participated in the conspiracy through the 2017 RSCS negotiations.

### F.  Timothy Mulrenin

Mr. Mulrenin argues that the government's evidence does not support an inference that Mr. Mulrenin knowingly joined a conspiracy.  Docket No. 884 at 4.  The

government opposes the motion, arguing that Mr. Mulrenin (1) as a manager, approved and encouraged the participation in the conspiracy of his subordinate, Carl Pepper; (2) directed Mr. Pepper to use competitor price information to formulate Tyson's bids; and (3) shared confidential Tyson bid information with Mr. Brady in exchange for competitor price information.  Docket No. 900 at 28-30.

The Court finds that the evidence is sufficient for a reasonable jury to conclude that Mr. Mulrenin joined the alleged conspiracy, knowing of its goal and intending to help accomplish it.

Tyson submitted its bid in the 2014 RSCS negotiations eight days early, on August 11, 2014.  *See* GX-1137; GX-1190; GX-1191.  On August 15, 2014, Mr. Mulrenin spoke with Mr. Brady for 10 minutes.  *See* GX-90-10 at 2; GX-1232 at 2.  A reasonable jury could conclude that Mr. Mulrenin, whose company Mr. Bryant testified was part of the charged conspiracy, was speaking with Mr. Brady in order to shore up support for the price increase Tyson had included in its bid submission.

Additionally, in March 2015, Mr. Mulrenin received an email from Mr. Pepper regarding a September promotion for Popeye's.  GX-617.  Popeye's was looking for a discount due to its "Big Box" promotion.  *Id.*  Mr. Pepper told Mr. Mulrenin that Tyson had "done this over the years.  I have talked to a couple company's and they are thinking .02 for September.  Giving the discount isn't going to affect amount of pounds because they are selling it for $5."  *Id.*  Mr. Mulrenin then forwarded the email to Steven Cullen, a Tyson employee with pricing authority, asking Mr. Cullen to "please let me know if we can do this at two cents."  *Id.*  A reasonable jury could conclude that Mr. Mulrenin's attempt to match Tyson pricing to competitor pricing was pursuant to an

agreement to fix prices.  Accordingly, the Court finds that the evidence, viewed in a light most favorable to the government, is sufficient to find that Mr. Mulrenin knowingly joined the alleged conspiracy by August 2014, knowing of its goal and intending to help accomplish it.  The Court will deny Mr. Mulrenin's motion.[10]

### G.  William Kantola

Mr. Kantola makes five arguments: (1) there is insufficient evidence to sustain a conviction; (2) the Court should apply a rule of reason, rather than *per se*, analysis to this case; (3) Mr. Kantola's conduct was not within the statute of limitations; (4) the evidence adduced at trial was an improper variance of the indictment; and (5) the

---

[10] On December 6, 2021, Mr. Mulrenin called Darrell Bowlin as a witness.  *See* Docket No. 902.  Mr. Bowlin is a director and cut-out manager in the small bird business unit at Tyson.  *Id.* at 5-7.  Mr. Bowlin testified, *inter alia*, that the business unit "own[s] the pricing that we tell our customers – our sales team to go get."  *Id.* at 6.  Mr. Bowlin testified that the sales team often pushed back on the price increases the business unit communicated to the sales team, and that Mr. Mulrenin and Mr. Roberts engaged in this push-back.  *Id.* at 10-12.  A reasonable jury could nevertheless give more weight to the evidence showing that Mr. Mulrenin knowingly joined the charged conspiracy.  *See United States v. Sedillo*, 509 F. App'x 676, 680 (10th Cir. 2013) (unpublished) (stating that, in viewing the evidence in the light most favorable to the government, the court should credit the testimony tending to support the conviction rather than the testimony to the contrary); *United States v. Williamson*, 53 F.3d 1500, 1516 (10th Cir. 1995) ("By viewing the evidence in the light most favorable to the government, we necessarily resolve any conflicts in the evidence in favor of the government and we assume the trier of fact found that evidence credible."); *United States v. Cervantes*, 920 F.2d 937, 1990 WL 200238, at *2 (9th Cir. 1990) (unpublished) (stating that the court could consider both the government and defendant's evidence, but finding that "there was sufficient evidence presented in the Government's case-in-chief to uphold the verdict"); 2A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 467 (4th ed.) ("The court must look to all of the evidence, and must take the view of the evidence and the inferences therefrom in the light most favorable to the government.  That the testimony is in conflict is not in itself enough to require judgment of acquittal.").

