```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 20-CR-00152-PAB
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    JAYSON JEFFREY PENN,
 7  MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
 8  ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
 9  WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12       Defendants

13  _____

                       REPORTER'S TRANSCRIPT
14                  Trial Preparation Conference

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 9:04 a.m., on the 10th day of February,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
 1                           APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng,
 4    U.S. Department of Justice, 450 Fifth Street N.W., Washington,
 5    DC 20530, appearing for Plaintiff.
 6            Anna Tryon Pletcher and Michael Tubach of
 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8    San Francisco, CA 94111-3823;
 9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10    N.W., Washington, DC 20006, appearing for Defendant Penn.
11            David Beller, Richard Kornfeld and Kelly Page of
12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13    CO 80202, appearing for Defendant Fries.
14            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16             Laura Kuykendall and Megan Rahman of Troutman Pepper
17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18    appearing for Defendant Brady.
19            Michael Felberg of Reichman, Jorgensen, Lehman,
20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21    10017;
22
23
24
25
```

```
 1                    APPEARANCES (Continued)

 2            Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5            Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7            Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10            James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12            Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14            Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16            Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19            John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

1            APPEARANCES (Continued)

2            Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5            Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                      PROCEEDINGS

16           THE COURT:  The matter before the Court is United

17   States of America versus Jayson Jeffrey Penn and others.  This

18   is Criminal Case 20-CR-152.

19           I will take entries of appearances, and I will start,

20   first of all, with the United States.  If you don't mind, I

21   know that some people are on VTC.  If you could indicate that.

22   And each person doesn't have to enter his or her appearance,

23   but rather one person could enter appearances on behalf of

24   multiple people.  But if you could let me know who is appearing

25   by VTC and who is in person, or why don't we just assume that

1    if you mention VTC, otherwise they are in person.  We'll make a

2    good record in that regard.

3                Ms. Call?

4                MS. CALL:  Yes, Your Honor.  Heather Call on behalf of

5    the United States.  And I am joined by my colleagues, Paul

6    Torzilli, Laura Butte, Jill Rogowski and Carolyn Sweeney in

7    person and Michael Koenig on the VTC.

8                THE COURT:  Good morning to you.

9                MS. CHENG:  And Cecilia Cheng is appearing on VTC as

10   well.

11               THE COURT:  Good morning to you.

12               On behalf of Mr. Penn?

13               MR. TUBACH:  Good morning, Your Honor.  Michael Tubach

14   on behalf of Mr. Penn who is here today.  Joining me is

15   Ms. Pletcher of my office and Brian Quinn and Chad Williams of

16   Davis, Graham & Stubbs.

17               THE COURT:  Good morning to you.

18               On behalf of Mr. Fries?

19               MR. KORNFELD:  Good morning, Your Honor.  Rick

20   Kornfeld, David Beller, Kelly Page on behalf of Mr. Fries.

21   Mr. Fries is appearing via VTC.

22               THE COURT:  Good morning to each of you as well.

23               On behalf of Mr. Brady?

24               MR. LAVINE:  Good morning, Your Honor.  Bryan Lavine,

25   Megan Rahman and Tiffany Bracewell appearing on behalf of

1    Mr. Brady.  Mr. Brady is appearing via VTC.

2            *THE COURT:*  And good morning to you.

3            And on behalf of Mr. Austin?

4            *MS. CARWILE:*  Good morning, Your Honor.  Laura Carwile

5    joined by my colleague, Julie Withers, in person.  Our client,

6    Roger Austin, is joining by VTC.  And we hope our colleague,

7    Michael Feldberg, is also on the VTC link, although he may not

8    be.

9            *THE COURT:*  I don't think he is, at least I don't see

10   him.

11           *MS. CARWILE:*  He may join.

12           *THE COURT:*  That's fine, great.  And good morning to

13   you.

14           On behalf of Mr. Mulrenin?

15           *MS. PREWITT:*  Good morning, Your Honor.  Elizabeth

16   Prewitt and Marci LaBranche for Mr. Mulrenin.  And Mr. Mulrenin

17   is appearing by VTC, Your Honor.

18           *THE COURT:*  Yes.  I see him and good morning to each

19   of you.

20           On behalf of Mr. Kantola?

21           *MS. HENRY:*  Good morning, Your Honor.  Roxann Henry on

22   behalf of Mr. Kantola along with Mr. James Backstrom.  And

23   Mr. Kantola is present in the courtroom.

24           *THE COURT:*  Yes.  Good morning to each of you.

25           And on behalf of Mr. Little?

1           *MR. BYRNE:*  Good morning, Your Honor.  Mark Byrne

2   appearing personally.  Jennifer Derwin and Dennis Canty

3   appearing by VTC.  And Mr. Little, I see him now appearing by

4   VTC.

5           *THE COURT:*  Yes, I see that.  Good morning to each of

6   you.

7           On behalf of Mr. Lovette?

8           *MR. FAGG:*  Good morning, Your Honor.  John Fagg.  I am

9   joined by Dru Nielsen and Kaitlin Price and my colleague, Jim

10  McLoughlin, is on VTC.  Are you there?

11          *THE COURT:*  He may not be right now.

12          *MR. FAGG:*  I did see him a few minutes ago.

13          *THE COURT:*  He may be temporarily disconnected.  Good

14  morning to you.

15          On behalf of Mr. Roberts?

16          *MR. GILLEN:*  Good morning, Your Honor. Craig Gillen.

17  I am joined by Anthony Lake, Richard Tegtmeier.  And

18  Mr. Roberts is joining by VTC.

19          *THE COURT:*  I see Mr. Roberts.  Good morning to each

20  of you.

21          On behalf of Mr. Blake?

22          *MS. JOHNSON:*  Good morning, Your Honor.  Wendy Johnson

23  and Barry Pollack here on behalf of Mr. Blake.  Mr. Blake, our

24  client, is joining via VTC with our colleague, Christopher

25  Plumlee, as well as we have Ms. Courtney Millian joining by

1  VTC.

2          THE COURT:  And I see Mr. Blake and Mr. Plumlee on

3  VTC.  Good morning to each of you.

4          MR. POLLACK:  Good morning, Your Honor.

5          THE COURT:  We are here today for a hearing on a

6  number of different things.  As I had indicated I think in a

7  minute order yesterday, we will start off by talking about

8  things pertaining to the trial, kind of a trial prep

9  conference.  We won't need to go over everything because we've

10  done this before, but we'll talk about a few things.

11          I am glad that the conflicts that some of the

12  attorneys had cleared.  Once I learned that the West Virginia

13  judge in Mr. Pollack's conflict had excused himself, I figured

14  that conflict would probably go away.  And I also thought that

15  Ms. Tubach and Ms. Pletcher's conflict might go away because

16  that trial seemed to be set a little too early in the Omicron

17  pandemic.  In any event, I don't know why that continued, but

18  it did.

19          Keep in mind, though, that I think we are scheduled to

20  end -- the last day of this trial will be on March 29, which I

21  think is a Tuesday.  That will be the last day of the trial.

22  Of course, the jury may still be deliberating, but that will be

23  the last day of the trial.  I am hoping that things go

24  smoothly.  We didn't have any problems last time even though we

25  had a lot of down time where we didn't have the jury in the

 1  courtroom, but that is the outside date of the trial.

 2       After that, as I indicated yesterday as well, I think

 3  that the most efficient use of our time would be to start going

 4  through those exhibits, the new exhibits.  And I tried to group

 5  them.  The grouping is not perfect, of course, but I want to

 6  try not to, you know, go through them one by one and have a

 7  parade up to the podium because as we know from the last trial,

 8  that is highly inefficient or at least it takes a lot of time.

 9       I understand where individual defendants may have

10  individual points, but if we can gain some efficiencies by

11  considering things in groups if that makes sense, let's try to

12  do that, try to get through those.  And then we will turn our

13  attention back to the motions this afternoon, assuming that

14  we've got time to do that.

15       I can, of course, rule on those motions without --

16  because they are already fully briefed.  This is unlike the

17  exhibits where we don't really have full explanations on those,

18  so that's why I am intending to put those towards the back, but

19  we will have to try to proceed as efficiently as possible so

20  that we get as much done today as we possibly can.

21       Anyone want to bring up some things before we dig into

22  the things that I just mentioned?  Okay.  So let us then talk

23  about some trial preparation things.  So once again, just to

24  remind you, and I know that you have transcripts of all this

25  and can check it, but so the first day of trial will begin at

1    8:00 a.m.  We won't, of course, have the jurors here, but we'll

2    see whether there is any last-minute issues that we need to

3    take up.

4            Once again, as I emphasized last time, no surprises

5    on -- we don't -- no emergency motions on the first day of

6    trial.  Anything that we can possibly resolve in advance of

7    Monday at 8:00 a.m. filed as much ahead of the trial as

8    possible because we want to make sure that jury selection

9    proceeds expeditiously on the first day and we don't keep the

10   jury waiting downstairs.

11           Just like last time, unfortunately because of the need

12   to socially distance people, you'll only be allowed to have a

13   client and two people, in other words, the people above the bar

14   in the courtroom.  And I guess we'll have to -- I think that

15   what we did last time is we opened up another courtroom so the

16   attorneys who couldn't fit in the courtroom were able to watch

17   the proceedings, so we will do that again this time.  And then

18   once we are done with jury selection, we have all those people

19   who are back in the gallery out, then we'll open up the

20   courtroom and hopefully everyone will fit.  If for some reason

21   they don't fit because there are more spectators or whatever,

22   then we will keep the overflow courtroom open until such time

23   as we don't need to anymore.

24           Once again, I am going to bar you from doing internet

25   research of jurors for purposes of jury selection, same order

1    as before.  I am this time going to use three alternates.  I

2    think we'll go with three this time.  It presents -- you know,

3    we have the logistical difficulties because we have so many

4    tables in the courtroom of, you know, where we are going to put

5    people -- poor Mr. Kahler as you all recall was kind of on the

6    chair with wheels on the outside -- but I think that we can

7    maybe accommodate that a little bit more.

8         So I am going to go with three, so that will give you

9    each an extra challenge.  So as a result, the government will

10   have eight.  The defendants will have 12.  And the replacement

11   jurors in the event that there is a successful challenge for

12   cause will -- I am sorry, so the presumptive group will be 15,

13   so we have three, so 12 plus three.  So that means that once we

14   start exercising challenges, which will just be to the 15, the

15   first replacement person will be juror 16, okay?  We will play

16   musical chairs like we did last time.

17        And here are the alternate seats which I just randomly

18   picked:  Seats 5, 10 and 13; 5, 10 and 13.

19        Do both sides want to go with the same rule that we

20   had last time which is that the challenges to the alternate

21   seats can be exercised at any point in time?

22        Any disagreement with that, Ms. Call?

23        MS. CALL:  No disagreement.

24        THE COURT:  And I think there is agreement among -- I

25   see lots of nodding affirmatively that we should go with that

1    rule, so we will do that for purposes of this trial as well.

2          Once again, we'll use the transceiver system.  I think

3    that worked quite well the last time, a few glitches, but on

4    the whole it's a reliable system and hopefully that will

5    continue to be so.  Only if we got into some blissful period of

6    post-Omicron immunity would we ever consider relaxing a mask

7    requirement.  I don't really anticipate that is going to

8    happen.  And in any event, I think that there are too many

9    people to even do a bench conference over at the side anyway,

10   so the transceiver system, I think, we would want to retain it

11   regardless.

12         All right.  Any questions that you have about jury

13   selection?

14         Yes, Ms. Call, go ahead.

15         *MS. CALL:*  Actually, just one logistical question on

16   the transceivers.  I noticed coming to the podium today there

17   isn't the battery box anymore to turn this microphone off.

18   Sitting down here should we be doing a different --

19         *THE COURT:*  I think we wired it.  Is that what

20   happened, Ms. Grimm?  Yeah, in order to avoid our battery

21   problems, I think we have it hard-wired somehow.  I haven't had

22   a chance to look at that.  I forgot.  That's a good point.

23         Mr. Beller?

24         *MR. BELLER:*  A couple of questions.  One, given that

25   we now have an extra alternate, I am wondering if the Court

1    would allow each side an additional five minutes of voir dire.

2            *THE COURT:*  Granted.  We will go with 50 minutes.

3            *MR. BELLER:*  My next question, Your Honor is -- thank

4    you very much.

5            My next question is if the Court -- I believe the

6    practice standards actually set forth -- or rather the local

7    rules set forth the order in which peremptories are to be

8    stricken, and I simply don't recall if those include the

9    additional alternate.

10           *THE COURT:*  That's a good question.  I didn't

11   double-check that.  Why don't I do this.  I'll take a look at

12   that order.  What usually happens -- actually, I think I do

13   know the answer to it.  As you know, in some rounds the

14   defendants have two challenges and in other rounds one.  With

15   the alternates, it's just in those tail end rounds, it's just

16   one per side.  And we'll do it the same.  We'll just -- it will

17   go a little bit -- one round longer, but it would just be one

18   per side, then.

19           *MR. BELLER:*  Thank you, Your Honor.

20           And then my final question is in the last trial the

21   Court had advised the jury that while we are 10 individual

22   defendants, that for the purposes of efficiency and expediency,

23   that we are combining.  And I am hoping that the Court will

24   give the same cautionary instruction.

25           *THE COURT:*  Yeah, I will do the same.

1          MR. BELLER:  Thank you, Your Honor.

2          THE COURT:  Mr. Beller, go ahead.

3          MR. BELLER:  I said I had one final question and I am

4   going to add to that and be greedy.  Your Honor, I am hopeful

5   that the Court would consider when introductions of parties are

6   made, if the Court would allow the removal of the mask just

7   momentarily for both sides to be able to simply say good

8   morning so that the jury can see us.

9          THE COURT:  Yes.  That's allowed under the local rules

10  anyway.  We didn't do that last time, but that is fine.  What

11  we want to avoid is talking without the mask, but introductions

12  without a mask I think is perfectly fine.

13         MR. BELLER:  Thank you, Your Honor.

14         THE COURT:  So just in case I forget to mention to the

15  jury that that is a perfectly appropriate thing to do, someone

16  can stand up and remind me of that, and then I'll let the

17  jurors know that that's allowed.  And anyone who would like to

18  do so may do so.  They don't have to, but if they want to, they

19  can, okay?

20             All right.  So we already talked about the time, so we

21  are going to increase the time per side to 50 minutes.  And

22  then in terms of the government's proposed voir dire -- I

23  didn't compare them to the government's questions last time.

24  The only one that I had a little bit of a problem was -- oh,

25  there was a question about what websites people looked at.

 1    Similar to one of the other questions, you should warn the

 2    jurors -- or tell the jurors that they don't have to reveal --

 3    indicate any political websites.  I don't want to kind of get

 4    into political websites they may be looking at.  Otherwise,

 5    those questions all seem fine.

 6            The defendants' questions, the same, the same

 7    questions as last time, the same rulings as last time.

 8    Remember, no prefaces.  You can't give a little set speech and

 9    then ask a question.  You can't, you know, put up trial

10    balloons.  You can't mention any facts.  It just has to be

11    questions posed to people.  It went smoothly last time and I

12    anticipate it will go smoothly this time as well.

13            How about other than maybe changes of counsel,

14    anything about the preliminary instruction that you would like

15    to bring to my attention?  I did revise it just a little bit to

16    conform to the jury instructions that we ended up giving, but

17    anything that you wanted to bring up?

18            *MR. QUINN:*  Your Honor, I would mention quickly there

19    are a couple changes on the defense side, and I can give

20    Ms. Grimm those changes.

21            *THE COURT:*  No problem.  Thank you.

22            So opening statements, we'll stick with 20 minutes

23    again as before.  If the defendants want to swap their time

24    back and forth a little bit, that's acceptable.  Just -- you

25    will have to let me know.  And if you let me know in advance,

1    maybe even before the first day, that might be fine.  But if

2    you haven't decided until the first day of trial, that's okay

3    too.  But just for purposes of my keeping time and making sure

4    that it doesn't run over, I will need to know what that -- what

5    those allocations are, okay?

6              Any request for sequestration?

7         MR. POLLACK:  Yes, Your Honor.

8         THE COURT:  We just needed one.  Mr. Pollack has

9    indicated that Mr. Blake wishes that, so we will have

10   sequestration.  People did a great job during the first trial.

11   We didn't have any problems that I was aware of with that, but

12   you really have to keep vigilant and not forget to tell your

13   witnesses of the need to just not talk about the case and

14   particularly just within the building or within the security

15   line.  It's just -- it's very, very important that you drill it

16   into your witnesses and that each of you is very vigilant about

17   that as well.

18             Mr. Pollack?

19        MR. POLLACK:  Will we be following the same practice

20   that a government witness is not released from the subpoena

21   unless the defense agreed to release them at the conclusion of

22   their testimony?

23        THE COURT:  Yes.  We will do what we did last time,

24   which is when a witness is excused, I will ask whether the

25   witness is subject to recall by the defense.  So if I forget to

1    do that, don't be shy in terms of mentioning that to me so that

2    we'll try to make sure that you don't need to re-subpoena

3    someone.

4           And, of course, there is -- there may be a request to

5    subpoena certain of the government agents, but that's fine.  I

6    am doing a written order to effect, but, of course, it's best

7    to coordinate that type of thing in the event that one of the

8    government's witnesses is going to be recalled.  But yes, we

9    will, Mr. Pollack.

10          *MR. POLLACK:*  Thank you, Your Honor.

11          *THE COURT:*  Yes.  Once again, back on that point about

12   making sure that you're -- that everyone is really careful,

13   once again, Murphy's law is in full effect once the trial

14   starts.  Don't talk in the elevators because it's the person

15   you don't see in the back of the elevator, not that the

16   elevators are too crowded during the pandemic, but just be

17   real, real careful with all that.  Like I said, we -- obviously

18   people were very careful.  I didn't hear about any problems

19   during the first trial.  And I'll hopefully remember to warn

20   the respective jurors that they shouldn't have any contact with

21   you.

22          If you would do the same thing that we had talked

23   about before in terms of restroom use, if you could try to use

24   the upper levels.  I will have the jurors use the ones on the

25   lower levels.  What did we say last time, that the first and

1    second floors the jurors can be told about that, but the

2    attorneys, if they could use floors three and up just so we

3    have some separation because there's -- we are going to be

4    bringing in I think around 65 people, so it will be a lot of

5    people as you will recall from last time.

6            Yeah, Mr. Pollack.

7            MR. POLLACK:  Your Honor, I am sorry.  Before we leave

8    the sequestration point entirely, I had put in one of the 5,000

9    motions that has been filed the footnote that it's certainly

10   our understanding that Rule 615 would apply to testimony from

11   the first trial as well.  In other words, a witness in this

12   trial should not be shown testimony from the first trial, but I

13   wanted the Court to confirm that that is, in fact, the Court's

14   understanding of the rule.

15           THE COURT:  I haven't had a chance to look at that

16   yet, Mr. Pollack, so I am not -- I am unfamiliar with the law

17   on that subject.  Sorry, I will have to take a look.

18           MR. POLLACK:  Okay.  Thank you.

19           THE COURT:  Sure.  If we have a witness, an expert

20   witness who is called, as you will recall from the last trial

21   prep conference, I don't require you to tender a witness.

22   Rather, you can just call the witness and lay the foundation

23   for the witness' testimony.  My view on that particular subject

24   is that Rule 702 is focused on opinions, not people.  So my

25   blessing someone with a magic wand doesn't all of the sudden

1    make the person able to testify about any opinion within the

2    subject area that he or she can.  So you don't need to tender

3    the witness, but rather, of course, if the other side has an

4    objection, they are going to be making the objection, but you

5    should lay the necessary foundation, get the opinions in.

6         And then we talked about the exhibit notebooks.  We

7    are going to try to go more paperless next time.  I think that

8    that will hopefully make things a bit less cumbersome.  But I

9    can't remember if there was -- if we had an agreed upon

10   procedure for updating the exhibit list.  We will still need to

11   do that.

12        I need updated exhibit lists because I need to

13   indicate what's in, what's out, what the limiting instructions

14   are for each.  So if that needs to take place on a daily basis,

15   it's going to have to take place on a daily basis, you know,

16   just additional pages, whatever it is, not the whole thing

17   because I am busy writing away on it so I am not going to be

18   transferring my notes.  I don't have a little amanuensis who

19   does that overnight.  It will always just be me.  But we may

20   need that type of supplementation.

21        And, of course, to the extent that new exhibits exist,

22   I think we should probably still stick with the -- I know it

23   was a little bit cumbersome, but the process of submitting new

24   thumb drives if they need to be updated.  Once again, if you

25   have a good idea how to avoid some of that hassle, I am

1    certainly open to it; but barring some bright idea, I think we

2    will have to keep doing that.

3          Okay.  And then I didn't check back on the transcript

4    from last time, but I know that I read a few jury instructions

5    at the very beginning of the voir dire period.  Do you want me

6    to do those same ones, whatever those were?  I think

7    presumption of innocence and I am not sure if I read one about

8    defendants testifying, but whatever those were, do you want me

9    to do the same thing?

10         *MR. BELLER:*  Your Honor, it's our memory that you did

11   read the instruction regarding the defendants testifying, but

12   it is the defendants' position that the same instructions

13   simply be read again.

14         *THE COURT:*  Yeah, I will do that.

15         Okay.  Anything else that we should talk about in

16   terms of first day of trial issues, jury selection issues?

17         Okay.  All right.  Then my proposal is that we plunge

18   into the new exhibits that the government has identified as

19   ones that would be introduced without a sponsoring witness.

20   And as I said before, I have come up with some groups that may

21   be helpful, hopefully would be somewhat helpful in terms of

22   doing that.  So unless someone thinks that there is a better

23   way to handle that, why don't we dive with into that particular

24   issue.

25         Ms. Call, I will let you take it away.

1          MS. CALL:  All right.  And I do appreciate the

2     groupings you made.  I think that will be helpful.  I will

3     actually note I think the first five groupings, A through E,

4     are relatively similar, although I am sure there were

5     differences that the Court may have questions about and perhaps

6     the parties.  But with respect to all five, I will say what

7     these categories are are invoices and period pricing.

8          In the last trial, you may have heard the term

9     "current pricing" for period pricing which is essentially, as a

10    number of witnesses testified, these companies, you know, enter

11    into yearly contracts that set a price, but that's not the

12    price for the whole year.  So you have a price set in the

13    contract.  And then because grain fluctuate every period, which

14    is about a month, the actual prices charged fluctuated.  And

15    several witnesses testified to that.

16         So together kind of these invoices and the period

17    pricing establish the sales that were made pursuant to the

18    contract.  So the ones we have here are in the 2015 to 2017

19    year, so there was prices that were set as a result of the

20    negotiations that happened in 2014, which, of course, we heard

21    a lot about in the last trial.

22         The reason we are introducing these is essentially

23    together they are proof of the payment.  And as alleged in the

24    Superseding Indictment, Paragraph 50, part of the conspiracy

25    was sales and accepting payments for goods at fixed prices.  So

1    that's kind of what all these together establish.  And it's for

2    two customers in these documents, Popeye's and KFC.  So that's

3    kind of the reason why we are introducing them.

4         THE COURT:  Explain it to me again.  So I understand

5    the period pricing.  I understand how that can vary depending

6    on, you know, what the agreed upon contract terms were, but --

7    so what do these documents prove?

8         MS. CALL:  Sure.  And perhaps I may use an example, if

9    that would be helpful.

10        If Ms. Golshanara, if you should pull up Exhibit 9883

11   as well as 9816.  So the document on the left here is the

12   example of a period price.  So this is maybe like Tyson sending

13   a period price to --

14        THE COURT:  This is Docket No. 9833 for the record.

15        MS. CALL:  Thank you.

16        So that is the period price being sent to KFC to cover

17   the period, which I think is August -- July 16 through

18   August 12 of 2017, which I believe the bottom of that e-mail

19   indicates.  If you look on the right side, which is

20   Government's Exhibit 9816, that is an invoice from during that

21   period.  And the way you kind of link the two together and

22   figure out this invoice is pursuant to that period price is you

23   have to look at the right Rate column, which is the third to

24   the right on the invoice.

25        And you see there, there is a product described as

1    eight-piece and a rate of .9702.  And that is the same rate

2    that is in the e-mail in the period price.  So it's a couple

3    steps to get to it, but essentially the contract sets the base

4    level pricing.  Every month this period pricing is sent.  And

5    then on the tail end the invoices are charged at those period

6    prices during the period that follows.

7            THE COURT:  And Exhibit 9833 at the bottom explains

8    some of the factors that could cause variability in terms of

9    the period pricing, for instance the price of certain grains;

10   is that right?

11           MS. CALL:  Correct.  The grain and feed costs are the

12   main drivers.  That's really the variable section of these

13   contracts.  I think they were called margin over feed or cost

14   plus.  What these contracts did is you have things that were

15   set for the entire contract period, whether it be one year or

16   three.  That's, for example, the margin or other items.  And

17   then the feed is what really changes from period to period, and

18   the price fluctuates by period based on that.

19           THE COURT:  Okay.  And not that this means that they

20   are inadmissible, but, I mean, how do they advance the ball for

21   the government's case?

22           MS. CALL:  Sure.  As I said, you know, it is alleged

23   in the Indictment that payments were received at these fixed

24   prices.  That obviously is part of the reason of the time

25   period of the charged conspiracy going through 2019, so we do

1    want documents in evidence establishing those sales at those

2    fixed prices.

3            You know, as far as efficiency, we don't foresee

4    putting these in front of the jury in trial one by one by one,

5    which is part of the reason we hope to go through this today to

6    have those in evidence so we can refer them to the scope of

7    this conspiracy via these payments.

8            THE COURT:  Okay.  And let me mention just so we

9    understand, in the event that I rule that various exhibits are

10   admissible, they are not in evidence.  Someone still needs to

11   move them into evidence.  We are not adding anything outside of

12   the presence of the jury, so we will just need to do that.

13           Okay.  And did you -- well, why don't we go in order

14   here.  So why don't we focus, first of all, on those

15   handwritten notes which are the first category.  Do we have

16   those?  Actually, you know what, I am missing what went out to

17   the parties.

18           Ms. Butler, do you have a copy of what was attached

19   to --

20           MS. CALL:  If I may, Your Honor, we are happy to pull

21   up maybe the first document in each list as we go to the group.

22           THE COURT:  Yeah.  Does it start with 9810?

23           MS. CALL:  It does.

24           THE COURT:  Yeah, go ahead.

25           MS. CALL:  Yes, Your Honor.  So this is I believe --

1        *THE COURT:*  I am familiar with all of those.  So maybe

2   we should get responses from the defendants on those, first of

3   all.  Anyone want to take a shot?

4        Ms. LaBranche, go ahead.

5        *MS. LaBRANCHE:*  Would the Court like me to address all

6   A through E, because I think that's going to be a little

7   difficult, to be honest.

8        *THE COURT:*  No, no.  What I was hoping -- no, just

9   Group A.

10       *MS. LaBRANCHE:*  Your Honor, just kind of as an initial

11  matter, when Ms. Call was describing --

12       *THE COURT:*  Let's hold on one second, Ms. LaBranche.

13  We are getting some type of feedback.  I am not sure whether

14  anyone who is on VTC may have unmuted his or her microphone.

15  That may have caused some of the feedback.

16       Go ahead, Ms. LaBranche.

17       *MS. LaBRANCHE:*  Your Honor, just kind of as an initial

18  matter, I know we talked about this during the last trial, the

19  concern about putting all of these exhibits in without any kind

20  of a sponsoring witness.  When Ms. Call was just up here

21  explaining to the Court what these two exhibits next to each

22  other would mean, it takes some work to walk through what the

23  relevance is of one to the other.

24       And I just don't think under 104(b) that the Court can

25  allow the government to determine relevancy that's going to be

1    conditioned on a fact that needs to be proven at trial when the

2    government is telling us they are not going to use these

3    exhibits with witnesses at trial.  So as an initial matter, I

4    have that objection to all of the exhibits.

5            But specifically if we look at 9810, which is the

6    first exhibit in Exhibit A, obviously there is handwritten

7    notes on that.  But before we even get to that, this is a --

8    this is an invoice that is to -- billed to Shelton Restaurant

9    Group, shipped to Popeye's.  It has handwritten notes of

10   somebody who we don't even know who this is.  There is no cover

11   e-mail.  There is no context to this at all.

12           And to the extent that the government's going to argue

13   that all of these invoices -- so let's say we redact the

14   handwriting and somehow all of the invoices are then business

15   records, they need to have somebody come in and do that.  They

16   can't just tell us -- under 104(b) they can't just tell us

17   these are business records.  There needs to be a witness who

18   does that.  That objection applies to all of the invoices in

19   Exhibit A.

20           And as it relates to those invoices that actually have

21   a cover e-mail on them, those contain hearsay as well.  And the

22   Court has made very clear that while you may be willing to find

23   an invoice is a business record with the proper foundation

24   laid, an e-mail is not.

25           *THE COURT:*  Okay.  Great.  Thank you, Ms. LaBranche.

1          *MS. LaBRANCHE:*  Thank you, Your Honor.

2          *THE COURT:*  Response by -- anyone else want to add

3     anything?

4          Okay.  Ms. Call.

5          *MS. CALL:*  I will try to go in order.  So first as to

6     the question of, I guess, a percipient witness, we do

7     anticipate calling several witnesses who would be able to

8     testify to these documents.  But as I said before, it is really

9     a matter of efficiency that we are hoping to have the

10    admissibility ruling beforehand just because it will be quite a

11    use of the Court's time to lay foundation for that.  And I will

12    tell you it's not just me saying that.  I heard Ms. LaBranche

13    say that the government does not -- or does need a witness to

14    lay foundation, but that's actually not the case in the 10th

15    Circuit.

16         I will point you to *United States v. Hines*, which is

17    564 F.2d 925, and I will note for the convenience of the

18    parties I did send e-mails attaching some of the cases I might

19    point to this morning.  And that's in the 10th Circuit.  And

20    it -- the Court said then that business records possess a high

21    degree of trustworthiness and the necessity of admitting them

22    far outweighs the inconvenience that would result in having the

23    person who prepared the document testify.  The test of whether

24    such records should be admitted rests upon the reliability.

25         And there is other 10th Circuit cases for the same

1   proposition that, you know, the Court can take judicial notice.

2   And I believe I referred Your Honor during the last trial to

3   another 10th Circuit case, *FDIC v. Staudinger*, 797 F.2d 908,

4   for that same proposition.  Essentially the test that is

5   articulated is the Court can take notice of the nature of the

6   industry and the nature of the document in question in finding

7   that they are reliable.

8        And there is specific 10th Circuit precedent on

9   invoices as business records that can be admitted without a

10  witness to lay foundation.  And I think that's actually that

11  *Hines* case that I just referred to.  So the government does not

12  need to call a witness to lay foundation.  We believe invoices

13  by a major supplier, like Tyson Foods, are quite clearly

14  documents the company relies on throughout the course of its

15  business and their accuracy is important to the company.

16       And it's the same thing with this period pricing that

17  we are talking about because, like I said, those are setting

18  the pricing for the following month.  It is important to both

19  parties, the supplier and the customer, that those be reliable.

20  And as we've seen in evidence in this case, and I think the

21  exhibit is 22 -- 234, Government Exhibit 234 relates to

22  Church's.  And there is an instance there where a new item

23  showed up in period pricing when it was sent that the customer

24  hadn't seen before.  And within, I think, an hour, the customer

25  e-mailed back and said, you know, this wasn't agreed to.  What

1    is this?  And it shows the importance of the accuracy and

2    reliability of these documents to both parties.

