1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLORADO

    Criminal Action No. 20-CR-00152-PAB
3
    UNITED STATES OF AMERICA,
4
         Plaintiff,
5
    vs.
6
    JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12       Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 3

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:28 a.m., on the 27th day of October,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

1                             APPEARANCES

2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3     Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4     Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5     for Plaintiff.

6           Anna Tryon Pletcher and Michael Tubach of

7     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8     San Francisco, CA 94111-3823;

9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10    N.W., Washingon, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13    CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16           Laura Kuykendall and Megan Rahman of Troutman Pepper

17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18    appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21    10017;

22

23

24

25

1                        APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10             James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16             Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19             John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3     Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4     Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7     for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                    PROCEEDINGS

16         THE COURT:  We are back on the record in 20-CR-152.

17    It's my understanding that the United States had an issue to

18    bring up.

19         Mr. Koenig, go ahead.

20         MR. KOENIG:  A few things.  First, I want to circle

21    back to Mr. Feldberg's opening yesterday and his objection to

22    the prosecution and saying that nobody from the prosecution

23    bothered to try to get Mr. Austin's side of the story.

24         MR. POLLACK:  I am sorry, Your Honor.  Can you stand

25    at the microphone?  We cannot hear you back here.

1          MR. KOENIG:  Is this better?

2          The objection yesterday of what the prosecution may or

3     may not have done I think was inappropriate and also lacks a

4     foundation.  So now we have a problem where the jury has been

5     presented with a fact that's not a fact that the prosecution,

6     the four lawyers at this table did not, in fact, try to seek

7     Mr. Austin's side of the story.  So I would ask for some sort

8     of -- if he has a basis for saying that when we believe that's

9     not true, and also, you know, now the jury has a fact that's

10    just not a fact.

11         THE COURT:  Well, first of all, openings, of course,

12    are not evidence and the jury will be instructed to that.

13         MR. KOENIG:  Okay.

14         THE COURT:  Also typically when defendants in a

15    criminal case overpromise in their openings, the government

16    thinks that's great because they can remind the jury in closing

17    arguments all these things that were promised that never came

18    true.  You know, once again, it's -- the jury will be

19    instructed it's not evidence.

20         MR. KOENIG:  I do think it's a little different,

21    though, because we are talking about lawyer-to-lawyer

22    communications which is something we wouldn't enter into

23    evidence.  And to say that the prosecutors never approached --

24         THE COURT:  Well, I am not sure that the statement was

25    the prosecutors didn't approach.  I think that it was the

 1   government.

 2         MR. KOENIG:  No, the transcript is very clear.  It

 3   says no one from the prosecution sought to get Mr. Austin's

 4   side of the story, which I think is a problem.

 5         THE COURT:  Well, I do think that there should not be

 6   an attempt to interject attorneys into the process because the

 7   attorneys are not going to be interviewing people.  They are

 8   going to be at least accompanied by special agents, so that

 9   could potentially be a problem; but once again, there is

10   nothing to correct.  I am not going to correct anything.

11   Openings are not evidence.

12         MR. KOENIG:  Okay.  One other thing with the openings.

13   I know I raised this yesterday inarticulately.  However, the

14   statements that there is nothing wrong with price sharing, I

15   think that goes in contradiction to what Your Honor ordered

16   with respect to voir dire Instruction 14.

17         THE COURT:  Not really.  There was no representation

18   yesterday that you will be instructed that there is nothing

19   wrong with price sharing.  It's true it was an assertion, but

20   once again, it wasn't a claim that the law is such that.  So

21   it's something that I don't think the jury will conclude that

22   that's the law.  They've got to follow that.  It was just an

23   argument essentially.

24         MR. KOENIG:  Okay.  Two other things.  These are real

25   small.  I just wanted to make clear for the record that

 1   although the laptop is open now, we generally don't have jury

 2   facing laptops open.  The one thing is the tablet, but I just

 3   want to put on the record that all that's on there is the live

 4   stream of the transcript.  We are not putting stuff on there

 5   that the jury could see that, you know, they shouldn't see.

 6          THE COURT:  I would suggest getting those privacy

 7   screens, whatever, because those help.  And you might want to

 8   even once you obtain those just check before when the jury is

 9   not present.

10          MR. KOENIG:  Go back there and look.

11          THE COURT:  Yeah.  They work pretty well.

12          Mr. Canty?

13          MR. CANTY:  Mr. Canty for Mr. Little.  On that I would

14   note that the side bars are reported, so when the transcript

15   rolls by, it is in view of the transcript.

16          THE COURT:  The other thing is you just don't want the

17   jurors to try to see what's scrolling.  So that's why the

18   privacy screen should work pretty well.  They make it

19   impossible -- once again, test it out.  I think with the angle

20   of your screens even though the jury box is raised, I doubt

21   that anyone would really be able to tell with those.

22          MR. KOENIG:  Okay.  And I am a pretty slender guy, so

23   I could probably -- anyway.

24          THE COURT:  Yeah, that's tight quarters in here.

25          Go ahead, Mr. Koenig.

1          MR. KOENIG:  One other thing is I don't know, for

2     witnesses getting through this aisle, is it just going to have

3     to be shimmying through?

4          THE COURT:  It's just unfortunate, but we need to

5     accommodate people.  And I think that we do need to -- and if

6     you don't mind, could you mention to your witnesses or have

7     someone mention to your witnesses that they should try to get

8     through in that center corridor.  Otherwise, it's just -- a lot

9     of the jurors, of course, are weaving their way back over that

10    way and it worked, but we don't want witnesses to do that.

11    It's too bad.  And also it's kind of an intimidating group,

12    masked up and lots of people, but I think going through the

13    center is the best way.

14         MR. KOENIG:  I will just flag before we start calling

15    witnesses, we will have some legal issues to maybe go

16    through -- not witnesses, custodial witnesses, but I don't want

17    to hold up the openings for that.

18         THE COURT:  Well, Mr. Keech, how are we doing on

19    jurors?

20         COURT DEPUTY CLERK:  I don't have any updates.  I can

21    run back and check, though.  Which way do you prefer I go, this

22    way or across the courtroom?

23         THE COURT:  You can choose, Mr. Keech.

24         COURT DEPUTY CLERK:  Whichever is less distracting for

25    you.

1          THE COURT:  That's all right, probably the shortest

2     route.  Let's get a count.  We were missing some jurors.  So if

3     we have everyone, I think we will get going, but I don't want

4     to -- once again, we don't want to get bogged down and take

5     breaks unnecessarily and so forth.

6          Why don't you preview it now and we can see.

7          MR. KOENIG:  The preview is we are having to bring all

8     these custodial witnesses which is just fine, but the

9     defendants have indicated that they would like to authenticate

10    their exhibits during our case in chief on what I guess would

11    be called cross of our custodial witnesses and we don't think

12    that's proper.  If they want to enter into a stipulation,

13    that's fine.  But if they are going to make us do the

14    witnesses, I don't think it's proper for them.  It's certainly

15    outside the scope of our direct for them to authenticate their

16    own exhibits.

17         THE COURT:  It would be outside the scope.  Of course,

18    when you mention that, the proper thing to do is stipulate to

19    the authenticity of both sides.  That's what should happen.

20    And I understand that you have been trying to do that for a

21    long time, but that would save everyone lots of time, lots of

22    frustration, and we would achieve our goals of efficiency, so

23    that is what should take place.  But there is no rule against

24    introducing evidence on cross.  Once again, this is just a

25    scope objection.

1          MR. KOENIG:  Okay.  So is that they will be able to do

2     it or --

3          THE COURT:  No.  So what you are going to be doing is

4     after we do openings, you are going to be conferring with

5     people and reasonableness I am hoping will prevail.

6          Mr. Pollack?

7          MR. POLLACK:  Yes, Your Honor.

8          THE COURT:  You need a microphone too, Mr. Pollack.

9          MR. POLLACK:  We don't have a microphone back here.

10          THE COURT:  You have got one at the podium.

11          MR. POLLACK:  Thank you, Your Honor.

12          With respect to the comment that the government has

13     been trying for a long time to get stipulations, I would like

14     to correct the record on that.  The government --

15          THE COURT:  Well --

16          MR. POLLACK:  The government asked for us to stipulate

17     to authenticity and admissibility of millions of documents

18     without giving us the documents.  The first time they gave us a

19     list, not the actual documents, but a list of the documents

20     that they wanted us to agree to authenticity on was literally

21     within a day or two of trial.  And it was still thousands of

22     documents, many of which we have not gotten any 302 or

23     certificate of authenticity from a custodian that actually

24     adequately establishes the authenticity of those documents.

25     And the government has tried to condition any stipulation on

1   authenticity on admissibility.

2        So the fact of the matter is we would be happy to

3   stipulate to authenticity of documents that the government can

4   establish authenticity for, but what we are not going to do is

5   just sign a blank check that every document in the case is

6   authentic.

7        THE COURT:  Right.  I would assume that today, which

8   we'll have lots of testimony from custodians, that there may be

9   a better list.  I don't know.

10        MR. POLLACK:  I suspect that's correct.  In fact, my

11   hope would be maybe after the first handful of custodians we

12   will all have a better understanding of what it is the

13   government actually is able to present and whether or not the

14   Court finds that sufficient to authenticate, and that may allow

15   us then to reach some stipulations.

16        THE COURT:  Sure.  If we have to go through a couple

17   of custodians to see what happens, we can.  But I do think that

18   we could just save a lot of time, and even if we have to take a

19   little bit of extra long break so we can have some conferral,

20   that would -- could be quite productive.

21        MR. POLLACK:  We are more than happy to do that.  I

22   just wanted the Court to understand we are willing to

23   authenticate documents that truly can be authenticated and

24   that's never been the issue.  And I don't know if you are

25   through.  There were a couple issues I wanted to raise.

1          THE COURT:  Ms. Prewitt may have had something on this

2     issue.

3          MS. PREWITT:  Thank you, Your Honor, for Mr. Mulrenin.

4     I will say that some of the defendants have offered to

5     cross-stipulate to a few exhibits on our list with the exhibits

6     on the government's list, but the government has conditioned

7     any stipulation agreement to the agreement of all defendants in

8     this matter.  So to the extent Your Honor has some view that

9     the cross should be limited so that we can't seek to

10    authenticate documents that are in the -- that the defense

11    would seek to introduce, then I would just put to Your Honor

12    that there is a fairness issue at play.

13         THE COURT:  Well, right.  There is no efficiency if

14    there is not agreement, so maybe we have to do them all.  I

15    don't know.  I think we are going to have -- I think the

16    government -- No. 1, I would suggest trying to confer.  See if

17    we can get agreement.  Once again, that sounds like it may make

18    great sense.  If that's impossible, then I think that we'll

19    start off and we'll see how it goes.  And if there is an

20    objection of beyond the scope, we will see what happens.

21         MR. KOENIG:  If I may just for the record's sake, I

22    won't belabor the point, but obviously we do not agree with the

23    assertions of Mr. Pollack.

24         The only other thing is on the aisle issue, would it

25    be okay if when witnesses are coming through at least

1    defendants themselves aren't on the aisle?  Because I do feel

2    like that's, you know -- if it was maybe more just the lawyers

3    and not the defendants sitting right there where the witnesses

4    have to walk by?

5              THE COURT:  In the sea of blue and gray, I doubt that

6    anybody could really distinguish that.

7              MR. KOENIG:  Well, and I am mostly not talking about

8    custodians only, but...

9              THE COURT:  I don't think that's going to be an issue.

10   I really don't.

11             MR. KOENIG:  All right.  Thank you.

12             THE COURT:  We are still waiting for one juror, so we

13   have some for some issues.

14             Mr. Pollack?

15             MR. POLLACK:  Thank you, Your Honor.

16             Yesterday the government represented to you that they

17   have given us and are continuing to give us two days' notice on

18   the exhibits that they plan to use with witnesses.  At

19   11:29 p.m. last night we got an e-mail changing the exhibits

20   for witnesses that are listed for today.  At 7:44 a.m. this

21   morning we got another e-mail making further changes for

22   witnesses for today.  At 8:10 this morning we got another

23   e-mail making further changes for witnesses for today.  I

24   haven't been back to my computer for five minutes, so there may

25   be additional ones since then.

1          Your Honor, again we may still be in the catharsis

2     stage of this, but I did want to correct the record on the

3     government's representation about the two days.  I just don't

4     understand where that's coming from.

5          THE COURT:  Is the list shrinking?  That would seem to

6     be good.

7          MR. POLLACK:  Sometimes shrinking, but it is also

8     adding exhibits.  It is adding exhibits that were not

9     previously on the list for that witness.  And Your Honor, we

10    still do not have an exhibit list.  The exhibit list the

11    government gave on the date that the Court ordered an exhibit

12    list, the government has told us there have been changes and we

13    should no longer use that exhibit list.  But despite repeated

14    requests, they have not given us a new exhibit list.

15         THE COURT:  Mr. Koenig, let me ask you this.  It would

16    seem to me that both sides to the extent that there are

17    additions to the exhibit list, they should be at the end and we

18    shouldn't be -- I don't know if this is happening, but

19    shouldn't be changing up exhibits within the body of it because

20    it is extraordinarily awkward for everyone with exhibit lists

21    that are so long to, you know, throw one copy away and

22    substitute in another.  It should just be adding pages to the

23    end.

24         MR. KOENIG:  May I have Ms. Call address it?

25         THE COURT:  Sure.

1          MS. CALL:  I believe that is what the government is

2    doing, the only exception perhaps being sometimes where

3    attachments have had to be like amended in form, adding a page

4    or something, we have sometimes added a dash 1 to the exhibit

5    number; but otherwise any new exhibits are being added to the

6    end.

7          And just so I correct the record on this morning's

8    productions by the government, those were simply interview

9    reports from preparation of witnesses for trial within the past

10   week or so.  I don't believe there were any new documents sent

11   this morning.

12         MR. POLLACK:  Your Honor, each of the e-mails that are

13   referred to related to exhibits.  I was not counting the

14   numerous e-mails regarding additional interview reports.

15         THE COURT:  Okay.  All right.  Once again, I am not

16   going to police this one, but I do hope that we can gain some

17   regularity, and if there are changes, that those are

18   subtractions rather than additions.

19         MR. POLLACK:  Thank you, Your Honor.

20         And then just a couple of housekeeping points.  With

21   respect to witnesses, is it the Court's practice not to release

22   a witness from their subpoena unless the defense has agreed

23   that there will be no need to recall the witness or do we need

24   to separately subpoena every government witness?

25         THE COURT:  No, you do not.  But because of the length

1   of the trial and because of the number of witnesses, I don't

2   want it to be a routine practice that, you know, some witness

3   is, you know, effectively on call until --

4          MR. POLLACK:  Of course, Your Honor.

5          THE COURT:  -- late December, so it really needs to be

6   thought through.  And it needs to be coordinated so that in the

7   event that there is a witness who the defense would like to be

8   able to call in their case, we should -- you should let me know

9   that.  I don't want to -- I am worried that I may forget as to

10   particular witnesses.  So if there is that request, let me

11   know.  I will make that indication.  And then that way the

12   witness knows and the government can then coordinate that

13   witness so that he or she can be recalled.

14          MR. POLLACK:  Thank you, Your Honor.

15          I think certainly with respect to the custodians

16   unless and until we are able to iron out the issues regarding

17   authenticity, we would want the ability to recall those

18   witnesses.  Obviously, we don't expect them to be on call.  We

19   will coordinate with them if we actually need them and give

20   them adequate notice.

21          And then the other issue, with respect to case agents,

22   is it safe for us to assume that the government will

23   voluntarily produce their case agents and will not require us

24   to go through the subpoena process, including the Touey

25   regulations, to get the appearance of people that they are

1     calling?

2          *THE COURT:*  Mr. Koenig?

3          *MR. KOENIG:*  Well, I guess this issue has come up just

4     recently.  And I understand the regulation says if subpoenaed

5     pursuant to, you know, some sort of lawful process, but, you

6     know, if they make a request for a specific agent, but, you

7     know, there are a lot of agents.  So I would expect a request

8     for a particular agent.  And there may have to be a request to

9     a particular channel.  *Touey* is not my area of expertise and I

10    would have to go back and look at it, but we are certainly not

11    trying to put any hoops here that don't need to be.  I just

12    don't want to inadvertently bypass some process.

13         *THE COURT:*  Sure.  Mr. Pollack, are you talking about

14    the three main case agents?

15         *MR. POLLACK:*  Yes.  I am talking about members of the

16    prosecution team, yes.

17         *THE COURT:*  Well, check on *Touey*, but I am hopeful

18    that that formality will not have to be observed for the three

19    main case agents.

20         *MR. KOENIG:*  Right.  There have been several agents

21    who have taken 302s in the case.

22         *THE COURT:*  I think if you confer, Mr. Pollack will

23    have -- you can boil it down to specific names.

24         *MR. POLLACK:*  Thank you, Your Honor.

25         *THE COURT:*  Ms. Call?

1          MS. CALL:  If I may very briefly correct myself and

2     apologize to Mr. Pollack.

3          THE COURT:  So a quick one, Ms. Call.

4          MS. CALL:  I just did want to correct what I said

5     earlier.  I do understand there was a separate list sent I

6     believe this morning for certain custodial witnesses.  There

7     were more exhibits removed than were added, but there were a

8     number added, so I wanted to correct the record on that.

9          THE COURT:  Okay.  All right.  Are we ready to bring

10    the jury in?

11          Let's bring the jury in, Mr. Keech.

12          Once again, you may be prematurely standing up, but

13    we'll see.

14          (Jury present.)

15          THE COURT:  Good morning, ladies and gentlemen.  I

16    hope you had a good evening.  Let me just mention a few things

17    about those monitors.  They do make it somewhat awkward for you

18    to go in and out.  However, they are also expensive and quite

19    helpful to you because once an exhibit gets admitted, it will

20    be displayed on those.  So what I would recommend is that when

21    we are on a break, you can see that they will lean forward

22    towards the chair, and I would suggest that you make it

23    parallel to the chair as opposed to sideways.  A lot of you

24    have it sideways now.  Make it so that you can get by.

25          You can also put it into the little slot there between

1    the seats if you want, although that takes a little bit of

2    time.  People don't typically do that.  But we want to try to

3    avoid having them fall forward and get banged around because if

4    one of them goes out, then we have to wait typically and see if

5    we can get the IT department to fix it.  So anyway, just a

6    mention on that.

7            All right, ladies and gentlemen.  We are going to be

8    continuing at this time with opening statements.  So who has

9    the next?

10           MR. KORNFELD:  Your Honor, I am batting lead off this

11   morning.

12           THE COURT:  Thank you.  Then go right ahead.

13                          **OPENING STATEMENT**

14           MR. KORNFELD:  Your Honor, government counsel, defense

15   colleagues, members of the jury, actions speak louder than

16   words, Mikell Fries' actions, Claxton's actions.  When he was

17   sales manager and later when he became the president of Claxton

18   Poultry in 2016, Mr. Fries' actions demonstrate that he never

19   agreed to fix or to raise the price of broiler chickens.  He

20   never asked Scott Brady or any other Claxton employee to enter

21   into an agreement to fix or raise the price of broiler

22   chickens.

23           Claxton Poultry's prices were the result of

24   independent decision making with the input of the chief

25   financial officer, the operations team, the sales team and the

1    customers themselves.  Indeed the evidence will show that

2    Mikell Fries, Scott Brady and Claxton never conspired to

3    violate the antitrust laws of this country.

4         Good morning.  My name is Rick Kornfeld along with

5    David Beller who you have already met and Kelly Page.  It's our

6    privilege to represent Mikell Fries sitting next to Mr. Beller.

7    He is the president of Claxton Poultry.

8         Yesterday you heard a lot about Pilgrim's in the first

9    four openings from my colleagues.  This morning you are going

10   to hear a little bit about Claxton Poultry.  Claxton opened its

11   doors in 1949 as a one-plant operation in the small

12   southeastern town of Claxton, Georgia.  Claxton humanely

13   produces cage-free, antibiotic-free chicken.  Today 70 years

14   after its founding by Mr. Fries' grandfather, Norman Fries, it

15   remains a single plant operation.

16        Claxton accounts for less than 1 percent of the

17   broiler chicken market in the United States, less than

18   1 percent.  Claxton does not control the broiler chicken

19   market, members of the jury.  The market controls Claxton and

20   the customers know this.  To compete with the large publicly

21   traded multi-plant suppliers, Claxton's carved out its own

22   niche.  It produces only small birds.  You will remember the

23   little display in one of the other openings from yesterday.

24   These are chickens in the 2-1/2 to 6-pound range.  They are the

25   chickens that are favored by the national fast-food

1    restaurants, Chick-fil-A, KFC, Popeye's.

2         Claxton employs the same logistical process to price

3    its chicken that you heard about from my colleagues yesterday,

4    but Claxton's approach is different because it has to be.

5    Claxton has a lien corporate structure which allows it to avoid

6    the bureaucracy of large accounting departments, pricing

7    departments and data analytics departments.  Instead it relies

8    on a very small group, an executive team with decades of

9    experience in the poultry business that are guided by strong

10   customer relationships that date back to the founding of the

11   company 70 years ago and continue to this very day.

12        Claxton's No. 1 goal in price negotiations is very

13   simple.  It wants to maximize the volume at its single plant

14   and it wants to sell its chicken somewhere in the middle of the

15   price range established by the customers.  It doesn't want to

16   be at the low end of the price range for obvious reasons and it

17   doesn't want to be the highest price since that could put its

18   volume at risk.

19        What's very important to remember about the price

20   negotiation process, and this applies to the suppliers, it is

21   not winner take all.  You are going to hear about bids, but

22   it's not bidding in the traditional sense like the construction

23   business where one person wins and everybody else loses.  In

24   this industry there is plenty of business to go around.  The

25   demand for chicken as you have heard continues to rise year

1    after year after year.

2          So the customers, if you will pardon the pun, do not

3    want to put all their eggs in one supplier's basket.  They rely

4    on a supply chain of multiple suppliers around the country to

5    ensure the delivery, the constant and consistent delivery of

6    the same product at the same price to franchisees whether you

7    are in Alaska or Florida.

8          Claxton plays a small but important role in the supply

9    chain as a regional supplier in the southeastern United States.

10   Predominantly they supply to Georgia and Florida.  In order to

11   determine its price -- Claxton's chicken prices, Mr. Fries

12   considers a number of factors.  He considers his current price.

13   He looks at and you are going to hear about these publicly

14   available price indexes, like AgriStats and Urner Barry.

15         He considers economic factors that could affect his

16   cost, price of transportation, the price of fuel, most

17   importantly the price of corn and soy meal which is what is

18   used to feed the chickens.  And he considers his competitors'

19   prices.  Sometimes he learns about those prices because in

20   addition to selling chicken to Chick-fil-A and Popeye's and

21   KFC, Claxton sells to other suppliers like George's, Pilgrim's

22   and Tyson.

23         And sometimes Claxton buys from those suppliers too.

24   You heard a little yesterday about shorts and you are going to

25   hear a lot more about those.  Sometimes the customers

1    themselves share competitors' prices and sometimes so do the

2    distributors.  All of these pieces of information are data

3    points that Mr. Fries considers when pricing his chicken and

4    when filling out the cost-plus model for the chicken.

5          And you are going to hear a lot about the cost-plus

6    model.  It's basically a matrix where the suppliers fill in a

7    number of numbers, a number of factors, fuel, transportation,

8    et cetera, to come up with the price.  And it's a transparent

9    process.  The customers know exactly.  They see every data

10   point.  But for Mr. Fries, it's not just filling out a matrix

11   because Mr. Fries knows that as soon as he does that and

12   submits his first round bid, he is going to receive feedback

13   from his customers about whether his prices are too high.  And

14   he will adjust his prices based on the guidance he receives

15   from his customers.

16         It used to be the customers just dictated the prices.

17   You're going to see an e-mail from Mr. Fries to a customer

18   where he says in essence, I liked it the old way when you just

19   told me where to be.  Today there are these multiple rounds of

20   what they call bidding.  And now Claxton in the initial bid

21   submits a price.  The customer says it's too high.  Claxton

22   comes back with a lower price.  They lower their price every

23   single time.

24         In the course of this trial, you are going to see

25   example after example of Claxton following the directional

1    guidance of its customers when they say the price is too high.

2    At no time did Claxton walk away from potential business or

3    ignore the directional guidance of its customers.  It simply

4    cannot afford to do that.

5           Indeed the evidence will show that the power buyers,

6    the KFCs, the Chick-fil-As, the Popeye's, have tremendous

7    leverage over Claxton and they use it to get the best price

8    possible.  And you know what?  There is nothing wrong with

9    that.  That is business 101.  And in this case it leads to

10   competition among all the suppliers.

11          Now, let's talk a little bit about some of the alleged

12   incidents of price-fixing that you've heard about in this case.

13   First, you've heard about the 2013 price negotiations with KFC.

14   In that instance, Claxton submitted a first round bid that was

15   consistent on the eight-piece COB price, the whole chicken

16   price which is kind of the bellwether price, that was

17   consistent with its current price, but it asked for an increase

18   in wings and dark meat.

19          As the bidding rounds progressed, Claxton's customer,

20   Mike Ledford who you are going to hear from, told Claxton its

21   prices were too high.  So a text message that the government

22   told you about from Mr. Fries that says "Tell him we're

23   trying," in regards to allegedly attempting to raise the price

24   of chicken are just words because Claxton's actions in lowering

25   its price to KFC speak louder than words.

1          You have heard about the KFC, the small bird premium

2      is what it was known as in the chicken business in 2014.  You

3      heard a little bit yesterday about the dynamics of the chicken

4      business.  The business was going big bird.  People producing

5      big birds -- and Claxton does not even produce a single big

6      bird -- were making around 70 cents a pound in profit.  The

7      small bird producers like Claxton were breaking even at best

8      and losing money at worst.

9          The small bird customers like KFC saw what was coming.

10     You didn't have to be an economics expert to see what was

11     coming.  They either had to pay more money for small birds or

12     they were going to lose supply.  And that is exactly what

13     happened to Kentucky Fried Chicken Mother's Day weekend 2014.

14     Kentucky Fried Chicken ran out of chicken, not a great business

15     model for KFC.

16         So the small bird customers like KFC agreed to pay

17     more money to incentivize the small bird producers like Claxton

18     to remain in the small bird business.  They didn't get 70 cents

19     a pound to make up the difference, but they got enough money to

20     remain in the small bird business and to continue to enjoy and

21     facilitate the long-term customer relationships with the small

22     bird customers.

23         Here the customer dictated that the small bird price

24     for KFC was going to be very narrow.  And nevertheless, the

25     government alleges a conspiracy precisely because that range is

1    very, very narrow.  But the evidence will show that the

2    government's allegations are inconsistent with how small bird

3    pricing actually works and how the industry actually operates.

4         You've heard a little bit about margin and you are

5    going to hear a lot more about it in the next weeks.  For

6    Claxton margin has always been a placeholder even in the

7    beginning of negotiations.  It's not the be-all end-all for

8    Claxton.  For Claxton the bottom line is price, not margin.

9         The government's allegations about the 2014

10   negotiation and its fixation with margin again ignore how

11   Claxton actually prices its chicken and, more importantly,

12   ignore the fact that Claxton ultimately reduced its price from

13   its initial bid during that time period.  Again, Claxton's

14   actions speak louder than words.

15        You heard a little bit yesterday about Chick-fil-A's

16   decision in 2014 to go 100 percent antibiotic-free.  That was a

17   big deal.  They decided all their chicken throughout their

18   supply chain, no antibiotics ever.  So the producers -- or

19   excuse me, the suppliers in the supply chain like Claxton had

20   to figure out how to do that.  And it was a big deal for them

21   because that decision affected every aspect of the production

22   process.  It was also a big deal to Chick-fil-A because it was

23   going to cost more money.

24        Initially Chick-fil-A, the customer, estimated it was

25   going to be about 50 cents a pound.  And the idea was that was

1    going to be a pass-through.  Chick-fil-A was willing to pay the

2    extra cost, but people had to figure out what it was going to

3    cost.  So Claxton hired a consultant.  The consultant came back

4    and said, you know, we think it's 31, 32 cents a pound,

5    significantly less than the customer thought it would be.

6    Others in the supply chain hired their own consultants.  Many

7    of these consultants, by the way, worked for multiple

8    suppliers.  Those consultants came back, said, yeah, 31, 32

9    cents a pound.

10        So communications among suppliers in the Chick-fil-A

11   supply chain were a good faith attempt by those suppliers,

12   including Claxton, to figure out the actual cost of moving to

13   100 percent antibiotic-free, something the customer decided on

14   and demanded.  The government points to this as an example of

15   price-fixing, but you are going to see no evidence of Claxton

16   or Mr. Fries using this decision by Chick-fil-A to somehow jack

17   up their prices or otherwise take advantage of a very

18   important, very large and very long-time customer.

19        Indeed throughout this trial the government is going

20   to ask you to focus primarily on words.  And in the case of our

21   client, Mr. Fries, those words are few and far between.  He is

22   not on a lot of texts.  He is not on a lot of e-mails.  And

23   unlike many of these gentlemen who have predominantly sales

24   responsibilities, he is not on the phone 24-seven.  And while

25   we are talking about the phone, and this is an important point,

1    you are not going to see a single transcript of a conversation

2    eight years ago, six years ago, four years ago.  There is not a

3    wiretap.  There are no transcripts.  There are no insiders who

4    said, I participated in this conversation with Claxton and this

5    is what we were talking about.

6            Instead, you are going to see -- you are going to get

7    buried in phone records.  This number called this number on

8    this date.  And you are going to be invited to speculate about

9    what was being said on a number of conversations among a number

10   of people occurring eight years ago, very few of which even

11   involved Mr. Fries.  And while we are talking about insider,

12   the so-called conspiracy insider that the government referred

13   to yesterday is a gentleman named Robbie Bryant.  The evidence

14   will show that Robbie Bryant maybe met Mr. Fries one time and

15   in any event never did business with him and never discussed

16   business with him.

17           THE COURT:  Two minutes, Mr. Kornfeld.

18           MR. KORNFELD:  In addition to this day, the government

19   or federal agents have never interviewed a single Claxton

20   employee or asked to interview a single Claxton employee with

21   the exception of 7:00 o'clock last night when they interviewed

22   a records custodian who is going to be testifying in this

23   trial.  Did Mr. Fries sometimes learn about competitors'

24   prices?  Yes.  Did he sometimes use that information to

25   independently come up with his own price?  Yes.  That's just

1     good smart business.  The truth of this case, Mr. Fries' truth,

2     is that he never entered into an agreement to fix or raise

3     chicken prices.

4          You'll see like the economy, chicken prices go up.

5     Chicken prices go down.  And there is lots of factors including

6     supply and demand that explain this.  Indeed the government is

7     not going to put a single witness on that stand or present a

8     single piece of paper to you directly indicating or even

9     indicating at all that Mr. Fries knowingly joined a conspiracy,

10    knowingly participated in an agreement, knew there was an

11    agreement, knew there was something illegal or improper going

12    on.  There is not going to be any evidence of that.  Why?

13    Because there was no such illegal agreement.

14         Without context words have no meaning.  When Mikell

15    Fries took over as president of Claxton Poultry in 2016, he

16    never imagined his legitimate business communication, some from

17    many years ago, would be paraded around as evidence of an

18    alleged price-rigging conspiracy.  The government will offer

19    you snapshots of words, a text here, an e-mail here, some phone

20    records there in order to tell you a very narrow story.  But

21    the realities and the complexities of the broiler chicken

22    industry are going to require you to take a much deeper dive

23    into this unique supply chain.  With context Mr. Fries' words

24    and actions will speak for themselves.

25         At the end of this case, I will ask you to examine not

1    just Mr. Fries' words, but also his actions.  When you do that,

2    you will find that the government has failed to prove beyond a

3    reasonable doubt that an illegal agreement existed and that

4    Mikell Fries or anybody else at Claxton joined an illegal

5    agreement.  And you will find that Mr. Fries is not guilty of

6    the charge in this case.

7            Thank you.

8            THE COURT:  Thank you, Mr. Kornfeld.

9            Mr. Lavine?

10           MR. LAVINE:  It will be Ms. Rahman.

11           THE COURT:  Okay, great.

12                        **OPENING STATEMENT**

13           MS. RAHMAN:  Good morning, Your Honor.  Members of the

14   jury, my name is Megan Rahman, and along with Bryan Lavine and

15   Laura Anne Kuykendall we have the privilege of representing

16   Scott Brady.

17           Mr. Brady is in national accounts sales for Claxton

18   Poultry.  As you just heard from Mr. Kornfeld, Claxton is a

19   single plant broiler chicken producer in Claxton, Georgia,

20   which is about an hour west of Savannah.  Mr. Brady has been at

21   Claxton since August of 2012.  Here is what he does.  He

22   services certain of Claxton's national accounts including

23   Kentucky Fried Chicken, Popeye's, Chick-fil-A, and other

24   fast-food restaurant customers of Claxton.

25           He negotiates contracts, sorts out quality assurance

1    issues to make sure the chicken meets the customer

2    specifications, oversees the shipping and trucking issues for

3    the delivery of the chicken.  He is responsible for the sale of

4    any excess chicken.  And he coordinates with his customers and

5    other suppliers to cover any shortages of chicken in the supply

6    chain so that all of the Kentucky Fried Chicken, Popeye's and

7    Chick-fil-A stores have enough chicken to sell to their

8    customers every day.

9            Now, Mr. Brady negotiates contracts and signs

10   contracts on behalf of Claxton and he recommends pricing.  He

11   does not have pricing authority.  That belongs to the president

12   of Claxton, Mikell Fries.  During the charged conspiracy

13   period, Mr. Brady split his time working from his home in

14   Huntsville, Alabama, traveling to the plant in Claxton,

15   Georgia, which is about a six-and-a-half-hour drive, and

16   driving to visit Claxton's customers up and down the East

17   Coast.  Much of Mr. Brady's job is conducted by phone or e-mail

18   given his home office and regular commute to the plant and his

19   customers' corporate stores.

20           The government has alleged that Mr. Brady and the

21   defendants engaged in a conspiracy to rig bids and to fix

22   prices for broiler chicken products sold in the United States.

23   But the government is only going to show you a snapshot of

24   interaction between these defendants and certain customers over

25   eight years.

1           The government's alleged evidence of its conspiracy

2    involves multiple suppliers, multiple customers, various

3    chicken parts and widespread prices and costs.  What the

4    evidence will not show is an agreement between Mr. Brady,

5    Mr. Fries and any of these suppliers to rig bids or to fix

6    prices.  Not only that, the evidence will show that Claxton

7    doesn't even sell to some of these customers.  The government's

8    evidence amounts to a collection of unconnected events.  There

9    is no connection in time, purpose or subject matter among any

10   of them.

11          Now, you're going to hear that Mr. Brady and others

12   discussed pricing and that's absolutely true, but you are not

13   going to hear any evidence that Mr. Brady entered into any

14   agreement to rig bids or fix prices.  You're going to hear that

15   Mr. Brady and others talked on the phone a lot and that is

16   absolutely true, but you are not going to hear any evidence

17   that Mr. Brady entered into an agreement to rig bids or fix

18   prices.

19          Now, you've heard from my colleagues about the broiler

20   chicken industry and that the broiler chicken industry requires

21   supplier coordination so that the supply chain works

22   efficiently without interruption.  The system of joint supply

23   only works if the customer makes sure that the pricing between

24   suppliers is in a very narrow range and the production quality

25   and the specifications are the exact same.  They have to be the

1    same because each customer is buying a uniform product for its

2    restaurants across the country that must meet its proprietary

3    specifications.

4        Kentucky Fried Chicken's chicken sandwich requires a

5    different size chicken than Popeye's chicken sandwich.  The

6    supply chain only works if the suppliers are able to jointly

7    fulfill orders with the same product for the same customer.

8    Because of all this, suppliers need to collaborate which

9    includes sharing certain pricing information and supply

10    information to ensure a supply of interchangeable quality

11    chicken parts.  Claxton has been part of this supply chain for

12    decades and has established relationships with its customers

13    and the other suppliers to ensure that the supply chain

14    operates efficiently and effectively.

15        Pricing is established through annual pricing

16    negotiations between the suppliers and their customers.  The

17    government refers to these negotiations as bids.  As you've

18    heard from some of my colleagues, they are not traditional

19    closed bids.  The evidence will show they are more like annual

20    pricing negotiations.  No one is trying to get a winning

21    bidder.  The negotiations are not really a take-it-or-leave-it

22    proposition.  All of the suppliers are already preexisting and

23    approved broiler chicken suppliers with contracts already in

24    place with the customers.  None of them need to be picked as a

25    winner.

