1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                     REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 8

15   _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:40 a.m., on the 4th day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                              APPEARANCES
2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
5   for Plaintiff.
6            Anna Tryon Pletcher and Michael Tubach of
7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8   San Francisco, CA 94111-3823;
9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10  N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13  CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15  LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17  Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18  appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21  10017;
22
23
24
25
```

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
1              APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                        PROCEEDINGS

16         THE COURT:  All right.  Let's get the jury.

17         COURT DEPUTY CLERK:  The mics aren't working.

18         THE COURT:  Let's get the jury.  Are they ready?

19         COURT DEPUTY CLERK:  The jury is ready, but the

20   microphones aren't working.

21         THE COURT:  It turns out I guess my microphone --

22   actually, I think we can get by without my microphone.  None of

23   the microphones are working?  Okay.

24         COURT DEPUTY CLERK:  We're good.

25         MS. SWEENEY:  Your Honor, the government has just one
```

Robert Lewis - Cross

1    very quick thing to raise that should take one minute, just to

2    advise you that we will be taking Ms. Fisher after Mr. Lewis.

3    We advised the defendants of this a couple nights ago,

4    confirmed it last night.  They have her documents.  But there

5    is some childcare issues if she is extended into next week.

6             THE COURT:  That's fine.  Thank you.

7             (Jury present.)

8             THE COURT:  Good morning, Mr. Lewis.

9             THE WITNESS:  Good morning.

10            THE COURT:  All right.  Next cross-examination?

11            Mr. McLoughlin?

12            MR. McLOUGHLIN:  Thank you, Your Honor.

                         **CROSS-EXAMINATION**

13

14   BY MR. McLOUGHLIN:

15   Q.  Good morning, sir.  My name is Jim McLoughlin and I

16   represent Mr. Lovette.

17   A.  Good morning.

18   Q.  How are you this morning?

19   A.  Very well, thank you.

20   Q.  Good.  Let's get a few basics out of the way, sir.  You did

21   not communicate directly with Mr. Lovette in the course of the

22   2014 negotiations for 2015, did you?

23   A.  I did not.

24   Q.  And you didn't meet with Mr. Lovette in the course of those

25   negotiations, did you?

Robert Lewis - Cross

1   A.   I'm sorry?

2   Q.   You did not meet with Mr. Lovette either in the course of

3   those negotiations.

4   A.   I did not.  Thank you for speaking up.  No, I did not.

5   Q.   And please, if you can't hear me, flag it.  I'll speak up.

6   A.   Thank you.

7   Q.   Apologies.

8        And Mr. Lavine asked you a couple questions yesterday,

9   and I am going to ask you similar questions.  You don't have

10  any personal knowledge that Mr. Lovette entered into an

11  agreement with anyone to fix a price for broiler chickens, do

12  you?

13  A.   I do not.

14  Q.   And you don't have any personal knowledge that Mr. Lovette

15  entered into an agreement with a competitor to raise prices for

16  broiler chickens, do you?

17  A.   I do not.

18  Q.   And you don't have any personal knowledge that Mr. Lovette

19  entered into an agreement with a competitor of Pilgrim's to

20  maintain prices, do you?

21  A.   I do not.

22  Q.   And you don't have any personal knowledge that Mr. Lovette

23  entered into an agreement with a competitor of Pilgrim's to rig

24  a bid, do you, sir?

25  A.   No.

Robert Lewis - Cross

1  *Q.*  Sir, you were interviewed by the government a number of

2  times, at least four or five; is that right?

3  *A.*  Yes.

4  *Q.*  Okay.  And I'm going to assume that you answered the

5  questions that the FBI asked you to the best of your ability.

6  *A.*  Yes.

7  *Q.*  And you were as honest as you could be.

8  *A.*  Yes.

9  *Q.*  Now, did you tell the FBI that RSCS had not been good

10 listeners in the past and had not addressed previous issues in

11 the acquisition process for broiler chickens at RSCS?

12 *A.*  No.

13     *MR. McLOUGHLIN:*  Can we pull up just for the witness

14 and lawyers, please, H-635, and specifically at Page 3?

15     *MR. TORZILLI:*  Request for a copy.

16     *MR. McLOUGHLIN:*  These have all been produced to the

17 government, Your Honor, and they've had them forever.

18     *THE COURT:*  That's not really the issue.  If you have

19 a copy, that would be helpful.  There is lots of paper.

20     *MR. McLOUGHLIN:*  Would Your Honor like a copy for me

21 to hand to the Court?

22     *THE COURT:*  Yes, I think that would be helpful.

23     Ms. Grimm, can you hand that up?

24     *MR. McLOUGHLIN:*  And actually, sir, the old-fashioned

25 way, I will give you a paper copy.

Robert Lewis - Cross

1   *BY MR. McLOUGHLIN:*

2   Q.  Sir, I will direct you to the third paragraph on that page,

3   the second sentence.  And it says:  RSCS had not been good

4   listeners in the past and had not addressed previous issues

5   such as specifications, overpacked cases, quality assurance

6   issues, and did not always show a desire to work with

7   suppliers.

8          Sir, is it your testimony that the FBI agent who

9   prepared this summary of your interview did not record your

10  statements accurately?

11         *MR. TORZILLI:*  Objection.

12         *THE COURT:*  Overruled.

13  A.  I do not remember saying this.

14  *BY MR. McLOUGHLIN:*

15  Q.  Is it your testimony, sir, that you don't remember whether

16  you did or not or that the agent recorded your statement

17  inaccurately?

18  A.  I don't remember whether I said it or not.

19  Q.  Okay.  As we sit here today, you don't have any reason to

20  doubt that the agent who recorded this at the time which was on

21  or about July 9, 2021 got that correct, do you -- or incorrect,

22  excuse me.

23  A.  No.

24  Q.  And I apologize, I fumbled that question a bit.  So you

25  have no basis to believe that the agent who recorded this

Robert Lewis - Cross

1    information in July of 2021 got it wrong; is that correct?

2    A.  Correct.

3    Q.  And, sir, in that same interview you also said the RSCS

4    price model was out of sync, didn't you?

5    A.  I am sorry, was?

6    Q.  In that same interview you also said that the RSCS price

7    model was out of sync.

8    A.  I don't know that I used the terminology out of sync, but I

9    do recall talking about the model not being realistic.

10   Q.  Okay.  Thank you.

11          Now, sir, you also were interviewed later -- let me

12   grab my papers here.

13          Do you recall in a subsequent interview that you told

14   the agents who interviewed you in April of 2020 on the 26th

15   that Pilgrim's was one of the approved suppliers for KFC?

16   A.  Yes.

17   Q.  And do you recall saying, quote, Pilgrim's was always

18   aggressive?

19   A.  Yes.

20   Q.  Okay.  And do you also recall saying that Pilgrim's was

21   aggressive because they, quote, had other customers ready to

22   take supply if KFC did not want to buy it?

23          MR. TORZILLI:  Your Honor, I am going to object to

24   counsel quoting from information that's not in evidence.

25          MR. McLOUGHLIN:  Your Honor, this is

1400

Robert Lewis - Cross

1  cross-examination.  I think I am entitled to cross-examine this

2  witness about prior statements recorded in a 302.

3          MR. TORZILLI:  They are not his statements.  They are

4  the statements of the agent that wrote the summary report.

5          THE COURT:  Well, exactly.  The agent presumably

6  recorded the statements accurately and Mr. Lewis can be

7  confronted with statements that he apparently was the source

8  of.  Overruled.

9  BY MR. McLOUGHLIN:

10 Q.  Sir, do you recall saying that to the agents?

11 A.  Would you repeat the question, please?

12 Q.  Certainly, sir.  Do you recall that in April of 2020 you

13 told the agents who were interviewing you that Pilgrim's was

14 always aggressive in its pricing because, quote, they had other

15 customers ready to take supply if KFC did not want to buy it?

16 A.  I do not recall saying that.

17 Q.  Okay.  Let me ask you to --

18         MR. McLOUGHLIN:  Can I have 637, please?  We will do

19 this the old-fashioned way again with paper.  For those of us

20 of a certain generation it's a little easier.

21 BY MR. McLOUGHLIN:

22 Q.  And sir, I will direct your attention to Page 6 of that

23 document.  And do you see there where it says Exhibit 11

24 attachment, that paragraph?

25 A.  Yes.

Robert Lewis - Cross

1   Q.  Can you please read the last sentence out loud?

2   A.  Pilgrim's was always aggressive and they had other

3   customers ready to take supply if KFC didn't want to buy it.

4   Q.  Does that refresh your recollection that in words or

5   substance you gave that information to the FBI on April 24th,

6   2020?

7   A.  Sir, I can only say that there were numerous interviews and

8   I said a lot of things, and I don't remember all of it and I

9   don't remember this.

10  Q.  You don't disagree that the statement is true, do you?

11  A.  I do not disagree.

12  Q.  Okay.  And would you also agree, sir, that if Pilgrim's

13  Pride or any of the other suppliers that KFC purchased from had

14  someone who was willing to pay more for their chicken, they had

15  every right to sell it at the highest available price?

16  A.  Yes, as long as they met the commitment with RSCS that they

17  had made.

18  Q.  Yes, for a prior contract.

19  A.  Yes.

20  Q.  And let's talk about contractual commitments for a moment.

21          So you talked a little bit yesterday about this

22  three-year contract that KFC was pursuing.  And it's true, is

23  it not, sir, in the three-year contract proposal that RSCS

24  made, it reserved the right to reduce its volume purchases over

25  the three years depending upon its needs.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   Okay.  So in other words, RSCS was not guaranteeing these

3    suppliers that they could take to the bank that RSCS was going

4    to buy a certain amount of chicken each year, correct?

5    A.   The SBRA addendum had a specific volume listed for each

6    week of the year.  And it also contained a clause that if KFC

7    closed stores, that the volume was subject to change.

8    Q.   And there were other reasons under which KFC reserved the

9    right to reduce its volume, weren't there?

10   A.   I don't recall anything specifically in the SBRA that dealt

11   with that.

12   Q.   Point being, sir, that if KFC -- and KFC had been closing

13   stores over the last several years, hadn't it, several hundred

14   at least.

15   A.   That's my understanding, yes.

16   Q.   So faced with KFC closing hundreds of stores and not making

17   a guaranteed volume commitment, these suppliers had the risk

18   that somewhere two years out they might have loads of chicken

19   that they thought KFC would take that they had to sell

20   somewhere else; isn't that fair?

21   A.   Yes.

22   Q.   And you would expect that risk to be reflected in the bid

23   price that they gave to KFC, wouldn't you?

24   A.   I suppose so, yes.

25   Q.   Now, we've had a fair amount of discussion and we might

Robert Lewis - Cross

1    have a little more today about the fact that the price of small

2    birds was rising dramatically because of the demand.  Do you

3    recall that yesterday?

4    A.  Yes.

5    Q.  And you told the FBI that and the government agents that on

6    several occasions, didn't you?

7    A.  Yes.

8    Q.  Now, so in 2014 you were asking these suppliers to commit

9    to a three-year price with the exception of a feed adjustment,

10   correct?

11           MR. TORZILLI:  Objection, that's not the witness'

12   testimony.

13           MR. McLOUGHLIN:  Your Honor, it's cross-examination.

14   If I got it wrong, he can tell me.

15           THE COURT:  Well, in this case I agree.  Overruled.

16   A.  Would you repeat the question, please?

17           MR. McLOUGHLIN:  Can you read the question back, madam

18   court reporter?

19           (The record was read by the court reporter.)

20   A.  That is not correct.

21   BY MR. McLOUGHLIN:

22   Q.  What other adjustments were there?

23   A.  The agreement called for the suppliers to review pricing at

24   the end of each of three years.

25   Q.  Okay.  So if the price of small birds continues to rise

Robert Lewis - Cross

1   dramatically over the next several years, isn't it true that

2   these suppliers were at risk, because it was not an automatic

3   adjustment, that they might be required to sell chicken to KFC

4   at a price lower than they could sell it to somebody else?

5   A.   I'm not sure I can answer that question.  Maybe you can ask

6   it again.

7   Q.   Certainly.  Since this was a three-year contract with

8   certain defined price parameters, isn't it true that there was

9   a risk that in 2017 these suppliers might be in a position

10  where they could sell the chicken at a much higher price to

11  somebody else, but they had contractually committed it to KFC

12  at a lower price?

13  A.   When the agreement was signed, the suppliers accepted the

14  volume that was stated in the agreement and we would expect

15  that they would provide that volume regardless.

16  Q.   Regardless.  So the answer to my question is a little

17  simpler, isn't it?  It's just yes.

18  A.   I suppose, yes.

19  Q.   And you would expect the suppliers to want to be paid for

20  taking that risk in some amount, wouldn't you?

21  A.   Not necessarily.  Isn't there risk in all business

22  dealings?

23  Q.   Yes.  And you wanted to put that risk completely on the

24  supplier and not accept any of it; isn't that true?

25  A.   That isn't totally correct.

Robert Lewis - Cross

1  *Q.* Didn't you just say, sir, that the suppliers should be

2  prepared or could be prepared to take 100 percent of that risk

3  and wasn't that because KFC didn't want to take it?  And it was

4  your job to try and shift that risk.  Nothing wrong with that,

5  sir, but wasn't it your job to put the risk on the suppliers

6  instead of RSCS?

7       *MR. TORZILLI:*  Object to form.

8       *THE COURT:*  Overruled.

9  *A.* I am not comfortable answering that question.  I am not --

10 I'm not sure how to answer that question.

11 *BY MR. McLOUGHLIN:*

12 *Q.* Well, sir, just give us the best answer you can.  It's a

13 yes or a no.

14 *A.* It's closer to yes than no.

15 *Q.* Now, talking for a moment about this shift from small birds

16 to large birds, let's talk for a moment about Sanderson Farms.

17 You were in the purchasing group in 2005 and 2006 at RSCS, were

18 you not?

19 *A.* Yes.

20 *Q.* And in 2005 was Sanderson not just the largest supplier,

21 but didn't Sanderson win the supplier of the year award?

22       *MR. TORZILLI:*  Objection to the scope.

23       *MR. McLOUGHLIN:*  This is cross-examination, Your

24 Honor.  I think I will be able to tie it up very quickly.

25       *MR. TORZILLI:*  It still needs to be within the scope

1406

Robert Lewis - Cross

1  of the direct exam and I was focused on 2014.

2          MR. McLOUGHLIN:  It is within the scope, Your Honor.

3          THE COURT:  Overruled.  We will see where this is

4  going.

5  BY MR. McLOUGHLIN:

6  Q.  Do you recall that in 2005 Sanderson Farms, which was KFC's

7  largest supplier, was also producer of the year?

8          MR. TORZILLI:  Object to facts not in evidence.

9          THE COURT:  Sustained.

10  BY MR. McLOUGHLIN:

11  Q.  Sir, do you recall Sanderson Farms being given the producer

12  of the year award in 2005?

13  A.  Yes.  I don't remember the specific year, but I do remember

14  them getting supplier of the year.

15  Q.  And do you recall also that it was the very next year after

16  Sanderson was given the producer of the year award by RSCS that

17  it publicly announced it was going to get out of the small bird

18  business?

19  A.  I remember the announcement, but I do not remember the time

20  period.

21  Q.  Do you remember it being very close in time to the year in

22  which Sanderson was given producer of the year award?

23  A.  I do not.

24  Q.  And so Sanderson was, in fact, KFC's largest producer at

25  the time, wasn't it?

1407
Robert Lewis - Cross

1    A.   Yes, I believe they were.

2    Q.   Have you ever heard the expression the canary in the coal

3    mine, sir?

4    A.   Can't say that I have, no.

5    Q.   Wasn't Sanderson Farms leaving the small bird business when

6    it was KFC's largest supplier an indication to you years before

7    2014 that there was a problem with the small bird market?

8    A.   Yes.

9    Q.   And in the years until you came back in 2014, didn't you

10   recognize that KFC/RSCS, hadn't really done anything to fix

11   that which is why, as you discussed yesterday, you told these

12   suppliers, well, we are going to start anew in 2014.

13   A.   I can't speak for the years that I was not there.

14   Q.   Let's just speak for the years that you were, sir.  Isn't

15   it true during the years you were, KFC didn't do anything to

16   fix it?

17   A.   Well, we obviously did something to fix it or KFC would

18   have run out of product and it didn't.

19   Q.   Sir, didn't we go through at great length yesterday in 2014

20   KFC ran out of product?

21   A.   I am not referring to 2014.  You were asking me about the

22   period of time leading up to 2014 is the way I understood your

23   question.

24   Q.   Well, sir, in 2014 after years of doing business a certain

25   way KFC ran out of product, didn't it, on Mother's Day?

Robert Lewis - Cross

1  *A.*  Again, I don't remember running out of product, but I do

2  remember it being very, very tight.

3  *Q.*  Who is James Olson, sir, from Harmon Management?

4  *A.*  He is the chairman of the board.

5  *Q.*  Do you know him?

6  *A.*  I do.

7  *Q.*  Have you worked with him for many years?

8  *A.*  Yes, not a great deal, but some.

9  *Q.*  And if he testified in this trial that on Mother's Day KFC

10  stores had run out of chicken, would you dispute that

11  recollection by Mr. Olson?

12  *A.*  I do not dispute that --

13      *THE COURT:*  Hold on, Mr. Lewis.  That's an improper

14  form of a question to ask someone that type of thing.

15  Sustained.

16  *BY MR. McLOUGHLIN:*

17  *Q.*  Now, sir, you were asked a little bit about McKinsey.  Did

18  you participate in the kickoff presentation by McKinsey?

19  *A.*  I'm sorry, sir.  Would you repeat your question?

20  *Q.*  We talked a little bit yesterday about McKinsey & Company,

21  the consulting firm?

22  *A.*  McKinsey, yes.

23  *Q.*  And did you participate in any meetings with McKinsey?

24  *A.*  I do not remember McKinsey.  I have been asked that before.

25  I recognize the name, but I don't recall any interaction with

Robert Lewis - Cross

1    McKinsey.

2    Q.  Do you ever recall ever seeing a report prepared by

     McKinsey for strategy changes that RSCS could implement?

3

4    A.  I do not recall.

5    Q.  Can we pull up C-679, please -- excuse me, 659, 659.

6            MR. McLOUGHLIN:  Your Honor, if I may approach the

7    clerk and provide a copy for the witness and for the Court.

8            THE COURT:  Yes, you may.

9    BY MR. McLOUGHLIN:

10   Q.  Sir, what I would like you to do is just page through that

11   for a minute or two, take a look at it, and then I'll have a

12   few questions.

13           MR. TORZILLI:  Your Honor, I am going to object to use

14   of this document with this witness.  On each and every page it

15   says for board of directors only, and it hasn't been

16   established he is a board of the directors or otherwise saw

17   this in the ordinary course.

18           THE COURT:  That's overruled.  A question hasn't been

19   asked of the witness concerning the document yet, so it's

20   premature.

21           Go ahead.

22   BY MR. McLOUGHLIN:

23   Q.  Sir, do you recall seeing a report that is -- was in form

24   or substance this report or one substantially similar?

25   A.  I do not.

1410

Robert Lewis - Cross

1  *Q.*  You do not recall ever seeing this report?

2  *A.*  I do not.

3  *Q.*  Now, sir, if a consultant, a business consultant, was hired

4  and paid a very substantial amount of money to advise RSCS

5  about how best to deal with the shortage of chickens, would you

6  have expected that as the person responsible for acquiring that

7  chicken you would have been shown such a report?

8          *MR. TORZILLI:*  Objection, calls for speculation.

9          *THE COURT:*  Sustained.

10  *BY MR. McLOUGHLIN:*

11  *Q.*  Sir, in the ordinary course of business at RSCS, was it the

12  practice to provide the people who were in purchasing with the

13  best available information that KFC had about the market for

14  broiler chickens?

15  *A.*  Yes.

16  *Q.*  And given that it was the regular practice to provide

17  people like yourself who were buying broiler chickens with the

18  best available information, would you have expected if RSCS

19  paid a consultant a million dollars to do a report you would

20  have seen it?

21  *A.*  I was not an official employee of RSCS, so I'm not sure

22  that I was privileged to see this report.  I do not remember

23  it.

24  *Q.*  Okay.  But you were in charge of solving the small bird

25  problem, weren't you, in 2014?

Robert Lewis - Cross

1   *A.*  I was part of the team that was charged with solving the

2   supply issue.

3   *Q.*  And if RSCS had, in fact, paid a million dollars to have a

4   report and it was the regular practice to provide the best

5   information to the people buying broiler chickens, you would be

6   disappointed that you weren't shown that report, wouldn't you?

7        *MR. TORZILLI:*  Objection.

8        *THE COURT:*  Sustained, speculation.

9        *MR. McLOUGHLIN:*  Can we pull up H-703, please, on the

10  screen just for the witness, the Court and the lawyers?

11  *BY MR. McLOUGHLIN:*

12  *Q.*  Sir, let me ask you to take a look at Exhibit H-703.  And

13  you can look at the e-mail string on the bottom of the first

14  page there.  Do you see that?

15  *A.*  Could that be enlarged?  Thank you.

16       *MR. McLOUGHLIN:*  Please, for all of us.

17  *BY MR. McLOUGHLIN:*

18  *Q.*  Okay.  So it is addressed from Bob Glied at McKinsey.com to

19  you with a copy to Blaine Ratterman and Chris Held at McKinsey.

20  Do you see that?

21  *A.*  Yes.

22  *Q.*  Please read that e-mail.  When you finish reading it, let

23  me know.

24       *MR. TORZILLI:*  I object.  This document is not in

25  evidence.

1412

Robert Lewis - Cross

1    MR. McLOUGHLIN:  This is cross-examination, Your

2 Honor.

3    THE COURT:  He can look it over.  We'll see what the

4 next question is.

5 A.  Okay.

6 BY MR. McLOUGHLIN:

7 Q.  So does this e-mail refresh your recollection that McKinsey

8 & Company consulted with you, asked you questions and

9 specifically asked you questions about the specifications that

10 RSCS required its suppliers to meet?

11 A.  I do not remember this memo.

12 Q.  It's an e-mail, sir.  It's not a memo.

13 A.  E-mail.

14 Q.  So as you sit here today, you have absolutely no

15 recollection of communicating with McKinsey by e-mail or

16 otherwise.

17 A.  Sir, it's seven years ago.  I don't remember.

18 Q.  Okay.  Now, do you recall a meeting, sir, in June of 2014

19 when Pilgrim's came and presented information to RSCS about the

20 small bird market?

21 A.  No, I don't recall.

22    MR. McLOUGHLIN:  If I may approach, Your Honor.

23    THE COURT:  You may.

24 BY MR. McLOUGHLIN:

25 Q.  Please review that exhibit for a minute.  So this is marked

Robert Lewis - Cross

1    for cross-examination as Exhibit D-445.  We will go with D-444

2    in a minute if we need it.

3    A.   Okay.

4    Q.   Okay.  Now, sir, I'm also going to show you what has been

5    marked as Exhibit D-444.

6              MR. McLOUGHLIN:  May I approach?

7              THE COURT:  You may.

8    BY MR. McLOUGHLIN:

9    Q.   Does Exhibit D-444, sir, refresh your recollection that in

10   June of 2014 people from RSCS, including Steve McCormick the

11   president, Todd Imhoff the chief procurement officer, Ray Kahn,

12   the CFO, and yourself, as well as Bob Glied from McKinsey

13   Consulting met with executives from Pilgrim's to see a

14   presentation about the small bird market?

15   A.   It does not refresh my memory.  However, I recognize a few

16   of the sheets that I flipped through in the presentation.  I do

17   not remember the presentation.

18   Q.   So as you sit here today, you don't dispute that there was

19   a meeting.  You just don't remember it; is that fair?

20   A.   That's fair.

21   Q.   So looking at Exhibit D-445, that is a presentation that

22   you say you recall certain pages of; is that correct?

23   A.   Certain pages do look familiar.

24   Q.   Okay.  And what pages look familiar to you, sir?

25   A.   In the entire presentation?

1414

Robert Lewis - Cross

1    *Q.* Yes.  How many pages is the presentation, sir?  I am not

2    going to ask you to do math, sir.  Isn't it about 125 pages?

3            *MR. TORZILLI:*  Objection, relevance.

4            *THE COURT:*  Overruled.

5    *A.* I don't know.

6    *BY MR. McLOUGHLIN:*

7    *Q.* Well, the last three digits of the Bates number on the last

8    page are 268, right?  Do you see that?

9    *A.* Yes.

10   *Q.* And the first page the last three digits are 141.

11   *A.* Okay.

12   *Q.* What is 141 subtracted from 268?

13   *A.* 127.

14   *Q.* Now, do you recall in this presentation or otherwise that

15   there were a number of factors that were affecting the chicken

16   market overall in 2014 including the outbreak of PED in the

17   pork population?

18           *MR. TORZILLI:*  I object, Your Honor.  He already

19   testified he only recalls a few of the slides.

20           *THE COURT:*  Overruled.

21   *A.* I don't recall.  I do not recall.

22   *BY MR. McLOUGHLIN:*

23   *Q.* Do you recall that PED is short for porcine epidemic

24   diarrhea and it hit the pork population in the United States in

25   2013 and 2014 and drove up the price of alternative proteins?

Robert Lewis - Cross

1          *MR. TORZILLI:*  Object to an improper question and no

2     foundation.

3          *THE COURT:*  Overruled.

4     *A.*  Again, sir, we are talking seven years ago.  I don't

5     remember, no.

6     *BY MR. McLOUGHLIN:*

7     *Q.*  Having looked at this or at least skimmed through this

8     127-page presentation given by Pilgrim's to KFC, isn't it true,

9     sir, that Pilgrim's Pride went out of its way to give KFC the

10    best information it could bring to bear about the condition of

11    the small bird market in 2014?

12         *MR. TORZILLI:*  Objection, speculation.

13         *THE COURT:*  Overruled.  He can answer.

14    *A.*  It would appear from the presentation that that is true,

15    yes.

16    *BY MR. McLOUGHLIN:*

17    *Q.*  And that was pretty unusual, wasn't it, sir?  Suppliers

18    didn't come in with 127 presentations every year, did they?

19    *A.*  They did not.

20    *Q.*  And wasn't the overall message, sir, that this was a unique

21    year and significant price increases were coming because of

22    market conditions?

23    *A.*  I'm not sure I'm equipped to answer that question.

24    *Q.*  Is that because you just don't remember or another reason?

25    *A.*  Don't remember.  I don't recall studying that or knowing

Robert Lewis - Cross

1    about that was a priority for me at the time.  I was hired for

2    a two-month period initially and my charge was to secure a

3    supply and that was my -- that was my area of concentration.

4    Q.   I apologize, sir.  I want the record to be clear.  Is that

5    a long way of saying that you just don't remember?

6    A.   I just don't remember.

7    Q.   Okay, great.  And is it also a long way to say that the

8    people who were permanent employees at RSCS might have been

9    doing things they didn't tell you about?

10   A.   Yes.

11         MR. McLOUGHLIN:  Can we have Exhibit F-384, please?

12   BY MR. McLOUGHLIN:

13   Q.   Now, sir, you talked yesterday about the fact that there

14   was this small bird/large bird adjustment that KFC paid as part

15   of its pricing in the 2014 to 2015 contract.  Do you recall

16   that?

17   A.   Yes.

18   Q.   And, in fact, that was a number that KFC or RSCS solicited

19   from the suppliers asking them what number they needed; isn't

20   that correct?

21         MR. TORZILLI:  Misstates prior testimony.

22         THE COURT:  Overruled.  He can answer.

23   A.   Please repeat the question.

24         MR. McLOUGHLIN:  Sure.  Your Honor, I will save us

25   time, if I may approach.

Robert Lewis - Cross

1      THE COURT:  You may.

2   BY MR. McLOUGHLIN:

3   Q.  Please look at the e-mail chain, sir, that's been marked as

4   Exhibit F-384.  Just let me know when you're ready.

5   A.  Ready.

6   Q.  Great.  Sir, did you send the e-mail that is at the bottom

7   of Exhibit F-384 to Roger Austin on or about the date it bears?

8   A.  Yes.

9   Q.  Did you receive the replies from Mr. Austin that are listed

10  above on July 11, 2014?

11  A.  Yes.

12      MR. McLOUGHLIN:  Your Honor, we move the admission of

13  Exhibit F-384.

14      THE COURT:  Any objection to the admission of Exhibit

15  F-384?

16      MR. TORZILLI:  It's inadmissible hearsay, Your Honor.

17      THE COURT:  Response?

18      MR. McLOUGHLIN:  No, Your Honor, it's not hearsay

19  because the issue is not anything that's particularly written

20  here in terms of its veracity.  The issue is whether this

21  witness sent it -- he has verified that he sent it -- and

22  whether he got a response from Pilgrim's.  It establishes the

23  exchange.  It is not a question of the underlying content of

24  the writing that's referred here.  It is to confirm that he

25  solicited those things that are apparent on the face of the

Robert Lewis - Cross

1    document and got a response.  It has nothing to do with for the

2    truth of a matter asserted.  It simply doesn't apply.  And this

3    witness has confirmed he sent it.

4          THE COURT:  That part of the e-mail that he sent is

5    admissible.  The response is hearsay and the objection will be

6    sustained.

7    BY MR. McLOUGHLIN:

8    Q.  So I am going to ask you about the e-mail you sent, sir.  I

9    am going to ask you specifically did you not say to Roger

10   Austin by e-mail:  Roger, this will confirm our telephone

11   conversation of yesterday afternoon.  As mentioned, we will

12   schedule a conference call sometime within the next two weeks

13   to discuss the following.

14         Do you see that you wrote that?

15   A.  Yes.

16         MR. McLOUGHLIN:  Your Honor, may we publish the

17   particular portion that has been admitted?

18         THE COURT:  I haven't admitted it yet.

19         MR. McLOUGHLIN:  I am sorry.

20         THE COURT:  I said it was admissible, but I didn't

21   admit it because the document contains hearsay.

22         MR. McLOUGHLIN:  Your Honor, may we publish to the

23   jury just the portion -- because we can cut that back I

24   think -- that has been admitted or that Your Honor admits.

25         THE COURT:  I haven't admitted anything.

Robert Lewis - Cross

1    MR. McLOUGHLIN:  I apologize.  We move the admission

2    of the e-mail from Mr. Lewis to Mr. Austin dated July 10 that

3    is reflected on Exhibit F-384.

4    THE COURT:  Okay.  And implicit in that, then,

5    Mr. McLoughlin, is that the rest of the e-mail would be

6    redacted.

7    MR. McLOUGHLIN:  Yes, sir.  Yes, Your Honor.

8    THE COURT:  Then any objection to F-384 as redacted?

9    MR. TORZILLI:  No objection to the admission of F-384

10   as redacted.

11   THE COURT:  Okay.  Then F-384 as redacted will be

12   admitted.  And yes, Mr. McLoughlin, you may publish just the

13   portion that has been admitted, namely the e-mail from

14   Mr. Lewis.

15   BY MR. McLOUGHLIN:

16   Q.  Sir, do you see -- can you look on the last three bullets

17   about which you requested information from Mr. Austin and read

18   those to the jury, please?

19   A.  The first is profit margin needed and how that compares to

20   big bird profitability.  The second is the top five things that

21   could cause price variability.  The third is thoughts

22   concerning a three-year deal.

23   Q.  Does that refresh your recollection, sir, that RSCS asked

24   Pilgrim's and other suppliers about the profit margin it needed

25   with respect to the contrast between small bird and big bird

Robert Lewis - Cross

1    profitability?

2         *MR. TORZILLI:*  Object to the use of "and other

3    suppliers" in that question.

4         *THE COURT:*  Overruled.

5    *A.*  Yes.

6    *BY MR. McLOUGHLIN:*

7    *Q.*  And, in fact, you sent virtually this same e-mail to every

8    other supplier, didn't you?

9    *A.*  I would not say virtually, no.

10   *Q.*  Close?

11   *A.*  Similar.

12   *Q.*  Similar.  There is not a big difference between close and

13   similar, sir, is there?

14   *A.*  There is not a big difference, no.  I'm sorry.

15   *Q.*  Now, sir, we've established, have we not, that Pilgrim's

16   Pride had the right to sell its chicken to anyone who would pay

17   the highest price; have we not?

18   *A.*  Yes.

19   *Q.*  And so if that wasn't KFC, KFC would have to get the volume

20   somewhere else, correct?

21   *A.*  Please repeat.

22   *Q.*  If KFC was not willing to meet the price that others were

23   willing to pay, then KFC would have to get the volume somewhere

24   else; isn't that correct?

25   *A.*  We had no idea what others were paying.

Robert Lewis - Cross

1  Q.  That wasn't my question.  Would you like me to repeat it?

2  A.  All right.

3  Q.  If KFC was not willing to pay what others were willing to

4  buy that chicken for and Pilgrim's Pride sold it to somebody

5  else, then KFC would have to buy the chicken that it needed

6  from another supplier, correct?

7  A.  Correct.

8        MR. McLOUGHLIN:  Now, can we pull up Government

9  Exhibit 1086, please?

10  BY MR. McLOUGHLIN:

11  Q.  Now, sir, Pilgrim's proposed price for eight-piece chicken

12  on the bone was 1.1026, correct?

13  A.  I don't see that on this form, sir.

14  Q.  Actually, we are just going to jump to the final price.

15  It's actually on Page 2, but let's go to Exhibit D-341, please,

16  and save ourselves a little bit of time, sir.

17        MR. McLOUGHLIN:  May I approach, Your Honor?

18        THE COURT:  You may.

19  BY MR. McLOUGHLIN:

20  Q.  Now, the final price that Pilgrim's and RSCS negotiated was

21  1.0856, $1.0856 per pound, correct?

22  A.  Correct.

23  Q.  And, sir, if you'll turn to the third page of that exhibit,

24  it's correct that the agreed upon volume between KFC or RSCS

25  and Pilgrim's Pride was 2,110,500 pounds, correct?

Robert Lewis - Cross

1    A.  Correct.

2          THE COURT:  Mr. McLoughlin, did you want this

3    displayed to the jury?  I think it's in.

4          MR. McLOUGHLIN:  Yes, Your Honor.  You can put it up

5    as Government Exhibit 1026, which I believe is the contract.

6    If we can put it up as D-341, same document.

7          THE COURT:  Yes, it is a duplicate, but it was

8    admitted.

9          MR. TORZILLI:  Your Honor, they are not duplicate

10   documents, which I want to be heard on.  I realize this might

11   not be the appropriate time.

12         THE COURT:  D-341 is in.  It may be displayed.

13   BY MR. McLOUGHLIN:

14   Q.  So we'll flip to the third page there, sir, that's

15   Exhibit 2.  Does that show that the agreed upon volume was

16   2,110,500 pounds?

17   A.  For KFC eight-piece, yes.

18   Q.  And do you recall, sir, that in 2013 for the 2014 contract

19   year Pilgrim's and RSCS negotiated for Pilgrim's to provide

20   significantly more volume?

21   A.  Yes.

22   Q.  And do you recall that it was approximately 2.7 million

23   pounds?

24   A.  The number that stands out to me is actually 80 loads.

25   Q.  Yes, sir, that's exactly right.

Robert Lewis - Cross

1    A.   Okay.

2    Q.   So am I correct it was 2.7 million pounds or 80 loads?

3    A.   Yes.

4    Q.   And in 2014 for the 2015 it was 63 loads as opposed to 80.

5    A.   Yes.

6    Q.   So Pilgrim's lost approximately or gave up approximately

7    600,000 pounds in volume between those two contract years; is

8    that correct?

9    A.   My recollection is that they gave it up.

10   Q.   And did they tell you they were giving it up because they

11   could sell that chicken somewhere else at a higher price?

