1    IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 20-CR-00152-PAB
3
     UNITED STATES OF AMERICA,
4
          Plaintiff,
5
     vs.
6
     JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12        Defendants

13   _____

                   REPORTER'S TRANSCRIPT
14                 Trial to Jury, Vol. 9

15   _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:30 a.m., on the 5th day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

<pre>
 1                         APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
</pre>

1644

```
1              APPEARANCES (Continued)

2         Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5         Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7         Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10        James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12        Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14        Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16        Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19        John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
1              APPEARANCES (Continued)
2          Craig Allen Gillen and Anthony Charles Lake of
3     Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
4     Atlanta, GA 30339;
5          Richard L. Tegtmeier of Sherman & Howard, LLC,
6     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
7     for Defendant Roberts.
8          Barry J. Pollack of Robbins, Russell, Englert, Orseck
9     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10    DC 20006;
11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13    for the Defendant Blake.
14
15                   PROCEEDINGS
16         THE COURT:  Thank you.  Please be seated.  All right.
17    Did you have something to raise?
18         MS. SWEENEY:  Your Honor, I just have one small thing
19    to raise with regard to the scope objection that we made
20    yesterday.  The government had offered to defense counsel but
21    didn't hear back to stipulate as to the authenticity and
22    admissibility of what I believe is Defense Exhibit F-828.  We
23    have marked it -- which is the period pricing for period two.
24    We have marked it as Government's Exhibit 9697 and think that
25    would obviate the need and would be happy to introduce that in
```

1    front of the jury.  We would stipulate to admissibility and

2    authentication.  We believe that, plus Mr. Lewis' testimony and

3    Mr. Bryant's testimony about what period pricing is, when it

4    set and how it relates to contracts would obviate the need to

5    cross Ms. Fisher on this.

6         THE COURT:  So explain that to me again.  So there is

7    a defense Exhibit F something or other?

8         MS. SWEENEY:  F-828, which is period two pricing of

9    2017.  It is the document that they I believe showed to

10   Mr. Bryant but he did not recognize that corresponds to some of

11   the numbers in his handwritten list in Exhibit 1919.

12        THE COURT:  But then you mentioned some government

13   exhibits too?

14        MS. SWEENEY:  We just marked it as a government

15   exhibit, but we are happy to introduce either Defense

16   Exhibit 828 or government's exhibit, which is the exact same

17   document with the government exhibit number.

18        THE COURT:  Seems like it would be better since it's

19   been shown to someone, although Mr. Bryant didn't apparently

20   recognize it, to use the 828 number.  But you're still

21   objecting to any questions to Ms. Fisher about it?

22        MS. SWEENEY:  Correct.  And as we understood it, the

23   defendants' concern was establishing that that was the period

24   pricing in that time period and then later being able to argue

25   how those period pricings relate to Exhibit 1919, Mr. Bryant's

 1    handwritten notes, as opposed to any personal knowledge of

 2    Ms. Fisher.

 3         THE COURT:  Just so I make sure I understand this, so

 4    the government would be willing to admit F-828 or at least

 5    agree to the admission of F-828, but in addition to that have a

 6    stipulation as to some issues regarding it?

 7         MS. SWEENEY:  No, Your Honor, just to admit it.  And

 8    the stipulation would be admitting to its admissibility and

 9    authenticity.  So simply put, the government is willing to

10    admit the exhibit.

11         THE COURT:  Okay.  Ms. Rahman, response?

12         MR. LAVINE:  If we could have one moment, please, Your

13    Honor.

14         THE COURT:  Sure.

15         MS. RAHMAN:  Your Honor, the document I actually was

16    wanting to show Ms. Fisher was marked as Defendant's I-054,

17    which is the period two pricing, an RSCS document.  It's a

18    smaller document.  It's two pages.  It's sort of a compilation.

19    I have a copy for the Court.

20         Your Honor, I think we are in agreement.  They had

21    just put a different government exhibit number on it, so either

22    number works for me as long as the Bates number is the same.

23    So we would like to have it marked as I-054, Your Honor.  We

24    would like to move that one into evidence for the stipulation.

25         THE COURT:  Okay.  But the question is whether --

1    that's a multi-page exhibit?  I have got -- maybe I just have

2    two pages.

3             MS. RAHMAN:  It's two pages.  I think, Your Honor, the

4    one I handed up is double-sided.

5             THE COURT:  I was handed two copies of it, so no

6    problem.  So then the question becomes whether the fact that

7    that document won't have any objection as to its admissibility

8    then solves the problem of whether the scope of the direct can

9    be exceeded in your cross.

10            MS. PREWITT:  Your Honor, Defendant Mulrenin does not

11   believe that it cures it.  I think there has been substantial

12   confusion which is why the government is very quick to

13   stipulate this morning.

14            THE COURT:  Okay.  Well, we are where we were.  Maybe

15   we made a little bit of progress, but we are essentially where

16   we were yesterday.

17            Anything else to take up?

18            MS. PREWITT:  Your Honor, there is one other issue.

19            THE COURT:  Real quick.  These issues should be called

20   to my attention well before 8:30.

21            MS. PREWITT:  Actually, this was brought up by the

22   government.  They wish to take witnesses out of order and maybe

23   their view on that has changed.

24            MS. CALL:  Yes, Your Honor.  We informed defense

25   counsel last night we don't plan to take witnesses out of

1  order, but we did let them know that in line with Your Honor's

2  instruction at the end of the day yesterday, that the

3  government will be introducing several exhibits without a

4  witness.  So the plan at the moment is after Ms. Fisher's

5  testimony to introduce several documents, which may take

6  approximately an hour I would expect to give the jury

7  sufficient time to read those documents, and then to move on to

8  the next witness as planned, which I believe was Ms. Tucker,

9  then, Mr. Coan, then possibly Agent Koppenhaver.

10           THE COURT:  And then Special Agent Koppenhaver?

11           MS. CALL:  We are not quite sure at the moment how

12  long his testimony will be.

13           MS. PREWITT:  Your Honor, I will say some of these

14  documents we just received in terms of the ones they want to

15  admit and I am afraid there are going to be times we are going

16  to have to look at these documents.  Your Honor will recall I

17  made the mistake of not reading to the last page of the exhibit

18  introduced by the government which we had received late, which

19  included a hearsay statement, and thankfully Your Honor and the

20  government were able to look through that and correct it, but

21  given the lateness of receiving some of these exhibits, we are

22  going to have to take time looking at them.  We wish not to do

23  that in front of the jury.  Maybe there is a way we can work

24  around that at a point when it doesn't have to be dealt with

25  and have the jury waiting, but that is really the situation we

Sara Fisher - Cross

1    are contending with, Your Honor.

2            THE COURT:  Maybe the government can do the ones that

3    notice had been provided for in advance first so that people

4    have a chance, but on the other hand, people can't do two

5    things at once, so it's tricky.

6            MS. CALL:  To be clear, all the documents we were

7    introducing through Agent Koppenhaver or were planning to we

8    had provided many days ago and, of course, were already on our

9    exhibit list.  There are several more we may introduce today

10   that were, of course, on our exhibit list.  Once we decided we

11   would be introducing them today, we did notify defense counsel

12   right away, but as Ms. Prewitt said, that was last night.

13           THE COURT:  Okay.  Let's bring the jury back in.

14           (Jury present.)

15       (**Sara Fisher** was previously sworn.)

16                **CROSS-EXAMINATION CONTINUED**

17   BY MS. RAHMAN:

18   Q.  Good morning, Ms. Fisher.

19   A.  Good morning.

20           MS. RAHMAN:  Your Honor, one quick question.  So

21   stipulation for this document, you're still -- the government

22   is still objecting to the scope of the cross-examination, so

23   they are willing to stipulate to the admission of the document

24   but not allow me to ask any questions of the witness of the

25   document.  I just want to make sure I am correct on the

Sara Fisher - Cross

1    parameters.

2         THE COURT:  I don't know.  That's up to -- to the

3    extent that you have an agreement with the United States,

4    that's up to you.

5         MS. RAHMAN:  Can I have a moment to confer with

6    Ms. Sweeney?

7         THE COURT:  Yes.

8         MS. RAHMAN:  Your Honor, I would like to move for the

9    admission of I-054.

10        THE COURT:  All right.  Any objection to the admission

11   of I-054?

12        MS. SWEENEY:  No, Your Honor.

13        THE COURT:  Exhibit I-054 will be admitted.

14        MS. RAHMAN:  And Your Honor, given the government's

15   objection as to the scope of the cross-examination, I don't

16   have any further questions for Ms. Fisher.

17        THE COURT:  All right.  Additional cross-examination?

18        MS. CARWILE:  Thank you, Your Honor.

19        Before I do that, can we publish I-054 to the jury now

20   that it's been admitted?

21        THE COURT:  You may.

22                      **CROSS-EXAMINATION**

23   BY MS. CARWILE:

24   Q.  Good morning, Ms. Fisher.

25   A.  Good morning.

Sara Fisher - Cross

1    Q.  Let me just get situated here.

2         All right.  So yesterday on direct testimony you

3    testified about the 2017 RSCS negotiations for the 2018 through

4    2020 contract.  Do you remember that?

5    A.  Yes.

6    Q.  And on cross with Ms. Rahman you testified regarding the

7    Claxton finalized contract for that negotiation cycle.  Do you

8    remember that?

9    A.  Yes.

10   Q.  So I'm going to ask you about a few other suppliers,

11   another set of -- the other set of the suppliers for that

12   negotiation.  Is that all right?

13   A.  Yes.

14        MS. CARWILE:  So, Your Honor, may I approach the madam

15   clerk in order to provide documents?

16        THE COURT:  Yes.

17        MS. CARWILE:  Thank you.

18   BY MS. CARWILE:

19   Q.  All right.  So Ms. Fisher, you have a manila folder in

20   front of you; is that right?

21   A.  Yes.

22        MS. CARWILE:  And for the record, what I have handed

23   Ms. Fisher and provided copies to the Court and government

24   counsel are six documents.  For the record they are marked

25   B-963, F-747, F-783, F-789, F-796, and G-474.

Sara Fisher - Cross

1   *BY MS. CARWILE:*

2   Q.   Ms. Fisher, do you have all six of those documents in front

3   of you?

4   A.   Yes.

5   Q.   Okay.  In order to be a bit more efficient, I'm going to

6   ask you the same question regarding all -- my question will

7   pertain to all six of these documents, all right?

8   A.   Okay.

9   Q.   My first question is do you recognize these six documents?

10  A.   Yes.

11  Q.   What do you recognize them to be?

12  A.   They are the SBRA documents for the contract negotiations.

13  Q.   Okay.  So put another way, they are the contracts that the

14  suppliers for the 2017 negotiation cycle signed for the 2018 to

15  2020 period of pricing?

16  A.   Yes.

17  Q.   All right.  So let me ask you this, and again these

18  questions will be relevant to all six documents, all right?

19  A.   Okay.

20  Q.   Were these contracts created near the time at which they

21  were signed?

22  A.   Yes.

23  Q.   And these contracts were created and signed in the regular

24  course of business of RSCS?

25  A.   Yes.

Sara Fisher - Cross

1    *Q.*  And it was a regular practice of RSCS to create and sign

2    such contracts with chicken suppliers.

3    *A.*  Yes.

4    *Q.*  You have no reason to doubt the accuracy of the numbers

5    within those documents?

6    *A.*  No.

7          *MS. CARWILE:*  Your Honor, I would move for the

8    admission of all six documents at this time.

9          *THE COURT:*  Any objection to the admission of those

10   six documents?

11         *MS. SWEENEY:*  No, Your Honor.

12         *THE COURT:*  So B-963, F-747, F-783, F-789, F-796 and

13   G-474 will each be admitted.

14         *MS. CARWILE:*  Thank you.  And I am not going to bore

15   the jury with the publishing of those.  I will move on from

16   there.

17         *THE COURT:*  Okay.

18   *BY MS. CARWILE:*

19   *Q.*  So Ms. Fisher, you testified on direct yesterday that one

20   of the goals you achieved during this contract negotiation

21   cycle was a reduction in price; is that right?

22   *A.*  Yes.

23   *Q.*  Is it also fair -- I am sorry, were you saying something?

24   *A.*  No.

25   *Q.*  As to all -- as to the suppliers that were involved and

Sara Fisher - Cross

1  ultimately signed contracts with you for this cycle, is it fair

2  to say that OK Foods was one of them?

3  *A.* Yes.

4  *Q.* And did OK Foods submit a bid prior to signing a full

5  contract with RSCS?

6  *A.* Yes.

7  *Q.* And is it fair to say that Case was one of the suppliers

8  who signed a contract with RSCS?

9  *A.* Yes.

10  *Q.* And did Case also submit a bid prior to signing that

11  contract?

12  *A.* Yes.

13  *Q.* All right.  Pilgrim's Pride submitted a bid as well; is

14  that right?

15  *A.* Yes.

16  *Q.* Do you recall the date on which the bid was submitted to

17  you?

18  *A.* I do not.

19        *MS. CARWILE:*  Okay.  That's all right.  So I am going

20  to show the witness what has been previously marked E-467 and

21  E-468 for refreshment of recollection only, Your Honor.  May I

22  provide copies to the Court and witness?

23        *THE COURT:*  Yes.

24  *BY MS. CARWILE:*

25  *Q.* All right.  So Ms. Fisher, I am not asking you about

Sara Fisher - Cross

1    anything inside the document, but what I am asking you about is

2    whether your review of these two documents, the e-mail and

3    attachment, refreshes your recollection as to the date on which

4    RSCS received Pilgrim's Pride bid for this contract cycle we've

5    been discussing.

6    A.   Yes.

7    Q.   And what is that date?

8    A.   February 3rd, 2017.

9    Q.   Okay.  So if you could turn to the attachment -- which now

10   I have lost my copy, gave too many away -- to the attachment

11   E-468.  Can you take a look at that for me?  And I believe the

12   entire exhibit is six total pages.  And please let me know if

13   you also have six total pages in front of you, not including

14   the 467.

15   A.   Including the cover page?

16   Q.   Yes, including the cover page.

17   A.   Yes.

18   Q.   Thank you for that clarification.

19        So is it fair to say that -- you can actually remove

20   467 if you would like, if that's helpful.  I am just looking at

21   468.  Is it fair to say that there is a cover page indicating

22   document produced in native format and then five pages of an

23   actual document?

24   A.   Yes.

25   Q.   All right.  Do you recognize this just looking at E-468 in

Sara Fisher - Cross

1    its entirety?

2    A.   Yes.  I mean, it's a proposal.  I can't say with certainty

3    it was the attachment, but it appears to be the proposal that

4    was submitted from Pilgrim's.

5    Q.   Okay.  Will you accept my representation that it is the

6    attachment to that e-mail, 467?

7    A.   Yes.

8    Q.   All right.  So as to the bids, as to bids received by RSCS

9    and specific to the cycle in which you were involved, but

10   generally as well, are those bids submitted at or near the time

11   that the contract negotiations are going on?

12   A.   Yes.

13   Q.   And are those bids asked for and then received by RSCS in

14   the regular course of business?

15   A.   Yes.

16   Q.   And was it a regular practice of RSCS to solicit and obtain

17   bids from chicken suppliers prior to signing contracts?

18   A.   Yes.

19   Q.   Do you have any reason to doubt the accuracy of what is

20   contained in E-468?

21   A.   No.

22            MS. CARWILE:  Your Honor, I would move in E-468 as a

23   business record.

24            THE COURT:  Any objection to the admission of E-468?

25            MS. SWEENEY:  E-468, no objection.

Sara Fisher - Cross

1          *THE COURT:*  E-468 will be admitted.

2          *MS. CARWILE:*  Thank you.  And as Ms. Sweeney I imagine

3    as noting in her no objection, I do not request E-467 to be

4    admitted.  Thank you.

5    *BY MS. CARWILE:*

6    Q.  Okay.  So Ms. Fisher, you testified on direct that you

7    worked with a team at RSCS regarding the bidding and

8    contracting cycle for the 2018 to 2020 contract; is that right?

9    A.  Yes.

10   Q.  As part of your participation in that team, did you attend

11   or -- well, did you attend any presentations that were internal

12   RSCS presentations directly relevant to the contract

13   negotiations that you were conducting?

14   A.  Can you clarify what you mean by presentations?

15   Q.  I can, yes.  It's a little bit vague.  Sorry about that.

16          Were you ever presented with PowerPoint presentations

17   which contained information directly relevant to the contract

18   negotiation of that cycle?

19   A.  I don't recall exactly.

20   Q.  Okay.  Let me ask you to take a look at what has been

21   previously marked F-812 for identification only.

22          *MS. CARWILE:*  Your Honor, may I approach with copies

23   for the Court and witness?

24          *THE COURT:*  Yes.

25          *MS. CARWILE:*  Thank you.

1659

Sara Fisher - Cross

1  *BY MS. CARWILE:*

2  Q.  Ms. Fisher, I am going to ask you to take a look through

3  F-812 double-sided.  There are 14 -- let me make sure that's

4  right -- 14 slides and a cover page.  And just let me know when

5  you've had a chance to look through it.  Take your time.

6  A.  Okay.

7  Q.  All right.  Does your review of this document in front of

8  you refresh your recollection as to whether you've seen it

9  before?

10  A.  Yes.

11  Q.  Okay.  And you have seen it before; is that right?

12  A.  Yes.

13  Q.  So you at the time that these negotiations were going on,

14  you as part of the RSCS team were presented and some other word

15  meaning got to see or got to hear about this presentation on

16  behalf of RSCS; is that right?

17  A.  Yes.

18  Q.  Okay.  You've worked at RSCS for a while now, I think you

19  said 2009?

20  A.  2008.

21  Q.  2008, thank you.  And you work there now.

22  A.  Correct.

23  Q.  So if my math is right, which it probably won't be, is that

24  13, 14 years?

25  A.  Going on 14 years.

Sara Fisher - Cross

1   Q.  All right.  So you're -- you know the business practices of

2   RSCS generally across the company?

3   A.  Yes.

4   Q.  Okay.  Is it fair to say that the presentation -- I'm not

5   asking generally about presentations, but the presentation that

6   I've handed you, was it created at or near the time that it was

7   presented to you?

8   A.  Looking at it, it looks like it was a deck that we had put

9   together to go over the strategy for that negotiation for that

10  time period.

11  Q.  And you would have done that close in time to when you were

12  actually reviewing the information inside of that deck; is that

13  right?

14  A.  Yes.

15  Q.  And it sounded like you just said you may have had a hand

16  in the creation of this.  Is that fair to say?

17  A.  I mean, possibly.  There is -- I did a lot of the behind

18  the scenes analysis.

19  Q.  Okay.  So you may have had even more of a hand than perhaps

20  your superiors in creating this document because you were

21  actually doing the real work.

22  A.  I am not creating the document.  I may have provided

23  numbers potentially that went in here.

24  Q.  So it's fair to say that you may have had a hand in the

25  creation of the information inside of this document.

Sara Fisher - Cross

1    A.   Yes, potentially.

2    Q.   Was it -- given your 14 years' experience working for RSCS,

3    is creation of such internal decks, I'm going to call them,

4    PowerPoint presentations, part of the regularly conducted

5    business activity of RSCS in terms of conducting market

6    intelligence?

7    A.   I don't know that it would be considered market

8    intelligence.

9    Q.   I asked that incorrectly.  Let me just ask it more

10   generally.

11        Is it the regular -- are such decks such as the one in

12   front of you created in the regular course of business of RSCS?

13   A.   Yes.

14   Q.   And is it the regular practice of RSCS to create, present

15   and keep such documents?

16   A.   Yes.

17   Q.   As you looked through F-812, do you have any reason to

18   doubt the accuracy inside of that document?

19   A.   No.

20        MS. CARWILE:  Your Honor, I would move the admission

21   of F-812 as a business record.

22        THE COURT:  Any objection to the admission of F-812?

23        MS. SWEENEY:  Yes, Your Honor, on foundation and

24   hearsay grounds.

25        THE COURT:  Response?

1662

Sara Fisher - Cross

1    *MS. CARWILE:*  Well, the hearsay exception is the

2    business records exception.  And this witness testified she not

3    only recognizes and saw this document at the time, but she had

4    a hand in the creation of some of the information inside of it.

5    *THE COURT:*  Objection is sustained.  No. 1, the

6    witness does not have much familiarity with it at all.  She in

7    fact indicates that she may have seen it.  She may have

8    supplied some numbers for it.  There is a lot of other numbers

9    in it.  She didn't testify as to any particular number.

10   Moreover, by its very nature this is not a -- does not fit

11   within the business records exception.  The objection will be

12   sustained.

13   *MS. CARWILE:*  Your Honor, may I be permitted to ask

14   about one number inside of it in order to allay the Court's

15   concern about the number?

16   *THE COURT:*  Sure.  You can ask more than one question.

17   You can ask lots of questions about it to try to establish

18   foundation.

19   *MS. CARWILE:*  Thank you very much.

20   *BY MS. CARWILE:*

21   *Q.*  So Ms. Fisher, in 2016, the year that you -- your team

22   began the negotiations with chicken suppliers, you said you had

23   sent e-mails late 2016; is that right?

24   *A.*  Yes.

25   *Q.*  And in 2016 Pilgrim's Pride accounted for 25 percent of

Sara Fisher - Cross

1    RSCS's total volume of COB; is that correct?

2    *A.* I can't confirm.  That sounds about right, but I would have

3    to --

4    *Q.* Do you remember?

5    *A.* I don't remember the exact number, no.

6    *Q.* Okay.  Could you turn to the slide paginated 7 in that

7    exhibit?  And I direct your attention to the bottom left-hand

8    corner.

9            Do you see that?

10   *A.* Yes.

11   *Q.* I am directing your attention to the row entitled

12   Pilgrim's.  Do you see that?

13   *A.* Yes.

14   *Q.* Can you please let me know whether that refreshes your

15   recollection as to the total percent of volume that Pilgrim's

16   Pride supplied to RSCS by percent in 2016 of COB?

17   *A.* Yes, 25 percent.

18   *Q.* And is it also fair to say that Pilgrim's was supplying

19   $99.2 million worth of COB in the year 2016 to RSCS?

20   *A.* Yes.

21   *Q.* Now, moving forward into the future year that RSCS was

22   anticipating regarding new chicken contracts, is it fair to say

23   that the updated volume percent of COB that Pilgrim's provided

24   to RSCS among its total suppliers was 20 percent?

25           *MS. SWEENEY:* Your Honor, objection.  I just ask that

Sara Fisher - Cross

1   since this document is being used to refresh the witness'

2   recollection, it be taken down from the screen and she be asked

3   to put it aside.

4          *THE COURT:*  Sustained.

5   *BY MS. CARWILE:*

6   *Q.*  If you can put the document down.  And I am going to ask

7   you a direct question which is in the following year, 2017, or

8   the contract cycle of 2018 to 2020, was Pilgrim's total -- what

9   was Pilgrim's total percent volume that it supplied in COB to

10  RSCS?

11  *A.*  I don't recall.  And I know this says 20 percent, but I

12  don't know if this was the final awards or not, so I believe

13  that their volume did go down slightly, but I don't recall the

14  exact percent.

15  *Q.*  That's fair enough.  Thank you for the honesty on that.

16  Okay.  We can put that away.  Just a few more questions,

17  Ms. Fisher.

18          So you testified on direct that RSCS was satisfied

19  with where your company landed in terms of negotiations with

20  the group of chicken suppliers that you were negotiating with;

21  is that right?

22  *A.*  Yes.

23  *Q.*  With your first interview with the government on March 3rd

24  of 2021, you told them that you did, in fact, get -- RSCS,

25  excuse me, did get a reduction in price at the end of these

Sara Fisher - Cross

1   negotiations.

2   A.   Yes.

3   Q.   And you meant as to all the suppliers.

4   A.   I believe so, yes.

5   Q.   And you told the government that while you could not recall

6   the exact amount at the time of that interview, it was close to

7   the target price RSCS wanted; is that correct?

8   A.   I believe so, yes.

9   Q.   In an interview on September 21st of this year, you told

10  the government that RSCS was satisfied with where RSCS landed

11  in the negotiations, and you were actually able to deliver some

12  savings to the system; is that right?

13  A.   Yes.

14  Q.   And your next interview, October 18th of this year, you

15  told the government that RSCS was concerned about the upcoming

16  contract negotiation cycle because the small bird segment of

17  the market decreased over the years from a capacity standpoint

18  because the suppliers could achieve better profit margin on the

19  bigger birds; is that right?

20  A.   Yes.

21  Q.   And you recall being pleasantly surprised by the amount of

22  volume you were able to obtain.

23  A.   Yes.

24  Q.   And by the price you were able to secure.

25  A.   Yes.

Sara Fisher - Cross

1   *Q.*  In that same interview, you told the government that in

2   addition to obtaining cost savings for RSCS, you were able to

3   bring a couple of additional plant locations on to help with

4   geographic logistical issues and to secure the volume RSCS

5   needed; is that right?

6   *A.*  Yes.

7   *Q.*  And then in your interview with the government on

8   October 19 of 2021, you told the government that RSCS had gone

9   into those contract negotiations with a price in mind it

10  considered fair; is that right?

11  *A.*  Can you -- I am sorry, can you restate that?

12  *Q.*  Yeah, of course.  You told the government during that

13  interview that you had -- RSCS went into contract negotiations

14  with a price range in mind that it would consider fair and

15  reasonable; is that correct?

16  *A.*  Yes.

17  *Q.*  And you told the government that if the suppliers quoted a

18  price in that range, it did not necessarily matter how they got

19  to that price; is that right?

20  *A.*  Not necessarily.

21  *Q.*  You didn't say that to the government?

22  *A.*  I don't recall if I said that exactly.  I mean, we had a

23  range that we were going after and we requested cost models.  I

24  guess at the end of the day if we negotiated the price down, it

25  didn't matter, you know, where they took it out of the cost

1667

Sara Fisher - Cross

1    model, so I guess -- I guess that's fair.

2    Q.  So let me ask it this way.  If an agent for the FBI wrote

3    down that you told him or her if the suppliers quoted a price

4    in that range, it would not necessarily matter how they got to

5    that price --

6          MS. SWEENEY:  Objection, Your Honor.  She is reading

7    from a report of what the agent from the FBI might have written

8    down.

9          MS. CARWILE:  I am attempting to impeach the witness

10   with her denial that she said the statement.

11         THE COURT:  Overruled.

12   BY MS. CARWILE:

13   Q.  I can read it again.  If an FBI agent wrote in a report

14   that you told him if the suppliers quoted a price in that

15   range, it did not necessarily matter how they got to that

16   price, would that be a correct or incorrect recitation of what

17   you told that FBI agent?

18   A.  That's correct.

19   Q.  And then finally, you told the government if a competitive

20   bidding process got the final price lower than the anticipated

21   pricing, RSCS was okay with that.

22   A.  Yes.

23   Q.  And that's because your company is competing with other

24   purchasers for chicken, but you'd like to attain the best price

25   that works for your company.  Is that fair to say?

Sara Fisher - Cross

1    A.   Yes.  We would like to get the lowest landed cost to our

2    restaurants.

3    Q.   One more thing, Ms. Fisher.  In July of 2019 did you reach

4    out to Carl Pepper of Tyson to ask him about possibly moving

5    from the customer side to the supplier side?

6    A.   Yes.

7    Q.   And you asked him for suggestions of people you could talk

8    to about that potential shift; is that right?

9    A.   Yes.

10   Q.   And you asked Mr. Pepper of Tyson whether he knew about any

11   open positions in a supplier company, not just in his own

12   company, but you asked him if he knew about any open positions

13   at his competitors; is that correct?

14   A.   Yes.

15           MS. CARWILE:  I don't have anything further, Your

16   Honor.

17           THE COURT:  Thank you, Ms. Carwile.

18           Additional cross-examination?

19           Yes, Ms. Johnson.

20                        **CROSS-EXAMINATION**

21   BY MS. JOHNSON:

22   Q.   Good morning, Ms. Fisher.  My name is Wendy Johnson.  I

23   have a few questions for you.

24           Sitting here today, you do not have any personal

25   knowledge that Mr.  Blake, my client, engaged into any

Sara Fisher - Cross

1   agreement to rig bids or fix, raise or maintain prices, do you?

2   A.  No.

3   Q.  In fact, you do not have any knowledge that any of the

4   defendants sitting in this courtroom today engaged or entered

5   into any agreement to rig bids, fix, raise or maintain prices,

6   do you?

7   A.  No.

8   Q.  You mentioned that Mr. Blake from George's was your point

9   of contact, correct?

10  A.  Yes.

11  Q.  He never signed a supply contract, did he?

12  A.  I don't recall who signed it.  It has to be a VP or above.

13  Q.  And do you know Mr. Blake's title?

14  A.  I don't know exactly.

15  Q.  He was your general point of contact; is that correct?

16  A.  Yes.

17  Q.  And is it fair to say would you characterize him as a

18  middle man in the process relating information back and forth?

19  A.  I would probably say that's accurate, yes.

20  Q.  Somewhat like your position at that time; is that fair?

21  A.  Yes.

22  Q.  Did you sign contracts for RSCS?

23  A.  No.

24  Q.  And, in fact, you assumed Mr. Blake needed approval from

25  someone else in order to reach the final contract; isn't that

Sara Fisher - Cross

1    true?

2    A.  I would say that's accurate, yes.

3    Q.  That's what you told the government in your very first

4    interview; is that correct?

5    A.  Yes.

6    Q.  I would like to call back to the screen the Government's

7    Exhibit 1927 for your review, please.

8            Do you recall this e-mail that you talked about

9    yesterday?

10   A.  Yes.

11   Q.  The government introduced this exhibit and published it to

12   the jury.  And they even used it as a basis for their chart

13   which is 18-2, if we could show that briefly.

14           THE COURT:  I am sorry, which one did you want?

15           MS. JOHNSON:  Your Honor, Government Exhibit 18-2.

16   BY MS. JOHNSON:

17   Q.  Do you recall this chart?

18   A.  Yes.

19   Q.  And do you recall your testimony about that?

20   A.  Yes.

21   Q.  And I believe the government yesterday asked you do you --

22   are there any other George's employees that appear on this

23   summary, and your answer was no; is that right?

24   A.  Correct.

25           MS. JOHNSON:  I am sorry, these were introduced

Sara Fisher - Cross

1    yesterday and I would like to publish these for the jury's

2    review.

3           THE COURT:  We are talking about 18-2, so we can

4    display that now.

5           MS. JOHNSON:  Yes, sir.

6    BY MS. JOHNSON:

7    Q.  The inference left yesterday was that Mr. Blake was the

8    only one from George's involved in this meeting on 2/13/17; is

9    that correct?

10   A.  He was the required attendee.

11   Q.  So the inference was that he must be the guy who had all

12   the authority to negotiate for George's; is that correct?

13   A.  I don't think that's necessarily the inference.

14   Q.  So at this time I would like to show you an exhibit just

15   marked for identification I-067.

16          MS. JOHNSON:  Your Honor, we have a copy for the

17   Court.

18          THE COURT:  I can see it.  Thank you.

19   BY MS. JOHNSON:

20   Q.  Let's start at the bottom of this e-mail, please.  Is this

21   an e-mail from you to Mr. Blake?

22   A.  Yes.

23   Q.  And is it in reference to the meeting you testified about

24   before the jury yesterday?

25   A.  Yes.

1672

Sara Fisher - Cross

1    Q.  Does the e-mail appear to suggest that Mr. Blake was or was
2    not the only one in attendance?
3            MS. SWEENEY:  Objection, Your Honor.  She is asked
4    questions about a document not in evidence as opposed to
5    refreshing the witness' recollection with it.
6            THE COURT:  Sustained.  If you could lay more
7    foundation.
8    BY MS. JOHNSON:
9    Q.  Sure.  Did you send this e-mail to Mr. Blake?
10   A.  Yes.
11   Q.  And was it about the meeting that you testified to the
12   Court yesterday?
13   A.  Yes.
14   Q.  And did you get a response from Mr. Blake?
15   A.  I believe so, yes.
16   Q.  Okay.  In reading this e-mail, does it appear to you that
17   Mr. Blake was the only one in attendance at the meeting that
18   you testified about yesterday?
19   A.  Can you scroll up?
20   Q.  I can't, but I think somebody can.
21   A.  It is.  Ric said waiting to hear back from --
22           MS. SWEENEY:  Objection, Your Honor, hearsay.
23           THE COURT:  Sustained.
24   BY MS. JOHNSON:
25   Q.  Without telling the jury what Mr. Blake said, what was your

Sara Fisher - Cross

1  response to Mr. Blake?

2  A.  Great, thanks.

3        MS. SWEENEY:  Object, Your Honor, reading from a

4  document that is again not in evidence.

5        THE COURT:  Well, she can answer if she remembers.

6        MS. SWEENEY:  Then I would ask the document be taken

7  from the screen.

8        THE COURT:  Agreed.

9  BY MS. JOHNSON:

10  Q.  Did the document you just reviewed refresh your

11  recollection about who might have been in attendance at the

12  meeting?

