1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB

3

UNITED STATES OF AMERICA,

4

     Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,

7 MIKELL REEVE FRIES,
SCOTT JAMES BRADY,

8 ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,

9 WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,

10 WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,

11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 13

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:31 a.m., on the 12th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2             Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6             Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9             Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11             David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14             Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16              Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19             Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

1              APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10             James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16             Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19             John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1                  APPEARANCES (Continued)
 2            Craig Allen Gillen and Anthony Charles Lake of
 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4   Atlanta, GA 30339;
 5            Richard L. Tegtmeier of Sherman & Howard, LLC,
 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7   for Defendant Roberts.
 8            Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10   DC 20006;
11            Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13   for the Defendant Blake.
14
15                     PROCEEDINGS
16       THE COURT:  We are back on the record in 20-CR-152.
17   The jury is not present.  I had given -- I told the defendants
18   that if they didn't wish to be present today, they did not have
19   to be.  And it looks like a number of defendants have -- maybe
20   all have taken advantage.  We have got -- Mr. Penn is here.
21   Many have chosen not to be present, which is perfectly fine,
22   and those who have chosen to be present, that's perfectly fine
23   too.
24            So what we are doing today is we are working through
25   some exhibits that the government intends to introduce in its
```

 1    case in chief.  And why don't we first of all talk about what

 2    order we should take those up in.

 3              Mr. Byrne?

 4              MR. BYRNE:  Your Honor the government filed a motion

 5    to dismiss Count Three as to Mr. Little, and maybe we could do

 6    that first.  It should take 10 seconds if the Court would

 7    consider granting that motion.

 8              THE COURT:  It is already in the works.  The order

 9    should be docketed momentarily.

10              MR. BYRNE:  Thank you, Your Honor.  The only other

11    related issue is what the jury should be told.

12              THE COURT:  Yes, of course.

13              MR. BYRNE:  We have a suggestion.

14              THE COURT:  Go ahead, Mr. Byrne.

15              MR. BYRNE:  The jury can be told that the government

16    has moved to dismiss Count Two, I guess they are calling --

17              THE COURT:  I don't think we refer to them by numbers.

18              MR. BYRNE:  The obstruction count, and Defendant

19    Little does not object and the Court has granted the

20    defendant's motion.

21              THE COURT:  Response from the government?

22              MR. KOENIG:  That's fine.

23              THE COURT:  Okay.  So I will mention that on Monday at

24    some point in time.

25              MR. BYRNE:  Great.  Just to be clear, we are not

1    objecting because not only are they dismissing the obstruction

2    count with prejudice, but they have also stated that they are

3    not going to prosecute Mr. Little for the false statements

4    count.  So that's part of our reason of why we are not

5    objecting, just for the record.

6           *THE COURT:*  Right.  That's in the government's motion.

7           *MR. BYRNE:*  Thank you very much.

8           *THE COURT:*  Thank you, Mr. Byrne.

9           So it looks like in Docket No. 825 the government has

10   indicated -- has suggested an order, although that would appear

11   to be a little bit different than what we had talked about on

12   Wednesday in terms of dealing with the list that came out late

13   Wednesday as Docket No. 821.

14          Ms. Call, go ahead.

15          *MS. CALL:*  Yes, Your Honor.  I believe on Wednesday we

16   discussed both addressing kind of the list of substantive

17   documents as well as those sources underlying the summaries.

18   And as a matter of efficiency, we thought it might be quicker

19   to address those underlying sources first which were

20   Attachments 1 and 2 in both Docket 822 and 825.

21          *THE COURT:*  Reaction to that suggested order?

22          Ms. Henry.

23          *MS. HENRY:*  Your Honor, we haven't actually been given

24   the current version of the summaries which we are told by the

25   government that they are in the process of being revised, so it

1    may be very difficult to address that.

2            THE COURT:  Mr. Lavine?

3            MR. LAVINE:  I will let them address that issue first,

4    Your Honor.

5            THE COURT:  Fine.  Go ahead.

6            MS. CALL:  Yes, Your Honor.  Defendants have the very

7    near final versions of the summaries.  The government is still

8    checking their accuracy.  But as to the admissibility of the

9    sources for the purposes of showing an employer or a phone

10   number, I don't believe the summary itself really makes any

11   difference since we are not speaking to the admissibility of

12   the summaries today, but of those underlying sources.

13           THE COURT:  Mr. Lavine?

14           And then I will get back to you, Ms. Henry.

15           MR. LAVINE:  Your Honor, if I understand what the

16   government is going to do here today is they are going to start

17   with Exhibit 1 and Exhibit 2, which are sourcing documents to

18   Docket No. 825, if I am correct.  And I want to address -- if I

19   can ask the Court's indulgence so I can address this.  This

20   seems to be incredibly repetitive, redundant and completely

21   unnecessary.

22           What they are talking about in Exhibit 1 are employer

23   sources.  Now, the government has gone to painstaking details

24   to have each defendant identified not only by standing up in

25   the courtroom, but also by photographs, making sure that each

1    individual, whether it was Mr. Lewis, Mr. Ledford, Ms. Fisher,

2    whoever it was, identify who they dealt with at each company.

3    There is no question, Your Honor, as to which individual works

4    for what company.

5          And if I can just draw the Court's attention to

6    Exhibit 1 that they want to use, and I am a little confused

7    here, Your Honor.  And I don't like speaking that much in

8    court, but sometimes I have to get up and talk.  Employer

9    sources in Exhibit 1, if I look and I start with just the first

10   one -- I realize Your Honor hasn't had access to this -- what

11   they want to do, Your Honor, is to say -- they want to

12   introduce and want to use Mr. Fries as an example -- and his

13   counsel has authorized me to go ahead and use this as an

14   example -- to show where he worked in 2014.

15         And what they've done, Your Honor, is they have

16   attached an e-mail of 2015 --

17             MR. POLLAK:  We are having trouble hearing back here.

18             MR. LAVINE:  It says it's on.  Is that better?

19             THE COURT:  Yes.

20             MR. LAVINE:  So the one for Mikell Fries, Mr. Fries,

21   they are trying to confirm where he worked in 2014, but they

22   have an e-mail from 2015 with regard to Pollo Tropical.  They

23   wouldn't get this document in any other way, Your Honor.  They

24   are in a sense being disingenuous, and I don't use that

25   terminology lightly, but I have never seen anything like this.

1          So if I then go forward to Exhibit 3057, which is to

2    show where Mr. Brady worked in 2019, they've got a 2014 e-mail

3    to try and show where he worked in 2019.  If I then go on to

4    6184, they want to show where he worked in 2014, they have got

5    an e-mail from 2013.

6          I want to go one step further, Your Honor, and I am

7    going to go to Exhibit 6184.  They want to show where he worked

8    in 2014 and they have an e-mail from 2012 when he worked at

9    Pilgrim's, not at Claxton.  And then finally, if I go to 9260,

10   they want to show where Mr. Brady worked in 2012.  They have an

11   e-mail for George's.  And I have looked at this e-mail three

12   times, Your Honor, and I can't find Scott Brady's name

13   anywhere.

14         My point is this is just full of mistakes.  And the

15   government has said they have been careful.  They are trying to

16   be accurate.  And I understand people make mistakes, Your

17   Honor, but this is ridiculous.  And I think under -- I think

18   it's under Rule 611 as far as efficiency of admission of

19   evidence, this is just repetitive stuff.  They have gone to

20   painstaking efforts to show where these people worked.  Greg

21   Finch testified as to the e-mail addresses for both Mr. Fries

22   and Mr. Brady.  There is no question where these people worked.

23         The only reason they are doing this, Your Honor, is

24   they are trying to backdoor get documents in that there is no

25   reason for.  So I would ask the Court to seriously look at

1    this.  And I would address Exhibit 2 next, but this is

2    repetitive.  There is no rhyme or reason for employer sources

3    here.  And I don't know how we are supposed to respond when

4    they say they are trying to verify his employment on a certain

5    date and they give him an e-mail that has nothing to do with

6    that date.

7         If I may add one more thing, Your Honor.  I understand

8    people make mistakes, and I am all about it that we do make

9    mistakes in cases such as this size.  But, Your Honor, when I

10   read their briefing on this case, and I think it's 822, which

11   is the same I believe as 825, they talk about the fact that Joe

12   Brink can testify as to his e-mail address.  And I believe in

13   822 they said he has already testified.  I realize I may have

14   dozed off during trial, but I don't think I missed Mr. Brink's

15   testimony.  But if Mr. Brink is testifying as to his e-mail

16   address and where he is working, what is the point of having at

17   the bottom here -- Joe Brink's e-mails to show where his

18   employer source is.  It just doesn't make any sense, Your

19   Honor.

20        And this is just -- unfortunately, as officers of the

21   Court, we are supposed to be as efficient as possible.  This is

22   not efficient.  This is duplication.  This is redundancy.  And

23   the only reason for it, Your Honor, is they are trying to get

24   in documents that they would not get in normally.

25            *THE COURT:*  Thank you, Mr. Lavine.

1          Ms. Call?

2          *MS. CALL:*  I take it Mr. Lavine's statement that he

3     wouldn't have make these representations without carefully

4     considering it.  I will state the government did try to

5     stipulate multiple times as to the employer sources and the

6     phone numbers identified here.  Because the parties were not

7     able to and none of the defendants indeed responded to any of

8     these requests, the government then sought writings that would

9     be proper under Rule 1006 as a source for this information.

10    That's why this information is put in the way it is, because we

11    did seek to have proper 1006 summary charts which I think all

12    the parties are familiar with.

13         As we said in our motion, though, these sources are

14    only being offered, unless otherwise offered, because some of

15    them are 801(d)(2)(E) statements.  And we will make clear when

16    those are offered whether they are being offered for the truth

17    of the matter asserted therein, but these are simply being

18    offered for establishing these people were at these companies

19    and establishing certain phone numbers are tied to certain

20    people.

21         As I am sure Your Honor is aware, these underlying

22    sources for the summaries don't actually need to be admitted

23    into evidence.  They simply need to be admissible for the

24    purposes offered.  So we are happy to not admit the underlying

25    sources as long as we get a ruling on the admissibility for the

1   purposes which we are seeking.

2          As to any inaccuracies in Exhibit 1 to 825, I will own

3   that because I will say that was prepared at 1:00 in the

4   morning on the evening that we did file it.  I will say the

5   summaries, of course, are actually more accurate and are being

6   verified.  And I apologize if any years were incorrect on the

7   sources list that we filed on Wednesday evening.

8          THE COURT:  Ms. Henry, go ahead.

9          MS. HENRY:  Your Honor, if I first may address the

10  issue of the stipulations.  We are certainly not required to

11  take on the burden of correcting stipulations which have

12  numerous inaccuracies.  The burden is on the government.  I

13  have never been in a case where it's put to us to say would you

14  please provide our evidence for us.  The stipulations we were

15  given were rife with inaccuracies and certainly in regard to my

16  client.

17         But I would like to address the employer sources

18  issues here and -- there are two here listed for Bill Kantola,

19  2013 is 6143.  I wonder if we could pull up 6143 on the screen.

20         MS. CALL:  Your Honor, I think Ms. Grimm may need a

21  direction of which computer is pulling up the document.  The

22  government is happy to.

23         THE COURT:  Okay.

24         MS. HENRY:  And look at the second page of it.  Your

25  Honor, this document does not have Bill Kantola's name on it.

1    It appears to be completely irrelevant, but this is the

2    document that we were given in the court filing as the document

3    that shows Bill Kantola's employer source for 2013.

4          The second document that is listed here is Bill

5    Kantola for 2012.  And if we pull up that document, it does

6    show a date of 2012 and it does have an e-mail signature line

7    with Bill Kantola's information on it.  Again, we would have no

8    problem necessarily with the admission of that information

9    except that -- and this is what I was talking about when I said

10   without having the actual summary exhibits -- it's hard to

11   address how these are being used.

12         If we turn to Goverment Exhibit 1-1, and if we could

13   pull that up.  This shows the 7040 exhibit that is being used

14   in the employer sources for 2001 as his employment date, but

15   the date here it's being used for is in the middle of May 2013.

16   Moreover, if you then look at -- and I don't know whether we

17   need to pull it up -- but if you look at 14-2 exhibit, summary

18   exhibit, which is a 2012 date, they do not use 7040.  They have

19   chosen to use an entirely different document that is not

20   related.  This is the concern that we have, not just with the

21   accuracy of these issues, but also with the contextual way in

22   which these documents are being used.

23         Thank you.

24         Mr. Lavine, go ahead.

25         *MR. LAVINE:*  Yes, Your Honor.  Government counsel has

1    referenced the potential for a stipulation.  The stipulation

2    that we received was inaccurate.  And it just -- it got to the

3    point it just wasn't even worth trying to deal with.  Your

4    Honor, what we are talking about is cumulative evidence here.

5    In Exhibit 2 what they want is e-mail signatures.  They have

6    document after document that they have put in to show what the

7    e-mail signatures are.  There is no reason for it.  And they

8    are asking for a stipulation, and I am willing to try that,

9    Your Honor, but that's cumulative.  It makes no sense to put a

10   stipulation in considering the ends that the government has

11   gone to to identify who was involved from what company.

12          And if we just focus on Mr. Brady for a second, their

13   questions to Mr. Lewis, Mr. Ledford, Sara Fisher -- I am sure I

14   forgot somebody, Your Honor, I apologize -- they were very

15   clear:  Who did you deal with?

16          Mr. Brady.

17          Where did he work?

18          Claxton.

19          Did he send this e-mail?  Did you send this e-mail?

20          It all has it in there, Your Honor, the phone numbers,

21   the e-mail addresses, where they worked for every one of these

22   defendants in this courtroom -- sorry, they are not here.  But

23   the point is this is all cumulative and there is no basis for

24   this.  This is about as inefficient as lawyers can be in

25   representing to the Court.  And I would ask that you strike

1    Exhibit 1 and 2 because there is no basis for it.

2              THE COURT:  All right.  Thank you, Mr. Lavine.

3              Anything more, Ms. Call?

4              MS. CALL:  I don't believe so, Your Honor.

5              THE COURT:  Okay.  Sorry, Mr. McLoughlin.  Go ahead.

6              MR. McLOUGHLIN:  Your Honor, just to underscore the

7    point for Mr. Lovette for an employer source, given the number

8    of his communications that are already in, the government could

9    have chosen any number.  There are, for example, segments that

10   they could have selected of an SEC filing that would have

11   disclosed that he was the CEO at a particular time, but instead

12   they chose Exhibit 9020.

13            And the rhetorical purpose of the government in what

14   is supposed to be a neutral list of documents merely showing an

15   employer source is I think evident in 9020 in which the exhibit

16   the government selected just so happens in a remarkable

17   convenience to be an e-mail in which Mr. Lovette in March of

18   2014 discusses the George's dock report and makes numerous

19   comments about when you see a customer do hike the Fonz did,

20   thumbs up, because that's where chicken prices are going.

21            Now, of all of the sources, the literally thousands of

22   sources the government might have chosen to establish his

23   employment or information or his e-mail address, it just so

24   happens they chose one that is supportive of their narrative.

25   And it is that point that I think underscores the point that

1    Mr. Lavine is making that this is, in fact, arguably a dual

2    purpose document and inappropriately so.

3            Thank you.

4            THE COURT:  Ms. Call, let me ask you this.  So, for

5    instance, with Exhibit 1, this is Docket 822-1, does Exhibit 1

6    represent what will be marked as an exhibit or is this just a

7    list of exhibits that will be used -- that the government

8    intends to introduce in order to demonstrate years of

9    employment with particular companies?

10           MS. CALL:  The latter.

11           THE COURT:  Okay.  So those points about, for

12   instance, Mr. McLoughlin just made about 9020, that document

13   would -- you would move to admit it.

14           MS. CALL:  As I stated before, Your Honor, I don't

15   think the government actually needs to admit these underlying

16   sources as long as they are deemed admissible.  The only

17   relevance of them, you know, to the extent we are not offering

18   them otherwise, is to establish that the individuals listed

19   worked at the companies listed, and that is then conveyed in

20   the summary charts that defense counsel do already have.

21           So I think to the extent defense counsel are concerned

22   about the contents of those documents, perhaps a resolution

23   would be simply not to offer them and just ask for a ruling on

24   their admissibility for that purpose.  The other option is the

25   government is happy to redact the contents of the documents and

1    only offer them for the header information, at least for the

2    employer sources.

3         THE COURT:  So let's go back to Mr. Lavine's point,

4    which is if that's what you would be willing to limit it to,

5    aren't we just back to where we are already which is that there

6    has been testimony from custodians of records.  I don't have a

7    chart of seeing whether there is some gaps, but establishing

8    e-mail addresses and perhaps some phone numbers, although not

9    as many, for quite a few of the defendants and throughout the

10   trial then documents have been admitted containing names and

11   oftentimes e-mail addresses too, once again, with those

12   defendants.  So what would be the need to go through this

13   exercise if the admissibility of the underlying exhibits is

14   simply header information?

15        MS. CALL:  Yes, Your Honor.  So for the testimony, I

16   think if we were to rely on the testimony for the information

17   that is then in the summary charts, we would just need a ruling

18   that those summaries are being deemed admissible under both

19   1006 and Rule 611, because 1006 summaries generally would only

20   summarize contents of writings, recordings and photographs, not

21   in-court testimony.  So to the extent it's ruled admissible by

22   prior testimony and other documents in evidence, the government

23   wouldn't need these.

24        But I will note that some of these are years that are

25   not already covered in other documents and we did want to be

1    precise in ensuring there was a source associating a person

2    with a company in that particular year.  So that's the reason,

3    I think, for this chart.  And we did try to remove entries that

4    were either otherwise admitted in trial that establishes that

5    same fact or, I suppose, just that one because we were not

6    removing things covered by testimony.

7              THE COURT:  Ms. Henry?

8              MS. HENRY:  I will come up here just so people can

9    hear what I say.

10             The issue I think is still on these exhibits having

11   this source column, exhibit number.  And if that is the exhibit

12   number that relates to whatever here, we certainly are also not

13   ready to stipulate that everything in these exhibits is just

14   fine to be admitted because for two reasons; one, we would not

15   agree with the exhibits that we already have; but two, we

16   haven't actually seen the exhibits yet.  So we are certainly in

17   no position here to agree or even get into the issues of the

18   admissibility under 1006 right now.

19             Speaking only on behalf of my client, I am willing to

20   accept the concept of the redactions if that's the only purpose

21   for which they really want to use these documents.  If they

22   want to redact them to just those particular issues, that would

23   be fine from my client.

24             THE COURT:  Ms. Call, did you want to respond to that

25   first?

1          MS. CALL:  I did just want to correct the record that

2     the defense counsel do have the summaries themselves as well as

3     all of the underlying sources.  One note.  I believe in what

4     the government provided yesterday, there were 12 documents that

5     defense counsel believed to be new exhibits.  For purposes of

6     today and the exhibits we are covering today, there are six on

7     that list.  Three of them were just new printouts of documents

8     already provided to defense counsel that we had adjusted in

9     accordance with this past week's decision to kind of include

10    that native slip sheet followed by the document itself, so we

11    renumbered the documents when we reprinted them out.

12         One item was an attachment to an exhibit that defense

13    counsel already had that we had failed to number the

14    attachment.  Two of them I will note were new exhibits, but

15    they were already on the defendants' exhibit list.  So I want

16    everything to be clear as to what defendants do have at this

17    point.

18         THE COURT:  But the actual summaries that we're

19    ultimately talking about have not been finalized yet.

20         MS. CALL:  Yes.  I suppose the difficulty is the word

21    finalized.  So to the extent any of the substantive documents

22    aren't admitted in court, we will, of course, remove them from

23    the summaries.  So that's basically an ongoing process.  Until

24    the summaries get introduced, we will have to remove anything

25    that is not admitted.  That's perhaps some of the focus and

1    point of efficiency of doing this today, so the government can

2    use the determinations made today to finalize summaries and get

3    them to defendants in what is a final form this weekend.

4         MS. LaBRANCHE:  Your Honor, may I have the Court

5    inquire of the government when they expect that these summary

6    exhibits will be moved into evidence?  We are not getting them

7    until this weekend.  I don't know when we are going to have

8    time to review them and present argument to the Court on issues

9    that we have with them.

10        THE COURT:  Well, we are in a bit of a circular

11   argument.  We are still trying to figure out the process by

12   which we are going to do it.  I was almost thinking that if we

13   had what would appear to be the final version, people could

14   take a look at them and decide whether we need to go through

15   the process of trying to do all this.  Maybe they would be okay

16   because the fact that a given defendant worked during a given

17   year at a given company would not be controversial or that

18   would be fine.

19        Once again, not having -- I don't think I have looked

20   at those summaries, so I don't know exactly how it's set up.

21   But what Ms. Call is saying is that she can't really prepare

22   the summaries until she knows the ruling on the admissibility,

23   not the fact that the government will be admitting these

24   documents, but know that at least the underlying sources are

25   admissible.  So that's what we are still trying to figure out.

2656

1      I don't know if that answers your question.

2              *MS. CALL:*  And, Your Honor, if it's helpful, just to

3      ensure you are aware of what summaries we are talking about,

4      these are the summaries that we have submitted numerous times

5      both in the government's trial brief, as well as the motion --

6      government's response to the motion to exclude the summary

7      exhibits.

8              *THE COURT:*  Yeah, I understand; but as Ms. Henry says,

9      they are not quite final yet.

10             *MR. GILLEN:*  Your Honor, this is yet, candidly,

11     another example of exactly what we didn't want to have happen.

12     When we last met, the Court was specific in my recollection

13     about what the government was to do and what we were going to

14     begin doing on Friday, which was to put the exhibits in

15     chronological order so that we could march through them today,

16     and then, as I believe the Court indicated, if we had time,

17     then we could address issues regarding the summaries.

18             As sadly we had predicted, what we have from the

19     government is an example of what they are doing this morning;

20     that is, they send out something new and say, oh, by the way,

21     we want to address this in terms of employment and numbers and.

22     Then they send out as an exhibit to that, a bunch of backup

23     documents about which we are presently discussing.

24             The point here is, Your Honor, that this is an

25     unfortunate example of the continual problem that we have, at

1    least I had with the government in terms of moving the goal

2    post, if you will.  I suggest that we should do exactly what

3    the Court stated when we last met on Wednesday, which is to go

4    through the exhibits that they were to notify the Court about

5    on Wednesday, rather than coming into court indicating that

6    they want to get a lot of backup employment data to fulfill

7    their issues about employment and time and telephone numbers.

8    This is concerning to us, and I would object to their moving

9    the goal post yet again in terms of what we are doing today.

10           *THE COURT:*  Ms. Call, go ahead.

11           *MS. CALL:*  If I may make a proposal.  First off, we

12   did discuss discussing these underlying sources multiple times

13   in the last two weeks.  But as far as what may be efficient

14   today, perhaps rather than discussing the accuracy of the

15   underlying sources, which would be ripe for cross-examination

16   of the preparer of the summaries, we could just have legal

17   argument on just the admissibility of these kinds of documents

18   for these purposes and then move on to the more substantive

19   exhibits.

20           *THE COURT:*  I think it would be too vague, to tell you

21   the truth, with these kind of documents.  I am not sure that's

22   going to get us too far.  Here is what I suggest, and that is

23   we do as Mr. Gillen appropriately pointed out.  Our first order

24   of business was to look over the list that is part of Docket

25   No. 821, but then have people think about over the lunch break

1    the proposal that the government has made that really those

2    underlying documents, for instance, on Exhibit 1, and I am not

3    sure if they apply to Exhibit 2 of Docket No. 822, would be

4    limited to just the header information.  I am not sure if that

5    would help us work through that to establish that information,

6    but then in the event that we have time to get to that, then we

7    take it up.

8           Now, even though we had planned on going through that

9    list which is Docket No. 821, if our ultimate goal was to try

10   to get as much done as possible today and be as efficient as we

11   can to avoid next week being characterized by more sessions

12   like this outside the presence of the jury, so I am open to

13   doing something later today that might be more efficient and

14   which may have the benefit of allowing the government over the

15   weekend to get those summaries finalized, but I am quite

16   worried that we are just going to get bogged down on Exhibit 1

17   and Exhibit 2 this morning.

18          And because I think that there could be some utility

19   for people thinking about the limited way in which the

20   government wants to have the underlying source documents

21   considered, maybe it's best for us to shift over to Docket No.

22   821, work through those this morning, have people think about

23   it over lunch.  And then we will come back and see where we are

24   and what we might be able to accomplish in regard to the

25   employer source issues, all right?

1          MS. CALL:  That sounds like a good proposal, Your

2    Honor.  I will note for the documents listed in Exhibit 2, they

3    would not be redacted in their entirety because it would need

4    to include the phone number information that's contained in

5    those documents.

6          THE COURT:  Right.  By its nature it would be a little

7    bit different.

8          Ms. Henry?

9          MS. HENRY:  Your Honor, Ms. Call raised the issue

10   there that she had sent over a bunch of information last night

11   that we already had, et cetera.  I would just like to pull up

12   Exhibit 9725.  This is one of the ones that came over last

13   night.  And if we could focus on the bottom where it says it's

14   an excerpt of one particular document.

15         And Your Honor, with the assistance of Ms. Grimm, may

16   I give you that document?  I am sorry, I don't have extra

17   copies because it was a little early this morning by the time I

18   looked at this.

19         MS. CALL:  We did identify the error in that Bates

20   number this morning.  It was actually an excerpt of

21   Exhibit 9264 which has already been provided.  So I apologize

22   for the confusion.

23         MS. HENRY:  I don't know when it was this morning, but

24   that's the problem we're facing.

25         Thank you, Your Honor.

1           THE COURT:  Okay.

2           MS. PLETCHER:  Your Honor, one more thing before we

3    get started.  Anna Pletcher for Jayson Penn.  I believe what we

4    are going to be looking at today is Document No. 825, not 821?

5           THE COURT:  Yeah, 825 amends 821, that is correct.

6           MS. PLETCHER:  Thank you.

7           THE COURT:  Okay.  Why don't we get going, then, and

8    we'll start off with Exhibit 1909.

9           Go ahead, Ms. Call.

10          MS. CALL:  Yes, Your Honor.

11          The first document is Exhibit 1909.  And I will do

12   these from memory for a moment, but this is an e-mail with the

13   subject line Chicken on the Bone Update that I believe was sent

14   to Mr. Stiller at Pilgrim's.  And this document is essentially

15   a pure example of effect on the listener as to the non-hearsay

16   purpose of its introduction.

17          Mr. Stiller received this e-mail from RSCS asking for

18   revised bids by February 23rd.  Just six minutes later

19   Mr. Stiller reached out to Defendant Austin via text message,

20   which we are about to get to, and that night texted Defendant

21   Austin, "Need you tell industry we are going to hold."  You may

22   recall we had some extensive discussion about that text message

23   I believe a week back regarding Mr. Stiller's future potential

24   obstruction and concealment related to it.  It's offered for

25   the effect on Mr. Stiller, that it affected him to direct

1    Defendant Austin to reach out to customers to hold on the price

2    offer to KFC.

3              THE COURT:  So this comes -- okay.  Objections to

4    1909?

5              MR. FELDBERG:  Thank you, Your Honor.

6              The document is obviously hearsay.  I appreciate that

7    Mr. Stiller is alleged to be a co-conspirator and the Court has

8    made its finding in the *James* proceeding, but why is the effect

9    on Mr. Stiller's state of mind relevant to any issue in dispute

10   in this trial?  Mr. Stiller is not here.  His state of mind is

11   not at issue in any issue in controversy here, and therefore we

12   object.

13             THE COURT:  Mr. Fagg, go ahead.

14             MR. FAGG:  Your Honor, a couple of other points.  One,

15   this document is not on the *James* log, though it does involve

16   Mr. Stiller.  Two, there is nothing on the face of the

17   underlying hearsay e-mail from Mr. Suerken that indicates that

18   Mr. Stiller actually received it.  If you look at the

19   recipients there on the CC line, Mr. Stiller is not on there.

20             THE COURT:  True, although he obviously does have it.

21   I mean, he has got it.  But you are right, he is not on the

22   list.  Somehow he got it, but I am not sure what the relevance

23   of that is, but yeah, you're right.

24             Anyone else?

25             Response, Ms. Call?

1           *MS. CALL:*  Yes, Your Honor.  Since the content of this

2      e-mail is written by Mr. Suerken of RSCS, it simply wouldn't be

3      something on the *James* log because it isn't offered under

4      801(d)(2)(E).  The relevance is the effect on the listener,

5      which is Mr. Stiller, which is followed by his directive to

6      Defendant Austin.  So it is entirely relevant to this case.

7           *THE COURT:*  What is the effect on the listener?  Just

8      copied on it?  We have no idea.  I mean, there is no context

9      whatsoever within the e-mail that would explain how this

10     affected the listener.  He just forwarded it on.

11          *MS. CALL:*  The effect would be the very next exhibit

12     we are getting to, which would be 1850, which is him reaching

13     out to Defendant Austin and in the text message that follows in

14     Government Exhibit 1850, 1851, 1852, 1853, 1854, 1855 -- and

15     just three more -- 1856, 1858 and 1862.

16          *THE COURT:*  Why don't we pull up 1850, then.  Let's

17     just take a look at that.

18          *MS. CALL:*  1850 is a text from Mr. Stiller to

19     Defendant Austin saying, "What does Pete e-mail mean,"

20     referring to Pete Suerken who sent that previous e-mail.  If we

21     could perhaps side by side pull up 1856.  And I will thank

22     Ms. Pearce because she will be doing a lot of work this

23     afternoon and this morning.

24          *MR. FELDBERG:*  Your Honor, 1909, the first indication

25     that Mr. Stiller had any connection to it is dated

1    February 20th, and that's when Mr. Stiller, who was not a

2    recipient of Mr. Suerken's e-mail, apparently forwards it to

3    Mr. Lane.  The Exhibit 1850, which the government says is a

4    text from Mr. Stiller to Mr. Austin, is dated three days

5    earlier, February 17.  So I am not sure how the effect on

6    Mr. Stiller's mind three days later on February 20th has

7    anything to do with a text Mr. Stiller purportedly sent on

8    February 17.

9              THE COURT:  Response, Ms. Call?

10             MS. CALL:  Yes, Your Honor.  The Exhibit 1909, the

11   e-mail underlying that is on February 17.  We do have testimony

12   I believe from RSCS employees saying that they did BCC their

13   suppliers at times when they e-mailed them collectively.

14   Mr. Stiller's forwarding of the e-mail shows that he did

15   receive it on the February 17 date.  And, of course, the text

16   message we just showed in 1850 saying "What does Pete e-mail

17   mean" shows a direct response to that e-mail.  So I think that

18   effect on the listener is very clear from the combination of

19   1850 saying, "What does Pete e-mail mean," as well as 1856,

20   "Need you tell industry we are going to hold."

21             MR. FELDBERG:  Your Honor, there is no evidence in the

22   record that this particular February 17 e-mail from Mr. Suerken

23   was forwarded to Mr. Stiller.  The only information we have on

24   that subject is that on February 20th, three days later,

25   Mr. Stiller forwarded it to Mr. Lane.  So the proposition that

1    he received it on February 17 is without foundation.

2         THE COURT:  All right.  The objections will be

3    sustained.  No. 1, the Suerken e-mail is hearsay, and as

4    Mr. Feldberg pointed out, there is a disconnect between the

5    date on which it was forwarded, that Stiller forwards it to

6    Mr. Lane who is a Pilgrim's employee.  And as a result, the

7    claimed hearsay objection does not have any relevance to why

8    someone two days later would have been talking about it.  It

9    may very well have been exchanged somehow, some way, but as to

10   the hearsay exception that's being proposed for 1909, it is --

11   there is a disconnect there, and therefore the effect on the

12   listener would not provide an exception.

13        Next document?

14        MS. CALL:  The next document that we had on the list

15   was 1821.  I do believe this has actually already been admitted

16   as Defendants' Exhibit C-465.  So I would just like to confirm

17   that perhaps and we could move on.

18        THE COURT:  Let's pull up C-465.

19        C-465 has been admitted.

20        MS. CALL:  And 1821, Ms. Pearce, is the other document

21   to pull up.

22        Your Honor, there does appear to be a slight visual

23   difference based on the stickering, but the documents do bear

24   the same Bates number.

25        THE COURT:  It's just a sizing issue.  Everyone agree

1    those appear to be duplicates?  Okay.  So that handles that

2    one.  You don't need to obviously admit 1821.

3            MS. CALL:  Correct.

4            THE COURT:  Okay.  1822?

5            MS. CALL:  We will pull that up in one moment.

6        Government's 1822 is an e-mail chain I believe between

7    Defendant Austin and defendant -- not defendant, Mr. Bryant.

8    And I will note that there was a similar chain of this

9    previously admitted as Government Exhibit 1822 that was

10   admitted during the testimony of Mr. Bryant, but -- sorry,

11   1882, but we believe 1822 is relevant and provides some

12   certainty and clarification in the jury's viewing of this

13   document as to the time zone at the top e-mail here in 1822

14   which is necessary because it places it in clear context with a

15   call between Defendant Brady at Claxton and Defendant Austin, I

16   believe, at 10:11 that same day.

17           MR. FELDBERG:  Your Honor, would it be possible to put

18   1882 side by side so we can --

19           THE COURT:  Yeah, I think that would be useful.

20           MS. CALL:  I will note the time that I believe is

21   relevant in 1822 is the e-mail dated 12:54 p.m.

22           MR. FELDBERG:  So the government's proposal is to

23   admit -- 1882 is already in evidence.  And the government's

24   proposal is to admit 1822 as well?

25           THE COURT:  Yes.

1    MS. CALL:  I will note just for the record that this

2    was -- 1882 was on the James log, entry 236.

3    THE COURT:  Okay.  Any objection to the admission of

4    1882?

5    MS. PLETCHER:  Your Honor, it's duplicative and

6    confusing for the jury.  There are two documents that are

7    identical except for the time stamp, so I think that would be

8    quite confusing, and it's cumulative and unnecessary.

9    THE COURT:  Anyone else?

10   Response to that, Ms. Call?

11   MS. CALL:  Yes, Your Honor.  As I noted, the reason we

12   think this would be helpful is to the time stamp on the top of

13   1822.  The jury has heard testimony about the time zone of only

14   top e-mails in e-mail chains.  And because the timing is

15   relevant, we think having that certainty would be helpful.

16   THE COURT:  I guess the issue is whether the

17   testimony -- I forget who it would have come from, but

18   concerning the time stamp, you know, whatever time stamps were

19   put on by Pilgrim's, whether there would be testimony that the

20   jury has heard that would assist the jury in using both copies

21   to figure something out about which time it really was.

22   MS. CALL:  Yes, Your Honor.  The testimony would have

23   been Mr. Sean King from Consilio.  He testified to the

24   processes of documents for Pilgrim's Pride and that they were

25   placed in the UTC time zone.  I am not sure if it was specified

1    in the testimony, but we believe it only applies to the top

2    e-mail in the e-mail chain.

3          MR. FELDBERG:  Your Honor, reflecting on the point

4    Ms. Pletcher made, I think there is a danger of confusion here.

5    Sequencing in many instances in this case is important.  If the

6    jury has essentially two iterations of the same document with

7    different times, I am not sure what they are supposed to make

8    of that.  What are they supposed to conclude as to when the

9    document was sent?

