1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB

3

UNITED STATES OF AMERICA,

4

     Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,

7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,

8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,

9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,

10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,

11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT

14                  Trial to Jury, Vol. 16

15 _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:37 a.m., on the 17th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                              APPEARANCES
2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
5    for Plaintiff.
6            Anna Tryon Pletcher and Michael Tubach of
7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8    San Francisco, CA 94111-3823;
9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1                    APPEARANCES (Continued)
 2              Craig Allen Gillen and Anthony Charles Lake of
 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4    Atlanta, GA 30339;
 5              Richard L. Tegtmeier of Sherman & Howard, LLC,
 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7    for Defendant Roberts.
 8              Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10    DC 20006;
11              Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13    for the Defendant Blake.
14
15                         PROCEEDINGS
16         THE COURT:  Anything to take up before we bring the
17    jury back?  Looks like everyone is present and accounted for.
18              Okay.  Let's go ahead and bring the jury in.  And if
19    you can get the witness.
20              (Jury present.)
21         THE COURT:  Good morning, ladies and gentlemen.  Hope
22    you had a good evening.  We are ready to continue with the
23    direct of Mr. Brink.
24              Mr. Torzilli, go ahead.
25         MR. TORZILLI:  Thank you, Your Honor.
```

Joseph Brink - Direct

1          (**Joseph Brink** was previously sworn.)

2                  **DIRECT EXAMINATION CONTINUED**

3     *BY MR. TORZILLI:*

4     *Q.*  Good morning, Mr. Brink.

5     *A.*  Good morning.

6     *Q.*  Did there come a time in 2014 when you brought in a new

7     chicken supplier to supply chicken to Pollo Tropical?

8     *A.*  Yes.

9     *Q.*  Why did you bring in a new chicken supplier to supply your

10    restaurants?

11    *A.*  We brought in a new supplier to add more volume of chicken

12    due to the fact that we were getting less chicken offered by

13    our current supplier.

14    *Q.*  Can you explain why -- can you explain the circumstances as

15    to why you were getting less chicken from your current

16    suppliers?

17    *A.*  Pilgrim's did not give us our volume that we were having.

18    They reduced our volume.  And so we had to bring in another

19    supplier to help mitigate the difference and to have protection

20    as we are in a growth mode at that time.

21    *Q.*  So Pilgrim's was raising your price at that time?

22    *A.*  Yes.

23    *Q.*  And they were reducing your volume?

24    *A.*  Yes.

25    *Q.*  Who was the new chicken supplier that you were bringing

Joseph Brink - Direct

1   onboard?

2   *A.*  Mar-Jac.

3   *Q.*  Can you explain the process that you undertook to bring

4   Mar-Jac onboard?

5   *A.*  We brought in Mar-Jac.  We have a process where suppliers

6   have to get approved.  We have paperwork from the QA

7   department.  We have to do plant inspections.  We have to have

8   the product produced, brought into our test kitchen at the

9   corporate office to have them test the product to make sure it

10  works.  Then we have it go to the restaurant and do a test,

11  make sure it works.  Then we do a bigger test and then they're

12  approved.

13  *Q.*  Is that time and expense that folks at Pollo Tropical need

14  to expend?

15  *A.*  Yes.

16  *Q.*  Did you ultimately negotiate an agreement for chicken

17  supply with Mar-Jac?

18  *A.*  Yes.

19  *Q.*  Do you recall the prices that you agreed to with them?

20  *A.*  I do believe like 19 cents a pound increase like we have

21  right now.

22  *Q.*  So the agreement that you had with Mar-Jac was at the same

23  price levels as the agreements that you ultimately reached with

24  Pilgrim's?

25  *A.*  Correct.

Joseph Brink - Direct

1   Q.   And that you reached with Claxton?

2   A.   Correct.

3   Q.   And how about compared to the agreement that you reached

4   with Holmes?

5   A.   Holmes was less.

6   Q.   I want to go back to our discussion about stair-stepping.

7   And can you remind us what the purpose of stair-stepping prices

8   was in 2014?

9   A.   The purpose of the stair-stepping was to take a large price

10  increase and have an increase spread out over X period amount

11  of time.

12  Q.   Did you ask Holmes whether they would be willing to

13  stair-step their proposed increase?

14  A.   Yes.

15  Q.   And what did you agree to with Holmes on stair-stepping?

16  A.   I don't recall.

17  Q.   Do you recall the time period that the stair-stepping would

18  occur?

19  A.   One year or two years.  I don't really remember exactly.

20  Q.   Did Claxton agree to stair-stepping their increase?

21  A.   Yes.

22  Q.   Do you recall the circumstances of the stair-stepping that

23  you agreed to with Claxton?

24  A.   We took a large like 10-cent increase in January, and then

25  we had a smaller increase in April and a last increase in July.

Joseph Brink - Direct

1   Q.   So by July 1st of 2015 the price increase was fully

2   incorporated into the purchases that Pollo was making?

3   A.   Correct.

4   Q.   And did you ask Pilgrim's whether they would be willing to

5   stair-step the increase?

6   A.   Yes, I did.

7   Q.   What response did you get from Pilgrim's about

8   stair-stepping the increase?

9   A.   They would not cooperate.   The pricing started on

10   January 1st, the full impact.

11   Q.   So they rejected your request for stair-stepping the

12   increase?

13   A.   Yes.

14   Q.   Do you know why?

15   A.   No, I do not.

16   Q.   You said you came to an agreement with Claxton.   Will you

17   look at Tab 11 of your binder?   You should find there an

18   exhibit that's marked as GX-9726.   Do you see it?

19   A.   Yes, I do.

20   Q.   Do you recognize it?

21   A.   Yes, I do.

22   Q.   What is it?

23   A.   This is our contract that we issued to Claxton for our

24   chicken for 2015.

25   Q.   Is this a document that's in the files of Pollo Tropical?

Joseph Brink - Direct

1    A.  Yes, it is.

2    Q.  Is the agreement that's contained in Government

3    Exhibit 9726 signed?

4    A.  No, it is not.

5    Q.  Why is it not signed?

6    A.  That is our contract.  We gave it to Claxton and it was

7    going back and forth between the legal departments.  And as of

8    August it still was not completed of 2015.

9    Q.  And so the contract for calendar year 2015 was never

10   signed?

11   A.  Correct.

12   Q.  Did you -- did Pollo Tropical and Claxton abide by -- in

13   your view abide by the terms that are contained in what has

14   been marked as 9726?

15   A.  Yes.

16   Q.  And was the agreement that's contained in 9726 created and

17   maintained in the regular course of Pollo Tropical's business?

18   A.  Yes.

19   Q.  And is it a regular part of Pollo Tropical's business to

20   create and maintain agreements with its chicken suppliers?

21   A.  Yes.

22   Q.  And as far as you know, is the information contained in

23   9726 true and accurate?

24   A.  Yes, it is.

25          MR. TORZILLI:  Your Honor, offer 9726 into evidence.

3204

Joseph Brink - Direct

1          MR. BELLER:  If I may have a moment.

2          THE COURT:  You may.

3          MR. BELLER:  No objection.

4          THE COURT:  Any other objections to Exhibit 9726?

5          All right.  Exhibit 9726 will be admitted.

6          MR. TORZILLI:  Thank you, Your Honor.

7          Mr. Brink, you can put that document aside.

8   BY MR. TORZILLI:

9   Q.  Did Claxton ever offer a two-year agreement to Pollo

10  Tropical in the negotiations in 2014?

11  A.  Yes, they did.

12  Q.  Do you have an understanding as to why they wanted a

13  two-year contract?

14  A.  To protect themselves for the pricing stair-stepping and

15  they have the volume for two years.

16  Q.  What do you mean by protect themselves?

17  A.  That they were giving a discount on their pricing, so they

18  still had the volume of business for the following year.

19  Q.  What do you mean by discount?  You had testified earlier to

20  a significant price increase.  How does discount figure into

21  what you're describing?

22  A.  They were stair-stepping the price increase, so the full

23  impact of our price increase started in July, not January 1st.

24  So they did not give us a full impact for the full calendar

25  year.

Joseph Brink - Direct

1    *Q.* So you understood that they wanted 18 months worth of the

2    full impact of the price increase?

3    *A.* Yes.

4    *Q.* And what was your response to that proposal?

5    *A.* No.

6    *Q.* Did you ever give an indication to Claxton that you wanted

7    a two-year agreement?

8    *A.* No.

9    *Q.* Why didn't you want a two-year agreement?

10   *A.* I would not accept a price for two years at the current

11   level of the pricing because it was way too high.

12   *Q.* Did there ever come a time when anyone from Claxton told

13   you that Pollo Tropical was changing the agreement?

14        *MR. BELLER:* Objection, vague as to who the speaker is

15   for the determination of hearsay.

16        *THE COURT:* It's a yes/no question.  He can answer.

17   Overruled.

18   *A.* Yes.

19   *BY MR. TORZILLI:*

20   *Q.* Who communicated that to you?

21   *A.* Walter Cooper.

22   *Q.* What did he say?

23   *A.* He said that --

24        *MR. BELLER:* Objection, hearsay.

25        *THE COURT:* Overruled.

Joseph Brink - Direct

1    *A.*  He said it's supposed to be a two-year agreement.

2    *BY MR. TORZILLI:*

3    *Q.*  And what was your response?

4    *A.*  I said our pricing is for the one year.  We can work on the

5    volume for two years, but I would not commit to pricing for two

6    years.

7    *Q.*  So just to be clear, you never indicated to Claxton that

8    you were willing to agree to a two-year contract.

9            *MR. McLOUGHLIN:*  Objection, leading, Your Honor.

10           *THE COURT:*  Sustained.

11   *BY MR. TORZILLI:*

12   *Q.*  Did you ever indicate to Claxton an interest in a two-year

13   contract?

14   *A.*  No.

15   *Q.*  How did the prices that you ultimately agreed to with

16   Pilgrim's, with Claxton and with Mar-Jac compare to each other?

17   *A.*  They were -- at the end they were pretty much the same

18   price.

19   *Q.*  And by pretty much the same price, what do you mean,

20   please?

21   *A.*  Because the stair-stepping, by July they were all the same.

22   *Q.*  By July 1 of 2015 the prices for all three suppliers were

23   the same?

24   *A.*  Correct.

25   *Q.*  Was that true for the split WOG product?

Joseph Brink - Direct

1   A.  Correct.

2   Q.  Was that also true for the sized breast product?

3   A.  Correct.

4   Q.  Sir, how long have you been negotiating chicken contracts

5   with suppliers?

6   A.  Since 1994.

7   Q.  Do you consider yourself a tough negotiator?

8   A.  I think I'm fair, yes.

9   Q.  Do you consider yourself a successful negotiator?

10  A.  Yes.

11  Q.  Have you successfully negotiated deals with Mr. Little and

12  with Mr. Cooper, mutually beneficial deals over the years?

13  A.  Yes.

14          MR. McLOUGHLIN:  Objection, Your Honor.

15  Q.  Was 2014 --

16          THE COURT:  Hold on.  I haven't ruled on the

17  objection.  Overruled.

18  BY MR. TORZILLI:

19  Q.  Would you repeat your answer?

20  A.  Yes.

21  Q.  Was 2014 different?

22  A.  Yes.

23  Q.  How was it different?

24  A.  It was different because the pricing was the highest price

25  increase that we ever received from a chicken company, and

Joseph Brink - Direct

1  there was no negotiation, no talking.  And the matrix of

2  pricing did not match what we had done in the past.

3  Q.  Was it typical in your dealings historically with

4  Mr. Little and Mr. Cooper that they would compromise from their

5  initial or opening proposals?

6  A.  Typically, yes.

7  Q.  Was 2014 different in that regard?

8  A.  Yes.

9  Q.  How so?

10  A.  Pilgrim's offered the price and they would not -- they

11  would not discuss.  They said this is the price.  There is no

12  negotiation.  We want the same margins as large birds.  This is

13  the price.  Take it or leave it.

14  Q.  Did you ever explain to Mr. Little the potential or likely

15  impact to Pollo Tropical if the proposed price increases were

16  agreed to?

17       MR. BELLER:  Objection, relevance and hearsay, Your

18  Honor.

19       THE COURT:  Sustained.

20  BY MR. TORZILLI:

21  Q.  Sir, I'm going to show you a document that's been marked as

22  Government Exhibit 555.

23       MR. TORZILLI:  Your Honor, permission to approach the

24  witness?

25       THE COURT:  Yes.

Joseph Brink - Direct

1          *MR. BELLER:*  May we have a paper copy, please?

2          *MR. TORZILLI:*  I'll see if I have one.

3   *BY MR. TORZILLI:*

4   *Q.*  Do you recognize Exhibit 555?

5   *A.*  Yes.

6   *Q.*  What is it?

7   *A.*  This is an e-mail that I sent to Jimmie Little on

8   October 8th, 2014.

9   *Q.*  Is this an e-mail that you sent to him in connection with

10  the negotiations that you were having with Mr. Little for Pollo

11  Tropical's chicken supply for the following calendar year?

12  *A.*  Yes.

13         *MR. TORZILLI:*  Move to admit Exhibit 555.

14         *MR. CANTY:*  Objection, hearsay, relevance.

15         *THE COURT:*  We are not there quite yet.  Any objection

16  to the admission of Exhibit 555?

17         *MR. McLOUGHLIN:*  Objection with respect to 555, Your

18  Honor, that it is hearsay and cannot be admitted for the truth

19  of the matter asserted by Mr. Brink in the e-mail.  If the

20  government is offering it under some other exception, that's

21  different, but it's hearsay as offered.

22         *THE COURT:*  I am sorry.  Mr. Canty, what was your

23  objection again?

24         *MR. CANTY:*  Objection, hearsay and relevance.

25         *THE COURT:*  Mr. Beller?

Joseph Brink - Direct

1          MR. BELLER:  Your Honor, the Court has sustained this

2    exact objection now twice.  One of it was yesterday quite

3    lengthy on side bar.  One of it was to the last question.  So

4    in addition to what my colleagues have objected, I would add

5    that to their list of objections.

6          THE COURT:  All right.  Mr. Beller's objection will be

7    sustained.

8    BY MR. TORZILLI:

9    Q.  Mr. Brink, what was the magnitude in percentage terms of

10   the price increase that you ultimately agreed to with Mar-Jac,

11   Pilgrim's and Claxton?

12         MR. BELLER:  Objection, relevance, foundation and

13   vague.

14         THE COURT:  Overruled.  He can answer.

15   A.  It was about 20, 25 percent price increase.

16   BY MR. TORZILLI:

17   Q.  Why, sir, were you willing to agree to price increases of

18   that magnitude?

19   A.  I was not willing.  I had no choice.

20   Q.  What do you mean by you had no choice?

21   A.  They would not negotiate.  They would not compromise.  I

22   had to book chicken to protect the brand.

23         MR. TORZILLI:  Thank you, sir.  No further questions.

24         THE COURT:  All right.  Cross-examination?

25         Mr. Canty?

Joseph Brink - Cross

1            **CROSS-EXAMINATION**

2   *BY MR. CANTY:*

3   *Q.*  Good morning, Mr. Brink.  My name is Dennis Canty.  I

4   represent Jimmie Little and we are going to ask you some

5   questions this morning.  Along the lines of what you were

6   mostly asked about being a tough negotiator and a successful

7   negotiator, I want to talk to you about some of your

8   negotiation strategies.

9            You maintain multiple suppliers for Pollo Tropical; is

10  that correct?

11  *A.*  Yes.

12  *Q.*  Okay.  And using multiple suppliers can help to verify

13  pricing assertions made by suppliers regarding market trends.

14  Is that fair to say?

15  *A.*  Yes.

16  *Q.*  You verify what suppliers tell you about the market by

17  comparing their pricing, right?

18  *A.*  Yes.

19  *Q.*  Okay.  If one supplier gives you a high price and tells you

20  it's due to market trends, you can look at pricing from other

21  suppliers and if their pricing isn't as high, then you have

22  evidence that market trends don't support the price, right?

23  *A.*  Yes.

24  *Q.*  Conversely, if you check with other suppliers and their

25  price is similar, could that be evidence that market trends do

Joseph Brink - Cross

1  support the price increase?

2  A.  Could be.

3  Q.  It's nice to get pricing information from multiple

4  suppliers because it keeps all of them honest.  Is that fair to

5  say?

6  A.  That is true.

7  Q.  You can make sure that they're telling you the truth in

8  your negotiations?

9  A.  I can't tell if they're telling me the truth.  I just get

10  pricing.

11  Q.  But if they are lying to you -- if one of them is lying to

12  you about pricing and about what they're contentions are about

13  the market, you can catch them in the lie if you can talk to

14  the other suppliers, right?

15  A.  I don't know.

16  Q.  Is it important to you that suppliers are honest with you

17  in negotiations?

18  A.  Yes.

19  Q.  That they give you truthful information?

20  A.  Yes.

21  Q.  Because if you're not, the relationship between the parties

22  who are negotiating can break down?

23  A.  Yes.

24  Q.  In negotiating with chicken suppliers, you invoke

25  competitors as being lower priced in order to encourage

3213

Joseph Brink - Cross

1  suppliers to lower their prices, right?

2  *A.*  Yes.

3  *Q.*  And you use this strategy regularly, right?

4  *A.*  I use strategies, multiple strategies.

5  *Q.*  But that's one of them, right?

6  *A.*  That's one of them.

7  *Q.*  And from your perspective there is nothing wrong with that.

8  *A.*  I was just doing my job.

9  *Q.*  And you used that strategy in 2013 in negotiating with

10  Pilgrim's and Claxton for the year 2014 contracts, right?

11  *A.*  I don't recall.

12  *Q.*  You negotiated with chicken suppliers on behalf of Pollo

13  Tropical for their 2014 contract year, right?

14  *A.*  Yes.

15  *Q.*  Okay.  And do you recall using information about

16  competitors' prices to encourage Pilgrim's to lower its price

17  for split WOGs in 2014?

18  *A.*  I don't remember.

19  *Q.*  Who at Pilgrim's did you negotiate with for the 2014

20  contract?

21  *A.*  I do believe it was Jimmie Little.

22      *MR. CANTY:*  Your Honor, could I hand up some exhibits

23  through Ms. Grimm?

24      *THE COURT:*  Yes, you may.

25  *BY MR. CANTY:*

3214

Joseph Brink - Cross

1   Q.  Would you please take a look at what we've marked for

2   identification as Exhibit I-225, please.

3   A.  Yes.

4   Q.  Can you identify it for us, please?

5   A.  It's an e-mail from myself to Matthew Boarman.

6   Q.  And it's an e-mail you sent to Mr. Boarman on November 5,

7   2013, right?

8   A.  Correct.

9   Q.  Who is Matthew Boarman?

10  A.  He was a salesperson at Pilgrim's that we were dealing

11  with.

12  Q.  Did you negotiate with Matthew Boarman for the purchase of

13  chicken from Pilgrim's in 2014?

14  A.  I must have.  I don't remember.

15  Q.  For the 2014 contract year, pardon me, right?

16  A.  Correct.

17  Q.  And this e-mail concerns the 2013 negotiations for the 2014

18  contract year, right?

19  A.  Yes.

20  Q.  Which you were then involved in.

21  A.  Yes.

22  Q.  And this e-mail that you wrote accurately reflects events

23  that were happening to your knowledge at the time of those

24  negotiations?

25  A.  Yes.

Joseph Brink - Cross

1   *Q.*  And you were conveying a message to Mr. Boarman on

2   November 5th, 2013, weren't you?

3   *A.*  Yes.

4   *Q.*  What did you want Mr. Boarman to know?

5   *A.*  I wanted him to know that his prices were too high and he

6   needed to lower his pricing.

7         *MR. TORZILLI:*  Your Honor, objection to further use of

8   the document.  It's not been received into evidence.

9         *THE COURT:*  Well, I'm not sure what use is being put

10  to it, but I don't understand --

11        *MR. CANTY:*  To refresh recollection under 803(5).  The

12  foundation has been laid for that.  It can be read into the

13  record although the evidence has not been admitted as an

14  exhibit.

15        *THE COURT:*  Well, my point is that it hasn't been used

16  yet.  The objection is overruled.  We'll see.

17  *BY MR. CANTY:*

18  *Q.*  So you wanted Pilgrim's to lower its price on split WOGs

19  for the 2014 contract year, right?

20  *A.*  Correct.

21  *Q.*  Okay.  And what information did you share with Mr. Boarman

22  in order to get Pilgrim's to do that?

23  *A.*  I just gave him that there is two competitors, that he

24  needs to lower his pricing to be in the same ball park.

25  *Q.*  Why did you want them to be in the same ball park?

Joseph Brink - Cross

1   *A.*   To have pricing to be -- basically be the pricing to be.

2   *Q.*   Is the idea that the suppliers' pricing should be the same,

3   is that helpful to Pollo Tropical's business?

4   *A.*   It makes it easier for operations and the distributor.

5   *Q.*   How so?

6   *A.*   For the pricing to be invoiced and everything else for the

7   restaurants.

8   *Q.*   So having suppliers with the same price is something that

9   is an advantage to Pollo Tropical.

10  *A.*   I wouldn't say an advantage, no.

11  *Q.*   Is it something you were seeking in the negotiations in

12  2013?

13  *A.*   I was seeking to get the best price.

14  *Q.*   And to do so did you tell Mr. Boarman what his competitors'

15  price was?

16  *A.*   I said that would put them in the same playing field.   I

17  gave them guidance and a range.

18  *Q.*   Did you tell Mr. Boarman that, "I just received pricing

19  from two of your competitors and you need to lower the price of

20  WOGs from 89 cents to 88 cents delivered"?

21       *MR. TORZILLI:*   Objection, reading from a document not

22  in evidence.

23       *THE COURT:*   Sustained.

24  *BY MR. CANTY:*

25  *Q.*   Mr. Brink, did you tell Mr. Boarman what his competitors'

Joseph Brink - Cross

1    price was on November 5th, 2013?

2    A.  No.  I said it would put them on the same playing field,

3    give him a range.

4    Q.  You gave him a range?

5    A.  Guidance basically, helping them to get to where we need

6    them to be.

7    Q.  What was the guidance?

8    A.  Telling him he was too high, he needs to lower his pricing.

9    Q.  What was the range?

10   A.  He was a penny too high.

11   Q.  Did the negotiations in 2013 continue from here?

12   A.  I assume so.

13   Q.  Do you recall what happened next?

14   A.  No, I do not.

15   Q.  Did you follow up with Mr. Boarman?

16   A.  I do not remember.

17   Q.  Let's take a look at Exhibit I-226, if you could.

18          Can you identify Exhibit I-226 for us?

19   A.  It's an e-mail that I sent to Matt Boarman on 11/15.

20   Q.  That's 11/15/2013?

21   A.  Yes.

22   Q.  You sent him an e-mail on November 15th at 1:11 p.m.?

23   A.  I guess the time -- it says 6:22:16.  I don't know what

24   time.

25   Q.  I am sorry, the first e-mail on the chain starting from

Joseph Brink - Cross

1    below, right?

2    A.   I'm sorry.

3    Q.   Let me do it this way.   There are several e-mails in the

4    chain, right?

5    A.   Yes.

6    Q.   And it begins with you sending Mr. Boarman an e-mail on

7    November 15 at 1:11 p.m.?

8    A.   Yes.

9    Q.   And then he responds to you and then you respond to him,

10   correct?

11   A.   Yes.

12   Q.   These e-mail messages between you concern the 2013

13   negotiations for the 2014 contract year, right?

14   A.   Yes.

15   Q.   And which you were then involved in, true?

16   A.   Yes.

17   Q.   And do these e-mails accurately reflect what was happening

18   to your knowledge at the time of those negotiations?

19   A.   Yes.

20   Q.   So you followed up with Mr. Boarman on November 15th.   And

21   did you ask him about chicken prices for 2014?

22        MR. TORZILLI:   Objection, Your Honor.   The document

23   hasn't been received into evidence.

24        THE COURT:   Sustained.

25   BY MR. CANTY:

Joseph Brink - Cross

1    Q.   Did you check in with Mr. Boarman on November 15th?

2    A.   Yes.

3    Q.   Okay.  And what was the subject of your inquiry?

4    A.   I asked him, "Are we ready to go on chicken prices for next

5    year?"

6    Q.   And he responded to you, right?

7    A.   Yes.

8    Q.   And gave you some information?

9    A.   Yes.

10   Q.   And you responded to that, right?

11        MR. TORZILLI:  Objection, Your Honor.  The document

12   has not been received into evidence.

13        THE COURT:  The witness appears to be just reading

14   from the document.  There is no -- no independent recollection

15   has been established for this.  Sustained.

16        MR. TORZILLI:  Your Honor, may I ask that the document

17   be removed from display?

18        MR. McLOUGHLIN:  Your Honor, if we could ask

19   Mr. Torzilli to speak up a little bit.  I can't hear him.

20        THE COURT:  Sure, if you would, Mr. Torzilli.

21        MR. TORZILLI:  Yes, Your Honor.

22        THE COURT:  The document should be taken down unless

23   his recollection is properly refreshed.

24        MR. CANTY:  Your Honor, we offer Exhibit I-226 into

25   evidence.

Joseph Brink - Cross

1        THE COURT:  Any objection to the admission of Exhibit

2    I-226?

3        MR. TORZILLI:  Objection, hearsay.

4        THE COURT:  Response?

5        MR. CANTY:  The witness has testified it's an e-mail

6    he sent and it's a recorded recollection.

7        THE COURT:  Objection sustained.  It's hearsay.

8    BY MR. CANTY:

9    Q.  Mr. Brink, did you share with Mr. Boarman in November of

10   2013 what his competitors' prices were?

11   A.  I stated that there was the pricing and they were too high

12   compared to his other competitors.

13   Q.  Did you list his competitors by name in giving him

14   competitive pricing?

15   A.  Yes.

16   Q.  Who were those competitors?

17   A.  Claxton and Holmes.

18   Q.  And did you give Mr. Boarman the exact price to the penny

19   that Claxton and Holmes were charging?

20   A.  Yes.

21   Q.  What was that price?

22   A.  88 cents.

23   Q.  Why did you do that?

24   A.  I wanted them to get the pricing down so we can have

25   pricing that would be to the company -- that's going to be

3221

Joseph Brink - Cross

1    beneficial to both parties.

2    *Q.*  Can you look at Exhibit I-231, please.  When you are ready,

3    can you identify Exhibit -- I231 for us?

4    *A.*  This is our contract that we issued to Claxton Poultry.

5    *Q.*  Is it the contract for the 2014 supply?

6    *A.*  Yes.

7    *Q.*  And looking at the last page, is that your signature?

8    *A.*  Yes, it is.

9    *Q.*  Did you sign this document on or about December 10, 2013?

10   *A.*  Yes, I did.

11   *Q.*  Does Pollo Tropical enter into contracts like these in the

12   regular course of its business?

13   *A.*  Yes.

14   *Q.*  And does it keep records such as these in the regular

15   course of its business?

16   *A.*  Yes.

17   *Q.*  And is this an accurate copy of the contract for the 2014

18   supply year?

19   *A.*  It looks like it.

20        *MR. CANTY:*  We offer I-231.

21        *THE COURT:*  Any objection to the admission of I-231?

22        *MR. TORZILLI:*  No objection, Your Honor.

23        *THE COURT:*  I-231 will be admitted.

24        *MR. CANTY:*  Looking at the first page of I -- may we

25   publish?

3222

Joseph Brink - Cross

1              THE COURT:  You may.

2   BY MR. CANTY:

3   Q.  Looking at the first page of I-231, what is the 2014

4   product price per pound with Claxton?

5   A.  88 cents.

6              MR. CANTY:  Let's look at Exhibit I-228, if we could.

7   BY MR. CANTY:

8   Q.  Can you identify Exhibit I-228 for us?

9   A.  This is the contract from our company to Pilgrim's Pride.

10  Q.  It's for the 2014 contract year?

11  A.  Yes.

12  Q.  Is that your signature on the last page?

13  A.  Yes, it is.

14  Q.  Does Pollo Tropical enter into contracts like these in the

15  ordinary course of its business?

16  A.  Yes.

17  Q.  And keeps records such as this in the ordinary course of

18  its business?

19  A.  Yes.

20  Q.  And is this from your perspective an accurate copy of the

21  2014 contract with Pilgrim's for the 2014 supply year?

22  A.  Yes.

23              MR. CANTY:  We offer I-228.

24              THE COURT:  Any objection to the admission of I-228?

25              MR. TORZILLI:  No, Your Honor.

Joseph Brink - Cross

1        THE COURT:  I-228 will be admitted.

2        MR. CANTY:  May we publish?

3        THE COURT:  You may.

4   BY MR. CANTY:

5   Q.  The first page, what is the price, the contract price for

6   2014 for split WOGs with Pilgrim's?

7   A.  88 cents.

8   Q.  Identical to Claxton, right?

9   A.  Same price.

10  Q.  That's a product of your tough negotiation, right?

11  A.  It's the final price that we agreed to.

12  Q.  You wanted them both at 88 cents, right?

13  A.  I wanted the best price to be.

14  Q.  Now, for the 2015 contract year Mr. Little was the

15  Pilgrim's representative that you worked with, right?

16  A.  What year now?

17  Q.  The 2015 contract year, 2014 negotiations.

18  A.  Correct.

19  Q.  And when Mr. Little -- when did Mr. Little first reach out

20  to you to talk about pricing for 2015?

21  A.  It was -- I do recall we met for lunch late August, early

22  September.  We had a meeting just to catch up on stuff, and

23  then that's when the topic of pricing for 2015 was brought up.

24  The meeting stopped.  And then two weeks later we started

25  having our conversations for pricing.

Joseph Brink - Cross

1        MR. CANTY:  Let's pull up Government Exhibit 561,

2   please.

3   BY MR. CANTY:

4   Q.  Can you identify Government Exhibit 561 for us?

5   A.  I can barely read it.  These are e-mails back and forth

6   from Jimmie Little and myself.

7   Q.  Are these e-mails between you and Mr. Little on August 13th

8   and 14th of 2014?

9   A.  Yes.

10  Q.  Do they accurately reflect the negotiations you were having

11  with Mr. Little at the time?

12  A.  I don't remember.

13  Q.  You testified that you met Mr. Little for lunch at Pollo

14  Tropical in Addison, Texas, right?

15  A.  Correct.

16  Q.  Does this appear to you to be the messages between you and

17  he leading up to that meeting?

18  A.  I don't remember.

19        MR. CANTY:  Your Honor, this exhibit has been the

20  subject of prior discussions and the government plans to

21  introduce it.  It's been ruled admissible.  We offer it at this

22  point.

23        THE COURT:  Any objection to the admission of

24  Exhibit 561?

25        MR. TORZILLI:  Your Honor, we don't object, but from

Joseph Brink - Cross

 1   previous discussions that were had, we understand that it's

 2   associated with a limiting instruction that Your Honor is

 3   prepared to give.

 4          THE COURT:  Well, not necessarily.  It's being offered

 5   right now.  So the question is whether there is any objection

 6   to it.

 7          MR. TORZILLI:  No, we don't object to the admission of

 8   this.

 9          THE COURT:  Mr. McLoughlin?

10          MR. McLOUGHLIN:  Your Honor, pursuant to the Court's

11   prior ruling, we would request a limiting instruction.

12          THE COURT:  Let me take a look at what that limiting

13   instruction was.  Let's go on side bar.

14      (At the bench:)

15          THE COURT:  So refresh my memory, what was the

16   limiting instruction?

17          MR. TORZILLI:  I think the limiting instruction was

18   that Mr. Brink's statements were only offered for the effect on

19   the recipient for a non -- for that nontruth purpose.

20          THE COURT:  Okay.  Was there anything else that was

21   part of the limiting instruction?

22          MR. TORZILLI:  Your Honor, may I have a moment to

23   confer and confirm that?

24          THE COURT:  Sure.

25          MR. TORZILLI:  Thank you, Your Honor.  After

Joseph Brink - Cross

1   conferring with my colleagues, I confirm that the limiting

2   instruction is as I stated it.

3          THE COURT:  Okay.  Mr. McLoughlin, does that sound

4   right to you?

5          MR. McLOUGHLIN:  It does, Your Honor.

6          THE COURT:  Mr. Canty, anything from you?

7          MR. CANTY:  No, Your Honor.

8          MS. HENRY:  Your Honor, on behalf of Defendant

9   Kantola, since we have the issue of continuing -- we have

10  limiting instructions among everyone, we do not agree to the

11  limiting instruction and do not request it.

12         THE COURT:  Okay.  Anything more on that, Ms. Henry?

13         MS. HENRY:  No, Your Honor.

14         MR. POLLACK:  Your Honor, Gary Pollack on behalf of

15  Mr. Blake.  We will opt out and not join in Ms. Henry's

16  request.  We would like a limiting instruction.

17         THE COURT:  Okay.  Then I will go ahead and provide

18  that limiting instruction as to Mr. Brink's statements.  Thank

19  you.

20      (In open court:)

21         THE COURT:  Ladies and gentlemen, Exhibit 561 will be

22  admitted.

23         Can you display that on my screen, please?

24         However, ladies and gentlemen, the statements of

25  Mr. Brink's will be admitted for a limited purpose, namely not

Joseph Brink - Cross

1    for the truth of the matters asserted, but rather only for the

2    effect on the listener.

3              Exhibit 561 will be admitted with that limitation.

4              Go ahead, Mr. Canty.

5         MR. CANTY:  Thank you, Your Honor.

6    BY MR. CANTY:

7    Q.  Do you see Exhibit 561?  Government Exhibit 561 begins with

8    an e-mail from Mr. Little to you on August 13.

9              THE COURT:  Mr. Canty, did you want to display that?

10             MR. CANTY:  That would be preferable, Your Honor.

11             THE COURT:  You may.

12             MR. CANTY:  Thank you.

13   A.  Yes.

14   BY MR. CANTY:

15   Q.  He is asking you to send current specs for breasts and

16   splits, right?

17   A.  For both brands.

18   Q.  And he wants to review these so that we can start talking

19   about 2015 pricing; isn't that right?

