# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

    Defendants.

## DEFENDANT SCOTT BRADY'S MOTION FOR JUDGMENT OF ACQUITTAL

In its opening statement, the government described a conspiracy involving an "exclusive price-fixing club" in which members worked with a "pack mentality" to "form a unified front against their customers" and to raise prices or prevent price decreases. The government promised the jury they would hear testimony that the "club" members "got together" and "formulated a plan" to develop inflated bids or price-related terms, which they scurried back to their respective companies to implement. The government further promised the jury they would hear testimony from stonewalled customers who, unable to negotiate, were forced into "historic" price increases in 2014 for the upcoming contract year. The government led the jury to believe it would see a consistent pattern of coordination among the competitors across various other pricing events starting in 2012 and continuing for the better part of a decade.

The government's evidence fell far short. Carl Pepper, an alleged "insider" with no responsibility or authority whatsoever with respect to pricing, testified about making a number of calls during the summer of 2014 to three suppliers, including Mr. Brady, to substantiate a rumor about industry-wide price hikes. Mr. Pepper agreed his communications were "shop talk" or "water cooler talk," made for the purpose of finding comfort with the proposal that Tyson's pricing department, the ultimate decision-makers, developed and submitted to the customer months earlier. In no circumstance did Mr. Pepper or the suppliers with whom he spoke exchange any of their respective companies' pricing for the upcoming KFC contract.

Robert Bryant, another alleged insider, testified about a conspiracy grounded in 2014 and 2017 contract negotiations for KFC in which suppliers agreed to not undercut each other on volume or offer concessions on price. Mr. Bryant, however, never engaged in any communications with Mr. Brady or any other defendant, except his own Pilgrim's colleagues, and he never personally heard or saw any exchange of pricing information between anyone. As the Court recognized during trial, Mr. Bryant assumed, based on facts he did not observe, that there *must* have been an agreement between Pilgrim's and all suppliers. Further, Mr. Bryant—and the government's customer witnesses—ultimately described negotiations in which Claxton repeatedly reduced their pricing proposals and requested and/or received additional volume, often at Pilgrim's expense. Finally, almost every witness testified about unprecedented market conditions in 2014 that resulted in the so-called historic price increases, rather than any coordinated effort by suppliers.

The government failed to produce evidence sufficient to prove that Mr. Brady knowingly and intentionally entered into an agreement with anyone with the objective of rigging bids, fixing prices, and raising prices. Not a single piece of direct evidence exists to that effect. With the government's alleged insiders nebulously describing conduct that does not

reflect any meeting of the minds on the most basic level—much less actual coordination—the government attempts to characterize every routine business interaction among suppliers and their customers as in furtherance of an ill-defined conspiracy. The government urges the Court and the jury to draw inferences from text messages and phone records where none is warranted. When the government cannot produce evidence demonstrating beyond a reasonable doubt that Mr. Brady did anything other than receive pricing information from competitors on a handful of occasions and participate in phone calls with suppliers over eight years, the government fails to meet its burden. Accordingly, no reasonable jury could find Mr. Brady guilty of Count One, and this Court should enter a judgment of acquittal.

## LEGAL STANDARD

When a defendant moves for judgment of acquittal under Federal Rule of Criminal Procedure 29, a district court "must enter judgment of acquittal for any offense in which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a motion for judgment of acquittal, the Court views the evidence "in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine[s] whether that evidence, if believed, would establish each element of the crime." *United States v. Fuller,* 751 F.3d 1150, 1153 (10th Cir. 2014) (quotations omitted). A conviction cannot be obtained, however, "by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *United States v. Valadez-Gallegos,* 162 F.3d 1256, 1262 (10th Cir. 1998) (citing *United States v. James,* 44 F.3d 860, 865 (10th Cir. 1995)). Here, the evidence against Mr. Brady plainly fails to meet that standard, and judgment of acquittal should be entered.

# ARGUMENT

**Based on the evidence presented, no reasonable juror could find beyond a reasonable doubt that Mr. Brady conspired to commit a violation of the Sherman Act.**

The government must prove that Mr. Brady was personally aware of and entered into the charged conspiracy. It is "essential to determine what kind of agreement or understanding existed *as to each defendant*." *See United States v. Record,* 873 F.2d 1363, 1368 (10th Cir. 1989) (emphasis added) (citation omitted). The Tenth Circuit is "mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn,* 946 F.2d 738, 741 (10th Cir. 1991); *see also United States v. Kendall,* 766 F.2d 1426, 1432 (10th Cir. 1985) (neither knowledge alone nor mere association with conspirators enough to convict of conspiracy). The evidence "supporting the conviction [of Mr. Brady] must be substantial and do more than raise a suspicion of guilt." *Valadez-Gallegos,* 162 F.3d at 1262.