Sherman Act is void-for-vagueness as applied to this case.[11]  Docket No. 860.  The Court has already considered and rejected a number of these arguments, and incorporates those orders herein.

### 1. Vagueness

As the Court stated in its order denying Mr. Kantola's motion to dismiss the indictment, "Mr. Kantola neither cites nor lays out the standard for determining the vagueness of a law or identifies a case that has held that § 1 is unconstitutionally vague."  Docket No. 553 at 10.  Mr. Kantola's argument is brief and consists mainly of a citation to Mr. Bryant's testimony for the proposition that ordinary people are unable to understand what constitutes a violation of the Sherman Act.  *See* Docket No. 876 at 15. The Court rejects this argument for the same reasons given in the Court's order on Mr. Kantola's motion to dismiss.  *See* Docket No. 553 at 9-10.  Similarly, the Court rejects Mr. Kantola's argument that, "[a]s a matter of law, information exchanges are judged by the rule of reason."  *Id.* at 12.  This case is charged as price-fixing and bid-rigging, which are "horizontal restraints" in that they are "imposed by agreement between competitors," and, as a result, are per se unreasonable.  *See Sharp*, 485 U.S. at 723. The Court has already rejected the argument that "market analysis is required to demonstrate intent" in its order denying defendants' motions to dismiss, Docket No. 553 at 7 n.1, and rejects the argument again for the same reasons.[12]

---

[11] Mr. Kantola's second and fourth arguments are joined by Mr. Penn, Docket No. 880 at 2 n.1, Mr. Austin, Docket No. 874 at 3 n.1, and Mr. Little, Docket No. 882 at 3 n.1.  Mr. Lovette orally joined Mr. Kantola's second argument on December 16, 2021.

[12] The defendants also argued extensively against the Court's inclusion of Instruction No. 16, which instructed the jury, *inter alia*, that "[c]onspiracies to rig bids and fix prices are deemed to be unreasonable restraints of trade and therefore illegal,

17

## 2. Insufficiency of the Evidence

The testimony of Mr. Bryant, viewed in the light most favorable to the government, is sufficient for a reasonable jury to find that Mr. Kantola joined the conspiracy by the time of the 2014 RSCS negotiations.  Mr. Bryant testified that Mr. Kantola engaged in price-fixing with Pilgrim's.  Docket No. 860 at 41.  The basis of Mr. Bryant's knowledge was Mr. Bryant overhearing phone calls between Mr. Austin and Mr. Kantola and receiving information that Mr. Austin "relayed" from Mr. Kantola.  *Id.* at 43-44.  Mr. Bryant testified that Mr. Austin and Mr. Kantola frequently shared prices between 2014 and 2017 and the purpose of the information exchange was either to raise prices or prevent a price decrease for both Pilgrim's and Koch.  *Id.* at 46-47.  Mr. Bryant also testified that, when he asked Mr. Austin for competitor price information to assist Pilgrim's in developing its 2017 RSCS bid, his "expectation was that [Mr. Austin] would use his contacts at other companies that I mentioned before like Carl Pepper and Bill Kantola and Scott Brady and come back to me with pricing guidance on where our bid needed to be to be No. 2 in price."  *Id.* at 99.  This expectation was based on what he had observed in 2014.  *Id.* at 99-101.