3            I will say in addition to 803(6), both of these kinds

4    of documents, the period pricing invoices -- and I realize we

5    are just talking about A, which are e-mails and invoices

6    attaching them, so those --

7            THE COURT:  That was one thing that Ms. LaBranche said

8    is what foundation or what link would there be between what we

9    might describe as a cover e-mail and an invoice?

10           MS. CALL:  Yes, Your Honor.  I will say for the cover

11   e-mails, they are simply being introduced for, you know, the

12   relevant context and really the header information of who is it

13   coming from, who is it going to.

14           THE COURT:  Right.  But the question would be, because

15   it's not really obvious from the e-mail, you know, how it's

16   linked to a given invoice.  And during the first trial when we

17   had analogous situations to that, there was always a witness

18   who testified this e-mail belongs to this document.  This

19   document was an attachment to this e-mail.  So how could we

20   avoid or how could I rule in advance without that foundational

21   testimony?

22           MS. CALL:  Yes, Your Honor.  So, of course, there is

23   the authentication testimony from the last trial from the

24   witnesses from Tyson Foods, including Ms. Arens, Mr. Gresch,

25   Mr. Bunch.  And I can't name the specific one right now, but I

1    know my colleagues could, testified to the Tyson e-mail servers

2    and attachments and how those were related.  And I believe

3    counsel for Defendant Mulrenin on cross-examination kind of

4    asked more broadly, you know, all these documents that were

5    produce by Tyson with the TY and the TF Bates stamps which they

6    bear, do those bear the same indicia of reliability, which

7    would include the tying of the e-mails to the attachments.

8            THE COURT:  Okay.  Can we pull up Exhibit 9811 right

9    now?

10           So, for instance, with this particular document, what

11   foundation would be allowed for the admissibility of that

12   document?  What's the government anticipating?

13           MS. CALL:  Yes, Your Honor.  So I think as to

14   authenticity would be the same thing I just noted, that this is

15   an e-mail attaching the invoice here and that's essentially it.

16   As far as business records foundation, you know, I don't think

17   it's necessary for the Court to find that this is a business

18   record.  Nothing in here is being offered for the truth of the

19   matter asserted, but even more specifically, these kind of

20   communications with a customer, sending these invoices are

21   communications with independent legal significance under that

22   verbal acts doctrine that simply sending these invoices,

23   transmitting them between a seller and a buyer creates a

24   binding kind of relationship that does bind the parties here

25   and is non-hearsay for that purpose.

1        THE COURT:  Why don't we pull up 9826.  I am not quite

2   sure this is going to be the example I am looking for, but some

3   of those cover e-mails had -- it was more than just an e-mail

4   and the header information, but this is actually an example of

5   one where this seems to be some hearsay statements concerning

6   the invoice.

7        MS. CALL:  Yes, Your Honor.  As I said before, the

8   e-mails that are attached in these invoices are merely being

9   provided for the purpose of the context of the date, the sender

10  and the recipient.  Nothing in the e-mail we are going to be

11  introducing for the truth of the matter asserted.  If we don't

12  wind up using these with a percipient witness, that's -- on

13  these documents I will note Ms. Breck and Mr. Pepper are both

14  on the government's witness list.  We could, of course, redact

15  the document or we could have a limiting instruction for the

16  content of the e-mail.

17       THE COURT:  I think you would have to, otherwise it's

18  just hearsay, and a number of them have that problem.

19       Ms. Henry?

20       MS. HENRY:  Your Honor, we just did get the reference

21  to some of these cases this morning, so I don't know whether

22  everybody has had a chance to look at them.  I did pull up the

23  Hines case.  And it's very clear that it says the defendant is

24  challenging the action of the trial court and permitting a

25  witness to refer to an invoice or bill of sale which she claims

1   to have received at the time of her purchase of the vehicle, et

2   cetera, the testimony, et cetera.  So the business record came

3   in very clearly with the authentication and foundation laid by

4   a particular witness about why it was there, why it was

5   relevant, how it came in.  Efficiency is not a basis for

6   allowing the government's testimony to substitute without a

7   witness.

8           THE COURT:  All right.  Thank you.

9           Go ahead, Ms. Call.  Anything else?

10          MS. CALL:  I will just note it might be difficult for

11  people on the VTC if counsel don't come up to the podium.  I

12  don't know if it was an issue there.  We might try to recall

13  that.  But thank you to Ms. Henry because I did cite the wrong

14  case for that exact proposition.  *Hines* didn't have the

15  statement that it is laborious to call the creator of the

16  document, and in that case they had the person who purchased an

17  automobile who laid foundation for an invoice.

18          But it was in *FDIC v. Staudinger*, the other case I

19  referred you to, where there was no witness at all and the

20  Court found specifically that there is no requirement that the

21  party offering a business record produce the author of the

22  item.  And I believe in that case there was no sponsoring

23  witness at all.  And they cited to Weinstein's Evidence in

24  making that claim -- or finding.

25          THE COURT:  Ms. LaBranche, anything else from you?

1          *MS. LaBRANCHE:*  Your Honor, the other thing.  Can I do

2     it from here?

3          *THE COURT:*  Yeah, just keep your voice up because --

4     actually, maybe you should go to the microphone.  I am just

5     worried about people on VTC not being able to hear you.

6          *MS. LaBRANCHE:*  Sure.  The *Hines* case that the

7     government referred to when she was talking about how the Court

8     can rely on the nature of the industry and the nature of the

9     document, I think the argument is somehow that gets them around

10    actually having to put witnesses on.  They kind of vouch for

11    the nature of the industry and the nature of the document.

12    That's a really different situation.

13          In *Hines* it was about the numbers on automobiles.  And

14    as Ms. Henry mentioned, there was actually a witness on the

15    stand.  What I think the Court probably realized as you were

16    going through the documents that the government wants to put in

17    is that these invoices maybe aren't that reliable.  We happen

18    to have sections in the back where things are wrong and things

19    are being corrected.  And if we look at, you know, for example

20    9812, I mean, the whole point is there is handwriting on here

21    because this invoice doesn't match with what was actually

22    delivered to the customer.  So I don't think that you can

23    really say because Tyson is a large company that sends out

24    invoices, somehow that gets the government around having to

25    meet its burden under, you know, the business rule, business

1    record rule.

2              THE COURT:  Okay.

3              MS. LaBRANCHE:  Thanks.

4              THE COURT:  Here is my ruling on it.  The invoices are

5    admissible as business records.  Invoices -- Ms. LaBranche's

6    point is well taken and she is exactly right.  We see in this

7    group that there are some corrections to them, but they are --

8    Tyson's has every reason in the world, which is exactly what

9    the business records rule is all about, to make sure that the

10   information on those invoices is accurate and reliable.  The

11   fact that it doesn't work in every instance does not mean that

12   they are not admissible under the business records exception.

13   So the invoices are admissible; but, of course, there still

14   needs to be just that fundamental foundation laid that these

15   came from Tyson's.

16        The e-mails are a different subject.  There obviously

17   needs to be some foundation laid for them.  Ms. LaBranche is

18   correct about handwriting.  Unless someone testifies as to the

19   handwriting, handwriting on a document is not going to come in.

20   And it could be that the government redacts out everything but

21   the header information, and that would then make something

22   potentially admissible because that header information, if

23   there is no statement involved, it's just a transmission and

24   the header information indicates who it was distributed to.

25   That, once again subject to foundation being laid, is in all

1  likelihood going to be admitted.

2           However, the hearsay would have to have -- would have

3  to be some type of foundation laid for that, otherwise it's

4  just hearsay and it will preclude the admission of that

5  particular exhibit.  So the invoices are going to be admitted.

6  We don't know yet about the cover e-mails.

7           Ms. LaBranche?

8           MS. LaBRANCHE:  Your Honor, is that invoices without

9  the handwriting on them?

10          THE COURT:  Yes.  Any invoice with handwriting is not

11  admissible unless the handwriting is redacted out.

12          Okay.  Why don't we take up Group B.

13          Ms. Call?

14          MS. CALL:  Yes, Your Honor.  As a broad matter,

15  Group B consists of that period pricing we were discussing

16  earlier.  I think in some instances it's e-mails containing the

17  period pricing as well as attachments also containing the

18  period pricing, so I think it would be those same two bases for

19  admissibility being both the independent legal significance

20  under the verbal act doctrine we discussed earlier, as well as

21  803(6) and judicial notice, partially based on the large volume

22  of current prices of testimony during the last trial that Your

23  Honor can consider under 104(a) in making a ruling as to the

24  admissibility of these materials.

25          THE COURT:  I wasn't actually able to look at the

1    native documents, but the native documents consist of

2    spreadsheets that have cost models; is that right?

3         MS. CALL:  Yes.  It's the cost model showing the new

4    input grain price and I think sometimes there is a second tab

5    showing some more specifics about the grain purchase price in

6    some of them.

7         MS. HENRY:  Your Honor, we still have a little bit of

8    confusion between admissible and the foundation laid.  Without

9    a foundation laid to make certain what it is, it doesn't make

10   any sense to admit it without a sponsor.  And I think the issue

11   here is we're talking about admission without a sponsoring

12   witness as opposed to admissible.

13        And for many of these documents, if it's just like a

14   cost model that's sitting somewhere, there is no understanding

15   of what it is.  There is no foundation that has been laid for

16   this document.  It's just hanging out there.  And without --

17   it's inappropriate to have it admitted without a sponsoring

18   witness to explain really -- to authenticate it, to lay the

19   foundation of what it is.

20        THE COURT:  Yeah, I suppose that the term "sponsoring

21   witness" may not necessarily refer to a witness who may provide

22   authenticating information, but I think we understand that

23   distinction.

24        Mr. Tubach?

25        MR. TUBACH:  Your Honor, just as a matter of process,

1    do we have the rule in place in this trial as well that any

2    objection by one defense counsel is deemed to be an objection

3    by all?  I am assuming that's the case, but I was just agreeing

4    with Ms. Henry in any mind.

5             THE COURT:  Yes, unless someone disagrees in which I

6    will hear from that person at this time, I would assume we

7    apply that not only for today's purposes, but for purposes of

8    the retrial.  We had that rule in place last time and I think

9    it's the only workable rule to have.  So anyone disagree?

10            MR. TUBACH:  Thank you very much, Your Honor.

11            THE COURT:  Okay.  That will be the rule, then, for

12   today's purposes and for the retrial.

13            Ms. Call, go ahead.

14            Or Ms. LaBranche, go ahead.

15            MS. LaBRANCHE:  I apologize.  I did not realize you

16   were done.  So to me the Group B is a little different than

17   group one.  It is just like chalk full of hearsay.

18            THE COURT:  When you say chalk full, you are referring

19   to the e-mails.

20            MS. LaBRANCHE:  Exactly.  And the e-mails contain

21   hearsay.  To Ms. Henry's point, when I look through Group B, I

22   see that there is an e-mail at 9830 which has, like I said, a

23   lot of hearsay.  I assume that 9831 is the attachment to that

24   e-mail, but I don't know that.  None of us know that without a

25   witness testifying to that.  And then 9832 is yet another it

1    appears pricing model.  I don't know what that relates to at

2    all.  I don't know what it has to do with anything related to

3    the case.  Without a witness to testify, there is no relevancy.

4    It's not being connected to anything.

5        THE COURT:  Well, I suppose if there was a witness to

6    link the pricing model to 9830, there probably would.

7        MS. LaBRANCHE:  100 percent.  And I think a lot of

8    these documents, not the hearsay ones with the e-mails

9    necessarily, but a lot of the attachments absolutely could come

10   in with a witness.  But what the government is asking the Court

11   to do is to allow this to come in without a witness.

12       THE COURT:  Well, let's assume this.  Let's assume

13   that during the course of the trial, a Tyson custodian comes up

14   and says, yeah, 9830 is linked to 9831 and 9832 because I

15   looked at them and those are, in fact, the attachments to them,

16   to 9830.  Would that be sufficient, then?

17       MS. LaBRANCHE:  If the right Tyson employee with that

18   knowledge could, in fact, connect that up, I think that

19   probably would be sufficient.

20       THE COURT:  This wouldn't be a person with any

21   personal knowledge.  This would just be a guy who, as we saw

22   before, just did a quality control check essentially and was

23   able to determine that stored on the server the documents are

24   linked in that respect.

25       MS. LaBRANCHE:  It obviously doesn't get them around

1    the hearsay issues in the e-mail, but yes, as far as that

2    particular document was an attachment to that particular

3    e-mail, I think that would cure that.  But again, what the

4    government wants to do is they want to put these documents in

5    without a witness.  I mean, that's what this hearing is about,

6    so if they, in fact, could do that --

7              THE COURT:  Well, we may have a little ambiguity going

8    back to the sponsoring witness, so we can't get too hung up on

9    it.  But you are right, you couldn't get them in without some

10   witness.

11             MS. LaBRANCHE:  Right, but that's what they are asking

12   for all of these is exhibits without a witness.

13             THE COURT:  Okay.  Thank you, Ms. LaBranche.

14             Anyone else?

15             Okay.  Ms. Call.

16             MS. CALL:  Yes, Your Honor.  On that sponsoring

17   witness point just to perhaps add clarity, you know, I think

18   the government's intention in this list or understanding as

19   well was, you know, these are documents we intend to introduce

20   without a sponsoring witness with personal knowledge of the

21   documents.  As Your Honor I think kind of predicated, there is

22   the separate issue of authenticity particularly for e-mails for

23   which we do have a separate motion pending right now, but there

24   is kind of those divorced concepts.

25             But two things I did want to note about these

1    documents as to foundation and authenticity.  First is these

2    documents kind of make clear that they are what you think they

3    are in terms of authenticity and in terms of kind of just

4    relevance.  As I think Ms. LaBranche was noting, how do we know

5    what these are relating to?  Well, it says KFC pricing period

6    12 right there.  And I am sure there are a number of witnesses,

7    including KFC witnesses as well as Tyson, that may have

8    knowledge about these kind of things and can tie up relevance

9    later on.  But in terms of admissibility, I think it is quite

10   clear these relate to the allegations of the Indictment and

11   that is pricing related to KFC in the time period charged.

12          So I don't think there is all that much of an issue

13   there, as well as the -- it's not just the documents on their

14   face, but as I noted, there was the authentication testimony in

15   the trial, both the custodians and the fact witnesses

16   testifying about period pricing.  And under Rule 104 -- I think

17   (a), the Court is not bound by the Rules of Evidence and can

18   consider the evidence before him -- or you in making

19   determinations of foundation.  So I don't think there needs to

20   be evidence necessarily put forth in this trial to come to the

21   conclusion as to foundation on these, as well as relevance.

22          THE COURT:  Well, I agree with Ms. Henry that the

23   principle of efficiency, you know, doesn't suspend the Rules of

24   Evidence.  So I don't think that any of those documents can be

25   admissible or I can't deem any of them admissible today.

1    Certainly I think that foundation has got to be laid.  You

2    know, if a cover e-mail, which as Ms. Call says explains what

3    the relevance of the attachments which may be pricing models

4    is, then that would probably get the attachments in, but there

5    is still all the hearsay in the e-mails.  And so unless I --

6    there is some way to get around that problem, it's unlikely

7    that e-mails would get in.  So impossible for me to rule in

8    advance on I think Group B.

9              All right.  Why don't we take up Group C.  These all

10   have to do with I think Popeye's and, once again, some cost

11   models.

12             Ms. Call?

13             *MS. CALL:*  Yes, Your Honor.  I anticipate many of the

14   arguments would be the same, so I won't repeat everything.

15   These are Popeye's period pricing e-mails and their

16   attachments.

17             But I would point Your Honor with one more case with

18   respect to the independent legal significance doctrine or

19   verbal acts doctrine as it's more commonly called.  That's

20   *Cloverland-Green Spring v. Pennsylvania Milk*, 298 F.3d 201.

21   That's in the Third Circuit.  Actually, Weinstein's Evidence

22   cites this case for the proposition that the rule against

23   hearsay does not exclude relevant evidence as to what the

24   contracting party said or wrote with respect to the making of

25   the terms of an agreement.

1          So I think that these periods pricing and these

2    e-mails we're seeing, one is the period pricing itself which

3    really is the agreement, but the one or two sentences we are

4    seeing in the e-mails ahead of the period pricing is really the

5    communications of the contracting parties as a course of making

6    that agreement and cementing it.  So I do think those words are

7    not hearsay for this purpose and they really have that

8    independent legal significance and they relate to the making of

9    the terms of the agreement that are elucidated below them.

10         THE COURT:  I haven't read *Pennsylvania Milk*, but I

11   assume -- my suspicion is that *Pennsylvania Milk* is talking

12   about the parties' understanding of contractual terms and, you

13   know, whether they are in essence as we -- as is talked about

14   in terms of patents, whether they're their own lexicographers.

15   But what we are talking about in Group C doesn't seem to be

16   that.  It's just people talking about pricing models or

17   whatever.

18         MS. CALL:  Perhaps I should have given some more

19   context, Your Honor.  So *Pennsylvania Milk*, what it does relate

20   to is it's about statements of an offering party to sell a

21   product at a particular price.  So I think it is pretty on

22   point to the pricing kind of offers or agreements we're seeing

23   here.

24         THE COURT:  Okay.  As I said, I am not familiar with

25   it now.  I will take a look at it.

1          Ms. LaBranche?

2          *MS. LaBRANCHE:*  Your Honor, this was an offer.  And

3    the case -- Ms. Call sent us that e-mail at 8:44 this morning

4    with the cases attached that she thought she might rely on

5    today, so I haven't had a chance to look at it thoroughly, but

6    my understanding it's a commerce clause case and has to do with

7    the understanding of an offer that was made, which is

8    absolutely different than what we are talking about.

9          As it relates to Group C as a whole, again the same

10   problem that we were talking about is going to arise if there

11   is not -- if this comes in without a witness because we're

12   going to have to have somebody who can link the e-mail to the

13   attachment.  Some of these don't even have e-mails.  Some of

14   them are just the models.  The hearsay is on the front of all

15   of the e-mails.

16         And, you know, it's concerning to me that the

17   government is up here making an argument that you should

18   basically look at the subject line in the e-mail which is a

19   hearsay statement and say that because the subject line is

20   Popeye's pricing for June 2017, well, that must be what that

21   is, and therefore we should completely skip 104(b) in having

22   them have to have a witness to tie this all together.

23         So I think for the same reason that the Court was not

24   able to make a ruling on the documents in Group B, I think the

25   same thing applies here and the Court just can't make a ruling

 1   at this time that the government can move these exhibits in

 2   without a witness.

 3            THE COURT:  Thank you, Ms. LaBranche.

 4            Anyone else?

 5            Ms. Call?

 6            MS. CALL:  Nothing further, Your Honor.  I think that

 7   the same arguments would apply to these documents.

 8            THE COURT:  Yeah, same ruling too.  I don't think that

 9   there is any way for me to rule in advance on Group C because

10   they are -- this group is very analogous to Group B, so the

11   same ruling will apply to Group C as applied to Group B.

12            Why don't we shift over to Group D which I think is

13   the same -- same thing unless I am -- actually, I take that

14   back.  This is a little bit different because we have invoices

15   here.  So this group seems to perhaps be more analogous to

16   Group A.

17            But Ms. Call, I will let you talk about that.

18            MS. CALL:  Yes, Your Honor.  I think for the most part

19   it is.  I will try to parse out documents because I think some

20   of your prior rulings may apply.  So 9851, 9852, 9854 and 9862,

21   as well as the attachments to some of those e-mails, so 9853,

22   9855 and 9856 are all the e-mails and e-mails attaching

23   invoices, but I will note the distinction that I believe 9857

24   and 9858 are period pricing.

25            THE COURT:  9857 is an e-mail, right?

1          MS. CALL:  It is an e-mail attaching period pricing

2     which is in 9858.

3          THE COURT:  Okay.  I think that it's quite analogous

4     to Group A, but if anyone wants to add something to that, go

5     ahead.

6          MS. LaBRANCHE:  Recognizing that the Court views

7     invoices differently than other potential business records, it

8     may be that those invoices could come in by themselves.  My

9     concern is all of the e-mails and matching up again the

10    attachment to the e-mail.  So at 9854 there is an e-mail that

11    contains hearsay.  At 9852 there is an e-mail that contains

12    hearsay.  And again, if we don't have anyone explaining to us

13    why this is relevant, I don't understand how we get around

14    104(b) and allow the government to get up and put this in

15    without a witness with no context.

16         THE COURT:  Well, I think that Ms. Call articulated

17    the relevance of these documents regarding period pricing

18    generally, namely that the government needs to establish

19    that -- she could probably phrase it better, but that the

20    revenues were received by the defendants based upon the setting

21    of prices.

22         MS. LaBRANCHE:  Which we need a witness to testify to.

23    I mean, that may be what they think happens.  That may, in

24    fact, even be what happens, but without a witness, we don't

25    know that.

1          *THE COURT:*  Okay.  Anyone else?

2          Ms. Call?

3          *MS. CALL:*  Nothing further, Your Honor.  I think I

4     have addressed those points previously.

5          *THE COURT:*  Yeah, my ruling on Group A is going to

6     apply to Group D, namely that the invoices are business

7     records, but we're still going to need some foundation that

8     they came -- you know, they came from Tyson's; but that the

9     e-mails, while they may establish what the attachments are,

10    nonetheless are going to have to be able to come in, assuming

11    they contain hearsay which they seem to, through some

12    independent means.  So invoices, as long as they have that

13    foundation, are admissible as business records.  E-mails, we'll

14    have to see.

15         Okay.  Let us take a look at Group E.  Group E has to

16    do with a different customer, but I think it's the same types

17    of things that we had before, Mr. Pepper with an e-mail and

18    then an invoice which is 9860.

19         Ms. Call, anything more on that?  What's the

20    relationship between those?  I can't remember offhand, but is

21    one a cover e-mail of the other?

22         *MS. CALL:*  Yes, Your Honor.  There is a cover e-mail

23    attaching an invoice for Popeye's products and the Popeye's is

24    specified in the product name in that invoice.  To save some

25    time on the e-mail, I think the government is comfortable with

1    Your Honor's prior ruling on this that we will either be

2    introducing testimony on the e-mail or redacting the contents

3    of the e-mail.  And then the relevance of the invoice, that it

4    is Popeye's products as well.

5           THE COURT:  Ms. LaBranche, go ahead.  Do you mind

6    going to the microphone?  Once again, I can hear you fine, but

7    I am sensitive about the people who are on VTC.

8           MS. LaBRANCHE:  Yeah.  I would ask the Court to

9    inquire a little bit more about what the relevance is.  The

10   content of the e-mail, it appears to be an e-mail from a

11   customer to someone -- well, ultimately to Carl Pepper at Tyson

12   saying that, I think the weight is wrong.  So basically this is

13   an e-mail with an invoice attached that apparently the customer

14   thinks is incorrect.  I don't understand what the relevance is

15   to this case.

16          THE COURT:  Ms. Call, would that information be

17   redacted?

18          MS. CALL:  Yes, Your Honor.

19          THE COURT:  So in other words, I think, Ms. LaBranche,

20   the issue is just that the header information is -- maybe

21   Ms. Call has a supplementation.

22          MS. CALL:  I take Ms. LaBranche's point.  I don't know

23   that we appreciated that.  I think she does have a point that

24   the invoice may not actually be the final invoice in this

25   instance.  So to the extent these are being offered as proof of

 1   the sale, we can actually withdraw these two exhibits.

 2          THE COURT:  Okay.  So these two exhibits will be

 3   withdrawn?

 4          MS. CALL:  Yes, Your Honor.

 5          THE COURT:  Well, that solves that problem.

 6          By the way, we will probably take a break at 10:30,

 7   just so you know what the schedule looks like, since we started

 8   at 9:00 as opposed to 8:30.

 9          Why don't we take up, then, a larger group which is

10   Group F.

11          Ms. Call?

12          MS. CALL:  Yes, Your Honor.

13          So Group F consists of a series of e-mails in the -- I

14   believe it's September through November of 2014 time frame.

15   And what these are is they provide context around another

16   government exhibit, which is Government Exhibit 959 that was

17   admitted in the last trial and has been provisionally deemed

18   admissible by Your Honor in your ruling from yesterday.

19          And perhaps I am not -- to give some context, it's

20   belied in the documents and in 959 itself.  But what happened

21   is on September, September 2014, Defendant Roberts sent this

22   e-mail which is Exhibit 959, which I think we may have pulled

23   up on the screen right now, informing his colleagues at Tyson

24   that the Popeye's deal was done.  I think almost a 14-cent

25   increase.  Yes, Brandon, I increased the margin line from what

1   you gave me.

2        You may recall from the last trial Defendant Roberts'

3   counsel made an authenticity objection to 960, the attachment,

4   because the attachment showed almost a 17-cent price increase

5   which obviously wasn't in line with what was in the e-mail, so

6   for Defendant Roberts counsel it created some confusion about

7   whether that could actually be the attachment to the e-mail.

8        It turns out he is not the only person that was

9   confused by the discrepancy between the e-mail and the

10  attachment because those at Tyson were also confused.  So there

11  is a series of e-mails over the next two months that

12  essentially elucidated the fact that no one other than

13  Defendant Roberts knew what price was negotiated with Popeye's.

14        And what these are being offered to show here is

15  simply the authority that Defendant Roberts had over a price,

16  that he was not just a messenger, but that he did have

17  negotiating authority.  He did have the power to change the

18  margin.  And that's belied by the fact that he didn't land on

19  the price that the pricing people gave him, which is Government

20  Exhibit 9800 where Brandon Campbell sends him a price.  In

21  fact, he landed on a higher price that he negotiated himself.

22        There is case law for that proposition that documents

23  like this aren't hearsay when they are offered to show the

24  authority or control that an individual has.  And I will point

25  you to a couple.  One is *United States v. Peveto*.  That's 881

1    F.2d 844 in the 10th Circuit, 1989.  I will say the facts are a

2    little different in that case.  It's about a traffic ticket as

3    non-hearsay evidence to show that the defendant had just driven

4    the van in question and had control over it.

5          But there is other cases for that similar proposition.

6    Another one -- I will just cite two more, *FDIC v. Medmark,*

7    *Inc.*, 902, F.Supp. 1430, and that's a District of Kansas case,

8    and *United States v. Zuniga*, 2021 Westlaw 1345867.  And that

9    one admitted hearsay statements to show a defendant's control

10   or authority over a nightclub.  So here these documents are not

11   being admitted for the truth of anything in them, but just to

12   show Defendant Roberts' authority over pricing at Tyson, so

13   they are admissible on that basis.

14         *THE COURT:*  All right.  Response?

15         Mr. Gillen, go ahead.

16         *MR. GILLEN:*  A few opening remarks.

17         This hearing is about whether they get to admit

18   without a witness or any foundation documents which they wish

19   to introduce in the government's case in chief.  This group of

20   documents, first of all, I would like to comment a little bit

21   about the representation concerning about the evidence at the

22   prior trial.

23         The evidence at the prior trial through the testimony

24   of Brandon Campbell stated that as it related to the KFC 2014

25   transaction, that Brian Roberts did not have nor did the sales

1    unit have the authority to negotiate away from the directions

2    of the pricing model given to the sales unit by the pricing

3    unit, Mr. Brandon Campbell.  He also testified that on

4    occasions that sometimes the sales unit would be given a range

5    or could be given a range that they could negotiate within, but

6    that was not the case in the KFC matter.

7         So Mr. Campbell's testimony stated, and we covered

8    this in our closing, when we said this document is an example

9    of in some cases where there would be some discretion given to

10   sales if they were given a mark they had to hit and there could

11   be some area of negotiation by the sale team.  That's not what

12   we are talking about here on the government's request to have

13   these documents come in without any sort of witness or

14   foundation.

15        These -- this group, Group F, really is comprised of

16   two separate kinds of documents.  One set of documents are the

17   e-mails.  And the e-mails fall for the most part into clear

18   hearsay.  If we look at the specific examples that we have, we

19   have got 984 that they've marked.  That's a Brandon Campbell

20   e-mail which is hearsay.  We have a 985 Brandon Campbell e-mail

21   which is hearsay.  We have a 988 e-mail by Carl Pepper which is

22   hearsay.  We have 990, an e-mail by Carl Pepper, which is

23   hearsay.  We have 993, an e-mail by Carl Pepper forwarding an

24   e-mail sent to him by Kent Kronaugue, double hearsay.  We have

25   9800, an e-mail by Brandon Campbell, hearsay.  We have 9802, an

1    e-mail by Steven Cullen, hearsay.  We have, although this is

2    not a Tyson document, this is listed within the group --

3         THE COURT:  The last two may not quite fit in the

4    categories because they are Pilgrim's documents.

5         MR. GILLEN:  Right.  But again for the point, 9803

6    which is a Pilgrim's document, Justin Gay, hearsay.  So we have

7    the hearsay virtually all -- but there is some, a small

8    minority, but some of the e-mails within this grouping would be

9    e-mails that were sent by either Mr. Roberts or Mr. Mulrenin

10   which would fall into a different category that the government

11   could make an argument about admissibility, but I am not here

12   to make the arguments for them.  I am here to acknowledge there

13   is a distinction within the Rules of Evidence between the

14   admissibility of an e-mail from Mr. Roberts and Mr. Mulrenin

15   rather than all of the other e-mails that I have cited.

16        The second group of documents that you have here, what

17   you have is you have documents that are essentially

18   spreadsheets or Excel sheets that aren't linked in any way or

19   explained in any way.  And there are no, as we have discussed

20   before and counsel has made the arguments, there are no

21   foundational witnesses here.  There is no discussion about, for

22   example, the document that I am referring to which would fall

23   under this category is 987, which is a document produced and it

24   has the topic Tyson Foods, Popeye's Cost-Plus Model.  Who

25   created this?  Where was it attached?  Who sent it?  No linkage

1    whatsoever.

2         Second page of that, Cost Summary, Tyson Foods,

3    Corn/Soy.  Who created this?  When was it created?  Was

4    there -- who was it sent to?  Was there a business purpose for

5    it?  Nothing.  They simply want to stick a government's sticker

6    on it and send it into evidence with the jury and give their

7    explanation of what they think the documents mean.

8         We do -- they do the same thing in 989, again a

9    document produced that is Tyson Popeye's cost model, same

10   thing, cost summary model, same thing that we discussed before.

11   That is simply not linked up to any e-mail or any explanation

12   of why it's relevant or who created it.  They simply want to

13   stick a government sticker on it and send it out to the jury.

14   The pattern continues.

15        This is the same thing that they did in 991 where

16   again Tyson Foods, Popeye's pricing model, this one, 2015 price

17   increase of 14 cents.  They have got another second sheet where

18   it talks about cost summaries, et cetera, et cetera.  So

19   without any linkage whatsoever through a witness -- and one of

20   the things that the Court mentioned earlier and the government

21   made reference to, what happened in the first trial was if they

22   wanted to -- if the government wanted to introduce an

23   attachment, then they had people that come into court and would

24   say my name is, you know, Melvin Smurd, and I was asked by the

25   government to go in and to look at this e-mail where it says

1    there is an attachment.  I then went into our data bank.  I

2    looked at and I found in our system that the document which is

3    marked whatever exhibit was marked is the actual attachment

4    that was sent with this exhibit.

5           Now, the Court may remember that when the defense

6    tried to get in such an exhibit for -- in the July 2014 e-mail

7    from Mr. Roberts to Mr. Lewis cc'd to Pete Suerken, that

8    because we didn't have someone to say, yes, we went into our

9    electronic database to link up that attachment to this e-mail,

10   we didn't get it in.  It did not go into evidence.  The Court

11   excused it, and which is why the government's -- now what they

12   want to do is they want to submit for themselves these sorts of

13   documents that clearly are not linked up in any way nor

14   explained.