1          The evidence will show that each company already knows

2     they are a supplier at the time of these negotiations and

3     considers independent factors that are specific to their own

4     unique business such as the volume of product supplied, their

5     market share, different production capabilities and the variety

6     of product types being sold.  Because of the preexisting

7     relationship between the customer and the supplier, these price

8     submissions represent individual price negotiations between

9     long-standing suppliers and customers.  Unless there was a

10     quality issue or some supply issue, it was simply a matter of

11     negotiating price and allocating volume.

12          During these yearly negotiations to help make the

13     joint supply chain more efficient, the customers would guide

14     the suppliers on a price that was in a very narrow range.  The

15     suppliers were required to be within a tight range of pricing

16     where even a 3-cent submission or a 3-cent range from highest

17     price to lowest price was viewed by the customers as too much

18     and to be avoided.  Because of this the customers provided

19     directional guidance during the negotiations to achieve this

20     tight range of pricing, directional guidance you will hear that

21     Claxton responded to and abided by.

22          What's more, you'll hear how Claxton required their --

23     how Claxton's customers required Claxton to be on a cost-plus

24     pricing model.  Let's try that again.  Once more, you will hear

25     how Claxton's customers required Claxton to be on a cost-plus

1    pricing model which was designed by the customers where the

2    primary cost driver for the price of the chicken was the price

3    of corn and soybean meal which is used to create feed for the

4    birds.  Under this model pricing is adjusted on a monthly basis

5    based on changes in the price of corn and soybean.

6         Now, this cost-plus model highlights the transparency

7    of the negotiations.  The customer sees all of the suppliers'

8    costs, even the suppliers' profit margin during the

9    negotiations.  And because the supplier has been part of the

10   supply chain for many years, the customer has all of the

11   historical data as to each supplier's cost, margin and plant

12   capabilities.

13        And you'll hear that for the customer price is not

14   always the determining factor.  Supply is also important.  And

15   the customer needs its suppliers to be in a tight range for

16   pricing so that all of its franchisees are paying the same cost

17   whether they are buying chicken on the East Coast or the West

18   Coast or somewhere in between.  This is not a simple lowest

19   bidder.  It's the contract scenario.  And the documents you

20   will see from the customers during this trial will bear this

21   out.  You'll also see evidence that before soliciting bids the

22   customers know about what it should cost.  They have their own

23   competitive intelligence.

24        As Mr. Kornfeld told you, Claxton has been providing

25   chicken to these customers for decades.  Claxton only has

1 percent market share.  There are only about eight to 10

suppliers to provide the small bird we have been discussing to

these customers.  So of course there are going to be

conversations and sharing of information, but it's not all

pricing that's discussed.  You'll hear testimony that they also

discussed quantity assurance issues, covers and shorts, excess

chicken sales, shipping and trucking delivery issues, which

covers a lot of what Mr. Brady does on a daily basis for

Claxton.

      As an example, several times a week Claxton may have

extra loads of chicken available.  Because this is a fresh

product, when there are extra loads Mr. Brady has to sell that

product as quickly as possible.  Mr. Brady will reach out to

his customers and other suppliers to see whether anyone has a

need for this extra supply.  Mr. Brady reaches out by phone,

e-mail and text until he is able to sell the chicken.  He often

makes multiple calls to customers and suppliers over the course

of several hours in a day until the chicken is sold.

      But these conversations do not give rise to the level

of the conspiracy that the government describes because there

is no evidence that Mr. Brady agreed with anyone to rig bids or

fix prices.  You'll hear many of the calls simply reflect the

company's attempt to gather market intelligence with respect to

their own individual negotiations with customers, no different

than the competitive intelligence that the customers themselves

1   engaged in in advance of their negotiations with the suppliers.

2        And the evidence will show that Mr. Brady and Claxton

3   obtained pricing information from a bunch of sources, not just

4   competitors.  Mr. Brady and Claxton even obtained competitor

5   pricing information from their own customers.  And while the

6   customers may not want them sharing pricing information, none

7   of the customers have any personal knowledge that any supplier,

8   including Mr. Brady, entered into an agreement to raise prices

9   or fix bids.

10        It is the government's burden to prove to you beyond a

11   reasonable doubt that an agreement existed.  All of the

12   evidence you will hear is circumstantial evidence, phone

13   records of calls with no substance, no recordings of any of

14   these telephone calls, and documents with competitor pricing

15   but no source for the pricing and no discussion of an

16   agreement.  Based on that, the government is going to ask you

17   to assume that an agreement existed where one does not.

18        What else are you going to hear?  You will hear from

19   Robbie Bryant, the government's insider, a Pilgrim's employee

20   who never directly had a conversation with Mr. Brady about

21   pricing, about chicken or about anything in at least the last

22   10 years, never participated in a conversation with Mr. Brady,

23   and will not be able to tell you that Mr. Brady entered into

24   any agreement.

25        THE COURT:  Two minutes left, Ms. Rahman.

1           *MS. RAHMAN:*  The government will show you phone

2    records, but the government will not be able to present to you

3    a witness who actually participated on any of these calls and

4    who can testify as to what was said or meant during any of

5    them.  The government will show you text messages between

6    Mr. Brady and Mr. Fries and ask you to assume, and by assume

7    they want you to guess, an agreement with other suppliers

8    because Mr. Brady shared pricing information with Mr. Fries.

9           As Judge Brimmer told you, Mr. Brady has no burden of

10   proof, no burden of calling any witnesses or even producing any

11   witnesses.  Mr. Brady is presumed innocent and the government

12   must prove his guilt to each and every one of you beyond a

13   reasonable doubt.

14          There is one question for you to decide.  Did the

15   government prove beyond a reasonable doubt that Mr. Brady

16   conspired with anyone to fix prices or rig bids?  The question

17   isn't whether prices were shared with competitors because they

18   were or whether competitors talked to one another because they

19   did.  The question is whether there was an agreement and the

20   evidence will show there was not.

21          At the end of this trial after you have heard all the

22   evidence, we will come back to you and ask that you find Scott

23   Brady not guilty.

24          Thank you.

25          *THE COURT:*  Thank you, Ms. Rahman.

1        All right.  Mr. Gillen.

2            *MR. GILLEN:*  Thank you, Your Honor.

3                    **OPENING STATEMENT**

4            *MR. GILLEN:*  Ladies and Gentlemen of the Jury, good

5    morning.  My name is Craig Gillen and I, along with my

6    colleagues, have the great privilege of representing Brian

7    Roberts in this case.  Mr. Roberts in terms of the time period

8    of this charged Indictment worked at Tyson from June 2012 to

9    February 2016.  He had the title of vice-president of sales for

10   national accounts, a very impressive title.

11           Do we have a chart?  Let's see the chart, if we can.

12           This is the chart, organizational chart of Tyson

13   during the time period that we are going to be addressing

14   during this case.  Now, we have highlighted a picture of

15   Mr. Roberts down here with his title.  What's the purpose of

16   showing you that?  The purpose of showing you that is there are

17   a whole lot of folks north of Mr. Roberts in the management

18   structure at Tyson, and we're going to be talking about that

19   because it matters about this case and what happened.

20           So here we have Mr. Roberts working from June 2012 to

21   February 2016 in this role.  I'm going to be talking this

22   morning about the government's centerpiece case.  Their

23   centerpiece they talked about yesterday and will present

24   evidence on is the negotiations that took place in the summer

25   of 2014 for the KFC contract for 2015.

1          Now, the one thing that we know, that we all know, is

2     that indeed the price for chicken went up.  No doubt about

3     that.  But let's get one thing very clear.  It went up not

4     because of any conspiracy, not because of any agreement, not

5     because of any handshake secret deal that took place because it

6     didn't, because there is no conspiracy that Mr. Roberts or

7     anyone else joined in this case.  What mattered and why prices

8     went up is because the marketplace dictated that it had to go

9     up.  The marketplace drove the cost up.

10          And we're going to talk about the two sides of the

11    equation, if you will, the suppliers and KFC.  When we talk

12    about KFC, we are really in terms of the negotiations talking

13    about an entity called RSCS.  They were doing the negotiations

14    for KFC for this in the summer of 2014.

15          Now, what did KFC and what did the suppliers know?

16    They knew the same thing.  They knew that the price for -- that

17    the market for small bird was changing.  The suppliers knew

18    they were in the business of making a profit so that they would

19    be able to maximize a return on their investment.  Well, if

20    you've got a situation where you can have per pound double or

21    whatever it might be the profit on a big bird as opposed to a

22    small bird, common sense tells you let's transfer that small

23    bird plant into a big bird plant so that we can maximize the

24    return on our -- on the investment in the plant, in the people,

25    in the real estate, everything else.

1            So the suppliers knew that because they knew that from

2       the marketplace.  And also the suppliers and KFC knew there was

3       a movement when you -- they were moving away from small bird

4       plants to big bird plants.  That's a very big deal.  It's a big

5       deal because once you transform -- it might take a year to

6       transform the small bird plant to the specs for a big bird

7       plant.  Once you do that there is no going back.  People aren't

8       going to go back and say, let me go back and change this big

9       bird plant to a small bird plant.  So the trending was toward

10      big bird plants, and small bird plants were being transformed

11      into big bird plants.  That was trouble for KFC and they knew

12      it.  They knew it on their side of the table that the price for

13      small bird was going to up and go up significantly because of

14      the marketplace.

15            Now, what we have -- we talked a little bit about

16      Mother's Day.  2014 Mother's Day for KFC was a disaster, a

17      disaster.  You don't want to run out of chicken on Mother's Day

18      at KFC because that is the No. 1 day.  The No. 1 volume sale

19      for chicken at KFC is Mother's Day.  It was a disaster, not

20      enough chicken, a lot of stores were closing, and that's not

21      the way they want to go.  You don't go back to the KFC that was

22      closed when you want to go get a bucket of chicken for your mom

23      on Mother's Day.  They knew what was coming.  So internally

24      they wanted to -- KFC wanted to get a consistency and a

25      stability and that's why they asked -- were asking for a

1    three-year contract rather than a one-year contract.

2        Now, the government's case really boils down to the

3    essence of on this -- August of 2014.  August of 2014 they say

4    all these things happened.  You remember the opening, that a

5    bid went out or a request for a bid went out.  And then

6    suddenly the government says all sorts of things and

7    communications are happening between people in the industry,

8    that they were talking with each other, that this was going on.

9    Well, of all of the 16 million documents that have been swapped

10   around in this case and examined and flipped around, I am going

11   to ask you to remember one number, the most important number

12   for Mr. Roberts, 19.  Please remember the number 19.

13       Now, you are going to find out about how Tyson's sets

14   its prices.  Lovely fancy title, but Brian Roberts wasn't in

15   charge of setting the prices at KFC -- excuse me, at Tyson.

16   You will find out that what happened inside of Tyson is there

17   is a business unit.  A business unit structures what they want

18   from a particular transaction or contract.  And then the

19   business unit, the big bosses, they send their information down

20   to the pricing unit.

21       A man in the pricing unit by the name of Brandon

22   Campbell, which will be important in this case, Brandon

23   Campbell's job is to sort of run the number because he has been

24   told or be told what we need to get out of this contract in

25   terms of the big bosses from the business unit telling the

1   pricing unit.

2          In June, in June, on June the 5th before KFC ever

3   asked for a bid, before KFC ever said tell us what your

4   proposal is, internally Tyson had already run their numbers.

5   And Tyson had told Brian Roberts that the profit margin on any

6   KFC new deal was going to be 19 cents per pound, 19 cents per

7   pound, that number 19.  Before any even request from KFC came

8   out, he had been told exactly what the number was going to be.

9          Now, we're going to find out a little bit also in

10  terms of the folks who are on the other negotiating side.  Now,

11  KFC had, as I said, these -- some folks over at RSCS, a man by

12  the name of Pete Suerken was the lead guy, the lead person who

13  was the head negotiator for RSCS on behalf of KFC.  He also had

14  Mr. Lewis, who I believe will be a witness in this case, and

15  also Mr. Eddington.  Now, all these three people sort of formed

16  the team together on the Kentucky Fried Chicken side, which was

17  the RSCS side.  And they began talking with folks in the --

18  during the July phase and trying to get kind of what's going

19  on.

20         Now, Mr. Eddington was actually coming over from

21  Mar-Jac.  And he was coming -- because he was on the supplier

22  side, he knew full well what the situation was on the supplier

23  side.  He comes over with that full knowledge.  Pete Suerken

24  had that full knowledge as well.  So they send out a request

25  for proposal.  And if we see the second chart, we can see there

1   is a little bit of a time line here that you will see the

2   second proposal they ask -- excuse me, the first proposal they

3   say send it in by August the 19th.  Send into for KFC's

4   analysis by August the 19th.

5           Well, this is the story with Tyson.  Tyson had a

6   different business model different from all of the other

7   suppliers.  They weren't in a conspiracy with anybody.  They

8   had their separate business model which was -- which

9   contained -- and I will talk about two things which are sort of

10  important in terms of their business model.  Tyson wanted to

11  say, look, we want to marinate your chicken and then weigh it.

12  You know why?  After you marinate the chicken, it's going to

13  weigh more.  And so that's going to be more -- in terms of

14  their business model, they thought that's something they should

15  be paid for.

16          And the other thing there is a thing called

17  drain-back.  We don't want a 48-hour drain-back where basically

18  you are weighing the chicken after there has been a draining

19  process of 48 hours of liquid.  It weighs less.  So Tyson was

20  the only one of all the folks here that had this different

21  business model they submitted.

22          Now, they didn't submit their business model and their

23  proposal -- you're talking about showing no conspiracy.  KFC

24  said we want to see it on August the 19th.  Tyson sent it in on

25  August the 11th.  Now, why is that date important?  That date

1    becomes important because what you have is you've got a whole

2    bunch -- and you heard it in the government's opening.  During

3    the government's opening they are saying, well, what happened

4    you'll see is that the request for bids went out and the bids

5    were due on August the 19th and there were telephone calls

6    between people.  And we're going to show people calling each

7    other.  We're going to show people calling on August the 15th

8    and August the 18th.  And we are going to show that we don't

9    know what was said on the calls.  We are going to show they

10   were talking.

11          Well, Tyson had already submitted its bid before these

12   calls that the government was talking to you about on August

13   the 15th through August the 18th.  We had already mailed it in.

14          Now, in this industry you'll find, and Mr. Eddington

15   is an example, people are on the supplier side for a while,

16   then they go back.  Then they are on the purchaser side like

17   Eddington, worked at Mar-Jac, a supplier, then he is over with

18   RSCS buying -- so you are constantly seeing these kinds of

19   changing and interactions.  And these folks, a lot of these

20   folks would work together at different companies and stay in

21   touch, and in that respect it was not unusual for folks to be

22   staying in touch with one another.

23          Keep in mind now, the government is saying the bid is

24   due on August the 19th and these calls all took place between

25   the 15th and the 18th.  We have already mailed it in.  Does

1    that indicate a conspiracy when we have already sent our

2    request in?  And we have a different model than everybody

3    because we're trying to do this marination issue as well as the

4    drain-back issue unlike anybody else.

5            So what happens next?  Well, during the government's

6    opening they were talking about this is what the evidence is

7    going to show.  And they said, now, what you'll see is you'll

8    see some e-mails or you'll see some correspondence within

9    Pilgrim's right around on August the 18th where the government

10   says that we'll show where the standings were or the relative

11   proposals were and then they caught themselves.  I don't know

12   whether you caught it.  I did, but I was studying 16 million

13   documents.  They said, And then you'll see listed the numbers

14   for all of the other suppliers.  And then they caught

15   themselves and said, Well, almost all.

16           And the reason they said almost all is because in the

17   e-mail that the government was talking about, there is no Tyson

18   numbers.  There are no Tyson numbers that allegedly had been

19   swapped around and shared.  And this e-mail traffic came after

20   the calls the government was talking to you about on August the

21   15th through August the 18th.  No Tyson numbers.

22           Now, then what happens is after you send in your bid,

23   what happens is you sort of sit back and then the negotiations

24   start up again.  There was a second wave.  And then the second

25   wave where you are talking to folks, what was the second wave

1    and what was the proposal and the profit margin?  And the

2    government is focusing in on the profit margin here.  What do

3    you think the profit margin was for Tyson on that second

4    proposal?

5            Because what happened is KFC said we're not going to

6    do the marination thing for you.  We're not going to do the

7    drain weight for you.  Just give us the basics and so everybody

8    is reading off the same music sheet.  What was the profit

9    margin submitted by Tyson?  19, 19 cents per pound, exactly the

10   number I asked you to remember.  That's the number that was

11   submitted.

12           And what happens after -- what happens after the

13   submission where we have the situation where the submission has

14   gone forward on the second -- after some e-mails and some

15   chats?  How did KFC respond to this proposal?  Well, they said,

16   "Hey, if you can -- if we can do that number for you, will you

17   give us 11 more loads a week of chicken?"  So rather than

18   saying, "Oh, we can't believe you, Tyson," what they said is,

19   "Will you give us more business at that price?"

20           Now, when you talk about at the end of the day what

21   you have is you have in December, and you can see up here on

22   the chart in December the final contracts are signed and the

23   profit margin for Tyson's is .1931 which is 19 cents .3.

24           THE COURT:  Two minutes left, Mr. Gillen.

25           MR. GILLEN:  Exactly what we were going to do in June,

1    exactly what we were talking about.  And even then after the

2    indictment had come out, and that's about 2-1/2 cents

3    difference between Pilgrim's and Tyson.  Pilgrim's and Tyson

4    aren't friends.  You've heard the testimony the other day or

5    proposal of testimony that we shouldn't -- Tyson shouldn't even

6    be in the chicken business.  What happened to -- what was Pete

7    Suerken's attitude about what happened?  He thought Tyson's

8    chicken, the price was too low, and he was actually worried

9    about whether Brian Roberts would get in trouble because of the

10   price of the chicken.  That's how concerned he was.

11        Pete Suerken and Mr. Eddington, the central pieces of

12   the negotiations, were never even interviewed by the government

13   before the Indictment in this case.  And when Pete Suerken was

14   interviewed in his home, and he was secretly recorded by the

15   agents in his home asking him about this case, and they asked

16   him about the pricing, and what he told them in his home about

17   Tyson, is says, "Well, I thought they were cheap, relatively

18   cheap given that the marketplace existed and that their price

19   was deserved."

20        The difference between the 2-1/2 cents between the

21   profit margin of Pilgrim's and Tyson in a three-year contract

22   is worth millions and millions of dollars.  I will ask you

23   this.  Do you really think that Tyson's and Mr. Roberts or

24   Mr. Mulrenin would actually engage in a conspiracy to violate

25   federal law to make sure that their chief competitor,

1    Pilgrim's, made millions and millions of dollars more than they

2    did on the deal?  Please use your common sense.

3          When I come back to speak to you at the end of this

4    trial, I am going to ask you to return a verdict that speaks

5    the truth, a verdict of not guilty.

6          Thank you very much.

7          THE COURT:  Thank you, Mr. Gillen.

8          Ms. Prewitt?

9          MS. PREWITT:  Thank you, Your Honor.

10                          **OPENING STATEMENT**

11         MS. PREWITT:  Members of the jury, this is a case

12   about story telling, not by a witness or by documents, but in

13   this case by the government because the evidence will show that

14   the government doesn't have any proof that speaks for itself

15   because Tim Mulrenin could not and did not enter into the

16   conspiracy charged.

17         My name is Elizabeth Prewitt, and I am joined by

18   counsel Marci LaBranche and Caroline Rivera, and we are proud

19   to represent Timothy Mulrenin here in this case to contest this

20   baseless charge, one that Mr. Feldberg on behalf of Mr. Austin

21   posed to you as one that is just as tough as it gets, is

22   difficult as it gets, a criminal charge.  And even though we

23   did not know you a year ago, we have been waiting for this

24   opportunity to speak directly to you and tell you about Timothy

25   Mulrenin.

1          So let me tell you a little bit about Timothy

2    Mulrenin.  He worked -- Tim started working at Tyson as a

3    salesman in 2000 when he was 38 years old.  He is 59 years old

4    now.  Aside from a few years when he worked at another company,

5    he spent most of his career at Tyson in sales.  He worked with

6    another salesman by the name of Carl Pepper and he worked with

7    Mr. Roberts.  And you heard Mr. Gillen speak to you a few

8    minutes ago, Mr. Roberts was his supervisor.

9          You will learn that when he worked for Tyson, he

10   became somebody that his customers could count on and his

11   co-workers could count on.  You will hear about Carl Pepper in

12   the course of this case, not because you'll hear from

13   Mr. Pepper, but you will see texts and you will see e-mails.

14   And you will also learn that in 2018 Mr. Mulrenin decided to

15   move jobs to another chicken supplier.  He went to Perdue.  He

16   did that to work closer and have his work closer to where his

17   family is, his three young daughters, his wife, five sisters

18   and a brother.  And he remains employed by Perdue to this day.

19         But the government's story here, their story focuses

20   on Tim's time at Tyson.  Tim's role at Tyson was to sell

21   chickens to customers.  And you've heard some of these customer

22   names.  You have heard of KFC.  You have heard of Chick-fil-A

23   you've heard of others.  That's how he earned his living.  His

24   work performance depended on how many chickens he sold for

25   Tyson, not the prices that Tyson charged for those chickens.

1          During this trial you will come to know more about Tim

2    Mulrenin.  You will come to know more about how the Tyson sales

3    team operated and how they competed with other suppliers during

4    the entire period of the charged conspiracy.  They competed to

5    sell chicken.

6          Now let's turn to the government's story about Tim.

7    The government alleges that he was part of this eight-year

8    conspiracy, started in 2012.  It was a conspiracy to fix prices

9    and rig bids.  And in proving its case or attempting to prove

10   its case, the government will point to this smatter and

11   selection of e-mails, of texts, of records, of calls, all

12   showing that Tyson salespeople talked with salespeople at other

13   suppliers.  But you will learn through the course of this trial

14   there were very good reasons, and you have heard some of them

15   mentioned already, good reasons for suppliers to talk, reasons

16   that had absolutely nothing to do with collusion.

17         Ladies and gentlemen, don't be misled, Tyson

18   salespeople, as well as some of the other salespeople you will

19   hear about had relationships.  They had personal relationships,

20   they had professional relationships and they talked.  Because

21   ladies and gentlemen, this is the chicken industry.  That's how

22   it worked.  They called each other often, and you will learn

23   that customers expected that they would work together.  They

24   encouraged it and at times they demanded it.  So as a good

25   salesman, that's what was done.

1          Now, remember, ladies and gentlemen, the crime charged

2     here is one of conspiracy, an agreement to fix prices and rig

3     bids.  The government will argue that Tim joined this

4     conspiracy and he participated through certain phone calls, but

5     will not bring before you a single witness who will testify as

6     to what was said on those calls.  Think about that for a

7     second, not a single witness.

8          The government will also show you documents where this

9     salesperson, Carl Pepper, sourced competitive intelligence,

10    competitive intelligence about pricing from other suppliers.

11    And it will ask you, the government will ask you to assume, to

12    speculate that this was part of this eight-year-long conspiracy

13    that Tim Mulrenin was supposedly part of, and because Carl

14    Pepper reported to Tim Mulrenin, that that brought him into --

15    that brought Tim Mulrenin into this.  But when you see those

16    documents, I am going to actually ask you to look closely at

17    them.  I want you to look really closely at all of the evidence

18    in this case, especially the evidence the government provides

19    to you.

20         The documents that you will see will discuss what

21    prices suppliers might quote to customers.  You will see

22    nothing, nothing in those documents that says anything about

23    there being an agreement to fix prices.  And the government

24    will not offer testimony, as I mentioned, not anyone, not even

25    Carl Pepper.  They are not going to offer you anything to help

1  explain how any supposed agreement came to be or how anyone,

2  not even Tim Mulrenin, anyone came to participate.

3          During the course of the trial, you will see that the

4  evidence shows you, not only draws an incomplete picture, it is

5  a misleading picture.  For example, that 2015 case, the episode

6  that the prosecutor spent so much time talking to you about,

7  you will learn from documents and witnesses that Timothy

8  Mulrenin had nothing to do with those negotiations.  He didn't

9  have a role.  He didn't factor into it.  But yet you will see

10 that the government will try to write him in a role, a role

11 where he does not belong.

12         There are key principles that are important for you to

13 always keep in mind throughout this trial.  If competitors

14 share pricing information but still come up with their own

15 costs, their own prices, independently without collusion,

16 without an agreement, there is no crime.  There is nothing

17 criminal about suppliers talking about prices and talking about

18 discounts and talking about bids so long as it's not done

19 pursuant to an agreement to fix prices or rig bids.

20         Ladies and gentlemen, talking about costs and prices

21 is not the same thing as price-fixing.  Do not be misled.

22 Tyson salespeople like Tim talked to competing chicken

23 suppliers.  We mentioned lots of legitimate reasons for doing

24 that.  This included seeking out market intelligence, business

25 intelligence, because that's what you do.  That's what you do

1    in a competitive industry.  You try to get as much information

2    as you can get to inform your independent decision.

3            Sometimes as part of this they learned information

4    from their customers and sometimes they even learned this

5    information from other suppliers.  And this could be about

6    prices.  It helped them understand if Tyson was going to be an

7    outlier, an outlier with the cost, discounts and prices it

8    quoted to its customers.  Because if salespeople were sent by

9    their own pricing team with the prices to the customer with sky

10   high prices, that could upset that customer relationship and

11   that could hurt the sale.  So they wanted to know would Tyson

12   be in the ball park with its costs and prices in comparison to

13   quotes that might come from other suppliers?

14           You will hear that inquiring salespeople wanted to

15   know where the competition was.  But knowing, knowing and

16   independently pricing is not an agreement.  You won't see that

17   any supplier had any of Tyson's actual costs or actual price

18   quotes before they were submitted to the customer.  You should

19   ask how could Tyson's sales team be part of a price-fixing

20   agreement if no one has their prices?  The evidence will show

21   that Tim could not and did not fix prices or rig bids.

22           Again, it's about means and it's about motive and he

23   lacked both.  It will become clear as you learn how Tyson

24   operated that that just doesn't make sense.  The conspiracy

25   story you're being told just does not hold up.

1          First, Tyson was a large supplier.  It's a brand name

2     I am sure you have all heard of.  It was a key competitive

3     threat to big brand companies like Pilgrim's.

4          Second, Tyson had an organizational division.  It was

5     a big company.  You saw that chart that Mr. Gillen showed you.

6     And you will learn that there was a group of business people

7     called pricing people who were the number crunchers who

8     calculated the costs, they calculated margins, they calculated

9     profitability, and they set the price.

10          You will learn that these were very different groups.

11     The sales had one motive.  Pricing had another.  Sales sells.

12     Pricing prices.  And costs and prices were based on the pricing

13     team's independent analysis of a variety of factors, but

14     collusion was not a factor at play at all in the pricing at

15     Tyson.  In fact, the evidence will show that salespeople

16     sometimes asked their pricing people to lower costs and prices,

17     lower it down from what the Tyson pricing team wanted to

18     charge, but it never worked the other way around.

19          You will not see any evidence, ladies and gentlemen,

20     any evidence that salespeople pushed the pricing team to

21     increase prices or costs.  Think about that.  It's supposed to

22     be a conspiracy to raise prices.  And the evidence will show

23     that not only did it not make sense for salespeople to push for

24     high prices and risk the relationship, risk the sale, they

25     didn't have the authority to set prices.  No motive and no

1    means.

2          So even though you will see there will be cooperation

3    among suppliers, the Tyson team, you'll see that.  The Tyson

4    sales team always competed and it just never colluded.  You

5    just won't see that.  For example, at the very same time the

6    government alleges that Tyson was colluding with its

7    competitors to raise prices, at that same time over that same

8    period you will see the very same suppliers quite literally

9    cursing Tyson for pricing too low, for taking business away

10   from them.  Now, mind you, at this period of time they are

11   supposed to be together in cahoots in a conspiracy.  And that's

12   the dynamic, that competitive head-to-head competitive dynamic.

13         So let's turn to the Church's freezing charge the

14   government mentioned yesterday.  Let's remember that.  You

15   might because it's about Church's Chicken and in 2013 that was

16   one of Tyson's customers, Church's Chicken.  It wanted to be

17   able to make sure if there was a supply disruption, that there

18   was chicken on hand.  So what do you do?  You make sure you

19   have some in the freezer.  And they wanted a quote.  Church's

20   came to Tyson, said ask for a quote, and asked for other

21   suppliers to provide quotes.

22         Now, the prosecutor told you that Tim and others

23   conspired to raise this freezing cost.  Ladies and gentlemen, I

24   want you to remember that you were told that by the prosecutor

25   here.  But what the evidence will show is that Tyson sales team

1   each time lowered their freezing cost quotes in response to

2   competitive pressure.  And I will tell you right now that is

3   not something the government will feature in its case to you

4   and that is very misleading.

5          So the government got not just this little vignette,

6   this little chapter of their story wrong, the freezing charge

7   story; they got every single piece of the government's story

8   about Tim Mulrenin wrong.

9          And you will be faced with moments where you will see

10  Tim Mulrenin competing, lowering prices in response to

11  competitive pressure.  And you should ask yourself if he is

12  trying to beat the competition in moments like this, when he is

13  feeling the pressure and he is seeing that other suppliers are

14  quoting lower, and he is going internally to his pricing team

15  and saying, "Let's drop the price, let's drop the price," and

16  you are not seeing any other indication of collusion, no phone

17  calls, no texts, nothing like that, ask yourself does the rest

18  of the government's story make any sense?  Do you pick and

19  choose when you compete and when you don't?  Mind you, you'll

20  see these instances with every -- with the customers that the

21  government said collusion was occurring relating to those

22  contracts.

23         Now, you're going to see throughout this case the

24  government is going to leave so much on the cutting room floor

25  when they tell their story.  There are going to be pieces they

1    show you, snippets here that's going to fit in with a call

2    there and it's going to be woven together, but we are going to

3    help show you the other side of the story so you can see how

4    carefully orchestrated and selected it is.

5            You'll hear from witnesses.  And let's talk a little

6    bit about those witnesses because we told you that there are

7    not going to be any witnesses that are fact witnesses in this

8    case that will provide evidence as to what was said during

9    supposed conspiratorial calls.  You will hear from witnesses

10   representing customers who will say that if there was a

11   conspiracy to fix prices, that would be something that they

12   would consider to be wrongful or they didn't like it or they

13   had negative feelings about it.  Well, that is really hardly

14   surprising, but those witnesses can't offer any firsthand

15   accounts of the conspiracy.

16           And you're also going to hear from government

17   witnesses.  And they will walk through charts and graphs and

18   they will tell you about a phone call here and a text there,

19   and it will all be pulled together so they can tell their

20   story, but again no fact witness will testify.  These agents

21   won't have any firsthand knowledge.

22           But here is what you should focus on.  These agents

23   will be the government's key witnesses, key.  You'll see the

24   amount of time dedicated to them and how much evidence comes in

25   through those agents.  And you may ask yourself in this

1    criminal case without a single fact witness that will testify

2    to the existence of the conspiracy, why are these agents, the

3    government's key witnesses, against Timothy Mulrenin and other

4    defendants here?

5         That's really quite important because if the

6    government doesn't offer a witness that you would need to hear

7    from in order to find Timothy Mulrenin or anyone else guilty

8    beyond a reasonable doubt, then you must hold that against the

9    prosecution because it is always the government's burden to

10   provide you with the evidence to prove its case.

11        And you will learn during this trial that there are

12   times when the government had access to evidence, but decided

13   not to present it to you.  There will be witnesses they

14   interviewed, interviewed multiple times, but they decided not

15   to call to testify before you.  There will be documents that

16   they obtained but decided not to show you.  There will be parts

17   of documents that they have that they did not show you.  The

18   missing evidence, the evidence they will not show you will be

19   some of the most significant evidence in this case.

20        Ladies and Gentlemen of the Jury, there may be times

21   when we move through this trial when you ask the question of

22   why is Tim Mulrenin standing here?  And in those moments there

23   can be this tendency to fill in the gaps, to say, okay, there

24   is something that must have happened here.  Look at this

25   courtroom with all these people, the judge, the court reporter,

1    the seriousness, the carefulness of the selection of the jury

2    itself.  There must be something to this.  And I will ask you

3    to resist filling in that gap with the assumption that someone

4    did something wrong, Tim Mulrenin did anything wrong.

5            After all, look, the world is a scary place.  It's

6    more comfortable if we assume that only reckless people end up

7    in accidents, only unhealthy people get serious illnesses and

8    only guilty people end up having to face trial, face challenges

9    like this.  But, of course, we know that's not true.  We know

10   that innocent people must endure hardship and challenges when

11   they face trial like this.

12           *THE COURT:*  Two minutes, Ms. Prewitt.

13           *MS. PREWITT:*  Thank you, Your Honor.

14           And that's why the law requires, requires that we

15   presume defendants innocent until proven guilty.  I know that

16   you will do that for Tim Mulrenin.  We spent a lot of time with

17   you and hearing all your answers to your questions and all your

18   honesty and your patience.  And we know you will be careful.

19   We know you will use your common sense.  And we know that you

20   won't just accept what you're offered.  You won't just accept

21   that little sliver that you're given.  You will demand to see

22   more.  You will be critical and you'll question.  And most

23   importantly, you will not allow yourselves to be confused or

24   misled by what you're presented with.

25           At the end of this trial, we trust that you will find

 1   Timothy Mulrenin not guilty of the crime charged.

 2          On behalf of Timothy Mulrenin, we thank you.

 3          THE COURT:  Thank you, Ms. Prewitt.

 4          Ladies and gentlemen, we will go ahead and take our

 5   mid-morning break just a little bit early because if we did the

 6   next opening, it will be a little bit late.

 7          So keep the admonitions in mind, ladies and gentlemen.

 8   Don't talk about the case amongst yourselves.  And we will plan

 9   on reconvening at 25 minutes after, so 10:25.

10          The jury is excused.

11          (Jury excused.)

12          Anything to take up briefly before we recess?

13          We will be in recess, then, until 25 after.  You

14   didn't have anything, Mr. Koenig?

15          MR. KOENIG:  I just want to put on the record that

16   that was again just inappropriate argument.

17          THE COURT:  Okay.  Once again, assuming that's an

18   objection, I will overrule it.  It was close to the line.  It

19   didn't go over the line.  We will reconvene, then, at 25 after

20   10:00.  Thank you.

21      (Recess at 10:06 a.m.)

22      (Reconvened at 10:30 a.m.)

23          THE COURT:  Are we ready for the jury?  Let's get the

24   jury back in.

25          All right.  And now we will have the opening --

1    Ms. Henry, go ahead.

2                          **OPENING STATEMENT**

3         *MS. HENRY:*   Good morning.  My name is Roxann Henry,

4    and along with James Backstrom I have the honor of representing

5    Mr. Bill Kantola who is over there, all the way over.

6         The evidence will show that Mr. Kantola did not enter

7    into any price-fixing or bid-rigging agreement with any

8    competitor and that to have done so would have been counter to

9    what his job was.  His employer, Koch Foods, had a strategy

10   that was very different from what you've already heard.  He had

11   a contrary perspective.

12        Koch Foods not only had already invested in small bird

13   production; it was making additional investments in that

14   fast-food small bird production area.  It was trying to grow

15   its capacity, and Mr. Kantola's job was to sell that growing

16   capacity.  His job was to increase sales for Koch and take them

17   away from the competition.  Far from presenting any evidence

18   that would meet its burden of proof to show guilt beyond a

19   reasonable doubt, the government will present a guessing game

20   or, as Mr. Koenig characterized it, a puzzle.

21        What the government presents, most of it will not even

22   have any connection to Mr. Kantola.  We are almost at

23   Halloween, and I am certain many of you are familiar with games

24   where people try to make you see what's not there.  But then

25   you come out of the dark, you see the light, and what's around

1    you?  Ordinary things and there is no horrible things going on.

2    That's what you'll see here.  Here the government will be

3    saying price-fixing agreement and they will be showing you

4    cherry-picked graphics, theatrics, shock, surprise, nirvana?

5           But ladies and gentlemen, this is not a game.

6    Mr. Kantola is in this courtroom on trial as a defendant for a

7    felony.  That's not a game.  And when you actually look at the

8    evidence, what you will see regarding Mr. Kantola is a guy

9    going about his ordinary job, doing his work as a salesman and

10   trying to sell more chicken.  And he talked with people, people

11   he had good reasons to talk with.  Friendship is a good reason

12   to talk with people.

13          You know, what do you think that they meant by that

14   new and different mindset?  Have you gotten your bid in yet?

15   Who do you think the decision maker is going to be?  And if

16   you're a salesman, buying and selling chicken is a really good

17   reason to talk to folks too.  What do you have to sell?  And

18   when you have a problem and the truck overturned on the highway

19   and there is chicken feathers flying everywhere, but you've

20   committed to sell fresh chicken but you're short, you've got to

21   call somebody and see if you can get someone to cover that

22   commitment that you have made.