12   A.   I don't recall the reason that they gave.

13   Q.   And you at RSCS allocated that volume to the other

14   suppliers who were bidding, didn't you?

15   A.   Yes.

16   Q.   So in plain English because Pilgrim's price was higher,

17   they lost volume and you gave it to people who gave you a

18   better price; is that fair?

19   A.   That's not fair.

20   Q.   What's not fair about it?

21   A.   If they gave up the product, that was a choice they made,

22   not a choice I made.

23   Q.   Thank you.  Perfectly fair.  So if Pilgrim's could sell it

24   to somebody else at a higher price and so it didn't offer it to

25   you, you went and bought it from the other suppliers at what

Robert Lewis - Cross

1    was in fact a lower price than Pilgrim's was generally

2    offering, correct?

3    A.  Yes.

4           MR. McLOUGHLIN:  Can we pull up Exhibit GX-1160,

5    please?

6           Your Honor, I believe this was admitted yesterday.

7           THE COURT:  Let me just check.  Yes, you're right, but

8    for a limited purpose.

9           MR. McLOUGHLIN:  Can we publish it to the jury, Your

10   Honor, please?

11          THE COURT:  You may.

12          So ladies and gentlemen, just to remind you, this

13   exhibit was admitted yesterday just for a limited purpose,

14   namely the effect on the listener, not for the truth of the

15   matter, all right?

16   BY MR. McLOUGHLIN:

17   Q.  Now, sir, do you recall the discussion yesterday that you

18   sent Government Exhibit 1160 to all of the suppliers at one

19   time?

20   A.  Yes.

21   Q.  And do you recall, sir, that you said that you sent it

22   because you thought it would be more convenient?

23   A.  Yes.

24   Q.  Now, sir, is that your best recollection?

25   A.  Yes.  I copied everyone as a matter of convenience to

Robert Lewis - Cross

1    myself.

2    Q.   Okay.   Do you recall telling the government agents who

3    interviewed you on October 22nd that you thought you had sent

4    that e-mail to everyone at the same time to possibly create

5    some additional pressure?

6    A.   I don't remember saying that, but I don't doubt that I said

7    that.

8    Q.   Okay.   And in the negotiations if you could put pressure on

9    suppliers by communicating with all of them at the time, you

10   would do that.   You thought that was fair negotiation, correct?

11   A.   No.   There are many circumstances where I would not copy

12   all of them on the same correspondence.

13   Q.   Sir, I didn't say every.   I said weren't there certain

14   circumstances, and I apologize if I misstated, weren't there

15   circumstances where you would communicate with all of the

16   suppliers visibly to all of them if you thought as in this case

17   it might create a little extra pressure on them to lower

18   prices?

19   A.   I would likely do that.

20   Q.   And, sir, while you were using -- doing your job, sir,

21   using whatever method you could, the reasonable methods to get

22   the lowest price for your employer, didn't the suppliers also

23   have the right to use the best information available to them to

24   make well-informed independent decisions about what prices they

25   were going to offer to RSCS?

1426

Robert Lewis - Cross

1   A.   Yes, as long as they did that independently.

2   Q.   Yes, sir, as long as they made independent decisions; isn't

3   that right?

4   A.   Yes.

5   Q.   And the prices that they might submit or had submitted in

6   the past, prices, for example, they had submitted in the past

7   is information that belonged to them, correct?  It was their

8   past price or bid, correct?

9          MR. TORZILLI:   Objection, ambiguous as to them.

10  BY MR. McLOUGHLIN:

11  Q.   The supplier, sir.  I apologize.  When a supplier made --

12  had a price with you, sir, that was their information, as well

13  as RSCS's, wasn't it?

14  A.   Yes.

15  Q.   And the calculations they did to reach that price was also

16  their information, wasn't it?

17  A.   Yes.

18  Q.   And so long as they made completely independent decisions

19  about what they were going to bid, they had the right to use

20  their information in their best interest, didn't they?

21  A.   Their information, yes.

22  Q.   Sir, in terms of the information that was otherwise

23  available, did RSCS ever use AgriStats service?

24  A.   No.

25  Q.   Do you know what AgriStats is from your years in the

1427

Robert Lewis - Cross

1    industry?

2    A.  Yes.

3    Q.  Can you just describe for us a little bit what AgriStats is

4    based on your recollection?

5    A.  That's basically a reporting agency that collected data

6    from the poultry companies and issued a report.  That's about

7    all I know about it.

8    Q.  Did you ever see an AgriStats report?

9    A.  I don't recall ever seeing one, no.

10   Q.  And do you recall that those reports -- or do you recall

11   being told that those reports included bid and price

12   information across the industry?

13          MR. TORZILLI:  Objection, calls for hearsay.

14          MR. McLOUGHLIN:  I am asking him, Your Honor, for his

15   recollection.

16          MR. TORZILLI:  He is asking him if he has ever been

17   told something.

18          MR. McLOUGHLIN:  That's exactly right, Your Honor.

19   What happens after that -- the question of whether he was told

20   or not is not hearsay.

21          THE COURT:  He can answer yes or no.  Overruled.

22   BY MR. McLOUGHLIN:

23   Q.  You can answer the question, sir.

24   A.  Could you please repeat it?

25          MR. McLOUGHLIN:  Can we read that one, back, please?

Robert Lewis - Cross

1        (The record was read by the reporter.)

2   A.  Yes.

3        MR. McLOUGHLIN:  If I may, Your Honor, I am not sure

4   that Your Honor will want a copy of this.  I'm not sure that

5   anyone would want a copy.

6        THE COURT:  I'll decline for the moment.

7   BY MR. McLOUGHLIN:

8   Q.  Sir, I am showing you what's marked as Exhibit D-042, and I

9   will represent to you that this is a single AgriStats report.

10  Do you recall ever seeing anything like -- well, strike that.

11       Sir, having not used AgriStats but having been

12  informed about it, if a supplier subscribed to AgriStats, then

13  they would have significant information about pricing in the

14  market, wouldn't they?

15       MR. TORZILLI:  Objection to foundation and calls for

16  speculation.

17       THE COURT:  Sustained.

18  BY MR. McLOUGHLIN:

19  Q.  Sir, you already testified that you were aware that

20  AgriStats published pricing information; is that correct?

21  A.  I was aware that AgriStats published information.

22  Q.  And it was price and cost information included; isn't that

23  right, sir?

24       MR. TORZILLI:  Objection, foundation.

25       THE COURT:  Sustained.

Robert Lewis - Cross

1   *BY MR. McLOUGHLIN:*

2   *Q.*   Sir, do you have knowledge --

3   *A.*   That's my understanding.

4   *Q.*   That is your understanding.   So your best understanding

5   based on your years in the industry was that they published

6   price and cost information; is that correct?

7   *A.*   Yes.

8   *Q.*   And at the time you were doing your job be it prior to 2009

9   or in 2014, you would not have been surprised if suppliers used

10  that price and cost information in formulating their bids,

11  would you?

12  *A.*   I would not be surprised.

13  *Q.*   Because if you had this information, you would have used

14  it, right?   Common sense.

15  *A.*   Yes.

16          *MR. McLOUGHLIN:*   Thank you.   No more questions.

17          *THE COURT:*   All right.   Thank you.

18          Additional cross-examination?

19          *MR. FELDBERG:*   Yes, Your Honor.

20          *THE COURT:*   Mr. Feldberg, go ahead.

21                          **CROSS-EXAMINATION**

22  *BY MR. FELDBERG:*

23  *Q.*   Good morning, Mr. Lewis.   My name is Michael Feldberg.   I

24  represent Roger Austin.

25          We have never met or spoken, have we?

Robert Lewis - Cross

1    A.   No, sir.  Good morning.

2    Q.   Good morning.  You've testified yesterday, Mr. Lewis, that

3    in the poultry business even a 1 cent price differential could

4    be significant, correct?

5    A.   Correct.

6    Q.   1 cent on a hundred million pounds would be a million

7    dollars, correct?

8    A.   Yes.

9    Q.   And KFC purchased several hundred million pounds of chicken

10   every year, correct?

11   A.   Correct.

12        MR. FELDBERG:  Could we call up Government

13   Exhibit 10-4, which is in evidence?

14   BY MR. FELDBERG:

15   Q.   Mr. Lewis, Government Exhibit 10-4 contains a lot of

16   information, but could you focus, please, on the column that is

17   one column in from the right edge, 2015 contract price.  Do you

18   see that column?

19   A.   Yes.

20   Q.   And that lists --

21        MR. FELDBERG:  Could this be published to the jury,

22   Your Honor?

23        THE COURT:  Yes, it may.

24   BY MR. FELDBERG:

25   Q.   You see the column 2015 contract price?

1431

Robert Lewis - Cross

1    *A.*   Yes.

2    *Q.*   And it lists the 2015 contract price for six suppliers; is

3    that correct?

4    *A.*   Correct.

5    *Q.*   And those prices are different, are they not?

6    *A.*   Yes.

7    *Q.*   Each of the six suppliers had a different price for 2015,

8    correct?

9    *A.*   Correct.

10   *Q.*   And do you recall testifying yesterday that if there was

11   some sort of price-fixing agreement, you would expect the

12   spreads among the prices to narrow.  Do you recall that

13   testimony?

14        *MR. TORZILLI:*  Object, misstates the testimony.

15        *THE COURT:*  Overruled.

16   *A.*   I do not recall that specifically.

17   *BY MR. FELDBERG:*

18   *Q.*   But isn't it a fact, sir, that if there were some sort of

19   agreement, you would expect the range of prices to narrow.

20   *A.*   Yes.

21   *Q.*   Take a look at the 2014 contract price column.  That's the

22   left-most column.  Do you see that?

23   *A.*   Yes.

24   *Q.*   The range of prices there is a little less than 3 cents,

25   correct?  The prices are all different for the suppliers, but

Robert Lewis - Cross

1   the spread is a little less than 3 cents, correct?

2   A.   Yes.

3   Q.   And take a look at the column period nine pricing that's

4   the third column from the left.  Do you see that?

5   A.   I do not see period nine pricing, no, sir.

6   Q.   Do you see period 13 pricing?

7   A.   Yes.

8   Q.   And is the spread there basically about 1 cent?

9   A.   It's more than that.

10  Q.   A little more than 1 cent?  A cent and a half, 2 cents?

11  A.   Yeah, 2-1/2, 3 cents maybe.

12  Q.   Okay.  And the price spread for the 2015 contract is more

13  than 5 cents, correct?

14  A.   Correct.

15  Q.   Wider than either the period '13 spread for 2014 or the

16  2014 contract spread, correct?

17  A.   Correct.

18  Q.   Now, you testified yesterday about six suppliers.  Do you

19  recall that?

20  A.   Yes.

21  Q.   There was a seventh supplier to KFC in 2015, wasn't there?

22  A.   Yes, Case Farms.

23  Q.   That's correct.

24       MR. FELDBERG:  Could we please call up Defendant's

25  Exhibit F-744 not yet admitted.

Robert Lewis - Cross

1   *BY MR. FELDBERG:*

2   *Q.*  Do you recognize F-744, Mr. Lewis?

3   *A.*  Yes.

4   *Q.*  Is that the contract for 2015 between RSCS and Case Farms?

5   *A.*  Yes.

6            *MR. FELDBERG:*  We offer it, Your Honor.

7            *THE COURT:*  Any objection to the admission of F-744?

8            *MR. TORZILLI:*  It's not marked, at least the version

9   that I am looking at on the screen, so I object to the extent

10  it's unmarked.

11           *MR. FELDBERG:*  We marked the first page which is

12  redacted, Your Honor, consistent with the Court's rulings

13  yesterday.

14           We will be happy to hand you a copy, Mr. Torzilli.

15           *THE COURT:*  Yeah, let's get Mr. Torzilli a copy just

16  so he can take a look.

17           Any objection?

18           *MR. TORZILLI:*  Your Honor, my only is objection is as

19  follows, and I realize I don't have an opportunity to inquire

20  of the witness at this moment, but when I do, I think we are

21  going to establish that these cover pages that were the subject

22  of direct exam yesterday and Your Honor's ruling, that they are

23  part of the document the way it's maintained in the regular and

24  ordinary course of business at RSCS, and therefore will ask

25  that the documents of this type, contracts of this type be

Robert Lewis - Cross

1    admitted without the redactions on the cover page.

2          THE COURT:  Okay.  But the question now is whether the

3    document minus the cover page except for the Bates stamp number

4    and exhibit sticker, whether there is an objection to it.

5          MR. TORZILLI:  I don't object to the admissibility

6    provided that the cover page is admitted unredacted.

7          THE COURT:  Okay.  That objection will be overruled.

8    The exhibit as tendered which, ladies and gentlemen, as before

9    with some of those exhibits the first page redacted will be

10   admitted.

11         MR. FELDBERG:  Could we publish, please, F-744 to the

12   jury with the first page redacted?

13         THE COURT:  Yes.

14   BY MR. FELDBERG:

15   Q.  Mr. Lewis, can we scroll, please, to Page No. 2 of the

16   agreement between Case and RSCS for 2015?  Do you see the line

17   Total FOB Plant Cost?

18   A.  Yes.

19   Q.  And what was Case Farms total FOB plant cost in the

20   contract with RSCS for 2015?

21   A.  $1.0310 per pound.

22   Q.  If we can go back, please, to Government Exhibit 10-4 in

23   evidence.  The Case Farms price, the seventh supplier, is at

24   the low end of the range of the suppliers for 2015, correct?

25   A.  Yes.

Robert Lewis - Cross

1   Q.  In fact, it's the second lowest just a little bit higher

2   than George's, correct?

3   A.  Yes.

4   Q.  Mr. Lewis, did you know when you returned to RSCS in 2014

5   that Pilgrim's had recently come out of bankruptcy?

6   A.  I vaguely recall that, yes, sir.

7   Q.  And you knew that for a company coming out of bankruptcy,

8   it had an obligation to its shareholders to maximize

9   profitability, correct?

10  A.  Yes.

11  Q.  You talked a little bit yesterday in your testimony about

12  the wings component of KFC's business, correct?

13  A.  I am sorry, about the what?

14  Q.  Wings, chicken wings.

15  A.  Okay.

16  Q.  Do you recall mentioning that yesterday?

17  A.  Yes.

18  Q.  About what percentage of KFC's business was chicken wings

19  in 2015?

20  A.  I have no idea.

21  Q.  Would it be around 1 percent?

22  A.  It would be a low percentage.

23  Q.  A low percentage.

24  A.  Yes.  I'm not -- I don't know.

25  Q.  But much lower than COB and dark?

Robert Lewis - Cross

1  A.  Oh, yes, yes.

2  Q.  Much lower.

3  A.  Much lower.

4  Q.  In your work at RSCS, Mr. Lewis, both before you retired in

5  2009 and when you were dragooned back in 2014, did you ever

6  have occasion to communicate with other purchasers of chicken?

7  A.  Yes.

8  Q.  And when you communicated with other purchasers of chicken,

9  was one of the things you talked about the state of the market?

10  A.  No.  The only communication I had was with Mike Ledford who

11  had been in RSCS employment before, and Mike is a very good

12  friend and we just talked about general things.

13  Q.  No other communications with chicken suppliers -- I am

14  sorry, chicken purchasers?

15  A.  No.

16       MR. FELDBERG:  Could we call up, please, defense

17  exhibit for identification F-660.  This is not for publication

18  yet.

19  BY MR. FELDBERG:

20  Q.  Mr. Lewis, do you see F-660?

21  A.  Yes.

22  Q.  Do you recognize it?

23  A.  It appears that I wrote it.  I do not recognize it.

24  Q.  Do you have any reason to doubt that these are two e-mails

25  which you wrote to Roger Austin?

Robert Lewis - Cross

1   A.  No.

2        MR. FELDBERG:  We offer F-660, Your Honor.

3        THE COURT:  Any objection to the admission of F-660?

4        MR. TORZILLI:  May I get a copy?

5        THE COURT:  Yes.

6        THE WITNESS:  I have read the memo -- or the e-mail.

7   I am sorry.

8        MR. TORZILLI:  No objection, Your Honor.

9        THE COURT:  All right.  F-660 will be admitted.

10       MR. FELDBERG:  May we publish to the jury, Your Honor?

11       THE COURT:  You may.

12       MR. FELDBERG:  Thank you.

13  BY MR. FELDBERG:

14  Q.  Mr. Lewis, Exhibit F-660 consists of two e-mails from you

15  to Roger Austin, correct?

16  A.  Yes.

17  Q.  One on June 25th, 2014 and one on June 27th, 2014, correct?

18  A.  Yes.

19  Q.  Let's focus first on the bottom e-mail, June 25th, 2014.

20       You wrote, did you not, Mr. Lewis, that several weeks

21  ago, we established that your weekly base commitment of

22  eight-piece purple is 71 truckloads or 2,272,000 pounds,

23  correct?

24  A.  Yes.

25  Q.  And that's down from the 80 truckloads that you had

1438

Robert Lewis - Cross

1   committed to buy in the 2014 contract, correct?

2   A.  Yes.

3   Q.  And then could you read the next paragraph, please,

4   beginning:  Earlier this month.

5   A.  Earlier this month, you agreed to produce 12 incremental

6   loads of purple eight-piece over a three-year period at $1.30

7   per pound.

8   Q.  Did you mean a three-week period rather than a three-year

9   period, sir?  As you were reading you said over a three-year

10  period.

11  A.  It's three-week.  I am sorry, yes.  Three-week period at

12  $1.30 per pound.  Whatever weekly volume was produced above

13  your baseline of 2,272,000 pounds is subject to the special

14  pricing.

15  Q.  So would it be fair to say, Mr. Lewis, that because of the

16  extreme shortage of small birds in 2014, RSCS was willing to

17  pay for a three-week period $1.30 per pound for 12 incremental

18  loads?

19  A.  Yes.

20  Q.  And then if you could scroll or read -- go down to the

21  bottom and the paragraph that begins:  Finally.

22       You told Mr. Austin, did you not, that you would ask

23  that Pilgrim's produce and freeze any available eight-piece

24  purple label chicken on the bone for the target established at

25  25 truckloads with RSCS accepting responsibility for freezing

Robert Lewis - Cross

1   and storage costs for any frozen product.  Do you see that?

2   A.   Yes.

3   Q.   And why did you do that?

4   A.   Well, frozen chicken is a way for us to help ease the

5   pressure from the shortage of fresh.  So the idea was to put up

6   this frozen product as an insurance policy to cover future

7   needs.

8           MR. FELDBERG:   Now, can we scroll up to the top

9   e-mail, the June 27, 2014 e-mail.

10  BY MR. FELDBERG:

11  Q.   In your e-mail on June 27th, Mr. Lewis, two days after the

12  earlier e-mail, you made a correction to your earlier e-mail,

13  correct?

14  A.   Yes.

15  Q.   And could you look at the last sentence of your June 27th

16  e-mail beginning:  Finally.

17          Could you read that to the jury, please?

18  A.   Finally, we will appreciate having the first right of

19  refusal on any and all loads of purple label or dark meat in

20  the weeks to come.

21  Q.   What did you mean by asking for the right of first refusal?

22  A.   If Pilgrim's Pride had any product that was available, we

23  would ask that they come to us first and give us a chance to

24  say yes or no.

25  Q.   And why did you ask for that?

Robert Lewis - Cross

1    A.   We were in a severe supply shortage.

2    Q.   A historic shortage, was it not?

3    A.   A historic shortage.

4         MR. FELDBERG:   Could we call up, please, Defense

5    Exhibit F-811 for identification?

6    BY MR. FELDBERG:

7    Q.   Mr. Lewis, do you recognize this document?

8    A.   No, I do not.

9    Q.   Have you ever seen it before?

10   A.   I don't recall seeing this document before.

11   Q.   Okay.  The document is dated September 15, 2014.  You were

12   working at RSCS on that date, correct?

13   A.   Yes.

14   Q.   Let's just take a look at Page 2, please, which is headed

15   Executive Summary.  Does looking at Page 2, Mr. Lewis, refresh

16   your recollection as to whether you have ever seen this before?

17   A.   Yes, I recognize -- I believe I do recognize that page.

18   Q.   Well, just to -- while we're on it, let's look at Page 3.

19   Do you recognize that?

20   A.   I don't recognize that.

21   Q.   Let's try one more page, Page 4.  Do you recognize that,

22   sir?

23   A.   I do not recognize that.

24   Q.   So you recognize Page 2, but not Page 3?

25   A.   Well, I shouldn't say recognize.  Some of the comments or

Robert Lewis - Cross

1    statements on that page were familiar to me, but I don't

2    recognize this presentation.

3    Q.   Okay.  Fair enough.  Do you recognize the comment --

4    withdrawn.

5            Was it your view, sir, as of September 15, 2014 that

6    there will not be sufficient supply for all small bird

7    customers unless things change?

8    A.   Yes.

9    Q.   And KFC was a small bird customer, correct?

10   A.   Yes.

11   Q.   And was it your view as of September 15, 2014 that several

12   small bird plants had converted to big bird?

13   A.   Yes.

14   Q.   Thereby reducing supply.

15   A.   Yes.

16         MR. FELDBERG:  Could we call up, please, Government

17   Exhibit 507.

18            I believe it's in evidence, Your Honor.

19         THE COURT:  Let me check.  I don't find that as being

20   admitted.

21         MR. FELDBERG:  Let's bring up 507 for identification

22   and not publish it to the jury at this time.  That's not what I

23   thought it was.  My apologies, Your Honor.  I apologize, Your

24   Honor, it's Defendant's Exhibit G-507.  My apologies.  And I

25   think this is in evidence, Your Honor.

Robert Lewis - Cross

1      THE COURT:  Let me double-check.  I don't show that

2   having been admitted.

3      MR. TORZILLI:  Government Exhibit 1160 has been

4   admitted and I believe is a duplicate or near duplicate of

5   what's been marked as G-507.

6           THE COURT:  Mr. Torzilli, what was that number again?

7           MR. TORZILLI:  Government Exhibit 1160.

8           THE COURT:  Okay, 1160, let's take a look.

9           Is that what you were looking at, Mr. Feldberg?

10          MR. FELDBERG:  I believe it is, Your Honor.

11          THE COURT:  That has been admitted once again, ladies

12  and gentlemen, for a limited purpose, not for the truth of the

13  matter, but for the effect on whoever read it or listened to

14  it, all right?

15          That may be displayed.

16          MR. FELDBERG:  Thank you, Your Honor.

17          MR. TORZILLI:  Just one other thing.  If it may help

18  the witness, it is I believe at Tab 21 of the witness' binder.

19          MR. FELDBERG:  Thank you.

20  BY MR. FELDBERG:

21  Q.  Mr. Lewis, do you see the exhibit before you?

22  A.  Yes.

23  Q.  And that's the e-mail that you told us you wrote to all of

24  the suppliers together for convenience and also maybe to put a

25  little additional pressure on them, correct?

Robert Lewis - Cross

1   A.  Yes.

2   Q.  The first sentence reads, does it not:  We are making good

3   progress toward finalizing our COB commitments by the middle of

4   next week.

5           Do you see that?

6   A.  Yes.

7   Q.  And you wrote that, correct?

8   A.  Yes.

9   Q.  And you meant what you said, correct?

10  A.  Yes.

11          MR. TORZILLI:  Your Honor, this exhibit was admitted

12  for a nontruth purpose and I object to the previous question.

13          THE COURT:  He wrote the e-mail, so the question was

14  appropriate.  Overruled.

15  BY MR. FELDBERG:

16  Q.  And I just want to show you a couple of other exhibits,

17  Mr. Lewis.

18          MR. FELDBERG:  Can we call up, please, Defendant's

19  Exhibit H-940?

20  BY MR. FELDBERG:

21  Q.  Do you recognize Exhibit H-940 for identification,

22  Mr. Lewis?

23  A.  No.

24  Q.  You were one of the recipients of this e-mail, were you

25  not?

Robert Lewis - Cross

1    *A.*  Yes.

2    *Q.*  Do you have any reason to doubt that you received this

3    e-mail on or about August 20th, 2014?

4    *A.*  No.

5             MR. FELDBERG:  We offer it, Your Honor.

6             THE COURT:  Any objection to the admission of H-940?

7             MR. TORZILLI:  Your Honor, these are Mar-Jac produced

8    documents and the authenticating witness for the Mar-Jac

9    produced documents did not authenticate these.  And it's also

10   hearsay.

11            THE COURT:  Let me just look at it.

12            Response?

13            MR. FELDBERG:  Your Honor, Mr. Lewis has no doubt that

14   he received this e-mail.  It's received clearly as part of his

15   business, ordinary course of business.  It attaches a bid.

16   It's part of the overall range of bids received.

17            THE COURT:  How about authenticity?

18            MR. FELDBERG:  It's got a Mar-Jac stamp and the

19   witness has testified that he has no reason to doubt that he

20   received it.

21            THE COURT:  Objection sustained.

22            MR. FELDBERG:  Could we call up, please, H-941 for

23   identification?

24            Do you recognize this document, Mr. Lewis?

25   *A.*  I do not recall this document.

1445

Robert Lewis - Cross

1    *BY MR. FELDBERG:*

2    Q.  Okay.  We'll move on.

3            Mr. Lewis, you've been in business a long time,

4    correct?

5    A.  Well, not for the past 13 years, no.

6    Q.  But you were in business for a long time.

7    A.  I was, yes, sir.

8    Q.  And you have been in some tough negotiations, correct?

9    A.  Yes, sir.

10   Q.  And sometimes the market forces have abundant supply and

11   customers drive hard bargains, correct?

12   A.  Yes.

13   Q.  And sometimes there is tight supply and high demand and the

14   suppliers drive hard bargains, correct?

15   A.  Yes.

16   Q.  And that's what you would expect, correct?

17   A.  Yes.

18   Q.  That's business, right?

19   A.  Yes, sir.

20           *MR. FELDBERG:*  Thank you.  No further questions.

21           *THE COURT:*  Ladies and gentlemen, why don't we go

22   ahead and take the mid-morning break at this time.  Why don't

23   we plan on reconvening 25 minutes until 11:00.  The jury is

24   excused for the mid-morning break.

25           (Jury excused.)

Robert Lewis - Cross

1    The Court will be in recess.

2    (Recess at 10:17 a.m.)

3    (Reconvened at 10:37 p.m.)

4    THE COURT:  Let's bring the jury in.

5    MR. TUBACH:  Should we have the witness brought back

6    in, Your Honor?

7    THE COURT:  Yes, we should.

8    (Jury present.)

9    THE COURT:  Mr. Tubach?

10                        **CROSS-EXAMINATION**

11   BY MR. TUBACH:

12   Q.  Good morning, Mr. Lewis.  My name is Michael Tubach.  I

13   represent Jayson Penn.

14   A.  Good morning.

15   Q.  I have some questions for you.  If you can take a look at

16   the four loose documents in front of you.  I will hand counsel

17   copies.

18        MR. TUBACH:  I believe, Your Honor, there are copies

19   of these documents.

20        THE COURT:  Yes, I saw that.  Thank you.

21   BY MR. TUBACH:

22   Q.  Let's start with the first one.  You testified earlier that

23   you sent a similar e-mail requesting information about profit

24   margin need and how that compares to big bird profitability to

25   a number of other suppliers.  Do you recall that?

Robert Lewis - Cross

1    MR. TORZILLI:  Your Honor, I object.  The questions of

2    the first one, request counsel to identify what the first one

3    means.

4         THE COURT:  Sustained.  If you can clarify.

5    BY MR. TUBACH:

6    Q.  Of course.  Without looking at the documents you testified

7    earlier that you sent e-mails to a number of suppliers

8    requesting what profit margin they needed and how that compared

9    to big bird profitability.  Do you remember that testimony?

10   A.  Yes.

11   Q.  Take a look at G-504, if you would.  This is a document you

12   wrote and sent to Brian Roberts at Tyson on July the 10th,

13   2014, correct?

14   A.  Yes.

15   Q.  And this is essentially the identical e-mail to the one you

16   sent to Pilgrim's on the same day, correct?

17   A.  It appears to be identical, yes.

18        MR. TUBACH:  I move the admission of G-504, Your

19   Honor.

20        THE COURT:  Any objection to the admission of G-504?

21        MR. TORZILLI:  No objection.

22        THE COURT:  G-504 will be admitted.

23   BY MR. TUBACH:

24   Q.  Let's take a look at the next one, Mr. Lewis, C-451.

25   A.  Yes.

1448

Robert Lewis - Cross

1  *Q.*  And this is an e-mail that you wrote and sent to Bill

2  Kantola at Koch on or about July 10, 2014 also, correct?

3  *A.*  Yes.

4  *Q.*  It's essentially identical to the one you sent to

5  Pilgrim's, right?

6  *A.*  It appears to be identical.

7        *MR. TUBACH:*  I move the admission of C-451, Your

8  Honor.

9        *THE COURT:*  Any objection to the admission of C-451?

10       *MR. TORZILLI:*  I don't have a copy of it.  No

11  objection to the admission of C-451.

12       *THE COURT:*  All right.  That exhibit will be admitted.

13  *BY MR. TUBACH:*

14  *Q.*  Take a look, sir, at the next one, C-872.

15       *MR. TUBACH:*  I believe that has been provided to

16  counsel.

17  *BY MR. TUBACH:*

18  *Q.*  And I am interested here, Mr. Lewis, only in the e-mail

19  that starts on the bottom of the first page and goes on to the

20  second page.  And that's an e-mail from you to Mr. Tench at

21  Mar-Jac dated July 9 of 2014; is that correct?

22  *A.*  Yes.

23  *Q.*  And you -- this is similar to the e-mail you sent to

24  Pilgrim's and the other suppliers we have just been talking

25  about?

Robert Lewis - Cross

1    *A.*  Yes, it is similar.

2    *Q.*  And you sent that e-mail on July 9th, 2014, right?

3    *A.*  Yes, sir.

4         *MR. TUBACH:*  I move the admission of that portion of

5    C-872, Your Honor, that starts at the bottom of page Bates

6    number ending in 870 and goes on to the top of 871.  And we

7    will not move to admit that very first e-mail on the bottom of

8    Page 2.

9         *THE COURT:*  Any objection to the admission of C-872 as

10   redacted?

11        *MR. TORZILLI:*  We object on hearsay grounds to the top

12   three e-mails and also the fact that Mr. Lewis is not on the

13   top three e-mails.  And the additional objection is that this

14   is a Mar-Jac Poultry Bates stamped document and the

15   authenticating witness did not authenticate this document.

16        *MR. TUBACH:*  We are not moving the admission of the

17   first three e-mails.  It's irrelevant.

18        *THE COURT:*  Right.  Hold on one second.

19        Objection is overruled.  C-872 as redacted will be

20   admitted.

21   *BY MR. TUBACH:*

22   *Q.*  Take a look at the last one, would you, Mr. Lewis, A-644?

23   And there is some interlineation, as you will see, an e-mail

24   you sent to -- let me strike that and start over.

25        You sent an e-mail to Mr. Brady at Claxton on

Robert Lewis - Cross

1   July 10th, 2014 with essentially the same information that you

2   sent to all the others, right?

3   A.   Yes.  It appears to be roughly the same.

4   Q.   And this one is a little different because there is a

5   response from Mr. Brady to Mr. Fries interlineating potential

6   responses to your questions, right?

7   A.   Yes.

8   Q.   You did not write those responses, correct?

9   A.   No.

10   Q.   And you sent this to Mr. Brady on July 10, 2014?

11   A.   Yes.

12       MR. TUBACH:  Your Honor, I move the admission of

13   A-644.  We will be redacting all of the text after the

14   questions within the e-mail that Mr. Lewis sent, so we are not

15   moving the admission of those draft responses nor are we moving

16   the admission of the e-mail at the top from Mr. Brady to

17   Mr. Fries.

18       THE COURT:  Hold on one second, Mr. Tubach.  Let me

19   see if I can find that one among the ones -- I have got it.

20   Okay.  Just the lower e-mail, the one from Mr. Lewis?

21       MR. TUBACH:  Just the lower e-mail, but then we will

22   need to do some more redacting, Your Honor.  For example, in

23   the second bullet point after the word January it has some

24   numbers, and that's Mr. Brady's response that he sent to

25   Mr. Fries and just put in that e-mail.  So we would be

Robert Lewis - Cross

1    redacting those responses, so only Mr. Lewis' e-mail itself

2    would be moved into evidence.

3         *THE COURT:*  One moment.  I don't see those portions,

4    Mr. Tubach, that you mentioned that would need to be redacted.

5         But let me ask Mr. Torzilli, any objection to the

6    admission of A-644 as redacted?

7         *MR. TORZILLI:*  We object to any statements

8    attributable to Defendant Scott Brady admitted into evidence.

9    I think it's difficult from this printout which is black and

10   white it seems as opposed to a better printout to be able to

11   discern the interlineations between Mr. Brady's statements and

12   the e-mail.

13        *THE COURT:*  Oh, I see.  So portions of Mr. Lewis'

14   e-mail contain information that came from Mr. Brady?

15        *MR. TUBACH:*  Exactly, Your Honor.  The first one, for

16   example, to read two words, the very first bullet point, 13

17   loads and on, we would redact that because that's not part of

18   Mr. Lewis' e-mail and so on down.

19        *THE COURT:*  Back to you, Mr. Torzilli.  Given the fact

20   that the proposal is that those would be redacted out, any

21   objection?

22        *MR. TORZILLI:*  No objection with the statements

23   attributable to Defendant Brady being redacted out.

24        *THE COURT:*  Okay.  So as redacted Exhibit A-644 will

25   be admitted.

1452

Robert Lewis - Cross

1      *MR. TUBACH:*  Thank you, Your Honor.

2    *BY MR. TUBACH:*

3    *Q.*  Mr. Lewis, a few more documents -- that's all I have for

4    those documents.  You can put those aside.  A few more

5    documents.  You have a binder up there in front of you.  I

6    believe you do.

7    *A.*  Yes.

8    *Q.*  If you could take a look, sir, at what's been marked as

9    Government Exhibit 1027, GX-1027.

10          Do you see that?

11   *A.*  Yes.

12   *Q.*  This is a letter sent to Mr. Eddington.  He worked with

13   you, didn't he?

14   *A.*  He worked with me, yes.

15   *Q.*  And do you recall seeing this document, this letter being

16   sent to Mr. Eddington from Mar-Jac enclosing a response and a

17   bid?

18   *A.*  I do not recall seeing this letter.

19   *Q.*  If you can take a look at the second and -- the second page

20   of that document.  Tell me if you recall receiving, not

21   directly from Mr. Tench, but perhaps from Mr. Eddington,

22   receiving Mar-Jac's proposal for the bid for 2015-2017.

23   *A.*  I do not recall seeing that document.

24   *Q.*  Do you recall ever receiving a bid from Mar-Jac in the

25   August 2014 time period for 2015 pricing?

Robert Lewis - Cross

1    A.  Yes, I do.

2    Q.  Do you recall seeing whether it was different than the one

3    that's on Page 2 of this document or are you just not recalling

4    at this point?

5    A.  My memory tells me that the bottom line number total FOB

6    plant cost was different in the proposal that I saw.

7    Q.  So you don't recall seeing the proposal as reflected in

8    Exhibit 1027.

9    A.  I'm sorry?

10   Q.  You don't recall seeing the proposal as reflected in

11   Exhibit 1027.  Is that what you are saying?

12   A.  I don't recall.

13   Q.  You recall seeing a different proposal from Mar-Jac?

14   A.  Yes.

15   Q.  Was the price higher or lower than the one you're seeing

16   here?

17   A.  I believe it was lower.

18   Q.  Take a look at the next one, if you would, Exhibit 1007.

19   Do you recall receiving this e-mail from Darrell Keck at

20   George's on or about August 19, 2014?

21   A.  I do recall it, yes.

22   Q.  And you recall receiving the attachment also, correct?

23   A.  I recall receiving an attachment.  It's not here in my

24   copy.