13  A.  I guess.  I mean, I can't -- I read the e-mail and it looks

14  like he was asking for someone above him to get dates, so...

15        MS. SWEENEY:  Objection.

16        THE COURT:  Sustained.

17  BY MS. JOHNSON:

18  Q.  Let me publish the document back to you and have you review

19  the very top of the document.

20        Is that again a response from you to Mr. Blake?

21  A.  Yes, it is.

22  Q.  And we'll take the document down.

23        Did that refresh your recollection?  Did you recall

24  giving him any instructions about a calendar invite and what to

25  do about the meeting?

Sara Fisher - Cross

1   *A.*  As far as -- I am not sure I am understanding the question

2   exactly.

3           *MS. JOHNSON:*  May I review the screen, Your Honor?

4           *THE COURT:*  What?

5           *MS. JOHNSON:*  May I review the screen to see what's

6   being published or shown to the witness?

7           *THE COURT:*  Nothing right now.

8           *MS. JOHNSON:*  Can we put Exhibit I-067 back on the

9   screen, please?

10          *THE COURT:*  Yes.

11          *MS. JOHNSON:*  Your Honor, it appears that the document

12  may have changed.  I am not sure what's going on with the

13  publication.  May I approach the clerk to hand the document

14  I-067 to the witness?

15          *THE COURT:*  Yes.

16  *BY MS. JOHNSON:*

17  *Q.*  Ms. Fisher, I apologize.  It may be you were looking at one

18  document and I was talking about another, so I apologize for

19  any confusion about that.  I will give you a chance to review

20  that starting from the bottom and working your way up to the

21  top, and you can let me know when you've had a chance.

22  *A.*  Okay.

23  *Q.*  Now, if you'll lay the document down.

24          Does this refresh your recollection about a discussion

25  you had with Mr. Blake regarding the e-mail that you testified

Sara Fisher - Cross

1    yesterday about to the jury?

2    A.   Yes.

3    Q.   And based on your recollection, can you tell the jury if

4    there were or were not other people at the meeting?

5    A.   Yes.  It looks like based on this e-mail that --

6            MS. SWEENEY:  Objection, Your Honor.  The witness is

7    testifying about the e-mail as opposed to her memory.

8            THE COURT:  Sustained.  If you could clarify the

9    question.  In other words, make sure that she is testifying

10   just from her memory.

11   BY MS. JOHNSON:

12   Q.   Sure.  Again we have put the document down and it's

13   refreshed your recollection, correct?

14   A.   Yes.

15   Q.   And what do you recall about the discussions prior to or

16   whether or not there were additional people at the meeting?

17   A.   Yes.  Ric was working with Charles to see if they could

18   come as well.  We picked dates where Charles would be there as

19   well.

20   Q.   And who is Charles?

21   A.   I believe he is one of the brothers.  I don't know -- one

22   was an owner and one was -- I don't know what the other title

23   was, I believe.

24   Q.   And his last name is what?

25   A.   George.

Sara Fisher - Cross

1          MS. JOHNSON:  Your Honor, at this time I move to

2    introduce I-067.  We are happy to redact anything that is not

3    the writings of Ms. Fisher.

4          THE COURT:  In other words, to the extent that there

5    is a statement of someone other than Ms. Fisher, that would be

6    redacted from I-067?

7          MS. JOHNSON:  Yes, Your Honor.

8          THE COURT:  As redacted, any objection?

9          MS. SWEENEY:  Your Honor, just as to authenticity.  I

10   don't believe, but I don't have it in front of me, that a

11   George's custodian testified as to this document.

12         THE COURT:  She indicated that she recognizes the

13   e-mail.  The objection will be overruled.  I-067 as redacted

14   will be admitted.

15         MS. JOHNSON:  Mr. Brian, do you have this document?  I

16   am sorry, Your Honor.  I would like to publish this to the jury

17   if we have this corrected document.

18         THE COURT:  If it can be redacted on the fly, it may

19   be.

20         MS. JOHNSON:  Yes, sir.  Your Honor, it appears it

21   cannot be redacted on the fly, so I will move on.

22         THE COURT:  Sounds hike -- let's take a look.

23   Ms. Sweeney, does that look acceptable?

24         MS. SWEENEY:  Yes, Your Honor.

25         THE COURT:  Okay.  That may be published.

Sara Fisher - Cross

1      MS. JOHNSON:  Thank you, Your Honor.

2   BY MS. JOHNSON:

3   Q.  Ms. Fisher, a couple more questions.

4      You were interviewed at least five times by the

5   government in preparation for your testimony yesterday,

6   correct?

7   A.  That sounds about right, yes.

8   Q.  And in any of those interviews did the government ever show

9   you this e-mail?

10  A.  No.

11  Q.  Would you agree with me that not only did Mr. Blake need a

12  supervisor's permission before communicating terms, he also

13  needed supervisor approval to actually schedule the initial

14  meeting.  Isn't that fair to say?

15  A.  I don't know if he needed permission or if they just wanted

16  to join.  I can't answer -- I can't answer that.

17  Q.  Would you agree with me Mr. Blake was not the ultimate

18  decision maker?

19  A.  Yes.

20      MS. JOHNSON:  I would like to bring up Exhibit B, as

21  in boy, 963.  Could we see that on the screen?  I believe it's

22  been admitted, Your Honor.  I would like to publish it for the

23  jury.

24      THE COURT:  What was the number again?

25      MS. JOHNSON:  B, as in boy, 963.

1678

Sara Fisher - Cross

1        *THE COURT:*  It's in.  It can be displayed.

2   *BY MS. JOHNSON:*

3   *Q.*  Ms. Fisher, is this the signed contract that you testified

4   earlier with Ms. Laura Carwile?

5   *A.*  Yes.

6   *Q.*  And it's for George's?

7   *A.*  Yes.

8   *Q.*  For the 2018 through 2020 negotiation period; is that

9   right?

10  *A.*  Yes.

11  *Q.*  Who signed the contract on behalf of George's?

12  *A.*  Brian Coan.

13  *Q.*  Do you know Mr. Coan?

14  *A.*  Yes.

15  *Q.*  Do you know his position at George's?

16  *A.*  I don't know his exact title, no.

17        *MS. JOHNSON:*  That's all I have.  Thank you.

18        Ms. Henry?

19        Sorry, Mr. Quinn.

20                    **CROSS-EXAMINATION**

21  *BY MS. HENRY:*

22  *Q.*  Good morning, Ms. Fisher.

23  *A.*  Good morning.

24  *Q.*  My name is Roxann Henry and I represent Mr. Bill Kantola.

25        You testified on direct that you had initial meetings

Sara Fisher - Cross

1   with the presentation of prices from the suppliers, and I think

2   you mentioned that the Koch meeting was on January 20; was that

3   correct?

4   A.  I believe so, yes.

5          MS. HENRY:  Can we pull up C-465, which I believe is

6   the same as Government Exhibit 1821.  May I give a copy to the

7   witness?

8          THE COURT:  Yes, you may.

9   BY MS. HENRY:

10  Q.  Is that the bid that you received from Koch Foods?

11  A.  Yes, it appears to be.

12  Q.  And you kept the bid information in the regular course of

13  business?

14  A.  Yes.

15         MS. HENRY:  I will move for admission to C-465.

16         THE COURT:  Any objection to the admission of C-465?

17         MS. SWEENEY:  No, Your Honor.

18         THE COURT:  Exhibit C-465 will be admitted.

19         MS. HENRY:  Can we publish it to the jury, please?

20         THE COURT:  Yes.

21  BY MS. HENRY:

22  Q.  And Mr. Kantola told you that these were the same numbers

23  that were presented to you and your team on January 20; is that

24  correct?

25  A.  Yes.

1680

Sara Fisher - Cross

1    *Q.* And he also noted that Koch Foods had invested heavily in

2    the future of KFC and your continued growth, correct?

3    *A.* Yes.

4    *Q.* Now, if you could turn to the third page, please.

5           And you'll see there the total plant cost, total FOB

6    WOG plant cost?

7    *A.* Yes.

8    *Q.* And what is that number?

9    *A.* .9935.

10   *Q.* And that number is not 1.0125, is it?

11   *A.* No.

12          *MS. HENRY:* Can we pull up C-264 and C-265?

13          May I through Ms. Grimm hand a copy to the witness,

14   please?

15          *THE COURT:* Yes, you may.

16   *BY MS. HENRY:*

17   *Q.* Have you had an opportunity to review that?

18   *A.* Yes.

19   *Q.* And is that a further bid submission from Koch?

20   *A.* Yes.

21          *MS. HENRY:* Your Honor, I move to admit C-264.

22          *THE COURT:* Any objection to the --

23          *MS. HENRY:* And 265.

24          *THE COURT:* Let's take C-264 first.  Any objection?

25          *MS. SWEENEY:* For C-264 the government objects on

Sara Fisher - Cross

1   hearsay grounds.

2          THE COURT:  Response?

3          MS. HENRY:  The witness has testified that it's the

4   bid submission.

5          THE COURT:  The objection will be sustained, hearsay.

6          MS. HENRY:  I move to admit C-265.

7          THE COURT:  Any objection to the admission of C-265?

8          MS. SWEENEY:  No objection, Your Honor.

9          THE COURT:  C-265 will be admitted.

10         MS. HENRY:  Could we turn to the third page of that

11  and publish it to the jury, please?

12         THE COURT:  Yes, you may.

13  BY MS. HENRY:

14  Q.  What was the total cost pricing for the COB eight-piece

15  chicken?

16  A.  .9596.

17  Q.  And that was not 1.0125 either, was it?

18  A.  No.

19         MS. HENRY:  We can take that down?  And can we bring

20  up, again not for the jury yet, C-207?

21         And permission, may I please give a copy to the

22  witness?

23         THE COURT:  Yes, you may.

24  BY MS. HENRY:

25  Q.  Ms. Fisher, can you identify that document for us, please?

Sara Fisher - Cross

1    A.   Yes.   This is the SBRA for Koch Foods.

2              MS. HENRY:   Your Honor, I move to admit C-207.

3              THE COURT:   Any objection to the admission of C-207?

4              MS. SWEENEY:   No, Your Honor.

5              THE COURT:   C-207 will be admitted.

6    BY MS. HENRY:

7    Q.   Now, in Koch's contract C-207, there is stair-step pricing

8    for 2017, 2018 and 2019, '20; is that correct?

9    A.   Yes.

10   Q.   And to move this along quicker, is the price for the

11   regular chicken .9988 for 2017?

12   A.   Yes.

13   Q.   And for 2018 it came down .9487?

14   A.   Yes.

15   Q.   And for 2019, '20, it was .9390?

16   A.   Yes.

17   Q.   And none of those numbers are 1.0125, correct?

18   A.   Correct.

19             MS. HENRY:   I have no further questions.   Thank you

20   very much.

21             THE COURT:   Thank you, Ms. Henry.

22             Mr. Quinn?

23             MR. QUINN:   Thank you, Your Honor.

24                         **CROSS-EXAMINATION**

25   BY MR. QUINN:

Sara Fisher - Cross

1   Q.  Ms. Fisher, my name is Brian Quinn.  I represent Defendant

2   Jayson Penn.

3          How are you doing today?

4   A.  Doing okay, thank you.

5   Q.  That's great.  Do you still a copy of Exhibit No. F-812?

6   Do you have a copy of that or do you know?

7   A.  I do.

8          MR. QUINN:  Can you pull that up for me?  If we could

9   have that published for the witness, but not the jury.  Thank

10  you.

11  BY MR. QUINN:

12  Q.  I just wanted to ask you a few questions about this deck.

13  So I think when you were talking with Ms. Carwile, you said

14  that this deck kind of set forth the RSCS strategy for the 2018

15  negotiations; is that right?

16  A.  Yes.

17  Q.  And it would have identified goals for the 2018

18  negotiations.

19  A.  Yes.

20  Q.  And it may set priorities for the 2018 negotiations.

21  A.  Yes.

22  Q.  And is it fair to say that the deck likely reflects the

23  consensus of the RSCS team going into the 2018 to 2020

24  negotiations?

25  A.  Yes.

1684

Sara Fisher - Cross

1   *Q.* So what I would like you to do is turn to Page 2 of the

2   deck. The Bates number is RSCS002902 at the bottom. Are you

3   with me?

4   *A.* Yes.

5   *Q.* Do you see the top, the heading says Strategy there?

6       *MS. SWEENEY:* Objection, Your Honor. He is asking her

7   questions about a document that's not been admitted into

8   evidence.

9       *MR. QUINN:* Just trying to orient her, Your Honor.

10       *THE COURT:* Right. We will see where it's going.

11   Overruled.

12   *BY MR. QUINN:*

13   *Q.* Do you see -- there is a second heading on the page. Do

14   you see that?

15   *A.* The goals?

16   *Q.* That's right.

17   *A.* Yes.

18   *Q.* Can you look at the third bullet point under Goals for a

19   minute and tell me when you are ready?

20   *A.* Yes.

21   *Q.* Can you explain what that third bullet point means?

22       *MS. SWEENEY:* Objection, Your Honor. He is asking her

23   questions about a document not in evidence.

24       *THE COURT:* Well, sustained on foundation grounds.

25   She hasn't indicated that she is familiar with the document.

Sara Fisher - Cross

1  *BY MR. QUINN:*

2  Q.  Do you understand the concept of what the third bullet

3  point on that deck means?

4  A.  Yes.

5  Q.  Can you explain your understanding of what it means?

6  A.  We were -- one of our goals was to try to get the pricing

7  closer in range than what it was in the past.

8  Q.  So you wanted to drive suppliers' prices closer together.

9  A.  That was one of the goals, yes.

10  Q.  I understand.  Can you turn to Page 5 of that deck?  I

11  would like you to look all the way at the bottom of the page,

12  the last bullet point in bold and it's got some text under

13  that.  If you could take a look at that for a second and let me

14  know when you are ready.

15          MS. SWEENEY:  Objection, Your Honor, as to the

16  highlighting or identification on the screen that the witness

17  is being shown.  I thought we talked about sort of

18  highlighting.

19          THE COURT:  Well, Mr. Quinn directed her, in fact,

20  without mentioning any words to that portion, so that's

21  perfectly appropriate.  That's what she was being directed

22  towards.

23          MS. SWEENEY:  Thank you, Your Honor.

24  *BY MR. QUINN:*

25  Q.  What's your understanding of what was happening to the

Sara Fisher - Cross

1    range between suppliers' prices from the previous contract to

2    the current contract?

3    A.   It was decreasing.

4    Q.   It was decreasing.  So the suppliers' prices were getting

5    closer together.

6    A.   Yes.

7    Q.   And that was RSCS's goal for that negotiation.

8    A.   That wasn't the only goal, but that was one of the goals,

9    yes.

10   Q.   That was one of the goals, right?

11   A.   Yes.

12   Q.   So do you remember when the government asked you yesterday

13   so pricing parity was not your goal, and you testified no?

14   A.   Yes.

15   Q.   And that was wrong, right?

16   A.   Well, pricing parity is when they are equal.  And our goal

17   was to try to get them closer in range.

18   Q.   So just to clarify, it was a goal of yours to get the

19   suppliers' prices as close together as possible, right?

20   A.   We were trying to reduce the -- this gap, yes.

21            MR. QUINN:  No additional questions, Your Honor.

22            THE COURT:  Thank you, Mr. Quinn.

23            Additional cross-examination?

24            Ms. Price?

25                         **CROSS-EXAMINATION**

Sara Fisher - Cross

1    *BY MS. PRICE:*

2    *Q.*  Good morning, Ms. Fisher.  My name is Kaitlin Price and I

3    represent Bill Lovette.

4    *A.*  Good morning.

5    *Q.*  You have never had any interactions with Bill Lovette, have

6    you?

7    *A.*  No, I don't believe so.

8    *Q.*  And you have never spoken with Bill Lovette, have you?

9    *A.*  I don't believe so, no.

10            *MS. PRICE:*  Thank you.

11            No further questions, Your Honor.

12            *THE COURT:*  Thank you, Ms. Price.

13            Ms. Prewitt?

14            *MS. PREWITT:*  Your Honor, may I pass up to Ms. Grimm a

15   document?

16            *THE COURT:*  Yes.

17            *MS. PREWITT:*  It's Government Exhibit 1930.  If we

18   could display it on the screen, but not for publication to the

19   jury.

20                         **CROSS-EXAMINATION**

21   *BY MS. PREWITT:*

22   *Q.*  Good morning, Ms. Fisher.

23   *A.*  Good morning.

24   *Q.*  I am happy to report to you that I think you are in the

25   home stretch here.  I will be the last among defense counsel.

Sara Fisher - Cross

1    *A.*  Thank you.

2    *Q.*  And if I speak too quickly, if I put any questions to you

3    that you don't understand, please stop me.  I will be happy to

4    rephrase it for you, okay?

5    *A.*  Thank you.

6    *Q.*  I would like to direct your attention to Government

7    Exhibit 1930.  And just to orient you, I am going to just be

8    asking you questions about the negotiations for 2018 --

9    *A.*  Okay.

10   *Q.*  -- involving Tyson and focusing on the time period of those

11   negotiations, okay?

12   *A.*  Okay.

13   *Q.*  Now, you observed that it was Tyson's negotiation strategy

14   to offer greater discounts for more volume; isn't that correct?

15   *A.*  Yes.

16   *Q.*  Okay.  And the document you have in front of you,

17   Government Exhibit 1930, have you seen that document before?

18   *A.*  Yes.

19   *Q.*  And what is it?

20   *A.*  It is an e-mail from Tim Mulrenin.

21   *Q.*  And what is just in substance that e-mail about?

22   *A.*  He was giving basically a proposal for volume and pricing.

23   *Q.*  And in sum and substance, what was the proposal from your

24   recollection?

25   *A.*  I am sorry, can you rephrase the question?

Sara Fisher - Cross

1   Q.  Just in substance overall, what was that proposal, not

2   referring to the document, but based on your memory, the Tyson

3   proposal.

4   A.  They were offering different prices for different volumes.

5   Q.  And were those discounted prices?

6   A.  Yes, for more volume.

7   Q.  Now, have you seen this document before in your meetings

8   with the government?

9   A.  I don't believe so, no.

10  Q.  Now, to your recollection -- well, you testified earlier

11  that Carl Pepper was the day-to-day contact; isn't that

12  correct?

13  A.  Yes.

14  Q.  And you're familiar with a person by the name of Rich

15  Eddington; is that right?

16  A.  Yes.

17  Q.  And who is he in relation to the Tyson account?

18  A.  Rich Eddington was my boss at RSCS.

19  Q.  I am sorry, I apologize.  Now, with respect to -- who

20  signed the contracts on behalf of Tyson?  Do you recall who

21  signed them?

22  A.  I don't recall.

23  Q.  If it would help, you can look at what's before you as

24  G-474.

25  A.  Can I get this?

Sara Fisher - Cross

1   *Q.*  Please do.

2   *A.*  It looks like Joey White.

3   *Q.*  Thank you.  Is there a title next to that?

4   *A.*  No.

5   *Q.*  Now, this -- and this e-mail to you, and you said you

6   recall this e-mail; is that right?

7   *A.*  Yes.

8   *Q.*  Now -- and you said it was from Mr. Mulrenin.

9   *A.*  Yes.

10   *Q.*  You understand him to be a salesperson at Tyson Foods,

11   correct?

12   *A.*  Yes.  I believe he was Carl's boss.

13   *Q.*  At the time.

14   *A.*  Yes.

15   *Q.*  Now, this -- this is an offer in essence; is that right?

16   *A.*  Yes.

17   *Q.*  And you relied upon this offer as something that you would

18   take into account in the negotiations; is that right?

19   *A.*  Yes.

20   *Q.*  And you didn't have the authority to bind RSCS to any

21   contract; isn't that correct?

22   *A.*  Correct.

23   *Q.*  And, in fact, you worked under Mr. Eddington; isn't that

24   right?

25   *A.*  Yes.

Sara Fisher - Cross

1    Q.   And he was essentially the decider; isn't that right?

2    A.   Rich and Pete, yes.

3    Q.   Okay.  And by Pete you mean?

4    A.   Pete Suerken.

5    Q.   And by Rich you mean?

6    A.   Rich Eddington.

7         MS. PREWITT:  Now, Your Honor, Defendant Mulrenin

8    offers into evidence Exhibit No. 1930.

9         THE COURT:  Any objection to the admission of 1930?

10        MS. SWEENEY:  Only on hearsay grounds, Your Honor.

11        THE COURT:  All right.  Response?

12        MS. PREWITT:  She relied on this as an initial offer,

13   took it into consideration, and that was part of the

14   negotiation process.

15        THE COURT:  Sustained.  It's hearsay.

16   BY MS. PREWITT:

17   Q.   Ms. Fisher, I would like to direct your attention to G-474.

18   That was a document you just had in front of you.

19   A.   Okay.

20   Q.   Just for your reference, this is the Tyson 2018 pricing

21   contract.  It has the eight-piece pricing model as well as the

22   dark meat model as well as other models, right?

23   A.   Yes.

24   Q.   Now, I have -- I understand -- do you know what the term

25   chicken math is?

Sara Fisher - Cross

1  *A.*  Chicken math?

2  *Q.*  Children math?

3  *A.*  No.

4  *Q.*  Would it surprise you to hear that it's understood that

5  you're quite good at chicken math?

6  *A.*  I don't know what you want me to respond to that.

7  *Q.*  I don't think the math is that complicated here, but I will

8  ask you to walk through some of that for our benefit.  Is that

9  okay?

10       *MS. SWEENEY:*  Objection, Your Honor, as to foundation,

11  that line of questioning, if she doesn't know what it is.

12       *MS. PREWITT:*  I can move on.

13       *THE COURT:*  I am going to overrule that objection.

14  She may be able to figure it out.

15  *BY MS. PREWITT:*

16  *Q.*  Now, with respect to G-474, I would like to direct your

17  attention to Page 4 of that contract -- model, sorry.  Do you

18  see that?

19       *MS. PREWITT:*  Perhaps we can display that to the jury,

20  Your Honor.

21       *THE COURT:*  Yes.

22  *BY MS. PREWITT:*

23  *Q.*  Isn't it a fact that this proposes a price reduction based

24  on volume that ranges between 2 and 3 cents; isn't that right?

25  *A.*  Yes.

Sara Fisher - Cross

1  Q.  And could you walk us through what that amounts to in terms

2  of dollar savings?

3  A.  I mean, I would have to do the math.

4  Q.  Well, we can walk through it together.

5       THE COURT:  Let me just mention that basic calculator

6  I think is on the witness stand just in case Ms. Fisher wanted

7  to do some chicken math.

8       THE WITNESS:  Okay.

9  BY MS. PREWITT:

10 Q.  So let's take a look at that insert there with the pricing

11 discount.  Would you agree with me that the range of the

12 discounts is scaled to volume, so the more volume, the more

13 chicken sold, the higher discount that would be achieved, total

14 discount?

15 A.  Yes.

16 Q.  Now, let's talk about loads.  How many pounds of chicken

17 are in one load?

18 A.  I believe it should be about 40,000 pounds.

19 Q.  Okay.  So with 40 -- now, I would like to walk through this

20 and consider the scale of the discount and what that would

21 translate into savings for Tyson.

22 A.  Okay.

23 Q.  Sorry, savings offered by Tyson to KFC with respect to this

24 contract, okay?

25 A.  Okay.

Sara Fisher - Cross

1  *Q.*  Now, between 2 and 3 cents sounds like a small amount, but

2  we are talking about a lot of chicken; isn't that correct?

3  *A.*  Yes.

4  *Q.*  So if the volume was achieved at the end of the day, this

5  would amount to several million dollars worth of savings; isn't

6  that right?

7  *A.*  Yes.

8  *Q.*  For 2018 alone, does it seem about right -- and I am not

9  going to ask you to work through all the math, so I won't put

10  you entirely on the spot here -- but would it seem right to you

11  that for 2018 alone this would amount to almost $2 million in

12  savings?  We will just make it general, make it easy.

13  *A.*  Probably so.  Are you talking the 3 cents, the 2 cents,

14  just somewhere in that range?

15  *Q.*  Yeah, somewhere in that range, just a ball park.

16  *A.*  Yes, probably so.

17  *Q.*  And this represents more than just 2018, this discount

18  offering.  It goes as high as 3 cents for 2019; isn't that

19  right?

20  *A.*  Yes.

21  *Q.*  Okay.

22  *A.*  Yes.

23  *Q.*  Thank you.

24       Now, if you look at the next exhibit in this set, it's

25  on the next page, Page 5, you'll see there is also a pricing

Sara Fisher - Cross

1   model offered for dark meat.  Do you see that?

2   A.  Yes.

3   Q.  And you'll see that there is also a discount applied to

4   that as well, correct?

5   A.  Well, I don't know that it's necessarily a discount.

6   That's just how the dark meat is priced.

7   Q.  Right.

8   A.  It's off of the eight-piece model.

9   Q.  Thank you.

10          And that eight-piece model is discounted with a

11  sliding scale, correct?

12  A.  Yes.

13  Q.  So that would be an additional amount of money savings that

14  would go to KFC in relation to the dark meat; isn't that

15  correct?

16  A.  Yes.

17  Q.  And that is all based on volume?

18  A.  Correct.

19  Q.  And that is, in fact, consistent with the offer you

20  testified about earlier that was presented to you by Tim

21  Mulrenin in that e-mail we showed to you, Government

22  Exhibit 1930; isn't that correct?

23  A.  Yes.

24          MS. PREWITT:  No further questions, Your Honor.

25          THE COURT:  Thank you very much, Ms. Prewitt.

Sara Fisher - Redirect

1      MS. PREWITT:  Thank you very much, Ms. Fisher.

2      THE WITNESS:  Thank you.

3      THE COURT:  All right.  I think Ms. Prewitt is

4  correct.

5      And redirect?

6      MS. SWEENEY:  Thank you, Your Honor.

7                  **REDIRECT EXAMINATION**

8  BY MS. SWEENEY:

9  Q.  And good morning again, Ms. Fisher.

10  A.  Good morning.

11  Q.  When you were speaking on cross-examination with Mr. Quinn,

12  you said that you wanted suppliers to get their prices closer

13  together in that contract period; is that right?

14  A.  Yes.

15  Q.  And you said that was your goal?

16  A.  That was one of the goals, yes, for us to negotiate prices

17  closer together.

18  Q.  And did you ask the suppliers to coordinate with each other

19  in order to attain those prices closer together?

20  A.  No.

21  Q.  And did you want the suppliers to coordinate their prices

22  to get them closer together when submitting bids to RSCS for

23  that 2018 contract?

24  A.  No.

25  Q.  Why not?

Sara Fisher - Redirect

1   *A.*   Because it was a competitive bid and we didn't -- it was

2   confidential information and we didn't want them sharing

3   information.

4   *Q.*   And what was the confidential information?

5   *A.*   The pricing.

6   *Q.*   The bid?

7   *A.*   Yes.

8   *Q.*   And earlier when you were talking to another counsel on

9   cross-examination, you were asked about whether it mattered to

10  you how suppliers determined competitive prices.  Do you

11  remember that?

12          *MS. CARWILE:*  I would object.  That misstates the

13  testimony she gave.

14          *THE COURT:*  I am going to sustain the objection.  If

15  you can rephrase it.

16          *MS. SWEENEY:*  I can ask it in a different way, Your

17  Honor.

18          *THE COURT:*  Yes, go ahead.

19  *BY MS. SWEENEY:*

20  *Q.*   You were asked whether you told the government whether it

21  mattered -- I am sorry, that it didn't matter how suppliers

22  determined their prices when they were received; is that right?

23          *MS. CARWILE:*  I am going to have the same objection.

24  That's not the testimony she gave on cross.

25          *THE COURT:*  Overruled.  She can answer.

1   A.   So can you rephrase the question?  I am sorry.

2   BY MS. SWEENEY:

3   Q.   Sure.  Just give me one second.

4         So you were discussing with Ms. Carwile what you told

5   to the government that you said when suppliers quote a price in

6   the range within RSCS, it didn't necessarily matter how they

7   got to that price; is that right?

8   A.   Yes.

9   Q.   Would it have mattered to you if they had coordinated their

10   prices to get to that price?

11         MR. KORNFELD:  Objection, Your Honor.

12         THE COURT:  Overruled.

13   A.   So I meant that -- I didn't mean what the suppliers did to

14   get there.  I just meant that if -- it didn't matter where they

15   took the cost out of the cost model to get there is what I

16   meant.

17   BY MS. SWEENEY:

18   Q.   So would it have mattered to you if the suppliers had

19   coordinated their prices to attain the price that they

20   submitted to RSCS?

21   A.   Yes.

22   Q.   And why would it have mattered?

23   A.   Because that's not how we do business and we don't want

24   them talking.

25         MS. SWEENEY:  The government has no further questions

1    for this witness, Your Honor.

2              *THE COURT:*  All right.  Is Ms. Fisher subject to

3    recall?  I see Ms. Henry shaking her head yes.

4              *MS. RAHMAN:*  Yes, Your Honor.

5              *THE COURT:*  So Ms. Fisher, there is a possibility that

6    one of the defendants may recall you; and if so, they will be

7    in contact with you, all right?

8              *THE WITNESS:*  Okay.

9              *THE COURT:*  You are excused.  Thank you.

10             The United States may call its next witness.

11             *MS. CALL:*  Your Honor, may we have a very brief side

12   bar to clarify one thing that was said earlier outside of the

13   jury's presence?

14             *THE COURT:*  Yes.

15             (Brief discussion off the record.)

16             *THE COURT:*  Ms. Call, were you getting the same issue?

17   Were they charged overnight?

18             *MR. TUBACH:*  It's a symbol of a microphone and slash

19   and there is an X next to it.

20             *THE COURT:*  That's very odd.

21             Ms. Call, do you still need some type of a side bar?

22             *MS. CALL:*  It can probably be addressed publicly.

23             *THE COURT:*  I am sorry?

24             *MS. CALL:*  I can address it publicly, I believe.

25             I did just want to correct one name on the order of

1700

1  witnesses for this afternoon.  The correct order, and I am not

2  great with names so I have it written down this time, is we

3  will now be introducing several documents.  After that it will

4  be followed by Mr. Coan and then Ms. Tucker, who are two

5  authenticating witnesses, and then Mr. Ledford, who I believe I

6  missed earlier, before Agent Koppenhaver if he is necessary.

7  As I stated earlier, that may wind up not being necessary, in

8  which case the summaries that we had planned to introduce

9  through him will likely be pushed to next week through another

10  witness.

11          THE COURT:  Then the United States may call its next

12  witness.

13          MS. CALL:  Yes, Your Honor.  We do have a number of

14  documents to introduce at this time absent a witness.

15          THE COURT:  Yes, you may.  Go ahead.

16          MS. CALL:  I was able to print copies for everyone.

17  Would the Court like a copy of each as I pass them around?  We

18  will display them on the screen as well.

19          THE COURT:  I think that would be helpful.

20          MS. CALL:  We will start with Exhibit 6198.

21          THE COURT:  Government is moving the admission of

22  6198?

23          MS. CALL:  Yes, Your Honor.

24          THE COURT:  Any objection to the admission of Exhibit

25  6198?

1           MR. TUBACH:  Yes, Your Honor, it's hearsay, and in

2    particular the top portion.  This is probably better done on

3    side bar, Your Honor.

4           THE COURT:  Well, I think we probably will.  We could

5    have some issues on that.  So ladies and gentlemen, why don't

6    we do this.  Why don't we take an early morning break.  Why

7    don't we plan on reconvening 10 minutes after 10:00.  Keep the

8    admonitions in mind and the jury is excused.  Thank you.

9           (Jury excused.)

10          Ms. Grimm, why don't we get IT on its way.  And I

11   don't think -- of course, without the jury here we could delve

12   into this, but because we need to take -- this is going to be

13   our break, I think we should go ahead and take a break as well.

14          Ms. Call, anything quickly?

15          MS. CALL:  Yes.  Just to the extent it's relevant to

16   the break, I believe a number of the documents we planned to

17   admit were subject to the Court's prior ruling following the

18   James hearing, so this issue may come up for a number of the

19   documents, so I hope that we can fix the technological issue.

20          THE COURT:  Yeah, I think that when the government

21   moves the admission of one of the documents, if there is a

22   shorthand way of queuing me into whether some of those things

23   were done, that will be helpful.  That way we may not

24   necessarily need to do side bars as to everything which will be

25   cumbersome.

1    MS. CALL:  Just simply stating it was subject to a

2  prior ruling?

3    THE COURT:  Maybe you can just reference the docket

4  number.  What's the *James* order docket number?  That may be a

5  way to do it.

6    MS. CALL:  559.  I believe this one was *James* log

7  entry 13.