10         MS. CALL:  I think we're arguing perhaps the same

11   point with different conclusions, that the jury would actually

12   have some certainty in reaching a conclusion as to the times of

13   various e-mails in an e-mail chain where they do have those

14   various e-mails in multiple iterations so they can rely on that

15   top e-mail to determine the actual and correct time zone of the

16   document.

17         MS. PLETCHER:  Your Honor, if the government would

18   like to argue that that could be that a document that's already

19   been admitted has a different time zone than is actually on the

20   document, they can certainly do that in their closing argument.

21   Why we need to admit another document that would just add

22   confusion to the jury is the question here, and I think that's

23   unnecessary.

24         MS. CALL:  I believe to argue a time zone the

25   government would need the evidence in evidence to argue what

1    the appropriate time zone is, which would be based on the

2    testimony of Mr. King and the multiple documents.

3         THE COURT:  The objections will be overruled.

4    Actually, 1882 is not the same document as -- 1822 is not the

5    same document as 1882.  They are actually different.  And there

6    has been some testimony from Mr. King on that issue.  It would

7    be an issue that the jury could determine.  I don't think that

8    the fact that it may cause confusion, particularly this is a

9    different -- 1822 differs from 1882, would cause it to be

10   excluded.  So 1882 will be admitted.

11        MS. CALL:  I believe Your Honor meant 1822.  1882 has

12   already been admitted.

13        THE COURT:  Yeah, 1822 will be admitted.

14        Okay.  Next one?  Back to 1845.

15        MS. CALL:  Thank you, Your Honor.

16        1845 is an e-mail from Ms. Sara Fisher of RSCS to

17   Defendant Austin, as well as conspirators Robbie Bryant and Tim

18   Stiller.  Once again, this is being offered for effect on the

19   listener.  As you will see in this e-mail in the second line of

20   the content, Ms. Fisher conveys a February 3rd bid deadline.

21   And it is just, I think, two days before that deadline and

22   after this e-mail that Defendant Austin and Tim Stiller -- is

23   when Tim Stiller directed Defendant Austin to find out about

24   others.  And that's in Government Exhibit 1847 which we will

25   get to in a few moments to which Defendant Austin responded, "I

1    will do some scouting tomorrow and see what the pulse is." So

2    those two text messages would be the effect that is being

3    brought on from Exhibit 1845.

4          THE COURT:  All right.  Mr. Feldberg, go ahead.

5          MR. FELDBERG:  Your Honor, the document is hearsay.

6    Ms. Fisher was a witness in this trial called by the

7    government, but her testimony has come and gone.  The

8    government could have asked her about this document had it

9    chosen to.  It chose not to.  And therefore the document is

10   hearsay.

11         THE COURT:  True.  But she is saying it's just the

12   effect on the listener.  Do we have the same issue here, to

13   your knowledge, that we had with 18 -- sorry, 1909?

14         MR. FELDBERG:  I don't think it's precisely the same

15   issue, Your Honor, because Mr. Austin is a recipient of this

16   e-mail.  But this is an example of a problem that has occurred

17   frequently through the trial where the government will call a

18   witness, not use exhibits that reflect communications with that

19   witness, and then after the witness is no longer subject to

20   cross-examination introduce a document that is relevant

21   arguably to the witness.

22         The objection is that the document remains hearsay.

23   There is no particular reason to think it had any effect on the

24   state of mind of any of the recipients, including Mr. Austin.

25   And more fundamentally, our view is that if the government

1    wants to put in communications involving its own witnesses, it

2    should do so when they are on the stand so they can be subject

3    to cross-examination.

4            THE COURT:  Ms. Henry?

5            MS. HENRY:  Your Honor, to be clear, we do view this

6    as a violation of the confrontation rights.

7            THE COURT:  Ms. Pletcher?

8            MS. PLETCHER:  So the so-called effect on Roger

9    Austin, that happened four days later.  That e-mail is being

10   submitted on February 1st.  This e-mail from Sara Fisher is

11   dated January 27, so there is a gap of four days.  It's quite a

12   long time to allege there was some sort of effect on the

13   listener, and I don't think you can make that assumption.

14           THE COURT:  Why would an effect on the listener be

15   time limited, especially if it involves a deadline?

16           MS. PLETCHER:  I understand, but with four days and

17   who knows how many communications that Mr. Austin might have

18   had in those four days, I think it's quite attenuated, and

19   there needs to be a more direct connection between the two.

20           THE COURT:  Ms. Call, go ahead.

21           MS. CALL:  Your Honor, just first to note the

22   confrontation point and cross-examination point, I suppose.

23   This exhibit is on the defendants' exhibit list as E-549, so I

24   am quite certain they are aware of it and had the ability to

25   cross-examine Ms. Fisher on it should they have wished to.  The

1    government can then otherwise choose how it can efficiently

2    present information.  As we saw I believe on the record

3    Wednesday, establishing every contract and every deadline may

4    take some time with a witness where an e-mail may be

5    sufficient.

6            But as to the other points, I would just say that the

7    February 3rd deadline is clearly articulated in here, which is

8    the effect that the government is proposing that this e-mail

9    had, which the effect is then shown through the context as

10   noted on February 1st and then indeed the fact that I believe

11   Pilgrim's did submit its bid on February 3rd.

12           THE COURT:  And there is not any other evidence of

13   that deadline?

14           MS. CALL:  I don't believe so, Your Honor.  I think

15   this is how it was conveyed.

16           THE COURT:  Okay.

17           Anyone else?  Mr. Feldberg?

18           MR. FELDBERG:  Your Honor, I think there has been

19   testimony from Ms. Fisher about the February 3rd deadline, if I

20   recall correctly, but I don't think there is any controversy

21   that there was a February 3rd request for a deadline for that

22   round of bids.

23           MR. LAVINE:  Your Honor, I just want to confirm what

24   Mr. Feldberg said.  Sara Fisher did testify to the deadline.

25   There is no question.  It's in evidence.  She testified to it.

1          *THE COURT:*  Okay.  Then why do we need this one?

2          *MS. CALL:*  As far as the efficient presentation of

3     evidence and the jury's understanding of it, this exhibit and

4     this deadline is summarized on the summary charts that the

5     government has submitted, so it would properly be something

6     that can be summarized.  And I don't believe that the

7     government's case and the government's presentation of evidence

8     in an efficient manner for the jury to understand should be

9     prejudiced just because there is also testimony on the point.

10         *MR. FELDBERG:*  If the point is to establish that there

11    was a deadline, that's been established.

12         *THE COURT:*  Well, I think Ms. Call's point is one that

13    is related to 1006.  So she is saying that, well, we can't --

14    we need to summarize voluminous records through 1006, but I

15    think another issue is why can't a summary mention testimony

16    not under strictly 1006, but incorporating principles under

17    611.  And that I think Ms. Call would believe the issue here,

18    it would seem like given the fact that there has been

19    testimony, it would be an appropriate use of it without having

20    to put another document in that is trying to establish a point

21    made through testimony.

22         Mr. Beller?

23         *MR. BELLER:*  Thank you, Your Honor.  And on that note,

24    I will simply offer a response which is because at that point

25    it would become cumulative.  The purpose of 1006 is to

1    effectively summarize voluminous records, not to create an

2    argument for the government so as to be able to summarize their

3    presentation of evidence in a packaged way that is easily

4    understood by the jury.  And so that would be my brief but

5    respectful response to the Court as to why that cannot be

6    included in a 1006 summary.

7          Your Honor, what I am hearing from the government,

8    however, are two different arguments, and that is they are

9    offering this for the effect on the listener, although I am a

10   little uncertain as to who that listener is at this point,

11   No. 1, while also at the same time, No. 2, saying that they are

12   offering it to show a deadline of February the 3rd, which, as

13   Mr. Lavine and I believe Mr. Feldberg just indicated, has

14   already been established.  So hearsay is not simply that, as

15   the Court well knows, that the declarant is the individual on

16   the stand.  It's rather any out-of-court statement, and it

17   doesn't matter if the declarant is actually -- is on the stand.

18   That statement is still hearsay.

19         Here we have the added issue which Mr. Feldberg

20   identified which is that Ms. Fisher did, in fact, testify.

21   Ms. Fisher had the opportunity to testify as to every single

22   statement in that e-mail or at least the knowledge of that

23   information and deliver that knowledge to the jury.  We believe

24   that she has as to the deadline, and so anything in addition

25   would be inappropriate and is an out-of-court statement offered

1    for the truth of the matter asserted.

2          I also want to note, at least on behalf of Mr. Fries

3    and I believe the others will join, when we are talking about

4    testimony that is being offered for a limited purpose, Your

5    Honor, I think the Court has done a very nice job in indicating

6    that to the jury that it is being offered only for a limited

7    purpose.  But the cumulative effect of all of this is that we

8    are asking a jury to understand extraordinarily complex issues

9    of evidence, and at the end of the day I don't believe it's

10   particularly practical when we are adding limiting instruction

11   on top of limiting instruction to this jury with hundreds, if

12   not thousands, of documents.  And the bottom line is the jury

13   is, in fact, going to review this information for the truth of

14   the matter asserted despite the Court's, I think, very clear

15   limiting instructions otherwise.

16         So I do not believe that effect on the listener is, in

17   fact, an appropriate response as to these documents.  And I

18   don't believe that simply saying it is going to show that

19   somebody did something is an actual strict interpretation of

20   the rule.  Instead, effect on the listener is for the purpose

21   of showing that somebody else had knowledge, notice or

22   awareness, and that their knowledge or awareness is relevant

23   when the probable state of mind of the listener is itself an

24   issue, not simply we want to show that he received this.

25         Thank you.

1          THE COURT:  Ms. Call, go ahead.

2          MS. CALL:  Very briefly, we did review the transcript

3    of Ms. Fisher's testimony.  She did not establish the deadline.

4    She simply stated Claxton's bid was submitted on February 3rd,

5    but we cannot find a reference to the actual deadline in the

6    testimony, so I don't believe this would be cumulative.  I

7    would say it is -- and she also submitted -- testified that

8    Pilgrim's submitted its bid on the 3rd.  But regardless, the

9    non-hearsay purpose is still the same, that as of February 1

10   when Defendant Brady was reaching out to competitors, he was

11   aware of that February 3rd deadline, which is the effect on the

12   listener that we are bringing out here.

13         THE COURT:  So what was the testimony again?  What

14   were the two companies that submitted bids by that deadline?

15         MS. CALL:  Yes.  I will correct myself.  I think I

16   said Defendant Brady a moment ago when I meant Defendant

17   Austin.  The two companies that submitted bids were Pilgrim's

18   and Claxton on February 3rd.

19         THE COURT:  Okay.  Well, given the fact that Pilgrim's

20   submitted by February 3rd, I am not sure of the relevance of

21   knowledge of the deadline.  So what it appears to me is that we

22   have a situation where it's not -- she didn't testify about the

23   deadline, but she did testify as to this particular entity,

24   namely Pilgrim's, that it was submitted by that date.

25             The government wants to introduce this document as a

1    way of then being able to put information into a summary.  And

2    I do think that introducing what is essentially a cumulative

3    document for purposes of adding it to a summary is not

4    something that promotes efficiency; and as a result, I am going

5    to sustain the objection as to this one.  It is hearsay.  And

6    the effect on the listener has already been established because

7    we know it was established by that particular deadline.  We

8    also have information that another competitor submitted by the

9    same date which would inferentially lead to knowledge it was

10   some type of a deadline, so I will exclude this one.

11          MS. CALL:  If we may for perhaps efficiency sake skip

12   a couple documents.  Let me make sure I am saying a couple --

13   to 6235.  It is part of a text message chain that the next

14   documents are in and it is the first one.  So if we may address

15   that perhaps in a group with the others.

16          MR. FELDBERG:  I am sorry, which one?

17          MS. CALL:  6235.

18          THE COURT:  It's a little past the middle of the first

19   group.

20          MS. CALL:  I think it's the same chain as exhibits

21   1846 through 1849, which are the next four.

22          THE COURT:  Any objection to the admission of 6235?

23          All right.  That will be admitted.  You are finding

24   it?

25          MS. CALL:  It's a text message from I believe Tim

1    Stiller and it was part of *James* log entry 243, as were the

2    remaining four documents that we'll get to in a moment.  And

3    the text states, "Is KFC expecting the NHA at no cost"?

4              THE COURT:  Ms. Johnson?

5              MS. JOHNSON:  Your Honor, the government just referred

6    to the remaining four documents.  Could we have some

7    clarification of which four they are referring to?

8              THE COURT:  Sure.

9              MS. CALL:  1846 through 1849 which were all together

10   with Exhibit 6235, the contents of *James* log entry 243.

11             MR. FELDBERG:  I don't think I have an objection to

12   this, Your Honor.

13             THE COURT:  To that series, Mr. Feldberg, or are you

14   just limiting it just to 6235?

15             MR. FELDBERG:  Let me just look through the rest of

16   the documents in that series.

17             MS. HENRY:  Just to be clear, we have no further

18   objections.  We want to preserve the objections from the *James*

19   hearing.

20             THE COURT:  Sure.

21             MR. FELDBERG:  I echo Ms. Henry's comments about that

22   series of documents.

23             THE COURT:  Anyone else?  We are expanding it a little

24   bit.  We are talking about 6235, but also 1846 through 1849 as

25   well.  Okay.  Those will be admitted, co-conspirator hearsay --

1    or co-conspirator exception rather.

2              MS. CALL:  When you say both, Your Honor, do you mean

3    all five?

4              THE COURT:  Yes, as to 6235 and 1846 through 1849.

5              MS. CALL:  I believe Mr. Fagg may have a comment.

6              THE COURT:  Yes.

7              MR. FAGG:  Just before we move to the next exhibit,

8    Your Honor, for the purposes of efficiency, can we note our

9    objections to -- our continuing objections from the *James*

10   hearing for any documents that are on the *James* log for

11   purposes of today?

12             THE COURT:  Any objection to that, Ms. Call?

13             MS. CALL:  To their noting their objection?

14             THE COURT:  Yeah, just to have a continuing objection.

15             MS. CALL:  No, Your Honor.

16             THE COURT:  Okay, great.

17             MR. FAGG:  Thank you, Your Honor.

18             THE COURT:  We will consider it to be continuing for

19   today.

20             Okay.  Next one?

21             MS. CALL:  Next is Government Exhibit 1850.  I will

22   note I believe it is one chain stringing from 1850 to 1862.

23             MR. FELDBERG:  Can you give me a moment to look

24   through the exhibits, Your Honor?

25             THE COURT:  Yes, absolutely.  So why don't we consider

1    those as a chain, so 1850 through 1862.

2          MS. CALL:  Yes, Your Honor.  These were all contained

3    in a group as *James* log 316.

4          MS. PLETCHER:  I believe 1855 is not actually in that

5    sequence.

6          MS. CALL:  I think that is correct.  We'll address

7    1855 separately.

8          THE COURT:  I am sorry, what was that, Ms. Call?

9          MS. CALL:  1855 is to a different recipient, so we can

10   address that after this grouping.  So this would be just 1850

11   through 1854 and 1856 through 1862.

12         MR. FAGG:  Can I ask a point of clarification, Your

13   Honor, on that sequence?

14         MS. CALL:  Let me just read each individual number

15   because I think there may be a couple gaps in the chain.  So

16   1851, 1852, 1853, 1854, 1856, and 1858 and 1862.

17         MR. FELDBERG:  Your Honor, we have no additional

18   objections.

19         THE COURT:  Thank you, Mr. Feldberg.  Anyone else?

20   Then those exhibits will be admitted as co-conspirator hearsay.

21         MS. CALL:  I believe when I just listed it, I may have

22   skipped 1850 which is in that same chain and also in *James* log

23   316.

24         THE COURT:  So it's 1850 through 1856, 1858 and 1862.

25         MS. CALL:  1855 I believe we were addressing

1    separately.

2          THE COURT:  Okay, sorry.

3          MS. PLETCHER:  Your Honor, I believe it's separately

4    1856, 1858 and 1862 and not the intervening numbers.

5          MS. CALL:  Correct.

6          THE COURT:  Yes, right.

7          MS. CALL:  Next would be Government Exhibit 1855.

8    This was contained in *James* log entry 255.

9          THE COURT:  Any objections to 1855?

10         Ms. Pletcher?

11         MS. PLETCHER:  Actually Your Honor, no objection, but

12   I do have a concern that when this is presented to the jury as

13   I expect the government will be doing, that this particular

14   text not be read in sequence with the other texts that we were

15   just discussing because it is a separate text message, and that

16   might be misleading to the jury to insert it in the sequence of

17   other texts.

18         THE COURT:  Ms. Call?

19         MS. CALL:  I believe the government's intention would

20   be to put the text messages in chronological order as they are.

21         THE COURT:  Meaning what?

22         MS. CALL:  Meaning 1855 would be in the middle.  Of

23   course, they will be looking at the text messages and they can

24   see the participants on the header.

25         MS. PLETCHER:  Your Honor, I think that would be again

1    misleading that just because the text happened chronologically,

2    they are two entirely different conversations and different

3    threads.  So I do ask if they, the government, read it to the

4    jury do it separately.

5         MS. CALL:  If I may, the relevance may be confusing

6    here if the jury sees it out of order.  So 20 minutes after

7    this text message from Defendant Stiller to Defendant Penn

8    asking him if he wants a KFC update, 20 minutes later is when

9    Defendant Stiller directs Austin, "Tell industry we are going

10   to hold."  So there is a lot of relevance to the contextual

11   nature of those.

12        MS. PLETCHER:  I disagree, Your Honor.  There is

13   actually no evidence there was any phone call or any meeting

14   following this particular text, so I do think again that it

15   would be highly misleading to situate it with an entirely

16   different conversation just to suggest that there was some sort

17   of connection later on between those two threads.

18        THE COURT:  Mr. McLoughlin?

19        MR. McLOUGHLIN:  Your Honor, I want to join in

20   Ms. Pletcher's objection because going back to Mr. Lavine's

21   point and others, this is a habit which is to try and avoid

22   making an argument by using things like exhibit numbering and

23   presentation to create an inference with the jury when, in

24   fact, the government doesn't -- has not established the

25   foundation for that argument.  And sticking this document in

1    there acknowledging it is a separate text exchange is not an

2    accident.  As the government now reveals, which is no, no, no,

3    we are not saying it's separate, it's actually all in one chain

4    without again any inference or any evidence having established

5    it.

6            And the government is aware, because they have the

7    phone records, there wasn't a telephone call between them that

8    would establish that any communication had occurred nor any

9    other text message or an e-mail.  And this is quite frankly

10    using things like numbering and ordering again without a

11    witness so we can't cross-examine, again without our being able

12    to articulate these distinctions to the jury at the time and

13    create an implied inference that is, in fact, purposefully

14    misleading.

15            THE COURT:  All right.  Response, Ms. Call?

16            MS. CALL:  I believe Mr. Bryant did testify that

17    Mr. Stiller and Defendant Penn work in the same office

18    location, so I don't believe there is a call or a meeting

19    invite necessary to establish that.  As far as the allegation

20    of misleading numbering, as I said, they are numbered by order

21    in time.  And if you look at the Bates numbers in documents,

22    it's actually the same way they were produced by the company.

23    So they are simply numbered in the order that these were

24    received.  And I believe these are from Defendant Penn's phone.

25    They were produced in that order.

1          *THE COURT:*  Mr. McLoughlin?

2          *MR. McLOUGHLIN:*  Yes, Your Honor.  These men had

3   offices next to each other for years.  To imply that that

4   somehow supports a logical inference that they had a

5   communication about this fails the logic that I took in college

6   before I went to law school and fails with respect to law

7   school.

8          The second point is now we have a change in theory,

9   but that one doesn't work.  Their Bates number is identical and

10  they were produced in sequence, so therefore we get, regardless

11  of any logical inference to the jury, we get to number them the

12  same -- we get to number them in sequence exhibits.  Bates

13  numbering and how they happen to be produced is hardly a

14  logical support for using it as sequential exhibits, and that,

15  in fact, has nothing to do with why the government has numbered

16  them this way.

17         *THE COURT:*  It's Mr. Stiller to Mr. Penn.

18         *MS. CALL:*  Correct.

19         *THE COURT:*  I am going to overrule the objections.

20  The bottom line is you wouldn't have testimony from those two

21  people anyway and the bottom line is the government doesn't

22  have to try to avoid those types of things.  There is some

23  logic to what the government is saying.  It would necessarily

24  have to be straightened out and usually -- probably by argument

25  in any event; therefore, the objections will be overruled and

1   1855 will be admitted.

2           Next one?

3           MS. CALL:  Next is Government's Exhibit 1863.  This is

4   a text message from Mr. Stiller again to Defendant Penn.  And I

5   will note this was withdrawn from the government's *James* log.

6   It had been entry 263.  But I will note "Need me" is simply a

7   question not offered for the truth of anything in it.  We are

8   not saying that Defendant Penn did need Mr. Stiller.  And it's

9   also necessary for the context of Mr. Penn's response which is

10  the next exhibit.

11          THE COURT:  Could you put that up to?

12          MS. CALL:  Yeah, 1864, if we could pull that up side

13  by side, please.  And Exhibit 1864 I will note was *James* log

14  item 262 which was ruled on favorably.

15          THE COURT:  Okay.

16          Ms. Pletcher, go ahead.

17          MS. PLETCHER:  Your Honor, we object to this on

18  relevance grounds.  It was not ruled on in the *James* log and

19  the government is not offering it to show that there was --

20  that this was a co-conspirator statement.  There is no

21  relevance grounds that the government has articulated that

22  would justify an exception to the hearsay rule.

23          THE COURT:  Ms. Call?

24          MS. CALL:  To respond briefly, as Ms. Pletcher noted,

25  it wouldn't be on the *James* log because the government is not

1    suggesting it is a statement in furtherance.  Rather, it's

2    context for the text message that Defendant Penn sent three

3    minutes later which was in the government's *James* log.

4         *MS. PLETCHER:*  It's not an exception to the hearsay

5    rule.  If the government is trying to invoke the rule of

6    completeness, that would be improper in this case because they

7    are the ones who are sponsoring this document, so I am not

8    hearing any viable exception to hearsay.

9         *MS. CALL:*  Your Honor, context is an exception for a

10   known hearsay purpose.  The Fourth Circuit has recognized that

11   in *United States v. Wills* in 2003.  Cite for that is 346 F.3d

12   476 saying that statements of third parties are admissible as

13   non-hearsay where they are reasonably required to place

14   responses in context.

15        *THE COURT:*  Ms. Pletcher?

16        *MS. PLETCHER:*  The purpose they are clearly

17   introducing it for is to provide full context for what the

18   government is alleging is a co-conspirator statement.  This was

19   not offered on the *James* log, so the *James* log -- again, Your

20   Honor's determination there has to mean something.  The

21   government could have offered it there.  They didn't.  They

22   appear to be changing their theory here.  And they still can't

23   offer hearsay grounds, so we still maintain our objection.

24        *MS. HENRY:*  Nor is 1864 in any way misleading so it

25   needs some sort of correction.

1        *THE COURT:*  What about Ms. Henry's point?  Why do you

2    even -- I don't quite understand.  This is a separate point,

3    but why do you need 1863 given the fact that 1864 seems to do

4    whatever you conceivably want it to, "Come to BL office.  Let's

5    discuss KFC."

6        *MS. CALL:*  We just included it as relevant context.

7    If defense counsel are going to continue their objections to

8    it, it's not necessarily proving any point that's extremely at

9    issue here.

10        *THE COURT:*  Okay.  Withdraw 1863?

11        *MS. CALL:*  Yes, Your Honor.

12        *THE COURT:*  Okay.  Are we going to talk about 1864

13    now?

14        *MS. CALL:*  Yes.

15        *THE COURT:*  All right, 1864.  Anything more on that,

16    Ms. Call?

17        *MS. CALL:*  No, Your Honor.  I will just note again

18    this was *James* log entry 262.

19        *THE COURT:*  Okay.  Any objections to 1864?

20            All right.  That will be admitted.

21            All right.  1890?

22        *MS. CALL:*  Yes, Your Honor.  The next exhibit is 1890.

23    Let me pull it up.  1890 is an e-mail chain between Robbie

24    Bryant and Tim Stiller.  Starts with an e-mail saying, "Call in

25    about 30 to discuss KFC that work?"  Followed by Mr. Bryant's

1    response, "Ready."  I will note that the, "Call in about 30 to

2    discuss KFC" is simply a question, so it's not something that

3    the government is offering to prove the fact of the matter

4    asserted.  And to the extent that there is an assertion, it's

5    frankly a statement of intent of what the topic of this call

6    would be, so that would be admissible and an exception to the

7    hearsay rule under 803(3).

8         THE COURT:  I assume based on those arguments that

9    this is not on the James log.

10        MS. CALL:  Yes, Your Honor.

11        THE COURT:  Mr. Feldberg?

12        MR. FELDBERG:  First point is it's not on the *James*

13   log, and the Court has addressed that issue previously

14   including the statement that a *James* hearing has to mean

15   something.  Second point is Mr. Bryant was a government witness

16   at this trial.  If there was something relevant about this

17   exchange, obviously the government could have asked Mr. Bryant

18   about it, asked if there was a phone call.  He would have been

19   subject to cross-examination.  And this is essentially creating

20   an impression of some sort of activity that probably is not

21   relevant, but even if it were is no longer subject to

22   cross-examination because Mr. Bryant's testimony has come and

23   gone.  It's a similar argument that we have made with respect

24   to a number of the documents, Your Honor.

25        THE COURT:  Thank you, Mr. Feldberg.

2688

1            Mr. Fagg?

2            *MR. FAGG:*  One point of clarification, Your Honor.

3    Exhibit 1890 was originally on the *James* log and withdrawn from

4    the government.

5            *MS. CALL:*  To put to bed has to be on the James log

6    argument, the government was very judicious in putting

7    documents in the *James* log that it believed to be

8    co-conspirator statements in furtherance of the conspiracy.

9    That does not limit the introduction of relevant evidence that

10   is admissible, including this document.  I think it is going a

11   bit far that defense counsel proposed that every statement that

12   happens to be made by a co-conspirator needed to be on the

13   *James* log.  It's just not the case.

14           This is an extremely relevant e-mail that takes place

15   on the day that KFC bids were due and after the time period

16   that Mr. Bryant did testify about where Defendant Austin called

17   him and provided him what Mr. Bryant believed to be

18   competitors' bid prices, so this is extremely relevant.  It is

19   admissible under 803(3) and is non-hearsay and it should be

20   admitted on those grounds.

21           *THE COURT:*  Mr. Feldberg?

22           *MR. FELDBERG:*  The only basis for admissibility that

23   at least I can discern is as a co-conspirator, and that was the

24   whole purpose of the *James* hearing.  I am not sure I understand

25   Ms. Call's argument that this is relevant for the effect on the

1    listener's mind.  I am not sure why the effect on either

2    Mr. Bryant's mind or Mr. Stiller's mind has anything to do with

3    any issue in controversy here.

4         MS. CALL:  I am happy to correct that because that is

5    not the argument that was made.  It's simply not hearsay.  It's

6    a question and as a statement of intent under 803(3).

7         MR. FELDBERG:  I am sorry, I apologize.  I

8    misunderstood your argument.  But nevertheless, this is at

9    least arguably a co-conspirator declaration.  We had a lengthy

10   hearing over two days to address co-conspirator declarations.

11   This was withdrawn from that proceeding and Mr. Bryant has come

12   and gone.

13        THE COURT:  Ms. Henry?

14        MS. HENRY:  Further, Your Honor, counsel for the

15   government has really only addressed the second part of this

16   statement.  I don't believe the top part has really even been

17   addressed.  It clearly is being offered for the truth of the

18   matter asserted and clearly is hearsay.  The man testified and

19   was available.

20        THE COURT:  Ms. Call?

21        MS. CALL:  I am happy to redact that one word.

22        MR. McLOUGHLIN:  Your Honor, so the record is clear on

23   this, is the government bringing to the deck the entire

24   responsive e-mail?

25        THE COURT:  No, I think just the word "Ready," I

1    think.

2         *MR. McLOUGHLIN:*  Then we get to the question of what

3    is the relevance or exception by which the government wants to

4    keep the blank response where it invites the jury to speculate

5    endlessly about why this word or whatever -- they will know

6    it's a word -- why there was a redaction.  What was so bad that

7    it had to be kept from them?  If the response is hearsay, the

8    entire communication becomes hearsay, not a particular word in

9    that communication, and the fact of the communication in this

10   circumstance becomes inadmissible and irrelevant.

11        The government is once again trying to have it both

12   ways.  Let's just take a little bit and that leaves us all the

13   room we want to argue anything else we want.  The entire thing

14   should be redacted, Your Honor.

15        *THE COURT:*  Ms. Pletcher?

16        *MS. PLETCHER:*  Thank you, Your Honor.

17        And following up on Mr. McLoughlin's point, the

18   statement, "Call in about 30 to discuss KFC that works," it

19   seems pretty clear that the government is trying to introduce

20   that for the truth of that statement, that there was a call in

21   30 minutes or at least to suggest that.  And they have said

22   that this is for the effect on the listener, but it seems

23   pretty clear that that's not.  You have to accept the truth of

24   the statement in order for it to have any meaning.  That's

25   problematic.  There is no hearsay exception.

1          *THE COURT:*  Ms. Call, anything else?

2          *MS. CALL:*  No, Your Honor.  I think -- well, yes, Your

3     Honor.  Very briefly, I think, you know, there is some sort of

4     implied assertion in any statement of intent, but that doesn't

5     belie rule 803(3).  And the fact just because you are stating

6     your intent may imply that that may happen does not take away

7     the fact that that is a real hearsay exception, and with the

8     fact these people believed they would be having a call in 30

9     minutes to discuss KFC is exactly the kind of communication

10    that that rule gets to.

11         *THE COURT:*  I am going to sustain the objections.  For

12    one thing, it really is true that the *James* hearing has to have

13    some meaning, and the fact that we spent so much time on this

14    one document proves the point.  We are spending time in the

15    trial when we could have been spending time outside of trial.

16    And we've got a clock going on in this trial and it's going to

17    be done by December 21st, so that is one thing.

18         But I think that simply taking out the word "Ready"

19    would not solve anything either because it then -- I am not

20    sure what the justification would be for the lower part to be

21    non-hearsay, so I will sustain the objection.  I will exclude

22    1890.

23         Next one?

24         *MS. CALL:*  I believe I misplaced my list, but I

25    believe the next one is 1894.

1          *THE COURT:*  That's correct.

2          *MS. CALL:*  I will note very briefly just with this

3  *James* hearing issue, it's the government's position that much

4  of the time would apparently be unnecessary given the majority

5  of these documents were on the government's *James* log, so we

6  apologize for any time needed for statements by co-conspirators

7  that may not be in furtherance but otherwise would be

8  admissible, but the vast majority are on the *James* log.

9          So 1894 is an e-mail from Tim Stiller to Robbie

10  Bryant, and this was on the *James* log entry 261.

11          *THE COURT:*  Any objection to 1864?

12          Mr. Feldberg?

13          *MR. FELDBERG:*  Yes, Your Honor.  It's a similar

14  argument to the objection we made to 1890.  There is nothing --

15  there is the potential for misleading here because there is no

16  evidence that a call actually took place.  The government could

17  have established that a call took place or didn't because it

18  had one of the people on this exchange on the witness stand,

19  Mr. Bryant.  To the best of my recollection, that question was

20  not asked.  The question of whether or not there was a call was

21  not established, if I am misremembering.  I am happy to be

22  corrected, but that's my recollection.

23          Given the fact that if I am correct that either

24  duplicative if the fact was established through testimony or if

25  it was not, then the opportunity to test whether a call

1    happened has come and gone.  And our view is the government

2    should not be able to introduce the document at this time when

3    they had a witness here who could have established whatever

4    happened.

5             THE COURT:  Any other objections?

6             Ms. Call, anything from you?

7             MS. CALL:  No, Your Honor.  I'll just state none of

8    that changes the fact that this is admissible under

9    801(d)(2)(E).

10            THE COURT:  Objection will be overruled.  This will be

11   admitted as an exception to the hearsay rule, co-conspirator

12   statement.

13            MS. CALL:  I have retrieved my list.

14            The next document should be 1615, 1615.  We are

15   switching time periods here.  1615 is a text message between

16   Defendant Fries and Defendant Brady in 2013.  It was contained

17   in *James* log entry 43 which was ruled on favorably.

18            THE COURT:  Any objections to the admission of

19   Exhibit 1615?

20            MR. BELLER:  May we have just one moment, Your Honor?

21            THE COURT:  Absolutely.

22            MR. BELLER:  Your Honor, I am not going to belabor

23   rulings the Court already made in the *James* hearing, but based

24   on the testimony of Mr. Ledford and the evidence that was

25   presented before the jury, and that is that the reduced weight,

1   the request to reduce the size of the birds was an

2   impossibility, it couldn't be done.  And based on the fact that

3   it simply could not be done, I don't see how this particular

4   text message can advance a conspiracy.  And that is Mr. Ledford

5   was saying this was a research project, can it be done, and a

6   discussion between Mr. Brady and Mr. Austin that the answer is

7   no, they are in agreement with us, I believe is simply not

8   relevant to an underlying conspiracy, and for that reason we

9   would object.

10          THE COURT:  All right.  Mr. Feldberg?

11          MR. FELDBERG:  I have an additional objection, Your

12  Honor.  This exhibit is dated I think March 8th of 2013.  The

13  testimony of Mr. Ledford established that on February 27th,

14  2013, a little more than a week before this, Mr. Austin told

15  Mr. Ledford that -- am I misreading the date?

16          THE COURT:  Yeah, it appears to be a different time

17  period.

18          MS. CALL:  I believe Mr. Feldberg may be correct.

19  It's March 8th and I think it's in European time on the

20  document.

21          MR. FELDBERG:  That would make sense, Your Honor.

22          THE COURT:  Okay.

23          MR. FELDBERG:  A rare moment where the government

24  thinks I'm right.

25          THE COURT:  Go ahead.

1          MR. FELDBERG:  Please continue in that vein.

2          The testimony of Mr. Ledford established that a little

3   more than a week before this on February 27th, Mr. Austin

4   responded to an individual inquiry from Mr. Ledford on this

5   exact subject by saying Pilgrim's had no capacity to produce

6   the smaller bird.  Therefore, there can't possibly be any

7   collusive conduct because Mr. Austin was asked earlier whether

8   Pilgrim's could do this and he said no long before there was

9   any discussion with Mr. Brady or anybody else.

10          THE COURT:  All right.

11          MS. CALL:  I will address that twofold.  First I will

12   point Your Honor to a 10th Circuit case, *United States v.*

13   *Reicher*.  It's R-E-I-C-H-E-R.  And maybe I will be able to

14   follow up with an actual citation, but it has the proposition

15   that the impossibility to rig bids is no bar to the crime.  So

16   the fact there that this text message saying "I talked to Roger

17   about the KFC sizes and he is in agreement with us," there was

18   an agreement reached as to whether these companies, whether it

19   was possible or not, would agree to KFC's request for a reduced

20   size bird does not bar the fact that this would actually be

21   price-fixing or bid-rigging.

22          And I will note regarding the research project,

23   Mr. Ledford did testify that this was a serious request and not

24   that he was --

25          THE COURT:  I am sorry?

1      MS. CALL:  That it was a serious request and he did

2   want to actually know what the cost was to supply this reduced

3   size bird.