20   A.  He said he needed them to review for 2015 discussions.

21   Q.  Okay.  So -- and discussions, I mean, we're going to be

22   talking about pricing, right?

23   A.  I assume so.

24   Q.  I'm trying to pinpoint the date on which you and Mr. Little

25   first had a lunch in 2014 to discuss the concept of 2015

Joseph Brink - Cross

1   pricing and the price increases that you talked about

2   yesterday.  Does this e-mail refresh your recollection that

3   that meeting with Mr. Little would have occurred on August 14

4   of 2014 or thereabouts?

5   A.  I don't remember exactly, but I do remember we were looking

6   at getting Pilgrim's the opportunity to bid for chicken breasts

7   for both brands at the time we owned and giving him the specs.

8   And that's what -- primarily the meeting was to go, to see how

9   it was going, the specifications.  Can they do it?  That's the

10  first question.  Can they do it?  Are they able to do it?  And

11  that was the whole process of starting the specification

12  exchange.

13  Q.  So you did have lunch with Mr. Little on August 14, 2014?

14  A.  I assume that's the date.  I don't remember the date

15  exactly, but it's about that time.

16  Q.  All right.  Do you recall whether at that meeting

17  Mr. Little talked to you about the price increases for 2015?

18  A.  Towards the end of our lunch the discussion came up about

19  chicken pricing for 2015, and that's when he said, "It will be

20  2."  I said, "2 cents?"  He said, "No.  It will start with a

21  2."  And that's when the meeting ended.

22  Q.  And that's what I was trying to do.  I was trying to get a

23  feel for when that conversation happened, and August 14 --

24  A.  I assume that's the date.  I don't know for sure.  I assume

25  that's the date.

Joseph Brink - Cross

1    *Q.*  Do you have an understanding of why Mr. Little was

2    preparing you for a price increase for the year 2015?

3    *A.*  Do not know.

4    *Q.*  Let's look at Government Exhibit 548 which you were asked

5    about yesterday and is in evidence.

6              *MR. CANTY:*  May we publish, Your Honor?

7              *THE COURT:*  You may.

8    *BY MR. CANTY:*

9    *Q.*  Do you recall this e-mail from September 16, 2014?

10   *A.*  Yes.

11   *Q.*  And Mr. Little is checking in with you wanting to know what

12   works for you to know 2015 pricing?

13   *A.*  Correct.

14   *Q.*  And what he is saying in his e-mail to you is that he

15   doesn't want you to be surprised by the price increase, right?

16   *A.*  Correct.

17   *Q.*  He wants you to be ready, right?

18   *A.*  It says, "I don't want you to be surprised not be ready."

19   *Q.*  He had a typo in the beginning of the e-mail, right?  It

20   said "I don't want you to be ready"?  In fact, what he meant

21   was the opposite?

22   *A.*  Yes.

23   *Q.*  So you understood that Mr. Little was coming to you with

24   this pricing information as early as he could because he didn't

25   want you to be surprised.  He wanted you to be ready, right?

3230

Joseph Brink - Cross

1    *A.*   That's what he said.  We don't do chicken typically that

2    early in the year.

3         *MR. CANTY:*  Let's look at Government Exhibit 547, if

4    we could.  I will give the government a moment to take a look

5    at what I'm talking about.  And I will begin by saying I

6    believe this is something that the government plans to admit

7    and has been already ruled on and will offer it at this time.

8    We offer 547.

9         *THE COURT:*  Any objection to the admission of

10   Exhibit 547?

11        *MR. TORZILLI:*  Your Honor, I don't think it's been

12   raised in previous proceedings.

13        *MR. McLOUGHLIN:*  I apologize, Your Honor.  I cannot

14   hear Mr. Torzilli.

15        *THE COURT:*  Mr. Torzilli, could you articulate that a

16   little bit louder?

17        *MR. TORZILLI:*  I don't think this was raised in

18   previous proceedings, Your Honor.

19        *MR. CANTY:*  If I am wrong, I'll move on.  Does the

20   government have an objection?

21        *THE COURT:*  That's ultimately the issue.  So any

22   objection to the admission, not just by the government, but by

23   anyone to Exhibit 547?

24        *MR. TORZILLI:*  It's hearsay, Your Honor.

25        *THE COURT:*  Response?

Joseph Brink - Cross

1          MR. CANTY:  We'll withdraw, Your Honor.

2          THE COURT:  Okay.  547 will be withdrawn, the request

3    to admit it.

4    BY MR. CANTY:

5    Q.  Let's look at Government Exhibit 9740, which I believe you

6    were asked about yesterday.  And I want to draw your attention

7    to the last and next to last page where that last message is

8    split across.

9          MR. CANTY:  May we publish, Your Honor?

10         THE COURT:  I'm sorry.  Which exhibit number is this

11   one?

12         MR. CANTY:  9740.

13         THE COURT:  Has it been admitted?  Okay.  It has been

14   admitted and may be published.

15   BY MR. CANTY:

16   Q.  And this is when you first received Claxton pricing for

17   2015; is that right?

18   A.  Correct.

19   Q.  And here on September 22nd, 2014, Mr. Cooper gives you

20   pricing of $1.07 delivered on split WOGs, right?

21   A.  Yes.

22   Q.  Did Mr. Cooper ever at any time in 2014 give you an FOB

23   price for split WOGs?

24   A.  I do not remember.

25   Q.  His pricing was always delivered pricing, wasn't it?

Joseph Brink - Cross

1    A.  At the beginning he gave me pricing, but I do believe later

2    on I broke out the pricing because I got the freight adjusted

3    later on.  This was the first pass of pricing.

4    Q.  Did Mr. Cooper ever give you an FOB price?

5    A.  Later on in the year, yes, he did.

6    Q.  When was that?

7    A.  I do not remember the actual date.

8    Q.  Is it fair to say that going into negotiations with chicken

9    suppliers, you have an idea of the volume that Pollo Tropical

10   is going to need over the course of the year?

11   A.  I'm sorry, what now?

12   Q.  Sure.  When you go into negotiations with chicken

13   suppliers, you have an idea of the volume that Pollo Tropical

14   is going to need for the coming year, right?

15   A.  Correct.

16   Q.  Okay.  And one of the things you're trying to do during

17   negotiations is figure out how much chicken, how much volume

18   you can get from each supplier, true?

19   A.  I'm sorry, I don't understand your question.

20   Q.  Sure.  One of the things you're trying to figure out in

21   negotiations is how much volume each supplier is going to get,

22   right?

23   A.  I'm asking suppliers how much chicken volume can they do

24   for us.

25   Q.  Okay.  With the idea that between all of the suppliers,

Joseph Brink - Cross

1   some of them will take this much -- some of this -- each of

2   them will take a part of the volume that makes up your annual

3   need, true?

4   A.   Correct.

5   Q.   Okay.  Mr. Cooper in No. 3 in this e-mail says, "Increase

6   in volume between 500K," 500,000, "to 1 million pounds on the

7   splits."  Do you see that?

8   A.   Yes.

9   Q.   He is saying that he can increase volume.

10  A.   Yes.

11  Q.   Right?  He can double the volume that you might ask of him,

12  right?

13  A.   That is not correct.

14  Q.   Okay.  How do you interpret that?

15  A.   This is -- he wanted to increase his current volume by that

16  much.

17  Q.   His current volume.

18  A.   Correct.

19  Q.   And when -- so that's an interesting point too.  You're

20  saying right now in 2013 as -- in 2014 as you are talking to

21  him, he is saying he could give you more volume on the splits?

22  A.   That's what I took out of it, yes.

23  Q.   Anytime that -- well, strike that.

24          In doing so, in doing so he is competing with the

25  suppliers, is he not?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   He is saying, I can give you this volume.  Give it to me

3    instead of the other suppliers, right?

4    A.   No.

5    Q.   Okay.  Explain your answer, please.

6    A.   He is just giving me his ability of how much chicken he can

7    do for us for the next calendar year.

8    Q.   For the next calendar year.

9    A.   Correct.

10   Q.   So he is saying, give me that volume.  Don't give it to

11   another supplier, right?

12   A.   No.  Is just saying this is how much chicken he can give,

13   that he can provide for our company.

14   Q.   Mr. Cooper wants as much volume as you can give him, right?

15   A.   I don't know what he wanted.

16   Q.   But he's telling you, I'll take up to a million pounds,

17   right?

18   A.   He just said they had the ability to take on more chicken.

19   Q.   Did you respond to Mr. Cooper?  You did, right?

20   A.   I'm sure I did.

21   Q.   You told Mr. Cooper that his pricing, the $1.07 a pound,

22   was a larger increase than Pilgrim's, right?

23   A.   I don't remember.  I don't see it here on the e-mails.

24        MR. CANTY:  Can we scroll up a page?

25   A.   This is a reference because of the fact that they were

Joseph Brink - Cross

 1  going to change the way how they were going to bill us on our

 2  chicken.  So our final end case weights were going to be

 3  higher; therefore, the pricing per case is going to be higher

 4  than Pilgrim's.

 5  *BY MR. CANTY:*

 6  *Q.*  Okay.  So is it your testimony sitting here today that when

 7  you said to Walter, "This is a larger increase than Pilgrim's,"

 8  you weren't talking about the $1.07 per pound in 2015?

 9  *A.*  It was a combination of both.  The final end product, we

10  buy it by the case.  So if we're buying per the case and the

11  case weights are now higher than our spec range, we are paying

12  more money for our chicken overall compared to the competitor.

13  *Q.*  Is it your testimony that you were telling Mr. Cooper that

14  $1.07 a pound was a larger increase than Pilgrim's or you

15  weren't?

16  *A.*  I'm talking about combination of both.  It takes, one, with

17  the change of a spec range equals our case weight.  That is

18  what we get charged by Claxton, a fixed case weight price.

19  *Q.*  You didn't have pricing from Pilgrim's on September 22,

20  2014, did you?

21  *A.*  Yes, I did.

22  *Q.*  You did.

23  *A.*  On an e-mail -- on a phone conference.

24  *Q.*  And you testified that -- let's go up the chain to the top.

25          I think you testified yesterday about the increase is

3236

Joseph Brink - Cross

1  19 cents per case, meaning 19 cents per pound, and that is

2  basically what Pilgrim's is charging us, right?

3  A.  Correct.

4  Q.  And that's the price that you testified yesterday you got

5  from Pilgrim's in a conference call, right?

6  A.  I do believe, yes.

7  Q.  You testified that you had a conference call with

8  Mr. Little and your CFO on September 22?

9  A.  Yes.

10  Q.  And Mr. Little told you a price, right?

11  A.  Yes.

12  Q.  A price that was a 19-cent increase?

13  A.  Yes.

14  Q.  And he said the price is the price?

15  A.  Yes.

16  Q.  And you had until 2:00 p.m. to accept the price?

17  A.  Correct.

18  Q.  Would you agree with me, sir, that if Mr. Little didn't

19  have a price yet to give you on September 22, that your

20  testimony is just plain false?

21  A.  Excuse me?  I don't understand the question.

22  Q.  Isn't it a fact, sir, that on September 22 Mr. Little

23  didn't yet have a price from the pricing group at Pilgrim's

24  that he could give you?

25          MR. TORZILLI:  Objection, foundation.

Joseph Brink - Cross

1          THE COURT:  Overruled.  He can answer if he knows.

2     A.  I was given the price over the phone from Jimmie Little of

3     19 cents per pound.

4     BY MR. CANTY:

5     Q.  Do you recall that Mr. Little gave you a -- during that

6     call Mr. Little gave you a range of what you might expect to

7     see in 2015 and not an actual price?

8     A.  No.

9     Q.  Do you recall what range of price increase that was that

10    Mr. Little gave you during the call?

11         MR. TORZILLI:  Objection, foundation.

12         THE COURT:  Overruled.  He can answer if he

13    understands.

14    A.  I don't understand your question.

15         MR. CANTY:  Let's pull up Government Exhibit 563 and

16    564 side by side, if we could.  Your Honor, these are

17    government exhibits we have gone over already that the

18    government indicated they wished to introduce after the

19    testimony of Mr. Brink, and we would move them into evidence

20    now instead.

21         THE COURT:  First of all, the fact that the government

22    may have an intention that was expressed outside, not in front

23    of the jury, is irrelevant and should not be mentioned.  And

24    you're offering both of these now?

25         MR. CANTY:  Yes.

3238

Joseph Brink - Cross

 1         THE COURT:  Any objection to the admission of

 2    Exhibit 563 and 564?

 3         MR. TORZILLI:  No objection, Your Honor.

 4         THE COURT:  Exhibits 563 and 564 will be admitted.

 5         MR. CANTY:  Permission to publish, Your Honor?

 6         THE COURT:  You may.

 7    BY MR. CANTY:

 8    Q.  Let's look at Exhibit 563 first.

 9         My question to you, Mr. Brink, is you're aware that

10    Mr. Little in giving you pricing for the 2015 contract year

11    needed to go back to the pricing group at Pilgrim's and get

12    pricing information, right?

13         MR. TORZILLI:  Your Honor, I object.  The witness is

14    not a participant in either of the two e-mails that are being

15    displayed to him.

16         THE COURT:  I am going to sustain the objection.  He

17    can -- if you could rephrase that, Mr. Canty.

18    BY MR. CANTY:

19    Q.  Mr. Brink, did you understand that in getting pricing and

20    offering you and Pollo Tropical pricing for the year 2015,

21    Mr. Little would need to go to the Pilgrim's pricing group and

22    get that pricing to be able to give it to you?

23         MR. TORZILLI:  Objection, foundation.

24         MR. CANTY:  I asked for his understanding.

25         THE COURT:  Overruled.  He can answer if he knows.

Joseph Brink - Cross

1    A.  I do not know.

2    BY MR. CANTY:

3    Q.  Was it your understanding in the course of your

4    negotiations with Mr. Little over the years that Mr. Little set

5    the prices for Pilgrim's?

6    A.  Again, I got pricing.  I don't know where all the pricing

7    comes from in the company.

8    Q.  Was it your understanding that Mr. Little came up with the

9    pricing or that someone else at Pilgrim's did?

10   A.  I do not know.

11   Q.  Let's look at Government's Exhibit 564.  That's an e-mail

12   from Mr. Little to Mr. Boarman on September 23rd, 2014.  That's

13   the day after your conference call, right?

14   A.  That's the date, yes.

15   Q.  Okay.  And what Mr. Little says to Boarman is that, "Joe

16   did not handle the 15 to 22 cent increase well as expected!"

17          Do you see that?

18   A.  Yes.

19   Q.  Does that refresh your recollection that what Mr. Little

20   told you on your conference call was that there would be a

21   range of 15 to 22-cent increase?

22   A.  No.

23   Q.  And you maintain your testimony that Mr. Little gave you a

24   price of a 19-cent increase?

25          MR. CANTY:  Yes.  Let's look at Government

Joseph Brink - Cross

1   Exhibit 566, please, which is in evidence.

2           May we publish, Your Honor?

3           THE COURT:  You may.

4           MR. CANTY:  Let's look at the beginning e-mail all the

5   way to the bottom, if we could.

6   BY MR. CANTY:

7   Q.  Do you remember being asked questions about this e-mail

8   yesterday?

9   A.  Yes.

10  Q.  September 29th is a full week after your alleged conference

11  call with Mr. Little, right?

12  A.  Yes.

13  Q.  And at your request he is sending pricing and supply for

14  2015 via e-mail, right?

15  A.  Correct.

16  Q.  And he gives you $1.02 FOB, right?

17  A.  Correct.

18  Q.  Is that a 19-cent increase over the 88 cents from 2013?

19  A.  That's not apples to apples.  It's not the same pricing

20  parameters.  We had delivered pricing.  This is FOB pricing,

21  not the same pricing matrix.

22  Q.  I understand that FOB is not the same as delivered.  We

23  went over that yesterday.  Mr. Little doesn't give you freight

24  in this e-mail, does he?

25  A.  On this e-mail, no, he does not.

Joseph Brink - Cross

1    *Q.* Mr. Little doesn't give you freight until, if we look at

2    this e-mail further up, until October 2nd, 2014; isn't that

3    right?

4    *A.* I can't tell here.  October 2nd, yes.

5    *Q.* And with that freight added, then we get -- we come to

6    $1.07125, right?

7    *A.* Correct.

8    *Q.* But it's not until October 2 that you get that full price

9    from Mr. Little, right?

10   *A.* In writing, yes.

11           *MR. CANTY:*  Now let's go back down to the first couple

12   e-mails in that chain beginning with Mr. Brink's e-mail

13   replying on September 30th.

14   *BY MR. CANTY:*

15   *Q.* Now, Mr. Little is giving you $1.02 FOB pricing on split

16   WOGs, right?

17   *A.* Yes.

18   *Q.* And you reply to him among other things -- I am going to

19   select some sentences here -- "Your competitors have submitted

20   pricing that matches you but it was delivered pricing."

21           Do you see that?

22   *A.* Yes.

23   *Q.* Again -- and below, "Again your pricing below should be

24   delivered to current final destination points and then you

25   match your competitors."

Joseph Brink - Cross

1          Do you see that?

2  *A.*  Yes.

3  *Q.*  As of September 30, 2014, had any other supplier offered

4  you a price of $1.02 delivered on split WOGs?

5  *A.*  On split WOGs?

6  *Q.*  Yeah.

7  *A.*  I had one supplier, yes, lower, not same price.

8  *Q.*  Listen to my question.  As of September 30, 2014, had any

9  other supplier offered you a price of $1.02 delivered on split

10  WOGs?

11  *A.*  I don't recall exactly the dates.

12  *Q.*  You had two other competitors, right?  It was Claxton and

13  Holmes?

14  *A.*  Correct.

15  *Q.*  And Claxton we know we saw was at $1.07, right?

16  *A.*  Uh-huh.

17  *Q.*  And Holmes you testified yesterday was 10 cents lower than

18  everybody, right?

19  *A.*  Right.

20  *Q.*  So that's lower than $1.02, right?

21  *A.*  I guess so.

22  *Q.*  So when you're telling Mr. Little that you have a

23  competitor at $1.02, that's not true, is it?

24  *A.*  I'm not giving the actual pricing.  It is I had suppliers

25  who had lower pricing.

Joseph Brink - Cross

1   Q.  Well, you double-down.  October 2 at 11:08 a.m. --

2        MR. CANTY:  Can we go up and see that?

3   BY MR. CANTY:

4   Q.  You said, "Again your competitors are lower than you with

5   delivered pricing compared to your FOB pricing.  Pilgrim's

6   needs to match to show compromise."  Do you see that?

7   A.  Uh-huh.

8   Q.  You're telling Mr. Little that Pilgrim's needs to match

9   $1.02 to show compromise, right?

10  A.  No.  I'm telling him he needs to lower his price to show

11  compromise.

12  Q.  Higher up at 8:22 a.m. you do it again.  "Again this is not

13  going to work and Pilgrim's needs to match pricing from your

14  competitors."  Do you see that?

15  A.  Yes.

16  Q.  And what you're telling Mr. Little is that you have

17  competitors at $1.02 delivered and he needs to match that,

18  right?

19  A.  No, I'm not, because that's not what it states here.

20  Q.  You're not telling Mr. Little he needs to match the $1.02?

21  A.  No.

22  Q.  Yesterday when the government was asking you questions,

23  Mr. Torzilli, he said:  What are you trying to refer to when

24  you say "then you match your competitors?"

25        And your testimony, Answer:  That he should have his

Joseph Brink - Cross

1  final delivered pricing in to us so I could match up the final

2  cost going into a distributor, so I can match apples to apples

3  or chicken to chicken.

4           Do you remember that?

5  A.  Correct.

6  Q.  So not only were you lying to Mr. Little in your e-mail,

7  but now you were lying to this jury about your lying, right?

8  A.  No.  You asked if this pricing was to matching the FOB.  He

9  lists the freight costs.  So I am looking at FOB plus freight

10 equals a final cost to our distributor.  His final pricing was

11 higher than the competitors.  That's what I'm talking about.

12 Q.  I want to talk a little bit about -- Holmes Foods had --

13 what was Holmes Foods' price for 2015?

14 A.  I don't remember exactly.  I think they were about 9 or 10

15 cents less total delivered cost than Pilgrim's.

16 Q.  And it was different than Pilgrim's, right?

17 A.  Correct.

18 Q.  So if anybody said that in the 2014, 2015 time period that

19 Holmes Foods agreed with Pilgrim's on a price, that would be

20 flat out wrong, wouldn't it?

21 A.  I don't understand your question.

22           MR. TORZILLI:  Objection, foundation.

23           THE COURT:  Overruled.

24 BY MR. CANTY:

25 Q.  That would be flat out wrong, wouldn't it?

Joseph Brink - Cross

1   A.   I don't understand your question.

2   Q.   Sure.   Pilgrim's price for 2015 was what?

3   A.   Delivered, $1.07125.

4   Q.   And Holmes was?

5   A.   I would have to look at the exact price, but it was less.

6   Q.   But at least 9 or 10 cents less, right?

7   A.   Correct.

8   Q.   So if anybody said that those two companies agreed on a

9   price, that would be flat out wrong, right?

10          MR. TORZILLI:   Objection, also vague.

11          THE COURT:   Sustained.   It is unclear.

12          MR. CANTY:   That's all I have, Your Honor.

13          THE COURT:   Thank you, Mr. Canty.

14          Additional cross-examination?

15          Mr. Beller, go ahead.

16          MR. BELLER:   Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18   BY MR. BELLER:

19   Q.   Good morning, Mr. Brink.   Mr. Brink, my name is David

20   Beller.   I represent Mikell Fries of Claxton Poultry.   I am

21   going to be asking you some questions today as well, okay?

22   A.   Okay.

23   Q.   So I want to talk about who you were doing business with

24   while you were negotiating on behalf of Pollo Tropical.   So you

25   know, Mr. Brink, that you are testifying today in a federal

Joseph Brink - Cross

1   criminal case against individuals, right?

2   A.  Correct.

3   Q.  Okay.  And so the individuals that you dealt with were

4   Jimmie Little at Pilgrim's, right?

5   A.  Correct.

6   Q.  John Cortill at Holmes Foods.

7   A.  Correct.

8   Q.  Walter Cooper at Claxton Poultry.

9   A.  Correct.

10  Q.  And Mr. Cooper at Claxton Poultry had the title of sales

11  manager.

12  A.  Correct.

13  Q.  Scott Brady of Claxton Poultry was not your main point of

14  contact.

15  A.  Correct.

16  Q.  Mikell Fries was not your main point of contact.

17  A.  Correct.

18  Q.  Mikell Fries in 2014 when you were negotiating with

19  Mr. Cooper also had the title of sales manager.

20  A.  I do not know.

21  Q.  Fair.  You were not negotiating with Jerry Lane, who was

22  then the president/CEO of Claxton Poultry.

23  A.  Correct.

24  Q.  And while you know Mr. Fries, you did not deal with him on

25  pricing.

Joseph Brink - Cross

1    A.  Correct.

2    Q.  Same questions with Mr. Brady.  While you may know

3    Mr. Brady, he was not negotiating with you on pricing for Pollo

4    Tropical.

5    A.  Correct.

6    Q.  Your job, Mr. Brink, as I understand it, is to obtain

7    competitive pricing from suppliers for chicken in addition to

8    other supplies, fair?

9    A.  Correct.

10   Q.  And I believe you testified on direct examination that you

11   conduct market research to maintain awareness about current and

12   market pricing.

13   A.  I said I look at the pricing of feed and things that go

14   into the cost of chicken.

15   Q.  Sure.  And one of those things is that you look at the

16   Urner-Barry Market Index to research trends.

17   A.  That's one of the markets I look at.

18   Q.  Now, on the Urner-Barry market we are talking about split

19   WOGs, correct?

20   A.  I was looking at the price of corn.

21   Q.  Oh, excuse me.  So you're looking at the price of feed on

22   Urner-Barry.

23   A.  No, I'm looking at the price of corn first on the Chicago

24   Mercantile Exchange.  I look at the reports and look at the

25   trends of grain, as that is one of the main ingredients that

Joseph Brink - Cross

1    goes into the cost of producing chickens.

2    Q.  I understand that.  Do you also look at Urner-Barry chicken

3    prices?

4    A.  Yes.

5    Q.  Okay.  And so on Urner-Barry chicken prices there is many

6    different categories, right?

7    A.  Correct.

8    Q.  One of the categories is WOG, meaning without giblets.

9    A.  Correct.

10   Q.  You purchase WOGs, but your WOGs are split, correct?

11   A.  Correct.

12   Q.  So it's not necessarily an exact comparison; is that right?

13   A.  Correct.

14   Q.  And you also look at Urner-Barry eight-piece cut-up, right?

15   A.  No.

16   Q.  So let me understand.  So WOGs get -- you purchased WOGs

17   that are cut.

18   A.  But they are not cut into eight-piece cut.

19   Q.  I completely understand.  Bear with me.  Answer my

20   question.  You purchase WOGs that are cut.

21   A.  Correct.

22   Q.  Okay.  So if you're looking at Urner-Barry WOG price, that

23   is not what you're buying.  You're buying a WOG that has been

24   cut.

25   A.  Correct.

Joseph Brink - Cross

1   *Q.* Now, what you're not buying to your point is a WOG that has

2   been cut into eight pieces.

3   *A.* Correct.

4   *Q.* So when we're looking at an Urner-Barry market, your

5   product fits somewhere in between a WOG price and a WOG

6   eight-piece price.

7   *A.* Okay.

8   *Q.* Is that right?

9   *A.* Probably.

10  *Q.* Because the WOG eight-piece is cut on the exact same

11  machine as your WOG that is cut in half, right?

12          *MR. TORZILLI:* Objection, foundation.

13          *THE COURT:* He can answer if he knows.

14  *A.* I don't know if it's the same machine.

15  *BY MR. BELLER:*

16  *Q.* Understood, and I appreciate that answer.  For purposes of

17  my clarification because you have said that you study the

18  markets and you consult with the markets, I am trying to get an

19  idea of which markets you're looking at.

20  *A.* I get reports from different markets.

21  *Q.* All right.  And you would agree with me that Pollo Tropical

22  only sells Grade A meat, right?

23  *A.* Yes.

24  *Q.* Okay.  Now, these market reports that you're looking at

25  that are provided to you you would agree with me are relied on

Joseph Brink - Cross

1    by people in the broiler industry.

2           *MR. TORZILLI:*  Objection, foundation.

3           *THE COURT:*  He can answer if he knows.

4    *A.*  I do not know.

5    *BY MR. BELLER:*

6    *Q.*  Well, you certainly rely on them.  That's what you had

7    testified to, right?

8    *A.*  Correct.

9    *Q.*  And you are in the broiler industry.

10   *A.*  I am in the restaurant industry.

11   *Q.*  Purchasing broilers.

12   *A.*  And other products too.

13   *Q.*  I appreciate that.  Let me be clear because I didn't ask

14   you about other products.

15          You are in the broiler industry and you purchase

16   broilers.  Is that a true statement?

17          *MR. TORZILLI:*  Your Honor, may we have a side bar?

18          *THE COURT:*  Yes.

19      (At the bench:)

20          *THE COURT:*  Mr. Torzilli, go ahead.

21          *MR. TORZILLI:*  I wanted to make an objection at side

22   bar rather than in open court, but we object to counsel's

23   continued punditry and verbal reactions to the witness' answer

24   such as, "that's fair" or "very good" or "I understand."  We

25   think it's inappropriate being done on a continual basis.

Joseph Brink - Cross

1        *THE COURT:*  Mr. Beller?

2        *MR. McLOUGHLIN:*  Your Honor, if I may before

3    Mr. Beller.  This is Jim McLoughlin.  For cross-examination in

4    a federal criminal trial that objection is meritless.  It is

5    perfectly appropriate for a lawyer to try to establish a

6    dialogue with a witness in cross-examination and have a two-way

7    communication.  And for the government to object to that effort

8    in cross-examination has no foundation in the rules of

9    evidence.  It has no foundation in due process.  And that kind

10   of restriction on the ability to cross-examine as one will

11   creates a due process issue.

12       *MR. BELLER:*  Your Honor, what I would add quite

13   briefly is the government continually objects based upon their

14   feelings, thoughts and emotions.  Unfortunately, I am not

15   trained on their feelings, thoughts and emotions.  If the

16   government would like to object based on law or based on the

17   rules of evidence, that gives me an opportunity to be able to

18   respond with the education and experience I have.  I do not

19   believe that there is a basis for this objection nor has there

20   been one stated.  If they would like to state a basis in law, I

21   would be thrilled to be able to respond.

22       *THE COURT:*  Here is the deal.  I disagree with

23   Mr. McLoughlin.  There is no exception for cross-examination in

24   a criminal case.  Questions are to be put to the witnesses and

25   attorney commentary on them afterwards can be inappropriate.

Joseph Brink - Cross

1   Mr. Beller's commentary is typically unobjectionable.  It's

2   just keeping the flow going and that's fine.

3            However, attorneys cannot comment on an answer, cannot

4   endorse an answer, cannot cast doubt on an answer through a

5   statement of the attorney, so that would be an appropriate

6   objection.  And I didn't hear Mr. Beller do anything of that

7   nature, but if he did, that would be inappropriate, but I

8   haven't heard that.  So I don't -- his comments that he does as

9   a matter of style through his cross-examinations I haven't

10  found to stray into some impropriety, all right?

11           Anything else, Mr. Torzilli?

12           *MR. TORZILLI:*  No, sir.  Thank you, Your Honor.

13           *THE COURT:*  Thank you.

14     (In open court:)

15  *BY MR. BELLER:*

16  *Q.*  So where we were -- what we were talking about when we left

17  off is that you purchase chicken from chicken suppliers.

18  *A.*  Correct.

19  *Q.*  That chicken is referred to as broilers.

20  *A.*  Some of the chickens.

21  *Q.*  You purchase chickens from broiler suppliers, yes?

22  *A.*  Yes.

23  *Q.*  And therefore you operate and work within the broiler

24  industry.

25  *A.*  I don't consider that.  I operate in the restaurant

Joseph Brink - Cross

1   industry.

2   Q.  Who purchases from broilers.

3   A.  Correct.

4   Q.  Purchases broilers.  So we will keep going.  In the

5   restaurant industry --

6   A.  Yes.

7   Q.  -- you look at market reports such as corn.

8   A.  Correct.

9   Q.  You look at market reports such as Urner-Barry and chicken

10  markets, the Urner-Barry chicken market.

11  A.  Is one of the markets I look at, yes.

12  Q.  One of them.  And so now I'm understanding.  So it is in

13  the restaurant industry that you rely on these market reports.

14  A.  I don't rely on them.  I use them as guides.

15  Q.  Very good.  What is the difference between relying on them

16  and using them?

17  A.  I take the reports and look at the reports as a guide to

18  determine what the pricing should look like based upon all the

19  factors that are out there.

20  Q.  And you use them as well to inform your perspective in

21  negotiating with the suppliers.

22  A.  Yes.

23  Q.  And because that research, Mr. Brink, can help to

24  understand not only current market trends -- well, current

25  market trends regarding procured material.

Joseph Brink - Cross

1  A.  I don't understand your question.  I'm sorry.

2  Q.  Well, let me ask you again because I think perhaps I put

3  the wrong emphasis on certain words.

4       The research can help to understand current market

5  trends regarding procured material, but also the feed inputs

6  that may impact future poultry procurement.

7  A.  Yes.

8  Q.  You also verify pricing assertions that are made by the

9  suppliers regarding those market trends.

10  A.  I verify -- I don't understand what you meant by verifying.

11  Q.  Do you recall speaking with the Department of Justice on

12  October the 4th, 2021?

13  A.  Yes.

14  Q.  At that particular meeting Ms. Call was present; is that

15  right?

16  A.  I don't remember who was present.

17  Q.  Well, do you recall Mr. Torzilli being present?

18  A.  I do believe he was there.

19  Q.  Do you recall Special Agent Repp being present?

20  A.  I don't remember all the people that were there.

21  Q.  That's okay.  That's why I have to ask these questions.

22       Do you recall Special Agent Taylor being present?

23  A.  Again, I don't remember all the agents who were there.

24  Q.  Is that a no?

25  A.  I don't remember.

Joseph Brink - Cross

1    Q.   Okay.  Do you recall telling them, and I quote, "Using

2    multiple suppliers can help to verify pricing assertions made

3    by suppliers regarding market trends"?

4         MR. TORZILLI:  Objection to quoting from an interview

5    report.

6         THE COURT:  Overruled.

7    A.   I do believe -- yes.

8    BY MR. BELLER:

9    Q.   So you asked me what verify means, and I suppose I am

10   asking you.  You said, "Using multiple suppliers can help to

11   verify pricing assertions made by suppliers regarding market

12   trends."  So what did you mean by verify?

13        MR. TORZILLI:  Objection, Your Honor, quoting from an

14   interview report which is not a statement of the witness.

15        THE COURT:  He endorsed the statement and can explain

16   the meaning of a particular term.  Overruled.

17   A.   I got supplier bids from multiple suppliers.  And if there

18   are variances that show up, then I know I have a major issue on

19   pricing.  When suppliers don't -- usually with bids they are

20   relatively close.  This time there was a large gap in pricing.

21   BY MR. BELLER:

22   Q.   Good.  So what we were talking about was actually market

23   trends and the Urner-Barry reports.

24   A.   No, I was talking about the final pricing that I got from

25   the suppliers.

Joseph Brink - Cross

1    Q.  So in terms of understanding what trends in the market

2    reports and how those trends helped inform you on pricing, I

3    want to ask you a couple more questions.

4          Claxton's price in 2014 was 88 cents a pound, right?

5    A.  Yes.

6    Q.  You would agree with me that that was significantly below

7    these market trend reports that you consulted.

8    A.  I don't remember.

9    Q.  Well, in 2016, so two years later, it was 98 cents a pound;

10   is that right?

11         MR. TORZILLI:  Objection, scope as to the year 2016

12   relative to what was covered on direct.

13         THE COURT:  Overruled.

14   A.  I don't remember.

15   BY MR. BELLER:

16   Q.  Well, do you remember that in 2016 Claxton's price was

17   significantly less than the market trends that you considered?

18   A.  I don't remember.

19   Q.  So we're talking about these grain trends or feed trends

20   that you were looking at that you were consulting.  One of them

21   was corn, right?