No direct evidence exists that Mr. Brady was involved in a conspiracy to fix prices and to rig bids. No witness had actual knowledge that Mr. Brady entered into an agreement with anyone in violation of the Sherman Act. As discussed further below, the circumstantial evidence of Mr. Brady's participation in the alleged conspiracy is equally lacking.

**A. The government's alleged "insiders" do not establish Mr. Brady's knowing involvement in any conspiracy.**

    **1. The conduct recalled by Carl Pepper does not establish the existence of or Mr. Brady's involvement in a price-fixing and bid-rigging conspiracy.**

Carl Pepper offered no testimony implicating Mr. Brady in a conspiracy to fix prices and to rig bids. Mr. Pepper testified that in 2014 he and Mr. Brady "discussed the contract coming up for

4

KFC" and "a substantial pricing increase." (3/2 Tr. at 256:18-22.)[1] Mr. Pepper then offered the conclusion that "Claxton was also going to agree to have a substantial pricing increase." (3/2 Tr. at 256:18-25 – 257:1-12.) Mr. Pepper did not offer any further testimony about his "understanding" about the existence of an agreement. (3/2 Tr. at 258:4-8.)

After that, his testimony unraveled. First, Mr. Pepper repeatedly stated that he had no recollection of any specific communications with Mr. Brady, and he offered a variety of legitimate business reasons for calls with competitors.[2] Importantly, Mr. Pepper admitted that he had assumed telephone calls selectively shown to him by the government, including two calls with Mr. Brady on August 15, 2014, related to contract negotiations. (3/3 Tr. at 70:4-14; 3/7 Tr. at 144:1-5, 153:8-11, 223:3-5, 223:9-15; *see also* 3/2 Tr. at 256:5-9, 14-17.) However, Mr. Pepper later affirmed that he could not have had a telephone call with Mr. Brady regarding a "substantial price increase" on August 15, 2014 because the meeting precipitating that phone call took place on August 19, 2014, and he had no other calls with Mr. Brady in the month of August. (3/7 Tr. at 206:15-25 – 207:1-11, 219:2-13, 221:20-22, 223:16-22, 225:8-22, 226:17-25.)

Setting aside these undisputed facts, even if Mr. Pepper did communicate with Mr. Brady about a "substantial price increase," the substance of the purported conversation(s) does not establish an unlawful agreement to fix prices and to rig bids or Mr. Brady's knowing participation

---

[1] Unless otherwise indicated, transcript citations refer to the unofficial daily transcript. Given their draft status, Mr. Brady defers to the Court's recollection if it differs from the unofficial transcripts in any way.

[2] Mr. Pepper testified repeatedly that he did not have any recollection of telephone calls purportedly made to or received by him. (*See, e.g.*, 3/2 Tr. at 253:2-6, 256:14-17; 3/3 Tr. at 42:14-24, 56:23-25, 57:1-9, 58:12-15, 63:3-25 – 64:1-16, 66:22-24, 68:3-6, 70:4-14.) Further, Mr. Pepper affirmed that he spent a "great deal" of time talking to chicken suppliers about purchasing chicken (3/3 Tr. at 2013:13-21, 2014:1-12), and calls with competitors could be about "a lot of different things." (3/3 Tr. at 125:9-14; *see also, e.g.*, *id.* at 91:1-5 (quality control), 102:11-25 – 105:1-10 (covering shortages), 124:13-18 (jokes).)