As noted about Exhibit 1822 above, Mr. Austin emailed Mr. Bryant on January 17, 2017 that "Koch meets with [RSCS] Friday."   GX-1822.  Mr. Bryant understood this to mean that "Bill Kantola was going to meet with KFC on that Friday and that Roger and Bill – Roger Austin and Bill Kantola would speak and we would find out the details

without consideration of the precise harm they have caused or any business justification for their use."  Docket No. 921 at 18.  The Court incorporates its oral ruling on December 7, 2021 rejecting defendants arguments against the inclusion of Instruction No. 16.

of that meeting." Docket No. 860 at 96. Mr. Bryant believed that, though the email only said Koch, it meant Mr. Kantola because Mr. Kantola and Mr. Austin spoke routinely and Mr. Bryant "got information from Roger that was provided by Bill Kantola and Bill Kantola worked at Koch." *Id.* at 97. Mr. Bryant testified that he asked Mr. Austin to find out competitor prices so that Pilgrim's could be the second highest bidder, and he did receive competitor pricing information for the bid. *Id.* at 100-01; GX-1882. Viewed in a light most favorable to the government, this evidence is sufficient for a reasonable jury to find that Mr. Kantola joined the conspiracy by 2014 with the intent to advance its goals.

### 3. Variance

Mr. Kantola argues that the government, rather than proving a single over-arching conspiracy, only introduced evidence as to multiple conspiracies. Docket No. 876 at 13-15. "It is a fundamental precept of federal constitutional law that a court cannot permit a defendant to be tried on charges that are not made in the indictment." *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995) (alteration, internal quotation marks, and citation omitted). The Tenth Circuit recognizes two types of variances: simple variances and constructive amendments. *United States v. Koerber*, 10 F.4th 1083, 1115 (10th Cir. 2021).

> At one end of the variance spectrum is a simple variance, which occurs when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. . . . At the other end of the spectrum is a more severe alteration known as a constructive amendment. A constructive amendment occurs when the district court's instructions and the proof offered at trial broaden the indictment.

*Id.* at 1115-16 (alteration, internal quotation marks, and citation omitted).  Mr. Kantola argues that a simple variance occurred.  Docket No. 876 at 13-15.  This issue was argued extensively both in jury instruction conferences and with respect to the jury note written on December 15, 2021 at 2:45 p.m.  Docket No. 923 at 5.  The Court has already found that the testimony of Mr. Bryant is sufficient for a reasonable jury to conclude that the charged conspiracy existed.  *See supra* Section III.A.  Accordingly, the Court rejects this argument.

### 4.  *Statute of Limitations*

Mr. Kantola argues that, if there was any conspiracy, he withdrew before October 6, 2015.  Docket No. 876 at 12.  He additionally argues that there is no evidence that Mr. Kantola engaged in a conspiratorial act after October 6, 2015 or that Pilgrim's or other suppliers received payments on artificially increased prices after that date.  *Id.* at 12-13.  At the jury instruction conference on December 7, 2021, Mr. Kantola argued for an instruction on withdrawal, stating that a resumption of competition showed Mr. Kantola's withdrawal.  The Court rejected this assertion, finding that there was an insufficient factual predicate to give a jury instruction on withdrawal as to Mr. Kantola.  For the same reasons, the Court will deny Mr. Kantola's motion to the extent it argues that he withdrew from the alleged conspiracy.

As to Mr. Kantola's statute of limitations argument, the Court will also reject it.  Once Mr. Kantola joined the conspiracy, there is no need for the act within the statute of limitations period to have been made by him.  *Kemp*, 907 F.3d at 1270 (a Sherman Act conspiracy "remains actionable 'until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in overt

acts designed to accomplish its objectives.'" (quoting *United States v. Inryco, Inc*., 642 F.2d 290, 293 (9th Cir. 1981)).  Mr. Byrant's testimony is sufficient to support a reasonable jury finding that conspiratorial acts were taken in 2017 with respect to the 2017 RSCS negotiations.  Accordingly, the Court will deny Mr. Kantola's motion.

### H.  Jimmie Little

Mr. Little argues that there is insufficient evidence to support a conviction.[13]  Docket No. 882 at 3.  For the following reasons, the Court disagrees.