15          The problem, the many, many levels of problems that we

16   have here, no foundation laying, no explanation, no anything.

17   That's the reason why they need to have someone come in.  And,

18   you know, listening to counsel today explain, it's a circular

19   argument.  The reason why we want to introduce all these

20   documents without a witness is because we're going to have

21   witnesses to explain them, Your Honor.  That's what they've

22   said.  Well, what are we doing here if they are going to have

23   witnesses that are going to say, yes, that's my document.  I

24   created it.  I sent it to so and so.  Then why are they trying

25   to introduce it in this form today?

1          I would ask the Court to say to them, you know, if you

2    say you're going to have a witness, introduce it through your

3    witness.  Don't try to come in here and put a government

4    sticker on it and say don't worry about it.  We're going to

5    have Carl Pepper talk about it or we're going to have somebody

6    else talk about it.  Have them put witnesses up and do it the

7    right way.  The way -- you know, and exclude their evidence the

8    way that our exhibit was excluded in the first trial on this

9    very point.

10          Again, as we go through examples, 9801, same thing.

11   We've got a document that's just sticking out there, same

12   document, pricing cost model 2015, same second page, cost

13   summary, no linkage whatsoever.  And to round it out, we have

14   the same problem in 9804.  Just for the sake of completeness,

15   that is not a Tyson document.  That's a Pilgrim's document, but

16   the same problem in terms of admissibility would apply equally

17   to the Tyson document as it does to the Pilgrim's document.

18          And even a larger problem -- so the purpose now is

19   they should not be allowed to introduce these documents without

20   a witness, without a foundation, without showing the proper way

21   that it should come in, and we would object to that.

22          In addition to that, as the Court is aware, it is our

23   position that as it relates to the 2014 Popeye's pricing,

24   that -- and we had a separate brief on this in terms of our

25   motion *in limine*, which perhaps we can address later, but the

1   essence of it as it applies to relevance to these documents is

2   as follows.  And that is there is no charge, there is nothing

3   in this Indictment which talks about any of these defendants

4   engaging in a conspiracy to fix and bid rig prices on the

5   Popeye's negotiations which took place in the summer of 2014.

6           And in their response when the government says, oh,

7   well, you know, pay no attention to that, Your Honor, because

8   later in our Indictment we talk about our big box discount that

9   we wanted that was going to come up in September for a 2-cent

10  discount.  They can't have it that way.  The negotiations for

11  the Popeye's 2014 ended and was over, signed and sealed before

12  the Popeye's raising of the issue of this big box discount.

13          So they are trying to conflate the two to say that

14  this is relevant.  It's not relevant.  It is an attempt by the

15  government to simply throw in, as they have or attempted to do

16  in the first trial and now even more so, as many different -- a

17  blizzard of documents to confuse the jury and to say to the

18  jury, see, look what internally they were talking about in

19  Tyson's.

20          And as the Court is aware during the jury instruction

21  by the Court on this matter and as we cite in our brief, you

22  can't have a conspiracy within the same company.  They can't

23  say, well, look, we've got Brandon Campbell and we've got Brian

24  Roberts and we've got Cullen and we've got Mulrenin all talking

25  about Popeye's pricing.  That's not a Sherman antitrust

1    conspiracy.  It can't be.

2         So I would ask -- I would wonder out loud, what is

3    their argument?  What is their proffer to this Court that they

4    have any evidence whatsoever that would show that there was

5    some kind of linkage or improper price-fixing with other

6    suppliers with Tyson, with the Tyson employees, or are they

7    simply trying to just cloud the issue, add more documents to

8    the blizzard of documents they have submitted to this jury and

9    hope that this jury will buy into their theory that, hey, I

10   know it's confusing, but look, go ahead and convict them

11   because they wouldn't be here if they haven't done something

12   wrong.  And that's really what they've tried to do.

13        Thank you.

14        THE COURT:  Thank you, Mr. Gillen.

15        Before we hear from Mr. Fagg or anyone else, why don't

16   we go ahead and take our break.  I will try to look at those

17   cases that Ms. Call cited over our break.  Why don't we plan on

18   reconvening at 10 minutes to 11:00.

19        Ms. Henry, did you have something before?

20        MS. HENRY:  To your point of looking over the cases,

21   we were looking over the U.S. v. Pang case that I believe

22   Ms. Call cited, and I wanted to especially bring to your

23   attention there where the Court said that the government did

24   have the responsibility to authenticate the invoices as what

25   they purported to be and that that was still a very important

1    part of the burden that they have, and that they had done that

2    in that particular case by linking the invoices to canceled

3    checks to show that they were, in fact, the correct invoices,

4    et cetera, et cetera.  And they went through in some

5    specificity that issue of authentication.  So I just wanted to

6    point that issue out.

7            THE COURT:  Thank you.

8            We will be in recess, then, until 10 minutes of 11:00.

9    Thank you.

10       (Recess at 10:35 a.m.)

11       (Reconvened at 10:55 a.m.)

12           THE COURT:  All right.  Any other comments from

13   defense counsel as to Group F?

14           Yes, Mr. Fagg, go ahead.

15           MR. FAGG:  Thank you, Your Honor.

16           I am not going to belabor the points that my colleague

17   just made, but with respect to Exhibits 9803 and 9804, those

18   were the two Pilgrim's related documents that we think are

19   different here.  And for all of the reasons that were just

20   previously raised about why the other documents are not

21   admissible, we believe that these documents also should not be

22   admissible in particularly in this hearing today.

23           The e-mails are a series of e-mails between Mr. Lane,

24   Mr. Gay, Mr. Stiller, Mr. McGuire at Pilgrim's.  They are

25   hearsay.  They were not on the *James* log.  They were not on the

1   government's attempt at a revised *James* log.  So those

2   statements that are in there are hearsay and the e-mails should

3   not come in.

4          The pricing model that supposedly relates to Popeye's

5   is also not a business record.  We have no way of knowing

6   whether or not that pricing model is a final pricing model.

7   It's not going to Popeye's.

8          And as we see just from looking at the e-mail,

9   Mr. Lane says, you know, here is the model to send to Popeye's.

10  And then 10 hours later Mr. Gay responds back and says he made

11  a conversion and he changed something in the pricing model.  So

12  there is no indicia of reliability of the actual pricing model

13  that Mr. Gay attached to his e-mail back to Mr. Lane that would

14  indicate that this document -- either the e-mail or the

15  attachment should be admitted.

16          *THE COURT:*  Thank you, Mr. Fagg.

17          Anyone else?

18          Ms. Call?

19          *MS. CALL:*  I will start with the kind of first set of

20  documents excluding 9803 and 9804 for Popeye's.

21          First, I'll point to what some of the evidence is

22  showing collusion with respect to Popeye's to address counsel

23  for Roberts' points about the relevance to that.  So first off,

24  as the evidence in the prior trial showed and some of the

25  documentary evidence that has already been ruled on by Your

1    Honor and will come in at this trial shows just two weeks

2    before the e-mail 959 where the Popeye's deal was finished was

3    the kind of beginning of the negotiations with KFC where we did

4    see Defendant Roberts and Defendant Mulrenin involved in calls

5    with their competitors, not just on September 15, the day their

6    competitors were submitting their prices, but also on

7    August 11th, the day that Tyson submitted theirs.

8         Then two weeks later when Defendant Roberts submits

9    his -- or finalizes Popeye's deal, and on that day we once

10   again see Defendant Roberts calling his competitor, Defendant

11   Brady, before submitting that deal.

12        There is additional evidence showing Popeye's as a

13   victim of this conspiracy.  And I think Defendant Roberts'

14   counsel pointed to some of that which is a slightly different

15   time period here, and that's Government Exhibit 617 where

16   Mr. Carl Pepper does explicitly tell his supervisor in March of

17   2015, so just after this, that with respect to a discount for

18   Popeye's, that he had talked to a couple companies and they

19   were thinking 2 cents for the discount.  So they were

20   coordinating on not just whether, but also the amount of the

21   discount they were going to give.  So there certainly is

22   evidence in the record of Popeye's as a victim.

23        But as I said on the onset, much of this evidence

24   right here is showing Defendant Roberts' pricing authority and

25   his role at Tyson with respect to Popeye's as a victim, but

 1    with respect to his other customers as well.  So I wanted to

 2    lay that kind of relevance point.

 3         I did want to point Your Honor to some of the specific

 4    exhibits here.  You know, I noted the non-hearsay purpose for

 5    all of their introduction, but if I can find my page, there

 6    were a couple I wanted to specifically flag.  Give me one

 7    moment, Your Honor.

 8         THE COURT:  Sure.

 9         MS. CALL:  And those were at 9800 and 9801.  That's

10    the initial September 3rd e-mail from Brandon Campbell that I

11    had mentioned sending the approved price model to Defendant

12    Roberts two days before he finalized the pricing at a higher

13    price.  That's being introduced as proof of Defendant Roberts'

14    knowledge as to what he was authorized by pricing to negotiate,

15    which is, of course, not precisely what he did negotiate as we

16    saw in 959, because when he says, "Yes, Brandon," Brandon who

17    sent him this model two days before, the pricing -- "the margin

18    is up from what you gave me."

19         Does Your Honor need a moment on that exhibit before I

20    move on?

21         THE COURT:  Hold on just one second.

22         MS. CALL:  We can pull up the attachment side by side,

23    but 9801 is the attachment and that's what provides the actual

24    model with the margin amount, which for that one is 13 cents

25    which is lower than the ultimate margin that Defendant Roberts

1    negotiated.

2         *THE COURT:*  Okay.

3         *MS. CALL:*  One other document would be Government

4    Exhibit 995.  As an initial matter, I will note it's, of

5    course, not being offered for the truth of the matter asserted

6    and is not hearsay.  I don't know that anyone is purporting

7    that anyone was actually popping champagne in response to the

8    Popeye's deal being done, so that simply makes it non-hearsay.

9    In addition, it would be admissible under just against

10   Defendant Mulrenin as a statement of his own.

11        And I think I have two more I wanted to point Your

12   Honor to.  985, and this is an e-mail from Brandon Campbell

13   which shows that he does not have the pricing and it's really a

14   request, "Let me know when you hear back from Brian on the

15   Popeye's agreement," so it's not hearsay.  There is nothing to

16   be asserted for the truth of it.  It's a request for something.

17   The value of the evidence doesn't rely on anything of the truth

18   that's being said there.

19        And the last is 992.  And that's a for lack of a

20   better term command or directive between Defendant Mulrenin to

21   Defendant Roberts that they need to reconcile the numbers based

22   on that discrepancy in 959 between the price increase in the

23   e-mail versus the attachment.  As I said or maybe I didn't say,

24   a command is not hearsay.  "We need to reconcile these

25   numbers," is not offered for the truth of what's being said,

1    but that the message being conveyed between the two.  Of

2    course, it's also admissible against Defendant Mulrenin as his

3    own statement as well.

4         All right.  I will rely on the briefing for the

5    Copperweld issue that was raised with respect to communications

6    between individuals at Tyson.  Of course, just because a

7    company can't conspire within itself does not mean there cannot

8    be co-conspirators within one company who also conspire with

9    others.  And Defendant Mulrenin and Roberts, of course, worked

10   at the same company and in Your Honor's *James* ruling already

11   found them to be co-conspirators, so we will rest on the

12   briefing for the rest of that unless Your Honor has specific

13   questions.

14        THE COURT:  Can you tell me, so I have got copies of

15   opinions that you cited, but I am not -- I wanted to be clear

16   about what proposition you thought I should draw from them.  So

17   if you don't mind, let me ask you about that.  I think I

18   understand on *Zuniga*, *Medmark* and the case that -- oh, yeah,

19   *Peveto*.  But what was -- what again was the proposition from

20   *Hines*?

21        MS. CALL:  If I may have one moment, Your Honor.

22        THE COURT:  Sure.  I think *Hines* is just maybe a

23   business record issue.

24        MS. CALL:  I think that's right, Your Honor.  If we

25   may perhaps table a response on that because I do need to pull

1    up the case and refresh myself.

2         THE COURT:  Where within *Pennsylvania Milk* was the

3    portion that you thought supported the idea of a independent

4    legal significance proposition?

5         MS. CALL:  I believe it was on 218.  I believe it

6    might be in Footnote 20.

7         THE COURT:  I am sorry, what was that?

8         MS. CALL:  I believe it's in Footnote 20.  I believe

9    that the district court refused to consider testimony by

10   Cloverleaf employees regarding the offers made by Pennsylvania

11   dealers.

12        THE COURT:  Yeah, I see that.  Okay.  Then what about

13   the *Staudinger* case?

14        MS. CALL:  One moment.

15        THE COURT:  Is that just a business records case?

16        MS. CALL:  That was one of the business records ones.

17        THE COURT:  All right.  I think I am good on that.

18        MS. CALL:  Do you still want the cite?  It's at 910,

19   and I think I specifically quoted it when I said there was no

20   requirement that the party offering a business record produce

21   the author of the item.

22        THE COURT:  Okay.  Anything more from anyone on

23   Group F?

24        MS. CALL:  Nothing from the government.

25        THE COURT:  Okay.  First of all, I don't -- I am

1    unable to draw any type of legal principle from the cases that

2    the government has cited that would somehow get these documents

3    in without some further foundation to them.  You know, it

4    sounds as if the government's purpose for trying to introduce

5    the documents is a relevant and appropriate one if they are

6    trying to suggest that Mr. Roberts in fact had pricing

7    authority that, you know, there may later come during the trial

8    a suggestion that he did not have, but the e-mails are to me

9    just hearsay.

10          The native documents would have to be linked as we

11   have talked about with some of the other attachments.  And I

12   agree with Mr. Gillen that, you know, we don't necessary --

13   Mr. Fagg's point about that one, 9804, we would need to know

14   more about the pricing model to know whether it's a business

15   record or not.  If it's just a draft, then it really does not

16   fit within the business records exception.  So we would have to

17   know whether it was, in fact, the business model, in which case

18   it probably would come in.  We don't know sufficient -- a

19   sufficient amount of information about that now to be able to

20   rule in advance.

21          This is not to say that certain of the documents, for

22   instance, ones that Ms. Call referenced that are between

23   defendants or statements of defendants are not going to be

24   admissible against that defendant.  They are statements of a

25   co-conspirator and a defendant and those are probably going to

1    come in as to that person.

2            However, I don't think that I need to make rulings on

3    that for today's purpose because that's not really what the

4    government is trying to do with this particular category, but

5    rather establish their admissibility generally as to all 10

6    defendants.  And I don't find that as to any of these documents

7    that the government has made that type of a showing.  So we'll

8    have to take up these documents individually as they come in

9    and looking for hearsay exceptions for the hearsay that's in

10   all the e-mails and looking for some foundation as to exactly

11   what business record exception or other type of hearsay

12   exception the native documents would fall under.

13           Why don't we take up Group G now.

14           And maybe, Ms. Call, once again, this is just kind of

15   big picture type stuff, but what's the relevance of the

16   organizational structure things?

17           *MS. CALL:*  I can save us some time.  In reconsidering

18   some of these documents in the time since we made our filing, I

19   think we can withdraw all of category G for at least use

20   without a percipient witness.

21           *THE COURT:*  Okay.  In other words, for today's

22   purposes we can ignore Group G.  Okay.

23           *MS. CALL:*  And if I may, Your Honor, I did want to

24   respond on something I tabled earlier so I do address your

25   question on *Hines*.  I had misunderstood your question about

1    your point to a briefing.  And although I would like to think I

2    have several hundred cases in my mind, I didn't realize it was

3    the case I had cited to.  The page I was citing in that was 928

4    where the Court had described inconvenience of calling the

5    author of a document as a records custodian, although as

6    counsel have noted, there was a witness.  It was just the

7    purchaser who testified about the invoice.

8         THE COURT:  Okay.  Right.  Okay.

9         Why don't we take up Group H now.

10        MS. CALL:  And we will also save some more time on

11   this group and we will not be admitting these without a

12   sponsoring witness.

13        THE COURT:  Okay.  Let's take up the next group which

14   is Group I.

15        MS. CALL:  Group I, and if Ms. Golshanara can pull up

16   1449, I think should be a good example.

17        These are contracts I believe for KFC among a number

18   of suppliers I think for the 2012 year.  And I believe the only

19   objections to these were authenticity and then the presence of

20   the confidentiality warning on that first page.  I will, of

21   course, point to Your Honor there are some motions pending sort

22   of on this issue in the motions in limine about the

23   confidential nature of prices and whether that should be

24   permissible in this trial.

25        In 1018 the government has made some argument about

1      the relevance of the sacredness of price and how really the

2      customers in this industry are the ones that set the

3      expectations about competition and how that really does matter

4      in this case.  The fact that the customers view their prices as

5      sacred matters because it points to the purpose and the state

6      of mind to the defendants when they are sharing their prices

7      that they know it's something that's not expected in the

8      industry.  It's not expected by the customers and it's not

9      expected by any of their colleagues.

10            So we think -- it's part of the document.  This wasn't

11     how it was produced to the government.  This is how it was

12     retained at RSCS, so it's not the same thing as the Bates

13     stamps that I think defense counsel were also concerned about,

14     but this is just the document on its face and it sets forth

15     RSCS's expectations with respect to confidentiality.

16            MS. HENRY:  Your Honor, I don't believe there was any

17     testimony that this was the way these certificates of

18     authenticity were kept that way in the ordinary course of

19     business.  That is strictly testimony of the government.  There

20     was no testimony from any witness to that effect.

21            MR. TUBACH:  We are not operating on a clean slate

22     here.  The Court in the last trial ruled that these initial

23     pages would not come into evidence for the reasons we

24     articulated back then.  They still apply today.  There is no

25     reason why these -- why a hearsay statement of confidentiality

1    that is not part of the original document should come into

2    evidence and there is no basis for reconsideration.  We ask

3    that these initial pages of all the contracts --

4        THE COURT:  I don't know if I ruled on this

5    certificate of authenticity, but it's materially similar.

6        MR. TUBACH:  I don't know about this specific

7    document.  You are right, Your Honor.  I was thinking more

8    broadly about the concept of that cover page of all of the RSCS

9    mostly documents, but also UFPC.  The Court had ruled that

10   those were not coming into evidence, so we had redacted or

11   simply removed them, and that's what we ought to do in this

12   trial also.

13       THE COURT:  Ms. Henry, did you have something?  Go

14   ahead.

15       MS. HENRY:  I just want to confirm when we are talking

16   about an exhibit number, our understanding was that the exhibit

17   number would be the same exhibit as was offered and introduced

18   in the previous trial.  And in many of those circumstances they

19   were redacted and we understood that that was the exhibit that

20   was being offered here.  If they are changing now to a

21   different exhibit from what was entered previously, we really

22   need to understand that.

23       THE COURT:  Ms. Call?

24       MS. CALL:  Yes, Your Honor.  So there is a couple

25   points.  One, as to what I think Ms. Henry called the proffer

1   from the government on the nature of this document, there is

2   one thing on the face that makes it clear that this isn't just,

3   you know, a slip sheet made for it to come to the government.

4   And that's the company name.  There was testimony in the prior

5   trial that UFPC was the predecessor for RSCS, so it's not a

6   company we could contact anymore to get this record from.

7            But second, we did try to elicit testimony about the

8   nature of how this was stored and whether that sheet was on,

9   and I believe it was objected to and excluded in the prior to

10  trial.  So it's not for lack of trying or effort that that

11  information isn't before the Court outside of me telling it to

12  you.

13           As to the confidentiality language generally, I

14  understand Mr. Tubach's point and Ms. Henry's point about the

15  Court's rulings in the prior trial, though I am not quite

16  certain whether they were rulings or it was defense counsel

17  applying the redactions themselves in many instances, but we

18  didn't agree with that characterization.  We have now filed a

19  motion again with respect to, you know, confidentiality of

20  prices.  So it is something we are seeking to take up again.

21           And I do take Ms. Henry's point about redactions

22  changing.  We'll confirm on our side.  I don't believe we have

23  meant to change any redactions from how things were admitted

24  aside from this confidentiality language here.

25           *THE COURT:*  My ruling from the first trial is going to

1    apply to these cover sheets.  I think that they are excludable.

2    They should be excluded and for the same reasons that I

3    excluded them in the first trial, even though this may not be

4    an example of one of the ones, but it's very similar.  And I

5    think maybe this is just an earlier version of one that RSCS

6    later may have changed a bit.  I will exclude those.

7            Let us now take you Group J.

8            MS. CALL:  Yes, Your Honor.

9            I believe Group J consisted of contracts and bids for

10   which the defendants have only objected on authenticity

11   grounds.  And this may be just a good time to raise, since

12   we've had some discussion of authenticity today, you know, the

13   government does have a pending motion relating to authenticity

14   of documents that we think the law supports the Court's finding

15   of authenticity without us needing to bring in the 20 or so

16   custodians we currently have on our witness list.

17           So I just wanted to flag that motion for Your Honor

18   because it does affect our preparation for the first week of

19   trial.  And we think it would really expedite this trial and be

20   an efficient use of the Court's and the jury's time, so that is

21   one thing I wanted to flag.  But I will let defense counsel

22   raise any additional points, I suppose, on authenticity.

23           THE COURT:  Why don't we hear first from Ms. Henry and

24   then from Mr. Gillen.

25           MS. HENRY:  If we could pull up 1254 and 1255.  These

1    were described in the log as e-mails from one of the

2    defendants.  And in point of fact, they are not.  They are from

3    someone who is completely extraneous to anything here at this

4    point in terms of they are just hearsay.  And that was -- so

5    there is a hearsay objection on both 1254 and 1255 which is the

6    attachment, as well as the authentication objection.

7              THE COURT:  All right.  Mr. Gillen?

8              MR. GILLEN:  Your Honor, we would object to 1457 which

9    is a hearsay document authored from Tim Scheiderer and it is

10   clear hearsay, so we would object on those grounds.  He says

11   updated round two pricing.  Adjusted formula are now included.

12   What they have on the next exhibit is the problem that they've

13   had so many times this morning, and that is a document produced

14   that by itself in 1458 is simply a -- some sort of spreadsheet,

15   some sort of summary that is not linked in any way to a

16   document.  And it would require in our view a witness to come

17   in to lay the foundation as to why this would be admissible as

18   a Tyson document, and whereas the covering material for that,

19   just like we said before in terms of the Tyson witness who came

20   in and identified how the attachment was linked up to a

21   specific e-mail, they have the same problem regarding 1458.

22              So I need not go back over all the matters that we

23   argued earlier.  They apply equally here to the three pages or

24   the four pages of some kind of spreadsheet, when it was

25   created.  Who created it?  Was it a draft?  Was it not?  Was it

1   sent by somebody?  When was it sent?  So for all those reasons,

2   Your Honor, we would object.

3           THE COURT:  Thank you.

4           Ms. Carwile, go ahead.

5           MS. CARWILE:  Thank you.

6           So, Your Honor, I am going to address specific

7   exhibits in Group J as well.  As to Exhibits 1736, 37, 38 and

8   39, those are e-mails from my client to people who work for

9   RSCS.  We are maintaining the current authenticity objection,

10  but we don't dispute the content.

11          Moving to 1743 and the attachment 1744, those -- that

12  is an e-mail from Greg Tench to RSCS during the bidding process

13  in 2014.  I did not see this document on either *James* log, the

14  original or the supplemental.  Counsel from the government can

15  correct me if I'm wrong, but I don't believe the authenticity

16  of this e-mail and its attachment was addressed at the trial.

17  And in any event, they have not provided enough authenticity,

18  relevance or the fact that they are asking for an e-mail from

19  someone who is not a party opponent here to come into an RSCS

20  that wasn't on the *James* log as a co-conspirator statement.

21          And the final exhibit on the list in Group J,

22  Government 9753, the Court will remember that there was

23  extensive briefing and argument regarding the rules of

24  completeness with respect to certain documents that the defense

25  was asking to come in.  Exhibit 9753 is identical to Defense

1    Exhibit D-839 from the first trial.

2         THE COURT:  What was it?

3         MS. CARWILE:  D-839, Your Honor.  And we certainly do

4    not dispute the admissibility of this document.  We maintain

5    our request that it come in.  Our only request is that it

6    remain under a defense exhibit for continuity sake given the

7    record.

8         THE COURT:  All right.  Thank you.

9         MS. CARWILE:  Thank you.

10        THE COURT:  Anyone else?

11        Ms. Call, go ahead.

12        MS. CALL:  Yes, Your Honor.  I am reacting on my feet

13   a bit here because there were some new objections that weren't

14   in the defendants' prior submission.  But as far as the hearsay

15   nature of some of the e-mails which are either attaching a

16   contract or themselves a bid and attaching a bid, I think the

17   non-hearsay -- or the hearsay exception that would be

18   applicable would be that independent legal significance, verbal

19   act that we discussed since these are communications setting

20   the terms of an agreement or an offer in the case of a bid, so

21   I would rely on those same cases I cited previously for that

22   proposition.

23        Regarding Government's Exhibit 9753, the one that is

24   the same underlying document, same Bates number as the previous

25   defense exhibit D-839, you know, I don't see why in a totally

1    new trial the reason for the government to be commanded to

2    admit an exhibit bearing a defense exhibit sticker, I think it

3    does looks a little strange.

4         I understood the sort of utility around the

5    discussions in the first trial of doing it, but I don't see a

6    problem with a government sticker.  And I think it is on the

7    record they have the same Bates number and it's on our exhibit

8    list bearing the same Bates number, so there is no question

9    whether it's the same document between the two trials.

10         As to authenticity, a number of these were in the

11   previous trial and specifically exhibit numbers subject to

12   authentication testimony by custodians.  I will note some of

13   them were not, but for the reasons we have set forth in our

14   briefing that is pending that I mentioned, we believe that they

15   are covered substantially by the testimony and should be deemed

16   authentic.

17         And I believe that's it.  We can expound on anything

18   if Your Honor would like to hear any more, but those are our

19   points on authenticity.

20         *THE COURT:*  Ms. Henry?

21         *MS. HENRY:*  I heard no response whatsoever to

22   Government Exhibit 1254 and 1255 hearsay.  Do we take it that

23   that is conceded?

24         *THE COURT:*  I'm not sure.  I mean, Ms. Call's general

25   point was that they -- some of the exhibits may have

1    independent legal significance.

2         *MS. HENRY:*  This one does not.  It was not within the

3    scope of what the independent legal significance argument she

4    made.  It has nothing to do with the bid submissions.

5         *THE COURT:*  Ms. Call?

6         *MS. CALL:*  I appreciate the reminder because I did

7    forget to address that document.  I think in terms of that I

8    would frankly agree with Ms. Henry, and we will at this time

9    withdraw that for purposes of consideration for admission

10   without a sponsoring witness.

11        *THE COURT:*  That meaning?

12        *MS. CALL:*  1254 and 1255.

13        *THE COURT:*  Okay.  As to the authenticity aspect of

14   these, we'll take that up this afternoon when we talk about the

15   government's motion as to authenticity.

16        As to Exhibit 9753, I agree with Ms. Carwile that we

17   should keep the same exhibit number.  It's good for the Court

18   of Appeals to the extent that there is a reference back to the

19   first trial.  It really -- I don't think any jury really cares

20   about what the exhibit number is, whether it's defendants' or

21   the government, so we should I think retain D-839 as to that

22   one.

23        But otherwise I don't find any persuasive points

24   regarding independent legal significance, and therefore to the

25   extent that they are hearsay, I don't find that that's an

 1    exception to them.  So they would need some non-hearsay

 2    foundation or some exception in order to get those in.

 3              Why don't we take up Group K.

 4              MS. CALL:  Yes, Your Honor.  On the hearsay ruling

 5    just for some clarification, is that specific to the e-mails

 6    for which a hearsay objection was made just now by defense

 7    counsel?  I presume it's not to the contracts themselves?

 8              THE COURT:  Correct.

 9              MS. CALL:  All right.

10              MR. LAVINE:  Your Honor?

11              THE COURT:  Yes, Mr. Lavine, go ahead.

12              MR. LAVINE:  Just one point here.  I notice that the

13    government is now going to introduce documents that we

14    introduced during cross-examination and use defense numbers.

15    And now they are changing up the numbers on these documents.  I

16    think it's going to create a little bit of confusion for the

17    appellate record, Your Honor, if there is an appellate record.

18              THE COURT:  What do you mean by that?

19              MR. LAVINE:  Well, I think that some of the contracts

20    that they are talking about, it's the same contracts we

21    introduced during the first trial under defense exhibit

22    numbers.  And now they are changing the numbers to use the

23    government numbers.  So we are going to have the same

24    document --

25              THE COURT:  Yeah, I would prefer for the reasons I

 1    just mentioned that we use the same number.  I think it just --

 2    it's a small difference admittedly, but I just think that it

 3    may for the Court of Appeals be, you know, assuming it gets

 4    appealed, of some incremental benefit to them.  Because I just

 5    don't see -- jurors don't care about that type of stuff.  They

 6    couldn't care less.  As a matter of fact, you could make the

 7    argument if you are introducing one of the other side's

 8    exhibits, it must mean that the other side doesn't understand

 9    what their evidence is.  So anyway, I think that we should

10    preserve those same exhibit numbers from the first trial.

11         MR. LAVINE:  Thank you, Your Honor.

12         THE COURT:  Okay.  Sorry, Ms. Call.  Group K?

13         MS. CALL:  Yes, Your Honor.  I believe this is similar

14    to some of the items in the last group, so your prior ruling

15    may stands.  But this is an e-mail, 1741 is an e-mail from a

16    Tyson employee sending a KFC bid, so it's essentially an offer,

17    on November 5th of 2013.  And then the bid is attached as

18    Exhibit 1742.

19         I believe the only objections here for 1741 was

20    authentication only and for 1742 was rule of completeness.  And

21    I believe the defendants notes that there was two additional

22    attachments to the e-mail.  That is Government Exhibit 1741

23    that the government is not seeking to admit at this time.  It

24    would be the government's position that the standards in the

25    10th Circuit under both *Lopez-Medina*, which is 596 F.3d 716,

1    and other cases is just not met in terms of the requirements of

2    Federal Rule of Evidence 106 that there is simply nothing about

3    the offer and the actual, you know, bid pricing being attached

4    that's misleading or needs to be explained fully by the

5    surrounding documents.

6         And, of course, I believe everyone is, of course,

7    aware just because documents are found in the same place,

8    whether it be a residence or in an e-mail, doesn't mean they

9    all have to be introduced together.  So I don't think the

10   standards under Rule 106 in terms of completeness are met here

11   that would require the government to admit the other

12   attachments just for the sake of doing so.

13        THE COURT:  And refresh my memory, what is 1742?

14   That's one of the attachments referred to in 1741?

15        MS. CALL:  Correct.

16        THE COURT:  Mr. Gillen?

17        MR. GILLEN:  Your Honor, even though when we filed our

18   objections we did not specifically state it, I am stating it

19   now that also our objection to 1741 is hearsay.  It's a hearsay

20   document from Tim Scheiderer.  That's 1741.  It should go

21   out -- it should not be admitted without a sponsoring witness

22   delaying the reasons or the basis for its admission as a

23   business record and not hearsay.

24        1742 fails under the same problems that many of the

25   other proposed documents fail on in that it is a document

1    with -- that was produced -- counsel made the representation

2    that it was the attachment to 1741.  If that's the case, they

3    need to put a witness up to explain that to lay the foundation

4    as they did in the first trial.

5            As I mentioned on the record earlier, we had a

6    situation where we did not get our document admitted that

7    was -- that was in our view the attachment to an e-mail from

8    Mr. Roberts to Mr. Lewis and to Mr. Suerken.  If the

9    government, if they want this in, they should go about laying

10   the foundation linking up through a witness, a witness linking

11   this document to this e-mail, and then we can address the

12   admissibility of it at that time.  Thank you.