23          And let's not forget, Mr. Kantola talks to the

24   customers.  How many small bird plants are there?  What do you

25   see going on?  What do I need to do to be able to sell more

1    chicken?  What you will not see in this room, a room with the

2    lights on, what the evidence will not show is that Mr. Kantola

3    agreed with anyone to rig a bid or fix a price in any of these

4    phone calls.  He did not.

5         Now, the government as you all know can't tell you

6    what's in those phone calls, what was talked about.  There are

7    no recordings.  There are no videos of meetings.  Even the

8    government doesn't claim that there were any meetings to fix

9    prices.  The witness that the government talked about will tell

10   you a story and he'll tell you another story and another.  And

11   he did not have any calls that he is going to talk about that

12   he ever claims he had with Mr. Kantola.

13        So how do you find out what's going to happen?  You

14   will have power to see what really happened, not in some puzzle

15   game, with real evidence in this courtroom.  What the evidence

16   will show is that it is absurd to presume that Mr. Kantola made

17   any pricing agreement with competitors, first, because the

18   evidence will show that Mr. Kantola wasn't even the person at

19   Koch Foods who made the decisions about what prices to charge

20   KFC and the other fast-food customers.  And as you have already

21   heard, the folks he was talking to, similarly they didn't have

22   the power to set the prices for their companies.

23        Equally important, though, you need to look at what

24   happened.  Let's go to a specific example of purported

25   evidence.  Mr. Kantola was involved in negotiating Koch's

1  proposal to supply KFC with chicken for 2013.  He worked on

2  what was called the fresh part of the bid, the fresh chicken.

3  Another salesman in his company worked at other products and

4  submitted the bid.  Mr. Kantola obviously had to give him

5  pricing to get the bid together, put it in.

6  　　　　　Early on in the process Mr. Kantola sends an e-mail to

7  another colleague at Koch saying the decision has been made to

8  see if we can get a bit more on the dark meat.  But look what

9  happens.  The proposals come in.  They are not all aligned.

10  Mr. Kantola listens to the customer.  Koch Foods decides to go

11  back to the lower price.  Now, that surely isn't evidence of a

12  price-fixing agreement, but that's the evidence that the

13  government is going to present to you.

14  　　　　　And the government will talk about phone calls around

15  the time of these negotiations.  And then one of the suppliers,

16  Pilgrim's Pride, has an internal document.  And on that

17  internal document they list some of the competitors, some, and

18  they put numbers next to them.  And what are you really going

19  to see when the lights are on?  The number, that price number

20  for Koch Foods, it's not Koch Foods' price.

21  　　　　　*THE COURT:*  I don't know what that is.  Sorry,

22  Ms. Henry.

23  　　　　　Mr. Keech, do you have any ideas?

24  　　　　　*COURT DEPUTY CLERK:*  I am guessing something is

25  hitting a microphone at one of the counsel tables.

1          *MS. HENRY:*  Of course, Mr. Kantola has no idea of

2     what's in an internal Pilgrim's Pride document and we can't

3     tell you where that number came from.  Maybe it was a guess.

4     Maybe it came from a customer.  Maybe it was some sort of

5     extrapolation.  But what we can tell you is that the evidence

6     will show unequivocally, and this is the government's own

7     evidence, that it was not Koch's number.

8          *THE COURT:*  Hold on one second.  I am going to ask

9     that everyone, if you are on some type of wifi-enabled device,

10    turn it off at this time because we are getting some type of

11    feedback and I don't know what it is, but it's disrupting the

12    opening.

13         *MS. HENRY:*  The government didn't talk about the 2014

14    contract with KFC when prices came down, but it did talk about

15    the 2015 contract.  Mr. Koenig said that you will see evidence

16    that the suppliers coordinated their stories to threaten the

17    customers to take away their chicken.  But what actually

18    happened, Mr. Kantola made no such threat.  Just the opposite.

19         Similarly, the government doesn't explain how it

20    became apparent to everyone that small bird prices were going

21    to increase, how prices were going to reconcile that

22    profitability difference between doing big birds and small

23    birds, and that it was KFC itself that signaled that to the

24    suppliers, at least specifically to Mr. Kantola.

25         And the government isn't going to talk to you about

```
 1    all of the available information there was about that price
 2    difference, that it was widely available information including
 3    publicly available information.  It wasn't difficult for a
 4    supplier to make an assumption about where other suppliers
 5    were.  Part of the salesman's job is to collect information to
 6    help its company evaluate how to price products.  The
 7    government may show you documents with Mr. Kantola using the
 8    term "competitive intel." Yet far from having any sinister
 9    meaning, that just shows Mr. Kantola going about his job.
10          Look very carefully at the context of these documents.
11    The government is not going to present any evidence at all that
12    they relate to any sort of a price-fixing agreement.  I believe
13    the evidence is going to show that information about prices was
14    widely available from a wide variety of places.  Mr. Kantola
15    could hear on the street what was happening.  A customer calls
16    him up and says, "My current supplier is increasing prices.
17    What can you do for me?"  That's competitive intel that a
18    supplier is increasing prices.
19          THE COURT:  Ms. Henry, why don't we try to get the
20    problem fixed.  We will get IT down here because I don't want
21    your argument -- trying to have you argue over this bad static.
22    I just don't know what the problem is.  Let's hold on for a
23    second and see if we can get IT here.
24          (Brief recess.)
25          Go ahead.
```

1          *MS. HENRY:*  I hope folks have heard what I have been

2     saying.

3          *THE COURT:*  Feel free to repeat anything that you wish

4     to.

5          *MS. HENRY:*  I will go back a little bit so you can

6     make certain you heard, okay?  Sorry about that.

7          Let me go back to after the 2013 KFC contract, and I

8     will pick up where I was talking about the 2014 contract.  And

9     as I said, the government didn't say anything about that one

10    because the prices went down.  But 2015 what you were told was

11    that the evidence will show you that suppliers coordinated

12    their stories to threaten the customers to take away their

13    chicken.  That's what you were told.

14         But what actually happened?  Mr. Kantola made no such

15    threat and, in fact, did the exact opposite.  And similarly,

16    the government doesn't talk about how it became apparent to

17    everyone that small bird prices were going to increase.  They

18    were going to reconcile that profitability difference between

19    the big and small bird pricing that you've heard about and that

20    it was KFC that signaled that that was happening to the

21    suppliers, at least specifically to Mr. Kantola.

22         And the government isn't going to tell you about why

23    the availability of data, about that profitability difference

24    and about how it was even publicly available data on that.  It

25    wasn't difficult for a supplier to make assumptions about what

1   other suppliers were doing.

2          Now, part of a salesman's job is to collect

3   information to help his company evaluate how to do pricing.

4   And the government may show you documents where Mr. Kantola

5   uses the term "competitive intel."  Well, far from having any

6   sinister meaning, all that shows is that he was doing his job.

7          Look carefully at the context of these documents.  The

8   government won't show you any evidence that competitive intel

9   meant somehow that there was a price-fixing agreement.  Indeed,

10  the evidence is going to show that there was a lot of

11  information about prices from a wide variety of sources.

12  Mr. Kantola would hear in a street business, people would call

13  up and say, "My current supplier is increasing prices.  What

14  can you do?"  Well, that's competitive intel that a supplier is

15  increasing prices.  When he hears that a lot, that's pretty

16  serious intel.

17         Customers gave a lot of information.  They routinely

18  were not shy about sharing very specific prices about what you

19  needed to do to be competitive or to share a number range or

20  this is the lowest number I've got.  And in some instances you

21  will see a customer who shares very detailed information about

22  competitor pricing.

23         The government is trying to make you see an eight-year

24  price-fixing conspiracy without a single meeting among

25  competitors to try and make this work, not a single multi-party

1    phone call.  You need to consider really carefully whether that

2    makes any sense because what you will see is that what the

3    government is suggesting is not there.  And this is true

4    especially when you look at the evidence regarding Mr. Kantola.

5         Most of what the government presents won't have any

6    connection to him.  To give you an example, Mr. Koenig talked

7    about five suppliers, the five suppliers selling to Chick-fil-A

8    and that competitors talked about Chick-fil-A's 2015 contract.

9    Well, setting aside that the government isn't going to present

10   any evidence that the competitor discussions had anything to do

11   with a price-fixing agreement and that Mr. Kantola isn't

12   involved in any of those discussions, the government is wrong.

13   Koch Foods wasn't a competitor in that process and Koch Foods

14   wasn't selling chicken to Chick-fil-A.

15        The point is aside from the inaccuracy that when you

16   look at the government's evidence, you need to look very

17   specifically and separately at what is being said with regard

18   to Mr. Kantola because when you do that, you'll find out that

19   there is nothing there to consider.  It doesn't even relate to

20   him.  It has no connection at all to Mr. Kantola.

21        You have a difficult job.  This was discussed quite a

22   bit in the selection process.  But you need to look separately

23   and put yourself in Mr. Kantola's shoes and from his viewpoint

24   look at what the government presents.  When you do that, you

25   will be able to see that there is no evidence of his agreeing

1  with competitors on what prices to charge, that he had no

2  motive or ability to enter into a price-fixing agreement.

3        As I said, his objective and that of Koch Foods was to

4  take business away from the competition.  He wanted to take

5  away their business and make more sales for Koch Foods.  And to

6  do that he applied a basic principle of trying to listen to the

7  customer and understand what the scope of things were, what was

8  going on.  Sure, Koch Foods wanted to get the best price it

9  could, but as I noted, his employer was doing something no

10  other supplier was doing.  Koch Foods not only had made the

11  substantial investment in small bird fast-food production, it

12  was making additional heavy investments in that area and was

13  willing to make more investment.

14        Mr. Kantola's job was to sell that growing capacity.

15  To do that, he needed more loads of chicken, more volume, more

16  chicken sold.  And while Koch sought better pricing to afford

17  the investment and customer commitment, to reach Koch's goals

18  Mr. Kantola could not have given away, taken away Koch's

19  bargaining independence.  It was critical to have that, to know

20  that he could move if he needed to or not.  Koch's owner set

21  the targets.  Mr. Kantola listened to the customers.  And the

22  strategy was successful.

23        The evidence will show that in 2015 Koch increased its

24  sales to KFC and the other fast-food suppliers at the expense

25  of its competitors.  It took more loads of chicken and the

1    competitors lost loads.  Mr. Kantola did not and could not have

2    agreed to any price-fixing agreement.  Instead, the evidence

3    will show Mr. Kantola to be someone who dealt fairly with his

4    customers.  He listened to them.  He had friends across the

5    industry and he did his job as a salesman.  What you will see

6    is that Mr. Kantola did not enter into any agreement to fix

7    prices or rig bids.

8             Please remember as you sort through the evidence and

9    you look at it just how serious this trial is for Mr. Kantola

10   and don't get distracted by games or theatrics.  When you do

11   that, you will find that at the end of the day we will be

12   asking you and you will want to give a verdict of not guilty.

13            Thank you.

14            THE COURT:  Thank you, Ms. Henry.

15            Mr. Pollack?

16            MR. POLLACK:  Thank you, Your Honor.

17                        **OPENING STATEMENT**

18            MR. POLLACK:  Until he retired a few years ago, Ric

19   Blake was a national sales director for George's, a

20   family-owned chicken producer in Springdale, Arkansas.  This

21   means that Mr. Blake serviced national customers of George's

22   like KFC and Popeye's and acted as a point of contact for

23   George's with these customers.  Mr. Blake did not share with

24   George's competitors any information about what George's was

25   bidding to obtain contracts with KFC, with Popeye's or with any

1  other customer.  And Mr. Blake did not receive any information

2  from George's competitors about what they were bidding to

3  obtain contracts from KFC or Popeye's or anyone else.

4        At no time did Mr. Blake have the authority to decide

5  what George's would bid to obtain these contracts.  At no time

6  did he tell his bosses who did decide what George's would bid

7  what the competitors were bidding.  He couldn't have done that

8  even if he wanted to.  He didn't know what George's competitors

9  were bidding.  How could he align bids with George's

10 competitors?  How could he align George's bids with George's

11 competitors, make George's bids similar or identical to those

12 of George's competitors, when he didn't know what George's

13 competitors were bidding?  He couldn't.  He couldn't.  It's as

14 simple as that.

15       My name is Barry Pollack along with my colleagues,

16 Wendy Johnson and Chris Plumlee.  We represent Mr. Blake.

17 Mr. Blake -- it's hard to see who is who in this courtroom.

18 Mr. Blake, do you mind standing up for just a second?  Thank

19 you.

20       So Mr. Blake couldn't decide what George's would bid.

21 He didn't share what George's would bid with others.  He didn't

22 know what the competitors were bidding.  In other words, he

23 could not possibly have been part of any agreement or a

24 conspiracy to align or rig George's bids with its competitors.

25 If you listen closely to the prosecutor's opening statement

1    yesterday, you noticed he didn't quote a single text of

2    Mr. Blake's.  He didn't quote a single e-mail of Mr. Blake's.

3    In fact, he barely mentioned Mr. Blake.  So why is Mr. Blake

4    here sitting in this crowded courtroom rather than back home

5    where he belongs with his family in Arkansas?

6           Mr. Blake is here for one reason.  Mr. Blake is here

7    because the government either does not understand or has chosen

8    to ignore the difference between bids and prices.  Years ago

9    Mr. Blake was asked by one of his bosses to find out what

10   prices George's competitors were charging and Mr. Blake did.

11   In fact, for years Mr. Blake made an effort to learn what

12   George's competitors were pricing -- were charging, what their

13   prices were, and he kept track of those prices of George's

14   competitors.  Now, the government alleges because he tracked

15   George's competitors' prices, that he must have been aligning

16   bids with competitors, but prices and bids are entirely

17   different things.

18           Prices:  After a customer has signed a contract with a

19   supplier under the terms of that contract, the price will

20   fluctuate from period to period.  Each period is about a month.

21   And it will fluctuate if there are increases or decreases in

22   certain costs like grain prices and freight charges.  The price

23   fluctuates from period to period, but the price is dictated by

24   an existing signed contract.  The price is what the supplier is

25   charging under that existing signed contract.

1          Bids:  Almost every year companies like KFC and

2     Popeye's put out requests for proposals.  For example, in

3     October of 2012, they might send the various chicken suppliers,

4     their suppliers, requests for proposals for contracts for the

5     year 2013.  Bids are what the supplier presents to the customer

6     in response to those requests for proposals.  It's an offer to

7     try to get a new contract for future business for the following

8     year.

9          Bids are usually broken down into what the suppliers'

10    costs are plus some profit margin that the supplier is seeking.

11    Competitors are allowed to share with each other information

12    about what they're intending to bid.  I think you have heard

13    that from almost every counsel in opening statement.  It is

14    illegal only if suppliers agree amongst themselves on the

15    amount that they're going to bid, and that is what the

16    government alleges happened here.

17         The government alleges, one, the competitor shared bid

18    information with each other; and two, they agreed to align or

19    fix those bids.  But Mr. Blake didn't do either.  He did not

20    exchange bid information with competitors.  And since he didn't

21    know what the competitors' bids were, he could not possibly

22    have aligned George's bids with those of his competitors.  The

23    information that Mr. Blake obtained and tracked was price

24    information, what competitors are currently charging under

25    their existing contract or have charged in the past, not bid

1   information about what the competitors are intending to bid to

2   get a future contract.

3          Now, costs change every year.  Market conditions

4   change every year.  Knowing the price that Tyson's or Pilgrim's

5   or anybody else is charging today under its existing contract

6   would not tell Mr. Blake what they will bid to get a new

7   contract for next year.  And if Tyson's or Pilgrim's learned

8   what George's was charging today under its existing contract,

9   it would not tell them what George's will bid to get a contract

10  for next year.

11         The price information would not allow the suppliers to

12  bid or rig -- I am sorry, to align or rig bids.  It would not

13  tell them anything about what the bids were going to be.

14  Rather, knowing a competitor's price just tells a company where

15  they currently stand in comparison with their peers, with their

16  competitors.

17         Now, customers may say they didn't want a supplier to

18  track what the other suppliers were charging.  The government

19  might suggest that these prices are somehow secret and that one

20  supplier should not know what the other supplier is currently

21  charging.  The evidence will show that's not the case.  You

22  have already heard from a number of people about the fact that

23  these suppliers were at times competitors with each other.

24  They are both suppliers.  But at other times they have a

25  vendor/customer relationship with each other.  They buy and

1    sell chicken from each other.  And the reason is each

2    supplier's contract requires them to supply a certain volume of

3    chicken each week to the customer.

4            So let's say if George's or any other supplier was

5    short on filling an order for a particular week, it would want

6    to get chicken from one of the other suppliers so it could meet

7    its obligation to its customer.  If George's was required to

8    deliver 300 truckloads of chicken to KFC this week but it only

9    had 250 truckloads, it would look to buy 50 truckloads of

10   chicken meeting KFC specifications from another KFC supplier.

11           Mr. Blake might call a colleague at Claxton or

12   Pilgrim's or one of the other KFC suppliers to see if they had

13   enough KFC chicken that they could sell George's 50 truckloads

14   that week.  And if they did, Claxton or Pilgrim's would sell it

15   to George's at the price that they charge KFC under their

16   contract with KFC.  What does that mean?  That means George's

17   would learn exactly what Claxton or Pilgrim's was charging,

18   what its price was for KFC chicken that week because that's the

19   price George's would have to pay to Claxton or Pilgrim's for

20   that chicken.

21           If Mr. Blake wanted to know what a competitor charged

22   KFC in any particular period, he could have figured it out by

23   just combing through all the invoices George's got from its

24   competitors every time George's bought chicken from that

25   competitor.  But instead of going through the effort of looking

1    at every purchase for every supplier for every period, he would

2    get the same information by simply calling up a distributor who

3    knew what the suppliers were charging.  Or he might even call

4    the supplier itself and say, What's your current price for KFC

5    chicken or for Popeye's?

6          He wasn't getting secret information.  He was just

7    gathering current or past prices, the very information that

8    those companies regularly conveyed to George's when George's

9    bought chicken from them.  He certainly was not getting

10   information about what the competitor was going to bid to get

11   future business.

12         Prices versus bids:  You will see no evidence, no

13   evidence that Mr. Blake shared bids with competitors and no

14   evidence he received from competitors what they were bidding,

15   no e-mails with Mr. Blake sending or receiving bids, no texts

16   with Mr. Blake sending or receiving bids, no evidence that

17   George's bids were aligned with those of George's competitors.

18   So what evidence will the government present to try to prove

19   that Mr. Blake was sharing or receiving information about bids

20   rather than prices?

21         Telephone calls:  You have already heard a lot about

22   telephone calls.  Mr. Blake talked frequently with the other

23   suppliers, with his competitors.  The government will ask you

24   to infer that in these calls Mr. Blake must have been sharing

25   information about George's bids and receiving information about

1   George's bids.  You won't hear recordings of the call and you

2   won't hear another participant to the call come in and say that

3   that's what was being discussed.

4        The government itself will concede that there are many

5   reasons for competitors to speak to each other.  One

6   significant example is the one that I've just discussed, when

7   the suppliers are buying or selling chicken from each other.

8   And you will see evidence that these calls that Mr. Blake made

9   or received with competitors routinely happened when George's

10  either needed to buy chicken from another supplier or another

11  supplier was looking to buy chicken from George's.

12       These calls were not about exchanging amounts that

13  each company was bidding in response to a request for proposals

14  for customers for future contracts.  These calls were simply

15  about Mr. Blake being a point of contact for George's when

16  other suppliers wanted to buy from George's or George's wanted

17  to buy from other suppliers.

18       Other than the phone calls, what other circumstantial

19  evidence will the government present?  The government will show

20  you texts and e-mails from people other than Mr. Blake, and

21  they will say that this is circumstantial evidence that

22  Mr. Blake somehow shared with competitors what George's was

23  bidding for future prices.

24       Circumstantial evidence like any other evidence can be

25  very powerful; and like other evidence, it can be very weak.

1   The circumstantial evidence that the government will present to

2   you that Mr. Blake exchanged bid information with its

3   competitors is so weak that it amounts to nothing more than a

4   guess, a guess.  A guess is not evidence and it certainly is

5   not evidence beyond a reasonable doubt, not even close.  The

6   government simply misinterprets this evidence.  The

7   government's guess is wrong.

8          And the government will show you no evidence that

9   Mr. Blake received information from competitors about the

10  amount that they would bid.  So even if you went along with the

11  government's guess and thought that Mr. Blake did tell a

12  competitor what George's was bidding, he still could not have

13  been in a conspiracy to align or fix prices.  He could not have

14  told his bosses what competitors were bidding and so they could

15  not have used that information to align or fix George's bids

16  with those of its competitors.

17         You will not hear from any witness who worked for a

18  competitor of George's who will say that Mr. Blake told that

19  witness the amount of George's bids or that that witness told

20  Mr. Blake what a George's competitor was bidding.  You will not

21  hear evidence that Mr. Blake could set George's bids or

22  provided competitors' bids to his bosses at George's who did

23  decide what George's would bid.  You will not see a single text

24  or e-mail from Mr. Blake to competitors in which he shares

25  George's bids, receives George's bids or even discusses

1    George's bids.

2          At the end of the day, the government will prove to

3    you exactly what I have just told you.  Mr. Blake kept track of

4    what competitors' prices were.  He might share with a

5    competitor what George's price was, what George's was currently

6    charging, but that is very different from exchanging bids.

7    Bids are what the companies are offering to try to get a future

8    contract, and exchanging bids is very different from agreeing

9    or aligning those bids.  Since Mr. Blake never exchanged bid

10   information in the first place, he could not possibly have been

11   in a conspiracy to fix or align bids.

12         When you hear all of the evidence in this case, my

13   colleague, Wendy Johnson, will ask you to find Mr. Blake not

14   guilty of an antitrust violation.  And after hearing all of the

15   evidence, you must find Mr. Blake not guilty because Mr. Blake

16   is not guilty.  He belongs back home in Arkansas.

17         Thank you.

18         *THE COURT:*  Thank you, Mr. Pollack.

19         All right.  Ladies and gentlemen, you have now heard

20   the opening statements.  We are now ready to begin the

21   evidentiary portion of this trial.  And we'll start off with

22   the United States.

23         The United States may call its first witness.

24         *MS. SWEENEY:*  Thank you, Your Honor.  Before we call

25   our first witness, I wanted to note one thing for the record.

1    All of our witnesses will be wearing ClearMasks.

2         *THE COURT:*  I am not sure -- it depends on what they

3    look like.  The ClearMasks as a product -- is the brand name?

4         *MS. SWEENEY:*  Yes.

5         *THE COURT:*  They don't work.  They don't have any

6    filtering capability whatsoever.  They will need to wear other

7    masks.  I am familiar with the product and the product does not

8    involve filtering and filtering is what makes masks safe.

9         *MS. SWEENEY:*  Thank you, Your Honor.

10        If the government could have just one minute to

11   confirm with the witness that they are wearing a non-ClearMask,

12   and then we will call our first witness.

13        *THE COURT:*  Yes.

14        *MS. SWEENEY:*  Your Honor, may I step out for a minute?

15        *THE COURT:*  You may.

16        Ladies and gentlemen, you will notice over there we

17   have a podium and a microphone too.  Some attorneys may choose

18   to do their examination from that location.  It has a document

19   viewer, so there are some advantages, but an attorney can also

20   go to another location as well.

21        *MS. SWEENEY:*  The government is now prepared to call

22   James Olson.

23      (**James Olson** was sworn.)

24        *THE WITNESS:*  I do.

25        *COURT DEPUTY CLERK:*  Please state your name and spell

James Olson - Direct

1    your first and last name for the record.

2          *THE WITNESS:*  James Olson, J-A-M-E-S, O-L-S-O-N.

3          *THE COURT:*  Mr. Olson, if you don't mind, if you could

4    adjust the microphone a little bit, try to raise it a bit and

5    try to lean into it.  We will try to adjust it, too, so the

6    volume is up, but we want to make sure we can hear you.  Great.

7    Thank you.

8          Go ahead.

9                        **DIRECT EXAMINATION**

10   *BY MS. SWEENEY:*

11   *Q.*  Good morning, Mr. Olson.  Are you currently employed?

12   *A.*  No.

13   *Q.*  What was the last place of your employment?

14   *A.*  I was employed at Harman Management Corporation.

15   *Q.*  If I call it HMC, will you understand what I am referring

16   to?

17   *A.*  Yes.

18   *Q.*  What was your position at HMC?

19   *A.*  I was CEO.

20   *Q.*  How long did you work at Harman Management Corporation?

21   *A.*  Since 1976.

22   *Q.*  And how long were you CEO?

23   *A.*  Since 19 -- let's see, 2003, 2003.

24   *Q.*  So when did you leave your position as CEO at Harman

25   Management Corporation?

James Olson - Direct

1    A.   I started my retirement in 2016 and it was a gradual

2    retirement over four years.  I retired in the fall of 2020.

3    Q.   And between 2003 and 2016, what was your position at Harmon

4    Management Corporation?

5    A.   I am sorry.  Repeat that?

6    Q.   Between 2003 and 2016, what was your position at Harman

7    Management Corporation?

8    A.   I was the CEO.

9    Q.   So when did you -- and I apologize if you repeated this

10   already, but when did you end your time as CEO at HMC?

11   A.   I ended it in 2016, but it was a gradual retirement.  I

12   still held some responsibilities as we transferred it to the

13   new CEO.

14   Q.   Thank you.  What were your responsibilities as CEO at HMC?

15   A.   I was the final decision maker on any major decisions.  I

16   set strategy, set the culture for the company, oversaw finance,

17   IT, real estate, insurance and legal matters.

18   Q.   And did your responsibilities include ensuring supply of

19   food to HMC restaurants?

20            MR. McLOUGHLIN:  Objection, foundation.

21            THE COURT:  Overruled.

22   A.   Indirectly, yes.

23   BY MS. SWEENEY:

24   Q.   Could you describe what type of business --

25            THE COURT:  One moment, Ms. Sweeney.  Mr. Keech, could

James Olson - Direct

1    you raise the level of that microphone?

2            MS. SWEENEY:  Your Honor, if it continues, I can move

3    to the other lectern to see if that's the problem as well.

4            THE COURT:  I doubt it, but we can try.

5    BY MS. SWEENEY:

6    Q.  So what type of business is HMC?

7    A.  We are a franchise of Kentucky Fried Chicken.

8    Q.  What is a franchise?

9    A.  A franchise is being able to have the licensed rights to

10   operate a Kentucky Fried Chicken restaurant from a parent

11   company, in our case Kentucky Fried Chicken Corporation.  You

12   pay a fee to have the rights.  You go through an approval

13   process.  And then you're licensed to use the name, the marks,

14   the products and the processes.

15   Q.  So when was HMC founded?

16   A.  It was in the early sixties.

17   Q.  And who founded HMC?

18   A.  Our founder, Pete Harman.

19   Q.  Can you provide some background as to the Harman Management

20   Corporation?

21   A.  Before Harman Management was formed in the sixties, Pete

22   Harman was the first franchisee with Colonel Harland Sanders

23   who originated the concept.  Pete Harman grew --

24           MR. TUBACH:  Objection.  It's hearsay.

25           THE COURT:  Overruled.

James Olson - Direct

1   *A.* Pete Harman was influential within the brand.  He helped

2   the colonel find other restauranteurs to agree to license the

3   recipe, the original recipe, and he was a good partner with the

4   colonel over the years.

5   *BY MS. SWEENEY:*

6   *Q.* When you say the colonel, who are you referring to?

7   *A.* Colonel Harland Sanders, the originator of the recipe of

8   original recipe chicken.

9   *Q.* You mentioned earlier that HMC had franchises.  Franchises

10  of what?

11  *A.* We primarily are Kentucky Fried Chicken restaurants.  We do

12  have a few Taco Bell restaurants also.

13  *Q.* How many Kentucky Fried Chicken restaurants does HMC own?

14  *A.* Currently we own 289.

15  *Q.* From the perception of the public -- are there other KFCs

16  that are not franchise restaurants?

17  *A.* Yes.  There are about 50 that the parent company, Kentucky

18  Fried Chicken Corporation, owns and operates.

19  *Q.* From the perception of the public, can you tell the

20  difference between a franchise store and a corporate store?

21      *MR. McLOUGHLIN:*  Objection, Your Honor, to determine

22  what the perception of the public might be.

23      *THE COURT:*  Sustained, not enough foundation.

24  *BY MS. SWEENEY:*

25  *Q.* So you talked about KFC franchise stores and KFC corporate

James Olson - Direct

1   stores.  Is there a difference between the two?

2        MR. McLOUGHLIN:  Objection to form.

3        THE COURT:  Overruled.

4   A.  A restaurant should have no visible changes in image,

5   signage for products or service levels.  Obviously, there are

6   different levels of performance in every restaurant, but the

7   standards are the same.

8   BY MS. SWEENEY:

9   Q.  You mentioned that HMC owns hundreds of KFC restaurants; is

10  that right?

11  A.  Yes.

12  Q.  Where are they located?

13  A.  In the state of Washington, HMC is the state of Washington,

14  California, Colorado, Utah, Wyoming, Nebraska, South Dakota and

15  Ohio.

16  Q.  How many KFCs does HMC own in the state of Colorado?

17  A.  Approximately, 52.

18  Q.  And how long has HMC had KFC restaurants here in Colorado?

19  A.  I believe it was 1979.

20  Q.  And has HMC had Colorado KFC restaurants for the entire

21  time of your employment at HMC?

22  A.  No.

23  Q.  So can you explain that answer?

24  A.  Yes, I am sorry, we did have them.

25  Q.  Can you explain that answer?

James Olson - Direct

1   A.  Well, I started at HMC in 1976 and then we bought the

2   stores in 1979.

3   Q.  And HMC continued to have ownership of the KFC restaurants

4   in Colorado?  Did HMC continue to have ownership of the KFC

5   restaurants in Colorado through the time of your retirement?

6   A.  Yes.

7   Q.  Mr. Olson, are you familiar with the term Yum Brands?

8   A.  I am.

9   Q.  What is it?

10  A.  Yum Brands is kind of the umbrella corporation, the

11  publicly-traded company that owns the rights to Kentucky Fried

12  Chicken, Taco Bell, Pizza Hut and the Habit Burger.

13  Q.  And are Yum Brands related to HMC?

14  A.  Not directly.

15  Q.  Can you describe what you mean by that?

16  A.  We work directly with -- HMC works directly with the brand

17  company, so we would work directly with KFC corporate and with

18  Taco Bell corporate.

19  Q.  And what would be the purpose for working directly with KFC

20  corporate and Taco Bell corporate?

21  A.  That's who we receive -- or HMC receives our franchise

22  rights from.

23  Q.  Mr. Olson, after you retired did you remain involved in the

24  chicken industry?

25  A.  Yes.

James Olson - Direct

1    Q.   How so?

2    A.   I remained as chairman of the board of HMC.

3    Q.   How long have you been on the board of HMC?

4    A.   Since 1991, I believe.

5    Q.   And how long were you chairman of the board?

6    A.   Since approximately 2005.

7    Q.   Can you describe what type of store KFC is?

8    A.   It's commonly called a fast-food concept or a quick-service

9    restaurant concept, QSR for short.

10   Q.   What's the difference between fast-food or quick-service

11   restaurant or a QSR that you just described?

12   A.   Just a term that's used.

13   Q.   So are fast-food and QSR and quick-service the same?

14   A.   Yes.

15   Q.   What does KFC stand for?

16   A.   Kentucky Fried Chicken.

17   Q.   What types of products does KFC sell?

18   A.   We sell chicken.  We sell it in various forms.  We sell it

19   in bone-in form.  That's the common chicken that you would cook

20   at home that you would buy at a supermarket.  We also sell it

21   in tenders or strips.  That's a further processed product that

22   does not have bones in it.  We also sell chicken sandwiches.

23   And we've had other products over the years that have been on

24   and off the menu that are all chicken.

25   Q.   Focusing your attention to the year 2014 and 2015, were

James Olson - Direct

1    there any other products that KFC sold at that time?

2    A.   Yes.  We sold hot wings.  We sold a product called popcorn

3    chicken and we sold a product called boneless chicken.

4    Q.   And I would like to direct your attention to a new topic

5    and to the years 2012 through 2016.  So focused on those years

6    2012 to 2016, in your role as CEO of Harman Management

7    Corporation, did you know how KFC restaurants, the agency-owned

8    KFC restaurants purchased chicken?

9    A.   Yes.

10   Q.   How did they purchase chicken?

11   A.   Chicken was contracted for the KFC system through a company

12   called Restaurant Supply Chain Solutions known as RSCS.  They

13   would negotiate with the different chicken vendors and secure

14   sourcing, negotiate pricing, determine transportation and

15   oversee distribution.  And as HMC is a member of the RSCS, we

16   would buy chicken through the RSCS.

17   Q.   So just to clarify, when you said they would negotiate, who

18   is the "they" that you were referring to?

19   A.   The RSCS.

20   Q.   Does RSCS stand for anything?

21   A.   Restaurant Supply Chain Solutions.

22   Q.   What is RSCS?

23   A.   It's a cooperative corporation.  It's owned by the members.

24   The members are the stockholders who are franchisees, as well

25   as KFC corporate restaurants.  Each of them buy a share of

James Olson - Direct

1   membership in the RSCS and are given benefits through that

2   cooperative effort.

3   Q.  So how is HMC related to RSCS?

4   A.  We are a stockholder member and we have a membership for

5   each -- HMC has a membership for each one of the restaurants

6   that is in the HMC family.

7   Q.  And continuing to focus on the years 2012 to 2016, did you

8   personally have a role at RSCS?

9   A.  Yes, I did.

10  Q.  What was your role?

11  A.  I was on the board of directors for the RSCS.

12  Q.  What was your position on the board of directors?

13  A.  I was director most years.  I was chairman for a couple of

14  those years.

15  Q.  When were you chairman?

16  A.  I don't recall.

17  Q.  Was it between the years of 2012 and --

18       MR. McLOUGHLIN:  Objection, leading, Your Honor.

19       THE COURT:  Overruled.

20  BY MS. SWEENEY:

21  Q.  Was it between the years of 2012 and 2016?

22  A.  It could have been.  I can't say for sure.

23  Q.  Did you represent a certain constituency on the board?

24  A.  Yes.  Directly HMC has a permanent seat as a director on

25  the RSCS board.  That was given from the early days of the

James Olson - Direct

1    foundation of the RSCS.  So I -- directly I represent HMC as a

2    director on the RSCS board.

3    Q.  You mentioned directly.  Is there any other representation

4    that you had on the board?

5    A.  It was my belief and thinking that I represented

6    franchisees on the West Coast.  Since most of our restaurants

7    were on the West Coast, I felt I represented their interest as

8    well.

9    Q.  Can you describe again what RSCS's role is in purchasing of

10   chicken for the HMC-owned KFC restaurants?

11   A.  Their role, the RSCS's role is to source supply, to

12   negotiate price, to ensure QA, to determine freight costs for

13   the movement of the product and to negotiate distribution cost

14   from the regional distribution centers.

15   Q.  When you said source supply, what did you mean by the word

16   source?

17   A.  To go out and find people that could provide chicken

18   products within the specifications that KFC corporate

19   determined.

20   Q.  When you said negotiate price, how would -- how did that

21   affect the purchases by HMC KFC restaurants?

22        MR. McLOUGHLIN:  Objection, Your Honor.

23        THE COURT:  Overruled.

24   A.  I am not sure I am clear on the question.

25   BY MS. SWEENEY:

James Olson - Direct

1    Q.  Sure.  I will ask it a different way.  When you said that

2    RSCS was involved in negotiating price, did that negotiated

3    price relate in any way to the HMC-owned KFC restaurants?

4    A.  Yes.  We had to purchase chicken from the RSCS.  We

5    couldn't buy chicken locally or as we chose.  We had to buy it

6    from approved vendors that were approved by KFC Corporation.

7    And as a member of the RSCS, we had to buy chicken from them.

8    Q.  So would HMC buy chicken directly from RSCS?

9    A.  We would buy chicken from the vendors, but the price would

10   be negotiated by the RSCS.

11   Q.  And how was that price that was negotiated with the RSCS,

12   was that price formalized?

13   A.  Yes.  There was a contract signed by the RSCS management

14   team.

15   Q.  How often were supply contracts negotiated between the

16   years of 2012 and 2016?

17   A.  For '12, '13 and '14, those contracts were annual which had

18   been a historical practice.  The RSCS signed a three-year

19   contract starting for the 2015 year.

20   Q.  In your role on the board of RSCS, were you involved in or

21   informed of the RSCS contract negotiations?

22   A.  Yes.

23   Q.  At what point in the negotiations was the board involved,

24   were you involved?

25   A.  For the 2015 year?

James Olson - Direct

1   Q.  Yes.

2   A.  We were involved in late summer, early fall, after the

3   first round of negotiations happened between the RSCS team,

4   purchasing team, and the vendors.

5   Q.  You mentioned the first round of negotiations.  Could you

6   describe what you're talking about?