25   Q.  Oh, sorry.  Look at -- it's Exhibit 1008.  It's the next

Robert Lewis - Cross

1   exhibit.

2   A.  Yes, I recognize this.

3   Q.  And this was George's bid to you as part of this

4   negotiation for 2015 pricing, correct?

5   A.  It was not only their bid, it was a very detailed

6   presentation addressing a number of the items that we had

7   requested they respond to.

8   Q.  Understood.  So it was the bid plus other information; is

9   that right?

10  A.  Correct, yes.

11          MR. TUBACH:  Your Honor, I move the admission of

12  Exhibit 1007 and 1008.

13          THE COURT:  Any objection to those two exhibits?

14          MR. TORZILLI:  No objection.

15          THE COURT:  Exhibit 1007 and 1008 will be admitted.

16  BY MR. TUBACH:

17  Q.  Let's take a look at Exhibit F-888 in your binder, if you

18  would.

19          And I recognize you're not -- it's an e-mail.  You are

20  not listed as an addressee of the e-mail from Mr. Roberts at

21  Tyson.  My question is do you recall if this e-mail was ever

22  forwarded to you?

23  A.  I do not.

24  Q.  Take a look at the next exhibit which is 889 and tell me if

25  you recognize this document as Tyson's bid on or about

Robert Lewis - Cross

1  August 22nd, 2014.

2  A.  I recognize Pages 2 and 3.

3  Q.  Oh, yes.  The first page is sort of a placeholder, right?

4  And you recognize Pages 2 and 3 of Exhibit F-889 as a bid you

5  received from Tyson on or about August 22nd, 2014; is that

6  right?

7  A.  Yes.

8       MR. TUBACH:  Move the admissions of Pages 2 and 3 of

9  F-889.

10       THE COURT:  Any objection to Pages 2 and 3 of F-889?

11       MR. TORZILLI:  Request for a copy?

12       MR. TUBACH:  My apologies.

13       MR. TORZILLI:  No objection to the admission of those

14  pages.

15       THE COURT:  Pages 2 through 3 of F-889 will be

16  admitted.

17  BY MR. TUBACH:

18  Q.  If you could turn to A-298, which should be the next one.

19  This is an e-mail from Mr. Scott Brady at Claxton to you on or

20  about September 9th, 2014.  Do you recall receiving that e-mail

21  on or about that date?

22  A.  Yes.

23  Q.  And you recall sending the e-mail on September 8 just below

24  it from you to Mr. Fries and Mr. Brady?

25  A.  I do not recall the e-mail, but it appears that I wrote it.

1456

Robert Lewis - Cross

1  *Q.*  Do you have any doubt that you sent it?

2  *A.*  I have no doubt.

3  *Q.*  That's your e-mail address there, correct?

4  *A.*  Yes.

5  *Q.*  And take a look at A-299 which is the attachment.  Do you

6  recall receiving the attachment on or about September 9, 2014?

7  This is the Claxton Poultry bid, revised bid, on September 9,

8  2014.

9  *A.*  I recall seeing the Claxton bid.  I can't say that I

10  recognize the numbers that I see.

11  *Q.*  But you recall receiving a bid attached to this e-mail on

12  September 9, 2014.

13  *A.*  I do, yes.

14       *MR. TUBACH:*  I move the admission of A-298 and A-299.

15       *THE COURT:*  And A-299?

16       *MR. TUBACH:*  Yes, both, Your Honor.  I just realized I

17  don't think I handed a copy to counsel.  My apologies.

18       *MR. TORZILLI:*  Objection to the admission of 298 to

19  the extent it's being admitted for the e-mail written by Scott

20  Brady.

21       *THE COURT:*  All right.  And what about the second half

22  of the document, the e-mail from Mr. Lewis?

23       *MR. TORZILLI:*  No objection to the admission of that.

24       *THE COURT:*  Okay.  And Mr. Torzilli, if you are ready

25  on A-299.

Robert Lewis - Cross

1          MR. TORZILLI:  I would object to 299 because the way I

2     am understanding this document 299 is an attachment to the

3     e-mail that Defendant Scott Brady sent to Mr. Lewis and others,

4     so it similarly would be hearsay.

5          MR. TUBACH:  It's a bid just like all the other bids I

6     have just been talking about.

7          THE COURT:  Okay.  Response, Mr. Tubach, first of all,

8     as to A-298?

9          MR. TUBACH:  Yes, Your Honor.  298 is simply a

10     covering of explaining what 299 is.  The 299 itself is just a

11     spreadsheet which we printed out here and it explains from who

12     it is and the date on which it was sent.  The witness testified

13     that he recalled receiving it on September 9, 2014, so I don't

14     believe that the sender of the e-mail is essential other than

15     it identifies who the company is.

16          THE COURT:  The objection to Exhibit A-298 will be

17     sustained as hearsay on the front part of it.  And the

18     objection to A-299 will be overruled and Pages 2 through 3 will

19     be admitted.

20          MR. TUBACH:  Just to understand, no portion of 298 is

21     admissible, even the date?

22          THE COURT:  You haven't offered that.  I am not going

23     to rule in advance, but you haven't asked for that.

24          MR. TUBACH:  We would move the admission only of the

25     first portion of the e-mail that shows the sender, the dates

1458

Robert Lewis - Cross

1    and the recipients with the subject line and the Bob and then

2    the first two sentences after that.

3            THE COURT:  All right.  Mr. Torzilli, so there has

4    been a new offer and that is that -- and I assume Mr. Lewis'

5    e-mail as well?

6            MR. TUBACH:  Yes, Mr. Lewis' e-mail.

7            THE COURT:  So any objection to the redactions being

8    proposed, namely that the first part, the To, From, subject

9    matter would be allowed, as well as the first two sentences

10   after the trade?

11           MR. TORZILLI:  No objection to A-298, that top e-mail

12   the way Your Honor just described it.

13           THE COURT:  Okay.  And that's the way you proposed it.

14   I just wanted to make sure.  So A-298 as redacted will be

15   admitted.

16           MR. TUBACH:  Thank you, Your Honor.

17   BY MR. TUBACH:

18   Q.  Take a look at F-881 in your binder.  It should be just a

19   tab or two down.

20           Do you have that in front of you, sir?

21   A.  Yes, I do.

22   Q.  Do you recognize this as an e-mail that Mitch Mitchell at

23   Case Farms sent you on September 9, 2014 attaching a cost --

24   KFC 2015 bid?

25   A.  I don't remember this e-mail.

Robert Lewis - Cross

1    Q.  Do you have any reason to doubt you received this e-mail?

2    A.  No, I received the e-mail.

3    Q.  It's your e-mail address, right?  Your e-mail address is

4    Robert.Lewis@RSCS.com, correct?

5    A.  Yes.

6    Q.  So you have no reason to doubt you actually received this

7    e-mail?

8    A.  No reason.

9    Q.  Take a look at the attachment which is F-882.  Skip the

10   first page of F-882, if you would.  Go to the second and

11   continuing pages.

12          Do you recognize this as a bid that you received from

13   Case on or about September 9, 2014?

14   A.  I don't recognize these documents.

15   Q.  You don't believe you've ever seen this document before?

16   A.  I'm not going to say I never have seen them.  I just don't

17   remember seeing them.

18   Q.  Case was one of the companies that bid for KFC business for

19   2015, right?

20   A.  Yes.

21   Q.  And you were in touch with Mitch Mitchell at Case?

22   A.  Yes.

23   Q.  And he sent you bids and revised bids during the bid

24   process, didn't he?

25   A.  Yes.

Robert Lewis - Cross

1    *Q.*  Do you have any reason to doubt that Mitch Mitchell sent

2    you this e-mail and the attached bid?

3    *A.*  No.

4          *MR. TUBACH:*  Your Honor, I move the admission of F-881

5    and F-882.

6          *THE COURT:*  Any objection?  Do you have copies?

7          *MR. TORZILLI:*  Your Honor, my objections are lack of

8    foundation at least from this witness, as well as hearsay.  And

9    I believe that the documents that have been marked as F-881 and

10   F-882 were not within the scope of the RSCS custodian witness

11   authentication.

12         *THE COURT:*  Response, Mr. Tubach?

13         *MR. TUBACH:*  Your Honor, Mr. Lewis has just testified

14   he had no doubt he received this e-mail.  It's his e-mail

15   address.  He agreed that he had received e-mails from Mitch

16   Mitchell at Case Farms attaching bids, and he has no doubt that

17   this is a bid he received.

18         *THE COURT:*  F-881 will be refused.  It's hearsay.

19   F-882 will be refused, lack of foundation.

20   *BY MR. TUBACH:*

21   *Q.*  Go to the next one, if you would, F-743, and again you can

22   skip the first page of that.  Take a look at this document and

23   tell me if you recall -- do you recognize this as the 2014

24   contract for Case Farms to sell chicken at KFC?

25   *A.*  Yes.

1461
Robert Lewis - Cross

1  *Q.*  And this is a document that RSCS kept in the ordinary

2  course of its business?

3  *A.*  Yes.

4  *Q.*  A document upon which it relied in conducting its business,

5  right?

6  *A.*  Yes.

7  *Q.*  And making this record, this contract was part of the

8  regular practice of the business, correct?

9  *A.*  Yes.

10       *MR. TUBACH:*  Move the admission of F-743 with the

11  redaction of the first page as we've been talking about, Your

12  Honor.

13       *THE COURT:*  I actually don't have that one.

14       Mr. Torzilli, any objection to the admission of F-743

15  with the cover page redacted?

16       *MR. TORZILLI:*  Object to the redaction, but I

17  otherwise don't object to its admission.

18       *THE COURT:*  The objection will be overruled.  F-743

19  will be -- and I am not sure if it's redacted already.  Well,

20  in the form that you are offering it if it's been done already,

21  but in any event, I will call it F-743 as redacted concerning

22  the first page will be admitted.

23       *MR. TUBACH:*  Thank you, Your Honor.  We will redact

24  just for the record everything except the Bates number and the

25  government exhibit.

Robert Lewis - Cross

1    THE COURT:  Yes, consistent with the redactions to

2  similar cover pages.

3    MR. TUBACH:  Thank you, Your Honor.

4  BY MR. TUBACH:

5  Q.  Take a look, if you would, at F-788 which should be the

6  next one.  Again, skip the first page.

7    And do you recognize this as the 2014 contract between

8  Marshall Durbin and KFC for the sale of chicken?

9  A.  I have not seen this document before, but I recognize it as

10  a contract between RSCS and Marshall Durbin.

11  Q.  It's a contract between RSCS and Marshall Durbin?

12  A.  Yes.

13  Q.  And that signature is Michael Ledford on the bottom there?

14  A.  Yes.

15  Q.  And he was at the time the principal negotiator for KFC at

16  what was then UFPC?

17  A.  Repeat the question?

18  Q.  He was the principal negotiator at UFPC for the purchase of

19  chicken, right?

20  A.  Yes.

21  Q.  And again UFPC is the predecessor to RSCS, right?

22  A.  Yes.

23  Q.  Let me lay a few more foundational questions.

24    These types of contracts are the ones that UFPC and

25  RSCS used in its business, regularly conducted business,

Robert Lewis - Cross

1    correct?

2    A.  Yes.

3    Q.  And it kept this record as part of its regular practice as

4    part of the purchase of chicken, correct?

5    A.  Yes.

6         MR. TUBACH:  I move the admission of F-788 with the

7    exception of redacting the first page.

8         THE COURT:  Any objection to the admission of F-788 as

9    redacted?

10        MR. TORZILLI:  Object on foundation grounds.

11   Mr. Lewis returned to RSCS in May of 2014 and this entity

12   Marshall Durbin was defunct as a going concern, so he wouldn't

13   have had opportunity in the ordinary course of business to be

14   consulting with this contract.

15        MR. TUBACH:  The witness testified previously that he

16   looked at the prior contracts to see -- familiarize himself

17   with the chicken industry when he returned.  This is no

18   different in date than the previous Exhibit F-743 that the

19   Court has already admitted.

20        MR. TORZILLI:  Also object to the redaction on the

21   page, the first page.

22        THE COURT:  Okay.  The objection as to the redaction

23   will be overruled.  The objection as to the foundation will

24   also be overruled.  Mr. Kent testified as a custodian regarding

25   the RSCS documents.  He conducted among other things a

1464

Robert Lewis - Cross

1   historical review of the logs, indicated that the documents

2   were accurate and reliable.  His review functioned properly.

3   Even though he may not have been specifically asked as to this

4   particular range of Bates stamp numbers, his testimony would

5   establish that the information was authentic.  This is a

6   pricing model which constitutes a business record.  F-788 as

7   redacted will be admitted.

8   *BY MR. TUBACH:*

9   *Q.*  Mr. Lewis, you can put that binder away for a moment.

10         I want to change focus a little bit.  You testified

11  yesterday I believe about contract pricing and about period

12  pricing.  Do you recall that?

13  *A.*  Yes.

14  *Q.*  And those two are not the same, are they?

15  *A.*  They are not the same.

16  *Q.*  Contract pricing is what is reflected in the documents

17  we've just been looking at where there is a signature by both

18  parties and we have the numbers laid out which show what the

19  contract price is, correct?

20  *A.*  The contract price in effect is the period one pricing for

21  the year covered.

22  *Q.*  Let's talk about that.

23  *A.*  Yes.

24  *Q.*  Take a look at Exhibit 11.  If the government's binder is

25  still up there -- I don't know if it is -- take a look at 1126,

Robert Lewis - Cross

1    if you would.  And that is Tab 23 of your binder.  That's the

2    Pilgrim's contract price for 2015, correct?

3    A.   Yes.

4    Q.   The contract rather, correct?

5    A.   Yes.

6    Q.   And what's the date?  Strike that.

7           When you are putting in a period pricing, let's say

8    you said a period is every four weeks, correct?

9    A.   Yes.

10   Q.   So there are 13 periods in a year?

11   A.   Yes.

12   Q.   So that means a new period is going to begin on January 29;

13   is that correct?

14   A.   The periods kind of fill -- in a strange way, I don't

15   remember when period four -- or one ended.

16   Q.   If the periods are four-week periods --

17   A.   Yes.

18   Q.   -- and there is seven days in a week, so that would be

19   January 28 would be the end of period one, close enough.

20   January 29 roughly would be the start of period two, correct?

21   A.   Yes.

22   Q.   Is it also the case that approximately two weeks before

23   January 29th is when period two pricing would be set; is that

24   right?

25   A.   Approximately.

Robert Lewis - Cross

1  Q.  And that's because McLane and other distributors needed to
2  get that information.
3  A.  Yes.
4  Q.  But it wasn't established earlier than that.  It was about
5  two weeks before, right?
6  A.  Yes.
7  Q.  Okay.  Now, take a look at Exhibit 1126, if you would.
8  What's the date at the top of that contract?
9  A.  September the 30th, 2014.
10  Q.  You would agree with me, would you not, that as of
11  September 30, 2014, the parties would not know what the period
12  one pricing would be two months later.
13        MR. TORZILLI:  Objection, foundation.
14        THE COURT:  Overruled.
15  A.  This -- again this would be the period one pricing.  The
16  1.0856 would be the pricing for period one of 2015.
17        THE COURT:  Mr. Tubach, would you like to display
18  this?  It's been admitted.
19        MR. TUBACH:  Yes, Your Honor, absolutely, 1126, just
20  the top portion to look at the date.
21  BY MR. TUBACH:
22  Q.  So it's your testimony that the price listed in this
23  contract dated September 30th was the period one price for
24  2015?
25  A.  Yes.

Robert Lewis - Cross

1   Q.   And you're certain about that.

2   A.   If my memory is correct, yes.

3   Q.   If your memory is not correct, then you are wrong, right?

4   A.   Yes.  It's been seven years.  I am trying to answer you

5   truthfully, but...

6   Q.   I absolutely know that, sir.

7   A.   That to me was the period one pricing.

8   Q.   But you just testified that the period pricing wouldn't be

9   set until two weeks before the period began, right?

10  A.   Before period two and before period three and so forth.

11  Q.   So it's your testimony that for all periods except period

12  one the period price was determined two weeks before the period

13  began?

14  A.   Approximately, yes.

15  Q.   But for period one, the period one pricing was established

16  by the contract.

17  A.   Yes.

18  Q.   Okay.  How is it that the parties could know on

19  September 30 of 2014 what the period one price would be?

20  Doesn't that depend on the price of corn and soybean?

21  A.   Well, if you look back in the other sheets that are covered

22  by this SBRA, there is a feed calculation sheet.  And the 2677

23  number on that second page is exactly the same as the first

24  number, the feed expense in the cost model itself, so they

25  correspond exactly.  That's how the feed cost was determined

1468

Robert Lewis - Cross

1    and established for period one.

2    Q.  And you're saying that was established on September 30.

3    A.  Or thereabouts.  I mean, the -- I don't know.

4    Q.  You're not sure.

5    A.  I don't know if it was established on September the 30th.

6    Q.  Well, it would have to have been established on or before

7    September 30th under your testimony, correct?

8    A.  I would assume so, yes.

9    Q.  Now, let's go to Page 2.  What is the contract price for

10   Pilgrim's for 2015 under this contract?

11   A.  1.0856.

12        MR. TUBACH:  So the jury can see it also.

13   BY MR. TUBACH:

14   Q.  It's $1.0856, correct?

15   A.  Correct.

16   Q.  You recall, Mr. Lewis, that RSCS kept track of period

17   pricing every period, right?

18   A.  Yes.

19   Q.  And had a spreadsheet to do that, right?  It was a form?

20   A.  Yes.

21   Q.  You are familiar with that form, right?

22   A.  Yes.

23   Q.  And it changed every month.

24   A.  Yes.

25   Q.  And that contained the period pricing for every one of the

Robert Lewis - Cross

1   customers -- sorry, every one of the suppliers, right?

2   A.   Yes.

3   Q.   And you used that in your business, correct?

4   A.   Yes.

5           MR. TUBACH:   May I approach, Your Honor?   I want to

6   hand the witness what has been marked as H-976.

7           THE COURT:   You may.

8           MR. TUBACH:   I have a copy for the Court also if the

9   Court would like to see it.

10  BY MR. TUBACH:

11  Q.   You have that in front of you, sir?

12  A.   I do.

13  Q.   You recognize H-976 to be the period one pricing

14  spreadsheet that you just testified about earlier?

15  A.   Yes.

16  Q.   And this is a document that RSCS used in the ordinary

17  course of its business, correct?

18  A.   Yes.

19  Q.   And it was part of the regular practice of RSCS to create

20  this document and use it in its business, correct?

21  A.   Yes.

22  Q.   And it's reliable and accurate, correct?

23  A.   Yes.

24          MR. TUBACH:   I move the admission of H-976.

25          THE COURT:   Any objection to the admission of H-976?

1470

Robert Lewis - Cross

1    MR. TORZILLI:  No, Your Honor.

2    THE COURT:  H-976 will be admitted.

3    MR. TUBACH:  If we can publish this to the jury.

4    THE COURT:  You may.

5    MR. TUBACH:  If we can just focus on that top line,

6    please.  If we could blow up that first line even a little

7    bigger if that's possible.  It may not be -- that's fine.

8    BY MR. TUBACH:

9    Q.  You just testified that the contract price for 2015 was

10   1.0856, right?

11   A.  Yes.

12   Q.  Can you read for us what the period one 2015 price was for

13   Pilgrim's?

14   A.  $1.0682.

15   Q.  That's not $1.0856, is it?

16   A.  No.

17   Q.  So, in fact, the contract price for 2015 is not at all the

18   period one price that RSCS paid for its chicken, right?

19   A.  No, assuming this report is correct, no.

20   Q.  And that's because the period one price for 2015 wasn't set

21   until that two weeks before period one started, right?

22   MR. TORZILLI:  Objection, foundation.

23   THE COURT:  Overruled.  He can answer if he knows.

24   A.  I do not know -- I did not prepare this report.  That was

25   not my responsibility.  And I do not know the source of these

Robert Lewis - Cross

1    prices.

2    BY MR. TUBACH:

3    Q.  Sir, you just testified this is a report that you relied

4    upon in your business and admitted such, correct?

5         MR. TORZILLI:  Your Honor, I object to the question.

6    He has already testified that by the time that this report

7    would be in effect he had left RSCS.

8         THE COURT:  Overruled.  He can answer based upon his

9    description of this type of report and the nature of it.

10   A.  Would you repeat the question?

11   BY MR. TUBACH:

12   Q.  This is the period one pricing chart for 2015.  You just

13   testified to that, right?

14   A.  Yes, it is.

15   Q.  Okay.  And so in fact, not just for Pilgrim's, but for all

16   the suppliers the contract price is not the same as the period

17   one price; is that right?  I can go through all these if you

18   would like.

19   A.  I cannot answer that for all suppliers.  I can just see

20   Pilgrim's Pride in front of me.

21        MR. TUBACH:  Why don't we call up 10-4 which I believe

22   has been admitted into evidence.

23        THE COURT:  It has.

24   BY MR. TUBACH:

25   Q.  What is the 2015 contract price for Claxton on 10-4,

Robert Lewis - Cross

1   Mr. Lewis?

2   *A.*  For 2015?

3   *Q.*  Yes, sorry, for 2015.

4   *A.*  Yes.  It's 1.0669.

5   *Q.*  And what is the period one 2015 price reflected on Exhibit

6   H-976?

7   *A.*  I am sorry, you just asked me about Claxton and the one in

8   front of me is Pilgrim's.

9   *Q.*  I am sorry, I am now looking at the H-976, the spreadsheet

10   of period one pricing.

11   *A.*  Okay.  Repeat the question, please.

12   *Q.*  Of course, I will be happy to.  So the contract price

13   listed on 10-4 is $1.0669, right?

14   *A.*  Yes.

15   *Q.*  What's the period price for Claxton for period one 2015?

16   *A.*  1.0497.

17   *Q.*  Those are different, right?

18   *A.*  Those are different.

19   *Q.*  Tyson, it's 1.0762 is the contract price for 2015, right?

20   *A.*  Yes.

21   *Q.*  And what's the period one 2015 price for Tyson?

22   *A.*  1.0295.

23   *Q.*  Those are different, right?

24   *A.*  Yes.

25   *Q.*  So you are starting to get the idea.  The contract price

Robert Lewis - Cross

1  listed on 10-4 and the period one price are not the same at

2  all, are they?

3  A.  That's correct.

4  Q.  So this chart -- and to be clear, sir, you didn't prepare

5  10-4, did you?

6  A.  I did not prepare that summary sheet, no.

7  Q.  That chart was prepared by the government, right?

8  A.  Yes.

9  Q.  And they handed it to you, right?

10  A.  Yes.

11  Q.  And they are the ones who put 2015 Contract Price & Margin

12  (Period 1), right?

13  A.  Yes.

14  Q.  You didn't do that yourself.

15  A.  I did not.

16  Q.  Let's look at the left part of that chart.  It also says

17  2014 Contract Price & Margin (Period 1).  Do you see that?

18  A.  Yes.

19  Q.  Let me show you what we marked as Exhibit F-821.

20        MR. TUBACH:  If I may approach, Your Honor.

21        THE COURT:  You may.

22  BY MR. TUBACH:

23  Q.  Take a look at F-821 and tell me if you recognize it as the

24  period one 2014 spreadsheet that RSCS relied upon in its

25  business in tracking chicken prices.

Robert Lewis - Cross

1    A.  You say relied on.  This is basically historical

2    information.

3    Q.  Yes.  This is the same document as H-976 except it's for a

4    different period.

5    A.  Correct.

6    Q.  And RSCS used this period spreadsheet in the course of its

7    regularly conducted activity, right?

8    A.  Yes.

9    Q.  In tracking chicken prices that it was -- for purchase for

10   KFC, correct?

11   A.  Yes.

12   Q.  And this is accurate and reliable to the best of your

13   knowledge, right?

14   A.  Yes.

15           MR. TUBACH:  Move the admission of F-821.

16           THE COURT:  Any objection to the admission of F-821?

17           MR. TORZILLI:  No objection, Your Honor.

18           THE COURT:  F-821 will be admitted.

19   BY MR. TUBACH:

20   Q.  Now, take a look if you would again at Exhibit 10-4.

21           MR. TUBACH:  We will put that up on the screen.  I am

22   just going to do one of them here.

23           This can be published to the jury.

24           THE COURT:  It may.

25   BY MR. TUBACH:

Robert Lewis - Cross

1   Q.  So you see the contract price listed under there for 2014

2   for Pilgrim's is .9250, right?

3   A.  Yes.

4   Q.  And could you read for us what the period one 2014 price is

5   for Pilgrim's is under Exhibit F-821?

6   A.  .9011.

7   Q.  Those are different, aren't they?

8   A.  Yes.

9   Q.  Again, you didn't prepare chart 10-4, did you?

10  A.  I'm sorry?

11  Q.  You didn't prepare chart 10-4.

12  A.  I did not.

13  Q.  Now, take a look, if you would, at Exhibit 1129.  The chart

14  in 10-4 described this be as contract price, correct?

15        MR. TUBACH:  I believe this has been admitted, Your

16  Honor, and I'd ask it be published to the jury.

17        THE COURT:  It may.

18  BY MR. TUBACH:

19  Q.  Do you see that in front of you?

20  A.  I do.

21  Q.  That's not a contract, is it?

22  A.  It's not a contract, but it appears that it is the cost

23  model for period one that would have been the top sheet on the

24  SBRA addendum set for Tyson.

25  Q.  So this, what is Exhibit 1129, what is the period one price

Robert Lewis - Cross

1   for Tyson?  Can you see that, sir?  It might be a little small

2   for you.

3   A.   .8988.

4   Q.   .8988.  So now take a look at F-821, if you would.  What is

5   the Tyson period one 2014 price?

6   A.   .8988.

7   Q.   Same price, right?

8   A.   Yes.

9   Q.   That's not the contract price listed in 10-4, is it?

10  A.   Without the supporting documents around it, I cannot answer

11  that yes or no.

12  Q.   Has the government ever shown you a Tyson contract price

13  for 2014, as far as you know?

14  A.   Yes.

15  Q.   But it didn't say .8988, did it?

16  A.   I don't recall.

17  Q.   So there really is a difference, do you agree with me now,

18  sir, between contract price and period one pricing based on all

19  the documents we've reviewed?

20  A.   According to these documents, yes, that's true.

21  Q.   So this chart is wrong, isn't it?

22  A.   The numbers are correct.  You know, it may be a question on

23  the headings, but the numbers are accurate.

24  Q.   Absolutely right, sir.  The numbers are correct, but the

25  Period 1 in parenthesis is totally wrong, isn't it?

Robert Lewis - Cross

1    A.  If you go by these summaries, yes.

2    Q.  The government just botched that one, didn't they?

3            MR. TORZILLI:  Objection.

4            THE COURT:  What's the objection?

5            MR. TORZILLI:  Not a question.

6            THE COURT:  It was a question.  I think maybe the

7    objection would be that it's rhetorical.  I will sustain that.

8    BY MR. TUBACH:

9    Q.  You can put those documents away, Mr. Lewis.

10            I want to turn to the 2015 negotiations just briefly.

11   It is your testimony, isn't it -- forgive me if I've

12   forgotten -- that it was RSCS's idea to do a three-year deal

13   rather than a one-year deal, right?

14   A.  Yes.

15   Q.  That wasn't the suppliers' idea.  That was RSCS's idea,

16   right?

17   A.  Yes.

18   Q.  And it was RSCS's idea to negotiate earlier in the year for

19   2015 pricing than they would normally do in the cycle of

20   negotiations.  Do you recall that?

21   A.  I can only speak for 2014.  I don't know about prior years.

22   Q.  Well, certainly not in the years that you weren't there,

23   understood.  But the years when you were there before you

24   retired, the negotiations didn't generally start as early as

25   August, right?

Robert Lewis - Cross

1  A.  That -- yes.

2  Q.  They generally started later, right?

3  A.  Yes.

4  Q.  The reason they started earlier in 2014 was because RSCS

5  wanted to try to lock in as much supply as it could before its

6  competitors started locking in supply, right?

7  A.  You could say that's part of the reason.

8  Q.  That was part of the reason, wasn't it?

9  A.  Yes.

10  Q.  Now, you testified earlier that you purchased 10 loads of

11  what you called insurance chicken at roughly $1.40 or so a

12  pound, right?

13  A.  Yes.

14  Q.  Was that 10 loads a week or just 10 loads?

15  A.  It was just 10 loads, 10 loads period, not per week.

16  Q.  Was that fresh or frozen?

17  A.  Fresh.

18  Q.  And how -- those 10 loads of fresh chicken were going to

19  have to be used pretty quickly, right?

20  A.  Yes, but --

21  Q.  Sell it or smell it?  You've heard that term, right?

22  A.  Those 10 loads were not for immediate delivery, as I

23  recall.

24  Q.  I am sorry, I didn't mean to interrupt.  Go ahead.

25  A.  I am sorry, go ahead.

Robert Lewis - Cross

1   Q.  Those 10 were going to be frozen or you just were prebuying

2   them?  I didn't understand.

3   A.  Prebuying.  It wasn't for use that day or that week.  It

4   was for use later on.

5   Q.  So they weren't being delivered to you right away?  You

6   were just paying for them right away?

7   A.  Paying for them as they were shipped.

8   Q.  And, in fact, you recall that -- I believe you testified

9   yesterday you purchased some of that chicken from Mar-Jac at

10  about $1.40 a pound, right?

11  A.  Yes.

12  Q.  You also purchased some from Pilgrim's at $1.42 a pound,

13  correct?

14  A.  I don't recall that.

15  Q.  Do you recall buying 19,801 pounds of eight-piece chicken

16  on the bone on or about June 9, 2014 at $1.42 a pound from

17  Pilgrim's?

18  A.  I don't recall that.

19  Q.  Do you recall using ERB Poultry as a distributor?

20  A.  ERB Poultry, yes.

21  Q.  ERB Poultry is located in Lima, right, Lima, Ohio?

22  A.  Yes.

23  Q.  As you sit here today, you don't have any memory of

24  purchasing 19,000 pounds of chicken from Pilgrim's for $1.42 a

25  pound?

1480

Robert Lewis - Cross

1    A.   No, sir.  It's seven years ago or so.  I do not remember.

2    Q.   I understand.  Let me ask it a broader way.  Those 10 loads

3    of chicken you bought at about $1.40 a pound, you didn't buy

4    them just from one supplier.  You bought them from multiple

5    suppliers, right?

6    A.   No, my recollection is it came all from Mar-Jac.

7    Q.   So you thought all of them came from Mar-Jac.

8    A.   The 10 loads.

9    Q.   Thank you.  And that chicken was about 50 cents -- strike

10   that.

11          You purchased those around the beginning of June of

12   2014; is that right?

13   A.   I don't remember the date.

14   Q.   You purchased them before the contract negotiations for

15   2015 prices though, right?

16   A.   It seems to me that the 10 loads were purchased before the

17   contracts were finalized.

18   Q.   And before the negotiations were finalized, right?

19   A.   Yes.

20   Q.   So this was before you had received the bids on or about I

21   believe it's August 7 -- August 19 when the bids were due,

22   right?

23   A.   Yes.

24   Q.   So sometime before then you purchased these 10 loads of

25   chicken at about $1.40 a pound, right?

Robert Lewis - Cross

1    *A.*  Again, I don't remember the date.

2    *Q.*  Not the precise date, but you believe it was before the

3    bids were submitted.

4    *A.*  I'm not certain about that.

5    *Q.*  Okay.  And that purchase of chicken was 50 cents higher

6    than the contract price for 2014, wasn't it?

7    *A.*  Yes, it was.

8    *Q.*  And, in fact, you tried to buy other chicken at $1.40 a

9    pound from other suppliers and couldn't get it, could you, even

10   at $1.40 a pound?

11   *A.*  I don't recall if I contacted other suppliers.

12   *Q.*  Do you recall speaking to anyone at Claxton or Tyson asking

13   to buy chicken for $1.40 a pound and being told they don't have

14   any for you?

15   *A.*  I don't recall that.

16   *Q.*  Do you doubt that that happened, sir?

17   *A.*  Seven years ago, I don't -- I don't doubt it, but I don't

18   remember it.

19          *MR. TUBACH:*  Thank you, Your Honor.  I have no further

20   questions.

21          *THE COURT:*  Additional cross?

22          Mr. Gillen?

23                        **CROSS-EXAMINATION**

24   *BY MR. GILLEN:*

25   *Q.*  It's still morning?  Good morning --

Robert Lewis - Cross

1    *A.*   Good morning.

2    *Q.*   -- Mr. Lewis.  How are you?  My name is Craig Gillen and I

3    represent Brian Roberts.  And I have some questions to ask you.

4    Let's start off a little bit where Mr. Tubach left off.

5    Setting the stage, and I want to move through it quickly

6    because we've gone extensively on this.

7              You come back in a crisis, correct?

8    *A.*   Yes.

9    *Q.*   The crisis is twofold.  One, Mr. Ledford has left, correct?

10   *A.*   Yes.

11   *Q.*   And two, that there is a major crisis of supply for chicken

12   for KFC, correct?

13   *A.*   Yes.

14   *Q.*   Part of that crisis was manifested on Mother's Day when we

15   had a -- basically almost a disaster on Mother's Day for KFC,

16   correct?

17   *A.*   Yes.

18   *Q.*   And that -- you are sort of thrown into the middle of all

19   this out of retirement and you are jumping in to try to solve

20   this, correct?

21   *A.*   Yes.

22   *Q.*   You mentioned that you are part of a team.  And the team,

23   you mentioned Pete Suerken, correct?

24   *A.*   Yes.

25   *Q.*   Pete Suerken -- when you came back out of retirement, Pete

Robert Lewis - Cross

1    Suerken was still there or was there working for RSCS, correct?

2    A.   Yes.

3    Q.   And he was as you said the quarterback of this team for the

4    negotiations for RSCS, correct?

5    A.   Yes.

6    Q.   So you've got the quarterback, Pete Suerken, and then we've

7    got a little bit of a gap because then Mr. Ledford left and

8    we've got to fill that position which is ultimately filled by

9    Mr. Eddington right around the 1st of August of 2014, correct?

10   A.   Yes.

11   Q.   Now, Mr. Eddington is somebody who had knowledge in the

12   chicken business, particularly because he worked at Mar-Jac

13   before he came over to KFC, correct?

14   A.   Yes.

15   Q.   And that's not uncommon for people to be working for the

16   supplier end of things and then go to work for the consumer,

17   the buyer end of things like a KFC, correct?

18   A.   I'm not personally aware of any other cases like that, but

19   I would not doubt that that's true.

20   Q.   Okay.  And so, well, for example, Mr. Suerken, he had

21   worked at a supplier before, hadn't he, and then ended up

22   working for a purchaser, right?

23   A.   I'm not familiar with Mr. Suerken's background.

24   Q.   Okay.  All right.  In any event, we have got the team

25   formed.  The quarterback is Mr. Suerken.  Mr. Eddington comes

Robert Lewis - Cross

1    in in August of 2014.  And you're there based upon your

2    experience that you had had prior to your retirement to come in

3    to help out in this crisis, correct?

4    A.  Yes.

5    Q.  Now, in terms of the quarterback, Mr. Suerken was the

6    person who ended up making -- would be making the decisions and

7    calling the shots; is that fair?

8    A.  Yes.

9    Q.  Because that's what quarterbacks do, right?

10   A.  Yes.

11   Q.  But you were jumping in with your experience.  And you

12   jumped in pretty early because what you wanted to do was to hit

13   the ground running and to find out what could be done to sort

14   of get some stability for KFC for a long-term period, correct?