8    THE COURT:  I am sorry, what?

9    MS. CALL:  13 for Exhibit 6198.

10    MR. TUBACH:  I can't hear what she is saying.

11    MS. CALL:  *James* log entry 13 for Exhibit 6198.

12    MR. TUBACH:  Thank you.

13    MR. POLLACK:  Your Honor, the government at

14  10:00 o'clock last night sent us a list of documents by exhibit

15  number that they were going to want to introduce today without

16  a sponsoring witness.  This document was not on the list.  We

17  have no ability to on the fly figure out how this relates to

18  what's in the *James* log because we've got entirely different

19  numbers from the *James* log.  I again would object to our not

20  having 48 hours notice, not having 48 minutes notice, and

21  getting the documents in a way that it's impossible for us to

22  know what the Court's prior rulings have been on the documents.

23    MR. McLOUGHLIN:  For the record, I would add that when

24  we received this e-mail at 10:04 last night, I e-mailed the

25  government and asked them for copies of the documents

1    immediately electronically.  They declined to provide them so

2    that we didn't have time before the hearing to review them and

3    said that they would provide printed copies at the hearing.  So

4    we were at a place where they have declined to provide us after

5    specific request to the information we need, as Mr. Pollack

6    indicated, to do an analysis in a timely way.

7        MS. HENRY:  Your Honor, I think the point here is

8    simply efficiency.  And if they could give us a list and give

9    it to us in sufficient advance for us to go through it, this

10   process will go a lot faster.

11       THE COURT:  Response?

12       MS. CALL:  Your Honor, I think we all certainly agree

13   efficiency would be great.  Government Exhibit 6198 was

14   provided in a list to defense counsel three or four days ago on

15   the list for the anticipated testimony of Agent Koppenhaver.

16   And with regards to our discussion yesterday, we have now

17   decided to offer it absent Agent Koppenhaver's testimony, so

18   defense counsel were on notice for this particular document.

19       For the list of I believe 20 or so additional exhibits

20   we notified them last night that we would be offering absent a

21   sponsoring witness, the government's agreement with defense

22   counsel had been to provide exhibit numbers for exhibits that

23   would be introduced through witnesses two days in advance.

24   That just does not apply to this situation and they do not need

25   to prepare for cross-examination at least of me, I suppose, on

1    these documents since I am just offering admission.  We have

2    brought paper copies so they have adequate time to review them

3    and they were all previously on the government's exhibit list.

4         THE COURT:  So I don't understand the problem.  If

5    this -- if 6198 was a document that was going to be introduced

6    or shown to or whatever through Agent Koppenhaver, and that was

7    provided three or four days ago, what's the notice problem?

8         MR. McLOUGHLIN:  The notice problem, Your Honor, is

9    it's one of many.  And when we get a new list, we then have to

10   get into a database, pull them down and figure out what is

11   what.  And it's mixed up among a dozen or 20 or more documents

12   that they sent us last night.  We are not talking about five

13   documents for Mr. Koppenhaver.  We are talking about 224.

14        THE COURT:  Nonetheless, had he testified, that's what

15   he was going to do.  These were going to be offered through

16   him.  So I don't see any problem with this particular one.

17   Now, the 20 new ones, that's different, and 10:00 o'clock last

18   night is not sufficient time to be able to figure that all out.

19   But I don't see any problem with this one.  Defense counsel

20   should have been ready.

21        MR. POLLACK:  Your Honor, I think you just highlighted

22   the problem.  Frankly, I didn't know ahead of just being handed

23   this document whether it was new or not because there is no way

24   for me to tell.

25        THE COURT:  Well, yeah, there was a way to tell,

1    because it was on the list for Special Agent Koppenhaver.

2             MR. POLLACK:  But there was no way to see whether or

3    not this was --

4             THE COURT:  Mr. Pollack, don't interrupt me.

5             MR. POLLACK:  I am sorry, Your Honor.  I didn't intend

6    to.

7             THE COURT:  No. 1, it makes a bad record.  No. 2, you

8    just don't do it.  Got it?

9             MR. POLLACK:  I apologize, Your Honor.  I didn't

10   intend to.

11            THE COURT:  Yeah, I understand.  Let's hear from

12   Ms. Prewitt because she wanted to mention something.

13            MS. PREWITT:  Thank you, Your Honor.  As you heard

14   Mr. Ledford's name mentioned, this is what I raised this

15   morning.  He is a fact witness, Your Honor.  As of yesterday

16   morning, we were told Mr. Ledford would be testifying after

17   Mr. Koppenhaver.  It was after the hearing yesterday that they

18   switched it and last night told us that, in fact, Mr. Ledford

19   will go forward.  We are doing everything we can.  We have not

20   as the defense objected to changes in the order when there have

21   been circumstances that merited it.  And, Your Honor, this is

22   something that makes it difficult for us to defend our clients

23   with switches like this, Your Honor.

24            THE COURT:  Okay.  Because given -- when did --

25   because you just learned today that Ledford may be up and you

1706

1    aren't ready for him?

2         *MS. PREWITT:*  He was always on the witness list, but

3    it's the switching of the order.  And that is meaningful given

4    the amount of preparation for each one of these witnesses, Your

5    Honor, and there hasn't been a basis established.  If they are

6    planning not to call Mr. Koppenhaver, I completely understand.

7    But what they are trying to say is, no, Your Honor, we are

8    going to think about it and we may just call him later.  And I

9    just think that we're really counting on some order here and a

10   lack of chaos, and that's not what we are getting on the part

11   of the government.

12        *THE COURT:*  Well, on Ledford let's see what happens.

13   We don't exactly know what's going to happen, but let's focus

14   more on the exhibits that are going to be introduced.  And --

15   sorry, I will hear from Ms. Henry.  Then I will go back to

16   Mr. Pollack.  Then I will go back to Mr. McLoughlin and

17   Mr. Beller maybe.

18        *MS. HENRY:*  So we were not thinking we were talking

19   about the Koppenhaver exhibits, but there are over 200 of them.

20   And so I also just wonder in terms of timing and the break, you

21   know, when we're going to do that with the jury.  And perhaps

22   it's going to be an extended discussion either this way in

23   front of the jury or perhaps we need to go through all these

24   exhibits with the objections, give us some time without the

25   jury to sit there and watch us.

1        THE COURT:  Well, that's not a bad suggestion.  I

2    mean, it could be cumbersome, I just don't know.  I think we

3    better try to get IT here and see if we can figure out the

4    transceiver system because we ultimately may need that.

5            Mr. Pollack?

6        MR. POLLACK:  Your Honor, first of all, let me again

7    apologize.  I did not intend to interrupt the Court.

8        THE COURT:  Apology accepted.  No problem,

9    Mr. Pollack.  Go ahead.

10       MR. POLLACK:  Thank you, Your Honor.  I have

11   substantive objections to this document, but --

12       THE COURT:  I don't want to get into those now just

13   because I think we will get bogged down.  This is going to be

14   the break, so I want to make sure people get the break, but

15   anything else?

16       MR. POLLACK:  No, Your Honor.  I just want to make a

17   point when I am handed a document in court that was not on the

18   list of what we anticipated was going to be used today, even as

19   that list was supplemented as late at 10:05 last night, there

20   is no way for me to look at this document, know whether it's

21   new or whether it was one of the 224 that were designated for

22   Ledford, know whether it was admitted in the *James* log or not

23   admitted in the *James* log.  So it just makes it very difficult,

24   if not impossible, to be in a position to analyze the document

25   and raise the objections that we may or may not have to the

1   document.  So it's a broader point than this particular

2   document.  It's a systemic problem that is interfering with our

3   ability to represent our clients.

4       *THE COURT:*  To the extent that the government provided

5   a list of documents that were going to be used with Agent

6   Koppenhaver, I mean, the direct implication -- yesterday we had

7   two phones go off.  Now we've got another phone going off.  If

8   we have any more phones going off, I am going to strongly

9   consider a remedy that was used in the past that judges of this

10  court have used, which is your phone will be turned over to us

11  and you will get it back at 5:00, okay?  You have got to have

12  those phones silenced.  I am not going to do that yet, but

13  we're getting there.

14      Okay.  So anyway, my point is if there were a list of

15  documents that were listed for Special Agent Koppenhaver,

16  defense counsel have got to be ready to go on those because, of

17  course, the whole point of the summary witness briefing was

18  that, hey, what does he know about these things?  He doesn't

19  know anything.  So obviously the anticipation would be that

20  defense counsel would have to be ready to go on any

21  admissibility objections.

22      *MR. POLLACK:*  I agree with that completely, Your

23  Honor.  My point is simply I've got no way of knowing whether

24  or not this document was on the list for Koppenhaver.  I accept

25  the government's representation that it was and so the issue is

1    resolved with respect to this document.  I am raising a more

2    systemic problem which is when we are handed documents in court

3    that we have not been told would be used today even when we

4    were specifically told which ones would be used today and this

5    was not on the list, we don't have the ability in real-time to

6    figure out is this a new document?  Is it a document that was

7    listed for another witness?  Was it on the *James* log?  Was it

8    not on the *James* log?

9          And that was the issue.  That is the problem that's

10   presented by getting notice, albeit very late notice, as to

11   what's going to be used today and then still having that not

12   actually being what's used today.  We get presented with

13   documents that weren't on that list.

14         *MS. CALL:*  Your Honor --

15         *MR. McLOUGHLIN:*  Your Honor, if I may first.

16         *THE COURT:*  Let's hear from Mr. McLoughlin, then I

17   will let you have it.

18         Go ahead.

19         *MR. McLOUGHLIN:*  To underscore Mr. Pollack's point

20   briefly, it means spending hours cross-checking against the

21   various exhibit lists of was it on Mr. Koppenhaver's list, was

22   it on somebody else's list?  Because we are talking a total of

23   2000 government exhibits.

24         The other point here is the government's position is

25   we give you 48 hours notice if it's related to a witness, but

1    we can dump as many exhibits we want on you at 10:00 the night

2    before because we never committed to give you a list of the

3    exhibits we were going to introduce at trial the next day

4    unless that document was associated with a witness, which means

5    the government has taken the position that they are not going

6    to give us time to evaluate these documents, make an analysis

7    of an evidentiary objection and be prepared.

8           And, Your Honor, I would request that you order the

9    government to provide us with any document they intend to

10   introduce as an exhibit 48 hours in advance whether it's

11   through a witness or otherwise.

12          THE COURT:  Response, Ms. Call?

13          MS. CALL:  On the first point, I think the government

14   is happy for the exhibits we notified counsel of last night to

15   wait to offer those until Monday so counsel has appropriate

16   time to review them for their evidentiary objections.  So today

17   we will only introduce ones that we had already notified them

18   days ago that we would be introducing on the Agent

19   Koppenhaver's list.

20          As to the second point, I think there is one point

21   that that was simply not the agreement, but I will counter that

22   that this is no different and even more notice than the

23   government has been given in making determinations on

24   admissibility of exhibits offered on cross, so I don't quite

25   see the unfairness issue quite as much.  But we are doing all

1    we can to provide them advance notice when we are going to

2    offer exhibits.

3         THE COURT:  And Ms. Prewitt, real quick?

4         MS. PREWITT:  Real quick, Your Honor, given what was

5    just said, if Your Honor is inclined to let the government take

6    witnesses out of order and let Mr. Ledford testify, we were

7    provided this morning with a document that they were going to

8    show to him today.  If the government is going to be consistent

9    with that position, then I would assume that they are not going

10   to try to offer that document through Mr. Ledford if Your Honor

11   agrees with them taking that order.

12        THE COURT:  I don't think I am going to rule on

13   Ledford yet because I think we have to wait to see whether he

14   might actually be called.  If he is, then that issue will

15   become material.

16        Mr. Beller.

17        MR. BELLER:  Only, Your Honor, echoing Ms. Henry's

18   suggestion.  I imagine there is going to be hours of objections

19   and discussion regarding some of these exhibits.  And so to the

20   extent we can consider potentially letting the jury go home

21   early one afternoon, whether it's Friday or Monday, hashing

22   that out on the record, so to the extent the government wishes

23   to simply enter documents en mass, we can do that quickly and

24   efficiently with the jury.

25        THE COURT:  I think that -- actually, let's think

1    about that.  I am going to -- we are going to go on break.  I

2    am going to give you the usual 20 minutes because there is

3    still a lot of people heading to the restrooms, but think about

4    that because while documents have to be admitted or refused in

5    front of the jury, the jury doesn't necessarily have to sit

6    around while we talk on transceivers, so that may be a good

7    suggestion.

8          And as part of that, we need to think about how long

9    this process may take.  But without the jury present, I think

10   we could more conveniently go through those foundational issues

11   and then on the record once the jury is back, whenever that is,

12   be able to very smoothly offer, refuse, whatever, and get

13   through it that way.  I think that would be more respectable of

14   the jury's time, and I think we would be able to more

15   efficiently and thoroughly get through it.  So that's not a bad

16   idea.

17         Why don't we do this.  Why don't you think about that.

18   Think about what you would suggest.  Whenever you do things

19   like this, there is a real danger that you tell the jury come

20   back at 2:00 and we are not ready until 4:00 or something.  But

21   if that happens, so be it, but let's try to think about that

22   estimate and I'll come back at 10:30.  We'll talk about that

23   briefly.  Then if we have some direction for the jury, we'll go

24   ahead and let them know about that, okay?

25         We will be in recess.  Thank you.

1    (Recess at 10:08 a.m.)

2    (Reconvened at 10:34 a.m.)

3    THE COURT:  Do we have an idea or do we have a

4    proposal perhaps on what we should do?

5    MS. CALL:  Your Honor, where we are at the moment is

6    the government has sent defense counsel just moments ago the

7    list of 30 or so documents that we were intending to introduce

8    now absent a sponsoring witness.  What we had proposed is to

9    switch immediately to the two custodians that were next up on

10   the list, Mr. Coan and Mr. Tucker, so that counsel has the

11   ability to review those 30 documents or so over lunch.

12   I think approximately 25 of the 30 were subject to the

13   Court's prior *James* ruling, but we do understand that counsel

14   is very likely to have additional objections.  And I think they

15   may have a separate proposal on how much time is necessary to

16   discuss those objections.

17   THE COURT:  Do you think the custodians will take us

18   to lunch?

19   MS. CALL:  I doubt that, Your Honor.

20   THE COURT:  But the idea would be -- so here is the

21   question.  So we put two custodians on.  That takes however

22   much time it takes, but my guess it won't take too long.  And

23   at that point in time we have this issue again.  And because

24   those witnesses aren't going to take long, it will also not

25   give anyone much time to look over the new list.

1        What we could do is -- I think it's a great idea to do

2    the custodians.  Let's fill up a little bit of time.  And it's

3    too bad we can't do another witness after that but I understand

4    the notice issue because all of the sudden we don't have a

5    witness that's going to take three hours.

6        MS. CALL:  I'll note as much as you said it was a new

7    list, these were all included on the list provided to counsel

8    many days ago for Agent Koppenhaver's direct.  So I would think

9    they have already prepared what objections they had planned to

10   lodge, but --

11       THE COURT:  My point is this.  Once we get to the

12   point where we may be plunging into the documents, it may be --

13   we could then take an early lunch for the attorneys and the

14   jury and then come back at it, maybe not as long a lunch as

15   usual, but that would give people an additional amount of time

16   to work through them.

17       MS. CALL:  One alternative approach is we do have the

18   next witness, if we were to not call Agent Koppenhaver,

19   Mr. Ledford prepared and ready to go and testify.  And we did

20   provide counsel notice days ago that he would be called

21   possibly as early as today.  So I don't know that there is a

22   notice issue with Mr. Ledford.  But if he is ready, if we want

23   to jump straight to him and then address the 30 documents

24   afterwards.

25           THE COURT:  And, well, there was the issue with at

1     least one of the exhibits.  Maybe one idea might be to do the

2     Ledford direct, I don't know, Ledford direct, and then we could

3     see where we are, and then we could hold off on the Ledford

4     cross until Monday.

5          Ms. Johnson?

6          MS. JOHNSON:  With respect to the custodians, one of

7     the custodian witnesses, Ms. K.C. Tucker, she was not on the

8     government's original list.  And her colleague, there was a law

9     firm and they obviously have been sitting in -- her colleague

10    has been sitting in court for the entire trial and has been

11    providing summary and updates of the first week of this court

12    hearing, all the days of the trial, Your Honor.  So Ms. Tucker

13    has been getting daily updates for the first week of the trial.

14         Now, once the government decided to add her to their

15    list, it's our understanding the law firm took appropriate

16    action and she did not get notices for this week.  But Your

17    Honor, as the Court knows, all the custodial witnesses who were

18    being presented as well as some other evidence that first week

19    of trial, Ms. Tucker was not sequestered because she was not on

20    the government's list, and we would object to her being called

21    as a witness.

22         THE COURT:  Okay.  Let's take up that issue as to

23    Ms. Tucker.

24         MS. CALL:  That is the first time this issue has been

25    brought to the government's attention.  It sounds like she was

1    not in the courtroom.  I don't know if I heard you correctly --

2    or heard Ms. Johnson correctly, so I am not quite sure what the

3    issue is.

4         THE COURT:  Well, what Ms. Johnson said is that

5    because she wasn't on the list, she didn't know.  She was

6    getting updated by someone who was in the courtroom and

7    therefore exposed to substantial amounts of testimony.

8         MS. CALL:  If we could hear, Your Honor, just so we

9    fully understand what the source of that information is, but

10   regardless, I don't know how that affects her ability to

11   authenticate records since she is being called as a records

12   custodian.

13        THE COURT:  All right.  Ms. Johnson, how would it

14   affect her ability to authenticate records?

15        MS. JOHNSON:  Your Honor, she has received notices and

16   updates from the opening statements thereon.  So I think to --

17   it's possible that her testimony could be tainted based on the

18   narrative, the road map that the government has set forth and

19   in anticipation of that with her testimony with regard to --

20   and what -- Your Honor, there is going to be boxes of documents

21   and what's contained, what could potentially be relevant.  I

22   think the fact she has been exposed to the testimony from

23   openings and throughout the entire first week of trial could

24   have an effect on her testimony.

25        THE COURT:  How would it?  If she is just being asked

1   about a document, was that on the server?  I am not sure.

2          *MS. JOHNSON:*  It wasn't on the server, Your Honor.

3   And I don't mean to interrupt, Your Honor, but these documents

4   were not on a server.  They were in boxes.  They were held in

5   boxes for years after our client retired.  She physically

6   reviewed some of those documents.  And to the extent that they

7   have been alluded to in court, the relevance thereof or any

8   relationship to this hearing at all, Your Honor, I think that

9   has an effect on her testimony.

10          *THE COURT:*  Response?

11          *MS. CALL:*  She is purely being called as a custodial

12   witness, so I think it's the government's position that nothing

13   she may have heard secondhand would have any effect on her

14   possible testimony.

15          *THE COURT:*  Has she been interviewed?  Has a 302 been

16   produced for her?

17          *MS. CALL:*  If I can confer one moment.

18          *THE COURT:*  Sure.

19          *MS. CALL:*  Your Honor, she was interviewed for the

20   first time this week, and we have provided the notes of that

21   interview to defense counsel.

22          *THE COURT:*  And Ms. Johnson, but is it your

23   understanding she was exposed to summaries of testimony before

24   this week?

25          *MS. JOHNSON:*  Yes, Your Honor.

1          THE COURT:  Yeah, it depends on the questions that are

2     being asked of her.  I just don't know at this time.  We may

3     have to get a proffer of what her testimony is going to be so

4     that we can analyze whether or not -- the fact that she was

5     exposed to testimony could potentially taint it.  I just don't

6     know at this point in time.

7          MS. JOHNSON:  Thank you, Your Honor.

8          MS. CALL:  I will just add that I do understand

9     Ms. Tucker wrote a declaration that had been provided

10    previously.  And the substance of her testimony is essentially

11    within the bounds of that declaration.

12         THE COURT:  Okay.  What's the day of the declaration

13    approximately?  Was it before the trial started?

14         MS. CALL:  Yes.

15         THE COURT:  Well, that could make a difference.

16         Mr. Beller?

17         MR. BELLER:  Thank you, Your Honor.  I will be brief.

18         An alternative proposal for the Court to consider and

19    the government to consider is not just the 30 documents, and I

20    agree, my understanding is many of those are, in fact, *James*

21    documents and it may take a while not necessarily for us to

22    understand the objections, but rather to lodge the objections

23    and make sure that the record is clear on those objections,

24    No. 1.

25         But No. 2, so not just those 30 documents, but any

1    other document that the government intends on introducing

2    without a sponsoring witness, that those could all be addressed

3    at a single time before the Court.  So to the extent that those

4    can all be made available and ready in an organized manner, we

5    send the jury home after lunch or before lunch and we take all

6    of those up, make all of the appropriate objections and orders,

7    and then the government presents those in a single easy fashion

8    on a day that's convenient.

9             I think it is extraordinarily unlikely that

10   Mr. Ledford is done today even if cross-examination were

11   permitted.  So it is no more inconvenient to Mr. Ledford to

12   come back on Monday for testimony than it would be today.

13   Certainly we agree with the government that absent the record

14   that was made by Ms. Johnson, that the custodial witnesses

15   testify today and that we sort of take care of all of this.

16   And frankly, it may be more efficient than doing it over

17   receivers over the course of several hours.  Thank you.

18            THE COURT:  Yeah, I think that Mr. Beller's point is a

19   good one.  We don't want to do this again.  So if there are

20   more documents than the 30 where the government wouldn't have a

21   witness, the witness would not -- or at least the witness

22   wouldn't be adding any testimony that had a bearing on

23   admissibility, that if we're going to try to work through the

24   documents, we should work through the documents.  The

25   government can introduce them whenever it wants to, but at

1    least we would have gone through the process of trying to

2    identify objections.

3            I would indicate to the jury, and this is something to

4    think about too, let's assume that we have a document, it was

5    on the *James* log.  The Court found that it had co-conspirator

6    hearsay.  And let's assume that I then rule that it is

7    admissible.  Whether in mentioning the fact that it has been

8    admitted to the jury, whether I would say defendants objected

9    to this, I overruled the objection, but that's something you

10   can think about.

11           But because of the fact that I anticipate, and you can

12   correct me if I'm wrong, that most of the objections would

13   probably be done by side bar and therefore the jury wouldn't

14   hear them anyway, that I can explain to the jury that rather

15   than them just sitting here while we go through that process,

16   we would excuse them early.

17           So if we do the custodians, and I am going to -- given

18   the fact that there has been a declaration, Ms. Johnson, from

19   Ms. Tucker, I am going to allow her to testify, but she can be

20   cross-examined on any potential bias that she has had.  I do

21   understand that technically there has been a violation, not a

22   purposeful one because the government called her later, but

23   because she appears to have been exposed to information, that

24   she can be cross-examined about that.  But I am assuming that

25   her testimony is going to be focused on her declaration and she

1   can be controlled through her declaration, okay?

2        *MS. JOHNSON:*  Thank you, Your Honor.

3        *THE COURT:*  So we will bring the jury back in.  We

4   will do Mr. Coan, do Ms. Tucker.  And then I don't think we

5   should necessarily go into Mr. Ledford because he -- it's true,

6   he could fill up until noon, but do we have an estimate how

7   long we think that -- once again, if we follow Mr. Beller's

8   suggestion of rolling up our sleeves and doing not just 40, but

9   more than 40, how long that that would take?  Should we let the

10  jury go for the rest of the day?

11       That is actually my inclination.  I am just worried

12  that we bring them back at 3:00 and then tell them to go back

13  until 4:00 and then we would cut them loose for the day.  I

14  don't know.  I would explain to the jury that we are not --

15  this is all in an effort to be efficient.  And as I instructed

16  them at the very beginning of the case, there may be occasions

17  when they are excused, but it would ultimately save time.

18       Anyone think that that is too much time, that we won't

19  get through it all?

20       *MS. CALL:*  I am trying to understand the list that's

21  being proposed.  Was it any document that the government may

22  introduce without a sponsoring witness ever in this trial?

23       *THE COURT:*  Well, no, not necessarily.  What the

24  suggestion is is that we started off with Koppenhaver.  It was

25  like 274 documents.  Then it got down to 74 documents.  And now

1    all of the sudden it's down to 40 documents.  And I think that

2    the suspicion is that, you know, 232 documents might come back

3    at some later time.

4         MS. CALL:  I can correct that, Your Honor.  I think

5    the remaining documents are largely ones that underlie the

6    summary exhibits which, as I said earlier today, we would plan

7    to move through another witness likely next week.  Many of them

8    or vastly all of them are phone record excerpts which have

9    previously been admitted or sources that associate individuals

10   with phone numbers or associate individuals with their

11   employers.  I believe that is the vast majority, if not all of

12   the remaining documents that are not in that list of the 30

13   that I have sent to defense counsel.

14        THE COURT:  Okay.  So, Ms. Call, knowing -- or at

15   least you understand what may be moved later.  And is what

16   you're saying is that there are not documents other than the 40

17   that we're talking about that would be similar, in other words,

18   the co-conspirator hearsay type documents or documents that may

19   trigger authenticity issues other than potentially at least

20   some of the phone records, although as you say, most of the

21   phone logs -- most of the phone exhibits have already been

22   entered.

23        MS. CALL:  Let me confer one moment.

24        MR. KOENIG:  I am sorry, my apologies.

25        THE COURT:  No, that's all right.

1          MS. CALL:  So, I mean, I think we are ready to go with

2     even the 300, and defense counsel have been notified of those.

3     And perhaps we can address them all.  I imagine the amount of

4     time would be less in terms of lodging objections for those

5     phone number sources and those employer sources or at least

6     that counsel could perhaps group their objections into

7     particular kinds.  And I am trying to remember the question

8     that I was answering at the moment, but I imagine we could

9     address all of that 300 if counsel wanted to today, but it will

10    not be until later next week that the remaining sources would

11    be relevant as sources underlying those summaries.

12         THE COURT:  I think it's worthwhile talking about

13    them.  If we are going to take the afternoon off, I think we

14    should try to work through them.  Even if we can't

15    necessarily -- we are not going to rule on anything

16    technically, but I think that it's worthwhile for us to work

17    through the issues there because our goal here is to make

18    things go more smoothly later for the sake of efficiency.

19         Ms. Johnson?

20         MS. JOHNSON:  Yes, Your Honor.  We likely would agree

21    with that.  There are several admission issues that we would

22    like to address the Court with regard to the source documents

23    for the summaries that the government will be seeking to

24    introduce, so that in the interests of saving time, we would

25    agree with the Court's suggestion of taking it up today.

1          THE COURT:  Is that something that we can do,

2     Ms. Call?

3          MS. CALL:  Yes, Your Honor.  And I will flag that.

4     There are obviously other summary exhibits and sources

5     underlying those that we had planned to introduce later in the

6     trial, so the issue may come up again or at least similar

7     issues, but we are happy to address all the Koppenhaver

8     exhibits today.

9          THE COURT:  Well, I think the idea would be even

10    though the government intends to introduce them later, that if

11    we can talk through some of the issues, not all of the issues

12    perhaps, but at least some of the issues with those exhibits,

13    it might be productive to do so.  Then even if the government

14    has a witness who adds an additional layer of foundation, we

15    will have talked through some of those other issues beforehand

16    and that would help with determining whether or not that

17    particular document is admissible.

18         MS. CALL:  Yes.  And certainly my point had been that

19    the Koppenhaver exhibits, so that group of 300, is separate

20    from a list that we had planned to introduce later in trial.

21    As we noted in our briefing earlier this week, those largely

22    relate to the KFC 2014 negotiations.  While there are other

23    documents and other underlying sources and other summary

24    exhibits that will come up later, so it won't be a complete

25    one-on-one list of documents that we would address today, but I

1725

1    believe, like as Your Honor said, many of the issues may be

2    similar.

3            THE COURT:  Right.  I think that once again

4    Mr. Beller's point was not to limit it just to the Koppenhaver

5    collection, but rather to expand it to similar exhibits that

6    would have similar problems to the 40 that we're going to talk

7    about.

8            MS. CALL:  And as far as addressing those today, Your

9    Honor, so the government has provided notice of the Koppenhaver

10   documents to defense counsel days ago.  As to the other set I

11   was talking about, they are, of course, on our exhibit list,

12   but I don't know that counsel is prepared to address those

13   issues today.

14           THE COURT:  Okay.  Well, once we get through the 40,

15   then we can try and we'll see.  You know, I would like to -- if

16   we are going to excuse the jury once we get through with the

17   custodians, then let's roll up our sleeves and try to

18   accomplish as much as we can.  If we can't get to it because

19   people aren't ready, okay, but maybe we can.

20           MS. CALL:  Yes, Your Honor.  The government is

21   prepared to address the issues, and I don't mean to speak for

22   defense counsel.

23           THE COURT:  Of course not.

24           Ms. Henry?

25           MS. HENRY:  We have the Koppenhaver list and we have

1    the list that we got after 10:00 o'clock last night.  But I

2    would request if we could get a list of the other ones that we

3    are going to consider today, that would expedite everything.

4         MS. CALL:  If I may perhaps refer defense counsel to

5    the summary exhibits that have all been provided, and I believe

6    they are on the list we provided to the Court and defense

7    counsel last week or so mapping them.  They would be the

8    sources cited on those summaries.

9         THE COURT:  Okay.  Ms. Prewitt?

10        MS. PREWITT:  As your Honor predicted, it seems like

11   the trial is accelerating.  And I would ask for the summary

12   charts that the government proposes to put in with Agent Taylor

13   as well so that we can work through any issues in advance, Your

14   Honor.

15        THE COURT:  Well, if he is the last witness, it could

16   be a process of elimination, but to the extent that information

17   could be shared in advance.

18        MS. CALL:  And certainly those were the summary charts

19   that I was just noting.

20        THE COURT:  Okay.  So can we bring the jury back in

21   now and then call Mr. Coan and Ms. Tucker?

22        Okay.  Why don't we bring the jury back in.

23        (Jury present.)

24        THE COURT:  Ladies and Gentlemen of the Jury, sorry

25   for that long break.  We got the technical problem figured out

Brian Coan - Direct

1  relatively soon, but we've been talking about some other ways

2  to make things move along efficiently.  As I mentioned to you

3  at the beginning of the trial, there may be occasions where we

4  might have you go back to the jury room, but we would be

5  thinking of ways, so we have been doing that.

6        But we are ready to go right now and the United States

7  may call its next witness.

8        *MS. BUTTE:*  Thank you, Your Honor.  The United States

9  calls Brian Coan.

10       (**Brian Coan** was sworn.)

11       *THE WITNESS:*  I do.

12       *COURT DEPUTY CLERK:*  Please state your name and spell

13  your first and last name for the record.

14       *THE WITNESS:*  Brian, B-R-I-A-N; last name is Coan,

15  C-O-A-N.

16                    **DIRECT EXAMINATION**

17  *BY MS. BUTTE:*

18  *Q.*  Good morning, Mr. Coan.

19  *A.*  Good morning.

20  *Q.*  Where do you work?

21  *A.*  George's, Incorporated.

22  *Q.*  How long have you been employed there?

23  *A.*  Since 2017.

24  *Q.*  What is your job title?

25  *A.*  Senior vice-president of food service sales.

1728

                              Brian Coan - Direct

1    Q.   What are your responsibilities in that position?

2    A.   I am responsible for all the food service sales of the

3    company.

4    Q.   Are you familiar with how George's stores its documents?

5    A.   I am.

6    Q.   How does George's store its documents?

7    A.   We store them on paper files and on computer, personal

8    computer or hard drive.

9    Q.   With respect to paper files, does George's use any off-site

10   storage facilities to store those documents?

11   A.   We do.

12   Q.   Where are those facilities located?

13   A.   Across the street from the corporate office in a warehouse.

14   Q.   And where is the corporate office located?

15   A.   402 West Robinson Avenue in Springdale, Arkansas.

16   Q.   What types of documents are stored at the storage facility?

17   A.   Old files from what I understand.

18   Q.   Have you ever been to that storage facility?

19   A.   I have.

20   Q.   When have you been there?

21   A.   I went there in November of 2020.

22   Q.   Why did you go to that facility?

23   A.   I went there to retrieve some documents with our attorney.

24   Q.   And who was that attorney?

25   A.   K.C. Tucker.

Brian Coan - Direct

1    Q.  Did you locate any hard copy documents there?

2    A.  We did.

3    Q.  What did you locate?

4    A.  Some old sales files.

5    Q.  Were those old sales files in some sort of storage

6    container?

7    A.  They were in what you call a white banker's box.

8    Q.  What do the boxes look like?

9    A.  They were white banker's boxes that you would store things

10   in like the one on the desk over there.

11   Q.  Did they have any type of writing or descriptors on them?

12   A.  One of them did, yes.  And they had sales on the end of it

13   or names and things like that.

14   Q.  What names did you see on those boxes?

15   A.  One had Ric Blake on it.

16   Q.  Did you open the box with that name on it?

17   A.  I did.

18   Q.  What did you see inside?

19   A.  Manila folders with customer names on the tabs.

20   Q.  What did you do with the documents in those boxes?

21   A.  Closed it back and let K.C. Tucker take them.

22   Q.  After you gave the boxes to Ms. Tucker, did you change or

23   alter the materials in the boxes in any way?