4      THE COURT:  Mr. Beller?

5      MR. BELLER:  Very briefly.  Only that the case cited

6   by the government premises or concludes that there was, in

7   fact, a bid.  My point here is that based upon the testimony of

8   Mr. Ledford, which I don't believe there is going to be any

9   additional testimony on this subject, there was no request for

10  a bid.  There was simply a request of can this be accomplished

11  or can it not be accomplished, and if it can be accomplished,

12  what would be the price.  The answer back to Mr. Ledford is it

13  can't be accomplished.  So therefore it's not a bid, and

14  because it's not a bid, I don't believe it goes to an element

15  of the Sherman Act and therefore is not relevant.

16     THE COURT:  What did Mr. Ledford say about -- he was

17  okay with suppliers talking about some logistical details in

18  order to produce the birds.  Perhaps he had talked about

19  building sizes or some other things of that nature, I don't

20  quite recall, but how -- why would this necessarily -- this

21  statement necessarily imply that they weren't doing what he

22  thought was fine?

23     MS. CALL:  I believe Mr. Ledford was quite clear that

24  he did not want the suppliers discussing pricing that would be

25  offered to him.  While this was a request for a reduced size

1    bird, the request was what would the cost be for us to attain

2    that, so this is a request for pricing.

3              I hear Mr. Beller saying this is not a bid.  First, a

4    bid is not an element of a Sherman Act violation and not

5    everything standing alone has to be a violation in the first

6    place.  This is entirely relevant conduct and collusion

7    regarding pricing which is really what actually a Sherman Act

8    violation is.  It's an agreement as to price.  And this seems

9    to be really just that.

10             MR. BELLER:  Your Honor, to answer the Court's

11   questions directly, I believe on direct examination the

12   question was:  Did you expect them to talk?

13             I believe that his answer was initially:  No.

14             On cross-examination he was impeached with that answer

15   and he admitted that.  He had advised the government, as well

16   as the jury, that he certainly would not be surprised if they

17   spoke.  And his testimony is that he considered the request to

18   be both outrageous and laughable, both words coming directly

19   from the witness stand.  While he did say it was a serious

20   request and he wanted a serious answer, he also believed it was

21   impossible, outrageous and laughable.

22             MR. FELDBERG:  Your Honor, this isn't a discussion

23   about pricing.  As Mr. Beller noted, this is a discussion about

24   whether it's possible to create a bird of this particular size.

25   They haven't gotten to pricing.  They never got to pricing

 1    because on February 27th Pilgrim's responded it was not and

 2    others responded whenever they did respond.  The issue never

 3    got to pricing.

 4         MS. CALL:  If I may just follow up on the portions of

 5    the record Mr. Beller quoted.  I apologize we were a little

 6    slower in pulling it up.  On redirect, so after the direct and

 7    cross-examination, Mr. Ledford was asked precisely about his

 8    request contained in Government Exhibit 1607 and 1601.

 9         He was asked:  Did you ask any of the chicken

10    suppliers to communicate with one another about the request

11    that we just looked at?

12         His response was:  No.

13         Then he was asked:  Did you -- did anyone ever -- did

14    any of the chicken suppliers ever tell you that they were

15    communicating about their request?

16         He responded:  No.

17         He was then asked:  Did Roger Austin or Scott Brady

18    ever tell you they were in communication with each other about

19    the request?

20         He said:  No.

21         Then he was asked:  Would you have expected them to be

22    in communication with each other about your request?

23         He said:  No.

24         Then he was asked:  Why not?

25         And he said:  I think the information I was looking

1    for was specific to each company.

2              And he goes on.

3              It would not have been my expectation that they would

4    have talked about it.

5              Then he was asked:  In your view would it have been

6    appropriate for them to be communicating about that?

7              And that question was sustained, so there was not a

8    response to that.

9              MR. FELDBERG:  The fact of the matter remains that is

10   Mr. Ledford testified the Austin response from Pilgrim's was on

11   February 27, long before this.  And if we look at the text of

12   the e-mail itself, I talked to Roger about the KFC sizes, not

13   pricing, sizes.  This is a discussion, if it happened, about

14   sizes, not pricing.

15             THE COURT:  All right.  The objections will be

16   overruled.  This is -- obviously, you can interpret this in a

17   number of different ways.  It's not without ambiguity.  But

18   there is some probative value from the government's

19   perspective, although as Mr. Feldberg says, it talks about

20   sizes, but the sizes, of course, and we know from some of the

21   e-mails, and this is what Mr. Ledford was looking for, broke

22   down into pricing.  It was, you know, whether or not they could

23   pull it off, what the cost would be.  So I do think that it is

24   indeed relevant; and as a result, I will overrule the

25   objections on 1615 and it will be admitted.

1        Why don't we go ahead and take our break.  Do you want

2   20 minutes?  It doesn't matter to me.  We have a little bit

3   fewer people.

4        MR. TUBACH:  I think 15 is probably going to suffice.

5        THE COURT:  All right.  We will have a 15-minute

6   break.  We will plan on reconvening 25 minutes of 11:00.

7        The Court will be in recess.  Thank you.

8     (Recess at 10:20 a.m.)

9     (Reconvened at 10:35 a.m.)

10       THE COURT:  Back on the record.  Mr. Byrne, go ahead.

11       MR. BYRNE:  Yes, Your Honor.  Thank you for your

12   order.  I would just note that in the government's motion, they

13   also withdrew their opposition to our objection to dismissing

14   Count Two without prejudice.  Previously Your Honor had ruled

15   that Count Two would be dismissed without prejudice, but they

16   are withdrawing that objection now.  So we would ask that Count

17   Two, which was the false statement count, now be dismissed with

18   prejudice consistent with the government's request in that

19   motion.

20       THE COURT:  That's true.  But the government didn't

21   move to do that.  It provided -- it made that statement.

22       MR. BYRNE:  I would move, then.

23       THE COURT:  Well, the government typically would be

24   the movant.  The government previously had asked for something

25   different.  If the government wants to in writing move to

1    dismiss Count Two with prejudice, I'll rule on that for sure.

2    And maybe the government will since it's indicated no intention

3    of ever prosecuting Mr. Little as to that, but that was the

4    nuance there why I did not dismiss Count Two with prejudice.

5             MR. BYRNE:  Can I ask if Mr. Koenig would do that

6    orally on the record, make the motion?

7             MS. CALL:  I am happy to do it since he has a box in

8    his lap at the moment.  We would file such a motion.

9             THE COURT:  Yeah, that's fine.  I wouldn't do that.  I

10   don't like to dismiss counts orally, so the government has

11   indicated it's going to file a motion.  And I will rule on that

12   motion obviously, Mr. Byrne, okay?

13            MR. BYRNE:  Thank you.

14            THE COURT:  Great.  Let's continue.

15            MS. CALL:  The next document is one we addressed

16   briefly on Wednesday and that's Government Exhibit 1700.  And

17   Your Honor had reserved ruling on that to provide the parties

18   adequate notice to address the one sentence in the top.

19            And if Ms. Grimm, I believe we have the government

20   ready to be published.  We just need the government's computer

21   switched.

22            If I can remind the Court, Exhibit 1700-1 containing

23   the underlying e-mail has already been admitted into evidence.

24   The only issue at this time is the top e-mail in Exhibit 1700.

25   Would you like some argument on it from the government?

1          *THE COURT:*  Yes.

2          *MS. CALL:*  As counsel I believe noted on Wednesday,

3    Your Honor did previously rule on this in the *James* log.  It

4    was entry 73.  And you ruled that this was not a statement in

5    furtherance of the conspiracy.  Nevertheless, it is admissible.

6    It's basically essentially what Rule 803(3) gets to.  It is a

7    statement of intent saying, "FYI, I will make some calls."

8          It is entirely within the scope of that rule to use a

9    statement of intent such as this to prove those calls, although

10   I will note that they are also in evidence, the calls

11   themselves are in Government Exhibit 8003.  But essentially

12   this is almost the exact kind of statement that was addressed

13   by the Supreme Court in *Mutual Life Insurance v. Hillmon*, which

14   is 145 U.S. 285, which all the counsel in this room may be

15   familiar with as the basis for the creation of Rule 803(3).

16         It involves a statement by a victim saying they were

17   going to meet Angelo, which was used as proof of the fact that

18   that meeting did occur, which is essentially the exact same

19   situation we have here, a statement of intent going to make

20   some calls used as proof of that intent, as well as the calls

21   themselves.

22         *THE COURT:*  All right.  Any objections to

23   Exhibit 1700?

24         Mr. Beller.

25         *MR. BELLER:*  Your Honor, I believe this has already

1   been discussed at length, so I won't get into further detail

2   although to say I do believe this is hearsay.  The Court

3   specifically found that this was not a statement in furtherance

4   of the conspiracy under 801(d)(2)(E).  To the extent that it is

5   admissible, I would ask for a limiting instruction as to

6   Mr. Fries, and I assume that the other co-defendants would join

7   in that.

8           THE COURT:  All right.  Anyone else?

9           MR. FELDBERG:  Other than to say we would join in the

10  objection.

11          THE COURT:  Yeah, and that's implied as we've talked

12  about before.

13          Ms. Call?

14          MS. CALL:  Yes, Your Honor.  I think it's the same

15  argument.  This is simply not offered for the truth and it's

16  also under an exception 803(3).  As I said, Government

17  Exhibit 8003 establishes the truth.  So the point of this is

18  essentially the intent that Mr. Brady articulated that he would

19  make some calls, which makes it admissible against all 10

20  defendants under 803(3).

21          MR. BELLER:  Your Honor, I would simply note that the

22  statement of the government is that it is not being offered for

23  the truth.  It is only being offered to show that he is, in

24  fact, and did, in fact, make calls which is offered for the

25  truth by statement.  I see Ms. Call shaking her head

1    frantically.  Go ahead.

2         *MS. CALL:*  I believe my statement was it was his

3    intent to make calls, not that the calls occurred.  There is

4    other evidence already in the record that the call did occur.

5    I will note it's also relevant for Defendant Fries' knowledge

6    of Mr. Brady's intent.

7         *MR. BELLER:*  So the point that I was trying to make,

8    Your Honor, is that the argument that's presented by the

9    government is, in fact, truth of the matter asserted.  She is

10   just not using those specific words.  But the argument as to

11   why it should come in as an exception to hearsay is because it

12   is being offered for the truth of the matter asserted which is

13   by definition hearsay.

14        *THE COURT:*  Anything else, Ms. Call?

15        *MS. CALL:*  No.  I think we may just be splitting hairs

16   as to what intent is.  But regardless, under 803(3) it is an

17   exception to the hearsay rule that would allow this to come in

18   for the truth of the matter regardless.

19        *THE COURT:*  I am going to sustain the objection on

20   hearsay grounds.  I think essentially Mr. Beller is right.  The

21   intent is actually just the statement, "I will make some

22   calls."  If you try to penetrate that and then ask what your

23   mental state was, I mean, everyone has a mental state beyond

24   any type of a statement.  Essentially what this would be coming

25   in for would be to prove that he is going to make some calls

1    and that's what this statement is.  I don't think that 803(3)

2    gets a state of mind exception, would allow that particular

3    statement to reflect the state of mind, and as a result, I am

4    going to sustain the objection as to hearsay.

5            MS. CALL:  Very briefly because I think this may come

6    up more, I would just point Your Honor to *Mutual Life Insurance*

7    *v. Hillmon* because I think that is the actual purpose of 803(3)

8    that such a statement of intent or motive or plan can be used

9    to prove the fact that that actually did occur and that was

10   followed through on.  I think the one exception that 803(3)

11   does provide is you can't have a statement of, you know, belief

12   that is used to prove the basis for that belief, which is not

13   what is being done here and not that exception carved within

14   the exception that is in 803(3).

15           THE COURT:  All right.  Next one?

16           MS. CALL:  Next is Government's Exhibit 1713.

17           MR. FELDBERG:  We have no objection, Your Honor.

18           MS. CALL:  I apologize.  On the last document, Your

19   Honor, were you sustaining the objection in entirety, because I

20   believe there is also a basis under 801(d)(2)(A) against

21   Defendant Brady and some defendants have requested a limiting

22   instruction.

23           THE COURT:  Let's go back to that.  I don't recall

24   that well what we talked about on Wednesday regarding 1700.

25           MR. FELDBERG:  Your Honor, may I make an additional

1    comment on 1713?

2         THE COURT:  Let's hold that for just a second because

3    Ms. Call wanted to go back to 1700.  I think she is referencing

4    something we talked about on Wednesday which I am not really

5    recollecting.

6         MS. CALL:  I apologize.  I don't believe it was talked

7    about Wednesday.  I believe at the beginning of the objections

8    here defendants noted that if Your Honor was going to admit it

9    against Defendant Brady, that there be a limiting instruction.

10   And this would be entirely proper under 801(d)(2)(A) as a

11   statement of Defendant Brady.

12        THE COURT:  Yeah, that is true.  So 1700, the top part

13   of it, because the bottom part has already been admitted as

14   1700-1, the top part will be admitted as to Defendant Brady

15   only because it is a statement of a party opponent.

16        MR. BELLER:  If I may briefly.  I understand the

17   Court's ruling.  I also understand that I specifically said if

18   it's going to come in, I would request a limiting instruction,

19   but I do so still with both the concern as well as the very

20   polite objection that I believe that the limiting instructions

21   themselves and this evidence coming in to whatever extent it is

22   probative of some point as to one defendant, I do believe it is

23   prejudicial as to the others as is a limiting instruction which

24   does not cure that prejudice.  So I understand the Court's

25   ruling, but I do want to continue to object to the giving of

1    limiting instructions for these reasons.

2         THE COURT:  Yeah, and I understand the point.

3    Unfortunately, were that to be true, we would essentially be

4    ground to a halt because as to any given exhibit, there may be

5    limiting instructions.  I understand that in a long trial one

6    would other about that, but there is a presumption that the

7    jury does follow those instructions; and as a result, I will

8    overrule that objection.

9         MR. BELLER:  Understood.

10        One second, Ms. Call.

11        Do you mind putting 1700 back up just for one second?

12        MS. CALL:  Yes, Your Honor.  Okay.

13        THE COURT:  Next exhibit?

14        MS. CALL:  That would bring us back to Exhibit 1713,

15   and I believe Mr. Feldberg wanted to be heard.

16        THE COURT:  Yes.

17        MS. PLETCHER:  On 1713 we object to this document.  It

18   is not listed on the *James* log.  We believe that it is hearsay

19   and for that reason we object.

20        THE COURT:  All right.

21        MS. CALL:  I am happy to address this perhaps e-mail

22   by e-mail in this chain, if that makes sense.

23        THE COURT:  Go ahead.

24        MS. CALL:  The bottom e-mail from Mr. Ledford

25   essentially offered not for the truth, but rather the effect on

1    the listener, i.e., what's shown in this very e-mail here that

2    the e-mail motivated Defendant Austin to do some scouting.  The

3    middle e-mail along the lines we were just talking about would

4    be an 803(3) statement of intent that Defendant Austin would do

5    some scouting.  And then the top e-mail is also quite honestly

6    not offered for the truth.  "There you go disappointing Mike

7    again," so it's simply just non-hearsay.

8           MS. PLETCHER:  Your Honor, I think it is quite clear

9    that each of these statements certainly are being offered for

10   the truth.  Mr. Ledford's statement that he was disappointed, I

11   think that is clearly a statement the government is trying to

12   put out there to express that he was disappointed and he was

13   looking for different types of pricing.  There is a next layer

14   in here, Mr. Austin's response that he was going to do some

15   scouting.  Again, the government is clearly offering that for

16   the truth that he is going to go do some scouting, whatever

17   that means, but that is the basis for putting this in in the

18   first place.

19          THE COURT:  Yeah, I am sure that the government

20   intends to admit it against Mr. Austin for the truth of the

21   matter asserted, so that wouldn't be something that the

22   government was trying to admit otherwise.

23          MS. CALL:  I will note that Defendant Austin's

24   statement would be both the 803(3), so admissible against

25   everyone, as well as 801(d)(2)(A), a statement of his own.

1          *MS. PLETCHER:*  The statement at the top I don't

2     understand the relevance, then, if it's not being admitted for

3     the truth, disappointing Mike, the relevance of that statement.

4          *THE COURT:*  Response?

5          *MS. CALL:*  Simply relevant as context.

6          *THE COURT:*  Context to what?

7          *MS. CALL:*  Context of the conversation.  You know, I

8     don't think we have a particular purpose with that top e-mail.

9     That's simply what the e-mail contains.  We are happy to redact

10    that statement if Your Honor believes it's hearsay, but it's

11    not being offered for the truth.

12         *THE COURT:*  Ms. Pletcher, not on that last point, I

13    think I know enough on that, but anything else?

14         *MS. PLETCHER:*  Yes.  To the extent that the statement

15    by Mr. Austin is being admitted under 801(d)(2)(A) if that is

16    what the government intends to do, I would ask for a limiting

17    instruction.

18         *THE COURT:*  The government is not.  I think it's

19    admitting that, as Ms. Call just mentioned, against all the

20    defendants as a co-conspirator statement.

21         *MS. PLETCHER:*  Then I would just note that that was

22    not admitted on the *James* log.  And to get back to our

23    discussions we have had again throughout the day today on

24    statements not admitted on the *James* log.  That was not

25    mentioned at all on the *James* log, and to the extent it's being

1    offered under 801(d)(2)(E), I don't think the government has

2    established sufficient foundation.

3            THE COURT:  Okay.  Mr. McLoughlin, go ahead.

4            MR. McLOUGHLIN:  Your Honor, one of the issues with

5    this exchange and others, and I want to bring it up because I

6    think it's something that's going to occur, is that the

7    government is stretching the effect on the listener when it

8    comes to e-mail beyond the original purpose and the current

9    purpose of the exception because those cases talking about the

10   effect on the listener, there is simply no debate about the

11   real world action taken by the individual about whom the effect

12   is at issue.  Here what we have is an argument that is shown to

13   be effect on the listener where they are also relying on a

14   hearsay statement from the listener, which is the responsive

15   e-mail, to show what that effect might have been.

16           THE COURT:  Sorry, Mr. McLoughlin.  Are you now

17   talking about the top e-mail?

18           MR. McLOUGHLIN:  The middle one, Your Honor, the

19   Austin e-mail, saying I will do after I check around.  So what

20   you then have is that statement is not hearsay because the

21   hearsay statement that follows is in some way demonstrated that

22   it may have had an effect on the listener and therefore they

23   both wind up coming in.  Again, all of those cases where it's

24   the effect on the listener, the listener does something in the

25   real world that is in evidence.  And so you have this -- the

1    government is creating a circular loop where they are using an

2    argument that some hearsay fact establishes that there may have

3    been an effect on the listener so they get another hearsay

4    statement in.

5            And I think under the concept of the original rule,

6    which was I think very well stated by Mr. Beller earlier, it

7    was not intended to have that kind of circularity.  It is the

8    real world event that is not in issue which gives the indicia

9    of reliability that brings you back to saying, okay, well,

10   that's not the purpose.  Here where you have both you don't get

11   that.  I would argue that the government is again for all of

12   these cases trying to create a universal exception for the

13   effect on the listener and they have simply overstretched the

14   rule.

15           *MS. CALL:*  First, I may be mishearing a bit, but I do

16   think effect on the listener and 803(3) are being conflated a

17   bit.  The first e-mail is being offered for the effect on the

18   listener.  That effect is proven in two ways; first, the real

19   world statement here of Mr. Austin's intent to do some scouting

20   which is admissible under 803(3).  Second, I will point to

21   documents also in evidence which is Government Exhibit 1733

22   showing the very next morning Defendant Brady and Defendant

23   Austin speaking, so that the effect that we are arguing

24   occurred actually did occur in those phone calls.

25           *THE COURT:*  Okay.  I am going to sustain the objection

1    given the fact that this was not on the *James* log and we are,

2    once again, wasting a lot of time on this particular thing.  I

3    think that the bottom half of the e-mail doesn't have to be

4    admitted for the truth of the matter asserted.  It could rather

5    just help explain why Mr. Austin responded to it.  The top part

6    seems completely irrelevant.  But in any event, I am going to

7    exclude it based upon the fact that could have, should have

8    been on the *James* log.

9          MS. CALL:  Your Honor, would you admit it under

10   801(d)(2)(A) against Mr. Austin?  I suppose I could personally

11   use some clarification.

12         THE COURT:  Yes, it can be admitted for that purpose.

13   But once again, the top part just seems completely irrelevant,

14   and I think you conceded that.  But Mr. Ledford's statement can

15   be admitted not for the truth of the matter asserted, but

16   rather just for the effect on the recipient, namely Mr. Austin

17   Mr. Austin's statement can be admitted against him only.  And

18   the top part of it doesn't seem to be relevant, as you said.

19         MS. CALL:  Just so I understand so I don't duplicate

20   arguments on future exhibits, Your Honor, is it Your Honor's

21   belief that documents that could be considered 801(d)(2)(E)

22   cannot come in under other hearsay exceptions such as 803(3) or

23   is it that this specific document doesn't meet the requirements

24   of 803(3)?

25         THE COURT:  This doesn't meet 803(3).  Once again, the

1    government's theory on 803(3) is so expansive that there is

2    virtually no limit to it.  I haven't heard the limiting

3    principle.  Usually those are just contemporaneous -- if you

4    are talking about state of mind, for instance.  Is that what

5    you are talking about?

6         MS. CALL:  Yes, the statement of intent which is

7    specifically, I believe, included in the language of 803(3).

8         THE COURT:  Well, you know, what statement doesn't

9    have a statement of intent in it?  I just don't see it here.  I

10   mean, you know, if anytime anyone would express a statement

11   that he or she might do something in the future, I don't think

12   that that's the intent of the rule that that then all comes in.

13   Instead, I think that it would clearly come in just as a -- you

14   know, that's really for the truth of the matter asserted that

15   he's going to do some scouting.

16        So I reject that particular hearsay exception which

17   otherwise perhaps could come in against everyone, but I do

18   believe that it can come in just against Mr. Austin; for the

19   Ledford, not for the truth of the matter asserted; and the

20   Austin statement, just as to Mr. Austin.

21        MR. BELLER:  Your Honor, I think implicit in that

22   ruling is that there will be a limiting instruction as to the

23   other defendants; is that correct?

24        THE COURT:  Not as to the other defendants by name,

25   but rather can only be considered against Mr. Austin.

1        *MR. BELLER:* Very good.  Thank you.

2        *MR. FELDBERG:* Your Honor, when you give that

3   instruction, could you say rather than against Mr. Austin as

4   relevant to Mr. Austin or as to Mr. Austin, words to that

5   effect?

6        *THE COURT:* Response, Ms. Call?  Any suggestion on how

7   you think that should be worded?

8        *MS. CALL:* Yes.  I suppose the language of

9   801(d)(2)(A) is that the evidence is offered against the party.

10  So I think it would be in line with 801(d)(2)(A) to use the

11  word against.  That's simply what evidence is being offered for

12  in a criminal trial.

13       *MR. FELDBERG:* Well, really the thrust of the rule, at

14  least as I have always understood it, is that it's admissible

15  as to a particular defendant.  And since there are aspects of

16  particularly this document that we consider positive for

17  Mr. Austin, we would ask the Court to consider a more neutral

18  way of phrasing.

19       *THE COURT:* Yeah, I am going to reject that.  I think

20  as Ms. Call said, the reason the government is offering it is

21  against Mr. Austin, so that would be the purpose for which it

22  can be used.

23       Okay.  Next document?

24       *MS. CALL:* Next exhibit is Government's Exhibit 1734.

25  This is a text message chain between Defendants Fries and

2715

1   Brady.  And it was contained on the Government's *James* log,

2   entry 309, and was ruled on favorably.

3           *THE COURT:*  This is 1734?

4           *MS. CALL:*  Yes, Your Honor.

5           *THE COURT:*  Any objection to 1734?

6           Mr. Beller?

7           *MR. BELLER:*  Your Honor, I continue to object to this

8   as both hearsay, recognizing that my client is listed on here,

9   but also as to relevance.  Your Honor, I think the

10  uncontroverted testimony is that knowing a back price or

11  knowing a dark price without knowing the COB price does little

12  to no good and it is only formulaic.  So I believe this is

13  going to be unfortunately misinterpreted by the jury.  Given

14  the fact that knowing a formula price does not allow an

15  individual to be able to or facilitate the commission of a

16  Sherman Act violation, I do believe that this is not relevant,

17  risks confusing the issues and confusing the jury.  And for

18  those reasons, I am objecting.

19          *THE COURT:*  Thank you.

20          Ms. Call, response?

21          *MS. CALL:*  I believe it is quite clear on the record

22  from the numerous contracts that have been entered into

23  evidence that the dark meat price was based on this back

24  moment, so it is certainly fixing a part of price when you are

25  fixing the dark meat, you know, amount back, being that

1    subtraction that we've learned about.

2         And I will point you to the Supreme Court case on that

3    point that fixing a part of price is price-fixing would be

4    *Socony Vacuum*, S-O-C-O-N-Y, V-A-C-U-U-M.  I will also note the

5    evidence thus far about tracking current pricing, Mr. Bryant

6    did testify that Defendant Austin had told him that he had been

7    monitoring current pricing of competitors for many years such

8    that the calls between Defendant Brady and Defendant Austin at

9    this time, Austin would have had the information necessary to

10   even calculate that specific price based on at least an amount

11   back from the current pricing.  So I don't believe that

12   argument exactly flows that this is only in relation to a small

13   component of price when the competitors did have the means to

14   calculate off of current pricing a change.  But I think

15   regardless that the main argument would be this is fixing a

16   component of the price.

17        THE COURT:  All right.  Anyone else?

18        The objection will be overruled.  This chain of text

19   messages I understand on dark meat, even though there may be

20   some formulaic aspect to it, nonetheless, it was something that

21   was negotiated and it is relevant.  I will overrule the

22   objection and it will be admitted as co-conspirator statements.

23        Next one?

24        MS. CALL:  Next is Government's Exhibit 920.  920 is

25   an e-mail chain between -- well, starting with an e-mail from

1    Meyer Skalak of Chick-fil-A and going on to include e-mails

2    involving Defendant Penn, Defendant Lovette and Justin Gay.

3    This was contained on the government's *James* log as *James* log

4    entry 97 which received a favorable ruling.

5              *THE COURT:*  All right?  Objections to Exhibit 920.

6              *MR. BELLER:*  If we could have one moment, please.

7              *THE COURT:*  Yes.

8              *MR. BELLER:*  Your Honor, I am not seeing anybody

9    objecting.  Since I asked for a moment, I wanted to let the

10   Court know.  Thank you.

11             *THE COURT:*  All right.  Exhibit 920 will be admitted.

12             Next one?

13             *MS. CALL:*  Next is Government's Exhibit 982.  This is

14   a text message chain between Defendant Brady and Defendant

15   Fries.  This was on the government's *James* log as entry 100 and

16   received a favorable ruling.

17             *THE COURT:*  Any objections to 982?

18             *MR. FAGG:*  Just one moment, Your Honor.

19             *THE COURT:*  Yes.

20             *MR. BELLER:*  Your Honor, I do object and I object

21   under 404(b).  Your Honor, the 2015 CFA contract price is not

22   alleged anywhere in the Indictment or the Superseding

23   Indictment.  I understand the Court's prior ruling regarding

24   the fact that the government has alleged in Count One simply a

25   price-fixing, and therefore, generally speaking, anything and

1    everything that may, I guess, involve that is admissible.  I

2    would respectfully disagree with the Court's order noting that

3    we had asked for a bill of particulars.  The government argued

4    successfully that we were not entitled to a bill of particulars

5    because the government instead provided a superseding

6    indictment -- excuse me, a speaking indictment.

7          Your Honor, given the fact that this text exchange at

8    best is dealing with the contract that is not mentioned in the

9    Indictment in any way nor I believe has there been testimony

10   about this fact pattern, I do believe this is 404(b).  The

11   government had the opportunity to list additional incidents in

12   their 404(b) notice and this particular exchange was not

13   included.  And for that reason I would ask that it be excluded.

14         MS. PLETCHER:  And, Your Honor, to Mr. Beller's

15   objection I would add there was no mention in the *James* log of

16   any statements related to price-fixing or bid-rigging with

17   respect to the CFA 2015 contract.

18         MS. LaBRANCHE:  Your Honor, for all the reasons just

19   stated, I would also object under 403.  I think this is going

20   to confuse the issues for the jury.

21         THE COURT:  Ms. Call?

22         MS. CALL:  As Your Honor previously noted, the

23   Indictment charges a price-fixing conspiracy beginning as early

24   as 2012 through at least as late as 2019 for the sale of

25   broiler chicken products of which Chick-fil-A purchased.  As to

1   the 404(b) issue, this is not 404(b) because it's entirely

2   within the scope of what was charged.  And as to any notice

3   issue defendants are complaining of, this was on the

4   government's *James* log in entry 100, and therefore there is not

5   an issue as to notice regarding Chick-fil-A.

6          *THE COURT:*  Mr. Beller, go ahead.

7          *MR. BELLER:*  Only that, Your Honor, I agree, it was

8   noted on the *James* log.  It was also objected to.  So this is

9   not a new objection.  Under the government's theory, 404(b) has

10  absolutely zero place in this courtroom absent -- or within

11  2012 and 2019, and I simply disagree with that analysis.

12         *THE COURT:*  I am going to overrule the --

13         Ms. Henry, sorry.  Did you have something else?

14         *MS. HENRY:*  Yes, Your Honor.  We also wanted to point

15  that with regard to the information in the Indictment, et

16  cetera, there is nothing that connects any of this relationship

17  to Mr. Kantola, our defendant, and we would ask for a limiting

18  instruction.

19         *THE COURT:*  Okay.  Ms. Henry's objection will be

20  overruled.  Mr. Beller's objection and those of the others will

21  be overruled too.  I do think that this particular instance is

22  within the scope of the Superseding Indictment.  As noted, it

23  was an issue that was ruled on in connection with the *James*

24  hearing although, as Mr. Beller says, over objection.  And as a

25  result, I find that this is admissible as co-conspirator

1    statements.

2            Ms. Call, go ahead.

3            *MS. CALL:*  Yes.  The next exhibit is 9714 and 9715.

4    For the record, I will note these were two of the newer ones

5    provided to defense counsel.  But as I did note at the

6    beginning of today's hearing, these were both on the

7    defendants' exhibit list as Exhibits G-449 and G-450.

8            With that noted, we can start with Exhibit 9714.  And

9    I'll note for 9714, the government would only seek admission of

10   this under 801(d)(2)(A) as to Defendant Mulrenin.

11           *MS. LaBRANCHE:*  I think the government meant to refer

12   to 9715 only as to Mr. Mulrenin?

13           *MS. CALL:*  Let me confer.  Perhaps if we could pull

14   them up side by side.

15           I did mean 9714.  It is an e-mail attaching Government

16   Exhibit 9715.

17           *MS. LaBRANCHE:*  Then I have them backwards.  Thank

18   you.

19           So, Your Honor, I have different objections for each

20   of the two documents.  As it relates to 9715, first of all, I

21   think it's hearsay.  Second of all, and probably more

22   importantly, it's cumulative.  We had hours and hours of

23   testimony about antibiotic-free chicken, Chick-fil-A's process

24   beginning in 2014, so I would object to 9715 on those grounds.

25           As it relates to 9714, I would object on relevance

1    grounds.  Again, while the jury has heard a lot about the ABF

2    process for Chick-fil-A, there is nothing that is relevant

3    about Mr. Mulrenin getting this document and forwarding it on

4    to anyone in his company.  Again, I think it's cumulative.

5              And more importantly and probably my bigger concern is

6    I think there are some real 403 issues in this e-mail.  As the

7    Court knows, we have been going back and forth a little bit

8    about what's marked confidential.  And one of the issues that

9    the jury is going to have to decide, and they've heard evidence

10   on both sides, is whether or not sharing of information about

11   bids was permitted.

12             In this e-mail there is language that says in the

13   second paragraph, "Our conversations with CFA are, of course,

14   confidential."  That is in relation to CFA's conversion.  It's

15   in relation to that particular press release.  If the Court

16   were to allow this document to go to the jury, I think it could

17   cause some real confusion about whether all communications with

18   CFA are, in fact, confidential, including those especially

19   conversations about prices when clearly this just has to do

20   with the press release.

21             THE COURT:  Okay.  Response, Ms. Call?

22             MS. CALL:  Sure.  I will address each item in turn.

23   For Exhibit 9715 which is the attachment, I will note it is

24   actually somewhat cumulative because it is a duplicate of

25   Government's Exhibit 356 which is already in evidence, this

1    press release.  This was authenticated and foundation laid by

2    Mr. Skalak already.  But obviously the relevance here is the

3    fact it is attached to this e-mail from Defendant Mulrenin

4    which is Government Exhibit 9714.

5         As to relevance, first I would, I guess, make the

6    point that if it's totally irrelevant, why would it be on the

7    defendants' exhibit list?  But aside from that which is not

8    really quite the argument is that --

9         THE COURT:  Sometimes the answer to that is because

10   the attorney said to a paralegal put every single document that

11   was ever produced on the exhibit list.

12        MS. CALL:  The exhibit list would be much larger if

13   that were the case.

14        But regardless, for the e-mail there has obviously

15   been collusion alleged or at least there is in evidence

16   collusion regarding the Chick-fil-A conversion to NAE in 2014.

17   That includes phone calls between Defendant Brady and

18   competitors including Justin Gay at Pilgrim's, Searcy Wildes at

19   Perdue and Defendant Mulrenin at Tyson immediately or on dates

20   around when these communications with Chick-fil-A were

21   occurring.  And those phone calls are contained in Government's

22   Exhibit 352, 353 and 354.

23        As well there is a text message in Exhibit 355, which

24   we will get to in a moment, that further makes clear that

25   collusion.  It is from Defendant Brady to Defendant Fries

1    saying, "I talked to Tim today at Tyson" -- and this is the

2    same day as the call between Brady and Defendant Mulrenin.  "I

3    talked to Tim today at Tyson and for ABF they are at .02 per lb

4    live weight.  He said they are supposed to give a number to

5    Chick-fil-A today.  I told him we were .31 to .32 per lb on

6    finished product."  So the relevance is quite clear.

7            But as to the confidentiality language, it's extremely

8    relevant that Defendant Mulrenin -- and this is only, as I

9    said, being offered against him -- believed his communications

10   with his customers surrounding this conversion to be

11   confidential.  It goes directly to Defendant Mulrenin's state

12   of mind when having these undisclosed conversations with his

13   competitors about pricing for this product.

14           *THE COURT:*  Ms. LaBranche?

15           *MS. LaBRANCHE:*  Yes, Your Honor.  The exhibits that

16   Ms. Call just read off to the Court were telephone calls that

17   occurred in March and communications that occurred in April.

18   So there were not communications prior to this as was being

19   referenced by the government.

20           But really the issue is I think the government has

21   just demonstrated that what they intend to do is exactly the

22   concern that I have, which is take this communication where it

23   says confidential completely out of context and try and use it

24   for an improper purpose.  Under 403 this just cannot go to the

25   jury nor does it need to because the jury has heard more than

1   enough about the ABF process.

2          THE COURT:  But what evidence is there that would

3   support your interpretation of what confidential means?

4          MS. LaBRANCHE:  It's not my interpretation of what

5   confidential means.  It's my interpretation of these

6   conversations about this specific document.