22   A.  Yes.

23   Q.  And those informed you as to what kind of negotiations or

24   what kind of prices may be coming at you.  I think that was

25   your testimony.  Is that fair?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   Now, you had negotiated for the last several years a fixed

3    price.

4    A.   Yes.

5    Q.   A fixed price is different than a cost-plus price, right?

6    A.   Correct.

7    Q.   And in that a fixed price does not vary at all based on

8    what's happening in the grain market.

9    A.   Correct.

10   Q.   A fixed price does not change based on what's happening

11   with the corn market.

12   A.   At that period of time, correct.

13   Q.   Yeah, at that period of time.  And so hypothetically if you

14   have entered into an 88-cent contract with Claxton Poultry to

15   supply you chicken and corn goes out the roof, Claxton Poultry

16   has to eat that difference.

17        MR. TORZILLI:  Objection to the hypothetical.

18        THE COURT:  Overruled.  He can answer.

19   A.   I don't know how Claxton purchased their chicken -- I mean

20   their corn.  I don't know how they book their corn.  I don't

21   know their time frames.  I don't know any of those internal

22   triggers that they use in their company, so I do not know.  I

23   can't answer that.

24   BY MR. BELLER:

25   Q.   Well, and you didn't have to know because you had a fixed

Joseph Brink - Cross

1   price.

2   A.   Correct.

3   Q.   And just like there was instability or unknowns for the

4   supplier regarding feed market, there were those same unknowns

5   for you.

6   A.   I don't understand what you're asking.

7   Q.   Well, that's because it was a terrible question.  Let me

8   try again.

9        If your contract price is 88 cents --

10  A.   Yes.

11  Q.   -- and corn becomes extremely inexpensive.

12  A.   Yes.

13  Q.   You don't get the benefit of that corn price going down

14  during that contract year.

15  A.   Correct.

16  Q.   And so what you were doing when you're negotiating is you

17  were looking at these market reports for a fixed period of time

18  to determine what price chicken may be based on that corn price

19  at that moment in time.

20  A.   I'm looking at the pricing of corn for the futures going

21  into the following contract year.

22  Q.   Great.  And so when we're talking about futures, these are

23  contracts that may be a year in advance.  It may be two years

24  out, for example.

25  A.   On what?  I am sorry.  I don't understand what you are

Joseph Brink - Cross

1    asking.

2    Q.  When you're purchasing chicken and you're signing contracts

3    with suppliers --

4    A.  Yes.

5    Q.  -- you're signing a contract for a year or sometimes even

6    two.

7    A.  Correct.

8    Q.  So while you can look at futures in these markets, it

9    doesn't tell you whether there's going to be a drought in 18

10   months.

11   A.  Correct.

12          MR. BELLER:  Your Honor, this is a good time.

13          THE COURT:  It is a good time because it's right on

14   time.

15          And, ladies and gentlemen, we will go ahead and take

16   our mid-morning break for 20 minutes, so plan on reconvening at

17   25 minutes until 11:00.

18          The jury is excused.

19          (Jury excused.)

20          Mr. Brink, you are excused until after the break.

21   Thank you.

22          I would like to let the jury know at the time they are

23   excused for lunch what the schedule will be like tomorrow so

24   they can plan accordingly.  Are we still -- assuming that we're

25   going to devote tomorrow to working through exhibits?  Okay.

Joseph Brink - Cross

1   If there is a dissenter, you can let me know.  Otherwise, I am

2   assuming that's the case.

3          MR. FELDBERG:  No dissenter, but if tomorrow will be a

4   non-jury day, may defendants be excused?

5          THE COURT:  For their planning purposes that is also

6   true, okay?  I will let them know that, then.

7          We will be on break until 25 minutes until 11:00.

8   Thank you.

9       (Recess at 10:16 a.m.)

10      (Reconvened at 10:40 a.m.)

11         THE COURT:  Ms. Grimm, let's go ahead and get the

12  jury.  Yes, we can get the witness too.

13         (Jury present.)

14         THE COURT:  Mr. Beller, go ahead.

15         MR. BELLER:  Thank you.

16  BY MR. BELLER:

17  Q.  So Mr. Brink, I want to talk to you about the market

18  conditions in the summer of 2014.  That summer something

19  happened with beef and pork, right?

20  A.  Yes.

21  Q.  And on direct examination you testified that because corn

22  prices were coming back in line, the price of chicken should

23  have decreased because the commodity market was correcting

24  itself on feed costs.

25  A.  Correct.

Joseph Brink - Cross

1   Q.   The price of beef and pork are going all over the place

2   during this period of time even though these two meat markets

3   are eating the same corn that the chicken are eating.

4   A.   Well, yeah, but how they eat and how fast they grow and

5   process are completely different.

6   Q.   Absolutely, and we are going to get into that in just a

7   moment.   But even though corn prices are coming down in the

8   summer of 2014, that did not change the instability in the beef

9   and the pork markets, did it?

10  A.   I don't recall the exact matters for pork and beef at that

11  time.

12  Q.   Okay.   Because of these corn prices, you on behalf of Pollo

13  budgeted for a projected increase.

14  A.   I'm sorry, what did you say?   I don't understand your

15  question.

16  Q.   Yeah.   In the summer of 2014, you budgeted for an increase

17  in the price of chicken.

18  A.   No.

19  Q.   On March the 5th of 2021, you met with the government.

20  A.   Yes.

21  Q.   You were asked a series of questions by the government.

22  A.   Yes.

23  Q.   You answered their questions to the best of your ability.

24  A.   I do recall, yes.

25  Q.   And you were asked about what you were budgeting going into

Joseph Brink - Cross

1   the contract negotiation in the summer of 2014.  Do you recall

2   that?

3   A.  I don't remember exactly.  I don't remember because we were

4   doing our forecasts for 2015.  I was doing it in the middle of

5   August and September during the process when I got approached

6   by the chicken companies.

7   Q.  So yes, you do remember speaking to them and being asked

8   questions in March of 2021?

9   A.  I guess so, yes.

10  Q.  Do you recall telling them in March of 2021 that that

11  summer the budget was predicted to increase by a couple of

12  cents?

13  A.  I thought it was going to be an increase or a decrease with

14  a couple of cents because of the market conditions of the corn.

15  Q.  So yes, you told them that you were going to be budgeting

16  for an increase by a couple of cents.

17  A.  I don't remember.  I guess so.

18  Q.  A few cent increase to be on the safe side.

19  A.  Correct.

20  Q.  Because you would agree with me, Mr. Brink, that you knew

21  the prices were going to be going up.  You just didn't know to

22  what degree.

23  A.  I don't know how long or when the prices were going to go

24  up or down.

25  Q.  But in the summer of 2014, you knew they were going up.

Joseph Brink - Cross

1   A.   They were up because that was a time of year when chicken

2   and beef and pork are always up for grilling season.

3   Q.   What you did not tell the government in March of 2021 is

4   that beef and pork and chicken were going up because of

5   grilling season.

6   A.   I don't remember.

7   Q.   What you told them was that their markets -- that something

8   happened in those markets, that the price of corn was coming

9   down and you were budgeting for chicken prices to go up, fair?

10  A.   Repeat that again, please?

11  Q.   What you told the government in March of 2021 is that there

12  was something happening in the beef and pork markets.

13  A.   Yes.

14  Q.   Corn was coming down.

15  A.   Yes.

16  Q.   And you were budgeting for increases in the chicken market

17  going up.

18  A.   I don't remember exactly, but that sounds about right.

19  Q.   You did not tell them that prices are always going up

20  during that period of time because of the summer and grilling

21  season.

22  A.   I don't remember.

23  Q.   Chicken size depends on a lot of different factors.  You

24  would agree with me there?

25  A.   I don't understand what you're asking.

3264

Joseph Brink - Cross

1   *Q.* Well, if you feed a chicken for an extra week or two, it's

2   going to grow larger.

3   *A.* Correct.

4   *Q.* So how long they're in the broiler house eating has an

5   impact on what their size is.

6   *A.* Correct.

7   *Q.* So if corn is very inexpensive, it economically makes sense

8   to continue to feed those birds for an extra week or two and

9   get a much larger bird.

10       *MR. TORZILLI:* Objection, foundation.

11       *THE COURT:* He can answer if he knows. Overruled.

12   *A.* I don't know what the chicken companies do internally and

13   what their practices are on how and when they feed chickens,

14   when they process chickens and when they sell them to the

15   restaurants.

16   *BY MR. BELLER:*

17   *Q.* So yesterday when you were testified you were asked about a

18   large bird versus a small bird and the margins.

19   *A.* Yes.

20   *Q.* And Mr. Torzilli asked you about the margins between a

21   small bird and a large bird.

22   *A.* Correct.

23   *Q.* And you testified to the jury that the margin for a large

24   bird is going to be much larger.

25   *A.* Correct.

Joseph Brink - Cross

1   Q.   And it's going to be much larger because you get a much

2   larger bird, right?

3   A.   Correct.

4   Q.   But it's the same amount of manpower to process the bird.

5   A.   Correct.

6   Q.   And the way you get a larger bird is you keep feeding a

7   bird.

8   A.   But it's a different species of bird.  You're looking at a

9   small bird versus a large bird.  They are completely different.

10  Q.   I am sorry, because I thought your testimony to the jury

11  just a moment ago is that you didn't know the ins and outs of

12  raising a bird, so I want to focus on that.

13  A.   No, no.  My question -- my answer to you is I don't know

14  how -- when the chicken companies will feed the chickens, when

15  they process the chickens and everything else.  I was told by

16  the industry and everything else that the larger birds, which

17  is a completely different species of chicken, they, of course,

18  take longer to feed because they're a bigger bird, but that is

19  a whole different process, a whole different chicken than a

20  3-pound broiler chicken.

21  Q.   So it is your testimony to the jury that a small chicken

22  and a large chicken are different species of chickens?

23  A.   They are different breeds.

24  Q.   Different breeds of chickens.

25  A.   Yes.

Joseph Brink - Cross

1   Q.  So you are unaware that it's the exact same breed only fed

2   for an extra two weeks?

3   A.  No.  I know the breeds of a chicken just recently, a few

4   years ago.  Back then I did not know about all the different

5   breeds of chickens and how it works.

6   Q.  And who do you consult with or who is your expert that

7   tells you that a small bird and a large bird are different

8   breeds of chickens?

9   A.  We met with all the chicken companies to verify all of our

10  species of chickens and what we're using, and that is what --

11  we met with all the chicken companies.

12  Q.  When you say all the chicken companies, tell me who you met

13  with.

14  A.  We met with Claxton.  We met with Koch, George's, Mar-Jac.

15  I think those are the big ones we met with.

16  Q.  And they advised you, to make sure that I'm understanding,

17  that the difference between a 3-pound chicken and a 9-pound

18  chicken is that they are completely different breeds.

19  A.  They are different -- there is breeds and there is the

20  Cobb.  There is Ross.  There is all different species and some

21  species of birds grow larger than the other species of birds.

22  Q.  Understood.  So let's go back to what my question was just

23  a moment ago.  And that was you believe that corn prices should

24  drive the price of the chicken for purposes of setting your

25  price.

Joseph Brink - Cross

1   A.   It should, yes.

2   Q.   Okay.  Despite you, as you have said to the jury, not being

3   a chicken grower.

4   A.   Correct.

5   Q.   When chicken -- when corn is very expensive --

6   A.   Yes.

7   Q.   -- it makes sense to process the chicken at a younger age.

8   A.   I don't know.  I don't know the process of chickens.

9   Q.   So you don't know the process of chickens, but you know

10  that if corn is expensive, that the chicken would be expensive.

11  Am I understanding you properly?

12  A.   Well, if the chicken -- if the feed cost is one of the most

13  important input costs in a chicken company, it's only logical

14  that the chicken costs would go up if the chicken prices --

15  corn goes up.  If the corn prices go down, then chicken prices

16  should go down.

17  Q.   Okay.  And if chicken prices are low based on what you said

18  was logic, if chicken prices are low, it makes sense to try to

19  feed the chicken for an extra week and get a larger chicken.

20  A.   Again, I don't know how the chicken companies -- when they

21  process chickens what the advantages are.  I know that weather

22  sometimes makes a big difference on chickens, but I don't know

23  the feeding habits of how many days they feed a broiler and how

24  many days they actually process the chicken.  It's up to them

25  on what their variability is.  I don't run a chicken plant.

Joseph Brink - Cross

1   Q.   And so that means you also agree that you don't know the

2   correlation between corn price and chicken processing.

3   A.   I do not -- I don't know the exact process between with

4   what suppliers do on their internal side of when they feed

5   chickens, when they process them.  I know the pricing

6   correlation of corn because that is an impact to cost of goods

7   on a chicken.

8   Q.   And you know that based on logic.

9   A.   Based upon we've been told and logic.

10   Q.   Okay.  Because you're not a chicken producer and you don't

11   know, as you said, what it takes to grow a chicken.

12   A.   I don't understand your question.

13   Q.   My question is, was that your testimony to the jury just

14   now, that you are not a chicken producer?

15   A.   Correct.

16   Q.   And that you don't know the process and the different

17   factors that it takes to grow a chicken.

18   A.   I don't know all the processes, correct.

19   Q.   So I want to talk to you, then, about the small bird supply

20   in 2014.

21   A.   Okay.

22   Q.   It was tight.

23   A.   Yes.

24   Q.   And you knew it was tight in 2014.

25   A.   I don't remember exactly how tight it was, but I know it

Joseph Brink - Cross

1    was tight.

2    *Q.*  And when we say that supply was tight, that meant there

3    weren't enough small birds to meet the demand of the people

4    wanting to buy them.

5    *A.*  Correct.

6    *Q.*  Demand was up in the summer of 2014 for these small birds.

7    *A.*  I assume so.

8    *Q.*  And because of this basic principle of supply and demand,

9    the market showed increases.

10   *A.*  Okay.

11   *Q.*  Is that a yes?

12   *A.*  Yes.

13   *Q.*  And part of the reason you knew supply was tight and demand

14   was up is because you spoke to the chicken suppliers in 2014.

15   *A.*  No.  I don't understand the question.

16   *Q.*  My question is your knowledge that supply was tight and

17   demand was up you gained because you spoke to chicken suppliers

18   in 2014.

19   *A.*  They provided information, yes.

20   *Q.*  So yes, you spoke to chicken suppliers in 2014.

21   *A.*  In September and October, yes.

22   *Q.*  Okay.  And you were informed in 2014 whether it's the

23   summer or the fall that many of the suppliers were either not

24   accepting new customers or there was no additional chicken

25   supply.

Joseph Brink - Cross

1    MR. TORZILLI:  Objection, calls for hearsay.

2    THE COURT:  Overruled.

3  A.  I don't remember all the parameters for every supplier.

4  BY MR. BELLER:

5  Q.  Do you recall being interviewed by the government on

6  March 5th, 2021?

7  A.  Yes, I guess so.

8  Q.  Do you recall being asked the same question that I just

9  asked you, and your answer to the government on March the 5th

10  of 2021 is that suppliers either were not accepting new

11  customers or there was no chicken supply.

12  A.  I don't remember, but there was a tight supply of chicken

13  in that summer time period.

14  Q.  So you testified to the jury just this morning that you

15  were shocked by the pricing that came in 2014, right?

16    MR. TORZILLI:  Objection, misstates testimony.

17    THE COURT:  Overruled.

18  A.  I was shocked by the amount of the increase, yes.

19  BY MR. BELLER:

20  Q.  All right.  And however, while being shocked by the amount

21  of increase -- well, let me back up.  You agreed to that

22  increase insofar as at least Pilgrim's is concerned.

23  A.  I agreed to the pricing because I was told there was no

24  negotiation.  I had to protect the brand and secure the

25  chicken, as we were told if we don't, we're going to lose our

Joseph Brink - Cross

1   volume.  At that period of time we had to protect the brand.

2   Q.  Let me ask you my question.  You agreed to the increase in

3   2014 with Pilgrim's.

4   A.  Yes.

5   Q.  And this increase with this shocking price that you were

6   forced to enter into.

7   A.  Yes.

8   Q.  And even by paying Pilgrim's this shocking price, they

9   still did not have as much volume as you needed.

10  A.  They initially did not provide the volume, but at the end

11  they gave me the volume that we originally were going to have.

12  Q.  So it wasn't such a shocking price that they were willing

13  to give you even more chicken.

14  A.  No, Pilgrim's gave me the chicken that we originally were

15  using for that year, for next year.

16  Q.  Now, anyplace that serves chicken is a competitor to Pollo

17  Tropical.  Am I repeating your testimony properly?

18  A.  Yes.

19  Q.  You compete, I believe you said, with KFC, Popeye's,

20  Bojangles?

21  A.  Any chicken company, yes, pretty much any chicken company

22  that produces chicken in our markets.

23  Q.  Chipotle?

24  A.  Chipotle, yes.

25  Q.  So if supply is tight in 2014, that also means that you are

Joseph Brink - Cross

1   competing with these other buyers for the same supply.

2   A.   Yes.

3   Q.   When supply is tight, prices go up.

4   A.   Yes.

5   Q.   Even if corn is down, if supply is tight, prices go up.

6   You would agree with me.

7   A.   To a point.

8          MR. BELLER:  If we can show the witness an exhibit

9   that is introduced into evidence, and that's Government

10  Exhibit 9740?

11         THE COURT:  You may.

12         MR. BELLER:  And if we may publish, Your Honor.

13         THE COURT:  You may.

14  BY MR. BELLER:

15  Q.   Mr. Brink, I want to ask you a little bit about this

16  exhibit that Mr. Torzilli asked you about yesterday.  And I

17  want to ask you about a couple of lines that you were not asked

18  about.  So if we look at the middle of the second page, this is

19  an e-mail from you to Mr. Walter Cooper dated Monday,

20  September 22nd at 1:50 in the afternoon.  Do you see that?

21  A.   Yes.

22  Q.   You say to Mr. Cooper, "This is a larger increase than

23  Pilgrim's," right?

24  A.   Yes.

25  Q.   And that was based on an initial, I guess, price estimate

Joseph Brink - Cross

1  from Mr. Cooper that the price of chicken moving forward was

2  going to be $1.07 a pound, right?

3  A.  Part of it.

4  Q.  Well, we say part of it and we can talk a little bit about

5  that because actually included in that price is the actual

6  freight, right?

7  A.  Yes, in this price.  But the pricing here on this e-mail

8  was regarding the fact that they were going to have our chicken

9  not be our set invoice weight and having it be higher weights

10  in our boxes which will make our case price higher which makes

11  our total cost higher.

12  Q.  Let me go back to the question that you were asked, and

13  that is $1.07 includes freight.

14  A.  Correct.

15  Q.  Thank you.  And your response to Mr. Cooper's e-mail is,

16  "This is a larger increase than Pilgrim's."

17  A.  Keep going down further.  "If we are paying these higher

18  prices, we will not pay more for than our spec allows," because

19  they were going to change our spec of our weights in our

20  chicken boxes.  That makes our total cost higher.

21  Q.  Mr. Brink, you were not asked any of that.  Let me ask my

22  question.  And my question is you wrote to Mr. Cooper.

23  A.  Yes.

24  Q.  "Walter, this is a larger increase than Pilgrim's."

25  A.  Correct.

Joseph Brink - Cross

1    Q.  Thank you.  Now let's go to Mr. Cooper's response.  And

2    this is an e-mail that you were asked about at length on direct

3    examination.  Mr. Cooper tells you, and this is the bottom of

4    Paragraph 1 -- excuse me, the last sentence on Paragraph 1

5    where Mr. Cooper says to you, "We have to be very careful,

6    especially in a fixed agreement, who we partner with.  We only

7    have so many pounds and have to do our best to place them

8    correctly."

9         That's what he stated to you, right?

10   A.  Yes.

11   Q.  Fixed meaning an agreement that doesn't vary based on corn

12   and soybean meal.

13   A.  Correct.

14   Q.  The next paragraph he talks about other concessions that

15   Claxton is willing to make.  He says, "Is Pilgrim's willing to

16   do all of this?"  Right?

17   A.  Yes.

18   Q.  The beginning of his next paragraph, "My guess is no,"

19   right?

20   A.  Yes.

21   Q.  Then if we go to the top of the next page.  So "If we are

22   higher than Pilgrim's, we are worth it," right?

23   A.  That's what he wrote.

24   Q.  He writes, "We have been approached by other customers

25   requesting pricing and supply."

Joseph Brink - Cross

1           That's the prior page, excuse me.  Yes?

2    A.  Yes.

3    Q.  He tells you that he has other buyers for your chicken.

4    A.  Yes, he did.

5    Q.  That, "We have been approached by other customers

6    requesting pricing and supply."

7    A.  Yes.

8    Q.  He admits to you that not all of those other customers are

9    within your specifications.

10   A.  He says some are, some aren't.

11   Q.  That's right.  Next page, he points to the problems in the

12   past you've had with Pilgrim's and tells you, "We did the right

13   thing."

14   A.  Correct.

15   Q.  And this is all in response to you telling Mr. Cooper that

16   Claxton is higher than Pilgrim's.

17   A.  Correct.

18   Q.  And I want to focus on the times of these two e-mails.  You

19   would agree with me that Mr. Cooper's response is within six

20   minutes of you writing to him.

21   A.  Yes.

22   Q.  Mr. Cooper in this e-mail is undercutting Pilgrim's by

23   giving you step pricing.

24   A.  I don't -- here, right here on the e-mail here on the

25   9th -- the 22nd and there was a 6-minute response later, there

Joseph Brink - Cross

1    was no talking about stair-stepping on this e-mail.  Yeah,

2    right here it is.  It says here, "I hope for Pollo that

3    Pilgrim's will consider step pricing."

4    Q.  And the e-mail that led to this exchange was Mr. Cooper

5    conceding and giving you the price increase on stair-step

6    pricing.

7    A.  I did not have the final pricing yet, but they were talking

8     about they were going to work with us on stair-stepping.

9    Q.  If we can go to the preceding e-mail, please, the preceding

10   e-mail sent on the same day at 12:47 p.m. by Walter Cooper to

11   Joe Brink.

12   A.  Correct.  That's the first e-mail.  I was talking about the

13   one you were talking about which was six minutes in between.

14   There was no listing of stair-stepping pricing.

15   Q.  You haven't been asked a question, Mr. Cooper.  Mr. Brink,

16   excuse me.

17          My question is Mr. Cooper told you that he was willing

18   to give you stair-step pricing.

19   A.  Correct.

20   Q.  And that this is something that Pilgrim's he guessed was

21   unwilling to do for you.

22   A.  That's what he said on the last e-mail on the 22nd.

23   Q.  You --

24          MR. BELLER:  I am done with that.  Thank you.

25   BY MR. BELLER:

Joseph Brink - Cross

1    Q.  You testified on direct examination that this

2    September 22nd exchange is the same day that you had a

3    discussion with Mr. Little.

4    A.  Correct.

5    Q.  You have met with the government seven times?

6    A.  I don't know the amount of times.

7    Q.  Well, you met with the government as recently as was it

8    yesterday or Monday night?

9    A.  I think it was Monday night.

10   Q.  Monday night you met with the government.  And the purpose

11   to meet with the government was to practice your testimony,

12   right?

13   A.  They were asking questions to explore the truth and I was

14   giving my answers.

15   Q.  And you did that with them six other times, correct?

16   A.  I don't know the amount of times.

17   Q.  Do you recall -- we've spoken about March 5th.  Do you

18   recall that, that time?

19   A.  About that time period, yes.

20   Q.  Do you recall another time was April the 21st?

21   A.  I don't remember all the dates.

22   Q.  And "I don't know" is an okay answer.

23   A.  I don't know.

24   Q.  Do you recall meeting with them on October the 4th?

25   A.  Yes.

Joseph Brink - Cross

1    Q.  Do you recall meeting with them on October the 19th?

2    A.  Yes.

3    Q.  Do you recall meeting with them on November the 8th?

4    A.  Yes.

5    Q.  Do you recall meeting with them on November the 14th?

6    A.  Yes.

7    Q.  Do you recall meeting with them on November the 16th?

8    A.  Yes.

9    Q.  November the 16th is the first time in any of those seven

10   meetings that you have ever disclosed that you had a telephone

11   conversation with Jimmie Little on September the 22nd, 2014.

12   A.  The date -- I went to my calendar and I found the date.  I

13   told them we had a meeting.  And I looked at my calendar -- I

14   found the calendar and I found the dates.

15   Q.  Let me ask my question again.

16        On November the 16th, 2021 is the first time you have

17   ever told the Department of Justice that you met with

18   Mr. Jimmie Little on September the 22nd, 2014.

19        MR. TORZILLI:  Objection, misstates prior testimony.

20        THE COURT:  Overruled.  He can answer.

21   A.  That was the first time I actually gave the actual date.  I

22   knew -- confirmed the date and what our meeting was.

23   BY MR. BELLER:

24   Q.  Is that a yes?

25   A.  Yes.

Joseph Brink - Cross

1   Q.  Thank you.  You were asked many times yesterday by the

2   government regarding this statement of, "Take it or leave it."

3   Do you recall those questions and your answers?

4   A.  Yes.

5   Q.  At no time did Walter Cooper of Claxton Poultry ever tell

6   you that Claxton Poultry's price was take it or leave it.

7   A.  Correct.

8           MR. TORZILLI:  Objection, calls for hearsay.

9           THE COURT:  Sustained.

10  BY MR. BELLER:

11  Q.  Are you aware of Claxton Poultry ever taking a position

12  that the price was take it or leave it?

13  A.  They never mentioned that.

14  Q.  Never in text message?

15  A.  I don't recall.

16  Q.  Never in a letter or a memo?

17  A.  I do not recall.

18  Q.  And never in a pricing proposal.

19  A.  I do not recall.

20  Q.  Many customers just like you use many suppliers.  You're

21  aware that many other buyers of chicken also purchase from many

22  different suppliers.

23  A.  I'm sorry, what?  I don't understand your question.

24  Q.  Do you know if KFC has more than one chicken supplier?

25  A.  Yes.

Joseph Brink - Cross

1    Q.  Do you know if Popeye's has more than one chicken supplier?

2    A.  I assume they do.

3    Q.  Do you know if Wal-Mart has more than one chicken supplier?

4    A.  I assume they do.

5    Q.  Do you know if Chipotle has more than one chicken supplier?

6    A.  I don't know, but I assume so.

7    Q.  Well, you do know based on your experience in the

8    restaurant industry that there are times where chicken

9    suppliers must speak with other chicken suppliers.

10   A.  I don't know that.

11   Q.  If Holmes cannot deliver your product, you have to source

12   that product from another supplier.

13   A.  If -- yes and no.  If there is an issue with chicken from a

14   supplier, then my distributor tells me there is an issue.  Then

15   we call our back-up suppliers and we initiate, say, hey, we

16   need a load coming into Kelly's to cover because of a hurricane

17   or whatever weather conditions or whatever is happening that we

18   had to go to a different plant.  But we initiate it.

19   Q.  And excuse me to the court reporter.  If we can read back

20   my question, please.

21            (The record was read by the court reporter.)

22   BY MR. BELLER:

23   Q.  Is that a yes?

24   A.  No.

25   Q.  You don't know?

Joseph Brink - Cross

1    A.   I don't know.  When we have an issue, I take care of it

2    with the chicken companies.  I don't know the internal

3    mechanisms if they are talking to each other to cover supply.

4    I don't know that.

5    Q.   You just don't know.

6    A.   I don't know.

7    Q.   Okay.  And so if they run out of boxes, you don't know if

8    they have to speak in order to source boxes.

9    A.   I don't know.

10   Q.   If they run out of labels, you don't know if they have to

11   speak to cover each other on labeling.

12   A.   Again, I don't understand why they would be calling each

13   other on labels when they are all USDA labels and they are

14   marked per labels for the companies.

15   Q.   My question is, do you know?

16   A.   I do not know.

17   Q.   Thank you.  Do you know if they have to speak to each other

18   regarding maybe one plant goes on strike and they don't have

19   enough workers to process their chicken?

20   A.   I do not know.

21   Q.   Do you know if they have to speak to each other if there is

22   a COVID outbreak in a plant and they can't process all their

23   chicken?

24   A.   I do not know.

25   Q.   Do you know if they have to speak to each other if there is

Joseph Brink - Cross

1  a computer hack and they need assistance feeding their

2  chickens?

3  A.  I do not know.

4  Q.  Do you know if they have to speak to each other if there is

5  a coccidia outbreak and one of their houses are sick?

6       MR. TORZILLI:  Objection, foundation.

7       THE COURT:  Overruled.  He can answer if he knows.

8  A.  I do not know.

9  BY MR. BELLER:

10  Q.  Mr. Canty asked you about Exhibit 527.

11      MR. BELLER:  Your Honor, can we confirm that that is

12  in evidence, please?

13      THE COURT:  Yes.

14      MR. BELLER:  Excuse me, Your Honor, it's actually 566.

15      THE COURT:  566 has been admitted.

16      MR. BELLER:  Thank you.

17      If we can show 566 to the witness, please.

18  BY MR. BELLER:

19  Q.  Mr. Brink, I am hoping that you will take a moment to read

20  through this e-mail to yourself, and then let me know when you

21  get to the part where you state that competitors have to match.

22      MR. BELLER:  May we publish, please?

23      THE COURT:  You may.

24  A.  I don't understand where you are asking for me to read.

25  BY MR. BELLER:

Joseph Brink - Cross

1   Q.  I am asking you to look for the portion where it says that

2   the competitors need to show compromise and the competitors

3   need to match.  Have you gotten to that section?

4   A.  I am reading it still.  Yes, I see it here, yes.

5   Q.  This is an e-mail from you to Mr. Jimmie Little at

6   Pilgrim's Pride, right?

7   A.  Correct.

8   Q.  You wrote to Jimmie Little at Pilgrim's Pride on October

9   the 3rd of 2014 regarding pricing.  "Again this is not going to

10  work and Pilgrim's needs to match pricing from your

11  competitors," right?

12  A.  Lower their pricing, yes.

13  Q.  My question was, is that what you wrote to Jimmie Little --

14  A.  Yes.

15  Q.  -- on October the 3rd of 2014?

16  A.  Yes.

17  Q.  If you read down, you also wrote to Jimmie Little on

18  October the 2nd, 2014, you would agree with me that you wrote

19  to Jimmie Little again, "Pilgrim's needs to match to show

20  compromise."

21  A.  Meaning they need to lower their pricing.  That's what I

22  meant by writing that.

23  Q.  I understand.  My question, however, is did you write

24  "Pilgrim's needs to match to show compromise," on October the

25  2nd, 2014?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   You testified both yesterday as well as this morning that

3    Holmes was a competitor of Pilgrim's and Claxton, right?

4    A.   Correct.

5    Q.   Holmes was 10 cents cheaper than Pilgrim's and Claxton, I

6    think you said 9 to 10 cents.

7    A.   Correct.

8    Q.   Holmes is a single plant facility in Texas?

9    A.   Correct.

10   Q.   Claxton is a single plant facility in Claxton, Georgia?

11   A.   Correct.

12   Q.   You have stores in the south in Georgia and Florida.

13   A.   Correct.

14   Q.   You have stores in Texas.

15            MR. TORZILLI:  Objection, foundation.

16            THE COURT:  Overruled.

17   A.   Correct.

18   BY MR. BELLER:

19   Q.   Holmes is providing chicken primarily to your stores in

20   Texas.

21   A.   Correct.

22   Q.   Claxton is providing chicken primarily to your stores in

23   the south, namely Georgia and Florida.

24   A.   Correct.

25   Q.   Holmes by and large is not shipping chicken from their

Joseph Brink - Cross

1   small plant in Texas all the way to Orlando or Miami, Florida.

2   A.   That is not correct.

3   Q.   You got a load.

4   A.   The load, yes.

5   Q.   The majority -- my question was carefully worded.  The

6   majority, the majority of the product from Holmes is going to

7   your stores in Texas.

8   A.   Correct.

9   Q.   Freight from Claxton, Georgia to Orlando is significantly

10   different than freight from Texas to Orlando, Florida.

11   A.   Correct.

12   Q.   Sir, I want to talk to you a little bit more specifically

13   about your negotiations with Mr. Cooper.  Mr. Cooper, as we

14   established, informs you that the FOB price is $1.07, right?

15   A.   FOB price?  I don't remember.  I thought it was delivered

16   pricing.

17   Q.   It is delivered pricing, excuse me, that the delivered

18   pricing is $1.07.

19   A.   That sounds correct.

20   Q.   As we've established, you asked for a stair-step increase

21   starting in January of 2015.

22   A.   Correct.

23   Q.   You asked for that stair-step price on November the 30th of

24   2014, right?

25   A.   I don't recall the actual date.

Joseph Brink - Cross

1          MR. BELLER:  If we can have Exhibit 500, please,

2    government's exhibit.

3          Your Honor, I believe this is admitted and published.

4          MR. TORZILLI:  Your Honor, to the extent it's not, the

5    government agrees to its admission into evidence.

6          MR. BELLER:  Thank you, Your Honor.  And based on that

7    stipulation, I would offer it into evidence and ask that it be

8    published.

9          THE COURT:  Any objection to the admission of

10   Exhibit 500?

11         All right.  Exhibit 500 will be admitted.

12         MR. BELLER:  And if we can publish, please.

13         THE COURT:  You may.

14   BY MR. BELLER:

15   Q.  Are you able to see that okay, Mr. Brink?

16   A.  Yes.

17   Q.  Mr. Brink, my question was that Mr. Cooper responded to

18   your request for stair-step pricing on October the 2nd in 2014.

19   If you can take a moment to simply confirm your ability to

20   answer my question.

21   A.  Reading this e-mail here that you have shown, all I see is

22   October 13th, 14th dates here.

23   Q.  Okay.  And it may need to be the next page.

24   A.  On October 2nd here is when Walter started to give me

25   options for stair-stepping pricing.

Joseph Brink - Cross

1    Q.   So is that a yes?

2    A.   Yes.

3    Q.   All right.  And Mr. Cooper also lowers your price by a

4    penny.