in such a conspiracy.[3] Mr. Pepper's stated purpose for purportedly making a number of telephone calls at unknown times to Mr. Brady, Mr. Blake, and Mr. Little was to substantiate a rumor. (3/7 Tr. at 131:7-13; 140:14-24; *see also, e.g.*, 3/2 Tr. at 244:12-18; 244:25 – 245:1-4; 250:17-22, 256:18-25 – 257:1-2; 3/3 Tr. at 38:9-11; 39:1-3; 39:12-16; 43:10-24.) Mr. Pepper did not know who informed him about the rumored "substantial price increase"; he did not know the magnitude of it; and he never communicated to Mr. Brady or anyone else what he meant by "substantial." (3/3 Tr. at 48:14-19; 49:22-15 230:18-23; 3/7 Tr. at 143:1-11, 143:6-11.) Furthermore, Mr. Pepper repeatedly testified that he never shared Tyson's pricing information—whether current or future— with anyone. (3/3 Tr. at 192:19-21, 193:10-13, 194:9-11; 3/7 Tr. 132:19-21, 171:18-20, 261:22-25 – 261:1-5.) Mr. Pepper never received pricing specifics from Mr. Brady (3/3 Tr. at 247:14-21, 247:22-5 – 248:1-3), and Mr. Pepper could not articulate what information he learned from Mr. Brady that he then purportedly transmitted to his supervisor, Mr. Mulrenin. (3/3 Tr. at 81:15-23, 82:8-11, 86:9-13.)

Whatever information Mr. Pepper sought and received, he did so for the unilateral benefit of Tyson; nothing in Mr. Pepper's testimony even suggests a *quid pro quo* between he and Mr. Brady or anyone else. There is no evidence of interdependence between Mr. Pepper's announcement of Tyson's general intentions and Mr. Brady's purported response that, in his opinion, it appeared Claxton was considering something similar. (*See* 3/3 Tr. at 245:13-17 (Mr.

---

[3] Mr. Pepper also testified unequivocally that he did not have authority to make any decisions whatsoever regarding Tyson's pricing: Mr. Pepper did not lead negotiations; Mr. Pepper did not create or review pricing models; and Mr. Pepper did not even have discretion to forward pricing to customers without approval. (3/3 Tr. at 277:23-25 – 278:1; 3/7 Tr. at 34:1-16, 56:5-15, 61:20-23, 82:20-25 – 83:1-4, 87:3-7, 98:15-20.) Mr. Brady also did not have pricing authority. (3/1 Tr. at 27:24-25.) Further, Mr. Pepper and Mr. Suerken confirmed that Tyson submitted its proposal to RSCS in July and its price never changed. (*See* 3/3 Tr. at 245:13-17; 3/8 Tr. at 90:12-18, 92:1-19.) Under this reality, Mr. Pepper *could not* have agreed to fix prices and to rig bids with Mr. Brady at any time, much less in August.

Pepper affirming that the model Tyson's pricing department developed in June 2014 "was the same basically over when the contract was signed"); 3/7 Tr. at 144:6-25 – 145:1-5 (Mr. Pepper affirming that he made calls "to protect Tyson" and to "[m]ake sure I didn't lose any business": "I'm always competing with other competitors.").) The government's evidence of Mr. Brady's participation in the charged conspiracy vis-a-vis Mr. Pepper is nonexistent.[4]

### 2. Robert Bryant has no personal knowledge of Mr. Brady's involvement in any price-fixing or bid-rigging conspiracy.

Robert Bryant likewise offered no testimony implicating Mr. Brady in the charged conspiracy. Indeed, Mr. Bryant testified that he has not had a substantive conversation with Mr. Brady since Mr. Brady left Pilgrim's in 2012. (3/9 Tr. at 87:2-22.) Mr. Brady never gave Mr. Bryant Claxton's prices and Mr. Bryant never gave Mr. Brady Pilgrim's prices (*see* 3/9 Tr. at 96:1-14); Mr. Bryant was not aware of Claxton's bids or bid process (3/9 Tr. at 94:21-25 – 95:1-14); and Mr. Bryant never personally heard or witnessed Mr. Brady or anyone else sharing pricing information. (*See* 3/8 Tr. at 209:13-16; 3/10 Tr. at 14:10-17.)

### a. The conduct in 2014 recalled by Mr. Bryant does not establish the existence of or Mr. Brady's involvement in a conspiracy.