Mr. Bryant testified that Mr. Little collected information from competitors in order to increase prices with another competitor without the fear of losing volume.  Docket No. 860 at 29-30.  Mr. Bryant based this understanding on phone conversations in approximately 2014 and 2015 where Mr. Little "relayed information from conversations he had with – I can't remember their name, but a person at Holmes[14] and a person at Tyson Foods."  *Id.* at 30.  Mr. Bryant "recall[ed] [Mr. Little] relaying that he talked to his contact at Holmes and what they were going to submit on pricing.  I don't remember the customer.  I just remember we had a shared customer with them and he was relaying what they were going to submit versus us on that shared customer."  *Id.*  Mr. Bryant believed that Mr. Little was collecting this information in order to increase prices, together with Holmes, and not lose volume.  *Id.* at 31.  The basis of this understanding was past phone calls and conversations between Mr. Bryant and Mr. Little.  *Id.* at 30-31.

---

[13] Mr. Little joins the portions of Mr. Kantola's motion arguing that the government has not proven an undue restraint of trade and that there has been an improper variance.  Docket No. 882 3 n.1.  The Court rejected these arguments in the section of the Order pertaining to Mr. Kantola.

[14] Holmes is a poultry processor in Texas.  Docket No. 860 at 30.

The government also presented evidence of Mr. Little gathering competitor pricing information. For instance, the Unified Foodservice Purchasing Co-op ("UFPC")[15] 2013 first-round contract bids were due on October 10, 2012. GX-1438. On October 8, 2012, Mr. Little had phone calls with Mr. Kantola and Mr. Brady. GX-90-10 at 1-2; GX-1432 at 3; GX-1434 at 1. Claxton, Koch, and Pilgrim's then all submitted dark meat bids of 30 cents back. GX-9691 at 3; GX-9692 at 2; GX-9693 at 2. A reasonable jury could conclude that Mr. Little played a similar role in the 2014 RSCS negotiations. On August 18, 2014, Mr. Little had phone calls with Mr. Kantola, Mr. Austin, and Mr. Pepper. GX-90-10 at 1-3; GX-1235 at 1-3. Mr. Little also spoke with his supervisor, Mr. Austin, who spoke with his supervisor, Mr. McGuire. GX-90-10 at 1-2; GX-1235 at 3; GX-1236 at 2. Mr. McGuire then sent an email to Mr. Penn stating that "Roger [Austin] did some checking around" and listing the "range of the total increases" that Pilgrim's competitors were submitting in their bids. GX-9744. The Court has already concluded that a reasonable jury could find this evidence supported Mr. Penn's involvement in the conspiracy. *See supra* Section III.B. The Court finds the same with respect to Mr. Little. A reasonable jury could conclude that Mr. Little's communication with competitors preceding a bid submission, where Pilgrim's then had access to competitor pricing information, was made pursuant to an agreement to fix prices.

The government also presented evidence of Mr. Little's negotiations with respect to Pollo Tropical in 2014. Joseph Brink, the purchaser for Pollo Tropical, testified that he was "shocked" by the price increases Pilgrim's sought. Docket No. 896 at 25.

---

[15] UFPC was the predecessor to RSCS. Docket No. 890 at 8.

However, Mr. Brink testified that Mr. Little refused to negotiate and told him that "this is the price."  *Id.* at 36, 60-63.  Mr. Little repeatedly communicated with Walter Cooper of Claxton during this time period.  GX-90-10 at 1-2; GX-584 at 1-2; GX-585; GX-587; GX-588 at 3; GX-589 at 1-2.

The Court finds that, "considering the collective inferences to be drawn from the evidence as a whole," *Tennison*, 13 F. 4th at 1059, there is sufficient evidence for a reasonable jury to conclude that Mr. Little joined the conspiracy by 2012 with the intent to advance its goals.  Accordingly, the Court will deny Mr. Little's motion.

### I.  William Lovette

Mr. Lovette argues that there is insufficient evidence to sustain a conviction against him.  *See generally* Docket No. 881.  The government objects, arguing that Mr. Lovette "participated in the conspiracy with a clear understanding of its aims."  Docket No. 900 at 19.  The government cites the following evidence to support this claim: (1) Mr. Penn reported to Mr. Lovette, the Pilgrim's CEO, for much of the alleged conspiracy period; (2) Mr. Penn received competitor bid proposals for the 2014 RSCS contract negotiations in an email and responded that he would discuss the information with Mr. Lovette; (3) Mr. Lovette agreed with Joe Grendys, CEO of Koch, to reject Sysco's proposal for 65-day payment terms; and (4) Mr. Lovette advanced the conspiracy through Mr. Austin.  *Id.* at 18-19.