13           THE COURT:  Thank you, Mr. Gillen.

14           Anyone else?

15           Ms. Call, anything more?

16           MS. CALL:  I don't believe so.  Very briefly in

17   response to the new hearsay objection, I already noted I

18   believe this is a bid.  And as the cases we've cited you to

19   previously today, including the *Pennsylvania Milk* footnote I

20   referred Your Honor to earlier, a price offer, which is what a

21   bid is, is not hearsay for that purpose because it has a legal

22   effect and this is a bid for KFC.

23           THE COURT:  Can we display 1541 again?

24           MS. CALL:  Yes, Your Honor.

25           THE COURT:  Okay.  Yeah, I find that -- I overrule the

1    hearsay objection to 1741.  There is just a statement, but it

2    just basically indicates that, you know, here it is.  Thanks

3    for your business.  I don't find that to be hearsay.  It's just

4    a transmittal.  It doesn't vary in any -- to any great extent

5    in terms of just the transmittal information.

6            I do agree with Mr. Gillen that there needs to be some

7    foundation that 1741 is, in fact, the attachment, so there

8    would have to be authentication there.  No arguments are being

9    made about rule of completeness that I've heard, so I am not

10   going to rule on that.

11           Let's move to the next, Group L.

12           MS. CALL:  I think we will be able to pick up the pace

13   for at least a period of time here for Category L.  We are

14   going to withdraw these documents for use without a sponsoring

15   witness.

16           THE COURT:  Okay.  Group M.

17           MS. CALL:  All right.

18           THE COURT:  A lot of these are somewhat individual.

19   They are almost a group of miscellaneous things.

20           MS. CALL:  What may be efficient, Your Honor, we will

21   be withdrawing several of these, so perhaps I point to the ones

22   that we will not be withdrawing.

23           THE COURT:  Sure.

24           MS. CALL:  We will start with 1753 and 1754.

25           THE COURT:  Why don't we cross ones off the list.

1    That's so much more satisfying.

2              *MS. CALL:*  We can cross off 1257, Your Honor.

3              *THE COURT:*  What about 303?

4              *MS. CALL:*  I did want to point Your Honor to that.  So

5    I don't believe there was an Exhibit 303 on the government's

6    list.  I wasn't certain of whether it may have been a typo.

7    There were several exhibits Your Honor noted for -- to be ruled

8    on today that were not included on the list, Your Honor,

9    provided in the buckets.  I have a list of those here.  One is

10   330, so I was wondering if that might be what the 303 referred

11   to.

12             *THE COURT:*  Potentially, but let's skip over that

13   issue now and we'll -- what other ones or, rather, what other

14   exhibits in Group M are you actually withdrawing?

15             *MS. CALL:*  You will have some satisfaction with the

16   length of the list.  6329, 6330, 6332, 6331, 6343, 6344.  It

17   might be easier, there is only three documents on the list that

18   we are going to keep in.

19             *THE COURT:*  I didn't realize --

20             *MS. CALL:*  I didn't realize it until I was going

21   through my list here.

22             *THE COURT:*  1753 is one of them, right?

23             *MS. CALL:*  Yes, and its attachment 1754.

24             *THE COURT:*  Okay.  What's the other one?

25             *MS. CALL:*  The other is 9752.

1          THE COURT:  Okay.  Go ahead, Ms. Call.

2          MS. CALL:  1753 is an offer just as the last document

3    I believe we were considering, so it is a price offer.  And I

4    think Ms. Golshanara has it on the screen right now.  1754 is

5    the attachment containing Koch's bid, so it would be the

6    government's position that this is an item of independent legal

7    significance and non-hearsay for that purpose.

8          THE COURT:  All right.  Ms. Henry?  And then I will

9    hear from Ms. Carwile.

10         MS. HENRY:  So I guess we would say, first of all,

11   that Ms. Call's characterization of this as a bid is not, in

12   fact, I think on the document.  It just says here you go sort

13   of thing, so I don't think that we have authenticated it to

14   what she says the proponent claims it is.  This is one of those

15   exhibits that may very well be admissible with a sponsoring

16   witness who can say, yes, this is what it is, but without that

17   it's not properly authenticated.  A foundation hasn't been laid

18   and it's hearsay.

19         Secondly, with regard to 1754, which again we have the

20   government's testimony that this is the attachment, Mr. Ward

21   explicitly in his authentication regarding Koch records

22   explained that he could not identify what was the attachment in

23   the database.  That was part of his testimony.  Now, again --

24         THE COURT:  Did he testify as to this exhibit or just

25   generally?

1          *MS. HENRY:*  Generally he said he couldn't do it.  Now,

2    again what we saw on the last trial was that many of these

3    witnesses, for example, Ledford and Lewis, when they were shown

4    the documents, they did, in fact, authenticate that this was

5    the attachment to it and this was the bid, but without that it

6    can't be just put in without a sponsoring witness.

7          *THE COURT:*  Okay.  Thank you, Ms. Henry.

8          Ms. Carwile?

9          *MS. CARWILE:*  Yes, very briefly, Your Honor.

10          9752 is one of the other documents.

11          *THE COURT:*  I don't think we have gotten there yet,

12    but you can jump ahead of Ms. Call.

13          *MS. CARWILE:*  I am so sorry.  I just heard her say

14    that was the last one on the list, so I just wanted to address

15    something briefly on it.

16          *THE COURT:*  Go ahead.

17          *MS. CARWILE:*  We again don't dispute the

18    admissibility.  It was a document that was included in the

19    defense briefing on the rule of completeness.  And as with the

20    earlier document, we would just ask that this be introduced

21    under the original defense exhibit number which was I-141.  And

22    we maintain our request that it come in as well.

23          *THE COURT:*  Okay.  Thank you, Ms. Carwile.

24          Anyone else?

25          Ms. Call?

1          MS. CALL:  Two things I want to respond to.  First,

2   with respect to 1753 as to who knows what this document is, I

3   think it's quite clear in the name of the attachment that's on

4   the face of the document, it says Yum, which is the parent

5   company of KFC as we know from testimony in documents.  Final

6   cost model.  And I just think it's clear that this is what the

7   document appears on its face to be.

8          As to authentication, I don't want to belabor it and

9   repeat the points, as we have it very well laid out in the

10  briefing, so I won't quite address that.  But for Mr. Ward's

11  testimony, he did testify about e-mail attachments.  He could

12  not open them, I think Ms. Henry is correct, but he did say you

13  could tell when a document had an attachment and that the

14  metadata within the system connected the e-mails to their

15  attachments in a way that I think is sufficient for a finding

16  that they are tied to those e-mails that they were then

17  produced out with.  So that is with respect to 1753 and 54.

18         And then to briefly address 9752, I think we will

19  stand on your Court's prior ruling and admit that under the

20  previous exhibit number.

21         Oh, let me -- I may have missed a moment on the

22  argument on this one.  Was this actually previously admitted

23  subject to the rule of completeness or is this a new argument?

24         THE COURT:  I couldn't remember, but Ms. Carwile

25  knows.

1          MS. CARWILE:  Sorry to kick you off the podium to be

2    at the microphone.  This was admitted prior under the rule of

3    completeness as I-141.  It was one of the documents that came

4    in.

5          THE COURT:  Do you recall what government exhibit was

6    admitted that then triggered the admission of I-141 under the

7    rule of completeness?

8          MS. CARWILE:  I do.  It was Government 1546.

9          THE COURT:  Anything else on that one, Ms. Call?

10         MS. CALL:  No, Your Honor.

11         THE COURT:  Okay.  I don't remember what 1546 was, but

12   I think it presumably would be the same ruling under the rule

13   of completeness assuming the government introduces 1546.

14         And then I do find that Exhibit 1753 is not hearsay.

15   I do agree with Ms. Call that the information on that reflects

16   what the nature of the attachment is, but as Ms. Henry

17   mentioned, we do need foundation to determine exactly whether

18   1754 is the attachment.  That could come from Mr. Ward.  You

19   know, he doesn't have to specifically say, oh, yeah, I know

20   that 15 -- 1754 is the attachment.  But if by his analysis or

21   from another witness' analysis there is evidence that links

22   1754 to 1753 as an attachment, then that presumably would

23   constitute adequate foundation that, in fact, 1754 is the

24   attachment, all right?

25         It's quarter to 12:00 now.  So because as I indicated

1    in Group N, I am going to rule on those separately, why don't

2    we go ahead and break for lunch now.  Why don't we plan on

3    reconvening at 1:15 and then we will take up motions.  I can't

4    guarantee you that I am going to rule on all of the motions

5    this afternoon.  I am -- for one thing, I am delighted that we

6    got through what we did this morning.  That's really good.  I

7    anticipated that might take longer, so we've made good progress

8    and we will try to make progress this afternoon too.

9           Anything anyone would -- Mr. Byrne, did you have

10   something you would like to take up?

11          *MR. BYRNE:*  I just have a question.  So some of these

12   exhibits without sponsoring witnesses you said you would decide

13   in response to Docket 941.  Is that what we are going to do

14   again this afternoon or are you going to do that on paper?

15          *THE COURT:*  Paper.

16          *MR. BYRNE:*  Okay.

17          Ms. Call?

18          *MS. CALL:*  Very briefly, just because it may affect

19   potentially scheduling for today.  I can't say I saw it, but I

20   was informed that there was an order that came out on the

21   government's Rule 15 motion.  And I just wanted to note that

22   the government had offered in its brief to provide ex parte

23   information to the Court if you wanted that.  That offer is

24   still available, but I just wanted to flag it.

25          *THE COURT:*  What offer was that?

1        *MS. CALL:*  Sure.  We offered to provide some certain

2    information regarding back on ex parte if the Court wanted it.

3    I don't think it's necessarily relevant now that the motion has

4    been denied, but I did want to flag for Your Honor we will be

5    filing a motion to seek VTC testimony, which I believe you had

6    mentioned in your ruling.

7        *THE COURT:*  Okay.  I will look for that.

8        *MS. CALL:*  Thank you.

9        *THE COURT:*  Ms. Henry?

10       *MS. HENRY:*  Your Honor, with regard to the motion that

11   Mr. Byrne just raised with regard to the *James* hearing that you

12   said you would take on the paper, there are new developments

13   with regard to one or two of those exhibits that relate

14   explicitly to the list of coming in without a sponsoring

15   witness, so I can address them after lunch or now, but I do

16   want to address those.

17       *THE COURT:*  Why don't you mention them now.

18       *MS. HENRY:*  Okay.  It's pretty simple.  Government

19   Exhibit 6337, if we could maybe even pull that up.

20       *MR. TORZILLI:*  Your Honor, actually if I may address

21   6337, it might obviate the need to take this up.

22       *MS. HENRY:*  Perfect.

23       *MR. TORZILLI:*  Paul Torzilli for the United States.

24   So we are prepared to withdraw from our supplemental *James* log

25   Government Exhibits 6337 and 6338.

1      THE COURT:  Ms. Henry, did you have a different

2  exhibit number?

3      MS. HENRY:  No, those are the exhibit numbers.

4      And let me just ask Mr. Torzilli before you go all the

5  way back, so are you also withdrawing those as without a

6  sponsoring witness, because they are on both lists.

7      MR. TORZILLI:  The answer to that is yes.

8      THE COURT:  Okay.  Thank you, Mr. Torzilli.

9      Mr. Beller?

10      MR. BELLER:  Your Honor, only for the purpose of

11  making good use of our lunch hour, are there specific motions

12  the Court intends to address or specific motions the Court does

13  not intend to address that we can prepare for?

14      THE COURT:  I can't give you that information yet.

15      MR. BELLER:  Okay.

16      THE COURT:  Right.  Because I am going to -- that's

17  one of the things I'll figure out over the lunch hour.  Sorry

18  for the lack of guidance on that.

19      Ms. Henry?

20      MS. HENRY:  So also with regard to the *James* log

21  issue, this does not -- this does not come up on the without a

22  sponsoring witness.  I don't believe -- well, it does come up

23  there as well.  There have been some very new developments with

24  regard to -- and if we could pull them up, it's Exhibits 1409,

25  and then it's going to be 1521 and 1521-1.  These are three

1    documents -- and if you start with the first one, I think

2    that's helpful.  It's 1409.  These are three documents that

3    were admitted on the basis of Bruce MacKenzie being a

4    co-conspirator.

5         We have just learned, and by just I mean I think it

6    was Tuesday night after I went to bed, so it's learned pretty

7    much yesterday in terms of getting interview notes from the

8    government that they have now gone and interviewed

9    Mr. MacKenzie.  And that interview basically completely is

10   contrary to any concept that Mr. MacKenzie was a

11   co-conspirator.  And more to the point, the government has now

12   asked Mr. MacKenzie specifically about those three documents

13   and went through with him exactly what they meant, how they got

14   the information, what it was, and that it was not, in fact, in

15   furtherance of any conspiracy, and that Mr. MacKenzie was not a

16   co-conspirator in any conspiracy.

17        At the time of the *James* hearing, the only evidence or

18   non-evidence or admissible, whatever it was, the only thing

19   that was brought to bear on Mr. MacKenzie being a member of a

20   conspiracy were these documents, and that Mr. Taylor at the

21   time opined personally on what he very explicitly said was just

22   his personal belief about those documents.  And he was unable

23   when questioned to identify anything else that could bear on

24   whether Mr. MacKenzie was a co-conspirator in any conspiracy.

25        This new evidence completely refutes any connection

1    for Mr. MacKenzie being part of the conspiracy and changes the

2    basis, the very fundamental basis to the ruling on those

3    documents.  And I would note that nothing that came out in the

4    prior trial related to Mr. MacKenzie whatsoever.

5             THE COURT:  Yeah, I can't remember anything.

6             Ms. Call, do you want to have some time over the lunch

7    break to look into that or you can respond now if you choose.

8             MS. CALL:  Yes, Your Honor.  We will look over the

9    lunch break.  I will just note at least the exhibit we have up

10   there is a statement of Defendant Kantola at the very top, so

11   the ruling is not only based on Mr. MacKenzie's statements.

12            MS. HENRY:  I am sorry, I may have given the wrong

13   one.  The first one is 1519.  I am sorry.  I apologize.  It's

14   1519, 1521 and 1521-1.  I apologize.

15            MS. CALL:  Thank you.  We'll review.

16            THE COURT:  So because we have taken up some

17   additional time, why don't we plan on reconvening at 1:30,

18   okay?

19            The Court will be in recess.  Thank you.

20        (Recess at 11:55 a.m.)

21

22

23            (Reconvened at 1:35 p.m.)

24            THE COURT:  All right.  We are back on the record in

25   20-CR-152.  And we will go ahead and take up some motions, but

1    we will hear from Mr. Tubach first.

2         MR. TUBACH:  Just very briefly, Your Honor.

3         A footnote to the objection for one is an objection

4    for all, the Court had previously given a jury instruction

5    instructing the jury on that concept that basically they

6    shouldn't draw any inference from the fact that others weren't

7    objecting, that we were simply lazy.  And we would ask the

8    Court give that instruction again.  If the Court wants the

9    exact language it used, it was in transcript 416, Lines 9

10   through 22.

11        THE COURT:  Yes.  I will do so.  I think that that's

12   appropriate to do.

13        MR. TUBACH:  Thank you very much, Your Honor.

14        THE COURT:  Hold on one second, Mr. Tubach.  Let me

15   jot a note down.  What was the citation for the exact language

16   that I used?

17        MR. TUBACH:  Transcript 416, Lines 9 through 22.

18        THE COURT:  Okay, great.  Thank you.

19        MR. TUBACH:  Thank you.

20        THE COURT:  Mr. Byrne?

21        MR. BYRNE:  Yes, Your Honor.  Before we leave the

22   exhibits without a sponsoring witness issue, and I am sorry I

23   didn't raise it before lunch, to the extent that the Court is

24   going to rule on admitting exhibits without a sponsoring

25   witness that are just in evidence versus need authentication or

1    foundation or something like that, we would ask that we be

2    allowed -- in other words, the timing of when the government

3    introduces those exhibits is not after the witness testifies,

4    for example, that the exhibit is about so that we could have a

5    chance to cross-examine the witness about that exhibit.  So the

6    timing would be an issue.

7         For example, I think in the last trial there were some

8    Joe Brink documents that were introduced after Joe Brink

9    testified.  And we couldn't cross-examine him during his

10   examination, but then they were introduced afterwards.  So I

11   just want to make sure that we have an opportunity to use the

12   exhibits that the government intends to introduce without a

13   sponsoring witness with a witness that the exhibit would be

14   relevant to.  Does that make sense?

15        THE COURT:  Maybe not.

16        Ms. Call?

17        MS. CALL:  Yeah, I think I hear the argument.  I don't

18   see how defense counsel would be prohibited from impeaching or

19   refreshing using something that hasn't been admitted yet.  And

20   I can't see a basis to kind of force the government when to

21   admit exhibits and I can't say particularly what our plan is

22   with respect to each one, but I think I oppose the point just

23   based on its breadth perhaps.

24        THE COURT:  Well, oftentimes one side will maybe lay

25   layers of foundation with a witness -- or, sorry, with a series

1    of witnesses and then at the end of that string move the

2    admission of an exhibit.  So to request that someone move the

3    admission of an exhibit in connection with each witness could

4    be problematic, and for that reason I don't know given the

5    exhibits that we're talking about whether that would occur.

6         It would also seem to me that assuming that these

7    exhibits -- now if these are the new set, then it would be

8    different because, of course, the previous trial wouldn't give

9    anyone any advance notice of that, but that's my only concern

10   is that if there are -- if the government has to move the

11   admission of things before it could get in anyway just to give

12   people notice about the relevance of a given exhibit to the

13   testimony of a given witness --

14        MR. BYRNE:  Well, I am not even sure I am asking they

15   would have to admit it, but that they wouldn't object that it

16   was inadmissible necessarily if we wanted to admit it, for

17   example, during our cross-examination of a witness or something

18   like that.  But I think maybe this is not ripe yet, but I just

19   wanted to raise the issue.

20        THE COURT:  Right.  I think that's a good point.  I

21   would suggest that to the extent that the government knows that

22   a witness may have some information about a topic that is going

23   to be pertinent to an exhibit, that the government maybe flag

24   that for the defendants.  I'm not saying that the failure to do

25   so is fatal to the admission, but that might be a way to handle

1    that issue too.  Bottom line is I think you're right,

2    Mr. Byrne, we will probably have to take it up as it arises,

3    but --

4         MR. BYRNE:  Okay.  I just wanted to raise it.  Thank

5    you.

6         THE COURT:  Mr. Gillen?

7         Anything else on that point?  Did you want to bring up

8    something on that point, Mr. Gillen?

9         MR. GILLEN:  No, Your Honor.

10        THE COURT:  Let me hear from Ms. Call first so we can

11   close out that topic.  Then I will turn to you.

12        MS. CALL:  I am trying to stick the contours of this.

13   I do see some additional logistical difficulties of there may

14   be game time decisions on whether or not to even admit certain

15   documents.  And if we may disclose on a list, for example,

16   before someone's testimony we may admit a certain document but

17   we choose not to, are we going to have to get on a side bar

18   each time with the defendants requesting we admit it if we

19   perhaps weren't ever going to.  So I am trying to just think

20   around the contours of this, but it just seems a difficult rule

21   to put in place.

22        THE COURT:  Well, yeah, my guess is it probably

23   wouldn't pertain to very many exhibits to begin with, so we may

24   be fretting about something.

25        MS. CALL:  A side note, I don't know if this was at

1    all an aspect of Mr. Byrne's point, of course, the Rules of

2    Evidence still apply to both sides.  We do have different

3    rules, for example, co-conspirator statements available on our

4    end that they can't, so I certainly don't want this kind of

5    ruling to be used as a way to for defendants to try to get in

6    their own statements or co-conspirator statements just because

7    there is a chance the government may admit it.

8         THE COURT:  Yeah, I don't think anyone was suggesting

9    that the Rules of Evidence wouldn't apply.

10        MR. GILLEN:  Your Honor, I don't know whether the

11   Court has made a decision about what the Court is going to hear

12   oral arguments on or not.  I would just ask the Court, Mr. Lake

13   and I need to be in Atlanta tomorrow morning and that requires

14   our getting the last flight out.

15        THE COURT:  You are going to catch that flight.  To

16   the extent that -- and there is some -- I will go through the

17   list right now and I will tell you which we are going to take

18   up today by argument or not.

19        MR. GILLEN:  We probably have to --

20        THE COURT:  What time do you need to leave?

21        MR. GILLEN:  We need to leave at 2:30 to make sure we

22   get on the 5:00 o'clock.  It used to be a 6:00 o'clock flight

23   and now they have done away with that apparently.  The last

24   flight to Atlanta is at 5:04.  So the only matter that we would

25   be arguing or I would be arguing is our motion *in limine* to

1    exclude the Popeye's pricing, the 2015 pricing for Popeye's.

2    Don't know whether that's on your list of motions to hear

3    argument on or not, but if it is, then I would appreciate the

4    Court accommodating us in terms of scheduling.

5           THE COURT:  Yes.  Thanks for that heads-up.  And just

6    to make clear something that's implied, it's not as if by

7    virtue of you needing to leave for your flight Mr. Tegtmeier

8    can't be here.  It's just that you would prefer to be in on

9    that particular motion.

10          MR. GILLEN:  That is correct, Your Honor.

11          THE COURT:  Okay.  That's no problem.  Yeah, there are

12   a series of some of the motions *in limine* that the defendants

13   filed that we'll take up towards the end with the exception of

14   the one that Mr. Gillen just mentioned, but I may not be in a

15   position to rule on them, but I will give people an

16   opportunity, if they wish, to bring up any oral argument that

17   they choose on to, okay?

18          *James* log I will rule on.  This is Docket No. 941.  I

19   will rule on that in writing.  I have ruled on the Rule 15

20   request.  The government also filed the request that that be

21   conducted by video teleconference.

22          Do defendants want an opportunity -- I haven't read

23   the motion itself, but it probably is fairly self-evident.  If

24   people want to file a written response, and it seems like

25   people would, how soon do you think that could be responded to?

1    You probably need to get it going pretty quick.  Maybe by the

2    end of the day tomorrow?

3         MR. TUBACH:  That should be fine, Your Honor.  I'll

4    just say it's fine, yes.

5         THE COURT:  Okay.  People grudgingly -- thought

6    balloons grudgingly say fine.  So I will rule on that one,

7    then, on paper.

8         Okay.  Why don't we take up Mr. Gillen's.  Why don't

9    we start off with that one.

10        Mr. Gillen, go ahead.

11        MR. GILLEN:  Thank you, Your Honor.  This is the

12   motion *in limine*, the Roberts motion *in limine* to exclude

13   evidence regarding the Tyson Foods 2015 pricing for Popeye's.

14        THE COURT:  No. 954.

15        MR. GILLEN:  Yeah, that's 954, Your Honor, Docket 954.

16        We touched upon this briefly when I was speaking with

17   the Court about the earlier documents that would not have a

18   sponsoring witness, and this came in under Section F as you may

19   remember.  The points that we made then which I would again

20   make and confirm again is that what's happening here, and when

21   you look at this Indictment, there has been no mention ever in

22   the Superseding Indictment about any allegation of price-fixing

23   in the negotiations for the 2014 Popeye's.

24        Now, what's happened here is that the government has

25   decided that they want to make a big deal about this particular

1    thing and then again cause the confusion, frankly, with the

2    jury about it because there is no -- to our knowledge, no

3    evidence that the government -- and I asked earlier prior to

4    lunch whether they could proffer any evidence that there was

5    any sort of government evidence that's going to show or proffer

6    or allege that there was any conspiracy with Tyson's

7    individuals, whether it's Mr. Roberts, Mulrenin, Pepper,

8    anybody with another supplier to in any way violate the Sherman

9    Antitrust Act regarding the negotiation for Popeye's for 2014.

10        In response, the government, well, gee, we've got

11   telephone calls, and they are kind of mixing and matching how

12   they would choose to use whatever calls they allude to.  They

13   have no evidence whatsoever that there was any kind of

14   collusion at all regarding that.

15        And what's happened here, because it wasn't named in

16   the 14 episodes, and the government gets up to say in response,

17   well, the Indictment shows that there was in March, there

18   was -- of 2015 there was the beginning of a dialogue regarding

19   Popeye's big box promotion where they wanted a discount and

20   whether or not there was any kind of conversation with

21   suppliers about discount or the big box, that sort of thing,

22   which is entirely different than what our motion addresses.

23        Our motion addresses the --

24        THE COURT:  Did the big box promotion come up during

25   the first trial?  If so, that term is not ringing a bell.

1          MR. GILLEN:  I don't -- the Roberts group is not

2     particularly involved in that.  I don't think it frankly did.

3     If it did, I can't point you to any part of the record where it

4     did.  I can point you -- the reason why I bring it up is to

5     differentiate and distinguish between the government's failed

6     attempt to support the inclusion of this kind of evidence

7     regarding the 2014 Popeye's.  That's the problem that they

8     have.

9          So if their allegations begin regarding a big box

10    promotion and Kent Kronaugue talking about it in March of 2015

11    and then whatever happens in the spring or in the September of

12    2015 has nothing to do with what we are asking the Court to

13    exclude.  What they are trying to do, and as we say in our

14    motion, and I will repeat and emphasize what I said earlier,

15    what they've tried to do is they've tried to create within the

16    Tyson community, oh, look, they're talking about Popeye's.

17    They must be colluding.  They must be fixing prices on Popeye's

18    2014 chicken.

19          As we all know from the jury instruction and from the

20    basic antitrust law, one cannot have a conspiracy within --

21    even if they thought that the evidence showed there was a

22    conspiracy, solely within Tyson.  That's not enough.  The

23    government then comes back to say, oh, well, we think that

24    there were contacts between Pepper and there were contacts

25    between Mulrenin and Roberts with other people for other

1    suppliers during this time period.  That's the same evidence

2    they used in their argument for the KFC.

3              What they want to do is they want to say can't we just

4    guess our way into getting into this prejudicial evidence?

5    Can't we just sort of say let's just say that if anything that

6    has to do with chicken and pricing for chicken that we think

7    might muddy the minds of the jury, please let it in so that we

8    can then have the jury so confused.

9              And at the end of the day, there will be no -- unless

10   something drastic happens, I am unaware of a single witness or

11   allegation that they're going to have that's going to say we're

12   going to show through witness A, B, C and D that there was some

13   kind of collusion between Tyson's and any other supplier

14   regarding the Popeye's 2014.

15             So our motion is basically saying that what we see

16   here is the government's attempt, really, to sort of say, well,

17   we've got these e-mails.  We think that they -- that it sounds

18   good.  They've got one e-mail where somebody is talking about

19   how the different prices were -- that people was signed up and

20   they are popping champagne.  It wasn't written by Mr. Roberts,

21   but that doesn't have anything to do with whether or not a

22   crime has been alleged or a crime has been proven as it related

23   to Popeye's 2014.

24             So what our motion focuses on essentially is, look, at

25   the very best they could say, oh, well, we think this is

1    potentially relevant under 404(b).  They gave us no notice

2    under 404(b) about similar acts.  They had -- you know, they

3    had their first Indictment and then they had their second

4    Indictment, and they put literally the kitchen sink in this

5    Indictment.  What they didn't put in this Indictment is any

6    allegation of collusion regarding Popeye's 2014.

7            And so what we're asking the Court to do is to say

8    enough is enough regarding this.  You are not going to permit

9    this.  And the jury needs to do -- because what I think we need

10   to do, and I say this in the deepest, deepest sincerity, Your

11   Honor, we need to be working to try to crystallize and clarify

12   the picture for the jury rather than add more convoluted

13   allegations of e-mails concerning pricing that has nothing to

14   do with what they've charged.

15           So for all those reasons we would say -- we would ask

16   the Court to grant our motion regarding limiting the -- under

17   404(b) failure to notice the Popeye's 2014 for all the reasons

18   that we've stated.

19           And again, if the government in response can get up

20   here and represent to the Court that they have a single

21   witness, anybody, do they have a single witness who is going to

22   come into this courtroom and say, yes, Tyson was involved in a

23   conspiracy with other suppliers.  These are the people.  This

24   is what we're going to show.  Do they have that?  Maybe they

25   do.  If so, let's hear about it now because we certainly

1    haven't seen it in their pleadings.  We certainly haven't seen

2    it in the representation they made to the Court about the

3    relevance of the Group F e-mails that we had discussions about

4    earlier today.

5          So I think we need to, rather than playing the game

6    of, well, we don't need to get into that, we are not going to

7    tell you about that, we have an overarching conspiracy that

8    starts in 2012 and runs to 2019 and whatever has anything to do

9    with chicken, we say we can throw it in.  And I would ask the

10   Court to grant our motion.

11         THE COURT:  All right.  Thank you, Mr. Gillen.

12         Ms. Prewitt?

13         MS. PREWITT:  Thank you, Your Honor.

14         I would join in those arguments made on behalf of

15   Mr. Roberts.  I would add to them the constructive variance

16   argument.  Your Honor, this was not something again, as

17   Mr. Gillen pointed out, part of the episodes mentioned within

18   the Indictment.  And I sincerely doubt this episode was

19   something that was presented to the Grand Jury as an episode of

20   collusion.

21         The only changed circumstances we have here -- because

22   all of these documents have been in the possession of the

23   government.  They have been there and available to use at

24   trial.  The only thing that's changed in terms of circumstances

25   is that there were, as the Judge revealed in polling the jury,

1    nine votes of acquittal that the jury had -- was willing to --

2    willing to share with the Court vis-a-vis Mr. Roberts and

3    Mr. Mulrenin.  That's the changed circumstances.

4         And you can see how the government has reacted.  And I

5    will give them credit.  They certainly have pluck.  They have

6    determination.  They have absolutely doubled down to scour

7    whatever they can find to bolster their case against

8    Mr. Mulrenin and Mr. Roberts, but they have done it in a way

9    that materially varies from the Indictment.  And that poses

10   real issues for the defense in this case.

11        Like Mr. Gillen said, there is not a single witness

12   that's mentioned anything about this particular episode.  There

13   is no other evidence other than, hey, that kind of makes sense.

14   Look at some of the phone calls.  I bet we can piece something

15   together to create an image as if there is collusion where they

16   have actual no real evidence it.  So for those reasons, Your

17   Honor, I would respectfully submit that this information --

18   this evidence should be excluded.

19        THE COURT:  Thank you, Ms. Prewitt.

20        Anyone else?

21        Ms. Call or whoever from the government's side wants

22   to respond.

23        MS. CALL:  Ms. Rogowski.

24        THE COURT:  And Ms. Rogowski, if you want to stand on

25   the government's response, that's fine too.  I am not going to

1   rule on this motion now.  It totally up to you.

2          *MS. ROGOWSKI:*  I will just a few words, Your Honor.

3   Jillian Rogowski on behalf of the United States.  So just in

4   response to a couple of the things that Mr. Gillen and

5   Ms. Prewitt said, we have extensively briefed the issue of

6   presenting evidence that was not in the Indictment, so we don't

7   need to rehash that.  I just point Your Honor to the 10th

8   Circuit case *Ocampo*, which is at 148 F.Appx. 703.  And that is

9   in our briefings, Your Honor.

10          I would also like to point out the fact that we did

11   admit evidence in the first trial relating to Popeye's 2015.

12   We did admit Government Exhibit 617.  And in addition,

13   Mr. Bryant did testify that an SMS meeting -- SMS is the buying

14   cooperative Popeye's -- Jason McGuire told Roger Austin to put

15   out the idea of price increases out into the industry.