7   A.  Typically the RSCS purchasing team would meet with the

8   vendors and get initial thought on what they thought pricing

9   was going to be for the coming year.  They would meet again two

10  or three more times before a final contract was finalized.

11  Q.  And you talked about they would come in two or three more

12  times.  Is that related in any way to the word "round" you used

13  earlier?

14  A.  Yes.

15  Q.  How are the two related?

16  A.  There would be an early meeting in like August, September,

17  which would be the first round.  They would -- they being the

18  purchasing team -- would meet again with vendors approximately

19  a month later.  And typically a third round would be in

20  December when a final contract was signed.

21  Q.  Focusing on the year 2014 as you described before, focusing

22  on the year 2014, at what point was the board advised -- I

23  think you said they were involved or informed of this contract

24  negotiation process.

25  A.  I can't say.  I can't pick a particular meeting that we

James Olson - Direct

1   were informed of it, but I knew of it by probably August.

2   Q.  And was that before the contract was signed or after?

3   A.  Before.

4   Q.  And if you could just remind us, who was that contract --

5   generally who were those contracts being negotiated with?

6   A.  The contract was negotiated between the RSCS and whichever

7   chicken vendors they chose to negotiate with.

8   Q.  When you say chicken vendors, can you describe what it is

9   you are talking about?

10  A.  Are you asking for names of companies?

11  Q.  Sure.  If you could describe just what you mean by chicken

12  vendors.

13  A.  They would be the people that would grow, process and

14  package the chicken for distribution that met the

15  specifications of KFC corporate out to the franchised and

16  company stores.

17  Q.  Between 2012 and 2016 -- well, which chicken vendors did

18  KFC -- HMC-owned KFC restaurants purchase from?

19  A.  My recollection is that we were with George's, we were with

20  Pilgrim's Pride, Mar-Jac and Tyson.

21  Q.  Are you familiar with the term chicken supplier?

22  A.  Yes.

23  Q.  Is the term chicken supplier related in any way to the term

24  chicken vendor?

25  A.  Yes, and I think I also used processor.  They would process

James Olson - Direct

1    the chicken, but that would be a chicken supplier.

2    Q.  So were you involved in the purchase of chicken for the

3    HMC-owned KFC restaurants?

4    A.  Yes.

5    Q.  How were you involved?

6    A.  I was involved as a director of the RSCS in terms of

7    providing insight and coaching to the management team on their

8    negotiations.  I was also involved as the CEO of HMC with

9    individual vendors on negotiating terms.

10   Q.  And what terms would you negotiate as the CEO of HMC?

11       MR. McLOUGHLIN:  Objection, Your Honor, as to time,

12   dates and years.

13       THE COURT:  Overruled.  Go ahead.

14   A.  Can you ask the question again?

15   BY MS. SWEENEY:

16   Q.  In your role as CEO of HMC, you said that you were involved

17   in negotiations specifically with the chicken suppliers.  What

18   were those negotiations?

19   A.  They would be more financial terms or delivery terms.  We

20   couldn't negotiate the price.  The fixed price of the product

21   was determined by the RSCS.  But we could talk about things

22   like payment terms that were quicker than what the RSCS had

23   negotiated, guaranteed loads, short weight credits, things that

24   were outside the scope of the contract with the RSCS.

25   Q.  And what was the purpose of those negotiations?

James Olson - Direct

1    *A.*  Cost reduction.  We were trying to find something that

2    benefited both the chicken supplier and HMC that could benefit

3    them, benefit us and provide some savings.

4    *Q.*  Could you describe how the terms that you just described

5    would lead to cost reduction for HMC?

6    *A.*  You know, years, I can't remember which year, but for many

7    years we had something called a short weight credit.  The

8    chicken shows up and within the specifications that it has to

9    be within a certain weight range.  If the case of chicken

10   showed up below that weight range, we could turn in a request

11   for a short weight credit from the chicken processor.

12          That was a very cumbersome act for both HMC and our

13   distributor and it was also cumbersome for the chicken

14   processor.  So one year we determined with the chicken

15   processors that we would waive doing that and have some

16   discount from what the negotiated price was from the RSCS.

17   *Q.*  Were your negotiations throughout the year successful?

18   *A.*  Yes.  Typically there was a working -- business working

19   mentality that would look for solutions that would benefit both

20   parties.

21   *Q.*  And can you describe what you mean -- or can you describe

22   when you say -- when I said they were successful, can you

23   describe why you thought they were successful?

24   *A.*  By the agreement of the chicken processor to the idea, it

25   seemed to be beneficial to them.  And we were provided a

James Olson - Direct

1   discount from the RSCS negotiated price, so we felt it was a

2   benefit to us.

3   Q.  So the end result was that you got a discount?

4   A.  Yes.

5   Q.  And you described these negotiations generally.  Did these

6   negotiations -- directing your attention to the year 2014, did

7   these negotiations occur then?

8   A.  Yes.

9   Q.  What type of chicken did HMC-owned KFC restaurants

10  purchase?

11  A.  Previously mentioned items, chicken on the bone, further

12  processed chicken which is chicken that was used for chicken

13  sandwiches, for tenders or strips, popcorn chicken, hot wings.

14  Q.  You mentioned chicken on the bone.  Could you describe

15  further what that is?

16  A.  Yeah.  If you think about a live chicken, the chicken

17  processor would take that chicken, end its life and pluck it

18  and then take off pieces of that chicken, meaning the head, the

19  neck, the feet.  They would eviscerate it.  And then you're

20  ending up with a chicken body or carcass that is the wings,

21  legs, thighs and breasts of the chicken.

22  Q.  So what product at KFC did the chicken on the bone go into?

23  A.  I am sorry?  Say that again?

24  Q.  What product at KFC did the chicken on the bone go into?

25  A.  It went into our bone-in original recipe chicken and our

1   bone-in crispy chicken.

2   Q.  What size bird did the chicken on the bone come from that

3   HMC-owned KFC stores purchased?

4   A.  There is a specification called out by KFC corporate and

5   that bird weight was an average of 2-1/2 pounds.

6   Q.  And was that the weight of the bird when it was still

7   alive?

8   A.  Oh, no.

9   Q.  Can you describe what 2-1/2 pounds, how that relates to the

10  size of the bird?

11  A.  That's the end body of the processed chicken when it's only

12  the wings, legs, thighs and breast.

13  Q.  And how many pieces, if any, was chicken on the bone?

14  A.  It was cut into eight pieces.

15  Q.  You talked about some further processed products.  You

16  mentioned sandwiches, tenders, strips and hot wings.  What size

17  chicken did those come from in 2014 and 2015?

18  A.  My best recollection is that they came from both small bird

19  and large birds.

20  Q.  When you say small bird, what do you mean?

21  A.  Small bird is that 2-1/2 pound bird.

22  Q.  When you say large bird, what do you mean by that?

23  A.  It would be a processed product where its finished weight

24  was 3-1/2 pounds or larger.

25  Q.  And you talked about chicken on the bone coming from about

James Olson - Direct

1   a 2-1/2 pound bird.  Was that also true in 2014 and 2015?

2   A.  Yes.

3   Q.  Of the products that you've discussed, chicken on the bone

4   and the further processed, could you give a percentage as to

5   which was -- or could you give an estimation as to which was

6   the largest of the products that was purchased by HMC-owned KFC

7   stores?

8   A.  Chicken on the bone.

9   Q.  Can you give some magnitude to that?

10  A.  I would say 55 percent.

11  Q.  In total about how much chicken was purchased for the

12  HMC-owned KFC stores between 2012 and 2016?

13  A.  Between 35 million and 40 million pounds.

14  Q.  And was that for the whole time period that I described,

15  2012 to 2016?

16  A.  No, annually.

17  Q.  So every year.

18  A.  Yes.

19  Q.  Between those years again focusing on 2012 to 2016, were

20  you involved in selecting the chicken suppliers that the

21  HMC-owned KFC restaurants purchased from?

22  A.  No.

23  Q.  Did you have any influence in selecting those suppliers?

24  A.  Yes.

25  Q.  Can you describe that?

James Olson - Direct

1   A.  As a director of the RSCS, I would always push for the

2   lowest priced chicken supplier to be allocated more to the West

3   Coast, and that was because freight to move that product to the

4   West Coast was much higher than it was for KFC restaurants in

5   the southeast or the midwest, so the freight increase would be

6   offset by the lower price of the chicken supplier trying to

7   equate some balance.

8   Q.  When you said you would push for it, can you describe how

9   you would push for it?

10  A.  I would talk with the management team at the RSCS.  It was

11  their job to allocate where the product went, which suppliers

12  were sent to which regions in the country.  The job of the

13  cooperative is to try and find -- to treat all members equally,

14  and therefore that was a way to compensate for the higher

15  freight costs for the West Coast.

16  Q.  When you said the job of the cooperative was to treat all

17  the members equally, can you describe what that means

18  practically?

19  A.  That to the best of the RSCS's ability, they were to try

20  and create equality across the board, so that just -- that's

21  trying to treat all the members equally.

22  Q.  And did RSCS -- approximately how many suppliers did RSCS

23  source from?

24  A.  It would vary in different years.  It would vary between

25  how many chicken-on-the-bone suppliers and how many further

James Olson - Direct

1    processed suppliers, but probably in totality I would think 13.

2    *Q.* And you mentioned about four suppliers that you believe the

3    HMC-owned KFCs purchased from between 2012 and 2016; is that

4    right?

5    *A.* Yes.

6    *Q.* When those purchases were made, were they made through the

7    contracts, the RSCS contracts you described earlier?

8    *A.* Yes.

9    *Q.* And were the prices on all of those contracts the same?

10   *A.* No.

11   *Q.* Was that a problem?

12   *A.* No.

13   *Q.* Why not?

14   *A.* You would assume that different companies would -- excuse

15   me.  You wouldn't assume.  I would assume as a customer and an

16   end user that the chicken suppliers would charge different

17   prices because they have different cost structures, different

18   strategic plans, and I would expect some variance.

19   *Q.* Was it a problem for the hundreds of KFC stores that HMC

20   owned?

21          *MR. McLOUGHLIN:*  Objection to form.

22          *THE COURT:*  Overruled.

23   *A.* No.

24   *BY MS. SWEENEY:*

25   *Q.* Why not?

237

James Olson - Direct

1  A.  It was part of being -- part of the -- it was for HMC,

2  being a part of the RSCS, you assumed that you would have to

3  buy off the contracts that the RSCS negotiated.  So being a

4  member meant that you gave up that right to try and negotiate

5  individually, and you had to take the benefits of the

6  cooperative along with some items that could be perceived as a

7  negative.

8  Q.  So from your perspective the membership in RSCS, you just

9  said you gave up your ability to separately negotiate supply

10  prices?

11  A.  Yes.

12  Q.  Can you describe practically how the chicken would get from

13  a chicken supplier or chicken vendor, as you described, to a

14  KFC restaurant?

15  A.  The RSCS would negotiate a freight line to pick product up

16  from the chicken supplier and move it to a distribution center

17  that was regionally located all across the United States.

18  Harmon Management was served by four different of those

19  distribution centers in Colorado, in California, Utah and in

20  Portland.

21  Q.  I am sorry, you said Colorado, California, Utah and what

22  was the last?

23  A.  Portland.

24  Q.  You mentioned earlier that George's was one of the vendors

25  that the HMC-owned KFC restaurants purchased from; is that

238

James Olson - Direct

1   right?

2   A.   Yes.

3   Q.   I would like to ask you a few questions about that.   Where

4   is George's located?

5   A.   I believe they are located in Arkansas.

6   Q.   And you just mentioned the four locations of the

7   distribution centers.   Did HMC ever have distribution centers

8   in Arkansas?

9   A.   No.

10  Q.   So practically how did the chicken get from George's in

11  Arkansas to HMC's distribution centers in Colorado, California,

12  Utah or Portland and then to the ultimate restaurants?

13  A.   The RSCS would negotiate with the freight line to pick the

14  product up from George's in this case and to take that product

15  to one of the distribution centers.   The product would be

16  stored at the distribution center, and then that distribution

17  company would be responsible to take orders from an individual

18  franchisee and to deliver the chicken and other products to

19  that location.

20  Q.   When you say the ultimate franchisee, what are you

21  referring to?

22  A.   I don't think I said ultimate.   Maybe I did.   To each

23  individual franchisee.

24  Q.   When you say franchisee, do you mean KFC restaurant?

25  A.   Yes.

James Olson - Direct

1   *Q.*  So who would place the order at the distribution centers

2   for the chicken?

3   *A.*  For the distribution centers?

4   *Q.*  Who would place the orders with the distribution centers to

5   get the chicken?

6   *A.*  The restaurant manager would put in an order from the

7   distribution center.  The manager of the distribution center

8   would determine how much product they needed from the chicken

9   supplier.

10  *Q.*  So the chicken would travel from George's in Arkansas to

11  one of the four distribution centers that you described to the

12  restaurant.

13  *A.*  Yes.

14  *Q.*  Mr. Olson, are you familiar with someone by the name Brian

15  Roberts?

16  *A.*  I am.

17  *Q.*  Do you know Mr. Roberts?

18  *A.*  I do.

19  *Q.*  How do you know him?

20  *A.*  We have partnered with him for many years purchasing

21  products from different companies that he's worked for over the

22  years.

23  *Q.*  And what are some of the different companies he has worked

24  for over the years?

25  *A.*  I believe I said -- I think I'd said earlier that it was

James Olson - Direct

1    Sanderson Farms, but I believe it was Simmons I first met him

2    at.  And then he worked at Marshall Durbin and also at Tyson.

3    Q.  What was your relationship with Mr. Roberts?

4    A.  It was I would say a friendly business relationship.  It

5    wasn't purely business and it wasn't purely friendship.  It was

6    a friendly business relationship.  We got along.  I liked

7    Brian, thought he represented his businesses well, and we

8    enjoyed doing business with him.

9    Q.  Have you ever met him face to face?

10   A.  Yes.

11   Q.  About how many times?

12   A.  Dozens, two, three dozen times.

13   Q.  Over the course of how long?

14   A.  10 years.

15   Q.  Do you see him here in the courtroom today?

16   A.  I believe I do.

17   Q.  Would you be able to identify him by describing where he is

18   sitting or something he is wearing?

19   A.  Yes.

20   Q.  Could you do so?

21   A.  Yup.  He is sitting right behind you and just waved to me.

22   He has got a blue shirt and blue tie on.

23        MS. SWEENEY:  Your Honor, the government would ask

24   that the record reflect the witness identified Defendant

25   Roberts.

James Olson - Direct

1          *THE COURT:*  It shall.

2     *BY MS. SWEENEY:*

3     *Q.*  Would you recognize a photo of Defendant Roberts if I were

4     to show you a picture of him?

5     *A.*  Yes.

6     *Q.*  There should be a file folder in front of you, and I would

7     ask you to open it up and look at Exhibit 9251.  And please

8     look up at me when you're done.

9          Do you recognize this document?

10    *A.*  Yes.

11    *Q.*  What is it?

12    *A.*  It's Brian Roberts.

13    *Q.*  Is it him or is it a depiction of him?

14    *A.*  It's him.

15    *Q.*  Is it a photograph?

16    *A.*  Yes.

17    *Q.*  How do you know that it's a photograph of Defendant

18    Roberts?

19    *A.*  I don't know how to answer that.  It looks like a

20    photograph to me.

21    *Q.*  And how do you know it's a photo of him?

22    *A.*  Because I recognize him.

23    *Q.*  Is it a fair and accurate depiction of Defendant Roberts?

24    *A.*  Yes.

25    *Q.*  Now turning your attention, are you familiar with someone

James Olson - Direct

1   by the name of Ric Blake?

2   A.   I am.

3   Q.   Do you know Mr. Blake?

4   A.   I do.

5   Q.   How do you know him?

6   A.   Again, he was a long-term chicken supplier with us.  We

7   worked with him for many years through the George's company, we

8   meaning RSCS.  Both Ric and Brian were thought highly of within

9   the HMC organization.  In fact, we bestowed upon both of them a

10  title of business partner, not a vendor.  A lot of people think

11  of their suppliers as vendors, but we thought of both of these

12  gentlemen that they went above and beyond the normal vendor

13  role and we designated them a title of business partners.  And

14  we invited them on to our HMC's annual convention where we

15  would take all of our franchise partners on a trip someplace

16  and we had certain business partners join us.  And both of

17  those two gentlemen were considered in that class.

18  Q.   Was there anyone else at George's that you worked with

19  aside from Mr. Blake?

20  A.   Not that I did.

21  Q.   Did you ever meet Mr. Blake face to face?

22  A.   Yes.

23  Q.   How many times?

24  A.   Dozens again.

25  Q.   Over the course of how many years?

James Olson - Direct

243

1   A.   Again, over 10 years.

2   Q.   Do you see him here in the courtroom today?

3   A.   I do.  Yes, I do.

4   Q.   Could you identify him by describing where he is sitting or

5   something that he is wearing?

6   A.   Yup.  He has got the mask on.  He is waving.  He has a

7   brown-gray suit, pin-striped shirt, looks like brown tie.  Am I

8   close?

9        MS. SWEENEY:  The government would ask that the record

10   reflect that the witness has identified Defendant Blake.

11        THE COURT:  It shall.

12        It's noon, Ms. Sweeney.  Would now be a convenient

13   time to take our lunch break?

14        MS. SWEENEY:  Your Honor, may I have two questions?

15        THE COURT:  Sure.

16   BY MS. SWEENEY:

17   Q.   Would you recognize a picture of Defendant Blake if I were

18   to show you one of him?

19   A.   Yes.

20   Q.   I would like to direct your attention to Government's

21   Exhibit 9236 in the folder in front of you.  Do you recognize

22   it?

23   A.   I do.

24   Q.   What is it?

25   A.   It's a picture of Ric Blake.

244
James Olson - Direct

1    *Q.*  How do you know?

2    *A.*  It looks just like him.

3    *Q.*  Is it a fair and accurate depiction of Defendant Blake?

4    *A.*  Yes.

5         *MS. SWEENEY:*  I apologize, that was four questions,

6    but we are ready to recess.

7         *THE COURT:*  As a lawyer you never promise how many

8    questions you might have because you never keep it.

9         *MS. SWEENEY:*  As it came out of my mouth, Your Honor,

10   I knew it would likely be four.  I apologize for that.

11        *THE COURT:*  No problem.

12        Ladies and gentlemen, we will go ahead and take the

13   lunch break now.  We will reconvene at 1:30.  Keep the

14   admonitions in mind.  And if you go outside, as I mentioned to

15   you yesterday, try to keep those yellow juror buttons visible.

16   Don't let anyone try to talk to you about the case.  And we

17   will see you back at 1:30.  The jury is excused.

18        (Jury excused.)

19        Mr. Olson, you can step down.  Thank you very much.

20   And if you can come back, then, at 1:30.

21        Anything before we recess?

22        Yes, Mr. Tubach.

23        *MR. TUBACH:*  Your Honor, just briefly, I understand

24   the Court issued an order this morning that I have not yet had

25   a chance to read that relates to handwritten notes of

James Olson - Direct

1    Mr. Martin.  We had anticipated filing a brief, didn't

2    understand the Court was going to be issuing an order as

3    quickly as it did.  We would like the opportunity to file that

4    brief immediately and have the Court at least consider the

5    arguments we are making.  We think there is a serious

6    confrontation clause issue.

7            THE COURT:  Yes.  If you could file that.  So you are

8    going to file it over the lunch hour?

9            MR. TUBACH:  We'll file it very quickly, yeah.

10           THE COURT:  I will take a look at that.

11           MR. TUBACH:  Thank you very much.  I appreciate it.

12           THE COURT:  Anything else?  We will be in recess --

13           MS. SWEENEY:  I apologize, Carolyn Sweeney for the

14   United States.  One quick logistical question.  In terms of

15   scheduling the witness after Mr. Olson, we are planning for

16   one-to-one cross, but I just wanted to get your sense if we

17   should be planning.  We don't want, obviously, witnesses to not

18   be ready when the Court is ready, but we wanted to get your

19   sense on if you had a thought of what the planning amount is.

20           THE COURT:  I'm sorry, I didn't quite understand the

21   question.

22           MS. SWEENEY:  Sure.  So we have a number of custodian

23   witnesses who are ready to testify when we are finished with

24   Mr. Olson's testimony.  In terms of estimating, we are planning

25   to have them here and ready to go about -- however long

James Olson - Direct

1    Mr. Olson is, we are planning for a one-to-one time on cross.

2    So we just wanted to advise you and see if you have a different

3    sense as to if we should have our witnesses here earlier.

4    That's really the question.

5            THE COURT:  The answer is have them ready once

6    Mr. Olson leaves the witness stand.

7            MS. SWEENEY:  Yes, Your Honor.  Thank you.

8            THE COURT:  You knew that would be the answer.  That's

9    what we have to do.  Especially with custodians, there may be a

10   lot of them.  They may get stacked up and they will undoubtedly

11   not like that, but it's just the way that we will have to go

12   throughout the trial.

13           Mr. Pollack?

14           MR. POLLACK:  Yes, Your Honor.  With the custodians,

15   one of the issues with respect to authenticity is as I

16   understand it some of the documents that the government wants

17   authenticated were not actually collected from the source.

18   They are not documents that were sent to a supplier via Grand

19   Jury subpoena, but rather were collected indirectly.  And the

20   supplier provided them in the civil class action and then

21   several steps later the plaintiff's attorney provided them to

22   the Department of Justice.

23           As I understand the Court's ruling on the motion *in*

24   *limine*, there is to be no mention of the civil class action, so

25   I just wanted to make sure we are all on the same page in terms

247

James Olson - Direct

1   of how witnesses are going to refer to what they did with the

2   documents if the answer is something other than, I gave them to

3   the Department of Justice.

4        THE COURT:  Well, it depends.  Obviously if the

5   government has to take a roundabout route, which I said that

6   the government could, I think that they should start off by

7   doing it without much detail so that it, as you suggest, leaves

8   out details regarding why they were produced to that particular

9   person or entity or however, but nonetheless allows the

10  government to establish the fact that those came from this

11  particular company.

12       MR. POLLACK:  Company or law firm.

13       THE COURT:  Well, that's where we start to get a

14  little bit tricky.

15       MR. POLLACK:  I believe that some of these documents

16  were provided by plaintiff's law firm.

17       THE COURT:  Sure.  Not knowing all the details, I

18  can't quite guide you specifically, but we should try to keep

19  from the jury the fact that they were provided to a plaintiff's

20  law firm through the course of litigation.  So it would be

21  better to leave out those details if at all possible so long as

22  we have someone within the chain, we might say, that, you know,

23  can establish that that document or these documents came from

24  the -- we will call them supplier.

25            Once again, I don't quite know how it will be done,

James Olson - Direct

1    but I do want to make sure that we don't interject.  And the

2    witnesses should be prepared so they don't just volunteer, you

3    know, details about law firms, plaintiffs, lawsuits, that type

4    of thing.

5            MS. SWEENEY:  And, Your Honor, just if I may be heard

6    on this.

7            THE COURT:  Sure.

8            MS. SWEENEY:  The government's plan is to refer to the

9    other litigation as another matter.  And to ask leading

10   questions to get around that, we have talked to the witnesses

11   and advised them that we plan to refer to it as another matter.

12   And when we use the terms "another matter," we are talking

13   about the Northern District of Illinois broiler chicken

14   litigation.

15           THE COURT:  Yes, use some type of term like that that

16   is not likely to be understood by the jury as involving other

17   litigation.  But in addition to telling the witness that you

18   will be using that type of term, you need to in addition prep

19   the witness so that the witness understands the sensitivity of

20   it and does not -- because after all, they are under oath, they

21   have to tell the truth, but they can tell the truth without

22   mentioning specifics that would then foil the attempt of using

23   a vague term.

24           MS. SWEENEY:  Yes, Your Honor, and I believe we have.

25           THE COURT:  Anything else, Mr. Pollack?

James Olson - Direct

1          MR. POLLACK:  No, that's fine, Your Honor.

2          THE COURT:  We will be in recess.

3          (Recess at 12:07 p.m.)

4          (Reconvened at 1:32 p.m.)

5          THE COURT:  Ms. Prewitt, do you have an issue?

6          MS. PREWITT:  The defendants conferred over lunch.  I

7   think we are making some progress over stipulations.  And we

8   would like to request some time perhaps after Mr. Olson steps

9   off the stand so we can just confer with the government and try

10  to iron some things out.

11         THE COURT:  That could be good.  So you would suggest

12  taking a recess.  How long do you think it might be?

13         MS. PREWITT:  I think it would be more than 15

14  minutes.  I think half an hour is probably the quickest given

15  the amount of work we need to do.

16         THE COURT:  Mr. Koenig, your thought on that?  Does

17  that sound good to you?

18         MR. KOENIG:  Yeah, that sounds good.

19         THE COURT:  I think that could ultimately save us

20  quite a bit of time, so we will plan on doing that once

21  Mr. Olson is done.

22         Let's bring Mr. Olson in at this time.

23         MS. PREWITT:  Your Honor, would it be okay if we

24  stayed in the courtroom?

25         THE COURT:  That's perfectly fine.  We will have the

James Olson - Direct

1    jury excused and you can use the courtroom.

2          Mr. Olson, if you don't mind, could you resume the

3    witness stand?

4          And Mr. Keech, could you get the jury?

5          *COURT DEPUTY CLERK:*  Yes, Your Honor.

6          *THE COURT:*  Thank you.

7          (Jury present.)

8          Please be seated.

9          Go ahead, Ms. Sweeney.

10         *MS. SWEENEY:*  Thank you, Your Honor.

11         Good afternoon, Mr. Olson.

12         At this time, Your Honor, the government moves to

13   admit Government Exhibits 9251 and 9236 into evidence.

14         *THE COURT:*  All right.  Any objection, first of all,

15   to the admission of Exhibit 9251?

16         *MR. GILLEN:*  No objection.  Your Honor.

17         *THE COURT:*  9251 will be admitted.  And what was

18   the --

19         *MS. SWEENEY:*  The second exhibit was 9236.

20         *THE COURT:*  Any objection to the admission of 9236?

21         *MR. BELLER:*  Your Honor, on behalf of Mr. Fries, we

22   object to the admission of both photographs, and I am happy to

23   state the bases if the Court wishes.

24         *THE COURT:*  You should because I don't understand the

25   basis for it.

James Olson - Direct

251

1        MR. BELLER:  The basis for it is that I don't believe

2   that it's relevant for Mr. Fries.  I also believe that the

3   depictions of those particular photographs and the way they are

4   depicted is not probative to any fact as to Mr. Fries.  It is

5   certainly prejudicial.

6        THE COURT:  Any objection?

7        MS. JOHNSON:  Yes, Your Honor, Wendy Johnson for

8   Mr. Blake.  We would object.  And I apologize to the Court.  I

9   don't know which number the Blake photo was, but we would

10  object specifically to Mr. Blake's photo.  It's irrelevant.  He

11  has been identified in court.  He stood up in opening.  The

12  witness identified him.  There is no relevance and we don't see

13  the reasoning for have the photograph introduced.

14       THE COURT:  And yes, it's 9236, the photo of

15  Mr. Blake.

16       MR. BELLER:  May I supplement my objection?

17       THE COURT:  Very quickly.

18       MR. BELLER:  Simply to say other photographs that were

19  more flattering were provided to the People, and the People are

20  choosing not to introduce the photographs that were otherwise

21  provided, but are instead choosing to provide these two

22  photographs.

23       THE COURT:  Mr. McLoughlin?

24       MR. McLOUGHLIN:  Yes.  For Mr. Lovette we would join

25  in the objections and reiterate the point that accurate

James Olson - Direct

 1   photographs were provided by the defense and the government

 2   declined to use them.

 3        *THE COURT:*  The government can choose its own

 4   evidence.  The issue is whether it's admissible.  I find that

 5   both photographs are.  9236 and 9251 will be admitted.

 6   *BY MS. SWEENEY:*

 7   Q.  Mr. Olson, did there come a time where chicken suppliers

 8   could not fully supply HMC's KFC restaurants?

 9   A.  At various times over the years that would happen caused by

10   weather or a truck couldn't get through.  Are you referring to

11   a specific time?

12   Q.  I am directing your attention to 2014.  And Mr. Olson, I

13   just ask that you lean into the microphone.  I am struggling to

14   hear you.

15   A.  I am about 2 inches away, maybe 1.

16   Q.  Thank you.  Directing your attention to 2014, was there a

17   time when the chicken suppliers could not fully supply HMC's

18   KFC restaurants?

19   A.  Yes.

20   Q.  And when was that in 2014?

21   A.  It was over the Mother's Day weekend.

22   Q.  How do you remember that it was Mother's Day?

23   A.  Mother's Day is traditionally are peak day of the year and

24   it's the year we sell the most chicken.  We had spot shortages

25   throughout our HMC system and it caused some friction and some

James Olson - Direct

1    internal struggles to make sure our stores had as much chicken

2    as possible.

3    Q.  You described Mother's Day as one of the peak days of the

4    year.  Why is it a peak day of the year?

5    A.  It started in the early days when we first got onto

6    television and we didn't have a big television budget.  So

7    we -- we meaning at the time was called an NAC, it was the

8    advertising council -- would put money into holidays in order

9    to advertise Kentucky Fried Chicken and it increased sales.

10            Mother's Day was very successful because it gave mom a

11   day off from cooking and it kind of caught on.  And even though

12   we haven't advertised on Mother's Day particularly in past

13   years, the tradition has been set and people still come in and

14   we have a real spike in sales on Mother's Day.

15   Q.  When you said we was the national ad council, was that a

16   part of KFC?

17   A.  Yes.  It's an advertising council.  It's made up of

18   corporate members and franchisees.

19   Q.  Do you know what happened on Mother's Day 2014?

20   A.  Within Harman Management?

21   Q.  With the Harman Management owned KFC restaurants, do you

22   know what happened on Mother's Day 2014?

23   A.  Yeah.  There were -- there wasn't enough chicken to go

24   around, basically, and distribution centers were pressing the

25   chicken processers, the chicken suppliers to give them extra

James Olson - Direct

1   loads.  And when -- depending on the success of that, we also

2   had to try and move chicken between distribution centers.  If

3   one distribution center had some inventory, they were moving it

4   to another distribution center to try and meet their needs.

5   And then internally there were areas where stores were swapping

6   product between stores in order to keep people in supply.

7   Q.  Did it affect any of HMC's KFC stores?

8   A.  Yes.  There were some that had to close early.

9   Q.  Did you have any role in securing chicken that Mother's Day

10  weekend of 2014?

11  A.  No.

12  Q.  What was your reaction to the shortage that weekend?

13  A.  My reaction was to talk to our distributors and find out

14  what they were doing to secure more supply.

15  Q.  Did you take any other steps after that weekend in response

16  to the supply shortage?

17  A.  For long-term or within that weekend?

18  Q.  Let's start within that weekend and then let's turn to

19  long-term.

20  A.  No, there wasn't anything else I did other than talk to the

21  distributors that we were associated, we meaning Harman

22  Management, was associated with.

23  Q.  And in the long term did you take any steps as a result of

24  that weekend?

25  A.  Yes.

James Olson - Direct

1    *Q.*  What were those steps?

2    *A.*  I put together an e-mail that I sent to the CEO of the

3    RSCS, and I listed various ideas that I thought could be

4    mutually beneficial to the system and to the chicken suppliers.

5    *Q.*  And now I would like to direct your attention to 2014.

6    Earlier we were talking about chicken supply contracts that

7    were negotiated with RSCS.  Was one of those chicken -- I

8    believe you said that one of those chicken supply contracts was

9    negotiated in 2014; is that correct?

10   *A.*  Could you restate that again?

11   *Q.*  Sure.  So we were talking about chicken supply contracts

12   before the lunch break that were negotiated with RSCS.  And I

13   believe you said that one of the chicken supply contracts was

14   negotiated in the year 2014; is that correct?

15   *A.*  Yes.

16   *Q.*  And what years was that covering supply for?

17   *A.*  It was a three-year contract.

18   *Q.*  So what are the three years that it covered?

19   *A.*  It would cover 2015, 2016 and 2017.

20   *Q.*  What happened with that contract?

21   *A.*  It went into force.

22        *MR. McLOUGHLIN:*  Objection, Your Honor.  In addition

23   to form, lack of foundation.

24        *THE COURT:*  Overruled as to both.

25   *BY MS. SWEENEY:*

James Olson - Direct

1    *Q.*  So what happened with that contract?

2    *A.*  It went into force.

3    *Q.*  Could you explain a little further?

4    *A.*  Franchisees, all the members of the co-op, including the

5    corporate stores, were obligated to meet the requirements of

6    that contract, and that was -- it included a large increase in

7    price.

8    *Q.*  So let's talk about the negotiations of that contract.

9    What was your understanding of the market dynamics going into

10   that contract negotiations?

11   *A.*  As a director, I knew that chicken suppliers were saying

12   that there was more profit for them in moving to larger birds

13   and getting out of the small bird category.  And from my

14   knowledge and experience in the business for as long as I have

15   been in it, I believe that's true.  There was a higher profit

16   margin for them in the bigger birds.

17           I understood as a director that they were going to

18   make that move relatively quickly.  And that was a concern for

19   the RSCS because KFC corporate hadn't changed their

20   specifications yet.  And if the chicken suppliers moved out of

21   the small bird category, we wouldn't have product to sell.  So

22   the RSCS purchasing team in negotiations with the chicken

23   suppliers came back with that we needed to do a three-year

24   contract and that we needed to accept plus/minus 10 cent

25   increase per pound in cost.

257

James Olson - Direct

1   Q.  You mentioned a change in the KFC specifications.  Can you

2   describe what you mean by that?

3   A.  KFC prescribes that we sell a product within a certain

4   weight specification of the chicken, and that's a 2-1/2 pound

5   chicken.  If we went to a 3-1/2 pound chicken, we meaning the

6   whole system, corporates stores, KFC franchisees, if we moved

7   to buy 3-1/2 pound chicken, not only would it disrupt the

8   financial dynamics of our pricing, but it would disrupt our

9   processes.  Our fryers aren't set up to cook that size chicken.

10  So being a franchisee, we can't determine the spec of this

11  chicken.  We can't change the process of cooking the chicken.

12  We were kind of caught in the middle of what was happening in

13  the market by the decision of moving to bigger birds.

14  Q.  And when did you learn about this shift that you just

15  described from the smaller birds to the larger birds?

16  A.  There had been -- I had heard about it as a -- as the CEO

17  of Harman Management and as a director of the RSCS.  There had

18  been talk about a shift to bigger birds for a couple of years,

19  but there hadn't been any real decision and action to make that

20  happen.  So it was common knowledge in the summer and fall of

21  2014, but then when the negotiations went into play, I believe

22  it was August or September of '14 is when the reality hit that

23  we were kind of stuck.

24  Q.  And what do you mean by when you say you were kind of

25  stuck?

James Olson - Direct

1   *A.* Again, as we are leading our company, I can't change.  I

2   can't make an agreement to buy a bird outside the spec of

3   Kentucky Fried Chicken Corporation's requirements.  I can't do

4   that.  The RSCS isn't supposed to by spec outside of what KFC

5   says too.  So if all the chicken suppliers moved out of our

6   spec, there weren't other chicken suppliers that could fill

7   that void and we would be stuck without product.  We would have

8   a supply issue.

9   *Q.* Could HMC purchase chicken products from other suppliers

10  than the ones that you had been dealing with?

11  *A.* Not unless it was approved by both KFC corporate and the

12  RSCS.

13  *Q.* Did there come a time in the year 2014 when you were

14  negotiating the three-year contract that you became involved in

15  contract negotiations?

16       *MR. McLOUGHLIN:* Objection to form, Your Honor.  I

17  think the witness has established that you, as in he, is not

18  negotiating a contract.  We have not identified who was

19  negotiating the contract.

20       *THE COURT:* Objection sustained as to the word "you."

21  If you could clarify.

22       *MS. SWEENEY:* Sure.

23  *BY MS. SWEENEY:*

24  *Q.* Mr. Olson, did there come a point in time in 2014 that you

25  personally became involved in that contracting process?

James Olson - Direct

1    *A.*  I never became involved in the contracting process on the

2    price of the product itself.

3    *Q.*  Did there ever come a time in 2014 when you personally

4    became involved in contract negotiations with chicken

5    suppliers?

6    *A.*  Yes.

7              *MR. McLOUGHLIN:*  Object to form.

8              *THE COURT:*  Overruled.  He answered.

9    *BY MS. SWEENEY:*

10   *Q.*  I am sorry, could you repeat that?

11   *A.*  Yes.

12   *Q.*  And when was that?

13   *A.*  In the fall, probably October or November of 2014.

14   *Q.*  And can you explain what your negotiations, your personal

15   negotiations were with the chicken suppliers?