15   A.  Yes.

16   Q.  In this case we've seen the long-term period was let's kind

17   of find out if we can get our prices early and we can get a

18   three-year commitment.  That was part of the "let's save KFC"

19   plan, right?

20   A.  That was part of the strategy, yes.

21   Q.  So what happens is that you then end up communicating

22   fairly early in the summer with some of the folks for the

23   suppliers, right?

24   A.  Yes.

25   Q.  And you were reaching out and talking to people that you

Robert Lewis - Cross

1    knew from the supplier companies about what their thoughts were

2    and what their needs were, right?

3    A.   Yes.

4    Q.   Now, the model -- I want to focus a little bit on Tyson.

5    The Tyson model which was presented in the summer of 2014 was

6    really different than the model of some of the other suppliers,

7    wasn't it?  Let me break that down.

8    A.   I don't recall that, sir.  I don't remember that.

9    Q.   Let me break it down and see if it jogs your memory.

10          Do you remember that in the Tyson model, unlike the

11   other models, there was an issue about where Tyson wanted to

12   deal with the marination issue which is sort of let's weigh the

13   chicken and get paid on that after the marination has been

14   applied to the chicken.  Do you remember that?

15   A.   I remember seeing that memo in some of these binders, one

16   of these binders, yes.

17   Q.   So you do remember that aspect of the Tyson -- which was

18   unique to Tyson, correct?

19   A.   It would have been, yes.

20   Q.   And the other aspect of the Tyson presentation or the Tyson

21   model which was different from everybody else is that Tyson

22   wanted to have a different understanding regarding the

23   drain-back weight, correct?

24   A.   That's my understanding, yes.

25   Q.   So for the edification of the jury, the drain-back weight

1486
Robert Lewis - Cross

1    is kind of like there is a 48-hour period where liquid is taken

2    from the chicken and Tyson wanted to weigh it before that

3    period was over.  And KFC model said no, we weigh it after the

4    drain-back weight, right?

5    A.   I don't remember that situation in that much detail.

6    Q.   But you do remember the concepts from the Tyson model which

7    was really unique from any of the other suppliers in those two

8    respects, right?

9    A.   I remember it only because I saw the document that dealt

10   with it.  I don't remember it otherwise.

11   Q.   Now, around in July is when you started reaching out and

12   asking folks to start formulating their ideas, right?  We've

13   seen an e-mail early on cross-examination about you reaching

14   out on July the 10th, correct?

15   A.   Yeah, I began in July.  I don't remember specific dates.

16         MR. GILLEN:  Now, what I would like to do for the

17   purposes of moving through this, I am going to reference you

18   up -- we can bring out not for publication to the jury --

19   G-629.

20         And Your Honor, I am going to be asking him about this

21   and confining ultimately our request for admission to the

22   latter part of the front page of 629 and the top of 629, which

23   would be e-mails from Mr. Lewis.

24   BY MR. GILLEN:

25   Q.   Now, do you see that in front of you, Mr. Lewis?

Robert Lewis - Cross

1   A.   I do.

2   Q.   Focusing on the bottom where it says Robert Lewis and then

3   July the 10th, Thursday, correct?

4   A.   Yes.

5   Q.   And if you flip over the page, that is an e-mail that you

6   wrote and sent to Mr. Brian Roberts, correct?

7   A.   Correct.

8        MR. GILLEN:   Your Honor, I would move for only the

9   portion of 629 which has to do with Mr. Lewis' e-mail.

10       THE COURT:   Any objection to Exhibit G-629 as

11  redacted?

12       MR. TORZILLI:   Can I see a copy?

13       MR. GILLEN:   Oh, okay.

14       MR. TORZILLI:   Your Honor, if the exhibit is being

15  admitted only for the very first e-mail in the chain, so the

16  e-mail from Mr. Lewis that begins on the bottom of the first

17  page and goes onto the second page and everything else is not

18  admissible and becomes redacted, we would have no objection.

19       THE COURT:   Right.   And that's what Mr. Gillen

20  offered.   And with that redaction, Exhibit G-629 will be

21  admitted.

22       MR. GILLEN:   Thank you, Your Honor.

23  BY MR. GILLEN:

24  Q.   And just to kind of fast-forward through this quickly,

25  Mr. Lewis, this is -- G-629 is an e-mail from you on July the

1488

Robert Lewis - Cross

 1   10th, 2014 to Mr. Roberts, correct?

 2   *A.*   Yes.

 3   *Q.*   Again, this will confirm our telephone conversation.

 4   Apparently you had already had a conversation with Mr. Roberts

 5   earlier prior to this e-mail?

 6   *A.*   Yes.

 7   *Q.*   And you say:  As mentioned, we will schedule a conference

 8   call sometime within the next two weeks to discuss the

 9   following.

10         *MR. GILLEN:*  Excuse me, Your Honor, if we can display

11   the admitted exhibit, the redacted portion.

12         *THE COURT:*  Yes, you may.

13   *BY MR. GILLEN:*

14   *Q.*   We will schedule a conference call sometime within the next

15   two weeks to discuss the following.  And there are a number of

16   things you want to talk about, number of loads you can supply

17   of eight-piece.  Do you see that on bullet No. 1, correct?

18   *A.*   Yes.

19   *Q.*   No. 2, dark meat loads you want to make available beginning

20   in July, correct?

21   *A.*   Beginning in January.

22   *Q.*   Excuse me, in January.  I stand corrected.  Thank you.

23   *A.*   Yes.

24   *Q.*   What are your top four or five concerns about your dealings

25   with RSCS, and these are issues about relationships that you

Robert Lewis - Cross

1   wanted answered, correct?

2   *A.* Yes.

3   *Q.* And then update your margin over feed model to reflect

4   current cost, correct?

5   *A.* Yes.

6   *Q.* And then profit margin needed and how that compares to big

7   bird profitability, correct?

8   *A.* Yes.

9   *Q.* So that part there had to do with, okay, we're talking

10  about what your profit margin -- what are you going to need for

11  your profit margin and comparing with this big bird

12  profitability issue which was hanging over KFC there in the

13  summer of 2014, right?

14  *A.* We didn't know the difference prior to this note.  We were

15  looking for some direction as to what the supplier felt that

16  profitability was.  And the information that was being

17  submitted would be for our consideration.  It wasn't

18  necessarily that we were going to accept what was presented.

19  *Q.* Well, so you send this out to Mr. Roberts on July the 10th.

20  And Mr. Roberts sends you a response with the Tyson KFC model

21  on the same day, July the 10th, doesn't he?

22  *A.* I believe that's correct, yes.

23          *MR. GILLEN:* I would like to show just for the

24  purposes now -- if we can take that off the screen.

25  *BY MR. GILLEN:*

Robert Lewis - Cross

1  Q.  And I am going to ask you about G-523.

2         MR. GILLEN:  And this is for only -- not for the jury

3  yet.

4  BY MR. GILLEN:

5  Q.  And I would like to ask you some questions about this.

6         Is this an e-mail response that you got back from

7  Mr. Roberts on the very same day?

8  A.  Yes.

9  Q.  And is this what you were expecting back from him and you

10  were presenting this -- or receiving this in the context of

11  your work for RSCS to find out what Tyson's KFC model,

12  marinated model would be for their proposal, correct?

13  A.  Yes.  I did not know, however, what his conversation with

14  Mr. Suerken involved.

15  Q.  Okay.  But what you do know is you sent an e-mail to him on

16  the same day, and the same day he sends you out an e-mail and

17  an attachment with a model, correct?

18  A.  Yes.

19         MR. GILLEN:  Your Honor, I would move for the

20  admission of G-523.

21         THE COURT:  And that's unredacted.  That's the

22  entirety of it?

23         MR. GILLEN:  Yes, Your Honor.

24         THE COURT:  Let's let Mr. Torzilli have a look at it.

25         MR. TORZILLI:  Objection, hearsay, Your Honor.

Robert Lewis - Cross

1        THE COURT:  It's consistent with the previous

2   document, transmittal document.  I will overrule the objection.

3   Exhibit G-523 will be admitted.

4        MR. GILLEN:  And the attachment which was attached to

5   that, I would like to -- excuse me.  If we could -- pardon me.

6   If we could publish the admitted 523, please.

7        THE COURT:  Yes, you may.

8   BY MR. GILLEN:

9   Q.  And this is the e-mail that Mr. Roberts sent to you

10  regarding -- with an attachment, correct?

11  A.  Yes.

12       MR. GILLEN:  Okay.  Now if we can take that off.

13  BY MR. GILLEN:

14  Q.  And I would like to show you, not for publication to the

15  jury, Defendant's G-524.  Now, this would be the attachment.  I

16  am going to ask you some questions about this, Mr. Lewis.

17       This was the attachment that was sent by Mr. Roberts,

18  correct?

19  A.  I don't recognize this.

20  Q.  You did receive the attachment from him, did you not?

21  A.  There was an indication on the cover note, yes, that there

22  was an attachment, but I don't remember.

23       MR. GILLEN:  Your Honor, I would move for the

24  admission of 524 because it is the attachment to 523.

25       THE COURT:  Any objection to the admission of G-524?

Robert Lewis - Cross

1492

1     MR. TORZILLI:  Copy, Your Honor.

2     THE COURT:  Yes.

3     MR. TORZILLI:  Your Honor, a couple of objections

4  here.  One is foundation.  The witness is not an appropriate

5  sponsoring witness.  He doesn't know about it.  The second is

6  it's hearsay with no recognizable exception.  And also this is

7  dated June 2014, so without conducting further investigation it

8  does seem like maybe it's not the attachment to the e-mail.

9     THE COURT:  Response, Mr. Gillen?

10     MR. GILLEN:  Well, Your Honor, it is the attachment to

11  the e-mail.  As a matter of fact, the same exhibit has been

12  marked by the government as Government Exhibit 1164, 1183 and

13  1186.  So they've had -- I think they listed this same document

14  three times.  It is the attachment to the e-mail and I would

15  like to ask -- this is a portion of the exhibit which has been

16  admitted, and I would like to ask questions of the witness

17  about it.

18     THE COURT:  No portion of the exhibit has been

19  admitted.  The objections as to foundation and hearsay will be

20  sustained.

21  BY MR. GILLEN:

22  Q.  During the -- let me ask you away from the document itself,

23  Mr. Lewis.  Do you remember in July of 2014 Tyson sending a

24  model proposal for a deal to be set by the end of July 2014?

25  A.  I recall that, but I have seen documents that spurred my

Robert Lewis - Cross

1    memory about that.

2    Q.  I am sorry, what was the answer?

3    A.  I know about it.  I remember it.  My memory was spurred by

4    some documents that I had seen before today.

5    Q.  So what your memory is is that you have seen documents

6    which refreshed your recollection such that you understood that

7    Tyson was trying to close a deal by -- with a proposal and a

8    model by the end of July 2014, correct?

9    A.  The -- we were trying to finalize the proposals by the

10   middle of August.  I don't recall giving anyone a deadline to

11   provide a final proposal by the end of July.

12   Q.  I didn't ask whether you gave them a deadline.  Did Tyson

13   propose to you a model submitted to you on July the 10th, 2014

14   containing a model for a deal and requesting that the deal be

15   agreed upon by the end of July 2014?

16   A.  I recall receiving a proposal from Tyson, but I don't

17   recall those specific dates.

18   Q.  But let me work at it another way.  You said that you had

19   remembered looking at documents which refreshed your

20   recollection that Tyson had tried to have a deal in July of

21   2014.  What were those documents?

22   A.  I have seen documents that confirmed that we were beginning

23   the negotiations in July and that we were having meetings in

24   the early part of August and that we were looking to have

25   proposals in hand by the middle of August, and that is in

Robert Lewis - Cross

1   general terms, that applied to all suppliers.

2   Q.  Well, specific as to Tyson, do you remember again in August

3   of 2014 where Tyson made a presentation to RSCS?

4   A.  I do not remember the presentation.

5   Q.  Do you remember that in August of 2014 that Tyson asked to

6   reach a conclusion and reach a deal with RSCS on the KFC 2015

7   negotiations by the end of the week of August 19th?

8   A.  I do not recall.

9   Q.  You said that you had reviewed the Tyson proposal, the

10  initial proposal, right?  You told us you sent out a letter

11  saying, I want to hear back from everybody by August the 19th.

12  Do you remember that?

13  A.  Yes.

14  Q.  Do you remember that Tyson through Brian Roberts submitted

15  their proposal pursuant to your directive on August the 11th to

16  Mr. Eddington?

17  A.  I know that Tyson submitted their proposal, but I don't

18  know what date.

19  Q.  Are you aware that Tyson submitted their proposal early?

20  A.  I don't remember that.

21  Q.  Now, if a proposal was sent from Tyson to Mr. Eddington

22  without a cc to you, how would you ever receive their proposal?

23  A.  Well, I saw it.  I saw the proposal.

24  Q.  My question is if the proposal were to be sent from

25  Mr. Roberts to Mr. Eddington with no cc's, how would you have

Robert Lewis - Cross

1495

1    gotten a copy of the proposal?

2    A.  Probably from Mr. Eddington.

3    Q.  Do you have a recollection of that?

4    A.  No, I do not.

5    Q.  Do you have a recollection of speaking with Mr. Eddington

6    on or about August the 11th concerning the proposal that had

7    been forwarded to RSCS by Tyson?

8    A.  Sir, again, it's been over seven years.  I do not remember.

9    Q.  When you were going over the proposals during the

10   government's direct examination, I didn't see you testifying

11   about the Tyson proposal in round one.  Do you remember

12   testifying at all about that during the government's direct

13   examination?

14   A.  I remember talking about the proposals for all six

15   suppliers.

16   Q.  Yeah.  But did you talk about the Tyson proposal on your

17   direct examination and when it was submitted?

18   A.  Yes.

19   Q.  What did you say about when the Tyson proposal was

20   submitted?

21   A.  I don't remember what I said specifically about the Tyson

22   proposal.

23   Q.  As you sit here today, when do you think Tyson submitted

24   their bid during August of 2014?

25   A.  I assume that since we asked for an August 19 deadline, it

1496
Robert Lewis - Cross

1   was on or about that time.

2   Q.   So you are assuming that, correct?

3   A.   Yes, sir.

4   Q.   You have no recollection of when it was actually submitted,

5   correct?

6   A.   I don't remember specifics from seven years ago.

7   Q.   I see.  During your prep with the government, did they show

8   you -- did they ever show you the date when Tyson submitted

9   their bid?  Did they ever show you that during your prep?

10  A.   They may have, but I don't remember the date.

11  Q.   Did they ever say to you how did this -- or point out to

12  you when if Tyson submitted early?  Did they ever do that in

13  your preparation for the testimony to this jury?

14  A.   I don't recall that, no.

15  Q.   Did they show you all of the proposals that had been sent

16  out in round one?

17  A.   Yes.

18  Q.   Did they show you the dates of the proposals when they had

19  been submitted?

20  A.   I don't recall.

21  Q.   And how many times did you meet with the government?

22  A.   Probably five conference calls and perhaps three

23  face-to-face meetings.

24  Q.   Okay.  Now, you were shown -- and during your testimony on

25  direct, you were giving answers about your recollections about

Robert Lewis - Cross

1    how the group handled their pricing.  Do you remember that?

2    A.  Yes.

3    Q.  And that's based upon your general recollection of seven

4    years ago, correct?

5    A.  No, not entirely.  I saw documents that helped spur my

6    memory.

7    Q.  Well, did you -- when they were prepping you for trial, did

8    they show you any Tyson model that was submitted in July of

9    2014 and what the margins were to be at that time?

10   A.  They showed me a model from Tyson, but again I don't

11   remember any dates.

12   Q.  How many models from Tyson did they show you?

13   A.  I believe there were a total of three.

14   Q.  Three models they showed you?

15   A.  I'm sorry?

16   Q.  Three models?

17   A.  Yes, one from 2014, one for 2015, and one that was the -- I

18   believe the initial proposal from Tyson, but it didn't have a

19   date on it.  I just saw the model itself.  There was no

20   correspondence attached to it that I can recall.

21   Q.  They showed you a contract for 2014 between Tyson and RSCS?

22   We are backing up.  We are getting a little bit out of that --

23   now we are sort of in that end of 2013 period.  Did they show

24   you a contract, signed contract between Tyson and RSCS signed

25   in 2013 for the year 2014?

Robert Lewis - Cross

1    *A.*   Yes.  An SBRA addendum is what I saw, a signed addendum.

2    *Q.*   A signed contract you were shown.  Is that your testimony?

3    *A.*   Yes.

4         THE COURT:  Mr. Gillen, can you look for a convenient

5    breaking spot?  It's noon now.

6         *MR. GILLEN:*  Yes, Your Honor.  This is fine.

7         THE COURT:  Ladies and gentlemen, we will go ahead and

8    take the lunch break.  Keep your yellow juror buttons visible

9    if you are in the hallways or outside the courthouse.  Keep the

10   admonitions in mind.

11        The jury is excused.  We will reconvene at 1:30.

12   Thank you.

13        (Jury excused.)

14        Mr. Lewis, you are excused until after the lunch

15   break.  Thank you very much.

16        *THE WITNESS:*  Thank you.

17        THE COURT:  Anything to take up before we break for

18   lunch?  Yes?

19        *MR. McLOUGHLIN:*  One very small matter, Your Honor.

20   We've been informed by the government that it is withdrawing

21   9168, Government Exhibit 9168 in its entirety.  I received that

22   e-mail last night, so I think that issue is resolved.

23        THE COURT:  And just by way of making the record,

24   9168, was that the 8-K that we were talking about at the end of

25   the day yesterday?

Robert Lewis - Cross

1    MR. McLOUGHLIN:  It is, Your Honor.  It is excerpts

2  from the 2011 Form 8-K filed by Pilgrim's Pride with respect to

3  certain compensation for the year 2011 prior to the conspiracy.

4  Yes, that's the document.

5    THE COURT:  Okay.  And just to make the record, 9168

6  has been admitted, right?

7    MS. CALL:  Yes, Your Honor.  And as a matter of fact,

8  would you like us to withdraw that before the jury?

9    THE COURT:  Yes, that would be the appropriate

10  procedure, but I appreciate the heads-up on that.  And at some

11  point today perhaps between witnesses if you would initiate

12  that or at least remind me and I'll make the record on it, but

13  it should be in front of the jury, yes.

14    MS. CALL:  Of course.

15    MR. McLOUGHLIN:  And I will note to the jury the

16  document was never published to the jury, so...

17    THE COURT:  I will mention that to the jury as well.

18  They haven't seen it, but it has been withdrawn just in case we

19  have someone taking copious notes and may wonder later on.

20    Anything else?  We will be on our lunch break until

21  1:30.  Thank you.

22    (Recess at 12:02 p.m.)

23    (Reconvened at 1:30 p.m.)

24    THE COURT:  All right.  Ms. Grimm, let's bring the

25  jury back in.

Robert Lewis - Cross

1           (Jury present.)

2           THE COURT:  Ladies and gentlemen, before Mr. Gillen

3    begins, let me just take care of one bit of housekeeping.  An

4    exhibit, 9168, was admitted.  You haven't seen it.  However --

5    in other words, it hasn't been shown to you.  However, the

6    United States who moved its admission -- I believe Ms. Call,

7    correct me if I'm wrong -- is now withdrawing that exhibit; is

8    that correct?

9           MS. CALL:  Yes, Your Honor.  And we did notify

10   defendant there is a chance we may re-enter it, at which time

11   will we address appropriate redactions, but at this time we are

12   withdrawing it.

13          THE COURT:  So just in case you are keeping track,

14   ladies and gentlemen, Exhibit 9168 has been withdrawn.

15          Mr. Gillen, go ahead.

16          MR. GILLEN:  Thank you, Your Honor.

17   BY MR. GILLEN:

18   Q.  Mr. Lewis, now I can say good afternoon.  I have a few more

19   questions.

20   A.  All right.  Good afternoon.

21   Q.  You were shown I believe during cross-examination a

22   document regarding the Tyson proposal, the second Tyson

23   proposal, did you remember that, by Mr. Tubach?

24   A.  Yes.

25          MR. GILLEN:  I want to put that up if we could, F --

Robert Lewis - Cross

1    it's in evidence -- F-889, please.  And I believe this has been

2    admitted, Your Honor, so if we could show that to the jury when

3    it comes up.

4         THE COURT:  Yes, I believe it has been, and it may be

5    shown to the jury.

6         MR. GILLEN:  F-889.  If you could turn not to that

7    page, but if we could get the second page in that exhibit.

8    Could we blow up, if we can, the bottom quarter of that

9    exhibit, please?  There we go.

10   BY MR. GILLEN:

11   Q.  Do you see where it says margin?

12   A.  Yes.

13   Q.  And under the new, that's the new proposed Tyson proposal

14   for profit margin, correct?

15   A.  Yes.

16   Q.  And that's the profit margin that they were proposing for

17   the new KFC 2015 contract, correct?

18   A.  Yes.

19   Q.  And that number, the profit margin, is 19; is that right?

20   A.  Yes.

21        MR. GILLEN:  Could we highlight that, please, if we

22   can highlight the 19?  Thank you very much.

23        Now, I would like to also show you if we can put 10-4

24   up, the government's summary witness up -- excuse me, chart,

25   10-4.  If we can blow that up, please, just the chart itself.

Robert Lewis - Cross

1   BY MR. GILLEN:

2   Q.  Now, here you have seen this a few times during your

3   examination, haven't you?

4   A.  Yes.

5   Q.  And under Tyson if we move all the way over to the 2015

6   contract price margin, we look over there and there is a number

7   of .1931, correct?

8   A.  Yes.

9   Q.  And what that means is that's 19 cents .3, right?

10  A.  Yes.

11  Q.  So that 19 cents .3 is the final profit margin that was

12  agreed upon with Tyson, correct?

13  A.  Yes.

14  Q.  Now, to finish up and wrap up here, Mr. Lewis, you have

15  absolutely no direct knowledge whatsoever about Brian Roberts

16  or Tim Mulrenin engaging in any conspiracy to fix prices,

17  correct?

18  A.  That's correct.

19  Q.  Or to set prices improperly, correct?

20  A.  That's correct.

21  Q.  Or in any way to engage in any kind of bid-rigging or

22  price-fixing; isn't that right?

23  A.  That's right.

24      MR. GILLEN:  That's all I have, Your Honor.

25      THE COURT:  Thank you.

Robert Lewis - Cross

1      Additional cross-examination?

2      Ms. Henry, go ahead.

3                          **CROSS-EXAMINATION**

4   *BY MS. HENRY:*

5   *Q.* Good afternoon, Mr. Lewis.  My name is Roxann Henry and I

6   represent Mr. Bill Kantola.

7   *A.* Good afternoon.

8   *Q.* We have never met, have we?

9   *A.* No, ma'am.

10  *Q.* Do you know that even though you retired about 13 years ago

11  that there are folks at RSCS that still refer to you as a

12  legend?

13  *A.* They are being too kind.  Thank you.

14  *Q.* Well, when you came back in 2004, your job was to help with

15  supply for KFC, right?

16  *A.* Yes, ma'am.

17  *Q.* And you succeeded in that.

18  *A.* Yes.

19  *Q.* And you succeeded in that not just for 2015, but you also

20  helped create a sustainable source of supply because OK Foods

21  thereafter found it sufficiently profitable to actually convert

22  a plant to produce fast-food small bird production, correct?

23  *A.* Ma'am, would you repeat that question and maybe get closer

24  to that microphone.

25  *Q.* Sorry about that.

Robert Lewis - Cross

1    A.  Yes, ma'am.  I'm sorry.

2    Q.  Not a problem.  That better?

3    A.  Yes, ma'am.

4    Q.  Great.  So you also helped create a sustainable source of

5    supply for KFC because after the 2015 contracts OK Foods found

6    it sufficiently profitable to convert a plant to small bird

7    fast-food production.

8    A.  I didn't catch the name of the supplier that you mentioned.

9    Q.  OK Foods?

10   A.  OK Foods?

11   Q.  You're not familiar with that?

12   A.  No, ma'am.

13   Q.  Well, you know that it hadn't happened in a very long time

14   for any plant to convert to small bird fast-food production?

15   A.  That's correct.

16   Q.  And by long time, I mean a very long time, hadn't it been?

17   A.  That's fair, yes, a very long time.

18   Q.  Now, as I said, I represent Mr. Bill Kantola.  You don't

19   need a driver's license picture to be able to identify him, do

20   you, sir?

21   A.  I do not.

22   Q.  He is sitting right here.

23           And you had contact with him on a variety of subjects

24   after you returned to RSCS in 2014.

25           *MS. HENRY:*  Can I actually send up a binder for

Robert Lewis - Cross

1    Mr. Lewis through Ms. Grimm?

2         *THE COURT:*  Yes, you may.

3    *BY MS. HENRY:*

4    *Q.*  And one of those things was to work on a win-win

5    proposition to give Koch an immediate price and case weight

6    adjustment that not only helped Koch, but also helped KFC with

7    its supply constraints, right?

8    *A.*  Yes.

9    *Q.*  And if you turn to Tab 1 in your binder.

10        *MS. HENRY:*  And let's pull up C-454.  And that is not

11   yet admitted.

12   *BY MS. HENRY:*

13   *Q.*  Can you identify that document, sir?

14   *A.*  Yes, ma'am.

15   *Q.*  Is it a confirmation of your agreement on the price

16   adjustment and the case weight adjustment?

17   *A.*  Yes.

18   *Q.*  And again, the confirmation of Mr. Kantola with regard to

19   the receipt of that confirmation?

20   *A.*  Yes.

21   *Q.*  And was that documentation made in your regular course of

22   business while you were working at RSCS?

23   *A.*  Yes.

24   *Q.*  And made relatively contemporaneously with the agreement

25   that you've referenced?

1506

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And the documentation would be maintained in the ordinary

3    course of business?

4    A.   Yes.

5            MS. HENRY:   Your Honor, I would move to admit C-454

6    and to publish it to the jury.

7            THE COURT:   Any objection to the admission of C-454?

8            Do you have a copy?

9            MR. TORZILLI:   I don't have a copy, Your Honor.

10           Your Honor, I object to the admission of the top

11   e-mail which is written by Defendant Bill Kantola, but do not

12   object to the admissibility of the lower e-mail written by

13   Mr. Lewis.

14           THE COURT:   Response?

15           MS. HENRY:   Your Honor, the earlier part of the e-mail

16   is not being submitted for the truth of a thank you.  It's

17   being submitted for a confirmation of the contract and that is

18   what the witness testified to.

19           THE COURT:   Given that he testified to that already, I

20   will sustain the objection as to the top e-mail.

21           MS. HENRY:   We would move to admit the part of the

22   document from -- without the first part of the e-mail, then.

23           THE COURT:   All right.  In other words, just the

24   e-mail from Mr. Lewis?

25           MS. HENRY:   Yes.

Robert Lewis - Cross

1          *THE COURT:* I believe, Mr. Torzilli, the government

2     does not object to that portion.

3          *MR. TORZILLI:* That's without objection.

4          *THE COURT:* Then C-454 will be admitted as redacted.

5          *MS. HENRY:* Can we publish it to the jury, please?

6          *THE COURT:* Yes, as redacted.

7     *BY MS. HENRY:*

8     *Q.* Now, in early July you were starting the process for the

9     2015 contract and you also sent an e-mail as we've talked about

10    previously to a lot of the suppliers in connection with that

11    process.  Do you recall speaking to Mr. Kantola as well about

12    starting the process?

13    *A.* Yes.

14         *MS. HENRY:* And let me bring up C-451 and I believe

15    that has already been admitted, so if we could publish it to

16    the jury.

17         *THE COURT:* Yes, you may.

18    *BY MS. HENRY:*

19    *Q.* Have you had a chance to look at the document, Mr. Lewis?

20    *A.* Yes, ma'am.

21    *Q.* So Mr. Kantola would have received from you in this

22    document one -- the point about the profit margin needed and

23    how that compares to big bird profitability, right?

24    *A.* Yes.

25    *Q.* So from his perspective he could see that that was a

Robert Lewis - Cross

1  concern for RSCS, couldn't he?

2  A.  Yes.

3  Q.  And there were other conversations that you had with

4  Mr. Kantola about the big bird/small bird issues, didn't you?

5  A.  I'm sure there were, but I don't remember specifically when

6  that occurred.

7  Q.  Well, you indicated on a number of occasions that RSCS was

8  very concerned about how this big bird/small bird profitability

9  difference was affecting supply, right?

10  A.  Yes.

11      MS. HENRY:  Can we pull up Exhibit H-703?

12  BY MS. HENRY:

13  Q.  You said that you couldn't remember a specific example.

14  Does this help refresh your recollection that on July 18 you

15  had such conversations or communications with Mr. Kantola about

16  some of the issues?

17  A.  Yes.

18  Q.  And that was in connection with the conversation that you

19  were having with Mister -- is it Glied, G-L-I-E-D?  Did I

20  pronounce it correctly?

21  A.  I'm not familiar with that individual.  I don't know how to

22  pronounce that.  I'm sorry.

23  Q.  But he sent you an e-mail, right?

24  A.  He did.

25      MR. TORZILLI:  Your Honor, I object to questioning

1509

Robert Lewis - Cross

1    about a document that's not in evidence.

2         THE COURT:  He was asked -- it's true, originally he

3    was just asked if this document refreshed his memory.  He can

4    be asked about the subject matter, but not specifically as to

5    words within the e-mail.  It has not been admitted.

6    BY MS. HENRY:

7    Q.  Well, let me turn to Exhibit C-458.

8         Mr. Lewis, you just testified that you were not

9    familiar with Mr. Glied of McKinsey.  Does this document -- I

10   mean, this document explicitly says that you were asking

11   Mr. Kantola about his thoughts on questions that Bob Glied with

12   McKinsey had regarding the spec weight changes and additional

13   supply?

14        MR. TORZILLI:  Objection, foundation.

15        THE COURT:  Also I will sustain it on the ground that,

16   Ms. Henry, you're reading a document to him that has not been

17   admitted.

18        MS. HENRY:  Your Honor, it's a prior inconsistent

19   statement and I move for its admission.

20        THE COURT:  A prior consistent statement?

21        MS. HENRY:  It's a prior inconsistent statement.  He

22   testified that he was not familiar with Mr. Glied.

23        THE COURT:  Any objection to the admission of C-458?

24        MR. TORZILLI:  May I have a copy?

25        Objection, hearsay.

Robert Lewis - Cross

1          *THE COURT:*  Sustained.

2   *BY MS. HENRY:*

3   *Q.*  Mr. Lewis, does that refresh your recollection that you

4   did -- you were familiar with Mr. Glied?

5   *A.*  It does not.

6          *MS. HENRY:*  Can you pull up Exhibit C-659 -- and I

7   don't believe that that has been admitted yet -- and turn to

8   Page 4.

9   *BY MS. HENRY:*

10  *Q.*  Mr. Lewis, does that refresh your recollection at all that

11  you were talking to someone at McKinsey?

12  *A.*  It does not.

13  *Q.*  Do you have any idea or recollection as you sit here today

14  of who was the individual you were talking to at McKinsey?

15  *A.*  No.  I don't remember him at all.

16  *Q.*  Well, let's see if we can refresh your memory a little bit

17  more.

18         *MS. HENRY:*  Let's turn to Exhibit C-457.

19  *BY MS. HENRY:*

20  *Q.*  Can you identify that document?

21  *A.*  My name is on that document, but I do not recall.  I do not

22  recall it.

23  *Q.*  Do you have any recollection of talking to Mr. Bill Kantola

24  about there were 30 small bird plants that you were hearing

25  about and that you thought there might only be 25?

Robert Lewis - Cross

1          MR. TORZILLI:  Your Honor, I object to counsel --

2          THE COURT:  Sustained.  You can't read the document to

3    the witness.

4          MS. HENRY:  I'm asking his recollection, sir.

5          THE COURT:  Was that a question, Ms. Henry?

6          MS. HENRY:  I was just asking for --

7          THE COURT:  Then ask a new question, please.

8          MS. HENRY:  Yes, please.  Thank you.

9    BY MS. HENRY:

10   Q.  Do you recall talking to Mr. Kantola about the small bird

11   issue and how many plants there were?

12   A.  I remember talking to him a number of times about small

13   birds, but I do not remember a discussion about how many

14   plants.

15   Q.  And these discussions that you were having with

16   Mr. Kantola, they were early on prebid discussions, were they

17   not?

18         MR. TORZILLI:  Objection, hearsay.

19         THE COURT:  Overruled.

20   A.  The date on this e-mail would indicate that it was about

21   the time we were beginning to talk to suppliers about the 2015

22   proposals.

23   BY MS. HENRY:

24   Q.  So it was sometime in July that you recall having these

25   conversations?

Robert Lewis - Cross

1    A.  Yes.

2          MR. TORZILLI:  Your Honor, may I ask that the exhibit

3    be removed from the field of vision of the witness?

4          THE COURT:  It may.

5          MR. TORZILLI:  Thank you.

6    BY MS. HENRY:

7    Q.  Do you recall telling Mr. Kantola that other suppliers had

8    threatened to convert away from small birds and that that

9    threatening posture was not very well received at RSCS?

10   A.  I do not recall that, no.

11   Q.  Do you remember that Mr. Kantola talked to you about a

12   mutually beneficial long-term relationship with Koch Foods?

13   A.  Yes.

14   Q.  And do you recall him talking also about making -- that

15   Koch Foods was making investments in small bird fast-food

16   production?

17   A.  Yes.

18   Q.  And that that would help create supply expansion?

19   A.  Yes.

20         MS. HENRY:  Let me pull up C-281.

21   BY MS. HENRY:

22   Q.  Now, in the regular course of your business you solicit and

23   receive the positions of suppliers on specific contract terms?

24   A.  Yes.

25   Q.  And you would receive those positions on specific contract

Robert Lewis - Cross

1   terms and maintain that information in the ordinary course of

2   business?

3   A.   I'm sorry, would you repeat that?

4   Q.   Would you maintain that information in the ordinary course

5   of business?

6   A.   Yes.

7   Q.   Can you identify C-281?

8   A.   The top portion is an e-mail from Bill Kantola to me.

9   Q.   Go ahead.

10  A.   The bottom portion is an e-mail from myself to Bill

11  Kantola.

12  Q.   And this was about the drafting of the pricing provisions

13  in the 2015 contract, correct?

14  A.   Yes, according to the subject, yes, it is.

15  Q.   And it was important for you to know what the positions of

16  the suppliers were and for them to know what the positions of

17  RSCS were in those negotiations, correct?

18  A.   Yes.

19            MS. HENRY:  We move to admit C-281.

20            THE COURT:  Any objection -- do you have a copy?

21            Okay.  Any objection to the copy -- to the admission

22  of C-281?

23            MR. TORZILLI:  I object to the hearsay.

24            THE COURT:  Response?

25            MS. HENRY:  It's a business record.

Robert Lewis - Cross

1           *THE COURT:*  It's not a business record.  Sustained.

2     *BY MS. HENRY:*

3     *Q.*  Was it part of your regular course of business to solicit

4     and receive contract position information in the course of your

5     negotiations?

6     *A.*  Yes.

7     *Q.*  And that occurred as a regular part of your business.

8     *A.*  Yes.

9           *MS. HENRY:*  Your Honor, I believe we have established

10    a foundation for a business record.

11          *THE COURT:*  I disagree.  I have written an order on

12    this subject.  It does not meet the business rule exception.

13          *MS. HENRY:*  Then, Your Honor, we would seek to admit

14    it not for the truth of the statement, but for the

15    understanding of the parties as they entered into the

16    negotiation process.

17          *THE COURT:*  I'll reject that ground as well.  It would

18    be the -- the admission of it and that fact is for the truth of

19    the matter.

20    *BY MS. HENRY:*

21    *Q.*  Mr. Lewis, you were aware that Koch Foods was making very

22    substantial investments for KFC, correct?