24   A.  I did not.

25            MS. BUTTE:  May I have a moment to confer?

Kirsten Tucker - Direct

1          THE COURT:  You may.

2          MS. BUTTE:  No further questions.

3          THE COURT:  Thank you.

4          Cross-examination?

5          MR. POLLACK:  Your Honor, I don't have any questions.

6          THE COURT:  Mr. Coan, you are excused.

7          THE WITNESS:  Thank you.

8          The United States may call its next witness.

9          MS. BUTTE:  The United States calls K.C. Tucker.

10      (**Kirsten Tucker** was sworn.)

11          THE WITNESS:  I do.

12          COURT DEPUTY CLERK:  Please state your name and spell

13    your first and last name for the record.

14          THE WITNESS:  My name is Kirsten Tucker;

15    K-I-R-S-T-E-N, T-U-C-K-E-R.

16                        **DIRECT EXAMINATION**

17    BY MS. BUTTE:

18    Q.  Good morning, Ms. Tucker.

19    A.  Good morning.

20    Q.  Do you represent George's?

21    A.  I do.

22    Q.  Have you represented George's with respect to producing

23    documents in response to a Department of Justice subpoena?

24    A.  Yes.

25    Q.  Did you assist with collecting documents to produce in

Kirsten Tucker - Direct

1    response to that subpoena?

2    A.   Yes.

3    Q.   What did you do with respect to collecting documents?

4    A.   I collected documents from Brian Coan.

5    Q.   What types of documents did you collect from Mr. Coan?

6    A.   Three boxes of documents.  I met him at a warehouse and

7    collected those three boxes.

8    Q.   Do you recall where that warehouse is located?

9    A.   It's in Springdale, Arkansas.

10   Q.   Could you describe the boxes that you collected?

11   A.   They were banker's boxes of documents.

12   Q.   Did they have any writing or descriptors on the outside of

13   the boxes?

14   A.   Yes.

15   Q.   Could you describe that for us?

16   A.   Generally, yes.  They didn't all have the same writing.

17   They had different writing.  One box had some letters and then

18   a date, I think it was May -- it was 5/4/27, and said Ric

19   Blake, National Accounts files, I think.

20   Q.   What did you do with those boxes?

21   A.   I brought them back to my office.

22   Q.   And what happened after you brought them back to your

23   office?

24   A.   A third party came that same day to collect them to scan

25   them.

Kirsten Tucker - Direct

1   Q.  Prior to providing the documents to that third party, did

2   you change or alter the contents in any way?

3   A.  I did not.

4   Q.  What happened to the boxes after you provided them to that

5   third-party vendor?

6   A.  They were scanned by the vendor, and then the boxes were

7   returned to my office.

8   Q.  Were the scanned documents produced to the Department of

9   Justice in response to its subpoena?

10  A.  Yes.

11          MS. BUTTE:  At this time, Your Honor, I would like to

12  hand the witness a binder of documents, as well as a list

13  marked as Government Exhibit 9689 that lists the documents in

14  the binder.

15          THE COURT:  You may.

16  BY MS. BUTTE:

17  Q.  Ms. Tucker, have you reviewed the documents in this binder?

18  A.  Yes.

19  Q.  How did you do that?

20  A.  Last night I was given I think it's the same binder, one

21  that looks very similar at least, and I reviewed the pages in

22  it.

23  Q.  What are the documents in the binder?

24  A.  They are documents that were in two of the three boxes that

25  I collected.

Kirsten Tucker - Direct

1    Q.  And did there come a time before you received this binder

2    that you also reviewed the documents in those boxes?

3    A.  Yes, ma'am.  I received a list of documents and compared

4    those to the documents that were in the actual boxes.

5    Q.  And those were the originals that were in the boxes.

6    A.  Yes.

7    Q.  When you reviewed the documents, the originals in the

8    boxes, did you undercover any issues with the documents as they

9    were originally produced to the Department of Justice?

10   A.  Yes.

11   Q.  Could you explain what those issues were?

12   A.  Yes.  Some pages, the color did not come through on the

13   scan.  And then there were I think it was seven documents that

14   did not have all of the pages in the scan.

15   Q.  Are you aware if those documents were subsequently produced

16   to the Department of Justice?

17   A.  Yes.

18   Q.  And are those documents in your binder now?

19   A.  One of them is the older one.

20   Q.  Do you know which tab that was?

21   A.  It might take me a minute.

22   Q.  Okay.

23   A.  Okay.  So Tab 5 is the newer version of Tab 12.

24   Q.  Okay.  Thank you.

25          So other than Tab 12, are the documents in your binder

Kirsten Tucker - Direct

1   the same as those documents that were in the original boxes?

2   A.  Not all of them.  Some of them were the corrected scanned

    documents.

3

4   Q.  That's what I meant.  So the documents that were originally

5   found in the boxes.

6   A.  Yes.

7   Q.  Based on your review, are those documents in the binder

8   with the exception of Tab 12 true and accurate copies of the

9   documents contained in the warehouse boxes?

10  A.  They appear to be.

11          MS. BUTTE:  Just for the record, I will note that Tab

12  12 is Government Exhibit 6123.

13          May I have a moment to confer?

14          THE COURT:  You may.

15          MS. BUTTE:  I will just also note for the record Tab 5

16  which I believe the witness testified was a corrected version

17  is Government Exhibit 9688.

18          And I have no further questions.

19          THE COURT:  Thank you.

20          Cross-examination?

21          MS. JOHNSON:  We have no questions, Your Honor.

22          THE COURT:  All right.  Ms. Tucker, you are excused.

23  Thank you very much.

24          THE WITNESS:  Thank you.  Do I leave the binder here?

25          THE COURT:  Yes, you can just leave it there.

Kirsten Tucker - Direct

1          *THE WITNESS:*  Thank you.

2          *THE COURT:*  All right.  Let's do a quick side bar.

3      (At the bench:)

4          *THE COURT:*  So should we go ahead and dismiss the jury

5   then for the day?  Do we have anything?  I don't think we have

6   any other witnesses today, right?  Sorry, Ms. Call?  I don't

7   think we are going to do Mr. Ledford even though we could get

8   50 minutes of Mr. Ledford in, but it doesn't matter to me.

9          Okay.  I will go ahead and excuse the jury for the

10  day, have them come back at 8:30 on Monday.

11         *MR. TUBACH:*  I could hear the Court, but I could not

12  hear.

13         *THE COURT:*  Let's repeat that, yeah.  Ms. Call --

14  Mr. Tubach can you hear me now?  Can you hear Ms. Call?  I

15  don't know, but I think we are going to dismiss the jury, so

16  okay.

17      (In open court:)

18         *THE COURT:*  Ladies and Gentlemen of the Jury, I am

19  going to dismiss you for the day.  During the rest of the day,

20  the attorneys and I are going to work through some issues as to

21  documents.  Those documents, because the objections to them

22  would likely be done by side bar and you wouldn't hear

23  anything, so in order to spare you listening to white noise for

24  a large portion of the day, we are going to try to do that

25  outside of your presence.  And as a result, we think that we

Kirsten Tucker - Direct

1   can speed things up accordingly.

2          The fact that it's a nice day outside may be an

3   additional benefit.

4          Ms. Ramsey?

5          *JUROR:*  I just want to make sure I can wait in the

6   building.

7          *THE COURT:*  Yes, you can.  I apologize if any of you

8   don't have anywhere to go, but you can absolutely stay in the

9   jury room for the rest of the day if you wish.

10          *JUROR:*  No, I just need to call my husband and let him

11   know.

12          *THE COURT:*  Right.  And while you are waiting for a

13   ride or whatever, you can stay in the jury room, any of you can

14   for as long as you want.  I understand that you obviously

15   haven't made plans for this.  This is kind of coming out of the

16   blue, but that's what I am going to do, okay?

17          So hold on.  We are not quite ready.  I don't want to

18   assume that you would rather hop out of your chair than stay

19   with us for the rest of the day, but so there is going to be --

20   you have got the weekend.  You have got the rest of today.  But

21   keep your vigilance up, okay?  Because we still have a lot of

22   the trial left, obviously, and so you don't have to think about

23   the trial, but on the other hand, do think about those

24   admonitions.  Don't start looking information up.  Don't start

25   doing other things.

Kirsten Tucker - Direct

1      If you want to go back to work today or whatever or

2 not, any of those things, but we'll plan on reconvening next

3 week.  So next week we'll start at 8:30.  We will start at the

4 usual time.  But remember that Thursday is a federal holiday,

5 so we will not have court on Thursday.  We will have court on

6 Friday, however, okay?

7      Hope you have a good rest of the day.  Hope you have a

8 good weekend, ladies and gentlemen.  The jury is excused.

9      (Jury excused.)

10      THE COURT:  Next question.  That is would you like to

11 take an early lunch break now so that you would be better

12 prepared once we start going through the documents?  I see some

13 heads shaking yes and no heads shaking no.  Mr. Beller is

14 counting heads as well.

15      MR. BELLER:  It looks like the I's have it, Your

16 Honor, so if we could take an early lunch.  And then I will

17 coordinate with Ms. Call to make sure we have all the documents

18 to review over the lunch hour so we can hopefully have a very

19 productive afternoon.

20      THE COURT:  That's great.  Next question is how long

21 of a lunch hour?  We can have the regular lunch hour, hour and

22 a half, which would mean that we by my calculation would come

23 back at a quarter of 1:00 or we could do an abbreviated lunch

24 like an hour for lunch.  It's up to you.  It doesn't matter to

25 me.

1738

Kirsten Tucker - Direct

1   MR. BELLER:  Your Honor, I believe the consensus is

2   two, and let me tell you why.  Ms. Call had sent us all of the

3   documents.  I very much trust that she did while we were on

4   break.  There is some wifi issues for the government in here

5   and we have not yet gotten those.  It's a wifi issue.  So I

6   think two hours makes sense so we can resolve our receipt of

7   those documents and then give us appropriate time to be able to

8   review those.

9   MS. CALL:  If I may perhaps at this time, so folks to

10  be able to appropriately prepare, kind of propose an order for

11  going through the documents later.

12  THE COURT:  Yes, that's great.

13  MS. CALL:  I think what makes sense is going through

14  those 40 or so that defense counsel have already reviewed that

15  is that winnowed list that is somewhere stuck in the internet

16  at the moment, and then perhaps transitioning from that we can

17  move to the government's summary exhibits.  I think probably

18  what makes the most sense is starting with the documents of

19  substance that are actually excerpted and we can review those

20  in order.  And then if there is time and if we make it there,

21  we would go to some of the other underlying sources.  But as I

22  said, the phone records are already in evidence, so it would

23  mostly be I think the phone sources which underlie Exhibit

24  90-10 followed by sources that are the sources for defendants'

25  employers as listed in the summaries.

Kirsten Tucker - Direct

1          THE COURT:  Okay.  And do you have the list of the 40

2    documents for me?

3          MS. CALL:  Yes.  When I retrieve the document that is

4    currently on the internet, I can send it to Your Honor and I

5    can copy defense counsel.

6          THE COURT:  Right.  If you send it to chambers, that

7    would be great.

8          Mr. Pollack?

9          MR. POLLACK:  Just one process question, Your Honor.

10   Obviously, there is only one attorney per witness.  We are now

11   doing a list of documents that aren't necessarily affiliated

12   with a particular witness.  Is the Court going to require that

13   a single attorney raise all the objections or can we divide the

14   documents up?

15         THE COURT:  No, you can divide and conquer.

16         So the proposal would be to reconvene at 1:15?  Let's

17   do that.  Anything else that we should take up before we

18   recess?

19         MS. PREWITT:  Your Honor, do our clients need to be

20   here for the later conference?

21         THE COURT:  They do not.  Unless you anticipate that

22   there is some critical issue other than this, I don't regard

23   what we are about to do as being a critical stage.  I will

24   recount for the jury what's in and what's out.  If anyone

25   disagrees with that, let me know.  And if the government has an

Kirsten Tucker - Direct

1    objection to the defendants themselves being excused from what

2    we're talking about, they can articulate that now, but I would

3    say the clients, if the clients wish to be here, they obviously

4    can.  If they wish to not be here, they do not need to be here.

5          MS. PREWITT:  Thank you, Your Honor.

6          THE COURT:  We will be in recess, then, until 1:15.

7    Thank you.

8        (Recess at 11:17 a.m.)

9        (Reconvened at 1:18 p.m.)

10         THE COURT:  We are back on the record in 20-CR-152.

11   The jury is not present and we are going to talk about certain

12   exhibits that the government intends to move the admission of

13   without a sponsoring witness.  Our objective is to try to iron

14   out some of the objections and rulings on those to facilitate

15   the introduction of those exhibits.

16         So that being said -- and also I had indicated that

17   some of the defendants, if they chose not to be here, would not

18   need to be here.  And, in fact, some of the defendants are not.

19   Some of the defendants are present.

20         How do we want to proceed?

21         Ms. Call?

22         MS. CALL:  Good afternoon.  I believe we had discussed

23   starting with the set of 30 exhibits that the government has

24   sent the Court this afternoon the list of exhibit numbers.

25         THE COURT:  Yes, and I have those.

Kirsten Tucker - Direct

1          *MS. CALL:*  All right.  So perhaps we start with

2    Government's Exhibit 6198, which is where we left off this

3    morning.

4          *THE COURT:*  Okay.

5          *MR. GILLEN:*  Your Honor, we would ask counsel to speak

6    up a little bit.  We have difficulty hearing.

7          *MS. CALL:*  Is this an appropriate volume?

8          *MR. GILLEN:*  Thank you.  And if counsel could repeat

9    the exhibit number that was given.

10         *MS. CALL:*  Yes.  It is Exhibit 6198.

11         *THE COURT:*  Can we put that up on the screen?

12         *MS. CALL:*  Yes, we will do that now from the

13    government's computer.  Your Honor, given the volume here, is

14    it all right if counsel for the government confers during

15    objections and then I can return to the stand to respond?

16         *THE COURT:*  Yes, that's fine.

17         *MS. CALL:*  Thank you.

18         *THE COURT:*  Okay.  And, then Ms. Call, were you going

19    to provide essentially your argument for admissibility and then

20    we'll hear objections after that?

21         *MS. CALL:*  Yes, Your Honor.  So Government's Exhibit

22    6198 is an e-mail chain between Ms. Brenda Ray and Larry Pate

23    from Pilgrim's dated August 31st, 2012.  This is entry No. 13

24    on the government's *James* log.  And we believe it is admissible

25    as co-conspirator statements, and that would be all the, I

1742

Kirsten Tucker - Direct

1  believe, e-mails contained in this chain.

2      THE COURT:  But this is a one-page document?

3      MS. CALL:  Yes, Your Honor.

4      THE COURT:  Right.

5      So objections to 6198?

6      MR. POLLACK:  Yes, Your Honor.  Would you like me to

7  come to the podium or address you from here?

8      THE COURT:  As long as you speak up.  If anyone has

9  trouble hearing, we can have you go to the microphone, but if

10 not, you can stay there.

11     MR. POLLACK:  Okay.  First of all, Your Honor, an

12 objection based on authenticity.  The Pilgrim's custodian,

13 Mr. Sangalis, talked about the integrity of the Pilgrim's

14 system, the original collection of documents to be produced to

15 the Department of Justice, but he did not testify or attempt to

16 testify that this particular document was amongst that

17 collection.

18     The witness that the government called to try to

19 establish the authenticity of this particular document was

20 Mr. Challa.  And what Mr. Challa said was that he was given a

21 long list of documents which included this document, but he

22 didn't have time to actually go back to Pilgrim's servers to

23 verify that each and every document on the list was on

24 Pilgrim's server.  He did so for about 70 to 80 percent of the

25 documents, but he never specified which 70 to 80 percent of the

Kirsten Tucker - Direct

1    documents he did that for.

2          So there is nothing in the record that this was

3    either -- this particular document was either authenticated

4    when it was originally pulled and then an unbroken chain of

5    custody to today, nor is there nothing in the record working

6    backwards that this particular document was traced back to the

7    original collection or back to Pilgrim's server.  So that's the

8    authenticity objection.  I do have additional objections.  I

9    don't know if you want me to stop there.

10         THE COURT:  Yes.  Let's take them one at a time so we

11   make sure that each one gets addressed.

12         Ms. Call, response to Mr. Pollack?

13         MS. CALL:  Yes, Your Honor.  I believe Mr. Challa

14   testified as to the e-mail systems of Pilgrim's, how e-mails

15   and attachments are saved and stored on the PTC server.  I

16   believe he confirmed he was able to confirm for each of the

17   documents contained in his binder that the e-mail addresses on

18   those documents were from or would have been maintained on

19   Pilgrim's servers.

20         In addition, Mr. King from Consilio confirmed how his

21   company extracted and copied those documents, including both

22   the Pilgrim's and the PILGRIMS-DOJ Bates prefixes.  Government

23   Exhibit 6198 here contains one of those Pilgrim's DOJ Bates

24   prefixes, and both of them confirm that these were true and

25   accurate copies of what would have been maintained on Pilgrim's

Kirsten Tucker - Direct

1    servers.

2          *MR. POLLACK:* Your Honor, if I might respond to that.

3    The only effort by Mr. King or Mr. Sangalis to address this

4    document is simply say that I recognize that Bates prefix, but

5    anybody could take a document and put that Bates number on

6    there.

7          The only person who tried to say that this document

8    either came from what was originally collected from Pilgrim's

9    servers or traced it back directly to Pilgrim's servers was

10   Mr. Challa.  The fact that it reflects a Pilgrim's e-mail

11   address doesn't make it an authentic document.

12         They had Mr. Challa start to do what would have been

13   necessary to authenticate this document.  The problem is they

14   gave him such a long list, that he only got 70 to 80 percent of

15   the way through it.  And he didn't testify as to which ones he

16   did and which ones he didn't do.

17         *THE COURT:* The objection is going to be overruled.

18   Mr. Pollack is right in terms of the testimony by Mr. Challa,

19   but nonetheless, the fact that Mr. Challa tested 70, 80 percent

20   of them and testified that he didn't find any errors in those

21   gives a great deal of certainty to the accuracy of the process

22   that was used.  And I find that the government in terms of

23   authenticity has made a prima facie case as to authenticity.

24   Any additional questions that may have come out through

25   Mr. Challa can, of course, be argued to the jury, but I do find

Kirsten Tucker - Direct

1   that that objection itself will be overruled.

2           Additional ones, Mr. Pollack?

3           *MR. POLLACK:*  Yes.  Your Honor, in the original e-mail

4   in this chain, Brenda Ray e-mails a number of people, some of

5   whom there has been no evidence about, saying that she received

6   a call today from a friendly competitor.  There has been a

7   follow-up e-mail from Mr. Pate to Ms. Ray saying, "Who would

8   the friendly competitor be?"  And Ms. Ray responds, "George's."

9   And, of course, the inference that one might draw from that

10  document is that Mr. Blake, the only person here affiliated

11  with George's, is the source of Ms. Ray's information.

12          However, the government back in November of 2020 in a

13  letter providing exculpatory information said, and I quote, and

14  this is from Page 13 of the November 24th, 2020 letter, and I

15  have marked it for identification as I-119 if the Court would

16  like a copy.  The relevant portion says:  Ray told Penn and

17  others at Pilgrim's that she got a call from, quote, a friendly

18  competitor to thank Pilgrim's for increasing their prices.  Ray

19  said these competitors were following Pilgrim's price per it.

20  There is then a citation to this precise e-mail by Bates

21  number.

22          In her interview with counsel, Ray identified George's

23  as the friendly competitor.  Greg Nelson of George's told Ray

24  that George's price were increasing.  What it doesn't say in

25  that letter, but which is apparent from the memorandum of

Kirsten Tucker - Direct

1   interview of Ms. Ray, and I have marked that for identification

2   as I-118, again I can hand up the Court a copy, while that it

3   is a correct summary of what she said about who was the source,

4   she also eliminates Mr. Blake as the source.  On Page 6 of that

5   memorandum of interview, she says she did not know Ric Blake.

6          You will recall, Your Honor, at the *James* hearing the

7   government used this exact same document without disclosing to

8   the Court that the government knew that Mr. Blake was not the

9   source of this information.  And on cross-examination I asked

10  Agent Taylor about that and Agent Taylor readily conceded when

11  shown the memorandum of interview I just referenced that, in

12  fact, Ms. Ray had identified who the source was by name and

13  that it was somebody other than Mr. Blake and that, in fact,

14  she did not know Mr. Blake.

15         At the *James* hearing employing, as the Court of course

16  does at that point, a preponderance standard and allowing

17  hearsay, the Court nonetheless found that the government had

18  not demonstrated that Mr. Blake was a member of the conspiracy

19  anytime prior to October 24th, 2017.  There has been no

20  evidence adduced at the trial to date that Mr. Blake was a

21  participant prior to that date, certainly no evidence in

22  addition to what was produced at the *James* hearing.  And, in

23  fact, there has been no evidence at the trial that Mr. Blake

24  was a member of the conspiracy at all.

25         The only thing we have heard so far is from Mr. Bryant

Kirsten Tucker - Direct

1    that Mr. Bryant got a list of prices from Mr. Austin that

2    included a figure for George's.  He does not say that

3    Mr. Austin said he got that figure from George's, much less

4    that he got it from Mr. Blake.  And we now know from the

5    document introduced this morning that, in fact, that list of

6    prices was not a list of future prices.  It was to the one

7    thousandth of a cent precisely the period 2017 pricing.

8         If this document were admitted, the jury would be

9    allowed -- indeed invited to speculate that Mr. Blake was the

10   source at a time there is no evidence he was a member of the

11   conspiracy and when we all know that, in fact, he was not the

12   source.  Given that, Your Honor, I would argue, one, the

13   document is not even relevant; but two, whatever probative

14   value it might have with respect to Mr. Blake is clearly

15   outweighed by the risk of misleading or confusing the jury and

16   it's highly prejudicial.

17        The mere fact that something qualifies as an

18   801(d)(2)(E) statement does not mean it is not still subject to

19   401 and 403 analysis.  In fact, it is.  I would cite the Court

20   to *United States v. Van Nuys*, 707 F.Supp. 465 at 468, a 1989

21   decision of the District Court of Colorado excluding an

22   801(d)(2)(E) statement under 403.

23        And there are numerous other courts that have reached

24   the same conclusion.  I can cite *United States v. Bradshaw*, a

25   First Circuit decision, 281 F.3d 278, *United States v.*

Kirsten Tucker - Direct

1    *Ferguson,* a District of Connecticut decision, 246 F.R.D. 107, a

2    District of Columbia decision, *United States v. Safavian,*

3    435 F.Supp.2d 36, and finally an Eastern District of New York

4    case, *United States v. Carneglia,* 256 F.R.D. 384.

5         So for all those reasons, Your Honor, even if this

6    statement qualifies as an 801(d)(2)(E) statement and even if

7    the government were subsequently to prove that Mr. Blake was a

8    member of the conspiracy and therefore this could be admitted

9    against him on those grounds even though he didn't become a

10   member for several years after that, even if all of that is

11   correct, given that we all know that the reference to George's

12   is a reference to somebody other than Mr. Blake, this document

13   should be excluded under 403.

14        *THE COURT:*  Thank you, Mr. Pollack.

15        Response by the government?

16        *MS. CALL:*  Yes, Your Honor.

17        So as an initial matter, I think the reference to a

18   company is not so prejudicial as to any one employee of that

19   company that should exclude evidence otherwise admissible under

20   801(d)(2)(E).  There are numerous documents in this case where

21   the value of the evidence and the fact that it is in

22   furtherance of the conspiracy is established by the naming of a

23   competitor name and not necessarily a specific individual at

24   that company.  There are plenty of e-mails indicating that and

25   a number including George's.

Kirsten Tucker - Direct

1           The government is not limited in its presentation of

2    evidence in this case to just presenting evidence relative to

3    the 10 defendants charged here as individual participation, but

4    the government must also prove the existence of this

5    conspiracy.  And George's -- any employee of George's

6    participation in it is relevant to that proof and relevant to

7    the proof against Mr. Blake whether he or anyone else at his

8    company was a conspirator.

9           In addition, as to the current prices note that

10   Mr. Pollack raised, I believe Mr. Bryant's testimony has

11   established that the monitoring of current prices were acts in

12   furtherance of the conspiracy.

13          Furthermore, I think this document will also be

14   relevant to Defendant Penn as well, and so it should not be

15   excluded solely on the grounds of prejudice against Mr. Blake,

16   which it is the government's position there is no such -- such

17   high prejudice there.

18          Let me confer for one moment.

19          THE COURT:  And also isn't it true that Mr. Pate and

20   Ms. Ray have been identified as having acted within the scope

21   of the conspiracy in my James order 559?

22          MS. CALL:  Yes, Your Honor.  That is perhaps the first

23   thing I should have noted, but I was mostly addressing the

24   relevance -- or the objection as to prejudice rather than just

25   to the sufficiency under 801(d)(2)(E), but of course Ms. Ray

Kirsten Tucker - Direct

1   and Mr. Pate were both found to be co-conspirators.

2          THE COURT:  Hold on one second, Mr. Pollack.  I think

3   Ms. Call was going to confer.  Then I will go back to you.

4          MS. CALL:  One other thing to correct on the record, I

5   believe Mr. Pollack said the Court found Mr. Blake to be a

6   conspirator not until 2017, but he may have misspoken.  I

7   believe he meant 2016.

8          THE COURT:  I think it was 2016.

9          Go ahead, Mr. Pollack.

10         MR. POLLACK:  Yes, Your Honor.

11         It is correct that the Court found at the *James*

12   hearing that Pate and Ray were co-conspirators, but this is

13   reflecting a statement of Mr. Nelson who the Court has not

14   found is a co-conspirator, Mr. Nelson of George's.  And the

15   prices with respect to Mr. Bryant again are in 2017, so they

16   are well after this.  In any event, Mr. Bryant did not testify

17   that current prices were used in furtherance of the conspiracy.

18   He testified that they could be used in furtherance of the

19   conspiracy.  I specifically asked him whether he had any

20   information that Mr. Blake had used current prices in that

21   fashion and his answer was no.

22         THE COURT:  I am going to overrule the objection.  The

23   points that Mr. Pollack makes are good ones, but those are ones

24   that can be made to the jury.  I think that the fact that there

25   was communications through this unspecified source of

Kirsten Tucker - Direct

1    information but nonetheless involving Ms. Ray, involving

2    Mr. Pate, and communications with a friendly competitor is

3    relevant to the government's charge.  And as a result, for that

4    reason it would -- I think that the document itself is

5    relevant.

6          In terms of the 403 analysis, in and of itself this

7    document does not have any undue prejudice.  Once again,

8    Mr. Pollack is correct it potentially could be read in that

9    way, but it's not on its face anything that would suggest that.

10   So I find it relevant even though it's a time period that I

11   haven't found in the *James* order involved information that

12   would involve Mr. Blake, but I do think that this document is

13   otherwise relevant to the government's case and for that reason

14   I will overrule the objection.

15         *MR. POLLACK:*  In light of that ruling, I would ask for

16   a limited instruction as to how the -- what use the jury will

17   make with this document.  As the Court just said, the jury

18   could conclude from this document that Mr. Blake was the

19   source.  And we know that is simply false.  I would ask the

20   Court to give an instruction that the document is relevant to

21   the jury's consideration as to whether or not a conspiracy

22   existed, but it may not be used as evidence that Mr. Blake is

23   the employee of George's being referenced in the document.

24         *THE COURT:*  And remind me, Mr. Pollack, so the

25   information, you reference that DOJ letter.

1752

Kirsten Tucker - Direct

1     MR. POLLACK:  Let me hand both the memorandum of

2  interview and the excerpt from the letter up to the Court, if I

3  can.  And so it's clear, the original letter I think was 50

4  pages long.  What I have given the Court as an excerpt is the

5  first page and the introduction and then the relevant page.

6  And let me give a copy to counsel as well.  Again, the MOI is

7  marked as I-118 and the excerpt from the November 24, 2020

8  letter is marked as I-119.

9     THE COURT:  Mr. Pollack, I am looking at Page 13.  Oh,

10  I see, Greg Nelson in the middle.

11     MR. POLLACK:  And in the memorandum of interview the

12  relevant portion starts at the bottom of Page 3 and carries

13  over to the top of Page 4, and then the statement that she did

14  not know Ric Blake is on Page 6.

15     THE COURT:  And then what's the status of Ms. Ray as a

16  potential defense witness?

17     MR. POLLACK:  She has been identified as a unindicted

18  co-conspirator.  I think originally she was covered under an

19  agreement with the government.  The government revoked that.

20  The government has represented that they would provide immunity

21  to her if she chose to testify in this trial.

22     THE COURT:  So you could call -- I am posing this.

23     MR. POLLACK:  Your Honor, I have been informed that

24  apparently she presently has COVID, so we don't actually know

25  if she would be available or not available.  But, Your Honor,

Kirsten Tucker - Direct

1    irrespective of that, I would agree that if there were any

2    ambiguity whatsoever, it was not clear, it was a fair inference

3    that the source is George's, referring to the one and only

4    George's employee who is here, if there was any fair debate

5    about whether it was actually a reference to Ric Blake, I would

6    agree.  Let it in and I can address it in the defense case.

7            But it seems to me we are in a very different

8    situation where the government has no good faith basis

9    whatsoever for suggesting that the source is Mr. Blake.  The

10   source is Mr. Nelson, who is not a co-conspirator.  And to

11   allow the jury to have that misimpression for a number of weeks

12   until we get to the defense case whether or not I am or not

13   able to call Ms. Ray -- if she is unavailable, at that point I

14   would have to move for a mistrial -- there is just no reason to

15   do it, to allow the jury to have that misimpression.  I would

16   just like a limiting instruction.  The Court said the jury

17   could well draw that inference.  I would like an instruction

18   that they shouldn't draw that inference.

19           THE COURT:  Response, Ms. Call?

20           MS. CALL:  Yes.  A point of clarification as to what

21   we know or do not know.  Of course, this report reflects an

22   agent's notes of what was said in this interview, but as

23   Mr. Pollack himself mentioned, the government has taken away

24   Ms. Ray's protections under the plea agreement because of

25   doubts to her credibility.  So we are not conceding that what

Kirsten Tucker - Direct                                                    1754

1    she represented in this interview was, in fact, the truth and

2    that the source of this was, in fact, whoever she said it was.

3           But aside from that, I did want to note that we

4    further have not yet suggested in this trial what the source of

5    that information or who the source of that information was at

6    George's, but I just believe a limiting instruction will not be

7    proper in this instance.  And the 30 or so other instances

8    where George's name may come up in a document, whether or not

9    it's suggesting that it would be attributable to Mr. Blake,

10   it's not so highly prejudicial that that would be necessary.

11          THE COURT:  Mr. Pollack, go ahead.

12          MR. POLLACK:  I was just going to note that Ms. Ray's

13   immunity was pulled only after she appeared on the defense

14   witness list.  Her availability I think is very much in doubt.

15   And again, there is just no reason -- there is no legitimate

16   reason.  There is no nonprejudicial reason.  If what the

17   government is saying we're not putting it in for the jury to

18   draw that inference, we are putting it in for other reasons,

19   that's fine, but let the jury know that.  Why should everybody

20   in this room know that and the only people who don't are the 12

21   people in the box?

22          THE COURT:  I am going to refuse Mr. Pollack's

23   request.  Here is why.  If we did things during the course of

24   the trial and essentially made footnotes to the jury on all

25   sorts of documents, No. 1, I have never done that.  It's highly

1755
Kirsten Tucker - Direct

1    unusual.  I don't know exactly what use the government is going

2    to suggest from this document.  Mr. Pollack can defend

3    Mr. Blake by calling Ms. Ray.  If that turns out not to be the

4    case, we'll see.

5         There is always the possibility that depending on

6    Ms. Ray's availability and so forth and so on, that some type

7    of limiting instruction can be given to the jury later, maybe

8    even in the jury instructions.  Once again, we'll have to see.

9    But at this point in the trial to make -- to have it come in

10   with a statement to that effect when it could very well -- when

11   the fact that it wasn't Mr. Blake as the source, I don't think

12   that that's appropriate at this point in time.

13        MR. POLLACK:  Your Honor, to be clear, I am not asking

14   an instruction that Mr. Blake was the source.  I am asking for

15   an instruction they can only consider the document for a

16   limited purpose, which is an instruction the Court gives

17   routinely, but it would specify that the purpose is for their

18   consideration as to whether or not it is evidence that a

19   conspiracy existed as opposed to for their consideration of

20   whether or not Mr. Blake is the person referenced in this

21   document.  So I am not asking the Court to make the actual

22   assertion to the jury.  I am simply asking the Court to

23   instruct the jury not to draw the inference that the Court said

24   it could draw which is an incorrect inference.

25        THE COURT:  Okay.  So it would be to tell the limited

Kirsten Tucker - Direct

1    purpose, and that limited purpose --

2            MR. POLLACK:  Is to determine whether or not the

3    conspiracy existed, not whether any particular defendant was a

4    member of that conspiracy.

5            THE COURT:  Well, the problem with that instruction is

6    that in terms of the two Pilgrim's people, that would not be

7    appropriate.