7          THE COURT:  Then why would -- if the definition of

8   confidential is apparent from the document, then why would it

9   be misleading?

10         MS. LaBRANCHE:  What the e-mail says is, "Our

11  conversations with CFA are, of course, confidential and they

12  have not confirmed to the press who their suppliers are."  This

13  is not about what the prices are going to be from the

14  suppliers.  This is just about the information that CFA has

15  provided to the suppliers to say you're going to be our

16  suppliers.  It's not that the suppliers cannot be communicating

17  with each other.

18         I think this was a -- I think what the evidence showed

19  was that this was a pretty big thing for CFA to be jumping into

20  in the market, and therefore the communications with the

21  suppliers around whether or not they were going to do that and

22  how they were going to do that, that's what's being kept

23  confidential.

24         THE COURT:  Okay.  Anyone else?

25         MS. HENRY:  I just wanted to clarify Ms. Call said

1    that she was only seeking to admit this against Defendant

2    Mulrenin, and so I am assuming that we also have a limiting

3    instruction here.

4         THE COURT:  There would be, right.  You are absolutely

5    right because I assume this was not on the *James* log.

6         MS. CALL:  Correct, Your Honor.

7         THE COURT:  The objection will be overruled.  The

8    confidentiality aspect to it, I think once again for whatever

9    utility it exists, it's apparent on the document.  I do believe

10   it has some relevance in terms of what Mr. Mulrenin's

11   expectations were regarding that.  It could be explained, of

12   course, in argument, but I do think that both the Exhibit 9715,

13   although it may be a duplicate, but in order to prove that it

14   is the press release that is referred to in 9714 is admissible

15   as to Mr. Mulrenin only, and I will give a limited instruction

16   to that effect.

17        Ms. LaBranche?

18        MS. LaBRANCHE:  Your Honor, if I may just briefly, the

19   government acknowledged when they first mentioned these two

20   exhibits that these were exhibits that were recently produced.

21   They did not seek to admit them through a Chick-fil-A witness.

22   And I feel like this is a violation of my client's

23   constitutional rights to not have to put on a defense that now

24   the only way I can answer these is I have to call a witness in.

25   I just want to make sure that's clearly part of my objection.

1          *THE COURT:*  Okay.  That will be overruled too.  I am

2     not quite sure, that seems like an unlimited principle.  The

3     document itself, both documents I believe are admissible as

4     to -- as against Mr. Mulrenin.

5          Okay.  Next document.

6          *MS. CALL:*  The next is Government Exhibit 519.  Now I

7     am moving on to Pollo Tropical.  It's an e-mail chain between a

8     conspirator, Tim Stiller, and Randy Long of Pilgrim's.  It was

9     contained on the government's *James* log as entry 173 and

10    received a favorable ruling.

11         *THE COURT:*  And Mr. Long -- okay.  He is Pilgrim's,

12    right?

13         *MS. CALL:*  It is one page.

14         *THE COURT:*  Objections?

15         Ms. Pletcher, go ahead.

16         *MS. PLETCHER:*  Yes, Your Honor.  Randy Long is not a

17    co-conspirator as far as I understand.  So I don't understand

18    how the government is offering this as a co-conspirator

19    statement and, if that's the case, which statements in

20    particular they are offering under that exception.  And in

21    addition, Your Honor, they are offering the statement Mr. Long

22    made on October 8th at 3:24 p.m.  It's also prejudicial, in

23    particular the statement "People running companies today will

24    have taken their money and run."  I think that's a highly

25    prejudicial statement.

1          MS. CALL:  I should note some of the contents of this

2     e-mail has been previously litigated and ruled on separately.

3     The defendants filed a motion to exclude the term "Mafia," in

4     Mr. Long's statement in ECF-534.  The government responded in

5     ECF-565 citing this very document.  And the Court found in

6     ECF-604 also I believe citing this very document that there is

7     little danger of unfair prejudice from the use of the term

8     particularly given its tongue-in-cheek meaning.

9          THE COURT:  Okay.

10          MS. CALL:  And that is the probative value in this

11     context.

12          THE COURT:  And what about Ms. Pletcher's point about

13     Mr. Long not being identified as a co-conspirator?

14          MS. CALL:  So Mr. Stiller has been found to be a

15     co-conspirator.  I think the response is to Mr. Stiller's

16     e-mails here are just very necessary context to the

17     conversation.  We simply couldn't excise them out of this

18     e-mail.  Of course, I will note his question, "Did you tell him

19     you were in the Mafia," would be non-hearsay because it is a

20     question as we've briefed several times.  That would be the

21     relevance.  And the non-hearsay use would be the context.

22          THE COURT:  Mr. Beller?

23          MR. BELLER:  Thank you, Your Honor.  And I agree with

24     the statements of Ms. Pletcher that this is hearsay.  At the

25     risk of sort of taking the conversation in a different

1    direction, I would note that Pollo Tropical also not part of

2    either the Indictment or the Superseding, Your Honor, with the

3    Court's indulgence, we are going to be filing just a very brief

4    argument on that with the Court in order to preserve that

5    issue.

6            THE COURT:  Sure.

7            MR. BELLER:  Your Honor, I am anticipating that Joe

8    Brink, who is the buyer for Pollo Tropical, is going to be put

9    on by the government sometime next week.  Your Honor, Pollo

10   Tropical has not produced documents in this case -- or let me

11   be clear.  Insofar as we are aware, the government has not

12   received documents on Pollo Tropical and provided them to us.

13           There was an exchange about this issue this morning.

14   The government maintained that there were no documents produced

15   in this matter.  We assume that that means that the government

16   has not received any documents, DOJ has not received any

17   documents as to Pollo Tropical either in this matter or in any

18   others that would require their disclosure to the defense.

19           The reason I raise this now, Your Honor, is because to

20   the extent that this comes in, the defense has not been

21   afforded documents to be able to appropriately rebut this

22   particular exchange.  While there was some litigation regarding

23   the use of the word "Mafia," I maintain respectfully that I do

24   believe that it is -- it does invoke a certain bias.  I believe

25   that it is a racial bias.  It's one against what would normally

1   be considered to be Italian individuals.  So for all of these

2   reasons, most importantly the hearsay issue and the 404(b)

3   issue as to Pollo Tropical, we continue to object.

4           THE COURT:  Ms. Call?

5           MS. CALL:  Perhaps this will be the first time the

6   government says this, but the *James* hearing does have to mean

7   something.  And I think here this was already ruled on.

8   Statements by both these individuals were contained in the

9   *James* log and Your Honor did find them to be in furtherance of

10  the conspiracy.

11          As to the second point raised by Mr. Beller about

12  documents produced by Pollo Tropical, A, there is no

13  requirement for the government to obtain documents that it

14  doesn't already have; but B, his statement directly misstates

15  the e-mail conversations over last night and this morning.  And

16  I will let my colleague, Mr. Torzilli, be more clear as to what

17  was the contents of those discussions because he will have more

18  direct knowledge than me.

19          THE COURT:  Go ahead, Mr. Torzilli.

20          MR. TORZILLI:  Thank you, Your Honor.

21          Just very quickly, I want to make sure that the record

22  is completely clear.  I think counsel had stated that we had

23  told them there are no Pollo Tropical documents.  And as I

24  think we have told them maybe four times now in writing, there

25  are 12 Pollo Tropical produced documents in this matter, which

1    includes both the preceding Grand Jury investigation and the

2    related civil matter.  And the defendants have received all 12

3    of those documents I think in some cases now three times and

4    maybe more than three times.  So any Pollo Tropical produced

5    documents in our possession the defendants have in duplicate.

6         MR. BELLER:  To the extent there was a misstatement, I

7    completely agree with Mr. Torzilli.  He has, in fact, both told

8    us about those select documents and also provided them to us.

9    So if I spoke too generally that there were no documents, that

10   certainly was not my intention.  I think what gives me some

11   pause is the ongoing use of the word "in this matter."  And I

12   want to be clear that there are multiple, as the Court knows,

13   indictments over -- that encompass many different

14   co-conspirators as defined by the government.  And so I assume

15   when we're talking about in this matter, what we're talking

16   about is that the government does not have any additional

17   documents in their possession regardless of which matter we are

18   actually talking about.

19        THE COURT:  Mr. Torzilli, do you want to provide a

20   response to that?

21        MR. TORZILLI:  Yeah, just very briefly, Your Honor.

22   So in this matter we are including all the preceding Grand Jury

23   investigations leading up to not only the filing of this case,

24   but there are other filed cases resulting from this same

25   conspiracy.  We still only have 12 Pollo Tropical produced

1   documents.   There is a related civil case from which we've

2   received some information including documents.   There are still

3   only 12 Pollo Tropical produced documents and the defendants

4   have them.

5           THE COURT:   Okay.

6           Ms. Pletcher?

7           MS. PLETCHER:   Yes, Your Honor.   To address Ms. Call's

8   points with respect to the hearsay issues on this document,

9   Mr. Long is not a co-conspirator.   So to the extent that his

10  statements are being admitted for, quote, context, I am

11  concerned that they are prejudicial to Mr. Penn and should be

12  excluded under 403, in particular this e-mail written at

13  3:24 p.m.

14          THE COURT:   And what portion of it, Ms. Pletcher, do

15  you consider to be prejudicial?

16          MS. PLETCHER:   So in particular this line, "People

17  running companies today will have taken their money and run."

18  It's an opinion right from an individual who is not a

19  co-conspirator.   It has no relevance to the underlying issues

20  and I do -- I have a concern that --

21          THE COURT:   What does it mean and why do you think it

22  would prejudice defendant in this case?

23          MS. PLETCHER:   This concept, people running companies

24  today, would be generally attributable to CEOs and other

25  high-level executives.   And this concept of they will take

1    their money and run, that there is something somehow

2    inappropriate or distasteful or immoral about people running

3    companies, and I am concerned about that.

4            THE COURT:  Ms. Call?

5            MS. CALL:  I will note the implication here seems to

6    be that the price increases obtained in 2014 won't follow

7    through into 2017 and there is a fear that prices may go down.

8    As everyone here is aware, collusion has been alleged both in

9    2014 and in 2017 when these contracts came up for

10   renegotiation, so these statements are directly relevant to

11   multiple things at issue in this case.

12           THE COURT:  Okay.  And then just so I am clear,

13   Ms. Call, given the fact that Mr. Long is not a co-conspirator,

14   the government is offering those statements not for the truth

15   of the matter asserted, but rather just for the effect on the

16   listener who is Mr. Stiller.

17           MS. CALL:  Yes, Your Honor.  I don't think we are

18   actually saying anyone has taken their money and run.  It's a

19   statement in the future anyways, but nothing in that is being

20   offered for the truth.

21           THE COURT:  Ms. Henry, did you have something?  I saw

22   you.

23           MS. HENRY:  I will first just note that Mr. Stiller is

24   not a defendant, so his state of mind is not at issue in this

25   proceeding.  But I also wanted to point out that in regard to

1    my client, Mr. Kantola, the government has not alleged anything

2    related to this.  And if there is any sense of admitting this

3    document, there should be a limiting instruction because the

4    government is very aware that, in fact, he was competing at

5    this time with regard to this account.

6         THE COURT:  I am going to deny that particular

7    objection because I do think that if this comes in, it could be

8    admissible against all.

9         Ms. Call, did you want to respond to anything else on

10   this one?

11        MS. CALL:  I don't believe so, Your Honor.

12        MS. PLETCHER:  Your Honor, if I may, I just have one

13   more point.  Ms. Call did state that this was being admitted

14   for the effect on Mr. Stiller.  Mr. Stiller and Mr. Long were

15   not the ones who were negotiating the Pollo Tropical contract,

16   so I think there is a relevance issue there.

17        And then one more point on this concept of taking

18   their money and run, it is my understanding that the government

19   is intending to argue that one of the motives for the alleged

20   price-fixing is that these executives were profiting from

21   this -- from this alleged conspiracy.  And this concept of

22   taking money and run and compensation and executives and

23   somehow the illicit profits concept here, I would just

24   reiterate I do believe that's prejudicial.

25        THE COURT:  Mr. McLoughlin?

1          *MR. McLOUGHLIN:*  Your Honor, there is another brief

2     point to be made here.  The government's argument that it is

3     with respect to the impact -- or effect on Mr. Stiller, there

4     is nothing in the e-mail or anything else by which the

5     government tells us what that effect they seek to prove might

6     be, so there is a substantial relevancy argument, except the

7     government says that in 2014 they were talking about pricing.

8     Everyone thought pricing would go down three years later in

9     2017, and so the relevancy is with respect to what happens in

10    2017 with respect to pricing, if I understand the government's

11    argument.

12          The use of that hearsay exception to argue that the

13    effect on Mr. Stiller is somehow related to pricing three years

14    later given the number of intervening events and to the extent

15    one might be speculating about what might happen in the future,

16    the connection with respect to the exception that the

17    government relies upon simply cannot be logically present.

18    There are too many intervening events in those three years to

19    make this in any way relevant.  And they have not articulated

20    anything with respect to 2014 and something Mr. Stiller may or

21    may not have done as a result of this that would support their

22    argument.

23          *THE COURT:*  Let me ask you this, Ms. Call.  If

24    Mr. Long, not a co-conspirator, his statements are being

25    offered for effect on the listener, what would be the relevance

1   of the top e-mail?

2        *MS. CALL:*  Yes.  And just to clarify what I think was

3   argued, I don't know that I ever said effect on listener.  I

4   believe I stated Mr. Stiller's statements were 801(d)(2)(E)

5   statements in furtherance of the conspiracy, and that the

6   e-mails between the two then are necessary for relevant

7   context.  And I will point you back to that *United States v.*

8   *Wills* Fourth Circuit case I stated earlier for that

9   proposition.

10       But to actually answer the question you asked on the

11  top e-mail, I agree perhaps that there may not be relevance

12  there.  We are happy to redact it.  It's frankly not being

13  offered for the truth, but that is one point.  But second, I do

14  want to make clear that Robert Bryant did testify that the

15  price increases sought in 2014 were industry-wide as to small

16  bird customers. and the government is alleging and will prove

17  as a part of its case that the collusion that occurred in 2014

18  affected KFC as well as other small bird companies' customers

19  including Pollo Tropical.

20       And for this particular negotiations, there are

21  numerous -- I can count at least eight calls between Defendant

22  Little and Mr. Walter Cooper at Claxton, both who were involved

23  in these negotiations, interspersed between communications with

24  a customer regarding these negotiations leading to at the end

25  the morning after the final time Defendant Little spoke to

1   Mr. Cooper, he e-mailed the Pollo Tropical buyer saying, "We

2   will need to hold on our pricing," which then led to

3   Mr. Stiller five days later saying, "People don't have

4   options." So we believe there is sufficient evidence and there

5   will be more regarding collusion on other small bird customers

6   in 2014, including Pollo Tropical.

7           THE COURT:  Ms. Pletcher, the last point.

8           MS. PLETCHER:  Thank you, Your Honor.  I do take issue

9   with the government's use of the case *Wills*.  I think they are

10  overreaching with that case which held that the statements that

11  were admissible for context were admissible in part because

12  they were incriminating statements themselves.  In this case

13  these statements that are being sought to be admitted are for

14  context and are not in themselves incriminating statements.  I

15  think that's a line the government is crossing here, so *Wills*

16  would be inapposite.

17          MS. CALL:  I think in another case Tim Stiller's

18  statements -- let's see, 5:17 p.m. and 7:53 p.m. would just be

19  nonsensical without the e-mails in between.

20          THE COURT:  Okay.  Then as to Exhibit 519, I will rule

21  and will give a limiting instruction to the effect that

22  Mr. Long's statements will not be considered as to the truth of

23  the matter asserted, but only as the effect on the listener.

24  That will necessitate excluding the top e-mail because that

25  doesn't have any effect on the listener and doesn't seem to

1    otherwise have relevance given that fact.  It's hearsay.  But

2    the statements of Mr. Stiller are admissible as co-conspirator

3    statements.

4              All right.  Next one?

5         MS. CALL:  Next is Government's Exhibit 528.  This is

6    an e-mail chain including e-mails between Mr. Brink from Pollo

7    Tropical followed by internal -- actually, they all include

8    him, I apologize, with Defendant Little and Defendant Austin.

9    This exhibit was contained on the government's *James* log at

10   entry 157 and received a favorable ruling.

11        THE COURT:  Objections to 528?

12        MS. HENRY:  Just to preserve the same objection I made

13   on the earlier Pollo Tropical.

14        THE COURT:  Yes.  And that will be denied for the same

15   reasons.

16        MR. BYRNE:  Defendant Little would join in that 404(b)

17   objection.  Otherwise, we don't object.

18        THE COURT:  That will be denied for the same reason.

19             Anyone else?  All right.  Exhibit 528 will be admitted

20   as co-conspirator --

21        MR. BELLER:  If I may, one additional objection is

22   that Mr. Joe Brink is in this e-mail chain repeatedly, and I

23   believe that that is hearsay.  And I don't believe that there

24   has been a stated basis as to why his statement should be

25   admissible.

1          *THE COURT:*  Response, Ms. Call?

2          *MS. CALL:*  It would go to the same point as extremely

3     necessary context for the e-mails of the defendants

4     interspersed among here.  And I will note that Mr. Brink is on

5     the witness list to be covered this week and can certainly be

6     cross-examined on this document.

7          *THE COURT:*  Well, we could take this up then after he

8     testifies, but if you want a ruling on it right now, I think we

9     need to address Mr. Beller's point.

10         *MS. CALL:*  I think this is just extremely necessary

11    context, the repeated request from the buyer to compromise and

12    meet its competitors to have competitive pricing is the context

13    necessary to understand the statements by Defendant Little and

14    Defendant Austin that have been ruled to be statements in

15    furtherance of the conspiracy here.

16         I will note this was an e-mail I was referring to a

17    moment ago when I noted that Defendant Little after speaking to

18    his competitor, Walter Cooper at Claxton, told Mr. Brink that

19    we are going to hold on pricing. That is the e-mail at

20    9:16 a.m., the second down on this page.

21         *THE COURT:*  All right.  I will admit 528 concerning

22    statements of Mr. Little.  However, as to the statements of

23    Mr. Brink, I will instruct the jury they cannot be considered

24    for the truth of the matter asserted, but rather only for the

25    effect on the listener.  I will take a quick look at that *Wills*

2739

1   case over lunch, but that's my ruling unless there is some

2   reason to reconsider it.  And also depending on the testimony

3   of Mr. Brink, it's possible that it could be considered, you

4   know, for the truth of the matter asserted if you went over it

5   with him, but for purposes of now, cannot, okay?

6            MS. CALL:  I will note for scheduling purposes, I

7   think we are getting to documents that we for this set will not

8   be introducing until after the testimony of Mr. Brink, so we

9   may have time to readdress Mr. Brink's statements in this

10  e-mail during his testimony.

11           THE COURT:  Okay.

12           Next exhibit?

13           MS. CALL:  Next is Government's Exhibit 541 following

14  what appears to be a fairly -- not fairly company-wide, but an

15  e-mail to many people at Pilgrim's.  This is an e-mail chain

16  then between conspirators Tim Stiller and Jason McGuire.  This

17  was contained on the government's *James* log as entry 154 and it

18  received a favorable ruling.

19           THE COURT:  Any objections on 541?

20           Ms. Pletcher?

21           MS. PLETCHER:  Yes, Your Honor.  We object.  The piece

22  of this document that was on the *James* log was only the first

23  e-mail and nothing else.  And correct me if I'm wrong, but I do

24  believe that's the case.  So everything from Mr. McGuire's

25  e-mail at 10:53 a.m. below is not on the *James* log and that is

1   hearsay, and we would on object on that ground.

2        THE COURT:  Okay.

3        MS. PLETCHER:  And one more piece here.  So the

4   statement by Mr. McGuire where he says "riding on the jet and

5   everything," I would argue that's also highly prejudicial, this

6   presumption that there is some sort of wealth or affluence, and

7   I feel that would be prejudicial to the jury.

8        THE COURT:  Okay.

9        Ms. Call?

10       MS. CALL:  Just for that last 403 argument, I don't

11  believe the jet would necessarily relate to any of the

12  defendants.  This is a discussion between two other

13  co-conspirators, Tim Stiller and Jason McGuire, so I don't

14  think there is any implication from this document that any of

15  the defendants rode on any jets.

16       But otherwise I will note, and I don't know if Your

17  Honor has a strong feeling on this, but obviously we excerpted

18  portions of documents on the *James* log itself, but the

19  underlying documents were all provided as a part of the *James*

20  submission.  So perhaps some guidance may be necessary, I

21  suppose, on what Your Honor in making its ruling relied on as

22  the statements in furtherance of the conspiracy, whether it was

23  just limited to the excerpts on the log versus the underlying

24  documents that were provided.

25       THE COURT:  Well, you can only rule on what you have

2741

1   in front of you.  And if the statement that I had in front of

2   me was the top one, then it's logical that I ruled on that.  I

3   wouldn't necessarily have known about the rest.  I am not sure.

4          MS. CALL:  Yeah.  The point that I may have not

5   articulately said was the documents were in front of Your

6   Honor, so I don't know if you were considering the log itself

7   when ruling on statements versus the underlying documents.

8          THE COURT:  Oh, I see what you mean.  Yeah, I did look

9   over all the documents in making the ruling.

10         Mr. Fagg?

11         MR. FAGG:  Sure, Your Honor.  I think for this exhibit

12  that begins in Bates numbers 2261, that document is not what is

13  referenced in *James* log entry 154.  *James* log entry 154 ends in

14  2265.  I think that explains some of the disparity here between

15  what this e-mail says on Exhibit 541 and what was on the *James*

16  log.

17         THE COURT:  And 2265, was that a portion of the

18  document that we're looking at now, do you know?

19         MR. FAGG:  Yes, Your Honor.  I know that it contains

20  the top portion of that e-mail.  I am not sure what else.

21         THE COURT:  Thank you, Mr. Fagg.

22         Ms. Call?

23         MS. CALL:  If Your Honor would like, I think we

24  probably could pull up the document that was on the *James* log.

25  I am guessing it was a duplicate if it contains the top e-mail.

1          THE COURT:  Right.  That could be helpful.

2          MS. HENRY:  While we are waiting for that, I would

3    note that our understanding was that at the *James* hearing they

4    designated very specific statements to be admitted and that

5    those were the statements that Your Honor ruled on as admitted

6    as to co-conspirator statements.

7          THE COURT:  Okay.

8          MS. CALL:  Government Exhibit 542 that is now on your

9    screen was the precise statement or the document that was on

10   the *James* log.  You will see the same e-mail chain with two

11   additional e-mails at the top.  We are happy to offer

12   Exhibit 542.

13         THE COURT:  Okay.  So are you offering -- you are

14   substituting 542 for 541?

15         MS. CALL:  Yes, Your Honor.

16         THE COURT:  All right.  Ms. Pletcher, anything?

17         MS. PLETCHER:  Yes, Your Honor.  I still object.  The

18   Court considered the statements that were identified in the

19   *James* log and ruled on those, but the statements at the bottom

20   of this document, which if you could just pull up the entire

21   document again instead of just the zoomed in.

22         THE COURT:  Yeah, that would be helpful.  Could we

23   zoom out?  There we go.

24         MS. PLETCHER:  So the original message here from

25   Ms. Lawson, again who is not a co-conspirator, this message

1    with some financials, I just don't see how that's relevant to

2    this case.  And again those statements were not identified as a

3    co-conspirator statement, so I still maintain my relevance

4    objection.

5              THE COURT:  Okay.

6              MS. CALL:  Your Honor, I will agree that the

7    statements by Ms. Lawson we were not purporting to be

8    co-conspirator statements.  I will note that it seems a little

9    untenable to be redacting out interspersed e-mails for every

10   e-mail chain among the 300 or so *James* log exhibits.  But if

11   the Court finds it necessary, we are happy to redact that out.

12             THE COURT:  I don't think that that was necessarily

13   the suggestion, but -- I think the argument is it wasn't ruled

14   on in the *James* log, so it's open game for an objection such as

15   Ms. Pletcher made.  You know, one argument would be as we've

16   talked about with some other exhibits is that is there a

17   hearsay exception to Ms. Lawson's comment, who Ms. Lawson not

18   having been identified as a co-conspirator.

19             MS. CALL:  Yes.  I think here it would be two points.

20   So first it would be a line of cases regarding context to

21   conversation, but I think along those same lines here would be

22   offered for the effect on the listener.  As we had

23   conversations in the past in this courtroom, EBIT and EBITDA

24   are both profit-related terms which appears here to have

25   spurred a discussion of price increases and margin in that

2744

1    e-mail at the top.  So essentially it would be an effect on the

2    listener argument as to this e-mail from Ms. Lawson.

3            THE COURT:  Mr. Fagg?

4            MR. FAGG:  Yes, Your Honor.  I think what a clear

5    indication on this is that Mr. Stiller is commenting that he

6    was added to this list and somehow or another made more

7    important by being added to some distribution list, not a

8    reflection on any of the profit amounts.  And so we would

9    object to the lower information that is on there.  And to the

10   extent that Ms. Pletcher has not proposed to redact that

11   information as irrelevant, we would make that proposal.

12           THE COURT:  Anything else, Ms. Call?

13           MS. CALL:  No, Your Honor.

14           THE COURT:  All right.  Then as to -- we substituted

15   now Exhibit 542.  I do find that Ms. Lawson's statement -- she

16   is not a co-conspirator -- is hearsay.  I will provide a

17   limiting instruction to the jury that her statement cannot be

18   considered for the truth of the matter asserted, but rather

19   only for the effect on the recipients, namely explaining the

20   Stiller/McGuire back-and-forth that goes on after that which is

21   admissible as co-conspirator statements.

22           Well, it's almost noon.  Time flies when you're having

23   fun.  So next question, and that is do you want to take our

24   usual hour and a half?  Do you want to cut it a little shorter,

25   do an hour?  I don't mind either way.  I don't know what the

1   logistics are for you to be able to get outside the courtroom

2   and then get back in and have lunch at the same time, so I am

3   open to suggestion.

4        *MS. CALL:*  An hour is fine by the government, but I

5   will let defense counsel --

6        *MR. BELLER:*  Sounds like there is a consensus that an

7   hour is okay with us too.

8        *THE COURT:*  Why don't we plan on reconvening at

9   1:00 p.m., then.  The Court will be in recess.  Thank you.

10       (Recess at 11:58 a.m.)

11       (Reconvened 1:02 p.m.)

12       *THE COURT:*  Ms. Call, next document?

13       *MS. CALL:*  Next on the list is Government's

14  Exhibit 545.  And I think I can do a moment to speed up this

15  hearing.  In reviewing this, I notice it's another duplicate of

16  another one later on in the list, so we will not offer 545.

17       *MR. BYRNE:*  Can I ask you which one?

18       *MS. CALL:*  559.

19       So if we move on from 545, that will take us to 546.

20  546 is an e-mail involving Defendant Little, and it was

21  contained on the government's *James* log, *James* log entry 137,

22  and it did receive a favorable ruling.

23       *MR. BYRNE:*  Your Honor, this is 545?

24       *MS. CALL:*  546.

25       *THE COURT:*  Yeah, 546.

1          Any objections to 546?

2          Mr. Byrne?

3          MR. BYRNE:  I do have an objection.  Your Honor,

4    Matthew Boarman has not been identified as a co-conspirator,

5    and so I don't think this would qualify, although I suppose

6    this is Jimmie Little's --

7          THE COURT:  Right, it's from Mr. Little.

8          MR. BYRNE:  From Mr. Little.  Okay, I withdraw my

9    objection.

10         THE COURT:  You are right about Mr. Boarman, but this

11   is from Mr. Little.

12         Ms. Pletcher?

13         MS. PLETCHER:  My objection here goes to relevance,

14   Your Honor.  I still don't understand what the allegations are

15   with respect to Pollo Tropical, if they are alleging that there

16   was some price-fixing or bid-rigging with respect to the 2015

17   contract, 2014, 2013, 2012.  It's just not clear to me, and I

18   would ask that the government clarify what the relevance is

19   exactly.

20         THE COURT:  Ms. Call, go ahead.

21         MS. CALL:  Your Honor, as stated previously, the

22   testimony has adduced the fact that the conspiracy in 2014

23   involved a conspiracy to raise prices across the small bird

24   industry.  Pollo Tropical is a small bird customer and would be

25   covered by that testimony.

1          In addition, the evidence, including phone calls that

2     are already in evidence that I cited to earlier, show phone

3     calls between Defendant Little and Walter Cooper of Claxton

4     during negotiations with Pollo Tropical and immediately -- or,

5     sorry, the day before Pilgrim's submitted -- or Pilgrim's told

6     Pollo Tropical that they would need to hold on prices.  So the

7     evidence both with respect to the negotiations with Pollo

8     Tropical as well as broader testimony establish the relevance

9     of those negotiations for the conspiracy.

10          MS. PLETCHER:  Your Honor, again I am not sure I

11     understand exactly what the scope is of the allegation with

12     respect to Pollo Tropical.  What I am hearing is that it's just

13     the 2014 pricing?  And I would just like some clarification on

14     that point.

15          THE COURT:  Ms. Call?

16          MS. CALL:  The evidence I was just discussing was

17     relating to 2014 negotiations for the 2015 contract year.

18          MR. BYRNE:  Your Honor, the only other thing would be

19     the 404(b) objection with respect to all the Pollo Tropical

20     exhibits.

21          THE COURT:  Right.

22          Go ahead.

23          MS. HENRY:  Perhaps I might respectfully request a

24     continuing objection along the lines that I have already stated

25     with regard to Pollo Tropical.

1          *THE COURT:*  Yes, I think that's appropriate.  Thank

2     you, Ms. Henry.

3               Anything else?

4               I will overrule the objection as to relevance.  As

5     explained by Ms. Call, this document would seem to be relevant

6     to that theory which otherwise seems to be proper and therefore

7     this will be admitted as a co-conspirator statement.

8               All right.  Next document?

9          *MS. CALL:*  The next document is Government's Exhibit

10    559.  I will note this is a two-page document.  There is one

11    sentence on the second page, so we will put them up side by

12    side.

13              Government's Exhibit 559 is an e-mail chain between

14    Defendant Little and Defendant Austin including some

15    additional -- one e-mail from Mr. Boarman at Pilgrim's.  This

16    was contained on the government's *James* log as *James* log entry

17    113.  It did receive a favorable ruling.  As to Mr. Boarman's

18    e-mail which is limited to one e-mail in this chain at

19    4:03 p.m., the majority of it is frankly questions so would be

20    non-hearsay for that purpose, but to the extent there is any

21    hearsay in here, it's relevant context which is non-hearsay as

22    well, so that would be the admissibility of that.

23         *MR. BYRNE:*  I would just object to Mr. Boarman's.  I

24    don't think it is an exception to the hearsay rule.  I think

25    it's straight hearsay and he is not a co-conspirator.

1      MR. FELDBERG:  Just to clarify, I think there were two

2  comments from Mr. Boarman in this document.

3      MS. CALL:  Thank you for that clarification.  I will

4  note that Defendant Little forwarding the entire chain to

5  Defendant Austin essentially makes the underlying contents

6  almost attributable to Mr. Little as an act in furtherance of

7  the conspiracy that would apply to all of the e-mails in the

8  chain.

9      Anyone else?

10      MR. FELDBERG:  If I may, Your Honor.

11      THE COURT:  Go ahead.

12      MR. FELDBERG:  The substantive comment here from

13  Mr. Austin, "I would hesitate to give any numbers until we have

14  this KFC deal ironed out," I think that's what it says, I don't

15  see any relevance to that.  He is basically discussing with a

16  colleague holding off on what they are going to propose to

17  customer A until they've worked out a deal with customer B.  I

18  don't see how that has anything to do with the charges in the

19  Indictment.

20      THE COURT:  Ms. Call?

21      MS. CALL:  Yes, Your Honor.  First I will state that

22  obviously that statement was already ruled on by Your Honor in

23  the order on the James hearing in ECF 559, but more broadly

24  it's entirely relevant.  And I think the testimony of

25  Mr. Bryant as well established that KFC was targeted during

2750

1    those negotiations before other small bird customers so that

2    those price increases could be obtained across the small bird

3    industry, so it goes directly to the breadth of the conspiracy

4    in 2014 that we were just talking about with respect to some of

5    the other documents.

6            MR. BELLER:  Your Honor, thank you.  The only

7    additional statement that I would make or additional objection

8    that I would make as to hearsay and Mr. Boarman, that the

9    underlying premise of the government and that is if a statement

10   or an assertion is followed by a question mark, it is therefore

11   hearsay -- or excuse me, it is therefore a question and cannot

12   be a statement, and that is absolutely not true.  If a question

13   contains an assertion or if the declarant intended the question

14   to be an assertion, it is, in fact, a statement under a hearsay

15   analysis.  So I would simply offer that in addition to the

16   arguments that have been made as to Mr. Boarman.

17           Thank you.

18           THE COURT:  Anything on that point, Ms. Call?

19           MS. CALL:  Yes, Your Honor.  So I may have missed a

20   moment.  I believe the second portion that Mr. Beller said is

21   correct, that if something is intended to be an assertion, that

22   does affect the analysis for hearsay purposes.  However, as the

23   case I cited the other day -- and I hope that I can find it

24   again -- stated, it's almost impossible to imagine a question

25   that does not include some kind of assertion.  And the question

1    is not whether there is some kind of assertion, but whether it

2    was intended to be one.  And the vast majority of questions

3    would not contain an intended assertion.

4         As to the ones here, "Is there an issue" doesn't seem

5    to include an intended assertion.  And then, "Do you mind if I

6    continue this conversation" is not really quite intended to be

7    an assertion either, but I will also note it's frankly just not

8    offered for the truth of the matter asserted.

9         THE COURT:  On 559, first of all, Mr. Feldberg's

10   objection to relevance will be overruled.  It does seem to have

11   some relevance to the Pollo Tropical issues, and therefore it's

12   appropriate on that ground.  In terms of the hearsay objection,

13   Mr. Boarman is not an identified co-conspirator.  I will admit

14   this document in order to explain the effect on Mr. Little and

15   to the extent that it may come up, although I think Mr. Austin

16   is responding to Mr. Little, so I will provide a limiting

17   instruction.

18        Let me just note as to that *Wills* issue that we were

19   talking about, the *Wills* being *United States v. Wills*, 346 F.3d

20   479, it is true that in *Wills* they talked about context.  In a

21   later opinion by the Fourth Circuit, which is *United States v.*

22   *Jordan*, which is 952 F.3d 160, Judge Harris for the Fourth

23   Circuit, footnote, the sister of Elizabeth Harris, the Colorado

24   Court of Appeals judge, made it clear that hearsay statements

25   introduced for context must be admitted not for the truth of

1   the matter asserted.

2           So in reality if you want to distinguish between

3   context and effect on the listener, I think it's a very fine

4   distinction.  I am not even sure if it's a distinction with a

5   difference.  Both will be admitted for the same purpose, mainly

6   to explain why the defendant or conspirators making the next

7   comment.  So I will admit 559 as to Mr. Little, Mr. Austin, but

8   I will provide the jury with a limiting instruction as to the

9   statements of Mr. Boarman.

10          MS. CALL:  Can you repeat what the limiting

11  instruction was, Your Honor?

12          THE COURT:  Yes, that the statements of Mr. Boarman

13  would not be admitted for the truth of the matters asserted by

14  Mr. Boarman, but rather simply for the effect on the

15  recipients.