5    A.   Correct.

6    Q.   Lowers your price because he was able to source freight

7    from Claxton, Georgia to Orlando, Florida for a penny less than

8    he had originally quoted you.

9    A.   Correct.

10   Q.   So instead of $1.07 including freight, it's now $1.06

11   including freight.

12   A.   Correct.

13   Q.   That six is actually freight, right?

14   A.   I don't understand your question, I am sorry.

15   Q.   In other words, the chicken that you were buying was

16   costing you $1.  And the additional 6 cents was for freight.

17   A.   No, I don't believe so.  I think it was the other way

18   around.  It was a dollar -- the freight went down a penny.  It

19   was like 5 cents and went to 4 cents, so whatever the price was

20   was the freight that went down.

21        MR. BELLER:  If we can bring the exhibit back up and

22   publish it for both the jury and the witness.

23   BY MR. BELLER:

24   Q.   You can take a moment to review.

25   A.   I am reviewing -- what am I looking for?  This is all the

Joseph Brink - Cross

1    stair-stepping information.  Here the freight, he was able to

2    lower the freight by a penny, so that would put them at $1.06

3    per pound delivered.

4    Q.  Right.  He offers you this penny reduction without you

5    asking.

6    A.  I don't recall if I asked for it.

7    Q.  You and Mr. Cooper engaged in a back-and-forth over the

8    amount and the timing of the increase.

9    A.  Correct.

10   Q.  You requested a dime increase go into effect January of

11   2015?

12   A.  Correct.

13   Q.  And an 8-cent increase go into effect in July of 2015?

14   A.  The original, yes.

15   Q.  And what was being negotiated was a two-year deal.

16   A.  Not on pricing.

17        MR. BELLER:  If we could have Exhibit 500 brought back

18   up, please.

19   BY MR. BELLER:

20   Q.  Mr. Brink, I want to draw your attention to the e-mail with

21   Walter Cooper dated Monday, October 13th at 2:38 p.m.  That is

22   the bottom of Page 2 going onto the top of Page 3.

23        If you could read the line from Mr. Cooper to you at

24   the top of Page 3.

25   A.  "I now have authority to offer you a two-year agreement

Joseph Brink - Cross

 1  based on being able to agree to one of the below."

 2  Q.  And there is then a discussion regarding a couple of

 3  options for stair-step.

 4  A.  Correct.

 5  Q.  And so my question was at the time the two of you were

 6  discussing a two-year agreement.

 7          MR. BELLER:  We're done with the exhibit.

 8  A.  Okay.

 9  BY MR. BELLER:

10  Q.  That's a question.

11  A.  I'm sorry.  I didn't understand your question.

12  Q.  You were discussing and negotiating a two-year agreement.

13  A.  Walter proposed a two-year agreement, yes.

14  Q.  Very good.  The two-year agreement was for this stair-step.

15  In other words, Claxton was going to reduce the amount of the

16  increase over a six-month period of time in exchange for this

17  two-year agreement.

18  A.  That was the proposal.

19  Q.  And so if we did a 10-cent increase in January, that would

20  make your chicken in January 98 cents delivered.

21  A.  That sound correct.

22  Q.  98 cents delivered is the same amount that Holmes was

23  providing chicken to you for.

24  A.  I don't remember the exact price for Holmes, but it's

25  pretty close.  The Holmes pricing was for the whole year.

Joseph Brink - Cross

1   Q.  You said it was about half of the amount.  Half of the

2   amount here would be about 98 cents?

3   A.  Uh-huh.

4   Q.  Again, that included the freight.

5   A.  Correct.

6   Q.  During this same period of time that you were paying

7   Claxton 98 cents including freight, you were paying Pilgrim's

8   Pride $1.02 not including freight.

9   A.  We paid -- I don't understand your question because

10  everything is paid by freight included.

11  Q.  Well, you went through a very long examination with

12  Mr. Canty where you had indicated that the $1.02 did not

13  include freight; is that right?

14  A.  Correct.

15  Q.  And so the $1.02 that was negotiated with Pilgrim's did not

16  include freight.

17  A.  We never finalized the price.  We finalized the final cost

18  with freight.

19  Q.  The $1.02 that was being discussed during negotiation did

20  not include freight.

21  A.  That was FOB, correct.

22  Q.  The 98 cents to Claxton Poultry did include freight.

23  A.  Correct.

24  Q.  When you sent the contract, so after a lengthy

25  back-and-forth with Mr. Cooper, you two agree on the

Joseph Brink - Cross

1   stair-step, right?

2   A.   Eventually, yes, we did.

3   Q.   And looking at exhibit -- the exhibit that you were just

4   looking at, Mr. Cooper said we're able to offer you a two-year

5   deal with stair-step following, with the following stair-step.

6   A.   That was one of the proposals, yes.

7   Q.   When you sent the contract over to Claxton Poultry, the

8   contract was drafted and originated by you or by Pollo

9   Tropical.

10  A.   Yes.

11  Q.   And the contract that was e-mailed over was only for a

12  year.

13  A.   This is not the agreement that we agreed to at the very

14  end.

15  Q.   I understand that.   That's the contract.   We're getting

16  there.

17  A.   Okay.

18  Q.   When you signed a contract or rather when you drafted a

19  contract with Pollo Tropical -- or excuse me, with Claxton, you

20  sent the contract over, it included a stair-step and was only

21  written for a single year.

22  A.   Correct.

23  Q.   You signed Pilgrim's contract on February the 14th, 2015;

24  is that right?

25  A.   I don't remember the dates, but it could be.

Joseph Brink - Cross

1    Q.  You signed Pilgrim's contract in 20 of 2015.  Yes?

2    A.  I don't have the contract here.  It sounds correct.

3    Q.  You never signed the Claxton contract.

4    A.  We never got a contract finalized, yes.  We never signed

5    it.

6    Q.  You continued to push and negotiate with Claxton through

7    December of 2014.

8    A.  Yes.

9    Q.  Despite the fact that the contract was never signed,

10   Claxton continued to operate under sort of a gentleman's

11   agreement and continued to give you this stair-step pricing,

12   right?

13        MR. TORZILLI:  Objection to the use of gentleman's

14   agreement.

15        THE COURT:  Overruled.  He can answer.

16   A.  We had the agreement drafted.  It was going back and forth

17   between legals on both companies.  It was August and September

18   and it still was not finalized between the two companies.

19   BY MR. BELLER:

20   Q.  Claxton continued to operate under the terms and conditions

21   of the unsigned contract.

22   A.  Correct.

23   Q.  And that included giving you this stair-stepped reduced

24   pricing.

25   A.  Correct.

3293

Joseph Brink - Cross

1    Q.  Claxton Poultry had supplied Pollo Tropical with chicken

2    for the last, what, 12, 13 years?

3    A.  Or longer.

4    Q.  In that 12, 13 or longer year time, they have been your

5    only constant chicken supplier.

6    A.  I don't understand the question.  What do you mean constant

7    chicken supplier?

8    Q.  Your other chicken suppliers have come and gone.

9    A.  Correct.

10   Q.  Claxton is the only one that has stayed with you during

11   that period of time.

12   A.  Correct.

13   Q.  The contract that was being negotiated, but never signed,

14   was for all of 2015.

15   A.  Correct.

16   Q.  While there was some discussion or confusion that it may

17   have been or was supposed to be a two-year contract, right?

18   A.  Our contracts were for 2015.

19   Q.  In August of 2015 with no signed contract you advised

20   Claxton that they are going to be losing volume for the coming

21   year.

22   A.  Correct.

23   Q.  You are told or you understand the position of Claxton at

24   that point was that they were operating under the belief that

25   you all had a contract.

Joseph Brink - Cross

1   A.   The volume was going down in 2015 as we changed our product

2   specifications, we were buying different kind of chickens, and

3   our sales were down because of --

4   Q.   You are not answering the question you're being asked, so I

5   am going to try it again.

6          Claxton was concerned at the loss of volume because

7   they believed that they were operating under a contract with

8   you.

9   A.   But the contract was for one year.

10  Q.   And this is in August of 2015 that you two were having this

11  discussion.

12  A.   Probably.

13  Q.   They had given you stair-step pricing up until July of

14  2015.

15  A.   Yes.

16  Q.   And in August you tell them that you are taking away

17  volume.

18  A.   Yes.

19  Q.   In August of 2015, you tell them you're taking away volume

20  and you want to renegotiate because you're no longer willing to

21  adhere to the contract.

22  A.   The contract was for one year.

23  Q.   And you weren't willing to adhere to the contract because

24  you never signed it.

25  A.   It was never finalized by both companies.

Joseph Brink - Cross

1    Q.  You never signed it.

2    A.  It was never signed by any party.

3    Q.  Is that a yes or a no?  You either signed it or you didn't

4    sign it, Mr. Brink.

5    A.  I did not sign it.

6    Q.  You did not sign the contract.  You advised Mr. Cooper that

7    he better get better on pricing if he wanted to keep your

8    business.

9    A.  I guess so.

10   Q.  Mr. Cooper told you, "I thought this was a two-year

11   contract."

12         MR. TORZILLI:  Objection, calls for hearsay.

13         THE COURT:  Sustained.

14   BY MR. BELLER:

15   Q.  Did you believe that Claxton thought it was a two-year

16   contract?

17   A.  No.

18   Q.  With Holmes Poultry you had a two-year contract.

19   A.  I do believe so.

20   Q.  And if we can see I -- let me back up.

21         You had tried to have the employer -- or to have all

22   the different suppliers enter into two-year contracts.

23   A.  We were trying to have the pricing broke apart over a

24   two-year period to make the price increase be smaller over two

25   years.

3296

Joseph Brink - Cross

 1  Q.  And that's what you thought all of your suppliers were

 2  going to do over that two-year period of time.

 3  A.  But they did not do that.

 4  Q.  And Claxton gave you a stair-step price for six months.

 5  A.  Right.

 6  Q.  And then in month seven you said, "We don't have a signed

 7  contract," right?

 8  A.  I did say that.

 9  Q.  I have one last series of questions for you.

10         You had stated earlier on your examination that you

11  consult with different market reports.  We went through that.

12  A.  Yes.

13  Q.  One of those reports is the Urner-Barry.

14  A.  Yes.

15  Q.  You consult with those reports throughout negotiation.

16  A.  Yes.

17  Q.  You ask suppliers to show you these market reports --

18  A.  Yes.

19  Q.  -- to justify their prices.

20  A.  Yes.

21  Q.  As we just got done going through, in 2014 one of the

22  Pilgrim's negotiation price points was $1.02.

23  A.  FOB.

24  Q.  FOB plus freight of 5 cents.

25  A.  5 -- a little more, yes.

3297

Joseph Brink - Cross

1    Q.   5 and a few hundredths of a penny.

2    A.   Correct.

3    Q.   Claxton was one of six delivered?

4    A.   At the end, yes.

5    Q.   The Urner-Barry market report average for 2014 for the

6    entire year was $1.15.

7    A.   Okay.

8    Q.   Yes?

9    A.   I assume so.  I don't have the reports.  I don't know.

10   Q.   Would it assist you if you had the opportunity to look at

11   an Urner-Barry report?

12   A.   I would like to have more time to study it, but I don't

13   remember.  We had contract pricing through 2014.

14   Q.   Absolutely.  You have contract pricing through 2014.  And

15   your contract pricing through 2014 was 88 cents for Claxton

16   Poultry when the 2014 market index that you says drives or

17   facilitates negotiation was $1.15 per pound, right?

18   A.   That was the spot market pricing, correct.

19   Q.   Right, the spot market price that you consult and consider

20   in determining what price should be.

21   A.   It's one of the factors, correct.

22   Q.   That $1.15 market price does not include freight.

23   A.   On the Urner-Barry?

24   Q.   Yeah.

25   A.   Correct.

Joseph Brink - Cross

1    Q.  And so if Claxton Poultry had negotiated 88 cents including

2    freight, you would agree with me that that is significantly

3    less than the $1.15 annual average of the market that you claim

4    that you consult to determine and drive and negotiate prices.

5            MR. TORZILLI:  Objection, foundation.

6            THE COURT:  Overruled.

7    A.  That is one -- our pricing that we got for 2014 was based

8    upon 2013's.

9    BY MR. BELLER:

10   Q.  And in 2014 the pricing, the average pricing was $1.15.

11   And by your answer I assume that means that the 2015 pricing

12   was based on the 2014 average and the 2014 average was $1.15.

13   A.  I don't remember the exact averages, but it was a tool that

14   we used.  We have always been paying lower than the market

15   price.

16   Q.  Significantly 20 to 25 cents lower.

17   A.  We have always been lower, correct.

18   Q.  And here if the market price was $1.15 and you were paying

19   Claxton for 2015 $1, you were still paying 15 cents less than

20   the market price.

21   A.  I guess so.

22   Q.  It wasn't a shocking number after all.

23   A.  It was a shocking number because of the corn prices.

24   Q.  And you, Mr. Brink, won the battle of the chicken in 2014,

25   right?

Joseph Brink - Cross

1    A.  Basically we got everybody to be agreeing to the weights of

2    the chicken so we can have pricing going into the system

3    correctly.

4    Q.  Is that a yes that you won the battle of the chicken in

5    2014?

6    A.  I won the battle of the chickens is a generic -- just that

7    we got it done.

8    Q.  And that's what you boasted to your co-worker in December

9    of 2014 is we won the battle of the chicken.

10   A.  We won the battle of the chicken was referring to getting

11   everything corrected and having it ready to go.

12   Q.  Yes, that's what you said to a co-worker.

13   A.  Correct.

14          MR. BELLER:  I have nothing further.  Thank you.

15          THE COURT:  Thank you, Mr. Beller.

16          Additional cross-examination?

17          Mr. McLoughlin?

18                        **CROSS-EXAMINATION**

19   BY MR. McLOUGHLIN:

20   Q.  Good afternoon, sir.  My name is Jim McLoughlin and I

21   represent Bill Lovette.  Let's get some basics out of the way,

22   sir.

23          In the negotiations with Pilgrim's that you've talked

24   about, you never met with or spoke to Bill Lovette, did you?

25   A.  Correct.

Joseph Brink - Cross

1    *Q.*  And you never had any e-mail or other communication with

2    Bill Lovette, did you?

3    *A.*  Correct.

4    *Q.*  And, in fact, you told the government you've never met Bill

5    Lovette, correct?

6    *A.*  Correct.

7    *Q.*  Now, you also told the government that you had no personal

8    information that any of your suppliers were communicating with

9    each other about your contract; is that correct?

10   *A.*  Correct.

11   *Q.*  So having no personal knowledge of that allegation, you

12   were unhappy about the price that you were paying in 2015 after

13   the 2014 negotiations, correct?

14   *A.*  Correct.

15   *Q.*  And part of the reason you were unhappy is because as the

16   chief procurement officer, it's your responsibility to acquire

17   the products that Fiesta Restaurant Group or Pollo Tropical

18   needs to run its business at the lowest possible price,

19   correct?

20   *A.*  Correct.

21   *Q.*  And that is so that Fiesta Restaurant Group which owned

22   Pollo Tropical can maximize its profits for its shareholders;

23   is that correct?

24   *A.*  Ultimately, I guess so, yes.

25   *Q.*  Well, is there anything about that that confuses you that

3301

Joseph Brink - Cross

1   you have to guess?

2   *A.* Well, I purchase the product to get the lowest price so we

3   can keep the pricing as best we can to our consumers.

4   *Q.* Because that drives volume and that increased volume drives

5   profits, correct?

6   *A.* Correct.

7   *Q.* Okay.  Now, can we also agree that as your supplier, the

8   Pilgrim's Pride company had no obligation to sell you chicken

9   for less money than they could sell it to somebody else,

10  correct?

11  *A.* I do not know.  That's their obligation.

12  *Q.* I'm sorry, sir.  How many years have you been in the

13  chicken business and procuring chickens?

14  *A.* A long time, since '94.

15  *Q.* Since '94.  2004 -- 18 years ball park?

16  *A.* Ball park.

17  *Q.* What did you do before that?

18  *A.* I was in operations.

19  *Q.* For what?

20  *A.* Restaurants, for Grandy's.

21  *Q.* What did you do before you were in operations for

22  restaurants?

23  *A.* Before that I was a molecular biologist.

24  *Q.* Do you have a university degree?

25  *A.* Yes.

Joseph Brink - Cross

1    Q.   In molecular biology?

2    A.   No, in biology.

3    Q.   In biology.  Did you ever take any business courses?

4    A.   In college, yes.

5    Q.   You did.  Okay.  So based on your college business courses

6    and your years in business, is it your testimony to the jury

7    that you don't know whether Pilgrim's Pride had no duty to sell

8    Pollo Tropical chicken for less than they could sell it to

9    somebody else?

10   A.   That's their obligation.  I'm saying I don't know what

11   Pilgrim's Pride was wanting to do with their chicken volume.

12   It's their obligation to do what they want to do with their

13   customers.

14   Q.   I didn't ask you what they wanted to do.  Sir, let me

15   rephrase it for you.

16          Was it your view in September and October of 2014 that

17   Pilgrim's Pride had a duty to sell you chicken for less than

18   they could sell it to somebody else?

19   A.   I don't know.

20   Q.   You don't remember?

21   A.   I know that they can sell chicken to whomever they wish to.

22   They didn't have to give me chicken.

23   Q.   Okay.  So is that a yes to my question that they didn't

24   have an obligation to sell you chicken if they could sell it to

25   somebody else for more.

Joseph Brink - Cross

1    A.   That's their obligation.  That's the whole process, yes.

2    Q.   When you say that's their obligation, that's their

3    obligation to their shareholders, right, to maximize their

4    profit, correct?

5    A.   I don't know what their obligations is to shareholders.

6    Q.   How long have you worked for a public company?

7    A.   About six years.

8    Q.   You are in the senior management of that public company,

9    aren't you?

10   A.   Yes.

11   Q.   And as the senior officer of a public company, is it your

12   testimony you don't know the obligations of a public company to

13   its shareholders?

14        MR. TORZILLI:  Your Honor, I am going to object.

15   These questions are speculative, and I am happy to have a side

16   bar to elaborate.

17        MR. McLOUGHLIN:  Your Honor, there is absolutely

18   nothing speculative about this gentleman's testimony.

19        THE COURT:  I think we are sidetracked right now.  I

20   am going to sustain the objection.

21   BY MR. McLOUGHLIN:

22   Q.   So you just said for a moment a moment ago in response to a

23   question from Mr. Beller that price in 2014 was based on the

24   price in 2013 for chicken.  Was that what you said?

25   A.   Uh-huh.

Joseph Brink - Cross

1    *Q.* Sir, is it also fair to say that when a company like

2    Pilgrim's Pride gave you a price, they weren't looking

3    backwards.  They were actually looking forwards to what they

4    could sell it to someone else in 2015 in order to decide what

5    price to quote you?

6            *MR. TORZILLI:*  Objection, foundation.

7            *THE COURT:*  Overruled.  He can answer.

8    *A.* I don't know how Pilgrim's determined their pricing

9    structure when they gave me the pricing for our contract.

10   *BY MR. McLOUGHLIN:*

11   *Q.* So shouldn't have the answer to Mr. Beller have been I

12   don't know instead of price in 2014 was based on 2013?

13   *A.* I said that's -- I don't know how Pilgrim's does their

14   pricing models and how they did it, determined the pricing they

15   gave to us.

16   *Q.* Now, would you agree with me that basic economics price is

17   determined by the intersection of supply and demand?

18   *A.* That's one aspect, yes.

19   *Q.* What other aspects are there?

20   *A.* Corn, feed.

21   *Q.* Sir, I didn't ask you about chickens.  I said about

22   generally with respect to basic economics for the sale of a

23   product, any product, it is at the intersection of supply and

24   demand.

25   *A.* Yes.

Joseph Brink - Cross

1   *Q.*  And, in fact, it doesn't matter how much it cost you to

2   make the product.  If there is no demand for it, you're not

3   going to be able to sell it above your cost.  And if there is a

4   large demand for it, you can sell it for a profit.  Isn't that

5   basic economics?

6   *A.*  Yes.

7   *Q.*  So when you say you were looking at corn and apparently

8   exclusively corn to decide how much a chicken company was going

9   to ask for their product, did you look at the demand side for

10  that product?

11  *A.*  Yes.

12  *Q.*  What did you look at for the demand side?  Was it the

13  Urner-Barry Index?

14  *A.*  I have several reports I get.  Urner-Barry is one of them.

15  *Q.*  What were the others?

16  *A.*  American Restaurant Association, ArrowStream.

17  *Q.*  Sir, let's just say the three-year average from 2012 to

18  2015, how many small birds did Chick-fil-A buy?

19  *A.*  I do not know.

20  *Q.*  Do you know, did their purchases increase over those years?

21         *MR. TORZILLI:*  Objection, foundation.

22         *MR. McLOUGHLIN:*  Your Honor, I believe I am entitled

23  to test his knowledge of the industry given his testimony.

24         *THE COURT:*  Overruled.  He can answer if he knows.

25  *A.*  I assume -- Chick-fil-A was growing in customer store

Joseph Brink - Cross

1    count, so I assume their chicken purchases also increased.

2    *BY MR. McLOUGHLIN:*

3    *Q.*  And Costco was also growing in rotisserie chicken, wasn't

4    it?

5    *A.*  Yes.

6    *Q.*  So you would assume their purchases were going up, correct?

7    *A.*  I don't know exactly how much purchases there were, but we

8    can assume.

9    *Q.*  And the same is true with respect to Wal-Mart, isn't it?

10   *A.*  Again, I don't know how many stores, the growth and

11   everything else, but yes, we can assume.

12   *Q.*  Isn't it a fact, sir, that going into 2014 you had no clear

13   view of the demand side for small birds?

14   *A.*  I know the demand for our company.  I do not know the

15   demand from every company.

16   *Q.*  Right.  And so at the same time, sir, when you didn't know

17   what the demand was across the market for small birds, do you

18   know how many small bird plants were converted to large bird

19   plants over the prior five years?

20   *A.*  Not exactly.

21   *Q.*  Give me your approximate understanding.

22   *A.*  I don't know how many plants had converted over the years.

23   *Q.*  So when you said not exactly, the real answer is I have no

24   idea.

25   *A.*  I have no idea exactly how many numbers were converted.

Joseph Brink - Cross

1    Q.   Okay.  And at the same time you don't know small bird

2    demand.  And, sir, when we talk about this, you said in

3    response to a question about being in the broiler chicken

4    business, you are in the restaurant business, correct?

5    A.   Correct.

6    Q.   You don't really know the chicken processing growing

7    business, do you?

8    A.   Not to the level that they do.

9    Q.   Right.  And earlier if I understood your testimony having

10   said you don't really understand the business, you testified in

11   response to a government question that basically the cost of

12   labor to produce a small bird and a large bird is approximately

13   the same.  Do you remember that testimony?

14   A.   That's what I was told by the suppliers in the past.

15   Q.   What provider told you that?

16   A.   I don't remember which suppliers we spoke to regarding all

17   of this.

18   Q.   Just one.  I am just asking for one.

19   A.   I would probably assume it was Pilgrim's.

20   Q.   But you don't know.  You are assuming.

21   A.   I am assuming.

22   Q.   What year did they tell you that?

23   A.   2010, 2011.

24   Q.   Okay.  Have you ever been in a small bird processing plant?

25   A.   Yes.

Joseph Brink - Cross

1    Q.   Have you ever been in a large bird processing plant?

2    A.   No.

3    Q.   Do you understand that one of the differences between a

4    large bird plant and a small bird plant is in a small bird

5    plant they basically take the chicken and cut the chicken, but

6    basically stays in one piece, and in a large bird plant they

7    take it apart.

8    A.   Correct.

9    Q.   Okay.  How many employees are in a small bird plant in a

10   processing line?

11           MR. TORZILLI:  Objection, foundation.

12           THE COURT:  Overruled.  He can answer if he knows.

13   A.   I do not know.

14   BY MR. McLOUGHLIN:

15   Q.   If I told you it was seven, would you be able to disagree?

16   A.   On the processing plant?

17   Q.   On a line in a processing plant.

18   A.   I don't know exactly how many employees.  They are all over

19   the place and at the end the production line there is packers

20   and everything else.  I don't know the actual number of

21   employees on a line.

22   Q.   Right.  So if I suggested to you that the average would be

23   three hangers, one floor cleaner, one machine operator, one

24   scaler and one stacker for a total of seven, you would not be

25   able to disagree, would you?

3309

Joseph Brink - Cross

1          MR. TORZILLI:  Objection, foundation.

2          THE COURT:  Sustained as to form.

3    BY MR. McLOUGHLIN:

4    Q.  Isn't it true that you don't know how many hangers there

5    are on a line in a small bird plant?

6    A.  When you go into a plant, I have never counted how many

7    hangers are hanging chicken in the line because typically we're

8    not allowed to go into the dirty part of the plant and the

9    clean part of the plant.

10   Q.  Sir, did I ask you why you don't know?

11   A.  I'm just telling you I don't know the exact numbers.

12   Q.  No, sir, you're not telling me that.  Isn't it true you

13   told me everything but I don't know?

14   A.  Okay.  I do not know the actual numbers.

15   Q.  Okay.  Let's talk about a large bird plant.  How many

16   employees are on a line in a large bird plant?

17   A.  I do not know.

18   Q.  Can you give me an approximate number?

19   A.  I do not know.

20   Q.  If I suggested to you there would be one loader, four

21   shoulder cutters, two pullers, one floor cleaner, two wing

22   cutters, one wing grader, two wing scalers and a wing boxer for

23   a total of approximately 30, would you disagree?

24          MR. TORZILLI:  Objection, form and foundation.

25          THE COURT:  Sustained.

Joseph Brink - Cross

 1   *BY MR. McLOUGHLIN:*

 2   Q.  Sir, do you have any idea whether or not the number of

 3   employees on a single line in a large bird plant is 30 or more?

 4   A.  I have no idea.

 5   Q.  So if you have no idea how many people it takes to run a

 6   line in a small bird plant and a large bird plant, isn't it

 7   true that you have absolutely no idea what the average labor

 8   cost is per bird for a small bird and a large bird?

 9   A.  That's not correct.  I was told that the finished -- for

10   chicken breast meat that they get more chicken produced with

11   the same amount of labor.  That's what I was told.

12   Q.  That's what you were told.

13   A.  Yes.

14   Q.  But you can't tell us --

15   A.  That's why the plants converted to large birds.

16   Q.  You can't tell us who.

17   A.  I don't remember.

18   Q.  You can't tell us when.

19   A.  It's been years ago.  I do not remember.

20   Q.  Listening to these questions, sir, does it occur to you

21   that maybe your information might be incorrect or your

22   recollection might be failing?

23   A.  I do not know.

24   Q.  But certainly you would agree with me that the jury should

25   not rely on your testimony with respect to that cost

Joseph Brink - Cross

1   differential because you don't know.

2   A.   I do not know.

3   Q.   You don't know whether they should rely or not?

4   A.   I was told information that I was utilizing from my past

5   experience.

6   Q.   Okay.  Sir, I think it's been established that you used

7   competitors' pricing, including the exact price, to try to push

8   down the price of a competing supplier.  Is that a fair summary

9   of where we are in your testimony?

10   A.   I gave ranges, yes.

11   Q.   I'm sorry, this is a yes or no, sir.  You did more than

12   give a range.  You gave a specific number of 88 cents, didn't

13   you, or do we have to go over that again?

14   A.   One year, yes, I did, yes.

15   Q.   And when you said to other suppliers, "They gave me the

16   same number, but theirs is delivered and yours is FOB," that's

17   pretty precise guidance, isn't it?

18   A.   It's giving guidance, yes.

19   Q.   I didn't say giving guidance.  I said precise guidance.

20   Isn't that precise guidance?

21   A.   It can be, yes.

22   Q.   What's different between "is" and "can be" that you picked

23   can be?

24   A.   I interpret it as a guidance.  That's my interpretation.

25   Q.   Now, when you were giving that guidance over those years,

3312

Joseph Brink - Cross

1  sir, it was your expectation that the person to whom you would

2  give that guidance would then respond by lowering their price;

3  isn't that correct?

4  A.   That was my goal, yes.

5  Q.   And so you communicated that information to them with the

6  expectation and purpose to generate a reaction in them which is

7  lower price, correct?

8  A.   Correct.

9       MR. McLOUGHLIN:  Your Honor, based on the witness'

10  testimony, I would move the admission of the exhibits that

11  Mr. Canty previously proposed on the ground that they are

12  outside the hearsay rule because they are admissible for the

13  effect on the listener and also for future conduct, so that

14  would be I-231 and I-228.

15       THE COURT:  Let's take them one at a time.  Could

16  those be displayed on the monitor for my benefit?  I-231 has

17  already been admitted.

18       MR. McLOUGHLIN:  Excuse me, Your Honor.  I think I

19  have got the wrong one.  It's I-226 and I-225, my apologies,

20  225 and 226.  I was on the wrong page.

21       THE COURT:  Any objection to the admission of I-226?

22       MR. TORZILLI:  I'm sorry, Your Honor.  226?

23       MR. McLOUGHLIN:  It's actually I-5226 and I-5225.  No?

24  I-226 and 225.

25       MR. TORZILLI:  Being asked whether to object on I-226,

Joseph Brink - Cross

1    I do on the grounds that it's hearsay.

2         THE COURT:  All right.  Objection is sustained.  It is

3    hearsay and there is no hearsay exception for it.

4    BY MR. McLOUGHLIN:

5    Q.  Sir, now, you talked a little bit about the pricing

6    negotiations, and we've talked about this stair-step concept of

7    pricing.  Do you recall that?

8    A.  Yes.

9    Q.  And in fact, stair-step pricing means you had a lower

10   annual price for the year for chicken from that supplier,

11   correct?

12   A.  Yes.

13   Q.  Which is to say quite simply Claxton negotiated with you

14   and gave you a lower price than Pilgrim's Pride.

15   A.  For the year, yes.

16   Q.  For the year.

17        THE COURT:  Mr. McLoughlin, it's just about noon.  A

18   few more questions is fine, but if you could look for a

19   convenient --

20        MR. McLOUGHLIN:  This is as good a place as any, Your

21   Honor.

22        THE COURT:  Ladies and gentlemen, we are going to

23   break for lunch.  Let me give you information about our

24   schedule for planning purposes.  And that is tomorrow we are

25   going to meet just among the attorneys and myself so that we

3314

Joseph Brink - Cross

 1   can go through more exhibits, so we won't have court tomorrow.

 2   No court, of course, on Friday either.  So what that means is

 3   that -- we will this afternoon, though.  Once we break then

 4   this evening, you won't be coming back until Monday at 8:30,

 5   okay?  I just wanted to let you know that so you can plan

 6   ahead, all right?

 7          In the meantime, keep all those admonitions in mind.

 8   Keep your yellow juror buttons visible.  It's a little colder

 9   today, so if you go out, try to keep those visible like, for

10   instance, if you go to a restaurant or something like that.

11          The jury is excused for lunch.  We will reconvene at

12   1:30.  Thank you.

13          (Jury excused.)

14          Mr. Brink, you can be excused until 1:30.  Thank you.

15          Anything we should talk about?  Mr. Koenig?

16          *MR. KOENIG:*  Sure, Your Honor.  In the event that we

17   did get through the witnesses before the end of the day, our

18   suggestion would be respectfully to start in on the documents

19   to get a head start on tomorrow, if possible.

20          *THE COURT:*  As opposed to?

21          *MR. KOENIG:*  Well, I mean, if we get through -- who is

22   the last one today, Hoyt.

23          *THE COURT:*  Oh, the witnesses that we talked about

24   yesterday, yeah, right.  I think that that probably makes

25   sense.

Joseph Brink - Cross

1           MR. KOENIG:  That's all I was --

2           THE COURT:  Anyone have any thoughts on that?  That

3    would seem logical.  That would be consistent with what we have

4    been talking about since we anticipated yesterday that going

5    through the witnesses that were referred to would be our agenda

6    for today, and then our next order of business would be to go

7    through documents.  So were we to in essence get through all

8    the witnesses that we talked about yesterday, I think it makes

9    sense that we go ahead and excuse the jury and then start

10   working on those exhibits.

11          Anyone else have anything to bring up?

12          All right.  We will be in recess.  Thank you.

13       (Recess at 12:02 p.m.)

14       (Reconvened at 1:33 p.m.)

15          THE COURT:  Let's go ahead and bring the jury back in.

16          (Jury present.)

17          THE COURT:  And here comes Mr. Brink.

18          All right.  Mr. McLoughlin, go ahead.

19          MR. McLOUGHLIN:  Thank you, Your Honor.

20   BY MR. McLOUGHLIN:

21   Q.  Mr. Brink, let's quickly do a little housekeeping, please.

22          MR. McLOUGHLIN:  Can I get that binder?  Can we pull

23   up Government Exhibit 592, please?

24   BY MR. McLOUGHLIN:

25   Q.  Mr. Brink, do you recognize Government Exhibit 592 as the

3316

Joseph Brink - Cross

1  contract for the year of 2015 between Pollo Tropical and

2  Mar-Jac Poultry?

3  A.  Yes.

4  Q.  So is that your signature on Page 9 of the contract?

5  A.  Yes.

6  Q.  And is this a business record of this contract that your

7  company keeps in the ordinary course of its business?

8  A.  Yes.

9  Q.  And is this a business record that you rely on in the

10  ordinary course of Pollo Tropical's business?

11  A.  Yes.

12      MR. McLOUGHLIN:  Your Honor, we would move the

13  admission of Government Exhibit 592.

14      THE COURT:  Any objection to the admission of

15  Exhibit 592?

16      MR. TORZILLI:  No objection, Your Honor.

17      THE COURT:  Exhibit 592 will be admitted.

18      MR. McLOUGHLIN:  Can we pull up, please, Government

19  Exhibit 558?

20  BY MR. McLOUGHLIN:

21  Q.  Sir, do you recognize this as the contract between -- that

22  being Government Exhibit 558 as the contract between Pollo

23  Tropical and Pilgrim's Pride for the year 2013?

24  A.  Yes.

25  Q.  And, sir, is this contract a business record that Pollo

Joseph Brink - Cross

1    Tropical keeps in the ordinary course of its business?

2    A.   Yes.

3    Q.   And is this a document, being the contract, that you and

4    Pollo Tropical relied on in the ordinary course of the

5    company's business?