Notwithstanding these absolute truths, Mr. Bryant offered two points in his testimony about Mr. Brady. When asked his basis for saying that Mr. Brady participated in certain conduct—which conduct Mr. Bryant concluded was "cooperating with competitors to formulate bids and sharing

---

[4] The government elicited additional testimony from Mr. Pepper regarding two pricing events involving Popeyes: (1) a promotional discount in 2015; and (2) negotiations in 2017 for a 2-year contract beginning in 2018. Mr. Pepper mentioned Mr. Brady only in connection with the promotional discount. Mr. Pepper testified that the amount of the discount for the promotion *came from the buyer*. (3/7 Tr. at 30:15-18 ("Q. Now, in fact, Mr. Kronauge asked if everyone, each supplier including Tyson was able to offer the 2-cent discount for this promotion? A. Yes, ma'am."), 33:11-13, 35:4-20 (affirming that Popeyes "got the discount that Mr. Kronauge asked from all the suppliers, the 2-cent discount").)

7

those prices amongst competitors to either increase or limit a decrease in pricing"—Mr. Bryant testified it was "[o]verhearing a phone call between Roger Austin and Scott Brady and numerous phone calls . . . between Roger Austin and myself over the course of several years."[5] (3/8 Tr. at 152-12:14, 186:7-9.) Mr. Bryant also referenced unspecified conversations with Jason McGuire that formed the basis of his understanding that "others at Pilgrim's" discussed pricing with unspecified suppliers. (3/8 Tr. at 209:17-21.) Mr. Bryant provided no testimony whatsoever as to what information, if any, was relayed to him from Mr. Austin, Mr. McGuire, or anyone else at Pilgrim's specific to or from Mr. Brady, or when that occurred.

Mr. Bryant's recollection of a fragment of an "overheard" phone call in which Mr. Brady was named was equally devoid of detail. Mr. Bryant did not know if it occurred before or after a customer meeting, or on another day altogether as part of a hypothetical preview call to a customer. (3/8 Tr. at 217:20-25 – 218:1-15; 3/9 Tr. at 121:20-25 – 123:1-8.) Mr. Bryant admitted that the only thing he recalled overhearing Mr. Austin say was the "price is the price," and "I just need to know how many loads they want at that price." (3/8 Tr. at 217:20-25 – 218:1-15; 3/9 Tr. at 91:20-22.) He did not hear anything Mr. Brady may have said, he did not know who initiated the call, and he was not present for the full conversation. (3/9 Tr. at 87:23-5 – 93:1-20.) Mr. Austin did not

---

[5]  Mr. Bryant's complete basis for his "understanding" as to the existence of an agreement "between Pilgrim's and its competitors to raise prices in 2014 for KFC" was "[t]he phone calls I overheard, the ultimate price increase, and the emails and conversations between myself and Jason McGuire." (3/8 Tr. at 224:10-17.) The "phone calls [he] overheard" were not conversations; rather, Mr. Bryant walked into Mr. Austin's office on two occasions and heard him state the same two sentences and nothing else. (3/8 Tr. at 229:9-13; 3/9 Tr. at 87:23-5 – 93:1-20.) Next, the email underpinning his "understanding" was GX-1066, which is an internal Pilgrim's exchange stating that KFC was "surprised" with "how much higher" suppliers' proposals were and, in Jason McGuire's opinion, "Yep that should help y'all out some." GX-1066. GX-1066 does not contain any pricing information. Finally, the only detail Mr. Bryant offered about "conversations between [him]self and Jason McGuire" were vague "assurances" at unknown times that all suppliers were seeking price increases. (3/8 Tr. at 214:5-7, 228:19-22.)

8

ask the person on the other end of the line to agree with Mr. Austin and no discussion of prices occurred. (3/9 Tr. at 92:3-22, 93:11-20; 3/10 Tr. at 7:7-12.)

In striking Mr. Bryant's testimony about the existence of an agreement in 2014, the Court explicitly found that Mr. Bryant "didn't mention anything about the fact that there was a congruence of price increases or . . . that because Pilgrim's got this price increase, that that then caused him to infer that there must have been a more widespread agreement . . . . I don't find that there is a basis for his understanding. . . ." (3/8 Tr. at 237:17-25 – 238:1-14, 239:14-24.) As the Court's ruling made clear, to find that the government satisfied its burden through Mr. Bryant's testimony that Mr. Brady knowingly and intentionally entered into an agreement with anyone with the objective of rigging bids, fixing prices, raising prices, and preventing price decreases requires "piling inference upon inference"; no logical or reasonable juror could reach that conclusion. *See Valadez-Gallegos,* 162 F.3d at 1262 (citation omitted).

### b. The conduct in 2017 recalled by Mr. Bryant does not establish the existence of or Mr. Brady's involvement in a conspiracy.