The Court has previously discussed Exhibit 1074 and found that it supports that Mr. Penn knowingly joined the conspiracy.  *See supra* Section III.B.  In the exhibit, Mr. Penn receives an email from Mr. McGuire that "Roger did some checking around" and the ranges of increases that competitors were using for the 2014 RSCS negotiations.

GX-1074.  Mr. Penn responded, "I am good.  Will review with Bill in am.  Will advise."
*Id.*  It is a reasonable inference that Mr. Lovette is the "Bill" Mr. Penn refers to, as Mr.
Lovette was his boss and goes by Bill.  Additionally, it is a natural inference that Mr.
Penn did review the competitor price ranges with Mr. Lovette.  Mr. Penn told a co-
conspirator he would do so and Mr. Lovette was the Pilgrim's CEO.  Mr. McGuire's
email indicates that Pilgrim's "wanted to be the leader," *id.*, and competitor information
would be necessary for Pilgrim's to know and for Mr. Penn to discuss with Mr. Lovette.
A reasonable jury could conclude that Mr. Penn discussed this information with Mr.
Lovette in order to obtain Mr. Lovette's approval, and that Mr. Lovette therefore had
joined the conspiracy.

The government additionally points to Exhibit 1051, where, on August 26, 2014,
Mr. Austin emailed Mr. Penn a detailed recap of his meeting with RSCS the week
before.  GX-1051.  Mr. Austin indicates that he will be "hold[ing] firm" on the price in the
negotiations.  *Id.*  Mr. Penn then forwarded the email to Mr. Lovette saying, "I told Roger
to proceed."  *Id.*  A little over two hours after Mr. Penn forwarded the email to Mr.
Lovette, Mr. Lovette called Mr. Austin and they had a fifteen minute conversation.  GX-
10-2; GX-1237 at 2; GX-90-10 at 2.  Later that day, Mr. Brady texted Mr. Fries that he
"talked to [R]oger [Austin] about KFC and Greeley told him not to come down on price."
GX-1238.  It is a reasonable inference that Mr. Lovette was directing Mr. Austin's price
negotiations and was doing so pursuant to an agreement to fix prices.

"[C]onsider[ing] both direct and circumstantial evidence, together with the
reasonable inferences to be drawn therefrom" and "the collective inferences to be
drawn from the evidence as a whole," *Tennison*, 13 F.4th at 1059 (citation omitted), a

reasonable jury could conclude that Mr. Lovette knowingly joined the charged

conspiracy, knowing of its goal and intending to help accomplish it.  Accordingly, the

Court will deny Mr. Lovette's motion for judgment of acquittal.

### J.  Gary Brian Roberts

#### 1.  Written Motion

Mr. Roberts argues that the evidence is insufficient to sustain a guilty verdict.

*See generally* Docket No. 877.  Mr. Roberts argues that the government introduced no

evidence showing that Mr. Roberts was aware of or joined the charged conspiracy.  *Id.*

at 2.  The government responds, arguing that (1) Mr. Roberts spoke with competitors in

order to assure a price increase for the 2014 RSCS negotiations; and (2) Mr. Roberts

approved and encouraged the participation of Mr. Pepper in the conspiracy.  Docket

No. 900 at 27-29.

The Court finds that the evidence is sufficient for a reasonable jury to conclude

that Mr. Roberts joined the alleged conspiracy, knowing of its goal and intending to help

accomplish it.  Tyson submitted its bid in the 2014 RSCS negotiations eight days early,

on August 11, 2014.  *See* GX-1137; GX-1190; GX-1191.  On August 15, 2014, Mr.

Roberts spoke with Mr. Penn twice[16] and Mr. Brady three times.  GX-90-10 at 1-3; GX-

1231 at 1-3.  A reasonable jury could concluded that Mr. Roberts, whose company Mr.