16          We also -- Your Honor ruled on *James* log entry 143

17   which is relating to Popeye's pricing and negotiations.  And

18   Your Honor did rule that it was, in fact, in furtherance of the

19   conspiracy.  So in addition to our papers, that is what we

20   would like to present to the Court.

21          *THE COURT:*  Thank you, Ms. Rogowski.

22          Mr. Gillen?

23          *MR. GILLEN:*  Just briefly, Your Honor.

24          We asked them to proffer.  They don't have a single

25   proffer or a single witness that will say that Tyson was

1   conspiring with anybody.  They say -- they are now saying, oh,

2   well, in a meeting with Pilgrim's, it was said that, hey, get

3   the word out to the industry.  There is no evidence that there

4   was any word getting out to Tyson regarding let's set up our

5   prices on Popeye's 2015 chicken, period.

6           There has been -- and importantly, of the 17 million

7   pages, and we've -- after the government came back and as we

8   know, as Ms. Prewitt said, the government I think was a little

9   surprised with the jury and how they viewed the government's

10  presentation.  And so they went back in again and did all of

11  their research and let's dig more deeper and deeper and deeper

12  into Tyson.  Even digging as deep and deep as they have, and

13  you can see from their new exhibits, their new emphasis, that's

14  one of the points of emphasis that they apparently are going to

15  have in the second trial.  Even with that focus, they still

16  can't point to a single document within Tyson or anybody else

17  that there was any collusion or agreement with Tyson and

18  anybody in the supplier industry of the other suppliers, none.

19          And again, the false flag here about the discount, big

20  box discount, as we point out in our pleadings, that big box

21  discount by Mr. Kronaugue was flagged, first of all, in March

22  of 2015, months after the final contract was signed with

23  Popeye's and Tyson in 2014 for the 2015.  So they can't say

24  that they are going to then shoe-horn the 2-cent discount which

25  wasn't even mentioned, wasn't on the table, had nothing to do

1   with the documents that they are presently trying to get in

2   before this jury.

3          My concern is evidence exactly by what we've seen from

4   the government today, and that is if they can say, if we can

5   only get these documents in, then maybe we can confuse the

6   jury.  Maybe we can cloud this issue.  Maybe we can say, hey,

7   Kronaugue had the big box thing in March and they signed it in

8   September of 2015, therefore don't you think that any

9   correspondence within Tyson in the fall of 2014 is a crime?

10          It just doesn't exist, Your Honor.  We certainly hope

11   that you will consider our motion and will grant our motion to

12   exclude this evidence.  Thank you.

13          THE COURT:  Thank you, Mr. Gillen.  And whenever you

14   and Mr. Lake need to leave, go ahead and do so.

15          MR. GILLEN:  Thank you very much, Your Honor.

16          THE COURT:  Seeing people's upgraded masks reminds me

17   of something, and that is the Court managed to procure some

18   KN95s, not to pass out when you come into the building, but

19   enough for the jury at least, so I will be offering the jurors

20   the ability to use those masks during the course of the trial.

21          I'm not exactly optimistic about them taking me up on

22   that offer.  People tend to like their masks.  And I had a

23   trial in January, just a short three-day trial, but I had it in

24   here.  It seemed pretty lonely, let me tell you, in here, just

25   one defendant.  But yeah, my offer that they upgrade their mask

1    to the surgical mask that we had -- I didn't have the KN95s at

2    the time -- was not really taken up.  But anyway, we'll offer

3    the KN95s.

4         Ms. Henry, go ahead.

5         *MS. HENRY:*  Your Honor, this morning there was

6    discussion about Government Exhibit 1753 and 1754.  And as I

7    was looking at them, they did seem really familiar to me.  And

8    I realized that they are actually C-480 and C-482, which are

9    the defendants' exhibits that were admitted in the last trial,

10   so I suspect that Ms. Call also didn't recognize that and I

11   assume that you want them culled.

12        *THE COURT:*  What were the government numbers?

13        *MS. HENRY:*  The government numbers were 1753 and 1754

14   and they are really C-480 and C-482, apparently.  Just wanted

15   to bring that up.

16        *THE COURT:*  Yeah, that's great.  Thank you.

17        Ms. Call?

18        *MS. CALL:*  If I could ask just a point of

19   clarification on this.  Of course when the government goes

20   identifying its exhibits, it's not necessarily looking at the

21   defense exhibit list.  We are looking at the same underlying

22   documents.  To the extent that there are exhibits that are

23   marked the same for both sides, I take your position to be just

24   ones that were actually admitted by the defendants in the

25   previous trial.

1          THE COURT:  That's correct, yeah.

2          MS. CALL:  We will do a look through our exhibit list

3     and make sure we note any that were admitted that we may

4     also --

5          THE COURT:  Yeah, right.  It's just -- the premise is

6     that if it was admitted in the first trial under a defense

7     exhibit, we should try to preserve that same exhibit number in

8     the second trial, assuming that it's admitted in the second

9     trial, as opposed to doing it through a government number.

10          MS. CALL:  Of course.  We'll do that.

11          THE COURT:  Okay.  Why don't we take up the

12     government's motion regarding reconsideration of the Court's

13     ruling related to the scope of Mr. Bryant's testimony.  This is

14     Docket No. 957.

15          Mr. Torzilli?

16          MR. TORZILLI:  Yes, thank you, Your Honor.

17          Just briefly on it, I think we largely stand on the

18     briefing we submitted, but just to, I guess, highlight the key

19     point.  In the first trial, ultimately Your Honor decided based

20     in large part on the 10th Circuit decision in the case *U.S. v.*

21     *Robinson* that it was appropriate to allow the defendants to

22     inquire into on cross-examination issues relating to dishonesty

23     of the witness on cross-examination.  And the rationale there

24     drawing upon *Robinson* was that Mr. Bryant was the only

25     cooperator or the only insider witness to the conspiracy and

1    that that brought some elevated importance to his testimony,

2    and therefore additional leeway was appropriate for the

3    defendants to inquire into those -- the issues on

4    cross-examination.

5         That rationale no longer exists.  We are prepared to

6    call additional insider witnesses, including Mr. Pepper, the

7    former conspirator, in our case in chief in the upcoming trial,

8    so that rationale for the heightened importance that existed in

9    the first trial doesn't in the second.

10        THE COURT:  Let me ask you about Mr. Pepper because it

11   seemed to me, and I could be mistaken, but it seems to me that

12   Mr. Pepper, one reason perhaps that he wasn't called is that

13   Mr. Pepper was disputing the idea that he was part of a

14   criminal conspiracy to begin with; was that right?  Is he

15   saying, yeah, I did various things, but I didn't think they

16   were wrong.  I never, you know, thought that for a minute.  If

17   that's true, then he would seem to be of somewhat a different

18   character or importance than, for instance, Mr. Bryant.

19        MR. TORZILLI:  We fully expect Mr. Pepper to testify

20   that he did participate, knowingly participated in the

21   conspiracy.

22        THE COURT:  And knowingly participated in the

23   conspiracy?

24        MR. TORZILLI:  Correct.

25        THE COURT:  Okay.  Keep going.

111

1          MR. TORZILLI:  So the rationale that applied to the

2    first trial doesn't exist in the second trial, and as a

3    consequence, there are material change circumstances that make

4    it appropriate for Your Honor to reconsider that previous

5    ruling.

6          THE COURT:  Thank you, Mr. Torzilli.

7          We are really getting some action now.  Actually,

8    Ms. Prewitt --

9          MR. TUBACH:  I think she beat me to the punch, Your

10   Honor.

11         THE COURT:  Yeah, although she has further to go, she

12   did start to get up first.

13         MS. PREWITT:  So just want to deal with that one point

14   because Your Honor really inquired of the government on a

15   critical point vis-a-vis Mr. Pepper.  We have talked about this

16   before.  There has been a history vis-a-vis Mr. Pepper and real

17   questions about whether he would admit to participation in the

18   charged conspiracy.

19         We have read the 302s, right?  We have read the MOIs.

20         THE COURT:  When you talk about 302s, are there some

21   new 302s?

22         MS. PREWITT:  There is one new one we received.  It

23   does not change the equation in terms of looking at the types

24   of statements, what he would admit to now relative to what he

25   has admitted to before, which we don't know what's going to

1    happen between the time that he gave that statement in January

2    and the trial.  But where we are sitting now based on the

3    defendants, based on the discovery we received, Mr. Pepper is

4    not admitting to the participation in the conspiracy charged.

5         He is admitting to sharing information -- to

6    discussing prices, right?  He is admitting to the understanding

7    that there was a common understanding among suppliers that

8    prices would increase in 2015, which is an understanding the

9    whole industry had save for maybe a couple of suppliers,

10   purchasers who were not particularly tapped in to the market

11   realities.  So that's really what we have of Mr. Pepper.

12        So if there are statements that show Mr. Pepper is

13   actually confessing to his participation in the charged

14   conspiracy, we need to see them as discovery.  Look, we filed

15   motions, Your Honor, and I understand the reasoning for Your

16   Honor rejecting our motion to obtain notes of interviews of

17   Mr. Pepper.  I understand that.  I understand that Mr. Gillen's

18   subpoena, 17(c) subpoena has been denied.

19        We are trying to understand how the government could

20   have optimism that Mr. Pepper would confess to his

21   participation agreement, which is really a critical issue here

22   because -- and this is bleeding into the *James* hearing and I

23   will step away in a second -- because they are predicating the

24   admissibility under 801(d)(2)(E) of a number of statements, 22

25   statements, based on that premise.  And that is one that is

 1   very much in question.  It is the reason why we subpoenaed

 2   Mr. Pepper.  That's why we wanted to cross-examine him at the

 3   *James* hearing.  That's why we wanted to cross-examine

 4   Mr. Taylor about what Mr. Pepper said at the last *James*

 5   hearing, but we were cut off by the government.

 6           So that is an essential issue we are dealing with.

 7   And we really need to understand how they can have that

 8   optimism about what he would testify to because we have no

 9   indication having looked at the reports of interviews that he

10   would actually say that.

11           THE COURT:  Can you refresh my memory, Ms. Prewitt --

12   I am sure that Mr. Torzilli could too -- but let me just ask

13   you, was there a discussion at the last trial about issues

14   pertaining to immunizing Mr. Pepper?

15           MS. PREWITT:  Absolutely.

16           THE COURT:  It seems like this issue could loom, but

17   obviously Mr. Torzilli can address that.  Maybe you can refresh

18   my memory.

19           MS. PREWITT:  Yes, Your Honor.  Tyson Foods,

20   Mr. Pepper's then employer, was an applicant for immunity.  And

21   under the terms of the program of the antitrust division where

22   a company is conferred conditional immunity, its employees fall

23   under that protection in terms of non-prosecution for

24   cooperation in an investigation.  A letter was issued that

25   covered all Tyson employees, all Tyson employees.

1          THE COURT:  The Pilgrim's letter presumably.

2          MS. PREWITT:  Excepting Mr. Pepper.  He was carved out

3    specifically from that because the government was dissatisfied

4    because Mr. Pepper's statements did not go far enough to

5    admitting an agreement.  And, in fact, Agent Taylor testified

6    to this.  We cross-examined him on it.  The government sought

7    to cut off that cross-examination.  And what Agent Taylor

8    testified to was that the government was, in fact, dissatisfied

9    because they felt Mr. Pepper could tell them more.

10         From what we can see comparing the agent reports from

11   before the *James* hearing where he asserted his Fifth Amendment

12   because he has been carved out from the protections of that

13   leniency matter, which would have given him non-prosecution

14   protections, comparing those interview notes to the one we are

15   look at now, we really don't see any difference.  What we see

16   is Mr. Pepper will, if he takes the stand, presumably testify

17   that he talked about prices, obtained competitive intelligence

18   about prices from suppliers, and even felt remorseful and

19   wrong.  And, Your Honor, that features prominently in his

20   interview reports.

21         THE COURT:  And was that true even before the most

22   recent 302?

23         MS. PREWITT:  That was.  And this will go to another

24   issue that I know is on deck, Your Honor, but the going in so

25   hard constantly with witnesses on regret and remorse and it was

1    wrong about sharing confidential information is essentially a

2    way to get around the fact that he will not on all fours say,

3    "I participated in an agreement to fix prices and rig bids."

4    And Your Honor, I think that is pivotal because so much hinges

5    upon him saying that in terms of the *James* hearing analysis.

6           *THE COURT:*  Mr. Tubach?

7           Thank you, Ms. Prewitt.

8           *MR. TUBACH:*  Just pivotally on that, Your Honor,

9    whatever Mr. Pepper ends up saying at trial shouldn't affect

10   the extent to which we can cross-examine Mr. Bryant.  What

11   everyone says about Mr. Bryant as the sole witness or not the

12   sole witness and have they managed to squeeze some more

13   testimony out of a witness they previously have kicked out of

14   the amnesty program, the factor remains he is a key witness,

15   Mr. Bryant is a key witness.

16          He worked at Pilgrim's.  He, as the Court has heard

17   his testimony, knows about it.  So whether the government has

18   one witness or two witnesses, he is still key.  We have to be

19   able to cross-examine him about concepts that are going to make

20   the jury believe that he is perhaps not a credible witness.  So

21   the Court last time, what the Court said was you can

22   cross-examine him about the fact that he lied, whether he lied

23   under oath -- I am sorry, lied to the agents when he was being

24   interviewed, but I don't want you to get into the substance of

25   what he lied about.  And that was a line that we stuck to.

1          And what we are saying now is so far so good, but we

2    need to -- and he has now admitted that he lied.  Of course,

3    the government said in response to an earlier motion, he never

4    lied so that's not relevant.  So now he has admitted on the

5    stand that he has lied, okay.

6          The question is, can we go farther than that?  It

7    seems to me there is several layers that we could go farther.

8    The one would be, you know, did you lie about other crimes?

9    Because all we were able to ask him is whether he lied

10   repeatedly about other matters that weren't antitrust and

11   didn't involve these defendants.  That could be anything.  And

12   the fact that he is lying to the FBI after being warned not to

13   lie about other criminal behavior that he engaged in is a

14   significantly different scenario than just saying you lied to

15   the FBI and we don't know about what.  So he lied.  The second

16   level would be he lied about other crimes.

17         The third would be those crimes were themselves crimes

18   of dishonesty.  When he -- and I don't know how to do this in a

19   public forum.  I don't know if we need to seal this.  I feel

20   like I need to talk about what it is Mr. Bryant did.  And if

21   the Court wants to seal this transcript --

22        THE COURT:  I am familiar with it -- I think, at

23   least, because it had come up in the briefing before the last

24   trial in regard to Mr. Bryant, I believe.  So you can --

25   without being too specific about it, I think I know what that

1    is, unless you have new information that wasn't included in the

2    previous briefing.

3        MR. TUBACH:  I can refer to it obliquely.  There is

4    conduct involves his colleagues and crimes of moral turpitude

5    I'll call them.  Then related to that is this separate scheme

6    of paying -- having those colleagues pay him back.

7        THE COURT:  Having to do with expense accounts?

8        MR. TUBACH:  Yes, floating costs to them in their

9    bonus is the way he described it in a 302.  He floated the cost

10   to them in their bonus, and they then repaid him in cash.  So

11   on the crimes of turpitude, those probably constitute a

12   violation of the Travel Act, certainly constitute crimes under

13   Georgia law.

14       And then there is the separate crime of sort of

15   covering up how the payment is made which appears to have

16   involved Pilgrim's bonus payment system.  Now, the government

17   says, well, that's just not true.  They can certainly say that,

18   but in his 302 he said he floated costs to them in their bonus,

19   so we ought to be able to inquire is into that.  So that's sort

20   of level three.  And the last level would be can we get into

21   the details of exactly what he was doing in these crimes of

22   moral turpitude, and that is a whole different level.

23       So my suggestion is that we at least be able to go to

24   level three, which is to say we get to cross-examine him about

25   the fact that he lied, about the fact that he lied about

1    something that was a crime, and the fact that those crimes were

2    crimes of dishonesty.  And if the Court wants to not have us

3    inquire into specifically whatever the sort of details would be

4    of the crimes of moral turpitude, that I can complete

5    understand.  But I do think for purposes of evaluating

6    Mr. Bryant's credibility, it's key that he committed those

7    crimes of dishonesty and then lied to the FBI in the same

8    interviews where he is saying that our clients committed

9    crimes.  What juror wouldn't want to know that in evaluating

10   Mr. Bryant's credibility, a key witness for the government.

11          THE COURT:  Right.  Mr. Tubach has brought in a

12   separate motion which is at Docket 1001, but that's okay

13   because it is related.

14          MR. TUBACH:  I guess I didn't address their motion

15   which is now they have one and --

16          THE COURT:  You kind of did because the first point

17   related to it.

18          Ms. Carwile, go ahead.  Then I will hear from

19   Mr. Kornfeld.

20          MS. CARWILE:  Yes, Your Honor, just briefly on

21   Mr. Tubach's response to the government's motion you first

22   brought up.  I would note that obviously the Court is aware

23   this is 10 different defendants and 10 different cases.  And

24   Mr. Bryant's testimony relates to some, but not all, and

25   Mr. Pepper's testimony relates to others.  So for some of the

1   clients here Mr. Bryant is the only witness.  And I think

2   that's important.  Just having two witnesses say something

3   general about a conspiracy doesn't make there be two as to all

4   defendants.

5           THE COURT:  Yeah, that's a good point.

6           MR. TUBACH:  I forgot one important point, Your Honor.

7           What this really sets up is all those factors that I

8   mentioned sets up this sort of Damocles argument that these are

9   crimes for which he can still be prosecuted and for which he

10  does not have immunity.  And it's government, the Federal

11  Government, that's going to decide whether or not to prosecute

12  him for these crimes.  That is classic cross-examination

13  material.  It is the sort of Damocles hanging over his head,

14  and depending on what he says on that witness stand, they can

15  decide whether or not they are going to prosecute him for mail

16  fraud, let's say, or any of the other crimes.

17          And that's a critical piece of cross-examination to

18  understand not just the fact that he engaged in dishonest act

19  as an untruthful person, but he now has a substantial bias to

20  testify in the manner that the government wants him to testify

21  because otherwise he could be looking at being prosecuted for

22  crimes that don't have anything to do with this.

23          THE COURT:  Thank you.

24          Mr. Kornfeld?

25          MR. KORNFELD:  Obviously, not shockingly, I agree with

1    what Mr. Tubach is saying, but I think there is three other

2    just kind of macro points that need to be stated.  And I will

3    be candid, when I saw this motion from the government, I was

4    flabbergasted.  And I was flabbergasted for three reasons.

5         No. 1, the defendants, each and every one of them,

6    have a constitutional right under the Sixth and Fourteenth

7    Amendment to confront witnesses against them.  There is no

8    bigger witness against them, although frankly he didn't say all

9    that much from our perspective, than Mr. Bryant.  So to argue

10   that somehow because they are trotting in a second flipper, if

11   in fact that's what Mr. Pepper turns out to be, that that's

12   somehow under the 10th Circuit obviates our ability to confront

13   a key witness, be it the key witness or one of the two key

14   witnesses, that makes no sense to me and that certainly makes

15   no sense to me under the Constitution.

16        The second thing that I think is important to note is

17   credibility as a general matter is always relevant.  So it

18   isn't just this cumulative analysis.  And, you know, it's the

19   very fact that all -- the credibility of every witness is

20   always relevant and it's a heightened sense of relevance when

21   it's a key witness.

22        And the third thing is, and I don't disagree with

23   Mr. Tubach about sort of the different levels of lying, but the

24   macro point I think is a key one.  This man got up on that

25   stand and admitted under oath in a federal district court that

1       he is a liar, No. 1, and repeatedly; and No. 2, admitted that

2       he lied to the government during the time he was cooperating

3       with the government in this very case.

4               So to the extent there is sort of a spectrum of lies

5       if, in fact, there are, you know, this is high on the spectrum

6       or middle of the spectrum, whatever the metaphor is, precisely

7       because he is lying to the very masters to which he is now

8       serving, and that's the United States Government, and to the

9       point of Mr. Tubach, he is doing so sort of at his peril, the

10      sort of Damocles argument.  So it is beyond my comprehension

11      that the government could with a straight face say that our

12      star flipper witness, the horse we're riding for the second

13      time, you don't get to ask him if he lied and he lied on the

14      stand and he admitted under oath that he lied to us, the

15      government, lied to the government.  That makes no sense to me.

16              So I would ask the Court not only to be mindful of

17      kind of all these things, but also the constitutional

18      dimensions of our rights to confront each and every witness to

19      and including Mr. Bryant.  Thank you.

20              THE COURT:  Thank you, Mr. Kornfeld.

21              Ms. Johnson, go ahead.

22              MS. JOHNSON:  Your Honor, quickly just to add a couple

23      of points to what Ms. Prewitt talked to the Court about.

24              I think this all started with a question from the

25      Court to the government which they did not answer.  The

1    question as I remember it was something to the effect of

2    Mr. Pepper, and as you recalled correctly, wasn't -- the reason

3    he was not called to testify was because he wouldn't come close

4    or all the way to admitting there was agreement, that he was a

5    participant in an agreement.  Mr. Torzilli responded with we

6    fully expect him to testify that he was a part of it.

7           What he says now and what he has said in the 13

8    interviews, I think the time line is critically important.  And

9    it folds into the arguments with respect to the *James* hearing

10   process.  The timing of his carve-out was right before and just

11   after the defense subpoenaed him to the *James* hearing.  And it

12   was only after that he was carved out and then he had to take

13   the Fifth, so effectively preventing us from the very questions

14   that we all would love to ask Mr. Pepper.  So I think the

15   timing is important and also it's telling that the government

16   did not answer the question that the Court posed.

17          Thank you.

18          *THE COURT:*  Thank you, Ms. Johnson.

19          Mr. Torzilli.

20          *MR. McLOUGHLIN:*  Your Honor, if I may, one additional

21   point here, specifically to the *Robinson* citation issue.  As

22   Your Honor will recall in *Robinson*, the issue the 10th Circuit

23   addressed was whether the defendants could inquire into the

24   defendant's mental health history and his use of prescription

25   drugs.  And in that opinion, the Court noted that the

1    cooperating informant was a star witness, and that made the

2    inquiry, which was a very sensitive matter, to be considerably

3    more relevant.

4           However, the premise of the government's notion that

5    the defendants' rights here with respect to Mr. Bryant and its

6    prior -- the defendants' prior request to cross-examine

7    Mr. Bryant about these issues is dependent on *Robinson* is, in

8    fact, incorrect.  That was a limiting citation.  And again as

9    the point we made, Mr. Bryant does not become less of a star

10   witness because there was a costar.

11          But secondly, and more relevantly, I think, in

12   contrast to *Robinson* where the issue was the gentleman's, you

13   know, his mental health history and his prescription drug use,

14   here we are talking, as Mr. Kornfeld quite ably noted, not just

15   to his truthfulness in specific instances of lying to the FBI,

16   but also underlying that specific instances of untruthfulness

17   and dishonesty to his employer with respect to these

18   submissions of expenses.

19          Where that takes you is right into Rule 608(b).  This

20   should be a very non-controversial issue because 608(b) is very

21   clear that except for a conviction under Rule 609, the Court

22   may on cross-examination allow specific instances of

23   misconduct, including federal convictions, to be inquired into

24   if they are probative of the character for truthfulness or

25   untruthfulness of the witness or any other witness.  And it is

1    simply impossible for the government to argue in good faith

2    that the untruthfulness to the FBI and the untruthfulness to

3    his employer is not probative of the character of the witness

4    for untruthfulness.

5          So again, this argument that somehow there is a change

6    in circumstances and *Robinson* is irrelevant and *Robinson* is the

7    only thing upon which our cross-examination rights rely upon,

8    they are simply all false premises.  And for those reasons the

9    motion should be rejected offhand.  Thank you.

10         THE COURT:  Thank you, Mr. McLoughlin.

11         Mr. Torzilli, go ahead.

12         MR. TORZILLI:  I want to respond to a number of the

13   points, but first I want to make a point and make an

14   application.  I heard defense counsel refer to the government

15   as masters of Mr. Bryant, and that's completely inappropriate,

16   what it implies and the imagery it generates.  So my

17   application is that Your Honor order that defense counsel not

18   use that sort of terminology in the jury's presence.

19         THE COURT:  Well, we are not really talking about that

20   now.  I do think that especially now within the last couple of

21   years that term is, you know, very highly charged and is not a

22   good one to use, but I don't want to become the regulator of,

23   you know, all terms.

24         Go ahead, Mr. Torzilli.

25         MR. TORZILLI:  Okay.  I want to respond to a number of

1    the points that counsel have made.  Let me start first with

2    points that relate to Mr. Pepper.  I think we frankly have a

3    disagreement with defense counsel over what the interview

4    reports say.  And defense counsel has all the interview

5    reports, all the 302s.  There is another one being prepared for

6    an interview that was conducted earlier this week and it will

7    be promptly provided to the defendants upon its completion.

8         But in essence, he states his knowing participation in

9    the conspiracy and the evidence clearly supports that.  As a

10   result of the *James* hearing where there was an extensive

11   submission of documents and obviously live testimony, the Court

12   ruled that Mr. Pepper knowingly participated in the charged

13   conspiracy and joined the conspiracy knowingly at least as of

14   May 31st, 2013, I believe is what the order says.

15        And then in the order that the Court issued denying

16   all the defendants' Rule 29 motions, the Court pointed out that

17   Tyson was a participant in the conspiracy and that the

18   individuals at Tyson involved included Mr. Pepper.  So I think

19   it's well supported, at least for purposes -- evidentiary

20   purposes that Mr. Pepper is a co-conspirator.

21        In terms of leniency applications, we can't verify,

22   the antitrust division won't verify any sort of leniency

23   application information, but I will make the point that if we

24   did give the company and employees of the company protections,

25   we wouldn't obviously do that just to hamper the defendants in

1    their ability to pursue what they want to.

2            THE COURT:  And that stands for Mr. Pepper?

3            MR. TORZILLI:  So for Mr. Pepper, we have executed

4    with him a non-prosecution agreement that the defendants know

5    about because we produced that agreement to them in discovery.

6            THE COURT:  Okay.  And Mr. Pepper has his own

7    attorney?

8            MR. TORZILLI:  He is represented by his own counsel,

9    individual counsel, yes, sir.

10           THE COURT:  And is that counsel available and will be

11   there for the trial just in case issues come up?

12           MR. TORZILLI:  Their counsel will be available and

13   will be present at trial, yup.

14           If Your Honor will just give me one second, let me

15   look over my notes to see if there are any other points that I

16   wanted to raise.

17           THE COURT:  Yeah, that's fine.

18           MR. TORZILLI:  Just to go back to Mr. Bryant now, at

19   the last trial it's still our view that as a result of -- as a

20   result of Mr. Pepper, that the rationale in Robinson doesn't

21   apply and that the additional leeway Your Honor provided in the

22   first trial is now not necessary.  But if Your Honor views

23   things differently to go back to the dishonesty point, where

24   Your Honor ended up at the first trial was striking a balance

25   between inquiring into dishonesty and not inquiring into the

1    underlying details which do raise, I think, significant issues

2    of 403, as Your Honor noted in ruling the way that you did in

3    allowing the additional leeway.  So I think, Your Honor, if the

4    Court is headed in that direction, I think those principles of

5    unfair prejudice very much come into play in terms of the

6    details involved here.

7         And then the last point I'll make is just in response

8    to I think it was counsel for Mr. Austin referring to the --

9    kind of the individual nature of certain witnesses and who they

10   testify against.  Ultimately where we have a case about a

11   conspiracy, so ultimately the evidence of a conspiracy is

12   evidence that relates to each and every defendant.  So even if

13   a specific witness does not specifically identify a particular

14   individual, their general testimony about the operation of the

15   conspiracy would apply equally to others.

16         THE COURT:  All right.  Thank you, Mr. Torzilli.

17         MR. TORZILLI:  Thank you, Your Honor.

18         THE COURT:  Anyone in rebuttal want to say anything?

19   Ms. Prewitt, go ahead, and then Ms. Henry.

20         MS. PREWITT:  Thank you.

21         As Your Honor can well imagine, we have poured over

22   these agent reports for Carl Pepper.  We have poured over them.

23   Defense counsel here have all poured over them.  We are not

24   reading what the government claims is in those reports.  I

25   would like to make an oral application for the underlying agent

1    reports, underlying agent notes for those reports based on

2    special circumstances.  And I acknowledge, Your Honor, that is

3    not the district practice in the normal course, but there are

4    extraordinary circumstances here given what a pivotal witness

5    they claim he will be and given the fact that there is a real

6    dispute about what he said during those interviews.

7         Your Honor, I will point out that the government has

8    voluntarily handed over a number of handwritten agent notes for

9    witnesses that it called to testify at trial.  It has chosen

10   with respect to Mr. Pepper to have agent reports printed.  We

11   have never gotten the underlying notes.  The government is

12   picking and choosing which witness interviews it memorializes

13   and produces in the form of agent reports versus underlying

14   notes.

15        So I'd just ask for Your Honor's consideration.  We

16   could, of course, provide the Court additional information on

17   that request, but I would make that oral application, Your

18   Honor, just with respect to Mr. Pepper to address this very,

19   very critical issue which is the absolute core, the core of the

20   government's case.

21        THE COURT:  I am going to reject -- I will deny that.

22   Assuming that request is a motion, I will deny that.  I don't

23   think that the fact that the government may be treating

24   Mr. Pepper a little bit differently in terms of production of

25   agent notes in and of itself would cause me to treat him any

1    differently.  I think as a number of defense counsel mentioned

2    at the beginning of the argument as to the government's motion

3    regarding Mr. Bryant, we'll have to see what happens when

4    Mr. Pepper takes the stand.  And that's really going to be the

5    proof in the pudding in terms of what he says, so we'll have to

6    see on that.

7          Mr. Torzilli, you seem like you have a burning point,

8    so go ahead.

9          *MR. TORZILLI:*  Just to respond to two points.

10          I think the first point relating to reading the 302s

11    and what to draw from them I think can be viewed as a

12    reflection of or a microcosm of just the fundamental

13    disagreement in this case.  Defense counsel don't believe a

14    conspiracy existed or at least they are representing their

15    client in that way and we do.  So I think they're there or

16    there is no they're there I think is a function of what your

17    perspective is.

18          Second, on the notes, just to make this very, very

19    clear, as we got close to the first trial, we chose to deliver

20    to the defendants, produce to the defendants agent notes of

21    interviews so that we could produce them immediately, so not

22    have the agent go back, type up a report, get it all together

23    and then produce it out.  So that is the rationale for why we

24    sometimes produced the notes as opposed to reports.  And I

25    suspect we will reinstitute that practice because we are

1   getting close to trial and want to get the defendants

2   information as promptly as we can.

3         THE COURT:  Ms. Henry, go ahead.

4         MS. HENRY:  With regard to Mr. Bryant's testimony, I

5   think it's important that we address head on Rule 403 because

6   that's really what's at issue here.  When we're looking at Rule

7   403, the grounds for exclusion are unfair prejudice, confusion,

8   misleading.  There is no issue of misleading here.  What he did

9   is what he did.  Confusion, there is no issue of confusion.  He

10  did what he did, doesn't really confuse the jury in any way.

11  In terms of prejudice, as Your Honor mentioned numerous times,

12  the fact that it hurts one side does not make it unfair

13  prejudice.

14        On the other side, we have the probative value here.

15  The probative value on dishonesty is huge with a witness

16  especially like this.  And I am not certain that I agree with

17  my colleague that you can separate out moral turpitude from

18  dishonesty.  In fact, I think if we look at many of the

19  statutes, regulations that exist in this country, you will see

20  that they are, in fact -- moral turpitude is often consider as

21  dishonesty in many contexts.  So what we have when we are

22  looking at this balance here for -- there is no really unfair

23  prejudice because the prejudice is only with regard to his

24  credibility.  That does not make it unfair.