16   *A.*  I met individually with Tyson and George's and we discussed

17   terms similar to those that I had discussed earlier that I

18   was -- I could not change the price of the chicken, but I could

19   talk to the suppliers about other variables, whether it be

20   financial terms or contract ideas similar to the ones I said

21   was short weight, quick pay, guaranteed loads.  So I could talk

22   to them about terms that were outside or in addition to the

23   contract that the RSCS negotiated.

24   *Q.*  And what was the purpose of those negotiations?

25   *A.*  To get some discount from what the stated contract was.

James Olson - Direct

1   *Q.*  And that would be a discount for whom?

2   *A.*  Harman Management Corporation.

3   *Q.*  At the time that you started these negotiations, was the

4   RSCS supply contract finalized?

5   *A.*  No.

6          *MR. McLOUGHLIN:*  Objection.  Your Honor, it would be

7   A, double hearsay because he was not involved; and B, we

8   haven't established any foundation that he knew the date it

9   was -- for any of these particular suppliers actually

10  negotiated and agreed as opposed to later signed.  There are a

11  variety of problems with the question.

12         *THE COURT:*  Sustained, foundation.  If you could lay

13  foundation for his knowledge.

14         *MS. SWEENEY:*  Thank you.

15  *BY MS. SWEENEY:*

16  *Q.*  Do you know -- were you informed when the RSCS contract was

17  finalized?

18  *A.*  As a director on the board, yes.

19  *Q.*  And were you aware --

20         *MR. McLOUGHLIN:*  I apologize, Your Honor.  Object to

21  form.  Contract with what supplier?  There are quite a few.

22         *THE COURT:*  Overruled.

23  *BY MS. SWEENEY:*

24  *Q.*  Were you aware -- as a member of the board of RSCS, were

25  you aware of the contract negotiations that RSCS was engaging

261
James Olson - Direct

1  in?

2  A.  Yes.

3  Q.  And were you aware of -- earlier you described various

4  rounds of negotiations.  Were you aware of the various rounds

5  of negotiations that RSCS was engaging in?

6  A.  Yes.

7  Q.  So these negotiations that you were -- that you, Mr. Olson,

8  were engaged in with the chicken suppliers, you said with

9  George's and with Tyson's, were you aware of where in that

10  contract process based on your time at RSCS, on the board of

11  RSCS, where in the contract process your negotiations fell?

12  A.  As stated earlier, it was either in October or November.

13  Q.  Were you aware when you engaged in these negotiations with

14  George's and Tyson, were you aware or did you know if the final

15  RSCS contract was signed at that point?

16  A.  I did not know.

17  Q.  You did not know if it was signed at that point?

18  A.  No.

19  Q.  All right.  So you were discussing the negotiations that

20  you had --

21  A.  Can I restate that?  Because I knew it wasn't signed.  The

22  way you asked the question, I --

23  Q.  So at the time --

24          THE COURT:  I don't think he is finished with his

25  answer.

James Olson - Direct

262

1          MS. SWEENEY:  I apologize.

2          Go ahead, Mr. Mr. Olson.

3    A.  Just the way you stated the question was kind of a double

4    negative where I got spun around, but I knew the contract

5    wasn't going to be signed until December.

6    BY MS. SWEENEY:

7    Q.  So at the time that you were engaging in these negotiations

8    with George's and Tyson, you just said you knew the contract

9    was not going to be signed until December.

10   A.  Yes.

11   Q.  So was the contract signed in November of 2014, the RSCS

12   contract?

13   A.  No.

14   Q.  Thank you.  Turning to the negotiations that you had with

15   Tyson's and with George's -- and we will start with Tyson.  I

16   will ask you a few questions about that.  Who did you meet with

17   at Tyson's for the negotiations that you personally had that

18   you have been describing?

19   A.  Brian Roberts.

20   Q.  And what did Defendant Roberts tell you -- when you had

21   these negotiations, what was the manner of negotiation?

22   A.  It was informal.  We went to dinner.  We talked as we

23   usually would talk, talk about background, family, got around

24   to business, talked about brainstorming on ideas that could

25   possibly net us some discounts from what the negotiated RSCS

James Olson - Direct

 1   price was.

 2   Q.  So the meeting was in person?

 3   A.  Yes.

 4   Q.  And you said it was over dinner?

 5   A.  Yes.

 6   Q.  You said how they could net us.  Who is us that you are

 7   referring to?

 8   A.  Harman Management Corporation.

 9   Q.  What did Defendant Roberts tell you in these negotiations?

10   A.  Kind of the bottom line was there wasn't any movement this

11   year.

12   Q.  Can you describe what you understood by that?

13   A.  That the price set by the RSCS was going to be the price we

14   had to live with, that there wasn't going to be any terms

15   outside of that that we could work on.

16   Q.  Had you had these negotiations in prior years?

17   A.  Yes.

18   Q.  What had been the outcome of these negotiations in prior

19   years?

20   A.  Always something favorable.  We usually could work together

21   to find something that we thought was mutually beneficial, you

22   know, not just one-sided, but something that could work for

23   both parties.

24   Q.  And as you just described, is that how the negotiations

25   went in 2014?

264

James Olson - Direct

1   A.   No.

2   Q.   How would you describe that they went in 2014?

3   A.   There wasn't any real discussion other than the statement

4   that the price was what it was and there wasn't any chance of

5   making any changes to it.

6   Q.   Did you plead your case on behalf of HMC?

7   A.   Yes.

8   Q.   What did you say?

9   A.   I think I said the obvious.  Brian has been in the business

10   a long time, so knowing that there was a 10-cent hike in

11   chicken prices, it's going to be financially difficult for us.

12   A penny a pound to us is about $400,000 to us, meaning HMC.

13   It's about $400,000 impact on bottom line profits.  So a

14   10-cent increase is easily calculated to be about a $4 million

15   impact, so that was going to affect Harman Management

16   Corporation and our partners running the restaurants.

17   Q.   And did you say that to Defendant Roberts?

18   A.   No, I think I generalized it.  I don't think I specifically

19   threw those numbers out.  I think I said something like --

20         MR. BELLER:  Objection, hearsay.

21         THE COURT:  Overruled.

22   A.   I believe I said something like, "You know how much this is

23   going to impact us."

24   BY MS. SWEENEY:

25   Q.   And what did he say in response?

James Olson - Direct                                          265

1   *A.*  He seemed to have -- it's a judgment on my call, but from

2   our relationship over the years, I think he felt --

3            *MR. McLOUGHLIN:*  Objection, Your Honor.  The question

4   is what he said and this becomes an opinion or judgment

5   question.

6            *THE COURT:*  Yeah, sustained.  So if you could state

7   the question to Mr. Olson again.

8            *MS. SWEENEY:*  Yes, Your Honor.

9   *BY MS. SWEENEY:*

10  *Q.*  Mr. Olson, what did Defendant Roberts say in response?

11  *A.*  I can't remember verbatim what he said.

12  *Q.*  And I think you said this earlier, but were your

13  negotiations with Tyson successful this year in 2014?

14  *A.*  No.

15  *Q.*  I would like to turn to your negotiations with George's.

16  Who at George's did you meet with?

17  *A.*  Ric Blake.

18  *Q.*  And what was the manner -- where did that meeting occur?

19  *A.*  I can't recall that meeting.  I recall the meeting.  I

20  can't recall the location of the meeting.

21  *Q.*  Were you in person or over the phone or by e-mail?

22  *A.*  In person.

23  *Q.*  What did Mr. Blake tell you at that meeting?

24  *A.*  Very similar response, that although we had worked on

25  creative ideas in the past, there wasn't any movement this

James Olson - Direct

1    year.

2    Q.  And what did you tell him?

3          MR. BELLER:  Objection, hearsay.

4          THE COURT:  Overruled.

5    A.  I said the same thing, that this was a huge impact to our

6    system, and we were hoping we could find some alternatives for

7    some discounts that would help offset the increase.

8    BY MS. SWEENEY:

9    Q.  And what was his response?

10   A.  I don't remember verbatim what he said.

11   Q.  Were you -- what was the ultimate result of that meeting

12   with Mr. Blake at George's?

13   A.  There was no new outcome, so there wasn't any real result

14   other than not having a result.

15   Q.  And by not having a result, was HMC able to get the

16   additional discount that year from George's?

17   A.  No.

18   Q.  How about from Tyson's?

19   A.  No.

20   Q.  When you negotiated with Defendant Roberts and Defendant

21   Blake, did you negotiate with them together?

22   A.  No.

23   Q.  Why not?

24   A.  I don't think that's how you do business.

25   Q.  Can you explain a little further?

James Olson - Direct

1   *A.*   Yeah.  Whatever -- you know, if one of our business

2   partners had offered something, I wouldn't share that with the

3   other.  That's not -- in my system of operating, that's not

4   appropriate behavior.  I think that would be unfair to one

5   person that gave us a discount to share that with somebody

6   else.

7   *Q.*   So did you share the fact of the discount with one company

8   with the other company in 2014?

9   *A.*   No.

10  *Q.*   Did you share the fact of the discount from one company

11  with another company prior to 2014?

12  *A.*   Never.

13  *Q.*   How about after 2014?

14  *A.*   No.

15  *Q.*   Did you want Defendant Roberts and Defendant Blake to be

16  talking about prices?

17          *MS. JOHNSON:*  Objection.

18          *MR. BELLER:*  Objection.

19          *MR. McLOUGHLIN:*  Objection.

20          *THE COURT:*  I am not sure what the question means, so

21  I will sustain it as being vague.

22  *BY MS. SWEENEY:*

23  *Q.*   When you were in the negotiation and completing the

24  negotiation in 2014, did you expect Defendants Roberts and

25  Blake to talk about prices?

James Olson - Direct

1    MR. McLOUGHLIN:  Your Honor, objection with respect to

2  the witness' expectation.  The crazy point is his expectation

3  is purely idiosyncratic, it is personal, and it is not relevant

4  to the issues the jury has to decide.  But to the extent it

5  might be, it's substituting his opinion for that of the jury.

6    MR. BELLER:  Thank you, Your Honor.  And I object

7  under all of those grounds in addition to relevance as to

8  Mr. Fries and Claxton Poultry.

9    THE COURT:  Objections will be overruled.  The witness

10 can answer.

11 A.  Can you state it again?

12 BY MS. SWEENEY:

13 Q.  Sure.  So in your negotiations in 2014 or after, did you

14 expect Defendants Blake and Roberts to talk about prices?

15 A.  No.

16 Q.  Why not?

17    MR. McLOUGHLIN:  Your Honor, same objection and an

18 additional objection as to Mr. Lovette.

19    MR. GILLEN:  And I object.  It assumes facts not in

20 evidence.

21    THE COURT:  Objections will be overruled.  He may

22 answer.

23 BY MS. SWEENEY:

24 Q.  Why not?

25 A.  I expect both suppliers to be working earnestly to give us

James Olson - Direct

1    their best price, and I think for them to share their

2    information ends up not having as much of a free market.

3            MR. McLOUGHLIN:  Objection, move to strike.

4            THE COURT:  That will be denied.

5    BY MS. SWEENEY:

6    Q.  When you talked -- can you explain a little further what

7    you meant by not a free market?

8            MR. McLOUGHLIN:  Same objection, Your Honor, as to

9    this witness offering opinions about what a free market is.

10   It's a legal conclusion for Your Honor to instruct the jury and

11   for the jurors to decide.

12           THE COURT:  I am going to sustain that objection.

13   BY MS. SWEENEY:

14   Q.  Coming out of those meetings, what was your reaction,

15   Mr. Olson?

16   A.  I -- I was -- I think I would term it I was very

17   questioning what was going on.

18   Q.  What did you mean by you were very questioning?

19           MR. McLOUGHLIN:  Objection, Your Honor.  May we be

20   heard over the microphones?

21           THE COURT:  Yes.

22      (At the bench:)

23           THE COURT:  Go ahead, Mr. McLoughlin.

24           MR. McLOUGHLIN:  Your Honor, we know from the 302 that

25   what the witness is about to say is he suspected there was

1    collusion, although he did not know for sure.  That is his

2    speculation.  It is prejudicial.  It does not have a foundation

3    in fact.  It is based on his conversation that they wouldn't

4    give him a discount as to terms that are not at issue in this

5    case which is discounts on freight or something else.  It

6    doesn't even go to the RSCS price.  And for him to be allowed

7    to speculate that there was collusion on an ancillary contract

8    that is not the subject of this case is, A, prejudicial, B,

9    irrelevant, and it's hearsay.  And it would ultimately result

10   in an opinion that is based or should be based on Rule 702, not

11   701.

12          THE COURT:  Let me just ask one thing before I give

13   Mr. Tubach an opportunity.  I think that was him.

14          MR. GILLEN:  Mr. Gillen.

15          THE COURT:  Yeah, make sure you identify yourselves

16   when we speak.

17          It's not clear to me from the witness' testimony what

18   discounts he was negotiating.  Of course, as Mr. McLoughlin

19   alluded to, the witness had testified that he didn't have any

20   ability to change the prices of the chicken, so the discounts

21   are a bit of a mystery to me.

22          But perhaps Ms. Sweeney, you could explain what you

23   anticipate that the witness would be talking about in terms of

24   these discounts and then why that would be relevant to any

25   ability he would have to form an opinion about collusion.

James Olson - Direct

271

1          *MS. SWEENEY:*  Yes, Your Honor.  Can you hear me?

2          *THE COURT:*  Yes.

3          *MS. SWEENEY:*  Great.  So this morning it might have

4    been a function of the lunch break, but this morning he

5    described that he would engage in these negotiations on

6    price-related terms, so on the price of -- the pricing terms

7    and there are a few others that would ultimately end up giving

8    the HMC franchise a discount in prices.

9          *THE COURT:*  As to what?

10         *MS. SWEENEY:*  As to the prices that his franchises --

11   so the 200 some stores that KFC owns, the price they would pay

12   chicken suppliers for chicken.  So the testimony that he has

13   provided and is about to provide goes to the overarching scheme

14   the government has charged and the united front that the

15   defendants are putting up in these 2014 contract negotiations.

16         *THE COURT:*  Right.  But what testimony do you

17   anticipate from Mr. Olson regarding his -- we could call it a

18   conclusion.  Is he going to draw some conclusion that there was

19   some type of collusion among chicken suppliers or at least the

20   two that he was dealing with?

21         *MS. SWEENEY:*  No, Your Honor.  He will not draw a

22   conclusion.  In our conversations with him, he has not drawn a

23   conclusion.  He is stating his state of mind at the time that

24   he had suspicions, but that he wasn't -- he never ran them down

25   and he wasn't sure if they were true, but they were suspicions

272
James Olson - Direct

1   in his mind.

2       THE COURT:  Okay.  But you intend to elicit and you

3   think that he will say that he had suspicions?

4       MS. SWEENEY:  I believe, yes, we intend to elicit that

5   he had suspicions and also that he was not sure of whether or

6   not the suspicions were true, so it will be clear it goes to

7   his state of mind.

8       THE COURT:  Why would his state of mind about

9   something that might otherwise be prejudicial and irrelevant be

10  somehow relevant?

11      MS. SWEENEY:  Your Honor, as you stated in your motion

12  *in limine*, ECF 604, that the witness' state of mind that

13  something may be wrong or improper may be probative to the

14  jury's determination of the elements of Count One.

15      THE COURT:  True, but it can't be just suspicion about

16  something that the witness really doesn't know about.

17      Mr. Gillen, I am going to give you a chance to weigh

18  in because I think that maybe you had said something.  Go

19  ahead.

20      MR. GILLEN:  Yes, Your Honor.  First of all, the

21  testimony should be stricken for the following reasons:  No. 1,

22  this testimony is being elicited concerning an alleged

23  negotiation over some sort of, as he said, quick pay or quick

24  discount pay on items he has explicitly admitted that he was

25  not a part and could not be a part of the formal negotiations

James Olson - Direct

1    which forms the basis for the charges in this indictment.

2    That's entirely left up to the RSCS.  That he was not a party

3    to that, he was not a party to any of those negotiations.  As a

4    matter of fact, I think that franchisees such as Mr. Olson are

5    prohibited from attempting to negotiate separately around RSCS

6    in terms of pricing.

7         So what we have here is we have him saying I wanted to

8    get a better deal from Tyson and from Mr. Roberts, Mr. Blake.

9    I wanted to get a better deal from them and I wanted it so that

10   I could get the financing, as he described, financing terms

11   that had been negotiated in the past.  That's No. 1.

12        No. 2 is that he is saying that he was involved in

13   these activities or these meetings in October and November

14   subsequent to the series of meetings and conversations that

15   Tyson -- that Mr. Roberts and Mr. Blake would have had with

16   RSCS representatives.  So the party is over by that time.

17   Whether the contract had been signed, ultimately was signed in

18   December is not the point.

19        No. 3, the question that I find to be highly improper

20   by the government is did you expect Mr. Roberts and Mr. Blake

21   not to talk or discuss these matters.  And there is no

22   evidence, I find no evidence whatsoever that the government is

23   going to be able to prove any sort of conversation by Mr. Blake

24   and Mr. Roberts about whether they are going to give a discount

25   to Harman which is not a part of this indictment.  This is a

James Olson - Direct

1    rabbit hole the government wants us to chase down so that they

2    can continue to, in my mind, mislead this jury about the

3    central issues.

4            THE COURT:  All right.  Ms. Sweeney, anything else?

5            MS. SWEENEY:  In responding to Mr. Gillen, I believe

6    it was -- this evidence is highly probative of the charged

7    conspiracy which is an overarching conspiracy by the defendants

8    to discuss prices and is one example of the united front that

9    the defendants posed in 2014 in negotiation for chicken prices.

10           THE COURT:  My ruling is as follows.  The fact that

11   the two suppliers at issue were -- decided not to negotiate on

12   prices, this isn't price for chicken.  These are things other

13   than the price for chicken.  But to an owner, a franchise owner

14   such as HMC, a dollar is a dollar, so they would be interested

15   in conducting those negotiations.  I think that that could be

16   some evidence of what could be called a united front.

17           However, Mr. Olson's speculation about what that may

18   mean and his suspicions, I haven't heard any foundation for him

19   having that, particularly since he is just talking to two

20   different people as far as I can tell.  And as a result, that's

21   improper opinion evidence and I will not allow the government

22   to ask a question that it anticipates would elicit that answer.

23           MS. JOHNSON:  Your Honor, Wendy Johnson for Mr. Blake.

24           I just want to point out to the Court -- and I thank

25   you for the ruling -- but it seems that the government is

James Olson - Direct

 1   conflating the negotiations, if they happened, of the separate

 2   issues with what the testimony has shown already, which the

 3   witness has already stated he was not involved and could not be

 4   involved with the RSCS negotiations.  That's the testimony.

 5   And my fear is that any further testimony about these

 6   extraneous negotiations for HMC independently would be

 7   confusing to the jury and prejudicial to the defendants because

 8   they will assume, and rightfully so, that it could be conflated

 9   and could be the same negotiations as the RSCS negotiations.

10        THE COURT:  I don't think so, especially given the

11   fact that cross-examination can make that distinction, but I

12   don't think that the distinction will -- is subject to such

13   confusion that the jury won't be able to understand it.

14        Thank you.

15        MR. McLOUGHLIN:  Your Honor, Jim McLoughlin for

16   Mr. Lovette.  Mr. Lovette would join in the objection of

17   Mr. Blake's counsel.

18        MR. TUBACH:  Michael Tubach.  I will join in that too.

19        MS. HENRY:  Roxann Henry.  I would join that again and

20   also point out that it's irrelevant to my client and

21   prejudicial.

22        MR. LAVINE:  Your Honor, Bryan Lavine.  I also join in

23   that objection, please.

24        MR. BELLER:  This is David Beller on behalf of Mikell

25   Fries.  I also join in that objection and note an ongoing

James Olson - Direct

1  continuing objection as to hearsay in that none of these

2  negotiations were actually included in the government's

3  801(d)(2)(E) filings, the ruling by the Court, and ultimately

4  as testified by this witness, this has nothing to do with my

5  client.  So I persist, respectfully, that all of this

6  information is hearsay and is prejudicial as to my client.

7  Thank you.

8       MR. FELDBERG:  Michael Feldberg for Mr. Austin.  I

9  join the last objection from Mr. Beller.

10      MR. LAVINE:  Your Honor, Bryan Lavine.  I also join in

11  that objection.

12      THE COURT:  Okay.  The last three objections will each

13  be overruled.  This is a charged conspiracy.  It doesn't really

14  matter whether we are talking about a particular defendant's

15  client because of the charge of the conspiracy.  It wouldn't

16  necessarily matter otherwise because it may be relevant to some

17  defendants, not necessarily others.  As to all the other

18  objections, each of those will be overruled.  All right.  Thank

19  you.

20      MS. JOHNSON:  Mr. Johnson for Mr. Blake, we do join in

21  the last objections.

22      THE COURT:  Okay.  That will be denied for the same

23  reason.

24      MR. McLOUGHLIN:  As does Mr. Lovette, Your Honor.

25      MR. TUBACH:  Michael Tubach, I hate to keep doing

                              277
                     James Olson - Direct

1    this.  Can we have one objection count for all?

2         THE COURT:  We can.  The defendants were supposed to

3    get back to me whether they had some type of an agreement.

4    They never did.  So that needs to be taken care of because this

5    is going on way too long.  The jury is going to get bored out

6    of its mind.

7         Thank you.

8      (In open court:)

9         The objection will be sustained in part and overruled

10   in part.

11        MS. SWEENEY:  I am sorry, Your Honor.  I didn't hear

12   what you said.

13        THE COURT:  The objection will be sustained in part

14   and overruled in part.

15   BY MS. SWEENEY:

16   Q.  Mr. Olson, what eventually happened at the end of your

17   negotiations in 2014 with the two chicken suppliers?  What

18   eventually happened?

19        MR. McLOUGHLIN:  Objection to form.

20        THE COURT:  Mr. McLoughlin, did you make that

21   objection?

22        MR. McLOUGHLIN:  Yes.

23        THE COURT:  Maybe we can get the microphone positioned

24   a little closer to you because I can just barely hear when you

25   do object.  What was the objection?

James Olson - Direct

1       MR. McLOUGHLIN:  Objection to form, foundation, what

2   happened.

3       THE COURT:  Overruled.

4   A.  There were no discounts allowed for Harmon Management

5   Corporation.  And Harman Management Corporation abided by the

6   pricing that had been negotiated by the RSCS.

7   BY MS. SWEENEY:

8   Q.  And what was that pricing?

9   A.  There was different pricing from different suppliers.

10  Q.  Can you give a ball park of the pricing?

11      MS. JOHNSON:  Objection, Your Honor.  A ball park,

12  it's irrelevant.  If the witness can testify to the specifics,

13  we are fine with that, but a ball park is irrelevant.

14      THE COURT:  It's not irrelevant, but it is vague.  I

15  will sustain it on that ground.

16  BY MS. SWEENEY:

17  Q.  Mr. Olson, do you recall what the price increase was from

18  the suppliers that the HMC-owned KFC restaurants were

19  purchasing to?

20  A.  One was a little under 10 cents a pound and one was a

21  little over 10 cents a pound.

22      MS. SWEENEY:  Your Honor, may I have a minute to

23  confer with my colleagues?

24      THE COURT:  You may.

25  BY MS. SWEENEY:

James Olson - Direct

1   Q.   And Mr. Olson, just to clarify your last answer, was the

2   final price a little bit over and a little bit under 10 cents a

3   pound?

4        MS. JOHNSON:  Objection, Your Honor.  It's unclear

5   what the final price is.  We are now talking about two

6   different negotiations and it's unclear, so I would object for

7   those reasons.

8        THE COURT:  Overruled.

9   BY MS. SWEENEY:

10  Q.   So Mr. Olson, the final RSCS contract price that HMC-owned

11  KFC restaurants purchasing chicken from, you mentioned one was

12  a little over 10 cents and one was a little under 10 cents.

13  Were those the final negotiated prices around that 10-cent

14  mark?

15  A.   That was the negotiated increase.

16  Q.   The negotiated increase you said?

17  A.   Yes, increase.

18  Q.   Mr. Olson, in your time at HMC, did you ever negotiate with

19  chicken suppliers jointly?

20  A.   Never.

21  Q.   At any point in 2012 or 2016 did you ever ask suppliers to

22  coordinate their pricing?

23  A.   No.

24  Q.   At any point in that time period did you ever ask the

25  chicken suppliers to coordinate on how high price increases, if

James Olson - Cross

1   there were price increases, should be?

2   A.  No.

3           MR. McLOUGHLIN:  Objection, Your Honor.  We have

4   already established this witness is on the board of directors.

5   He did not negotiate pricing in any of those years with any of

6   these suppliers except possibly two suppliers with a discount

7   particular to Harman.  Any question about what a price increase

8   would be with regard to RSCS, which this question does, is

9   double hearsay and outside the scope of his knowledge and it

10  lacks a foundation.

11          THE COURT:  I will sustain the objection.  He already

12  testified that he never negotiated pricing for chicken.

13          MS. SWEENEY:  The government has no further questions

14  for this witness.

15          THE COURT:  Thank you.

16          Cross-examination?

17          Mr. Gillen, go ahead.

18                      **CROSS-EXAMINATION**

19  BY MR. GILLEN:

20  Q.  Good afternoon, Mr. Olson.

21  A.  Hello.

22  Q.  My name is Craig Gillen.  I represent Mr. Roberts.  I have

23  a few questions to ask you.

24          First of all, let's go back.  You mentioned the market

25  dynamics in 2014, correct?

James Olson - Cross

1    A.   Yes.

2    Q.   And the market dynamics in 2014 was such that there was a

3    concern by KFC and RSCS about suppliers changing from small

4    bird plants to big bird plants, correct?

5    A.   Yes.

6    Q.   And the concern there was -- I believe you testified that

7    the concern was that if a supplier can make more money per

8    pound on a big bird plant, then that would drive the incentive.

9    The market incentive would be for them to transfer that small

10   bird plant to a big bird plant, correct?

11   A.   It could.

12   Q.   I am sorry?

13   A.   It could.

14   Q.   And the worry and the concern inside of KFC was that --

15            MS. SWEENEY:   Objection, Your Honor, foundation.

16            THE COURT:   Well, let's hear the question first.

17   BY MR. GILLEN:

18   Q.   Your worry and concern was that in the event that there was

19   this trend of transferring small bird to big bird plants, if

20   that continued it could have an absolutely devastating effect

21   on your business, KFC business, right?

22   A.   Yes.

23   Q.   Okay.  And so now we've got the dynamic set.  We have a

24   disaster on Mother's Day, correct?

25   A.   Yes.

James Olson - Cross                                                282

1   *Q.* And when I mean disaster, there are, as you testified,

2   literally some KFC stores running out of chicken on Mother's

3   Day of all days, right?

4   *A.* Yes.

5   *Q.* And as we indicated, Mother's Day is the day that

6   historically for KFC that is the biggest sales day of the year,

7   correct?

8   *A.* Yes.

9   *Q.* And so that in the spring of 2014 continued to set off

10  alarm bells within KFC that we have potentially a big supply

11  problem, correct?

12  *A.* Yes.

13  *Q.* And that is one of the reasons that, of course, within KFC

14  you knew that there were going to be price increases because of

15  supply and demand, right?

16  *A.* Not necessarily.

17  *Q.* Oh, you didn't know that. Well, did you not suspect that

18  when people can make more money selling big bird than a small

19  bird, that that might create less of a supply on the

20  marketplace?

21          *MS. SWEENEY:* Object, Your Honor, as to foundation.

22          *THE COURT:* Overruled.

23  *A.* Could you ask that again, please?

24  *BY MR. GILLEN:*

25  *Q.* Did you understand that if somebody has got -- can

James Olson - Cross                                    283

1    transform a small bird to a big bird plant, that that's going

2    to create a supply problem in the small bird production,

3    correct?

4    A.  Yes.

5    Q.  You have got to answer yes or no.

6    A.  Yes.

7    Q.  I am sorry, it's difficult to hear.  Thank you.

8           Now, when you have a lower supply -- and you have been

9    in business for how many years?

10   A.  45 years.

11   Q.  And you know supply and demand.  When you have a higher

12   demand and you've got a supply problem, what happens?  Prices

13   go up, right?

14   A.  They could.

15   Q.  So prices go up when you've got a problem with supply and

16   demand.  And you saw in the Mother's Day period there is a

17   potential big problem that we've got to deal with, right?

18   A.  Yes.

19   Q.  Now, one of the ways that internally -- and now, you're not

20   only dealing from the Harman company on the -- for the KFC

21   franchise within that entity, but you're also on the board,

22   correct?

23   A.  Correct.

24   Q.  At that time were you the chairman of the board for RSCS?

25   A.  I don't recall.

James Olson - Cross                                      284

1    *Q.*  But you were on the board.  You do remember that.

2    *A.*  Yes.

3    *Q.*  So you were there and watching kind of what was happening,

4    what the strategy was, correct?

5    *A.*  Yes.

6    *Q.*  And one of the things that KFC wanted to do because they

7    understood the problems of, you know, you don't want to run out

8    of chicken every day like you did on Mother's Day, do you?

9    *A.*  No.

10   *Q.*  So what you want to do is you want to try to stabilize the

11   marketplace as best you can, correct?

12   *A.*  Or change the marketplace.

13   *Q.*  Well, or change it for the better for you, correct?

14   *A.*  Yes.

15   *Q.*  But in order to work to address the risk that you had about

16   the problem with supply and demand, internally KFC is going, we

17   need to have -- not like we usually do a one-year contract.  We

18   need a three-year commitment from these people, right?

19   *A.*  I am not sure where that initiated.

20   *Q.*  Well, it initiated from KFC, right?

21   *A.*  I don't know.

22   *Q.*  Well, it initiated -- you don't know who suggested that

23   there be a three-year contract rather than a one-year contract?

24   *A.*  I do not.

25   *Q.*  You were on the board of RSCS in the summer of 2014, and

James Olson - Cross                                              285

1    you're telling this jury that you don't know who came up with

2    the idea for a three-year contract.

3             MS. SWEENEY:  Object, Your Honor, asked and answered.

4    BY MR. GILLEN:

5    Q.  Was it the suppliers or --

6             THE COURT:  Mr. Gillen, you've got to wait for me to

7    rule on objections.

8             MR. GILLEN:  I apologize, Your Honor.

9             THE COURT:  The objection is overruled.  Now you can

10   ask another question.

11            MR. GILLEN:  Thank you.

12   BY MR. GILLEN:

13   Q.  Now, what we have here is you're telling us as a member of

14   the board of RSCS in the summer of 2014 you don't know whether

15   it was KFC or whether it was the suppliers that came up with

16   the idea of having a three-year contract?

17   A.  Or if it was me.

18   Q.  I am just asking, you or KFC or RSCS or the suppliers on

19   one side, who was it?

20   A.  I don't know.

21   Q.  You have forgotten or you just never knew?

22   A.  I don't know.

23   Q.  Okay.  So now we've got the scenario set up, and I think

24   the way that you described it in your testimony was that the

25   franchisees, they were going to have to accept the contracts

James Olson - Cross

1   because of what was happening in the market.  Do you remember

2   that phrase you used, what was happening in the market?

3   *A.*   Yeah.

4   *Q.*   So when you are talking about having to accept the prices

5   that were put on the -- through the negotiations of the

6   contract through RSCS, that was a result of what was happening

7   in the market, correct?

8   *A.*   That was what was told to me as a director.

9   *Q.*   And being told to you as the director, the people telling

10   you were the people negotiating on behalf of RSCS, correct?

11   *A.*   Yes.

12   *Q.*   Let's go over some of those names.  Now, in the summer of

13   2014, there was a man by the name of Pete Suerken, correct?

14   *A.*   Yes.

15   *Q.*   Now, Pete Suerken, what was his position at RSCS?

16   *A.*   He had different positions over the years.  He may have

17   been over purchasing at that time.

18   *Q.*   Well, he was the No. 1 negotiator in the summer of 2014 for

19   the KFC contracts for 2015, correct?

20         *MS. SWEENEY:*  Objection as to foundation.

21   *BY MR. GILLEN:*

22   *Q.*   Is that correct or not?

23         *THE COURT:*  Mr. Gillen, once again, you have got to

24   let me rule on objections.  Overruled.

25         Go ahead.

James Olson - Cross

1  *BY MR. GILLEN:*

2  Q.  Isn't it correct that Pete Suerken was in charge of the

3  negotiations for RSCS that summer of 2014 through the fall of

4  2014 negotiating the KFC 2015 contract?

5  A.  I can't say for a fact I know that.

6  Q.  Well, do you know that Pete Suerken -- who was?  Who do you

7  think was in charge, Mr. Olson?

8  A.  There were various people involved at the time.

9  Q.  Well, we've got Pete Suerken and you know that he was

10  involved, correct?

11  A.  Yes.

12  Q.  And then we've got Rich Eddington.  Do you know who Rich

13  Eddington is?

14  A.  I do.

15  Q.  Tell the jury who Rich Eddington is.

16  A.  He was involved on the purchasing team for chicken.

17  Q.  And Rich Eddington was someone who had come over -- in the

18  summer of 2014, he had come over from Mar-Jac over to work for

19  RSCS, correct?

20  A.  I don't know where he came from.

21  Q.  You do not know where Mr. Eddington came from.

22  A.  Yes.

23  Q.  Do you know when he came to RSCS?

24  A.  I believe it was the spring of '14, approximately.

25  Q.  Well, it was in the summer -- was he -- he was involved in

288

James Olson - Cross

1   the KFC negotiations?

2   A.   Yes.

3   Q.   And then there was Mr. Lewis, correct?

4   A.   Yes.

5   Q.   So we have got three people there.  And what they would do

6   is they would send out -- they communicated with the suppliers,

7   sometimes collectively, through e-mails, but would meet with

8   them individually, correct?

9   A.   That's my understanding, yes.

10  Q.   And there were different meetings and different e-mails set

11  up.  The one thing that we can be sure of is that you were not

12  in a single one of those meetings, were you?

13  A.   No.

14  Q.   So when we are talking about the negotiations for the KFC

15  2015 contract, we can be sure that you did not attend a single

16  meeting with a supplier; isn't that right?

17  A.   Yes, that's correct.

18  Q.   We can also be sure that when we have the e-mails

19  concerning communications back from the suppliers to RSCS and

20  RSCS back to the suppliers, that you were not copied or cc'd on

21  a single one of those e-mails, were you?

22  A.   I can't recall any e-mails or correspondence.

23  Q.   And when the proposal for a bid was sent out by RSCS asking

24  the supplier to submit their numbers, you didn't do that, did

25  you?

289
James Olson - Cross

1    A.  No.

2    Q.  And when they responded to the request from RSCS for a

3    proposal for KFC, they didn't send it to you, did they?

4    A.  No.

5    Q.  As a matter of fact, is there any meeting or e-mail or any

6    kind of document or proposal that was sent to you at all in the

7    summer of 2014 that had anything to do with -- from the

8    suppliers about this contract?

9    A.  No.  That would be inappropriate.

10   Q.  As a matter of fact, you say the word it would be

11   inappropriate.  Let's talk about that.  And it would be

12   inappropriate for you, Mr. Olson, to communicate directly with

13   any of the suppliers about pricing because that would be in

14   violation of your membership with the RSCS; isn't that right?

15   A.  I am unclear on the question.

16   Q.  Well, I will clarify it.

17          You said it would be inappropriate.  It would be

18   inappropriate for you as a franchisee to try to negotiate

19   separate and apart from RSCS a separate pricing for the KFC

20   contracts in 2015; isn't that right?

21   A.  Are you asking about the discounts?

22   Q.  I am asking about the contract.  We are talking in this

23   case about the contract, the KFC contract for 2015, okay?

24   A.  Okay.

25   Q.  It would be inappropriate for you as a franchisee to

James Olson - Cross

1    attempt to go around the corner, scoot around the corner and

2    bypass RSCS and try to negotiate separately with any of the

3    suppliers on pricing; isn't that right?

4    A.  On the base contract that they signed, absolutely correct.

5    Q.  I'm not saying base -- the contract about the pricing for

6    the chicken for three years.  That's what I am talking about.

7    A.  Okay.

8    Q.  And it would be inappropriate for you to engage in any

9    negotiations or try to circumvent RSCS in any way to try to

10   work a separate deal, the Harman Group as a franchisee; isn't

11   that right?

12   A.  I would say no because I think you're including the

13   discount conversations I had with your client.

14   Q.  No, I am talking about the contract that was signed that

15   KFC had for the -- this is about the 2015 pricing contract,

16   okay?  So when I ask you a question, keep in mind I am asking

17   you about the pricing contract, all right?

18   A.  Okay.

19   Q.  It would be inappropriate for you as a franchisee to try to

20   go around the corner and try to circumvent RSCS and try and

21   negotiate pricing on the contract separately, wouldn't it?

22   A.  In my definition of my understanding of what you're asking

23   me, absolutely correct.