23    *A.*  Yes.

24    *Q.*  And that they were also seeking pricing that would support

25    the financial foundation used to secure the funds for the

Robert Lewis - Cross

1    significant plant conversion that they were working on.

2    A.  Yes.

3              MS. HENRY:  Can we pull up Government Exhibit 1160,

4    which I believe has already been admitted?

5              THE COURT:  I think that's true.  Let me check.  Yes,

6    it has been for a limited purpose.

7              So ladies and gentlemen, this has been admitted, once

8    again, not for the truth of the matters asserted, but rather

9    for the effect on the reader or listener.  And it can be

10   displayed.

11   BY MS. HENRY:

12   Q.  And again in that document you were telling Mr. Kantola and

13   what he would have heard and understood from you is that you

14   were making good progress in the bid negotiation; is that

15   correct?

16   A.  That was in the context of we are making good progress, and

17   by that I meant RSCS as well as all of the suppliers involved.

18   Q.  Right.  And you also explained to him that RSCS had a very

19   different mindset concerning the supplier relationships,

20   correct?

21             MR. TORZILLI:  Objection to the hearsay.  It has not

22   been admitted for the purpose that's the premise of the

23   question.

24             THE COURT:  Overruled.  He can answer.

25   A.  Yes.

Robert Lewis - Cross

1   *BY MS. HENRY:*

2   Q.  Let me rephrase it.  That is what Mr. Bill Kantola would

3   have received in your communication, correct?

4   A.  Yes.

5   Q.  From his perspective, that's what he would have seen,

6   correct?

7   A.  I'm sorry --

8   Q.  From his perspective, that's what he would have seen in

9   your communication, that he would see that they were making

10  good progress and that you had a very different mindset,

11  correct, sir?

12  A.  Yes.

13  Q.  Do you recall whether or not Koch had submitted a second

14  round bid or just continued the discussion over the phone or in

15  person rather than with a submission of a new bid proposal?

16  A.  I believe at that point in time the second round proposals

17  had not been received.

18  Q.  But do you recall whether or not Koch even made a second

19  round proposal, formal proposal, or whether it was just a

20  matter of further discussion between you and Mr. Kantola?

21  A.  I am not sure if I can answer that question specifically,

22  but we would have had more than one discussion about things,

23  yes.

24  Q.  And even after you had received the initial pricing from

25  Koch, you continued to discuss with Mr. Kantola about trying to

Robert Lewis - Cross

1    get even more supply, correct?

2    A.   Yes.

3    Q.   So from his perspective, he would have heard you asking

4    again for more supply even after you had his price, right?

5    A.   Yes.

6    Q.   And, in fact, you worked with Mr. Kantola toward trying to

7    convert a part of Chattanooga's facility to try to process dark

8    meat for KFC.

9            MR. TORZILLI:   Objection, foundation.

10           THE COURT:   He can answer if he knows.   Overruled.

11   A.   Would you repeat the question, ma'am?

12   BY MS. HENRY:

13   Q.   You and Mr. Kantola worked together to try and convert a

14   part of Koch's Chattanooga facility to try and process more

15   dark meat for KFC, did you not?

16           MR. TORZILLI:   Same objection.

17           THE COURT:   Overruled.

18   A.   Yes.

19   BY MS. HENRY:

20   Q.   And that would have required even additional investment by

21   Koch, even more than the investment that you had been talking

22   about previously, correct?

23   A.   I don't know the answer to the question about more, but

24   yes, it would have taken an investment to make it happen.

25   Q.   Well, you remember a lot of the earlier investment was also

Robert Lewis - Cross

1    about the Gadsden plant, do you?

2    A.  Yes.

3    Q.  Do you remember that KFC even sent engineers to the

4    Chattanooga plant to see if that could possibly work to expand

5    production and that Koch was trying to do that?

6    A.  Yes.

7              MS. HENRY:  Let me turn to some of the government's

8    exhibits.  Can we pull up Government Exhibit 1023, 24, 25 and

9    26?

10   BY MS. HENRY:

11   Q.  And that would be at tab -- it's in your binder at Tab 9.

12             Do you see those?

13   A.  Yes, I do.

14   Q.  And in the ordinary course of your business, you received

15   bids from suppliers, correct?

16   A.  Yes.

17   Q.  And you asked them to give you their proposals.

18   A.  Yes.

19   Q.  And you received those proposals in the ordinary course of

20   business.

21   A.  Yes.

22   Q.  Government Exhibit 1023, 24, 25 and 26 are the proposal

23   that you received from Koch Foods?

24   A.  Yes, as it relates to quality assurance issues.

25   Q.  Well, please look on 1026, sir.

Robert Lewis - Cross

1    *A.*  I have 1026.

2    *Q.*  So this was the complete proposal package that Koch was

3    offering to you on -- in August?

4    *A.*  Yes.

5            *MS. HENRY:*  Your Honor, we move to admit Government

6    Exhibit 1023, 1024, 1025 and 1026.

7            *THE COURT:*  Any objection to those exhibits?

8            *MR. TORZILLI:*  Can I ask that 23 and 24 be displayed

9    on the screen just for a moment so I can review it quickly?

10           *THE COURT:*  Yes.

11           *MR. TORZILLI:*  Thank you.  The government has no

12   objection to the admission of 1025 and 1026.  Those are for

13   lack of a better term the eight-piece bid.  We do have an

14   objection to 1023 and 1024 being inadmissible hearsay.

15           *THE COURT:*  Response, Ms. Henry?

16           *MS. HENRY:*  The witness testified that that was the

17   entirety of the price proposal that was received.  And the

18   government's own witness, Ms. Bieganowska -- I may have

19   mispronounced her name -- did in fact testify that these were

20   all the attachments to that exhibit.

21           *THE COURT:*  All right.  Exhibits 1025 and 1026 about

22   which Ms. Bieganowska testified will be admitted.  The

23   objections to 1023 and 1024 will be sustained.  They are

24   hearsay.

25           *MS. HENRY:*  Ms. Bieganowska did, in fact, testify with

Robert Lewis - Cross

1    regard to Exhibits 1024 and 1025 as well as 1026, and I have

2    the testimony of Ms. Bieganowska in front of me.

3         THE COURT:  What's the point of making that comment?

4    She testified as to authenticity.  She did not testify -- she

5    couldn't testify anything as to a hearsay exception.

6         MS. HENRY:  Correct.  Thank you, Your Honor.

7         Can we please publish to the jury 1023?

8         THE COURT:  1023?  That's been refused.

9         MS. HENRY:  I am sorry, I misunderstood.

10        THE COURT:  1023 and 1024 are refused.  1025 and 1026

11   are admitted.

12   BY MS. HENRY:

13   Q.  Mr. Lewis, do you recall that Mr. Kantola was suggesting

14   that they might even be able to increase their availability to

15   KFC by 250 percent?

16   A.  I remember that there would be an increase, but I don't

17   recall what percentage.

18   Q.  But you recall that Mr. Kantola was seeking to increase

19   volume from KFC in the negotiations, correct?

20   A.  Yes.

21        MS. HENRY:  If we turn back to the government's

22   notebook, Government Exhibit 1122, which I believe has already

23   been admitted into evidence.

24        THE COURT:  It has.

25        MS. HENRY:  And if we could -- Your Honor, may I move

Robert Lewis - Cross

1   to the viewer for a moment?

2          THE COURT:  I'm sorry?  Yes, you may.

3   BY MS. HENRY:

4   Q.  First of all, could we turn on Government Exhibit 1122 to

5   Page -- and it's got the Bates numbers at the bottom -- 956

6   ending Bates numbers.

7          THE COURT:  Ms. Henry, I guess we don't have a

8   microphone there, but I think --

9          MS. HENRY:  We do.  There we are.  Sorry about that.

10         THE COURT:  Do you mind repeating that?

11         MS. HENRY:  Yes.  RSCS, and it ends 956.

12  BY MS. HENRY:

13  Q.  Mr. Lewis, could you please let us know what is the

14  estimated volume per week for Koch for KFC eight-piece COB for

15  this contract that was for the year 2014?

16  A.  679,500 pounds per week.

17         MS. HENRY:  Okay.  And can we turn to Government

18  Exhibit 1123 and Page RSC and the last is 962.

19  BY MS. HENRY:

20  Q.  And this is the contract that you negotiated, correct,

21  Mr. Lewis?

22  A.  Yes, ma'am.

23  Q.  And what is the weekly volume commitment for KFC

24  eight-piece COB for that contract?

25  A.  1,139,000 pounds per week.

1522

Robert Lewis - Cross

1       MS. HENRY:  Can we show on the viewer here?  I think
2   I've written down.
3   BY MS. HENRY:
4   Q.  So Koch increased its volume in the 2014 negotiations for
5   the contract year 2015 through '17 by -- let's see, I'm not
6   really great at this, but I think it's roughly 500,000 pounds,
7   so we will just put -- okay.
8       MS. HENRY:  So let's turn to Government Exhibit 1126.
9   And I think this has already been admitted.
10      THE COURT:  Yes, it has.
11      MS. HENRY:  And if we turn to the last -- to
12   Page 1581.
13   BY MS. HENRY:
14   Q.  This is Pilgrim's contract.  And what is the estimated
15   annual volume there?
16      MR. TORZILLI:  I am going to object to the question.
17   The page that counsel is referring the witness to is for
18   further processed poultry products rather than COB products.
19      THE COURT:  Ms. Henry, did you hear the objection?
20      MS. HENRY:  I am sorry, I did not.
21      THE COURT:  Okay.  Then could you go to a microphone,
22   Mr. Torzilli, and repeat your objection?
23      MR. TORZILLI:  I object to the question because the
24   question counsel was attempting to pose to the witness referred
25   the witness to information regarding further processed poultry

Robert Lewis - Cross

1    products, as I understand it, rather than what I think counsel

2    intended to ask about which is chicken-on-the-bone products

3    which is on the preceding page.

4           MS. HENRY:  And I am going to thank Mr. Torzilli and

5    request that we do, in fact, go to the correct page.

6           THE COURT:  Okay.  The objection will be sustained.

7           MS. HENRY:  It's more of a clarification, and I thank

8    you very much.

9    BY MS. HENRY:

10   Q.  So what was the KFC eight-piece COB number for the 2015,

11   Mr. Lewis?

12   A.  The weekly volume commitment is 2,110,500 pounds.

13          MS. HENRY:  And let's lastly go to Government

14   Exhibit 1729.  And there we are looking at a page that ends

15   1565.

16   BY MS. HENRY:

17   Q.  And this was for the 2014 contract for Pilgrim's.  And how

18   much was the KFC eight-piece COB?

19   A.  2,670,435 pounds per week.

20          MS. HENRY:  So if we could go back to the viewer for a

21   moment.

22   BY MS. HENRY:

23   Q.  I think I've written down here pretty much correctly, have

24   I, Mr. Lewis?

25   A.  Yes.

Robert Lewis - Cross

1    *Q.*  This is the '14.  This is the '15.  This is the '15.  And

2    again Pilgrim's lost roughly 500,000; is that correct?

3    *A.*  Yes.

4    *Q.*  And Koch gained 500,000, correct?

5    *A.*  Roughly, yes.

6        *MS. HENRY:*  Now, can we pull up Government Exhibit

7    1243?  I believe that's already been admitted.

8        *THE COURT:*  Yes, it has been.

9    *BY MS. HENRY:*

10   *Q.*  So you recall --

11   *A.*  Ma'am, may I ask you to drop that down?

12   *Q.*  Thank you.  Good.  Keep reminding me.

13       Okay.  So you recall seeing these period pricing

14   charts, right?

15   *A.*  Yes.

16   *Q.*  We talked about them quite a bit.

17   *A.*  Yes.

18   *Q.*  And they were available to numerous people at RSCS, weren't

19   they?

20   *A.*  Yes.

21   *Q.*  And they were also available to folks outside of RSCS,

22   weren't they, the distributors, for example?

23   *A.*  Not these reports.  The prices they knew because they were

24   directly involved, but not these reports.

25   *Q.*  So they didn't get precisely these reports, but they got

Robert Lewis - Cross

1    the information that was in them.

2    A.  Part of this information, yes, ma'am.

3    Q.  They would get the information for the distributor that

4    they needed for the pricing, et cetera.

5    A.  Yes.

6    Q.  Now, this period 13 information, it wasn't available at the

7    time of the negotiations, was it?

8    A.  The 2015?

9    Q.  Right.

10   A.  No, ma'am.

11   Q.  So it wouldn't have had anything whatsoever to do with the

12   negotiation process that you've talked about here.

13   A.  This report?

14   Q.  Correct.

15   A.  That's correct.

16   Q.  Period 13.

17   A.  That's correct.

18   Q.  Nothing.

19   A.  Yes, ma'am.

20   Q.  So earlier when you met with the government, they showed

21   you a chart that had period nine pricing on it, didn't they?

22   A.  Yes.

23   Q.  And that pricing would have been for November -- or when

24   would that pricing have been for, September?

25   A.  It could be, depending on how the period would fall, could

Robert Lewis - Cross

1    be August, September, October.  Sometimes there was an overlap

2    into another month, but roughly September.

3    Q.  But it wouldn't have had the same theatrical dramatic

4    difference in the price between -- that was shown on -- and we

5    can up GX-10-4.

6             MR. TORZILLI:  Object to form.

7             THE COURT:  Overruled.

8             MS. HENRY:  And we can publish that to the jury

9    because it has been admitted?

10            THE COURT:  You can.

11   BY MS. HENRY:

12   Q.  And you didn't choose to put those numbers on that chart,

13   did you?

14   A.  I did not.

15            MS. HENRY:  We can take that down.  Thanks.

16   BY MS. HENRY:

17   Q.  Turning back to Mr. Bill Kantola here, is it fair to say

18   that you were not only friends, but felt that you had a good

19   working relationship?

20   A.  Yes, ma'am.

21   Q.  You tried to be fair with him and you believed he had been

22   fair with you.

23   A.  Yes.

24   Q.  And you personally don't have any knowledge at all that

25   Mr. Bill Kantola ever agreed to raise prices.

Robert Lewis - Cross

1   *A.*  No, ma'am.

2   *Q.*  You don't have any personal knowledge that he ever shared

3   prices with any competitor.

4   *A.*  No.

5   *Q.*  And you don't have any personal knowledge that he engaged

6   in any sort of a conspiracy to stabilize or maintain prices, do

7   you?

8   *A.*  No.

9   *Q.*  And you don't have any reason from your knowledge to

10  believe that he engaged in any conspiracy to fix prices or rig

11  bids, do you?

12  *A.*  No.

13          *MS. HENRY:*  Thank you very much, Mr. Lewis.

14          *THE COURT:*  Thank you, Ms. Henry.

15          Additional cross?

16          Mr. Pollack?

17          *MS. PREWITT:*  Nothing on behalf of Mr. Mulrenin, Your

18  Honor.

19          *THE COURT:*  All right.  Thank you.

20                     **CROSS-EXAMINATION**

21  *BY MR. POLLACK:*

22  *Q.*  Mr. Lewis, you've been asked a lot of questions by a lot of

23  lawyers; is that fair?

24  *A.*  Yes, sir.

25  *Q.*  And with every one of those questions you have done your

Robert Lewis - Cross

1    best to give us your honest answer, correct?

2    A.   Yes, sir.

3    Q.   And you have been asked about events that happened seven

4    years ago, correct?

5    A.   Seven years or more, yes.

6    Q.   Or more.  But nonetheless, you have done your best to give

7    your honest answers, correct?

8    A.   Yes, sir.

9    Q.   And you will do the same with me.

10   A.   Yes.

11   Q.   And it doesn't matter whether you are being asked by the

12   government or you are being asked by a defense attorney, you

13   are going to give your honest answers, right?

14   A.   Yes.

15   Q.   And to be clear, I think you have been asked this by some

16   of the attorneys, but I want to make sure it's clear for

17   everybody, you are not saying that you have knowledge that any

18   of the defendants participated in a conspiracy to align bids,

19   fix bids or anything like that, correct?

20   A.   That's correct, yes.

21   Q.   You're just here to give us your recollections of your own

22   participation in the 2014 price negotiations, correct?

23   A.   Yes.

24        MR. POLLACK:  I would like to call up for

25   identification what's been marked for identification only at

Robert Lewis - Cross

1   this point I-074.

2   *BY MR. POLLACK:*

3   *Q.* And this is an e-mail chain, but I am only going to ask

4   about the chain that begins at the bottom of the first page.

5            And that, Mr. Lewis, is an e-mail from you to Darrell

6   Keck of George's; is that correct?

7   *A.* Yes.

8   *Q.* Dated June 4th, 2014?

9   *A.* Yes.

10  *Q.* And it memorializes, does it not, an agreement that you had

11  reached with Mr. Keck?

12  *A.* Yes.

13  *Q.* And it was a regular part of your practice if you reached

14  an agreement over the phone or in person to set down the terms

15  in an e-mail so it would be memorialized, correct?

16  *A.* Yes.

17  *Q.* And you took care when you did that to try to be accurate

18  because you knew that people were going to rely on what you put

19  in that kind of an e-mail, correct?

20  *A.* I'm sorry, would you repeat?

21  *Q.* Sure.  When you did an e-mail trying to memorialize the

22  terms of an agreement, you knew it was important to be

23  accurate, correct?

24  *A.* Yes.

25  *Q.* And you knew that people were going to rely on it so it was

1530

Robert Lewis - Cross

1    important to get it right.

2    A.  Yes.

3         MR. POLLACK:  With that, Your Honor, I would move the

4    admission of I-074, but again only that bottom e-mail and I

5    will redact the remainder of it.

6         THE COURT:  Any objection to the admission of I-074 as

7    redacted?

8         MR. TORZILLI:  No objection.

9         THE COURT:  That portion of I-074 will be admitted.

10        MR. POLLACK:  Brian, can you call up and if we could

11   have the jury see I-074 as admitted?

12        THE COURT:  They may.

13   BY MR. POLLACK:

14   Q.  And so Mr. Lewis, again this is June of 2014, correct?

15   A.  June of -- yes.

16   Q.  And the agreement that you've reached with Mr. Keck of

17   George's is to buy an additional 64,000 pounds or two

18   truckloads of eight-piece chicken on the bone purple label for

19   six weeks beginning June 2nd and running through July 5th?

20   A.  Yes.

21   Q.  And does that mean two truckloads total during that

22   six-week period or does it mean two truckloads every week for

23   each of those six weeks?

24   A.  I don't remember specifically, but I'm going to say that it

25   was each week.

Robert Lewis - Cross

1   Q.  And that was over and above what George's was already

2   committed to supplying you through its 2014 contract that was

3   already in place, correct?

4   A.  Yes.

5   Q.  And because it was over and above the amount that was

6   agreed to in that 2014 contract, you had to reach a separate

7   agreement for this additional amount of chicken, right?

8   A.  Yes.

9   Q.  And because market conditions had changed since the 2014

10  agreement had been negotiated, you wouldn't necessarily expect

11  the price that you're paying here to be the same as the

12  contract price, correct?

13  A.  No.

14  Q.  No, you would not expect the price to be the same?

15  A.  That is correct.  I would expect the price to be different.

16  Q.  And when I say market conditions, in other words, since

17  that last contract was negotiated, the supply of chicken may go

18  up, the demand for chicken may go up or vice versa, correct?

19  A.  Yes.

20  Q.  And if the supply has gone down and the demand has gone up,

21  you would expect that you would not be able to -- you would

22  have to negotiate a higher price, correct?

23  A.  Under these circumstances, yes.

24  Q.  And conversely, if supply had gone up and demand had gone

25  down, you would have hoped you would be able to negotiate a

1532

Robert Lewis - Cross

1    better price.

2    A.   Yes.

3    Q.   But in this instance what you negotiated was $1.30 a pound

4    FOB, correct?

5    A.   Yes.

6    Q.   And that was the price that RSCS on behalf of Kentucky

7    Fried Chicken was willing to pay given the current market

8    conditions, correct?

9    A.   Given the desperate situation we were in, yes.

10   Q.   Okay.  Exactly.  And, in fact, it's actually more than

11   $1.30 because that does not include the freight or delivery

12   charges, correct?

13   A.   Correct.

14   Q.   And as you go down the e-mail and carry over to the next

15   page, you're asking for even additional supply from George's

16   beyond that, correct?  I said asking.  You actually already

17   agreed to, correct?

18   A.   Yes.

19   Q.   And again you discuss the possibility of you freezing some

20   of that additional supply, correct?

21   A.   Yes.

22   Q.   And I think we've discussed this before.  Kind of as an

23   insurance policy for you if you were so desperate for chicken,

24   you would be willing to use frozen chicken at Kentucky Fried

25   Chicken stores rather than fresh chicken.

1533
Robert Lewis - Cross

1    *A.*  Yes, but there is also an advantage for the supplier that

2    could continue producing and freezing that product rather than

3    cutting back on production.

4    *Q.*  So it was good for both you, the customer, and for

5    George's, the supplier?

6    *A.*  Yes.

7    *Q.*  And that's probably why you were able to reach an

8    agreement, right?

9    *A.*  Yes.

10   *Q.*  Now, the government yesterday in its direct examination

11   showed you e-mails, individual e-mails that you had sent one to

12   each supplier, and they showed you e-mails that you had sent to

13   six different suppliers that were essentially identical.  Do

14   you remember that?

15   *A.*  Yes.

16        *MR. POLLACK:*  And let's start with 1134, which is

17   already in evidence.  I think we need that on the screen for

18   the jury if we can, Your Honor.

19        *THE COURT:*  Let me just double-check it.  I think

20   you're right.  I don't show 1134 as having been admitted.

21        *MR. POLLACK:*  I thought 1134, 35, 36, 37, 38 and 39

22   were all admitted together.  They were all one tab in the book.

23        *MR. TORZILLI:*  I believe we admitted those as a group

24   of one exhibits.

25        *COURT DEPUTY CLERK:*  It's in.

1534

Robert Lewis - Cross

1    THE COURT:  It's in.  It may be displayed.

2  BY MR. POLLACK:

3  Q.  So 1134, that was to one of the suppliers, Case, correct?

4  A.  I don't see the 1134 you are referring to, but the e-mail I

5  am looking at is to Kevin Phillips at Case Farms.

6    MR. POLLACK:  Brian, can you scroll down the screen so

7  Mr. Lewis can see the exhibit number?

8  BY MR. POLLACK:

9  Q.  So 1134 was to Case.

10  A.  Yes.

11  Q.  And 1135 was to Koch.

12  A.  Yes.

13  Q.  And 1136 was to Mar-Jac.

14  A.  Yes.

15  Q.  And 1137 was to Claxton.

16  A.  Yes.

17  Q.  1138 was to Tyson's.

18  A.  Yes.

19  Q.  1139 was to Pilgrim's.

20  A.  Yes.

21  Q.  And that's six.

22    The government didn't even show you your communication

23  with George's, did they?

24  A.  I don't recall.

25  Q.  Okay.  The government did show you some responses that you

Robert Lewis - Cross

1   got as a result of sending out those e-mails.  Do you recall

2   that?

3   A.   Yes.

4   Q.   I believe the government showed you Exhibit 1028 which is

5   in evidence.

6   A.   I don't recall.  Are you looking for an answer?  I'm sorry.

7        MR. POLLACK:  No, we are waiting on the Court to

8   verify --

9        THE COURT:  Is 1128 in, Ms. Grimm?

10        MR. TORZILLI:  I think counsel was asking about 1028.

11        THE COURT:  1028.  That sounds familiar.  Let me

12   check, though.  Yes, that's in.  It may be displayed.

13        MR. POLLACK:  Thank you, Your Honor.

14   BY MR. POLLACK:

15   Q.   Do you recall, Mr. Lewis, the government showing you a

16   response you had gotten from Mar-Jac?

17   A.   Yes.

18   Q.   And the government also showed you 1104, again in evidence,

19   a response from Pilgrim's.

20   A.   I don't recall.

21        MR. POLLACK:  Again, we just need to wait for the

22   Court to verify that 1104 is in evidence.

23        THE COURT:  It is and may be displayed.

24        MR. POLLACK:  Thank you, Your Honor.

25   BY MR. POLLACK:

Robert Lewis - Cross

1    *Q.* And so that was a response from Pilgrim's that the

2    government showed you, correct?

3    *A.* I don't recall. I would remember any attachments better

4    than I would the correspondence piece.

5    *Q.* Fair enough.

6         *MR. POLLACK:* If you can show 1105-1, which was the

7    attachment to the e-mail that I just showed you, and that is

8    also in evidence.

9         *THE COURT:* Correct. It may be displayed.

10   *BY MR. POLLACK:*

11   *Q.* Do you recall, Mr. Lewis, the government showed you that

12   response from Pilgrim's?

13   *A.* Yes.

14   *Q.* And finally, Mr. Lewis, the government showed you 1132 and

15   its attachment, 1133, both already in evidence. And this was a

16   response from Claxton.

17        *THE COURT:* They both have been admitted.

18   *A.* Yes.

19   *BY MR. POLLACK:*

20   *Q.* The government didn't show you a response from George's.

21   *A.* Yes. There was a presentation prepared by the George's

22   team that was in response to our request for a proposal.

23   *Q.* You are absolutely right. There was. It's Exhibit

24   No. 1008, but that wasn't shown to you by the government. That

25   was shown to you by Mr. Tubach, Mr. Penn's counsel. Do you

1537
Robert Lewis - Cross

1    recall that?

2    A.   That was shown to me by the government.

3         MR. POLLACK:   Okay.   Can we go ahead and put up 1008?

4         THE COURT:   Yes.

5         MR. POLLACK:   Can I inquire who moved that into

6    evidence?

7         THE COURT:   I don't have that record I am sorry to

8    say.

9         MR. POLLACK:   Thank you, Your Honor.

10   BY MR. POLLACK:

11   Q.   In any event, this is George's proposal -- or response, I

12   should say, correct?

13   A.   Yes.

14   Q.   To your inquiry.

15   A.   Yes.

16   Q.   And if we can look at -- and let me -- maybe I should

17   clarify.   When I asked about the government, the government

18   showed you this document when they were preparing you to

19   testify, correct?

20   A.   That's correct.

21   Q.   But they didn't show you this document during your

22   testimony.   The first time it appeared in court was when

23   Mr. Tubach used it.

24   A.   I don't remember.

25   Q.   Fair enough.   You can't remember every document you've been

Robert Lewis - Cross

1    shown in the last day and a half?  I don't blame you.

2    A.  No, sir, there is a lot of things I don't remember.

3    Q.  Fair enough.  You and me both.

4         Let's -- if we can look at Page 620, ends with the

5    Bates No. 620 of this presentation.  And this is the follow-up

6    that -- this starts a portion of the proposal -- I am sorry,

7    the portion of the document where George's is giving you their

8    response to your inquiry, correct?

9    A.  Yes.

10   Q.  Okay.  And what they actually do is they provide a couple

11   of different options in response.  If you look at the next

12   page, 621, it outlines an option one.  And if you go a couple

13   pages further to Page 623, it outlines an option two, correct?

14   A.  Yes.

15   Q.  Did all the suppliers offer multiple options like that or

16   was that unique to George's?

17   A.  That was -- I believe that was unique to George's to this

18   extent.

19        MR. POLLACK:  If we can look at 1160 which is also in

20   evidence, albeit for a limited purpose.

21        THE COURT:  It may be displayed.

22   BY MR. POLLACK:

23   Q.  And Mr. Lewis, this is the e-mail that you sent on

24   August 29th to all seven of the suppliers, correct?

25   A.  Yes.

Robert Lewis - Cross

1  Q.  And you send it to Darrell Keck as the person at George's,

2  correct?

3  A.  Yes.

4  Q.  And for the 2014 bid negotiation that you've testified

5  about, Mr. Keck was the person at George's with whom you

6  negotiated.

7  A.  He was the point person, yes.

8  Q.  I'm sorry, I didn't quite catch that.

9  A.  He was my main contact at George's.

10  Q.  He was your main contact.

11  A.  Yes.

12  Q.  And you were aware, were you not, that Mr. Keck was

13  Mr. Blake's boss?

14  A.  Yes.

15  Q.  And not only was Mr. Keck your main point of contact for

16  this negotiation, but you recalled that one of the Georges was

17  involved in the negotiations, correct?

18  A.  Yes.

19  Q.  So when it came to talking about prices, you were talking

20  not just with Mr. Keck, but with Mr. George.

21  A.  I only remember Mr. George's involvement in one meeting.  I

22  don't recall any other communication with him.

23  Q.  Okay.  And you knew, though, that Mr. George was Mr. Keck's

24  boss, correct?

25  A.  Yes.

1540

Robert Lewis - Cross

1   Q.  George's is a family-owned company?

2   A.  Yes.

3   Q.  And the George brothers were owners of the company,

4   correct?

5   A.  The George brothers were co-CEOs.  I am not sure really who

6   owned the company, but...

7   Q.  Co-CEOs meaning the highest ranking officials in the entire

8   organization, correct?

9   A.  Yes.

10  Q.  So your primary point of contact was Mr. Blake's boss, but

11  you knew that Mr. George, who was at least Mr. Blake's boss's

12  boss, was involved in the negotiations.

13  A.  Yes.

14          MR. POLLACK:  If we can go to 1121 which is also in

15  evidence.  This is the contract that RSCS signed with George's

16  at the end of this process, the 2015 to 2017 contract, 1121.

17          THE COURT:  Yes, it may be displayed.  It's in.

18  BY MR. POLLACK:

19  Q.  And I think -- if you can go to the bottom of the page, who

20  signs the contract on behalf of George's?

21  A.  Charles George.

22  Q.  Charles George who is one of the George brothers?

23  A.  Yes.

24          MR. POLLACK:  Thank you.  Let's pull up Government

25  Exhibit 10-4, which is also in evidence.

Robert Lewis - Cross

1        *THE COURT:*  That may be displayed.

2   *BY MR. POLLACK:*

3   *Q.*  Now, Mr. Tubach --

4        *COURT DEPUTY CLERK:*  I am sorry, Your Honor.  I don't

5   show this is admitted.

6        *THE COURT:*  This is Government Exhibit 10-4.

7        *COURT DEPUTY CLERK:*  10-4, thank you.

8   *BY MR. POLLACK:*

9   *Q.*  Mr. Tubach showed you the contract prices, some of which

10  are reflected on this document, correct?

11  *A.*  Yes.

12  *Q.*  And he also showed you some period prices at least as those

13  prices were reflected in RSCS's records, correct?

14  *A.*  Yes.

15  *Q.*  After looking at the documents that Mr. Tubach showed you,

16  would it be fair to say that the column that says 2014 Contract

17  Price (Period 1) and the column that says 2015 Contract Price

18  (Period 1), that the numbers that are in there are actually the

19  contract prices, not the period one prices with the exception

20  of Tyson's and for Tyson's the number is the period one price;

21  is that correct?

22  *A.*  Yes.

23  *Q.*  And so if you're comparing any of the others to Tyson, you

24  are not actually comparing apples to apples.  You are comparing

25  apples to oranges, correct?

Robert Lewis - Cross

1  A.  I'm not -- I'm not real clear about your question.

2  Q.  Sure.  Well, we saw that the period one price is not the

3  same as the contract price, correct?

4  A.  Yes.

5  Q.  So if we're taking some figures that are contract prices

6  and another figure that's a period one price, we're not

7  comparing apples to apples.

8  A.  My recollection is the document that you're referring to

9  was actually the contract price.  It was actually in the SBRA

10  addendum.

11  Q.  It was not the period one price?

12  A.  It was also -- well, what we were calling the period one

13  price.

14  Q.  And let's talk about the period prices.  This shows period

15  13 prices?

16  A.  Yes.

17  Q.  And there are 13 periods, 13 sets of period prices in any

18  given year?

19  A.  Yes, yes.

20  Q.  And I know because you testified about this you felt very

21  strongly, you do feel very strongly that one supplier should

22  not know the other supplier's period prices, correct?

23  A.  Correct.

24  Q.  But I want to be very clear, if all I know are the period

25  prices, the current prices, that does not tell me what any of

Robert Lewis - Cross

1   the suppliers are going to bid for the following year, does it?

2   A.   Could you ask that again?

3   Q.   Sure.  Pick a period, any period during the year.  Let's

4   say I learned what all of the suppliers' period prices were for

5   that period.  I knew what their current prices are.  Would that

6   alone tell me what they were going to bid in response to an RFP

7   for next year's contract?

8           MR. TORZILLI:  Objection, foundation.

9           THE COURT:  Overruled.  He can answer.

10  A.   No.

11  BY MR. POLLACK:

12  Q.   Now, let me see if I can find my paper copy.  I am afraid

13  my eyes are not quite good enough for the screen.

14          If you look at George's 2014 contract price, it's

15  .9215?

16  A.   Yes.

17  Q.   And their 2015 contract price was $1.307, correct?

18  A.   Yes.

19  Q.   So that's about an 11-cent increase, correct?

20  A.   Yes.

21  Q.   Not 15 to 20 cents, a little less than 11 cents, correct?

22  A.   Yes.

23  Q.   And according to the government's chart here for 2015,

24  George's margin -- and that's profit margin, correct?

25  A.   Yes.

Robert Lewis - Cross

1   Q.  -- was .1798.  Do you see that?

2   A.  Yes, yes.

3          MR. POLLACK:  Okay.  Now, let's go to -- back to 1121,

4   which was George's contract for 2015.  And if you can show us

5   where it gives the margin?

6   BY MR. POLLACK:

7   Q.  The way the government got that .1798 is they actually

8   added two figures together, the supplier margin and the big

9   bird adjustment, correct?

10  A.  Yes.

11  Q.  So the chart doesn't tell us that, but if you do the math,

12  you would agree with me that's what the government did?

13  A.  Yes.

14  Q.  And let's look at the supplier margin.  The supplier margin

15  is .0967 for the 2015 to 2017 contract?

16  A.  Is that a question for me?  I'm sorry, yes.

17  Q.  Yes.  For the 2015 to 2017 contract, George's supplier

18  margin was .0967?

19  A.  Yes.

20          MR. POLLACK:  Let's go back to 10-4.

21  BY MR. POLLACK:

22  Q.  And what was George's margin for the 2014 contract?

23  A.  .0967.

24  Q.  Exactly the same to the thousandth of a penny, correct?

25  A.  Yes.

1545

Robert Lewis - Cross

1      MR. POLLACK:  Let's go back to 1121, same page we were

2  looking at before with the margins.

3  BY MR. POLLACK:

4  Q.  What's different is on top of that margin there is a new

5  line item, big bird adjustment, correct?

6  A.  Yes.

7  Q.  And that's what you negotiated with Mr. Keck.  What RSCS

8  was getting under this contract was that George's was going to

9  set aside enough capacity to be able to supply small birds to

10  KFC for a three-year period.  That capacity couldn't be

11  converted to big birds because they had to provide -- they were

12  contractually obligated to provide supply to KFC, correct?

13  A.  Yes.

14  Q.  And big birds were more profitable, right?

15  A.  That's what they tell us.

16  Q.  Okay.  And so you accepted Mr. Keck's representation in

17  that regard and negotiated with him this adjustment to reflect

18  the loss of profitability that George's was going to incur by

19  continuing small bird production rather than converting to big

20  bird.

21      MR. TORZILLI:  Objection to the reference to Mr. Koch.

22      THE COURT:  He said Keck.  Overruled.

23  A.  Please ask the question again.

24  BY MR. POLLACK:

25  Q.  Sure.  It was Mr. Keck's position that George's should be

Robert Lewis - Cross

1    compensated for the fact that they were foregoing the

2    opportunity to move to big birds which were more profitable,

3    correct?

4    A.  Yes.

5    Q.  And as a result of your negotiation with Mr. Keck, you on

6    behalf of RSCS agreed to that extra 8 cents to reflect that,

7    correct?