8            MR. POLLACK:  But they are not on trial here.  I said

9    the defendants.  They can consider it as to whether or not the

10   conspiracy existed, but they can't consider it as to whether or

11   not any of the defendants on trial were a member of that

12   conspiracy.

13           MS. CALL:  May I respond, Your Honor?

14           THE COURT:  Yes.

15           MS. CALL:  I will note that regardless of the source

16   from George's, the participation of any other individual at

17   George's is relevant to whether Mr. Blake knowingly joined the

18   conspiracy as well in that this is a conspiracy between

19   competitors.  And if others at his company were involved, it

20   may be relevant as to his means, motive or ability to join the

21   conspiracy.

22           THE COURT:  Response to that, Mr. Pollack?

23           MR. POLLACK:  First of all, again the government has

24   not ever labeled Mr. Nelson as a co-conspirator.  The

25   government did not at the *James* hearing put on any evidence

Kirsten Tucker - Direct

1    that Mr. Nelson was a co-conspirator.  So the government now

2    wants the jury to draw an inference which is purely speculation

3    that Mr. Nelson was a co-conspirator and then speculation on

4    top of that that that means that Mr. Blake was a

5    co-conspirator.  To me that just illustrates that the

6    prejudicial nature of the evidence outweighs its probative

7    value.

8         THE COURT:  Yeah, actually because I don't think that

9    there is a basis given the memo that Mr. Pollack provided since

10   the -- even Ms. Ray was not accurate, there is no reason to

11   otherwise determine who that would be.  The best information

12   that the government has and that anyone has is that it came

13   from Mr. Nelson.  He is not listed.  I will provide the

14   limiting instruction that Mr. Pollack has suggested.

15        The jury can consider it for the existence of the

16   conspiracy, but in terms of whether or not they can

17   determine -- what was it, Mr. Pollack, that you said?

18        MR. POLLACK:  They cannot consider it for purposes of

19   evaluating whether any of the defendants on trial here were

20   members of the conspiracy.

21        THE COURT:  This document.

22        MR. POLLACK:  This particular document, a limiting

23   instruction with respect to this document only.

24        THE COURT:  Okay.  Any other objections, Mr. Pollack?

25        MR. POLLACK:  No, Your Honor.

                                                                              1758
                         Kirsten Tucker - Direct

 1           THE COURT:  Let me just make some notes to myself.

 2           MS. CALL:  Your Honor, I don't believe that

 3   instruction would be proper as to the whole document.  For

 4   example, the initial e-mail in the chain was sent to Defendant

 5   Penn.  He is on the CC line.

 6           THE COURT:  Right.  So Mr. Tubach, do you want to

 7   respond to that?

 8           MR. TUBACH:  I am sorry, I missed -- I missed what

 9   counsel --

10           THE COURT:  Ms. Call's point was that if you look at

11   Exhibit 6198 at the very bottom, you will see that Mr. Penn is

12   copied.  So the issue is whether Mr. Pollack's suggestion that

13   the Court give that limiting instruction as to all defendants,

14   an exception would be made for Mr. Penn because he is, in fact,

15   copied on the original e-mail.

16           MR. TUBACH:  I certainly don't want any instruction

17   that says you can specifically consider this document against

18   Mr. Penn.  I would suggest that the Court not give that sort of

19   instruction.

20           THE COURT:  Well, it would be -- I think the

21   suggestion would be that limiting except for Mr. Penn so he

22   would get called out.

23           MR. TUBACH:  We certainly don't want him called out in

24   a limiting instruction, Your Honor.  We don't think it's

25   appropriate to specifically call him out.  This colloquy here,

Kirsten Tucker - Direct

1    this e-mail from Ms. Ray to many and then CCing Mr. Penn

2    appears in another government exhibit that the government is

3    seeking to introduce later today, and this will come up again.

4    So I don't think the limiting instruction with a carve-out for

5    Mr. Penn and highlighting him specifically is appropriate.

6              THE COURT:  Response, Ms. Call?

7              MS. CALL:  I think I would suggest as kind of a

8    go-between between those two proposals that the e-mails above

9    that bottom e-mail have that limiting instruction, whereas the

10   bottom e-mail could be taken against all defendants and that

11   may solve Mr. Tubach's concerns and Mr. Pollack's to the extent

12   that George's is not listed in that bottom e-mail.

13             THE COURT:  Mr. Pollack, go ahead.

14             MR. POLLACK:  Your Honor, I could accept the limiting

15   instruction with respect to the upper portion of the e-mail,

16   but what would make more sense to me would be to simply redact

17   the upper portion of the e-mail.  If what the purpose is is to

18   show that Mr. Penn was cc'd on the e-mail, which by the way

19   went to a number of people who nobody is saying are

20   co-conspirators, if they want to put that in, you know, that's

21   not an issue.

22             The only purpose of the latter e-mail is the improper

23   purpose.  So I would suggest we either keep it the original

24   e-mail, but alternatively I would accept that the instruction

25   that I asked for, that the Court explain that that only applies

Kirsten Tucker - Direct

 1   to the e-mails involved with the bottom e-mail.

 2        THE COURT:  Mr. Tubach?

 3        MR. TUBACH:  Your Honor, here I may part company with

 4   Mr. Pollack.  If the other government exhibit is going to be

 5   introduced, we do think the language above, the bottom e-mail

 6   in this exhibit, Government 6198, explains Ms. Ray's statement.

 7   Of course, we have no objection to a limiting instruction that

 8   Mr. Pollack has suggested.  And I have another hearsay

 9   objection that I can make.

10        THE COURT:  One second.  Let me make a few notes,

11   Mr. Tubach.

12        Okay, Mr. Tubach.  Did you have something that relates

13   to 6198?

14        MR. TUBACH:  Yes, Your Honor, very briefly.  It

15   relates to three words.  I believe this is hearsay within

16   hearsay.  At the very bottom of the e-mail where it says in the

17   second to last sentence, "They thanked us for taking the lead

18   and told me that contrary to what we might hear regarding their

19   company, they are following" and then "as are others."  That is

20   hearsay within hearsay.  The only way this person, presumably

21   Mr. Nelson, knew about what others are doing is because someone

22   told him what others were doing.  And we're now I think three

23   levels of hearsay deep.

24        So my request would be to redact those three sentences

25   as hearsay within hearsay and without any exception because

Kirsten Tucker - Direct

1    there can't be an argument from counsel that whoever made those

2    statements to Mr. Nelson was a member of the conspiracy because

3    nobody knows who those people are.

4              THE COURT:  I am going to reject that request.  I am

5    also going -- the limiting instruction I am going to give will

6    indicate that the jury can consider the exhibit to prove the

7    existence of a conspiracy, but not as to whether any defendant

8    was a member of the conspiracy except for Mr. Penn who is

9    copied on one of the e-mails.  I think that's fair because

10   Mr. Penn is indeed copied.

11             Mr.  McLoughlin?

12             MR. McLOUGHLIN:  Your Honor, one ancillary point.

13   This document and a number of the others produced by a variety

14   of the companies, but particularly Pilgrim's, has Highly

15   Confidential on the bottom.  It was added with the Bates

16   numbers.  We would request that all of those be redacted for

17   the obvious reason.  We don't want the jury to be confused

18   about the nature of this communication or any other that the

19   company tagged.

20             THE COURT:  Yeah, I think we need to make an effort to

21   do that.  That was a later added -- it's a product of

22   discovery.  And I think it could mislead the jury if they --

23   they may see that on a lot of things and maybe it's already on

24   a lot of things, but I do think it's misleading.

25             MR. McLOUGHLIN:  We would ask universally -- and

Kirsten Tucker - Direct

1   obviously we will cooperate with the government.  It's for

2   everyone's benefit the jury not be confused -- if there are

3   documents that have been admitted, they can be redacted as

4   well.  We are happy to cooperate.

5        THE COURT:  Unless anyone has a problem with that, I

6   think that should be done, because the jury may not understand

7   that that's just something that was added later, but for

8   certain documents it could be misleading.

9        MS. CALL:  This does seem like quite a large

10  undertaking that perhaps should have been raised earlier.

11  These Bates designations were created by the company, not by

12  the government.  I am wondering whether the jury could perhaps

13  just be instructed regarding those designations on the bottom

14  left-hand corner of documents.  I believe that's the only place

15  where they are found with those designations.

16       MR. McLOUGHLIN:  We will provide the government with a

17  redacted copy, Your Honor.

18       THE COURT:  I think Ms. Call is bringing up a

19  logistical matter which is it could be quite cumbersome to do

20  that.  Let's leave that.  I will let you think about that.  But

21  at the very minimum I think that the Court would need to let

22  the jury know that that type of wording is probably in the same

23  place on virtually everything, but that type of thing was added

24  later and it has no relevancy to any issue in this case.

25       Mr. Tubach?

1763
Kirsten Tucker - Direct

1        MR. TUBACH:  Your Honor, one brief, and I won't try

2   the Court's patience.  This same document, the e-mail at the

3   bottom is in another exhibit that's going to be admitted where

4   there will be no limiting instruction at all if the Court

5   allows it.  So calling out Mr. Penn specifically here doesn't

6   serve any purpose when the exact same e-mail is going to be

7   admitted later without any limiting instruction and the jury

8   would be fully allowed to consider that for any purpose.

9        THE COURT:  Which one is that just for Ms. Call's

10  benefit?

11       MS. CALL:  I believe I have the number, Mr. Tubach.

12       THE COURT:  She knows about it, then.  I don't

13  necessarily need to.  What's your response to that, Ms. Call?

14       MS. CALL:  Yes, I think that would be fine.  I think I

15  just want to ensure that the limiting instruction is clear that

16  the contents of that e-mail, of course, then could be

17  considered in the other exhibit as to Defendant Penn without

18  the limiting instruction and it not be confused that this

19  e-mail when you create the limiting instruction cannot be

20  considered when it will be obviously contained in another

21  government exhibit.

22       THE COURT:  Well, I think that the suggestion would be

23  that when I give the limiting instruction as to 6198 and not

24  single out Mr. Penn, but given the fact that the government is

25  going to admit -- we'll see -- the same e-mail that's at the

1764
Kirsten Tucker - Direct

 1    very bottom of this exhibit and would not, according to

 2    Mr. Tubach, come with a limiting instruction, that therefore

 3    the jury can consider that to prove that Mr. Penn was a member

 4    of it, but that way we don't have to call him out in this

 5    limiting instruction.

 6          MS. CALL:  I think that is what I had intended in

 7    proposing the limiting instruction to only apply to e-mails

 8    above that one, but we are comfortable with however Your Honor

 9    deems it most appropriate.

10          THE COURT:  Well, then I will take out the reference

11    to Mr. Penn since the government is going to be introducing

12    that elsewhere, okay?

13          All right.  Any further objections as to 6198?

14          MR. McLOUGHLIN:  A tiny housekeeping matter, Your

15    Honor -- I apologize -- for the record.  We are going to be

16    talking about *James* determinations and a variety of other

17    things.  I think certainly on behalf of Mr. Lovette and

18    probably on behalf of the other defendants, sometimes the Court

19    can be quite aggressive about waiver issues.  We just want to

20    register a continuing objection whether if we don't raise a

21    *James* objection in this discussion, we want to reserve any

22    objections we have with respect to that.  We are not waiving

23    anything and wanted the record to be clear.

24          THE COURT:  In terms of the Court's ruling on -- in

25    connection with the *James* hearing?

Kirsten Tucker - Direct

1           MR. McLOUGHLIN:  Yes, Your Honor.

2           THE COURT:  Yes, understood.

3           MR. TUBACH:  Your Honor, I think I'll only have to do

4    this once.  Even though the jury is not here, we are still able

5    to lodge an objection by one counsel as an objection for all so

6    we don't have to do it separate?

7           THE COURT:  Yes.

8           Next exhibit?

9           MS. CALL:  This is very timely.  The next exhibit is

10   3037, and I will pass that out to counsel.

11          Your Honor, would you like a paper copy?  I am happy

12   to hand it up to Ms. Grimm.

13          THE COURT:  No, if it's just one page.

14          MS. CALL:  Government Exhibit 3037 is an e-mail

15   between Jayson Penn and Jason McGuire at Pilgrim's which, as

16   Mr. Tubach was noting, is a follow-on chain to that e-mail we

17   were just speaking about in Government Exhibit 6198.  And I

18   will note now this was entry 14 on the government's *James* log.

19   And it is the government's position that this is a

20   co-conspirator statement admissible under 801(d)(2)(E), both

21   the original e-mail as well as Mr. Penn's at the top of this

22   chain.

23          THE COURT:  Mr. Tubach looks like he is ready to go.

24          MR. TUBACH:  No argument other than the arguments I

25   already made and those made by other counsel.

1766
Kirsten Tucker - Direct

1          THE COURT:  Anyone else?  The Court will admit this

2     document, overrule the objections.  Sorry, Mr. Pollack.

3          MR. POLLACK:  A couple things.  First of all, I

4     understand the Court's ruling on authenticity with respect to

5     Pilgrim's documents, but I wanted to make sure that the record

6     is clear that we maintain that objection with respect to this

7     document.  I don't need to make it every time a Pilgrim's

8     document comes up as long as the Court is amenable to a

9     standing objection with respect to the Pilgrim's documents on

10    authenticity grounds.

11         THE COURT:  Yes.  And assuming that that is the case,

12    then my -- unless there is a quirk in something, but my ruling

13    will also be to that effect.  But as long as something -- a

14    document originated from a Pilgrim's e-mail source, then I am

15    fine with that being a standing objection.

16         MR. POLLACK:  The other thing, Your Honor, is I want

17    the same limiting instruction.  Again, the lower e-mail here is

18    an e-mail from Brenda Ray talking about a call with a friendly

19    competitor.  The inference in conjunction with the other

20    document is that that friendly competitor is George's and,

21    while the jury doesn't know that Mr. Nelson is the source, that

22    Mr. Blake is the source.  So I would ask that the same

23    instruction be given with respect to this document.

24         THE COURT:  Ms. Call?

25         MS. CALL:  On the face of this document there is no

Kirsten Tucker - Direct

1    sort of prejudice of the kind that Mr. Pollack described

2    regarding Mr. Blake.  George's is nowhere mentioned on

3    Government Exhibit 3037, so we don't believe such a limiting

4    instruction would be appropriate for this document.

5         THE COURT:  I think Mr. Pollack's point is that this

6    one and the last one could be read in conjunction, and

7    therefore someone could figure out, if they put two and two

8    together, that it could be because there is a reference back to

9    the same friendly competitor.

10        MS. CALL:  I take the point.  I think the government's

11   position would just still be that this is not itself

12   prejudicial, but we will be inclined to do whatever Your Honor

13   proposes there.

14        THE COURT:  I will go ahead and give the same limiting

15   instruction just because of Exhibit 6198, and given the fact

16   that the bottom e-mail is the same could lead to the same

17   inference.

18        MS. CALL:  Do you mind, Your Honor, repeating the

19   limiting instruction?  Because I believe this is a different

20   e-mail chain obviously Mr. Tubach had advised.  And it would

21   certainly be our position that that limiting instruction not

22   apply for all defendants because of Mr. Penn's obviously --

23        THE COURT:  You are right.  I think the limiting

24   instruction would have to be limited to the lower e-mail, so in

25   other words, not the -- it would not apply to the upper e-mail.

Kirsten Tucker - Direct

1           MS. CALL:  Do you mind reading that limiting

2      instruction?

3           THE COURT:  This is the one for 6198.  The jury can

4      consider this exhibit, 6198, to prove the existence of a

5      conspiracy, but not as to whether any defendant was a member of

6      that conspiracy.

7           MS. CALL:  Your Honor, respectfully I do believe

8      Defendant Penn would need to be carved out even to that lower

9      e-mail because his receipt of it and knowledge of the contents

10     of that lower e-mail are entirely relevant to his participation

11     and not just the fact that he forwarded it on and what was said

12     in that higher e-mail in the chain.

13          THE COURT:  Many Tubach?

14          MR. TUBACH:  Your Honor, I respectfully disagree with

15     my colleague, Mr. Pollack.  I think it's going to be quite

16     clear given the two different documents that if a limiting

17     instruction is only given as to the 6198, that that's going to

18     be applying only to George's.  I do think it's prejudicial to

19     Mr. Penn to have him specifically called out and say basically

20     announce from the Court telling the jury, hey, you should look

21     at this and see if Jayson Penn is part of the conspiracy.  They

22     can read the document.

23          THE COURT:  No, I wouldn't do that.  What I would do

24     is just say -- I would give -- the limiting instruction would

25     only apply to the lower e-mail.  I wouldn't mention Mr. Penn.

1769

Kirsten Tucker - Direct

1        MR. TUBACH:  There will be no mention of Mr. Penn at

2    all in the instruction.

3        THE COURT:  That's right.  I would just indicate to

4    the jury that the lower e-mail -- I would give the same

5    limiting instruction, but I wouldn't mention Mr. Penn.

6        MR. TUBACH:  As long as Mr. Penn is not mentioned in

7    the instruction, I am fine with the limiting instruction.

8        THE COURT:  All right.  Any other objections?

9        All right.  Then I will give that limiting instruction

10   as to the lower e-mail, but otherwise that will be admissible.

11       Next?

12       MS. CALL:  Your Honor, could I be heard briefly on

13   that lower e-mail?  I do believe that instruction may confuse

14   the jury as to how they consider Mr. Penn forwarding the e-mail

15   and calling it not a legal conversation while they cannot

16   consider the lower e-mail as to his participation in the

17   conspiracy because obviously the two need to be read together

18   for the jury to understand how this relates to Defendant Penn's

19   culpability.

20       THE COURT:  I understand, but it's such a -- we are

21   cutting it really thin here because, you know, he is forwarding

22   it the next day.  And so the jury can consider that, the top

23   e-mail, the next day as to his participation and he is making a

24   comment on it, then, you know, what would the jury not think?

25       MS. CALL:  Yes, Your Honor.  Maybe there is some

Kirsten Tucker - Direct

1    confusion here.  I did not mean to imply the timing of his

2    participation in the conspiracy, but more so that they may be

3    confused as to whether they can consider what the contents were

4    of that e-mail on August 31st in considering Defendant Penn's

5    participation because quite apparently the contents of that

6    e-mail are relevant to then him calling it not exactly a legal

7    conversation.

8         THE COURT:  I think that's an argument the government

9    can make.  I just don't see as a practical matter why it would

10   limit the ability of the government to make any arguments as to

11   the upper.  He is forwarding and commenting on the lower, so --

12   and the jury can consider that.

13        MS. CALL:  Certainly.  Perhaps the point there is I do

14   want to confirm that the government's argument, then, that the

15   contents of that lower e-mail aren't relevant to Defendant's

16   Penn participation would not violate that limiting instruction.

17        THE COURT:  Because of the upper, because the upper is

18   linking it in, right.  And Mr. Tubach has not argued otherwise.

19   He just didn't want to have Mr. Penn separately called out.

20        All right.  Next exhibit?

21        MS. CALL:  Next exhibit is Government Exhibit 1190 and

22   1191.  And I will note, Your Honor, this may already be

23   admitted as a defense exhibit, but we don't yet have electronic

24   copies of those and cannot confirm that easily.  I believe if

25   it is one, it would have come in through Mr. Gillen or

Kirsten Tucker - Direct

1   Ms. Prewitt.

2          MR. KOENIG:  And this is multi-page.  Can we hand it

3   up?

4          THE COURT:  I don't show it as in.  Do you Ms. Grimm?

5          MS. CALL:  I believe it would have a different

6   defendant's exhibit number, but I am trying to comply with your

7   instruction not to introduce duplicates of the same document.

8   May I hand this to Ms. Grimm?

9          THE COURT:  You may.

10          Mr. Gillen, do those look familiar to you?  They don't

11   look familiar to me, but --

12          MR. GILLEN:  Well, they do look familiar to me, but

13   not as exhibits that have already been introduced.  We'll

14   short-circuit it.  We have no objection to the admissibility of

15   1190 and 1191.

16          THE COURT:  Thank you, Mr. Gillen.

17          Anyone else want to comment on those two?

18          Next ones?

19          MS. CALL:  Next exhibit is Government Exhibit 1158.

20   And I will pass this up.  It's a one-pager.  I will note for

21   Your Honor this was not contained on the government's James

22   log.  The initial e-mail from Defendant Roberts would be an

23   801(d)(2)(E) statement.  The e-mail at the top from Rich

24   Eddington at RSCS would be 803(3) as to then existing mental,

25   emotional, physical state of Mr. Eddington.

Kirsten Tucker - Direct

1          It is also relevant to the effect on the listener

2   being Defendant Roberts as to the push-back he received from

3   the customer on the day that Tyson submitted its initial bid to

4   RSCS and then obviously his actions after this time, which

5   there are phone records already in evidence establishing his

6   contacts with competitors within several days of this e-mail.

7   I'll also note that many of the statements in that top e-mail

8   are questions and would be non-hearsay on those grounds as

9   well.

10         MR. GILLEN:  Your Honor, this is a quintessential

11  example of the sort of document and the sort of hearsay which

12  the Court has consistently sustained in the last several days.

13  This is Rich Eddington writing an e-mail.  It's hearsay.  And

14  he is responding.  He did get the proposal which is in 1190 and

15  1191.  His response is a hearsay response.  And so we would ask

16  the Court --

17         THE COURT:  When you say his response, who do you

18  mean?

19         MR. GILLEN:  His response, this is his response back

20  to --

21         THE COURT:  Mr. Eddington's response?

22         MR. GILLEN:  Mr. Eddington's response is pure hearsay.

23  And consistent with the Court's rulings over the last few days

24  concerning e-mails and specifically e-mails in which people --

25  the proponent or the declarant is not a witness, has not

1773

Kirsten Tucker - Direct

1    verified it, it is hearsay.  We ask the Court to exclude 1158.

2         THE COURT:  Response?

3         MS. CALL:  Yes, Your Honor.  I can be brief and rely

4    on the non-hearsay grounds I identified earlier being 803(3),

5    effect on the listener being Defendant Roberts.  As we'll see

6    throughout the evidence presented in this trial, that push-back

7    from the customer of this kind is what motivated defendant's

8    actions in this conspiracy.  So this kind of e-mail is entirely

9    relevant as kind of a kick-off of conspiratorial acts that

10   follow.

11        I will also note some of these likely constitute

12   excited utterances.  You will see use of, for example, two

13   question marks and "You're trying to get me fired before I even

14   move here," but that would be our grounds for the non-hearsay

15   use of these statements.

16        MR. GILLEN:  In a brief response to that, Your Honor,

17   first of all, it's not an excited utterance.  It's a response.

18   He then goes on to say, "Seriously recap the reality of what

19   you're asking."  He is simply asking for a response.

20        The other thing that the government knows that is

21   important here is that Mr. Eddington when asked concerning

22   whether he was upset or concerned about whether he was going to

23   get fired indicated that really, and I am paraphrasing, that

24   really this was sort of a smart aleck response to Mr. Roberts,

25   someone with whom he had dealt with in the past and was

Kirsten Tucker - Direct

1    personal friends.  So this is the government's attempt to try

2    to put before a jury or this jury an improper inference they

3    know is incorrect.

4         They know that Eddington has told them that this was

5    not -- he wasn't serious.  He wasn't upset.  He was sort of

6    smart-alecking back to somebody that he has worked with and

7    known, and therefore this isn't an excited utterance.  He is

8    not worried about getting fired.  He is simply responding back.

9    This is pure hearsay.  They can't paint it any other way.  So I

10   would ask the Court consistent with the previous ruling to

11   exclude this.

12         THE COURT:  Mr. McLoughlin?

13         MR. McLOUGHLIN:  The government's argument also that

14   it somehow represents under hearsay rules the effect on the

15   listener, the fact of the matter is it can be neither because

16   Mr. Eddington -- this document does not indicate what

17   Mr. Roberts -- the effect on Mr. Roberts in Mr. Eddington's

18   e-mail.  So it cannot be -- with respect to Mr. Roberts, as the

19   government appeared to indicate -- a document within that

20   exception.  So it should not be admitted on that ground.

21         The other issue I think with respect to this as

22   counsel noted with respect to excited utterance, even assuming

23   the time zones are equivalent, the response is two hours later,

24   if I am doing my math correct, or at least two hours later.

25   And so I am not great on the time zone translations here, but

Kirsten Tucker - Direct

1    there is no indication that the circumstances here are such

2    where it is an immediate response as is universally required

3    for an excited utterance.  And I'm not aware of an excited

4    utterance in an e-mail that goes half a page.  It's just too

5    much --

6             THE COURT:  What about the two question marks in a

7    row?

8             MR. McLOUGHLIN:  Your Honor, in today's day and age

9    merely having two question marks, if that were to qualify as an

10   excited utterance, then everything is.  I think that standard

11   is a bygone one, Your Honor.

12            MR. GILLEN:  One more point, Your Honor.  The

13   government says this is an example of how then Mr. Roberts is

14   worried about a push-back.  This is the problem that we have in

15   this case with the government's theory.  And it's frightening,

16   frankly.  This is the problem.  The problem is that they are --

17   and they are going to present to this jury a flurry of

18   telephone calls.  Look, they are all calling each other right

19   around August the 15th or August the 18th.  They must be

20   conspiring.  They must be sharing information.

21            Now, as the Court remembers from the testimony earlier

22   of Mr. Lewis, Mr. Lewis said, I asked for the -- for the

23   proposals to be sent in by the 19th of August.  So if, for

24   example, if Mr. Roberts had sent his proposal in on August the

25   19th, then a flurry of conversations in which he was a party,

Kirsten Tucker - Direct                                        1776

1    that might have a little bit more relevance.

2            The problem for the government is that this shows that

3    Tyson, unlike any other of the suppliers, submitted their

4    proposal one week -- eight days early.  And they submitted it

5    eight days early.  And what they are going to try to do is take

6    this e-mail, make it into something they know it isn't, because

7    they have talked to Mr. Eddington.  They know what

8    Mr. Eddington's response was.  And to sit here and tell the

9    Court that this was some excited utterance where he was all

10   upset I find, to be kind, disingenuous because they know that

11   he was like, come on.  He was friends with Mr. Roberts.  They

12   had known each other for years.  And Mr. Eddington worked with

13   Mr. Roberts twice.

14           So he told the government, I was just kidding around.

15   This was is smart-alecky.  But now they are pretending in this

16   courtroom to justify this e-mail coming in by asserting to the

17   Court that this is some excited utterance of where

18   Mr. Eddington is outraged and shocked and upset.  Just not

19   true.  But it breaks their theme about how this whole flurry of

20   telephone calls from the 15th to the 18th had to do with

21   setting prices.  Tyson sent their price in, sent it in on

22   August the 11th, just like the 1190 and 1191 showed.

23           We would ask the Court to exclude this.

24           *THE COURT:*  Response, Ms. Call?

25           *MS. CALL:*  I think Mr. Gillen's arguments would go to

Kirsten Tucker - Direct

1    the weight rather than the admissibility of this.  The

2    non-hearsay purposes we've cited stand regardless of any of

3    those points.  The two I'll highlight are obviously the 803(3),

4    as well as the effect on the listener, the Defendant Roberts,

5    which I think really does carry the day here.  This is August

6    11th, the date Tyson submitted its bid submission.  As

7    Mr. Gillen noted, it was four days later on August 15th when

8    Tyson was scheduled to have received a follow-up from RSCS on

9    this bid, which is the very same day that Defendant Roberts had

10   phone calls with his competitors.  So I believe this is motive

11   and intent of that future conspiratorial act and therefore is

12   not hearsay for effect on the listener because it is that

13   motive.

14            THE COURT:  I am going to exclude the exhibit.  It is

15   hearsay.  The hearsay exception of 803(3), then existing

16   mental, emotional, physical condition, I think Mr. McLoughlin

17   has a point.  This, yes, it would probably have an effect on

18   someone, but we don't have any context on what that effect

19   would be or why it would come into being or anything else.  It

20   instead would really just be considered -- I just can't

21   separate that out from the truth of the matter asserted, and it

22   doesn't seem to have any materiality to this particular case.

23            Effect on the listener, same thing.  And moreover,

24   excited utterance, No. 1, this e-mail is not, you know, a

25   couple of swear words and exclamation points.  Instead, it

Kirsten Tucker - Direct

1    actually has -- it starts off with four different subpoints and

2    cost data and all sorts of other things.  So it took a while to

3    compose.  There seems to be, as Mr. McLoughlin said, a time

4    passed after the first e-mail was received.  And there is

5    nothing about it that would -- I'm not even sure e-mails can be

6    excited utterances, but it would have to look a lot different

7    than this particular one.  So I don't find that there is any

8    hearsay exception to it, and for that reason I will exclude

9    this particular exhibit as hearsay.

10          Okay.  Next one?

11          MS. CALL:  The next exhibit, Your Honor, is

12   Government's Exhibit 1175.

13          THE COURT:  Ms. Prewitt, any objection to this one?

14          MS. PREWITT:  No, Your Honor, none.

15          THE COURT:  Anyone else?

16          MR. BELLER:  On behalf of Mr. Fries and Mr. Brady, we

17   object to this regarding Mr. Eddington and his hearsay

18   statements.

19          THE COURT:  Response to that?

20          MS. CALL:  Your Honor, that is necessary context to

21   the understanding of the top statement "Will do" by Defendant

22   Mulrenin.  And there is 10th Circuit law, I am happy to point

23   you to it, United States v. Hinson, 585 F.3d 1328, I believe,

24   saying that third-party statements are admissible as

25   non-hearsay when they are required to place the defendant's

Kirsten Tucker - Direct

1   responses in context.  And this is further the same thing,

2   effect on the listener, that first off it's a request which is

3   generally taken by courts not to be hearsay.  It says, "Please

4   call me tomorrow."

5           Then it's necessary context for Defendant Mulrenin's

6   response the next day, "Will do," as well as it is relevant and

7   non-hearsay for the effect on the listener, Defendant Mulrenin,

8   who also that Friday, August 15, reached out to competitors as

9   we have shown from the phone calls already in evidence.

10          THE COURT:  Thank you.

11          Mr. Beller anything else?

12          MR. BELLER:  Thank you, Your Honor.  I will be very

13   brief only to say that I agree with Ms. Call regarding the

14   status of the law on third-party declarants, but the issue here

15   is that the subject matter and the direction is coming from the

16   third party who is actually making the statement.  The "Will

17   do" is the equivalent of an "okay" or "I hear you."

18          So the thought process here, the subject matter is

19   actually coming from Mr. Eddington, who was the declarant as to

20   the thought, and therefore the third-party analysis that

21   Ms. Call is asking the Court to do, if not by Mulrenin,

22   Mr. Mulrenin, would be as to that top statement.  So that's the

23   reason why I believe this is, in fact, hearsay without an

24   exception.

25          THE COURT:  I am going to overrule Mr. Beller's

Kirsten Tucker - Direct

1    objection.  I think it's appropriate that the jury be able to

2    consider the request, which is what Mr. Eddington is making.

3    And then, of course, Mr. Mulrenin then responds to that.  It

4    wouldn't make any -- Mr. Mulrenin's response back "Will do"

5    wouldn't be intelligible if it weren't for the request.  So I

6    do find that under 10th Circuit authority it's appropriate for

7    the jury to be able to see the entirety of 1175 and for that

8    reason will overrule that objection.

9         Next one?

10        MS. CALL:  The next is Government Exhibit 1035 and its

11   attachment 1036.  I believe we have two versions of the

12   attachment, 1036-1 and 1036-2, which I should have flagged for

13   my colleague.

14        MR. GILLEN:  Your Honor, may I raise this one

15   procedural issue?  I am not sure whether anyone here in the

16   room actually needs extra copies of the exhibits.  It's kind to

17   have made them, but I am just worried about just more paper

18   coming and coming.  If someone wants them, maybe they could

19   indicate that, but we've all got them bindered up, I think.

20   They don't have to continue to pass them out.

21        THE COURT:  That's fine.  But it sounds like the

22   government has them available if anyone needs them.

23        Okay.  And so, Ms. Call, you're displaying right now

24   1036, but I think that you indicated that in reality you are

25   going to be talking about 1036-1 and 1036-2.

Kirsten Tucker - Direct

1          *MS. CALL:*  Yes.  May I pass these back up?  I can

2     explain.  1035 and the attachment 1036 were both *James* log

3     entry 117 on the government's *James* log which the Court ruled

4     in favor of.  The distinction between 1036-1 and 1036-2 is that

5     there were hidden columns in the native Excel spreadsheet that

6     is Exhibit 1036 in native form.  The 1036-1 is simply a

7     screen-shot with the columns hidden and 1036-2 is a screen-shot

8     with them unhidden.  And let me correct that I am correct in

9     this before I finish.

10         I believe 1036-2 is being passed around by counsel and

11    it will be with all parties momentarily if they do not have it

12    up.

13         *THE COURT:*  Let me ask you this, Ms. Call.  So if

14    that's true, then what's the difference between 1036 and

15    1036-1?

16         *MS. CALL:*  Yes, Your Honor.  1036 is just a PDF

17    created from the Excel, whereas 1036-1 is a screen-shot showing

18    the headers you would see and the columns in Excel if you were

19    to look at it on your computer.  I believe currently 1036-1 and

20    2 are what you are viewing on the viewer at the moment.