16          MS. CALL:  And otherwise the contents of 559 would be

17  admissible against all 10 defendants, correct?

18          THE COURT:  Yes.

19          MS. CALL:  To be slightly less vague on the record,

20  the case I was citing to regarding questions was *United States*

21  *v. Jackson,* 88 F.3d 845 from the 10th Circuit.

22          THE COURT:  Okay.  Next exhibit?

23          MS. CALL:  Next exhibit is Government's Exhibit 561.

24  I will note this is a two-page document.  The second page only

25  contains the word Jimmie, so perhaps we will only include the

1    first page so that it is a little bit more readable.  This does

2    have very light text.  I am happy to hand out paper copies if

3    that would be helpful.

4         THE COURT:  Okay.  Any further argument, Ms. Call?

5         MS. CALL:  I will note this was on the government's

6    *James* log, *James* log entry 114, and did receive a favorable

7    ruling.

8         THE COURT:  Objections to 561?

9         MR. BELLER:  Your Honor, the statement from Joe Brink,

10   who is again the buyer for Pollo Tropical, I would simply ask

11   at this point for an offer of proof as to what the relevance of

12   this particular e-mail is as to the other defendants.

13   Obviously Mr. Brink's statement is hearsay, but understanding

14   the underlying relevance will allow us to determine the

15   admissibility of this.

16        THE COURT:  Response, Ms. Call?

17        MS. CALL:  The relevance would be Defendant Little's

18   understanding in this conversation that the purpose of the

19   meeting that Mr. Brink asked for was relating to pricing for

20   2015.  I will say that's pretty apparent from Defendant

21   Little's statement in the bottom e-mail from 4:45 p.m.  I would

22   say the intervening e-mails from Mr. Brink are just details in

23   setting up that meeting.  And so it's really just context for

24   the answers that Mr. Little gives.

25             But in addition, the kind of relevance overall to this

2754

1   e-mail is, as I have been stating several times, relevant to

2   these negotiations are that Defendant Little had phone calls

3   with his competitor, Walter Cooper, from Claxton.  And he had

4   at least one the very same day as this e-mail as he is setting

5   up a meeting with a buyer, as he did on other relevant days

6   throughout these negotiations.  That is all I have on that

7   point.

8            THE COURT:  All right.

9            Mr. Beller?

10           MR. BELLER:  Thank you, Your Honor.  So based on that

11  it sounds like Joe Brink's statements are, in fact, hearsay.

12  And therefore I am asking the Court to the extent this is given

13  that it only be that bottom e-mail from Jimmie Little and that

14  there be a limiting instruction of the same.

15           THE COURT:  Anything else, Ms. Call?

16           MS. CALL:  Yes, Your Honor.  I did want to point out

17  regarding the phone calls I was referencing, when he says, "Can

18  we just meet at PT around 11," Defendant Little called Walter

19  Cooper from Claxton immediately before that e-mail was sent or

20  I think within an hour or so as well as a couple hours after

21  which appears based on the e-mail to be just after the meeting

22  would have occurred.  Defendant Little called Walter Cooper at

23  1:42 p.m.eastern, which if I am doing the math right would be

24  11:42 mountain time.  I will just note the statements by

25  Defendant Little including the ones higher up in the document

2755

1   were ruled on on the *James* log and are relevant.  I don't

2   believe it would be necessary to just include that bottom

3   e-mail from Defendant Little.

4        *MR. BYRNE:*  Your Honor, we don't necessarily have an

5   objection to this if Mr. Brink is going to testify about this

6   and he can be cross-examined on it.  He is on the witness list

7   and I am assuming he is going to be called.

8        *THE COURT:*  We are assuming for purposes of what we

9   are doing today is that he may not testify about this.

10  Obviously, if he were to testify about it, it could put it in a

11  bit different light, but --

12       *MR. BYRNE:*  Then I join in Mr. Beller's objections.

13       *THE COURT:*  All right.  The Court will admit this

14  document as co-conspirator hearsay.  However, I will provide a

15  limiting instruction that the statements of Mr. Brink will be

16  admitted not for the truth of the matters that Mr. Brink

17  asserts, but only for the effect that those statements have on

18  the listener.

19       Next document?

20       *MS. CALL:*  Next document is Government's Exhibit 563.

21       *THE COURT:*  Argument?

22       *MS. CALL:*  Exhibit 563 was not contained on the

23  government's *James* -- sorry, I apologize --was *James* log entry

24  152.  However, Your Honor found it not at the time to have

25  established that this was in furtherance of the conspiracy.  As

2756

1    far as admissibility of 563, this is an e-mail with one

2    statement from Defendant Little to Thomas Lane, Eric Oare and

3    Tim Stiller at Pilgrim's.  It states, "I need 2015 pricing for

4    splits and breast."

5         So as an initial matter, it's essentially a command or

6    a question asking for pricing.  Mr. Lane was responsible for

7    pricing at Pilgrim's.  And such orders or requests are not

8    hearsay.  I will cite for that *United States v. Ballou* which is

9    a District of New Mexico case, 59 F.Supp.3d 1038, as well as

10   *United States v. Bellomo* from the Second Circuit, 176 F.3d 580,

11   and *United States v. White*, 639 F.3d 331 which says a command

12   is not hearsay because it is not an assertion of fact.

13        So essentially this is non-hearsay that is admissible

14   on that ground because it's simply a command from Defendant

15   Little to others at Pilgrim's.  And it's entirely relevant to

16   basically providing context of the negotiations at this time

17   with Pollo Tropical and where Pilgrim's was with respect to

18   developing pricing.

19        *THE COURT:*  All right.  Mr. Byrne?

20        *MR. BYRNE:*  Yes, Your Honor.  I think that it's

21   ridiculous to say that because there is an exclamation point on

22   it, that that's a command.  Mr. Little is asking for

23   information from people within his company for pricing because

24   he doesn't have any pricing authority.  This was ruled by Your

25   Honor not to be in furtherance of the conspiracy.  I haven't

 1   had a chance to read the cases she cited, but I don't think it

 2   could fall within any of those exceptions.  It's straight

 3   hearsay and it's not in furtherance of.

 4           THE COURT:  Do you want to respond to that one?  I

 5   think Mr. Beller has an objection too.  Maybe not.

 6           MR. BELLER:  Despite the body language, I'm okay.

 7           THE COURT:  Okay.

 8           MS. CALL:  I think, I suppose, more generally, and

 9   whether it's a command or a question, both of them are

10   non-hearsay, but the context I think is the important point

11   that brings in the relevance here which is the status of

12   Pilgrim's negotiations regardless of what Mr. Little's pricing

13   authority, but it also provides context for the fact that

14   Defendant Little before he spoke to the buyer for Pollo

15   Tropical later this very same day, it provides context on what

16   his knowledge was of pricing at the time and perhaps, you know,

17   motive for his call to Walter Cooper that also occurred later

18   that day after I believe the meeting with Pollo Tropical.

19           And the day following this e-mail is when Defendant

20   Little shared within Pilgrim's -- and I think we'll get to this

21   document in a moment -- the magnitude of the price increase

22   that he was expecting on these items and the fact that the

23   buyer didn't handle it well.  So it's kind of necessary context

24   for the jury's understanding of when and where Defendant Little

25   became aware of the magnitude of the price increases and

1    conveyed it to the customer.

2            THE COURT:  Mr. Beller?

3            MR. BELLER:  Your Honor, I would only add that the law

4    of the case is such that this was not admissible.  You know,

5    despite sort of the initial statement that this was not

6    hearsay, the rest of the argument by the government is that all

7    of this was hearsay.  And all of that has already been

8    litigated and argued to the Court and the Court has already

9    ruled on the same.

10           THE COURT:  Anything else, Ms. Call?

11           MS. CALL:  If I follow correctly, I think that the

12   argument conveyed by Mr. Beller -- and my response to it is

13   simply that 801(d)(2)(E) is not the only exception to the

14   hearsay rules.  And as I have noted, this is non-hearsay

15   because of simply what's in here.  It's not being offered to

16   say Defendant Little actually needs 2015 pricing.  It's the

17   fact that he was requesting it at the time which makes this

18   relevant.  And let me still add it's admissible under

19   801(d)(2)(A).  If I don't ever say that, it's implicit that I

20   am.

21           THE COURT:  Mr. McLoughlin?

22           MR. McLOUGHLIN:  Two short points, Your Honor.

23           First, the argument that this provides context to

24   things which went on for a variety of days overstates the

25   requirement of Rule 106 with respect to context.  And we need

1    it for context for things that happened days later is not a

2    general exception to the hearsay rule. 106 is considerably more

3    narrow.

4         The second point is the claim that this is not wanted

5    or desired by the government for the truth of the matter

6    asserted and therefore is somehow not hearsay is not credible

7    on its face.  From the government's explanation, it is evidence

8    they want it for exactly that purpose because they want it for

9    context of the information he then conveys later having

10   requested the pricing and his knowledge of the material

11   increase in pricing later.  So their articulated basis for the

12   exception is I think an ostensible fiction.

13        THE COURT:  Anything else, Ms. Call?

14        MS. CALL:  Just to, I suppose, clarify, the context

15   points are simply pointing to relevance of this document.  The

16   admissibility of it would be based on its face somewhat of a

17   hybrid between a question and a command, I suppose, both of

18   which would be non-hearsay because this simply isn't an

19   assertion.  I will conclude my argument with that.

20        THE COURT:  I am going to sustain the objection in

21   terms of it being a non-hearsay assertion or question.  I do

22   think that Mr. Byrne is correct that it's really just a

23   statement.  The exclamation point doesn't really change the

24   essential character of it.

25        I also agree with Mr. Beller that this is a document

1   that I ruled against in terms of the *James* hearing.  However,

2   as to Ms. Call's point that it is admissible against Mr. Little

3   as a statement of a party opponent, that is true, and I will

4   provide a limiting instruction to that effect.  It is

5   admissible against Mr. Little only.

6           Next exhibit?

7           MS. CALL:  Next exhibit is Government's Exhibit 564.

8           If my colleague Mr. Berlin could zoom on this perhaps.

9           This is an e-mail from Defendant Little.  It was

10  included on the government's *James* log as *James* log entry 153

11  and it was ruled on favorably.  And it's just one e-mail.

12          THE COURT:  All right.  Any objections to 564?

13          MR. BYRNE:  No, Your Honor.

14          THE COURT:  All right.  Exhibit 564 will be admissible

15  as a co-conspirator statement.

16          Next exhibit.

17          MS. CALL:  Next exhibit is Exhibit 567.  This is an

18  e-mail from Defendant Little to Joe Brink, who was the buyer

19  for Pollo Tropical.  I will note that this precise document had

20  been *James* log 172 which the government did withdraw.  However,

21  there was another *James* log entry, 168, which contained this as

22  well as additional e-mails which the Court ruled on favorably.

23          THE COURT:  Any objection to Exhibit 567?

24          MR. BYRNE:  Not from Mr. Little.

25          MR. BELLER:  May I inquire if the other exhibit the

1    government is referencing is also going to be admitted?

2         MS. CALL:  It is not.

3         MR. BELLER:  Based on that, no objection.  Thank you.

4         THE COURT:  Then Exhibit 567 will be admitted,

5    statement of a co-conspirator.

6         All right.  Next exhibit?

7         MS. CALL:  All right.  We are moving on from Pollo

8    Tropical.  The next exhibit on the list is Government's

9    Exhibit -- I may have missed one -- 803.  Your Honor, I am

10   certain this was contained on the James log, but I am missing

11   my note for this particular document, so we will --

12        MR. FAGG:  Your Honor, it's James log 224.

13        THE COURT:  Thank you, Mr. Fagg.

14        Anything else, Ms. Call?

15        MS. CALL:  Nothing.

16        THE COURT:  Objections to 803?

17        803 will be admitted, co-conspirator statement.

18        Next exhibit?

19        MS. CALL:  Next on the list is 740.  I will note that

20   in looking this over, I think it may have been the incorrect

21   document.  And we intended to include 739, so I may suggest

22   addressing this after the next document on the list which

23   actually includes I believe the same e-mail from the customer.

24   It's a separate version of that chain.

25        THE COURT:  So take up 744 first?

2762

1          *MS. CALL:*  Yes.

2          *THE COURT:*  Okay.  Let's take up 744.

3          *MS. CALL:*  744 is an e-mail chain starting with an

4     e-mail from the buyer for Popeye's and then following internal

5     e-mails at Tyson between Defendant Mulrenin and Carl Pepper.

6     It was contained in the government's *James* log as entry 286 and

7     received a favorable ruling.  The bottom e-mail from

8     Mr. Kronaugue would be offered for effect on the listener being

9     the statements from Defendant Mulrenin and Carl Pepper.

10         *THE COURT:*  Any objections to 744?

11         *MR. LAVINE:*  Yes, Your Honor.  First of all, I think

12    the bottom part of it is hearsay, but I think there is a bigger

13    issue here, Your Honor.  There is a confrontation issue and a

14    due process issue.  What they are trying to do now is introduce

15    the contract with Popeye's without any sponsoring witness

16    whatsoever.  In fact, the government had on its witness list

17    for some time Kent Kronaugue, who was president of SMS.  They

18    have withdrawn his name from the witness list.

19         And so what they are going to try to do, Your Honor,

20    is put these documents into evidence.  And then what they are

21    going to do is put them onto a summary sheet, which we are

22    going to have to address later on.  And they are going to send

23    it back to the jury and then they are going to argue that there

24    was a problem with this contract and just look at the e-mails

25    and the phone records.  There is no sponsoring witness

1    whatsoever.  There is a serious confrontation clause here.

2          THE COURT:  All right.  Response, Ms. Call?

3          MS. CALL:  Yes, Your Honor.  Mr. Kronaugue was never

4    on the government's witness list.  He is on the defendants'

5    witness list.  And then I will note that this is simply a

6    non-testimonial statement, so there wouldn't be a confrontation

7    issue.

8          THE COURT:  I think Mr. Lavine's point is that if

9    there is no evidence, and I don't know if this is right, but if

10   there is no Popeye's contract, is the government going to argue

11   that there was a contract and make any arguments that may be

12   dependent upon its terms which would require the jury to

13   consider something that I would have instructed the jury was

14   not admitted for the truth of the matter asserted.

15         MS. CALL:  I am trying to understand the argument, and

16   I may be just dense here, but essentially there is a request

17   from the customer from Popeye's here asking for a reduction in

18   price.  It is followed by conversations or phone calls at least

19   between competitors and followed by submissions of bids by

20   several of the competitors -- or the defendants' employers,

21   yeah, proposals of these.  So I am not sure that I quite

22   understand the argument here.

23         THE COURT:  Well, Mr. Lavine, he can clarify, but I

24   think what he is suggesting is that if we admit the lower part

25   of the e-mail, even with a limiting instruction, and if there

1    is no other evidence of what that Popeye's contract is or was,

2    that then the jury could only have statements like that one

3    from Mr. Kronaugue as the basis to understand what the terms

4    would be.  Now, I am not sure if that's exactly what

5    Mr. Lavine's point was, but will the government, for instance,

6    be putting in bid information, for instance, or other types of

7    information?  I don't know.

8        MS. CALL:  At least I know we will be submitting

9    e-mails that contain bid terms.  So, for example, and I think

10   we are going to get here, Government's Exhibit 748 is an e-mail

11   from Carl Pepper at Tyson telling the Popeye's buyer we will do

12   1 cent per pound for 2017 and another 1 cent per pound for

13   2018, so it's essentially an offer as to how much they will

14   decrease the pricing.

15       And I will just make the point again that the

16   possibility of success of price-fixing is not necessary.  And

17   here you see a request from the customer followed by

18   coordination between customers as to how to respond.  And a

19   final contract isn't necessary for this to be relevant and

20   admissible.

21       THE COURT:  Mr. Lavine, anything else?

22       MR. LAVINE:  Your Honor, there is no contract here.

23   And I don't know how the defense is supposed to defend against

24   something like this when all they are trying to put in is a

25   bunch of e-mails and some phone records.  And what counsel was

2765

1   reading from is exactly the summary that they want to send back

2   to the jury.  So what's going to happen in closing argument,

3   they are not going to have enough time to cover all this.  I am

4   sure Your Honor is not going to give them four hours to close.

5   And I am not trying to invade upon whatever the Court is going

6   to decide as far as closing argument.

7           So what they are going to say, Your Honor, is look at

8   these e-mails, look at these phone calls on Exhibit 14.1, and

9   that shows an agreement.  There is no agreement.  There is no

10  contract.  There is nothing.  And I don't know how we are

11  supposed to defend against that when we can't -- when the

12  government doesn't even call the main person, which is Kent

13  Kronaugue.

14          And contrary to the government's assertion, they

15  didn't have him on as a fact witness.  They had him on as a

16  custodian to authenticate and they withdrew him from the list.

17  So they are completely backing off of pulling anyone in here to

18  address this Popeye's issue, and all they want to do is

19  introduce some e-mails and some phone calls and basically say

20  there is some illegal agreement.  That's a confrontation issue,

21  Your Honor, and I don't think that's the prejudice that we can

22  overcome.

23          THE COURT:  Okay.  Let me -- as long as Mr. Lavine

24  brought up the issue of closings, this is a sidetrack I think

25  we need to think about, and that is, you know, we knew the

2766

1    cumulative effect of 30-minute openings, so you all need to

2    take into account the cumulative effect of whatever length of

3    closings you're going to have.  Because since we are going to

4    be ending on December 21st, you know, if you back it all up, we

5    are going to have to finish the evidence probably the week

6    before.  So anyway, I just wanted you to keep that in mind.  Do

7    that math because it means that the evidence has to be closed

8    well before December 21st.

9          Okay.  Back on our points.  Ms. Call, did you want to

10   say anything more in response to Mr. Lavine's point?

11         *MS. CALL:*  I don't believe so, Your Honor, no.

12         *THE COURT:*  And I thought someone -- did someone else

13   have a point to make?

14         Mr. Fagg?

15         *MR. FAGG:*  I was going to raise the point, Your Honor,

16   about the October filing with Mr. Kronaugue, so ...

17         *THE COURT:*  Okay.  I am going to overrule that

18   particular objection.  I will only admit Mr. Kronaugue's

19   statement for the effect on the listener.  I haven't heard

20   enough to be able to determine whether or not, you know, this

21   would provide some type of a confrontation clause issue.  I

22   don't think it would.

23         The government is right that the government doesn't

24   have to demonstrate that there actually was a contract here.

25   Rather, it would only need to show that there has been some

2767

1    type of a conspiracy that was formed in regard to this

2    particular matter.  So the rest of it will be admissible as a

3    co-conspirator statement, but the statement from Mr. Kronaugue

4    will be identified as being admitted, but not for the truth of

5    the matter asserted, only for the effect on the listener.

6          Ms. Henry?

7          *MS. HENRY:*  Your Honor, respectfully I would like to

8    make the same objection we made with regard to Pollo Tropical

9    with regard to the Popeye's 2018.  And if I could just have a

10   continuation objection with the other documents that relate

11   specifically to this Popeye's issue.

12         *THE COURT:*  Yes, you can.  I will overrule that

13   objection for the same reason as I did the Pollo Tropical, but

14   I will give you a continuing objection as to that.

15         *MR. BELLER:*  Your Honor, if I may.

16         *THE COURT:*  Yes.

17         *MR. BELLER:*  Your Honor, understanding the Court's

18   limiting instruction, I think that begs the question for the

19   jury which is if this is being offered for the effect on the

20   listener, how does the jury then rationalize or determine

21   whether or not there was an underlying conspiracy unless they

22   consider the statement of Mr. Kronaugue for purposes of finding

23   the agreement.  And so I think that is -- I suppose being very

24   respectful of the Court's ruling, I think it leaves us with

25   that question, which is this must be considered for the truth

1    of the matter asserted; otherwise, it's simply not relevant to

2    the jury's determination of whether or not there was a

3    conspiracy in the first place as to brand X and Mr. Kronaugue.

4           THE COURT:  If this were the only document, maybe so,

5    but I get the impression from the government that there are

6    going to be other documents that would provide that context.

7    So I think there will be more than this, and for that reason

8    this -- that statement by Mr. Kronaugue in 744 would not have

9    to bear all the weight, and as a result, I don't think that

10   that effect would take place.

11          Ms. Prewitt?

12          MS. PREWITT:  Your Honor, would it be okay to reserve

13   ruling and have Your Honor rule on those other documents the

14   government is referring to before you make a final ruling on

15   this?  I think we will be moving through the list and it might

16   provide further context for Your Honor's ruling.

17          THE COURT:  I will maintain my ruling for now, but if

18   there is cause to reconsider, we can take that up.

19          MS. PREWITT:  Thank you, Your Honor.

20          MR. BELLER:  My one final request.  Will the Court at

21   least defer the decision on whether or not to give a limiting

22   instruction?  Because of my earlier concerns regarding the

23   giving of limiting instructions, we may ask the Court to

24   provide this document or allow the government to provide the

25   document without that limiting instruction.  And I am hopeful

1    that we could simply raise this at another time depending on

2    what other documents come in and what other issues are

3    presented.

4           THE COURT:  I am not quite sure how that would work,

5    Mr. Beller.  I can understand why for whatever reason the

6    defendants may wish to have the limiting instruction omitted,

7    but I am not sure the mechanism by which we would do so and

8    whether that would take a lot of time, so that's why I am a

9    little bit -- you can do that.  You know, if it comes up, I'll

10   know what you're talking about if you want to raise that.

11          MR. BELLER:  Understood.

12          THE COURT:  We'll just see.

13          MR. BELLER:  Understood.  Thank you.

14          THE COURT:  All right.  Next exhibit?

15          MS. CALL:  Yes.  If we could pivot to the one I

16   mentioned before I listed as 740, but it should be 739.  And we

17   will pull it up.  It is essentially this same e-mail from

18   Mr. Kronaugue but received by Justin Gay at Pilgrim's.  And

19   perhaps now that we are on the fifth time of me arguing effect

20   on the listener here, I will argue it a little better, which is

21   this document, as well as many others in this case, establish a

22   bidding deadline that was given to competitors.

23          So in this e-mail Mr. Kronaugue says looking for your

24   changes.  "Please send it to me by September 5th."  And this is

25   on August 16th he says this.  So we now have this August 16th

1    e-mail and a deadline set of September 5th.  And in many

2    instances throughout this case it's in that interim period that

3    we see the effect on the competitors being that in anticipation

4    of this bidding deadline, they then reach out to their

5    competitors.

6           We think this is necessary.  And I realize it may be

7    considered a bit duplicative to put this same e-mail in

8    evidence, but Mr. Gay's receipt of this is entirely important

9    because it is on September 5th that bidding deadline that

10   Mr. Gay calls Defendant Brady and Defendant Brady calls

11   Mr. Carl Pepper of Tyson.  So the fact in the anticipation of

12   that deadline and the need that the competitors had to submit

13   prices was really the motive for them reaching out to each

14   other.

15          THE COURT:  Well, the repetitive part is just the

16   e-mail from Mr. Kronaugue, right?

17          MS. CALL:  I didn't hear your second word.

18          THE COURT:  What you just described as the repetitive

19   part, that's just the Kronaugue e-mail, but this is to a

20   different group of people.

21          MS. CALL:  Yes.

22          THE COURT:  Objections to 739?

23          MR. BELLER:  We maintain a confrontation clause

24   objection.

25          THE COURT:  Anything else?

1            Mr. Fagg?

2            MR. FAGG:  Yes, Your Honor.  I believe that this

3    document here which is 739, I didn't look at the Bates number,

4    but looking at the text it appears that this was ruled on at

5    the James hearing and was found not to meet the standard for

6    801(d)(2)(E).  And that is James log entry 285.

7            MS. PLETCHER:  So one of the problems with this

8    document is Justin Gay's statement is, "Well, I figured the

9    portion in red was coming," and this is a black and white

10   document.  We don't know what he was referring.  So there is a

11   problem here with respect to relevance and to determining

12   whether this actually was a statement in furtherance as the

13   government alleges.  But in addition, Your Honor, as Mr. Fagg

14   stated, already found it was not.

15           THE COURT:  Go ahead, Mr. McLoughlin.

16           MR. McLOUGHLIN:  Your Honor, just for the clarity of

17   the record, to the point well made that the document on its

18   face refers to something that's not visible in black and white,

19   that would certainly be a best evidence objection to the

20   document where it is self-evident in the document that whatever

21   copying method was used -- and again there is no Bates number

22   on this one, at least we can't see it on the screen -- yeah,

23   down below, great.  I still can't read it, but -- it's way too

24   small, but that's okay.  So we have a material best evidence

25   problem where, in fact, as noted, it goes to the understanding

1    and interpretation of the document.

2        I would note also, of course, that Mr. Gay's statement

3    would be hearsay and because to the extent it's offered for the

4    truth of the matter asserted, which I think it is, and not

5    covered on the *James* log, there wouldn't be an exception that

6    would make it admissible.

7        THE COURT:  Okay.

8        Ms. Call?

9        MS. CALL:  As I believe I said earlier, but I may have

10   not, this isn't being offered under 801(d)(2)(E) at this time.

11   It's simply for the effect on the listener being Justin Gay's

12   receipt of the e-mail.  We are not offering those first two

13   e-mails for the truth of the matter.  The relevance here is

14   really the request and the bidding deadline for Mr. Kronaugue.

15       THE COURT:  Mr. McLoughlin?

16       MR. McLOUGHLIN:  Your Honor, I think to state the

17   obvious or what appears to be the obvious, but if you are

18   offering something to show the effect on the listener, there

19   should actually be an effect in words or substance.  And the

20   mere statement that he expected it is coming is not the effect

21   of a statement within the scope of that exception.  And the

22   Swiss Army knife that the government is trying to turn this

23   exception into is simply not applicable where the individual

24   doesn't do anything with respect to it or express anything else

25   that is a demonstrable effect within the anticipated definition

2773

1    of that term in the rule.

2          MS. CALL:  The effect here would be what I stated

3    earlier, which is the September 5th calls between competitors

4    on the date that bids were due and before they were submitted.

5    And that is government Exhibit 764, 765, another call on 764

6    between Justin Gay, the recipient of this e-mail, and Defendant

7    Brady from Claxton as well as Carl Pepper at Tyson.

8          THE COURT:  Mr. McLoughlin?

9          MR. McLOUGHLIN:  Your Honor, to the point earlier when

10   it's talking about the effect, the phone call the government is

11   arguing is the effect here is days later or longer.  And with

12   the existence of enumerable number of intervening events, the

13   government has, other than its own desire to argue to the jury

14   that there is a connection, has demonstrated no connection

15   between that phone call and this e-mail sufficient to make a

16   finding that that telephone call is an effect of this e-mail.

17         THE COURT:  Anything else, Ms. Call?

18         MS. CALL:  I will note the additional evidence of

19   collusion during this time which I believe we'll get to very

20   momentarily.  I noted there was a call between Defendant Brady

21   and Carl Pepper following Brady's conversation with Justin Gay,

22   the recipient of this e-mail.  Carl Pepper from Tyson later

23   also reaches out to Defendant Blake on the day after the

24   bidding deadline, but I will note Tyson had not actually

25   submitted its bid yet.  Following Defendant Pepper -- following

1    Mr. Pepper's call with Defendant Blake, he texted Defendant

2    Mulrenin saying, "Got a general idea of what George's is

3    doing."  That's right after he said Popeye's proposals, so the

4    context was clear.  Defendant Mulrenin then directed him to

5    call Mr. Cullen, who was an employee of Tyson with

6    responsibility for pricing.  Mr. Pepper then said, "Called

7    Cullen and told him what I heard George's was doing.  Also told

8    him about Mar-Jac.  Said would get back with me this

9    afternoon."

10         So there is evidence that the competitors, including

11   Carl Pepper, were colluding with respect to these negotiations.

12   And the additional phone calls on that date, the September 5th

13   deadline including the one with Justin Gay and Defendant Brady

14   are the effect that the government is showing that this e-mail

15   proposing this bedding deadline had.

16         THE COURT:  Let me ask a question.  Mr. Gay is listed

17   as a co-conspirator, right?

18         MS. CALL:  Yes.

19         THE COURT:  Ms. LaBranche?

20         MS. LaBRANCHE:  Your Honor, this series of

21   communications that the government just relayed to you should

22   be considered as support for allowing this exhibit in have not

23   been authenticated in this case.  They are the next series we

24   are going to get to.  So I would ask that the Court not

25   consider those.  I do not believe they will be able to come in

1    as evidence.  So to the extent the Court was going to consider

2    those, I would ask if maybe the Court would perhaps jump to

3    those and make that determination first before we allow the

4    government to rely on this evidence that's not going to come

5    in.

6              THE COURT:  Mr. Fagg?

7              MR. FAGG:  Last point, Your Honor.

8              If you listen to what the government said when they

9    described the subsequent conduct that they allege occurred and

10   was related to this e-mail, we just addressed 744 which related

11   to Mr. Mulrenin and others.  What I believe I heard Ms. Call

12   say, the subsequent activity did not relate to Mr. Gay.  So in

13   addition to the other reasons including it wasn't found to be a

14   co-conspirator in *James*, this is also duplicative of 744 to the

15   extent that what we are talking about is Mr. Kronaugue's

16   e-mail.

17             THE COURT:  Okay.  Ms. Call, is there some -- do you

18   think Ms. LaBranche's suggestion about taking up those other

19   ones may provide context for this one or what's your feeling on

20   that?

21             MS. CALL:  So if I am understanding her correctly, I

22   believe she's referring -- I am not quite sure, actually.  So

23   Exhibit 746, 752, 753, 754, 755, 756, 757 and 758 -- sorry, one

24   more -- 751 are that text message conversation I was referring

25   to.  I at least have in my notations that we had an

1    authentication certificate by Mr. Stephen Gresch and that there

2    was also testimony by Ms. Bunch and Ms. Arens relating to these

3    documents and their authenticity.  So we can perhaps pivot to

4    that.

5         THE COURT:  Ms. LaBranche, is your point dependent

6    upon whether there is authentication for those?

7         MS. LaBRANCHE:  That's exactly right, Your Honor.  I

8    can summarize for you very quickly what our position is.

9         THE COURT:  Well, why don't we come back to 739.  I

10   hate to do that because I will forget all the nuances of all

11   the arguments, but why don't we jump ahead to that string of

12   text messages, I assume they are text messages, 752 all the way

13   down to 751 in that block.  And then we will -- I will rule on

14   739 after that.

15        MS. CALL:  I assume we may just want to take

16   authenticity first with respect to these text messages.

17        THE COURT:  I agree.  Which one do you want to start

18   with, 752?

19        MS. CALL:  Yes.  And we are working on pulling the

20   certificate from Mr. Gresch on this and the precise testimony

21   by Ms. Bunch and Ms. Arens, but this was relevant to both of

22   their testimony.  So I suppose while we pull that up, if

23   Ms. LaBranche wanted to argue.

24        MS. LaBRANCHE:  I would ask that if we could have

25   Page 809 pulled up.  I think that's probably what you are

1   looking for if you would like to go first, Ms. Call.

2          MS. CALL:  Ms. LaBranche, if I could have some

3   clarification.  I will address the Court while asking this

4   question, but I don't know what the reference to Page 809 is.

5          THE COURT:  It may be a list.

6          MS. LaBRANCHE:  Your Honor, I will come up if that's

7   okay.

8          THE COURT:  Yes, sure.

9          MS. LaBRANCHE:  So the Court may recall that the first

10  like Tyson custodian that the government called was a woman

11  named Ms. Arens who came in and she testified about pulling

12  certain documents and e-mails off of the Tyson server and then

13  providing them to a third-party vendor.  Steven Gresch is that

14  third-party vendor who worked at TransPerfect.

15         He testified what his company did when they received

16  the documents from Ms. Arens, as well as some devices that his

17  company had actually forensically imaged itself.  Then he tried

18  to talk about some other devices that had been forensically

19  imaged by The Oliver Group.

20         If I could pull up Exhibit H-809.  I believe I need to

21  go to the third page.

22         This is the certificate that the government provided

23  to us from Mr. Gresch.  If the Court can see, the iPhone8 from

24  Carl Pepper, it was sourced from The Oliver Group, not from

25  Mr. Gresch's company, TransPerfect.  So there was a point in

2778

1    time during Mr. Gresch's testimony where the government tried

2    to nonetheless authenticate the materials that came off of

3    Mr. Pepper's phone by asking about hash tag values.  This was

4    objected to by Mr. Pollack and the Court sustained the

5    objection.  All of that took place on October the 28th.

6         On November the 3rd the government then brought Kent

7    Oliver in from The Oliver Group so that he could talk about

8    collections of data he had gotten from certain Tyson employees

9    including Carl Pepper.  However, his testimony, and it's at

10   pages 66 and 69 of November 3rd, went only to laptops.  There

11   was no testimony at all about Mr. Pepper's iPhone.  So

12   authentication-wise there is a link in the chain that is just

13   completely missing.

14        THE COURT:  Okay.  Thank you, Ms. LaBranche.

15        MS. LaBRANCHE:  Thank you.

16        THE COURT:  Go ahead, Ms. Call.

17        MS. CALL:  Yes, Your Honor.  As Ms. LaBranche noted,

18   Ms. Arens and Ms. Bunch from Tyson did testify about the

19   collection process of these materials.  While Mr. Oliver may

20   not have specifically testified to these, any break in that

21   chain of custody goes to the weight of the evidence and not to

22   the admissibility.  And we believe that this was sufficiently

23   authenticated by the others who did testify regarding these

24   documents.

25        THE COURT:  How?  I mean --

1      MS. CALL:  Essentially that they are able to testify

2  about the process and confirm that the records are true and

3  accurate copies.  And I do need to go back and look at their

4  testimony.  I don't have it before me at the moment.  I have

5  received a note that I believe this was actually covered by the

6  government's 902(14) motion regarding self-authenticating

7  evidence and that the certificate from Mr. Gresch was provided

8  with that, as well as I believe the Bates numbers for these

9  documents.  And the defendants at the time did not object to

10  these as self-authenticating records, so this may be a moot

11  point.

12      THE COURT:  I just don't recall.

13      MS. CALL:  We are pulling up the ECF number of the

14  Court's ruling.

15      THE COURT:  So were these documents on Exhibit 9549

16  which was I think shown to Ms. Arens?

17      MS. CALL:  We will pull up 9549 and confirm that.  May

18  I have the Court's indulgence for a moment?

19      THE COURT:  Sure.

20      MS. CALL:  I don't believe these Bates numbers were on

21  what was provided to Ms. Arens.  However, unless I am reading

22  this incorrectly, the Court's ruling in ECF-673 did cover the

23  extractions done by FTI Consulting which, and this is just my

24  memory at the moment -- TransPerfect, I apologize.

25      THE COURT:  They are all listed on Page 2, the

1    left-hand column.

2         MS. CALL:  So it's page -- are you discussing the

3    Court's ruling on 673 or --

4         THE COURT:  No, no.  I was just saying that so it

5    looks like they are on a list of exhibits that Ms. Arens was

6    asked to review.  I don't recall what her testimony was about

7    those, though.

8         Ms. LaBranche?

9         MS. LaBRANCHE:  Your Honor, as the Court may recall,

10   there was testimony that the government wanted Ms. Arens to

11   only talk about certain documents.  These are again, these

12   e-mails or these texts came off of devices that The Oliver

13   Group gathered.  Whether or not Ms. Arens gave some kind of --

14   as we know, the government was trying to do business records

15   that shouldn't have been business records.  I think Ms. Arens

16   got up and testified about 7 million documents that she was

17   authenticating.