6    A.   Yes.

7         MR. McLOUGHLIN:   We would move the admission of

8    Government Exhibit 558, Your Honor.

9         THE COURT:   Any objection to the admission of

10   Exhibit 558?

11        MR. TORZILLI:   No objection, Your Honor.

12        THE COURT:   Exhibit 558 will be admitted.

13        MR. McLOUGHLIN:   Now, can we pull up just for the

14   witness, please, Defense Exhibit A-706?

15   BY MR. McLOUGHLIN:

16   Q.   And, sir, I would ask you to review A-706 and let me know

17   when you are ready.

18   A.   Yes.

19   Q.   Sir, let us start at the bottom of the first page.  Is the

20   message that is at the bottom of the first page that shows it

21   is between you sending an e-mail to Walter Cooper on

22   December 17, 2014 at 9:05 p.m. a message that you sent to

23   Mr. Cooper in the ordinary course of Pollo Tropical's business?

24   A.   Yes.

25   Q.   And Mr. Cooper responded to you on December 22 at 9:30 a.m.

3318
Joseph Brink - Cross

 1   Does that refresh your recollection that Mr. Cooper

 2   communicated to you that the contract you sent him in the first

 3   e-mail or attached to the first e-mail was a one-year contract,

 4   and he told you he was under the impression that the term of

 5   the agreement was supposed to be a two-year contract?

 6            *MR. TORZILLI:*  Objection, improper refreshment.

 7            *THE COURT:*  Overruled.

 8   *A.*  Yes.

 9   *BY MR. McLOUGHLIN:*

10   *Q.*  Okay.  And when he asked you in that form of the question

11   that Claxton was under the impression that the agreement was to

12   last for two years until December 31, 2016, isn't it true that

13   you said to him, "It is but the volume will change in 2016.

14   The volume will increase in 2016"?

15            *MR. TORZILLI:*  Objection.  The document is not in

16   evidence.

17            *THE COURT:*  Sustained.

18   *BY MR. McLOUGHLIN:*

19   *Q.*  Sir, did you tell Mr. Cooper on December 22, 2014 in

20   writing that, in fact, he was correct that the agreement

21   between Pollo Tropical and Claxton was supposed to be for two

22   years and, in fact, was for two years?

23            *MR. TORZILLI:*  Objection.  The document is not in

24   evidence and the witness is referring to the document in

25   answering counsel's questions.

3319

Joseph Brink - Cross

1          *THE COURT:*  Sustained.

2          *MR. McLOUGHLIN:*  Will you please take down the

3    document, please?

4          Madam court reporter, would you read my question back,

5    please.

6          (The record was read by the court reporter.)

7          *MR. McLOUGHLIN:*  That's a yes or no, sir.

8    *A.*  I don't know.  It was -- basically it was an agreement he

9    wanted two years, but we do not put two-year pricing on a

10   contract.

11   *BY MR. McLOUGHLIN:*

12   *Q.*  Sir, I didn't ask you what the contract was.  I asked you

13   what you told Mr. Cooper.  Did you not tell Mr. Cooper on

14   December 22, 2014, it, being the contract, is a two-year

15   contract, but the volume will change in 2016?  Yes or no?

16         *MR. TORZILLI:*  Objection, hearsay.

17         *THE COURT:*  He asked what he told Mr. Cooper.

18   Overruled.

19   *BY MR. McLOUGHLIN:*

20   *Q.*  Yes or no?

21   *A.*  Yes.

22   *Q.*  And you also told him having confirmed it was a two-year

23   contract that the volume will increase in 2016, did you not?

24   Yes or no?

25   *A.*  That was in the e-mail, yes.

Joseph Brink - Cross

1    *Q.* And when you sent that e-mail to him, you knew that you

2    were speaking on behalf of your employer and that he, as an

3    employee of Claxton, would rely on your representation to him,

4    didn't you?

5             *MR. TORZILLI:* Objection, foundation.

6             *THE COURT:* Overruled.

7    *A.* I replied back to him saying that that was correct.  We

8    thought -- we wanted a two-year agreement, but we would not do

9    a two-year on pricing.  We did two-year volume.

10   *BY MR. McLOUGHLIN:*

11   *Q.* Sir, that's fascinating, but it has nothing to do with what

12   I asked you.

13            *MR. TORZILLI:* Objection.

14   *BY MR. McLOUGHLIN:*

15   *Q.* Isn't it true that when you sent the e-mail you knew, as an

16   employee of Pollo Tropical, that he, as an employee of Claxton,

17   would rely on your representation to him that it was a two-year

18   contract?  Yes or no?

19   *A.* Yes.

20   *Q.* I am sorry, I didn't hear you.

21   *A.* Yes.  My voice is going.  I'm sorry.

22   *Q.* And, in fact, you expected that Claxton would continue to

23   supply your company with chicken at a reduced price in reliance

24   on your telling him it was a two-year contract; isn't that

25   true?

Joseph Brink - Cross

1      *MR. TORZILLI:*  Objection as to his expectation.

2      *THE COURT:*  Overruled.  He can answer.

3  *A.*  No.

4  *BY MR. McLOUGHLIN:*

5  *Q.*  No?

6  *A.*  No.

7  *Q.*  Okay.  Now, sir, you also told him the volume would

8  increase in 2016, didn't you?

9  *A.*  Yes, we did.

10  *Q.*  And you expected he would rely on that, yes?

11  *A.*  Yes, at the time, yes.

12  *Q.*  And that would, in fact, be an inducement that Claxton

13  continue to supply chicken to Pollo Tropical at the contract

14  price; isn't that right?

15  *A.*  Yes.

16  *Q.*  And that is why you also told him it was a two-year

17  contract because you expected that he would rely on that to

18  continue to supply chicken to Pollo Tropical at the contract

19  price.

20  *A.*  Yes.

21  *Q.*  But you knew when you sent it that because you had not

22  signed it, you could walk away when you needed to, didn't you?

23  *A.*  That is not correct.

24  *Q.*  Did you think you had a binding contract when you sent that

25  e-mail?

Joseph Brink - Cross

1   A.  We sent the contract and I thought it was going to get

2   signed.  And it went through legal as I stated before.  If it

3   got approved by legal by both parties, it would have been

4   signed.

5   Q.  I am sorry, sir.  I didn't ask you any of that.  I asked

6   you when you sent the e-mail, did you believe you had a binding

7   contract, you, Mr. Joseph Brink?

8        MR. TORZILLI:  Objection, calls for a legal

9   conclusion.

10        THE COURT:  Overruled.

11   A.  I sent the contract.  The e-mail was all in progress, so I

12   thought we were having a contract in progress.

13   BY MR. McLOUGHLIN:

14   Q.  Is that a yes or no to my question, sir, or would you like

15   to read it back?

16        MR. McLOUGHLIN:  Can you read it back, please?

17        (The record was read by the court reporter.)

18   A.  I said yes.

19   Q.  Thank you.  Now, sir, in terms of your time in the

20   industry, are you familiar with the National Chicken Council in

21   the United States?

22   A.  Yes.

23   Q.  And can you tell the jury just generally what the National

24   Chicken Council is?

25   A.  It's a council of all chicken suppliers that represent the

Joseph Brink - Cross

1   chicken council -- all chicken suppliers.

2   Q.   And it also has associate members who are organizations

3   that purchase chicken, correct?

4   A.   I assume so, yes.

5   Q.   And it has meetings periodically that are attended by

6   people with an interest in the industry including chicken

7   suppliers and purchasers and others; is that correct?

8   A.   Yes.

9   Q.   Have you ever attended a meeting?

10   A.   No.

11   Q.   Do you know people who have?

12   A.   Not personally, no.

13   Q.   Did you ever read any of their publications?

14   A.   I don't recall.

15   Q.   The National Chicken Council was a fairly well-known

16   organization in the industry, isn't it?

17   A.   Yes.

18   Q.   Relatively prestigious to be on the board of that

19   organization would you say?

20         MR. TORZILLI:  Objection, foundation.

21         THE COURT:  Overruled.  He can answer if he knows.

22   A.   I don't know.

23   BY MR. McLOUGHLIN:

24   Q.   And you're generally aware that their annual meeting of the

25   National Chicken Council or their quarterly meetings get a

3324

Joseph Brink - Cross

1  pretty robust attendance; is that fair?

2  A.  I don't know.

3  Q.  Never attended.

4  A.  Never attended.

5  Q.  Now, sir, in 2014 when you were negotiating with Pilgrim's,

6  with Mr. Little, you were told that Pilgrim's would have to

7  restrict the volume to 125,000 pounds per week plus or minus

8  10 percent; is that correct?

9  A.  That was the final agreement we got to, correct.

10  Q.  And the reason -- one of the reasons for that was that

11  Pilgrim's informed you that it just didn't have the volume to

12  commit to Pollo Tropical in excess of that amount because of

13  other commitments; is that correct?

14  A.  I don't remember all that.

15  Q.  What do you remember?

16  A.  That I didn't have enough chicken.  And they went back and

17  came up with a solution.  And instead of having an annual

18  commitment, we got down to a weekly agreement plus or minus

19  10 percent.

20  Q.  And that was because they couldn't commit unrestricted

21  volume to you; isn't that correct?

22  A.  We didn't have restricted volume.  We had annual volumes.

23  Q.  No, I'm sorry, sir.  I think you misunderstood my question.

24          The reason they limited you to 125,000 pounds per week

25  is because they didn't have the volume to commit that you could

Joseph Brink - Cross

1    take as much as you wanted; isn't that correct?

2    A.   Yes.

3    Q.   And that was because demand was high.  Everyone was telling

4    you that; isn't that correct?

5    A.   Yes.

6    Q.   And you told the FBI and the government that you went

7    around to other suppliers to see if you could acquire some more

8    chicken, and they all told you that they didn't it have to

9    sell.  Is that fair what you told the government and the FBI?

10   A.   I called other suppliers.  Some said yes.  Some said no.

11   Q.   And the ones that said no said they didn't have supply.

12   A.   Correct.

13   Q.   The only one that said yes was Mar-Jac, right?

14   A.   Correct.

15   Q.   And then you purchased about 3 million pounds from Mar-Jac,

16   right?

17   A.   Correct.

18   Q.   Now, you were asked if Claxton has one plant, correct?

19   A.   Correct.

20   Q.   Mar-Jac has how many plants?

21   A.   For the chicken plants, I think there is two.

22   Q.   Two.  And Holmes had one small bird plant?

23   A.   Correct.

24   Q.   Do you know how many small bird plants Pilgrim's had?

25   A.   No, I know they have a lot.  They have several.  I don't

3326

Joseph Brink - Cross

 1  know exactly how many chicken plants they have.  They have so

 2  many brands they purchased over the years, I don't know the

 3  exact number.

 4  Q.  But it is a large number, isn't it?

 5  A.  The largest supplier, had the most plants.

 6  Q.  So in some sense Claxton or Holmes wasn't really competing

 7  with Pilgrim's because they could not meet the volume

 8  commitments that Pilgrim's could should Pilgrim's have that

 9  volume available because Pilgrim's just had more plants than

10  they did; isn't that correct?

11  A.  In theory, yes.

12  Q.  And in reality too.  Let's not talk about theory.  Let's

13  talk about reality.  Wasn't that the reality in 2014?

14  A.  I don't understand.  What do you mean?

15  Q.  Do you understand the difference between reality and

16  theory?

17  A.  Well, yes, but I don't know what you're asking, your

18  question.

19  Q.  Isn't it true that in reality, because Pilgrim's had so

20  many more facilities, that Claxton or Holmes could not provide

21  you the supply across the country that you needed to get from

22  Pilgrim's?

23  A.  If Pilgrim's has more capacity, they should have

24  availability of product, correct.

25  Q.  And you relied on that expectation, didn't you?

Joseph Brink - Cross

1   A.  They were one of the suppliers.  They weren't the main

2   supplier.

3   Q.  Sir, is there a problem with just yes or no to a question?

4   A.  Okay.  I say I don't know, my answer.

5   Q.  I am asking you what you relied on.

6   A.  I relied on our current suppliers, their volumes and their

7   ability to take care of our current business and with our

8   growth models.  That's what I relied on.

9   Q.  And we've agreed, haven't we, that given that Claxton and

10  Holmes only had one plant each, they couldn't fill the void

11  that Pilgrim's -- losing Pilgrim's would create; isn't that

12  right?

13  A.  If I lost Pilgrim's, I would have to find another supplier,

14  correct.

15  Q.  So in some sense they really didn't compete because they

16  couldn't deliver what Pilgrim's was delivering; isn't that

17  correct?

18  A.  Objection, asked and answered.

19       THE COURT:  Overruled.

20  A.  Pilgrim's was my main -- my only supplier until I added

21  Mar-Jac on my sized breast.

22  BY MR. McLOUGHLIN:

23  Q.  All right.  I think we are about done, sir.

24       Now, would you agree with me that Pollo Tropical does

25  not have the right to dictate the profit margin of any other

Joseph Brink - Cross

1    company?

2    A.   Yes.

3    Q.   And so when you testified that when you were told that

4    Pilgrim's wanted the same margin for its small bird as large

5    birds, when you said that was not acceptable, that was not

6    within your purview, was it?

7    A.   That's my opinion.

8    Q.   Well, you used it as more than an opinion.  You expressed

9    it to Pilgrim's.

10   A.   Because we are looking at different cost models.  We are

11   looking at size birds -- small bird plants versus large bird

12   plants.

13   Q.   Right.  And haven't we already established that it's not

14   your right to tell Pilgrim's how to run its business?

15   A.   They have every right to do what they want to do.

16   Q.   Now, sir, 2015 was a reasonably good year for Fiesta Group

17   and Pollo Tropical, wasn't it?

18   A.   I assume so.

19   Q.   Well, you were an employee then, right?

20   A.   Correct.

21   Q.   And in that year didn't annual revenues grow by 12-1/2

22   percent to $687.4 million?

23   A.   I don't remember exactly.

24        MR. McLOUGHLIN:  Your Honor, may I provide the witness

25   a document to help him refresh his recall?

Joseph Brink - Cross

1          THE COURT:  You may.

2          MR. McLOUGHLIN:  And I have copies for the government

and the Court and one for me.

4    BY MR. McLOUGHLIN:

5    Q.  If you look at the first page, the same store sales at

6    Pollo Tropical increased in 2015, did they not?

7    A.  The comparable sales increased, yes, at both brands.

8    Q.  The comparable sales for the jury is sales at existing

9    stores, not increased volume as a result of a new store

10   opening, correct?

11   A.  Correct.

12         MR. McLOUGHLIN:  Thank you, Your Honor.  I have no

13   further questions.  Thank you, Mr. Brink.

14         THE COURT:  Thank you.

15         Additional cross-examination?

16         Go ahead, Ms. Pletcher.

17                    **CROSS-EXAMINATION**

18   BY MS. PLETCHER:

19   Q.  Good afternoon, Mr. Brink.  My name is Anna Pletcher and I

20   represent Mr. Penn.

21         You have never met Mr. Penn, have you?

22   A.  No, I have not.

23   Q.  And you have never spoken to him?

24   A.  No.

25         MS. PLETCHER:  Thank you.  That's all my questions.

Joseph Brink - Cross

1        *THE COURT:*  Thank you, Ms. Pletcher.

2             Mr. Pollack, go ahead.

3                          **CROSS-EXAMINATION**

4    *BY MR. POLLACK:*

5    *Q.*  Good afternoon, Mr. Brink.  You testified that your

6    suppliers were Pilgrim's, Claxton and Holmes; is that right?

7    *A.*  In 2014, yes.

8    *Q.*  And then eventually Mar-Jac as well?

9    *A.*  Yes.

10   *Q.*  The company George's was not one of your suppliers?

11   *A.*  Correct.

12   *Q.*  And so all of the testimony you gave yesterday, all of the

13   testimony that you gave today, none of that relates to

14   George's, correct?

15   *A.*  Correct.

16   *Q.*  And Mr. Blake was an employee of George's until he retired

17   back in 2018.  Do you know Mr. Blake?

18   *A.*  No, I do not.

19             *MR. POLLACK:*  Thank you, Mr. Brink.

20             *THE COURT:*  Thank you, Mr. Pollack.

21             Ms. Henry?

22                          **CROSS-EXAMINATION**

23   *BY MS. HENRY:*

24   *Q.*  Good afternoon.  I think we are getting toward the end

25   here.  I am Roxann Henry and I represent Mr. Bill Kantola.

Joseph Brink - Cross

1   Koch Foods was not involved in the 2014 negotiations that

2   you've discussed here; isn't that correct?

3   A.  Correct.

4   Q.  Nor was Mr. Bill Kantola?

5   A.  Correct.

6   Q.  Koch Foods did come in as a new competitor in 2016 to Pollo

7   Tropical, didn't it?

8   A.  Correct.

9   Q.  And when it came in, it took away sales volume that

10  otherwise would have gone to the prior incumbents or other

11  suppliers, correct?

12  A.  Correct.

13          MS. HENRY:  No further questions.

14          THE COURT:  Thank you, Ms. Henry.

15          Mr. Gillen?

16                      **CROSS-EXAMINATION**

17  BY MR. GILLEN:

18  Q.  Good afternoon.  Craig Gillen representing Mr. Roberts.  A

19  quick question.

20          The testimony today and yesterday had nothing to do

21  with Tyson, correct?

22  A.  Correct.

23  Q.  Had nothing to do with Brian Roberts, correct?

24  A.  Correct.

25  Q.  And nothing to do with Tim Mulrenin, correct?

Joseph Brink - Redirect

1    A.  Correct.

2           MR. GILLEN:  That's all I have.  Thank you, Your

3    Honor.

4           THE COURT:  Thanks you, Mr. Gillen.

5           We may have gotten to everyone, I am not sure, but

6    anyone else?

7           All right.  Redirect.

8                    **REDIRECT EXAMINATION**

9    BY MR. TORZILLI:

10   Q.  Good afternoon, Mr. Brink.  Just a few questions for you to

11   follow up on some of the points that were raised with you on

12   cross-examination.

13          MR. TORZILLI:  If I can ask, Your Honor, for the IT

14   technician for defense counsel if they could call up I-228,

15   please.  It was admitted into evidence this morning.  And if,

16   Your Honor, we can have permission to publish I-228.

17          THE COURT:  Yes, you may.

18          MR. TORZILLI:  Thank you.

19   BY MR. TORZILLI:

20   Q.  Sir, do you recognize the exhibit on the screen, I-228?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's the contract between Pilgrim's Pride and Pollo

24   Tropical.

25   Q.  Who signed that contract on behalf of Pollo Tropical?

Joseph Brink - Redirect

1    A.   I did.

2    Q.   And who signed that contract on behalf of Pilgrim's Pride?

3    A.   Jayson Penn.

4         MR. TORZILLI:   Thank you.   We can take that exhibit

5    down.   Thank you.   Now if we can call up Exhibit 500,

6    Ms. Golshanara.   Thank you.   And I believe this has been

7    received into evidence and request that it be published.

8         THE COURT:   It has been admitted and may be published.

9         MR. TORZILLI:   Thank you, Your Honor.

10   BY MR. TORZILLI:

11   Q.   Sir, do you recognize Exhibit 500?

12   A.   Yes.

13   Q.   You were asked about it on cross-examination?

14   A.   Yes.

15   Q.   Let's look at an e-mail that starts at the bottom of Page 2

16   and then goes on to the top of Page 3.   It's an e-mail written

17   by Mr. Cooper.

18   A.   Yes.

19   Q.   Who did he write that e-mail to?

20   A.   He wrote the e-mail to me.

21   Q.   And what does he say in that e-mail?

22   A.   He said, "Joe, we apologize for misunderstanding concerning

23   stair pricing.   Please see our e-mail below sent on 10/2."   And

24   he lists the different options for price stepping.

25   Q.   Then what does his next sentence say?

Joseph Brink - Redirect

1    A.  "I now have authority to offer you a two-year agreement

2    based on being able to agree to one of the below."

3    Q.  Based on this exhibit, Mr. Brink, who is Mr. Cooper getting

4    his authority from?

5    A.  From whoever makes the decisions at Claxton.

6         MR. TORZILLI:  Okay.  Can we look at a first page of

7    Exhibit 500?

8    BY MR. TORZILLI:

9    Q.  Who are these e-mails on this first page to and from?

10   A.  These appear to be -- these are e-mails between Walter

11   Cooper and Mikell Fries.

12        MR. TORZILLI:  Thank you, sir.  We can take that

13   exhibit down.

14   BY MR. TORZILLI:

15   Q.  This morning, Mr. Brink, you were asked about the loss of

16   volume of split WOG products in your purchases from Claxton.

17   Do you remember those questions?

18   A.  Yes.

19   Q.  And was there an answer that you did not have the

20   opportunity to complete?

21   A.  Yes.

22   Q.  Can you now complete your answer that you were unable to

23   this morning regarding the loss of volume of split WOG products

24   that you were purchasing from Claxton?

25        MR. BELLER:  Objection, vague and non-responsive.

3335

Joseph Brink - Redirect

1      *THE COURT:*  Overruled.

2      *BY MR. TORZILLI:*

3      *Q.*  You can answer.

4      *A.*  We as a company were trying to combat the high prices of

5      chicken and were looking at different chicken products to

6      mitigate the price increase.  We looked at buying hind saddles,

7      which is the back half of the chicken, as a way to decrease our

8      cost of chicken.  And doing so is about 20 percent of our

9      volume.  We were anticipating going to hind saddles which would

10     take away from the whole chickens.  We did offer Claxton

11     opportunity to do the hind saddle product for us.  We gave them

12     the first chance.  And they were not able to do it.

13     *Q.*  Can you explain what a hind saddle is, please, sir?

14     *A.*  The hind saddle is --

15            *MR. BELLER:*  I am going to object as outside the

16     scope.

17            *THE COURT:*  Response?

18            *MR. TORZILLI:*  It was only outside -- to the extent it

19     was outside the scope, which I don't believe it was, it was

20     because he wasn't able to complete an answer to a question he

21     was asked.

22            *MR. BELLER:*  Because it wasn't responsive, Your Honor.

23     It's outside the scope.

24            *THE COURT:*  Sustained.

25     *BY MR. TORZILLI:*

3336
Joseph Brink - Redirect

1  Q.  When the volume of split WOG product that you were

2  purchasing from Claxton decreased, was it your intention to try

3  to give Claxton an opportunity to make up for that lost volume

4  by purchasing a different product from Claxton?

5  A.  Yes.

6  Q.  You were also asked on cross-examination whether chicken

7  suppliers must speak with each other when orders can't be

8  filled.  Do you remember that?

9  A.  Yes.

10 Q.  And you said no and it's the response --

11        MR. BELLER:  Objection, leading.

12        THE COURT:  We haven't heard the whole question yet.

13 Overruled.

14 BY MR. TORZILLI:

15 Q.  What was your answer to those questions?

16        MR. McLOUGHLIN:  Objection, just repeating his answer,

17 asked and answered.

18        THE COURT:  Overruled.

19 BY MR. TORZILLI:

20 Q.  What was your answer, sir?

21 A.  My answer was if there is a shortage of chicken, if we had

22 an issue, that should be coming from me calling the other

23 suppliers to see if I can pick up some product to help offset a

24 supply issue at another plant.

25 Q.  So in your view when there is an order that a chicken

Joseph Brink - Redirect

1   supplier can't fill, is there any reason for that chicken

2   supplier to be communicating with another chicken supplier?

3   A.   No.

4   Q.   Is there ever a reason for chicken suppliers to speak to

5   each other about prices, bids or negotiations?

6   A.   No.

7   Q.   Why not?

8        MR. McLOUGHLIN:   Objection, Your Honor.

9        THE COURT:   Overruled.

10  A.   Because we want a fair price competitive process to have

11  fair competitive pricing.

12  BY MR. TORZILLI:

13  Q.   And why would communication among chicken suppliers on the

14  subjects that -- those subjects potentially be counter to that?

15  A.   It would defeat the purpose.

16       MR. McLOUGHLIN:   Objection, Your Honor, calls for

17  expert testimony.   This gentleman is not qualified to give an

18  opinion and this is beyond the scope of the cross-examinations

19  which did not go into this issue.   We are not going to have the

20  opportunity to cross-examine him as we have with some of the

21  other witnesses on this issue.

22       THE COURT:   Overruled on both counts.

23  BY MR. TORZILLI:

24  Q.   You can complete your answer, sir.

25  A.   I forgot what I was saying.   I'm sorry.

Joseph Brink - Redirect

1      MR. TORZILLI:  If we could ask the court reporter to

2   read back the question.

3          (The record was read by the court reporter.)

4   A.  Because it would defeat the purpose of having pricing

5   that's independent of each other so I can compare pricing

6   between all companies.

7   BY MR. TORZILLI:

8   Q.  You were also asked on cross-examination about small bird

9   chicken supply being short in the year 2014.  Do you remember

10   those questions?

11   A.  Yes.

12   Q.  And what was your -- the basis for your understanding that

13   small bird chicken supply was short in 2014?  How did you know

14   that?  How did you learn that?

15   A.  Suppliers were calling, telling me that they were having

16   major shortages of chicken.

17   Q.  So suppliers were telling you that?

18   A.  Yes.

19   Q.  Other than what suppliers told you, was there any

20   independent way for you to verify whether small bird supply was

21   short in 2014?

22      MR. McLOUGHLIN:  I object to the hypothetical, Your

23   Honor, as to what research he could do.  If he wants to ask him

24   did he do anything else, great, but this hypothetical about

25   what research he might have done given all the sources I think

3339

Joseph Brink - Redirect

1    is improper as to form and foundation.

2          THE COURT:  Overruled.

3    BY MR. TORZILLI:

4    Q.  You can answer, sir.

5    A.  Basically reading reports that -- coming up on chicken

6    companies and everything else, the overall response was there

7    was a high demand and a low availability of chicken.

8    Q.  Is short chicken supply a reason for competing chicken

9    suppliers to coordinate their bids in negotiations?

10          MR. BELLER:  Your Honor, that is so wholly improper as

11   to the relevance for this jury's determination of whether or

12   not that fact even happened.  I completely object to this line

13   of questioning.  It has happened with every witness and this

14   Court has upheld that objection every single time.

15          THE COURT:  Mr. Beller, let's go side bar.

16      (At the bench:)

17          THE COURT:  Mr. Beller, that objection was -- went a

18   bit beyond the bounds.  You cannot, No. 1, indicate some of

19   your own statistics in terms of how often I've sustained

20   objections.  That's improper.  Also the beginning of the

21   objection was improper as well.  The basic objection will be

22   sustained, namely that the question was -- lacks the foundation

23   for this particular witness.

24          Anything else, Mr. Torzilli, on that?

25          MR. TORZILLI:  No, sir.

Joseph Brink - Redirect

1            THE COURT:  Thank you.

2            MR. BELLER:  My apologies.

3        (In open court:)

4            THE COURT:  The objection will be sustained.

5            MR. TORZILLI:  Thank you, Your Honor.

6    BY MR. TORZILLI:

7    Q.  Mr. Brink, you were asked on cross-examination about your

8    giving specific guidance to suppliers during your negotiations

9    with them.  Do you recall that?

10   A.  Yes.

11   Q.  Can you tell us what the purpose was of your giving

12   specific guidance to suppliers during the negotiations?

13   A.  Trying to get them to get their pricing lower to be more

14   competitive.

15   Q.  And why did you want that?

16   A.  Because I need to get the pricing the best I can be for the

17   company that we both can live with, I can live with and the

18   company -- chicken companies can live with so we both can

19   recede and not have issues going down in the future.

20   Q.  On cross-examination you were asked about following corn

21   and feed prices.  Do you remember that?

22   A.  Yes.

23   Q.  Mr. Brink, have chicken suppliers ever agreed with you

24   during your career purchasing chicken that corn and feed prices

25   are a good way to forecast the trend of chicken prices?

Joseph Brink - Redirect

1          MR. BELLER:  Objection, relevance, 404(b).

2          MR. McLOUGHLIN:  Objection, Your Honor, also hearsay

3    particularly given the witness -- they asked him.  He couldn't

4    remember who told him what about this issue.  It's clearly

5    hearsay.

6          THE COURT:  I am going to sustain it on relevance

7    grounds.

8    BY MR. TORZILLI:

9    Q.  Sir, do you have an understanding of whether others beside

10   yourself in the chicken industry view corn and feed as a source

11   of information to forecast chicken prices?

12         MR. BELLER:  Same objection, Your Honor.

13         MR. McLOUGHLIN:  Also objection as to foundation, Your

14   Honor, as to what he would know and how he would know it.

15         THE COURT:  Sustained, relevance.

16         MR. TORZILLI:  May I confer?

17         THE COURT:  Yes.

18   BY MR. TORZILLI:

19   Q.  Sir, when you gave specific guidance to suppliers during

20   your negotiations with them, did you have an expectation as to

21   whether they would communicate that guidance with one another?

22   A.  No.

23         MR. McLOUGHLIN:  Object, Your Honor.  Assumes facts

24   that are simply not in evidence.

25         THE COURT:  I am going to sustain that objection.

Joseph Brink - Redirect

1              *MR. TORZILLI:*  Nothing further.

2              *THE COURT:*  All right.  Is Mr. Brink subject to

3    recall?  Okay.  Mr. Brink, you are excused.  Thank you very

4    much.

5              *THE WITNESS:*  Thank you.

6              Mr. McLoughlin?

7              *MR. McLOUGHLIN:*  Your Honor, I am informed that the

8    answer to the last question after the objection was sustained

9    is in the transcript.  We would request to strike the answer.

10             *THE COURT:*  Ladies and gentlemen, that answer of

11   Mr. Brink the jury should disregard because the Court did

12   sustain the objection, okay?

13             The United States may call its next witness.

14             *MS. CALL:*  Your Honor, we have some documents we would

15   like to offer into evidence at this time.

16             *THE COURT:*  Go ahead.

17             *MS. CALL:*  The government now offers Exhibit 559.

18             *THE COURT:*  All right.  Ladies and gentlemen, by prior

19   ruling Exhibit 559 has been admitted, however, with the

20   following limitation.  It should not be considered for the

21   truth of matters that Mr. Boarman said, but rather may only

22   be -- his statements may only be considered for the effect that

23   those statements have on the listener.

24             *MS. CALL:*  Permission to publish?

25             *THE COURT:*  You may.

Joseph Brink - Redirect

1          MS. CALL:  We will zoom in a little more because I

2     think the writing is small on this e-mail.

3          THE COURT:  All right.

4          MS. CALL:  Ms. Golshanara, could you zoom in on the

5     next e-mail?

6          THE COURT:  Everyone good?

7          Okay.  Next part.

8          Everyone good on that part?  Okay.

9          All right.  Next exhibit?  Was that it on that one?

10         MS. CALL:  Yes, it was.  Next is Government Exhibit

11    561.

12         THE COURT:  Ladies and gentlemen, Exhibit 561 has been

13    admitted but with the following limitation; namely, that the

14    statements of Mr. Brink should be considered for you not for

15    the truth of the matters asserted, but only for the effect of

16    those statements on the listener.

17         MS. CALL:  Permission to publish?

18         THE COURT:  Yes, you may.

19         MR. LAVINE:  Your Honor, this has already been

20    published to the jury once.  I believe it was already published

21    during Mr. Brink's testimony.

22         THE COURT:  You are quite right.  And it was admitted

23    too.  Thank you, Mr. Lavine.  Yes, so we don't need to do that,

24    go through that.

25         MS. CALL:  All right.  We can move on.  The next is

3344

Joseph Brink - Redirect

1   Exhibit 546.

2           THE COURT:  And by previous ruling, ladies and

3   gentlemen, that has been admitted.

4           MS. CALL:  Permission to publish?

5           THE COURT:  You may.

6           All right.

7           MS. CALL:  Next is government Exhibit 542.

8           THE COURT:  Ladies and gentlemen, this has been

9   admitted, but with the following limitation, that the

10  statements of Ms. Lawson should not be considered by you for

11  the truth of the matters asserted, but rather only for the

12  effect of those statements on the listener.

13          MS. CALL:  Permission to publish?

14          THE COURT:  You may.

15          MS. CALL:  Just for clarification, I believe the

16  portion on the right was under the portion on the left.

17          THE COURT:  All right.

18          MS. CALL:  If Ms. Golshanara could expand the next

19  portion.

20          THE COURT:  All right.

21          MS. CALL:  All right.  I believe there is one more

22  portion.

23          THE COURT:  Everyone good on this portion of the

24  exhibit?  Okay.  Thank you.

25          MS. CALL:  The next is Government's Exhibit 500.  And

                              3345
                    Joseph Brink - Redirect

 1   I will note that this was published on cross and redirect, but

 2   I don't believe the jurors got to see every portion of the

 3   document.

 4        THE COURT:  Okay.  Then it can be published.

 5        MR. LAVINE:  Your Honor, I believe this was

 6   republished on redirect, if I am correct, and I believe it was

 7   during direct.  I don't see the reason for it to be published

 8   again.

 9        THE COURT:  Well, the claim was that a portion of it

10   had not been shown to the jury.  I can't recall myself.

11        MR. LAVINE:  I'm not sure I can either, to be honest

12   with you.

13        MS. CALL:  I believe for the first page the witness

14   was just asked who the communications were between, but it was

15   never zoomed on.  And it was very far out and I don't believe

16   the jurors had an opportunity to read it.

17        THE COURT:  All right.  Let's just focus on those

18   portions that the government does not believe had been shown.

19        MR. LAVINE:  Thank you, Your Honor.

20        MR. McLOUGHLIN:  Your Honor, just for the record,

21   whatever portion the government wanted should have been shown

22   during Mr. Brink's direct.  This was a document which he was a

23   party and we object to their putting these exhibits on after he

24   was there and repeating it.

25        THE COURT:  Was it published to the jury in part -- I

Joseph Brink - Redirect

1    don't recall -- on direct?