Mr. Bryant also testified about negotiations in 2017 for the next KFC contract; he offered no testimony regarding Mr. Brady's conduct during that period. Mr. Bryant had no personal knowledge about any communications with or involving Mr. Brady. (*See* 3/10 Tr. at 14:10-17.) On these bases alone, the government has failed to satisfy its burden of proving that in 2017 Mr. Brady knowingly and intentionally entered into an agreement with anyone with any objective.

Even if the Court scrutinizes Mr. Bryant's testimony for any scintilla of evidence that relates to Mr. Brady in 2017, all Mr. Bryant offered was speculation about internal Pilgrim's communications. First, the government showed Mr. Bryant an internal Pilgrim's email dated January 17, 2017, wherein Mr. Austin wrote to several Pilgrim's colleagues that "Claxton meets with them [RSCS] in [sic] Thursday and I will get a blow by blow Friday morning." (GX-1882;

*see also* 3/8 Tr. at 245:4-9.) Mr. Bryant explained that Claxton had a meeting with KFC that Thursday and his "understanding" of the email was that Mr. Austin and Mr. Brady would talk on Friday "about the contents of that meeting." (3/8 Tr. 247:13-23.) Mr. Bryant believed information about Claxton's meeting with KFC "would give [Pilgrim's] an indication of what KFC had told our competitors and what their position was with our competitors and if it differed from the position that they took with Pilgrim's. It may give us some insight into how these negotiations would actually unfold." (3/8 Tr. at 247:9-15.) Mr. Bryant did not offer any testimony indicating that Mr. Austin and Mr. Brady ever actually spoke. Mr. Bryant did not testify that this "blow by blow" included the exchange of any pricing information or resulted in any type of agreement or "understanding." Indeed, Mr. Bryant told the jury that he did not recall Mr. Austin ever responding to GX-1882. (3/8 Tr. at 253:20-21.)

Second, Mr. Bryant testified that he asked Mr. Austin for competitor pricing information, and *Mr. Bryant's purpose* in doing so was "[t]o limit the amount of [a] price decrease" sought by RSCS. (3/9 Tr. at 21:3-5.) Mr. Austin provided Mr. Bryant current pricing information for several suppliers,[6] including Claxton. (*See* 3/9 Tr. at 6:8-21.) *Mr. Bryant* then used that information *to lower Pilgrim's price twice*, even though such reductions were not reflective of Pilgrim's actual costs. (3/8 Tr. at 169:6-11; 3/9 Tr. at 16:8-15, 20:7-17.)

Mr. Bryant knew *nothing* other than what he wrote down. (3/10 Tr. at 13:19-22.) He did not know whether price sharing had occurred between Mr. Austin and anyone else. (3/10 Tr. at

---

[6]   The government repeatedly framed its questions to reference bid information and elicited testimony from Mr. Bryant that he received bid information from Mr. Austin. (3/8 Tr. at 43:12-17, 174:14-22, 169:14-15 ("Q. Now, Mr. Bryant, I have been asking you about your use of competitors' bids that you received. . . ."); 3/9 Tr. at 6:10-15, 9:2-4, 9:8-11.) Notwithstanding, Mr. Bryant later affirmed that prices in his handwritten notes were current contract prices. (*See* 3/9 Tr. at 14-16 ("Q. But what we know for sure is it was the current contract price, correct? A. That's correct.").)

10

13:15-17, 19-22; *see also* 3/8 Tr. at 156:13-19; 3/9 Tr. at 21:10-16.) He did not have any understanding as to how much KFC wanted Pilgrim's to reduce its price or KFC's expected price concession. (3-9 Tr. at 20:18-24.) He did not know anything about where Pilgrim's competitors, including Claxton, were in their negotiation process. (3/10 Tr. at 13:19-22.) The basis for his expectation about what other suppliers would do was laden with buzzwords but lacked all substance. (*See* 3/9 Tr. 12:3-19, 15:3-11.) And Mr. Bryant did not know the results of the negotiations, including that multiple suppliers—including Claxton—submitted pricing lower than what was reflected in his notes, undercut Pilgrim's, and received at least some of Pilgrim's volume. (*See* 3/9 Tr. at 96 – 97:2-3, 119:16-25 – 121:1-9; 189:4-194:1-20, 207:2-23, 212:12-14; *contra* 3/8 Tr. at 165:24-25 – 166:1-3, 167:22-25, 170:13-19, 170:21-25 – 171:1-2; 3/9 Tr. at 43:12-17, 136:19-24, 207:2-23.)