Bryant testified was part of the charged conspiracy, was speaking with Mr. Brady and

Mr. Penn in order to shore up support for the price increase Tyson had included in its

bid submission.  Accordingly, the Court finds that the evidence, read in the light most

---

[16] There was an additional call the morning of August 15, 2014 from Mr. Penn to
Mr. Roberts that had an elapsed time of 0 minutes.  GX-1231 at 1.

favorable to the government, is sufficient to find that Mr. Roberts knowingly joined the alleged conspiracy by August 2014, knowing of its goal and intending to help accomplish it.  The Court will deny Mr. Roberts' motion.[17]

### 2.  *Oral Motion*

Mr. Roberts orally renewed his Rule 29 motion on December 6, 2021 after the close of all evidence.  Mr. Roberts noted that he had previously filed a motion for mistrial based on constructive amendment, which the Court had denied as premature.  Mr. Roberts renewed this argument, stating that the government failed to show a single overarching conspiracy and instead showed multiple, smaller conspiracies.  Mr. Roberts additionally argued that the alleged conspiracy was complete at the time of any agreement and therefore the statute of limitations would have run.  To the extent Mr. Roberts argues that a variance occurred because the indictment charged an overall conspiracy and the evidence showed only multiple, smaller conspiracies, the Court rejects this argument for the reasons given in Section III.G.3 with respect to Mr. Kantola.  Moreover, the Court rejects Mr. Roberts' statute of limitations argument for the reasons given in Section III.G.4.

---

[17] On December 6, 2021, Mr. Roberts called Brandon Campbell as a witness.  *See* Docket No. 905.  Mr. Campbell has been employed by Tyson in a number of positions, including small bird pricing.  *Id.* at 5-6.  Mr. Campbell testified, *inter alia*, that the small bird business was "not a profitable business" so "the direction from the business unit was to expand our margins on our small bird business unit to be able to get to a more sustainable profit margin."  *Id.* at 24.  A reasonable jury could find more credible the evidence showing that Mr. Roberts was attempting to shore up support for the Tyson price increase pursuant to the charged conspiracy.  *See* authority cited *supra* note 10.

To the extent Mr. Roberts orally renews his arguments regarding a constructive amendment, the Court rejects them for the following reasons.[18]  The mistrial motion does not cite any caselaw for the proposition that each act alleged in the indictment is a separate charge.  *See generally* Docket No. 812.  Additionally, the arguments based on *Kotteakos v. United States*, 328 U.S. 750 (1946), *see* Docket No. 812 at 10-11, are misplaced.  As discussed extensively at the December 7, 2021 jury instruction conference and the Court's answer to the jury note written on December 15, 2021 at 2:45 p.m, Docket No. 923 at 5, the government may sustain its burden by proving a narrower conspiracy fully contained within the charged conspiracy.  Docket No. 921 at 24; *United States v. Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005) ("A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment." (quotation omitted)).  Accordingly, the Court rejects these arguments.

### K.  Rickie Blake

Mr. Blake argues that there is insufficient evidence to sustain a conviction.  *See generally* Docket No. 879.  The government argues that there is sufficient evidence to support a conviction based on: (1) telephone calls Mr. Blake had with co-conspirators; (2) a text message from Mr. Brady to Mr. Fries that "George's is .30 back on dark meat" that occurred five minutes after a phone call between Mr. Brady and Mr. Blake; (3) Mr.

---

[18] The portion of the mistrial motion that seeks a mistrial is moot in light of the Court's order declaring a mistrial on December 16, 2021.  However, the Court considers the arguments raised in the motion in the context of the Rule 29 motion.

Austin's inclusion of George's pricing in emails that contained competitor pricing; and (4) Mr. Olson's belief that Mr. Blake was uncharacteristically inflexible during 2014 negotiations and that Mr. Olson's meeting with Mr. Roberts was very similar to that with Mr. Blake.  Docket No. 900 at 34-36.