25        THE COURT:  Thank you, Ms. Henry.

1          Anyone else?

2          All right.  I am going to rule on both of those

3    motions.  Just so we're clear, the government's motion is

4    Docket No. 957.  The defendants' motion is Docket No. 1001.

5          First of all, I am going to deny the government's

6    motion.  I think that the balance that I struck originally for

7    the first trial in regard to Mr. Bryant was the appropriate

8    one.  It's true that Mr. Bryant admitted in the course of his

9    interviews with the special agents that he had done the things

10   that Mr. Tubach alluded to.  He has never been prosecuted for

11   any of those things.  Those aren't convictions or anything of

12   that nature.

13         And moreover, as I held originally, those are -- don't

14   relate in any direct way to anything that's going on in terms

15   of this trial.  They are not of direct relevance.  And while

16   you could consider the type of financial improprieties

17   dishonest, I still don't think that without there having been a

18   conviction for it that those are really -- the facts underlying

19   them are relevant to the jury's consideration.  And that's why

20   it brings in a lot of 403 concerns.

21         The balance that was struck was that Mr. Bryant could

22   be impeached and asked the question whether he had, in fact,

23   lied to the agents, and that's what he testified to.  The fact

24   that he testified to that in the first trial doesn't bootstrap

25   it into some higher level of offense or something.  He's

132

1    just -- that was the balance that was struck and he admitted to

2    it.  He had to admit to that.  He did.  That doesn't somehow

3    now provide a new grounds to justify going into the details

4    further.

5         So I think it's appropriate that he be allowed -- that

6    the defense can impeach him the way he was in the first trial,

7    but I will deny the defendants' motion because I don't think

8    that going into any additional detail would be appropriate.  I

9    think it would be prejudicial, unnecessary, so I won't allow

10   that.

11        I appreciate Mr. Tubach's point about the Damocles

12   issue, but once again, I don't think that that issue alone

13   would justify the 403 prejudice that would invariably come with

14   going into the details of that misbehavior and possibly

15   misdeeds.

16        All right.  So I have ruled on the Rule 17(c) ones, or

17   if I haven't, I will be doing so in writing.

18        Why don't we take up the government's omnibus motion

19   *in limine*.  Why don't we take the topics one by one.  Actually,

20   some of these things I am just going to rule on because I think

21   they are fairly well briefed.

22        First of all, in terms of the government's first

23   argument, this is in Docket No. 977 on jury nullification,

24   that's probably too strong of a term.  What the government is

25   pointing to are various instances of appealing to sympathy,

1    reciting things that are not in evidence, things of that

2    nature.  And the reason why objections, for instance, during

3    the opening statements were overruled is because they didn't --

4    they didn't rise to some type of magnitude that really merited

5    sustaining an objection.

6          However, once again, you cannot in opening statements

7    make any factual representation that you don't have a good

8    faith belief that you're going to back up.  That's why for

9    Mr. Little, I mean, there was a reason to mention that because

10   there was an anticipation that, in fact, evidence about his

11   family situation would come up, so that wasn't any type of a

12   violation.  But, you know, once again the defendants should not

13   be mentioning things about families and things of that nature

14   unless they intend to introduce evidence about that.

15         There is some things that are just -- people have

16   families.  If they were convicted, there would be impacts.

17   Those are the types of things that typically come up in trial.

18   Those don't strike me in any way as some type of violation of

19   those rules.  But I do want to caution that people shouldn't be

20   straying into the realm of putting things in front of the jury

21   or making assertions that aren't backed up.

22         The fact that, well, if they didn't bring them up,

23   there was no evidence.  You'll tell the jury that they can only

24   consider -- that opening and closings aren't evidence.  That,

25   of course, is not a cure-all.  Otherwise, it would make

1  openings and closings total free-for-alls.  But I really don't

2  think that we're going to get into -- have problems like that,

3  but the government essentially, the general point that the

4  government is making is a correct one that you can't go into --

5  can't mention things for purposes of generating sympathy that

6  you don't intend to put evidence on.

7      Let's talk about the issue of how to refer to the fact

8  that there was a trial before this one that's coming up.  I am

9  going to rule that you need to inform your witnesses, and you

10  need to be careful, you need to refer to that not as the

11  previous trial, not that there was a mistrial.  That's in

12  particular something that's absolutely -- we should not get

13  that information in front of the jury.  So my suggestion is

14  that we should try to refer to previous testimony as previous

15  testimony, not -- I would say not in a proceeding.  I don't

16  like the term "proceeding" because, of course, we talked about

17  in the last trial other litigation that's stirring around in

18  the country.  And a jury may think that other proceedings refer

19  to other cases, so that may not be so good.

20      But I think that maybe other hearings or just previous

21  testimony, previous testimony in this case, I don't think the

22  jury is going to equate that with there is a previous trial.

23  So that's what I would suggest.  And you'll have to really be

24  careful with your witnesses.  There is a distinct danger, and I

25  wouldn't be surprised if it happens at some point that someone

1    accidentally, not an attorney, but a witness accidentally

2    mentions something and then we'll have to deal with it then.

3            You know, witnesses, we are so jaded as being

4    attorneys, but the witnesses, they are up there.  They're

5    nervous.  They are trying to tell the truth.  They are under

6    oath.  And they can make mistakes, inadvertent mistakes.  But

7    nevertheless, you should try your best to make sure they are

8    sensitized to that so we avoid references to there having been

9    a previous trial.

10           But I do agree with the government that it is

11   irrelevant and potentially prejudicial to have the jury know

12   that there was a hung jury.  It's just irrelevant.  There could

13   have been lots of reasons for that.  And, in fact, I am sure

14   there were lots of reasons for that.  We know the splits, but

15   we don't really know anything else about why particular jurors

16   voted the way that they did, so anyway, it won't be -- that's

17   what we should try to do.

18           Anyone want to -- Mr. Pollack, do you have something

19   on that?

20           MR. POLLACK:  Yes, Your Honor.  I see two distinct

21   issues.  One is might there be circumstances where it is

22   appropriate to reference that prior testimony was in a trial as

23   opposed to some other type of proceeding; and then secondly, is

24   there any instance where it's appropriate to tell the jury the

25   outcome of that prior trial was a mistrial.

 1             And I don't think in our papers we were even arguing

 2      for the latter, and I certainly understand the Court's ruling

 3      with respect to the latter.  And if the Court has ruled with

 4      respect to the former as well, I won't belabor the point.  But

 5      I think we certainly argued that there could be a scenario if a

 6      witness changes their testimony from something that they said

 7      in the prior trial, that it would be proper cross-examination

 8      to say, "And you previously sat in front of a jury in a

 9      proceeding of equal magnitude and said exactly the opposite."

10      That has a different character to it to me than saying, "You

11      previously said something different at a hearing."

12             THE COURT:  Yeah, I am going to rule against that.  I

13      think that what's really relevant is you testified under oath.

14      That's the big deal.  I know that for rhetorical purposes

15      you're right, you looked at another jury.  That would be --

16      that's good.  But in this case it comes with a distinct

17      prejudice, prejudicial effect, and for that reason I will not

18      permit that.  But I think you get most of that by being able to

19      point out that the person, you know, took the oath.  You can go

20      through all that type of oath impeachment.

21             MR. POLLACK:  I hate to lose a rhetorical point that's

22      good, but I understand the Court's ruling.  Thank you.

23             THE COURT:  Thank you, Mr. Pollack.

24             Mr. Byrne?

25             MR. BYRNE:  Your Honor, I also understand the Court's

1  ruling, but no offense to any civil litigators in the

2  courtroom, but I think there is a difference between lying, for

3  example, in a deposition versus lying in federal court in front

4  of a jury.  So I am not suggesting we should be allowed to say

5  that, but just lying under oath, I mean, a lot of people fill

6  out their mortgage loan applications and say that none of their

7  down payment is borrowed or something like that.  That's under

8  oath too or under personality of perjury.

9        So I think it's important to draw a distinction and to

10  somehow impress upon the jury that that was an extremely

11  important thing that they were testifying about and in that

12  proceeding, not just that it was under oath, because that can

13  mean a lot of different things to a lot of different people.

14        THE COURT:  Yeah.  And I did not mean to suggest that.

15  The only thing I meant to suggest is that you can't bring up

16  the fact, you know, with a jury sitting right there.  It can't

17  be to the jury.  But right, obviously you all know how to do

18  it, but it could be, you know, you took an oath.  You subjected

19  yourself for prosecution of perjury.  It was in federal court.

20  All of those are totally proper.

21        MR. BYRNE:  I am just trying to clarify how far we can

22  go.  We don't want to get in trouble, obviously.

23        THE COURT:  You can go down that road.  There is no

24  problem.  Just not, "There was a jury there," okay?

25        MR. BYRNE:  Thank you.

1      THE COURT:  Okay.  Any more issues on the testimony of

2   Cesar Urias?  I am not sure if that's how he pronounces his

3   name.  This is in Docket 977.  The defense indicated they are

4   not going to bring up -- or he is not going to testify about

5   the morale turpitude and those types of things for which

6   questions cannot be asked.  I agree with the defendants that

7   they shouldn't have to otherwise reveal what he is going to

8   say.  They don't have an obligation to.

9      MR. TORZILLI:  Nothing further.

10      THE COURT:  That's my ruling, then, on that one.

11      Antitrust training, so Mr. Torzilli or whoever wants.

12      Ms. Call?

13      MS. CALL:  Very briefly, Your Honor, because I think

14   this is set forth in the government's motion.  But one changed

15   circumstance since the last trial is additional information

16   that came to light for the government that certain defendants

17   being Defendant Penn and Lovette, first of all, actually

18   approved and reviewed specific -- they call it AgriStats

19   policy, but it specifically tells employees of Pilgrim's that

20   they cannot share current, future, any sort of pricing with

21   competitors in very specific terms, and this was months before

22   the conduct in 2014.  We think that that evidence is so

23   probative of their state of mind.

24      THE COURT:  So obviously the document that is

25   attached, as defendants correctly pointed out, is undated and

1   it's a draft and it says something about to be determined be

2   probably.  I am not sure what the acronym means, but...

3          So what would be the testimony from the government's

4   witnesses that would get past those issues?

5          MS. CALL:  Yeah, we anticipate testimony, and

6   specifically from Mr. White from Pilgrim's, that that was the

7   final policy at Pilgrim's even despite those words.

8          THE COURT:  Who?

9          MS. CALL:  Nicholas White was in the compliance

10  department at Pilgrim's and worked with defendants in

11  developing that policy and can share information as to where it

12  was saved as well within Pilgrim's to be made available to

13  others.

14         THE COURT:  Does he know anything about whether the

15  policy was ever essentially put into effect, disseminated?

16         MS. CALL:  He describes it as a final policy of the

17  company, so I think that --

18         THE COURT:  But no copy has ever been found.

19         MS. CALL:  As far as dissemination, what we would

20  expect he would testify to would be that it was put on a shared

21  server at the company where employees could access certain kind

22  of like compliance policies.

23         But the relevance is not just who it was disseminated

24  to.  It was also the defendants who actually did review it and

25  approve it, so their state of mind is not just based on who it

1    was disseminated to, but their view and their instruction to

2    their employees or belief that their employees should be

3    instructed even that this should not happen at the company

4    because, you know, a large part of the defense is, you know,

5    it's good business to get your competitors' pricing.  Yes, they

6    did it from their competitors, but that wasn't their state of

7    mind.

8             THE COURT:  Okay.  Responses?  Anything else from the

9    defendants on this one?

10            Mr. Fagg, go ahead.

11            MR. FAGG:  Thank you, Your Honor.

12            We are here 10 days from the beginning of trial and a

13   final copy of that policy and procedure has never been

14   produced.  We have never seen a 302 from Mr. White, who was not

15   on the government's witness list until 48 hours ago, about

16   anything about this policy.

17            THE COURT:  I would assume too, I mean, once again,

18   assuming that the document coding was decent, that out of

19   all -- this document was searched for, but it just doesn't

20   exist or something.  I don't know.  It would seem surprising to

21   me that the final version of this doesn't exist among all the

22   documents that were produced, but --

23            MR. FAGG:  I can assure you, Your Honor, that we

24   searched hard for it and there is not a final version of this

25   document that's been produced, and I believe that that's what

1    Ms. Call just represented as well.

2         And so the Court ruled prior to the last trial that

3    policies and procedures would not be admitted because they are

4    not a standard by which these defendants should be judged.

5         THE COURT:  This document, it may be characterized as

6    more of a hybrid.  You are right, it is a policy.  And were I

7    to allow it in, you would need to -- it would have to be

8    accompanied by a limiting instruction that, you know,

9    violations of this in and of itself doesn't have any relevance

10   to what we are doing here today.  It only would be relevant for

11   purposes of state of mind or something like that.  So it

12   probably would have to have a limiting instruction, you are

13   right.

14        MR. FAGG:  Sure, Your Honor.  And I think then we get

15   into an unfair prejudice situation as it relates to two of the

16   defendants, Mr. Lovette and Mr. Penn, in which a draft policy

17   is presented to the jury when no other policies and procedures

18   as it relates to any other companies are based on the Court's

19   prior ruling admitted into evidence.  And so we have this one

20   document out here that would be confusing and prejudicial

21   because it would just relate to two of the individuals.  There

22   is no indication that anyone else ever received this at all.

23        And there is -- they proffered today that there is

24   going to be testimony that it was posted to a share point.  We

25   have never heard anything else in the case about documents

1    being posted to a share point other than this particular

2    document right now in court.  This is the first time that we

3    are hearing this.  And so it seems to be incredibly prejudicial

4    to these two defendants, Mr. Lovette and Mr. Penn.

5          The other thing we have, Your Honor, and some of my

6    other colleagues may have another point to raise on this, but

7    the government has indicated that they are going to testify --

8    or they are going to offer Mr. White and they identified him as

9    the former compliance officer, chief compliance officer.  He

10   was the formal general counsel of Pilgrim's.  And at the time

11   of these communications, he was, in fact, the general counsel

12   of Pilgrim's.

13         And so any discussions that Mr. White may have had

14   with Mr. Lovette and Mr. Person that they may be seeking to

15   elicit through this document raise all sorts of privilege

16   issues for Mr. Lovette and Mr. Penn in that the communications

17   that they have sought to associate with the document are

18   redacted.  We don't know to what extent Mr. White --

19         *THE COURT:*  What was that last point, Mr. Fagg?

20         *MR. FAGG:*  Sure.  There are some communications that

21   are associated with the policy, this AgriStats policy, which I

22   believe are redacted.

23         *THE COURT:*  And how did that -- you mean the 302 is

24   redacted?

25         *MR. FAGG:*  No.  In the e-mail, and I apologize, I

1    don't think I have a copy of it with me --

2         THE COURT:  Yeah, I don't have the e-mail.  I have

3    Docket No. 9865, but I didn't look at the other one.

4         MR. FAGG:  In the e-mail that accompanies that draft

5    policy that I believe the government intends to use with

6    Mr. White, it is heavily redacted by Pilgrim's before it was

7    produced.  We have no idea what that says.  We have no idea to

8    what extent -- we don't know -- putting Mr. White on the stand

9    is fraught with peril given that he was wearing two hats.  He

10   was the general counsel and he was the chief complains officer.

11        We don't know what sort of representations he may have

12   made to Mr. Lovette or Mr. Penn about the hat he was wearing to

13   the extent he was wearing his general counsel hat, who he

14   represented, did he give them advice, did he tell them that he

15   was the lawyer for the company as opposed to lawyers for them.

16   And so this -- the testimony of Mr. White is a separate and

17   very concerning issue.  We didn't file a motion *in limine* as it

18   relates to him because he wasn't on the witness list until 48

19   hours ago.

20        THE COURT:  I would suggest this, Mr. Fagg.  If you

21   know enough information now to file a motion *in limine*, I will

22   allow you to file one out of time.  I would try to do it as

23   soon as you can.  I do agree with you that if Mr. White had

24   both of those capacities, the privilege issues could be a

25   little bit tricky, so it might be a good idea to think about

 1   those in advance of his testimony.

 2        *MR. FAGG:*  Thank you, Your Honor.

 3        And just circling back very briefly on the issues of

 4   the policies and procedures, we have not seen anything that we

 5   believe change -- warrants changing the Courts' earlier rulings

 6   as it relates to the admissibility of policies because we think

 7   it is ripe for confusion of the jury and don't think it can be

 8   cured with a limiting instruction.

 9        *THE COURT:*  Thank you, Mr. Fagg.

10        I think Mr. Byrne was next and then Ms. Henry.

11        *MR. BYRNE:*  Your Honor, although this relates directly

12   to Mr. Lovette and Mr. Penn, it also relates indirectly to

13   Mr. Little and perhaps Mr. Austin because it is a Pilgrim's

14   policy.  It's undated.  So there could even be an argument or

15   inference that somehow Mr. Little or Mr. Austin were aware of

16   this policy, and there is no evidence that there were, that it

17   was ever distributed or disseminated to them, so they could

18   suffer prejudice by this also.

19        *MS. CARWILE:*  I agree with Mr. Byrne on behalf of

20   Mr. Austin.

21        *MS. HENRY:*  I will make it on behalf of all the other

22   defendants because I know Mr. Fagg made the motion as prejudice

23   to Mr. Penn and Mr. Lovette, but the spillover effect would be

24   tremendous and be highly prejudicial to all of the defendants.

25        *THE COURT:*  And in what respect, Ms. Henry?

1          MS. HENRY:  If there is a sense that this policy is

2     really what is right and what is wrong, that is going to be a

3     confusion to the jury.  I mean, the whole concept of putting in

4     this policy of this is what's right and this is what's wrong,

5     it creates a huge issue in terms of confusion for the jury in

6     terms of what the law is and what it is that's right and wrong.

7     I mean, that's what -- in their minds, that's what they're

8     going to be thinking that they are deciding.  And suddenly they

9     are being told this is what it is.

10          THE COURT:  Okay.  Why don't we hear from

11     Ms. LaBranche and then Mr. Tubach and then maybe Mr. Beller.

12          MS. LaBRANCHE:  Your Honor, I know we are talking

13     about the government's omnibus motion, but I was hoping I could

14     also address we had briefed this issue in our filing at

15     document 994.  And in that what -- if it's okay with the Court

16     if I address that right now.

17          THE COURT:  Yeah, go ahead.

18          MS. LaBRANCHE:  So in that motion what we did is we

19     asked the Court to just uphold the rulings that had been made

20     previously because the Court did address this issue as it

21     relates to Mr. Roberts and Mr. Mulrenin and to Tyson during the

22     last trial.  And what the Court did then is the Court

23     specifically excluded three exhibits, 3062 -- I am sorry, the

24     Court specifically excluded 3062, 3087 and 9754.  And the

25     reason that the Court did that -- these were antitrust training

1    materials.

2         And the reason the Court did that is the Court noted

3    that it would be very difficult to show these documents to the

4    jury.  It would be problematic because it could basically

5    impact what the jury was being informed the law was.  And that

6    even though the training may have some relevance, that

7    relevance would be outweighed by undue prejudice.

8         Now, the government has said in their omnibus motion,

9    well, yeah, but things have changed now because now we have

10   somebody who has personal knowledge who is going to come in and

11   say that they know that Mr. Mulrenin and Mr. Roberts, you know,

12   attended this training.  And first of all, I don't think that

13   changes what the Court did rule; but even if it did -- because

14   one of the things the Court did is the Court did look at and

15   consider the fact that there was not evidence that Mr. Mulrenin

16   had, in fact, attended that training -- the government doesn't

17   have a witness who will come in with personal knowledge.

18        I would ask the Court to inquire if they believe I am

19   wrong, but it appears to me the government had endorsed a

20   witness named Tara Love that they were going to have come in

21   and talk about not only those three exhibits that the Court

22   already specifically rejected, but also a number of other

23   exhibits related to antitrust that we believed was in violation

24   of the Court's prior ruling.

25        Now that we got the new witness list, I think two days

1   ago, Ms. Love is no longer on that.  There is an individual

2   named Mr. Malone.  Mr. Malone apparently works at Tyson, I

3   can't really tell, maybe IT, maybe enforcement -- or, yeah,

4   anticorruption, antitrust person there.  And the government as

5   I understand it is saying, well, this is different.

6   Circumstances have changed because now Mr. Malone is going to

7   come in and he is going to say he has personal knowledge.

8           Well, Mr. Malone was not even employed at Tyson at the

9   time when this antitrust training was provided.  He may have

10  gone back and looked at some records and is going to say that

11  he is relying on those records and therefore that's his

12  personal knowledge, but that's not personal knowledge.  So I

13  wanted to get that personal knowledge piece out there so the

14  Court can inquire, but I think the simplest thing for the Court

15  to do is uphold the decision that was made previously because

16  nothing has changed and the prejudicial effect of these

17  exhibits is extreme.  It substantially outweighs any probative

18  value.

19          *THE COURT:*  Thank you, Ms. LaBranche.

20          Who did I say was next?

21          Mr. Tubach.

22          *MR. TUBACH:*  Thank you, Your Honor.  I just wanted to

23  highlight how game changing and prejudicial it would be to let

24  in these policies in respect to Pilgrim's.  It is inconceivable

25  that a jury isn't going to draw exactly the conclusion that is

1    improper, which is that if someone violates that company

2    policy, they have somehow violated the law in some larger

3    sense.

4           This case is not an HR proceeding.  It's not a

5    proceeding in which we are trying to decide if someone should

6    be fired or not.  This is a federal criminal trial about

7    antitrust.  And the idea that the government is going to get up

8    and say, well, they had a policy that said they shouldn't do

9    it, they shouldn't even gather information from competitors,

10   that has nothing to do with whether they actually violated the

11   federal criminal law.  Those policies are often put in place

12   prophylactically to prevent people from getting in trouble when

13   they do something that isn't actually a violation of the law.

14   That's why you have compliance policies, to draw that line far

15   away from what the actual criminal conduct is.

16          And to -- the fact that the government now claims to

17   have the general counsel saying that Mr. Penn and Mr. Lovette

18   approved this, we haven't seen a 302.  We have no idea.  We

19   assume that's accurate.  That doesn't change at all whether

20   it's a policy that ought to come in.  It is still a policy.

21   Whether someone reviewed and approved it or simply received it

22   and read it makes no difference.  We don't know the context in

23   which that policy was implemented.

24          There is a reference to an AgriStats investigation, a

25   civil antitrust AgriStats investigation that apparently led to

1    this policy in some way.  It would be terribly prejudicial to

2    let this into evidence.

3         THE COURT:  As I was trying to suggest to Mr. Fagg, I

4    think that you might be able to with a limiting instruction

5    segregate out the policy issue from training that may put you

6    on notice of what the law is, but then I think that there is

7    still then the issues of in reality what's the relevance of

8    that?  Ignorance of the law is no excuse, but why is knowledge

9    of the law an excuse?  And, of course, the government has

10   argued that it goes to state of mind.

11        But, yeah, I just wanted to make the point that you

12   might be able to cure the policy issue by making sure the jury

13   understands you can't regard some violation of this internal

14   policy as having anything to do with the case, but we still

15   kind of are begging the question of whether there would be

16   either downsides or even particular relevance to the law aspect

17   of it.

18        MR. TUBACH:  If we would get to argue that we didn't

19   know it was a violation of law, that ignorance of the law was

20   an excuse, we would have a whole different conversation.  This

21   seems to be an entirely one-way ratchet.  They want to

22   introduce evidence there is this policy that's not the law.

23   They want to introduce evidence from witnesses to say they

24   thought it was morally -- it was unethical to exchange pricing

25   information.  They want to have all this one-sided testimony

1    about how it was wrong.  And then there is -- the jury

2    instruction doesn't say anything about that at all.

3            It's not curative to simply let them put on this vast

4    amount of evidence and then have one jury instruction that

5    says, oh, by the way, all that evidence, it's not really

6    relevant do whether or not they actually committed this crime.

7    The question here, the state of mind in this case is whether

8    they entered into an agreement.  It is not whether they

9    violated a compliance policy.  So the state of mind of

10   violating a compliance policy or not violating a compliance

11   policy doesn't say anything about whether or not they entered

12   into that agreement.  And that is -- this is game changing,

13   Your Honor, if this policy comes in, absolutely.

14           *THE COURT:*  Mr. Beller?

15           *MR. BELLER:*  Thank you, Your Honor.

16           And you've heard quite a bit of argument, so I will do

17   my best to be brief.  I think while I join in my colleagues'

18   arguments, certainly I think my client and perhaps some of the

19   other non-Pilgrim's individuals who are in a bit of a unique

20   position, the argument is quite different.  The concern that I

21   have primarily with the introduction of this particular policy

22   as to the co-defendants is that the policy is simply not an

23   accurate statement of the law.  While it may be in certain

24   circumstances and given certain details, it's simply not true.

25   It's not the law.  And so based on that alone, I believe that

1    this is unduly prejudicial to my particular client and I should

2    say Mr. Brady as well, those who are within Claxton.

3          And so since we are in a joint trial, that begs the

4    question of what probative value does this policy in a

5    different company have as to my particular client, and I would

6    argue, Your Honor, that it has none.  There is no probative

7    value as to my client and it is very clearly prejudicial.

8          The Court mentions appropriately whether there can be

9    particular limiting instructions.  And, Your Honor, as to this

10   issue in particular, I don't believe that there is a limiting

11   instruction that somehow undoes the prejudice as to my client.

12   I would note for the Court that I think we risk going down a

13   rabbit trail as to this particular issue because, of course,

14   for those of us that this is particularly problematic and

15   prejudicial, it forces us to ask additional questions of

16   Mr. White.

17         And when we ask those particular questions of

18   Mr. White such as what was the purpose of the policy or why was

19   this policy put in place or how, I think -- and certainly if

20   the government were to ask those questions, we are now talking

21   about 701, 703 issues, No. 1.  No. 2, we also have a situation

22   where we have a policy and witness testimony that usurps the

23   Court's power and authority in being able to instruct the jury

24   properly as to the law.

25         I think we may very well have what amounts to be an

1    expert witness in antitrust or certainly what sounds to be an

2    expert witness in antitrust explaining details to the jury that

3    is simply inconsistent with the Court's instructions regarding

4    what is, in fact, legal and what is not legal or why a policy

5    would be in place or a policy not be in place.

6         THE COURT:  Let me just -- sorry to interrupt,

7    Mr. Beller.  But what do you regard as the inaccuracy in the

8    law?

9         MR. BELLER:  Well, I think very simply put, the

10   statement that you are not to share pricing information, that

11   sharing of pricing information is an antitrust or may be an

12   antitrust violation.  And as the Court knows, that is

13   inconsistent with the instructions that the Court gave

14   previously and I anticipate being given again.  So to be more

15   specific, that's what I am referring to.

16        Your Honor, the other issue, of course, and one that's

17   briefed and I won't belabor, that is we are talking about a per

18   se violation.  So if we are talking about the relevance of this

19   particular policy to show state of mind as to one defendant, it

20   is without question that that is going to be imparted to the

21   other defendants, which I would argue that the state of mind of

22   one is simply not relevant as to my client's state of mind that

23   the government also has to prove beyond a reasonable doubt.

24        So, Your Honor, for -- actually one more piece, excuse

25   me, and that is the question is undoubtedly going to be asked

1    or at least implied that if there was a policy at this one

2    particular company, was there a policy in other companies.  And

3    perhaps more importantly based on what I am understanding to be

4    the government's argument for the probative value, that being

5    the state of mind, the Court correctly identified that also

6    means that if my client or my client's company did not have

7    such a policy, that we did not have that state of mind which

8    goes to an ignorance of the law exactly not being a defense.

9         So I think if we're talking about why this is

10   probative as to one defendant, it quickly opens the doors to

11   the other defendants to be able to say, well, wait a minute.

12   We didn't have such a policy, and therefore we had no

13   knowledge.

14        So for all of these reasons I would also join in the

15   arguments of my colleagues and simply urge the Court to not

16   allow this particular piece of evidence in.  Thank you.

17        *THE COURT:*  Ms. LaBranche, go ahead.  Then after this

18   we will take a break quick, but we will complete our -- hearing

19   the arguments on this particular issue.

20        Go ahead.

21        *MS. LaBRANCHE:*  Could I have Exhibit 9216 pulled up?

22        Your Honor, when I was up here, I was talking

23   specifically about the antitrust training as it related to

24   Tyson and Mr. Roberts and Mr. Mulrenin, but there are two other

25   internal compliance policy documents that the government

1    appears to be trying to get in.  One is 9216, which I am having

2    pulled up right now, and the other is 9222.

3            In addition to everything we just went over on these

4    two, they are just not relevant.  When you look at 9216, it has

5    nothing to do with anything specific to antitrust, period.

6    It's Mr. Mulrenin is going to follow management standards of

7    behavior.  That doesn't tie into this case at all and is purely

8    just being brought in for 403 purposes to put this in front of

9    the jury and somehow say he violated the standards of his

10   company.

11           As far as the one as to Mr. Roberts at 9222, Page 6 --

12   I can only assume that the government is trying to get in

13   Page 6 because the rest of the pages in here, even with my very

14   generous reading of them, I just cannot think of a single

15   reason why they would be relevant -- this talks about

16   confidentiality of company information.

17           You know, this is a -- this is a document that is not

18   related to antitrust training again.  It is related to

19   confidential information of Tyson, not confidential information

20   of what's being bid.  This is very reminiscent to me of what

21   the government was trying to do in the first trial with I think

22   mischaracterizing the ABF information that's confidential to

23   try to confuse the issues in front of the jury.

24           I think that that document as it relates to

25   Mr. Roberts does the same thing.  There is a word called

1    confidential, just like they were trying to do earlier today

2    with the RSCS, there is a word of confidential, so I want to

3    put that document in so I can say something's confidential when

4    it really has nothing to do with anything in this case.

5            THE COURT:  Why don't we go ahead and take a break.

6            Mr. Fagg do you have a quick point?

7            MR. FAGG:  A quick point.  Thank you, Your Honor.

8            One, with respect to Mr. White, he was -- if he was

9    wearing more than one hat, it was as a compliance officer, and

10   we'll run this down before we file our motion *in limine*, but I

11   believe he may not have even been the chief compliance officer

12   at this time.  He was only the general counsel.  And if you

13   look at the policy here, it says the policy owner is the legal

14   department.  There is obviously inherent issues that would be

15   created by admitting a policy that is owned by and presumably

16   created by a lawyer.

17           THE COURT:  Well, on the other hand, assuming -- given

18   the topic you would probably expect it would come from the

19   legal department if you're talking about make sure you don't do

20   this because it could violate the raw.

21           MR. FAGG:  I am not sure I agree with that, Your

22   Honor.  I think you might expect that the legal department

23   would be involved in it, but I think in my experience in

24   representing large corporations the policy is very rarely owned

25   by the legal department and is created by the lawyers, but

1    instead is owned by someone else, for example, in compliance

2    who would be the owner of that policy.  Here it is the legal

3    department.  And the documentation that the government has

4    created -- has produced indicates it was Mr. White who was the

5    one who circulated this policy.

6         Two, with respect to your question about the incorrect

7    statements of law, I do believe that to Mr. Tubach's point

8    there are indirect statements of law that are within this

9    policy because they -- at least they give the implication of an

10   incorrect statement of the law because they are defining the

11   policy for the company as opposed to the law, but it makes it

12   appear as if that is the law where it's talking about antitrust

13   laws.

14        But it also talks about the wire fraud and the mail

15   fraud statutes which are clearly not at issue in this case and

16   it melds those together in the discussion.  It also sets bars

17   in here that are completely irrelevant and not realistic about

18   what happened in the real world.  Do not discuss or show

19   AgriStats reports or any information with anyone else.  And

20   these reports are discussed generally by AgriStats.  They are

21   discussed publicly by AgriStats.

22        *THE COURT:*  Right.  I mean, if I were to allow the

23   policy to be admitted, there would need to be some redactions

24   because there is things in them that you just mentioned that

25   would probably merit that.

1          MR. FAGG:  We think that there are so many of those

2     even in itself that that would make it unfairly prejudicial

3     because it would cause the jury to speculate about what is all

4     this other information that's redacted.

5          THE COURT:  Why don't we plan on reconvening 20

6     minutes of 4:00, so 15-minute break.  We will be in recess.

7     Thank you.

8          (Recess at 3:23 p.m.)

9          (Reconvened at 3:43 p.m.)

10          THE COURT:  Mr. Fagg, go ahead.

11          MR. FAGG:  Thank you, Your Honor.

12          Just on the last issue that we were just talking

13     about, I do believe that Mr. White was only the general counsel

14     at this time.  He did not come -- have any other role other

15     than general counsel until 2020, which would have been

16     significantly after that.

17          And so for that reason and for the other reasons we

18     discussed earlier, we would ask the Court to defer ruling on

19     this particular motion until we have an opportunity to brief

20     for the Court the motion *in limine* related to Mr. White.  I

21     think they are inextricably intertwined here in a way, at least

22     as it relates to that particular issue.  If the Court believes

23     it's otherwise inadmissible, then that's fine.  But as it

24     relates to this particular issue and as it relates to

25     Mr. Lovette's and Mr. Penn's state of mind, we think that we

1    have to think about the privilege issues here and the

2    communications with counsel because to the extent they had a

3    state of mind, which none of the documents indicate that they

4    did because all they did was receive documents, then their

5    state of mind would be based on the advice of counsel.

6            *THE COURT:*  And if Mr. Lovette files a motion *in*

7    *limine* regarding some of these privilege issues regarding

8    Mr. White, when can you do that?

9            *MR. FAGG:*  Would noon on Tuesday be agreeable?

10           *THE COURT:*  I was thinking about end of the day on

11   Monday.

12           *MR. FAGG:*  Offer accepted.  Thank you, Your Honor.

13           *THE COURT:*  Government response on antitrust policy

14   and anything else?  You don't have to, but if you want to.

15           *MS. CALL:*  I know we have been talking about this for

16   a while and it sounds like there will be briefing, but to I

17   guess address the Tyson training as well, because that may not

18   be covered by the briefing, I just want to briefly clarify some

19   of the Court's prior ruling or at least my understanding of

20   them.

21           In Docket 603 the Court did find antitrust trainings

22   to be relevant.  The government, of course, offered several

23   documents that had to do with antitrust training, but sometimes

24   there was a gap in the chain.  It was there was a training, but

25   we didn't like have the content of the training or we didn't

1    have something showing the person attended it.  We think these

2    witnesses really fill that hole and can speak to exactly what

3    the defendant's state of mind would be.

4         So a lot of the bases for the Court's prior rulings we

5    don't believe are present anymore.  And we think that's very

6    important.  It's important that these defendants in 2014 even,

7    Defendant Roberts, I think the record showed he received

8    training the day before his one and only call with Defendant

9    Penn.  It's important they received these trainings.  They knew

10   what they were doing was wrong.  And they turned around, they

11   shared prices and coordinated prices with their competitors.

12        Ms. Henry earlier made a point that there is a

13   distinction between evidence that's prejudicial and evidence

14   that's harmful to someone's case.  We think the probative value

15   here of the defendants' state of mind so the government can

16   prove the purpose of what they were doing, that they were

17   sharing their prices to raise them, to hold firm, rather than

18   just good business is important and extremely probative and

19   that the prejudice is really minimal regarding the legal

20   language that is inherent in a communication telling you, hey,

21   what you're about to do is wrong.

22        THE COURT:  Okay.  Let's jump ahead and then we will

23   come back to the government's omnibus motion.  But why don't we

24   jump ahead to Docket No. 992.  This is the government's motion

25   for a pretrial ruling on authenticity and business records.

160

1           The defendants' response said, hey, it's a little bit

2   premature we are talking.  What's the status of that?  Let me

3   preface it by saying this.  I haven't had a chance yet to look

4   into the cases, you know, whether you could even do this.  It

5   strikes me as somewhat counterintuitive, but let's assume that

6   you could, you know, before the trial make rulings on certain

7   things and then that stands.  Authenticity rulings stand for

8   purposes of the trial.  We still have the issue of why we

9   would -- why anyone would want to go through that again.

10          Before the first trial you may think, well, we don't

11  know how it's going to go.  We haven't heard the witnesses.

12  We'll see.  Well, now we kind of know those things, so I

13  would -- I don't know if you have had a chance to talk it

14  through yet, but I think that that is a good idea.  There

15  certainly would seem to be certain categories of these

16  documents and the foundation that was laid for them that we

17  just do not have to repeat again.  Not to hold Mr. Gillen to

18  rhetorical points, but like he said, nice if we could simplify

19  this trial and really focus on the real clash in the evidence,

20  the real -- or the lack of evidence.  But if we know what the

21  evidence is and we anticipate it's going to be the exact same

22  thing in the retrial, there may be opportunities for

23  stipulations on certain things and try to focus the jury's

24  attention on what's truly at issue.

25          So with that introduction, how are we doing on those

1    negotiations that are alluded to?

2            Yes, Ms. Rogowski.

3        *MS. ROGOWSKI:*  So, Your Honor, we are still in

4    discussions with defendants.  We did send them a list of

5    documents that we hope they would agree to stipulate to the

6    authenticity of.  We are willing to accept a list in return,

7    but that's kind of where things stand right now.

8        *THE COURT:*  Right.  And here is one thing I am hoping

9    that's not the case.  For some reason I thought I saw some

10   allusions to it, but I would hope that the negotiations aren't

11   just, you know, we sent them a list.  They haven't responded.

12   To me that's not real negotiations.  You know, hopefully the

13   communications between the two sides are real communications

14   and that, you know, there is -- people can talk over the phone

15   and hash things out, talk about things, because that's really

16   the only way that anything is going to happen between now and

17   the trial, which is coming right up.

18       *MS. ROGOWSKI:*  Yes, Your Honor, we agree.  And we

19   certainly are open to having further discussions over the

20   phone.  I will say we haven't gotten a lot back from the

21   defendants in that regard.  And that is, you know, one of the

22   reasons why we can submit our motion.  I am happy to discuss

23   that motion further if now is the time, but also I want to give

24   the defendants a chance to respond.

25       *THE COURT:*  Yeah, I am not going to go further into

1    it, but I will look for some indication.  Maybe you can file a

2    status report early next week letting me know what's going on.

3    Obviously, the players, the decision makers are all in this

4    room, and so after this hearing certainly some communications

5    can take place, not necessarily resolving these issues, but at

6    least talking about how further negotiations or discussions

7    would and when they would take place, so otherwise I'll just

8    rule on it.  But, you know, I do think that there is -- there

9    would seem to be some mutual benefit to arriving at agreements

10   on some of this stuff so we don't have to go through the same

11   brain damage that we did the first trial because it's just

12   inherently uninteresting.

13            MS. ROGOWSKI:  We certainly agree, Your Honor.

14            THE COURT:  Okay.  Now we'll switch back and we'll

15   talk about the agent's testimony.

16            Sorry, yes, go ahead.

17            MS. PRICE:  Your Honor, I just want to clarify the

18   defendants do agree with Your Honor and counsel that it is

19   beneficial for us to reach an agreement and we are still

20   working to do that.  But the list, my understanding is that the

21   list that was provided to us was the government's exhibit list

22   which is over 2700 documents.  That was their offer.

23            So we are just trying to work through a way to be more

24   realistic in a universe to get 10 defendants to agree to an

25   authentication.  So we are going to continue to work through

1    that and we will do as the Court instructed and provide a

2    status report, but I just wanted to be clear we are working

3    through it as best we can, but the list wasn't a culled down

4    version.  And, in fact, at the last trial I believe the

5    government only admitted 488 documents, so it just wasn't

6    realistic for us in the time frame provided to agree to.

7           THE COURT:  Yeah, that's the thing.  If you want to

8    reach a deal, you have to facilitate a deal, so it has to be a

9    workable group of documents.  The defendants, for instance,

10   could suggest, well, I don't know about 5,000, but here a group

11   we think would.  So there are various ways that if you want to

12   reach a deal, you can facilitate it and hopefully both will do

13   that.

14          MS. PRICE:  Yes, Your Honor, and we will continue to

15   do so.

16          MS. ROGOWSKI:  Your Honor, if I may.

17          THE COURT:  Yes, go ahead.

18          MS. ROGOWSKI:  So that's precisely the reason, Your

19   Honor, we wanted to move forward with the categories of

20   documents that we believe were authenticated in the first trial

21   instead of picking out document by document.  And we believe

22   that that approach would have, in fact, benefited both sides

23   because if a witness from Pilgrim's, for example, testified

24   about how e-mails were stored and maintained on the servers and

25   testified about a large group of those documents, we believe

1    that authentication testimony would also apply to other

2    Pilgrim's documents that maybe weren't necessarily on his list,

3    but were stored and maintained in the same way.  And we believe

4    that that type of an arrangement would benefit both parties

5    which is why we initially asked for that.

6         Defendants said that that was not specific enough.  So

7    we are certainly willing to come to, you know, more of an

8    agreement, but we are trying to do that and we -- that's the

9    reason why we first presented the idea of categories of

10   documents.

11        *THE COURT:*  Right.  Once again, you may have to go in

12   stages.  Can we agree that these documents that the witness

13   talked about at the first trial, there could be a stipulation?

14   Yeah, okay.  Now, here is the next group of documents and these

15   would seem to fall in the same category.  If we had to recall

16   Mr. So and so again, he would say the same thing about these,

17   that type of thing.  So try to get agreement on the smaller

18   category of documents and then see if you can work more

19   specifically -- specifically identify documents in the second

20   category and on down the line.

21        But I can understand why if the defendants are being

22   asked to just agree to a category of documents without specific

23   exhibit numbers, of course they are going to be a little bit

24   hesitant.  They need time to try to figure out what they would

25   be agreeing to and all those types of things.  Once again, we

1    are running out of time, so I think it needs to be concrete and

2    try to get agreements on what's possible.

3         *MS. ROGOWSKI:*  All right, Your Honor.  And on that

4    note of time, I will note we haven't received a proposal from

5    defendants at all.  And this is one of the reasons why we did

6    file our motion.  And we do urge you to consider our arguments

7    in that motion related to authenticity regardless if we can

8    come to an agreement.

9         *THE COURT:*  Sure.  If there is no agreement, I will.

10   I am just suggesting people have to have a can do attitude

11   instead of haven't heard back from them, that type of thing.

12        *MS. ROGOWSKI:*  Understood.

13        *THE COURT:*  Let's go back to the agents' testimony.

14   First of all, with Special Agent Koppenhaver, he is going to

15   testify, be the first witness.  And as I recall the case law, I

16   haven't gone back and refreshed my memory on it, but that

17   overview testimony, I think the government is taking a very

18   overly inclusive definition of overview.  You know, for

19   instance, it's not that you give an overview about all sorts of

20   granular detail about how Mr. Brady's cellphone search came

21   about.  That's the type of thing he is not going to be able to

22   testify about, period.

23        Overview testimony is just about categories of things

24   that explain how the investigation, you know, was initiated,

25   but not in a lot of detail, what -- the agents then decided

1    that they needed to do X, Y and Z.  They did that.  But that's

2    all it is.  It's not testimony about then we decided to

3    subpoena so and so or anything in any great detail.  It's just

4    real overview type testimony so that the jury has some

5    understanding of how the investigation was launched, the fact

6    that, you know, Grand Jury was involved, categories of

7    documents were procured, all sorts of things like that.  But I

8    have this feeling that the government anticipates that he would

9    be getting into much, much greater detail than an overview

10   witness would ever be allowed to present.

11           Ms. Call?

12           *MS. CALL:*  Yes, Your Honor.  I don't think we were

13   actually contemplating that much detail.  I think it is

14   intended to be very high level.  And while I know Your Honor is

15   characterizing it as overview testimony, you know, the way that

16   cases have described overview is an agent giving a preview of

17   what you are going to see for the rest of the trial.  And

18   that's not what this is.  This is really the background of the

19   investigation and high-level things about how the investigation

20   proceeded, which is different than what is really characterized

21   as overview in the case law, in at least some of the negative

22   case law about it.

23           So I wanted to draw that distinction.  We recognize

24   that.  We do plan for it to be high level and not draw that

25   line to granular details of each subpoena or each search

1    warrant all that much.

2          THE COURT:  Yeah, because the defendants can object if

3    it gets to be too much detail, of course, and we'll just have

4    to see what it is, but while I agree and there is no problem,

5    makes sense that you might have a witness such as Special Agent

6    Koppenhaver providing an overview at the beginning, it really

7    has to be pretty general stuff.

8          MS. CALL:  Yes, Your Honor.

9          THE COURT:  Mr. Byrne, go ahead.

10         MR. BYRNE:  Just real quickly on Koppenhaver, I think

11   the government said in their motion he was going to testify

12   about interviews with different people and search warrants and

13   things like that, and so I just want to make sure that that is

14   not something that he is going to be allowed to do.

15         THE COURT:  Well, we shall see, but specific search

16   warrants, specific interviews, yeah, that is not an overview.

17   The fact that you're doing interviews is perfectly appropriate.

18         MR. BYRNE:  Just in general.

19         THE COURT:  Yeah, that's one of your investigative

20   techniques.  And I think it would even be appropriate that he

21   testify about the types of people that he is interviewing, some

22   categories.  Well, we need to talk to some people like this,

23   but not naming names, not so we identified Mr. and so-so.  We

24   went and talked to him.

25         MR. BYRNE:  I just wanted to be clear.

1          *THE COURT:*  And then let's see.  I am trying to look

2     at the defendants' response to the omnibus motion on that issue

3     because there was one other issue with Special Agent

4     Koppenhaver's testimony that I was a little worried about.  Let

5     me see.

6               Mr. Tubach, go ahead.

7          *MR. TUBACH:*  I will wait until the Court finds what it

8     was looking for.

9          *THE COURT:*  Right.  I think this is the reference in

10    Docket No. 1017 to whether Special Agent Koppenhaver could

11    explain how he and the other agents probed into whether there

12    was any evidence of bid-rigging or price-fixing and offer

13    firsthand observations about that.

14              Once again, I think that that -- that may stray into

15    some inappropriate opinion testimony and that's not really what

16    overview testimony is about.  It's not, yeah, we gathered all

17    these documents and then I drew the following conclusions after

18    my preliminary review, things of that nature, so I think that

19    that is the type of things that would be inconsistent with an

20    overview witness.

21              Mr. Tubach, go ahead.

22         *MR. TUBACH:*  Your Honor, I was just going to say in

23    light of the Court's statements about the limited nature of

24    what Agent Koppenhaver could say, we are concerned that the

25    government has proposed he be on the witness stand for eight

1    hours.

2         THE COURT:  Well, I can't imagine that, so I am

3    thinking it's padded, but we'll hear from Ms. Call.

4         MR. TUBACH:  This is a witness list they filed 48

5    hours ago which is what our concern is.

6         MS. CALL:  As the government indicated in its witness

7    list, the timing includes both direct and cross-examination.

8    And I think we are trying to be realistic in the expectations

9    of cross-examination based on experience in the last trial.  We

10   do not expect his direct to be anywhere near eight hours.

11        THE COURT:  Hopefully the cross wouldn't be either,

12   but we'll see.  We'll see.

13        Okay.  So now let's talk about Special Agent Taylor.

14   I do agree with the observation in the defendants' response

15   that we know how the summary exhibits came about.  And maybe

16   perhaps Special Agent Taylor helped out with some of the

17   identification of documents that would go in there and so forth

18   and so on, but once again, it seems -- it would be surprising

19   to me that Special Agent Taylor had any personal knowledge that

20   would enable him to talk much about that.  Maybe he does,

21   but -- and that's what we really talked about with Special

22   Agent Taylor from the get-go was in terms of him being like a

23   sponsoring witness for particular documents.

24        Really what he does is he knows the documents.  And he

25   may, you know, know the documents because he's the case agent

1    and he has to.  That's his job.  It's part of his job.  That to

2    me is very unlike the witness in the case that the government

3    cites who was sitting in some room listening to wiretaps.

4    That's a much different experience than document review.  And

5    so I do want to -- we'll see what Special Agent Taylor

6    testifies about, but his knowledge of the documents I think is

7    probably not going to be a permitted category of testimony

8    because that's what lawyers do in their closings.  It's just

9    not -- that doesn't give him the foundation to offer testimony

10   or form opinions.

11         Ms. Henry?

12         *MS. HENRY:*  Your Honor, we just also wanted to point

13   out that in the exhibit -- in the witness list that we just

14   got, Rachel Evans is scheduled to testify again.

15         *THE COURT:*  Well, once again, maybe the government has

16   multiple layers, but the summaries came in with the help of

17   Ms. Evans.  But I am not saying that Special Agent Taylor,

18   perhaps he did have a part and he could testify about that

19   role.  That would probably be perfectly fine.  I am just a

20   little bit perplexed as to what he would be testifying about.

21   We'll see, but I didn't glean from the government's description

22   exactly what admissible evidence he has.  He may.  He may,

23   obviously, if he had some personal knowledge about things, but

24   testimony about the documents I am skeptical, okay?

25         What other categories were there in the omnibus motion

 1   that I haven't addressed?  Yeah, I think those were all of

 2   them.

 3          Okay.  So let's turn our attention over to Docket No.

 4   999.  This is certain defendants' motion to conduct a *James*

 5   hearing in regard to Mr. Pepper.  I am going to deny that.  I

 6   don't think that there is any need to do so.  And to the extent

 7   that there are new data, I don't think there are, I don't see

 8   the need to do a new *James* hearing, so I am going to deny that

 9   motion.

10          Docket number -- why don't we take up Docket No. 1002.

11   This is the government's motion to exclude expert testimony.  I

12   agree with the defendants this is really a motion for

13   reconsideration.  The standards haven't been met to do it.  I

14   required that before the last trial any 702 challenges be

15   articulated at that time.

16          So to the extent that they were not, those are denied

17   as untimely.  And I agree that in particular the benchmarking

18   testimony was a subject of the previous government motion in

19   that regard, so I will deny the government's motion.

20          And why don't we take up Mr. Lovette's motion on the

21   Sysco payment terms.

22          Mr. Fagg?

23          *MR. FAGG:*  Thank you, Your Honor.

24          There are -- we felt strongly that the Sysco payment

25   terms based on the evidence that came in at the last trial

1    should not come in in this next trial because they were

2    irrelevant to the issues that were the subject of this entire

3    trial, and as a result of being irrelevant or in addition to

4    being irrelevant were unfairly prejudicial because the

5    government is seeking to get the jury to draw inferences or

6    confuse the jury or cause jury confusion at least and

7    potentially mislead the jury about the issues related to these

8    payment terms which are just not part of the rest of the case.

9           Since we filed our motion, the government has filed

10   its revised witness list and they have taken Melissa Hoyt, the

11   witness from Sysco, off of the witness list.  And so

12   understanding that presumably they determined that Ms. Hoyt did

13   not provide any sort of testimony that would link these two

14   things together, they've decided not to call her at all.  And

15   so presumably the only evidence that the government would seek

16   to introduce related to these payment terms are the single

17   e-mail that's between Mr. Lovette and Mr. Grendys from Sysco.

18          And we think that the government was right not to

19   recall Ms. Hoyt.  They've come to the realization that these

20   are just -- this is something that's separate and apart from

21   the rest of the case, and trying to shoe-horn it in through a

22   single e-mail between Mr. Lovette and Mr. Grendys that relates

23   to an issue that's entirely different from the rest of the case

24   we think is improper.  We think it should be excluded.  It's

25   irrelevant to the rest of the case.  It's unduly -- you're

1    asking too much of this jury to decipher what this e-mail is

2    about when there is going to be no other testimony whatsoever

3    about what these payment terms actually are.

4            And we think that -- Your Honor, if we look at the

5    government's cases that they cite in opposition, notably the

6    *Burtch v. Milberg* factors case -- I am sorry, the *Catalano*

7    case, which is a Supreme Court case, in which the government

8    alleges that payment terms are in separate part from pricing.

9    There is actual a Third Circuit case, the one I was just

10   referring, *Burtch v. Milberg*, 662 F.3d 212, in which the Third

11   Circuit explained that the *Catalano* case did not suggest the

12   price information and credit information are equivalent for

13   purposes of antitrust violations and they are quite different.

14           And what the *Catalano* case talks about is fixing

15   credit terms.  And that's simply not what this e-mail is about.

16   That's not what -- the e-mail is about a communication about a

17   rumor about particular credit terms that Sysco was going to

18   offer.  Again, this is a situation where we are not operating

19   from a blank slate.  We know what Ms. Hoyt said.  They expected

20   that there was going to be push-back.  They expected that there

21   was going to be rumors about that.  They operationalized that

22   within Sysco.  So basically a flippant e-mail between two

23   individuals is not evidence of fixing credit terms.

24           And so we -- so we have the benefit of knowing that.

25   So we think that in light of what we all now know based on

1    Ms. Hoyt's testimony and the fact that Ms. Hoyt is not going to

2    be testifying again, we think that allowing this e-mail between

3    Mr. Lovette and Mr. Grendys, one-off communication to be

4    presented to the jury will confuse the jury, will mislead the

5    jury and somehow or another cause them to believe that this is

6    part and parcel of the rest of the case when, in fact, it's

7    just not.

8              THE COURT:  Thank you, Mr. Fagg.

9              Anyone else on that before I hear from the government?

10             Ms. Sweeney?  Are you on this one?  Go ahead.

11             MS. SWEENEY:  Yes, Your Honor.  So this is essentially

12   a motion for reconsideration of Government's Exhibit 803, which

13   as Mr. Fagg noted was already admitted into evidence.  We do

14   take issue with his characterization of the Sysco credit terms

15   that they are irrelevant to the rest of the case.  We strongly

16   believe they are not irrelevant to the rest of the case.

17             They are alleged in the Superseding Indictment as one

18   instance when -- an episode that shows how the overarching

19   conspiracy worked.  At this time Defendant Lovette and

20   Mr. Grendys, who was found at the *James* hearing as a

21   co-conspirator -- and that's ECF-559 at Page 8 where he was

22   found a co-conspirator -- they connected when there was a price

23   or price-related term.  And as *Catalano* stands for, it is the

24   credit terms, payment terms are price-related terms, the fixing

25   of which is a violation of the Sherman Antitrust Act which is

1    what is alleged here.

2         So the way that the conspiracy operated, as I believe

3    we described in our closing arguments and the evidence as

4    elicited at trial, is there would be a request from a customer

5    on price or a price-related term, discussion among the

6    conspirators, an agreement on how to proceed.  And here that

7    agreement was not to adopt Sysco's request for increased

8    payment terms, credit terms.  And that was the conspiracy.

9    This is one example of that conspiracy in action between

10   Defendant Lovette and between Mr. Grendys.

11        With regard to Ms. Hoyt, she is not on the

12   government's witness list.  The government does intend to

13   solicit evidence of what payment terms, generally what they

14   are, and to introduce Government Exhibit's 803, which is

15   already ruled on in the *James* hearing as an 801(d)(2)(E)

16   statement of Mr. Lovette and of Mr. Grendys.

17        One other point I want to make which I believe we put

18   in our papers was that Government's Exhibit 803, the

19   conversation, the e-mail that I believe Mr. Fagg described as

20   flippant, it does show that the defendants -- or the defendant

21   and Mr. Grendys, who were putting this in writing, took no

22   precautions and expressed no fear when they were talking to

23   other co-conspirators about sensitive information, the requests

24   from their customer, Sysco Foods.  There was no sort of caution

25   or fear of undercutting that's expressed in the communication.

176

1    And other than that, we rely on our papers.

2         THE COURT:   Thank you, Ms. Sweeney.

3         Ms. Henry?

4         MS. HENRY:   Your Honor, with regard to the *James*

5    hearing and Mr. Grendys, the decision with regard to

6    Mr. Grendys was based on the hearing entirely on Exhibits GX --

7    Government's Exhibit 1519, 1521, 1521-1, which are the exact

8    same exhibits that I mentioned with regard to Mr. MacKenzie who

9    has now given a very detailed interview to the government

10   explaining exactly what those documents were about, that they

11   were not conspiratorial in any way, and that Mr. MacKenzie was

12   not, in fact, a co-conspirator.  So there are -- I just have to

13   point that out that there are changed circumstances with regard

14   to that issue as well.

15        Thank you.

16        THE COURT:   Thank you.

17        Ms. Sweeney, if you don't mind, what about this

18   MacKenzie -- or Ms. Call can handle this.  What is the story

19   with Mr. MacKenzie?

20        MS. CALL:   Sure.  So in these communications, 1519,

21   1521 that Ms. Henry has referred to, we have a couple of things

22   here.  One is a communication from Mr. MacKenzie up to Joe

23   Grendys saying, Bill is getting us pricing.  And what we saw in

24   the documents and in the government's summary exhibit was

25   really happening at that time is Defendant Kantola was reaching

1    out to three of his competitors in the hour before and 10

2    minutes after that e-mail.  The other one was another message

3    where Mr. MacKenzie was transmitting an Excel spreadsheet

4    containing competition's pricing.

5            Ms. Henry's described this new report as, you know,

6    definitive of Mr. MacKenzie saying he is not a participant in

7    this conspiracy and how clear it was.  I can't tell you how

8    many times I read "I don't know" in the notes or "I don't know

9    where Defendant Kantola got his information from," so I don't

10   know it's as clear as what Ms. Henry is saying.

11           The point is regardless of what any of us believe

12   Mr. MacKenzie's credibility in his statements to the

13   government, that doesn't actually really affect the

14   admissibility of the documents we are talking about here, 1519

15   and 1521.  Here is why.  And I am going to take it a little

16   slow because I don't think this is really a way we have

17   approached 801(d)(2)(E) in our discussions here in this court,

18   and I do want to be clear, and perhaps frankly I should have

19   been arguing this for other evidence.

20           But 801(d)(2)(E) is divorced when it talks about a

21   conspiracy and that someone was a member of a conspiracy and

22   something is in furtherance of it.  That's not inextricably

23   intertwined with a charged conspiracy in a case.  That's very

24   clear in the law.  It's in Miller & Wright's Evidence.  It's in

25   Wigmore.  It talks about these conspiracies and they don't have

1    to be the same ones charged for statements to be admissible

2    under 801(d)(2)(E).

3          And the reason is just when people enter into some

4    joint undertaking or a common goal, it's that kind of

5    partnership between them that allows their statements to be

6    admissible against them.  So there is cases where there is just

7    people who had a common goal of setting up this healthcare

8    system and because they were working together, their statements

9    are admissible under 801(d)(2)(E) even if one of them is

10   charged with mail fraud or something like that.  I can point

11   you to a couple of cases for this proposition.

12         One is *United States v. Anderson*, 55 F.Supp.2d 1163.

13   That's in the District of Kansas, and it collects and cites

14   several cases from several circuits; as well as *United States*

15   *v. El-Mezain*, 664 F.3d 467 in the Fifth Circuit.  That case

16   quotes "Conspiracy as an evidentiary rule differs from

17   conspiracy as a crime."

18         For these particular documents I don't want to

19   necessarily get into Mr. MacKenzie's credibility, and we don't

20   have to get into it here, but for purposes of 801(d)(2)(E) and

21   whether those statements are still admissible, Mr. Kantola and

22   Mr. MacKenzie were still in a common joint undertaking and

23   that's all that 801(d)(2)(E) requires.  They work on these

24   negotiations together.  They are trying to get the prices they

25   want from their customers together.  And because of that common

1    goal, because of that partnership, their statements are

2    admissible against each other, but here against Defendant

3    Kantola.

4         So that's kind of one thing I realize -- approach we

5    haven't talked about to 801(d)(2)(E) because we largely talked

6    about the charged conspiracy, but the statements are still

7    admissible regardless of Mr. MacKenzie's now interview with

8    DOJ.

9         *THE COURT:*  Thank you.

10        Ms. Henry?

11        *MS. HENRY:*  Your Honor, I haven't read those cases,

12   but I would be shocked if there is case law that says that

13   because people work together in the same company, that somehow

14   that is a conspiracy that makes any declaration that somebody

15   said a co-conspirator statement for all time against all

16   issues.  That's absurd.  That is just utterly absurd.

17        Ms. Call, whatever she wants to say, she can say, but

18   she didn't, that Mr. McKinsey was not credible.  She didn't

19   deny that he, in fact, dealt with each separate statement here

20   and that he explained each statement and why it was not in any

21   way related to conspiracy, and that is not denied by the

22   government.

23        And this notion that it's somehow admissible in the

24   abstract is irrelevant.  We are talking about 801(d)(2)(E).

25   And for 801(d)(2)(E) to apply, the declarant, in this case for

1    those documents the declarant is Mr. MacKenzie, and he is not a

2    co-conspirator.  There is no basis now to argue that he is,

3    none.  I didn't hear any other than the fact that he works in

4    the same company as Mr. Kantola.  And that does not make him a

5    co-conspirator for 801(d)(2)(E).

6           THE COURT:  All right.

7           Mr. Fagg, go ahead.

8           MR. FAGG:  Thank you, Your Honor.

9           Just one final point.  When we're talking about

10   potentially misleading the jury or jury confusion as we are in

11   our motion to exclude evidence related to the Sysco payment

12   terms, we cannot put on blinders, right?  So we all know here

13   from the government's own witness, right, that these -- neither

14   Koch nor Pilgrim's ever received these 65-day terms, that they

15   both took wildly different approaches to negotiating with

16   Sysco, that Pilgrim's reached an agreement in a couple weeks,

17   that Koch took years to do it.  We know that Mr. Lovette wasn't

18   involved in the communications from the government's own -- or

19   the negotiations, rather, from the government's own witness.

20          So there is no evidence and I don't believe the

21   government is going to be able to elicit any evidence,

22   especially with not calling Ms. Hoyt, that these companies took

23   some sort of common approach and that this was actually related

24   to this overarching scheme.

25          I mean, we know what this case is about.  It's about

1   rigging bids and fixing prices.  And that's been clear in the

2   jury instructions.  It's been clear in all of the parties'

3   evidence that they've put on, the openings and the closings.

4   And to say this convoluted theory about payment terms is

5   somehow or another the same thing knowing what we know from

6   Ms. Hoyt is just wrong, and it will lead to confusion of this

7   jury about something that's completely irrelevant.

8        *THE COURT:*  Thank you, Mr. Fagg.

9        Anything more from the government?

10       Ms. Sweeney, go ahead.

11       *MS. SWEENEY:*  Just two quick points, Your Honor.  The

12  first is that sort of going back to the issue that I believe

13  Ms. Henry raised about evidence of Mr. Grendys' participation

14  in the conspiracy, in addition to the documents that she

15  referenced, Government Exhibit 803 is another document that

16  shows his participation in the conspiracy as well.

17       The second is I don't believe as the testimony that

18  came out, I don't believe this would lead to or has led to jury

19  confusion.  It's not a case of putting blinders on, but

20  presenting evidence to the jury and having them decide whether

21  the government has met its burden of proving a conspiracy.

22  Thank you.

23       *THE COURT:*  Thank you, Ms. Sweeney.

24       So I will take -- I am going to take the Sysco payment

25  terms motion, Docket No. 990, under advisement and I will issue

1    a written ruling on that one.

2         Let me just go back to the government's motion to

3    exclude expert testimony because I said it was untimely and it

4    was really a motion for reconsideration.  Part of that motion

5    of the not untimely.  Part of that motion was not asking for

6    reconsideration.  And that had to do with whether some of the

7    experts' opinions were informed by privileged documents, but

8    the response by the defendants was that -- assured the Court

9    that they were not, so that part of the motion seemed to have

10   been mooted.

11        Do you agree with that, Mr. Torzilli?

12        MR. TORZILLI:  The motion itself is a motion that was

13   filed in the first trial, so some of this might be a repeat of

14   what Your Honor said, but just with a little more explanation.

15   The motion we filed now was similar to, very similar to the

16   motion we filed in the first trial.  And Your Honor denied that

17   as moot because the defendants decided that they weren't going

18   to call their experts.  There were a number of pieces to that

19   motion.

20        One piece to that motion was the benchmarking analysis

21   piece which in our view was not untimely because the

22   supplemental disclosure that Your Honor had ordered the

23   defendants to produce was produced to us I believe on

24   October 22nd, and we filed our motion shortly thereafter.  And

25   then the second piece of it was the privilege piece that Your

1    Honor mentioned a moment ago.  And then there is a third piece

2    involving discussion of essentially hearsay evidence as part of

3    expert testimony.

4        THE COURT:  Okay.

5        Ms. Pletcher, go ahead.

6        MS. PLETCHER:  Thank you, Your Honor.

7        I think it will help allay the Court's concerns and

8    the government's as well that we have reconfirmed with

9    Professor Snyder that he did not see any of the documents that

10   plaintiffs claim is privileged and none of them formed the

11   basis of his opinions, and he will not be referencing it in his

12   testimony.

13       THE COURT:  Yeah, I assumed that, that much, but I

14   appreciate the additional clarification on that point.

15       Mr. Lavine, go ahead.

16       MR. LAVINE:  I would just like to revisit for a moment

17   the testimony regarding the agents.  I understand what you said

18   as far as Koppenhaver testifying about the investigation at a

19   very general high level which is fine.  That's not what the

20   government intended when it filed its documents because it went

21   into significant detail, which I think the Court has said

22   you're not going to permit that to happen.

23       What my concern is with Agent Taylor, what they have

24   done is they filed the same thing that they filed in the first

25   case.  And you had a discussion with government counsel of what

1    Taylor could not do and Taylor did not testify.  What I am

2    concerned about is we allow Taylor to testify without some

3    proffer of what he is going to say, it's going to put the

4    defense in a very awkward position because we are going to be

5    standing up and objecting to pretty much everything he says.

6    Because he is not going to testify about the investigation

7    because that's something that Koppenhaver will already have

8    testified to, so it will be repetitive.  So the only thing he

9    is going to testify to is how these summary charts came

10   together or documents or something.  And I just think this is

11   fraught with the problem that we are going to go down a

12   rabbit's hole that we are going to have a problem with.

13          And I would ask the Court to consider asking the

14   government or requesting the government, give a proffer.  What

15   is it that you think Agent Taylor is going to testify to, so we

16   don't have to deal with it at the time he takes the stand.

17   Because otherwise I am concerned if we are constantly

18   objecting, the jury is going to think, well, what are these

19   people fighting so much for?  Why don't they want the agent to

20   testify?  Because the agent himself is an FBI agent.  He is

21   going to carry some credibility before the jury.  And I think

22   it's just fraught with problems if we don't deal with it now

23   before he testifies.

24          THE COURT:  Well, we will have time during the trial

25   to revisit that issue or to at least think about it, but I am

1    not inclined to do that at this point.  I mean, I wouldn't want

2    to put on a case where the last witness is basically -- doesn't

3    say anything because objections are sustained.  That would be a

4    bad way to end a case.  And, of course, I heard during the

5    first trial about all sorts of cross-examination questions that

6    the defendants would love to ask Special Agent Taylor.  So, you

7    know, even if he didn't get to answer any questions on direct,

8    it seems like the defendants would love to ask him all sorts of

9    things about his knowledge of those documents.

10        So there is, you know, there is several ways to look

11   at it.  But like I said, I've cautioned the government about my

12   concerns about whether he is going to have personal knowledge

13   to testify about much, but I don't want to go down the path of

14   asking -- or getting proffers from people because I don't think

15   we need that yet.  And, of course, it could be a two-way

16   street, and the defendants wouldn't like that.

17        *MR. LAVINE:*  I understand, Your Honor, but I think

18   that every one of the defense counsel is very concerned about

19   doing a full cross-examination because once we open the door,

20   we can't close that door.  And so we are very mindful of that.

21   And while we have said before we would love to cross-examine

22   the agent, there are significant limitations.  Even *Brooks* is

23   really what addresses that, and I don't think there is anybody

24   in this room that wants to go down that path with Agent Taylor.

25        *THE COURT:*  Well, I don't think -- my purposes of

1    cautioning the government is because we're not going down that

2    path, so that's why I don't -- and you're right.  I mean, the

3    defendants may have some concerns about objecting constantly

4    and looking like you're keeping evidence from the jury, but

5    that can happen with a lot of different people.  He is the last

6    witness.  We will have lots of opportunities.  We will have

7    Koppenhaver as an example at least of some analogous witness in

8    some respect.  So I think we will have to let it play out.  I

9    am not willing to at this point have the government make a

10   proffer yet, but we'll see.

11        MR. LAVINE:  Thank you, Your Honor.  I appreciate the

12   consideration.

13        Yeah, Mr. Torzilli, go ahead.

14        MR. TORZILLI:  One more point just to go back to the

15   expert motion.  And we appreciate counsel's representation

16   regarding Professor Snyder.  The defendants also have on their

17   witness list another economic expert, Dr. Sengupta, and we

18   don't have any information about the extent to which she has

19   been tainted by privileged information.

20        THE COURT:  Ms. Pletcher, I don't know if you are

21   handling Dr. Sengupta.  Is it Mr. Pollack?  Is it the same

22   issues that you're aware of?  You may not even have looked into

23   it and thought of it.

24        MR. POLLACK:  There are no issues.  Dr. Sengupta has

25   not been shown privileged documents and will not be opining

1    about them.

2         THE COURT:  Thank you, Mr. Pollack.

3         How about -- so Docket No. 1000 is the defendants'

4    joint motion to prohibit the use of the term price-fixing.  I

5    am going to deny that motion.  Price-fixing is enough of a

6    generic term that I don't think it's a loaded term.  I don't

7    think it's going to prejudice people, so I disagree with the

8    motion in terms of it being irrelevant or prejudicial under

9    Rule 403.

10         Mr. Tubach?

11         MR. TUBACH:  Just in the very specific -- and not

12   rearguing the point, just in the very specific context in which

13   this came up was in front of -- with Mr. Koenig asking Robert

14   Bryant about certain conduct in which he engaged with simply

15   price exchange.  And he said:  Can we just call that

16   price-fixing?  And Mr. Bryant said:  Sure, let's do that.

17         And he started calling it price-fixing.

18         THE COURT:  Yeah, I agree with you because that's

19   redefining a term, so I do think that that would be

20   inappropriate.  It's redefining a term and using a more -- a

21   term that is at issue in the case, what the jury is ultimately

22   going to try to determine.  So yeah, I do agree with you on

23   that one, Mr. Tubach.

24         Okay.  Let us turn to -- so I will issue a written

25   order on 994.  Once again, that has to do with antitrust

1    issues.  Even though Ms. Love is apparently not going to be

2    called, there may be another witness to that effect.

3            Why don't we take up the 989.  This is the motion *in*

4    *limine* to prohibit witnesses from using the term wrong, immoral

5    or words to that effect.

6            Any further argument on that one, Mr. Fagg?

7            *MR. FAGG:*  Your Honor, Mr. McLoughlin is on the phone.

8            *THE COURT:*  Mr. McLoughlin, go ahead.

9            *MR. McLOUGHLIN:*  Good afternoon again, Your Honor.

10           First, Your Honor, I want to in addition to our brief

11   address the points that the government made in its response.

12   None of the cases the government relies upon are persuasive to

13   the government's point.  In fact, they actually demonstrate the

14   opposite.  The government first relies on the *Todd v. Exxon*

15   case in its argument that if a witness considers information

16   sharing to be wrong or inappropriate, it makes it more likely

17   that competition was reduced and hence more likely the

18   conspiracy existed.

19           The problem with that is that *Todd v. Exxon* holds

20   nothing of the kind nor can one infer that from *Todd v. Exxon*.

21   *Todd v. Exxon* is a civil case in which the employee of an oil

22   company alleged that the oil company exchanged information

23   about what certain job positions would be paid, and

24   specifically in Paragraph 106 alleged that assurances were

25   given that that information would be used to set salaries, as

1    well as in the subsequent paragraph alleging that they agreed

2    to specific discounts where the job characteristics were

3    somewhat different from company to company.

4          The Second Circuit on what was a motion to dismiss,

5    which had absolutely of course nothing to do with the

6    admissibility of evidence or this conclusion, starts its

7    opinion, as it rightly should under *Connolly*, by saying, we

8    must accept all the allegations of the complaint as true.  And,

9    of course, as a result, you also have to give every possible

10   inference to the plaintiff.  Having applied *Connolly* correctly,

11   the Court simply said it's alleged an agreement.  There are

12   economic factors here that would make that rational with

13   respect to the structure of the industry and a variety of other

14   things, so we are not going to dismiss the complaint.

15         There is nothing about that procedurally or with

16   respect to the antitrust laws that in any way supports the

17   government's argument.  And to claim that as a result, a mere

18   cooperative exchange of information is sufficient also ignores

19   the fact that in that case the Second Circuit cited *United*

20   *States v. Gypsum* in which the Second Circuit in that case said,

21   "The exchange of price data and other information among

22   competitors does not invariably have anticompetitive effects;

23   indeed, such practices can in certain circumstances increase

24   economic efficiency." So this notion that because these buyers

25   have -- individuals have a certain opinion, that that under

1   this case becomes admissible is simply untrue.

2        Another case that I would note for Your Honor that the

3   government relies upon is the *Locke* decision, *United States v.*

4   *Locke*.  And the problem with *Locke* is similar in that it in

5   essence holds exactly the opposite of what the government says.

6   In *Locke* it was a bank fraud case, and an essential element of

7   bank fraud is the information that was misrepresented had to be

8   material.  The government got testimony from bank officers that

9   they believed the information to be -- that was provided to be

10  fraudulent and misleading which defined an essential element of

11  the terms that the government had to prove to succeed on the

12  offense.

13       And their testimony, because they were exercising that

14  they would as bank officers be exercising their judgment as to

15  whether to grant a loan or not, their opinion or professional

16  judgment in the course of their business about whether or not

17  information would affect their decision to grant a loan was, in

18  fact, a valid lay opinion.  That stands in utter and stark

19  contrast to the situation here where the representative of the

20  buyers said I believe it was wrong or I believe it was cheating

21  or I believe it was immoral.

22       Then the government most frequently asked a question,

23  why?  And the purpose of that question was followed through,

24  and that is the witness most often said, well, because I think

25  it reduced competition or raised prices or might get the best

1    price, which takes you out of *Locke*.  It takes you then out of

2    *Todd*.  But it also takes you into the problems we identified

3    under Rule 701 and 702, which is their opinion about whether it

4    affects competition or how it affects the price is, in fact,

5    the testimony that is limited to an expert.

6              Because the United States (inaudible) has made very

7    clear that whether or not it affects a price negatively is a

8    function of the structure of the market and a variety of

9    factual circumstances not addressed by the government here,

10   which indeed the government has argued repeatedly it need not

11   address and so to preclude the defendants from putting on

12   similar evidence.

13             So we have the situation here where the government is

14   getting in these surreptitious expert opinions dressed up as

15   lay opinions about why people, A, thought it was wrong and the

16   fact they did think it was wrong, which again is in violation

17   of 703.  The 701 standard is actually quite clear.  An opinion

18   is only admissible if it aids the jury or it makes the witness'

19   testimony more clear.

20             Since all of these witnesses testified that they had

21   no factual information about whether, in fact, there was an

22   agreement to fix a price, their opinion about information

23   sharing, which again they weren't privy to firsthand

24   information as to its extent or what information was shared and

25   when and why, becomes simply misleading and the product of mere

1    ignorance and speculation.  So it's again that case goes down

2    the road to it is, A, an unqualified opinion; and B, you go

3    down to 403 where there is a substantial risk of confusion to

4    the jury.

5            And that is where we get to the *Connolly* decision

6    which we briefed, Your Honor, and that decision, which again is

7    a fraud case, is a really critical decision here because the

8    Second Circuit makes very clear in its analysis of that -- the

9    government's strategy in that case, a case in which the

10   antitrust division participated and was on brief in the Second

11   Circuit that the strategy of getting either co-conspirators,

12   which would apply to Mr. Bryant and Pepper under the

13   government's case, or anyone else -- in that case they had a

14   so-called expert testifying that the information was wrong

15   because it was unfair or it was cheating.

16           In fact, the resulting confusion of the jury in that

17   case, the Second Circuit made clear it also resulted in

18   confusion to the trial judge because an inaccurate standard was

19   applied based on that ruling.  And, in fact, the trial judge

20   made clear that that testimony was the basis on which he denied

21   the Rule 29 motions.

22           And the Second Circuit made clear that that kind of

23   evidence is simply off point to the question of whether the

24   essential elements of the offense, which in that case was

25   fraud, were met.  And here where the essential element is an

1    agreement to rig bids and fix prices, the question of their

2    opinion about whether information exchanged was improper or

3    otherwise takes you exactly down the road that the government

4    went in *Connolly*, and it is exactly the *Connolly* holding that

5    this Court can rely upon to conclude that that information

6    should not be admitted.

7            *THE COURT:*  Thank you, Mr. McLoughlin.

8            Anyone else?

9            Government response?

10           Ms. Sweeney, go ahead.

11           *MS. SWEENEY:*  Yes, Your Honor, just a few points on

12   this.

13           First I would note that this is essentially again a

14   motion for reconsideration.  Your Honor decided in our original

15   motions *in limine* in ECF-604 at Pages 3 and 4 on this topic.

16   There were also multiple objections to this type of testimony

17   throughout trial that were overruled again based on that

18   decision in ECF-604.

19           Second, I will point to the themes that the defendants

20   in the first trial highlighted in their opening statements and

21   closing arguments, such as, it makes good business sense to

22   find out the prices of your competitors.  This information from

23   customers who are saying, no, we didn't actually want that to

24   happen, including I believe it was from Ms. Fisher who said

25   when I found out the suppliers were talking to each other about

1    selling shortages to each other, I told them to stop it and

2    they all had to come through me because I didn't want them to

3    have the pricing information from each other on these shortage

4    sales.  It goes directly to that point to the defendants'

5    knowledge and state of mind.

6              Third, I want to address the point about the *Todd v.*

7    *Exxon* case which does clearly state that, "Price exchange is a

8    factor that can support a finding of a price-fixing

9    conspiracy."  And as I believe we cited in our brief, I believe

10   that's at Page 198.

11             *THE COURT:*  Yeah, you definitely cited that in the

12   brief.

13             *MS. SWEENEY:*  And the *Connolly* opinion, the Second

14   Circuit's discussion of the testimony about wrong doesn't say

15   that the government cannot offer testimony about whether or not

16   something is wrong, but it was really more focused on

17   establishing -- or adding additional information on top of that

18   additional evidence introduced at trial to establish the fraud.

19   And since this is not a fraud case here, it's not sort of on

20   all fours with the question at issue.

21             *THE COURT:*  All right.  Anything else, Mr. McLoughlin?

22   Anything else from you?

23             *MR. McLOUGHLIN:*  Yes, Your Honor.

24             Just on *Todd*, the issue here is not evidence of

25   whether there was a price exchange.  The issue here is offering

1    an opinion about that price exchange.  And they are two very,

2    very different things.  It is also about the question of the

3    opinion, whether it's right or wrong, or the effect of that

4    exchange.

5            So the government's reliance on the fact that price

6    exchange could be indicative of an agreement simply is off

7    point to what we are trying to exclude here, which is the

8    evidence of a witness, as you may recall, saying, yes, I

9    thought their exchange of information was immoral or it was

10   cheating.

11           This is in some sense about how the buyer wants

12   ignorance of its suppliers because it believes it can exploit

13   that ignorance against sellers to drive them to different

14   prices.  And we saw, for example, Mr. Ledford admit that he, in

15   fact, as evidenced in e-mails, that he, in fact, misstated what

16   bidders had said.

17           Meanwhile, on the other hand, you had suppliers

18   saying, well, that's nice that you want to be ignorant, but I

19   need price verification.  I need these other things.  So the

20   fact that they disagree about what is to their individual

21   advantage in the negotiations, particularly a relational

22   negotiation where one has a continuing discussion is, you know,

23   irrelevant to the question of whether there is an agreement to

24   fix a price in violation of Section 1.

25           And to conflate those where it is again an issue of

1    who believes it's more to their tactical advantage to have one

2    level of knowledge or the other, which is in essence what the

3    government is doing here is saying, well, they wanted to have

4    more leverage.  Okay.  Well, great.  The suppliers wanted

5    leverage as well.  So that should not be the kind of fight in a

6    criminal antitrust case that you don't get (inaudible) to the

7    jury, particularly where Your Honor is going to say at the end

8    of the trial information exchange is not in and of itself a

9    violation of the Sherman Act where they have been hearing

10   opinions for weeks that these people believe it was.

11             THE COURT:  All right.  Ms. Prewitt, go ahead.

12             MS. PREWITT:  Thank you, Your Honor.

13             Just briefly, this is the case that the government

14   wants to try.  It wants to try the case of exchanging prices is

15   immoral.  It's unethical.  That's what they want to try because

16   it's one they can prove.  What they are going to struggle with

17   in the course of this trial is proving the crime that has been

18   charged, a conspiracy to fix prices and rig bids.

19             In this case what we have seen in the course of this

20   trial, and this is the changed circumstances, Your Honor, is

21   the banging that drum with every single witness.  And it was a

22   crescendo and at moments Your Honor reined back lines of

23   questioning because it kept getting louder and louder as they

24   banged that drum, it's unethical, it's immoral, and actively

25   eliciting that testimony.

1         And Your Honor, I can tell you from what I'm seeing,

2   reading the 302s as they come in to us, they are banging that

3   drum.  And it will be louder and louder and it will be more and

4   more frequent.  And we will have a trial about the morality of

5   sharing price information.  That's what this case will be

6   about.  It's why so much of this evidence has been coming in,

7   Your Honor, why we are having discussion about compliance

8   programs, why we are having discussions about confidentiality

9   agreements, because that's the winning case for the government.

10  It's not the crime charged.

11        Thank you, Your Honor.

12        THE COURT:  Thank you, Ms. Prewitt.

13        Ms. Pletcher?

14        MS. PLETCHER:  Thank you, Your Honor.

15        I have two points.  One, this follows up on what

16  Ms. Prewitt is saying.  The real heart of the problem here is

17  making the connection between the defendants' state of mind and

18  these statements by various witnesses or other so-called victim

19  witnesses that sharing prices is wrong.  I fail to see and I

20  have yet to hear the government articulate how, say,

21  Mr. Brink's position that sharing information about prices and

22  negotiation affects my client's state of mind and whether he

23  entered into an agreement to fix prices with competitors.  I

24  don't see that connection.  They have not made that connection.

25  And because of that gulf between those two things, there is a

1    huge amount of prejudice that falls into that space.

2             And the other point, and I believe that part of Your

3    Honor's ruling on this in the first trial had to do with the

4    fact that it was potential for defendants to cross-examine

5    witnesses on this testimony; but, in fact, it really isn't

6    possible to effectively cross-examine on someone's morality or

7    what they believe is right or wrong.  There is no real line of

8    cross-examination that can get to that because it's a personal

9    belief.

10            And then that's another real problem here.  If this

11   was about facts, about concrete facts, we could cross-examine.

12   But we just can't that.  We can't do that with a subjective

13   belief.  That's the other real problem that I wanted to raise

14   here.  Thank you.

15            THE COURT:  Thank you, Ms. Pletcher.

16            Ms. Henry, go ahead.

17            MS. HENRY:  Thank you, Your Honor.

18            A number of my colleagues have already stolen a lot of

19   my thunder on the issue of relevance.  The personal morality of

20   a buyer here is simply not relevant to any issue in this case.

21   The government has claimed that this is a per se case, that

22   motivations are irrelevant.  So the only issue is really this

23   relationship that Ms. Pletcher just explained, which is how

24   does it get to whether you joined a conspiracy to fix prices,

25   not whether you shared or whatever.  It goes to a very specific

1   issue.

2          Also, I would take issue with -- I realize that you

3   did, in fact, rule on this initially, but as we went through

4   the trial, there were, in fact, many places where you did, in

5   fact, sustain objections to those questions as they started to

6   come in, I think because it really did question -- your point

7   in sustaining the objection was a relevancy issue on some of

8   these.

9          And when you look at the incredible prejudice on the

10  one hand from this type of evidence with whatever the probative

11  value is here, which we obviously say there is none, but at

12  best there is not much, and you make that balance, there is --

13  it is really going to lead to excessive confusion about what

14  the law is and about what the inquiry is actually that the jury

15  has to make, because the jury is looking at whether these

16  people voluntarily and intentionally entered into an agreement

17  to fix prices.

18          Thank you, Your Honor.

19          *THE COURT:*  Thank you.  Anything more from the

20  government?

21          *MS. SWEENEY:*  Just two brief points.  And I think a

22  lot of these were made in our original motion *in limine* and in

23  our response.

24          But the first is this is more of an issue than just a

25  person's morality, as I think many of the defense counsel have

 1    described.  It's also the expectations of suppliers -- I am

 2    sorry, of purchasers in their jobs of what their suppliers were

 3    going to be doing or not doing with the information, with the

 4    bid information that they were being shared.  And those

 5    expectations, the business expectations of the suppliers are

 6    relevant to the case.  This is a per se Sherman Act case about

 7    competition.

 8         But it also -- before I get to the next point, this

 9    testimony didn't come from just one customer.  It wasn't just

10    Joe Brink of Pollo Tropical who didn't want anybody else to

11    speak about other current prices and future bids and that was

12    sort of an outlier, but it was all of the customers that were

13    on the stand testified that they didn't want the sharing of

14    future bid information and many of them testified they didn't

15    want the sharing of current information.

16         As that seems to be something that was commonly

17    understood among the purchasers of chicken, that goes towards

18    the defendants' knowing joinder of this conspiracy that it

19    wasn't -- that they were just doing what they thought their

20    customers wanted them to do, but they, in fact, were doing

21    something contrary to that.  And other than that, we will rely

22    on our papers.

23         THE COURT:  One clean-up matter.  Docket No. 961, the

24    defendants' motion *in limine* to exclude certain testimony of

25    Special Agent Taylor, I am going to deny that without prejudice

1    as I discussed somewhat with Mr. Lavine.  We'll have to see

2    what the overview of the testimony actually -- or the summary

3    testimony or whatever his testimony may be, what it really

4    actually consists of.  And any motions I haven't ruled on today

5    which have already been filed, I will rule on those on paper.

6         Anything else briefly that we should take up given the

7    fact that we are all assembled?

8         Mr. Kornfeld, go ahead.

9         MR. KORNFELD:  Just a couple housekeeping things, Your

10   Honor.  One is the Court was kind enough at various times

11   during the trial to allow the defense to gather in your

12   courtroom.  And we were wondering -- and I believe the

13   government has some space in this building.  We are wondering

14   if we can rely on that during the trial days kind of in the

15   regular course to gather there over the lunch hour.

16        THE COURT:  Yeah, if you wouldn't mind paying

17   attention to my docket because there will be certain days that

18   I might have something over the lunch hour, but the use of the

19   witness rooms as we'll call them, yes.  And the courtroom too,

20   no reason why you can't do that.  So I don't think that the

21   government has a space in this building, but I want to be fair

22   about it.  So if the government needs space too, you know, let

23   me know.  But as I mentioned last trial, I should have made you

24   aware of the ability for both sides to use the courtroom and

25   the witness rooms up there for whatever purposes.

1           *MR. KORNFELD:*  Great.  Thank you.

2           The second thing is to get some guidance from the

3    Court should we have a sleeping juror.  We on the defense side

4    and perhaps some of the government on this side of the table

5    perceived on numerous occasions Mr. Perez, who was one of the

6    jurors in the back, appear to be sleeping.  I mean, I don't

7    know if he was sleeping or not.

8           *THE COURT:*  Mr. Perez was difficult to figure out.

9           *MR. KORNFELD:*  When he didn't have his earbud in.

10          *THE COURT:*  Well, you really couldn't tell because

11   there were occasions when I was worried about that, but then he

12   seemed to be awake and paying attention and similarly -- well,

13   on a few cases Ms. Perez also.  That's why I took that quick

14   break that one day because I was a little worried about her,

15   but I would ask for a -- it's awkward.  It's always awkward,

16   but if you suspect that, ask for a bench conference.

17          *MR. KORNFELD:*  Thank you.  That's what I figured,

18   but...

19          *THE COURT:*  Just asking for that may cause enough of a

20   disruption in the tone of what's going on to cause a juror to

21   wake up.

22          *MR. KORNFELD:*  And the third thing, Your Honor, is

23   whether the Court would consider -- repeatedly during the

24   course of the trial, the defendants were referred to by the

25   government as Defendant Fries, Defendant Penn before the jury.

1    And I understand that they technically, of course -- or not

2    technically.  They are, in fact, defendants.  But I do have

3    some concern, and my colleague shared it, about the cumulative

4    effect of that label and how that could undermine the

5    presumption of innocence.

6           So I would ask the Court to consider just directing

7    the parties to refer to, all the people to and including the

8    defendants, as Mr. So and so or Ms. so and so.  I don't think

9    it undermines the government's ability to ask a witness for

10   example, did you have a conversation with Mr. Fries.  And I am

11   not saying the government did this all the time, but it

12   happened enough.  In a two-day trial, three-day trial, it is

13   what it is, but a 23-day trial, we do have that concern.  So I

14   don't know -- I don't think that rose to the level of a motion

15   *in limine*.  It's more a concern that we have.  But I would ask

16   the Court to consider, you know, extending just the same

17   formality to the defendants' names rather than labeling them

18   defendant.

19          THE COURT:  Yeah, I am going to deny that.  They are

20   defendants and the government can refer to them as such.  As a

21   matter of fact, there could be some utility to people referring

22   to them as that because I think the jury has difficulty,

23   especially when everyone is in a mask, to know who is who and

24   to differentiate among people, because there are a lot of names

25   that are going to get floated around.

1           So it's not necessarily -- it may even be helpful and

2    just for the jury to know when someone is referring to, okay,

3    that's one of the defendants, we get that, because they are not

4    sitting there looking at captions, case captions, like we do.

5    So, you know, I think that's a good idea that was brought up at

6    the very beginning of the day today about being able to

7    introduce people without masks on.  I think that's good.  And

8    for the attorneys too, whatever you want to do in that regard,

9    but no, I think that the government can refer to people by --

10   if they want to call them Defendant Fries or something, that's

11   okay.

12           MR. KORNFELD:  Thank you, Your Honor.

13           THE COURT:  Ms. Call?

14           MS. CALL:  Very briefly.  That just brought to mind

15   something from the last pretrial conference and I don't think

16   Your Honor addressed today and I just wanted to confirm was

17   still in place.  I think you articulated an order or preference

18   that counsel not refer to their clients by first name

19   throughout their openings.  I think there were some missteps

20   last time which I doubt were intentional, but I wanted to

21   confirm that was still your Court's --

22           THE COURT:  There were.  It wasn't universal.  That's

23   a little bit of a sticky issue I will say.  I don't prefer it,

24   but I can't really say that it's like a bad thing.  Now, when

25   you're asking questions, you cannot do that.  You cannot, you

1    know, you can't refer to the witness on the witness stand as by

2    his or her first face name alone, but I am not going to

3    prohibit the defendants from using first name only in their

4    openings or closings.  I don't prefer the practice, but I can't

5    say that it's -- I am not aware of any cases that prohibit it.

6         Mr. Tubach?

7         MR. TUBACH:  A slightly related point, it has to do

8    with the photographs of the defendants.  In the last trial, the

9    government introduced photographs that by all appearances

10   looked like mugshots.  We had provided other photographs to the

11   government and had not agreed they should be admissible because

12   the Court hadn't ruled on that yet.  Now the Court has ruled

13   that photographs of the defendants will be admitted

14   notwithstanding the fact they are here in court, we would ask

15   the government be directed to use the photographs we provided

16   them rather than clearly prejudicial photos that look like

17   mugshots.

18        THE COURT:  I am going to deny that request too.  I

19   would prefer that -- no one likes to have a bad photo being

20   bandied about, but, of course, the defendant can introduce

21   their own good photos if they want.

22        MR. TUBACH:  It's not so much good or bad, Your Honor.

23   Of course, I like to have my better side photographed than my

24   worst side, if there is one, but it's more that they look like

25   mug shots.

1          THE COURT:  I don't really agree with that.  They look

2     like driver's license photos, some of them bad ones, but they

3     don't look like mugshots to me.  They really don't.

4          MS. CALL:  Just for the record, they are driver's

5     license photos.

6          THE COURT:  The government has pointed that out.

7     There are no -- we wouldn't anticipate that any of the

8     defendants would have mugshots and they don't except for their

9     arrest in this case, but yeah, we talked about that before.  It

10    would be better if the government used the better photos,

11    but --

12          Anything else real quick, Mr. Fagg?

13          MR. FAGG:  Very briefly.  Obviously, we are having

14    discussions with the government about the authentication which

15    could shorten some of the projected time line here.  The

16    discussions we had today about Agent Koppenhaver and Agent

17    Taylor could also shorten the time line, but I did want to

18    raise for the Court we are concerned about the time line that

19    the government has presented in its witness list where we have

20    a 10-defendant case and the government's case is slated to go

21    through March the 15th.

22          Obviously, the Court has made clear that it doesn't

23    intend to have trial after the last day that is scheduled.  And

24    so we are quite concerned about the length of the government's

25    case while still also having our own rights to cross-examine

1   witnesses.

2           THE COURT:  Yeah, in criminal cases it's really hard.

3   In civil cases I put people on chess clocks and I work out the

4   clock.  Really as the disciplinarian, it's more difficult where

5   you have a criminal case where the government has the bulk of

6   the evidence and the defendants don't have to lay their cards

7   on the table in terms of exactly what witnesses they will call

8   and that type of thing.  So it is -- it's tricky, but we'll

9   have to as the trial progresses see how -- what the timing

10  looks like and whether we foresee problems based upon what the

11  defendants reasonably anticipate in terms of their case.

12          MR. FAGG:  Understood, Your Honor.  I just wanted to

13  flag that.  It was something that was a concern.

14          THE COURT:  I agree with you, and it potentially could

15  be an issue.

16          All right.  Anything else we should take up today?

17          All right.  Then for those defendants who are present,

18  but the same is true for those appearing by VTC, their bonds

19  will be continued.  And we will be in recess until the first

20  day of trial.  I will look for the motion that I think Mr. Fagg

21  will file, and then the response on the new -- the motion that

22  was just filed today after the government's Rule 15 motion was

23  denied.

24          The Court will be in recess.  Thank you.

25          (Recess at 5:07 p.m.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 11th day of February, 2022.


                              S/Janet M. Coppock