24   Q.  Thank you.  And so what happened is that there were

25   negotiations on the contract that went out, and then there were

James Olson - Cross

1    meetings and discussions about what the terms would be with

2    RSCS and the respective suppliers, correct?

3    A.   With me?

4    Q.   No, not with you.  RSCS met with and communicated with the

5    various suppliers to make sure that they would work out

6    whatever deal they had individually with those suppliers,

7    correct?

8    A.   Yes.

9    Q.   And on the pricing you were not involved in that at all.

10   A.   Correct.

11   Q.   Correct?  Now, what you're telling us is that in October,

12   now, the second wave -- do you even know when the suppliers

13   sent in their bids for 2014?

14   A.   I believe it was August or September.

15   Q.   Do you know the dates in August?

16   A.   No, I do not.

17   Q.   So you are unaware of the dates that RSCS actually asked

18   people to submit their pricing bids, correct?

19   A.   I do not know the date.

20   Q.   Well, then can you tell us the date of what the second wave

21   would be or the follow-up for proposal?  Do you know when that

22   was?

23   A.   No.

24   Q.   But what you do know is that your meeting, informal dinner

25   that you had with Mr. Roberts, that was either in October or

James Olson - Cross

1   November, right?

2   A.   Yes.

3   Q.   And by that time the various suppliers had met with and

4   discussed with RSCS kind of what the terms would be for each

5   one of them; isn't that right?

6   A.   Correct.

7   Q.   So what we had is by the time that you have dinner with

8   Mr. Roberts, that the Tyson position and virtually everybody's

9   position regarding what the pricing contract was going to be

10  with KFC, that those terms had already been agreed upon, right?

11  A.   I don't think they were agreed upon until December.

12  Q.   Formally signed in December, but they had been agreed upon,

13  right?

14  A.   I don't know that.

15  Q.   Well, you know how -- you tell me how it works in the

16  chicken business.  When you sit there and you have a

17  negotiation and then you say -- don't you say to somebody,

18  okay.  All right.  We are good with these terms.  And those are

19  the handshake deals that you have with folks.  And then, you

20  know, you get the lawyers to figure out the documents that are

21  signed in December, right?

22  A.   Okay.

23  Q.   Right?  You are in the chicken business for all these

24  years.  Is that right or not?

25  A.   I don't know what being in the chicken business has to do

293
James Olson - Cross

1   with it, but --

2   Q.  Well, we are talking about the chicken business.

3   A.  There is usually a time frame from anywhere from minutes to

4   days or weeks before a contract is signed.

5   Q.  In the chicken industry is it not common when you are

6   working out and negotiating a deal that there is an agreement

7   where there is an agreement and a handshake deal, and then down

8   the road the terms have been typed up by the lawyers who might

9   do it and it gets signed in December, right?

10  A.  Sure.  There is going to be a time difference.

11  Q.  Because in this industry a handshake means a lot, doesn't

12  it?

13  A.  It should.

14  Q.  And you've been in the chicken industry -- or you are not

15  now.  You are retired.  But all those years it meant a lot to

16  you, a handshake, didn't it?

17  A.  Yes.

18  Q.  Now, what you were then telling us about and telling the

19  jury about is not the KFC pricing contract.  It's something

20  quite different that had nothing to do with the terms of the

21  KFC pricing contract, right?

22  A.  Yes.

23  Q.  So what you're saying is that you had some side business

24  deal that you wanted to address with Mr. Roberts and Mr. Blake

25  respectively, right?

James Olson - Cross
294

1   A.   Yes.

2   Q.   And when you were telling us about that, you weren't saying

3   that there was anything that you were trying to do to get Tyson

4   to come down off their profit margin or to do anything else on

5   that KFC 2015 pricing contract, right?

6   A.   I couldn't.

7   Q.   You couldn't.  And you didn't, did you?

8   A.   No.

9   Q.   But what you were trying to do is you were trying to go

10  around and say, okay, look, you're a business partner.  We

11  value you.  We value you, Mr. Roberts.  We value you,

12  Mr. Blake.  Can't we do something on, you know, getting us some

13  financing terms, for example, right?

14  A.   Yes.

15  Q.   And that's a way where you're saying, well, you know, it

16  would be improper and we couldn't negotiate what the price is,

17  but we can talk about maybe how we are going to be paying for

18  that, right?

19  A.   Yes.

20  Q.   So when we talk about deals about pricing -- excuse me,

21  about financial terms, it's about, you know, let me give you an

22  example.  I don't know whether this is something you would do

23  or not.  To say, okay, gee, if we pay in 15 days, will you give

24  us 1 percent or 2 percent discount off; is that right?

25  A.   Yes.

295

James Olson - Cross

1   Q.  And so that really didn't have anything to do with the

2   actual pricing of the contract.  This had to do with you're

3   trying to work out some benefits that would be, as you said,

4   creative that would be to the benefit of your company, correct?

5   A.  And to the supplier also.

6   Q.  Right.  So, for example, like that, if somebody said, well,

7   you know, okay, what about -- I think you said quick pay or

8   something like that.  A quick pay would be a benefit to me if I

9   am selling you something.  If you say, I'll pay you in 15 days,

10  okay?  I'll cut off a percentage or two, right?  That way that

11  would be a benefit to you and a benefit to Tyson or any other

12  company, right?

13  A.  Yes.

14  Q.  So those are the sorts of things that you were trying to

15  work with when you were talking to Mr. Roberts and Mr. Blake,

16  correct?

17  A.  Correct.

18  Q.  Now, we have already established -- excuse me.  Strike

19  that.

20          You said on direct examination that you believe that

21  it was October or November when you and Mr. Roberts had dinner,

22  correct?

23  A.  Yes.

24  Q.  And so at that stage were you aware that the dust had

25  settled on the terms that had been reached with RSCS and, for

James Olson - Cross

1    example, Tyson's?

2    A.   I don't believe I knew that until the first week of

3    December.

4    Q.   So your testimony is you didn't know that until December.

5         And again, what you said is I think when you testified

6    about whether or not the franchises would take it, they took

7    the price increase, the market had dictated that and that you

8    had to accept that, right?

9    A.   Yes.

10   Q.   So your issue was you were hoping to get a little bit of an

11   extra.  It had nothing to do with the contract pricing.  You

12   were trying to get an extra deal that you would work to be

13   creative and to be imaginative so that you could get a benefit

14   for your company which would also benefit Tyson, correct?

15   A.   Correct.

16   Q.   So and what you then I believe said was that when you asked

17   Mr. Roberts about that, he just frankly said, "I can't do

18   anything.  I can't do anything for you on that," right?

19   A.   Yes.

20   Q.   So that's all he said to you.  When you were asking about

21   these creative things that you wanted as a side deal, he just

22   said, "I can't help you on that," right?

23   A.   That's correct.

24   Q.   And that's all he said, isn't it?

25   A.   I don't remember anything beyond that.

James Olson - Cross

1   Q.  Okay.  And then -- and I assume you guys talked some more,

2   finished up your meal and went about your way; is that right?

3   A.  Yes.

4   Q.  Now, Mr. Blake wasn't at dinner with you all, was he?

5   A.  No.

6   Q.  So you had dinner with Mr. Roberts and dinner with

7   Mr. Blake, correct?

8   A.  I can't recall if it was a dinner.

9   Q.  So you don't know whether with Mr. Blake if it was a dinner

10  or not.

11  A.  I can't recall that, no.

12  Q.  With Mr. Roberts you know it was.

13  A.  Yes.

14  Q.  So what you're saying is that both of them said, "Can't

15  help you," basically.

16        MS. SWEENEY:  Objection, hearsay.  He is eliciting

17  what the defendant said.  He represents Mr. Roberts.

18        THE COURT:  Well, it's true, but it's the same thing

19  that you elicited, so I will overrule the objection.

20  BY MR. GILLEN:

21  Q.  And that's basically "I can't help you this year,"

22  basically, right?

23  A.  Yes.

24        MR. GILLEN:  That's all I have, Your Honor.  Thank

25  you.

298

James Olson - Cross

1          THE COURT:  Thank you, Mr. Gillen.

2          Mr. Tubach.

3          MR. TUBACH:  Thank you, Your Honor.  One moment.  With

4    the Court's permission I have some documents in a binder I

5    would hand up to the witness.

6          THE COURT:  You can hand them to Mr. Keech.  He will

7    hand them to the witness.

8                         **CROSS-EXAMINATION**

9    BY MR. TUBACH:

10   Q.  Mr. Olson, I have some documents there I may or may not

11   show you.  I will direct you to the tab when I want to show

12   them to you, okay?

13   A.  Sure.

14   Q.  My name is Michael Tubach.  I represent Mr. Penn.  I have

15   just a couple questions for you.

16   A.  Okay.

17   Q.  You testified earlier that there was a potential for small

18   bird producers to move to big bird production, correct?

19   A.  Yes.

20   Q.  You knew, though, in fact, that that just wasn't a

21   potential.  That in fact had been happening for at least 10

22   years in the chicken business prior to 2014, right?

23   A.  Yes.

24   Q.  And, in fact, you saw documents in 2014 that showed that

25   from 40 small bird producers it had got down to 30 between 2005

James Olson - Cross

1   and 2014, right?

2   A.   There had been consolidation.

3   Q.   Well, not just consolidation, but the number of small bird

4   plants had changed between 2005 and 2014, right?

5   A.   That's correct.

6   Q.   And that number had gone down from about 40 to about 30,

7   correct?

8   A.   That sounds reasonable.

9   Q.   You talked earlier also about a three-year deal and that

10   this was basically something new that was being negotiated in

11   2014 for 2015, '16 and '17, right?

12   A.   Yes.

13   Q.   Had you ever negotiated -- or you didn't, but had RSCS ever

14   negotiated a three-year deal prior to 2014?

15   A.   Not to my knowledge until before 1996.  If it happened, it

16   happened then.

17   Q.   That was historic, right?

18   A.   Yes.

19   Q.   And a three-year deal, you testified earlier that meant

20   that you were stuck with that price, right?

21   A.   Yes.

22   Q.   That, of course, also meant that the suppliers were stuck

23   with supplying small bird for those three years, right?

24   A.   Correct.

25   Q.   They were committed to supplying the volume that they had

James Olson - Cross

1    contracted to supply for that entire three-year period, right?

2    A.   Which was the reason we agreed to the three years.

3    Q.   Well, it's not just what you agreed to.  In fact, wasn't it

4    you, sir, who suggested the three-year contract?

5    A.   I made a suggestion of that, yes.

6    Q.   Let me show you a document.  We will go to our first

7    document.  Why don't you take a look at Exhibit -- it's Tab 5.

8         MR. TUBACH:  And we have copies for counsel.

9    BY MR. TUBACH:

10   Q.   It's Exhibit C-755.  Take a look at that and let me know

11   when you have had a chance to look at it.

12   A.   I recognize the document.

13   Q.   This is a document you created, correct?

14   A.   Yes.

15   Q.   And this is a two-page document in which you summarized --

16   you say at the top, How to Increase Supply Capacity for COB,

17   right?

18   A.   Correct.

19   Q.   And COB is short for chicken on the bone, correct?

20   A.   Yes.

21   Q.   Do you know why you created this document?

22   A.   I created this in June of 2014, early part of June.  It was

23   two, three weeks after Mother's Day when we had our historical

24   shortage.  And I was using my career's knowledge and my

25   knowledge of the relationships I had with suppliers and also my

301

James Olson - Cross

1   knowledge from my role as a director to give the CEO of the

2   RSCS my ideas on possible solutions that would benefit the

3   system, and by the system I mean the franchise stores, and also

4   the suppliers.  I was looking for a solution that could work

5   out for both parties.

6   Q.  Take a look, if you would, at Tab 4 which may give us an

7   exact date.

8        MR. TUBACH:  And that's for the record Defense Exhibit

9   C-754.

10        THE COURT:  Until an exhibit has been admitted, ladies

11   and gentlemen, it won't be shown to you.  Once it's admitted,

12   then as long as an attorney asks that it be so-called published

13   to you -- that's a technical term -- then it will be displayed

14   on your screen and on the public monitors too, okay?

15        Go ahead, Mr. Tubach.

16        MR. TUBACH:  Thank you, Your Honor.

17   BY MR. TUBACH:

18   Q.  Have you had a chance to take a look at Tab 4, Exhibit

19   C-754?

20   A.  I have.

21   Q.  I am only interested in the very first e-mail on the bottom

22   of the second page.  Have you had a chance to look at that?

23   A.  Yes.

24   Q.  That's an e-mail that you wrote on June 9th, 2014 to Steve

25   McCormick, right?

James Olson - Cross                                                          302

1    A.   That's what I just stated, yes.

2    Q.   And who is Mr. McCormick?

3    A.   He is the CEO of the RSCS.

4    Q.   And attached to that e-mail was the document we have just

5    been talking about which was C-755, correct?

6    A.   Yes.

7            MR. TUBACH:  I move into evidence C-755 and C-754.

8            MS. SWEENEY:  I object as to hearsay and authenticity

9    of the documents, and in addition it is not relevant.

10           THE COURT:  And what is being displayed, 754 right

11   now?

12           MR. TUBACH:  What's on the screen is 754.  And I am

13   only moving into evidence the portion -- it's a longer e-mail,

14   but only that first part that's now up on the screen.  It goes

15   to the timing of the sending of the document.  That's not

16   non-hearsay.

17           THE COURT:  What's the government's objection to 755?

18           MS. SWEENEY:  I am sorry?

19           THE COURT:  To 755.

20           MS. SWEENEY:  755, Your Honor, is hearsay.  It's an

21   out-of-court statement repeated in court for the truth of the

22   matter.

23           THE COURT:  Objection will be overruled.  C-755 will

24   be admitted.

25           And what's the objection to C-754?

James Olson - Cross

1          MS. SWEENEY:  So Your Honor, we would ask that the

2     defendant redact the portions that are not admitted into

3     evidence.

4          MR. TUBACH:  I will be happy to do that, Your Honor.

5          THE COURT:  Yeah, because Mr. Tubach, you are only

6     moving the admission of what's being displayed on the screen

7     which I assume is a very -- I don't know what page that's on,

8     but just the -- a very --

9          MR. TUBACH:  It's the very bottom of the last page.

10    We will be happy to redact anything that is not currently --

11    well, was --

12         THE COURT:  What was, yes.

13         That objection will be overruled as well.  That

14    portion that was displayed of C-754 will be admitted.

15         MR. TUBACH:  Thank you, Your Honor.  I would ask to

16    publish Exhibit 755 to the jury.

17         THE COURT:  All right.  So ladies and gentlemen, this

18    is then, assuming that I grant that, which I do, then C-755

19    will be -- may be published to the jury.

20         MR. TUBACH:  Why don't we show C-755.

21    BY MR. TUBACH:

22    Q.  I would like to focus in on, Mr. Olson -- if we could pull

23    up specifically two -- the language that's the No. 2 and

24    highlight and bring that up.

25         Now, this is your statements to the CEO of RSCS about

James Olson - Cross

1  how they could try to ameliorate this supply problem, right?

2  A.  Yes.

3  Q.  And so one of the things you said on 2a is, "As chicken

4  suppliers have consolidated their business and there are fewer

5  production lines for 2.8 birds, the capacity for flexibility is

6  near non-existent," right?

7  A.  Yes.

8  Q.  And just so we have for the record here 2.8 birds, that is

9  shorthand, wasn't it, for 2.8-pound birds?

10  A.  Yes.

11  Q.  And that's just another way of saying small birds, right?

12  A.  Yes.

13  Q.  Let's look at 2b.  You were of the opinion in June of 2014

14  that there is, quote, "little or no reason for suppliers to add

15  new lines," right?

16  A.  To add any lines.

17  Q.  Yeah, to add new lines.  What that meant was add small bird

18  capacity, right?

19  A.  Right.

20  Q.  New lines meaning new lines within the plant that can

21  process small birds, right?

22  A.  You can't amortize a new line with a one-year contract.

23  Q.  So you anticipated my next question.  If you look at 2c,

24  your suggestion was, "The RSCS needs to change from year to

25  year contracts with the suppliers to longer term contracts

305

James Olson - Cross

1    (3 years?) which will allow them to invest in new line

2    capacity," right?

3    A.   That's correct.

4    Q.   That was your recommendation to the CEO of RSCS, right?

5    A.   Yes.

6    Q.   And the reason to recommend that was to assure that your

7    franchises would have enough chicken to sell and you would

8    never have another Mother's Day disaster, right?

9    A.   And beyond that point.

10   Q.   And beyond that.  Not just Mother's Day, but every day.

11   A.   To solve the short-term problem of supply.  It's to

12   hopefully solve the long-term problem by giving us three years

13   to see if we could migrate to bigger birds and to find out if

14   there were other solutions to the problem besides just those

15   two options.

16   Q.   And what you were proposing was that RSCS would, in fact,

17   basically pay for that additional capacity within the suppliers

18   and allow them to pay that off through higher prices amortizing

19   the cost of those new lines, right?

20   A.   That was a suggestion to look into, yes.

21   Q.   But RSCS, they didn't adopt a suggestion that the suppliers

22   could amortize the cost of those new lines by just increasing

23   their prices, right?

24   A.   Could you restate that?

25   Q.   Sure.  Your suggestion was that the suppliers ought to be

James Olson - Cross

1   able to recoup their cost of investing in new lines by just

2   adding a little more to the price of chicken and pay it off

3   over time, right?

4   A.  It was a suggestion for the CEO, Steve McCormick, to look

5   into to see if that was something feasible and it was something

6   that even the suppliers would be interested in.

7   Q.  But that was never done, was it?

8   A.  Not to my knowledge, no.

9   Q.  Now, you wrote this two-page document and sent it to

10  Mr. McCormick.  You did that as part of a whole process that

11  RSCS was going through in trying to make a strategic decision

12  about how to solve this supply problem, right?

13  A.  If you're -- are you referring specifically to another

14  party?

15  Q.  Well, yes.  I am asking specifically about the consulting

16  company.

17  A.  Yes, McKinsey was hired.  That was approved by the board of

18  directors.

19  Q.  And this was part of that process of hiring McKinsey and

20  having them conduct all this work, right?

21  A.  I don't know if this document had any bearing on that or

22  not.  I was never told that.

23  Q.  I am sorry?

24  A.  I was never told that.

25  Q.  You do recall that RSCS hired McKinsey & Company to help it

James Olson - Cross

1    come up with ideas for solving a supply problem, right?

2    A.   Yes.

3    Q.   Do you recall when that was?

4    A.   I don't.

5    Q.   Take a look at what's Tab 2.  It's Defense Exhibit H-609.

6    I will give you a chance to take a look at that.  Let me know

7    when you have had a chance to review it.

8          MS. SWEENEY:  Objection, Your Honor.  The document is

9    being published to the jury.

10         MR. TUBACH:  I didn't ask for that to happen.

11         THE COURT:  It can't be.  That was a mistake.

12         Go ahead, Mr. Tubach.

13         MR. TUBACH:  I am just waiting for the witness to

14   finish looking at the document, Your Honor.

15         THE COURT:  Sure.

16   A.   Do you want me to read the entire document?

17   BY MR. TUBACH:

18   Q.   No.  I am just asking if you recognize the document.

19   A.   I don't think I have ever seen it before.

20   Q.   Does that help refresh your memory, though, that on or

21   around June 3 of 2014 McKinsey & Company had been engaged by

22   RSCS to help it analyze this small bird supply problem?

23         MS. SWEENEY:  Objection, Your Honor, improper

24   questioning.  The witness said he didn't recognize the

25   document.

James Olson - Cross

1    *THE COURT:*  Well, he hasn't answered whether it

2    refreshes his recollection.  That's the question.

3    *BY MR. TUBACH:*

4    *Q.*  Does that help refresh your recollection about roughly when

5    this happened?

6    *A.*  I haven't read the whole document so I don't know if this

7    is like an RFP or if it's an actual contract that they were

8    going to enter into.

9    *Q.*  Fair enough.  Let's take a look at Tab-3, if you would.

10          *MR. TUBACH:*  This is for the record Defense Exhibit

11    H-610.

12    *BY MR. TUBACH:*

13    *Q.*  Again, I am only interested in the -- it's an e-mail

14    string.  I am only interested in the very last e-mail on the

15    very bottom e-mail on the very last page.

16    *A.*  On the last page?

17    *Q.*  Yeah, you don't need to read the whole thing.  That's an

18    e-mail from you to Mr. McCormick on June 5, right?

19    *A.*  Yes.

20    *Q.*  Do you see that?

21    *A.*  Yes.

22    *Q.*  A short e-mail, right?  That's June 5 of 2014.  In this

23    e-mail you are asking McCormick -- you are telling him that you

24    haven't heard from McKinsey yet; isn't that right?

25    *A.*  Yes.

James Olson - Cross

1   Q.  He said, "Wasn't that supposed to happen prior to the

2   meeting on the 11th," right?

3   A.  Yes.

4   Q.  Do you recall sending this e-mail?

5   A.  No, I don't.

6   Q.  Do you recall that McKinsey was supposed to contact you as

7   part of the process of McKinsey's retention and investigation

8   of this supply problem?

9   A.  I don't recall that specifically, but reading this e-mail

10  it makes me conclude that at some point someone said I was

11  going to be called.

12  Q.  And you said that the RSCS board approved the hiring of

13  McKinsey, right?

14  A.  Yes.

15  Q.  And you were on the board at the time, right?

16  A.  I was.

17  Q.  And did you approve that?

18  A.  Yes.

19  Q.  And how much did it cost to have McKinsey conduct the study

20  that they conducted?

21  A.  I don't recall.

22  Q.  Would you take a look back at Exhibit -- Tab 2 for you,

23  Exhibit H-609?  And I want to focus specifically on Page 4.

24         Before I ask you specifically about that page, I

25  wanted to ask you before RSCS hired McKinsey, were you familiar

James Olson - Cross

1    with McKinsey & Company?

2    A.   Yes.

3    Q.   Had you worked with them before?

4    A.   No.

5    Q.   Had RSCS ever worked with them before?

6    A.   I believe so.

7    Q.   Do you know when?

8    A.   I can't recall a date.

9    Q.   But you don't recall -- at least on the time that you were

10   serving on the RSCS board, you don't recall ever working with

11   McKinsey before?

12   A.   I don't have a specific memory, no.

13   Q.   So do you recall that -- and would it be fair to say that

14   McKinsey & Company is one of the premier consulting firms in

15   the country?

16   A.   Yes.

17   Q.   Perhaps the premier consulting firm?

18   A.   Possibly.

19   Q.   So looking now at Page 4, does that refresh your

20   recollection about the cost to RSCS of hiring McKinsey?  That

21   second full paragraph, it was about a million dollars, wasn't

22   it?

23            MS. SWEENEY:  Objection.

24            THE COURT:  That's an inappropriate comment.  He has

25   to look at the document and if it refreshes his memory, that's

James Olson - Cross

1   fine.  You can't read from the document, Mr. Tubach.

2           MR. TUBACH:  I wasn't.

3           THE COURT:  You mentioned the number.  That's

4   inappropriate.  Go ahead.

5   A.  Yes, I have read it.

6   BY MR. TUBACH:

7   Q.  Thank you.  Does that sound about right to you, that it

8   cost -- forget about the document now, that it was about a

9   million dollars?

10  A.  Yes.

11  Q.  Let me finish my sentence.  A million dollars that RSCS

12  spent to have McKinsey conduct this study, right?

13  A.  That's correct.

14  Q.  Was that unusual for RSCS to spend that kind of money

15  hiring a consultant?

16  A.  Yes.

17  Q.  And you were -- would you say you were relatively involved

18  in McKinsey's work over the following six weeks to prepare its

19  study?

20  A.  No, I wasn't involved.

21  Q.  You were not involved at all?

22  A.  Not that I recall.

23  Q.  Let's see if we can refresh your recollection.  Let's take

24  a look at Tab 6, if you would.

25          MR. TUBACH:  For the record, it's H-611.

312

James Olson - Cross

1    *BY MR. TUBACH:*

2    *Q.*  This is an e-mail.  Do you recall receiving this e-mail

3    that's H-611?

4            *MS. SWEENEY:*  Objection, Your Honor.  He is showing

5    the document to refresh his recollection, so the process for

6    refreshing recollection is just to ask if it refreshes his

7    recollection.

8            *THE COURT:*  I believe his question was whether he had

9    seen it.  He can answer that question.  Overruled.

10   *A.*  I am sure I saw it.  I am an addressee.

11   *BY MR. TUBACH:*

12   *Q.*  And do you recall that you were invited to a poultry

13   kickoff meeting with McKinsey for them to conduct their study

14   on around June 12th, 2014?

15   *A.*  I don't.

16   *Q.*  And looking at this document doesn't refresh your

17   recollection?

18   *A.*  No.

19   *Q.*  Who is Susan Adzick?

20   *A.*  She works with McLane Distribution Centers.

21   *Q.*  So you don't recall a meeting on June 12th at which

22   McKinsey, Young, RSCS, McLane and you were the only franchisee

23   representative participated in a kickoff meeting?

24   *A.*  I don't.

25   *Q.*  Do you recall participating in a second review meeting on

James Olson - Cross

1  or about July 10th, 2014?

2  A.  No.

3  Q.  Why don't you take a look at Tab 7, H-612.

4  A.  You said H-612?

5  Q.  For you it's just Tab 7.  Do you recall receiving an e-mail

6  on May 27, 2014 from the CEO of RSCS inviting you to a poultry

7  progress review meeting on July 10, 2014?

8  A.  Is this the meeting held in Tyson's headquarters?

9  Q.  I can't answer that question, sir.  Do you remember?

10 A.  I remember attending a meeting with many of the people that

11 are listed there at Tyson's headquarters.

12 Q.  And it could have been around July of 2014?

13 A.  Seven years ago, yes, it could have.

14 Q.  And you recall that there was a board meeting of the RSCS

15 at which McKinsey presented its results to RSCS that you had

16 asked for as a board member, right?

17 A.  Yes.

18 Q.  In fact, you got a sneak preview of that board

19 presentation, you alone with McKinsey.  Do you recall that?

20 A.  No.

21 Q.  Let me show you -- why don't you take a look at Tab 8.

22       MR. TUBACH:  For the record it's H-613.

23 BY MR. TUBACH:

24 Q.  Do you recall receiving this invitation to a meeting on

25 July 18th, 2014?

James Olson - Cross

1    *A.* This looks like it was a phone call meeting.

2           *MS. SWEENEY:* Objection, Your Honor.  Improper

3    refreshing his recollection.

4           *MR. TUBACH:* I am not asking for his recollection.  I

5    am asking if he recalls being invited to this meeting.

6           *THE COURT:* He is not attempting to refresh

7    recollection.  He is just asking the witness if he is familiar

8    with the document.  Overruled.

9    *A.* My life was meetings, so --

10   *BY MR. TUBACH:*

11   *Q.* I am sorry?

12   *A.* My life was meetings.

13   *Q.* My life was meetings.

14   *A.* Yes.  So this is a meeting seven years ago.

15   *Q.* Understood.  So as you sit here today, you don't recall one

16   way or the other whether you had a phone call with McKinsey

17   prior to that board presentation being presented to the whole

18   board?

19   *A.* No.  That would not have been unusual.

20   *Q.* And do you recall being sent the presentation prior to its

21   being presented at the board meeting?

22   *A.* No, but that wouldn't be unusual either.

23   *Q.* Take a look at Tab 9 and 10, if you would.

24          *MR. TUBACH:* For the record it's Exhibit H-614 and

25   H-615.  For the moment we are just going to do 614, and now we

James Olson - Cross

1    are going to do 615.

2    *BY MR. TUBACH:*

3    *Q.*  Have you had a chance to take a look at what for you is Tab

4    9 and 10 and for the record is H-614 and H-615.  I know you are

5    going through 615 now.  Can we start with 614 in Tab 9?  You

6    don't have to read through that entire document in H-615.

7    *A.*  Okay.

8    *Q.*  So you were sent the presentation that McKinsey prepared

9    ahead of the actual board meeting; is that right?

10   *A.*  Yes.

11   *Q.*  And that was in anticipation of the conference call that

12   you had with McKinsey that's reflected in Tab 8 for you which

13   is H-613, right, on July 18, 2014?

14   *A.*  I am sorry, one more time?

15   *Q.*  Sure.  The board presentation that was sent to you ahead of

16   time --

17   *A.*  Yes.

18   *Q.*  -- was in anticipation of that conference call you had with

19   McKinsey on July 18, 2014, the one that's in for you Tab 8, for

20   the record H-613.

21   *A.*  Okay.

22   *Q.*  Is that right?

23   *A.*  Yeah.  I would have to go back and look at the date, but I

24   am sure that's correct.

25   *Q.*  The date on H-613, Tab 8, is July 10 for a July 18 meeting.

James Olson - Cross

1  And on Tab 9, H-614, is also July 18.

2  A.  Okay.

3  Q.  Do you recall reviewing this what is H-615, Tab 10?  Do you

4  recall reviewing that?

5  A.  I do.

6  Q.  And you recall that conference call with McKinsey.  Did you

7  provide them any input?

8  A.  I am sure I did.

9  Q.  Do you recall at this point any idea what it was?

10 A.  No.

11 Q.  If there is something incorrect in here, do you think you

12 probably would have pointed it out to them if you knew it was

13 wrong?

14 A.  Yeah.

15 Q.  And was there anything in here that you recall as you sit

16 here today disagreeing with?

17 A.  As I sit here today, I can't recall anything.

18 Q.  Do you recall taking any notes of that meeting?

19 A.  No.

20 Q.  Is it your practice to take notes of meetings?

21 A.  Yeah.

22 Q.  And do you know what you might have done with those notes

23 if you took any notes?

24 A.  I probably thinned them out as I got retired.

25 Q.  Okay.  Very good.

James Olson - Cross

1          *THE COURT:*  Mr. Tubach, sorry, it's 3:15 or almost

2     3:15.  Would this be a convenient place for the mid-afternoon

3     break?

4          *MR. TUBACH:*  Absolutely, Your Honor.

5          *THE COURT:*  Great.

6          Ladies and gentlemen, we will go ahead and take the

7     mid-afternoon break at this time.  We will plan on reconvening

8     at 25 minutes to 4:00.  Keep the admonitions in mind.  The jury

9     is excused.

10          (Jury excused.)

11          *THE COURT:*  Mr. Olson, once again you are excused and

12    then we will reconvene at 3:30 -- what did I say, 25-minute to

13    4:00?  And that's actually what I wanted to ask about.  Is it

14    logistically difficult to do 15 minutes?  Do we still want to

15    stick with 20?

16          *MR. TUBACH:*  15 is fine with us, Your Honor.  I am not

17    going to have that much more.

18          *THE COURT:*  I am saying just in general from this

19    point going forward, do we need to take 20-minute breaks?  Can

20    we take 15-minute breaks?  People obviously need to have the

21    ability to take a break, but I was just curious.

22          *MR. TUBACH:*  I have got to go to the fourth floor to

23    use the restroom, which is like seven floors up, so I would

24    prefer the 20 if we can get it.

25          *THE COURT:*  If 20 works, that's fine.  Cumulatively,

James Olson - Cross

1    you can do the math, it adds up.  But on the other hand I don't

2    want to rush people, so we will stick with 20.  And speaking of

3    that so we aren't talking about things during the entire break

4    instead of taking a break, anyone have anything else?

5              All right.  We will be in recess.  Thank you.

6         (Recess at 3:17 p.m.)

7         (Reconvened at 3:38 p.m.)

8              THE COURT:  Let's bring the jury back in.

9              MR. TUBACH:  Your Honor, should we have the witness

10   come in now or wait until the jury is seated?

11             THE COURT:  Good point.  Let's bring Mr. Olson back

12   in.

13             (Jury present.)

14             THE COURT:  Mr. Tubach, go ahead.

15             MR. TUBACH:  Thank you, Your Honor.

16   BY MR. TUBACH:

17   Q.  Welcome back, Mr. Olson.

18             During our break did you meet with anyone from the --

19   the lawyers from the Justice Department?

20   A.  No.

21   Q.  Did you speak with anyone from the Justice Department at

22   all?

23   A.  No.

24   Q.  Thank you, sir.

25             Do you recall attending a board meeting on July 21st

319

James Olson - Cross

1    and July 22nd in Chicago of the RSCS board in 2014?

2    A.  That's a typical time to have a board meeting.

3    Q.  Okay.  Let me ask you a more direct question.  Do you

4    recall a board meeting in which McKinsey presented the results

5    of its study to the RSCS board?

6    A.  I remember them reporting to the board.  I don't remember

7    the dates.

8    Q.  Do you remember attending a board meeting in Chicago at the

9    Trump International Hotel?

10   A.  I remember being in the Trump.

11   Q.  Take a look at Tab 11 for you, Exhibit C-116 for the

12   record.

13          Have you seen this document before?  I am not going to

14   ask you to read the whole thing.  It's many pages long.  Do you

15   think you have seen this document before?

16   A.  Yes.

17   Q.  And you have seen it in your capacity as a board member

18   because you have to prove the minutes of the board, right?

19   A.  That's correct.

20   Q.  Is this the minutes of the board for July 21 and 22, 2014?

21   A.  Yes, it is.

22          MR. TUBACH:  I will move Exhibit C-116 into evidence.

23          THE COURT:  Any objection to C-116?

24          MS. SWEENEY:  Your Honor, I don't believe Mr. Tubach

25   has laid the proper foundation.  It seems like he is trying to

James Olson - Cross

 1 | get it in as a business record, but he has laid no foundation

 2 | for it.

 3 |         THE COURT:  So what's the objection?

 4 |         MS. SWEENEY:  So the objection is to hearsay.  There

 5 | is no foundation.

 6 |         MR. TUBACH:  Your Honor, this clearly is a record of

 7 | the minutes of the board of directors of the corporation.  It's

 8 | quintessential.

 9 |         THE COURT:  It's hearsay.  It will be refused.

10 |         MR. TUBACH:  I am sorry, I didn't hear.

11 |         THE COURT:  It's hearsay and it will be refused.  It

12 | doesn't meet the business record exception for the reasons I

13 | mentioned in my order concerning business records.

14 |         MR. TUBACH:  Thank you, Your Honor.

15 |         THE COURT:  Go ahead.

16 | BY MR. TUBACH:

17 | Q.  Mr. Olson, do you recall that in that presentation that

18 | McKinsey gave it was a lengthy presentation, right?

19 | A.  Yes.

20 | Q.  And you recall that Pete Suerken was there, right?

21 | A.  I believe he was.  I don't recall for sure.

22 | Q.  But you believe he was there.

23 | A.  Yes.

24 | Q.  And there were folks from McKinsey there, right?

25 | A.  Yes.

James Olson - Cross

1   Q.  And what was the upshot of the presentation that McKinsey

2   made to you?  What's your take-away from that meeting, from

3   that presentation?

4   A.  That the supply issue was complicated and that the outcome

5   was that we needed to put some product into a frozen state to

6   help boost supply going into peak periods.

7   Q.  Do you recall McKinsey telling you in that meeting that the

8   supply of small birds had been shrinking over time?

9   A.  Yes.

10  Q.  And that the reason for that was because big birds were

11  much more profitable to make than small birds, right?

12  A.  Yes.

13  Q.  Why don't you take a look at Tab 12, which is for the

14  record Exhibit 7 -- C-781.

15         MR. TUBACH:  And just as a housekeeping matter, Your

16  Honor, the first page of this document has what's called a slip

17  sheet in it because it was produced in native format, so we

18  simply affixed the same Bates label to the slip sheet, as well

19  as the first page of the actual document.

20  BY MR. TUBACH:

21  Q.  Mr. Olson, have you seen -- putting aside the first page of

22  Tab 12, Exhibit C-781, have you seen this document before?

23  A.  Yes, I have.

24  Q.  And what is it?

25  A.  It's the McKinsey report produced for the RSCS and shown to

James Olson - Cross

1    the board.

2    Q.  And this was the presentation that they made that you

3    participated in as a board member, correct?

4    A.  Yes.

5    Q.  And is this a presentation that RSCS relied upon in making

6    its decisions about how to increase the supply of small birds?

7    A.  I am sure they relied on it, yes.

8    Q.  Not they; you, sir, RSCS, the board of directors.

9    A.  Yes.

10   Q.  And you also relied on this document for the purpose of

11   deciding that the strategy that RSCS would pursue was to try

12   and do a three-year contract, right?

13   A.  Yes.

14   Q.  And that was your idea, right?

15   A.  I don't know if I originated it.  I offered that as an idea

16   to Steve McCormick.

17   Q.  And was there anything in this document that you didn't

18   already know when you got it?  You have been in the chicken

19   business a long time.  McKinsey had spent six weeks intensively

20   studying.  Was there anything in here that you learned that you

21   didn't already know?

22   A.  It's hard to answer that without totally reviewing this

23   document and going back and recollecting what I knew before and

24   after seven years ago.

25   Q.  Fair enough.  Do you recall what the difference in

James Olson - Cross

1    profitability was between big birds and small birds on a

2    per-pound basis roughly?

3    A.   I believe it was over the 10-cent increase.

4    Q.   It was about 20 cents per pound difference, right?

5    A.   It could have been.

6    Q.   Does that sound right to you?

7    A.   It's possible.  I can't say for sure.

8    Q.   But in that meeting McKinsey told you that the difference

9    between the big bird profitability and the small bird

10   profitability was about 20 cents per pound, right?

11           MS. SWEENEY:  Objection, Your Honor, hearsay.

12           THE COURT:  Overruled.

13   A.   I would have to look through this document again to confirm

14   that.

15   BY MR. TUBACH:

16   Q.   Sure.  Take a look at Page 8 of the document.

17   A.   I see it.

18   Q.   Do you recall that McKinsey in its presentation informed

19   the RSCS board of directors and Pete Suerken, the chief

20   negotiator for RSCS for chicken, that the difference between

21   big bird profitability and small bird profitability is about 20

22   cents.

23   A.   Yes.

24   Q.   And small bird profitability was 10 cents per pound and big

25   bird profits was about 30 cents per pound, right?

324

James Olson - Cross

1   A.   That's what McKinsey said, yes.

2   Q.   And they also told you in that meeting that the demand for

3   small birds had been going up, right?

4   A.   Yes.

5   Q.   For example, Chick-fil-A was buying a lot of small birds,

6   right?

7   A.   I don't know what they were buying.

8   Q.   So you don't know one way or the other whether Chick-fil-A

9   was buying small, medium or big birds?

10  A.   No.

11  Q.   You knew the rotisserie chickens at the supermarket, those

12  precooked rotisserie chickens, those are small birds?

13  A.   Yes.

14  Q.   And that demand had been growing quite a bit.

15  A.   Yes.

16  Q.   And Popeye's had been growing quite a bit, right?

17  A.   Yes.

18  Q.   And so you understood that the demand for small birds had

19  been going up, right?

20  A.   Correct.

21  Q.   And you understood that the supply of small birds had been

22  going down, right?

23  A.   Yes.

24  Q.   I believe you testified about that earlier.  And did you --

25  did McKinsey tell you in that presentation that KFC's 2014

James Olson - Cross

1    pricing, the pricing that was then in the contract, was about

2    14 percent below the market price at that time?

3    A.   I don't recall them saying that.

4    Q.   Take a look at Slide 12, if you would.

5         Do you know what the Georgia Dock is, sir?

6    A.   Yes.

7    Q.   What is it?

8    A.   It's a standard or a benchmark for chicken sold in the

9    general market on the open market.

10   Q.   And it's a public benchmark, right?

11   A.   Yes.

12   Q.   And you can look it up.  You maybe have to pay a fee, but

13   it's public data you can look up, right?

14   A.   Yes.

15   Q.   So you recall McKinsey telling the board of directors in

16   July of 2014 that the KFC price in 2014 was 14 percent below

17   the Georgia Dock Index for small birds.

18   A.   As I hope it would be.

19   Q.   So that's a yes.

20   A.   That's what the cooperative is supposed to do.  It's not

21   supposed to negotiate the same price that a small mom-and-pop

22   operator who buys off the Georgia Dock would buy for.

23   Q.   I am not asking right now for the reasons it should be

24   less.  I am just asking whether or not that was the case.

25   A.   Yes.

326

James Olson - Cross

1   *Q.*  Okay.  14 percent below the Georgia Dock, right?  Right?

2   *A.*  Yes.

3   *Q.*  But that meant that if they can sell their chicken

4   elsewhere, the suppliers are better off selling to people other

5   than KFC, is that right, for more money?

6   *A.*  To a certain point.

7   *Q.*  That's what McKinsey told you, right?

8   *A.*  If the demand was to pick up 175 truckloads a week and they

9   could sell that at a higher Georgia Dock price, obviously yes,

10   if there was a market for that.

11   *Q.*  Understood.  And do you recall anything that Pete Suerken

12   said in that July 2014 board meeting relating to the market

13   dynamics for small birds?

14        *MS. SWEENEY:*  Objection, hearsay.

15        *THE COURT:*  Response?

16        *MR. TUBACH:*  It's not going to the truth, Your Honor.

17   It's going to the knowledge of RSCS going into these

18   negotiations.

19        *THE COURT:*  The effect on the listener?

20        *MR. TUBACH:*  Yes.

21        *THE COURT:*  Anything else on that?

22        *MS. SWEENEY:*  No, nothing further.

23        *THE COURT:*  Overruled.

24        So ladies and gentlemen, certain statements that a

25   person outside the court may make which would otherwise be

James Olson - Cross

 1    hearsay can be considered by the jury not for the truth of the

 2    matter.  So, for instance, a witness might say what someone

 3    else said to him or her.  You can consider that statement for

 4    how it may have affected that person's future actions or lack

 5    of actions, but not -- it I tell you.  If I only admit it for

 6    that purpose and not for the truth of the matter, then you can

 7    consider it for that, but you can't assume that what was said

 8    to the person was true, okay?

 9           Go ahead, Mr. Tubach.

10           MR. TUBACH:  Thank you, Your Honor.

11    BY MR. TUBACH:

12    Q.  Again, do you recall anything Mr. Suerken saying in that

13    meeting about the small bird market?

14    A.  I can't think of the specific comment that he made.

15    Q.  You can't recall him, for example, disagreeing with

16    McKinsey's presentation, right?

17    A.  I don't recall him disagreeing, no.

18    Q.  And part of McKinsey's presentation, one of its key

19    findings was that if the current trends continued, that KFC ran

20    a significant risk of supply shortages which could cost the KFC

21    system in the range of $500 million to $1-1/2 billion in

22    revenue.  Do you remember that?

23    A.  I don't remember those numbers.

24    Q.  Take a look at Page 5, if you would.

25    A.  Page 5 of this document?

328

James Olson - Cross

1   Q.  Of this document, yes, thank you, and specifically this

2   third key finding.

3   A.  That's correct.  That's what it says in the deck.

4   Q.  And do you recall McKinsey telling you that basically

5   unless things change, KFC had some serious risk issues that

6   could be extremely expensive for them?

7   A.  I recall it after reading it right now.

8   Q.  You do recall that.

9   A.  After reading it right now.

10  Q.  Thank you.

11       MS. SWEENEY:  Your Honor, objection.  Just if we could

12  have a short side bar about the refreshing recollection.

13       THE COURT:  Okay.  Let's have a short side bar.

14    (At the bench:)

15       THE COURT:  Ms. Sweeney, what's your objection?

16       MS. SWEENEY:  Yes, Your Honor.  So for this question

17  and the past few questions Mr. Tubach has asked the witness if

18  he remembered something and then the witness just would read

19  something and say, well, I see that I have read it now, which

20  is improper refreshing of recollection where he should be

21  reading the document and then look up and testifying from his

22  own memory.  So it appears to be sort of an end around to get

23  information into the jury that is not otherwise admitted.

24       THE COURT:  Well, it is true that normally in terms of

25  refreshing recollection it's appropriate to show the witness a

James Olson - Cross

1    document and have the witness look away from the document, ask

2    if that refreshes their recollection and then have the witness

3    testify as to whether or not his recollection has been

4    refreshed.

5            This witness has already indicated that he has seen

6    the McKinsey report.  He has seen drafts of the McKinsey report

7    and he has been at a presentation where the McKinsey report has

8    been presented.  As a result, it's already been established

9    that he's seen this report, and for that reason I think that

10   Mr. Tubach has got a little bit of leeway in terms of asking

11   questions about it.  Moreover, I don't know, but I would assume

12   that maybe someone from McKinsey is going to be coming in and

13   testifying about the report.  So in essence I don't think that

14   any type of unfairness is being -- has taken place.

15           *MR. TUBACH:*  Thank you, Your Honor.  You are exactly

16   correct.  There is going to be a McKinsey witness testifying

17   later.

18           *THE COURT:*  Thank you.

19       (In open court:)

20           *THE COURT:*  The objection is overruled.

21           Go ahead, Mr. Tubach.

22   *BY MR. TUBACH:*

23   *Q.*  I want to turn to another topic now, if I could.

24           Do you recall your testimony earlier today where you

25   testified that you gave -- I believe your words were insight

James Olson - Cross

1   and coaching to the RSCS negotiators?

2   A.   Yes.

3   Q.   And you had some expertise to offer them.

4   A.   Correct.

5   Q.   And was one of those people Mike Ledford?

6   A.   I sent it directly to Steve McCormick.

7   Q.   But I don't mean just specifically that two-page document.

8   My question is a broader one which is when you testified

9   earlier about providing insight and coaching to the RSCS

10  negotiators, is that something you did over the years?

11  A.   Yes.

12  Q.   Did you speak with -- do you know who Mike Ledford is?

13  A.   Yes.

14  Q.   Who was he?

15  A.   He was over purchasing.

16  Q.   At RSCS, right?

17  A.   At the RSCS.

18  Q.   And he was for a time the chief negotiator for RSCS, right?

19  A.   Yes.

20  Q.   And in the early days I believe it was called UFPC; is that

21  right?

22  A.   And earlier than that the NPC.

23  Q.   Your memory outdates me.

24          Did you ever talk to Mike Ledford about the pricing

25  negotiations?

331

James Olson - Cross

1    A.   I can't recall specific conversations, but it would be in

2    the course of director talking to him whether formally during a

3    board meeting or informally about what was happening with

4    supply and what was happening with prices.

5    Q.   Of course.  Yeah, I am not asking about any specific

6    conversation at this point.  My question is just you did over

7    the course of the years have conversations with Mr. Ledford

8    about the state of the chicken negotiations and the chicken

9    prices; is that right?

10   A.   Yes.

11   Q.   And that was both in your capacity as a board member and in

12   your capacity just informally speaking to Mr. Ledford.

13   A.   Mostly in my role as a director.

14   Q.   During board meetings?

15   A.   Yes.

16   Q.   Okay.  But you also had side conversations with him at

17   times?

18   A.   Sure.

19   Q.   And you testified earlier that it was not important for

20   RSCS that the suppliers' prices be close together?  Did I hear

21   that right?

22   A.   That's correct.

23   Q.   Do you understand a concept called price parity, price

24   parity?

25   A.   I have a -- my definition of it.  I am not sure that's

James Olson - Cross

1    correct.

2    Q.  And price parity is basically when prices are close

3    together, right?

4    A.  Okay, fair.

5    Q.  Can we use that term?

6    A.  Yeah.

7    Q.  And do you recall that it was Mr. Ledford's expressed

8    strategy to get suppliers into price parity?

9            MS. SWEENEY:  Objection, Your Honor, foundation.

10           MR. TUBACH:  I am asking if he recalls.

11           THE COURT:  He is just asking.  Overruled.

12           MR. TUBACH:  I am trying to lay a foundation.

13           THE COURT:  Overruled.

14   A.  I don't remember that, and that would go against the

15   direction and purpose of the cooperative.

16   BY MR. TUBACH:

17   Q.  Let me show you what's been marked as -- and this is a

18   document that's not in your binder.

19           MR. TUBACH:  So I will have to hand it to the

20   courtroom clerk.  It's Defense Exhibit F-815.

21   BY MR. TUBACH:

22   Q.  First, Mr. Olson, this is a long document, 34 pages or

23   something.  I am not going to ask you to read through the whole

24   thing.  Take a look at the front page and glance through it.  I

25   just want to ask you first whether you have ever seen this

James Olson - Cross

1  document before.

2  *A.*  I don't recall seeing it.

3  *Q.*  Is this the kind of document that would be prepared for

4  presentation to the RSCS's board of directors?

5  *A.*  I don't recall seeing this much detail.

6  *Q.*  So it's your testimony that it was not RSCS's policy to

7  tighten the difference between suppliers' prices as much as

8  possible?

9  *A.*  No, it is not.

10  *Q.*  I think we have double negatives.  Your testimony is that

11  RSCS or its predecessor, UFPC -- and it's the same company,

12  right?

13  *A.*  Yes.

14  *Q.*  They just changed the name?

15  *A.*  Right.

16  *Q.*  I am just going to refer to it as RSCS.  Is that okay?

17  *A.*  Okay.

18  *Q.*  So is it your testimony that RSCS did not want the

19  suppliers to have the same pricing?

20  *A.*  They want the suppliers to give them their very best price.

21  *Q.*  And they were indifferent, as you recall, indifferent as to

22  whether suppliers' prices were the same or not.

23  *A.*  Indifferent, yes.

24  *Q.*  Thank you.  One more topic I would like to cover with you.

25  You can put that document away, sir.

James Olson - Cross

1            Do you recall a proposal in around March of 2013 where

2    RSCS suggested to its suppliers that they should lower the

3    weight of the chicken that they were selling to KFC?

4    A.   I do remember a conversation about that topic.

5    Q.   And the reason for lowering the weight of the chicken is

6    because you in your business buy by the pound and you sell by

7    the piece, right?

8    A.   Correct.

9    Q.   And when you sell by the piece, if you can reduce the

10   weight of the bird, the weight of those pieces, you can make

11   more money, right?

12   A.   Yes.

13   Q.   Because if you're selling 15 pieces of chicken and you can

14   make -- you can pay less for them, you can make more money,

15   right?

16   A.   Yes.

17   Q.   Do you recall having a -- strike that.

18            Do you recall that Mr. Ledford was at some point in

19   2013, March of 2013, asking the suppliers whether they could

20   lower the weight of their chicken?

21   A.   I don't know if Mr. Ledford did.  I know that was a topic

22   that was discussed.

23   Q.   Was that an idea that you supported, sir?

24   A.   I could see myself supporting it and not supporting it.

25   Q.   Do you recall --

James Olson - Cross

1    A.   If I could explain.

2    Q.   Sorry, I didn't mean to interrupt you.

3    A.   I could see supporting it because there was discussion that

4    the market was there.  As the market was shifting, we could

5    pick up product in that part of the supply curve.  There was

6    also a change in process on injection, pumping the bird up with

7    the marinate, which gave us the same size as the prior

8    specification would have been.  It was an idea that was tested

9    and not followed up on.

10   Q.   Tested in the sense that consumer tested?

11   A.   I'm not sure it was consumer tested.  It didn't get past

12   KFC's standards, KFC corporate.

13   Q.   And the basic idea, though, was that this idea that you

14   sometimes supported or maybe you didn't support was that you'd

15   be charging the consumers the same, but paying less for it

16   yourself, and that's how you make more money, right?

17   A.   Yes.

18        MR. TUBACH:  Thank you.  Your Honor, I have no further

19   questions.

20        THE COURT:  Thank you.

21        Mr. McLoughlin, cross-examination?

22                          **CROSS-EXAMINATION**

23   BY MR. McLOUGHLIN:

24   Q.   Good afternoon, sir.  My name is Jim McLoughlin and I

25   represent Mr. Lovette.  And I will have hopefully a few

James Olson - Cross

1    questions for you, but lawyers are usually lying when they say

2    it's two.  I have a binder that I may give to you with

3    documents, but we may be able to make due with the binder you

4    still have, I think.

5    A.  I do.

6    Q.  Great.  Sir, let me ask you to turn to the document that

7    was admitted C-755.

8    A.  Can you tell me what tab that is?

9    Q.  Is that Tab 8?  Five, thank you, Tab 5.

10        And, sir, if you take a moment to read on the first

11   page a little section there called Whole Bird Utilization.

12   Have you read it?

13   A.  I am familiar with it, yes.

14   Q.  Great.  So if I understand the concept, Yum and RSCS would

15   commit to purchasing the entire flock of birds of specific

16   weight ranges or their parts which would allow you to buy more

17   from a supplier and make it more efficient for the supplier to

18   supply KFC; is that fair?

19   A.  Yes.

20   Q.  And so if I understood you, you understood that helping the

21   supplier use the whole bird would make it more efficient and

22   cost effective for the supplier and for the buyer.

23   A.  That was my hope and intention, yes.

24        MR. TUBACH:  Your Honor, Michael Tubach.  This

25   document has actually been admitted into evidence.

337

James Olson - Cross

1           MR. McLOUGHLIN:  Can we display this, please?

2           THE COURT:  Absolutely.

3           MR. McLOUGHLIN:  And Paragraph No. 3?  Thank you.

4    BY MR. McLOUGHLIN:

5    Q.  Do you recall where you got the idea of suggesting that

6    whole bird utilization would be better for the supplier and if

7    you could manage to restructure your operations better or more

8    efficient for KFC as well?

9    A.  I recall just having casual conversations with the chicken

10   purchasers trying to understand how they proceeded, why there

11   were certain supply issues.  And one of the replies I got back

12   was that sometimes the chicken suppliers didn't have

13   destinations for the parts of the chicken that we weren't using

14   in the KFC brand.

15           I also got a glimpse into that by doing a plant tour

16   of the Marshall Durbin processing company and asked questions

17   while it was during that plant tour about what happened to the

18   different parts of the chicken.

19   Q.  And so if I'm understanding you, what your purchasers told

20   you is that the suppliers were looking to sell the entire bird

21   at the best price, and if you could help them with that, that

22   could benefit you.

23   A.  I don't know if they said the suppliers were looking for

24   it.  I think it was my initiating the conversation with them on

25   what happens?  You know, why can't we -- why are chicken

338

James Olson - Cross

1   breasts so high?  Well, it's because they got -- if you get

2   dark meat, you split it off.  You can't sell enough dark meat

3   to make up for all the white meat that's being used on further

4   processed.  So it was in that kind of a conversation of

5   understanding the issues that suppliers had.  I don't think I

6   recall anybody saying that suppliers were requesting that.

7   Q.  And your expectation was that that would be mutually

8   beneficial, so suppliers could very well like the idea.

9   A.  Like everything on this list, there were things that I

10  thought should be looked into to see if there was a good

11  solution that worked for the suppliers and for the system.

12  Q.  Okay.  Now, if you could turn to -- back to your Tab 11, I

13  think it is, the McKinsey presentation.

14  A.  That's not No. 11 in my book.

15  Q.  Excuse me, sir?

16  A.  That's not No. 11 in my book.

17          MR. TUBACH:  I believe it's Tab 12.

18          MR. McLOUGHLIN:  Tab 12, thank you.

19          THE COURT:  Mr. McLoughlin, sorry.  Rather than by tab

20  number, we need to make a record as to exhibit number.  I think

21  that's H-615.

22          MR. McLOUGHLIN:  Yes, Your Honor, H-615.

23  BY MR. McLOUGHLIN:

24  Q.  So sir, with respect to --

25          MR. TUBACH:  Your Honor, I am sorry to interrupt.

James Olson - Cross

1    Actually Tab 12 is C-781.

2              MR. McLOUGHLIN:  There are multiple copies.

3              MR. TUBACH:  615 was Tab 10.  I apologize for having

4    so many tabs.

5              MR. McLOUGHLIN:  The document number is C-781.

6              THE COURT:  Okay, great.  Thank you.

7    BY MR. McLOUGHLIN:

8    Q.  I would like to ask you for a moment to take a look at

9    Pages 10 and 11 of that document.

10   A.  Okay.

11   Q.  Great.  So in this period of time, 2014, among KFC's or

12   RSCS's competitors to buy small birds were Church's; is that

13   correct?

14   A.  Yes.

15   Q.  And El Pollo Loco; is that correct?

16   A.  I am not real familiar with their spec.

17   Q.  Does Page 10 refresh your recollection on that, sir?

18             MS. SWEENEY:  Objection, Your Honor.  He didn't say he

19   didn't remember.

20   A.  Page 10 shows that they are.

21             THE COURT:  Overruled.  Go ahead.

22   A.  Page 10 shows that they sell a bigger bird.

23   BY MR. McLOUGHLIN:

24   Q.  And Popeye's and Bojangles also had specs that overlapped

25   KFC's, so you competed with them to buy small birds, correct?

340

James Olson - Cross

1    *A.*  Yes.

2    *Q.*  And the retail grocers such at Wal-Mart and Kroger and

3    Publix and Costco also had specs that crossed over to KFC's,

4    and you were competing with them as well, were you not?

5    *A.*  Yes.

6    *Q.*  And is it fair to say that competing against Wal-Mart and

7    Costco in 2014 was difficult?  They were tough.

8    *A.*  They were a competitor, yes.

9    *Q.*  And, in fact, if you'll flip to Page 11, does that refresh

10    your recollection that Wal-Mart had overtaken KFC as Pilgrim's

11    biggest customer?

12    *A.*  Yes.  They sold a different product than us, but they were

13    selling whole birds.

14    *Q.*  And they were using the small birds for rotisserie chicken.

15    *A.*  Yes.

16    *Q.*  In fact, another one of your competitors, Popeye's, had

17    grown over 20 percent in the prior five years and they too were

18    buying more small birds.

19    *A.*  Yes.

20    *Q.*  It's fair to say, isn't it, sir, that the challenges that

21    KFC was facing in -- going into 2014, 2015 with respect to the

22    volume of the competition, the demand for those small birds and

23    the issues in supply that we've talked about put you at a

24    historic point which is why you spent a million dollars on

25    McKinsey to try and come up with the best strategy for KFC for

341

James Olson - Cross

1    dealing with this historic situation; isn't that fair?

2    A.   That's fair.

3    Q.   And isn't it fair also, sir, to -- didn't you also

4    understand at the time that your suppliers who were selling to

5    the Wal-Marts and the Publix and the Costcos and the Popeye's

6    had a pretty good idea of what the market value of their small

7    birds was because of all the people they were selling to and

8    they knew what they were willing to pay?

9    A.   Could you repeat that again?

10   Q.   Sure.  I apologize.  That was too long.  Isn't it true that

11   you understood in 2014 that your chicken suppliers, because of

12   all of their communications in selling to your competitors, had

13   a pretty good idea what their small birds were worth?

14   A.   I would be speculating on what they thought.

15   Q.   Now, sir, one thing I have appreciated in your testimony

16   was you are pretty straightforward about the fact that as the

17   CEO of HMC, it was your job to maximize profit for the

18   shareholders; is that fair?

19   A.   Yes.

20   Q.   So if you were a CEO of a chicken supplier, you would have

21   exactly the same objective, correct?

22   A.   Yes.

23   Q.   And to the extent those two goals might conflict because

24   they want more money for their birds and you want to pay less,

25   so long as you're playing fair, that is the way the system

James Olson - Cross

1    works; isn't that correct?

2    A.   Yes.

3    Q.   And for a number of years prior to the mid 2000s, KFC had

4    been very successful in negotiating with those suppliers to get

5    the lowest price that would allow it to be a low price supplier

6    to the public, right?

7    A.   I believe so.

8    Q.   But in 2014 the market changed.  And you understood that,

9    didn't you?

10   A.   I understood things had changed.  I was also looking for if

11   this was a new dynamic that we were working in, we needed to

12   look at how we were dealing with our suppliers differently,

13   where we were sourcing our products, how we were sourcing them,

14   the examples of the whole bird utilization, earlier mentioned

15   amortizing equipment lines.  These were all suggestions that I

16   had that I thought were going to work for the system, not just

17   for the franchisees.

18   Q.   And let me ask you -- I am going to change subjects just a

19   little bit.

20        About how many times did you meet with the government

21   in interviews?

22   A.   For this trial?

23   Q.   Yes, sir.

24   A.   Three or four.

25   Q.   Okay.  And do you recall about when they -- either they

James Olson - Cross

1    asked you or you volunteered to be a witness?

2    *A.*  Six months ago.

3    *Q.*  Did they ask you or did you volunteer?

4    *A.*  I was volunteered.

5    *Q.*  You were volunteered.  Okay.

6    *A.*  The attorney for the KFC concept of the RSCS --

7              *MS. SWEENEY:*  Objection, Your Honor.

8              *THE COURT:*  Do you want to ask a new question,

9    Mr. McLoughlin?

10             *MR. McLOUGHLIN:*  Yes.

11             *THE COURT:*  Go ahead.

12   *BY MR. McLOUGHLIN:*

13   *Q.*  So do you recall that in your interview on March 12, 2021,

14   which I believe was the first interview --

15   *A.*  Sound says right.

16   *Q.*  -- that you told the FBI that the reason for the increase

17   in the price of small birds was, quote, "that suppliers were

18   moving to large birds because they were more profitable."  Do

19   you recall that?

20   *A.*  Yes.

21   *Q.*  Now, sir, in your testimony you indicated that you believe

22   you represented the West Coast franchisees on the RSCS board;

23   that fair?

24   *A.*  Yes.

25   *Q.*  And is it also fair to say that there were some natural

344

James Olson - Cross

1  tensions among franchisees because everybody wanted to pay the

2  lowest price for chicken which maximized their profits; is that

3  fair?

4  A.  Yes, that's fair to say.

5  Q.  Is it also fair to say that if there was a big differential

6  between prices payed on the West Coast and the East Coast or

7  the north and the south or from a particular distribution

8  center that was being supplied by a particular supplier, if

9  there were big differences so the franchises were paying very

10  different prices, that was a real headache for RSCS and KFC?

11  A.  That's the purpose of the RSCS is to have difference in

12  prices.  Their job isn't to have price parity.  Their job is to

13  get the lowest price across the nation.  If you bundle up all

14  the costs across the nation, their job is to get the lowest

15  total cost.

16  Q.  And part of their objective was to have all of the

17  franchisees pay the same local costs because they didn't want

18  franchisees complaining that somebody had an advantage; is that

19  fair?

20  A.  That's not their goal, no.  They may try and do some

21  things.

22  Q.  Would it surprise you that that was something they worried

23  about?

24  A.  Would it surprise me that what?

25  Q.  That they would worry about the franchisees feeling they

James Olson - Cross                                    345

1  were hard done by because somebody got a better price?

2  A.  They were constricted on what they could do by the purpose

3  of what a co-op is.  And their job as they were directed to do

4  is to get the lowest national price, the total bundled price

5  nationally.  That was their responsibility.  After that fact

6  they may try and do some allocation changes which would help

7  balance some things out.

8           For instance, the price of chicken to the store is a

9  combination of the price of the negotiated contract with the

10  chicken suppliers, it's freight and it's the distribution cost

11  out of the distribution center.  So the RSCS staff could look

12  at that and say I'm going to try and take a higher priced

13  supplier and put it into a low freight route which then helps

14  balance out the high/lows across the nation.  But nobody

15  complained about the prices that the RSCS was getting.  They

16  complained about the freight that they were paying across the

17  country.

18  Q.  Right.  But HMC didn't pay a bundled price that was uniform

19  across the country.  You bought from specific sources, specific

20  distributors and paid a specific price; isn't that right?

21  A.  Right, correct.

22  Q.  And the price that the distributor charged was affected by

23  the price that the supplier charged; isn't that correct?

24  A.  Yes.

25  Q.  And so if a supplier to one distributor was charging more

James Olson - Cross

1   than the supplier to a different distributor, franchisees might

2   pay a different price, freight and everything else being equal;

3   isn't that correct?

4   A.   Yes.

5   Q.   And in that case when the franchisees found out about it,

6   they weren't happy; isn't that correct?

7   A.   They would voice displeasure.

8   Q.   Is that the same as not being happy?

9   A.   Well, yes, because they have a choice whether they were in

10  the co-op.  And if they thought they could buy better outside

11  the co-op, they have a right to do that.  But obviously when

12  you have 95 percent, 94, 95 percent of the franchisees that are

13  members, they think their total market basket of prices that

14  they get is better by going through the co-op.

15  Q.   Right.  Now, let me ask you, sir, when you were

16  negotiating -- let me strike that.

17         How long has it been since you as the CEO -- since

18  when, 1996?

19  A.   Yes.

20  Q.   How long has it been since you sat in a negotiating room

21  and negotiated for a day or two or three or four with a

22  supplier of anything?

23  A.   Never for that long.

24  Q.   Right.  You would go in, maybe have dinner and then leave

25  it to somebody else, right?

James Olson - Cross

1    A.  My job wasn't to negotiate prices, particularly for

2    chicken.

3    Q.  Right.  Is it unfair to assume that at some point in your

4    career or in conduct by the people who worked for HMC or RSCS,

5    they might have said to one supplier, you know, you're high.

6    You're 5 cents over this guy.  You should lower your price.

7           MS. SWEENEY:  Objection, calls for speculation.

8    BY MR. McLOUGHLIN:

9    Q.  I am asking, sir, about your experience over the last 40

10   years.

11          THE COURT:  Overruled.

12   A.  That negotiation with chicken suppliers would have only

13   happened by me or by the president of the distribution company

14   that we used in most of our markets, and I don't think we ever

15   said that.

16   BY MR. McLOUGHLIN:

17   Q.  Well, but I'm not just asking about you, sir, or HMC.  I am

18   also asking about RSCS and the people that work for RSCS.

19   A.  I can't speculate on what they might say.

20   Q.  And is it fair to say that if two competitors know each

21   other's price, one competitor might decide to beat that price

22   to get more volume; isn't that fair?

23   A.  It's possible, yes.

24   Q.  Okay.  And so when two competitors have information about

25   each other's prices, for example, like KFC might have about

James Olson - Cross

1   Popeye's or Chick-fil-A, you can make an independent decision

2   based on that information to lower your prices or compete in

3   some other way, can't you?

4   A.  Yes.

5   Q.  And however that plays depends upon the circumstances and

6   the individual; is that correct?

7   A.  I am not sure what that totally means.

8   Q.  And I won't give you a count, sir, but I am just about

9   done.  Thank you.

10        Now, do you recall ever getting any internal materials

11  about the conditions of the market from within KFC?

12  A.  I can't remember specifics.  I think we would get general

13  information at the advertising committee meetings.  And often,

14  most often the RSCS would record at those meetings.

15        MR. McLOUGHLIN:  Your Honor, if I may approach the

16  clerk, we are just going to ask about one document.

17  BY MR. McLOUGHLIN:

18  Q.  The clerk, sir, is showing you Exhibit C-121.  While we are

19  running around here, I am going to specifically direct you to

20  Page 6.  Please feel free to look at any pages.  And I am going

21  to jump gears a little bit on you, sir.

22        When you were meeting with the government these three

23  or four times, at least once and maybe on October 26th you

24  discussed your testimony with the government, didn't you?

25  A.  Yes.

James Olson - Cross

1  Q.  Did you discuss your testimony with the government on other

2  occasions other than October 26 or just on the 26th?

3  A.  I believe the first interview we had was just getting

4  background on me and my knowledge and experience, and there

5  were two or three meetings where there was more direct

6  questions.

7  Q.  And that would maybe be October 22nd and then October 26th?

8  A.  Yeah.

9  Q.  Okay.  And on October 26th or October 22nd, did they go

10  over specific questions and answers with you?

11  A.  Yes.

12  Q.  And did they ever suggest to you what the substance of one

13  of your answers could be modified to be or how it might be best

14  articulated?

15  A.  No.  They told me two things.  One is I used pronouns too

16  much and they said that fell into hearsay, so make sure I was

17  identifying who I was speaking at and about and for and always

18  tell the truth.  Those were the two take-aways.

19  Q.  Did they tell you if you were asked this question I just

20  asked you that that should be your answer, that they always

21  tell you to just tell the truth?

22  A.  No.  I think it was like, you know, I want to make sure I

23  do a good job.  And they said, "All you have to worry about is

24  telling the truth."

25  Q.  To that point if we could go to Exhibit C-121.

James Olson - Cross                                             350

1           Is this a document you recall having seen during your

2     years on the board of directors of RSCS?

3     A.   Yes.

4     Q.   Okay.  Do you recall seeing this specific document as you

5     have gone through it?

6     A.   I can't say I specifically remember each page of the

7     document, but I am sure I saw it.

8     Q.   But you generally remember it.

9     A.   Yes.  It would be common to get these reports.

10    Q.   Great.  And these reports were given for the purpose of

11    updating the board on what the plan was, right?

12    A.   Yes.

13    Q.   And they were also for the purpose of getting feedback from

14    the board as to whether this concept was something the board

15    wanted to be pursued; is that fair?

16    A.   Yes.

17    Q.   And so these were prepared to give the board the best

18    information that was available within KFC so you could make the

19    best decision, correct?

20    A.   Correct.

21    Q.   And this is the general format in which they were generally

22    prepared, yes?

23    A.   Right.  It would vary over the years, but this was pretty

24    common.

25    Q.   And in your memory of this document, seeing this document,

James Olson - Cross

1    sir -- again I am going to ask you to go to Page 6.  And in or

2    about August 14, 2014 -- let me stop.  I apologize.  And who

3    prepared these generally for the board?  It was the purchasing

4    people, correct?

5    A.  Correct.

6    Q.  So in August of 2014 the purchasing people told the board

7    that on Page 6 prices for breast meat and tenders have peaked

8    mere record levels due to limited egg supply, poor hatch

9    ability and high demand.

10         MS. SWEENEY:  Objection, Your Honor.  He is reading

11   from evidence that is not admitted into the record.

12         MR. McLOUGHLIN:  Your Honor, I move the admission of

13   C-121.

14         THE COURT:  Let me rule on the objection first.

15   Sustained.

16         MR. McLOUGHLIN:  I move C-121.

17         THE COURT:  Hold on.  You have got to let me talk.

18   Any objection to the admission of Exhibit C-121?

19         MS. SWEENEY:  Yes, Your Honor.  The government objects

20   on the basis of hearsay.

21         THE COURT:  Response?

22         MR. McLOUGHLIN:  Your Honor, first it is not admitted

23   for the truth of the matter asserted.

24         THE COURT:  What's it admitted for then?

25         MR. McLOUGHLIN:  It is admitted to identify the

James Olson - Cross

1    perspective and understanding of the purchasers from RSCS at

2    the time they were negotiating, their understanding of the

3    market conditions.  We are not saying this is an accurate

4    description of those conditions.  What we're saying is that's

5    what they believed when they went into the negotiations.  That

6    was what they were telling their board.  And it doesn't -- and

7    this gentleman recognizes it.  He has said in terms of

8    reliability that they gave the board the best information they

9    could that was available to them, which is indicia of

10   reliability under the hearsay rule.  So with respect to the

11   fact that it's as to their understanding and what information

12   they were using to develop their strategy, it is not for the

13   truth of the condition of the egg hatchability market.  It is

14   what they believe and it is therefore admissible.

15          THE COURT:  And they meaning who again?

16          MR. McLOUGHLIN:  RSCS, its purchasing people and its

17   board of directors.

18          THE COURT:  Sustained.

19   BY MR. McLOUGHLIN:

20   Q.  Mr. Olson, do you have any recollection of being told by

21   the RSCS purchasing people that conditions were -- let's call

22   it ripe for a historic rise in prices of the chickens that you

23   bought?

24   A.  At some point.  I don't know at the point of this document.

25   Q.  But at some point during the process for 2000 -- in 2014 to

James Olson - Cross                                              353

1    the year 2015, do you recall that?

2    A.   Yes.

3         MR. McLOUGHLIN:  No more questions, Your Honor.

4         THE COURT:  Thank you, Mr. McLoughlin.

5         Ms. Henry?

6                        **CROSS-EXAMINATION**

7    *BY MS. HENRY:*

8    Q.   Good afternoon, Mr. Olson.

9    A.   Hello.

10   Q.   My name is Roxann Henry and I represent Mr. Bill Kantola,

11   who is on the other side of the binders there.

12         Isn't it true that you have never had any dealings

13   whatsoever with Mr. Kantola?

14   A.   That is true.

15   Q.   In fact, you don't know him.

16   A.   Pardon me?

17   Q.   In fact, you don't know him.

18   A.   The first time I've seen him.

19   Q.   And isn't it correct also that your company, HMC, that the

20   HMC restaurants weren't getting their chicken from Koch Foods,

21   Mr. Kantola's employer?

22   A.   We did get some chicken from Koch Foods.

23   Q.   When did you get that chicken from Koch Foods?

24   A.   I think in both years, but possibly just '14.

25   Q.   You have no personal knowledge of anything that Mr. Bill

James Olson - Cross

1    Kantola did or did not do, do you?

2    *A.*   No.

3            *MS. HENRY:*   Thank you.

4            *THE COURT:*   Thank you, Ms. Henry.

5            Yes, Mr. Beller, go ahead.

6            *MR. BELLER:*   Thank you, Your Honor.

7                        **CROSS-EXAMINATION**

8    *BY MR. BELLER:*

9    *Q.*   Good afternoon, Mr. Olson.

10   *A.*   Hello.

11   *Q.*   Mr. Olson, I represent Mr. Mikell Fries of Claxton Poultry.

12   So I want to ask about your testimony related to your time as

13   CEO and chairman of HMC, okay?

14   *A.*   Okay.

15   *Q.*   You had testified to the jury that the individuals who

16   supplied the restaurants, upwards of 300 restaurants, were

17   George's, Pilgrim's, Mar-Jac and Tyson, right?

18   *A.*   Yes.

19   *Q.*   Claxton Poultry did not supply HMC with chicken broilers,

20   correct?

21   *A.*   Not in that time period.

22   *Q.*   Well, in fact, Mr. Olson, Claxton Poultry has never

23   supplied any HMC franchisee with chicken.

24   *A.*   I have seen the Claxton name.  It may not have been on

25   chicken on the bone.  It could have been some other products.

James Olson - Cross

1    Q.   Okay.  So fair to say that you have no knowledge, no

2    specific knowledge of Claxton Poultry ever supplying one of

3    your franchisees?

4    A.   With chicken on the bone, no, I don't.

5    Q.   With chicken on the bone.  Well, and any specific knowledge

6    of any other product to any franchisee of HMC ever.

7    A.   There could have been other products besides chicken on the

8    bone.

9    Q.   There could have been, none that you are aware of.

10   A.   Yes.

11   Q.   And you don't know my client, Mr. Mikell Fries?

12   A.   No.

13   Q.   You have never negotiated with Mikell Fries?

14   A.   Never.

15   Q.   You also don't know the salesperson for Claxton Poultry,

16   Scott Brady, correct?

17   A.   I don't know him and --

18   Q.   You've also never negotiated with Scott Brady.

19   A.   No.

20   Q.   The prior president of Claxton Poultry, you never

21   negotiated with him either; is that right?

22   A.   No.

23   Q.   Mr. Lane?

24   A.   No.

25            MR. BELLER:  Thank you, Your Honor.  I have no further

James Olson - Cross

1   questions.

2            *THE COURT:*  Thank you, Mr. Beller.

3            Ms. Johnson?

4                           **CROSS-EXAMINATION**

5   *BY MS. JOHNSON:*

6   *Q.*  Mr. Olson, good afternoon.  The good news is I am last.  I

7   have a few -- just a few questions for you, sir.

8            Now, just to be clear, I want to clear up a couple of

9   things.  It's been a long day and I understand that, but I

10  think you told Mr. McLoughlin that you were interviewed several

11  times by the government, correct?

12  *A.*  Yes.

13  *Q.*  And by my count I believe it's five.  Would you agree with

14  that?

15  *A.*  You probably have records on that, so it could be true,

16  yeah.

17  *Q.*  And, in fact, maybe at least three times within the last

18  six days; is that correct?

19  *A.*  Yes.

20  *Q.*  And then a couple of earlier ones.

21  *A.*  Yeah.  I probably didn't count the one when I arrived here.

22  *Q.*  Fair enough.  So I just want to also be clear when you were

23  speaking with Ms. Sweeney earlier today, she asked you a

24  question whether or not you were involved or informed of the

25  RSCS negotiations and your answer was yes.  And I just want to

James Olson - Cross

1   make sure, I think the testimony just clarified that, but to be

2   clear, you were only informed.  You were not involved during

3   the 2014 time period; is that correct?

4   A.  Yes, that would be more accurate.  Thank you.

5   Q.  And a little bit later Ms. Sweeney asked if you were

6   involved or had influence.  And again, same question.  To be

7   clear, you were only -- you only had influence.  You were not

8   involved; is that correct?

9   A.  Unless you are thinking of as involved as a director.

10  Q.  Fair enough.  But in the data -- in the actual room where

11  it happened, so to speak, in the negotiations themselves you

12  were not involved.

13  A.  No.

14  Q.  Now, you spoke about Mr. Blake.  He is my client.  But you

15  could not recall where you met with Mr. Blake in 2014; is that

16  correct?

17  A.  That's correct.

18  Q.  Do you recall what state it was in?

19  A.  No.

20  Q.  And typically when you have meetings, which I believe you

21  referred earlier that you have lots of meetings, and I can

22  appreciate that, how do you go about setting up your meetings?

23  A.  In this case it would have been organized through the

24  president of our distribution company.

25  Q.  So you would have had a call or an e-mail or a text or a

James Olson - Cross

1    meeting planner or something?

2    A.   Or a verbal communication.

3    Q.   Verbal?

4    A.   Between the president of Quality Distributing and myself

5    that there was going to be a meeting.

6    Q.   And we've talked about Quality Distributing.  It's come up

7    a little bit.  That's Gary Rancatore?

8    A.   Yes.

9    Q.   And you didn't testify that way today, but did you tell the

10   government that Mr. Rancatore was in the meeting with you and

11   Mr. Blake?

12   A.   Yes.

13   Q.   And we know that you weren't discussing the RSCS

14   negotiation.  Was it about the distributing functions that

15   Mr. Rancatore would have been involved in?

16   A.   Yes.

17   Q.   And that would make sense because you would talk about the

18   pricing, the period, payment early, because that's what the

19   distributing companies do, correct?

20   A.   Yes.  They are the one that purchases the products that end

21   up in our restaurants.

22   Q.   And do you own part of Quality Distributing or did you in

23   2014?

24   A.   I did and I do.

25   Q.   And wasn't there a time that RSCS and really your company

James Olson - Cross

1   as well moved over to McLane Distributing?

2   A.   Yes.   Quality Distributing was sold and at that time we

3   moved our business over to Tyson or -- excuse me, Tyson -- to

4   McLane.

5   Q.   To McLane Distributing.

6   A.   Yes.

7   Q.   And they performed a similar function to Quality

8   Distributing, correct?

9   A.   Yes.

10  Q.   Would it surprise you that that happened in July of 2014?

11  A.   No.

12  Q.   No, it would not surprise you?

13  A.   No.

14  Q.   So when again generally was this meeting with Mr. Blake?

15  A.   October or November.

16  Q.   So Mr. Rancatore and you -- if you had moved over to

17  McLane, what possible reason would you have to try to negotiate

18  pricing, payment terms, because wouldn't that be going through

19  McLane?

20  A.   Yes.   We had kind of a dual system.   McLane would charge

21  the restaurants.   They would be paying bills but -- this is

22  kind of complicated.   McLane would order the goods and deliver

23  it to the store.   We would bill the stores through the old

24  Quality Distributing pricing system, so that's where we would

25  take any discounts that came in.

James Olson - Redirect

1   Q.   True.  But the bottom line is George's paid McLane, did

2   they not?

3   A.   Yes.

4   Q.   Okay.  Are you aware that the government has provided

5   50 million documents -- you probably have already heard that

6   today -- in discovery, and there is not one single phone call

7   between you and Mr. Blake in all of 2014.

8   A.   That doesn't surprise me.

9   Q.   And there is not one single text message?

10   A.   Again, doesn't surprise me.

11   Q.   Not one single meeting planner?

12   A.   Nope.

13          MS. JOHNSON:  That's all I have.  Thank you.

14          THE COURT:  Thank you, Ms. Johnson.

15          Redirect?

16                  **REDIRECT EXAMINATION**

17   BY MS. SWEENEY:

18   Q.   Good afternoon, Mr. Olson.  You spoke at length with

19   Mr. Tubach about a number of meetings that you did not recall

20   happening, is that right, or you did not recall attending; is

21   that right?

22   A.   Not initially, no.

23   Q.   But you testified here earlier today about a meeting with

24   Mr. Roberts that you did remember.

25   A.   Yes.

James Olson - Redirect

1   *Q.*  And a separate meeting with Mr. Blake that you remember.

2   *A.*  Correct.

3   *Q.*  Of all the meetings -- you said your life was full of

4   meetings -- why do you remember those two meetings?

5   *A.*  Because the mutually beneficial communication we had didn't

6   exist in those meetings, which seemed a change to me.  I

7   remember more clearly the meeting with Brian because it was so

8   similar to the meeting with Rick that it gave me time to pause

9   and think about -- I questioned why was this happening.

10          *MR. McLOUGHLIN:*  Your Honor, objection.  I think we

11  are going to get into matters -- speculation that Your Honor

12  has already ruled was inappropriate.

13          *THE COURT:*  Assuming his answer is done, we didn't,

14  and I will overrule the objection.

15  *BY MS. SWEENEY:*

16  *Q.*  Mr. Olson, you spent a lot of time talking with the various

17  defense counsel about Defense Exhibit C-755; is that right?

18  *A.*  I can't remember which one that was.

19  *Q.*  I don't know what tab in the binder in front of you, but

20  the document has been entered into evidence.  And you testified

21  this was a list of ideas that you put together?

22  *A.*  Yes.

23          *MR. TUBACH:*  It's Tab 5.

24          *THE COURT:*  Thank you.

25  *BY MS. SWEENEY:*

1    *Q.* And could you just remind us why you put this list

2    together?

3    *A.* I was hopeful that we could find some solutions that worked

4    for both the chicken suppliers and for the franchisees and

5    company stores so that we could remove future issues with

6    supply.

7    *Q.* And did any of the solutions that you put together in this

8    list include having suppliers coordinate on price or on price

9    terms?

10           *MR. McLOUGHLIN:* Your Honor. The document is quite

11   clear. The document speaks for itself. This is argument.

12           *THE COURT:* Overruled.

13   *A.* No.

14           *MS. SWEENEY:* Thank you. The government has no

15   further questions.

16           *THE COURT:* Any request that Mr. Olson remain?

17           *MR. TUBACH:* With the Court's permission, could I ask

18   one more question of the witness?

19           *THE COURT:* No. We just don't have time in this trial

20   to do recross. So back to the question of whether Mr. Olson is

21   subject to recall.

22           *MR. GILLEN:* Not by Mr. Roberts, Your Honor.

23           *MS. JOHNSON:* No, Your Honor.

24           *THE COURT:* Anyone who wants him to be?

25           Okay. Thank you very much, Mr. Olson. You are

363

Melissa Sandoval - Direct

1    excused.

2         Normally even with 10 minutes left we would call a

3    witness, but I am wondering whether or not it would be

4    efficient given the nature of the witness to be called whether

5    we should or not.

6         The government's view?  We can.

7         *MS. ROGOWSKI:*  Your Honor, next we intend to call just

8    a Verizon custodian of records.  I believe we could get done

9    within a relatively short amount of time.

10        *THE COURT:*  Well, the question is whether that

11   relatively short amount of time is within the next 10 minutes.

12   We can if you want.

13        Okay.  Let's go ahead and call the witness.  We may

14   not finish, but we can start the witness.

15      (**Melissa Sandoval** was sworn.)

16        *THE WITNESS:*  I do.

17        *COURT DEPUTY CLERK:*  Please state your name and spell

18   your first and last name for the record.

19        *THE WITNESS:*  Melissa Lee Sandoval, M-E-L-I-S-S-A,

20   S-A-N-D-O-V-A-L.

21                    **DIRECT EXAMINATION**

22   *BY MS. ROGOWSKI:*

23   *Q.*  Ms. Sandoval, before we begin, do you also have a copy of

24   what's been marked as Government Exhibit 9556?

25   *A.*  Yes, I do.

Melissa Sandoval - Direct

1    Q.  Great.  Ms. Sandoval, can you please give the jury an idea
2    of your education?
3    A.  I have attended high school.  I have attended some college.
4    I do not currently have a degree.
5         MR. TUBACH:  Your Honor, I am having a really tough
6    time hearing the witness.
7         THE COURT:  Ms. Sandoval, if you don't mind, scoot
8    your chair in, and then lean into the microphone just a little
9    bit.  The masks obviously have a bit of an effect.  You might
10   even try raising the microphone a tad so it's closer to your
11   mouth.  Great.  Thank you very much.  And then speak up too.
12        THE WITNESS:  Okay.  I will try.
13   BY MS. ROGOWSKI:
14   Q.  Ms. Sandoval, where do you work?
15   A.  I work at Verizon Wireless.
16   Q.  How long have you worked there?
17   A.  I have worked there for 23 years.
18   Q.  What's your job title?
19   A.  I am a senior analyst with the executive relations team.
20   Q.  Could you please briefly describe your responsibilities as
21   a senior analyst?
22   A.  Certainly.  So part of my duties and responsibilities
23   include I appear as a custodian of records to authenticate
24   Verizon's business records.  I also handle small claims
25   litigation, arbitrations, mediations, executive level

Melissa Sandoval - Direct                                                365

1   complaints and agency disputes.

2   Q.  So Ms. Sandoval, I would like to direct your attention to

3   what's been marked as Government Exhibit 9556 and the binder

4   that's been placed in front of you.  Do you recognize both this

5   exhibit and the binder placed in front of you?

6   A.  Yes, I do.

7   Q.  How do you recognize it?

8   A.  These are Verizon records that I had an opportunity to

9   review prior to my testimony today.

10  Q.  And you also -- how do you recognize the exhibit?

11  A.  I am sorry, can you repeat that?

12  Q.  How do you recognize Exhibit 9556?

13  A.  Actually, I apologize.  I think I am looking at something

14  other than that piece of paper that's in front of you.

15       MS. ROGOWSKI:  I have an extra copy, Your Honor.

16  Permission to approach the witness?

17       THE COURT:  Mr. Keech will hand it up.

18  BY MS. ROGOWSKI:

19  Q.  And once you have had a chance to look, could you please

20  let the jury know how you recognize the list and if you do?

21  A.  This is essentially a list of all the exhibits that are

22  part of the binder that I had an opportunity to review prior to

23  today.

24  Q.  Could you give the jury an idea of what is in the binder

25  that you had an opportunity to review for today?

Melissa Sandoval - Direct

1   *A.*  So the binder contains toll records, subscriber

2   information, call detail records, text detail records.  There

3   are also activation and deactivation date information, device

4   ID information.  I believe there is also some other numbers

5   that are associated with specific accounts, explanation sheets.

6   I am trying to think if there was anything else that I recalled

7   seeing in the binder.  There may be one or two other items that

8   are included.

9   *Q.*  Well, if you remember anything later on, please feel free

10  to let me know, but that's all as far as I am aware of what's

11  contained in the binder.

12          In your role with Verizon, Ms. Sandoval, are you aware

13  of whether Verizon creates toll records?

14  *A.*  Yes, we do.

15  *Q.*  Could you please explain to the jury what a toll record is?

16  *A.*  A toll record is essentially a billing record.  It provides

17  information about calls placed and received, dates, times,

18  minutes of use.  Things like that are included in the toll

19  record.  It's essentially a bill that the consumer receives.

20  *Q.*  Are you familiar with how Verizon creates toll records

21  which you say are essentially a bill?

22  *A.*  Yes.

23  *Q.*  Could you please explain?

24  *A.*  Certainly.  Basically our network captures all of the call

25  activity on the switches in a specific area.  That information

Melissa Sandoval - Direct

1    is then downloaded into a billing file and that billing record

2    is then created depending on where the subscriber is

3    geographically.  The bill might have a little bit of a

4    different formatting or based on their plan, but essentially

5    that's how the toll record comes into play.

6    Q.  And are you familiar with how these toll records are

7    stored?

8    A.  Yes.

9    Q.  Could you please explain?

10   A.  The records are essentially stored electronically on a

11   network.

12   Q.  Are toll records made during the course of the regularly

13   conducted course of Verizon's business?

14   A.  Yes.

15   Q.  When are toll records generated, Ms. Sandoval?

16   A.  The actual records are generated at or near the time that

17   the calls are placed or received on our network.  Same thing

18   with text information, or shortly thereafter.

19   Q.  Is the making of the toll records a regular practice of

20   Verizon?

21   A.  Yes.

22   Q.  You touched on this briefly, but I wanted to ask again, you

23   said the Verizon toll records are sort of like a bill,

24   essentially a bill.  So how does Verizon use the toll records?

25   A.  The toll records are used primarily for billing purposes.

368

Melissa Sandoval - Direct

1   Q.  Let's move on to subscriber information.

2           In your role at Verizon, are you familiar with what

3   subscriber information is?

4   A.  Yes.

5   Q.  Could you please briefly explain what it is to the jury?

6   A.  Certainly.  So subscriber information would be the

7   consumer's first and last name.  We do take middle initial if

8   it's available.  It also includes their address, any contact

9   information so we can have a way to reach them.  Let's see what

10  else is included.  Subscriber information also includes

11  activation and deactivation dates as well for an account, as

12  well as the account number and the phone numbers that are

13  associated with their account.

14  Q.  Are you familiar with how this information is created?

15  A.  Yes.

16  Q.  Could you please explain?

17  A.  So the subscriber information is essentially obtained from

18  the subscriber or the consumer.  And it's essentially put into

19  the computer system so that we can ensure that that information

20  is associated with the appropriate toll record.

21  Q.  And are you familiar with how this information is stored?

22  A.  Yes.

23  Q.  Could you please explain?

24  A.  Certainly.  So the information is also stored

25  electronically.

Melissa Sandoval - Direct

1    Q.  And when is the subscriber information generated?

2    A.  Well, the subscriber information is obtained at the time

3    the service is set up.  That information can be modified at a

4    later time.  If, for example, the subscriber moves or has a

5    phone number change, things like that, then they would either

6    advise us or they can make the changes on line.  However, they

7    can't change their name, for example.  That remains as is, as

8    well as Social Security information would also remain

9    unchanged.

10   Q.  How does Verizon use the subscriber information?

11   A.  We use that information to essentially bill the customer

12   and also to make sure we have the appropriate contact

13   information that we need to reach them.

14   Q.  And is making the subscriber information a regular practice

15   of Verizon?

16   A.  Yes.

17   Q.  Ms. Sandoval, are you familiar with how this -- particular

18   to the subscriber information in that binder, are you familiar

19   with how it was retrieved and copied in response to a subpoena

20   by the Department of Justice?

21   A.  Can you repeat the question?

22   Q.  Are you familiar with how the subscriber information in the

23   binder in front of you, just particularly subscriber

24   information, was retrieved and copied and given to the

25   Department of Justice?

1    *A.*   Yes.

2    *Q.*   Could you please explain?

3    *A.*   So when there is a request made for records, it goes

4    through our Verizon security assistance team.  They ensure that

5    the proper legal process is followed and that information is

6    then essentially downloaded from our computer system and then

7    sent over by way of -- generally it's a CD.  It can also be

8    e-mailed or hard copy mailed to the requester.  I believe in

9    this case some information was sent via CD and there may have

10   been some e-mailed as well.

11   *Q.*   To the best of your knowledge, Ms. Sandoval, is this

12   process of copying the information to a CD, is that process

13   accurate or not accurate?

14   *A.*   To my knowledge, it's accurate.  I have seen it done

15   before.

16           *THE COURT:*  Sorry, now we are at 5:00 o'clock.  So

17   would this be a convenient time to break?

18           *MS. ROGOWSKI:*  Yes, Your Honor.

19           *THE COURT:*  Ladies and gentlemen, we will go ahead and

20   recess for the day.  Let me mention a couple of things.

21           Mr. Kahler, how are you doing down there?

22           *JUROR:*  I am all right.

23           *THE COURT:*  I don't want you to strain anything while

24   you are leaning.

25           Here is one thing I wanted to mention to the jurors.

1   So those of you who are fully vaccinated, if you wish, if you

2   feel comfortable as time goes on, you can, if you wish, move

3   closer to people.  If, once again, totally if you wish, and it

4   could provide Mr. Kahler with a seat, you don't have to do

5   that.  If you are good where you are, that's fine, or you are

6   also free -- I would like those of you who are over at the

7   right-hand side, my right-hand side, to stay in the same order.

8   But for those of you who are on the end, if you want to come up

9   with a rotation system to avoid Mr. Kahler hanging out, I mean,

10  Mr. Kahler, great microphone passer, yesterday was a great door

11  holder.  You know, he steps up like that, but I am just saying

12  that you can do that if you want.

13          *JUROR:*  I appreciate it.

14          *THE COURT:*  Ladies and gentlemen, same rules as

15  before.  I want to emphasize to you again you can't talk about

16  the case at all amongst yourselves.  When you get home, don't

17  talk to anyone.  Don't let -- you have to be vigilant about

18  that because it's going to be a while.  You have to keep that

19  up.  At the end of the trial, you can let loose on family

20  members, tell them everything you want, but maintain your

21  vigilance up to that point.  Don't look up any information.

22          And as Mr. Perez just did, the best way to get past

23  those monitors when you are leaving or coming back in is to

24  turn them so that they're sideways, not sideways as they are

25  now, but Mr. Tumminello, turn it the other way and push it back

1  towards the seat back.  I think that will allow you to get past

2  them easier.  They should turn all the way so they are facing

3  back.  Well, if they don't, don't try it.  Of course, we don't

4  want to push our luck.  They should be able to do that because

5  that way people could look at them.  Okay, great.  Have a good

6  evening ladies and gentlemen.  The jury is excused.

7          (Jury excused.)

8          Ms. Sandoval, you are excused.  Can you be back here

9  so we can resume at 8:30 tomorrow?

10         *THE WITNESS:*  Yes, your Honor.

11         *THE COURT:*  Great.  Thank you very much.

12         Just a few things.  This is for everyone including the

13  audience too.  We have had a few, as I count, three instances

14  today where cellphones have gone off.  I don't want to get to

15  the point where I order that everyone have their cellphones

16  off, but if you're in here, regardless of who you are, the

17  attorneys too, you have to have the cellphones silenced.  They

18  can't go off, okay?  On the whole people have been great about

19  it and everyone has been very quiet, and I very much appreciate

20  that, but just try to remember that about your phones, okay?

21         Also a number of exhibits were presented today that

22  aren't on my exhibit list.  We don't have them.  They are not

23  on any thumb drive that you have given to the Court and copies

24  weren't given to me when they were presented, so that's not

25  good.  So you need to figure out a way to correct that problem.

1    So, you know, some way, some how, you have got to get me

2    exhibits and the exhibit list has got to be up-to-date, all

3    right?

4         Any matters that we should take up before we recess?

5    Mr. Feldberg, go ahead.

6         *MR. FELDBERG:*  Thank you, Your Honor.  Michael

7    Feldberg for Mr. Austin.

8         At some point before the government calls -- thank

9    you, Your Honor.  At some point before the government calls

10   Mr. Bryant as a witness, which could happen as early as

11   tomorrow morning or tomorrow sometime depending on how things

12   go, we would like an opportunity to address the Court about his

13   cross-examination.  As the Court may know, we filed a brief

14   last night.  We filed it last night so people would have

15   adequate time to consider, and if DOJ wants to respond,

16   obviously that is up to them.

17        *THE COURT:*  Hold on one second, Mr. Feldberg.

18        Has the government responded to that yet?

19        *MR. KOENIG:*  No, we have not, Your Honor.

20        *THE COURT:*  That's fine.  Just checking.

21        *MR. FELDBERG:*  Whether it's tonight or tomorrow

22   morning or if Mr. Bryant is not going to get on the stand

23   tomorrow, at some later point we would like an opportunity to

24   address the Court before he --

25        *THE COURT:*  I think that's a good idea.  I think it's

1    best to have a hearing about that matter so that we can talk it

2    through.

3            When does the government anticipate that Mr. Bryant

4    may be called?

5            MR. KOENIG:  I think Mr. Feldberg was fairly close.

6    It could be tomorrow afternoon, but it could also be Monday.  I

7    don't know how long this --

8            THE COURT:  Well, if there is a possibility, that

9    means we need to talk about that probably no later than the

10   lunch recess.  We can talk about that 8:00 a.m. tomorrow.  I

11   think the conversation may take a little bit longer than

12   normal.  I don't want to talk about it -- I don't think -- we

13   may not necessarily have enough time if we start at 8:15.  So

14   do you want to do it at 8:00 a.m. tomorrow?

15           MR. FELDBERG:  At the Court's pleasure, Your Honor.

16           MR. KOENIG:  That will be fine.  Will the courtroom be

17   sealed during that?

18           THE COURT:  Why would it need to be?

19           MR. KOENIG:  Well, I don't know what they plan to get

20   into, but the --

21           THE COURT:  Have you had a chance to look at the

22   motion?

23           MR. KOENIG:  I have perused it.  I haven't had a

24   chance to read it.

25           THE COURT:  I don't think it really gets into a

1    sensitive area.  It goes into the area that was talked about in

2    terms of misstatements to the special agents.

3         MR. FELDBERG:  Your Honor, we have no intention of

4    describing the nature of the issues that are described, just

5    it's a question of the statements to the agents.

6         THE COURT:  Right.  I wouldn't close the courtroom to

7    talk about the motion itself, the scope of it as I recall from

8    looking at it.  But it can be addressed when we convene, so why

9    don't we do 8:00 a.m. tomorrow we will take that issue up,

10   okay?

11        MR. FELDBERG:  Thank you, Your Honor.

12        MR. KORNFELD:  Just a logistical issue, at the side

13   bar there is the issue of the all object rule.  I guess the

14   corollary is the all admission rule.  If the government moves

15   something, does anyone have an objection?  So we will take that

16   up tonight and hopefully come up with an efficient protocol and

17   we will report back to the Court tomorrow.

18        THE COURT:  That's great.  I appreciate that.

19        Mr. Fagg, go ahead.

20        MR. FAGG:  Thank you, Your Honor.  Just briefly,

21   Mr. Pollack raised the issue about the exhibit list from the

22   government earlier today and said that perhaps he was being

23   cathartic.  We would like and would request that the Court

24   order the government to produce an updated exhibit list by the

25   end of the day today.  We have their initial exhibit list.  We

1   have not received an updated exhibit list since that time,

2   since October 19th.  And there is a number of exhibits that the

3   government has designated, but we don't have the updated

4   exhibit list.  And it is making it extremely difficult and time

5   consuming for us to go through those documents and make sure

6   that we have them identified.

7        And the other thing we would ask is that for purposes

8   of our own cross-examination of witnesses that we be given

9   stamped copies of the government's exhibits because we don't

10   have those for all the government's exhibits.

11        *THE COURT:*  Do you mean copies that have -- that bear

12   an exhibit sticker?

13        *MR. FAGG:*  Yes, Your Honor.

14        *THE COURT:*  Okay.

15        Response as to that, Mr. Koenig?

16        *MR. KOENIG:*  Sure.  We would be happy to update -- it

17   was actually an issue I was going to raise.  Should we file it

18   as a supplement with the extra lines or should we -- because

19   you may have been writing already on what the exhibit list was.

20        *THE COURT:*  You're right.  Yeah, that's why it just

21   does not work for me to get a new -- that's why I want

22   additions too, supplemental pages too, that's good.  But

23   obviously we would -- it may be easy for purposes of the actual

24   documents as distinct from the list to get a new thumb drive.

25        *MR. KOENIG:*  Okay.  That's fine.

1          THE COURT:  And then back to Mr. Fagg's point, can you

2     do that then for the defendants?

3          MR. KOENIG:  A new thumb drive?

4          MR. FAGG:  A new thumb drive would be great, Your

5     Honor, yes.

6          THE COURT:  That might be the best way to update

7     things, but once again, I think this is a much more orderly

8     process.  Now, I know the defendants have I am assuming

9     organized -- is it organized by defendant through the letter

10    designations?

11         MR. FAGG:  No, Your Honor.

12         THE COURT:  So it would just be all at the end if they

13    are new exhibits?

14         MR. FAGG:  Yes.  And I don't think any of their

15    exhibits are organized by defendant.

16         THE COURT:  Because like Mr. Tubach had some exhibits

17    that are not on the list.  I am not sure, Mr. Tubach, were some

18    of the C series the 611?

19         MR. TUBACH:  We have some A series and some C series.

20         THE COURT:  Right.  So that's tricky for me to update

21    lists because they weren't on the list, so we need to update

22    those.  I can put in new pages after -- you know, for a

23    particular letter series, so maybe that's the best way to do it

24    there.  Anyway, we do need to think those issues through

25    because Mr. Fagg is absolutely right, I am writing notes on my

378

1   list.  I can't start all over.  It's rough.

2            MR. KOENIG:  The other thing if we could get a numb

3   drive of their new exhibits because we don't have those.

4            THE COURT:  Yes, both sides.  Once again, a new

5   version should be provided to the other side.

6            MR. KOENIG:  And then as far as the stickering goes, I

7   am only aware of just two or three where we got them out

8   because we hadn't had them stickered yet, but we wanted to meet

9   our two-day deadline, so apologies if we haven't gotten those.

10  One other thing was --

11           THE COURT:  Is this on the same topic that Mr. Fagg

12  brought up?

13           MR. KOENIG:  No.

14           THE COURT:  Okay.  Then I want to make sure Mr. Fagg

15  is done with his list.

16           Okay.  Now, Mr. Koenig, go ahead.

17           MR. KOENIG:  Thank you.  For the authentication-type

18  witnesses, do you want --

19           THE COURT:  That's a good point.  I am surprised,

20  frankly, that Ms. Sandoval is testifying because I didn't think

21  there was any objection like to toll records.  I didn't get

22  that impression.

23           MR. KOENIG:  Well, we don't have a stipulation and we

24  are doing authentication and business record, so that's why she

25  is here.  And there is also other things about the actual

1    record like how to interpret what time zone it is and --

2          THE COURT:  That's fine.

3          MR. KOENIG:  But then the AT&T --

4          MS. ROGOWSKI:  Your Honor had ruled on authentication

5    of the toll records, but we wanted to set the business records

6    foundation.  And additionally, we wanted to ask about the

7    authentication of the subscriber information in the records, so

8    that was the purpose of calling her.

9          THE COURT:  That's fine.  I was just curious.  So will

10   counsel have an opportunity overnight to have the discussion

11   that Ms. Prewitt alluded to earlier?

12         MR. KOENIG:  I think we should.  Probably, you know,

13   with all these lawyers, I would imagine -- the best way is

14   we'll have a brief discussion and I think the best way would

15   be, you know, to have them send us a proposed stipulation

16   because we'll have to be able to look through and see what

17   exact documents they are talking about here.

18         THE COURT:  Well, like Mr. Olson was talking about,

19   handshake, why don't you try to handshake, then write it up.  I

20   am worried that you are not going to be able to communicate

21   overnight very effectively if it's just e-mail or something.

22         MR. KOENIG:  As far as the authentication witnesses

23   with the binders, they are going to have a binder in front of

24   them like Ms. Sandoval did.  I don't know if you want to be

25   inundated with those.

1        THE COURT:  Be provided with those?  Probably not.

2   Probably not.  But then how are you going to actually move to

3   admit them, admit them as a group then after she has testified

4   about them or what?

5        MS. ROGOWSKI:  Your Honor, we were planning to just

6   move to have all the exhibits that were listed on the exhibit

7   list that we marked, for example the 9556 exhibit, ruled upon

8   for authentication purposes.  And then for any records that we

9   wanted to set the business records foundation for under 803(6),

10  we would specify those to you.

11       THE COURT:  And then move their admission at that

12  time?

13       MS. ROGOWSKI:  Yes, Your Honor.

14       THE COURT:  Okay.  Well, we'll see how that works.

15       MS. ROGOWSKI:  That's our plan.  If you have a

16  preferable solution, just let us know.

17       THE COURT:  I don't.  We'll see how it works.

18       Mr. Beller had something first, Mr. Tubach.

19       MR. BELLER:  Thank you, Your Honor, and I will be very

20  brief.  As to Exhibits 9251 and 9236 that have been received

21  into evidence, I objected.  The Court requested a basis and I

22  was uncomfortable saying it in front of the jury.  It is my

23  belief that these both look like mugshots.  It implies --

24       THE COURT:  I think they are driver's license photos,

25  though, aren't they?

1          MR. BELLER:  They are, but that's not in the record.

2     They appear to me to be mugshots even they are, in fact, I

3     believe driver's license photos.  So I say that not asking the

4     Court to reconsider understanding you have made a ruling, but

5     rather the basis as to why I believe they are prejudicial as to

6     my client that he conspired with individuals and these do

7     appear to be mugshots.

8          The government was provided photos that do not appear

9     to be mugshots.  They chose to not use them because the

10    defendants would not stipulate as to their admissibility, so

11    that was the basis for that objection.  To the extent there are

12    additional photos that are introduced, it will continue to be

13    an objection from team Fries and that's the basis.  And I

14    simply wanted the record to reflect that.  Thank you.

15         THE COURT:  Mr. Tubach, go ahead.  I am going to give

16    people about three more minutes, then we will go into recess.

17         MR. TUBACH:  Yes, Your Honor.  I just wanted to raise

18    a topic of the brief that we filed over the lunch hour.

19         THE COURT:  I told you I was going to read them, but I

20    didn't have a chance.  I didn't realize that it was 13 pages

21    long.

22         MR. TUBACH:  We wrote it very fast after leaving

23    court.

24         THE COURT:  Pretty good job for that fast.  Go ahead.

25         MR. TUBACH:  I didn't know if the Court wanted to take

1   this up.

2          THE COURT:  No.  I haven't had a chance to take that

3   up yet.  It does raise some interesting issues.

4          MR. TUBACH:  Perhaps we have time tomorrow morning

5   after discussing the other issue at 8:00.

6          THE COURT:  Yes.  Let's see if we have time to take

7   that up, but yeah, I haven't gotten through the end of it,

8   although I did kind of skim it, but I agree with you, there is

9   some interesting issues there.

10          MR. TUBACH:  Because this may come up in tomorrow's

11   testimony which is why I wanted to --

12          THE COURT:  Yes, agreed.  And the United States

13   obviously hasn't had a chance to respond to that yet.

14          MR. KOENIG:  Yeah, that's one thing we wanted to raise

15   is we would like an opportunity to respond.

16          THE COURT:  Yes.  If you could get something filed, I

17   will take a look at it.  We'll try to take a look at that

18   bright and early, but obviously we are meeting at 8:00, so it

19   would be a limited amount of time.

20          MR. KOENIG:  We'll do.  And just by way of the

21   photographs, let me just add that we got -- we have these

22   photographs and, you know, they are from DMV records.  The fact

23   that the defendants gave us the photographs but then wouldn't

24   stipulate to their authenticity is, you know -- I mean, I am

25   not sure what we were supposed to do, but I just wanted the

1    record to reflect the fact that we received them with

2    absolutely no concession has kind of put us in a tough spot.

3         THE COURT:  Okay.  Mr. Kornfeld, did you have

4    something?

5         MR. KORNFELD:  Your Honor, just one logistical thing.

6    We were having a brief side bar of our own about your comment

7    about getting you marked exhibits that are being used on

8    cross-examination.  Obviously if they are in our list, we ought

9    to be able to call them up and the Court would be able to see

10   it on the Court's monitor.

11        THE COURT:  Yeah, and that usually is okay.  And, in

12   fact, you're right.  I mean, I would not necessarily want to be

13   swamped with a bunch of loose papers because where am I going

14   to put them.  I don't have notebooks.  So that's a good point.

15   If you have it, I would suggest this.  Have a copy handy, and

16   then if I need it, I will ask for it, but that's a good point.

17        MR. KORNFELD:  I think our mistake was -- I was

18   getting my steps in when Mr. Tubach was doing the cross.  I am

19   happy to give Mr. Keech a copy too.  It frankly didn't occur to

20   me because I thought they were premarked.

21        THE COURT:  As long as you have an extra that you can

22   hand to me if I request it.

23        MR. KORNFELD:  That's great.  Thank you for that

24   direction.

25        Mr. Fagg, real quick.

1          Ms. Prewitt, I am going to cut you off.  Sorry.  We'll

2     take your comment up tomorrow.

3          MR. FAGG:  On the point of the photographs, the

4     defendants did agree to their authenticity and agreed to

5     stipulate to that.  It did not agree to their admissibility

6     because we didn't think it was necessary for a trial since they

7     are all sitting here.  In the event that the defendants -- and

8     we can corral them and would agree to the admissibility of the

9     photos that were submitted, we would ask if the Court would

10    consider that or if the Court would consider the other

11    photographs if we are able to --

12         THE COURT:  You can talk to the government about that.

13    I can understand why the government may want to put photos in,

14    especially with a long trial even though people are sitting

15    here because they are in masks, but that one just does not seem

16    like a great challenge in terms of being able to work it out.

17         MR. KOENIG:  If I misspoke, I didn't mean

18    authenticity.

19         THE COURT:  That makes good sense, though.  I

20    appreciate that there has not been an objection as to

21    authenticity of photos handed over.

22         We will be in recess, then, until 8:00 a.m. tomorrow.

23    Thank you.

24         (Recess at 5:25 p.m.)

25

1                                    INDEX

2     OPENING STATEMENT

3         By Mr. Kornfeld                                    153

4         By Ms. Rahman                                      164

5         By Mr. Gillen                                      173

6         By Ms. Prewitt                                     183

7         By Ms. Henry                                       196

8         By Mr. Pollack                                     206

9     WITNESSES

10        James Olson

11            Direct Examination By Ms. Sweeney              217

12            Cross-examination By Mr. Gillen                280

13            Cross-examination By Mr. Tubach                298

14            Cross-examination By Mr. McLoughlin            335

15            Cross-examination By Ms. Henry                 353

16            Cross-examination By Mr. Beller                354

17            Cross-examination By Ms. Johnson               356

18            Redirect Examination By Ms. Sweeney            360

19        Melissa Sandoval

20            Direct Examination By Ms. Rogowski             363

21

22

23

24

25

1                          INDEX (Continued)

2                             EXHIBITS

3    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4    C-754                     303

5    C-755                     302

6    9236                      252

7    9251                      252

8                        REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.   Dated

11   at Denver, Colorado, this 18th day of January, 2022.

12

13                              S/Janet M. Coppock

14

15

16

17

18

19

20

21

22

23

24

25