8    A.  Yes.

9    Q.  And we just saw that the price increase that George's

10   obtained from 2014 to 2015 was 11 cents, right?

11   A.  Yes.

12   Q.  If only eight of those cents were -- is big bird

13   adjustment, the other three is because George's cost went up 3

14   cents, correct?

15   A.  Yes, you could say that, yes.

16   Q.  Okay.  So in reality what they got was an 8-cent increase

17   in their total profit margin.

18   A.  Yes.

19          MR. POLLACK:  And if we can go back to 10-4, and I

20   want to look at 2014.

21   BY MR. POLLACK:

22   Q.  George's had the second lowest price under the 2014

23   contract of the six companies reflected here; is that correct?

24   A.  Yes.

25   Q.  And if I'm right that the Tyson comparison is not apples to

Robert Lewis - Redirect

1   apples, if you throw out Tyson, George's actually had the

2   lowest price, correct?

3   A.   If you remove Tyson, George's is the lowest.

4   Q.   And under the 2015 contract George's has the lowest price,

5   correct?

6   A.   Yes.

7   Q.   Whether or not you include Tyson, correct?

8   A.   Yes.

9   Q.   In 2014 George's had the second highest profit margin of

10  any of these companies under this contract, correct?

11  A.   Yes.

12  Q.   Only Pilgrim's was higher.

13  A.   Yes.

14  Q.   But in 2015 of all of these companies George's had the

15  lowest profit margin; is that correct?

16  A.   Yes.

17          MR. POLLACK:   I don't have anything else, Mr. Lewis.

18  Thank you.

19          THE COURT:   I think we are ready for redirect.   Would

20  that be correct?

21          All right.   Redirect?

22                    **REDIRECT EXAMINATION**

23  BY MR. TORZILLI:

24  Q.   Good afternoon, Mr. Lewis.   How are you?

25  A.   I'm pretty good.   Thank you.

Robert Lewis - Redirect

1   Q.  You are going to be better in a few moments when I am done

2   with these questions which should be brief.

3   A.  Thank you.

4   Q.  I do want to follow up.  You have been asked numerous

5   questions, but I am just going to follow up on a few points

6   that have been raised with you either yesterday afternoon, this

7   morning or earlier this afternoon.

8          So first, AgriStats, you were asked about AgriStats.

9   You were asked about publication of information.  Do you recall

10  that?

11  A.  Yes.

12  Q.  Do you know of any publication, whether it's AgriStats or

13  any other publication, publishing RSCS bids that were received

14  from chicken suppliers?

15          MR. McLOUGHLIN:  Objection, lack of foundation, Your

16  Honor.  We haven't established that the witness here has any

17  knowledge of what services are available.

18          THE COURT:  Overruled.  He can answer the question.

19  A.  In 2014 I was not aware of any.

20  BY MR. TORZILLI:

21  Q.  Would you want or would you expect anyone to publish the

22  bids that RSCS received from the competing chicken suppliers?

23          MR. McLOUGHLIN:  Objection, relevancy.

24          THE COURT:  Overruled.

25          MR. KORNFELD:  Your Honor, I also think it's improper

Robert Lewis - Redirect

1    bolstering.  Objection.

2           THE COURT:  Overruled.

3    BY MR. TORZILLI:

4    Q.  You can answer, sir.

5    A.  Would you ask it again, please?

6    Q.  Sure.  Would you want or would you expect any publication

7    to be publishing the RSCS bids that were received from the

8    competing chicken suppliers?

9    A.  No.

10          MS. PREWITT:  Objection, Your Honor, compound

11   question.

12          THE COURT:  Overruled.  You can answer.

13   A.  No.  I answered no.

14   BY MR. TORZILLI:

15   Q.  Thank you, sir.

16          And why not?

17   A.  Well, it is protected confidential information that should

18   not be shared outside RSCS.

19   Q.  Did you ever ask competing chicken suppliers to discuss the

20   bids that they were submitting to RSCS?

21   A.  With each other?

22   Q.  With each other.

23   A.  No.

24   Q.  Why not?

25   A.  It's -- it's morally wrong.

Robert Lewis - Redirect

1    Q.  What do you mean by that?

2            MR. McLOUGHLIN:  Objecting, move to strike, Your

3    Honor.  Your Honor excluded this kind of testimony with respect

4    to Mr. Olson for I think a very good reason that this

5    gentleman's particular moral code is simply not relevant to

6    this proceeding.

7            THE COURT:  The objection will be overruled, but I

8    won't allow any more questions on the subject.

9            MR. TORZILLI:  Can he finish answering the question?

10           THE COURT:  I think he did finish answering.

11           MR. TORZILLI:  Thank you, Your Honor.

12   BY MR. TORZILLI:

13   Q.  You were asked about negotiations that you conducted with

14   chicken suppliers.  Do you recall that?

15   A.  Yes.

16   Q.  And you were asked about give and take and the fluid nature

17   of those negotiations.  Do you remember that?

18   A.  Yes.

19   Q.  Have you ever asked competing chicken suppliers to raise

20   their prices either together or individually?

21   A.  No.

22   Q.  Why not?

23   A.  Because our goal was to shop for the -- or negotiate for

24   the lowest price.

25   Q.  And in your view what's the most appropriate way to go

Robert Lewis - Redirect

1   about that?

2   A.   Confidential bidding process.

3   Q.   Sir, you were also asked on cross-examination about

4   communications that you may have had with other purchasers of

5   chicken including Mr. Mike Ledford.  Do you remember that?

6   A.   Yes.

7   Q.   Did you, Mr. Lewis, ever communicate with any other

8   purchaser of chicken about contract prices or about bids?

9   A.   No.

10  Q.   Why not?

11  A.   Well, that's against my moral standard.

12  Q.   You mentioned that contract price information in your view

13  is confidential.  Is that an accurate statement in your view?

14  A.   Yes.

15  Q.   Could you turn to Tab 1 of your binder that you hopefully

16  still have in front of you?

17  A.   I have three binders.

18       MR. TUBACH:   Your Honor, if we can have just an

19  exhibit number so we can locate the document.

20  BY MR. TORZILLI:

21  Q.   If you can turn to Tab 1.  And do you see the yellow

22  sticker there that says Government Exhibit 1729?

23  A.   Yes.

24  Q.   Now, the version of the first page of Government

25  Exhibit 1729 that you are looking at has no redactions on it;

Robert Lewis - Redirect

1    is that right?

2    A.   Yes.

3    Q.   Okay.  Can you tell me whether in the ordinary course of

4    RSCS's business --

5             MR. TUBACH:  Your Honor, I object.  This is beyond the

6    scope of cross-examination.

7             MR. KORNFELD:  The Court has already ruled, Your

8    Honor, on the admissibility of this document which does not

9    include the page that the witness is being asked about.

10            MR. TORZILLI:  Your Honor, the defendants asked this

11   witness about the publication of information by AgriStats which

12   raises the issue of what information is public and what

13   information is not public, so it seems perfectly appropriate

14   for redirect.

15            THE COURT:  I need to see what 1729 is.

16            MR. TORZILLI:  Your Honor, may I hand up a copy?

17            THE COURT:  Yes.

18            MR. TUBACH:  Your Honor, I believe it's in the binder

19   that I handed up during my cross-examination, if that helps the

20   Court.

21            THE COURT:  Let me look for that.

22            Okay.  Sorry, Mr. Torzilli.  So 1729 doesn't deal with

23   AgriStat info.

24            MR. TORZILLI:  It does have a confidentiality

25   designation.

Robert Lewis - Redirect

1          MR. KORNFELD:  Your Honor, I am going to object to

2     that -- excuse me for interrupting Mr. Torzilli -- and express

3     a concern that we're weighing into an issue that this Court

4     resolved via motions *in limine*.

5          THE COURT:  Well, I think that this question is beyond

6     the scope.  I will sustain that.

7          MR. GILLEN:  Your Honor, may we have a side bar on

8     this?

9          THE COURT:  I have ruled already on this issue for

10    this particular line of questioning with Mr. Lewis.

11         MR. KORNFELD:  Your Honor, I would also ask that

12    Mr. Torzilli's prior comment be stricken from the record

13    regarding what is on that page.

14         THE COURT:  Statements of attorneys are not evidence.

15    The request is denied.

16         Go ahead.

17         MR. TORZILLI:  May I proceed?

18         THE COURT:  Yes.

19         MR. TORZILLI:  Thank you, Your Honor.

20         If we can call up Government Exhibit 10-4.

21         And Mr. Lewis, if you can look in the binder, I

22    believe it's Tab 31.  Let me know when you are there, sir.

23         Your Honor, this is received in evidence.  Permission

24    to publish?

25         THE COURT:  Yes.  And Mr. Torzilli, is this your copy

Robert Lewis - Redirect

1    of 1729?

2              *MR. TORZILLI:*  Yeah, may I retrieve that?

3              *THE COURT:*  Yeah, you may retrieve that.

4              *MR. TORZILLI:*  Thank you, Your Honor.

5    *BY MR. TORZILLI:*

6    *Q.*  You recognize this exhibit, correct?

7    *A.*  Yes.

8    *Q.*  Did you prior to starting your testimony yesterday do

9    anything to verify the accuracy of the information, the numbers

10   contained on this exhibit?

11   *A.*  Yes.

12   *Q.*  Can you explain to the Ladies and Gentlemen of the Jury

13   what you did to verify the information, the numbers that appear

14   in this exhibit?

15   *A.*  I pulled up the contracts for 2014 and took the information

16   that was on that signed document and recorded for the contract

17   price and the margin, and I did the same thing for '15, 2015.

18   And then I used the summary report that we looked at earlier to

19   get the period 13 prices for 2014.

20   *Q.*  And after you did what you just described to the Ladies and

21   Gentlemen of the Jury, what did you conclude about the accuracy

22   of the information contained in Government Exhibit 10-4?

23   *A.*  According to those documents, all of these numbers are

24   accurate.

25              *MR. TORZILLI:*  Thank you.  I have one short series of

Robert Lewis - Redirect

1    questions.  I just need to grab a document and I will be right

2    back.

3    *BY MR. TORZILLI:*

4    *Q.*  Mr. Lewis, if you can turn to Tab 30 of the binder you have

5    in front of you, you should find what's been marked as

6    Government Exhibit 1133.  Let me know when you're there.

7    *A.*  Yes.

8    *Q.*  What is Government Exhibit 1133?

9    *A.*  It is the second page of the SBRA addendum for Claxton

10   Poultry.

11          *MR. TORZILLI:*  And, Your Honor, if I may ask

12   permission to publish.  I believe this has been received in

13   evidence.

14          *THE COURT:*  It has, and you may publish it.

15          *MR. TORZILLI:*  Thank you.  And if we could go to the

16   next page of Exhibit 1133.

17   *BY MR. TORZILLI:*

18   *Q.*  Mr. Lewis, I would like to direct your attention towards

19   the bottom of the page.  Do you see the Total FOB Plant Cost

20   entry there?

21   *A.*  Yes.

22   *Q.*  And do you see right above it there is an entry?  It's a

23   three-word entry?  Do you see it?

24   *A.*  Yes.

25   *Q.*  What's that three word entry say?

Robert Lewis - Redirect

1    A.  Big Bird Profitability.

2    Q.  And does that tell you something about the nature of the

3    entry associated with those figures there?

4    A.  It tells me that --

5            MR. McLOUGHLIN:  Objection, Your Honor.  The document

6    speaks for itself.

7            THE COURT:  Overruled.  He can answer.

8    A.  It tells me that that's what the suppliers are -- well,

9    this supplier is receiving for profit for their big birds.

10   BY MR. TORZILLI:

11   Q.  So that's a type of profit that the competing chicken

12   suppliers were trying to garner from RSCS at the time?

13           MR. TUBACH:  Objection, Your Honor.  There is one

14   supplier, Your Honor, not multiple suppliers.

15           MR. KORNFELD:  Also misstates the evidence, also

16   leading.

17           THE COURT:  I will sustain it on leading grounds.

18   BY MR. TORZILLI:

19   Q.  Mr. Lewis, can you explain what you understand the entry

20   Big Bird Profitability to mean as it appears in Government

21   Exhibit 1133?

22   A.  That is added to the number two lines above of 10 cents

23   that actually equals a profit of 22 cents per pound.

24   Q.  And Mr. Lewis, were all the competing chicken suppliers

25   that you were negotiating with in 2014 asking for the same or

1   similar type of additional price?

2   *A.*   Yes.

3            MR. TORZILLI:   Your Honor, a moment to confer?

4            THE COURT:   You may.

5            MR. TORZILLI:   Nothing further.   Thank you, Your

6   Honor.

7            THE COURT:   Is Mr. Lewis subject to recall?

8            All right.   Mr. Lewis, the time has arrived.   You are

9   excused.

10           THE WITNESS:   Thank you, Your Honor.

11           THE COURT:   Ladies and gentlemen, why don't we go

12  ahead and take the mid-afternoon break even though it's a

13  little early since it's a breaking point.   Why don't we plan on

14  reconvening at 3:30.   The jury is excused for the afternoon

15  break.

16           (Jury excused.)

17           THE COURT:   We will be in recess.

18      (Recess at 3:10 p.m.)

19           THE COURT:   Mr. Tubach?

20       MR. TUBACH:   One brief preliminary matter.   Any

21  cross-examination conducted for Mr. Penn will be done by Brian

22  Quinn, our associate, who has entered an appearance in the

23  matter.

24           MR. FAGG:   Your Honor, for Mr. Lovette it will be

25  Kaitlin Price.

Sara Fisher - Direct

1          THE COURT:  Ms. Price?

2          MR. FAGG:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. FELDBERG:  For Mr. Austin it will be Ms. Carwile.

5          THE COURT:  I know Ms. Carwile, but not Mr. Quinn and

6    Ms. Price, so I appreciate the introductions.

7          All right.  Let's bring the jury in.

8          (Jury present.)

9          The United States may call its next witness and we

10   have the witness right there.

11         MS. SWEENEY:  The United States calls Sara Fisher who

12   is present in the courtroom.

13      (**Sara Fisher** was sworn.)

14         THE WITNESS:  Yes.

15         COURT DEPUTY CLERK:  Please state your full name and

16   spell your first and last name for the record.

17         THE WITNESS:  Sara Fisher, S-A-R-A, F-I-S-H-E-R.

18                     **DIRECT EXAMINATION**

19   BY MS. SWEENEY:

20   Q.  Good afternoon, Ms. Fisher.

21         Are you employed?

22   A.  Yes.

23   Q.  What's your employer?

24   A.  Restaurant Supply Chain Solutions.

25   Q.  Does it go by a different name sometimes?

Sara Fisher - Direct

1    A.   Yes, RSCS.

2    Q.   If I call your employer RSCS, will you understand what I'm

3    referring to?

4    A.   Yes.

5    Q.   Has it ever gone by any other names?

6    A.   Yes.  Unified Foodservice Purchasing Co-op and the KFC

7    National Purchasing Co-op.

8    Q.   And for the name Unified Foodservice Purchasing Co-op, does

9    that have a short name?

10   A.   Yes, UFPC.

11   Q.   What's the city and state of your current work location?

12   A.   Louisville, Kentucky.

13   Q.   And what's the city and state location of RSCS's

14   headquarters?

15   A.   Louisville, Kentucky.

16   Q.   Do you work at the headquarters?

17   A.   Yes.

18   Q.   And Ms. Fisher, how long have you been employed with RSCS?

19   A.   Almost 14 years.

20   Q.   When did you start?

21   A.   March of 2008.

22   Q.   Briefly, what does RSCS do?

23   A.   We are the sole supply chain arm for Yum Brands.

24   Q.   What are the Yum Brands?

25   A.   KFC, Pizza Hut, Taco Bell and Habit Burger Grill

Sara Fisher - Direct

1    restaurants.

2    Q.   And what is Habit Burger Grill?

3    A.   It's kind of a fast casual burger chain that Yum recently

4    purchased.

5    Q.   What is KFC?

6    A.   Kentucky Fried Chicken.

7    Q.   What's your current position at RSCS?

8    A.   Senior director of distribution in Habit Burger Grill.

9    Q.   How long have you been there?

10   A.   Since April of 2021.

11   Q.   What was your immediate prior position?

12   A.   Director of food procurement.

13   Q.   How long were you there?

14   A.   March 2019 to March 2021.

15   Q.   And your immediate position prior to that?

16   A.   Senior manager of poultry procurement.

17   Q.   When were you in that position?

18   A.   June of 2016 to March of 2019.

19   Q.   What were your responsibilities as the senior manager of

20   poultry procurement?

21   A.   I was responsible for contract negotiations and also

22   ensuring supply.

23   Q.   Did you hold any positions at RSCS prior to the senior

24   manager of poultry procurement?

25   A.   Yes.  I came in as a credit analyst in the accounting

Sara Fisher - Direct

 1    department and also worked on the KFC program management team.

 2    Q.   Do you have any post high school education?

 3    A.   Yes.

 4    Q.   What did you study?

 5    A.   Finance.

 6    Q.   And where did you study?

 7    A.   At Western Kentucky University.

 8    Q.   Did you receive a degree?

 9    A.   Yes, a bachelor's in finance.

10    Q.   Did you have any employment after college and before you

11    joined RSCS?

12    A.   Yes.   I worked at First Investors for a short time and also

13    Chase Bank.

14    Q.   So let's turn back to your role as senior manager of

15    poultry procurement.   You said you were there in 2016 to 2017;

16    is that right?

17    A.   June 2016 to March 2019.

18    Q.   2019, thank you.   Who did you report to?

19    A.   Rich Eddington.

20    Q.   And you said that your responsibilities were contract

21    negotiation and ensuring supply; is that right?

22    A.   Yes.

23    Q.   Could you describe what you mean by contract negotiation?

24    A.   We were responsible for negotiating the pricing and also

25    committing of volumes for the KFC chicken-on-the-bone product.

Sara Fisher - Direct

1    *Q.*  When you say KFC chicken-on-the-bone product, what

2    specifically are you talking about?

3    *A.*  It's fried chicken.

4    *Q.*  Was there only one product, the fried chicken, that you

5    were responsible for?

6    *A.*  There was eight-piece chicken on the bone and there was

7    also supplemental dark meat and supplemental split breast,

8    wings and livers and gizzards.

9    *Q.*  Let's start with the first item that you mentioned,

10   eight-piece -- chicken on the bone, excuse me.  What is it used

11   for?

12   *A.*  It's used for fried chicken.

13   *Q.*  And how many pieces are included, if any?

14   *A.*  It's an eight-piece cut.

15   *Q.*  Can you describe what that means?

16   *A.*  It just means that the chicken is cut into eight pieces.

17   *Q.*  And during the time when you were a senior manager of

18   poultry procurement, what size bird did that come from?

19   *A.*  A small bird.

20   *Q.*  Turning to some of the other products that you described,

21   the supplemental products, what is supplemental dark meat?

22   *A.*  It's the drums and the thighs.  And there are certain parts

23   of the country that the customers prefer dark meat over white

24   meat, so we offered that as a supplemental item so that those

25   restaurants could carry more dark meat than just what comes in

Sara Fisher - Direct

1   the eight-piece.

2   Q.  During the time that you were in the position of senior

3   manager of poultry procurement, what size bird did the

4   supplemental dark meat come from?

5   A.  Small bird.

6   Q.  You also mentioned supplemental split breast.  Can you

7   describe what that is?

8   A.  Similar to the dark meat, there is certain areas of the

9   country that preferred white meat more than dark meat, so we

10  offered that as a way for restaurants to purchase more white

11  meat.

12  Q.  What product did that go into?

13  A.  The fried chicken.

14  Q.  What size bird did the supplemental split breast come from

15  while you were the senior manager of poultry procurement?

16  A.  Small bird.

17  Q.  You also mentioned wings.  Could you describe what wings

18  are?

19  A.  Same thing as the others, just supplemental, that if

20  restaurants needed those if their customers preferred more

21  wings, that they could purchase those separate from the

22  eight-piece.

23  Q.  Would you tell the jury what size bird the supplemental

24  wings came from?

25  A.  A small bird.

1564

Sara Fisher - Direct

1   Q.  And finally you mentioned liver and gizzards.  Could you

2   describe what those are used for?

3   A.  They were certain areas of the country that like to eat

4   livers and gizzards.

5   Q.  What products did they go into?

6   A.  They were served as fried livers and gizzards.

7   Q.  And what size bird did those come from?

8   A.  Small bird.

9   Q.  So when you were senior manager of poultry procurement,

10  were you responsible for the negotiations relating to small

11  bird?

12  A.  Yes.  I was new to the role and so I was learning, and I

13  was responsible for all of the communication and kind of behind

14  the scenes analysis.

15  Q.  And of the chicken products that you've described related

16  to KFC, which was the largest by volume?

17  A.  The eight-piece.

18  Q.  And the eight-piece, could you describe further what that

19  was?

20  A.  The eight-piece chicken on the bone.

21  Q.  Is chicken on the bone sometimes described in a shorter

22  way?

23  A.  Yes, COB.

24  Q.  Was the eight-piece COB important for KFC?

25  A.  Yes.

Sara Fisher - Direct

1   *Q.* Why is that?

2   *A.* It was their main item on the menu.

3   *Q.* While you were the senior manager of poultry procurement,

4   about how much chicken did KFC purchase every year?

5   *A.* It's about 400 to 500 million pounds a year.

6   *Q.* And that would be per year you said?

7   *A.* Yes.

8   *Q.* So when you said you had responsibility for fresh chicken,

9   practically on a day-to-day level what did that mean?

10  *A.* I was responsible for making sure that the products that

11  was being produced at the suppliers went -- got through

12  distribution into the restaurants to support their business.

13  *Q.* In your position in -- as a senior manager of poultry

14  procurement, did you actually buy chicken for the KFC

15  restaurants?

16  *A.* No. RSCS doesn't take title to product, so we negotiate

17  the pricing and the volume commitments, but we don't actually

18  purchase the product.

19  *Q.* So who did purchase the product?

20  *A.* Distributors purchased from suppliers and restaurants

21  purchased from distributors.

22  *Q.* Could you just walk us through how would the chicken get

23  from the supplier ultimately to the restaurant?

24  *A.* So we would direct what distributors purchased from what

25  suppliers. And then -- or distributors would place a purchase

Sara Fisher - Direct

1   order with suppliers.  Either suppliers would ship to the

2   distributor or the distributor would pick up.  And then

3   restaurants would place orders with the distributors and

4   distributors would ship to the stores.

5   Q.  Were there any KFC stores in California?

6   A.  Yes.

7   Q.  Were there any of the KFC chicken suppliers in the time

8   that you were senior manager of poultry procurement that had --

9   that supplied from California?

10  A.  No, not that we were working with.

11  Q.  So the chicken would travel from the supplier into

12  California through that chain that you just described?

13  A.  Correct.

14  Q.  You mentioned your role in procurement at RSCS involved

15  negotiating contracts; is that right?

16  A.  Yes.

17  Q.  Could franchisees, could the restaurants themselves buy

18  chicken outside of these contracts that you negotiated?

19  A.  No.  They have to purchase from approved Yum distributors.

20  And then they -- the Yum distributors purchased from the

21  suppliers based on our contract negotiations.

22  Q.  And in your time as senior manager of poultry procurement,

23  which is what we'll be talking about today, who were the

24  approved chicken suppliers?  Which chicken suppliers were

25  approved that you just described?

Sara Fisher - Direct

1    A.  There were eight.  Do you want me to list them?

2    Q.  Yes, please.

3    A.  Case Farms, Claxton, George's, Mar-Jac, Pilgrim's, Tyson,

4    OK Foods, and I am missing one.

5    Q.  And we can come back to that.

6    A.  Okay.

7    Q.  So when you were in your position, did you actually -- were

8    you actually involved in the negotiations process?

9    A.  Yes.

10   Q.  What contract were you involved in the negotiation for?

11   A.  The 2018, '19 and '20.

12   Q.  And when did those negotiations begin?

13   A.  We sent out the initial letters in December of 2016.

14   Q.  Can you describe how that 2016, 2017, how that negotiations

15   process worked?

16   A.  So we went through an RFP process.  We kicked it off in

17   December of 2016.  We had each of the suppliers come in and

18   present their round one bids, proposals to us in person, and

19   then there was some further negotiation and then awards were

20   given.

21   Q.  Let's break that down.  You mentioned in the beginning

22   there was an RFP.  What is an RFP?

23   A.  It's just the formal kind of contract negotiation process

24   where you have an initial kickoff, and then you have several

25   rounds of proposals that are submitted before awards are given.

Sara Fisher - Direct

1    Q.  When you use the word kickoff, could you describe further

2    what you mean?

3    A.  We sent an e-mail just letting everyone know we were ready

4    to start the contract negotiations and what the timing of the

5    first round would look like.

6    Q.  And who received that e-mail?

7    A.  There were eight suppliers.

8    Q.  And then you discussed rounds of bidding.  Can you describe

9    what a round of bidding is?

10   A.  Each supplier would be -- if they were interested in

11   bidding on the business, would provide a proposal back to us

12   and that would be kind of round one.  That's where we had the

13   suppliers come in and present those.  And then there was a

14   second round where we -- further negotiations where they

15   provide revised bids.

16   Q.  And at the end you said there was an award.  Can you

17   describe what an award is?

18   A.  It was basically awards from a volume standpoint based on

19   the negotiations, so it would be an SBRA contract that we would

20   put in place that would have pricing and volume and plant

21   locations.

22   Q.  So an award is a contract?

23   A.  Yes.

24   Q.  And at the end of the negotiations process you were

25   involved in, how many of the eight suppliers that you sent the

Sara Fisher - Direct

1    kickoff e-mail to received awards?

2    *A.*   All eight.

3    *Q.*   So there were more than one?

4    *A.*   Yes.

5    *Q.*   Did you understand the suppliers at the time to be

6    competitors?

7    *A.*   Yes.

8    *Q.*   If they all won business, can you describe how you viewed

9    them as competitors?

10   *A.*   Because they were separate companies that were bidding on

11   our -- in a competitive contract negotiation bidding on

12   business.

13   *Q.*   What were they competing for?

14   *A.*   Volume of fresh chicken.

15   *Q.*   So for the contract -- I think you answered this already --

16   the contract that was negotiated in 2016 and 2017, can you just

17   remind me when that went into effect?

18   *A.*   It was for the calendar years '18, '19 and '20.

19   *Q.*   So it was a three-year contract?

20   *A.*   Yes.

21   *Q.*   Do you know -- are you aware of why there was a three-year

22   contract?

23   *A.*   Yes.  We were concerned about capacity.  And we wanted to

24   partner with the poultry suppliers and ensure that we had

25   capacity for long-term in the small bird space.

1570

Sara Fisher - Direct

1    Q.   And so how does that capacity concern relate to the

2    three-year contract?

3    A.   We wanted to lock in a longer term contract so that we knew

4    that we had that capacity over the three years.

5    Q.   So you mentioned earlier that the items that were in the

6    contract or in the award were volumes, price and plant

7    location; is that right?

8    A.   Yes.

9    Q.   Of these factors was any one more important to you than the

10   others during your contract negotiations?

11   A.   I mean, they are all very important.  Our goal is to get

12   the lowest landed cost to our restaurants, but plant location

13   plays a factor into that because from a geographic standpoint

14   where you're shipping.  So we're looking at the lowest landed

15   cost, not necessarily just the FOB, so they are all very

16   important.

17   Q.   So you mentioned FOB and lowest landed cost.  If we can

18   start with FOB.  What is FOB?

19   A.   FOB is the price of the product at the supplier before it

20   ships.

21   Q.   So would that be the cost of the product?

22   A.   Yes.

23   Q.   And what is lowest landed cost?

24   A.   That's the cost into the restaurants.

25   Q.   So can you describe further what that means?

Sara Fisher - Direct

1    A.   So there is added cost from -- once you purchase the

2    product, there is freight cost to get it from supplier to

3    distributor and distributor to store.  And there is distributor

4    markup and other costs that are associated that are added on to

5    that FOB.

6    Q.   You said your goal was to get the lowest landed cost?

7    A.   Yes.

8    Q.   Are you familiar with the term pricing parity?

9    A.   Yes.

10   Q.   What is it?

11   A.   When prices are the same.

12   Q.   Was that in any way involved in your contract negotiations?

13   A.   I mean, we tried to get the prices as close as possible,

14   but we know that with the plants in different locations and

15   different costs to produce, that that will never be the case,

16   so that wasn't the goal I would say.

17   Q.   So pricing parity was not your goal?

18   A.   No.

19   Q.   What, if anything, did you do with regard to pricing

20   parity?

21   A.   I don't know that I understand the question.  Sorry.

22   Q.   Sure, thank you.  I will ask a different question.

23        What, if anything, did you expect with regard to

24   pricing parity?

25   A.   I mean, we expected -- like I said, the prices from

1572

Sara Fisher - Direct

1    different plants, it's -- the cost to produce is always

2    different depending on plant location, so the expectation would

3    be that the prices are -- would be different, but we would try

4    to get them as close as possible.

5    Q.   And how would you do that?

6    A.   Through negotiation.

7    Q.   During that contract negotiation that you were a part of,

8    did you ever tell the chicken suppliers about your pricing

9    parity expectations?

10   A.   No.

11   Q.   Did you ever tell the chicken suppliers to coordinate on

12   pricing to help RSCS achieve pricing parity?

13   A.   No.

14   Q.   Why not?

15   A.   Because it was competition.  It's not the right thing to

16   do.  And for us it was a competitive bidding process and we're

17   trying to negotiate down, so we wouldn't want them sharing

18   confidential information with each other.

19   Q.   Not even to help you attain the pricing parity?

20   A.   No.

21   Q.   You said confidential information.  What specifically were

22   you referring to?

23   A.   Just the pricing that was submitted.  It's confidential

24   when we receive it.  We keep that information confidential.  We

25   don't share it with other suppliers.

Sara Fisher - Direct

1    Q.  So turning back to the actual negotiations, we've been

2    talking a little bit about the negotiations process.  When did

3    the negotiations begin for the contract that went into effect

4    in 2018?

5    A.  The initial kickoff was in -- the e-mail was sent in

6    December of 2016 and the first initial meetings were January of

7    2017.

8    Q.  So entering that RFP cycling or that RFP process, what did

9    you hope to achieve?

10   A.  We were hoping to achieve price reduction just based on

11   what we were aware of current prices and obviously locking in

12   the supply that we needed to support the restaurants.

13   Q.  And when you say current prices, was there a contract that

14   was already in place when you started negotiating the next

15   contract?

16   A.  Yes.

17   Q.  And when was that contract -- when did that contract start?

18   A.  I didn't negotiate that contract, so I don't know exactly

19   when it started.

20   Q.  Do you know the term, how long that contract was?

21   A.  I believe it was a three or four-year contract.  I am not

22   quite sure.

23   Q.  And do you know when the contract ended?

24   A.  It ended -- the contract started in 2018, so I believe it

25   ended in 2017.

Sara Fisher - Direct

1    Q.  Did you have any concerns going into that contract

2    negotiations for the 2018 contract?

3    A.  We were concerned with capacity.  That's why we started our

4    negotiations early, because we wanted to make sure that we

5    locked the capacity that we needed.

6    Q.  There should be in front of you a binder.

7           MS. SWEENEY:  And, Your Honor, I believe you have it

8    as well.

9    BY MS. SWEENEY:

10   Q.  I would like to direct your attention to Tabs 1 through 8.

11          And for the record, that's Government Exhibits 1921,

12   1922, 1923, 1924, 1926, 1927, 1928, and 1929.

13          If you could take a look at them and look up at me

14   when you're ready.

15          Are you ready?

16   A.  Yes.

17   Q.  Ms. Fisher, do you recognize these documents?

18   A.  Yes.

19   Q.  Generally, what are they?

20   A.  They are the e-mails that I sent in December of 2016 to

21   kick off the RFP.

22   Q.  And do they relate to the formal RFP process you were

23   describing earlier?

24   A.  Yes.

25   Q.  Who sent these e-mails?

Sara Fisher - Direct

1    A.  I did.

2    Q.  And when were they sent?

3    A.  December 9th, 2016.

4    Q.  Do they contain information about events that have happened

5    in the past?

6    A.  No.

7    Q.  Do they contain information about events that are happening

8    in the future?

9    A.  Yes.

10   Q.  And are these e-mails that we've looked at true and

11   accurate copies of documents as you received them?

12   A.  Yes.

13   Q.  How do you know that?

14   A.  I went back and checked my e-mail files.

15          MS. SWEENEY:  The government moves to admit the

16   exhibits in Tabs 1 through 8.  That's 1921, 22, 23, 24, 26, 27,

17   28 and 29.

18          THE COURT:  Is there a 1925?

19          MS. SWEENEY:  There is not a 1925.

20          THE COURT:  Okay, got it.  Any objection to the

21   admission of those exhibits?  All right.  Then each of those

22   exhibits will be admitted.

23   BY MS. SWEENEY:

24   Q.  Ms. Fisher, at this point I would like to direct your

25   attention to Tabs 9 through 16.

Sara Fisher - Direct

1           And for the record that's Government Exhibits 1942,

2    1943, 1944, 1945, 1946, 1947, 1957 and 1958.  There is also a

3    gap in that one.

4           And you can look up at me when you're ready.

5           Are you ready?

6    A.   Yes.

7    Q.   Do you recognize these documents?

8    A.   Yes.

9    Q.   Generally, what are they?

10   A.   They are meeting invitations that I sent to each of the

11   suppliers for the initial meeting to -- for them to provide

12   their round one bids.

13   Q.   And did you say you sent these invitations?

14   A.   Yes.

15   Q.   And were they part of the formal RFP process that you

16   described earlier?

17   A.   Yes.

18   Q.   Are these true and accurate copies of the invitations as

19   you sent them?

20   A.   Yes.

21   Q.   How do you know that?

22   A.   I checked my e-mail.

23   Q.   And you confirmed?

24   A.   Yes.

25            MS. SWEENEY:  The government moves to admit these

Sara Fisher - Direct

1   records as well.

2          THE COURT:  Any objection to 1942 through 1946 and

3   1957 through 1958?

4          Is that the whole list?

5          MS. SWEENEY:  And 1947, Your Honor.

6          THE COURT:  Okay, and 1947 too.  Okay.  Any objection

7   to those exhibits?  Each of those will be admitted as well.

8   BY MS. SWEENEY:

9   Q.  I would now like to turn your attention to Tab 17 in your

10  binder which is Government Exhibit 8-2.

11  A.  Okay.

12  Q.  Do you recognize this document?

13  A.  Yes.

14  Q.  Have you seen it before?

15  A.  Yes.

16  Q.  Generally what is it?

17  A.  It is a summary chart of the documents that we just looked

18  at.

19  Q.  And you said you have seen it before today?

20  A.  Yes.

21  Q.  In what context?

22  A.  In this binder.

23  Q.  Did you do anything to confirm that the information

24  contained in this document is accurate?

25  A.  Yes.  It matches the e-mails and the invites.

Sara Fisher - Direct

1    Q.  And how did you confirm that?

2    A.  I checked -- I compared the two.

3    Q.  And is it accurate?

4    A.  Yes.

5            MS. SWEENEY:  The government moves to admit Government

6    Exhibit 18-2.

7            THE COURT:  What tab is that?

8            MS. SWEENEY:  Tab 17, Your Honor.

9            MS. JOHNSON:  Maybe I misheard, but I thought

10   Ms. Sweeney said 8-2.  And is it 18 or 8?

11           THE COURT:  I believe it's 18-2.

12           MS. SWEENEY:  18-2.

13           THE COURT:  Any objection to the admission of 18-2?

14   18-2 will be admitted.

15           MS. SWEENEY:  Your Honor, the government requests

16   permission to publish 18-2 and Government Exhibit 1927 side by

17   side to the jury.

18           THE COURT:  You may.

19   BY QUESTIONER:

20   Q.  Ms. Fisher, can you see those on the screen in front of

21   you?

22   A.  Yes.

23   Q.  So let's start with Government Exhibit 1927.  That's in

24   Tab 6.

25           So you sent this e-mail?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   And who did you send it to?

3    A.   Ric Blake.

4    Q.   What company did Ric Blake work for?

5    A.   George's.

6    Q.   Why did you send it to Ric Blake?

7    A.   He was our main contact for the Yum business.

8    Q.   And can you describe what you mean, what responsibilities,

9    what interactions you had with him as your main contact?

10   A.   He was my day-to-day contact for any supply issues, as well

11   as the negotiation.

12   Q.   So he was your contact for the negotiations as well?

13   A.   Yes.

14   Q.   Is the information here, the To and the From, is that

15   reflected in Government Exhibit 18-2?

16   A.   Yes, in the bottom right corner.

17   Q.   How about the date that this e-mail in 1927 was sent?

18   A.   Yes, December 9th, 2016.

19   Q.   And is that also reflected in 18-2?

20   A.   Yes.

21   Q.   Was this e-mail sent to anybody else aside from Mr. Blake?

22   A.   Rich Eddington was copied.

23   Q.   And who is Rich Eddington?

24   A.   He was my boss.

25   Q.   Are the people who are copied on this e-mail reflected in

Sara Fisher - Direct

1    the chart?

2    *A.*   No.

3    *Q.*   So 18-2 just contains the To line information for this

4    e-mail?

5    *A.*   Yes.

6    *Q.*   So sticking with Government's Exhibit 1927, what is this

7    e-mail about?

8    *A.*   It was the initial e-mail that we sent just letting the

9    suppliers know we were kicking off the contract negotiations.

10   *Q.*   I would like to direct your attention to the second full

11   sentence that begins with "As we move."  Could you read that

12   out loud, please?

13   *A.*   "As we move into 2017, we are ready to begin conversations

14   surrounding the next agreements beginning in 2018 for the KFC

15   COB category."

16   *Q.*   And what information were you conveying with this?

17   *A.*   That we were ready to start the contract negotiations.

18   *Q.*   And I would like to direct your attention to the next

19   sentence.  If you could read it to yourself and then just tell

20   the jury what it is that you were conveying with this.

21   *A.*   We were letting everyone know that we wanted to have them

22   come in at some point in January to present their first round

23   proposals to us.

24   *Q.*   And when you say first round proposals, can you describe

25   what you mean?

1581

Sara Fisher - Direct

1   A.  Just the initial proposals for the RFP process.

2   Q.  In this e-mail did you ask Mr. Blake to do anything in

3   anticipation of that meeting?

4   A.  Yes.  We wanted them to provide their initial pricing

5   proposals using the cost model template that we utilize, as

6   well as break down the volume by plant that they were offering.

7   Q.  So starting with the cost model that you described, what is

8   a cost model?

9   A.  It's just a breakdown of all of the cost components that go

10  into the FOB cost.

11  Q.  And here in the first bullet it says "current cost model."

12  Can you describe what you mean by that?

13  A.  Yes.  All of the suppliers were current Yum suppliers, and

14  so we -- there is a cost model template that was utilized and

15  everyone was familiar with that.

16  Q.  Turning your attention to the second bullet, can you read

17  that out loud, please?

18  A.  "We will incorporate SCA modeling as the project

19  progresses."

20  Q.  What is SCA modeling?

21  A.  SCA was an IT tool that RSCS adopted.  It was a supply

22  planning tool.  And we were in the middle of implementing that,

23  and so we wanted to put that bullet point in there just so the

24  suppliers knew that that would be a part of the expectations of

25  supplying data for that program going forward.

1582
Sara Fisher - Direct

1    Q.   So when was the SCA model introduced?

2    A.   I'm not quite sure exactly when it was introduced, but we

3    were in kind of the beginning stages of it when we were

4    starting these negotiations.

5    Q.   And what type of information was included in the SCA model?

6    A.   Suppliers were asked to upload pricing, shipment

7    information by products that they were supplying, that type of

8    information.

9    Q.   And was this model used in the contract negotiation

10   process?

11   A.   No.

12   Q.   Turning to the third bullet, can you describe what you mean

13   when you talk -- can you read it and then describe what you

14   meant?

15   A.   "Provide a breakout of your offered weekly production of

16   8 Pc/dark meat by plant."  So --

17   Q.   I was going to ask, what did you mean by that?

18   A.   Some of the suppliers have multiple plants.  So the plant

19   locations are very important to us, as I mentioned earlier, so

20   we need to understand how much volume they were offering out of

21   each facility.

22   Q.   Did all of the suppliers have multiple plants?

23   A.   No.

24   Q.   For the suppliers that didn't have multiple plants, did you

25   ask them to come prepared with this information to your initial

Sara Fisher - Direct

1   meeting?

2   A.   No.  We took that bullet out of their e-mails.

3   Q.   And turning to your final bullet, could you take a look at

4   that and tell the jury what it is that you are asking for

5   there?

6   A.   We were just letting the suppliers know that we -- it was

7   very important to us that they offered the supplemental items.

8   They are not as easy to run, some of them, and so we just

9   wanted to make sure that they knew that was very important when

10  we were awarding business.

11  Q.   When you say supplemental items, are those the supplemental

12  items we were talking about earlier?

13  A.   Yes.

14  Q.   So why did you include this list in the initial kickoff

15  e-mail?

16  A.   Just to set the expectations of what we were looking for in

17  those initial meetings.

18  Q.   Did you send this kickoff e-mail to anyone other than

19  Mr. Blake at George's?

20  A.   No.

21  Q.   Did you send any other e-mails that were similar to anyone

22  other than Mr. Blake at George's?

23  A.   No, not that I recall.

24  Q.   And I would like to turn your attention --

25            MS. SWEENEY:   The Government asks permission to

Sara Fisher - Direct

1    publish 1942 alongside 18-2, the summary exhibit?

2              THE COURT:  You may.

3              MS. SWEENEY:  And that is I believe Tab 9.

4    BY MS. SWEENEY:

5    Q.  So looking at Government Exhibit 1942, can you just remind

6    us who sent this appointment?

7    A.  I did.

8    Q.  And who did you send it to?

9    A.  It went to Pete Suerken, Steve Campisano, Rich Eddington

10   and Ric Blake.

11   Q.  Who is Pete Suerken?

12   A.  He was Rich's boss.

13   Q.  So where was he employed?

14   A.  He was an RSCS employee.

15   Q.  How about Steve Campisano, who is that?

16   A.  Steve Campisano was an RSCS employee as well.  He was

17   responsible for further processed poultry at the time, but he

18   was -- had the chicken on the bone previous to that, so he was

19   included in the conversations.

20   Q.  When you said he had chicken on the bone previous, can you

21   just describe a little more what you mean?

22   A.  He was in my role previous to me having that.

23   Q.  And then I would like to direct your attention to the

24   Required Attendees at the bottom.  Who was listed here as the

25   Required Attendees?

Sara Fisher - Direct

1    *A.*  Ric Blake on the summary screen.

2    *Q.*  And on document 1942, who was listed as a required

3    attendee?

4    *A.*  Pete Suerken, Steve Campisano, Rich Eddington and Ric

5    Blake.

6    *Q.*  So of those four, which one appears in the summary?

7    *A.*  Ric Blake.

8    *Q.*  Do any other George's employees appear in the appointment?

9    *A.*  No.

10   *Q.*  So the ones that aren't on the summary, are they all just

11   RSCS employees?

12   *A.*  Yes.

13   *Q.*  And what day and time was this meeting set for?

14   *A.*  February 13th, 2017 at 2:00 p.m.

15   *Q.*  And what was the subject of this meeting?

16   *A.*  The Next KFC COB Agreement Discussion.

17   *Q.*  Did the meeting actually occur?

18   *A.*  Yes.

19   *Q.*  And what was the topic of the meeting?

20   *A.*  It was the KFC -- kind of the first round of that

21   negotiation.

22   *Q.*  Does this relate to the RFP process that you described

23   earlier?

24   *A.*  Yes.

25   *Q.*  Did you have initial meetings with other companies?

Sara Fisher - Direct

1   A.  Yes.

2         MS. SWEENEY:  So now I would like to take down and

3   just leave the government's summary chart 18-2.

4   BY MS. SWEENEY:

5   Q.  Which other companies did you have meetings with?

6   A.  OK Foods, Claxton, Case, Tyson, Koch, Mar-Jac and

7   Pilgrim's.

8   Q.  In addition to George's?

9   A.  Yes.

10  Q.  And are those the eight companies you were describing

11  earlier?

12  A.  Yes.

13  Q.  Did all of these companies receive an initial invitation?

14  A.  Yes.

15  Q.  Did all of these companies eventually have meetings for the

16  initial meeting you were describing?

17  A.  Yes.

18  Q.  So let's start with the first line here, the company.  What

19  company was listed in the first line?

20  A.  OK Foods.

21  Q.  So you sent that initial e-mail to OK Foods?

22  A.  Yes.

23  Q.  And why?

24  A.  Because we wanted them to participate in the RFP.

25  Q.  Did they participate in the RFP?

1587
Sara Fisher - Direct

1   A.   Yes.

2   Q.   You actually met with OK Foods?

3   A.   Yes.

4   Q.   Did they eventually receive an award?

5   A.   Yes.

6   Q.   Turning to the next line, that company is listed as

7   Claxton; is that right?

8   A.   Yes.

9   Q.   And you sent these e-mails?

10  A.   Yes.

11  Q.   Who did you send the initial e-mail to?

12  A.   Scott Brady.

13  Q.   Who is Scott Brady?

14  A.   He was my day-to-day contact at Claxton.

15  Q.   And when you say day-to-day contact, can you describe sort

16  of what context it was that you would communicate with

17  Mr. Brady?

18  A.   I worked with him on a daily basis with ensuring supply,

19  and he was also my contact for the contract negotiations.

20  Q.   And do you know Mr. Brady?

21  A.   Yes.

22  Q.   During your time in that position, how frequently would you

23  communicate with him?

24  A.   Sometimes daily depending on the week.

25  Q.   And in that 2017, did you have an initial meeting with

Sara Fisher - Direct

1   Claxton?

2   A.   Yes.

3   Q.   Who attended that meeting?

4   A.   I believe it was Scott Brady, Jeramie Martin and Mikell

5   Fries.

6   Q.   And do you remember that meeting?

7   A.   I do.

8   Q.   Why do you remember that meeting?

9   A.   It was the first time I think that I had met Jeramie and

10  Mikell.

11  Q.   At that meeting did you ask Claxton to coordinate pricing

12  during the RFP process?

13  A.   No.

14  Q.   And at that meeting did Mr. Brady tell you whether he

15  planned to or had already talked to other competing chicken

16  suppliers about the RFP process?

17  A.   No.

18  Q.   And I would like to direct your attention to the next line.

19  What company is listed there?

20  A.   Case Farms.

21  Q.   Did you send an initial kickoff e-mail to Case Farms?

22  A.   Yes.

23  Q.   Did you have an initial meeting with Case Farms?

24  A.   Yes.

25  Q.   Did Case Farms eventually receive an award?

Sara Fisher - Direct

1   A.   Yes.

2   Q.   Looking at the next line, Tyson, did you send an initial

3   e-mail to Tyson?

4   A.   Yes.

5   Q.   Who did you send it to at Tyson?

6   A.   Carl Pepper, Tim Mulrenin and Tim Scheiderer.

7   Q.   Who is Carl Pepper?

8   A.   Carl Pepper was my day-to-day contact.

9   Q.   When you say day-to-day contact, can you describe what the

10  context was?

11  A.   Ensuring supply and also contract negotiations.

12  Q.   And who is Tim Mulrenin?

13  A.   Tim was Carl's boss.

14  Q.   And what was your level of interactions with him?

15  A.   I didn't have a lot of interaction with him.  I mostly

16  talked with Carl.

17  Q.   How about the last person listed here, Tim Scheiderer?

18  A.   I honestly don't recall what his title was.  I didn't have

19  a lot of interaction with him.

20  Q.   So why did you send the initial e-mail to all three?

21  A.   I probably was asked to.

22  Q.   Did you eventually meet with Tyson?

23  A.   Yes.

24  Q.   And what date was that meeting?

25  A.   January 20th, 2017.

Sara Fisher - Direct

1    *Q.*   Turning to the next company, Koch Foods; is that right?

2    *A.*   Yes.

3    *Q.*   Who did you send the initial kickoff e-mail to?

4    *A.*   Bill Kantola.

5    *Q.*   Who is Bill Kantola?

6    *A.*   He was my day-to-day contact with Koch Foods.

7    *Q.*   And when you say day-to-day contact, can you describe the

8    context?

9    *A.*   Yes, just day-to-day ensuring supply, and then he was the

10   contact for contract negotiations.

11   *Q.*   What was your understanding of Mr. Kantola's role at Koch

12   Foods?

13   *A.*   He was the Yum account rep.

14   *Q.*   Did you have that meeting with Koch Foods?

15   *A.*   Yes.

16   *Q.*   Who attended that meeting?

17   *A.*   I believe outside of the RSCS team, I believe it was just

18   Bill Kantola.  He usually traveled alone.

19   *Q.*   And the other companies that we've talked about, Tyson,

20   Case, Claxton and OK Foods, who attended those meetings?

21   *A.*   Do you want me to go through the list?

22   *Q.*   I guess let me ask a much better question.

23          Were you the only RSCS representative at those

24   meetings?

25   *A.*   No.  Pete Suerken, Rich Eddington, Steve Campisano I

Sara Fisher - Direct

1    believe were all -- attended all of the meetings.

2    Q.  Turning your attention to the next line, Mar-Jac Poultry,

3    did they receive an initial invitation to bid?

4    A.  Yes.

5    Q.  Did they have an initial kickoff meeting?

6    A.  Yes.

7    Q.  Did they ultimately receive an award?

8    A.  Yes.

9    Q.  And the next line with Pilgrim's, did they receive an

10   initial invitation to bid?

11   A.  Yes.

12   Q.  And who did that get sent to?

13   A.  Roger Austin.

14   Q.  Who is Roger Austin?

15   A.  He was my day-to-day contact for KFC.

16   Q.  In what context?

17   A.  Ensuring supply and contract negotiations.

18   Q.  Was there eventually a meeting with Pilgrim's?

19   A.  Yes.

20   Q.  What date did that take place?

21   A.  January 27, 2017.

22   Q.  Do you remember that meeting?

23   A.  I do.

24   Q.  Why do you remember that meeting?

25   A.  I just remember there was a big group of Pilgrim's team

Sara Fisher - Direct

1    that came in for that meeting.

2    Q.   Were you the only RSCS representative at that meeting?

3    A.   No.  Pete Suerken, Rich Eddington and Steve Campisano were

4    there as well.

5    Q.   At that meeting did you ask Pilgrim's to coordinate pricing

6    during the RFP process?

7    A.   No.

8    Q.   Why not?

9    A.   Because that's not how we do business.  And they are

10   competitors and we were in the middle of a competitive bidding

11   process.

12   Q.   And at that meeting did Defendant Austin tell you whether

13   or not he planned to or had already talked to competing chicken

14   suppliers about the RFP process?

15   A.   No.

16   Q.   Turning to where we started, the last line, George's, you

17   did initially send an invitation to bid to George's?

18   A.   Yes.

19   Q.   What day did you send that?

20   A.   December 9, 2016.

21   Q.   Was that the same day that you sent the invitation to all

22   of the other suppliers?

23   A.   Yes.

24   Q.   And who did you send it to?

25   A.   Ric Blake.

Sara Fisher - Direct

1   Q.  Did George's eventually receive an award?

2   A.  Yes.

3         MS. SWEENEY:  We can take this down.  Thank you.

4   BY MS. SWEENEY:

5   Q.  So after you sent the initial kickoff e-mails and after you

6   had the initial meetings, what happened next?

7   A.  There was further negotiations and then contracts were

8   awarded.

9   Q.  Approximately how long did the contract negotiation process

10  take?

11  A.  I think it varied by supplier, but I think it was mid year,

12  maybe a little bit after by the time SBRAs were signed.

13  Q.  Can you just describe what the SBRA is?

14  A.  It's a Supplier Business Relationship Agreement.  It's an

15  RSCS document.  It's the contract between supplier and RSCS

16  that includes pricing and volume commitments and product and

17  that type of thing.

18  Q.  Did you achieve your goals?

19  A.  Yes.

20  Q.  In what way?

21  A.  We were able to get a price reduction and we also were able

22  to secure the supply that we needed.

23  Q.  So you can put your binder aside.

24        Now I would like to talk with you about a different

25  topic.  Are you familiar with the term shortage?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   What is a shortage?

3    A.   A shortage would be if there was a particular plant that

4    was supposed to provide a certain amount of truckloads of

5    chicken on a particular day and maybe the birds came in heavy

6    or light and they weren't able to do that.  And we would be

7    short, you know, product that needs to go to the distributors.

8    Q.   Can you describe how the birds coming in heavy or light

9    would relate to whether there is enough product to supply the

10   stores?

11   A.   So there is a certain specification that is provided by KFC

12   that has a weight range for the birds.  And so if -- they are

13   living creatures, so if they come in heavier than planned one

14   day or lighter than planned one day, that can throw off the

15   amount of birds that you have to produce to specification.

16   Q.   In your time that we've been talking about as the senior

17   manager for poultry, did shortages happen to KFC?

18   A.   Yes.

19   Q.   Can you just give an example of what that may look like

20   maybe using company A and company B to help describe to the

21   jury what that would look like practically?

22   A.   So if company A was supposed to ship five truckloads out

23   that day and their birds were coming in heavy, for example,

24   they would reach out to me and say, you know, I'm only going to

25   be able to have four.  And so then I would at that point reach

Sara Fisher - Direct

1    out to other suppliers and try to see if any of our other

2    approved suppliers had extra product where they could run that

3    product and we could have that distributor place a PO with

4    supplier B and get the product that way.

5    Q.   How often did shortages come up when you were in that

6    position?

7    A.   It was probably quite often just depending on the week and

8    the demand.   And like I said, they are live animals, so it just

9    depended on the day.

10   Q.   You said that they would call you in your position to

11   handle shortages; is that right?

12   A.   Yes.   That was -- that should have been the process, yes.

13   Q.   So what was your role?   When they would call you, what was

14   your role in handling the shortages?

15   A.   I would then reach out to other suppliers and try to find

16   the product that supplier A was short.   And then I would work

17   with the distributors and let them know to place a PO with

18   supplier B as opposed to supplier A because supplier A was

19   going to be short.

20   Q.   Did you ever learn about shortages any other way than a

21   supplier calling you?

22   A.   Yes.   We would learn about them from the distributors from

23   time to time.

24   Q.   And what would happen if you learned about a shortage from

25   a distributor?

Sara Fisher - Direct

1   A.  I would reach out to the suppliers to find out what was

2   going on and try to figure out why I wasn't contacted about it.

3   Q.  And why did that matter to you that you weren't contacted

4   about it?

5   A.  A couple of things.  I mean, it's transparency and

6   understanding if there is a bigger issue, a bigger supply issue

7   that we needed to worry about, but then we also didn't want the

8   suppliers managing it between themselves and talking about the

9   pricing that we had for each supplier with KFC product.

10  Q.  So if the suppliers were covering for each other, how would

11  that relate to discussions of prices?

12  A.  If they -- if they were covering for each other and not

13  getting us involved, then they would -- you know, they would

14  have to be aligned on a price somehow to buy from each other.

15  And so, you know, I don't know how they did that, but we did

16  not want them doing that because it would appear that they

17  would have to be talking about what they are charging each

18  other to be able to know.

19         MS. JOHNSON:  Objection.

20         THE COURT:  What's the objection?

21         MS. JOHNSON:  This calls for speculation.  The witness

22  is testifying.  She said I don't know how they would do that,

23  but we would want them doing X.  It's a speculative answer and

24  I would object.

25         THE COURT:  Overruled.  It's the basis of the policy

Sara Fisher - Direct

1    they had.

2         Go ahead.

3         *MS. SWEENEY:*  Thank you, Your Honor.

4    *BY MS. SWEENEY:*

5    *Q.*  When you were handling shortages, and you said company A

6    didn't have enough product so you'd reach out to company B,

7    what price were you buying the chicken from from company B?

8    *A.*  Company B's contracted price.

9    *Q.*  Not company A's contracted price?

10   *A.*  Correct.

11   *Q.*  Now, you've described when companies would cover for

12   shortages for each other.  You described it sort of

13   hypothetically.  Did that ever actually happen when you were in

14   your position?

15   *A.*  Yes.

16   *Q.*  And you said that there would be things you would tell the

17   suppliers.  Did you actually tell the suppliers those things?

18   *A.*  I'm sorry, I don't understand the question.

19   *Q.*  Sure.  Let me phrase it better.

20         So when you learned from a distributor that the

21   suppliers had covered for each other, how would the distributor

22   know?

23   *A.*  There were instances where the distributor would receive

24   somebody else's -- the product in somebody else's boxes or they

25   may just -- the supplier may have told them that they are

Sara Fisher - Direct

1  having somebody else cover.

2  Q.  So what happened next?  When this actually happened, when

3  you received a call from a distributor, what happened after

4  that?

5  A.  I would contact my contact at that supplier and just try to

6  figure out what was going on and let them know that that's not

7  how we want things to work and they need to reach out to me.

8  Q.  So you would let them know that that's not how you wanted

9  things to work?

10  A.  Yes.

11  Q.  And which of the two suppliers would you reach out to, the

12  one that didn't have enough product or the one that covered?

13  A.  Typically I would reach out to the one that had reached out

14  to somebody else.

15  Q.  So the one that didn't have enough product?

16  A.  Yes.

17  Q.  Turning back to your negotiations for the 2018 contract,

18  did you negotiate with each chicken supplier independently?

19  A.  Yes.

20  Q.  Why?

21  A.  Because it was a competitive bidding process.  And as I

22  mentioned, pricing is confidential to us and we don't share

23  that with suppliers, each other's pricing.

24  Q.  And at any point in that RFP process did you ask the

25  competing chicken suppliers to coordinate their pricing?

Sara Fisher - Cross

1    A.   No.

2    Q.   Why not?

3    A.   Because it's not how we do business.

4         MS. SWEENEY:   Your Honor, if I may have one minute to

5    confer.

6         THE COURT:   You may.

7    BY MS. SWEENEY:

8    Q.   One final question, Ms. Fisher, and I shouldn't say that

9    because lawyers almost never have one final question.

10        Earlier you were talking about FOB prices.   I think

11   you said that FOB prices were the suppliers' costs.   Were costs

12   the only thing that went into FOB prices?

13   A.   Well, FOB price is the price that was charged to us, so

14   that doesn't necessarily mean that was the cost of the product

15   itself.   That was the negotiated price that we aligned with

16   them on what they charge from their dock without any freight or

17   anything included in it.

18   Q.   So would that be the contract price?

19   A.   Yes.

20        MS. SWEENEY:   No further questions, Your Honor.

21        THE COURT:   All right.   Thank you.

22        Cross-examination?

23                       **CROSS-EXAMINATION**

24   BY MS. RAHMAN:

25   Q.   Good afternoon, Ms. Fisher.   My name is Megan Rahman and I

Sara Fisher - Cross

1    represent Scott Brady.

2            So you joined the procurement team at RSCS in June of

3    2016, correct?

4    A.   Yes.

5    Q.   So the negotiations for the 2018-2020 contract, that was

6    your first involvement in contract negotiations?

7    A.   Yes.

8    Q.   You said you had a behind-the-scene role for those contract

9    negotiations, correct?

10   A.   Yes.

11   Q.   And RSCS had previously negotiated a three-year contract in

12   2015, correct?

13   A.   I -- I can't confirm.  I wasn't involved in that.  I

14   believe it was a three or four-year contract, but I wasn't

15   involved.

16   Q.   I think you had testified that there was a three-year

17   contract in place at the time that you started this contract

18   negotiation for 2017.

19   A.   I think I said it was -- I think it was a three or

20   four-year contract, but there was a contract in place that was

21   expiring at the end of 2017.

22   Q.   Okay.  And RSCS was looking for a similar length contract

23   for 2017, for 2018, a three-year contract, another three-year

24   contract.

25   A.   Yes.

1601

Sara Fisher - Cross

1    Q.   And RSCS wanted to do that because they thought capacity

2    was tight and wanted to lock in volume?

3    A.   Yes.

4    Q.   And the longer term deal allowed RSCS to lock in volume.

5    A.   It allowed us to lock in volume for three years instead of

6    just looking at an annual deal, yes.

7    Q.   And it's true that the small birds and the small bird

8    inventory had reduced over the years, correct?

9    A.   Yes.

10   Q.   And the longer term contract provided RSCS with stability.

11   A.   Yes.

12   Q.   And there was a concern capacity would be an issue.

13   A.   Yes.

14   Q.   And RSCS looked at Urner-Barry and Express Market as

15   targets for their pricing negotiations, correct?

16   A.   I would say that we looked at those as like WOG costs from

17   those publications just to kind of get an idea of what WOG

18   costs were, yes.

19   Q.   So when you say WOG costs, what the eight-piece cost that

20   you have been talking about, what your target price might come

21   in at.

22   A.   Well, you can't look at those publications and it doesn't

23   necessarily -- it's not an apples-to-apples because our

24   specification has other costs and other things in it, so it's

25   not an apples-to-apples comparison, but it was used as a -- it

Sara Fisher - Cross

1    could be used as a guideline.

2    Q.   So it would give you a rough estimate, correct?

3    A.   Yes.

4    Q.   And then RSCS's goal was to get the lowest landed price.

5    A.   That's one of the goals, yes.

6    Q.   And that's the final cost of the production to the

7    distribution center?

8    A.   Well, really the lowest landed cost is to the restaurants.

9    Q.   To the restaurants.  But RSCS wasn't trying to just get the

10   lowest price, correct?  There were other important factors to

11   RSCS.

12   A.   Correct.

13   Q.   Plant location was important?

14   A.   Yes.

15   Q.   Quality was important?

16   A.   Yes.

17   Q.   Freight was important?

18   A.   Yes.

19   Q.   Bird size was important.

20   A.   Yup.

21   Q.   And each customer such as KFC has unique specifications for

22   their product.

23   A.   Yes.

24   Q.   So that's why the bird size is important for KFC.

25   A.   Yes.

Sara Fisher - Cross

1    Q.   And then geography is important?

2    A.   Yes.

3    Q.   Because KFC has to balance the supply of its chicken

4    throughout the country.

5    A.   Correct.

6    Q.   And it's important to RSCS to have multiple suppliers for

7    the fresh product for KFC.

8    A.   Correct.

9    Q.   Because there is a large demand and a large amount of

10   production facilities.

11   A.   Yup.

12   Q.   All right.  I would like to ask you a couple questions

13   about the negotiations that you testified to on direct.  So in

14   December you e-mailed the suppliers about beginning

15   conversations for the 2018 and 2020 agreement.  Ms. Sweeney

16   showed you a couple of those e-mails.  So RSCS was targeting

17   mid to late January for those initial meetings?

18   A.   Yes.

19   Q.   And at this initial meeting, you were asking the suppliers

20   to use their current cost model template as the basis for a

21   pricing discussion.

22   A.   Yes.

23   Q.   And you also wanted to discuss weekly production of

24   eight-piece and dark meat?

25   A.   Yes.

Sara Fisher - Cross

1   Q.  And this was the first time that RSCS began negotiations in
2   January for a contract.
3   A.  It was earlier.  I can't say it's the first time ever, but
4   it was earlier than I would say typical.
5   Q.  And typically the pricing negotiations probably took place
6   in late summer or fall; would you agree?
7   A.  Yes.
8   Q.  And then Claxton's meeting was scheduled for January 19.
9   We saw that exhibit that Ms. Sweeney put up.
10  A.  Yes.
11  Q.  And the meeting took place on January 19.  And Mr. Brady
12  and Mr. Fries and Mr. Martin attended on behalf of Claxton?
13  A.  I believe so, yes.
14  Q.  And you were there and Mr. Suerken and Mr. Campisano and
15  Mr. Eddington on behalf of RSCS?
16  A.  Yes.
17  Q.  And you reported to Mr. Eddington.  He was senior director
18  of procurement?
19  A.  Yes.
20  Q.  Now, following this meeting do you recall e-mailing the
21  suppliers again and asking them for a firm offer by the end of
22  the following week?
23  A.  I do not recall.
24       MS. RAHMAN:  Your Honor, may I have Ms. Grimm hand
25  this notebook?

1605

                          Sara Fisher - Cross

 1              THE COURT:  Yes, you may.

 2              MS. RAHMAN:  And I have a notebook for you, if that

 3   would be helpful.

 4              THE COURT:  Yes, that would.  Thank you.

 5   BY MS. RAHMAN:

 6   Q.  Ms. Fisher, can I ask you to look at Tab 3, please?

 7   A.  Okay.

 8   Q.  And at the very bottom of what's been marked as F-936 for

 9   identification, do you see that e-mail?

10   A.  Yes.

11   Q.  And this is an e-mail from you to Mr. Brady and Mr. Fries

12   and copying Mr. Eddington on January 27, 2017.  Would you

13   please review that e-mail.

14              Do you recall this e-mail?

15   A.  I mean, it's from me, so yes, re-reading it, yes.  It was

16   many years ago.

17   Q.  And that's your e-mail address, sara.fisher@rscs.com?

18   A.  Yes, it is.

19   Q.  Does this refresh your recollection as to whether you

20   e-mailed suppliers -- e-mailed Mr. Brady and Mr. Fries at the

21   end of January?

22   A.  Yes.

23   Q.  You can put that away.

24              So did you e-mail suppliers at the end of January and

25   ask for a firm offer by the end of the week?

Sara Fisher - Cross

1    A.   Yes.   I e-mailed Scott and Mikell.

2    Q.   So no firm offers were exchanged at that January 19th

3    meeting, correct?

4    A.   I don't recall the contents of the meeting, but reading the

5    e-mail, it would sound like it, yes.

6    Q.   And you didn't have a cost model at that meeting either,

7    did you?

8    A.   I am not -- I don't recall.

9    Q.   And you had meetings with all of the suppliers, correct?

10   A.   Yes.

11   Q.   And at these meetings RSCS was actually surprised to

12   discover there was more product available, right?

13   A.   Yes.

14   Q.   And that was a positive development for RSCS, correct?

15   A.   Yes.

16   Q.   And there were multiple rounds of negotiations for

17   2018-2020, correct?

18   A.   Yes.

19   Q.   And RSCS anticipated negotiating the prices down that year.

20   A.   Correct.

21   Q.   And RSCS, in fact, did do that.

22   A.   Yes.

23   Q.   And the contract prices actually were close to the target

24   prices RSCS wanted, correct?

25   A.   I don't recall the target prices that we were looking at,

Sara Fisher - Cross

1   but we were happy with the prices that we received.

2   Q.  Now, Mr. Brady sent you Claxton's proposal around

3   February 3rd.  Do you recall that?

4   A.  I don't recall.

5   Q.  I am going to ask you to look at Tab 4, please.

6          MS. RAHMAN:  Please let the record reflect I am asking

7   Ms. Fisher to turn to it Tab 4 in the notebook which is marked

8   as Defendants' Exhibit F-852.

9   BY MS. RAHMAN:

10  Q.  Would you please review Defendants' Exhibit F-852 by

11  reading it to yourself.

12  A.  Okay.

13  Q.  Does this refresh your recollection that Claxton -- that

14  Mr. Brady sent Claxton's pricing proposal on February 3rd?

15  A.  Yes.

16  Q.  You can put that document -- the binder, put it aside.

17         Do you recall whether Claxton was negotiating for

18  additional volume?

19  A.  Yes.

20  Q.  And do you recall whether Claxton was asking for increased

21  volume to include four additional truckloads of eight-piece and

22  one additional truckload of dark meat per week for the

23  2018-2020 contract?

24  A.  Yes, that's what the e-mail says here.

25         MS. SWEENEY:  Objection, Your Honor.  Ms. Rahman is

Sara Fisher - Cross

 1    reading from the document.

 2          THE COURT:  No, she is not actually.  She may be

 3    referring to it, but she asked the witness to put the document

 4    away.

 5          MS. SWEENEY:  And I'd ask that the witness put the

 6    document away.

 7          THE COURT:  She was already asked to.

 8          MS. SWEENEY:  I am sorry, Your Honor.

 9          THE COURT:  Overruled.

10    BY MS. RAHMAN:

11    Q.  That's approximately 134 pounds a week of eight-piece, that

12    four additional truckloads?

13    A.  I mean, I would have to do the math.

14    Q.  Okay, fine.  Now, can you also look at Tab 5 of your

15    binder, please.  Do you recognize this?  And this is marked as

16    F-853.  The first page is like a slip page, so you can move to

17    the second page.  It's probably easier for you.

18    A.  Yes.

19    Q.  And what is this?

20    A.  This is pricing.  It's a piece of the SBRA, I believe, that

21    has the prices listed for each of the particular items and the

22    case weights.

23    Q.  And --

24    A.  Or the formulas, yeah, sorry.

25    Q.  Do you know whether this was Claxton's initial pricing that

Sara Fisher - Cross

1    was sent by Mr. Brady on February 3rd?

2    A.   I can't confirm that.

3    Q.   Can I ask you to flip back to Tab 4?  Do you see Tab 5 is

4    the attachment to Tab 4?  And Tab 4 is Defendants' Exhibit

5    F-852?

6    A.   Okay.  I am not sure what you're asking me to confirm.

7    Q.   I'm asking you whether this was Claxton's initial pricing

8    proposal that was sent for these negotiations.

9    A.   I mean, if this was the attachment to the e-mail, then I

10   would say yes.

11            MS. RAHMAN:  Your Honor, I would like to move just the

12   attachment, the pricing proposal into evidence, please.

13            THE COURT:  Any objection to the admission of F-853?

14            MS. SWEENEY:  No, Your Honor.

15            THE COURT:  F-853 will be admitted.

16            MS. RAHMAN:  Can we publish it to the jury, Your

17   Honor?

18            THE COURT:  You may.

19   BY MS. RAHMAN:

20   Q.   Can we look at the third page of the document, but it's

21   actually the second page of the pricing proposal which shows

22   the -- sort of the line from corporate overhead to total FOB

23   plant cost.  And do you see that Claxton's eight-piece price

24   that was being proposed was .9939?

25   A.   Yes.

Sara Fisher - Cross

1    Q.  And then big bird profitability was at .0940?

2    A.  Yes.

3    Q.  And the supplier margin was at .0544?

4    A.  Yes.

5    Q.  Do you know what Claxton's 2017 pricing was?

6    A.  I do not offhand, no.

7    Q.  Can you look at Tab 6, please?  That's marked as F-754.

8         MS. RAHMAN:  And we have redacted the first page of

9    that in accordance with Your Honor's rulings.

10   BY MS. RAHMAN:

11   Q.  Do you recognize that, Ms. Fisher?

12   A.  I mean, it's a piece -- it looks like the SBRA, but I

13   didn't have anything to do with this contract.

14   Q.  But do you recognize what this is?

15   A.  It looks like a piece of the SBRA, yes.

16   Q.  But can you look at the entire document, please?

17   A.  It's the cost model that we use.

18   Q.  And is it signed?

19   A.  Yes.

20   Q.  Who signed it on behalf of RSCS?  Can you tell?  But it is

21   signed on behalf of RSCS?

22   A.  It is, yes.  I can't tell you what that signature says.

23   Q.  And what is the date of the contract?

24   A.  12/30/15 is when RSCS signed it.

25   Q.  Is it accurate to say that these documents, these types of

Sara Fisher - Cross

1  documents, are prepared in the ordinary course of business for

2  RSCS?

3  *A.*  Yes.

4       *MS. RAHMAN:*  Your Honor, I would move to admit this

5  Exhibit F-754 into evidence.

6       *THE COURT:*  Any objection to the admission of F-754?

7       *MS. SWEENEY:*  Yes, Your Honor, foundation.  The

8  witness said she didn't -- she didn't remember seeing this and

9  she didn't recognize the document.

10       *THE COURT:*  Response, Ms. Rahman?

11       *MS. RAHMAN:*  Well, Your Honor, she also said that it's

12  a contract that's kept in the ordinary course of business of

13  RSCS.  She's negotiated contracts for RSCS.  She is familiar

14  with them.  And I think she can testify that these contracts

15  are kept in the ordinary course of business at RSCS, these

16  types of documents.

17       *THE COURT:*  She is not a document custodian.

18  Objection is sustained.

19  *BY MS. RAHMAN:*

20  *Q.*  Do you recall that Mr. Brady sent you a revised pricing

21  after the February proposal?

22  *A.*  I don't recall.

23  *Q.*  That's fine.  I am going to show you Tab 8, please, of your

24  binder.  Actually, let's look at Tab 7 first.  For

25  identification purposes, it's marked as F-915.

Sara Fisher - Cross

1       Do you recognize this as a March 2nd, 2017 e-mail from

2   Mr. Brady to you and Mr. Eddington?

3   A.   Yes.

4   Q.   Do you see that it says attached is a KFC Cost 1 18?

5       MS. SWEENEY:   Objection, Your Honor, she is reading

6   from the document.

7       THE COURT:   Sustained.

8   BY MS. RAHMAN:

9   Q.   Ms. Fisher, can you tell me what this e-mail is?  Do you

10  recognize this e-mail?

11  A.   Scott Brady e-mailed Rich and I and it says there is a

12  revised pricing for 2018.

13  Q.   And can you look at Tab 9 of the binder, please, which has

14  been marked as F-916 for identification purposes?

15      Do you recognize that document, Ms. Fisher?

16  A.   Yes.

17  Q.   And what is that?

18  A.   That's an e-mail that I sent to Scott Brady.

19  Q.   I am sorry, Tab 8, which is marked as F-916.

20  A.   Okay.

21  Q.   I am sorry if I misspoke.

22  A.   This is a cost model.

23  Q.   Do you recognize this?

24  A.   I recognize the cost model format, yes.

25  Q.   Was this the cost model that was attached to F-915?

Sara Fisher - Cross

 1   A.  I mean, I don't know how to confirm if that was the exact

 2   cost model that was attached to the e-mail.

 3   Q.  Well, do you have any reason to doubt it wasn't the

 4   attachment to F-915?

 5   A.  I mean, I guess I don't have a reason to doubt it, but I

 6   can't confirm that this was the one that was attached to the

 7   e-mail.

 8   Q.  Do you recall getting a cost model from Mr. Brady on

 9   March 2nd, 2017?

10   A.  I don't recall offhand, but I know the e-mail shows that he

11   sent something, yes.

12   Q.  Do you recall getting revised pricing from Claxton during

13   the negotiations?

14   A.  Yes.

15   Q.  And sara.fisher@rscs.com is your e-mail address?

16   A.  Yes.

17   Q.  Do you have any reason to doubt that the spreadsheet

18   doesn't accurately reflect the information contained in it, the

19   spreadsheet at Tab 8?

20   A.  No.

21   Q.  And do you have any reason to doubt that this is not the

22   spreadsheet that Mr. Brady sent to you on March 2nd with his

23   revised pricing --

24   A.  No.

25   Q.  -- to your e-mail address at sara.fisher@rscs.com?

Sara Fisher - Cross

1          MS. RAHMAN:  Your Honor, I move admission just the

2     spreadsheet.

3          THE COURT:  Which is F-916.

4          MS. RAHMAN:  Yes, F-916.

5          THE COURT:  Any objection to the admission of F-916?

6          MS. SWEENEY:  Foundation, Your Honor, I would object.

7          THE COURT:  Response?

8          MS. RAHMAN:  Your Honor, Ms. Fisher, it's her e-mail

9     address.  She recalled receiving revised pricing from

10    Mr. Brady.  She has no reason to doubt that this is the revised

11    pricing that she received.  It is the attachment to the e-mail.

12    It was produced like that from RSCS.  And it is a bid

13    submission which is a business record of RSCS.

14          THE COURT:  There is no evidence that it's the

15    attachment.  The witness does not know that.  And moreover,

16    Ms. Fisher's name is not on docket number -- Exhibit No. F-916.

17    Objection is sustained.

18    BY MS. RAHMAN:

19    Q.  Do you recall whether Claxton reduced their pricing in

20    their bid proposal from February to March?

21    A.  I would have -- I can't recall offhand.  I believe that

22    they reduced their pricing from the initial bid to what was

23    awarded, but from a timing perspective, I don't recall offhand.

24    Q.  I would like to turn your attention to Tab 9 of the binder,

25    please.  It's marked as F-868 for identification purposes.

Sara Fisher - Cross

1          Do you recognize this document, Ms. Fisher?

2   *A.*   Yes.

3   *Q.*   What is this document?

4   *A.*   It's an e-mail that I sent to Scott Brady.

5   *Q.*   And when did you send this e-mail?

6   *A.*   May 11th, 2017.

7   *Q.*   And what is this e-mail about?

8   *A.*   It was an e-mail that was sent back to Scott just kind of

9   trying to wrap up all of the components that we were agreeing

10  to before we started working on the SBRA document.

11  *Q.*   Does this e-mail accurately reflect the information you

12  sent to Mr. Brady on May 11, 2017.

13  *A.*   Yes, I believe so.

14          *MS. RAHMAN:*  Your Honor, I would move for admission of

15  F-868.

16          *THE COURT:*  Any objection to the admission of F-868?

17          *MS. SWEENEY:*  No, Your Honor.

18          *THE COURT:*  Exhibit F-868 will be admitted.

19          *MS. RAHMAN:*  Can we publish it to the jury, Your

20  Honor?

21          *THE COURT:*  Yes, you may.

22          *MS. RAHMAN:*  Thank you.

23  *BY MS. RAHMAN:*

24  *Q.*   So Ms. Fisher, in this e-mail you are proposing a stair

25  step price impact to Claxton.  Do you see that?  It's sort of

Sara Fisher - Cross

1   in the middle.  It's per pound stair step price impact?

2   *A.*   Yes.

3   *Q.*   And the stair step price impact says for 2017 you would

4   have a $.01 starting with P6?

5   *A.*   Correct.

6   *Q.*   For 2018 it would be .0550 for eight-piece and .0495 for

7   dark meat?

8   *A.*   Correct.

9   *Q.*   For 2019 and '20 it looks like it's the same, .0595 for

10  eight-piece and .0595 for dark meat.

11  *A.*   Correct.

12  *Q.*   So this means that Claxton's price is decreasing every year

13  over a three-year period.

14  *A.*   Correct.

15  *Q.*   And this price reduction is lower than the initial price

16  proposal that Mr. Brady sent in February, correct?  You are

17  negotiating the price further down.

18  *A.*   I would have to confirm the numbers, but our goal was to

19  negotiate the price further down, yes.

20  *Q.*   And if you want to look at that price proposal, we can look

21  at it for confirmation if you are unsure whether it was a

22  further reduction.

23  *A.*   Am I allowed to look at it?

24  *Q.*   Absolutely.  It's in Tab 5 of your binder, F-853.

25         Does that help?

Sara Fisher - Cross

1    A.  Well, this is talking about like reductions.  It's not

2    talking about the FOB, what the actual FOB price was, and 5 is

3    showing the actual FOB price.

4    Q.  So Claxton's proposal was a one price, three years?

5    A.  Yes.

6    Q.  And RSCS was asking them to reduce their price every year

7    for the term of the three-year contract.

8    A.  Yes.

9    Q.  Which was different than the original proposal that Claxton

10   proposed.

11   A.  Yes.

12   Q.  And contracts were executed in August of that year,

13   correct?

14   A.  I would have to confirm that, but that timing sounds about

15   right.

16   Q.  So Tab 10 of your binder, if you could look at that,

17   please.  It's been marked for identification as Exhibit F-756.

18           Do you recognize this.

19   A.  Yes.

20   Q.  What is this?

21   A.  This is the SBRA that was signed.

22   Q.  Is this the contract?

23   A.  Yes.

24           MS. RAHMAN:  Your Honor, I would move this into

25   evidence, please.

Sara Fisher - Cross

1          THE COURT:  Any objection to the admission of F-756?

2          MS. SWEENEY:  No, Your Honor.

3          THE COURT:  F-756 will be admitted.

4          MS. RAHMAN:  May I publish it to the jury, Your Honor?

5          THE COURT:  Yes, you may.

6    BY MS. RAHMAN:

7    Q.  So let's look at the very first page of this exhibit.  It

8    says the applicable period is May 21st, 2017 through

9    December 31st, 2017.  Do you see that?

10   A.  Yes.

11   Q.  So the prices were renegotiated for 2017 starting in May

12   even though there was already a contract in place that was

13   supposed to go to the end of the year.

14   A.  Yes.

15   Q.  So the suppliers had to renegotiate their price in the

16   middle of the contract, the last year of the contract, correct?

17   A.  They were asked to, yes.

18   Q.  And Claxton did.

19   A.  Yes.

20   Q.  So let's look at Page 2 of this contract and the corporate

21   overhead to the supplier margin, if you look at that.  So for

22   the rest of May, 2017, Claxton's FOB cost was .9809 and their

23   supplier margin was .1540, correct?

24   A.  Yes.

25   Q.  And then if we go to Page 4 of the same contract, the next

Sara Fisher - Cross

1    period was for 2018, right, January 1st, 2018 through

2    December 31st, 2018?

3    A.   Yes.

4    Q.   And then if we go to Page 5, it shows that for 2018 the FOB

5    cost was reduced to .9371; is that correct?

6    A.   Yes.

7    Q.   And the supplier margin was also reduced to .0946.

8    A.   Yes.

9    Q.   And then if we go to Page 7 of the contract, the applicable

10   period is the last two years of the contract, January 2019

11   through December 2020.

12   A.   Yes.

13   Q.   And then we'll go to Page 8.  And the price is further

14   reduced for eight-piece to .9314, correct?

15   A.   Yes.

16   Q.   And the supplier margin is also further reduced to .0889.

17   A.   Yes.

18   Q.   So the prices were stepped over three years as we

19   discussed.

20   A.   Yes.

21   Q.   And Claxton agreed to RSCS's May 11 proposal --

22   A.   Yes.

23   Q.   -- asking for the step reduction over three years.

24   A.   Yes.

25   Q.   And this was a way to gradually reduce prices to make it

Sara Fisher - Cross

1    more fair for the buyers and the sellers so they weren't taking

2    one huge hit in one year; is that fair to say?

3    A.  I mean, not necessarily.

4    Q.  Okay.  Why would you do the stair-step reduction, then,

5    over three years?

6    A.  I mean, we were -- I mean, I guess that's a fair statement,

7    but --

8    Q.  Is part of it because it's really hard to forecast pricing

9    three years out?  It's just not an absolute process?

10   A.  I would say it's not absolute, no.

11   Q.  So Claxton took almost, I mean, a 10-cent reduction over

12   three years.  Do you recall that?

13   A.  I don't think it was a 10-cent reduction.  I think it

14   was -- it was the five -- the .0495 and then the next year was

15   .0595, so it was just an added penny.  It was an added 5 cents.

16   Q.  But if I told you that Claxton's 2017 price at the start of

17   '17 before this contract negotiated was .0369, and at the end

18   of 2020 they ended up at .9314, that's about 10 cents, isn't

19   it?

20   A.  What was the first number you gave me?

21   Q.  Before this contract was negotiated if Claxton's price was

22   .0369 -- 1.0369, sorry, and they ended up at .9314, that's

23   about 10 cents over three years, isn't it?

24   A.  Yes.

25   Q.  So they took about a 10 cent reduction over three years,

1  correct?

2  *A.*  Yes.

3  *Q.*  Now, you testified that RSCS didn't want suppliers

4  contacting each other about shortages, correct?

5  *A.*  Correct.

6  *Q.*  But RSCS knew it happened and you testified you knew it

7  happened.

8  *A.*  Yes.

9  *Q.*  And you don't know what direction was given to suppliers

10  prior to you taking over the position in 2016, correct?

11  *A.*  No.

12  *Q.*  Are you familiar with period pricing?

13  *A.*  Yes.

14  *Q.*  Okay.  And as part of your job at RSCS, you review the

15  period pricing, correct?

16       *MS. SWEENEY:*  Objection as to scope.  There was no

17  discussion of this on direct.

18       *THE COURT:*  Response, Ms. Rahman?

19       *MS. RAHMAN:*  Can we have a side bar, Your Honor?

20       *THE COURT:*  Yes.

21    (At the bench:)

22       *THE COURT:*  Ms. Rahman, go ahead.

23       *MS. RAHMAN:*  Your Honor, the government put on a

24  witness, Mr. Bryant, who testified that he was told that

25  certain numbers on a piece of paper, Exhibit 1919, were future

1    pricing submissions and received by competitors.  And he didn't

2    verify the numbers.  The government also didn't verify the

3    accuracy of these numbers, and now this testimony is out there

4    on redirect.

5            The government did ask a couple questions about that,

6    and Mr. Bryant confirmed his understanding and lack of

7    verification, but this testimony is now out there.  And we are

8    entitled to try to correct the record with this witness who is

9    familiar with period pricing, will be familiar with the period

10   pricing of this time frame, is familiar with the negotiations

11   and the pricing submissions of the suppliers.  We would just

12   like to correct the record if she is able.  Otherwise,

13   inaccurate testimony sort of remains uncorrected on the record.

14   While we can call her back as -- she is under subpoena, she

15   does have child care issue and has to travel and we are just

16   trying to be considerate of that.

17           THE COURT:  Response Ms. Sweeney?

18           MS. SWEENEY:  Your Honor, this line of questioning is

19   beyond the scope of the witness's direct, and the defense, as

20   stated, has her under subpoena.  They can call her back.  And

21   they also did have the opportunity to cross-examine Mr. Bryant,

22   which they did extensively.

23           THE COURT:  The objection will be overruled.  I am not

24   going to -- even though it could be extremely inconvenient to

25   have Ms. Fisher have to come back, nonetheless, if the

1    government insists on the scope, I will sustain the objection.

2         We almost got through a day without the use of the

3    transceivers, but not quite.

4         Okay.  Thank you.

5         THE COURT:  The objection is sustained.

6         Ms. Rahman, we are almost at 5:00, but you can ask a

7    few more questions.  But if you can look for a convenient

8    stopping point.

9         MS. RAHMAN:  Your Honor, this is a convenient stopping

10   point.

11        THE COURT:  Great.  Ladies and gentlemen, we will go

12   ahead and break for the day.  Keep the admonitions in mind.

13   Remember what I mentioned to you about not allowing yourself to

14   listen to people and maybe telling you about the case.  I am

15   not sure that anyone would, but just in case.  And we will be

16   back the same time tomorrow.  If you can be ready to go at

17   8:30.  The jury is excused for the evening.

18        (Jury excused.)

19        Ms. Fisher, you are excused for the day.  Thank you

20   very much.

21        THE WITNESS:  Thank you.

22        THE COURT:  Anything to take up at this time?

23        Ms. Call?

24        MS. CALL:  Very briefly, Your Honor.  I wanted to

25   inquire whether you had the opportunity to review the brief we

1624

1    filed last night following up on the anticipated agent

2    testimony.  I think hopefully we will be calling Agent

3    Koppenhaver tomorrow, so if you had the opportunity to consider

4    it, we would like to discuss now or --

5         THE COURT:  What did you want to discuss?  I was a

6    little bit inclined to just let it play out.  I still have

7    concerns.  I really do.  As you can tell from the *Brooks*

8    decision, the *Brooks* decision is fairly limited.  And Chief

9    Judge Tymkovich in it suggested that one way to get around

10   potential risks of improper overview testimony would be to

11   limit it to a high level of generality.

12        And I'm not -- who knows, but I am not too worried

13   about Special Agent Koppenhaver going through too much of an

14   overview per se; but once again, I still question whether for a

15   lot of the exhibits that the government may attempt to

16   introduce he is even necessary.  It seems to me that whether or

17   not those exhibits come in or not wouldn't depend upon any

18   testimony on his part.

19        But let's assume that he happens to be on the witness

20   stand at the time that the government moves their admission

21   and, in fact, they are admissible, to then have him read

22   selected portions of them to the jury I would probably not

23   allow.  The reason is because although it's true a number of

24   witnesses have read portions of exhibits to the jury after

25   having been admitted, with rare exceptions those witnesses have

1625

1    each been the author of that exhibit or perhaps they're reading

2    something that they acknowledged having received.

3         I think it's a little bit different to have a special

4    agent who has no personal knowledge of, you know, for instance

5    an e-mail, let's say it's a co-conspirator statement, read that

6    to the jury.  Now, that's not to say that it can't be displayed

7    to the jury and that would be fine, but I'm a little bit

8    worried -- once again, I haven't seen it happen and so I don't

9    know -- but I do have a few concerns about if that's going to

10   be the kind of MO of at least some of Special Agent

11   Koppenhaver's testimony.

12        MS. CALL:  Yes, Your Honor.  And for the documents, I

13   will say the ones we would anticipate to have him read, I tried

14   to do a count last night.  It's not all of the like 300 or so

15   documents that were cited.  It's more like -- an estimate would

16   be maybe 70 or so that we would actually be looking at with him

17   and looking at the From and the To and perhaps reading a

18   portion.

19        I think the government's position is just really we

20   are trying to figure out what a permissible way from your

21   standpoint would be to ensure that the jury can really digest

22   this information, see the documents.  If they are presented

23   with, let's say, a three-page e-mail, how are they going to --

24   how are we even going to give them time to review it in a

25   meaningful way in context with the other things that were

1   happening in that time frame.  Obviously, the summary exhibit

2   is one way to do that.  Do you take any issue with the agent

3   reviewing the context of materials that are in the summary

4   exhibits themselves?

5           THE COURT:  There is really no difference between the

6   concern that I just mentioned say with an e-mail and with a

7   summary exhibit because even if an agent put it together, once

8   again, the agent doesn't have any personal knowledge of it.

9           Now, for instance, a telephone record, you know, if

10  you've got Exhibit 8000, the 99,000-page exhibit and the

11  special agent was asked to find the telephone number needle in

12  that haystack, I think that that is probably quite legit.  That

13  sounds like an investigation.  There is some process that he

14  had to go through to identify that and maybe link it up and

15  that may be perfectly fine.  But for a summary exhibit of, say,

16  co-conspirator hearsay e-mails, that is not -- that doesn't

17  seem to be any type of an investigation.

18          And I do have concerns just as the Court in *Brooks*

19  expressed that, you know, for a special agent, for instance, to

20  say, oh, yeah, I thought this was a real important one, or

21  something of that nature or even, as I said before, just be

22  asked:

23          Do you see this one?

24          Yes.

25          Who is it to?

1            So and so.

2            Who is it from?

3            So and so.

4            Can you read the second sentence?

5            That -- I don't think that just because there is not a

6    great way to get that information in front of a jury, that that

7    would then entitle any party to have a reader as opposed to

8    putting it up on the screen.  Now, that's cumbersome too.

9    There is no doubt about it.  But that -- you know, that

10   strategic or logistical problem is one that is almost inherent

11   with documents that are coming in without a person who has some

12   personal knowledge of the document.

13           MS. CALL:  And just to be clear, as thrilling as Your

14   Honor does make it sound, I think we are anticipating that the

15   latter kind you described, the agent would not be saying, you

16   know, we found this e-mail to be important to the

17   investigation, making conclusions of that kind.  It would be

18   more so reading selected portions.

19           And perhaps I may suggest we could start out with the

20   reading.  And if Your Honor does see it becoming troublesome,

21   we can change or shift course to just displaying the documents.

22   But on that latter front, I know you were concerned about

23   highlighting or zooming to certain areas to draw attention when

24   a witness was testifying, but if the witness were not reading

25   portions, would Your Honor have any issue highlighting or

1628

1    zooming in on certain portions of documents for the jurors?

2         THE COURT:  Not when you're giving your closing.

3    That's a problem.  Being selective about it, it's a tricky

4    issue.  If you had a sponsoring witness, a witness with some

5    knowledge, you could do that.  But, you know, for the attorney

6    or for a witness who doesn't know anything about the document

7    to be asked to read a selective portion is different and it

8    would have no other -- the only thing I think the jury would

9    understand from it is that the government counsel thinks that's

10   the part that's important.  So that's not evidentiary.  That

11   boils down to being argumentative.

12        MS. CALL:  Okay.  Two things I perhaps did want to

13   point you to.  I know I said we made this filing last night.

14   It was obviously somewhere in between last night and this

15   morning.  But when we looked at it with brighter eyes, we did

16   notice two typos in our filing, one that I think is pretty

17   material because there was supposed to be a "not" in the

18   sentence and we left the "not" out.  Would Your Honor prefer us

19   to refile it or I can just correct the sentence on the record

20   here.

21        THE COURT:  You can correct it on the record if you

22   want here.

23        MS. CALL:  This is Docket 789.  The error is on Page 4

24   in the paragraph where *Brooks* is cited.  The sentence currently

25   reads:  Even assuming the agent's testimony qualifies as

1629

1    overview testimony, which it does not, they're anticipated

2    testimony will implicate these concerns.  We clearly meant

3    there to be a "not" after the will and before the term

4    implicate.  And that is a material error I did want to correct

5    today.

6            So we will, I suppose, proceed tomorrow kind of in the

7    way we outlined, but we are happy to start just leaving up

8    documents if Your Honor believes it is starting to push that

9    line in overview testimony, but I don't believe it does.

10           THE COURT:  I don't think you would get by the first

11   attempt.

12           MS. CALL:  Okay.

13           THE COURT:  That's just my sense.  You can try.  You

14   can try.  It's just -- to the extent you are seeking some

15   guidance, I think that it may be problematic for the reasons

16   that I just explained.

17           MS. CALL:  Of course.  And we did review *Brooks*, Your

18   Honor, and we do appreciate the concerns there.

19           THE COURT:  Right.  So once again, you do have a right

20   to display something that has been admitted and we can do that.

21   It's cumbersome.  And, you know, you have to -- for multi-page

22   exhibits you look at the jury and it's kind of like the one

23   who's -- I could maybe tell them once you've read it, look at

24   me, and then once everyone's at me.  We can go through that and

25   that's fine.  It doesn't mean that you have to show the jury

1    everything, but that's how it's typically done.

2         MS. CALL:  Just anticipating how this may flow, in

3    establishing relevance for those documents, before we move to

4    admit them, our intention had been to -- it's very much clear

5    on the face of most of these documents, so have the agent

6    review a From and To.  And we may ask a leading question to

7    prevent him from reading the context, like is a customer

8    mentioned in this e-mail or is a competitor mentioned in this

9    e-mail, just to establish relevance.  Does that sound like it

10   runs any risk of these things we're talking about?

11        THE COURT:  Yes, because, you know, typically the

12   relevance would be established -- with a lot of these documents

13   I would assume that the relevance may have -- may go more

14   towards attorney argument.  You would -- if there is an

15   objection that's irrelevant, you would have the ability to

16   respond to it.  We've already -- we already have a foundation

17   of certain facts.  We know what the charge is.  Those are

18   things that typically add up to the ability of a Court to

19   determine the relevance of it.

20        So it would surprising to me, although once again, I

21   don't know, that the -- that Special Agent Koppenhaver could

22   supply some fact testimony that would bear on relevancy.

23        MS. CALL:  Yes, Your Honor.  I think that would

24   probably be limited circumstances and I understand what you're

25   proposing -- or not proposing, but what you are anticipating

1    here, that we would simply offer the document, and the

2    relevance would be clear on the face.  And the attorneys can

3    argue as necessary if there is an objection on the grounds.

4           THE COURT:  I don't want to go too long on this, but

5    certainly I want to give the defendants an opportunity to add

6    their own comments.

7           Mr. Kornfeld, go ahead.

8           MR. KORNFELD:  Two things.  On that issue with the

9    Court's permission we are very concerned about this issue for

10   obvious reasons.  We are going to propose a limiting

11   instruction should it be necessary, and we'll get something to

12   the Court for its consideration consistent with *Ray* and *Brooks*

13   just in case we need it, but at least something so we're not

14   doing it on the transceivers on the fly.

15          THE COURT:  But one thing that you could maybe talk to

16   Ms. Call about is whether there is any anticipated expert

17   testimony.  It doesn't sound like it.  Moreover, this doesn't

18   really seem like the type of case like *Brooks* where things

19   would be outside of the ken of the jurors, like jurors

20   typically don't know about drug conspiracies.  But in this case

21   they probably do know about simple contract negotiations and

22   things of that nature, so I am not sure that there would be any

23   testimony from the special agents about the structure, things

24   of that nature.  I don't know, but that may make the chances of

25   the Court needing to give a limiting instruction low, but there

1    is no problem, of course, with something that the defendants

2    may want to tender to the Court just in case.

3           MR. KORNFELD:  Understood.  Thank you, Your Honor.

4           And the second thing related to this witness, I

5    understand in the -- not in the abstract, under the rules if

6    the government wants to take the position beyond the scope,

7    call this person back, that's fine.  There is two issues,

8    though, with that that I have a concern about.  One is

9    logistical.  The government sent us a number of e-mails that

10   this woman has childcare issues and can we move her around so

11   it's not to inconvenience her, et cetera.  And as I think the

12   Court maybe indicated stating the obvious, coming back to

13   Denver from Louisville a second time is an inconvenience.

14          But the second thing, Your Honor, and this is where I

15   think it's beyond just an application of the rules, and that is

16   we all know, and we put this on the record yesterday, that

17   Exhibit 1919 is inaccurate in terms of it suggesting that the

18   list of Bryant -- with Mr. Bryant is future pricing.  It's

19   current pricing.  We can clean that up in our case.  But if

20   everybody knows --

21          THE COURT:  How would Ms. Fisher know, though?

22          MR. KORNFELD:  What's that?  Well, I think that's what

23   Ms. Rahman was prepared to ask because I think she is familiar

24   with that.

25          THE COURT:  With that exhibit or just -- she is

1    familiar with what those analogous numbers would mean --

2         MR. KORNFELD:  Yes.

3         THE COURT:  -- for the contract period that she was

4    involved in.

5         MR. KORNFELD:  Yeah, that's right.  But I think that

6    could clear it up.  And I think -- I think precluding us from

7    doing that under a strict application -- or trying to do that

8    under a strict application of the rules when I think the

9    parties know that at least what's before the jury on that issue

10   is inaccurate, you know, I just think we're tending toward the

11   foul blow rather than the hard strike that's contemplated in

12   *Berger v. United States*.

13        So I would just ask the government to reconsider its

14   position so as not to inconvenience the witness that we've

15   tried to facilitate her personal convenience and so we can --

16   at least Ms. Rahman on her cross can try to clear up that issue

17   and not bring this witness back for that sole point.

18        THE COURT:  Yeah, I don't want -- I'll say this.  If

19   one side perceives it strategically important to enforce the

20   scope of a direct, I usually honor that because if you --

21   that's part of the name of the game.  You try to structure your

22   case.

23        MR. KORNFELD:  Sure.

24        THE COURT:  I will also say in all of the trials I

25   have presided over, I can't say that I have ever noticed any

1    strategic advantage from limiting the scope.  It usually

2    doesn't ever turn out to be that big of a deal.  So that's why

3    I do think it's a good idea for the government to think about

4    that because it's a long way to come back for what would

5    probably be not too many questions, maybe more than usual just

6    because she may not quite understand exactly why she is being

7    asked these things, but nonetheless, it's a long way.

8              Ms. Prewitt go ahead.

9              *MS. PREWITT:*  I just wanted to add to that comment.

10   Your Honor, Mr. Koenig made a lot of -- made a theatrical push

11   during his direct examination of Mr. Bryant to talk -- himself

12   expressed that this was future pricing.  It was a big feature

13   of his direct examination.  It's wrong and it's the ultimate

14   issue really.  It's was there sharing of future price

15   information.  And that is the reason we really feel this is

16   important to correct given the length of the trial, Your Honor.

17   And I know Ms. Rahman can move through this very quickly with

18   this witness just to clarify that.  I just wanted do add that.

19             *THE COURT:*  Once again, that's not the issue.  I have

20   no doubt that's a big deal and perhaps this witness could do

21   that.  I haven't heard anything that would suggest that she

22   cannot be recalled.  Now, if there is some reason to believe

23   that there is a very high probability that she couldn't be

24   recalled for some reason, I don't know what, that could be a

25   little bit different because then it could as a practical

1   matter prevent the defendants from the ability to correct

2   something that they think needs correcting.  I haven't heard

3   that yet, but that would be part of the calculation in talking

4   with the government about whether to relax the scope.

5          MS. CALL:  And just so the record is clear on what

6   we're discussing here, I think we're talking about Mr. Bryant's

7   testimony and his own handwritten notes.  What is currently on

8   the record is his belief as to what that was, so I don't know

9   that there is anything to correct, but I understand defense

10  counsel --

11         THE COURT:  Well, I think that the issue that's being

12  suggested that Ms. Rahman I think was probably asking to go

13  into would be, as I said before, to use the negotiations that

14  she was familiar with and to talk about whether it's current or

15  future.  That would perhaps reflect on a norm that may have

16  applied to the 2014 negotiations.  That's just my -- that was

17  my assumption.

18         MS. CALL:  I believe it's about the 2017 negotiations,

19  Your Honor.

20         MR. FELDBERG:  May I add one point, Your Honor?

21         THE COURT:  Yes.

22         MR. FELDBERG:  In response to Your Honor's comment

23  that there is some reason that Ms. Fisher could not come back

24  conveniently to court later on --

25         THE COURT:  I didn't say conveniently.  I am sure

1    that --

2         *MR. FELDBERG:*  We don't have access to Ms. Fisher.  We

3    have been denied an opportunity to speak with her or to have

4    any substantive conversations with her counsel.  All we know is

5    what we've heard from the government which is that she has

6    childcare concerns which have affected the scheduling, which of

7    course we have been willing to accommodate.  So at a minimum we

8    know she has some childcare issues.

9         I think it's fair to conclude from that that it would

10   be inconvenient for her to make a second trip from Louisville

11   to Denver.  And therefore, I join in the application of my

12   colleagues for the government to reconsider its position on

13   scope or for the Court in the exercise of its discretion to

14   manage the trial to consider allowing this brief inquiry

15   through Ms. Rahman.

16        *THE COURT:*  Right.  Convenience is not my -- the

17   forefront of my concern.  The issue would be whether there

18   would be some higher probability than usual of her not just

19   being inconvenienced, but not being able to make it back.

20        *MR. FELDBERG:*  We simply don't know, Your Honor.

21        *THE COURT:*  Yeah, the government does.  Like you said,

22   Mr. Feldberg, you probably can't access the witness, but I am

23   confident that the government would look into that and take

24   that into consideration.

25        *MS. CALL:*  We will consider it.  And just to be clear,

1  I think Your Honor understands, but the government has not

2  denied defense counsel access to witnesses.  I believe they

3  voluntarily just decided not to speak to defense counsel, but I

4  did want that to be clear.

5       THE COURT:  Ms. Prewitt?

6       MS. PREWITT:  She works for a company that's filed

7  civil litigation in connection with the matter and has a vested

8  interest in the outcome.  So I am just saying, Your Honor, the

9  decision about whether we had access or not is -- you know, I

10  think that Mr. Feldberg makes a fair point.

11      THE COURT:  I think that Mr. Feldberg's point -- I am

12  not assuming that the government is preventing anything.  I

13  think that the point was that she is not talking to the

14  defendants.

15      MS. CALL:  I also believe the point is incorrect that

16  RSCS has not filed a lawsuit in the civil litigation.  I

17  believe Ms. Prewitt was maybe referring to KFC.

18      MS. PREWITT:  I am sorry, thank you.

19      THE COURT:  Yes.

20      MS. PLETCHER:  Anna Pletcher for Jason Penn.

21       With respect briefly to this issue about the summary

22  witness, Agent Koppenhaver, tomorrow, I wanted to put on the

23  record that defendants do share the Court's concerns under

24  Brooks Ray and Crawford additionally, but we would ask perhaps

25  if it might be efficient for the Court to have an offer of

1    proof in the morning from the government.  It sounds like they

2    might be modifying their plans for this witness, and it might

3    be helpful to work through those issues in the morning before

4    the jury comes.

5           THE COURT:  Well, I am not sure if the government has

6    outlined exactly what it's going to go into anyway.  And

7    therefore, to the extent that there may be a different

8    approach, I am not sure what difference it would make to the

9    defendants.  I don't know.

10          Have you outlined what he is going to go into?

11          MS. CALL:  We have provided a list of all the exhibits

12   we plan to review with Agent Koppenhaver, including all of the

13   summary exhibits, to defense counsel.

14          THE COURT:  And is there some change?  Is the list

15   current?

16          MS. CALL:  It is current.  And I think what we've

17   outlined today is perhaps how we present the evidence, but not

18   what evidence be presented.

19          THE COURT:  Okay.  Anything else briefly?  We are

20   late.

21          We will be in recess until tomorrow.  Thank you.

22       (Recess at 5:25 p.m.)

23

24

25

1639

1                              INDEX

2     WITNESSES

3         Robert Lewis

4             Cross-examination By Mr. McLoughlin          1395

5             Cross-examination By Mr. Feldberg            1429

6             Cross-examination By Mr. Tubach              1446

7             Cross-examination By Mr. Gillen              1481

8             Cross-examination By Ms. Henry               1503

9             Cross-examination By Mr. Pollack             1527

10            Redirect Examination By Mr. Torzilli         1547

11        Sara Fisher

12            Direct Examination By Ms. Sweeney            1558

13            Cross-examination By Ms. Rahman              1599

14                            EXHIBITS

15    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

16    18-2                    1578

17    82                      1623

18    A-298                   1458

19    A-299, 2-3              1457

20    F-384                   1419

21    C-451                   1448

22    C-454                   1507

23    G-504                   1447

24    G-523                   1491

25    G-629                   1487

1    INDEX (Continued)

2    EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    A-644                  1452

5    F-660                  1437

6    F-743                  1461

7    F-744                  1434

8    F-756                  1618

9    F-788                  1464

10   F-821                  1474

11   F-853                  1609

12   F-868                  1615

13   C-872                  1449

14   F-889, 2-3             1455

15   H-976                  1470

16   1007                   1454

17   1008                   1454

18   1025                   1519

19   1026                   1519

20   1921                   1575

21   1922                   1575

22   1923                   1575

23   1924                   1575

24   1926                   1575

25   1927                   1575

1                                   INDEX (Continued)

2                                       EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 1928 |  | 1575 |  |  |  |
| 1929 |  | 1575 |  |  |  |
| 1942 |  | 1577 |  |  |  |
| 1943 |  | 1577 |  |  |  |
| 1944 |  | 1577 |  |  |  |
| 1945 |  | 1577 |  |  |  |
| 1946 |  | 1577 |  |  |  |
| 1947 |  | 1577 |  |  |  |
| 1957 |  | 1577 |  |  |  |
| 1958 |  | 1577 |  |  |  |

14                       REPORTER'S CERTIFICATE

15     I certify that the foregoing is a correct transcript from

16 the record of proceedings in the above-entitled matter.  Dated

17 at Denver, Colorado, this 21st day of January, 2022.

18

19                             S/Janet M. Coppock

20

21

22

23

24

25