21         *THE COURT:*  What's the government going to move the

22    admission of?

23         *MS. CALL:*  I believe we would be satisfied with just

24    1035 and then 1036-1 and 1036-2 --

25         *THE COURT:*  Okay.

Kirsten Tucker - Direct

1              *MS. CALL:* -- would be sufficient.

2              *THE COURT:* Grounds?  Does everyone have that now?

3     Okay, great.

4              Go ahead, Ms. Call.

5              *MS. CALL:* As I stated, the grounds for both of these

6     would be 801(d)(2)(E)., and they were both favorably ruled on

7     in Your Honor's *James* ruling as Item 117.

8              *THE COURT:* And refresh my memory, so -- oh, I am

9     sorry.  Let me take a look at 1035.

10             *MS. CALL:* Would you like me to specify some of the

11    bases, Your Honor?

12             *THE COURT:* Yeah, if you haven't already, go ahead.

13             *MS. CALL:* This is an e-mail from Jason McGuire who

14    Your Honor did find to be a co-conspirator to Defendant Penn,

15    subject line KFC.  In the attachment you will see the KFC cost

16    model that was being developed internally at Pilgrim's at the

17    time.  This e-mail is the day before the initial bid deadline.

18    In the lower left-hand side, you will see competitors' names as

19    well as pricing.  And in the unhidden columns there is

20    additional pricing and cost information for competitors.  I

21    believe that's columns L through N of Exhibit 1036.

22             *THE COURT:* Objections?

23             Mr. Tubach, go ahead.

24             *MR. TUBACH:* Yes, Your Honor.  The e-mail we got this

25    morning at 10:28 from Ms. Call made no reference to 1036-1 or

Kirsten Tucker - Direct

1    2.  It simply said 1036.  So this is the first time we are

2    hearing about this and have not prepared fully on this.  But in

3    any event, the 1036-1 and 2, there is no indication that

4    Mr. Penn received this, ever unhid the columns that the

5    government is pointing out.

6            The government knows that the manner in which the

7    spreadsheet was sent to Mr. Penn had the columns hidden and it

8    will be able to offer no evidence that Mr. Penn ever unhid

9    those evidence and saw any of the information listed in 1036-2.

10   And so for that reason we would ask that the Court not admit

11   1036-1 or 2.

12           *THE COURT:*  All right.  Response to that, Ms. Call?

13           *MS. CALL:*  Your Honor, as Mr. Tubach said, there may

14   not be evidence of what Mr. Penn did after receiving this

15   e-mail with the native Excel file.  I do not believe it is

16   grounds for exclusion.  That simply just goes to the weight,

17   not the admissibility of the evidence.

18           In the alternative, the government could submit just

19   the native form of 1036.  And when we would display it to the

20   jury, we would unhide the column so they can view the

21   information that was contained in so that document that Defendant

22   Penn received.  But I believe it will be much easier for the

23   jury to digest and view the evidence to view it in the form

24   that it is in in Exhibits 1036-1 and 1036-2.

25           I will also note that the existence of the hidden

Kirsten Tucker - Direct                                                1784

1    columns is also relevant as to Mr. McGuire who sent the

2    spreadsheet and his participation in the existence of the

3    conspiracy, so the information contained in those columns is

4    entirely relevant, as well as to Defendant Austin as the

5    evidence will show is likely the source of this information.

6          THE COURT:  But the native file which was I assume an

7    Excel spreadsheet?

8          MS. CALL:  Correct, Your Honor.

9          THE COURT:  So that was sent to Mr. Penn.  And

10   Mr. Penn you're saying would have had the ability, given the

11   fact that he got that Excel spreadsheet, to then look at the

12   columns whether they are hidden or not.

13         MS. CALL:  Yes, Your Honor.

14         THE COURT:  Okay.  Mr. Tubach?

15         MS. CALL:  At that point he could unhide the columns

16   himself.

17         THE COURT:  Right.  He would have the capacity to do

18   that because it was a native file.

19         MS. CALL:  Correct.

20         MR. TUBACH:  Yes, Your Honor.  We are not disputing

21   the capacity of that, but what this evidence will suggest is

22   that, in fact, this e-mail was sent to Mr. Penn with the

23   columns unhidden.  And we'll have no ability to show that, in

24   fact, the columns were hidden when they were sent to him, and

25   that seems to be precisely -- presumably if they are hidden and

Kirsten Tucker - Direct

1    sent to Mr. Penn and there is other information on there about

2    competitors that isn't hidden, the suggestion would be that he

3    was not unhiding the columns and there was no evidence that he

4    ever did so.

5         THE COURT:  What were you saying, Ms. Call, about the

6    fact -- do you have the capacity then to display the native

7    file?

8         MS. CALL:  We do, yes, Your Honor.  It may be more

9    difficult in terms of going back with the jury to do that, but

10   we can display the native file, open it as it was received, I

11   suppose, show the unhiding.  So I would suggest perhaps the

12   best way to do this would be to admit all three of 1036, the

13   native, 1036-1, 1036-2, and we could show the jury 1036 as it

14   was received, unhide the columns so that they can see, and then

15   they will have that understanding when the hard copies of

16   1036-1 and 1036-2 would be sent back.

17        MR. TUBACH:  Your Honor, there is absolutely no

18   evidence my client ever saw 1036-2, zero.

19        THE COURT:  That's not what she is suggesting.  But

20   what Ms. Call is suggesting is that the native file would be

21   sent back to the jury, but also these screen shots just to show

22   what things existed on it.

23        MR. TUBACH:  Well, Your Honor, I guess my suggestion

24   would be we admit the document that Mr. Penn would have gotten

25   and opened.  And if they have any evidence that he unhid the

Kirsten Tucker - Direct

1  files, then they could introduce that evidence.  But otherwise

2  the government is going to be attempting to draw an inference

3  that's not warranted on the facts as the government knows them.

4      THE COURT:  The objection will be overruled.  I think

5  that the government can --

6      MR. FAGG:  Your Honor?

7      THE COURT:  Go ahead, Mr. Fagg.

8      MR. FAGG:  We would object to the extent that the

9  government is proposing to offer three examples of this

10  document.  I believe that if I am understanding this correctly,

11  that 1036-1 and 1036 are basically the same.  And 1036-2 is the

12  version that has the columns unhidden.

13      THE COURT:  I asked Ms. Call that and she said that's

14  not true.  I asked if 1036 and 1036-1 are essentially the same.

15      MS. CALL:  Yes, Your Honor.  The distinction -- and

16  both are up on your screen right now -- is that 1036-1 is the

17  screen-shot showing the column headers where you can see the

18  columns are hidden by looking at the upper right-hand corner

19  where they jump from L to N in designation.  And 1036 would not

20  show that.

21      MR. FAGG:  I think that's my point, Your Honor, is

22  okay, for 1036, I don't understand why that is necessary and we

23  would object to it.

24      THE COURT:  I don't think she was going to admit 1036.

25      MR. FAGG:  Okay.  I apologize for the

1787
                        Kirsten Tucker - Direct

1   misunderstanding.

2          THE COURT:  No problem.  So I will allow 1035, 1036-1,

3   1036-2.  But you are going to show the -- pull up the native

4   file too and that will be an exhibit, right?

5          MS. CALL:  Yes, Your Honor.  We can do it either way,

6   whether it be 1036-1 and 2 or showing it through the native.

7   But as I understood it from Mr. Tubach, we are happy to show

8   the native if that makes it more clear how it was received

9   versus how the document can be altered -- not altered, but how

10  the columns can become visible.

11         THE COURT:  Mr. Tubach, I will let you take a shot at

12  this.  Are you requesting or do you want the native Excel

13  spreadsheet to go back to the jury?  Is that what you wanted?

14         MR. TUBACH:  Yes, I would, Your Honor, and in the form

15  Mr. Penn received it, not with the columns unhidden.

16         THE COURT:  Whatever the native format is.

17         MR. TUBACH:  Yes.

18         THE COURT:  So how are you going to mark that?

19         MS. CALL:  The native is currently marked as 1036 and

20  the two screen shots are 1036-1 and 1036-2, so we would propose

21  submitting all three.

22         THE COURT:  Okay.  So 1036, which Mr. Fagg just talked

23  about, that's just a printout from it.  But 1036 is now going

24  to be the actual -- it's going to have to be an electronic

25  exhibit.

Kirsten Tucker - Direct

1              MS. CALL:  Yes, Your Honor.  How would be the best way

2     to effectuate that?  We could provide a thumb drive to the jury

3     for any natives.

4              THE COURT:  That's a good question.  We will have to

5     think about that as time goes on.

6              MR. McLOUGHLIN:  Your Honor?

7              THE COURT:  Unless you have a suggestion on this

8     topic, Mr. McLoughlin, go ahead.

9              MR. McLOUGHLIN:  I don't have a solution, Your Honor.

10    I am a defense lawyer.  I am here to make your life more

11    difficult.  I apologize.

12              I would note for Your Honor that I think that maybe

13    the best way to look at this issue is a best evidence rule

14    problem.  The literature on applying the best evidence rule to

15    electronic documents is still in a significant amount of flux,

16    particularly in a situation where like this you have an

17    electronic document that's used that can be altered in a

18    variety of ways like a hidden column and an unhidden column.  I

19    think there is -- a potential consensus that is coming out is

20    where you have a document that requires manipulation, which is

21    to say unhide a column, the best evidence rule would point the

22    Court to say, no, that is not the way it was received or

23    perceived.

24              That is an altered document because you have to alter

25    it away from the best evidence document I had, which is the

Kirsten Tucker - Direct

1    native, in order to disclose the hidden column.  So the best

2    evidence rule says you produce only that document that the

3    Court knows was received and seen and is in the archive of the

4    custodian.  So what I would suggest, Your Honor, here, the

5    solution here is just the document with the columns not shown

6    and with the hidden columns not shown because the best evidence

7    of this document is, in fact, the one that does not have the

8    columns.

9         THE COURT:  All right.  I will overrule that

10   objection.  I don't think that that applies to this particular

11   thing.  This is a spreadsheet.  The native file would allow --

12   contains all of that and can be opened to show those particular

13   ones.  I think that the fact that the government is going to

14   introduce 1036-1, 1036-2, is an appropriate way of making it

15   easier for the jury to see what those two things are.  But the

16   jury will have the native one which will be marked I understand

17   as 1036.  That will be a remark.  It won't be a hard copy.  It

18   will be the native file.

19        MR. TUBACH:  Your Honor, how is the jury going to

20   understand in what form Mr. Penn received the spreadsheet?

21   They're going to introduce now two versions of it, plus a

22   native version.  I mean, probably not the best evidence rule or

23   just general --

24        THE COURT:  How about a sponsoring witness?

25        MR. TUBACH:  Your Honor, is the Court suggesting I

Kirsten Tucker - Direct

1  call my client to testify?

2        THE COURT:  No.  This might be an example of having a

3  special agent just walk it through just like that without

4  anything else.

5        MR. TUBACH:  Yes, Your Honor.  I hear the Court's

6  concern.

7        THE COURT:  That would be one appropriate example.  It

8  wouldn't be the witness adding anything to it, but just saying,

9  yeah, this is a native file.  This page is opened.  I don't

10  know if a special agent could do that, but that would be an

11  example of why it would be good to do that.

12        MR. TUBACH:  If the agent is capable of testifying how

13  it was received by Mr. Penn.  He may not be in a position to

14  answer that question.

15        THE COURT:  True, I don't know, but that's a

16  possibility.

17        Ms. Henry?

18        MS. HENRY:  I just want to point out that we do object

19  to the concept.  And I am a little unclear, is it just the

20  native that is now going to go in --

21        THE COURT:  No.

22        MS. HENRY:  -- or is it all three?

23        THE COURT:  It is the cover e-mail, it is the native

24  file which is going to be marked as 1036, as I understand it,

25  and then 1036-1 and 1036-2.

Kirsten Tucker - Direct

1          MS. HENRY:  We object to the cumulative nature of it

2     as well as the prejudice.

3          THE COURT:  That objection will be overruled.

4          Anything else on this one?  One minute, Ms. Call.  Let

5     me just jot a few notes down.

6          Go ahead, Ms. Call.

7          MS. CALL:  Yes, Your Honor.  The next document is

8     Government Exhibit 1074.  It contains an e-mail from Defendant

9     Penn to Jason McGuire at Pilgrim's.  And it also contains

10    further down e-mails including the lowest, I believe, is the

11    e-mail underlying Government's Exhibit 1035, and this is a

12    chain replying to that between Defendant Penn and Mr. McGuire.

13         This was contained on the government's *James* log as

14    entry 120, 120.  And we believe every statement in all of these

15    e-mails -- the contents of all of these e-mails would all be

16    statements of conspirators in furtherance of the conspiracy

17    under 801(d)(2)(E).  I will point Your Honor to the middle of

18    the page --

19         THE COURT:  Sorry to interrupt.  So 1074, is that a

20    one-page document?

21         MS. CALL:  It is, Your Honor.

22         I will point you to the middle of the page where it

23    says, "Koch, Case, Claxton, George's, Mar-Jac" and contains

24    price ranges and the sentence above that saying, "Roger did

25    some checking around today and I included the below regarding

1792

Kirsten Tucker - Direct

1   the range of the total increases, margin and costs folks are

2   going in with."

3        I will note that phone records already in evidence

4   show Defendant Roger Austin calling conspirators at other

5   companies on this day.

6        *THE COURT:*  Objections to 1074?

7        *MS. NIELSEN:*  Yes, Your Honor.  On behalf of

8   Mr. Lovette, we would object to 1074 because of the e-mail at

9   the top which reads, "I am good.  Will review with Bill in am.

10   Will advise."  Under *Van Nuys* the government still has to

11   establish relevancy.  And there has been no evidence presented

12   that there was any communication between Mr. Penn advising him

13   of this particular e-mail.  If there is some slight probative

14   value, we would object under 403 because any probative value is

15   substantially outweighed by the risk of undue prejudice,

16   misleading the jury, and causing them to speculate as to

17   whether this conversation or this advisement actually happened.

18        I will also note that Government Exhibit 1075 is

19   essentially the same document but without that portion of the

20   e-mail that we would object to.

21        *THE COURT:*  And the relevance of that is what,

22   Ms. Nielsen, 1075?  What's the relevance of that?  Why did you

23   just mention it?

24        *MS. NIELSEN:*  Your Honor, I am mentioning it because

25   it's essentially the same document as 1074.  We are only

Kirsten Tucker - Direct

1    objecting to the portion at the top of 1074 where there is not

2    relevance or there is a 403 objection.  The next document,

3    1075, is the same e-mail, but without that portion that we

4    object to.

5              THE COURT:  So your point being that you like 1075,

6    but don't like 1074.

7              MS. NIELSEN:  No, Your Honor.  I am saying that the

8    portion -- the top portion of 1074 is not relevant.  And if

9    there is any relevance, it should be excluded under 403.

10             THE COURT:  Okay.  Response?

11             MS. CALL:  Your Honor, I believe it is entirely

12   relevant and that the conclusion to draw from that is that

13   Defendant Penn planned to review this with Defendant Lovette,

14   his supervisor.  There is already testimony on the record of

15   the fact that Defendant Lovette was the supervisor of Defendant

16   Penn.  And I will note that there is additional evidence that

17   will be connected up later when it is offered showing in other

18   instances, including in 2012, when Defendant Penn received

19   competitors' prices from his subordinates, that he then

20   forwarded it on to Defendant Lovette.

21             We don't have that forward in this chain.  Their

22   offices were in the same location, so it is a conclusion that

23   the jury could very well draw and the government's position, we

24   proffer that "Bill" here does refer to Defendant Lovette.

25             THE COURT:  Any additional arguments on that one?

Kirsten Tucker - Direct

1           MS. NIELSEN:  I think she is conceding what I'm

2   saying.  She is asking the jury to speculate whether any

3   communication happened.  Whether there was a communication in

4   2012 has no bearing on whether Mr. Lovette was actually advised

5   of this e-mail.

6           THE COURT:  Objection is overruled.  This is a

7   perfectly appropriate co-conspirator hearsay document.  And

8   what the jury thinks about the reference to Bill doesn't have

9   any 403 implications at all.  Documents don't have to be

10  annotated with all sorts of footnotes or things of that nature.

11  This is an appropriate document.  I will admit it.

12          Next document?

13          MS. CALL:  The next document is Government's Exhibit

14  1075.

15          THE COURT:  Go ahead.

16          MS. CALL:  This contains an e-mail from Defendant

17  Jason McGuire to Jayson Penn.  It is a separate e-mail chain in

18  the same chain as Government Exhibit 1074.  You will see the

19  first two e-mails were inclusive of what was in Exhibit 1074.

20  And then the two responses at the top are a separate chain in

21  this communication between Defendant Penn and Defendant

22  Mr. McGuire.

23          I will note that this was contained in the

24  government's James log as entry 118.  I will note that this is

25  a different Bates number than the document that was 118.  It is

Kirsten Tucker - Direct

1   the precise same contents in a slightly more readable format.

2   I can't say why the company produced it in two ways, but it is

3   the same content of the e-mails between those two documents.

4   And it would be the government's position that all four of the

5   e-mails in this chain are co-conspirator statements under

6   801(d)(2)(E).

7          And as to the top two e-mails, I will note

8   specifically obviously the calculation of the profits that

9   Pilgrim's would obtain from this price increase that's

10  mentioned in the lower down e-mails.

11         THE COURT:  Is this a one-page or two-page document?

12         MS. CALL:  One-page.

13         THE COURT:  I don't count four.

14         MS. CALL:  When I said four e-mails, I believe I was

15  including the e-mail without content at the bottom which was

16  simply the e-mail attaching the spreadsheet we just reviewed

17  that was Government Exhibit 1035 and 1036.

18         THE COURT:  I see that now.

19         Objections?

20         Mr. Tubach?

21         MR. TUBACH:  Not to be arguing James, the only

22  objection I would have, the e-mail we received from Ms. Call

23  this morning suggested they were going to introduce two

24  versions of this document because there are two different Bates

25  numbers.  If the government is only moving into evidence

1796

Kirsten Tucker - Direct

1  Government Exhibit 1075, then that objection would be resolved.

2      MS. CALL:  Yes, Your Honor.  We are only moving in

3  1075.

4      MR. TUBACH:  Thank you, Your Honor.

5      THE COURT:  Additional objections?  Okay.  Yes, 1075

6  will be admitted.  It is co-conspirator hearsay.

7      MR. FAGG:  Your Honor, just one point of

8  clarification.  1075, that is a document that's ending in Bates

9  numbers 3486?

10      THE COURT:  Yes, that's right.

11      MS. CALL:  I apologize for the inaccuracy in what I

12  said earlier.

13      THE COURT:  Next document?

14      MS. CALL:  The next document is Government

15  Exhibit 1058.  And Your Honor, this is two pages.  If I may

16  pass one up through Ms. Grimm.

17      THE COURT:  Yes.

18      MS. CALL:  Government Exhibit 1058 was item entry 119

19  on the government's *James* log which the Court ruled favorably.

20  I will note this is another e-mail chain with separate

21  responses than what we just reviewed in Government

22  Exhibit 1075.  Specifically it is inclusive up through the

23  lower half of the first page where it contains that math, 2.15

24  in pounds times .16.  After that those e-mails are all a

25  separate chain from what's contained in 1075.  And this

Kirsten Tucker - Direct

 1    essentially shows Mr. McGuire and Defendant Penn arrange a call

 2    to talk about the data provided in the underlying e-mails, so

 3    we believe those all would be co-conspirator statements as

 4    well.

 5            THE COURT:  Thank you.

 6            Objections?

 7            All right.  1058 will be admitted as co-conspirator

 8    hearsay.

 9            MS. CALL:  The next document is Government's Exhibit

10    1063.  That's 1063.  And this is a one-page document, Your

11    Honor.

12            THE COURT:  Go ahead.

13            MS. CALL:  This is an e-mail from Jason McGuire to

14    Defendant Penn and Defendant Austin.  I should correct myself.

15    It is a calendar invitation, not an e-mail, arranging a

16    conference call, so it relates to Government's Exhibit 1058.

17    And this was sent within hours of that when Mr. McGuire said he

18    would send around call information and this includes the

19    contact information for that call.  So it is an instance of

20    conspirators contacting between each other the means of

21    contacting each other and is non-hearsay on that ground, as

22    well as the fact that a calendar invitation is a business

23    record under 803(6), and that this is a communication in

24    furtherance of the conspiracy under 801(d)(2)(E) and that the

25    conspirators are arranging, discussing the events.

Kirsten Tucker - Direct

1          *THE COURT:*  Response or objections?

2          Mr. Tubach?

3          *MR. TUBACH:*  Yes, Your Honor.  This is not a document

4    that was on the government's *James* log.  This is something new.

5    We would object as hearsay, inadmissible on any ground.

6          *THE COURT:*  Anyone else?

7          Response to Mr. Tubach?  Did you already?

8          *MS. CALL:*  Yes, Your Honor.  I had not responded.  I

9    believe it would still be permissible under 801(d)(2)(E), but

10   regardless, there are two additional --

11         *THE COURT:*  Well, here is the problem with that

12   theory, and that is the *James* hearing had to mean something.

13   The defendants raised the issue.  And according to 10th Circuit

14   preferred practice, we went ahead and had a hearing.  So if

15   this wasn't listed as a co-conspirator statement for the

16   Court's consideration, then I am going to consider it to be --

17   to not fall within that particular ruling and not consider it

18   under that exception.

19         So let's focus on the other two grounds that the

20   government provided.

21         *MS. CALL:*  Yes, Your Honor.  So it would be the 803(6)

22   exception in that a calendar invitation is the kind of record

23   maintained in the normal course of business.  There is the

24   further non-hearsay use that it is the communication of means

25   of conspirators to contact each other, which is just

Kirsten Tucker - Direct

1    non-hearsay under 10th Circuit precedent -- I apologize, other

2    circuit precedent of *United States v. Anello*, A-N-E-L-L-O.   And

3    this is in the government's trial brief, but the cite is.

4    765 F.2d 253.   And it's in the First Circuit from 1985 and

5    collects a number of cases on this point, as well as United

6    *States v. Ruiz*, which is 447 F.2d 918.   That's from the Second

7    Circuit in 1973.

8         THE COURT:   Okay.   Mr. Tubach, anything more on that

9    one?

10        MR. TUBACH:   Yes, briefly, Your Honor.

11        The purpose of introducing it for co-conspirator

12   statements, she seems to be saying the same thing in different

13   language, which is that if it's not admissible because it

14   wasn't introduced in *James*, they can still introduce it as

15   co-conspirators speaking with each other.   That's exactly what

16   this document purports to be, a communication from Mr. McGuire

17   to Mr. Penn and Mr. Austin.   So on that ground we would object.

18        We do not believe it qualifies as a business record.

19   There has been no one here that's testified that this document

20   was created in the ordinary course of business.

21        THE COURT:   I agree.   What about the *Anello* point and

22   the *Ruiz* case, in other words, the fact of a contact between

23   co-conspirators?

24        MR. TUBACH:   Your Honor, of course, they are also

25   co-workers.   And the idea that this would be simply a contact,

Kirsten Tucker - Direct

1  they are not just saying they had a contact.  The document is

2  saying we are setting up a meeting.  And that's exactly what

3  the co-conspirator statement -- that's why we have *James*

4  hearings, so we can determine whether or not that is part of

5  the conspiracy.  The government didn't put that on the log.

6  And so simply saying, well, this is an attempt to show that

7  they had an ability to meet with each other is -- seems

8  disingenuous in light of the fact that they have been

9  co-workers for years.

10      *THE COURT:*  Okay.  Yes, go ahead.

11      *MS. CALL:*  Three more points to briefly respond to

12  that is that:  First off, the calendar invitation information

13  in the header of this, most of which is auto-generated and

14  would be not considered hearsay for that reason.  There is no

15  declarant making those statements.  It's also not an assertion

16  by a person.

17      Secondly, I would say the information contained in the

18  content of the calendar invitation is non-hearsay because it is

19  relevant for the effect on the listener in that Defendant Penn

20  did call that very number indicated in the number the very next

21  day.

22      Lastly, it is also a non-hearsay purpose of its

23  introduction that the government is not saying there is any

24  truth to just the number that is in here, but simply just the

25  fact that this number is contained in this calendar invitation.

Kirsten Tucker - Direct

 1           THE COURT:  I am actually going to take this one under

 2    advisement.  I am going to look up the *Anello* case.  I am not

 3    sure whether that talked about co-conspirator -- whether it was

 4    under co-conspirator hearsay, whether it was some other

 5    exception.  I am not clear what exception that might fall

 6    under, but I will take a look at that and see whether that

 7    provides a basis.  I don't think that business records and I

 8    don't believe that -- I am not going to consider co-conspirator

 9    hearsay, so that's why I need to look at that case.

10           MS. CALL:  May I also direct Your Honor's attention to

11    another 10th Circuit case on the auto-generation point I noted,

12    which is *United States v. Hamilton*, 413 F.3d 1138, and that's

13    from the 10th Circuit in 2005.

14           MR. TUBACH:  Your Honor, just very briefly on the

15    auto-generation point, none of the information that is relevant

16    on this document was auto-generated.  The sender, the

17    recipients, the subject, the start date, the end date, none of

18    that -- the dial-in conference call, literally not a single

19    thing on this document that the government would want to use it

20    for was auto-generated, at least there is no evidence of that.

21           THE COURT:  Okay.  Next document?

22           MR. McLOUGHLIN:  Your Honor, if I may, the case which

23    the government refers was, if I am correct, a child pornography

24    case in which the relevant headers were to demonstrate that the

25    defendant had posted these documents onto a website.  The

1802

Kirsten Tucker - Direct

1    analogy or application of that kind of a principle as

2    contrasted to the circumstances here is -- it simply -- the

3    rationale underlying that, the logical sequence that is

4    required is simply completely different.  There is no doubt

5    that Mister -- that these gentlemen communicated all the time.

6    That case it was to demonstrate a connection of the document to

7    the individual and it simply is irrelevant.

8            THE COURT:  That was in *Anello*, Mr.  McLoughlin?

9            MR. McLOUGHLIN:  No, Your Honor.  That's the last case

10   the government cited, *Hamilton*.

11           THE COURT:  I will take a look at those cases.  I will

12   reserve ruling on that.

13           Next exhibit?

14           MS. CALL:  Next exhibit is Government Exhibit 1247.

15   This is another two-page document, if I may hand it up through

16   Ms. Grimm.

17           THE COURT:  Yes.

18           MS. CALL:  Government Exhibit 1247 is an e-mail from

19   Defendant Roger Austin to Defendant Jayson Penn with a subject

20   line:  KFC meeting last Friday.  This was contained in an

21   e-mail in the government's *James* log, entry 131.  It is a

22   lesser included chain.

23           I'll note that there is another government exhibit

24   containing this e-mail, and the purpose for the duplicative

25   entries here is simply for ease of reading because of the page

Kirsten Tucker - Direct

1   breaks in the document.  So we did include a separate exhibit

2   that has a lesser included chain for the jury's ease of reading

3   here.  Government Exhibit 1247 contains one e-mail, all from

4   Roger Austin, and it's the government's position that it is

5   admissible under 801(d)(2)(E).

6           THE COURT:  Mr. Tubach?

7           MR. TUBACH:  Your Honor, the only -- I want to make a

8   logistical one.  1247 and 1051 are identical except for the

9   very top of Exhibit 1051 where Jayson Penn writes to Bill

10   Lovette, "I told Roger to proceed."  I am not sure what

11   government counsel is talking about going on one page.  I have

12   both the documents here and both of the documents go onto two

13   pages, so we think that Exhibit 1051 contains everything that's

14   in 1247, so we don't honestly see why there would be the need

15   to introduce two copies.

16           THE COURT:  1051 and 1247, right?

17           MR. TUBACH:  Exactly.  1051 has one additional e-mail

18   that 1247 does not, but all of 1247 is contained in 1051.

19           THE COURT:  Response, Ms. Call?

20           MS. CALL:  Yes, Your Honor.  I don't know if

21   Mr. Tubach heard what I had just said, but the reason for the

22   duplicative entries is simply for the ease of reading because

23   of where the page breaks in the e-mail, but that is the

24   response on that.

25           THE COURT:  I don't have --

Kirsten Tucker - Direct

1          MS. CALL:  I can pass up 1051, if that would be

2     helpful.

3          MR. TUBACH:  I indeed did hear Ms. Call quite clearly.

4     That's why I noted to the Court that both e-mails go over two

5     pages, so there is no saving of paper.

6          THE COURT:  I will take a look at 1051.

7          MS. CALL:  It is the next document anyway.

8          THE COURT:  Oh, it is?

9          MS. CALL:  Yes.

10          THE COURT:  Okay.

11          MS. CALL:  I will note they do both break pages.  It

12     was just simply how we were viewing it in the Trial Director

13     software, that it was easier to view 1247 in the format it was

14     in that document.

15          THE COURT:  So are you agreeing with Mr. Tubach, then,

16     that 1051 does the job and 1247 would be duplicative?

17          MS. CALL:  I agree 1051 is certainly -- it does the

18     job.  I will just note I believe for the jury's view of the

19     evidence, we at least found it easier when putting it up on

20     Trial Director to not be breaking pages at a strange point in a

21     sentence using 1247.

22          THE COURT:  Yeah, I would consider 1247 duplicative,

23     so what I would prefer is that you introduce 1051.  Try to keep

24     down the number of pages.  I realize they are two separate

25     e-mails and 1057 does add that additional e-mail at the top,

1805

Kirsten Tucker - Direct

1     but it seems to contain -- 1051 incorporates 1247.

2          MS. CALL:  If I may be heard one more time?

3          One thing I have now appreciated, the time stamp is

4     different on the two e-mails.  And we do have testimony in this

5     case regarding how the time stamp works for e-mails at the top

6     of an e-mail chain.  So the government would seek to introduce

7     both exhibits because they do convey the information in a

8     different way based on the evidence in this case.  That is

9     essentially more understandable to determine the time of 1247

10    based on the testimony on the record.  The time is relevant

11    because of calls that are also in evidence.

12         MR. TUBACH:  I don't think there is any conceivable

13    relevance of the precise time when the e-mail was sent.  I

14    don't believe there is any magic to that.  There is nothing

15    that even turns on that.  I am just trying not to overwhelm the

16    jury.  They are going to get a lot of documents and it seems

17    like one of these is enough.

18         THE COURT:  Well, the jury has already heard all sorts

19    of things about time stamps and everything else, so I think the

20    government is right.  There is a difference, the time

21    difference exists between these two documents.  I think that

22    both are admissible.

23         MS. CALL:  Your Honor, while I don't mean to belabor

24    the point on 1063, I was advised by my colleagues I would like

25    to bring your attention to just one more case while you are

Kirsten Tucker - Direct

1    taking it under advisement.

2         *THE COURT:*  Yes.

3         *MS. CALL:*  That is *United States v. Casanova-Gomez,*

4    189 F.3d 479.  That's in the 10th Circuit from 1999.  And that

5    is for the proposition that the district court can conclude

6    that co-conspirator statements not included on a *James* log may

7    be admitted as 801(d)(2)(E) based on evidence admitted at

8    trial.

9         *THE COURT:*  I've looked at cases.  I can't remember

10   that one in particular, although I may have looked at that one.

11   It essentially is greatly at the discretion of the Court.  And

12   I think if I did read that one, I think that the judge had

13   mentioned at the *James* hearing that the government would not be

14   precluded from doing so.  And then later, I think during trial,

15   if I am thinking of the right case, the court -- or over

16   objection the court did admit a statement that did not come

17   from the *James* hearing, so that would be distinguishable.

18        I do think that it's almost necessary -- as a general

19   matter, it's a necessary implication for conducting a *James*

20   hearing that the government needs to put in front of the court

21   the various statements.  Otherwise, we would be spending the

22   trial doing that even though we devoted a considerable amount

23   of time beforehand to that very effort, okay?

24        *MS. CALL:*  Yes, Your Honor.

25        The next exhibit is Government Exhibit 1238, and that

Kirsten Tucker - Direct

1    is a one-page document as well.  It is a message exchange

2    between Defendant Fries and Defendant Brady.  This was

3    contained in the government's *James* log at entry 1232.  It's

4    the government's position that it is therefore a co-conspirator

5    statement.  I will note that this was also deemed

6    self-authenticated by the Court based on a certification

7    relating to these documents.

8         *THE COURT:*  But this is a government created

9    compilation; is that correct?

10        *MS. CALL:*  It is an excerpt from a larger spreadsheet,

11   Your Honor.  The extraction from the device was provided as a

12   many thousand entry spreadsheet containing text messages and

13   these are a number of those messages.  And it does identify

14   itself as an excerpt in the lower right-hand corner.  And we

15   just simply did that in accordance with Your Honor's

16   instruction at the pretrial conference to excerpt from

17   voluminous materials.

18        *THE COURT:*  Mr. Beller, go ahead.

19        *MR. BELLER:*  Thank you, Your Honor.  Good afternoon

20   again.  Judge, I agree, this is based on the Court's order

21   regarding the certificate of authentication.  There was not an

22   objection by the defense as to this.  However, with that said,

23   that certificate has not yet been entered into evidence.  So we

24   don't yet have the chain.

25        What we have is testimony by Mr. Morbey that he

Kirsten Tucker - Direct

1    collected the information from a third-party vendor.  He did

2    not indicate who that third-party vendor is.  The certificate

3    that the Court is aware of was filed in Docket No. 622.  That

4    was from Consilio.  Consilio did testify while the certificates

5    were entered into evidence on many of the other phones, for

6    reasons I don't know, it was not entered as to Mr. Fries's

7    phone.

8         With that said, Your Honor, Mr. Morbey had then

9    indicated that he or somebody from his office may have obtained

10   the information, unknown how that was obtained, from again a

11   third-party vendor.  And then he provided it to C Discovery.  C

12   Discovery or C Disco provided it to the Department of Justice.

13        So I think based on authentication this is premature,

14   and that while there may be some chain of custody, the chain of

15   custody does not at this point indicate who actually collected

16   the device, how it was collected, from whom it was collected or

17   who the owner is.  That is separate and apart from 1238.

18        And I would note to the Court in Column 2 it states

19   instant message number.  They are sequential, 551 through 554.

20   And then it jumps to 559 indicating that there are five

21   additional text messages in between here.  I would also note or

22   draw the Court's attention to the final phone which is the time

23   stamp time noting that the discussions in 551 through 554 occur

24   between August the 26th and August the 27th.  We then have five

25   text messages deleted.  And then that 559 text message is

Kirsten Tucker - Direct

1   inserted and that doesn't actually occur until September the

2   3rd.

3            So consistent with some of our other objections

4   regarding 1006-type summaries, Your Honor, I do believe that

5   this is cherry-picking.  I do think it's inappropriate in the

6   way it's structured to make it look as though the conversation

7   was seamless and simply went from text message 551 to 559.  And

8   so for those reasons, I do object.

9            THE COURT:  Thank you, Mr. Beller.

10           Response, Ms. Call?

11           MS. CALL:  Yes, Your Honor.

12           Mr. Beller was correct to cite the docket entry.

13  Where the government did submit the certification corresponding

14  to this device, it was Exhibit 35-6 in the government's filing.

15  I have ECF No. 623, not 622.  I believe the distinction may

16  have been perhaps one was restricted and one was not, I am not

17  certain, but I do have 623 in my notes on this.

18           THE COURT:  What is Docket No. 623?

19           MS. CALL:  That is the government's motion for the

20  ruling on authentication under 902(14), and then the

21  certification relating to this device was provided as

22  Exhibit 35-6 to that filing.

23           THE COURT:  Okay.  And then I wasn't quite following

24  it.  So did the Court then rule on that?

25           MS. CALL:  It did, yes.  The Court ruled that this was

Kirsten Tucker - Direct

1   deemed self-authenticating as an extraction from a device.

2   That was based on those certifications.  The chain of custody

3   that Mr. Beller noted would go to the weight, not the

4   admissibility of the evidence.

5         As to the excerpting, we believe this is proper

6   excerpting.  And the defendants are free to show the jury the

7   missing text messages if they choose to.  And I will note that

8   I -- the messages in the interim between 554 and 559 were

9   between Defendant Fries and a different individual, so this is

10  simply the chain between the two over the course of these days

11  in its entirety as -- between messages 551 and 559.

12        THE COURT:  Mr. Beller, anything else?

13        MR. BELLER:  Only very briefly, Your Honor, to orient

14  the Court, the motion is, in fact, document 622.  623 are the

15  exhibits.  It was a separate filing, so it's 623-1.  I don't

16  want to be disingenuous here, Judge.  We didn't object to

17  authentication.  I think we may be reading the Court's order a

18  bit differently.

19        In terms of the idea that these are from different

20  individuals or rather those five text messages are from

21  different individuals, that is not my understanding, but I want

22  to be very clear that I don't have the full extraction in

23  fronts of me.  So I am not necessarily saying that Ms. Call is

24  incorrect in what she just recited to the Court, but I do

25  continue to stand on the objection.

Kirsten Tucker - Direct

1          THE COURT:  Okay.

2          MR. BELLER:  Thank you.

3          THE COURT:  Thank you.

4          Yes, Mr. Fagg, go ahead.

5          MR. FAGG:  Your Honor, along the same lines, and I

6     believe, I believe that the native file of the extraction does

7     not have the information that's added in this table that

8     includes, for example, owner.  Am I wrong about that?

9          MS. CALL:  That is incorrect from my understanding.

10    Perhaps Mr. Fagg may be looking at a separate column.  I

11    believe these extractions sometimes do contain multiple columns

12    identifying participants and this is one of those columns.  It

13    contains what was in the native.

14         THE COURT:  The objection will be overruled.  I find

15    that Exhibit 1238 is admissible.  And to the extent that one of

16    the defendants wants to point out the gap that Mr. Beller

17    pointed out, the underlying document can be used for that

18    purpose, although from what the government says, it's of a

19    different subject and therefore the exclusion of it is not

20    misleading.  As indicated before, I ruled it was

21    self-authenticating, and I think that the jury can consider

22    further issues as to the weight, but I will admit 1238.

23         Why don't we go ahead and take our mid-afternoon

24    break.  We have been going for a little bit.  We have a few --

25    well, why don't we go a full 20 minutes.  We have been going at

Kirsten Tucker - Direct

1   it for a while.  Why don't we plan on reconvening at quarter to

2   4:00, okay?  The Court will be in recess.

3        (Recess at 3:24 p.m.)

4        (Reconvened at 3:46 p.m.)

5             THE COURT:  Mr. McLoughlin, go ahead.

6             MR. McLOUGHLIN:  Your Honor, if I may.  I hope I can

7   save Your Honor five minutes.

8             THE COURT:  We like that.

9             MR. McLOUGHLIN:  I hope so.

10            So with respect to the *United States v. Anello* case,

11  which I've got it right is 765 F.2d 253.

12            THE COURT:  I have read it.

13            MR. McLOUGHLIN:  Yes.  Do I have to belabor that this

14  has absolutely no relevance to the decision?

15            THE COURT:  No.

16            MR. McLOUGHLIN:  To what they are using it for.

17            THE COURT:  Right.  I think there may be some other --

18  I am going to look for another one.  One would think a calendar

19  entry, there would be some case about that.  But I agree with

20  you, *Anello* doesn't seem to have any relevance.

21            MR. McLOUGHLIN:  Thank you, Your Honor.

22            THE COURT:  What's our next exhibit?

23            MS. CALL:  The next one we might be able to save some

24  time on.  I did want to just confirm with Your Honor it has

25  already been admitted, and that is Government Exhibit 1160.

Kirsten Tucker - Direct

1          THE COURT:  Yeah, it has been admitted.  So what are

2    we doing with it?

3          MS. CALL:  I just want to confirm that on your record

4    and then we can move ahead.

5          THE COURT:  Yes, it's been admitted.  But once again,

6    here is the deal.  This is a little bit interesting.  I can't

7    remember who that was admitted through, although Mr. Lewis

8    looked at it.  I don't know if it was admitted through Lewis,

9    but for some reason we admitted it for a limited purpose.  But

10   since he has then looked at it, I think there is probably a

11   foundation to admit it for the truth of the matter as well, but

12   right now it's been admitted but for a limited purpose.

13         MS. CALL:  Yes, Your Honor.  I think the government

14   would move to admit it for a broader purpose now on a number of

15   bases.  I would include one as 801(c) being it's an item of

16   independent legal significance, which is the request in the

17   e-mail for a bid deadline which creates an obligation on the

18   recipients.

19         THE COURT:  Okay.  So I think it's now being offered

20   for the truth of the matter asserted.

21         MR. TUBACH:  No objection from Mr. Penn, Your Honor.

22         MR. FELDBERG:  None from Mr. Austin, Your Honor.

23         THE COURT:  Mr. Beller, go ahead.

24         MR. BELLER:  Your Honor, I continue to maintain that

25   this is hearsay.  And to be very clear with the Court, I do not

Kirsten Tucker - Direct

1    recall the full record as to why it was deemed hearsay last

2    time.  I have some concern that by not objecting now, we may

3    have waived an earlier objection, and so I respectfully persist

4    in the objection.

5              THE COURT:  I am going to overrule that objection.

6    Mr. Lewis testified about this document already.  And I think

7    that -- and moreover, he basically affirmed what he had

8    indicated to the -- that that was his e-mail to those various

9    recipients.  Like Mr. Beller, I don't remember exactly why it

10   was only limited -- or admitted for that limited purpose, but I

11   think that now a foundation exists for it to be admitted for

12   the truth of the matter asserted as well and will do so at this

13   time.  I will do it in front of the jury at this time, but that

14   will be my ruling.

15             All right.  Next exhibit?

16             MS. CALL:  Yes, Your Honor.  I am going to go slightly

17   out of order just for one document.  This is one that we

18   anticipated getting to today.  I am raising it earlier than I

19   had anticipated originally and that is Government Exhibit 7010.

20   And it is one page.  I can give the parties a moment to review

21   it.  We do not have paper copies of this one, but it will be

22   displayed on the screen and it is a very short document, 7010.

23             MR. TUBACH:  Your Honor, this document has been

24   provided to us previously.  Other than as a government exhibit,

25   I don't have any -- it's not on the list we got this morning at

Kirsten Tucker - Direct

1    10:30.  That's the list we have been using.

2          MS. CALL:  It was contained in Government Summary

3    Exhibit 90-10, which we anticipated getting to this afternoon.

4          THE COURT:  You mean it was a source material for

5    that?

6          MS. CALL:  Yes, Your Honor.

7          MR. BELLER:  While my colleagues are quickly looking

8    for it, I would simply note that it looks like the original

9    source material may have been from Mar-Jac Foods.  And to

10   repeat Mr. Torzilli, I don't believe that appropriate

11   authentication has been established for Mar-Jac Foods.  So to

12   the extent we continue to look for this underlying document, I

13   am hoping that we can somehow find out if it's even been

14   authenticated from the government's perspective.

15         THE COURT:  Why don't we take up authentication first.

16         MS. CALL:  Yes, Your Honor.

17         As to documents from Mar-Jac, I believe both

18   Mr. Morbey and Mr. Barela testified as to their receipt of

19   documents from Mar-Jac and the hosting of Mar-Jac's items on

20   the server maintained by Mr. Barela.  I believe this was in the

21   list of items that he attested to, and therefore the source of

22   this as a document coming from Mar-Jac has been established by

23   the testimony of both of those individuals.

24         THE COURT:  Let me ask you, Ms. Call, was a witness

25   asked about 1070 or was that on the list of documents that --

Kirsten Tucker - Direct

1          MS. CALL:  Yes, Your Honor.  I am now seeing I may

2   have misspoke that this was not specifically on the list

3   provided to those individuals, but they did both testify

4   generally as to their receipt of documents from Mar-Jac and

5   their hosting of documents bearing the same Bates designations,

6   generally in the Bates prefixes, I apologize, not the specific

7   Bates number on Exhibit 7010.

8          THE COURT:  Looking over -- go ahead.  We can --

9   anything that you have, Ms. Carwile, on this one?  Is it a

10  separate one or does it have to do with authentication?

11         MS. CARWILE:  It has to do with authentication.

12         THE COURT:  Go ahead.

13         MS. CARWILE:  To the extent this document I do not

14  believe that appeared on the very small subset of Mar-Jac

15  documents that Mr. Morbey testified about, I don't think it's

16  disputing that he was a chain to any of those documents anyway.

17  He certainly didn't testify as to the general productions of

18  the Mar-Jac documents.  In fact, my questions were specific to

19  the government provided list and that's what we asked him about

20  and he was able to testify about.  So he can't possibly lay the

21  foundation for all Mar-Jac documents having testified about

22  only three.

23         In addition, I -- and the government is free to

24  correct me if I'm wrong about this, but I don't see this

25  document on the *James* log which makes it another problem.  So I

Kirsten Tucker - Direct

1    suppose that's an admissibility objection.  I can hold off, but

2    just as to authentication.

3           THE COURT:  Right.  Anything else on authentication?

4           Mr. Tubach?

5           MR. TUBACH:  Yes, Your Honor.  Government Exhibit 9555

6    specifically listed the documents that the witnesses were

7    shown, Mr. Morbey was shown, I believe, and that was only

8    Exhibits 1028, 1029 and 1030.  He is a lawyer at another firm.

9    He has no idea.  He can't authenticate any Mar-Jac documents.

10   He can simply receive documents and send them on to the

11   Department of Justice.

12          THE COURT:  Response, Ms. Call?

13          MS. CALL:  No response in addition to the general

14   nature of their testimony that I identified earlier.

15          THE COURT:  So I will find that there is no

16   authentication for this particular document.  As Mr. Carwile

17   and Mr. Tubach noted, both Mr. Barela but also Mr. Morbey were

18   shown a very limited set of documents and they were only asked

19   about those documents.  Some custodians of record it's true not

20   only were asked to look at particular documents, but testified

21   about the entirety of documents or documents that all bore a

22   certain production prefix, but not these.  And as a result,

23   there is no foundation -- sorry, no authenticity established

24   for Exhibit 7010.

25          MS. CALL:  All right, Your Honor.  If I may pivot to a

Kirsten Tucker - Direct

1    different phone number source contained on the Government

2    Exhibit 90-10.  The next exhibit would be 9638, 9638.  It is I

3    believe a four-page e-mail that is being pulled up right now.

4    And I will note that we are only admitting it and offering it

5    for the limited purpose of the phone number identified on the

6    bottom of the fourth page in the footer of the e-mail which is

7    being displayed right now on the right side of the screen.

8          THE COURT:  I haven't had a chance to look at

9    everything, but since we are just talking about that phone

10   number, go ahead, Mr. Tubach.

11         MR. TUBACH:  Your Honor, just as a process matter, we

12   had been sent an e-mail from Ms. Call at 10:30 this morning

13   with a long list of documents we were supposed to be prepared

14   to discuss today.  We are prepared to discuss those, and now

15   the government is veering off and talking about others when we

16   haven't finish going through this list.  I don't know why

17   that's happening.

18            In addition, I've noticed I believe that document that

19   the Court is looking at is not on Agent Koppenhaver's long list

20   of the documents they were going to use with him.  If I am

21   wrong about that, the government can correct me.  But I thought

22   rather than have us scramble around to look at documents that

23   weren't specifically addressed on this list, I thought we would

24   go through this list first.  But if the Court wants to go in a

25   different order, that's, of course, the Court's prerogative.

Kirsten Tucker - Direct

1          MS. PREWITT:  We are just having trouble at locating

2     that document in production.  Is that something we received?

3          MS. CALL:  A very long time ago, yes.

4          MS. PREWITT:  Is it marked as an exhibit?

5          MS. CALL:  I believe so, yes.

6          MS. PREWITT:  We are searching for it.  Do you have

7     copies?

8          MS. CALL:  If counsel can let me know, as I said

9     earlier, we are only seeking introduction of the portion

10    displayed on the screen right now if that is sufficient, but we

11    are happy to return to this at a later time.  As I noted, we

12    were just going to one document outside of the 40 provided

13    earlier on the Government's Exhibit 90-10 which we specifically

14    discussed before lunchtime we anticipated getting to this

15    afternoon.

16         THE COURT:  Let's go back to the original list and

17    work through those and we'll get back to this one.  But now at

18    least counsel know that as to this document, all you are trying

19    to get in is really a phone number for Mr. Grindle?

20         MS. CALL:  Yes, Your Honor.  Sorry, may I specify?

21    Not the number for Mr. Grindle, but the number for the Mar-Jac

22    main line that is identified in the very bottom of the e-mail.

23         THE COURT:  It sounds like a great subject matter for

24    a stipulation.

25         MR. BELLER:  Judge, I am going to speak on behalf of

Kirsten Tucker - Direct

1   all defendants and say we would certainly entertain a better

2   understanding of what is needed and what the source is and we

3   will actually consider a potential stipulation on that matter.

4   Without obligating everybody and not having spoken to them, we

5   agree with Your Honor.

6          THE COURT:  So let's turn to the next on the list.

7   Mr. McLoughlin?

8          MR. McLOUGHLIN:  Your Honor, just on behalf of

9   Mr. Lovette, if there are additional documents that are not on

10  that list, we would like to get them now because this is for

11  us, given everything else we have to do and the volume of

12  documents, to be given a list and then have the list ignored

13  really is making it very difficult to defend.  So if there are

14  others, and clearly I think there are, we would like the

15  definitive list by 6:00 o'clock today so we can actually

16  prepare.

17         MS. CALL:  If I may respond, Your Honor.  It was

18  defense counsel who requested that this meeting this afternoon

19  include all documents intended to be introduced by the

20  government.  We've discussed on the record before the lunch

21  break using this time to go through the exhibits not only on

22  the list for Agent Koppenhaver, but the exhibits underlying the

23  government's summary exhibits which I sent to Your Honor and to

24  defense counsel at approximately, I think, 12:30 this

25  afternoon.  So I believe this was in the scope of what we

Kirsten Tucker - Direct

1   anticipated covering this afternoon.

2         THE COURT:  Right.  Why don't we, as I said, let's try

3   to without spending more time on this dispute just focus on

4   those 30, 40 documents, I am not sure which.

5         MS. CALL:  Yes, Your Honor.

6         The next exhibit is Government Exhibit 9672.  This is

7   an excerpt of a toll record.  I will note that although we have

8   introduced most of the toll records already in this case, this

9   is a separate excerpt that has since been identified and is an

10  excerpt from Government Exhibit 8024 for which foundation was

11  already laid and which was already admitted during the

12  testimony of Ms. Sandoval.

13        THE COURT:  It's a one-page exhibit?

14        MS. CALL:  It is three, so if I may hand this up

15  through Ms. Grimm.

16        THE COURT:  Yes.

17        MS. CALL:  I will note that defense counsel was

18  notified of the government's exhibit list earlier this week

19  several days ago.

20        THE COURT:  Mr. Tubach, go ahead.

21        MR. TUBACH:  With regard to Government Exhibit 9672, I

22  believe the Verizon custodian testified about a limited number

23  of documents and I don't believe this document was on the list.

24  I could be wrong about that, but I don't believe it was, so

25  therefore there would be no authentication.  Thank you.

Kirsten Tucker - Direct

1          THE COURT:  Response?

2          MS. CALL:  As I identified, Your Honor, this was an

3    excerpt from Government Exhibit 8024 which the custodian did

4    testify to and the contents are 100 percent included within

5    that more voluminous exhibit, so it would be authenticated by

6    Ms. Sandoval.

7          THE COURT:  Mr. Tubach, anything else?

8          MR. TUBACH:  No, Your Honor.  I don't have 8024 in

9    front of me.  I only prepared looking at this exhibit.

10          THE COURT:  The objection will be overruled.

11   Exhibit 9672 will be admitted.

12          Next?

13          MS. CALL:  Next exhibit is Government's Exhibit 1030.

14   And after discussions I believe earlier this week or perhaps

15   last week in court, the government has applied redactions based

16   on counsel for Defendant Penn's request.  I will hand out a

17   redacted version of that exhibit now.  It is one page, but if

18   Your Honor wants a copy.  The redacted version is displaying on

19   the screen.

20          THE COURT:  Okay.  Anything different, Ms. Call, than

21   in the myriad briefing on this particular exhibit?

22          MS. CALL:  I believe, Your Honor, this has been

23   sufficiently briefed.  I am happy to address the point on

24   reconsideration that I don't know the government previously

25   addressed in its briefing if Your Honor would like.

Kirsten Tucker - Direct

1              THE COURT:  I am not sure what you mean, but go ahead.

2              MS. CALL:  Yes.  I think I was going to state that --

3    I know Defendant Penn has noted that this is I believe he

4    thinks overdue perhaps and unnecessary motion for

5    reconsideration.  It's the government's position that this is

6    in no way a motion or reconsideration in that this exhibit has

7    not been offered or excluded by the Court thus far.  The

8    government simply provided an alternative means of

9    authentication to brief the Court on the issue given the

10   sensitivities underlying the civil litigation and the

11   government's previously noticed plan on how it would

12   authenticate this document.

13             Let me just review my notes quickly to see if there is

14   anything that was not previously addressed in the briefing.

15             THE COURT:  Why don't you respond to Mr. Penn's point

16   because Mr. Penn, I think the latest word on this is that

17   essentially what he was saying -- I don't mean to foreclose

18   Mr. Tubach from mentioning anything, but he is essentially

19   saying, well, under the new theory, who is the declarant?  And

20   is the declarant part of the conspiracy?  And if he is part of

21   the conspiracy, how come it wasn't brought up in the James

22   hearing?  Although I will let Mr. Tubach speak for himself, but

23   maybe you can address some of those issues, whatever you recall

24   from Mr. Penn's response.

25             MS. CALL:  Yes, Your Honor.  I would say the current

Kirsten Tucker - Direct

1   theory, although the government does believe there is

2   sufficient evidence to identify this as a statement by Mr. Pete

3   Martin from Mar-Jac, it is sufficient for authentication and

4   admissibility purposes that this document simply be found to be

5   written by a conspirator from Mar-Jac.

6        There are multiple Mar-Jac employees that the Court

7   has found to be members of this conspiracy in its *James* ruling.

8   The testimony already elicited by Mr. Morbey and Mr. Barella

9   that I summarized earlier in this hearing did elicit testimony

10  that this document was, in fact, a true and authentic copy of

11  what was housed on Mar-Jac's servers and that it came from

12  Mar-Jac.

13       And then on top of that similar to what we cited in

14  *United States v. Reyes*, I believe this is even stronger than

15  the evidence in that case in that the document here for

16  authenticity purposes contains conspirator names, the

17  defendant's name, a victim name, including Steve Campisano who

18  works for RSCS, and the date that is of importance in this

19  conspiracy as already elicited in testimony in this trial.  It

20  is certainly of the kind of evidence you would find in a

21  price-fixing conspiracy and is very -- contains indicia of the

22  kinds of evidence you would see here.

23       I will contrast that to what the document was at issue

24  in *Reyes* which simply included I believe initials, phone

25  numbers and some math, I think it was addition and subtraction.

Kirsten Tucker - Direct

1    I believe Defendant Penn said that was unquestionably criminal.

2    I don't think that even is the case of the standard that was

3    set in *Reyes*.  And it's simply a document bearing the kinds of

4    markings you would see for a crime of this kind.  It's

5    sufficient under 901 to find it authentic for these purposes.

6    And, of course, on the admissibility grounds we already have

7    Your Honor's *James* ruling on this document.

8         I will note there are some additional circumstances

9    that I believe were flagged in the government's brief including

10   a phone call between Defendant Penn and the Mar-Jac main line

11   which is contained in the exhibit we just introduced,

12   Government Exhibit 9672.  That indicates additional

13   circumstances sufficient to find that this is an authentic

14   document.

15        If I did not already note it, also contained on

16   Exhibit 1030 is pricing and volume of competitors which is that

17   kind of information making an indicia of a price-fixing

18   conspiracy.

19        THE COURT:  Okay.  Mr. Tubach?

20        MR. TUBACH:  Your Honor, the government appears now to

21   have abandoned a number of the efforts to get this document

22   authenticated.  They have given up on the idea that they can do

23   that with respect to Pete Martin, and they are now simply

24   saying because a witness testified that this came from Mar-Jac,

25   that somehow that makes it a co-conspirator statement.

Kirsten Tucker - Direct

1          From what I can tell looking at the Court's *James*

2   order, there were exactly four individuals identified as

3   co-conspirators at Mar-Jac.  The government has not -- Mar-Jac

4   itself was not found to be a conspirator and Mar-Jac has many,

5   many employees.  The idea that we can simply take this

6   handwritten document from a corporation and say this is a

7   co-conspirator statement or is admissible under Rule 901 I

8   think is not proper authentication.

9          There is nothing to indicate who wrote that document

10   at all.  We have no idea what the source of it is.  We don't

11   know where it came from.  All we know is that some vendor had

12   it uploaded by someone who used a password and an e-mail and

13   that's all we have.  And we have lots of argument in the brief.

14   As the Court noted earlier, this was the most litigated

15   document in the case, and I think the Court has sufficient

16   briefing on this.

17          *THE COURT:*  Thank you.

18          Ms. Call?

19          *MS. CALL:*  I will note to cite to *Reyes* that the fact

20   that there are numerous people who may be at a certain place

21   doesn't necessarily affect this determination.  In *Reyes* the

22   document at issue was found in a house and particularly a house

23   where drug trafficking activity happened.  So there are many

24   individuals that could be in a house, but that wasn't necessary

25   or even noted by the Court in its ruling finding that a

Kirsten Tucker - Direct

1    document found at this place could be deemed connected to the

2    conspiracy just because of the markings on the document itself

3    and where it was found.

4          I think the same thing here would apply that the Court

5    found -- my count was three, but I will take Mr. Tubach's

6    representation of four Mar-Jac employees have been found to be

7    involved in this conspiracy.  I will note that the government's

8    *James* submission only included items it intended to introduce

9    at trial, so that does not, you know, withstand the fact that

10   there may have been more members of Mar-Jac who were members of

11   this conspiracy, but I think the document on its face shows

12   it's the kind of document that would have been made by a

13   conspirator in this crime.

14         I will also note that there is indications that this

15   was written by Pete Martin, including the fact he said it was

16   his and his lawyer said it was his, but that is, of course, not

17   the evidence we are trying to use at this time to authenticate

18   it.

19         *THE COURT:*  Right.  I am not going to consider the

20   deposition or anything.  We may know that, but unfortunately,

21   we just don't have a basis to authenticate the handwriting.

22         Go ahead, Mr. Tubach.  Did you have something else?

23         *MR. TUBACH:*  Very briefly, Your Honor.  The government

24   mentioned this phone record that the Court has just admitted on

25   the government's representation that 9672 was included in 8024.

Kirsten Tucker - Direct

1    We have now checked 8024 and there is no record that the

2    Exhibit 9672, which is that supposed phone call from the

3    general number to Mr. Penn -- it is not included in 8024 unless

4    I looked up the wrong document.

5         MS. CALL:  I think this may be a misunderstanding on

6    counsel's point.  Certain phone numbers were provided in native

7    form, as well as with PDF.  So for the voluminous phone records

8    there was a PDF that I believe included the first and the last

9    page of the phone record.  And I believe there is a much longer

10   native which was the basis of Ms. Sandoval's testimony.

11        THE COURT:  Okay.  Getting back to Exhibit 1030, as I

12   indicated, I will not be considering the deposition because of

13   the confrontation clause issue there.  So what we're left with

14   is a document by an unknown author which contain statements.

15   And the authenticity issue is whether it is what it is

16   purported to be.

17        I find that given the fact that we don't know who the

18   author is -- there could be a number of people.  It doesn't

19   really matter whether there are four Mar-Jac people.  It's not

20   quite like a drug dealer house when, you know, that's not, you

21   know, a corporation -- I will sustain the objection and I will

22   refuse 1030.

23        Next document?

24        MS. CALL:  The next document is Government's Exhibit

25   955.

Kirsten Tucker - Direct

1          *THE COURT:*  Is that a one-page document?

2          *MS. CALL:*  Yes, Your Honor.  Government Exhibit 955 is

3    an e-mail chain between Lonnie Justice and Tim Stiller and

4    lower down you will see it also includes Defendant Little.

5    This was entry 151 on the government's *James* log previously

6    ruled on by Your Honor as coming in under the co-conspirator

7    exception, so we would offer it on that grounds.

8          *THE COURT:*  Any objections to 955?

9          *MR. BYRNE:*  Yes, Your Honor, Mark Byrne for

10   Mr. Little.  So even though this is on the *James* log, I would

11   note that I don't believe Lonnie Justice has been identified as

12   a co-conspirator.  That would be one issue.

13         Another issue, though, is that Mr. Little is at the

14   very bottom of this and he is sending an e-mail that appears

15   internally to other Pilgrim's people about his -- one of his

16   accounts, Boston Market, saying that "They've agreed to 2015

17   pricing.  Case weights will move to previous quarters actual."

18   There is nothing improper about that.  There is nothing

19   conspiratorial about that.  He is reporting to his supervisors

20   about -- or to his internal people about Boston Market.

21         He is not on any of the other parts of this and so he

22   wasn't a recipient.  He wasn't a sender on anything other than

23   that which is very innocuous, so I would object to having him

24   on this e-mail at all because of the taint.

25         *THE COURT:*  Anything else?

Kirsten Tucker - Direct

1          *MR. BYRNE:*  And it's hearsay, I believe, especially as

2     to Mr. Little because it's not a co-conspirator statement.

3     Maybe as to the others, but not as to Mr. Little.

4          *THE COURT:*  And Mr. Byrne, what did you think was

5     hearsay, the Justice statements or --

6          *MR. BYRNE:*  I think the whole thing is hearsay.  I

7     mean, I know you ruled that it's a co-conspirator statement,

8     but I am not sure that Mr. Justice was part of that conspiracy.

9          *THE COURT:*  Response to Mr. Byrne's objection?

10         *MS. CALL:*  Yes, Your Honor.  The allegations as well

11    as the testimony that has already been adduced at this trial by

12    Mr. Bryant confirms that the conspiracy at issue affected

13    numerous small bird customers in 2014 including Boston Market.

14    So the actions here in Mr. Little conveying the pricing that

15    was agreed to as well as the communications after that would

16    all be communications in furtherance of the conspiracy.  That

17    is my response.

18         *MR. BYRNE:*  Your Honor, under that theory any

19    communication Mr. Little had with anybody at Pilgrim's would be

20    in furtherance of the conspiracy.

21         *THE COURT:*  Ms. Call, what about Mr. Byrne's point

22    about Mr. Justice?

23         *MS. CALL:*  Yes, Your Honor.  Those statements at the

24    least would be relevant context just for the understanding of

25    this conversation.

Kirsten Tucker - Direct

1          *THE COURT:*  Who is Mr. Justice?

2          *MS. CALL:*  He is another employee at Pilgrim's Pride.

3          *MR. McLOUGHLIN:*  Your Honor, I think counsel's answer

4    tells you that the government doesn't know who this individual

5    is or what his or her employment position is.  And whatever one

6    can say about the first message, there is nothing about the

7    subsequent message that explains Mr. Little's message, which is

8    quite obvious and clear about a very simple concept which is

9    someone has agreed to pricing.

10         So the real purpose of the government's argument here

11   is they want the later communication at the top between

12   Mr. Stiller and Ms. or Mr. Justice, someone who is not

13   identified as a co-conspirator, the statement therefore cannot

14   be within 801(d)(2)(E) in furtherance of the conspiracy.  And

15   if the government wants that first e-mail at the bottom, that's

16   fine.  But with respect to the subsequent e-mails, they neither

17   provide context or come within the scope of the rule.

18         And under their theory, again it opens the door to

19   virtually any corporate communication in which any of the

20   alleged co-conspirators is involved with any one of the other

21   60,000 Pilgrim's employees.  At that point the exception they

22   have tried to create swallows the rule, so we would object.

23         *THE COURT:*  The objections will be overruled, both

24   Mr. Byrne's and also Mr. McLoughlin's.  This is a document that

25   was considered before I believe in connection with the *James*

Kirsten Tucker - Direct

1    hearing.  Mr. Justice, while not a named co-conspirator,

2    unindicted co-conspirator, is a Pilgrim's Pride employee.  And

3    the Court finds that it may be considered for what it's worth.

4    The limitations on this particular page are something that can

5    be pointed out to the jury by counsel, but I do find it's

6    admissible.

7         Mr. Tubach, did you have an additional ground?

8         MR. TUBACH:  Just one additional ground, Your Honor.

9    I am focusing just on the very top line.  Mr. Justice not

10   having been found to be a co-conspirator, his response

11   "Yahoooo" is just hearsay.  It's not offered to explain

12   anything, any other communication by an alleged co-conspirator

13   because it's the last communication in the e-mail.  We would

14   ask that that particular response be redacted as hearsay

15   without any exception.

16        THE COURT:  Response to Mr. Tubach's point?

17        MS. CALL:  I believe "Yahoooo" would qualify as an

18   excited utterance, and it is also not offered for the truth of

19   the matter asserted.

20        THE COURT:  Well, is anything of Mr. Justice being

21   offered for the truth of the matter asserted?

22        MS. CALL:  I don't believe any of the statements --

23        THE COURT:  I will admit it, but I will instruct the

24   jury that none of Mr. Justice's statements are being offered

25   for the truth of the matter asserted, but rather just to

Kirsten Tucker - Direct

1    explain what a response may have been.

2         All right.  Mr. Beller?

3         *MR. BELLER:*  Thank you, Your Honor.  My objection is a

4    bit more nuanced.  Your Honor, I am speaking not of the top

5    e-mail that says Original Message, From: Tim Stiller, To:

6    Lonnie Justice, at 11:43, but instead am speaking to the

7    remaining part of the exhibit.

8         I believe that reference to Boston Market was not made

9    in the Indictment.  It was not made in the Superseding

10   Indictment.  It also was not referenced in the government's

11   notice to the Court of intent to introduce 404(b).  So for

12   those reasons, I do believe that it is not relevant here

13   specifically, and even more specifically it is not relevant to

14   either Mr. Fries or Mr. Brady.

15        Thank you.

16        *THE COURT:*  Ms. Call?

17        *MS. CALL:*  Yes, Your Honor.  The Indictment charged a

18   price-fixing conspiracy affecting the sale of broiler chicken

19   products, which all of this would be included under the same

20   conspiracy and that the testimony at trial has adduced the fact

21   that multiple customers, those most specifically noted in the

22   Indictment and the Superseding Indictment, were affected.

23        I will note that those lower e-mails in the chain also

24   are highly relevant in that they are speaking about the price

25   increase to the small bird customer in 2014.  Tim Stiller's

Kirsten Tucker - Direct

1    note at 11:33 a.m. speaks of the magnitude of that price

2    increase, which in the range identified in this e-mail by

3    Mr. Bryant's testimony in this trial is unheard of in the years

4    that he has been in the industry.  And it goes on, of course,

5    beyond that.

6              THE COURT:  All right.  Mr. Beller, anything more on

7    that point?

8              MR. BELLER:  No, thank you.

9              THE COURT:  I will overrule Mr. Beller's objection.  I

10   do think that the Indictment would include such matters.

11   Boston Market wouldn't have to be separately identified as a

12   403 -- 404(b) incident.  Moreover, I think the context is

13   necessary to understand the top e-mail at the top of this

14   particular exhibit, so I will overrule the objection.  I will

15   limit it, though, and indicate to the jury that they cannot

16   consider Mr. Justice's statements for the truth of the matter

17   asserted.

18             Next exhibit?

19             MS. CALL:  Next exhibit is Government Exhibit 953.

20   This is a two-page document.

21             If I may hand a copy up through Ms. Grimm.

22             THE COURT:  Yes, you may.

23             MS. CALL:  Government Exhibit 953 is an e-mail chain

24   between Scott Tucker and Jason Slider.  This was contained on

25   the government's *James* log at entry 135 and was ruled on

Kirsten Tucker - Direct

1    positively by Your Honor, so the government would introduce it

2    under 801(d)(2)(E).

3         THE COURT:  Any objection to the admission of

4    Government Exhibit 953, Mr. Beller?

5         MR. BELLER:  Thank you, Your Honor.

6         I would note that my understanding of the *James* log is

7    that the first page of Government Exhibit 953 with the

8    exception of the final notation from Scott Tucker at 922, so I

9    am talking about the top of the page down to Jason Slider's

10   statement of, "Wow.  Price just went up higher for 2015," was

11   considered and included in the James log by the Court.

12   Anything after that going into the second page was not

13   considered by the Court.

14        THE COURT:  I don't think it was listed.  It may have

15   been an underlying document, but at least on the *James* log

16   yourself I think you are probably right, it's just the

17   statement from the very top was listed.

18        MR. BELLER:  Correct.  So for that reason I maintain

19   that this is, in fact, hearsay.  And I would note that I don't

20   believe Mr. Slider is listed as a co-conspirator.

21        THE COURT:  I don't believe so.

22        All right.  Response?

23        MS. CALL:  Yes, Your Honor.  I believe Mr. Beller is

24   correct that Mr. Slider was not an individual whose

25   communications were included on the *James* log.  It is the

1836

Kirsten Tucker - Direct

1  government's contention that he is a co-conspirator.  And for

2  the e-mails specific to here, I believe the various

3  communications, as we have pointed out earlier, are necessary

4  for understanding the context of the communications from

5  Mr. Tucker, who has been ruled a conspirator in Your Honor's

6  *James* log ruling.

7            THE COURT:  Who is Mr. Slider?

8            MS. CALL:  He is another employee of Pilgrim's Pride.

9            THE COURT:  Mr. Beller, anything more?

10           MR. BELLER:  Only, Your Honor, I was so excited to be

11  speaking, that perhaps I was quick to do so.  To the extent

12  that the Court is going to introduce the document, we would ask

13  that it be included in its entirety.  While we continue to

14  object to the notion that this is, in fact, hearsay, if the

15  Court is going to allow it, allow it including those other

16  statements that I had previously indicated an objection to.

17           THE COURT:  All right.  Ms. Prewitt?

18           MS. PREWITT:  I just want to be clear, the government

19  is now calling Mr. Slider a co-conspirator; is that right?

20           THE COURT:  Well, I am not sure what she said.

21           MS. PREWITT:  Just to clarify.

22           THE COURT:  To tell you the truth, it wouldn't matter

23  whether she did or didn't because he hasn't been identified as

24  one, at least as part of the *James* hearing.

25           Okay.  What I am going to do on this one is similar to

1837
Kirsten Tucker - Direct

1    what I did for 955, which is I do find that the document is

2    co-conspirator hearsay.  Mr. Tucker is identified on the

3    *James* -- in my *James* order as being a co-conspirator.

4    Mr. Slider, as we just talked about, is not.  I will instruct

5    the jury that it cannot consider statements of Mr. Slider for

6    the truth of the matter asserted, but only in order to explain

7    the context of comments back by Mr. Tucker.

8            *MS. CALL:*  I will note, if I may be heard just one

9    more time, that Mr. Slider's comments are mostly questions or

10   instructions and would be considered non-hearsay as well.

11           *THE COURT:*  All right.  I will maintain my ruling.

12           Next document?

13           *MS. CALL:*  The next document is Government's Exhibit

14   1193.  Your Honor, this is a calendar invitation from Pete

15   Suerken of RSCS to Defendant Roberts of Tyson.  This is on the

16   date that the final bid for RSCS was due in 2014.  The calendar

17   invitation includes an agenda with various points made by

18   Mister -- and I am going to pronounce his differently every

19   time I say it, I apologize -- by Mr. Suerken.

20           I will note that first, obviously, many of the

21   contents in here are likely excited utterance including the use

22   of what some may consider swear terms such as, "YOU ARE

23   SCREWED."  In addition, that statement is his then existing

24   state of mind which would be admissible under 803(3).

25           In addition the tongue-and-cheek nature perhaps of

Kirsten Tucker - Direct

1    this calendar invitation makes clear that the government's

2    purpose of offering it, that it's not for the truth, but in

3    fact that -- and in fact that he is not actually saying

4    anything truthful in this e-mail, but is rather introduced for

5    the effect on the listener, which is Defendant Roberts.

6              As I said, this is a conversation on the day that

7    Tyson's bid was -- final bid was due.  And it's entirely

8    relevant to this case whether when faced with attempts like

9    this by a customer to push back on price and to continue to

10   negotiate until the last day of the negotiations, that the

11   customers were trying to push down prices despite the

12   astronomical increases that defendants were seeking that year.

13   So Defendant Roberts' understanding of that and the effect it

14   has on the price that Tyson ultimately submits is very relevant

15   and makes clear the non-hearsay use of this document.

16             THE COURT:  Mr. Gillen.

17             MR. GILLEN:  Yet another example of pure hearsay, Your

18   Honor.  This is a classic example of pure hearsay.  And this is

19   another one where I believe that there is a little bit of a

20   misleading going on because the government has interviewed

21   Mr. Suerken in his home and they recorded him secretly about

22   this.  And he was explaining to the government at that time

23   that in the e-mail that he sent to Mr. Roberts contained

24   herein, he really -- it was kind of -- the relationship he had

25   with Mr. Roberts, which was a good one, and he had the kind of

Kirsten Tucker - Direct

1   relationship where he could let off some steam.  And he was

2   sort of being sort of a smart aleck.

3          That's the purpose here.  Because he had such a good

4   relationship with him, this is something that he felt like as a

5   smart aleck he could send to Mr. Roberts, but not to some of

6   the others.  It has nothing to do with what the government said

7   about forcing Tyson into changing their position.

8          What the government knows from jump street starting in

9   July of 2014, that Tyson -- we tried to get it in through

10  Mr. Lewis -- that Tyson unlike anyone else in the room sent

11  their pricing model to RSCS on July the 10th and laid out

12  exactly what they were going to be asking for which was

13  contained within their August the 10th proposal.  So this here,

14  Your Honor, is hearsay, and we would ask that the Court adhere

15  to and be consistent with its earlier ruling and sustain the

16  objection.

17         THE COURT:  Do you have a related point on that,

18  Mr. Tubach, or a different one?

19         MR. TUBACH:  Just the ultimate objection to the

20  excited utterance exception.  I believe we kind of put this one

21  to bed.  The idea that the fourth agenda item out of five typed

22  out and sent in an e-mail qualifies as an excited utterance I

23  think betrays a lack of understanding about what an excited

24  utterance is.  "Oh, my god, that guy just got ran over by a

25  bus," that's an excited utterance, or "That person just shot

Kirsten Tucker - Direct

1  someone," is an excited utterance.  The fact you can have like

2  a five agenda item that's clearly typed carefully and e-mailed

3  to someone, I don't believe the cases under excited utterance

4  would qualify.

5          THE COURT:  Even all caps?

6          MR. TUBACH:  I have been known to use all caps even

7  when I am not excited.

8          THE COURT:  Okay.  Ms. Call, go ahead.

9          MS. CALL:  To respond to Mr. Gillen's points, first

10 thing just for the record, there were three rounds of bidding

11 in this negotiation.  I know Mr. Gillen referenced the early

12 August submission, but September 3rd was the final round and

13 that was the date that this agenda was sent.

14          As to his other arguments, I don't believe that they

15 affect the non-hearsay use and purpose that the government has

16 stated and rather perhaps go to the weight rather than the

17 admissibility of this document.

18          Lastly, as I noted at the very beginning, I believe

19 this is Mr. Suerken's then existing state of mind under 803(3)

20 in addition to the all caps, as Your Honor pointed out, and use

21 of somewhat flagrant language making this an excited utterance.

22          THE COURT:  I am going to refuse this as hearsay.

23 There is a lot of substance to it.  There is a suggestion,

24 because Mr. Gillen has indicated there is actually a recording

25 of Mr. Suerken, that would explain different circumstances for

Kirsten Tucker - Direct

1    it; but in any event, I don't find that it is an excited

2    utterance.  I don't think that it's relevant for state of mind.

3    But it is clearly hearsay, so I will refuse that exhibit.

4         MS. CALL:  The next documents I will pass up as a

5    group.  This is Government's Exhibit 433 through Government's

6    Exhibit 447.

7         If I may pass these up through Ms. Grimm, Your Honor.

8         THE COURT:  Yes.

9         MS. CALL:  This is a text message conversation between

10   Tim Stiller and Defendant Penn.  I will note that every

11   separate exhibit is a separate text message in the chain.

12   These were contained in the government's *James* log as entry 177

13   which was ruled on positively by Your Honor.

14        I will note just for another ruling this was also

15   deemed self-authenticating per Your Honor's order in ECF-673 as

16   an extraction from an electronic device.  I will submit these

17   under 801(d)(2)(E).

18        THE COURT:  Any objection to the admission of the text

19   string which consists of Docket Nos. 433 through 447?  Those

20   will be admitted.  Do those count in our total?  Is that really

21   getting us through the list now?

22        MS. CALL:  There are two more left in that set of 30.

23   The next is --

24        THE COURT:  By the way, just to let people know, I

25   think what we'll do is five minutes till 5:00, we will stop.

Kirsten Tucker - Direct

1    We will figure out a game plan for the remaining ones that we

2    may not have gotten to.  I don't want to -- just in case people

3    have flights or whatever, I don't want to go too late past

4    5:00, okay?

5            Go ahead.

6            MS. CALL:  The next exhibit is Government Exhibit 940,

7    940.  This is a text message from Defendant Penn to Conspirator

8    Jason McGuire.  It was contained in the government's *James* log

9    as entry 184.  It was positively ruled on by Your Honor and it

10   was similarly deemed self-authenticating.

11           THE COURT:  Any objection to the admission of

12   Exhibit 940?

13           Mr. Tubach?

14           MR. TUBACH:  Your Honor, it is hearsay within hearsay.

15   This is recounting a comment that Mr. Penn allegedly made to

16   the board of directors.  And there is no hearsay exception for

17   that.  On that basis we would ask to exclude this document.

18           THE COURT:  All right.  That will be -- I will reject

19   that on the basis for refusing its admission.  The statement

20   that was made to the board is really not described.  It's more

21   of a statement just indicating that a comment was made to the

22   board praising him for having done that, so I will reject that

23   basis.

24           Mr. Beller?

25           MR. BELLER:  Thank you, Judge, and only adding

Kirsten Tucker - Direct

1    relevance as to Mr. Fries and Mr. Brady.

2         THE COURT:  I will reject that as well.  It's relevant

3    as to the conspiracy as a whole, and that can be -- those

4    statements can be used against others within the conspiracy, so

5    I will refuse that grounds.  940 will be admitted.

6         MS. CALL:  And the next document which as I promised

7    was the last of at least the initial list we planned to go over

8    this afternoon is Government's Exhibit 901.  Government's

9    Exhibit 901 is an e-mail from Defendant Kantola to Joe Grendys,

10   who was the head of his company at the time.  This was -- it

11   may not be clear -- it was either not in the government's *James*

12   log or it may not have been admitted by Your Honor under

13   801(d)(2)(E), and we can confirm that in a moment, but I would

14   submit this is admissible at least against Defendant Kantola

15   under 801(d)(2)(A), as well as the prices contained in here in

16   addition to being a co-conspirator statement, although I

17   understand Your Honor will take limited argument on finding

18   additional documents to be covered by that rule, that the

19   prices contained in this, including the future prices obtained

20   for 2015, constitute motive for a continuation of the

21   conspiracy and should thus be admissible under 803(3).

22        THE COURT:  Correct me if I'm wrong, but I think that

23   I -- I think I ruled on this as part of the *James* hearing and

24   found that it was not a co-conspirator statement.  I think

25   that's been ruled on.

Kirsten Tucker - Direct

1          MS. CALL:  Yes, Your Honor.  We did just confirm that

2    was *James* log entry 199.

3          THE COURT:  Ms. Henry?

4          MS. HENRY:  So it is hearsay.  Beyond that there is

5    relevancy.  It is misleading.  And it is prejudicial because it

6    is asking for a jury determination based on an emotional

7    response of these numbers.  There is a lack of foundation for

8    how these -- any of this would play in.  It is -- the

9    customers, the 2004, none of this is really relevant.

10         The numbers she referred to as prices are on the face

11   of the document not prices.  Indeed, without really getting

12   into the specifics of having a witness testify to it, it is

13   misleading if there is going to be some sort of an inference

14   that these are prices because they are not.  They are mostly

15   related to volume, increased volume that was received at each

16   of these customers.  So basically those are sort of substantive

17   issues.  I also have authenticity issues.  I don't know if you

18   would like to go through those first.

19         MS. CALL:  May I respond to that?

20         THE COURT:  We will take that up in just a minute,

21   Ms. Henry, in terms of authenticity.

22         Mr. Fagg, did you have something to add?

23         MR. FAGG:  Can I add something to that?  As it relates

24   to 801(d)(2)(A), I am not sure how a statement can be an

25   admission of Mr. Kantola if it's been ruled by the Court that

Kirsten Tucker - Direct

1   it is not in furtherance of the conspiracy.  It's unclear to me

2   what it would be an admission of if it's not in furtherance of

3   the conspiracy.

4         MR. TUBACH:  In addition to that, following up on

5   that, it certainly wouldn't be admissible as to any defendant

6   other than Mr. Kantola in any event.  And I am quite concerned

7   the jury is just simply not going to be able to keep track of

8   all these limiting instructions the Court is going to have to

9   give for these documents.  This is a document intensive case.

10  I just don't see how a jury -- we are having a hard time

11  keeping track of the limiting instructions.  I can't imagine

12  how they would do it.

13        THE COURT:  Ms. Call, responding to the comments you

14  heard so far?  Then I will come back to you, Ms. Henry, in just

15  a minute.

16        MS. CALL:  Yes.  So for the beginning of Ms. Henry's

17  statement, I don't see that on the face of the document.  It

18  begins with, "Joe, please find below the price adjustments you

19  and I achieved."  And nearly every number on this document

20  begins with a dollar sign.  So I believe this does indicate

21  prices or at least price increases I believe is what is

22  indicated on the document.

23        Otherwise, as I said, this is admissible under

24  801(d)(2)(E) as a statement by a party opponent, and there is

25  no in furtherance requirement similar to that under

Kirsten Tucker - Direct

1    801(d)(2)(E) in that rule.  So it would be admissible on those

2    grounds.  And the price increases here are extremely relevant

3    to this conspiracy in that they are the aims and the motivation

4    of it.

5           One more note.  I will flag, "The good news is there

6    is more to come" does appear to be a statement of future intent

7    under 803(3).

8           THE COURT:  I think that Mr. Fagg is right.  I think

9    that -- I just don't think that -- it would have been

10   admissible as statements in furtherance of the conspiracy if it

11   had that type of relevance.  Moreover, to suggest that it would

12   come in separately as a statement of Mr. Kantola, which

13   ordinarily a statement would, would then -- once again, it's a

14   little bit -- it seems to me as circular because then we get

15   right back to Mr. Fagg's point.  So unless the government has

16   something specifically on point to that effect, I think that

17   the *James* ruling is preclusive as to this particular document.

18          MS. CALL:  My colleague, Mr. Koenig, may speak

19   briefly.

20          THE COURT:  Sure.

21          MR. KOENIG:  Sure, Your Honor.  What I would point out

22   is that the rule of co-conspirator statements used to be

23   relevance, right?  And so then they tightened it down to in

24   furtherance and in the course of the conspiracy.  So there is

25   definitely room, there is daylight between relevance and in

Kirsten Tucker - Direct

1    furtherance and during the course of.  And we would say, then,

2    if this isn't -- we still obviously maintain it is in

3    furtherance, but there is that daylight.  And it is definitely

4    relevant to the object is to make money, right?  And it doesn't

5    even have to be the object of the conspiracy.  It's just his

6    object overall whether in the conspiracy or outside of it is to

7    make more money, so I think there is definitely relevance

8    there.

9         MS. CALL:  I will point out that the relevance point

10   is, of course, bolstered by the names of the companies

11   identified in the e-mail, being KFC, Popeye's, Church's, many

12   of which are identified in the Superseding Indictment although

13   anonymized.

14        THE COURT:  It's an interesting point.  If you want to

15   submit authority, anyone, on this point, I will consider it.

16   But the ruling at this time is I am -- I don't find that it's

17   admissible under 801(d)(2)(A).  I also don't think it's

18   relevant for any type of state of mind purposes either.  And we

19   haven't gotten -- did you want to talk about -- but I will

20   refuse, I will reject Ms. Henry's statements about the

21   relevancy issues, but I will hear your authenticity issue at

22   this time.

23        MS. HENRY:  Your Honor, I also would like to address

24   the misleading issue because I think that the statements that

25   the government has just made confirm, actually, that putting

1848

Kirsten Tucker - Direct

1     this into evidence would actually mislead the jury because you

2     can, in fact -- and the government is free to do this -- the

3     contracts are in evidence already.  Those contracts will show

4     exactly what the price increases are.  And they have already

5     made those arguments.  This is not that information.  And the

6     purpose for which they are suggesting that it is being offered

7     is an inference which is unwarranted and, in fact, contrary to

8     the record of the evidence that is already in this court

9     admitted.

10          In terms of authenticity, the document -- we had

11    Mr. Stewart Ward who testified with regard to Koch documents.

12    He did not testify specifically about this particular document.

13    He merely said that he had reviewed the documents.  He

14    testified that he did not check every last document extracted,

15    that he -- and he also did not apply the Bates stamps and does

16    not know who did.  It would be either other firms or it would

17    be potentially third-party vendors.  He did not testify to the

18    authenticity of this document.

19          THE COURT:  I will reject that authenticity argument.

20    Actually, the testimony of Mr. Ward is one of those custodians

21    who testified more broadly than any particular document set.

22    Mr. Ward talked about how he specifically looked for errors.

23    He ran a sampling of different documents to use that as part of

24    a test.  He didn't get any reports of any corruption issues.

25    Although he did train a third-party vendor to do extractions,

Kirsten Tucker - Direct

1   the third-party vendor was to report back any problems that it

2   had.  The vendor did report a few -- the vendors in plural did

3   report a few problems.  He resolved them.

4          He indicated that the documents -- he supervised the

5   collection of documents that were responsive to the Grand Jury

6   subpoena.  He testified that those -- those documents that were

7   incorporated were fair and accurate.  And then it's true in

8   regard to a particular list of documents, namely those in 9501,

9   he reviewed all of them but the last one.  And he compared them

10  against the Koch server.  He found all of those true and

11  accurate, so I will reject the authenticity basis.

12         Ms. Call, anything else?

13         *MS. CALL:*  Yes.  I believe you indicated your

14  receptiveness to perhaps briefing on the admissibility of that,

15  and the United States would request to be able to submit

16  briefing.

17         *THE COURT:*  I will take it under advisement as to --

18  well, I'll accept briefing on 801(d)(2)(A) from anyone who

19  wishes to do so.  My tentative ruling is that I am refusing the

20  admission of this document at this time because I think it's

21  precluded by my ruling on the *James* log.  But if you can get

22  any briefing in no later than -- I'll need to take a look at

23  it -- probably if you could have it first thing in the morning

24  by Monday.

25         *MS. CALL:*  Certainly, Your Honor.

1850

Kirsten Tucker - Direct

 1    I believe we have now come to the time we are through

 2    the set of 30 that we had anticipated, and it is very close to

 3    the 4:55 time Your Honor noted.

 4        THE COURT:  How many more documents do we need to go

 5    through this exercise as to?

 6        MS. CALL:  I think that may depend perhaps on

 7    defendants' stance.  These are the documents relating to the

 8    KFC 2014 negotiation.  There is another set of perhaps between

 9    30 to 40 relating to KFC 2017, as well as somewhere, I cannot

10    estimate, between 50 and 200 that would relate to other

11    effective negotiations that are summarized in the government's

12    summary exhibits.  So there is a large number of them were

13    contained on the government's *James* log, so its position would

14    be that extended objections to all these may not be necessary,

15    but I understand defendants may have a different point.

16        THE COURT:  Well, here is what I would like for people

17    to do and think about how we are going to go about ruling on

18    all those.  Once again, I don't think it's practical to do it

19    as they come up.  The fact that we've been here all afternoon

20    just goes to show that we can't subject the jury to that.

21        On the other hand, we're not going to have the jury

22    come in on Monday and then be told to go home.  So what I want

23    is that we start Monday and we have witnesses and we go on for

24    a while.  And maybe the government wants to introduce the

25    exhibits that we've ruled on today with the exception of the

1851

Kirsten Tucker - Direct

1    ones that I have taken under advisement, we can do that too.

2    But then we'll need a game plan going forward so that we can

3    get through these documents, get back on track, get witnesses

4    called.  Perhaps -- Mr. Ledford, perhaps we can get Mr. Ledford

5    done on Monday, that type of thing.

6         I would like to -- it would be better if we could get,

7    for instance, a full day of testimony in on Monday.  And then

8    if we have to take some time off to get through the rest of

9    things and not have the jurors even come in or only come in for

10   a half day or whatever, that would be better for them.

11        Mr. Koenig?

12        *MR. KOENIG:*  Can I raise one thing?  We were going to

13   notify the defendants tonight, but as long as we are in court,

14   we plan to call Mr. Smith out of order because he has some

15   special travel circumstances.  He is being escorted to and from

16   the airplane by agents and so -- and he has limitations on --

17   he basically has to be out of here by Wednesday.  And seeing

18   the cross of Mr. Lewis, Mr. Ledford could go on for days.  And

19   so we thought -- and Mr. Smith should be pretty short.  And

20   we'll get the exhibit list over to them for what's going to be

21   used with him this evening.

22        *THE COURT:*  Okay.  And when would you anticipate

23   calling Mr. Smith?

24        *MR. KOENIG:*  I guess it depends -- it would be in the

25   morning of Monday.  It depends how long getting documents in

1852

Kirsten Tucker - Direct

1    would be, right?  So if we put in documents first, it would be

2    an hour or two after we start, but it would be pretty much the

3    first witness Monday.

4            THE COURT:  Okay.

5            Mr. McLoughlin?

6            MR. McLOUGHLIN:  I am sure other counsel have comments

7    to make on this, Your Honor.  My first question would be after

8    Mr. Smith, who should we expect the witnesses to be?  And two,

9    can we get the exhibit list for Mr. Smith by 6:00 o'clock

10   tonight?  Because the government should clearly know by now,

11   since they listed Mr. Smith quite some time ago, what their

12   final list for the witnesses for Monday would be.

13           MS. CALL:  Your Honor, I believe Mr. Koenig did just

14   indicate we would send it tonight.  I think 6:00 o'clock may be

15   unreasonable given that it is 5:00 o'clock and we are still in

16   the courtroom.  I will note that we do and almost every day

17   comport with requests from various defense counsel for

18   immediate response to various matters, and it is becoming a

19   problematic issue for the government, at least our sleep

20   cycles, but that's more of a little cathartic complaint.

21           But on another item I did want to address on the

22   consideration of objections to the documents, we are doing the

23   best we can to provide advance notice of all exhibits that we

24   plan to enter, but the agreement that was reached as we noted

25   was only to case-in-chief documents.  And the government is

Kirsten Tucker - Direct

1   being required on a daily basis to assess the admissibility of

2   various cross documents with no notice from defense counsel and

3   having not even received any of the documents or many of the

4   documents on the defendants' cross list.

5           So it does seem to be putting the government at an

6   extreme disadvantage to be requiring the government to provide

7   every document it may ever plan to introduce that are all

8   already on the government's exhibit list and not being able to

9   consider objections without planning days in advance.

10          THE COURT:  Right.  Let's get back to what we were

11  going to talk about originally, and that is what I would like

12  to do and what I would like you to work on is try to get a full

13  day on Monday.  And then also think about when and how long it

14  will take to rule on the rest of the documents, the rest of the

15  exhibits.  Already we will have Thursday off, so let's think

16  about what's going to work out best.  Once again, my focus is

17  on not frustrating the jury with some type of kooky schedule

18  and not keeping them back in the jury room while we try to

19  figure things out, but rather try to figure things out in

20  advance so that we can have a good plan for them next week.

21          Mr. Pollack?

22          MR. POLLACK:  I am sorry, maybe I missed.  I am still

23  unclear.  If we are going to do a full day on Monday, if we

24  have an hour or so of admitting documents and then we have

25  Mr. Smith, that does not sound to me like it's close to a full

1854

Kirsten Tucker - Direct

1   day.  So I am still not clear who we will see after Mr. Smith.

2          THE COURT:  I am not either.  I am just asking that

3   the government or whomever, that we come up with a good plan,

4   mainly the government obviously.

5          MS. CALL:  In terms of the witness order which I think

6   was defense counsel's question, it would be Mr. Ledford being

7   after Mr. Smith.

8          MR. POLLACK:  Thank you.

9          THE COURT:  That might be a full day it sounds like.

10          MR. POLLACK:  It just was not clear to me if

11  Mr. Ledford was following Mr. Smith or not.

12          THE COURT:  Mr. Fagg?

13          MR. FAGG:  I am raising an issue for you that I

14  anticipate we'd want to raise on Monday morning before the jury

15  came in.  Mr. Koenig made reference to the fact that Mr. Smith

16  is being escorted to and from the airport.  We received a 302

17  from the government relatively recently indicating that

18  Mr. Smith was somehow or another afraid.

19          THE COURT:  I am sorry, what?

20          MR. FAGG:  That he was apparently afraid as a result

21  of this case.  And we haven't seen anything in this entire case

22  that would suggest that someone would have reason to be afraid.

23  To the extent that the government intends to elicit any

24  testimony about that, we would want to submit something to Your

25  Honor ahead of time.

Kirsten Tucker - Direct

1          *THE COURT:*  Ms. Call?

2          *MS. CALL:*  We do not intend to elicit testimony on

3      that point.

4          *THE COURT:*  Well, make sure he is prepared well, too,

5      because, you know, Mr. Fagg is right, if a witness were to

6      blurt out something like he is scared to death of these people

7      or something of that nature, that would be highly prejudicial.

8          *MS. CALL:*  Yes.  We will instruct him accordingly.

9          *MR. FAGG:*  Your Honor, one other point on that.  We

10     would also ask that when he arrives and walks into the

11     courtroom in front of the jury and he exits, that he does so as

12     every other witness does.

13         *THE COURT:*  Well, he doesn't know what everyone else

14     does, but we don't want him to be escorted in.

15         *MR. FAGG:*  Yes.  Thank you, Your Honor.

16         *THE COURT:*  I don't mean to make light of anything he

17     may be worried about, but he should not have an escort, okay?

18             Anything else we should take up?

19         *MS. CALL:*  I think just one minor point.  Perhaps to

20     just be respectful of the fears, if we could have that center

21     aisle perhaps not have defendants right on it.  It's just a

22     request to try to be respectfully of the witness' own concerns.

23         *THE COURT:*  I have been noticing Mr. Kornfeld and

24     Mr. Tubach and Mr. Beller, they have been trying to let the

25     people get by in a normal fashion.  I mean, it's tight there,

1856

Kirsten Tucker - Direct

1    but they have been doing that for everybody, okay?

2              Anything else?

3              Ms. Henry?

4         MS. HENRY:  And I may have been a little confused, but

5    it seemed that some of the exhibits that you sent to us, that

6    the government sent to us that we were supposed to go over

7    today were not gone over.  Are they withdrawn or were they

8    already admitted or maybe I just miscounted or --

9         THE COURT:  It's 5:00 o'clock, so we didn't get to

10   them.

11        MS. HENRY:  And then I would also ask if there are

12   other exhibits that the government knows for certain that they

13   are only asking for a small portion of the exhibit to come in,

14   if they could give us a little bit of notice of that, it would

15   probably expedite things a little bit.

16        THE COURT:  I agree.  For instance, if it's just a

17   phone number like we talked about that one document, that

18   problem may be solved with a stipulation.

19        MS. CALL:  Yes.  And I'll note we requested that

20   stipulation for all of the phone numbers that are on 90-10 and

21   have not heard back, but for the record so defendants

22   understand, the sources underlying 90-10 are being introduced

23   there for the purpose of associating a phone number with a

24   name, as I think we explained in the trial brief and some of

25   the briefings on the summary exhibits.  That's not to say that

Kirsten Tucker - Direct

1    some of those exhibits are not being admitted for other

2    purposes because some of them are, for example, excerpted on

3    the summaries and contained in the government's *James* log, but

4    the majority of them are for that purpose.

5           There is also a number of exhibits underlying the

6    government's summaries that are being introduced solely for the

7    purpose of associating names with employers.  We could perhaps

8    work on trying to identify those a little more clearly.

9           *THE COURT:*  Well, and keep in mind under my practice

10   standards if you want to do a stipulation, you just have a case

11   caption.  And then there is a -- and it says heading,

12   stipulation, numbered paragraphs, one stipulation per

13   paragraph.  People sign it.  You can slap an exhibit sticker on

14   it, move its admission, show it to the jury during closings,

15   whatever.  It's a good way to do it.  The fact that it's not

16   necessarily comprehensive, that there may be other stipulations

17   later doesn't really matter too much, but that's a good way to

18   save some time too.

19          *MS. CALL:*  Thank you, Your Honor.  That is precisely

20   how we drafted our proposal.

21          *THE COURT:*  Anything else?  Going once, going twice?

22   I hope everyone has a good weekend.  If you are flying, safe

23   travels.  We will be in recess until 8:30 Monday.

24      (Recess at 5:07 p.m.)

25

Kirsten Tucker - Direct

1                          INDEX

2    WITNESSES

3        Sara Fisher

4            Cross-Examination Continued By Ms. Rahman      1650

5            Cross-examination By Ms. Carwile               1651

6            Cross-examination By Ms. Johnson               1668

7            Cross-examination By Ms. Henry                 1678

8            Cross-examination By Mr. Quinn                 1682

9            Cross-examination By Ms. Price                 1687

10           Cross-examination By Ms. Prewitt               1687

11           Redirect Examination By Ms. Sweeney            1696

12       Brian Coan

13           Direct Examination By Ms. Butte                1727

14       Kirsten Tucker

15           Direct Examination By Ms. Butte                1730

16

17

18

19

20

21

22

23

24

25

Kirsten Tucker - Direct

1                      INDEX (Continued)

2                         EXHIBITS

3    Exhibit      Offered  Received  Refused  Reserved  Withdrawn

4    I-054                 1651

5    I-067                 1676

6    C-207                 1682

7    C-265                 1681

8    C-465                 1679

9    E-468                 1658

10   G-474                 1654

11   F-747                 1654

12   F-783                 1654

13   F-789                 1654

14   F-796                 1654

15   B-963                 1654

16                   REPORTER'S CERTIFICATE

17       I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.  Dated

19   at Denver, Colorado, this 24th day of January, 2022.

20

21                            S/Janet M. Coppock

22

23

24

25