18        To the extent this number of this iPhone that we know

19   was never in her possession and never could have been

20   authenticated by her somehow ended up on that exhibit I don't

21   think addresses the real issue here, which is we know that the

22   phone was provided to Oliver Group.  Oliver Group did the

23   extraction.  And Oliver Group has not authenticated anything

24   that they did to get that extraction, that it was, in fact,

25   Mr. Pepper's phone, that they met with Mr. Pepper, anything

1   like that.

2           THE COURT:  Mr. McLoughlin, go ahead.

3           MR. McLOUGHLIN:  Your Honor, with respect to the

4   argument that this issue goes to the weight of the evidence and

5   not admissibility, I don't think there is anything in the

6   commentary to Rule 901 that supports that argument.  The test

7   of it in 901(a) says to satisfy the requirement of

8   authenticating or identifying an item of evidence, the

9   proponent must produce evidence sufficient to support a finding

10  that the item is what the proponent claims it is.

11          There is no implication in the plain text of the rule

12  that permits the government to argue that this goes to the

13  weight of the evidence or that there is some other method or

14  means by which they can avoid the mandatory language of 901(a).

15          MS. CALL:  I will respond just that we have been

16  checking Ms. Arens' transcript and she did testify that she

17  reviewed every document on the list.  And I apologize, our

18  numbering may have been a little confusing that I did not see

19  it on the second page, but she did testify that she was able to

20  locate all of those records and identify that they were true

21  and accurate copies of what was maintained by Tyson.

22          MS. LaBRANCHE:  Your Honor, if she never got the

23  documents, she never had possession of his phone, how could she

24  possibly authenticate that they are true and correct copies of

25  anything?

1          THE COURT:  Well, I think she may be able to -- she

2     testified that she was familiar with Tyson's production, but it

3     still goes to the point that you're making and Mr. McLoughlin

4     has made which is, once again, that doesn't answer the question

5     as to what the source is.  So how do we know what the source of

6     the e-mail is?  Because it wasn't -- I think this would be a

7     document that's not on the server.  I don't know, I think --

8     because obviously things were collected from personal devices.

9     Whether those would be on the server as well, I'm not sure,

10    but --

11         MS. LaBRANCHE:  I would just refer Your Honor back to

12    Page 3 of 809 which shows that The Oliver Group went and got

13    the documents -- got the device and took documents off of the

14    device, so there is nothing about it coming through the Tyson

15    server.

16         THE COURT:  Can you put H-809 back up?  I want to take

17    a look at it.

18         And Ms. LaBranche, the document identifiers for

19    Mr. Pepper's iPhone, are those ones that match up with the

20    exhibits that we're talking about right now?

21         MS. LaBRANCHE:  They are, Your Honor.

22         MS. CALL:  I will note just looking at ECF 623-1 which

23    was the government's motion regarding the self-authenticating

24    devices, the certificate at issue here was Exhibit 30-1

25    relating to TransPerfect.  It did identify the source as an

1    Apple iTunes backup of a fourth generation iPad owned by Carl

2    Pepper, if I am reading this correctly.  And I believe that the

3    link Ms. LaBranche is discussing is how the extraction itself

4    was done by The Oliver Group.  It was then processed by

5    TransPerfect.  And so the certificate went to that processing

6    aspect, I believe, but she can correct me if I'm understanding

7    that wrong.

8            THE COURT:  Sorry, but Ms. Call, so is what you're

9    saying is the Court has already ruled on this issue?  That's

10   what I am not quite --

11           MS. CALL:  Yes, exactly.  The Court's ruling that I

12   referred to earlier, and I perhaps need to find the ECF number

13   again, did note the items processed by TransPerfect were

14   self-authenticating and the defendants had not objected to

15   that.

16           THE COURT:  Do you have a copy of that order?

17           MS. CALL:  It's in my hand apparently.

18           MS. LaBRANCHE:  Can I get a docket number, Your Honor?

19           MS. CALL:  673.  There may be some handwritten notes

20   by the government and I will refer you to Page 4.

21           MS. LaBRANCHE:  Your Honor, would I be able to look at

22   the Court's copy?

23           THE COURT:  Yes.  We are trying to print an extra copy

24   out too.

25           But Ms. Grimm, can you hand this to Ms. LaBranche?

1          MS. CALL:  The two relevant items would be the Court's

2     order and then the government's filing 623 and Exhibit 30-1 to

3     that.  With all of the back-and-forth, I think the government's

4     position is this would be a moot issue given the Court's prior

5     ruling.

6          MS. LaBRANCHE:  Your Honor, could we pull back out so

7     I can see the full page that we are on for H-809 and blow up

8     the bottom?

9          Your Honor, as I read your order, this relates to

10    extractions that were performed by, as it relates to the

11    electronic devices, a number of companies including

12    TransPerfect.  The whole point here is that TransPerfect did

13    not do this extraction.  And I believe the footnote makes clear

14    the forensic acquisition was created by The Oliver Group, not

15    by TransPerfect, so I don't believe it's covered by Your

16    Honor's order.

17         MS. CALL:  Your Honor, I still think that doesn't

18    cover the fact that the defendants and Defendant Mulrenin in

19    particular didn't object to the authenticity of these materials

20    when this was at issue in the motion.  And if they had

21    objected, perhaps the government would have gotten additional

22    testimony from Mr. Oliver when he was called.  We did have a

23    prior ruling that did cover these -- this device and these

24    materials.

25         THE COURT:  Yeah, I think -- so the issue would seem

2785

1    to be whether or not the documents at issue now which are

2    exhibits were identified in the government's notices which are

3    referred to in Docket No. 622, 623 in the order, the order

4    being 673.  I do find in that order that there was no

5    objection, so the issue would be whether or not those were at

6    issue in those two motions.

7              Ms. LaBranche?

8              *MS. LaBRANCHE:*  Your Honor, I would need to have just

9    a moment to pull up whatever the attachment is.

10             *THE COURT:*  Sure.

11             *MS. CALL:*  Your Honor, I am looking at Exhibit 1 to

12   the government's filing of 623.  I am saying Page 4 where it

13   notes 30-1 and discusses that certificate, they provide the

14   document identifiers of the documents at issue right now.

15             *MS. LaBRANCHE:*  Your Honor, I maintain the position

16   that we relied on the representation that this was an

17   extraction from TransPerfect.  When he got on the stand, when

18   Mr. Gresch got on the stand and started testifying, I think

19   that's when it became clear, at least in my mind, that he had

20   not performed that particular extraction on that particular

21   phone.

22             He was here.  And the government brought Mr. Oliver

23   back in knowing that we had objected on authentication grounds

24   through Mr. Gresch.  And so it seems to me that the fact that

25   it could somehow be waived because it was contained in one of

1    30-plus certification lists prior to trial when we developed

2    during the testimony that, in fact, no one can say under 901

3    that the information is from Mr. Pepper's phone with evidence

4    that was crucial, I would ask the Court to still find that this

5    has not been authenticated.

6         THE COURT:  What about the two footnotes that are

7    highlighted right now?

8         MS. LaBRANCHE:  Yeah, that was exactly the testimony

9    that Your Honor wouldn't let Mr. Gresch get.  That's what he

10   was trying to do.  He was trying to say I matched up the hash

11   values.  And we objected to that.  What he ultimately testified

12   to was that he was not there when The Oliver Group did the

13   extraction.  He never worked for The Oliver Group.  He was

14   never trained by them.  He may say yes, I think that they do

15   things right probably was essentially what he said, but he does

16   not have any personal knowledge.

17        THE COURT:  Mr. McLoughlin?

18        MR. McLOUGHLIN:  Your Honor, I would just note whether

19   we are talking about waiver or law of the case, I think it is

20   quite plain that at this point certainly after Mr. Oliver's

21   testimony and the TransPerfect testimony that there are facts

22   that were not before Your Honor, relevant facts at the time of

23   this issue, and they were not facts available to the defendants

24   either.  And so whatever the order is, you know, if Your Honor

25   has new facts you did not have at the time and were not

1    provided to the Court and were not provided to the defendants,

2    and so common sense would indicate that the best thing to do is

3    rule on the facts that you have available which are different

4    than at that time.

5         THE COURT:  All right.  I think the government is

6    right.  This is an issue that the court has ruled on.  The

7    defendants didn't object.  Footnotes 1 and 2 would provide at

8    least some basis to question the issue, and for that reason the

9    fact that there was no objection previously will mean that

10   those exhibits are authenticated.

11        Next -- so that's just authentication.  We will move

12   on to the next issue now.

13        MS. CALL:  Yes, Your Honor.  So the next issue will

14   be, of course, admissibility.  So starting -- I think this

15   group is, as I said, just to circle back, Exhibit 752, 753,

16   754, 755 through 758, as well as 751.  As far as admissibility,

17   this is essentially one text message conversation between

18   Defendant Mulrenin and Carl Pepper.  Several of these, although

19   not all, were on the *James* log, so perhaps should we address

20   this one at a time or as a group?

21        THE COURT:  I would say a group.

22        MS. CALL:  Okay.  So certain of them, and I will say

23   that's Exhibit 755 through 757, as well as 751 were on the

24   *James* log and ruled on favorably.

25        The ones that were not including the initial three

2788

1    text messages, 752, 753 and 754, just simply aren't being

2    offered under 801(d)(2)(E), but they are, like I said, relevant

3    context for the conspiratorial statement that follows.

4            So essentially Mr. Pepper texted Defendant Mulrenin

5    asking, "You with your customer," to which Defendant Mulrenin

6    responds, "Yes, what's up?"  And then Mr. Pepper goes on to say

7    "Popeye's proposal," and then goes on to make these

8    conspiratorial statements of, "Got a general idea of what

9    George's is doing," to which Defendant Mulrenin says, "Okay,

10   call Cullen."  And then Mr. Pepper says, "Called Cullen, told

11   him what I heard George's was doing and also told him about

12   Mar-Jac."

13           So there is the three statements that are

14   conspiratorial then which are preceded by just very relevant

15   context as to what initiated the conversation and what the

16   topic is which is the Popeye's proposal.  So I think this is

17   kind of a precise issue where there would be context necessary

18   and offered for a non-hearsay purpose as the kind of motivation

19   of Mr. Pepper's message of saying, "Got a general idea of what

20   George's is doing."

21           THE COURT:  Which documents were ruled on through the

22   James hearing process?

23           MS. CALL:  755, 756, 757 and 751.  The ones that

24   weren't as helpful were 752, 753, 754 and 758.

25           THE COURT:  Can you display one at a time, first of

1    all, 752?

2            *MS. CALL:*  Yes, Your Honor.  My colleague will do so.

3            *THE COURT:*  Oh, we've got that up now.

4            Then 753?  All right.  754?  And 758?

5            Okay.  Objections to that e-mail -- or text string?

6    Sorry.

7            Ms. LaBranche.

8            *MS. LaBRANCHE:*  As to 752, 754 and -- just those two,

9    I would object on hearsay grounds.

10           *THE COURT:*  And are those --

11           *MS. CALL:*  If you could pull up 752 and 754 side by

12   side.

13           *THE COURT:*  Who are the declarants in those?

14           *MS. CALL:*  Mr. Pepper.

15           *MS. LaBRANCHE:*  They were not found --

16           *THE COURT:*  Well, I don't think they were included on

17   the log as opposed to having been ruled against.

18           *MS. CALL:*  That's correct, Your Honor.

19           *THE COURT:*  Okay.  Anyone else?

20           All right.  Then each of those exhibits will be

21   admitted.  752 and 754 will be admitted, not for the truth of

22   the matter asserted, but rather for the effect on the listener.

23           *MR. BELLER:*  I would simply note back to the

24   objections on 739 and 744 which is that this all, I guess,

25   revolved around the truth of the matter asserted as to Kent

2790

1    Kronauge's statement, so for that reason the objection

2    continues.

3           THE COURT:  Okay.  It will be overruled.

4           MR. McLOUGHLIN:  Point of clarification, Your Honor.

5    With respect to those that are on the effect on the listener,

6    will there be a limiting instruction?

7           THE COURT:  Yes.

8           MR. McLOUGHLIN:  Thank you.

9           THE COURT:  Okay.  Now, could we go back to 739?

10          MS. CALL:  I believe that is where we had left off.

11          THE COURT:  Can we display 739?

12          MS. CALL:  If I am able to aptly articulate what was

13   the discussion on 739, I believe the government's position had

14   been that it is non-hearsay.  It's offered for the effect on

15   the listener, Mr. Gay.  And we have recounted the various

16   conspiratorial calls involving Mr. Gay, Defendant Brady and

17   then calls involving Carl Pepper of Tyson.  And we had then

18   referred back to the text messages involving Mr. Pepper and

19   Defendant Mulrenin as further evidence in their own words of

20   the conspiratorial acts going on around that time.  And I

21   believe that is why we had reserved ruling on the admissibility

22   of 739 for the effect on the listener.

23          THE COURT:  Mr. Fagg, anything new?

24          MR. FAGG:  Nothing new, Your Honor.  We just renew our

25   objection that this was specifically ruled on at the *James*

2791

1    hearing and found not to meet the standard under *James*.

2         THE COURT:  Right.  So I am going to sustain the

3    objections as to 739.  First of all, there was a ruling, and as

4    Mr. Fagg just noted, it was not found to be a co-conspirator

5    statement.  The second issue is I think there certainly is

6    something to the argument that there is a best evidence rule

7    objection here because it's just a black and white document.

8    That may not actually be too important, but when we get to the

9    effect on the listener, of course the effect on the listener

10   doesn't really have any real relevancy here because it doesn't

11   really explain anything about what is supposed to be happening,

12   and the government hasn't articulated how the effect here is at

13   all relevant.

14        This is just a proposal and then there is a comment

15   about, you know, the portion that was in red, which we don't

16   know exactly what it refers to.  And then there is an

17   additional statement by Mr. Bryant that really isn't -- it

18   doesn't really have anything apparently to do with the

19   Kronaugue e-mail anyway other than maybe it has to do with the

20   receipt of an official request, I am not sure.

21        MS. CALL:  I believe the government is only

22   introducing this for the effect on Mr. Gay.  Of that Kronaugue

23   e-mail, we are happy to redact the top two e-mails if Your

24   Honor deems them hearsay.  But essentially what this e-mail

25   does is establishes in Mr. Gay's mind the September 5th bidding

2792

1    deadline, which is then the date that Mr. Gay reaches out to

2    his competitors.  So the effect is that the motive for Mr. Gay,

3    knowing this deadline, to then reach out to his competitors.

4         THE COURT:  Right.  Well, if we redacted the top two,

5    then it's just redundant because we already know that it got

6    sent out to some unspecified group of people before.

7         MS. CALL:  One moment.

8         THE COURT:  One moment, Mr. McLoughlin.

9         Go ahead, Ms. Call.  Then we will go back to

10   Mr. McLoughlin.

11        MS. CALL:  I understand Your Honor said it was sent to

12   an unspecified group, but I think the importance and the

13   relevance to this for the effect is that Mr. Gay himself

14   received it.  And maybe the redaction is the issue here.  If we

15   could perhaps leave the header information of Mr. Gay then

16   forwarding it on, that would essentially be what the government

17   would want to establish.

18        THE COURT:  Go ahead.

19        MR. McLOUGHLIN:  Your Honor, we would note first, of

20   course, the e-mail from Mr. Kronaugue is not addressed to

21   Mr. Gay.  That's first.  Second, we get to the same problem we

22   had with the last time the government wanted to redact just

23   text, which is it invites speculation by the jury which is

24   worse than anything else.

25        And then when it comes back to the government's

2793

1    argument that the effect on the listener is in theory something

2    that happens in September, which is weeks later, and in fact,

3    it is completely dependent on the government's theory of

4    collusion, and so we get this circularity where the

5    government's theory which they are trying to prove, but hasn't

6    yet, becomes the admissibility basis for evidence that they

7    claim supports their theory even though it doesn't do so on its

8    face.  And we are talking about a, quote, effect on a listener

9    weeks later with no discussion of the intervening events and

10   communications.

11           THE COURT:  Response?

12           MS. CALL:  I don't believe there is any immediacy

13   requirement for effect on the listener.  I think all of us live

14   in a world of deadlines, and even ones that are days or weeks

15   ahead certainly have an effect, including, for example, court

16   deadlines on all of us that we have been living by quite often.

17   So I just don't take that argument when here we have a request

18   with a deadline following by on the date of that deadline a

19   clear effect which is the coordination between competitors

20   which is shown not only by the phone calls involving Mr. Gay,

21   but then the text messages between Defendant Mulrenin and

22   Mr. Pepper which shows that there was, in fact, coordination

23   around this time.

24           THE COURT:  Well, I think what you're saying is that

25   it seems to me that what the government wants is some evidence

1   that the Kronaugue e-mail was received because then that would

2   help explain why people did things down the road.

3          MS. CALL:  Yes, that it was received, as well as the

4   deadline that Mr. Gay understood to exist based on that e-mail.

5          THE COURT:  Well, we don't know that from anything on

6   739, though.

7          MS. CALL:  We do.  I believe it's on the last e-mail,

8   but let me confirm.

9          "Please send it to me by September 5th."

10         THE COURT:  All right.  Yeah, but you said effect on

11  the listener, and Mr. McLoughlin's point from way back was that

12  there is just no evidence of any effect here.  But I think what

13  you're saying is that the government wants the introduction of

14  the Kronaugue e-mail to demonstrate that Pilgrim's received

15  this particular e-mail, and then because the e-mail had a

16  deadline in it, that caused them to react in certain ways.  Is

17  that --

18         MS. CALL:  Yes.  The non-hearsay in 739 is Mr. Gay's

19  receipt of this e-mail and his belief based on it that there

20  was a September 5th bidding deadline.  And then the effect on

21  the listener is his understanding that there was this deadline

22  that then motivated him to reach out and coordinate with

23  competitors.

24         THE COURT:  Mr. McLoughlin?

25         MR. McLOUGHLIN:  We go back to, Your Honor, I don't

2795

1    recall there being a hearsay or other exception to the fact

2    that Mr. Gay received it.  And to the extent they are talking

3    about the document and the interpretation of the document, the

4    hearsay exception would, in fact, apply to the header as well

5    as to the text.

6         But also there is document -- Exhibit 744 to which

7    Mr. Kronaugue addresses, "Guys, please turn in your current

8    model."  And arguably the government can argue whatever it

9    wants off 744, but we go back to Mr. Lavine's point which is

10   the government is tying the evidence rules in a pretzel in

11   order to avoid calling a witness who was on their October 6

12   witness list who could provide this information, but they would

13   rather create a *Crawford* issue than do that.  And this presents

14   exactly why there are *Crawford* issues here.

15        THE COURT:  So what was -- what's the proposal, then,

16   or was there one as to what the government was suggesting about

17   redactions or -- I am just not sure.

18        MS. CALL:  The proposal would be to redact the

19   contents of the two e-mails at the top of the chain so that the

20   header information which is non-hearsay would remain as well as

21   the e-mail from Mr. Kronaugue which is not offered for the

22   truth, but for the effect on Mr. Gay.

23        THE COURT:  I am not sure it would be for the effect

24   on Mr. Gay.  Apparently it just would be for a purpose of

25   indicating that the proposal was received by Mr. Gay.  And then

1   subsequent that would have an effect perhaps on him later

2   because that would explain why he was doing certain things like

3   responding to the proposal or the request.

4        MS. CALL:  Correct.  The effect articulated is not his

5   two e-mails in this chain, but those other acts that we have

6   described.

7        THE COURT:  So what about that, Mr. McLoughlin?  If

8   the actual words in both Mr. Bryant's and Mr. Gay's responses

9   were redacted, what effect, if any, would that in your opinion

10  have on the admissibility of 739?

11       MR. McLOUGHLIN:  Two points.  One is the hearsay rule,

12  Your Honor.  The hearsay rule, offering something for the truth

13  of the matter asserted is not limited to the text written by

14  someone.  And those addresses to the extent they are offered

15  for proof of the effect asserted, which is that Mr. Gay or

16  Mr. Bryant or anyone else had these e-mails, they are offered

17  for the truth of the matter asserted in that text.  And the

18  hearsay rule applies.  So that doesn't get them around the

19  hearsay rule.

20       Second point is again you get this redaction where

21  particularly in a conspiracy case where the government is

22  inviting the jury to build inference and speculation based on

23  somebody made a phone call that we don't know what was said,

24  but here is what we think they said, and now we are creating

25  e-mails in which the government has, you know, redacted the

1   text so that we wind up with this speculation.

2           And at some point there is limiting instructions Your

3   Honor can provide that the jury will ignore.  And I think there

4   is a reasonable probability that whatever limiting instruction

5   Your Honor gives here, that will not deter that kind of

6   speculation.  So we come back to the government's inability or

7   unwillingness to solve the fundamental issue that is presented

8   by all of this.

9           THE COURT:  So here is my ruling on this one and that

10  is Exhibit 739 will be admitted, not for the truth of

11  Mr. Kronaugue's statement, not for the truth of Mr. Bryant or

12  Mr. Gay's statements, but rather simply for the purpose of

13  indicating whether or not Mr. Gay received the offer.  That has

14  been recognized as a non-hearsay purpose and I will provide a

15  limiting instruction to that effect.

16          Okay.  Next exhibit?

17          MS. CALL:  Before we move on, I want to make sure

18  there is a pin that hasn't gone back to.  I believe Your Honor

19  did rule on 744 already, but I wanted to double-check.

20          THE COURT:  Yes, I have ruled on that one.

21          MS. CALL:  The next exhibit is Government's Exhibit

22  710.

23          MR. FAGG:  Your Honor, before we move on, just one

24  point of clarification.  On 740 is the government still

25  attempting to --

1      THE COURT:  I took that as being withdrawn and

2   substituted with 739; is that right, Ms. Call?

3      MS. CALL:  Correct.

4      MR. FAGG:  Thank you.

5      THE COURT:  Go ahead, Ms. Call.

6      MS. CALL:  Document 710 is the September 5th

7   submission by Dean Bradley from George's.  And the exception to

8   the hearsay rule applicable here is the recognized exception

9   for communications of independent legal significance making

10  this non-hearsay.  Essentially the reasoning is that an offer

11  or bid binds a company in its negotiations legally making it

12  non-hearsay.  And if I can flip quickly enough, I can point you

13  to case law specifically about bids and offers being

14  non-hearsay for this purpose.

15     THE COURT:  That's true.  Of course, here we have --

16  it's an overview.  It's not -- so the legal effect exception

17  which does exist would not seem to apply necessarily to an

18  overview because I don't know if you'd do business with this

19  type of an e-mail.

20     MS. CALL:  I think the distinction -- one moment.

21     Perhaps if we could pull up Government Exhibit 711 as

22  well which is the attachment here.

23     THE COURT:  Yes.  You're right, maybe this is the

24  overview and the attachment is the bid.

25     MS. CALL:  We will pull them up side by side.

1          THE COURT:  Okay.

2          MS. CALL:  Essentially it's the e-mail and the cost

3     model taken together really are the bid submission,

4     particularly given that the request from the customer related

5     to stepping down decreases over a two-year period.  And that's

6     what's summarized in the e-mail here.  Let me show the model

7     while we're at it.

8          THE COURT:  Any objections to the admission of 710 and

9     711?

10          Ms. Johnson go ahead.

11          MS. JOHNSON:  First, I would like to start with an

12     under 901 and 902, authenticity.  As the Court will recall -- I

13     am using the real-time transcript, so I certainly would defer

14     to the Court's recollection, but back on October 28 --

15          THE COURT:  Here is one thing about those I want to

16     make sure that everyone understands.  The real-time is not

17     official.  It can't be quoted.  You can, of course, allude to

18     it.  You can summarize from it, but it really shouldn't be

19     quoted back because it's not an official transcript and it

20     hasn't been certified.

21          MS. JOHNSON:  Yes, Your Honor.  And simply trying to

22     repeat what has been done in the court so far, and just for the

23     Court's recollection, and I certainly will not quote from that,

24     but back on October 28th the government called Robert Hood as a

25     custodian for the George's records.  And there was several

1    issues with his testimony.  First and foremost, when Mr. Hood

2    was asked if he compared the documents on a list the government

3    gave him to those on the server of George's, it's my

4    recollection and from the transcript -- I am not quoting it --

5    he was unable to say that he did do that.  What he did say was

6    that he compared those documents on a list from a list given to

7    him by the government to the other list that was given to him

8    by outside counsel from another matter.  And as we know, it's

9    the civil matter.  He did not go back to the server and compare

10   those documents.

11         The second issue, Your Honor, is with regard to the

12   actual extraction of the documents.  Mr. Hood did not perform

13   that extraction.  He referred to another gentleman who actually

14   performed the extraction and the tool that that gentleman used.

15   That gentleman was not called to court to testify about the

16   operations that he took to perform this extraction.  When asked

17   specifically what Mr. Hood's knowledge was, I believe to

18   summarize the testimony was something along the lines of, well,

19   I trust his ability to go out and use that tool.  And if there

20   were problems, I trusted he would come and tell me about it.

21   He had no direct knowledge of the actual tools, the computer

22   tools that were used in the extraction and simply relied on the

23   trust of the person doing the extraction.

24         Jumping back, Your Honor, if you will allow me to,

25   when Mr. Hood compared the documents given to him by the

1    government to the documents given to him by the outside law

2    firm, I think his testimony was something akin to, they assured

3    me that these documents were copies that I had sent to them.

4            So for those reasons, Your Honor, we feel like the

5    government has not provided to the Court through testimony

6    sufficient indicia of authenticity of these documents.

7            THE COURT:  Response?

8            Mr. Beller, do you have an additional authenticity

9    point?

10           MR. BELLER:  I don't, so perhaps I am premature.

11           THE COURT:  Why don't we go ahead and deal with

12   authenticity first.

13           Ms. Call?

14           MS. CALL:  Yes, Your Honor.  As Ms. Johnson stated,

15   Mr. Hood did testify about the George's servers, as well as how

16   e-mails were saved and maintained on those servers.  And for

17   custodian of records authenticity, there is not a personal

18   knowledge requirement.  So the fact that he believed these to

19   be authentic based on any representations he had from counsel

20   or otherwise, what matters is his statement as an employee of

21   George's that this is what he says it is and it's an authentic

22   copy of an e-mail served to us saved on George's servers.

23           THE COURT:  Okay.  And what do you recall as to his

24   testimony regarding that comparison?

25           MS. CALL:  One moment.  It's stated, and I am not

2802

1    going to quote from the record here, but that he had reviewed

2    the documents and the binder and compared them to the Bates

3    ranges that Ms. Johnson had noted were given to him by counsel,

4    but he identified that the Bates ranges were directly from the

5    e-mail pulls that George's had done.

6         THE COURT:  Did Mr. Hood testify that all of the

7    documents that were on the list that you provided to him, that

8    he took those documents and made a comparison of ones on the

9    George's servers?

10         MS. CALL:  At one point he discussed how he did a

11   high-level comparison looking at each document at the Bates

12   stamps, at the length, whether there was an attachment, and at

13   a high level he said he felt comfortable that they were

14   accurate copies.  He then also said in response to a question

15   along the lines of whether the e-mails and the attachments that

16   were contained in the binder in front of him were true copies

17   of the versions of the e-mails and attachments, he said yes.

18         THE COURT:  Okay.  Ms. Johnson, go ahead.

19         MS. JOHNSON:  Your Honor, I agree that Mr. Hood felt

20   that the copies given to him by the government, he compared at

21   a high level to the copies given to him by outside counsel.

22   And I am certain the Court is refreshing its own recollection.

23   At no time did Mr. Hood compare any documents back to the

24   documents on the George's server.

25         THE COURT:  I thought that he testified that he

1    performed that.  That's what I had down, that he didn't just

2    compare it to the production documents, that he compared it

3    back to the George's server at that high level that Ms. Call

4    mentioned.

5         MS. JOHNSON:  Your Honor, I am not trying to quote the

6    transcript, but on the October 28 transcript, 102 through 104,

7    Mr. Hood said:  So I used the version that counsel sent me.

8    They assured me were copies of what we had sent them, and I

9    compared that to what we received from counsel through you,

10   meaning the government.

11        MS. CALL:  If I may briefly, on the page before that

12   he testified that he reviewed the Bates numbers that counsel

13   for the company had given him and compared that to the Bates

14   numbers of what he had -- was familiar that had been pulled

15   from George's server.  So he made the connection on that ground

16   between the documents that had been pulled from the servers as

17   well as what counsel for the company had told him.  And that

18   page is 121 to 122.

19        THE COURT:  And the document that he testified that

20   were so-called pulled from the servers, who pulled them from

21   the servers?  Was that independent of what he was provided by

22   counsel?

23        MS. CALL:  I will have an answer in one moment, if I

24   may.

25        THE COURT:  The issue is whether or not that he took

1  the list that the government provided him with and compared it

2  back to what was resident on the George's servers.

3       MS. CALL:  What I am seeing so far, it appeared he

4  testified as to the pull that -- and I think he may have used

5  the term we did from the servers.  And it appears he compared

6  on a Bates level basis the documents between the pull from the

7  servers and the list provided by the government, but let me

8  find more.

9       THE COURT:  Because my notes reflect, and Ms. Johnson

10 may be able to double-check this, but he was handed a binder.

11 The binder had an exhibit list.  It was 9553.  He was asked if

12 he had a chance to look at those.  He said yes.  And then he

13 said that they were given to me by my counsel.

14      So the question would be whether that is also the body

15 of documents that he did the comparison to or whether he was

16 taking the documents given to him by counsel and then comparing

17 those back to something that was resident on the George's

18 servers.

19      MS. CALL:  So I believe the portion that may answer

20 this question is actually at Page 103 of the transcript.  So he

21 essentially seemed to state something along the lines of he

22 believes the document pull I believe was done by his

23 subordinate, Keith Pennington, who pulled e-mails from the

24 system.  And he stated that those e-mails that were pulled then

25 got uploaded to servers for counsel for the company.  And

1   then --

2          THE COURT:  Hold on.  Let me just understand.  So

3   someone named Pennington pulled which documents?

4          MS. CALL:  I believe all of them, all the ones that

5   got pulled in response to requests for this case and the civil

6   case.

7          THE COURT:  Okay.  In response to subpoenas.

8          MS. CALL:  Uh-huh.

9          THE COURT:  Okay.

10          MS. CALL:  Or requests for documents in the civil

11   case.

12          THE COURT:  Right, right, right, yeah.

13          MS. CALL:  Then they get uploaded to the server for

14   counsel.  And then he testified along the lines of he received

15   a representation what he said was from counsel of the version

16   that counsel sent him that they were able to assure him came

17   from what he had provided based on the document pull to their

18   servers and that he confirmed those documents being accurate

19   copies of what's in the government's exhibits.

20          MS. JOHNSON:  Your Honor, that's precisely my point.

21   And I think we have been using a lot of pronouns here.  I think

22   it's really important to know who did what.  Mr. Pennington

23   performed the extraction.  It's the same individual that

24   submitted the documents to outside counsel for the civil case.

25   When asked on direct by the government, Mr. Hood was asked,

1    were you able to page through the documents?  Were you able to

2    compare them to versions of the actual documents on George's

3    certificates, to which he said, So I used the versions that

4    counsel sent me, but they assured me were copies of what we

5    sent to them.  And I compared that to what we received via the

6    government.

7          At no time did he go back to the George's servers.

8    He did not extract them.  Mr. Pennington extracted them.  In

9    fact, he did not understand or know the workings of the tool

10   used to perform the extraction.  And he said he trusted

11   Mr. Pennington.

12         THE COURT:  Who is Pennington?  Is he someone who was

13   working for Mr. Hood?

14         MS. JOHNSON:  He was in the same department, yes.

15         THE COURT:  He did testify, but I am not sure if it

16   was in relationship to Mr. Pennington, that he thought it was

17   working properly; that if it wasn't working properly, he would

18   know.  He was confident that he would tell me, I am not sure

19   who the reference to "he" was, maybe it was Mr. Pennington,

20   that I would be told but I wasn't told.  And, yeah, and then he

21   said, I looked at them and I compared the ones given from

22   counsel and then he confirmed.  So I think later on he does

23   confirm that the group that he compared it to had come from

24   counsel.

25         MS. JOHNSON:  Yes, Your Honor.

1          MS. CALL:  I think we are in agreement in the chain

2    here that it appears that Mr. Pennington, who Mr. Hood

3    supervised, did the actual pull.  Documents went to counsel.

4    And then in the process of authenticating the government's

5    exhibits, Mr. Hood used the assurances from counsel that those

6    were the same documents that were subject to that pull and

7    compared those to the government's exhibits.

8          And as I said earlier, there isn't a requirement of

9    personal knowledge regarding every step in this process.  And

10   Mr. Hood was reasonably able to rely on assurances from counsel

11   as to that step in the chain between documents coming from

12   Mr. Pennington to counsel and back to Mr. Hood.  And I think

13   essentially I think this is just all sufficient indicia of the

14   reliability of these documents because it's not, you know, so

15   high a standard that requires every single person who touched

16   these documents to testify.

17          THE COURT:  Ms. Johnson?

18          MS. JOHNSON:  It may not require every single person,

19   but we have already discussed two people today that have much

20   more knowledge related to the authenticity of these documents.

21   The outside counsel could have been called to testify.

22   Mr. Pennington could have been called to testify.

23          I would only note one more thing for the Court, Your

24   Honor.  Mr. Hood signed a certificate of authenticity and then

25   had to change that certificate of authenticity because some

2808

1    parts of the documents were changed by outside counsel.  It was

2    the headers.  It was some of the time and date stamps.  He

3    didn't really know because he wasn't part of that.  And I think

4    for all those reasons, Your Honor, there is just not sufficient

5    indicia of authentication by Mr. Hood.

6         THE COURT:  What about that last point?  I did

7    remember the problem apparently with his certificate of

8    authenticity.

9         MS. CALL:  I believe Mr. Hood testified that there

10   were some errors in his certificate and that all the errors

11   were fixed.

12        THE COURT:  But what was the nature of the errors?

13   Were they as Ms. Johnson indicated?

14        MS. CALL:  My understanding is they were related to

15   Bates number mistakes on the certificate that were corrected.

16        THE COURT:  Okay.  And the certificate that was

17   corrected, is the document that we are talking about now, is

18   that on the corrected certificate?

19        MS. CALL:  I will need to pull it up, but I am fairly

20   certain it is.

21        Yes.  And I have the certificate if you need that.

22        THE COURT:  Anything else, Ms. Johnson?

23        MS. JOHNSON:  Not related to authenticity, Your Honor.

24        THE COURT:  I am going to overrule the authenticity

25   objection.  I believe that the government has established that

1    the document in question is prima facie authentic.  Mr. Hood

2    testified that his employee, Keith Pennington, who he did

3    testify was his employee and who he oversaw, was responsible

4    for pulling those particular documents.  It is true that that

5    body of documents that Mr. Hood then compared the government's

6    list to was given to him by counsel, but the certificate of

7    authenticity he said was corrected.

8           There is no reason to believe that that differed in

9    any way or that that would destroy the authenticity of the

10   documents.  Mr. Hood compared the documents on the government's

11   list to the group of documents that he received that had been

12   pulled originally by Mr. Pennington but had been provided by

13   counsel.  And Mr. Hood also testified that he had no reason to

14   believe that there were any problems with the ability of the

15   extraction to provide true and correct copies.  He believed

16   that he would be told if there had been a problem.  He was

17   never told that there was any type of a problem.  And for that

18   reason, he believed they were true copies.

19          Next objections, Ms. Johnson?

20          MS. JOHNSON:  Yes, Your Honor.  Thank you.  We would

21   object to document 710 as hearsay.  Mr. Bradley nor

22   Mr. Kronaugue were co-conspirators.  This is an e-mail from

23   Mr. Bradley.  It is not on the James log for obvious reasons

24   and it's hearsay, Your Honor.

25          THE COURT:  I don't think there are any statements

1    from Mr. Kronaugue, though.  It's directed to him, right?

2          *MS. JOHNSON:*  It is.  It is an e-mail from

3    Mr. Bradley, Dean Bradley, to Mr. Kronaugue.

4          *THE COURT:*  Go ahead, Mr. Beller, when you are ready.

5          *MR. BELLER:*  I am ready.  Thank you, Your Honor.

6          Your Honor, as I understand it, the government is

7    moving to admit both the e-mail as well as the Excel native

8    file under 803(6), is that correct, just the business record

9    exception?

10          *MS. CALL:*  Not completely.  So there would two bases.

11   There would be the independent legal significance, which is its

12   own recognized non-hearsay purpose.  803(6) is likely also

13   another one as well.

14          *MR. BELLER:*  I would simply note that the foundation

15   for both has not been laid at this point.  We have

16   Mr. Kronaugue who ultimately has not testified that this has,

17   No. 1, legal significance or, No. 2, that it is kept in and

18   used in the ordinary course of business.  Certainly the

19   government has the opportunity to call him.  They can also call

20   someone from George's in order to lay the same foundation.  So

21   I believe the foundation can be laid through either entity and

22   at this point the government has called neither.

23          I do want to point the Court to I guess the underlying

24   issue that perhaps may or may not be obvious to the Court, and

25   that is that Mr. Kent Kronaugue of SMS, Popeye's, has

1    interviewed with the government several times.  I say several.

2    I am speaking generally.  Your Honor, and what he has to say is

3    exculpatory for the defendants.  And that is the reason why the

4    government at least in my personal view is not calling him and

5    only endorsed him as a witness for authenticity purposes, but

6    not for fact purposes.

7              As the Court knows, the defense then in turn listed

8    Mr. Kronaugue as a witness, as a potential witness.  Your

9    Honor, the government in Docket No. 670, which was their trial

10   brief, included a very telling footnote which is, for example,

11   Kent Kronaugue who is on the defendants' witness list is the

12   president of SMS.

13             SMS filed a civil suit on March the 1st, 2021.  The

14   SMS complaint explicitly incorporates the Superseding

15   Indictment in this case by reference and identifies SMS as the

16   victim referenced anonymously as cooperative 2.  If

17   Mr. Kronaugue testifies as a defense witness in a manner

18   inconsistent with the allegations in the SMS complaint, the

19   government should be permitted to use the complaint to impeach

20   him.

21             So the government is now trying to bootstrap in all of

22   these misleading e-mails and statements of both SMS, as well as

23   Mr. Kronaugue, get around the hearsay issue, get around the

24   confrontation issue while also threatening defendants that if

25   we put Mr. Kronaugue on the stand, that any statement his

1    employer has made in a civil action, his employer being the

2    entity, is going to then be used to impeach Mr. Kronaugue.

3            So it is this ongoing theme that is of consistent

4    concern to the defense, and our concern as to these documents

5    coming in as exceptions to hearsay with repeated limiting

6    instructions is the way around putting potentially exculpatory

7    evidence before this jury.  And so for all of these reasons we

8    continue to object to all of the Kent Kronaugue e-mails,

9    communications both to and from him, and specifically here the

10   lack of foundation under the rule to allow this evidence to go

11   in front of the jury.

12           THE COURT:  All right.  Thank you, Mr. Beller.

13           Anything to add on to that point, Ms. Johnson?

14   Otherwise, I will let Ms. Call respond to Mr. Beller.

15           MS. JOHNSON:  Please let Ms. Call respond.  I don't

16   have a new point.

17           MS. CALL:  I will start with the business records

18   issue.  First, as I noted, there is the other basis of the

19   independent legal significance.  But second, there is not

20   required to be a witness with personal knowledge of a business

21   record in order to properly lay foundation.  And I will point

22   Your Honor to *FDIC v. Staudinger,* S-T-A-U-D-I-N-G-E-R, which is

23   from the 10th Circuit.  It's 797 F.2d 908.  And in that there

24   is the precise challenge that a sufficient witness had not been

25   brought to lay business record foundation.  And the Court found

1    that contrary to Staudinger's assertion, there is no

2    requirement that the party offering a business record produce

3    the author of the item.

4         And it cites to then Weinstein's Evidence for the

5    proposition that a foundation for admissibility may at times be

6    predicated on judicial notice of the nature of the business and

7    the nature of the records as observed by the Court.

8         I think in this case we have had sufficient testimony

9    relating to a number of companies in this industry relating to

10   how these bids and the contracts are maintained in the normal

11   course of business and how they are relied on such that we

12   don't need that sufficient foundation for every time a contract

13   is entered into evidence in this case.  And it would be

14   sufficient for this Court to take judicial notice of that

15   nature of this kind of communication and the attachment in

16   Government's Exhibit 711.

17        I suppose I should briefly address, although I may not

18   hit every point, the confrontation issue.  And I think the

19   government simply disagrees that any exculpatory of any

20   statements with Mr. Kronaugue.  And it's fairly difficult to

21   imagine how a customer could provide evidence that tends to

22   show a lack of agreement between its suppliers and how any real

23   victim of the scheme would be able to speak anything as to an

24   agreement between others.  So I think that's the overall point

25   there, but essentially calling Mr. Kronaugue is not necessary

1    for the admissibility of these documents.

2          THE COURT:  Okay.  Ms. Johnson?

3          MS. JOHNSON:  One final point, Your Honor.  I respect

4    the Court's rulings thus far, but with that understanding I

5    would just ask the Court to hear yet again the confrontation

6    issue here, the compounding effect both for Mr. Blake and all

7    the defendants here, the Court I think is seeing the pattern.

8    And I understand and respect the Court's ruling that the

9    government can put their case on however they choose within the

10   rulings and the confines of the court, but the compound effect

11   of what is happening by the effective prevention of the

12   defendants from adequately cross-examining and confronting

13   their accuser, I would just ask the Court to consider that from

14   a confrontation issue.

15         THE COURT:  All right.  Mr. McLoughlin?

16         MR. McLOUGHLIN:  Your Honor, with respect to the case

17   cited by the government, I would note a couple of important

18   facts.  First, at issue in that case were bank records kept by

19   the bank.  And the Court did find that with respect to the

20   types of particular bank records, these were kept -- they were

21   the type of records maintained by banks in the ordinary course.

22         More importantly, in that case the custodian of

23   records testified that the records were of a type normally

24   maintained in the ordinary course of the bank's business, that

25   the records would be made in close proximity to the time of

2815

1    their origin.  And furthermore, Mr. Staudinger, the witness,

2    authenticated several of the documents himself.  So the

3    government's recitation of the basis in that case that judicial

4    notice is completely sufficient is not an accurate statement of

5    the holding.

6                *THE COURT:*  Ms. Call, anything else?

7                *MS. CALL:*  If it would be helpful, I have an extra

8    copy of the case if Your Honor would like it.

9                *THE COURT:*  I don't need it.

10               All right.  So as to Exhibits 710 and 711, I will

11   admit both of those and will overrule the objections.  As to

12   the confrontation clause issue, at least at this point I don't

13   see that there is such a large confrontation clause issue that

14   it would justify excluding either of these two exhibits.  I

15   don't think that foundation has been laid for a business record

16   exception at this point in time.  However, and I am not sure

17   where courts typically categorize it, but there is a recognized

18   exception for things that have independent legal significance.

19               The e-mail provides an overview, but it can easily be

20   compared to 711 which is the actual proposal.  As it says, it's

21   an overview of something that's attached.  That does have

22   independent legal significance because it is an offer that is

23   being made, and for that reason I do find it's a hearsay

24   exception.  And 710 and 711 will be admitted.

25               We are at the time of our mid-afternoon break.  Why

2816

1    don't we go ahead and take that now.  15 minutes from now would

2    be a little bit after 3:30.

3              The Court will be in recess.  Thank you.

4         (Recess at 3:16 p.m.)

5         (Reconvened at 3:34.)

6              THE COURT:  Ms. Call, go ahead.

7              MS. CALL:  I have been informed we may have skipped

8    one on the list earlier and that is Government's Exhibit 355.

9              THE COURT:  Was that a defense exhibit?  I thought it

10   was a defense exhibit.

11             MS. CALL:  I do not believe it was.  This was in

12   relation to Chick-fil-A.

13             THE COURT:  Oh, right.  I thought we covered 355,

14   but --

15             MS. CALL:  If you have it marked as admitted, I

16   suppose that is the end all be all, but let me know.

17             MR. FAGG:  For what it's worth, Your Honor, I have it

18   in my notes that we skipped it as well.

19             THE COURT:  We skipped it.  Okay.  355.

20             MS. CALL:  I will note for clarification of what's on

21   the screen, I think there is a little square that says

22   redacted.  I believe that's covering just an old exhibit

23   sticker and will not be on the version we will offer into

24   evidence.  Otherwise, I will note Exhibit 355 was contained on

25   the government's *James* log as entry 91 and was favorably ruled

1   on.

2   THE COURT:  Objections to 355?

3   355 will be admitted as a co-conspirator statement.

4   MS. CALL:  The next on the list is Government

5   Exhibit 733.  And I think to perhaps streamline the issues

6   here, we could probably switch that to 731 and we are putting

7   both on the screen now.  731 is a shorter version of the same

8   e-mail chain and the entirety of 731 was contained on the

9   government's James log as James entry 294 which was ruled on

10  favorably.

11  If counsel would like us to zoom in on 731, we could.

12  That will be helpful.

13  THE COURT:  You are substituting 731 for 733?

14  MS. CALL:  Correct.

15  MR. FELDBERG:  Your Honor, just a point of

16  clarification.  Is 733 then withdrawn?

17  THE COURT:  Yes.  It's being substituted.

18  Any objections to 731?

19  MR. FAGG:  Could you give us just a moment, Your

20  Honor?  We are trying to get oriented.

21  THE COURT:  No problem.

22  MR. FAGG:  We don't have 731. Your Honor, not speaking

23  on behalf of all the defendants here, but we were given 733 in

24  advance of this hearing today.  And I have prepared on that.

25  It appears to be a more complete version of 731, which I think

1    Ms. Call said was on the *James* log and is approved.  At least

2    speaking for Mr. Lovette who would propose to submit 733 as

3    initially proposed by the government, we would not object to

4    the fact that this bottom text did not -- there was a slightly

5    different Bates number that appeared on the *James* log.  I think

6    under the rule of completeness, 733 is the more complete

7    communication.

8          *THE COURT:*  Do you want to go back to 733 if that's

9    true?

10         *MS. CALL:*  Yes, Your Honor.  I think without Your

11   Honor needing to make a ruling on 106, we are happy to offer

12   733 if there is no objection to that.

13         *THE COURT:*  Any objection to 733?

14         *MR. LAVINE:*  Your Honor, no objection to 733.

15         *THE COURT:*  Then 733 will be admitted as a

16   co-conspirator statement.

17         Next one?

18         *MS. CALL:*  Next, a bit out of order here, the next is

19   732 which is actually the attachment to 731 we were just

20   talking about, so it's actually the bid submission by

21   Pilgrim's.  So I think for completeness it would be 731 and 732

22   to have the e-mail that attached the bid and that underlying

23   e-mail is already admitted in 733.

24         *THE COURT:*  So now you are proposing 731 and 732 be

25   admitted?

1          MS. CALL:  Yes, Your Honor.  I apologize.

2          THE COURT:  Mr. Fagg.

3          MR. FAGG:  I think I am following the logic on this

4    and 731 needs to give context to 732, so no objection.

5          THE COURT:  Okay.  Does 732 have any associated paper

6    or is that going to be admitted in native format?

7          MS. CALL:  You are predicting my next statement that

8    we did just create a version that has what we have been using

9    this week as the paper associated with a native that has the

10   place holder followed by a printout, and that is marked as

11   Government Exhibit 9723.  I am happy to pass that out to

12   counsel if folks would like to check it for accuracy.

13         THE COURT:  9723?

14         MR. FELDBERG:  Is this a paper version of 732?

15         MS. CALL:  If Mr. Feldberg could repeat himself.  I

16   did not hear.

17         MR. FELDBERG:  Is this a paper version of 732?

18         MS. CALL:  It is.  And I believe we provided it in

19   electronic form yesterday to counsel.

20         MS. HENRY:  Your Honor, if she is planning to put in

21   both the native and the paper, maybe we can review the paper

22   later rather than sit here and hold the proceedings up as we go

23   through a comparison?

24         THE COURT:  As long as you have access to the native

25   too.  You do?  Okay.  Assuming that they match up, any

1    objection to the admission of 731 and 732 and -- is it 9723?

2           MS. CALL:  Yes.

3           THE COURT:  Which would be a paper version of the

4    native which is 732.  All right.  Then those will be admitted.

5           Okay.  Next?

6           MS. CALL:  Next are Government's Exhibit 702 and its

7    attachment 703.  This is the Claxton bid submission to the

8    Popeye's buyer.  It was also contained in the *James* log as

9    *James* log entry 293 and received a favorable ruling.

10          THE COURT:  Okay.  Any objection to Exhibits 702 and

11   703.  Those will be admitted.

12          MR. BELLER:  Your Honor, as we are not objecting to

13   these documents coming in, the last several, that is only based

14   on the Court's prior ruling regarding confrontation and the

15   long silique that we had regarding the same documents from

16   George's.  So I point that out only for the purposes of

17   preserving our record as to any continuing similar type

18   documents related to Mr. Kronaugue and Popeye's.

19          THE COURT:  Understood, yes, and that will be the

20   case.

21          Next?

22          MS. CALL:  Next is Government Exhibit 746.  Your

23   Honor, I think there is a couple non-hearsay bases for

24   admission for this.  One is it's a question, and I will say

25   that because it's followed by a question mark.  There is a bit

1    of an assertion in there as well, but it's essentially offered

2    for that purpose, as well as really the effect on the listener

3    here.

4          The custodial information shows I believe this was

5    received by Carl Pepper who 30 minutes later reached out to

6    Defendant Blake at George's.  And then that is followed, of

7    course, by the text that we already saw from later that day

8    where Mr. Pepper texted Mulrenin, "Got a general idea of what

9    George's is doing."  So essentially this is somewhat of a ping

10   on the bid deadline from Mr. Kronaugue the day after the bids

11   were due which then caused Mr. Pepper to reach out to his

12   competitors.

13         THE COURT:  I guess the problem is -- let me try to

14   head this one off at the pass just a little bit.  The effect on

15   the listener is Mr. Kronaugue.  He sent it to himself, but how

16   do we know it was sent to anyone else?

17         MS. CALL:  Let me see if I have written that down

18   already, Your Honor.  I suppose one note would be the fact that

19   this document was produced by Tyson as indicated by the Bates

20   stamp and the testimony from the Tyson custodians regarding it.

21   But I get Your Honor's point regarding Carl Pepper

22   specifically.  I believe if given the opportunity, we could

23   pull the metadata and submit this at a later time along with

24   the metadata showing Carl Pepper as a recipient.

25         THE COURT:  Right now I just don't see any hearsay

1    exception to it, so as is it will be refused.

2          MS. CALL:  I believe now we get to skip ahead on the

3    list that we've already covered to -- just to confirm, on Your

4    Honor's list is 7501 marked as admitted?

5          THE COURT:  Yes.

6          MS. CALL:  So 748 and the attachment are the next.

7    And I will note this is along the same lines that 749 is the

8    native attachment, and then Government's Exhibit 9724 was

9    provided to defense counsel yesterday is the revised paper

10   printout.

11         THE COURT:  Okay.  Any objection to the admission of

12   748, the e-mail from Mr. Pepper to Mr. Kronaugue copied to

13   Mr. Mulrenin, the native version 749 and the paper printout of

14   749 being 9724?

15         All right.  Those will each be admitted.

16         Go ahead.

17         MS. CALL:  Next is Government Exhibit 9688.  Your

18   Honor, 9688 is fairly voluminous.  Would you like a paper copy

19   that I could pass up through Ms. Grimm?

20         THE COURT:  I did not know it was very voluminous, but

21   yes.

22         Go ahead.

23         MS. CALL:  Yes, Your Honor.  These are hard copy files

24   from the sales offices of George's.  And the testimony this

25   past week of Mr. Coan and Ms. Tucker, we've established that

2823

1    they were from the files relating to Defendant Blake.  The

2    government essentially would be submitting the -- what's typed

3    out in these as business records.  And then the handwriting

4    would be co-conspirator statements and alternatively admissible

5    under 801(d)(2)(A) against Defendant Blake.

6             THE COURT:  I am sorry, what was that point again?

7             MS. JOHNSON:  I could not hear, Your Honor.

8             MS. CALL:  I apologize.  So what's typed here we would

9    be submitting under 803(6) as business records and that these

10   were maintained by George's in the normal course of business.

11   And they were, in fact, stored in a warehouse as the testimony

12   of the custodians established.  And then the handwriting we

13   would be submitting as co-conspirator statements as well as

14   just statements offered against Defendant Blake as his own as

15   was established by the custodians.

16            I will note, Your Honor, these were -- this is a

17   slightly different exhibit number, but the next several

18   exhibits were the subjects of the government's supplemental

19   *James* submission that you considered and denied as I think

20   untimely based on the fact that Agent Taylor was not subject to

21   cross-examination on these documents, but they were previously

22   submitted by the government for consideration under

23   801(d)(2)(E).

24            THE COURT:  Okay.  Ms. Johnson?

25            MS. JOHNSON:  To start with that point, Your Honor,

1    the government tried to introduce these under the *James* hearing

2    and they were denied.  But more importantly, Your Honor, here

3    again on authenticity issues, I think Ms. Call just indicated

4    that these records had been found to be held and kept in the

5    regular course of business, and I don't think there is any

6    testimony before the Court that said that.

7           Mr. Coan, Brian Coan, and Ms. K.C. Tucker testified in

8    court on November 5th.  And in reviewing their testimony, what

9    the Court learned is that some two years, over two years after

10   Mr. Blake retired, boxes were located in a warehouse.  There

11   were three that both Mr. Coan and Ms. Tucker testified about.

12          Ms. Tucker testified that there was some writing on

13   the boxes.  It wasn't the same writing.  She also said one box

14   had the name Ric Blake on it, which would indicate that the

15   other two did not.  She then went on to look and review the

16   list of documents that the government gave her for review.  At

17   no time did she ever indicate which of the three boxes these

18   documents came from.

19          There is no foundation laid for the relevancy to these

20   documents and certainly there is nothing that ties any of these

21   documents to Mr. Ric Blake save his name on one of the boxes.

22   And we don't know where these documents came from.  They were

23   found.  They were located in a warehouse.  Mr. Coan testified

24   that he went to that warehouse on November 2020.  He laid no

25   foundation.  He gave no testimony about the regular course of

1    business, the way records are kept.  These boxes had been there

2    for some two years and two months since Mr. Blake left

3    George's.  There is nothing that indicates with any sufficient

4    reliability that these are all documents purporting to be

5    Mr. Blake.

6          Additionally, Your Honor, there is no evidence of a

7    handwriting expert, anything that would establish that these

8    documents, the handwritten portions come from Mr. Blake.  There

9    is zero evidence, zero foundation laid.  Your Honor, then when

10   you look at the documents, and I might need a calculator from

11   the witness stand, I think it's about 75 pages and many of them

12   are completely irrelevant.  There is duplication after

13   duplication.  There is the KFC meeting agenda for the calendar

14   year.  There are at least seven, I think by my count, of the

15   pricing schedules for KFC, and yet the government wants to

16   introduce these as related to and held by and authored by

17   Mr. Blake.

18         And for all those reasons, Your Honor, under 901 and

19   902 there is not a sufficient foundation laid.  There is no

20   sufficient indicia of authenticity.  And, Your Honor, they are

21   irrelevant in light of that.

22         *THE COURT:*  Anyone else on similar points?

23         *MR. FAGG:*  Yes, Your Honor.  To the extent that the

24   government contends that these -- I forgot how they referred to

25   it, but the computer printed documents are business records and

2826

1    to the extent they have handwriting on them, it goes exactly

2    against what the business records exception provides for.

3    These are individual notes.  I don't recall any testimony that

4    it's part of George's business process, what the ordinary

5    business process was to keep handwritten notes.

6        THE COURT:  Right.  I think that she was just saying

7    that the printed portion alone would be admissible under

8    business records, but the handwriting would have to come under

9    some separate exception.  That's what I understood, but she can

10   clarify.

11       MR. GILLEN:  Your Honor, if I may, just because this

12   is the prelude to some other documents with handwriting on them

13   that would be relevant to others.  We don't know who wrote

14   these and they were found in a warehouse after a number of,

15   what, two years or whatever.  We don't know how long they have

16   been there.  They pulled them out, had Blake's name on them,

17   that's it.  No one has identified when the handwriting was put

18   on there, by whom.  And so I would object to the introduction

19   of the documents and the documents which will subsequently come

20   with handwriting on them such that we have not established when

21   the handwriting took place or whose handwriting it is.

22          So merely for the government to say, well, we'll have

23   the documents as a business record and then the handwriting

24   would be admissible against Mr. Blake in our view just doesn't

25   cut it because they can't prove, have not proved, that the

1    handwriting was done by Mr. Blake.  Therefore, we would not

2    want to admit it against anybody, Mr. Blake or anybody else.

3    Coming down the road will be folders which have Brian Roberts'

4    name on it.  We are going to face that problem as we head down

5    through these documents.  We would move the Court not to allow

6    any of these documents in.

7              THE COURT:  All right.  Mr. Beller, do you have

8    something separate?

9              MR. BELLER:  Slightly separate, Your Honor.

10             Well, in addition to the statements that have been

11   argued by Mr. Gillen and Ms. Johnson.  I would note that under

12   the government's statement to the Court, they have satisfied

13   element 803(6)(B) -- well, they have proclaimed to which is

14   that the record was kept in the course of a regularly conducted

15   activity of a business.  (A), (C), (D) and (E) have not been

16   satisfied under that rule, Your Honor, and (E) specifically,

17   and that is the opponent of the evidence indicates or shows a

18   lack of trustworthiness in the document.  For all of the

19   reasons argued by my colleagues, I believe that the opponents

20   of the evidence have.

21             Your Honor, I would also note on behalf of my client

22   or I suppose the defendants other than Mr. Blake that I think

23   the cumulative effect of all the different limiting

24   instructions and/or evidence admissible as to only a certain

25   defendant is certainly at this point far more prejudicial than

1    it is probative, so I would object to the admission of this

2    evidence on that ground as well.

3            THE COURT:  Ms. Johnson?

4            MS. JOHNSON:  Yes, Your Honor.  A point of

5    clarification.  My colleague, Mr. Gillen, made a reference to

6    the documents in the Blake box or that they were somehow tied

7    to Blake.  I just want it to be clear there is no evidence that

8    there was clarification from the custodial witness that

9    testified that the documents the government is seeking to

10   introduce came from anything, any box that said Ric Blake.  The

11   testimony was there were three boxes.  One of them had Blake.

12   And there has been no clarification on where these documents

13   came from.

14           THE COURT:  Mr. McLoughlin, do you have a different

15   point?

16           MR. McLOUGHLIN:  Yes, very briefly, Your Honor.

17           To the extent the government is trying to argue that

18   these are business records kept in the ordinary course, the

19   issue in addition to the writing is because there is no

20   foundation, we don't know whether these are drafts or other

21   documents or finals.  Frequently, of course, companies will

22   keep the final contract, but may create a variety of iterations

23   and drafts prior to this conclusion.  Since without going

24   through page by page with a knowledge to a witness, we cannot

25   identify which might be drafts and which are not.  Clearly I

1    think companies do not keep drafts in the ordinary course of

2    their business, and so the lack of foundation with respect to

3    all of these alleged business records is quite insurmountable

4    for the government.

5             THE COURT:  Okay.  Go ahead, Ms. Call.

6             MS. CALL:  As to authenticity and the business records

7    admissibility, I think the exact point raised by a number of

8    these counsel go to really the reliability of these records and

9    the fact that they were kept and maintained in the course of

10   business that these were boxes found at George's, you know,

11   off-site storage facility two and a half years after Mr. Blake

12   retired and they had his name on it.  So clearly the business

13   had an interest in maintaining these documents.

14            THE COURT:  Hold on, Ms. Johnson.  But what about

15   Ms. Johnson's point?  I do recall that there were three and one

16   had Mr. Blake's name on it, but how do we know whether

17   Exhibit 9688 are documents that came from that box?

18            MS. CALL:  So Mr. Coan testified to the fact that he

19   looked inside the box that had Mr. Blake's name on it and found

20   manila folders with customer names and tabs inside that box.

21   He did not testify to the other two boxes, but I will note

22   that -- and it's a little different in a printout, but I

23   believe in the actual image of this, this cover is a manila

24   folder with a customer name on it and fits the description that

25   Mr. Coan gave to what he found inside the box that had

1    Mr. Blake's name on it.

2            THE COURT:  Okay.  And then in terms of handwriting?

3            MS. CALL:  So in terms of that, and I know Your Honor

4    is a bit familiar with it at this point, but I will direct you

5    to Federal Rule Of evidence 901(b)(4) which is what the

6    government has previously briefed regarding its response

7    regarding Exhibit 1030.  Essentially -- the first proposition

8    is this is Mr. Blake's handwriting based on those indicia from

9    the boxes, but 901(b)(4) allows for authentication by unique

10   characteristics.

11           And essentially what this first page shows you, the

12   competitor names, competitor phone numbers sitting right there

13   on the folder marked with a customer's name shows you that this

14   is the kind of document made by a conspirator in this case.

15   The handwriting contained here is several of the defendants in

16   this courtroom, their phone numbers.  And then the following

17   handwriting has competitors' prices on Page 3, on page ending

18   in 375.  I think there is several other pages in this one, but

19   this is the nature of what's contained in this document and the

20   ones to follow that is the precise kind of document that would

21   be written by one of the conspirators in this case, presumably

22   with the information coming from these names and phone numbers

23   on the front page.

24           MR. FELDBERG:  Your Honor, if I may be heard on this?

25   This is precisely the problem that we had with Government

1    Exhibit -- I think it was 1919 where you had a list of prices

2    and somebody testified that they were future prices and the

3    evidence turned out to be that they were simply current prices.

4         Now, in this instance, we don't know who wrote this.

5    We don't know what the notations mean.  We don't know what they

6    are.  We don't know whether they are current, future, past,

7    historical.  We have simply no information and no way to obtain

8    any information.  So all this can do is confuse the jury.  And

9    given the absence of reliability, the absence of authentication

10   and the fact that these are not business records, we would

11   object to their admission.

12        *THE COURT:*  Ms. Johnson?

13        *MS. JOHNSON:*  Yes, Your Honor.  A couple more points.

14   Throughout this trial it's been a primer on laying foundation

15   in such a way that a document becomes admissible, but that

16   foundation is lacking on so many levels.  First, and I know not

17   to pound the drum too heavily, but the government wants to

18   conflate all three boxes into one because that one box has Ric

19   Blake's name on it.  There is zero evidence before the Court

20   from where these documents came.

21        No. 2, whatever was in the box, there has to be some

22   showing that it was created and close in time.  There has to be

23   a showing, some indicia that it came from Ric Blake.  The fact

24   that there is writing in there is of no moment because the

25   government cannot tie that writing to Ric Blake.  There were

1      obviously other salespeople at George's.  None of them were

2      interviewed.  They have no way of knowing these documents are,

3      Your Honor.

4              And finally, I would like to point out to the Court

5      there is nothing here that proves the foundation for a business

6      record or the indicia of authentication for these records.

7              THE COURT:  All right.  Thank you.

8              Anything else, Ms. Call?

9              MS. CALL:  Nothing further on this document.

10             THE COURT:  Okay.  First of all, I agree that there is

11     no proper foundation for these being -- for the printed portion

12     of them being business records.  There may be some documents

13     that would be per se business records, I'm not sure, but there

14     is not sufficient foundation for these being such.

15             The fact that they have been sitting around in a

16     warehouse is irrelevant for a number of reasons.  Of course,

17     the reason that I think it might be safe to say that most

18     attorneys don't understand the business record exception is

19     because hearsay exceptions all have to do with reliability.

20     That's the key.  That's why they are exceptions.  They have to

21     be reliable.  So the fact that they are stored is irrelevant.

22     A lot of people think that, hey, if it's in my drawer, it's a

23     business record.  It's not.  Business records are a very narrow

24     category of things and these would not be those.

25             The other thing is that it's also true in terms of the

1    handwriting, I don't think we could really consider the

2    handwriting to be from a co-conspirator even if we knew for a

3    fact that they came from the one box that had Mr. Blake's name

4    on it.  But given the fact that, you know, it's like we have

5    three curtains and only one of the curtains has Mr. Blake

6    behind it, given the fact that there is just uncertainty there,

7    we could not say that this handwriting even came from a box

8    that contained his records.  So as a result, I do agree that

9    the -- this particular exhibit, there is no authentication

10   ground.

11          As we talked about with our famous Exhibit 1030 and

12   Mr. Tubach's point about in order to be authentic, it has to be

13   what it says it is.  We just don't know whose handwriting it

14   is.  Without knowing that, we can't say it's a statement of a

15   co-conspirator.  And because it doesn't fall within a business

16   record exception either, that one will be refused.

17          *MS. JOHNSON:*  Thank you, Your Honor.

18          *THE COURT:*  Next?

19          *MS. CALL:*  With that ruling I think we can for now at

20   least pass by a couple of exhibits and skip ahead to 6088 and

21   6089.

22          *THE COURT:*  Okay.  And has the government prepared a

23   non-native format for 6089?

24          *MS. CALL:*  I believe for this one we only have it in

25   native form.  It has many tabs and is not all that efficient

1    perhaps, I guess, to put in a paper form.  I think we may,

2    though, submit an excerpted version of it for purposes of

3    having a bit of a paper version in there.  The native is being

4    pulled up right now.

5             THE COURT:  Anyone need more time on this one?

6             MS. CALL:  I will note this was on the *James* log, log,

7    item 228.

8             THE COURT:  All right.  Any objections to 6088 and

9    6089?

10            MS. JOHNSON:  Yes, Your Honor.  At this point I

11   believe if we take a close look at 6089, I believe the document

12   was from 2009, which is, Your Honor, well outside the alleged

13   conspiracy.

14            MS. CALL:  Is Ms. Johnson referring to the metadata?

15            THE COURT:  I am not sure, but do you mind going back

16   to 6088?

17            MS. CALL:  6088 is an e-mail attaching 6089 and it is

18   dated August 15th, 2016.  I will note the filing attachment as

19   written on 6088 says Copy of Copy of DIST NATIONAL ACCOUNTS

20   2014.

21            THE COURT:  Do you have the right document,

22   Ms. Johnson?

23            MS. JOHNSON:  Yes, Your Honor.  At the top of the

24   spreadsheet it says Church's 2009.

25            THE COURT:  So that's on 6089?

1          *MS. JOHNSON:*  Yes, Your Honor.  And then about five

2     pages in it says Popeye's 2009.  And then finally about another

3     five pages in I believe it says KFC 2009.

4          Your Honor, we could provide the Court a paper copy if

5     that would help.

6          *THE COURT:*  I can see the tabs at the bottom and I can

7     see that some of those dates do correspond to what you were

8     saying.  Others are obviously within the conspiracy period.

9          Response?

10         *MS. CALL:*  Yes, Your Honor.  Essentially what this

11    spreadsheet shows is monitoring of competitor prices for a

12    number of years going back before the conspiracy and during it.

13    So I don't believe that the -- the fact that it goes beyond

14    what's alleged as far as the conspiracy makes this anything

15    other than admissible still under 801(d)(2)(E).

16         *THE COURT:*  Anything else, Ms. Johnson?

17         *MS. JOHNSON:*  Yes, Your Honor, one more point.  During

18    the *James* hearing and after, that the Court's subsequent

19    ruling, Mr. Blake was found to have joined the conspiracy by

20    the Court on October 24 of 2016, which I believe is after this

21    e-mail.

22         *THE COURT:*  Ms. Call, anything else?

23         *MS. CALL:*  I will note that this was subject to the

24    Court's ruling at the *James* hearing as well.

25         *THE COURT:*  Mr. Beller?

1        MR. BELLER:  Your Honor, may I inquire?  I see that

2   the e-mail, the cover e-mail was part of the *James* log and the

3   Court's determination.  I am not certain that the spreadsheet,

4   however, was.

5        THE COURT:  That, I don't remember.

6        MS. CALL:  I have both Bates numbers listed on the

7   *James* log, so that is GEODOJ_0333971, as well as the attachment

8   which is GEODOJ_0333972.  Obviously the voluminous contents of

9   this spreadsheet weren't able to be readily copied into the

10  *James* log.

11       THE COURT:  All right.  Anything else?

12       Okay.  Then I will overrule the objections.  6088 and

13  6089, the native version, will be admitted.  It is true that

14  there are certain tabs that go before the charged conspiracy

15  period.  Most of the data relates to issues within the

16  conspiracy period.  The jury, of course, will be receiving

17  instructions regarding what the conspiracy period is.  I do

18  find that this is relevant and admissible and will admit both

19  of those.

20       Next?  Go ahead.

21       MS. CALL:  The next document is Government

22  Exhibit 2004.  And one moment, Your Honor.

23       THE COURT:  Sure.

24       MS. CALL:  Your Honor, this is another one where there

25  was a slightly different version on the *James* log.

2837

1    Government's Exhibit 2005 was in its entirety on the *James* log,

2    so I think the government would substitute and offer 2005

3    rather than 2004.  And the difference is just the top e-mail in

4    the chain.

5            THE COURT:  Could you -- is it possible to pull up

6    both of those?  Oh, maybe they are.  Okay, great.

7            Mr. Fagg, go ahead.

8            MR. FAGG:  No objection to this.

9            THE COURT:  2005?

10           MR. FAGG:  2004 I believe is what they offered,

11   correct?

12           THE COURT:  Because 2005 was on the *James* log,

13   Ms. Call is suggesting a substitution of 2005 for 2004.  So I

14   will give you a chance to compare and contrast.

15           MS. CALL:  If it wasn't clear before, it's the same

16   underlying e-mail chain with just the top e-mail being

17   different responses in each.  Government's Exhibit 2005 is

18   *James* log entry 193.

19           THE COURT:  Mr. Beller?

20           MR. FAGG:  I am sorry, I missed that.

21           MS. CALL:  193.

22           THE COURT:  *James* log 193.

23           MR. FAGG:  Thank you.

24           MR. BELLER:  For purposes of protecting my objection,

25   Your Honor, I simply need to point out on this one that neither

1  King Soopers nor Kroger was noticed through the Superseding or

2  through the Indictment itself, so I do have a 404(b) objection

3  to this inclusion.

4      THE COURT:  Okay.  Government response as to that

5  objection?

6      MS. CALL:  King Soopers was one of the companies in

7  the Superseding Indictment and the Grand Jury transcript

8  included the same.

9      THE COURT:  All right.  Any objection, then?

10      Mr. Fagg, go ahead.

11      MR. FAGG:  Sure, Your Honor.  Exhibit 2004, as I

12  understand it, is the one that was proposed by the government

13  and that we prepared on for today.  We don't have an objection

14  to 2004.  We did not object that it wasn't the exact one on the

15  *James* log.  2005, candidly I am trying to get my head around

16  it.  We would object because we haven't had this.

17      MS. CALL:  With all due respect, I do just want to

18  note that the government on a daily basis has been assessing

19  admissibility of multi-hundred pages of documents handed to us

20  on cross.  So I don't believe an issue of two sentences should

21  create too much of a hard time assessing the admissibility of

22  this, but I will allow defense counsel time as they are all

23  very competent.

24      THE COURT:  Anyone need more time?  Mr. Fagg, do you

25  need to take a look at it a little bit more?

1          MR. FAGG:  Your Honor, I think it is slightly

2    different in that we have clients that we represent, clients

3    who are not here.  We did prepare on 2004.  We are not

4    intending to object, but it wasn't on the *James* log, so it is a

5    slightly different situation than Ms. Call is suggesting.

6          THE COURT:  I will overrule the objection.

7    Exhibit 2005 will be admitted as a co-conspirator statement.

8          Next?

9          MS. HENRY:  Your Honor, we would request a limiting

10   instruction with regard to Mr. Kantola as this incident has

11   nothing to do with him.

12         THE COURT:  Okay.  For rulings previously stated, I

13   will overrule that objection.

14         Go ahead.

15         MS. CALL:  Next is Government's Exhibit 2001.  I will

16   note that I don't believe this is the exact duplicate as what

17   was contained in *James* log 194, but the e-mail chain in here

18   was entirely subsumed in that *James* log entry as well as the

19   actual content of the entry contained every e-mail in this

20   chain.  As to the bottom e-mail from Mr. Baker at Pilgrim's,

21   that would be offered for the non-hearsay purpose of providing

22   context to Mr. Penn's responses.  I should clarify the bottom

23   e-mail as well as the second e-mail from the top are both from

24   Mr. Baker.

25         MS. PLETCHER:  Your Honor, I am not sure that there is

1    a difference between the two documents.  If the government is

2    aware of any difference, could you just point that out to the

3    defendants?

4         MS. CALL:  I apologize, what are the two documents?

5         MS. PLETCHER:  I am sorry, I was looking at the *James*

6    log entry and the document that's up for admission.

7         MS. CALL:  You know what?  I think Ms. Pletcher is

8    correct in that this is *James* log entry 194.

9         THE COURT:  Okay.  So answer, it's the same one.

10        Objections?

11        MR. GILLEN:  I would simply ask, there is a reference

12   in here of "Brian was *almost* excited about it.  He really

13   perked up."  That's not Brian Roberts.  I would ask for a

14   limiting instruction.  I don't think the government in any way

15   contends that's a reference to Brian Roberts.  And I don't want

16   this jury to think that the Brian referenced in this exhibit is

17   Brian Roberts.  So I would hope that the government would

18   concede in allowing a limiting instruction that that is not a

19   reference to Brian Roberts.

20        THE COURT:  Response, Ms. Call?

21        MS. CALL:  I think Mr. Gillen is correct because I

22   believe Brian is a Wal-Mart employee.  However, I don't know

23   that there is a risk of confusion to the jury here with the

24   name Brian.  As we have noted before, there are a lot of folks

25   with the same first names involved in this conspiracy, but I

1    don't believe that risk of confusion is here.  And I don't know

2    that there is an inculpatory issue regarding that the jury may

3    see the name Brian and think this is something conspiratorial

4    with respect to that name here because it is talking about a

5    customer.

6            MR. GILLEN:  Your Honor, if I may very briefly, that's

7    an illustration of the problem that we've had with so many of

8    the government's documents.  They don't have a sponsoring

9    witness.  They put a document in.  And the jury can see a name

10   like Brian and infer that might be Brian Roberts.  We have got

11   a Brian Roberts in the courtroom.

12           If we had a Chad Baker up, the cross-examination would

13   be:  That Brian isn't Brian Roberts, is it?

14           And the answer would be:  No.

15           But that's not the way that the government has chosen

16   to put their case together.  We would ask -- and they know that

17   it's not Brian Roberts -- what's the harm in making sure the

18   jury is not confused?

19           THE COURT:  Anything else, Ms. Call?

20           MS. CALL:  No, Your Honor.

21           THE COURT:  All right.  That objection will be

22   overruled.  Typically documents aren't admitted with that type

23   of footnote to try to clarify things.  I think Ms. Call is

24   right that just a common name, Brian, is not going to be

25   naturally associated with Mr. Roberts.  And I will admit this

1    document, but I will do so with a limiting instruction that the

2    statements of Mr. Baker will be admitted not for the truth of

3    the matter asserted, but rather for the effect on the listener.

4         Next?

5         MS. HENRY:  May we make the same objection, same

6    request for a limiting instruction as I previously have?

7         THE COURT:  Yes.  And that will be denied for the same

8    reason.

9         Go ahead, Ms. Call.

10        MS. CALL:  Next is Government's Exhibit 2002 and this

11   was contained in *James* log entry 195.  The entire e-mail chain

12   was contained in the entry, but the government would propose

13   the same limiting instruction with respect to the e-mails by

14   Mr. Baker contained in here.

15        THE COURT:  All right.  Any objections to

16   Exhibit 2002?

17        MR. GILLEN:  Your Honor, again same issue.  "Jayson,

18   Call Brian tomorrow and give him Otis' phone number, Bill."

19   This is a little more problematic than the one before where we

20   knew it was a reference to a Wal-Mart employee.  Here we have

21   again a document that cannot be cross-examined by us and a

22   message from Mr. Lovette to Mr. Penn, "Call Brian tomorrow."

23        I think this is an example, Your Honor, of where we

24   really, really do need either a sponsoring witness to clear it

25   up or a limiting instruction so that we don't have a situation

1    where the government is throwing a morass of paper into this

2    jury box and they pick that up and they make the wrong

3    conclusion about who Brian is.

4              THE COURT:  All right.  Response?

5              MS. CALL:  Yes, Your Honor.  This does contain that

6    same bottom e-mail tending to show that Brian is the customer.

7    I will also note that the testimony of Robbie Bryant as well

8    this document does indicate that Otis is a reference to Tyson.

9    There is Don Tyson Parkway's address in the e-mail at 2:43.

10   And I will just note that I don't think the jury would conclude

11   that Mr. Roberts would need the phone number of his own

12   company, so the risk of that kind of prejudice would be low

13   that they would come to the conclusion that Brian would be a

14   reference to Defendant Roberts.

15             THE COURT:  Ms. Pletcher?

16             MS. PLETCHER:  Thank you, Your Honor.  It's our

17   understanding that the Brian referenced in this document is

18   Brian O'Dell from Wal-Mart.  And perhaps if the government

19   would stipulate to that, that might resolve some of the

20   defendants' concern here.

21             THE COURT:  Stipulate how?

22             MS. PLETCHER:  We could draft up a stipulation perhaps

23   that that's who it's referring to specifically.  I just put

24   that out there for the government's consideration.

25             THE COURT:  Okay.  Any additional be objections?

1          All right.  This will be admitted with the same

2   limiting instruction as for document No. 2001.

3          Next exhibit?

4          *MS. HENRY:*  Your Honor, the same request as with the

5   previous document.

6          *THE COURT:*  All right.  That will be denied for the

7   same reason.

8          Go ahead Ms. Call.

9          *MS. CALL:*  The next exhibit is Government's

10  Exhibit 2000.  That was contained as *James* log entry 313 which

11  was ruled on favorably.

12         *THE COURT:*  Okay.  Any objection to the admission of

13  Exhibit 2000?

14         Exhibit 2000 will be admitted.

15         Go ahead, Ms. Call.

16         *MS. HENRY:*  Respectfully, Your Honor the same

17  objection.

18         *THE COURT:*  All right.  Same ruling.

19         *MS. CALL:*  The next exhibit is Government's Exhibit

20  109.  Your Honor, this was contained on the *James* log as log

21  No. 52, but Your Honor did find that these statements were not

22  in furtherance of the conspiracy.  They are rather offered

23  admissible against Defendant Little under 801(d)(2)(A).

24         *THE COURT:*  All right.  Objections as to Exhibit 109?

25         *MR. TUBACH:*  Yes, Your Honor.  We believe the e-mail

1    in the middle of the first page from Mr. Bradley is just pure

2    hearsay making a statement of fact about what's happened in the

3    past, and for that reason we would object to its admission.  It

4    is not admissible under 801(d)(2)(A) as to him obviously.  The

5    only thing that succeeds, that comes after that e-mail is a

6    request from Mr. Little to Mr. Lane when he's going to have

7    pricing.  And then he says, "Will have something Monday."  And

8    he says, thanks.  I just don't see how we get around the pure

9    statement of fact of Mr. Bradley's e-mail on May 31st at 1:05

10   p.m.

11            THE COURT:  Response, Ms. Call?

12            MS. CALL:  Yes, Your Honor.  For Mr. Bradley's

13   statement, it would be offered for the non-hearsay purpose of

14   the effect on Defendant Little.  And first off, it would be his

15   state of mind, although I realize it is not 803(3) I am

16   discussing right now, but his understanding going into these

17   negotiations of how Pilgrim's had previously priced and his

18   understanding that he would not have pricing information.

19            And the reason this effect is the non-hearsay purpose

20   is because the effect is absent hearing from his pricing team,

21   Defendant Little instead reached out to -- I want to get this

22   right, but I don't have the document if front of me -- I

23   believe it's Carl Pepper from Tyson via the phone and it's

24   after receiving the response from Mr. Lane.

25            MR. TUBACH:  That precisely proves my point.  She

1    wants to show what the pricing was prior to this which would

2    require them to go out and get pricing elsewhere.  That is

3    exactly the truth of the matter asserted, Mr. Bradley is

4    asserting, and there is no exception to the hearsay on that.

5              THE COURT:  Anything else, Ms. Call, on that point?

6    Then we will hear from Mr. Beller.

7              MS. CALL:  One moment.  I think, Your Honor, this is

8    kind of getting to the same point we discussed several times

9    regarding effect on the listener that in these bidding events

10   we have a request from the customer followed by whatever a

11   deadline is and conspiratorial acts in between.  So you really

12   can't understand, and the real purpose for offering these

13   pricing requests is to understand the effect that it had on the

14   defendants and the conspirators in the interim, so that's the

15   real non-hearsay purpose that we're getting out of this

16   underlying e-mail.

17             THE COURT:  Mr. Tubach?

18             MR. TUBACH:  Nothing further, just that it's a

19   statement of fact that you can't get around.  The effect on the

20   listener, all he is asking is when are we going to have

21   pricing, and he says we'll have it Monday, thanks.  It's not

22   really clear that that hearsay statement from Mr. Bradley is

23   necessary to have that effect on the listener.  What the past

24   practice is isn't what the effect on the listener is.

25             THE COURT:  Mr. Beller?

1              *MR. BELLER:*  Thank you, Your Honor.

2              Mr. Tubach had mentioned the e-mail from Mr. Bradley

3     which is the middle of Page 1.  I would also note that there is

4     the second page to this particular exhibit.  The entire second

5     page is all Mr. Bradley.  Again, the jury is going to have to

6     determine whether or not a conspiracy existed, and that's going

7     to be predicated on understanding the request from Church's in

8     the first place.  And therefore it is a declarative statement

9     on Mr. Bradley's part.

10             We believe that we have a confrontation right as to

11    Mr. Bradley which is the basis of this particular exchange.

12    And for that reason we would object in addition to what

13    Mr. Tubach says, but on confrontation grounds, unless, of

14    course, Mr. Bradley or someone from Church's is brought in to

15    testify to the same.

16             *THE COURT:*  All right.  Ms. Call, response?

17             *MS. CALL:*  I will note I did fail to address the first

18    e-mail.  This is essentially covered under 803(3) that

19    Mr. Bradley is stating his plan and intent of getting Pilgrim's

20    approved to be a frozen supplier.  It goes on to make -- give

21    some background.  But this isn't being offered for the purpose

22    of that.  It's purely the purpose of showing his intent which

23    is then followed by, of course, the request for pricing and

24    what goes on from there.

25             *THE COURT:*  The objections will be overruled.  I don't

2848

1    find that there is a confrontation issue here.  I also believe

2    and will give a limiting instruction that Mr. Bradley's

3    statements, the one that starts off this e-mail chain but also

4    the later one, will not -- the jury should not consider them

5    for the truth of the matter asserted, but only for the effect

6    on the listener.

7            There is, despite Mr. Tubach's argument, an effect on

8    the listener because Mr. Little after the second statement by

9    Mr. Bradley does respond to him.  And so for that reason, I

10   think there is a hearsay exception that would allow

11   Mr. Bradley's second statement.

12           Mr. Tubach?

13           MR. TUBACH:  Your Honor, the Court had previously

14   found this was not under 801(d)(2)(E), so is this now a

15   statement under 801(d)(2)(A)?

16           THE COURT:  I am sorry, maybe I missed that point.

17   Hold on.

18           MR. TUBACH:  I think we started with that, but then we

19   quickly got detoured.

20           THE COURT:  Yeah, so this would be admissible only as

21   against Mr. Little, then.

22           MR. TUBACH:  Quickly, as the Court is clearly aware

23   having looked out here, Ms. Pletcher had to leave.  And

24   Ms. Therani is going to assist with the rest of the hearing

25   until 5:00 o'clock.

1          *THE COURT:*  Okay, great.  I noticed Ms. Pletcher had

2    to leave and I can understand that.  Great.

3          And you were just covering the hand-off there?

4          *MR. TUBACH:*  I may be doing some more talking, Your

5    Honor, only because I can't help myself.

6          *THE COURT:*  I thought you had great restraint up until

7    just recently.

8          Go ahead, Ms. Call.

9          *MS. CALL:*  Next is Government's Exhibit 120.  This was

10   on the government's *James* log as No. 49 and was favorably rule

11   on.

12         *THE COURT:*  Okay.  Objections to 120?

13         *MR. GILLEN:*  Yes, Your Honor.  We would object.  We

14   objected to the *James* log at the *James* hearing.  We would renew

15   that objection.  In addition, we have the same issue regarding

16   the Dean Bradley communications about the history and

17   background that he went into in the same exhibit that you

18   previously examined regarding Mr. Little.  The same issue

19   applies here.  And, you know, one would then think perhaps the

20   Court is going to give a limiting instruction as it relates to

21   Mr. Bradley.

22         If that were the case, I would also like to put on the

23   record that the Court previously today stated that there is a

24   presumption that jurors are able to listen to and absorb and

25   follow limiting instructions.  And although I think that is

1    generally the case, I would like to put on the record that the

2    nature of this case, the complexity of this case, and the many

3    different limiting instructions which we will have with very

4    complicated and complex documents may overwhelm that

5    presumption concerning the limiting instructions which is one

6    of the hazards that you have when you have 10 defendants with

7    16 million documents produced in discovery and we're going

8    through this process.

9         So I would like to put on the record that as it

10   relates to limiting instructions, we have concerns whether the

11   jury will be able to do the mental gymnastics necessary to

12   follow the limiting instructions and not look at the Bradley,

13   in this case, Bradley statements in the limited way the Court

14   has stated.

15        THE COURT:  All right.  Additional objections?

16        All right.  That objection will be overruled.  I will

17   admit this document as Mr. Gillen predicted, not for the truth

18   of the matter asserted by Mr. Bradley, but only for the effect

19   on the listener.  I will give a limiting instruction to the

20   jury to that effect.

21        Next exhibit?

22        MS. CALL:  Next is Government's Exhibit 113.

23        THE COURT:  Objections to Exhibit 113?

24        Mr. Fagg, go ahead.

25        MR. FAGG:  Your Honor, I apologize for going

1    backwards, but just to make sure I was clear because there is a

2    limiting instruction coming for 109, that that document only be

3    admitted as it relates to Mr. Little?  If you said that, I

4    apologize, Your Honor.

5              THE COURT:  109?

6              MR. FAGG:  Yes.

7              THE COURT:  Yes, that's right.

8              MR. FAGG:  Thank you.

9              MS. CALL:  One item in the limiting instructions when

10   we talked about them, and I believe we addressed this some ways

11   back, but obviously communications that are co-conspirator

12   statements here, if they are being admitted under 801(d)(2)(A),

13   there is a bit of a distinction between it being considered for

14   the existence of the conspiracy as opposed to each defendant's

15   participation.  I believe the first time we discussed limiting

16   instructions, I believe what you had perhaps crafted may have

17   gone to this should not be considered as to other defendants'

18   participation in the conspiracy.  I could be incorrect, but

19   that is what I recall.

20             THE COURT:  We had way back when when that issue first

21   came up, I believe that there was an agreed upon limiting

22   instruction as to a given document.  Since then we have not

23   addressed that particular issue.  I do think that for

24   statements that are admitted against a party opponent, but not

25   as co-conspirator exceptions, that it's appropriate that it be

1    considered against just that defendant only.

2            I haven't found a case, and I don't recall looking at

3    this issue before, that would suggest that a limiting

4    instruction could allow the jury to consider a statement of a

5    party opponent against other defendants for proof of the

6    existence of a conspiracy.  I just haven't seen that case.  But

7    if you can provide me with that authority, I could think about

8    that.  Like I said, it came up once upon a time, but not since.

9    And I'm not sure of the law on that.

10           MS. CALL:  Yes.  I will note that the briefing the

11   government submitted several days ago regarding -- and maybe I

12   am tying them all together, but the Supreme Court precedence in

13   *Lutwak* and *United States v. Anderson* basically articulated that

14   evidence that is admissible and relevant can be, even if not

15   admitted under 801(d)(2)(E), considered against other members

16   of concealment as relevant and proof of the conspiracy.  It was

17   not specific to 801(d)(2)(A), but we are happy to look into

18   that.

19           THE COURT:  Yeah, I am looking for something specific

20   to that exception because I think that's important.  Otherwise,

21   courts may not -- courts may make certain statements not

22   intending or not anticipating, although appellate courts have

23   to do that all the time, as to how it could be used outside of

24   the context of those particular facts, so I think it would be

25   helpful to look for relevant precedent involving the same

1    issue.

2           MS. CALL:  Yes.  The government can look into that and

3    follow up.

4           THE COURT:  Okay.

5           MS. CALL:  Were we just beginning to consider 113?

6           THE COURT:  I think so.

7           Objections to 113?

8           MS. TEHRANI:  Yes, Your Honor.  Emma Tehrani on behalf

9    of Jayson Penn.  This exhibit was item No. 50 on the *James* log.

10   It was not admitted.  And we object on the ground that it's

11   hearsay and it's also not admissible under 801(d)(2)(A) because

12   Carl Pepper is not a party.

13          THE COURT:  Okay.

14          Response, Ms. Call?

15          MR. GILLEN:  We would join in that objection, Your

16   Honor.  And also for the sake of brevity, if I may incorporate

17   my previous objections to the Dean Bradley statements in this

18   exhibit as well as my comments on the -- my concerns about the

19   limiting instructions, I would appreciate that.

20          THE COURT:  Yes, I will.

21          MS. CALL:  Yes, Your Honor.  I believe the statements

22   by Carl Pepper that is sending the e-mail at the top here would

23   be admissible under the exception to hearsay for a statement of

24   plan or intent.  It's also essentially being offered as a false

25   statement and therefore is non-hearsay because following this

1    e-mail Mr. Pepper, rather than contacting his pricing group at

2    this time, reached out to competitors.

3         *MR. GILLEN:*  If I may try to follow through on that

4    logic.  So it's not admissible under 801(d)(2)(E) under the

5    *James* log, but they are saying Carl Pepper, not an indicted

6    defendant in this case, they want to introduce it to show that

7    he made a false statement.  We object to that.  That's not a

8    proper foundation for the admissibility of a document in a case

9    in which he is not a defendant.  Therefore, that would be an

10   additional objection that we would have to this exhibit.

11        *MS. CALL:*  I will just note that that point is

12   incorrect as false statements are essentially by the nature of

13   them not offered for the truth of the matter asserted and are

14   not hearsay on those grounds notwithstanding who the defendant

15   is in the case.  So if there is something that's arguably false

16   in this, that just means we are not offering this for the truth

17   that Mr. Pepper is getting with his pricing group.  We are

18   offering it instead for the fact and the real effect that he

19   reached out to competitors following this.

20        *MR. GILLEN:*  Under that convoluted logic any statement

21   by anybody that they think is a lie would be admitted into

22   evidence in this case.

23        *MS. CALL:*  Just briefly, there is 10th Circuit

24   precedence that the government has cited on this precise issue

25   in its briefing relating to -- I forget the title of the

1    briefing, but it was the concealment by Mr. Tim Stiller.  We

2    cited several 10th Circuit cases about the admissibility of

3    false statements as non-hearsay.

4          THE COURT:  I am going to sustain the objection as to

5    it being hearsay, Ms. Tehrani objection.  Because it was

6    rejected under the *James* log, it would only be able to come in

7    as non-hearsay as a party opponent.  Mr. Pepper is not.  The

8    argument that this is a false statement, not really.  I think

9    that is a very expansive concept, but at least part of that

10   response is not something that would be falsified.  It contains

11   freezer costs, mentions other things of that nature.  So given

12   the fact that Mr. Bradley is also a hearsay statement, I don't

13   find any basis for admissibility and will reject 113.

14         Can we do another in six minutes?

15         MR. TUBACH:  Not if our average holds, Your Honor.

16         THE COURT:  What are our stats, Mr. Tubach?

17         MR. TUBACH:  I will have to do the latest, but we are

18   currently over five minutes.  We have been speeding up a

19   little, but --

20         THE COURT:  Maybe with the running total we might have

21   time.  Why don't we go for it.

22         MS. CALL:  All right.  I will maybe skip one ahead to

23   something that may actually just be faster and that is

24   Government's Exhibit 114.  It was contained in the *James* log

25   and it was ruled on favorably as *James* log 53.

1            THE COURT:  Objections to 114?

2            MR. GILLEN:  Yes, Your Honor.  I would renew our

3      objections made at the *James* hearing, No. 1.  No. 2, again we

4      have issue regarding the Dean Bradley hearsay which I will use

5      my previous arguments, incorporate them herein, and also my

6      concerns about the complexities of limiting instructions in a

7      complex multi-defendant case such as this.

8            THE COURT:  Mr. Fagg?

9            MR. FAGG:  Sure, Your Honor.  And I don't believe that

10     this document was ruled on at the *James* hearing.  Perhaps a

11     similar document was, but I show *James* log entry 53, the

12     document ending in Bates No. 3846.  This is ending in 3844.

13           MS. CALL:  I do stand corrected, Your Honor.  *James*

14     log entry 53 contained one additional e-mail in this chain

15     which was I believe a response from Defendant Mulrenin saying

16     okay after Defendant Roberts' e-mail is contained at the top

17     here.  So this is all inclusive of what was in *James* log entry

18     53.

19           THE COURT:  Mr. Fagg, would you like that pulled up on

20     the screen just to compare?

21           MR. FAGG:  I will take the government's representation

22     of that, Your Honor.  I was just trying to track myself here.

23           THE COURT:  No, I am glad you are double-checking it.

24           Additional objections?

25           All right.  Mr. Gillen's two objections will be

1    overruled for the same reasons that I mentioned previously.

2    This document will be admitted with a limiting instruction,

3    namely that as to statements of Mr. Bradley, Mr. Bradley's

4    statements will not be considered for the truth of the matter

5    asserted, but rather for the effect on the listener.

6         Okay.  So we will have to take stock of how far we got

7    and there is a lot left to go.

8         Mr. Tubach?

9         *MR. TUBACH:*  I can just report on the stats.  We have

10   done about one document every four and a half minutes.  It

11   varied quite a bit as you would expect with authentication

12   issues.  Some have gone fast and some slower, but now we have

13   done a total of I believe 82 documents, 83.  It's taken 365

14   minutes, so we have a pretty robust data set.

15        *THE COURT:*  Yeah, it's good to do that.  So that gives

16   us powers of prediction.  So then what we have to think about

17   is what is going to happen next week and how we're going to do

18   next week.  So we are not having trial on Friday.  That's one

19   of our days that we won't be.  And so the question would be

20   should we have -- I don't know.  We have to just think that

21   through.

22        The jury is obviously coming back on Monday and we are

23   going to use Monday for testimony, especially since Mr. Skalak

24   needs to get his testimony wrapped up.  But after that I think

25   we need to think about what are we going to do on Tuesday,

1    Wednesday.  When does the government think it's going to rest?

2    Will that be next week?  I am increasingly pessimistic, but I

3    am not sure.  So I don't know, we don't necessarily need to

4    resolve that today, but if people have some thoughts or

5    predictions, that's fine.

6         Ms. Call?

7         MS. CALL:  Two updates and one question all related to

8    that.  As to the efficiency point, the parties are going to

9    confer over the weekend and attempt to reach a stipulation on

10   those underlying phone number and employer sources, so we hope

11   that that will be resolved by then.

12        THE COURT:  Yeah, it seems like we could save a lot of

13   time.  As we get further behind in our schedule, you know,

14   we'll reach a point of pareto-optimality where every hour spent

15   on one thing means an hour less on another.  And that's bad.

16   It's bad for everybody.  So I do think that there is an

17   incentive for both sides.  And I am not casting any aspersions.

18   I am just saying that that seems to generally be a good idea.

19   I think we would save a lot of time.  And it would seem like

20   some type of agreement could be worked out, but I am glad to

21   hear that's going to be occurring.

22        MS. CALL:  There may have been some confusion as to

23   something I said at the beginning of the hearing, so I just

24   wanted to make it clear.  Regarding the excerpt to I believe it

25   was Exhibit 9264, an exhibit that the government had identified

1    an error in the Bates number when it was Bates of an excerpt,

2    there was perhaps an understanding that I had communicated that

3    to defense counsel.  That was not correct.  The government had

4    internally identified the error this morning.

5                THE COURT:  Okay.

6                MS. CALL:  And the last is just a clarification.  The

7    government would hope regarding exhibits that are being

8    excluded as cumulative of testimony and how to best or

9    properly, I suppose, put that in our summary exhibits given

10   that -- and I do not want to give Ms. Coppock more work -- but

11   given that we haven't requested certified transcripts yet and

12   don't want to do that for a number of witnesses at the same

13   time.  So I am wondering if it would be proper to generally

14   refer to testimony in a summary exhibit for, for example, the

15   February, I think, 3rd bid deadline that we were discussing

16   earlier.

17               THE COURT:  So what you are saying is that to list as

18   a foundation for a summary exhibit, not a document, but

19   someone's testimony.

20               MS. CALL:  Precisely.  I think that would have to come

21   under Rule 611 likely.  Essentially we wouldn't be quoting the

22   transcript yet.  It would more so be a general statement of the

23   nature of the testimony as to the February 3rd bid submission

24   and citing testimony generally.

25               THE COURT:  I don't -- without prejudging that

1  particular exhibit, I don't see anything wrong with doing that

2  as long as you are not quoting from an unofficial transcript.

3      MR. KORNFELD:  Two things.  One, just consistent with

4  our brief colloquy on preview of coming attractions, wondering

5  what the Court's expectation is with respect to our Rule 29

6  motions.

7      THE COURT:  That was on my list too.

8      MR. KORNFELD:  I think we are all planning on filing

9  something.  And I don't know if the Court will also expect oral

10  argument, so any guidance you could give us would be helpful.

11      THE COURT:  Here is the thing.  I think it may be

12  best -- well, for one thing I know it's a little hard to

13  predict, but let's assume that some day the government rests

14  and then we'll have the Rule 29 issue queued up.  If the

15  defendants plan on submitting something in writing, each of

16  them, how long after the government rests would the defendants

17  be in a position to do that?

18      MR. KORNFELD:  Can we sort of confab on that and

19  answer that Monday morning?

20      THE COURT:  Right.  Because obviously -- I like the

21  idea of written materials in substitution of an oral motion

22  because it would save us a lot of time.  My concern was that

23  there would be some huge block of time devoted to each

24  defendant articulating a Rule 29 motion, which obviously could

25  be done, but it could take a lot of time.

```
 1              If it is submitted in writing, obviously I would have
 2     to take it under consideration for the period of time necessary
 3     for me to be able to digest it, which under the rule I can do
 4     as well.  It's just more likely that I am going to do that.  I
 5     am not saying I would not take it under consideration if it
 6     weren't all oral either, but I do think that does have an
 7     advantage of enabling us to then proceed and not have another
 8     long period of time that the jury has to go home.
 9              MR. KORNFELD:  I am sure you will not find this
10     shocking, Your Honor, that we are working on drafts, but
11     obviously they are drafts because we continue to hear testimony
12     and evidence.
13              THE COURT:  Right.  And the other thing is that the
14     very process that we're going through now may very well mean
15     that certain of the exhibits that the defendants would
16     naturally want to be addressing may not be ruled on yet.
17              MR. KORNFELD:  Great.  And then the second thing I
18     just mention very briefly strictly as a concern, and that is in
19     response to what the government talked about as sort of a
20     recollection of testimony being a foundation of a summary
21     exhibit under Rule 1006.  I mean, we obviously haven't
22     conferred, but just in looking at the rule, I don't know that a
23     1006 summary is a summary of what we think the testimony was.
24     So I express that as a concern and we can burn that bridge when
25     we get there.
```

1              THE COURT:  Yeah, when I saw you come up to the podium

2      with your little blue book, I was getting worried, but the

3      issue is -- that wouldn't conform with 1006, obviously.  The

4      issue would be whether or not it would be appropriate, and I

5      think I have ruled on this before, for an exhibit that may not

6      strictly comply with 1006, but nonetheless be a composite, so

7      it would come in under 611 because it would be helpful to the

8      jury in understanding disparate testimony or a variety of

9      information, et cetera, et cetera, things of that nature.  And

10     that is what I think Ms. Call is referring to, just that, you

11     know, rather than having to put in redundant exhibits, simply

12     to get -- to qualify under 1006 whether it could be part of a

13     summary exhibit even though part of the information on that

14     exhibit was testimony.

15             MR. KORNFELD:  Thank you, Your Honor.

16             MR. GILLEN:  Your Honor, very briefly on that point,

17     we would object under -- certainly under 1006, but even under

18     611, for in this case any kind of summary of what the

19     government's recollections of the testimony is.  Usually under

20     611 when that is permitted as a demonstrative, not as actually

21     an exhibit, it's because the trial has had many, many, many,

22     50, 40, 50 complex witnesses.  That's not the case that we have

23     tried here.

24             The case we have tried there have been very few

25     substantive witnesses put on by the government.  Most of it is

2863

1    the introduction of their documents.  And so in that respect

2    when we see what they are suggesting, our position will be that

3    that sort of let me tell you what I remember what the evidence

4    is should not be permitted before the jury other than in their

5    closing argument.

6         THE COURT:  Yeah, that forms a tricky logistical issue

7    to doing that.  We will have to see what the exhibit looks

8    like.

9         Anything?

10        MR. TUBACH:  Last point.  Just having done the math,

11   if we continue on the current path, it would take just under

12   five hours to finish the current list we have from the

13   government.

14        THE COURT:  Okay.  That's helpful.  So do we have --

15   are we good for a full day on Monday?

16        MS. CALL:  Yes, Your Honor.  While we are on the point

17   of the Rule 29s and the possible end of this case whenever it

18   is, we did want to inquire about timing for jury instructions

19   and when we should have our final proposed ones ready.  I

20   suppose that would perhaps just be at the close of the

21   government's case?

22        THE COURT:  No, it would start before then.  And what

23   we'll do once we start discussing jury instructions is I will

24   provide a court packet.  That court packet will be the basis

25   for our discussions, but if your favorite instruction is not in

1    there, it won't mean it won't be later.  It's just that that

2    will initiate our discussions.

3            We will then start having hearings, not necessarily

4    every evening, but periodically to start shaping -- try to

5    identify the issues, talk about instructions, and get us to a

6    point where once the evidence is closed, we pretty much got the

7    set ready to go.  We will then have our final jury instruction

8    conference and not delay the jury too much in terms of

9    finalizing the instructions.

10           But I don't think we need to worry about that quite

11   yet unless, for instance, it turns out that there is hardly any

12   defense case, although if that were the case, the jury would

13   probably be perfectly happy to go home for a couple days

14   knowing that they would not have to come back for weeks

15   thereafter.  So we'll play it by ear.  I'm not quite sure if we

16   are ready on that one yet.

17           Mr. Pollack?

18           MR. POLLACK:  Your Honor, I just wanted to inquire if

19   there were any changes on who we would anticipate testifying on

20   Monday and in what order.

21           MS. CALL:  Let me confer.  I don't believe there have

22   been any changes.

23           THE COURT:  Okay.  Yeah, that's a good question.

24           MS. CALL:  So the next four witnesses are Mr. Skalak

25   continuing on Monday followed by Weeks.

1              THE COURT:  And he is a custodian?

2              MS. CALL:  Yes.  And I believe that actually is out of

3      order, so I did misspeak, because he has some commitment --

4      followed by Mr. Brink followed by Ms. Dawson -- Mr. Dawson.

5              THE COURT:  All right.

6              MS. CALL:  Mr. Dawson is a custodian of records.

7              THE COURT:  Okay.  But no expectation of getting to

8      Nelson in all likelihood?

9              MS. CALL:  Doubtful on Monday, I believe.

10             THE COURT:  Okay.

11             MS. CALL:  After Dawson would be Ms. Hoyt from Sysco.

12             THE COURT:  Yeah, okay.

13             MR. BYRNE:  And then Nelson?

14             MS. CALL:  Given the dismissal of the additional count

15     today, we will not be calling Ms. Nelson.

16             THE COURT:  Okay.

17             So on Monday we will talk.  If a stipulation can be

18     reached as to those -- is it the phone records or was it the

19     employer matchup or both?

20             MS. CALL:  Optimistically, both.

21             THE COURT:  Okay.  We will see that.  And then let us

22     figure out the most juror friendly way of dealing with our next

23     break to go through exhibits.  The jury is actually quite

24     extraordinarily patient as you have all noticed, but let's try

25     to figure out something that would make sense for them.  I

 1    might even give them the option if we have two which they -- to

 2    think about and then they could consider which they would

 3    prefer, but we'll think about that, okay?

 4            Anything else that we should take up today?

 5            MS. CALL:  Just very briefly on that timing point, I

 6    should have noted the government would plan to offer some of

 7    these exhibits following certain witnesses next week, so it

 8    won't necessarily be witness to witness to witness.

 9            THE COURT:  Yeah.  I think that that's understood.

10    Okay.  Anything else?

11            All right.  Have a good weekend, ladies and gentlemen.

12    The Court will be in recess until Monday at 8:30.

13        (Recess at 5:15 p.m.)

14                     REPORTER'S CERTIFICATE

15        I certify that the foregoing is a correct transcript from

16    the record of proceedings in the above-entitled matter.  Dated

17    at Denver, Colorado, this 26th day of January, 2022.

18

19                         S/Janet M. Coppock

20

21

22

23

24

25