2              MR. KORNFELD:  And in redirect, Your Honor.

3              MS. CALL:  On direct I believe -- nothing was shown on

4    direct.  It was then shown on cross.  And on redirect -- I will

5    note Mr. Brink is at the bottom the e-mail chain and it

6    continues between individuals in an e-mail chain he is not a

7    part of.  And I believe the witness on redirect was referred to

8    that part and asked who were the participants.

9              THE COURT:  Yeah, I think we will get bogged down if

10   we reshow exhibits, so a better procedure would be to make sure

11   to display the exhibit to the jury when it's used with a

12   witness, assuming that it was displayed to the jury as part of

13   that examination.

14             MS. CALL:  All right.  The next exhibit is 567 and at

15   this time we are seeking to admit but not publish.

16             THE COURT:  Ladies and gentlemen, by prior ruling

17   Exhibit 567 has been admitted.

18             Next?

19             MS. CALL:  The next is government 519-1.  I will note

20   519 is subject to prior ruling and -1 just has the top e-mail

21   in the chain redacted.

22             MR. KORNFELD:  Your Honor, excuse me, but I think this

23   one might be subject to a limiting instruction.

24             MS. CALL:  It is.

25             THE COURT:  I think, though, that, Mr. Kornfeld, was

3347

Joseph Brink - Redirect

1    the purpose of the -1.  Hold on.

2         MR. KORNFELD:  Your Honor, I think it's the statement

3    toward the bottom of the e-mail on -1.

4         THE COURT:  Okay.  Yeah, -1 contains a redaction, but

5    there is still a limiting instruction.

6         So ladies and gentlemen, Exhibit 519-1 is admitted,

7    but it's subject to the following limiting instruction; namely,

8    that statements of Mr. Long should be considered not for the

9    truth of the matters asserted, but rather only for the effect

10   that those statements may have on the listener.

11        MS. CALL:  Permission to publish?

12        THE COURT:  You may.

13        Everyone good on that part?

14        Okay, next.

15        MS. CALL:  Ms. Golshanara, if you can zoom in on the

16   next portion.

17        THE COURT:  All right.  We're good on that part.

18        MS. CALL:  May we move on to the next exhibit?

19        THE COURT:  Yes.

20        MS. CALL:  The next is Government Exhibit 109.

21        MR. KORNFELD:  Your Honor, I think this one might

22   also --

23        THE COURT:  Yes, it is.  I just found that.

24        Ladies and gentlemen, this is subject to a limiting

25   instruction too.  It may only be considered as against

3348
Joseph Brink - Redirect

1   Mr. Little.  Moreover, Mr. Bradley's statements should not be

2   considered for the truth of the matters asserted, but rather

3   only for the effect that those statements may have on the

4   listener.

5         MS. CALL:  Permission to publish?

6         THE COURT:  You may.

7         MS. CALL:  Perhaps if Ms. Golshanara could zoom in on

8   the content of the e-mail and we could cut out the signature

9   line.

10         THE COURT:  Everyone good on that one?  Okay.

11         MS. CALL:  If you could zoom in on an earlier portion

12   of the e-mail.

13         THE COURT:  All right.

14         MS. CALL:  All right.  The next portion, please?

15         THE COURT:  Everyone good on that part?  All right.

16         MS. CALL:  All right.  We can move up to the top of

17   that e-mail chain.

18         THE COURT:  All right.

19         MS. CALL:  The next is Government Exhibit 120.  And I

20   will note for Your Honor the next couple do have limiting

21   instructions.  Would you like me to flag them for you each

22   time?

23         THE COURT:  No.  I just need to find them in my notes

24   and I have 120.  Ladies and gentlemen, by previously ruling

25   Exhibit 120 is admitted, but not for the truth of the matter

3349

Joseph Brink - Redirect

1   asserted by Mr. Bradley, but only for the effect that his

2   statements might have on the listener.

3          MS. CALL:  Permission to publish?

4          THE COURT:  You may.

5          Everyone good on that one?  Okay.

6          MS. CALL:  We will move to the next e-mail in the

7   chain.

8          THE COURT:  All right.

9          MS. CALL:  And the last e-mail in the chain.

10          THE COURT:  All right.

11          MS. CALL:  The next is Government Exhibit 108.

12          THE COURT:  Ladies and gentlemen, by previous ruling

13   Exhibit 108 is admissible as to -- as against Mr. Little only.

14   Moreover, as to the statements of Mr. Bradley, they should be

15   considered not for the truth of the matter asserted, but only

16   for the effect that those statements may have on the listener.

17          MS. CALL:  Permission to publish?

18          THE COURT:  You may.  All right.

19          MS. CALL:  If we could move to the next portion of the

20   chain.

21          THE COURT:  All right.

22          MS. CALL:  And the top of that chain.

23          THE COURT:  All right.

24          MS. CALL:  Moving on, the next is Government Exhibit

25   114.

Joseph Brink - Redirect

1        THE COURT:  Ladies and gentlemen, this exhibit is

2   admissible for a limited purpose, namely that the statements of

3   Mr. Bradley should be considered by you not for the truth of

4   the matters asserted, but rather only the effect that those

5   statements have on the listener.

6        MS. CALL:  Permission to publish?

7        THE COURT:  You may.

8        All right.

9        MS. CALL:  If you could zoom in on the next e-mail in

10  the chain.

11       THE COURT:  All right.

12       MS. CALL:  And the top portion of the chain.

13       THE COURT:  All right.

14       MS. CALL:  Next is Government Exhibit 224.

15       THE COURT:  Ladies and gentlemen, this has been

16  admitted but with the following limitation, that statements by

17  Ms. Knust and Mr. Hannigan should be considered by you not for

18  the truth of the matters that they assert, but rather only for

19  the effect that those statements have on the listener.

20       MS. CALL:  Permission to publish?

21       THE COURT:  You may.  All right.

22       MS. CALL:  If Ms. Golshanara could zoom up in that

23  e-mail.  I think we can zoom down to the signature line.  Thank

24  you, Ms. Golshanara.

25       THE COURT:  All right.

Joseph Brink - Redirect

1          MS. CALL:  If we could just zoom to the top to show

2    the participants.

3          THE COURT:  Okay.

4          MS. CALL:  Next is Government's Exhibit 247.

5          THE COURT:  Ladies and gentlemen, by prior ruling this

6    has been admitted.  However, it can only be considered as

7    against Mr. Little.  Also the statements of Ms. Knust and also

8    Mr. Adams can be considered not for the truth of the matters

9    asserted by them, but rather only for the effect that those

10   statements may have on the listener.

11         MS. CALL:  Permission to publish?

12         THE COURT:  You may.  Okay.

13         MS. CALL:  If we could zoom in on the top portion of

14   the chain.

15         THE COURT:  All right.

16         MS. CALL:  All right.  There is two more.  The next is

17   Government Exhibit 6134.

18         MS. HENRY:  Excuse me, I believe that one was refused.

19         THE COURT:  Let me check that.

20         MS. HENRY:  Can you check that, please?  I may be

21   wrong.

22         THE COURT:  Yeah, ladies and gentlemen, that has been

23   admitted.

24         MS. CALL:  Permission to publish?

25         THE COURT:  You may.  All right.

Joseph Brink - Redirect

1        MS. CALL:  The next is government Exhibit 221.

2        THE COURT:  Ladies and gentlemen, Exhibit 221 has been

3   admitted, but as to statements of Mr. Hannigan, Ms. Knust,

4   Mr. Scheiderer, Mr. Bowlin and Mr. Ramsey not for the truth of

5   the matters they assert, but rather only for the effect that

6   those statements may have on the listener.

7        MS. CALL:  Your Honor, I believe one more individual

8   on that list would be Mr. Lubert.

9        THE COURT:  Yes.  And he is there too, so the same

10  goes for Mr. Lubert.

11       MS. CALL:  Permission to publish?

12       THE COURT:  You may.  All right.

13       MS. CALL:  If Ms. Golshanara could please move up in

14  the chain.

15       THE COURT:  All right.

16       MS. CALL:  And continuing up in the chain, please.

17       THE COURT:  All right.

18       MS. CALL:  Please move up in the chain,

19  Ms. Golshanara.

20       THE COURT:  All right.  There is two e-mails in the

21  chain, so the second to the last is up now.  All right.

22       MS. CALL:  And now the top e-mail in the chain.

23       THE COURT:  All right.

24       MS. CALL:  The government will now call its next

25  witness and I will cede the podium to Ms. Butte.

Robert Dawson - Direct

1        THE COURT:  Ms. Butte, go ahead.

2        MS. BUTTE:  The United States calls Robert Dawson.

3    (**Robert Dawson** was sworn.)

4        THE WITNESS:  I do.

5        COURT DEPUTY CLERK:  Please state your name and spell

6    your first and last name for the record.

7        THE WITNESS:  My name is Robert Francis Dawson,

8    R-O-B-E-R-T, F-R-A-N-C-I-S, D-A-W-S-O-N.

9                    **DIRECT EXAMINATION**

10   BY MS. BUTTE:

11   Q.  Good afternoon, Mr. Dawson.

12        Where do you work?

13   A.  I work at Sysco Foods.

14   Q.  How long have you worked at Sysco foods?

15   A.  Almost four years.

16   Q.  What is your job title?

17   A.  Senior cyber analyst.

18   Q.  Could you describe your responsibilities in that position?

19   A.  I conduct electronic investigations in support of Sysco

20   legal, HR, and ethics and compliance.

21   Q.  Where were you employed before Sysco?

22   A.  KPMG.

23   Q.  What did you do there?

24   A.  Similar role.  I supported the office of general counsel by

25   performing electronic investigations as well.

Robert Dawson - Direct

1  Q.  Were you employed somewhere before KPMG?

2      MR. SCHALL:  I would object to his relevance of his

3  prior employment as a custodian.

4      THE COURT:  Overruled.

5  A.  Prior to that I worked at the Harris County Precinct 5

6  Constable's Office in Harris County, Texas as a patrol deputy.

7  BY MS. BUTTE:

8  Q.  And what were your responsibilities there?

9  A.  As a patrol deputy, cover all aspects of law enforcement

10  out in the community as well as in the office including

11  training new officers.  And I was also assigned to the FBI's

12  computer forensics lab for almost three years at the end of

13  that job.

14  Q.  As part your position at Sysco, are you familiar with the

15  domain name for Sysco?

16  A.  Yes.  It's sysco.com.

17  Q.  What is the process for assigning e-mail addresses at

18  Sysco?

19  A.  The process currently is first name.last name@sysco.com.

20  Q.  Was there a different process before that?

21  A.  Yes.  It was.  Before then it was last name.first name@

22  your location.sysco.com.

23  Q.  Are you familiar with how Sysco creates, manages, stores

24  and retrieves its e-mails and attachments?

25  A.  I am.

Robert Dawson - Direct

1   Q.   How are e-mails stored?

2   A.   We use the Office 365.

3   Q.   Are e-mails with the Sysco domain stored on Sysco's

4   systems?

5   A.   Yes.

6   Q.   How are attachments to those e-mails stored?

7   A.   Within the same system.

8   Q.   Are e-mails and attachments that are sent from and received

9   by an e-mail with a Sysco domain automatically saved on Sysco's

10  systems?

11  A.   They are.

12  Q.   Are you familiar with the header information in an e-mail

13  transmission?

14  A.   I am.

15  Q.   When you look at the header information in an e-mail, what

16  types of information is reflected?

17  A.   You'll see information about the sender, the recipient, the

18  subject and date, time.

19  Q.   For the date and time, are those fields recorded by Sysco's

20  systems for each e-mail and attachment that passes through its

21  system?

22  A.   They are.

23  Q.   Are those fields automatically generated?

24  A.   They are.

25  Q.   To the best of your knowledge, is that process reliable?

Robert Dawson - Direct

1    A.   Yes.

2    Q.   To the best of your knowledge, is that process accurate?

3    A.   It is.

4    Q.   For the names that are listed in an e-mail header, are

5    those fields automatically generated?

6    A.   They are.

7    Q.   To the best of your knowledge, is that process reliable?

8    A.   Yes.

9    Q.   And to the best of your knowledge, is that process

10   accurate?

11   A.   It is.

12   Q.   Did you have any responsibilities for collecting documents

13   for Sysco to produce in a matter?

14   A.   I have.

15   Q.   Are you familiar with how e-mails and attachments are

16   retrieved and copied by Sysco for that document collection?

17   A.   I am.

18   Q.   Could you describe that process?

19   A.   Yes.  The Office 365 has a content search portion and it's

20   the native to the Office 365.  It's their built-in collection

21   system.

22   Q.   And who retrieved and copied the documents for that Sysco

23   document collection?

24   A.   I did.

25   Q.   When did you do that?

Robert Dawson - Cross

1    A.  It was early 2019.

2    Q.  To the best of your knowledge, was that document collection

3    process reliable?

4    A.  Yes.

5    Q.  To the best of your knowledge, was that document collection

6    process accurate?

7    A.  Yes.

8    Q.  What did you do with the documents after you retrieved and

9    copied them?

10   A.  At the direction of Sysco legal, I uploaded them to the

11   vendor that was selected by Sysco legal department.

12   Q.  Did you alter or change the documents in any way before you

13   provided them to the vendor?

14   A.  No.

15   Q.  To the best of your knowledge, are the documents that you

16   provided to the vendor true and accurate copies of the original

17   e-mails and attachments that were maintained on Sysco's

18   systems?

19   A.  Yes.

20            MS. BUTTE:  May I have a moment to confer?

21            THE COURT:  You may.

22            MS. BUTTE:  No further questions.

23            THE COURT:  Thank you.

24            Mr. Schall, go ahead.

25                          **CROSS-EXAMINATION**

Robert Dawson - Cross

1   *BY MR. SCHALL:*

2   Q.   Mr. Dawson, my name is Frank Schall.  I represent

3   Mr. Lovette.  I just have a few questions for you.

4   A.   Sure.

5   Q.   So you started with Sysco in March of 2018; is that right?

6   A.   Yes.

7   Q.   And you discussed the process by which e-mails and their

8   attachments are captured and stored in the Microsoft 365,

9   correct?

10  A.   Yes.

11  Q.   But at some time prior to when you started at Sysco, Sysco

12  stored its e-mail in a different fashion, didn't it?

13  A.   As I understand it, yes.

14  Q.   And those were servers that were located at Sysco, correct?

15  A.   Correct.

16  Q.   And at some point before you started your job at Sysco,

17  Sysco transferred that information to the Microsoft 365,

18  correct?

19  A.   Yes.

20  Q.   You were not a part of that transfer process?

21  A.   I was not.

22  Q.   You don't know when it took place?

23  A.   Not specifically, no.

24  Q.   Okay.  And so -- okay.  So the documents that you -- that

25  Sysco produced, you said you collected those in early 2019?

Robert Dawson - Cross

1    A.   That's correct.

2    Q.   So anything that was produced recently within the last

3    month, you weren't a part of that production or collection?

4    A.   I don't remember anything from the last month.

5    Q.   Okay.  And so do you know when Sysco had its e-mails and

6    attachments stored at Sysco, do you know what time zone those

7    were stored in?

8    A.   I don't.

9    Q.   And so when Sysco moved to the Microsoft 365 servers, do

10   you know what time zone those e-mails were stored in at the

11   server?

12   A.   I was not part of the migration.  I don't know.

13   Q.   But even after that for anything after the migration, do

14   you know what time zone that the Microsoft servers capture the

15   e-mails in?

16   A.   I don't.

17   Q.   All of the documents that you identified, collected and

18   provided to the vendor, all of those documents were pulled

19   outside of the Microsoft 365 server, correct?

20   A.   Not outside.  They were extracted from the Office 365.

21   Q.   Thank you for clarifying.  So everything was from the

22   Microsoft 365 server.

23   A.   Yes.

24   Q.   So they would have to be all e-mails and their attachments?

25   A.   I am sorry?

Robert Dawson - Cross

1   Q.  They were all e-mails and their attachments if there were

2   any attachments?

3   A.  I didn't look inside of what was extracted, so I don't know

4   what was contained within.

5   Q.  Okay.

6        MR. SCHALL:  Your Honor, I would like to hand up a

7   binder of six documents through Ms. Grimm, if possible.

8        THE COURT:  All right.

9   BY MR. SCHALL:

10  Q.  Could you open that and take a look at the different

11  documents behind the tabs?

12  A.  Okay.

13  Q.  Are you through reviewing?

14  A.  Yes, sir.

15  Q.  Okay.  So just for the record, what I've handed you are

16  documents Defense Exhibit G-078, G-094, G-114, G-115, I-206,

17  and I-207; is that right?

18  A.  I see tabs that are named that way, yes, sir.

19  Q.  Do you recognize those documents as documents that are

20  produced by Sysco with a prefix on the bottom right?

21  A.  I can't identify that because I was not part of this part

22  of the production.

23  Q.  Okay.  Do you identify the documents that are in there

24  relate to the custodians that you were responsible for pulling

25  e-mails for?

Robert Dawson - Cross

 1   *A.*   That I can't say either.  I didn't look at what was -- the

 2   messages individually that were being extracted.  They were in

 3   PST form, which is a container file with thousands of e-mails

 4   that I didn't open and observe the contents.

 5   *Q.*   Okay.  Do you remember the list of the custodians you were

 6   responsible for identifying?

 7   *A.*   Not all of them, no.

 8   *Q.*   So in regard to your identification and collection of

 9   e-mails and attachments from the Microsoft 365 server, you have

10   already testified about that process, correct?

11   *A.*   Yes.

12   *Q.*   You had already testified you thought that process was

13   accurate, was reliable?

14   *A.*   Yes.

15   *Q.*   I am sorry, going back to accurate as a verbal response,

16   was it accurate?

17   *A.*   Yes.

18   *Q.*   Yes.  And so all the documents that you identified,

19   collected and provided to the vendor all went through the exact

20   same process; would that be fair?

21   *A.*   Yes.

22   *Q.*   Same level of reliability?

23   *A.*   Yes.

24   *Q.*   Same level of accuracy to all those documents?

25   *A.*   Yes.

3362

Robert Dawson - Redirect

1          MR. SCHALL:  Your Honor, one moment.

2          THE COURT:  Yes.

3          MR. SCHALL:  No other questions, Your Honor.

4          THE COURT:  Thank you, Mr. Schall.

5          Additional cross-examination?

6          All right.  Redirect?

7                    **REDIRECT EXAMINATION**

8    BY MS. BUTTE:

9    Q.  Mr. Dawson you testified that Sysco's documents used to be

10   on servers that were on premises; is that correct?

11   A.  As I understand it, yes.

12   Q.  Are you aware of any issues with the transfer of documents

13   from Sysco's on-premises servers to the Microsoft 365 system?

14   A.  None that I'm aware of.

15          MS. BUTTE:  I have no further questions.

16          THE COURT:  Thank you very much, Mr. Dawson.  You are

17   excused.

18          Ladies and gentlemen, just in time for the

19   mid-afternoon break.  We will go ahead and break.  Let's plan

20   on reconvening 25 minutes to 4:00.  The jury is excused.  Thank

21   you.

22          (Jury excused.)

23          Recess at 3:15 p.m.)

24          (Reconvened at 3:39 p.m.)

25          THE COURT:  All right.  Let's get the jury back in.

Melissa Hoyt - Direct

1              (Jury present.)

2              THE COURT:  Ms. Sweeney, the United States may call

its next witness.

4              MS. SWEENEY:  Thank you, Your Honor.  The United

States calls Melissa Hoyt.

6          (**Melissa Hoyt** was sworn.)

7              THE WITNESS:  Yes.

8              COURT DEPUTY CLERK:  Please state your name and spell

your first and last name for the record.

10             THE WITNESS:  It's Melissa Hoyt, M-E-L-I-S-S-A,

H-O-Y-T.

12                        **DIRECT EXAMINATION**

13   BY MS. SWEENEY:

14   Q.  Good afternoon, Ms. Hoyt.

15   A.  Hi.

16   Q.  Have you ever used a different name professionally?

17   A.  Yes.

18   Q.  And what name is that?

19   A.  Melissa Swain.

20   Q.  Could you spell the Swain, please?

21   A.  Yes, S-W-A-I-N.

22   Q.  Are you employed?

23   A.  Yes.

24   Q.  Where do you work?

25   A.  Sysco Corporation.

Melissa Hoyt - Direct

 1   *Q.*   What's the city and state of your work location?

 2   *A.*   Houston, Texas.

 3   *Q.*   And what's the city and state of Sysco Corporation's

 4   headquarters?

 5   *A.*   Houston, Texas.

 6   *Q.*   Do you work at headquarter?

 7   *A.*   Yes, ma'am.

 8   *Q.*   How long have you been employed at Sysco Corporation?

 9   *A.*   I have been employed with Sysco since 1996; 25 years.

10   *Q.*   So 25 years, is that what you said?

11   *A.*   Yes.

12   *Q.*   Briefly, what type of business is Sysco?

13   *A.*   Sysco is a food service distribution company.

14   *Q.*   What type of customers use Sysco's services?

15   *A.*   Sysco's services anywhere where you can eat food away from

16   home, so restaurants, schools, hospitals, stadiums, anywhere

17   where food is consumed outside of the home.

18   *Q.*   So what type of products does Sysco sell to restaurants?

19   *A.*   We sell food products obviously.  We sell disposables.  We

20   sell anything from the food that you eat to the restroom

21   materials that you may need to wash your hands.

22   *Q.*   And what type of products does Sysco sell to hospitals?

23   *A.*   The same type.

24   *Q.*   Now, does Sysco headquarters directly sell the goods and

25   services to the restaurants and hospitals?

3365

Melissa Hoyt - Direct

1   A.   No.

2   Q.   Are you familiar with the term operating company?

3   A.   Yes.

4   Q.   What is an operating company?

5   A.   An operating company is our warehousing system, so that's

6   where the food is stored and shipped into and shipped from to

7   the restaurants.

8   Q.   So does Sysco have operating companies?

9   A.   Yes.

10  Q.   And generally how do products flow from the suppliers to

11  customers?

12  A.   The operating companies place an order for the products

13  from the suppliers.  The suppliers -- either we pick it up or

14  the suppliers ship it to our operating companies.  And then we

15  receive that product into the warehouses, the operating

16  companies, and then we ship it to the customers from there.

17  Q.   What's your current position at Sysco?

18  A.   I am senior director of strategic sourcing.

19  Q.   And how long have you been the senior director of strategic

20  sourcing?

21  A.   Give me just a second.  I have to back into my resume.

22  Since about 2012, 2013.

23  Q.   So is it fair to say about eight years?

24  A.   That's about fair.

25  Q.   Have you held other positions at Sysco?

Melissa Hoyt - Direct

1    A.   Yes, ma'am.

2    Q.   What were those other positions?

3    A.   I started Sysco in 1996 as a merchandising manager at the

4    operating company in Houston.  I then became the poultry and

5    seafood buyer in that same location.  In 2004 I transferred to

6    the corporate office where I became the poultry product

7    manager.  Then in about 2008 I became the sourcing manager,

8    about 2012 a director of sourcing and about 2013 the senior

9    director of sourcing.

10   Q.   Did you have any positions before you joined Sysco?

11   A.   I did.

12   Q.   What was your employment before you joined Sysco?

13   A.   I worked for a company called McLane Foods out of Lubbock,

14   Texas.

15   Q.   What type of company is McLane Foods?

16   A.   They are also a distribution company.

17   Q.   Distribution of what?

18   A.   They distribute food and materials to like convenience

19   stores.

20   Q.   How long were you at McLane?

21   A.   Roughly four years.

22   Q.   So in total how long have you been in the food distribution

23   industry?

24   A.   Just under 30 years.

25   Q.   In that just under 30 years, have you had responsibility

Melissa Hoyt - Direct

1    for the purchases of poultry?

2    A.   Yes, ma'am.

3    Q.   And of those almost 30 years, for how many of those years

4    has poultry been a part of your responsibility?

5    A.   I have been working with poultry since 2000.

6    Q.   So fair to say 21 years?

7    A.   Yes.

8    Q.   Do you have any education after high school, Ms. Hoyt?

9    A.   I do.

10   Q.   Where did you go?

11   A.   I went to Sam Houston State University.

12   Q.   What did you study?

13   A.   I studied business.

14   Q.   What degree did you get?

15   A.   I have an MBA.

16   Q.   So turning back to your position as the senior director of

17   strategic sourcing, what does sourcing mean?

18   A.   Sourcing is the process that we use to procure and

19   negotiate with our suppliers for supply.

20   Q.   So are you responsible in your position as senior director

21   of strategic sourcing for buying products?

22   A.   No, ma'am.

23   Q.   So who would be responsible for that?

24   A.   The buyers at the operating company actually place the

25   purchase orders.

Melissa Hoyt - Direct

1    Q.  So how are you in your position involved in procurement?

2    A.  My team actually negotiates with the suppliers, so we set

3    the programs that our operating companies can purchase from.

4    So we determine who the suppliers are, the terms and contract

5    around those suppliers, how we are going to engage business

6    with them and the cost we're going to pay.

7    Q.  So you and your team negotiate the contracts, and the

8    operating companies buy the products; is that fair?

9    A.  That's correct.

10   Q.  As the senior director of strategic sourcing, what are your

11   primary responsibilities?

12   A.  I oversee bakery and convenience and protein areas of beef,

13   pork and poultry.

14   Q.  Do you have any direct reports?

15   A.  I do.

16   Q.  What are the titles of your direct reports?

17   A.  I have two direct reports that are both directors of

18   strategic sourcing.

19   Q.  Do they have any direct reports?

20   A.  They do.

21   Q.  What are those positions?

22   A.  They each have four sourcing managers that report to them.

23   Q.  Now, you mentioned earlier that you held the titles of

24   sourcing manager and sourcing director.  Did you hold these

25   positions before you took your current position?

3369
Melissa Hoyt - Direct

1    A.  I did.

2    Q.  Now, you said that one of the sourcing teams you oversee is

3    responsible for beef, pork and poultry; is that right?

4    A.  Yes, ma'am.

5    Q.  What is included in poultry?

6    A.  We have poultry broken out into three different areas.  We

7    consider turkey, fresh chicken and further processed chicken

8    part of our poultry area.

9    Q.  So in the beef, pork and poultry category, what's the

10   relative size of chicken as compared to the rest of the

11   category?

12   A.  It's a larger category.  It's a pretty substantial amount.

13   Q.  When you say it's a larger category, what specifically are

14   you referring to?

15   A.  We deal in pounds when it comes to meat and it's a much

16   larger per pound category than beef or pork.

17   Q.  And are you talking about chicken specifically or poultry

18   more generally?

19   A.  Chicken specifically, but the fresh chicken and the further

20   processed chicken.

21   Q.  Could you estimate approximately how much chicken Sysco

22   purchases per year?

23   A.  I don't know those numbers off the top of my head, but it

24   is several hundred million pounds.

25   Q.  And that's several hundred million pounds per year?

Melissa Hoyt - Direct

1    A.   Yes, ma'am.

2    Q.   So for the beef, pork and poultry category, how frequently

3    are contracts negotiated?

4    A.   They are usually negotiated about every two to --

5         MR. FAGG:   Objection, Your Honor, to relevance.  Can

6    we be heard on side bar?

7         THE COURT:   Yes.

8       (At the bench:)

9         THE COURT:   Go ahead, Mr. Fagg.

10        MR. FAGG:   Sure, Your Honor.  I allowed this

11   questioning to go on to lay some background and some experience

12   of this witness, but any questions about negotiating contracts

13   and even within the poultry industry is simply irrelevant to

14   Sysco as it relates to the Indictment and what we believe that

15   the evidence in this case is.  And the issue related to Sysco

16   relates to credit terms.  It doesn't relate to negotiating

17   contracts with the poultry suppliers, so we object on relevance

18   grounds.

19        THE COURT:   All right.  Ms. Sweeney, response?

20        MS. SWEENEY:   Yes, Your Honor.  I believe the witness

21   is about to testify that before 2016 pricing terms were

22   negotiated as part of contracts.  And what's alleged in the

23   Indictment is when Sysco decided to take pricing terms out of

24   the negotiation of contracts and they negotiated pricing terms

25   separately.  So it is background -- it lays background for

Melissa Hoyt - Direct

1    what's alleged in the Indictment.

2          THE COURT:  How much detail is she going to go into in

3    terms of negotiations?  I am not sure if there is a time period

4    specified in the question.

5          MS. SWEENEY:  Your Honor, I was going to ask how

6    frequently the negotiations take place and then the terms

7    typically negotiated which will include pricing terms, and then

8    asking about the switch of specifically focusing on pricing

9    terms before 2016 that pricing terms were negotiated

10   individually with the contract and after 2016 the transition to

11   taking pricing terms out of the contract.

12         THE COURT:  Anything else, Mr. Fagg?

13         MR. FAGG:  Yes, Your Honor.  I think that there is an

14   element of confusion in this because what they are talking

15   about in the Indictment are credit terms and how long different

16   suppliers Sysco would have to pay different suppliers.  If they

17   are talking about pricing, that's going to be a phrase that's

18   confusing to the jury, which is why we are objecting to

19   relevance.

20         THE COURT:  Ms. Sweeney, anything else?

21         MS. SWEENEY:  To that point, Your Honor, just that

22   Ms. Hoyt is prepared to explain what a pricing term is in

23   relation to how long Sysco has to pay the bills for the chicken

24   it purchases.  And all of this is in the Indictment.

25         THE COURT:  Okay.  And what do you anticipate the

Melissa Hoyt - Direct

1    answer will be when she explains what a pricing term is?

2         *MS. SWEENEY:*  At first she will describe -- I am

3    sorry, I used -- I meant payment term.  First she will describe

4    it is a payment that Sysco is paying the suppliers for the

5    goods it receives.  Then she will describe the different

6    payment terms.  There are net payment terms and cash discount

7    payment terms.

8         *THE COURT:*  But she is not going to frame her

9    testimony as far as you know in terms of a pricing term?

10        *MS. SWEENEY:*  No, Your Honor.  And I misspoke when I

11   said pricing term.  I meant to say payment term, so what's

12   alleged and what I plan to elicit is about payment terms.  That

13   was my misstatement.

14        *THE COURT:*  Mr. Fagg, anything else?

15        *MR. FAGG:*  Sorry, Your Honor.  No, as long as it's

16   referred to as payment terms, nothing further.

17       (In open court:)

18        *THE COURT:*  Go ahead, Ms. Sweeney.

19   *BY MS. SWEENEY:*

20   *Q.*  Ms. Hoyt, how frequently are the beef, pork and poultry

21   contracts negotiated?

22   *A.*  They were usually negotiated every two to three years.

23   *Q.*  How frequently are the chicken supply contracts negotiated?

24   *A.*  The same.

25   *Q.*  So I would like to direct your attention to negotiations

Melissa Hoyt - Direct

1    for chicken purchases.  In your current role are you

2    involved -- let me take one step back.  In 2016 in your role,

3    were you involved, personally involved in these negotiations?

4            MR. FAGG:  Objection, vague.

5            THE COURT:  Sustained.  Which negotiations?

6    BY MS. SWEENEY:

7    Q.  So Ms. Hoyt, turning to -- focusing on the year of 2016,

8    were you personally involved in negotiations for chicken

9    contracts?

10   A.  In some of them, yes.

11           MR. FAGG:  Same objection.

12           THE COURT:  Overruled.

13   A.  In some of them, yes, ma'am.

14   BY MS. SWEENEY:

15   Q.  And in which?

16   A.  Different negotiations.  I typically step in on some of the

17   harder negotiations.  My team can usually handle some of the

18   less complicated ones.

19   Q.  When you say the harder negotiations in the chicken --

20   broiler chicken contract, are there any in particular that

21   you're talking about?

22   A.  I would have been involved in a fresh chicken contract.  I

23   would have also been involved in a further processed contract.

24   Q.  Directing your attention to 2016, which chicken suppliers

25   did Sysco source from?

Melissa Hoyt - Direct

1   A.   We sourced from just about every chicken supplier that you

2   could think of, most of the suppliers out there, a lot of the

3   big names that you would recognize like Tyson, Sanderson Farms,

4   Pilgrim's Pride, George's, Mar-Jac, several suppliers that we

5   buy and negotiate with.

6   Q.   And in 2016 did Sysco source from Koch Foods?

7   A.   Yes, ma'am.

8   Q.   So when you were involved in these chicken contract

9   negotiations, who did you negotiate with?

10  A.   Well, we would negotiate directly with the suppliers.

11  Q.   Did you negotiate with each supplier independently?

12  A.   Yes, ma'am.

13  Q.   Now, when you negotiated these contracts with chicken

14  suppliers, what terms were negotiated?

15  A.   In reference to terms, what do you mean?

16  Q.   What terms were being negotiated in the annual or

17  semiannual -- or every two to three-year chicken supply

18  contracts?

19  A.   So we would negotiate legal agreements.  We would negotiate

20  what we call terms and conditions of it, so that would include

21  things like lead times, quantities, locations, sample policies,

22  broker policies.  We also would negotiate the cost, the length

23  of the contract, just about everything that the contract

24  involved.

25  Q.   Prior to -- are you familiar with the term payment term?

Melissa Hoyt - Direct

1    A.   Yes.

2    Q.   Prior to 2016 would you negotiate payment terms as part of

3    your contracts?

4    A.   Not necessarily.  In some instances we might have, but we

5    didn't negotiate payment terms too hard prior to that.

6    Q.   So before 2016 how did Sysco negotiate payment terms with

7    its suppliers, chicken suppliers specifically?

8    A.   In most cases, we accepted payment terms that suppliers

9    offered.

10   Q.   So can you give an example of what that would look like for

11   the different chicken suppliers?

12   A.   Sure.  Payment terms could range anywhere from net 30 to

13   net seven.  They could have a cash discount which might be

14   2 percent or 1 percent.  They would be all over the board.

15   Q.   And I'm sorry, Ms. Hoyt.  For the next answer could you

16   just lean into the microphone?

17   A.   Sorry.

18   Q.   Did there come a time when that changed?

19   A.   Yes.  In 2016 we standardized our payment terms.

20   Q.   Can you describe what you mean when you say you

21   standardized your payment terms?

22   A.   Sure.  We defined payment terms that we were going to

23   request from suppliers.  And we told our supplier community

24   that we were now going to have a standardized payment term

25   policy that we expected them to abide by.

3376

Melissa Hoyt - Direct

1  Q.  Were you involved in the standardization process?

2  A.  Yes, ma'am.

3  Q.  Were you concerned that Sysco would not get the

4  standardized terms with the chicken suppliers?

5          MR. FAGG:  Objection, leading.

6          THE COURT:  Sustained.

7  BY MS. SWEENEY:

8  Q.  Did you have an understanding as to whether Sysco would be

9  able to get these standardized terms with the chicken

10  suppliers?

11  A.  Yes.

12  Q.  What was the basis of that understanding?

13  A.  As we rolled out the payment term policy, our original

14  rollout depending on if it was a cash discount supplier, a net

15  supplier, our initial rollout was for net 65 with net term

16  suppliers.  I had gotten a lot of feedback from the supplier

17  community that net 65 was not a reasonable ask and that most of

18  the suppliers would not be able to abide by that.  It wasn't

19  just with poultry.  I did get that same feedback on pork as

20  well, but I did receive feedback that concerned me about being

21  able to get to a net 65 days.

22  Q.  So what, if anything, did you do as a result?

23  A.  So I did some deep analysis on that after I had gotten that

24  feedback from many of my suppliers.  What I did was I went in

25  and did an analysis to understand what kind of terms we were

Melissa Hoyt - Direct

1   getting across the board from our suppliers in those areas and

2   what we could do to maybe average that and come to a more

3   realistic ask that the suppliers could live with, figured out

4   what that should be.

5         I ended up doing different terms for pork and

6   different terms for poultry so they are not the same for either

7   of those categories because they didn't warrant being the same

8   for those categories.  Once I revealed all of that, I went to

9   my senior vice-president and I made a case to him that I

10  thought we should modify our ask.  And he agreed to do that.

11  Q.  When you say modify your ask, what categories were you

12  modifying the ask for?

13  A.  Pork and poultry.

14  Q.  And does poultry include chicken?

15  A.  Yes.

16  Q.  Was your recommendation adopted?

17  A.  It was.

18  Q.  For which suppliers?

19  A.  For all the chicken and pork suppliers, but we did have it

20  broken down into two different areas.

21  Q.  And what were those areas?

22  A.  So we looked at suppliers that we call harvest suppliers,

23  so those are suppliers where they are actually slaughtering an

24  animal.  And we set one type of term for a supplier that was

25  actually harvesting and slaughtering animals because those

3378

Melissa Hoyt - Direct

1    suppliers were buying directly from farmers where they were

2    obligated to pay the farmer within 48 hours.  I believe that's

3    the rule.

4         And then the other was suppliers that qualified --

5    what we called the further processed suppliers, meaning they

6    weren't actually slaughtering animals or harvesting animals.

7    They were buying carcasses and further processing them.  So we

8    had import.  We had a set of terms for suppliers that were

9    called harvest facilities and a different set for the further

10   processed and then the same thing in the poultry.

11   Q.  So after your recommendation was adopted, did Sysco

12   continue to seek standardized terms?

13   A.  We did.

14   Q.  Including for chicken suppliers?

15   A.  We did.

16   Q.  And were those the new shorter terms that you just

17   described?

18   A.  Yes, ma'am.

19   Q.  Were you involved in the implementation of these new terms?

20   A.  Yes.

21   Q.  What steps were taken internally at Sysco as part of that

22   implementation?

23   A.  So there were several steps that were taken.  We did a

24   rollout phase, if you will.  We rolled out the -- we broke the

25   news to our supplier community from our CFO in a letter.  And

Melissa Hoyt - Direct

1   then we followed up with an individual letter that came

2   directly from the senior directors like myself in different

3   protein -- or in the different category areas.  And we followed

4   up individually with suppliers and then we began continuing

5   those conversations as need.  So if a supplier agreed to our

6   terms policy, then we got a signed document to state that they

7   agreed to it and we didn't have to have that conversation

8   again.  If a supplier didn't agree, then we began negotiating

9   with that supplier.

10  Q.  Were you involved in that rollout?

11  A.  I was.

12  Q.  Are you familiar with the term letters campaign?

13  A.  Yes.

14  Q.  What do you understand the term letters campaign to mean?

15  A.  That was what I was just explaining.  We had a series of

16  letters.  The first letter was from our CFO announcing the new

17  term policy.  And then the second set of letters were from our

18  senior directors that were more geared towards individual

19  suppliers.

20  Q.  So focusing on the first letter that you described, who was

21  that from?

22  A.  That was from our CFO.

23  Q.  And who was that sent to?

24  A.  To our supplier community.

25  Q.  Was that sent to broiler chicken suppliers?

3380

Melissa Hoyt - Direct

1    A.   Yes.

2    Q.   And who was the CFO?  Who sent that letter?

3    A.   At the time it was a gentleman named Joel Grade.

4    Q.   You then described a second letter; is that right?

5    A.   Yes.

6    Q.   Who sent that letter?

7    A.   Myself and my peers.

8    Q.   So who did you send that letter to?

9    A.   So I would have sent that to select suppliers within the

10   bakery/convenience or the pork/poultry areas.

11   Q.   Did you send it to all of your suppliers in those areas?

12   A.   I didn't necessarily personally send it to all suppliers.

13   I sent it to most of them, though.

14   Q.   And do those areas include broiler chicken suppliers?

15   A.   Yes.

16   Q.   Were those letters sent at or around the same time?

17   A.   Yes.

18   Q.   What information was conveyed in that letter that you

19   wrote?

20   A.   I was just reiterating the original letter from our CFO,

21   and then it would have an attachment which was basically a

22   document that we were asking the supplier to sign with our new

23   terms and agree to the terms.

24   Q.   When you say the new terms, are you talking about the new

25   payment terms that you just described?

Melissa Hoyt - Direct

1   A.   Correct.

2   Q.   Now, let's focus on the word payment term.  Generally what

3   is a payment term?

4   A.   Payment term is the amount of time that you have to pay

5   your bill.

6   Q.   So let's take that step by step.  Starting with the word

7   payment, who is paying whom?

8   A.   Sysco would be paying the supplier.

9   Q.   And what is Sysco paying the supplier for?

10   A.   The products and goods that the supplier has sold us.

11   Q.   And what does the word term refer to in the term payment

12   terms?

13   A.   It's the length of time before the bill has to be paid.

14   Q.   So what measure of time is used to describe the term?

15   A.   Usually it's days.

16   Q.   And what specifically does the number of days measure?

17   A.   It's the amount of days from the date that we receive the

18   PO until when we have to pay the invoice.

19   Q.   So what is a PO?

20   A.   It's a purchase order.

21   Q.   And then what is an invoice?

22   A.   It's the bill for that purchase order.

23   Q.   So the payment term refers to the number of days that Sysco

24   has to pay essentially the bill that it receives for the

25   chicken that it purchases?

Melissa Hoyt - Direct

1   A.   Yes.

2   Q.   When you talk about payment terms, is it only talked about

3   in terms of the number of days?

4   A.   No.  It can be a cash discount term.

5   Q.   So let's start with -- are you familiar with the term net?

6   A.   Yes.

7   Q.   What does the term net mean?

8   A.   So net is just a -- you have so many days to pay the full

9   invoice.

10   Q.   So does net refer to the number of days or the full

11   invoice?

12   A.   Net is the amount of time.  So for instance, if you have a

13   net 30 supplier, it means that from the date that you receive

14   the PO, you have 30 days to pay that PO's bill.

15   Q.   And when Sysco has a net 30 payment term, does it pay the

16   full bill?

17   A.   Yes.

18   Q.   Now, you described the word discount.  Can you describe

19   what you were talking about there?

20   A.   Sure.  We have some suppliers that have what we call a cash

21   discount.  And so that is an amount that the supplier is

22   willing to give us off of our invoice for paying that invoice

23   in a shorter amount of time.

24   Q.   So can you give a practical example of what a cash discount

25   would look like in terms of payment terms?

3383
Melissa Hoyt - Direct

1    A.   Sure.   We have a supplier that has a 2 percent net 2 cash

2    discount.

3    Q.   And so what does that mean, the 2 percent net 2 cash

4    discount?

5    A.   Sure.   That means that Sysco would pay 98 percent of that

6    invoice if they paid that invoice within two days.

7    Q.   And there are some poultry suppliers that are discount

8    suppliers?

9    A.   We have a few, yes.

10   Q.   Are there poultry suppliers that are net suppliers?

11   A.   Yes.

12   Q.   Are there chicken suppliers that are discount suppliers?

13          MR. LAVINE:   Your Honor, could we have a side bar,

14   please?

15          THE COURT:   Yes.

16      (At the bench:)

17          THE COURT:   Go ahead, Mr. Lavine.

18          MR. LAVINE:   Yes, Your Honor.   I am going to object to

19   the constant reference to chicken suppliers.   We know from the

20   Indictment that this has nothing to do with either Mr. Brady or

21   Mr. Fries, but this is almost tainting all of the chicken

22   suppliers.   And that is highly inappropriate when the

23   government knows that it does not have anything to do, for

24   example, with either Mr. Brady or Mr. Fries.   There has got to

25   be some specificity as to what supplier they are talking about

3384

Melissa Hoyt - Direct

1    here and not trying to taint everybody in this room.

2         THE COURT:  Ms. Sweeney?

3         MS. SWEENEY:  Your Honor, I was just about to finish

4    the background section.  I was simply attempting to establish

5    for the jury what a payment term is and how it relates to the

6    purchase of poultry.  Immediately after this section I will be

7    getting into the specific negotiations about payment terms with

8    Pilgrim's Pride and with Koch and with no other chicken

9    suppliers, which are the two that are alleged in the

10   Indictment.

11        THE COURT:  Mr. Lavine, anything else?

12        MR. LAVINE:  No.

13        THE COURT:  I will overrule the objection given the

14   fact that we are going to get into the specifics against

15   specific companies that Ms. Sweeney mentioned, all right?

16        MR. LAVINE:  Thank you, Your Honor.

17        THE COURT:  Thank you.

18      (In open court:)

19        Go ahead, Ms. Sweeney.

20   BY MS. SWEENEY:

21   Q.  So Ms. Hoyt, we have been talking about payment terms.

22   When Sysco was purchasing chicken products or any products,

23   does Sysco prefer shorter or longer payment terms?

24   A.  Longer.

25   Q.  And why does Sysco prefer longer payment terms?

Melissa Hoyt - Direct

1    A.  It's the whole story times money.  As long as Sysco can

2    keep those monies for those invoices in their account, then

3    they can reinvest that money in other things that they can

4    possibly make additional money on.

5    Q.  So the additional money that Sysco makes by keeping that

6    money in its account longer, does that eventually go to the

7    supplier when Sysco ultimately pays its bill?

8    A.  No.

9    Q.  So does the length of the payment term relate to Sysco's

10   profit?

11   A.  So it affects our bottom line, yes.

12   Q.  And can you describe how?

13   A.  Well, the way that we do our accounting when we have longer

14   payment terms, then we can actually add those monies into our

15   bottom line at the end of the year by reinvesting those in

16   other things rather than just paying that invoice in those

17   days.

18   Q.  And the number of days in the payment terms that you

19   described is directly related to whether Sysco pays the full

20   invoice or has a cash discount; is that right?

21   A.  I'm sorry, can you repeat that?

22   Q.  Sure.  So the number of days in the payment term directly

23   relates to whether Sysco pays the full bill or has the cash

24   discount.

25   A.  Well, so there are two different types of terms.  There are

Melissa Hoyt - Direct

1   a net term which is just the number of days, and then there is

2   a cash discount with number of days, but it's two different

3   sets.

4   Q.  Okay.  So the cash discount with the number of days, how

5   does the number of days in the cash discount term relate to the

6   net terms?

7   A.  So I am not exactly sure where you are going with that, but

8   we usually ask for longer terms on a net supplier.  So on a net

9   supplier we would -- our standard term policy would be net 65

10  for most suppliers.  I believe it's net 14 for poultry

11  suppliers.  If we have a cash discount, our standard term would

12  be -- if it's a 2 percent cash discount, it would be 2 percent

13  30.  So instead of being 65 days, it would be 30 days because

14  the supplier is offering a discount.

15  Q.  So is it fair to say that cash discount terms are shorter

16  generally than net terms?

17  A.  That's a fair statement.

18  Q.  And Sysco's standard cash discount terms are shorter than

19  Sysco's standard net terms?

20  A.  That's fair.

21  Q.  So you testified earlier, Ms. Hoyt, that you were involved

22  in the introduction of standardized terms to chicken suppliers,

23  right?

24  A.  Yes, ma'am.

25  Q.  And you were involved through the sending of letters?

Melissa Hoyt - Direct

1   A.  Yes, ma'am.

2   Q.  And you also said that Pilgrim's Pride was a chicken

3   supplier to Sysco.

4   A.  It was.

5   Q.  Did you send a letter to Pilgrim's Pride regarding the

6   payment terms?

7   A.  I did.

8   Q.  What followed after that?

9   A.  A negotiation.

10  Q.  And were you involved in that negotiation?

11  A.  I was.

12  Q.  And what was being negotiated?

13  A.  The amount of the terms.

14  Q.  Who was your Pilgrim's Pride contract for that negotiation?

15  A.  Who was my contract?

16  Q.  Contact.

17  A.  Oh, I am sorry.  I believe at that time it was Brenda Ray.

18  Q.  Ms. Hoyt, I would like to direct your attention, you should

19  have a binder in front of you --

20  A.  Yes, ma'am.

21  Q.  To Tabs 3 and 4 which are Government Exhibits 843 and 844.

22  A.  Yes, ma'am.

23  Q.  Please review those exhibits either in the binder or on the

24  screen and look up at me when you're done.

25          Starting with Government Exhibit 843, do you recognize

Melissa Hoyt - Direct

1    this document?

2    A.   Yes, ma'am.

3    Q.   Generally what is it?

4    A.   This is an e-mail.

5    Q.   Who sent it?

6    A.   I did.

7    Q.   And who did you send it to?

8    A.   I sent it to Jayson Penn and Brenda Ray.

9    Q.   And what company were Jayson Penn and Brenda Ray with?

10   A.   Pilgrim's Pride.

11   Q.   What date did you send this?

12   A.   April 25th, 2016.

13   Q.   And generally what does this document relate to?

14   A.   This is an e-mail to reiterate -- this was part of the

15   letter campaign that you mentioned earlier.  This was the

16   second e-mail do reiterate the initial e-mail and to

17   specifically tell this buyer what we were asking for in terms.

18   Q.   Is there an attachment to this e-mail?

19   A.   Yes.  Your next exhibit is the attachment.

20   Q.   So let's look at Government Exhibit 844.

21          Do you recognize this document?

22   A.   Yes, ma'am.

23   Q.   Very generally, what is it?

24   A.   This is a payment term form.

25   Q.   Was it attached to the prior e-mail?

Melissa Hoyt - Direct

1    A.  Yes, ma'am.

2    Q.  How do you know that?

3    A.  Because I went and made sure that this e-mail was attached

4    correctly.

5    Q.  Can you explain how you made sure that this document was

6    attached -- that Government Exhibit 844 was attached to

7    Government Exhibit 843?

8    A.  Yes.  I went back to my own computer and searched in my own

9    files to make sure that this was the same e-mail.

10   Q.  And what did you find?

11   A.  It was.

12   Q.  Did you find there had been any alterations in Government

13   Exhibits 843 or 844?

14   A.  No.

15   Q.  Who drafted Government's Exhibit 844?

16   A.  So these are computer generated for me.  It's something

17   that I initiate, but I just push a few buttons and my computer

18   generates it for me.

19        MS. SWEENEY:  The government moves into evidence

20   Government Exhibit 843 and 844.

21        THE COURT:  Any objection to the admission of

22   Exhibits 843 and 844?

23        Those exhibits will be admitted.

24        MS. SWEENEY:  Your Honor, permission to publish

25   Exhibit 844?

Melissa Hoyt - Direct

1          THE COURT:  844?

2          MS. SWEENEY:  844.

3          THE COURT:  You may.

4    BY MS. SWEENEY:

5    Q.  So taking a look at Government Exhibit 844, can you

6    describe to the Ladies and Gentlemen of the Jury what it is

7    that they are looking at?

8    A.  Yes.  So this is a payment term form.  This is where we

9    actually specifically send this to a supplier, and this is our

10   request for our standardized payment term policy.  So what we

11   are asking here is we are asking the supplier to agree to this,

12   to sign it and return it to us.

13   Q.  And which supplier was Government's Exhibit 844 sent to?

14   A.  Pilgrim's Pride.

15   Q.  So what payment terms was Sysco seeking from Pilgrim's

16   Pride when this document was sent?

17   A.  Yes, ma'am.  So the payment terms on this one was a cash

18   discount.  Pilgrim's Pride was being asked for a 2 percent cash

19   discount to net 14.

20   Q.  So can you describe just practically what that means.

21   A.  Yes.  So what that means is that we wanted to be able to

22   pay the invoices from Pilgrim's Pride at all of our locations

23   or all the locations that we buy from Pilgrim's Pride.  If we

24   paid those invoices within two days, we would take a 2 percent

25   discount.  If we did not pay them within two days, then it

Melissa Hoyt - Direct

1    would be a net 14 that we would be obligated to pay them.

2    Q.   And were these the standard terms that Sysco was seeking?

3    A.   Yes.

4    Q.   The original standard terms or the new standard terms that

5    you described?

6    A.   These were the new standard terms that we were seeking for

7    cash discount suppliers.

8    Q.   So Sysco was seeking an option, either the 2 percent cash

9    discount or the net 14.

10   A.   Correct.

11   Q.   Did you ultimately agree on payment terms with Pilgrim's

12   Pride?

13   A.   We did.

14        MS. SWEENEY:   At this point I would like to direct

15   your attention to Tab 7 in your binder, Government

16   Exhibit 9700.   And this is just for the witness and the Court

17   and counsel.

18   BY MS. SWEENEY:

19   Q.   Do you recognize this document?

20   A.   Yes, ma'am.

21   Q.   Generally, what is it?

22   A.   This is a signed payment term form from Pilgrim's Pride.

23   Q.   Was this document created in the regular course of

24   business?

25   A.   It was.

Melissa Hoyt - Direct

1    Q.   And was it kept in the regular course of business?

2    A.   It was.

3    Q.   Did Sysco rely on this signed payment terms form --

4    A.   Yes.

5    Q.   -- in the course of its business?

6    A.   Yes.

7    Q.   Is this a true and accurate copy of this document?

8    A.   It is.

9    Q.   And how do you know that?

10   A.   Because I validated that.

11   Q.   And could you explain how you validated that this is a true

12   and accurate copy?

13   A.   Yes.  I went back to my personal computer to make sure that

14   this was exactly what I had received.

15   Q.   And what did you find?

16   A.   It was.

17   Q.   So government Exhibit 9700, did you find it was altered in

18   any way from what was on your computer?

19   A.   No, ma'am.

20        MS. SWEENEY:  The government moves to admit Government

21   Exhibit 9700.

22        THE COURT:  Any objection to the admission of Exhibit

23   9700?

24        All right.  9700 will be admitted.

25        MS. SWEENEY:  Permission to publish 9700 to the jury?

Melissa Hoyt - Direct

1          THE COURT:  You may.

2     BY MS. SWEENEY:

3     Q.  So Ms. Hoyt, what is reflected in Government Exhibit 9700?

4     A.  It is the payment terms that we agreed to with Pilgrim's

5     Pride.

6     Q.  And when did -- when were these signed?

7     A.  They were signed by Pilgrim's Pride on July 5th, 2016, and

8     it appears that they were signed by Sysco on July 6th, 2016.

9     Q.  Who signed these payment terms on behalf of Sysco?

10    A.  Brian Todd.

11    Q.  And what was his position?

12    A.  Vice-president strategic sourcing.

13    Q.  And who signed these terms on behalf of Pilgrim's Pride?

14    A.  Brenda Ray.

15    Q.  Let's focus on the first line and then the -- all of the

16    lines with the No. 2 in the New Cash Discount Days.  What terms

17    were achieved?  I should start -- let's start with the first

18    line.  What terms were achieved for this location?

19    A.  2 percent, 2.

20    Q.  Is this the term that Sysco was seeking?

21    A.  No, ma'am.

22    Q.  What's the different between what Sysco was seeking and

23    this term?

24    A.  This is a 2 percent, 2, 0.  We were seeking a 2 percent, 2,

25    14.

Melissa Hoyt - Direct

1    Q.   Is the same true for the third through sixth lines as well?

2    A.   Yes, ma'am.

3    Q.   And how does this term compare with what Sysco is seeking?

4    A.   This term that they signed is less favorable than what we

5    were looking for.

6    Q.   Let's take a look at the second line and then the last two

7    lines.  What terms were achieved there?

8    A.   0 percent cash discount, net 14.

9    Q.   And were these the terms that Sysco was seeking?

10   A.   No.

11   Q.   And how were they different?

12   A.   We were seeking 2 percent, 2, 14.

13   Q.   So were these terms more favorable or less favorable than

14   what Sysco was seeking?

15   A.   They were less favorable.

16   Q.   In what way?

17   A.   They were shorter and they removed cash discount.

18   Q.   Now, Ms. Hoyt, you also mentioned that Koch Foods was a

19   chicken supplier to Sysco in 2016; is that right?

20   A.   That's right.

21   Q.   Were you involved in the rollout of the standardized

22   payment terms to Koch Foods?

23   A.   I was.

24   Q.   What was your involvement?

25   A.   The same as it would have been with Pilgrim's.

Melissa Hoyt - Direct

1   Q.  Can you describe what that was?

2   A.  Yeah.  I would have sent them a letter specifically

3   outlining their payment term request that we had for them to

4   abide by our new standard payment terms, and then I would have

5   had negotiations with them.

6   Q.  And you said you would have sent them a letter.  Did you

7   actually send them a letter?

8   A.  I did.

9   Q.  And you said you would have been involved in negotiations.

10  Were you actually involved in negotiations?

11  A.  Yes, ma'am.

12  Q.  I would like to direct your attention to Tabs 8 and 9 in

13  your binder in front of you and that's Government Exhibits 854

14  and 855.

15       Starting with Government Exhibit 854, Ms. Hoyt, do you

16  recognize this document?

17  A.  I do.

18  Q.  Generally what is it?

19  A.  It's an e-mail.

20  Q.  And who is it from?

21  A.  It is from me.

22  Q.  And who did you send it to?

23  A.  John Marler.

24  Q.  When did you send it?

25  A.  April 27, 2016.

Melissa Hoyt - Direct

1  Q.  Does it have an attachment?

2  A.  It does.

3  Q.  And from a very high level, what is generally contained in

4  this e-mail?  In one sentence, what's the subject of this

5  e-mail, I should say.

6  A.  Payment term policy.

7  Q.  Turning to Government Exhibit 855 in Tab 9, do you

8  recognize this document?

9  A.  I do.

10  Q.  Very generally, what is it?

11  A.  It's a payment term form.

12  Q.  And who created this document?

13  A.  I did.

14  Q.  Did you create this document?

15  A.  Well, through a computer-generated system, yes.

16  Q.  Was it created at or near the time that it was sent?

17  A.  Yes.

18  Q.  Was this document created in the regular course of Sysco's

19  business?

20  A.  Yes.

21  Q.  And was it kept in the regular course of Sysco's business?

22  A.  Yes.

23  Q.  Is Government's Exhibit 855 in any way related to

24  Government Exhibit 854?

25  A.  Yes.  It is the attachment to the e-mail.

Melissa Hoyt - Direct

1    Q.   And how do you know that?

2    A.   Because I validated that.

3    Q.   Can you describe again how it is that you validated that?

4    A.   Yes, ma'am.  I went back to my personal computer, I pulled

5    these documents up and made sure that they were the exact same.

6    Q.   And were these two documents, Government's Exhibits 854 and

7    855, in fact the same that were on your computer?

8    A.   They were.

9         MS. SWEENEY:  The government moves for the admission

10   of Exhibits 854 and 855.

11        THE COURT:  Any objection to the admission of

12   Exhibits 854 and 855?

13        Both exhibits will be admitted.

14        MS. SWEENEY:  Permission to publish Government's

15   Exhibit 854.

16        THE COURT:  You may.

17   BY MS. SWEENEY:

18   Q.   So Ms. Hoyt, generally what is Government's Exhibit 854?

19   A.   It is an e-mail.

20   Q.   And what is the subject matter of the e-mail?

21   A.   Payment terms.

22   Q.   What were you conveying when you sent this e-mail?

23   A.   This was reiterating our CFO's payment term policy, and

24   then it was specifically to a supplier about what the payment

25   term expectation was for them.

3398

Melissa Hoyt - Direct

1    Q.   So I would like to direct your attention to the third

2    paragraph. And the first sentence of the third paragraph, if

3    you could read that out loud, please.

4    A.   Yes.  "We appreciate that extending payment terms can be a

5    sensitive topic for our suppliers."

6    Q.   What did you mean by that?

7    A.   It was a sensitive topic because it involved the cost of

8    money.

9    Q.   When you say the cost of money, what do you mean?

10   A.   It's the time value of money.  So we would be -- in essence

11   we would be holding the supplier's payment longer, which the

12   supplier would see that as costing them money.

13        MS. SWEENEY:  Permission to publish Government

14   Exhibit 855?

15        THE COURT:  You may.

16   BY MS. SWEENEY:

17   Q.   So Ms. Hoyt, what is here in Government's Exhibit 855?

18   A.   This is a payment term policy form for Koch Foods.

19   Q.   And did you send this with Government's Exhibit 854?

20   A.   Yes, ma'am.  It was the attachment.

21   Q.   For what purpose?

22   A.   To actually get them to sign this form so that we could

23   implement these payment terms.

24   Q.   So which terms are reflected in this box in the middle of

25   the page?

Melissa Hoyt - Direct

1   A.   These are the new standard payment terms that we have for

2   poultry suppliers of net 14.

3   Q.   And could you describe what terms it was specifically you

4   were seeking from Koch Foods?

5   A.   Yes.  We were seeking a net 14 payment term.

6   Q.   With no cash discount?

7   A.   Correct.

8   Q.   Did you ultimately reach an agreement with Koch Foods?

9   A.   We did.

10   Q.   Did Koch Foods ultimately agree to these payment terms?

11   A.   They ultimately did.

12   Q.   And when did they ultimately agree to these payment terms?

13   A.   About four years later.

14   Q.   Were you involved in the negotiations?

15   A.   Yes.

16   Q.   Why did it take four years?

17   A.   Koch didn't want to agree to our payment term policy.

18   Q.   Between when this was sent and the final contract four

19   years later, what payment terms was Koch operating under at

20   that time?

21   A.   I believe they were at net 7.

22   Q.   I would like to direct your attention to Tab 10,

23   Government's Exhibit 9701.

24        Ms. Hoyt, do you recognize this document?

25   A.   I do.

Melissa Hoyt - Direct

1    Q.  Very generally, what is it?

2    A.  It's a payment term form.

3    Q.  For which supplier?

4    A.  Koch Foods.

5    Q.  Is it signed?

6    A.  It is.

7    Q.  By whom?

8    A.  By Koch.

9    Q.  Is it signed by Sysco?

10   A.  It is not.

11   Q.  Was this document created in the ordinary course of

12   business?

13   A.  Yes.

14   Q.  Was it maintained in the ordinary course of business?

15   A.  Yes.

16   Q.  Did Sysco rely on the information contained in this

17   document in the course of business?

18   A.  Yes.

19   Q.  Were these --

20       MS. SWEENEY:  The government moves to admit

21   Government's Exhibit 9701.

22       THE COURT:  Any objection to the admission of

23   Exhibit 9701?

24       Exhibit 9701 will be admitted.

25       MS. SWEENEY:  Permission to publish 9701?

Melissa Hoyt - Direct

1           *THE COURT:*  Yes, you may.

2    *BY MS. SWEENEY:*

3    *Q.*  So Ms. Hoyt, you described 9701 as a partially signed

4    payment terms form sheet; is that correct?

5    *A.*  That's correct.

6    *Q.*  What is this -- let me take that back.

7           And you mentioned that Sysco relied on this; is that

8    right?

9    *A.*  Yes.

10   *Q.*  In what way?

11   *A.*  Well, this is what the supplier would have agreed to.

12   *Q.*  So in the intervening time between the -- well, between

13   September 16, 2016 and when the contract was ultimately signed,

14   what payment terms are in place?

15   *A.*  Net 7.

16   *Q.*  And is that reflected here?

17   *A.*  Yes.

18   *Q.*  And were these more favorable or less favorable than the

19   original payment terms sought?

20   *A.*  They were less favorable.

21          *MS. SWEENEY:*  You can take that down.  Thank you.

22   *BY MS. SWEENEY:*

23   *Q.*  Now, Ms. Hoyt, you testified that payment terms were

24   negotiated -- or were included in contracts prior to 2016; is

25   that right?

Melissa Hoyt - Direct

1    *A.*   Yes.

2    *Q.*   Including contracts with chicken suppliers?

3    *A.*   Yes.

4    *Q.*   And that they were standard payment terms from 2016

5    forward, correct?

6    *A.*   That is correct.

7              *MR. FAGG:*   Objection leading.

8              *THE COURT:*   Overruled.

9    *BY MS. SWEENEY:*

10   *Q.*   And in your negotiations with chicken suppliers regarding

11   payment terms, did you consider those chicken suppliers

12   competitors?

13             *MS. PAGE:*   Objection, vague as to chicken suppliers.

14             *THE COURT:*   Sustained, if you could specify.

15   *BY MS. SWEENEY:*

16   *Q.*   Sure.  So Ms. Hoyt, in your negotiations -- I take that

17   back.

18             Ms. Hoyt, you testified about your negotiations with

19   Pilgrim's Pride and Koch Foods with regards to payment terms;

20   is that right?

21   *A.*   Correct.

22   *Q.*   Did you consider Pilgrim's Pride and Koch Foods

23   competitors?

24   *A.*   They are.

25   *Q.*   Why?

3403

Melissa Hoyt - Direct

1    A.   They are competing poultry suppliers.

2    Q.   Competing for what?

3    A.   In my instance, they compete for my poultry sales.

4    Q.   And with regard to payment terms, how did you view payment

5    terms?  Did you view them as public information?

6    A.   No.

7    Q.   Did you view them as confidential?

8    A.   Yes.

9    Q.   When you were negotiating payment terms with Pilgrim's

10   Pride and Koch Foods, did you want those companies discussing

11   the payment terms with each other?

12          MR. FAGG:  Objection, Your Honor, assumes facts not in

13   evidence.

14          THE COURT:  Overruled.

15          Ms. Henry, did you have an objection?

16          MS. HENRY:  Relevance.

17          THE COURT:  That will be overruled.

18          THE WITNESS:  I am sorry, can you repeat the question?

19          MS. SWEENEY:  Sure.  If I might ask madam court

20   reporter to read it back.

21          (The record was read back by the court reporter.)

22   A.   Never.

23   BY MS. SWEENEY:

24   Q.   Did you ever ask Pilgrim's Pride or Koch Foods to discuss

25   payment terms with each other?

3404
Melissa Hoyt - Direct

1    A.  No.

2    Q.  Did you ever ask them to coordinate with each other on

3    payment terms?

4    A.  No.

5    Q.  Why not?

6    A.  Well, first and foremost, it would violate our NDA that we

7    have in place.

8           MR. FAGG:  Objection, Your Honor.

9           THE COURT:  Sustained.

10   BY MS. SWEENEY:

11   Q.  Without reference to any legal document --

12          MR. FAGG:  Objection, Your Honor.

13          THE COURT:  Sustained.  If you can ask a new question.

14          MS. SWEENEY:  Yes, Your Honor.

15          Your Honor, may I confer?

16          THE COURT:  Yes.

17   BY MS. SWEENEY:

18   Q.  Ms. Hoyt, in answering my prior question, you started with

19   first.  Can you describe your second and other reasons that you

20   did not want them to talk about payment terms?

21   A.  Sure.  If suppliers talked about payment terms with each

22   other, it would put Sysco at a disadvantage of what

23   negotiations we would be able to achieve with suppliers.  It

24   would hinder our ability to get to the best negotiation.

25   Q.  Now, Ms. Hoyt, earlier you testified that you negotiated

3405

Melissa Hoyt - Direct

1    with chicken suppliers independently; is that correct?

2          MS. PAGE:  Objection, vague as to the term chicken

3    suppliers again.

4          THE COURT:  Sustained.  If you can clarify with whom.

5    BY MS. SWEENEY:

6    Q.  Ms. Hoyt, you testified earlier that you were involved in

7    negotiations with chicken suppliers; is that right?

8          MS. PAGE:  Objection, vague as to chicken suppliers,

9    Your Honor.  I would ask that she be specific.

10         THE COURT:  She has previously testified that her

11   involvement varies depending on complications, so if you could

12   specify who she is talking about.

13         MS. SWEENEY:  Yes, Your Honor.

14   BY MS. SWEENEY:

15   Q.  You mentioned that Sysco has a number of chicken suppliers;

16   is that correct?

17   A.  That is correct.

18   Q.  And you identified a handful of those chicken suppliers; is

19   that right?

20   A.  Yes.

21   Q.  And you testified that you were involved in negotiations

22   with some of those chicken suppliers; is that right?

23   A.  That is correct.

24   Q.  And can you describe generally which of those chicken

25   suppliers you were involved in negotiations specifically

Melissa Hoyt - Cross

1   related to payment terms?

2   A.  Sure, yeah.  So I would have been involved in negotiations

3   on payment terms with at least Tyson, Sanderson Farms,

4   Pilgrim's Pride, Koch.  Those are the ones I can think of off

5   the top of my head.

6   Q.  And with regard to your negotiations about payment terms,

7   you testified that you negotiated with chicken suppliers

8   independently, the chicken suppliers that you just mentioned;

9   is that right?

10  A.  Yes.  I always negotiate with them independently.

11  Q.  And why?

12  A.  Well, we would never negotiate with suppliers as a group.

13  Each supplier negotiation is an independent negotiation.

14          *MS. SWEENEY:*  The government has no further questions.

15          *THE COURT:*  All right.  Thank you.

16          Cross-examination?

17          Mr. Fagg?

18          *MR. FAGG:*  Can I have one moment, Your Honor?

19          *THE COURT:*  Yes.

20          *MR. FAGG:*  Can I pass two binders up through

21  Ms. Grimm?

22          *THE COURT:*  Yes, you may.

23                     **CROSS-EXAMINATION**

24  *BY MR. FAGG:*

25  Q.  Good afternoon, Ms. Hoyt.

Melissa Hoyt - Cross

1   A.  Hi.

2   Q.  My name is John Fagg and I represent Bill Lovette.  And I

3   just have some questions for you this afternoon.

4           You testified that you worked for Sysco for

5   approximately the last 20-plus years, correct?

6   A.  That is correct, 25 years.

7   Q.  And Sysco is a multi-billion-dollar company, correct?

8   A.  That is correct.

9   Q.  And it is not only one of the largest food distributors in

10  the United States, it's actually the largest food distributor

11  in the entire world, correct?

12  A.  I'm not sure if that's correct or not, to be honest.

13  Q.  It's the largest in the United States, isn't it?

14  A.  I would agree, it's the largest in the United States.  I'm

15  not sure about the world.

16  Q.  So you talked to Ms. Sweeney a little bit about payment

17  terms, and I would like to start there, okay?

18          Payment terms define the amount of time that Sysco has

19  to pay its suppliers, yes?

20  A.  That is correct.

21  Q.  And so for example, if a payment term could be that Sysco

22  has seven days to pay a supplier of milk, fair?  The payment

23  term there would be seven days, fair?

24  A.  That could be a term.

25  Q.  And I believe you said this on direct, but that means that

Melissa Hoyt - Cross

1    within those seven days, Sysco has to pay the entire bill.

2    A.   If it's a net supplier, yes.

3    Q.   And this is important for Sysco because it means that it

4    dictates how long Sysco gets to hold onto its money, right?

5    A.   Correct.

6    Q.   And the longer that Sysco gets to hold onto its money, the

7    more it can use that money, yes?

8    A.   Correct.

9    Q.   And by extension it means the longer Sysco holds onto its

10   money, the shorter amount of time the suppliers have the money,

11   right?

12   A.   So I'm not sure I would say it that way.

13   Q.   Well, if Sysco owes a company net 7, that means Sysco gets

14   to keep that money for seven days after receiving the product,

15   correct?

16   A.   That is correct.

17   Q.   And it means that the supplier doesn't get that money for

18   seven days, right?

19   A.   That is correct.

20   Q.   And Sysco, when it has that money, it uses the money to

21   make more money, right?

22   A.   Correct.

23   Q.   By investing it, by gaining interest.

24   A.   Correct.

25   Q.   And Sysco is a for-profit company, correct?

Melissa Hoyt - Cross

1   *A.*   That is correct.

2   *Q.*   It's in the business of making money.

3   *A.*   Correct.

4   *Q.*   As are the chicken suppliers that you referenced earlier

5   that Sysco does business with.

6   *A.*   Correct.

7   *Q.*   So I want to talk a little bit about this new payment term

8   plan that you talked about earlier.  This new payment term plan

9   that came about or was launched, I think you used the phrase

10   rolled out, right, it was rolled out in April of 2016, correct?

11   *A.*   Yes, sir.

12   *Q.*   And it was rolled out company-wide at Sysco, right?

13   *A.*   That is correct.

14   *Q.*   Meaning it wasn't directed to the chicken companies, right?

15   *A.*   It was directed to our supplier community.

16   *Q.*   What you said earlier includes everything from food to

17   things that you might get in a restaurant like cups to things

18   you might get in the restroom when you are at a ballgame.

19   *A.*   That is correct.

20   *Q.*   And this was part of an organized large scale campaign at

21   Sysco, right?

22   *A.*   That is correct.

23   *Q.*   And the goal here was for -- to allow Sysco to make more

24   money.

25   *A.*   That is correct.

Melissa Hoyt - Cross

1   Q.  And can you give me a ball park on how many suppliers Sysco

2   has or how many -- let me ask a better question.

3        Can you give me a ball park on how suppliers Sysco had

4   in April of 2016?

5   A.  I could not give you an answer.  We have thousands of

6   suppliers.

7   Q.  Thousands.  Okay.  And this program related to payment

8   terms applied to all of them, correct?

9   A.  It does.

10  Q.  And this program was something that came down from your

11  superiors?

12  A.  Yes.

13  Q.  And you talked about a change in policy earlier, but this

14  was really a mandate that Sysco unilaterally imposed on its

15  suppliers, wasn't it?

16  A.  You could say that.

17  Q.  And in the letter -- the letters that were sent that you

18  talked about earlier, it actually said that the new payment

19  terms were effective immediately, right?

20  A.  I believe it did.

21  Q.  Let's talk a little bit about how you communicated this new

22  program to the suppliers.  Prior to the rollout you were

23  provided with training materials for this program, correct?

24  A.  That is correct.

25  Q.  And again, this program that was implemented was something

Melissa Hoyt - Cross

1    that was going to apply across all of the suppliers.

2    A.   That is correct.

3    Q.   And you mentioned earlier that there was an initial letter

4    that went out from Sysco's CFO to all of the suppliers.  Do you

5    remember that?

6    A.   Correct.

7    Q.   And that same letter went out to all of Sysco's suppliers,

8    correct?

9    A.   I'm not sure that it went to a hundred percent of our

10   suppliers, but I know that it went to all of our what we call

11   corporate managed suppliers.

12   Q.   So for purposes of our discussion today, all of the

13   corporate managed suppliers -- are all the chicken companies

14   that you referenced earlier, are they all corporate managed

15   suppliers?

16   A.   Yes, the ones that I referenced are.

17   Q.   And would all of the beef producers also be corporate

18   managed suppliers?

19   A.   So not every supplier is a corporate managed supplier, but

20   we have corporate managed beef suppliers.

21   Q.   Same thing about pork?

22   A.   Same.

23   Q.   Okay.  And that letter went out in April of 2016, correct?

24   A.   I believe that was the timing, yes.

25   Q.   And then after that I believe you said there were letters

Melissa Hoyt - Cross

1   that went out that were from the senior supply directors like

2   yourself, correct?

3   A.  That is correct.

4   Q.  And that was all part of the plan that was implemented

5   prior to the rollout, right?

6   A.  I believe so.

7   Q.  And some of those letters went out under your name?

8   A.  Some of them did.

9   Q.  And that would include the letters that went to Pilgrim's?

10  A.  Yes.

11  Q.  And the letter that went to Koch?

12  A.  Yes.

13  Q.  And to any other chicken suppliers that you were doing

14  business with that you mentioned earlier.

15  A.  So we could have been doing business with other chicken

16  suppliers that did not receive a letter from me.  It was a

17  rollout.  Only certain suppliers were assigned to me.  There

18  were other people on my team that other suppliers may have been

19  assigned to, so not every chicken supplier would have gotten a

20  letter from me.

21  Q.  They would have received a similar letter.  It just would

22  have had someone else's name on it.

23  A.  Correct.

24  Q.  So these were really form letters that were sent out,

25  right?

Melissa Hoyt - Cross

1    A.   I'm sorry, I don't understand that.

2    Q.   Do you know what a form letter is?

3    A.   I don't guess I do.

4    Q.   The letters that were sent out, you didn't draft it, did

5    you?

6    A.   No.

7    Q.   And the letters that went to the different chicken

8    suppliers, did you change them between supplier to supplier?  I

9    am not talking about the attachments.  I am talking about the

10   letters.

11   A.   They could have been changed.  There was more than one

12   letter.  So if we had a cash discount supplier, they would have

13   received a letter that was slightly different from the supplier

14   that was the net supplier.

15   Q.   So let's talk about that for a minute.  Cash discount

16   suppliers, Pilgrim's was a cash discount supplier prior to

17   April of 2016, right?

18   A.   That is correct.

19   Q.   And after this program went into effect, Pilgrim's was

20   still a cash discount supplier as well, right?

21   A.   That is correct.

22   Q.   But that's unique within the chicken industry, isn't it?

23   A.   It's somewhat unique.

24   Q.   Well, it's not somewhat unique, is it?  Isn't it true in

25   April 2016 there was only one other supplier that was -- that

Melissa Hoyt - Cross

1    had a -- chicken supplier that had a cash discount?

2    A.   There was one other supplier that I am aware of.  I'm not

3    sure if that was the only one.

4    Q.   But you can't name another one as we sit here.

5    A.   I can't.

6    Q.   And Koch Foods wasn't a cash discount supplier, was it?

7    A.   No.

8    Q.   And so these letters that went out, the first one from your

9    CFO and then the one that went out from you, this was really

10   notifying the suppliers that Sysco intended to change the

11   payment terms, right?

12   A.   Correct.

13   Q.   And it was also to try to engage the suppliers to negotiate

14   with you or accept your terms, right?

15   A.   So the ultimate goal was to get the supplier to accept the

16   terms.

17   Q.   Right.  But you understood when you launched this program

18   that it was going to require negotiation, right?

19   A.   With some suppliers.

20   Q.   And you knew that before the program even launched.

21   A.   Yes.

22   Q.   And in essence, what you were trying to get the suppliers

23   to do when you rolled this out is you were trying to get the

24   suppliers to agree to worse payment terms for them, right?

25   A.   That's fair.

Melissa Hoyt - Cross

1   *Q.* And at the time that Sysco mandated that these new payment

2   terms were going to go into effect, Sysco already had existing

3   payment terms with its suppliers, correct?

4   *A.* Yes.

5   *Q.* And those payment terms were not expiring in April of 2016,

6   were they?

7   *A.* Not to my knowledge.

8   *Q.* And the reason why Sysco believed that it could dictate

9   these new worse terms to the suppliers is because Sysco is a

10  behemoth and Sysco knew that the suppliers wanted to continue

11  to do business with Sysco; is that right?

12  *A.* I would not say it that way.

13  *Q.* Would you disagree with me that Sysco is a behemoth?

14  *A.* Sysco is a large company.

15  *Q.* And Sysco purchases a lot of chicken as well, doesn't it?

16  *A.* It does.

17  *Q.* Does Sysco believe  it's an important customer of the

18  chicken suppliers?

19  *A.* Yes.  We would assume that we're important to most of our

20  chicken suppliers.

21  *Q.* Okay.  So let's talk for a moment about the letters that

22  went out to these thousands of customers, okay?  I believe you

23  said earlier that these letters went out simultaneously.  Let

24  me be more specific.

25          The letter from your CFO went out more or less

3416

Melissa Hoyt - Cross

1   simultaneously to the suppliers, right?

2   A.   To the corporate billed suppliers.

3   Q.   And then the second letter that came under your name or

4   under one of your peers' names, those were also sent out

5   basically simultaneously, correct?

6   A.   Close in time.

7   Q.   And both of those letters were sent in April of 2016.

8   A.   I believe so.

9   Q.   And you talked earlier about some of the language in your

10  letter where you said you understood that payment terms were

11  sensitive to the suppliers.  Do you remember that?

12  A.   Correct.

13  Q.   And you knew that these for-profit companies were not going

14  to be happy with Sysco's efforts to try and dictate new payment

15  terms, right?

16  A.   Correct.

17  Q.   And that's because again it was going to be to the

18  suppliers' financial detriment to enter into these new payment

19  terms.

20  A.   So again, I wouldn't say it's to the detriment.  I don't

21  know what these suppliers have in payment terms with other

22  companies.  I know that Sysco's credit worthiness warrants

23  these type of payment terms.

24  Q.   We'll come back to that in a moment, but you said earlier

25  that this all relates to time and money, correct?

Melissa Hoyt - Cross

1    A.   Correct.

2    Q.   And so if time is not on your side because payment terms

3    have been extended, that is to a company's financial detriment

4    as compared to where they stood before they were extended, yes?

5    A.   It would affect them, yes.

6    Q.   To their detriment.

7    A.   It would be less favorable to them.

8    Q.   Okay.  Now, the length of time that Sysco proposed to the

9    chicken suppliers that it was doing business with that you

10   identified by name earlier was not uniform in all of those

11   letters that went out to those suppliers, correct?

12   A.   Are you asking me was it the same for all suppliers?

13   Q.   Correct, yes.

14   A.   No, it was not.

15   Q.   And so Sysco was not seeking the same payment terms from

16   all of the chicken suppliers when it rolled out this campaign,

17   correct?

18   A.   So it had standardized payment terms, but like I said

19   earlier, it depended on if you were a cash discount or a net

20   supplier.  So the net 14, if it was net suppliers, net 14 would

21   have been the ask from all of those suppliers.

22   Q.   Let's back up a little bit.

23        You mentioned at the beginning that this was a

24   campaign to get all suppliers to net 65, right?

25   A.   Originally.

Melissa Hoyt - Cross

 1   Q.  Okay.  And that is not the term, payment term, that you

 2   sent to Pilgrim's Pride, was it?

 3   A.  I'm not sure if we originally sent the net 65 to them, but

 4   we did -- as I mentioned earlier, we did modify those.

 5   Q.  You have met with the government on at least five occasions

 6   prior to your testimony today, correct?

 7   A.  That's probably about right.

 8   Q.  Okay.  And that was over the course of the last six weeks

 9   or so?

10   A.  Probably.

11   Q.  And in the course of any of those meetings with the

12   government, did you ever see a document in which Sysco proposed

13   to Pilgrim's 65-day terms?

14   A.  No.

15   Q.  As we sit here today, you can't recall ever seeing that

16   document, correct?

17   A.  Correct.

18   Q.  And I believe that you said earlier that you started with

19   this net 65-day terms for all of your suppliers, right?

20   A.  Correct.

21   Q.  And then you said that you changed -- you did some analysis

22   on your own and you decided to go for a more realistic payment

23   term, right?

24   A.  Correct.

25   Q.  Because 65 days was unrealistic.

Melissa Hoyt - Cross

1    *A.*  It was a big ask of the suppliers.

2    *Q.*  But it was unrealistic.

3    *A.*  Yes.

4    *Q.*  Let's talk for a moment, if we can, about this particular

5    time period, April of 2016 and the time period leading up to

6    that.  When this program was being first rolled out, you were

7    already aware that other large corporations had been extending

8    their payment terms with their suppliers, correct?

9         *MS. SWEENEY:*  Objection.  It calls for hearsay and we

10   can go to side bar if you would like.

11        *THE COURT:*  All right.  We can go to side bar.

12      (At the bench:)

13        *THE COURT:*  Ms. Sweeney, go ahead.

14        *MS. SWEENEY:*  Just briefly, Your Honor.  The

15   government understands that her knowledge of other suppliers'

16   payment terms comes from what she was told by her superiors,

17   and she has no direct knowledge of other suppliers' payment

18   terms.  So the question as posed would just call for hearsay,

19   her understanding of what she had been told by others within

20   Sysco.

21        *THE COURT:*  Mr. Fagg?

22        *MR. FAGG:*  Sure, Your Honor.  I am not asking her what

23   she was told.  I am asking her whether or not she was aware.

24        *THE COURT:*  And her awareness would be relevant to

25   what, Mr. Fagg?

Melissa Hoyt - Cross

1          MR. FAGG:  It's relevant, Your Honor, because other

2     suppliers were doing the same thing.  This was widely

3     publicized in the media at the time that Sysco launched this

4     campaign.

5          THE COURT:  All right.  Ms. Sweeney, anything else?

6          MS. SWEENEY:  Simply that the government would also

7     object on the grounds of relevance as what was elicited on

8     direct and what's in the Superseding indictment relates to the

9     payment terms, negotiations, for two particular chicken

10    suppliers.

11         MR. FAGG:  Just briefly, if I might, what's alleged in

12    the Indictment is something about 65-day terms were proposed to

13    Pilgrim's and Koch.  Neither of those companies ever received

14    65-day terms.  She just said that Pilgrim's never received

15    65-day terms.  This was something that was widely known in the

16    industry.  And the notion that it was somehow or another

17    confidential that Sysco was launching this massive campaign

18    against all the suppliers, thousands and thousands of

19    suppliers, it simply doesn't hold up.  That's why I am asking

20    her what her awareness was of these other similarly sized

21    companies.

22         THE COURT:  I think there is a distinction between her

23    learning information from her superiors and knowing about it

24    through public sources, so I am going to sustain the objection

25    as to that question.  But Mr. Fagg, if you have a different

Melissa Hoyt - Cross

1    question related to -- focused on public knowledge, then you

2    can ask that.

3         *MR. FAGG:*  Thank you, Your Honor.

4       (In open court:)

5         *THE COURT:*  The objection will be sustained.

6    *BY MR. FAGG:*

7    *Q.*  Ms. Hoyt, I would like you to turn in your binder to Tab

8    19, if you will.  You can set that document aside.

9         Ms. Hoyt, were you aware when Sysco launched its

10   campaign to revise these payment terms that other big companies

11   had launched similar efforts?

12   *A.*  I had -- I had heard that that was the case.

13   *Q.*  And were you aware of media coverage of those efforts?

14   *A.*  No, I don't believe I was.

15   *Q.*  When Sysco sought to implement this campaign, it was aware

16   that it may generate publicity, correct?

17   *A.*  I believe so.

18   *Q.*  And, in fact, part of the campaign and the training that

19   you received actually had a public relations component to it,

20   correct?

21   *A.*  That's why I said I believe so.  I believe I recall seeing

22   something about that in the training.

23   *Q.*  Because if Sysco is going to launch a 65-day -- or campaign

24   to get 65-day payment terms that are unrealistic, that is

25   something that could generate publicity, right?

Melissa Hoyt - Cross

1    A.  I would assume it could.

2    Q.  And the training that you received -- you received the

3    training prior to the rollout, right?

4    A.  I believe so.

5    Q.  And a big component of that training was about push-back

6    that Sysco expected to receive from the suppliers, fair?

7    A.  Fair.

8    Q.  And it provided mechanisms or processes that Sysco

9    employees were to follow when the suppliers pushed back.

10   A.  Correct.

11   Q.  And by push-back what I mean, to make sure we are on the

12   same page, is that suppliers don't agree to 65-day terms,

13   right?

14   A.  Correct.

15   Q.  Or they don't agree to whatever term Sysco ultimately

16   proposes to a particular supplier, right?

17   A.  That is correct.

18   Q.  And as part of that training and the process that Sysco

19   established, there were escalation processes within Sysco so

20   that employees could escalate it to their superiors, right?

21   A.  That's correct.

22   Q.  And some of that escalation would go to you.

23   A.  True.

24   Q.  And some of the escalation would go to people above you,

25   right?

3423

1    *A.* Correct.

2    *Q.* And there was also reporting processes that were

3    implemented so that Sysco employees could report back to

4    various levels of management about the success that Sysco was

5    having in implementing these new terms, right?

6    *A.* Correct.

7    *Q.* And some of that reporting involved not just success, but

8    it also involved pitfalls that people faced?

9    *A.* Yes.

10   *Q.* Hurdles?

11   *A.* Yes.

12   *Q.* Challenges?

13   *A.* Yes.

14   *Q.* And even an unwillingness to negotiate, right?

15   *A.* Correct.

16          *THE COURT:* Mr. Fagg, we are almost at 5:00 o'clock,

17   if you could look for a convenient stopping point.

18          *MR. FAGG:* We have found one, Your Honor.

19          *THE COURT:* Then ladies and gentlemen, we will go

20   ahead and break for the day.  So keep in mind what I mentioned.

21   So you won't be coming in tomorrow or Friday.  The next time

22   you come in will be Monday.

23          Keep the admonitions in mind, ladies and gentlemen.

24   Don't -- you know, if you get exposed to any publicity, avert

25   your eyes.  Change the channel.  Don't focus on it.  Don't let

1    anyone talk to you about it.  Obviously, don't discuss the case

2    amongst yourselves.  The jury is excused.  Hope you have a good

3    long weekend.

4         MR. KOENIG:  Could we have a quick side bar before the

5    jury is released?

6         THE COURT:  Yes.  Hold on, ladies and gentlemen.

7       (At the bench:)

8         THE COURT:  Go ahead, Mr. Koenig.

9         MR. KOENIG:  Your Honor, before the jury is released,

10   I wanted to raise one issue, and that is Mr. Beller's

11   inappropriate objection and the side bar and then sustaining

12   the objection maybe gave the impression that the government did

13   something wrong.  And I would request that the jury be

14   instructed that the government was not asking an inappropriate

15   question.

16        And I will specifically point to we asked the very

17   same questions of almost every witness and there is times

18   when -- like Smith, they didn't object there.  They didn't

19   object.  When we asked Sara Fisher, didn't object.  So now for

20   them to, you know, put on this really big boisterous objection

21   and side bar and then all of the sudden the objection is

22   sustained, I am afraid they may think that the government was

23   asking inappropriately.  And I would just ask that they be

24   disabused of that notion.

25        THE COURT:  I am going to refuse the request.  For one

 1    thing, as soon as the objection was made, I immediately called

 2    a side bar.  I don't think that the jury would necessarily

 3    think that the side bar was intended to rule on -- or to

 4    address something that the government did.  It is true that I

 5    did sustain the objection, but I don't get the impression that

 6    the jury would imply that the government did anything wrong.

 7    After all, the government already asked most of those questions

 8    on the direct already, and so I don't think that the jury would

 9    draw any adverse conclusion about the government.

10         Moreover, were I to try to correct the situation, I am

11    worried that there would be -- it would be tricky to do that.

12    And I think that the -- I am not sure even exactly how I would

13    go about doing it, but I think the effect of trying to correct

14    it would be worse medicine than what I consider to be the

15    nonimplication.  So I will decline that particular request.

16         MR. KOENIG:  May I just be heard on one other thing?

17         THE COURT:  Yes.

18         MR. KOENIG:  Your Honor did say at side bar that he

19    should not have said that.  You've upheld this objection every

20    single time.  And I really think that was inappropriate and

21    would deserve some sort of saying to the jury that, you know,

22    that was inappropriate and you shouldn't put any stock in that.

23         THE COURT:  Well, once again, for -- if I were to

24    somehow tell the jury that that was inappropriate, it would

25    just call further attention to it.  Once again, I just don't

 1    think that that type of correction is, A, necessary, and I also

 2    worry it could be misconstrued by the jury.  So while it was

 3    inappropriate, I think the fact that it was addressed at side

 4    bar was the proper thing to do, all right?

 5              MR. KOENIG:  Thank you, Your Honor.

 6         (In open court:)

 7              All right.  Now, ladies and gentlemen, you are excused

 8    until Monday at 8:30.  Hopefully you will have a good four

 9    days.

10              (Jury excused.)

11              Ms. Hoyt, so as I just indicated to the jury, we are

12    not coming back for testimony until Monday.  So if you could

13    come back Monday at 8:30.

14              THE WITNESS:  Okay.

15              THE COURT:  Thank you very much, Ms. Hoyt.  You are

16    excused at this time.

17              All right.  So tomorrow we'll pick up.  Do we want to

18    do 8:30?  It looks like we have general agreement.

19              MS. PREWITT:  No problem with 8:30, Your Honor.  I

20    think we are at a point where I think we have a stipulation or

21    we're really -- it sounds good.  So the issue really is those

22    summary charts which are obviously very important.  And I know

23    we discussed handling those tomorrow.  And so we'd just ask for

24    tonight if not too late an hour, that we have those charts.

25    And if there is anything that the government is just verifying,

1    they can highlight or italicize, but then we have something to

2    work with tomorrow.  That's what we would ask for.

3             MS. CALL:  They are in counsel's inbox right now.

4             MS. PREWITT:  Wonderful.  Thank you, Your Honor.

5             THE COURT:  I think the order we are going to go in is

6    we will pick up where we left off on Docket No. 825.  I think

7    perhaps the next document is Exhibit 948.  Was that right?

8             MS. CALL:  I cannot confirm the exact number at the

9    moment, but the plan where to pick up, yes.

10            THE COURT:  Is that list still current?  Is there some

11   things that changed?  Have we dropped anything or is that our

12   working list?

13            MS. CALL:  That is current.  I think there are four

14   total additions, which is Exhibit 518 that I mentioned on the

15   record yesterday relating to Mr. Cooper, as well as three

16   documents that are simply some sources for an employer that we

17   were not able to agree on with the stipulation, so I don't

18   believe they will take long, those three.

19            THE COURT:  Do the defendants know which those are?

20            MS. CALL:  They are also currently in their inbox.

21            THE COURT:  What's in their inbox identifies those

22   three documents by --

23            MS. CALL:  By exhibit number and they are attached.

24            THE COURT:  Well, that should be good.

25            Mr. Gillen?

1          MR. GILLEN:  Just for planning purposes, obviously the

2     government's case is going to go into Monday finishing up with

3     this witness.  May I inquire of the government what they intend

4     to do in terms of additional witnesses to close out for

5     planning purposes for the defense?

6          THE COURT:  Right.  And do you know that at this point

7     in time, Ms. Call?

8          MS. CALL:  At this moment the next witness would be

9     Ms. Evans.  And then we -- absent something changing, I don't

10    know that we have another witness.

11         THE COURT:  So if you could to the extent that you can

12    given the defendants a feel for that because Mr. Gillen, like

13    yesterday, you know, it obviously makes a difference in terms

14    of the ability of the defendants to be able to call a witness,

15    if they choose to do so, to know whether or not there is going

16    to be a witness after Ms. Evans.  So it would be helpful for

17    them to know that.

18         MS. CALL:  One moment, Your Honor.

19         My colleague raised a good question.  I believe the

20    other day you noted possibly taking several days to consider

21    written Rule 29 motions.  As far as what that means for next

22    week, would you envision that the defendants' case starting

23    right away or there being a break for the consideration of

24    those motions?

25         THE COURT:  There is not going to be a break.  We do

1    need to figure out -- if I understood from Mr. Kornfeld, the

2    thinking was that there would be a written submission of the

3    Rule 29 motions.  Obviously, the United States is going to need

4    time to respond to those, but what I envision is the Court

5    taking the Rule 29 motions under advisement and we will be

6    going into the defendants case, assuming they intend to present

7    one.

8         MS. CALL:  Does Your Honor currently have a vision on

9    the amount of time for the government's response with the

10   Thanksgiving holiday next week as well?

11        THE COURT:  I think -- let's take a look and see what

12   is filed.  Obviously, if it's something from each defendant and

13   it's very voluminous, it would be a different answer than if it

14   were less voluminous or not as many, but I think we will have

15   to play that by ear.

16        MS. CALL:  And lastly, I think I have said this

17   before, but I think as all parties are trying to plan for next

18   week, it would be helpful if the government could get any

19   clarity on the defendants' witness list out of the several

20   pages of witnesses that don't seem to be in actual order.

21        THE COURT:  Obviously, and that's why it's good for

22   the defendants to get the clarity on what Monday, for instance,

23   is going to look like so that they can do better planning and

24   be able to give you a better list.

25        MS. CALL:  Yes, Your Honor.

3430

1        MR. GILLEN:  In that respect, Your Honor, I believe

2   with Ms. Evans the government had projected one hour for her

3   direct testimony.  If we could inquire of the government

4   whether or not in light of their ever-moving issue regarding

5   the summary and the elimination of the agents' testimony,

6   whether or not that projection is still a valid one.

7        THE COURT:  Well, I didn't hear a projection.

8        MR. GILLEN:  I thought there was a projection that it

9   was put out on the initial listing how long a witness would be.

10   Ms. Prewitt indicates that there was such a projection I think

11   in writing.  I would defer to her to clarify the issue.

12        MS. PREWITT:  Your Honor, I will say that I think they

13   have been tracking.  The government's estimates have been

14   tracking what they predicted as far as I have been counting.

15   So it would be helpful for us to know, and we can confer

16   ourselves about the potential cross and come up with an

17   estimate that might help provide scheduling with more clarity.

18        THE COURT:  I may be misunderstanding things, but I am

19   thinking that perhaps the agents will not be testifying in the

20   government's case in chief, but that's something that can be

21   discussed to give a better sense of what Monday would look

22   like.

23        MS. PREWITT:  I was just thinking if it was going to

24   be reallocated to Ms. Evans, if she is estimated an hour or if

25   that's going to be three or four, that would be helpful for us

1  to know.

2        THE COURT:  No, that would be.  And also the

3  government, I think if the government could provide an estimate

4  of additional documents that may be moved into evidence because

5  that takes time too.  And that would affect when, for instance,

6  the defendants would need to have a witness ready.

7        MS. CALL:  Yes.  I anticipate we could probably

8  provide an update on Friday or so this week to the defendants

9  in writing.

10        THE COURT:  Well, I will let you discuss that, but I

11  do think it would be helpful.  We don't want to have down time

12  where the defendants -- there is not a good sense of when the

13  government is going to rest, and as a result, a witness isn't

14  ready, okay?

15        MS. CALL:  Understood.  Thank you.

16        One more question.  On the Rule 29, would you

17  anticipate having oral argument in addition to submissions on

18  the writings?

19        THE COURT:  I would not unless there is some real

20  request.  I think especially in a case like this, a written

21  Rule 29 motion tends to be more thorough, more accurate.  It

22  would have cross-references in it.  They generally tend to be

23  more useful.  And once you go that route, the articulation of

24  one orally becomes somewhat superfluous, so I wouldn't

25  anticipate that.

1          MS. CALL:  Thank you.

2          MR. KORNFELD:  Your Honor, just briefly, because

3     obviously the calendaring is a little bit in flux, which is no

4     fault of anybody's, what's the Court's expectation for the

5     timing of the filing of the Rule 29s after the government

6     closes?  We want to do it quickly, but --

7          THE COURT:  That's a good question.  If the defendants

8     wish to make what we might call a placeholder Rule 29 motion at

9     the close of the government's case orally, that could, of

10    course, make some sense because that way the Rule 29 motions,

11    the written product would be able to incorporate the very end

12    of the evidence.  And so I don't have a problem with that.  Any

13    sense, Mr. Kornfeld, and maybe you don't, of what time lag we

14    may be talking about, assuming, once again, that the government

15    rests on Monday?

16         MR. KORNFELD:  I've consulted with my colleagues.  I

17    think pretty quickly if they closed on Monday, you know,

18    perhaps, you know, the next day or sometime the next day.  It's

19    a little tricky because we're in court, but maybe -- my

20    suggestion without again consulting would be, you know, by the

21    end of the day the following day, whatever that is, so, you

22    know, Tuesday and whatever day Tuesday is.

23         MR. TUBACH:  How about Wednesday?

24         MR. KORNFELD:  Or Wednesday.

25         THE COURT:  I think Wednesday is fine.

1          MR. KORNFELD:  Some of these folks might be on an

2     airplane.  I don't have that problem.

3          THE COURT:  Yeah, some folks may be quite -- may be

4     focused on that flight on Wednesday.

5          MR. FELDBERG:  One other question on the Rule 29s.

6     Again, no one's fault, but we do not have an official

7     transcript.  And has the Court considered how you would like us

8     to refer to trial testimony given that we only have the

9     real-time?

10          THE COURT:  Well, yeah, that's right.  Once again, an

11     official transcript has not been ordered; and as a result, the

12     unofficial transcript -- what I am saying is that by

13     cross-references I mean you would have all the exhibit numbers

14     that could be plugged in and things of that nature.  I don't

15     mean to suggest that you would be quoting testimony or anything

16     like that.  You can, of course, refer to testimony and that can

17     be done without quoting an unofficial transcript, which you

18     shouldn't do anyway, but that's all I meant is that the written

19     product is inevitably more detailed than an oral motion, and so

20     that's an advantage of having a written Rule 29.

21          MR. FELDBERG:  Thank you, Your Honor.

22          THE COURT:  I hope that answers your question.

23          MR. FELDBERG:  So we can refer to testimony, but not

24     in quotes.

25          THE COURT:  You shouldn't quote it, but it can be

1   paraphrased from the unofficial transcript.

2             *MR. FELDBERG:*  Fair enough, Your Honor.  Thank you.

3             *THE COURT:*  Anything else we should discuss?

4             We will be in recess, then, until 8:30 tomorrow.

5   Thank you.

6       (Recess at 5:17 p.m.)

7                            INDEX

8   WITNESSES

9      Joseph Brink

10         Direct Examination Continued By Mr. Torzilli     3199

11         Cross-examination By Mr. Canty                   3211

12         Cross-examination By Mr. Beller                  3245

13         Cross-examination By Mr. McLoughlin              3299

14         Cross-examination By Ms. Pletcher                3329

15         Cross-examination By Mr. Pollack                 3330

16         Cross-examination By Ms. Henry                   3330

17         Cross-examination By Mr. Gillen                  3331

18         Redirect Examination By Mr. Torzilli             3332

19      Robert Dawson

20         Direct Examination By Ms. Butte                  3353

21         Cross-examination By Mr. Schall                  3358

22         Redirect Examination By Ms. Butte                3362

23      Melissa Hoyt

24         Direct Examination By Ms. Sweeney                3363

25         Cross-examination By Mr. Fagg                    3406

1                            INDEX

2                           EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    108                    3349

5    109                    3347

6    114                    3350

7    120                    3348

8    221                    3352

9    224                    3350

10   I-228                  3223

11   I-231                  3221

12   500                    3286

13   519-1                  3347

14   542                    3344

15   546                    3344

16   558                    3317

17   559                    3342

18   561                    3227

19   563                    3238

20   564                    3238

21   567                    3346

22   592                    3316

23   843                    3389

24   844                    3389

25   854                    3397

1                              INDEX (Continued)

2                                 EXHIBITS

3       Exhibit       Offered   Received   Refused   Reserved   Withdrawn

4       855                     3397

5       2472                    3351

6       6134                    3351

7       9700                    3392

8       9701                    3400

9       9726                    3204

10                        REPORTER'S CERTIFICATE

11          I certify that the foregoing is a correct transcript from

12      the record of proceedings in the above-entitled matter.  Dated

13      at Denver, Colorado, this 29th day of January, 2022.

14

15                              S/Janet M. Coppock

16

17

18

19

20

21

22

23

24

25