Mr. Bryant unilaterally requested information from Mr. Austin, and Pilgrim's used the information Mr. Austin provided *to independently formulate and lower its own bid*. (3/8 Tr. at 169:6-11, 174:6-13; 3/9 Tr. 16:5-15, 20:7-17.) Mr. Bryant offered no testimony that Mr. Brady or anyone at Claxton agreed to anything in 2017. Mr. Bryant had *one* current price for Claxton, and there is no permissible inference that can be drawn with respect to Mr. Brady's conduct from Mr. Bryant's mere receipt of that number. Here too, the government's evidence of Mr. Brady's participation in the charged conspiracy vis-a-vis Mr. Bryant is nonexistent.

**B.     None of the government's other witnesses had any knowledge of Mr. Brady's involvement in any conspiracy.**

The government's "outsider" witnesses also failed to implicate Mr. Brady in any wrongdoing. The government's parade of purported victims from RSCS—Michael Ledford, Peter Suerken, Robert Lewis, and Sara Fisher—had no personal knowledge of Mr. Brady's or anyone at Claxton's participation in any agreement to fix prices and to rig bids. (3/1 Tr. at 108:18-25 – 109:1-

3 (Mr. Ledford); 3/8 Tr. at 92:22-25 (Ms. Fisher); 3/15 Tr. at 33:6-9 (Mr. Lewis).) Instead, their testimony regarding Claxton's (i) willingness to negotiate, (ii) competitively low prices, (iii) practice of taking directional price guidance from RSCS to reduce prices, (iv) willingness to take additional volume, and (v) favorable market conditions for chicken suppliers tends to exculpate Mr. Brady and disproves the agreements Mr. Pepper and Mr. Bryant purportedly "understood." (*See, e.g.*, 3/1 Tr. at 57:13-25 – 60:1-15, 75:10-12 – 76:1-15, 78:5-12, 102:14-25 – 104:1-2 (Mr. Ledford); 3/2 Tr. at 47:21-24, 48:3-8, 164:1-8, 188:17-25 – 189:1-13 (Mr. Suerken); 3/8 Tr. at 46:24-25 – 47:1-16, 49:14-25 – 52:1-20, 53:7-25 – 54:1-6, 55:9-19, 55:23-25 (Ms. Fisher); 3/15 Tr. at 41:4-6, 58:14 – 59:2, 59:9-11, 60:2-10, 76:7-11, 94:12-15, 169:4-9, 191:25-192:3, 215:10-16 (Mr. Lewis).)  No other witness called by the government testified differently.[7]

**C.      The government's circumstantial case against Mr. Brady requires impermissible inferences be drawn from lawful conduct.**

Having no direct evidence against Mr. Brady, the government's case relies exclusively on leaps and inferences from texts, emails, and phone records in summary charts that were admitted through the testimony of Rachel Evans. As a threshold matter, the mere exchange of competitor information, in the absence of an agreement, does not constitute a *per se* violation of the Sherman Act. *See, e.g., United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n.16 (1978); *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 475 (10th Cir. 1990) ("[I]t is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or

---

[7]      The government's other victim witness—Joseph Brink—did not negotiate with Mr. Brady. (3/10 Tr. at 98:17-25.)

discuss common aims or objectives or exchange information on independently derived prices."); *United States v. B&H Maint. & Constr., Inc.,* 07-cr-90 (D. Colo. June 19, 2008), Doc. 319-10, at 7 ("It is not illegal to obtain information about a competitor's bid or to exchange bid information without more. It is only where such acts are done pursuant to an agreement between two or more competitors to rig bids that a violation of the law occurs.").

With no evidence that Mr. Brady entered into an agreement with anyone to fix prices and to rig bids, the government's case boils down to cherry-picked phone records over an eight-year period and a handful of text messages with Mr. Fries. For instance, in GX-1427, Mr. Brady and Mr. Fries exchanged messages in 2012 that include references to other suppliers' pricing or formulas. On its face, one of Mr. Brady's messages refers to "this month['s]" price from Mr. Austin—not a bid. The evidence further reflects that the dark meat formulas referenced by Mr. Brady in GX-1427 also were *current* formulas.[8] (*See, e.g.*, B-927 at 2; *see also* 3/1 Tr. at 190:22-25, 191:5-10.) Although the wing formula referenced in the text was in both Claxton's and Pilgrim's second-round bids for the 2013 contract, the customer included instructions on the cost model to insert a market price, and as Mr. Ledford testified, a market price plus a 10-cent labor adder is a common and fair starting place in negotiations. (3/2 Tr. at 40:3-25, 45:7-16, 46-47:1-6, 52:14-21; GX-1501.) Finally, Mr. Fries responds to the series with, "Tell him we are trying!" and Mr. Brady says, "Will do." But there is no call or message between Mr. Brady and Mr. Austin after this text exchange that indicates there was any response or follow-up, and

---

[8] Mr. Ledford testified that you cannot discern a supplier's actual 8-piece price or dark meat price if all you know is ".30 back." (*See* 3/1 Tr. at 41:21-25 – 42:1-18, 170:1-24.) The dark meat formula is meaningless on its own. Mr. Ledford further explained that period pricing would not inform any supplier about future bids. (3/1 Tr. at 166:16-18.) There was no competitive advantage to having period pricing, and having period pricing does not have an impact on the competitive bid process. (3/1 Tr. at 166:3-25 – 167:1.)

13

Pilgrim's submitted its bid before Mr. Brady ever responded to Mr. Fries. *See* GX-15 at 2. Importantly, Claxton never increased its price on *any* product during the 2012 negotiations. (3/1 Tr. at 43:25 – 44:1-10, 16-20; 45:20-22; 50:4-25 – 51:1-24; 52:9 – 54:1-9.)

Mr. Brady is permitted to obtain competitors' pricing—even bids—and share that pricing with Mr. Fries so long as the information is not shared pursuant to an agreement to fix prices or to rig bids. *See In re Text Messaging Antitrust Litig.,* 782 F.3d 867, 879 (7th Cir. 2015) (describing conscious parallelism—reacting to pricing without an agreement to do anything—which does not violate the Sherman Act); *B&H Maint. & Constr., Inc.,* 07-cr-90, Doc. 319-10, at 7 ("The mere exchange of information about a competitor's bid without more is not illegal.").

Further, calls among competitors are not evidence of a conspiracy when no proof exists regarding what was discussed. It is impermissible to infer a price-fixing or bid-rigging conspiracy if a defendant's "conduct is consistent with other, equally plausible explanations" such as rational, unilateral business behavior—here, phone calls over an eight-year-period among competitors who routinely buy chicken from and sell chicken to one another to cover orders for their common customers. (3/1 Tr. at 94:19-22, 97:17-25 – 98:1-19, 164:12-25 – 165:1, 165:18-24 – 167:1.) *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596 (1986); *see also Llacua v. W. Range Ass'n,* 930 F.3d 1161, 1179-80 (10th Cir. 2019) ("The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial.") (citing multiple cases); *Kleen Prods. LLC v. Georgia-Pacific LLC,* 910 F.3d 927, 938-939 (7th Cir. 2018) ("That [20 calls were made in the days around a price increase] is not enough. We cannot put much stock in the frequency of contacts, given the amount of trading that was taking place among the firms [and] we hesitate to impugn the companies' intentions solely from the timing of the contacts"). This is critically important in

criminal matters because the government must prove its case beyond a reasonable doubt—jurors may not convict on the basis of ambiguous evidence. *See Gypsum,* 438 U.S. at 441.

## CONCLUSION

The government failed to produce sufficient evidence that Defendant Scott Brady knowingly and intentionally entered into an agreement with anyone with the objective of fixing prices, raising prices, preventing price decreases, and rigging bids. No reasonable jury could find Mr. Brady guilty of Count One. Accordingly, Mr. Brady respectfully requests that a judgment of acquittal be entered.

Dated:  March 21, 2022

Respectfully submitted,

s/ *Bryan B. Lavine*
Bryan B. Lavine
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street, N. E., Suite 3000
Atlanta, Georgia 30308
404-885-3170
Fax: 404-962-6613
Email: bryan.lavine@troutman.com
*Attorney for Defendant Scott James Brady*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2022, I electronically filed the foregoing **DEFENDANTS SCOTT BRADY'S MOTION FOR JUDGMENT OF ACQUITTAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*/s/ Bryan Lavine*
Bryan Lavine