The testimony of Mr. Bryant, combined with the other evidence introduced by the government, is sufficient for a reasonable jury to conclude that George's was part of the charged conspiracy.  *See supra* Section III.A.  The government's evidence supports reasonable inferences that Mr. Blake shared George's price information with competitors pursuant to an agreement to fix prices.  The fall 2012 UFPC bidding process provides the most concrete example.  On September 28, 2012, Mr. Ledford sent a Request for Information ("RFI") to the suppliers.  GX-1438.  It set a deadline of October 10, 2012 to respond.  *Id.*  Between October 4, 2012 and October 9, 2012, Mr. Blake spoke with Mr. Kantola and Mr. Roberts.  *See* GX-90-10 at 1, 3; GX-1430 at 2; GX-1431 at 2.  Darrel Keck submitted George's RFI response on October 10, 2012.  GX-1406; GX-9690.  Second round bids were due on November 14, 2012.  *See* GX-1439 at 1.  On November 13, Mr. Blake spoke with Mr. Pepper and Mr. Brady.  *See* GX-90-10 at 1, 3; GX-1426 at 2; GX-1440 at 2.  Immediately after Mr. Blake spoke with Mr. Brady, Mr. Brady texted Mr. Fries, "George's is .30 back on dark meat."  *See* GX-90-10 at 1; GX-1426 at 2; GX-1427.  It is a reasonable inference that Mr. Blake informed Mr. Brady how far "back" George's dark meat bid would be.  It is also a reasonable inference that Mr. Blake provided competitors with the George's prospective bid information with the expectation that they would reciprocate.  When coupled with Mr. Bryant's testimony implicating George's in the charged conspiracy, a reasonable jury

could conclude that Mr. Blake knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it.

Further incidents support this conclusion.  On November 28, 2012 and February 1, 2017, Mr. Austin informed his supervisors at Pilgrim's that he would get the "pulse" on competitor positions; both times, he had phone calls with Mr. Blake shortly thereafter.  *See* GX-90-10; GX-1849; GX-1961 at 2; GX-1544 at 2; GX-1428 at 1. Accordingly, the Court will deny Mr. Blake's motion for judgment of acquittal.[19]

## IV.  CONCLUSION

The Court finds that the evidence is sufficient for a reasonable jury to find that the charged conspiracy existed and that each defendant knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it.  *See, e.g.*, *Metropolitan*, 728 F.3d at 451 ("Our examination of the evidence, with a view most favorable to the government, leads us to conclude that there is substantial proof, direct or circumstantial, together with reasonable inferences to be drawn therefrom, to sustain the burden of proving that the appellants were guilty of intentionally participating in a conspiracy to rig bids beyond a reasonable doubt.").  For the foregoing reasons, it is

**ORDERED** that Jayson Jeffrey Penn's Motion for Judgment of Acquittal [Docket No. 880] is **DENIED**.  It is further

---

[19] The Court has considered the evidence presented by Mr. Blake on December 6, 2021 through the testimony of Brenda Ray, Julie Lawrence, and Rhonda Warble and the documents moved into evidence.  A reasonable jury could give more weight to the evidence showing that Mr. Blake shared future price information and George's was part of the charged conspiracy, and make the inference that Mr. Blake shared the information in order to advance the conspiracy.  *See* authority cited *supra* note 10.

**ORDERED** that Defendant Mikell Fries' Motion for Judgment of Acquittal [Docket No. 875] is **DENIED**.  It is further

**ORDERED** that Defendant Scott Brady's Motion for Judgment of Acquittal [Docket No. 878] is **DENIED**.  It is further

**ORDERED** that Defendant Roger Austin's Rule 29 Motion for Acquittal [Docket No. 874] is **DENIED**.  It is further

**ORDERED** that Defendant Timothy Mulrenin's Motion for Judgment of Acquittal [Docket No. 884] is **DENIED**.  It is further

**ORDERED** that Defendant William Kantola's Memorandum in Support of Motion for Judgment of Acquittal [Docket No. 876] is **DENIED**.  It is further

**ORDERED** that Defendant Jimmie Little's Motion for Judgment of Acquittal [Docket No. 882] is **DENIED**.  It is further

**ORDERED** that William Lovette's Motion for Judgment of Acquittal [Docket No. 881] is **DENIED**.  It is further

**ORDERED** that Defendant Roberts' Motion for Judgment of Acquittal [Docket No. 877] is **DENIED**.  It is further

**ORDERED** that Mr. Blake's Motion for Judgment of Acquittal [Docket No. 879] is

**DENIED**.


DATED January 13, 2022.

BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge