**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   SCOTT JAMES BRADY,
4.   ROGER BORN AUSTIN, and
8.   WILLIAM WADE LOVETTE.

    Defendants.

---

**DEFENDANT SCOTT BRADY'S SUPPLEMENTAL MOTION FOR
JUDGMENT OF ACQUITTAL**

---

As established in Scott Brady's Motion for Judgment of Acquittal, Dkt. 1207,[1] and further proven during Defendants' case-in-chief, the government failed to produce evidence sufficient to prove that Claxton Poultry, Mr. Brady's employer, or Mr. Brady himself knowingly and intentionally entered into an agreement with anyone to fix prices and rig bids. At the close of this multi-week case, not a single piece of direct evidence exists to that effect. Indeed, the government conceded during Defendants' case-in-chief and its closing that well over half of its evidence—from documents and testimony to entries on its summary charts *relating to current or period pricing*—is irrelevant to the charged conspiracy, most notably including GX-1919, the centerpiece of "insider" Robert Bryant's testimony about the so-called conspiracy for the 2018 KFC contract.

---

[1]   Mr. Brady expressly incorporates by reference Dkt. 1207. This supplemental motion principally addresses evidence admitted after the close of the government's case-in-chief.

(*See* 3/22 Tr. 44:16–45:11, 170:14-18;[2] *see also* Dkt. 1207 at 13 n.8.) Further, Messrs. Gregory Finch, Richard Eddington, and Kent Kronauge provided unrebutted testimony that Claxton and Mr. Brady, among others, did not engage in unlawful conduct, and they dispelled the government's transparent attempts to characterize routine business interactions among suppliers and their customers as in furtherance of an ill-defined conspiracy.

Two reasonable juries have failed to find that Mr. Brady knowingly and intentionally entered into an agreement with anyone to fix prices and rig bids. *See* Dkt. 920, 1231. No reasonable jury will find Mr. Brady guilty of Count One, and this Court should enter a judgment of acquittal.

## ARGUMENT

**A.     There is no evidence that Claxton joined a conspiracy to fix prices and rig bids.**

    **1.     Gregory Finch comprehensively explained Claxton's business processes and strategy, and he proved that Claxton made independent pricing decisions.**

In their case-in-chief, Defendants called Gregory Finch, Claxton's CFO. Mr. Finch is responsible for developing the cost models submitted to QSR customers by inputting Claxton's actual costs from the general ledger and any estimated cost increases. (3/16 Tr. 240:4-7, 248:10-25–249:1-14, 260:12– 261:4; 3/17 Tr. 49:5-20, 56:1-11, 165:7-11.) Mr. Finch does not even consult with Mr. Brady or Mr. Fries on the cost components included in Claxton's pricing proposals to QSRs. (3/17 Tr. 49:15-25.)

Mr. Finch testified unequivocally that *regardless of what information or calls Mr. Brady may have received about competitor pricing*, Claxton always calculated, considered, and set its prices independently. (3/17 Tr. 50:6-7, 55:6-10, 95:9-18, 97:6–98:2, 107:3-22, 146:15-18, 166:5-

---

[2]     Unless otherwise indicated, transcript citations refer to the unofficial daily transcript. Given their draft status, Mr. Brady defers to the Court's recollection if it differs from the unofficial transcripts in any way.

13, 169:23-24.) No one at Claxton ever agreed to change or ever did change figures in Claxton's cost model, owned by Mr. Finch, to align price with a competitor. (3/17 Tr. 107:23–108:9.) For instance, Mr. Finch independently developed Claxton's bid for the 2015 KFC contract in late July 2014; he transmitted it to Mr. Brady and Mr. Fries on August 1; and those *same numbers* were submitted to RSCS on the August 19 bid deadline. (3/17 Tr. 61:24–64:13; GX-1133.) Claxton never learned any other suppliers' precise bids.[3] (3/17 Tr. 169:10-11, 170:9.) What Claxton's competitors were bidding simply was of no consequence because Claxton made independent business decisions. (3/17 Tr. 167:4-10, 167:11-19.)

Mr. Finch confirmed that Claxton has a longstanding, distinct, and independent negotiating strategy. Claxton's principal goals are to (1) maintain, and (2) incrementally grow its volume, which it accomplishes "by communication *with the QSR* and by following [*customers'*] *directional guidance on price*." (3/16 Tr. 249:15-22, 250:2-20; 3/17 Tr. 48:5-10.) Claxton "communicate[s] with the QSR and say[s] look, we want to be in the middle because we want to grow our volume. So you tell us where you want us to be in order to give us the extra two or three loads that we're looking for." (3/16 Tr. 250:14-18; *see also* 3/17 Tr. 166:20–167:19, 168:13-21, 184:3-4, 184:14-18.) Being in the middle allows Claxton to take volume from other suppliers on an annual basis, and it further enables Claxton to become a "go-to" for the customer *and* other suppliers to cover shortages. (3/16 Tr. 251:4-11; 3/17 Tr. 18:24–19:15.) Finding its way to the middle is not a function of any conspiracy; rather, Claxton measures itself against others' period pricing; receives

---

[3]   GX-10651 does not prove otherwise. On its face, the text states, "*Ledford* told Roger to be at .9250." What a customer directs a seller to do is not evidence that Mr. Brady ever had Pilgrim's bid for any given round of negotiations. It is uncontroverted that customers often disseminated competitively sensitive information, at times down to the fourth decimal point. (2/28 Tr. 03:9-19, 204:4-12 (Mr. Ledford); 3/17 Tr. 181:3-16 (Mr. Finch); 3/21 Tr. 218:18–221:19 (Mr. Kronauge discussing A-304 and GX-6034).) More importantly, there is no evidence that at any point Claxton matched or aligned its 8-piece or dark meat price with Pilgrim's.

3

information from distributors regarding its relative pricing position; and most importantly, relies on customer feedback. (3/16 Tr. 252:3-19, 263:11-13, 184:14-18.)

To achieve its goals, Claxton never has taken the position that "the price is the price," never has refused to negotiate, and never has refused to follow customers' downward guidance. (3/16 Tr. 255–256:17, 257:3-4; 3/17 Tr. 55:3-5, 65:1-15; 106:1-10.) Neither Mr. Finch nor anyone else at Claxton consulted with competitors to set Claxton's cost inputs. (3/17 Tr. 49:15-17.)

### 2. Richard Eddington further confirmed that Claxton's actions do not support the existence of a price-fixing or bid-rigging conspiracy.

Mr. Eddington, like his colleagues at RSCS upon whom the government relied, failed to support the existence of a conspiracy and to implicate Mr. Brady in any wrongdoing. *See* Dkt. 1207 at 11-12. Claxton never threatened to take its business elsewhere and never refused to negotiate with RSCS; Claxton responded to RSCS's directional guidance; and Claxton's consistent strategy was to be competitive, *relying on and trusting the buyer* to push Claxton to the middle. (3/15 Tr. 95:14-16, 97:24–99:4, 118:16-17, 134:5-7.) Mr. Eddington reiterated that market conditions in 2014 were unfavorable for buyers (3/15 Tr. 77:22–78:17, 140:25–141:6), and to secure KFC's supply, *RSCS told suppliers to incorporate additional margin into their proposals*— RSCS was willing to pay a premium to *all* suppliers to bridge the $1 *per bird* profitability gap between small and big birds. (*See* 3/15 Tr. 78:18–79:4, 92:25–94:15, 95:2-13, 115:9-15, 143:11-25; *see also* 3/17 Tr. 59:13–61:2, 61:18–62:3 (Mr. Finch explaining how Claxton developed its proposed "big bird adjustment" by calculating the opportunity cost of foregoing business with Chick-fil-A).) RSCS's "worst case" scenario for bridging this gap was 34 cents per pound; in the end, all suppliers reduced their bids, and the final increases were "within the range of expectation" given the market and recent sales to KFC at $1.30 per pound or more. (3/15 Tr. 96:10-17, 99:5-10, 117:14-16, 145:1-23, 150:8-22, 152:4-14.) Claxton's competitive bid pulled volume from

Pilgrim's, contrary to Mr. Bryant's testimony that the purpose of the conspiracy was to maintain market share and not lose volume. (*See* J-008.) Moreover, at RSCS's request, Claxton renegotiated its contract price only months later, which it had no obligation to do, and offered a 3-cent reduction for 2016 and 2017. (3/15 Tr. 109:6–110:7.) And it did so again in early 2017, renegotiating a 5.5-cent reduction for the last seven months of 2017. (3/8 Tr. 47:12-16, 52:5-20.)

Mr. Eddington further dispelled Mr. Bryant's speculation, based on a single e-mail, that Mr. Austin's purported effort to get a "blow by blow" of Claxton's meeting with RSCS in early 2017 was part of an illegal agreement. *See* Dkt. 1207 at 9-10. Mr. Eddington testified that RSCS strategized the order of its suppliers' initial meetings so that RSCS's message would filter through the supply chain, and that pricing was not part of the initial meetings. (3/15 Tr. 130:23–133:1.) Whenever and whatever message may have been shared afterwards—for which there is a complete failure of proof—it is undisputed that Claxton agreed to implement RSCS's price-reduction proposal that shaved off more than 10.5 cents from Claxton's price and Claxton twice asked for more volume. (3/8 Tr. 41:22–42:3, 55:23-25; 3/15 Tr. 135:21-23, 136:16–137:5.) Further, Mr. Eddington asked Mr. Brady to agree to a $49 case price on February 22, 2017, which Mr. Brady was authorized to and did accept in one day.[4] (3/15 Tr. 134:18–135:20.)

---

[4] Mr. Bryant testified that his Pilgrim's colleague, Tim Stiller, told Mr. Austin after Pilgrim's initial meeting with KFC in 2017 to "tell the industry" Pilgrim's was going to hold. (3/9 Tr. 21:24–22:24.) The government also included texts between Mr. Stiller and Mr. Austin in GX-19 purporting to show Pilgrim's "resistance" to a $49 case price. (GXs 1850-58.) First, there is no evidence that any "hold" message was transmitted to anyone. Second, the undisputed evidence from RSCS, acknowledged by Mr. Bryant, shows that Claxton did not adhere to any such directive, if one even was transmitted, for which there is no proof. (3/9 Tr. 41:22–42:3, 55:23-24 (Ms. Fisher); 3/15 Tr. 134:18–135:20, 136:16–137:5 (Mr. Eddington); *see also* 3/9 Tr. 95:15-21.)

Mr. Eddington's testimony exculpates Claxton, precludes inculpatory inferences from innocuous behavior like meeting "blow by blows," and disproves the vague "agreements" or "understandings" that Mr. Pepper and Mr. Bryant purportedly believed to exist.[5]

### 3. Kent Kronauge confirmed that none of the suppliers conspired to fix prices and rig bids for Popeyes, from 2014 to present.

Kent Kronauge, President of SMS, the buying cooperative for Popeyes, dealt a final and fatal blow to the government's allegations that Mr. Brady and others continually conspired in the fall of 2014, March 2015, and again during the fall of 2017 to fix prices and rig bids. Mr. Kronauge testified unequivocally that during 2014 negotiations, he told all suppliers to include in their cost models a 14-cent margin because SMS wanted to get ahead of market conditions. (3/22 Tr. 23:9–24:7, 24:8–25:10, 26:18-25, 28:2-5, 32:21–33:3, 67:24–68:5, GX-997.) Suppliers did not come up with this or similar figures on their own (3/22 Tr. 67:24–68:5), and Mr. Kronauge "would not care if they [collaborated with each other on their prices] or not" because he dictated what price SMS would accept for this contract.[6] (3/22 Tr. 58:3-9.) Notably, neither Mr. Pepper nor Mr. Bryant had anything to say about Popeyes' 2014 negotiations.

---

[5]   As with Mr. Finch, Mr. Eddington's testimony does not conflict with any testimony from Mr. Pepper or Mr. Bryant. Mr. Eddington also testified in detail about Claxton's and various other suppliers' negotiation strategies and bids, about which neither Mr. Pepper nor Mr. Bryant—as members of the alleged conspiracy—had any knowledge; accordingly, there is nothing against which Mr. Eddington's testimony can "conflict."

[6]   Although not in issue because of Mr. Kronauge's unrebutted testimony about the buyer-directed nature of Popeyes' pricing events, Mr. Kronauge confirmed, as did Mr. Ledford, Mr. Eddington, and Mr. Finch, that Claxton had a reasonable, independent business strategy. (3/21 Tr. 212:16–213:10.) Mr. Kronauge gave Claxton guidance on where its price needed to be to fit in the middle of the pack—guidance it would *not* need if it was conspiring, had competitors' bids, and could put itself in the middle. (3/22 Tr. 50:23–51:9.) Mr. Kronauge believed Claxton trusted his guidance, *but also expected Claxton to verify it*. (*Id.*) This is particularly true because Mr. Kronauge bluffed at times "to drive home a point" and in his experience, bluffing generally is "part of the industry." (3/21 Tr. 215:24–216:13; 3/22 Tr. 53:8-25, 66:12-21.) As a result of its independent strategy, Claxton is "probably the easiest [supplier] to deal with because wherever they've got to fit in, they will agree to do it." (3/21 Tr. 212:17-19.)

Mr. Kronauge testified that he then asked suppliers to provide a discount in 2015 for a promotion, the amount of which he set. (3/21 Tr. 225:10-23, 228:8-12; 3/22 Tr. 14:18-24, 19:22-24, 55:10-12, 55:19-22, 56:1-10, 67:7-15; *see also* 3/17 Tr. 80:4-17.) Mr. Kronauge vetted the idea and amount with Claxton, and by 11:30 AM ET on the day Mr. Kronauge sent out the blast request (*see* GX-600)—before evidence of any calls occurred between Mr. Brady and any other suppliers—Mr. Kronauge knew that Claxton agreed to provide the requested 2-cent discount. (3/21 Tr. 228:23-25, 231:25–232:11, 233:1-8.) Mr. Pepper did not testify differently. (3/7 Tr. 30:15-18, 33:11-13, 35:4-20.) Claxton gave Mr. Kronauge exactly what he requested when he requested it, there is no evidence that Mr. Brady agreed to anything with any other supplier relating to the discount, and no reasonable juror would find otherwise.

Finally, Mr. Kronauge testified unequivocally that during 2017 negotiations, he used a discount offered by Tyson to KFC as leverage in seeking a discount for Popeyes, he came up with the term of the discount he wanted for Popeyes, and he was happy with the discounts secured in 2018 and 2019. (3/22 Tr. 35:6–36:3, 36:11-14, 68:6-13; GX-701.) Although Mr. Pepper did not mention Mr. Brady in connection with the 2017 Popeyes negotiation, he testified that calls he made on or around the bid deadline were to "ask[] [suppliers] if they had sent in their bids"—*not* what suppliers' pricing proposals were. (3/3 Tr. 139:24–140:3.) Viewing Mr. Kronauge's and Mr. Pepper's testimony in the light most favorable to the government, the only information Mr. Pepper received from other supplier(s) was *the length of time* over which Mr. Kronauge's requested discount would be spread, not the amount. (3/3 Tr. 143:13–144:6.) Mr. Pepper did not testify nor is there any evidence that Mr. Pepper received any information from Mr. Brady or Claxton. Mr. Pepper never mentioned to anyone what Claxton planned to submit or had submitted *because he did not know*. (*See* GX-752—GX-758.) Mr. Kronauge, rather, told Mr. Pepper the range of

7

discounts and, consistent with his express invitation (*see* GX-744), that most suppliers were spreading it over two years. (3/3 Tr. 148:21–149:13.)

Viewed in the light most favorable to the government, no reasonable juror would find—based on the unrebutted testimony of Messrs. Finch, Eddington, and Kronauge, the contracts and bid themselves, and even the government's own witnesses—that Claxton fixed prices and rigged bids for any customer during the relevant period.

**B.   There is no evidence that Scott Brady knowingly and intentionally entered into an agreement to fix prices and rig bids—or could he do so in the first place.**

Mr. Finch testified unequivocally that Mr. Brady does not have pricing authority, cannot set prices, and cannot agree to any pricing strategy on behalf of Claxton. (3/16 Tr. 247:11-23, 248:2-5, 3/17 Tr. 108:2-5; *see also* 3/1 Tr. 27:24-25 (Mr. Ledford); 3/21 Tr. 233:1-8 (Mr. Kronauge).) Conduct by an employee without the requisite authority to fix prices of his employer forms no basis for a legitimate inference of participation in a price-fixing conspiracy. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125, 135, 137 (3d Cir. 1999) (finding "sporadic exchanges" and "desultory collection[s] of information 'on the street'" by sales reps who lack pricing authority is "far removed from a concerted reciprocal exchange of important pricing and marketing information by the officers of major companies, particularly an exchange pursuant to an agreement"); *Pevely Dairy Co. v. United States*, 178 F.2d 363, 369-70 (8th Cir. 1949); *United States v. Ward Baking Co.*, 243 F. Supp. 713, 716 n.5, 717-18 (E.D. Pa. 1965). Nevertheless, Mr. Finch's unrebutted testimony, set out below, explained many communications the government alleges are evidence of Mr. Brady's participation in the conspiracy. No reasonable jury would find

8

that Mr. Brady could or did enter into an agreement with anyone to fix prices and rig bids based on these communications.[7]

### 1. Generic Telephone Calls

Mr. Finch explained that in Mr. Brady's role as National Account Sales Manager, his job is to sell chicken—to Chick-fil-A, Popeyes, KFC, and other broiler chicken suppliers. (3/16 Tr. 245:13-19, 246:13-25.) Mr. Brady, in fact, has secured millions in sales by phone, which Mr. Finch frequently observed in his own office and otherwise learned about through his role preparing and paying related purchase orders. (*See* 3/17 Tr. 16:15–18:1-20, 18:24–19:23, 20:14–21:1.) In evaluating Claxton's transactional records, Mr. Finch swiftly debunked the government's unsubstantiated inferences from toll records and in "summary charts" that Mr. Brady's mere use of a telephone on a given day was conspiratorial. Rather, as examples, Mr. Finch proved that Claxton sought to purchase Chick-fil-A tenders from Mr. Mulrenin at Tyson and Mr. Gay at Pilgrim's on October 31 and November 1, 2013, consistent with calls on GX-17. (3/17 Tr. 21:19–22, 27–30:5, 36:25–39:24.) Similarly, Mr. Gay sought to purchase Popeyes strips from Claxton on September 6, 2017, coinciding with calls on GX-7. (3/17 Tr. 46:3– 47:12; J-041.)[8]

### 2. GX-3, 9, 355, and 982

The government chose not to call a witness to address any of its allegations or exhibits pertaining to Chick-fil-A, including GX-3 and GX-355 (purporting to relate to Chick-fil-A's transition to antibiotic-free chicken) and GX-9 and GX-982 (reflecting random communications

---

[7] Mr. Finch's testimony does not conflict with any testimony from Mr. Pepper or Mr. Bryant. Mr. Finch testified in detail about Claxton's negotiation strategy and bids, about which neither Mr. Pepper nor Mr. Bryant—as members of the alleged conspiracy—had *any* knowledge; accordingly, there is nothing against which Mr. Finch's testimony can "conflict."

[8] Rhonda Warble further explained telephone calls listed in GX-15 between Mr. Brady and Mr. Blake, which related to issues with two separate loads George's purchased from Claxton. (3/16 Tr. 217:24–226:24 (discussing I-337 and related phone records).)

about Chick-fil-A hiring Mr. Ledford and Claxton's transition from Chick-fil-A's breast model). Accordingly, with respect to GX-3 and G-355, Mr. Finch's unrebutted testimony is that Claxton did not have any experience raising antibiotic-free birds; Chick-fil-A did not provide any direction to Claxton on how to raise such birds; and Chick-fil-A did not decide on the specifications for its program until approximately August 2014, *months* after the press release and texts reflected in GX-3 and GX-355. (3/17 Tr. 82:6-8, 83:2-23, 84:2-9, 87:6-15.) Claxton did not convert its production to antibiotic-free until January 2017—*years* later—and Claxton did not earn any profit for the conversion. (3/17 Tr. 84:23–85:8, 89:15-20.) Rather, Chick-fil-A offered to reimburse suppliers for the additional production costs; the "NAE" cost was "strictly a pass-through." (3/17 Tr. 84:10–85:11, 89:6-11.) More importantly, given Claxton's lack of experience, *Chick-fil-A directed Claxton to speak with other suppliers on how to raise antibiotic-free birds and the cost of doing so*, and Claxton ultimately decided its adder amount independently, based on the advice it received from other suppliers and a consultant.[9] (3/17 Tr. 86:4-23, 87:16-20, 88:2-15.)

As to GX-9 and GX-982, Mr. Finch's unrebutted testimony established that until 2015, Claxton used a "dramatically different" market-based model for pricing its chicken while all other suppliers used a cost- or grain-based model. (3/17 Tr. 98:11–99:12, 100:8-19, 100:24–101:15.) Mr. Finch testified that it is impossible for a supplier using a grain-based model to impact the prices of or align prices with a supplier using the market model (3/17 Tr. 101:16–102:7, 103:1-4), and there is no evidence that Claxton or Mr. Brady were attempting to do so.

3. **GX-1615**

---

[9] The ABF, *not* NAE, information reflected in GX-355 came from Mr. Mulrenin, whom the government now has dismissed with prejudice from this case. Dkt. 1236, 1237.

The government admitted GX-1615 without a sponsoring witness. Mr. Finch's uncontroverted testimony,[10] however, established that this text was about Mr. Ledford's request to explore the possibility of producing a smaller bird for KFC. Mr. Finch testified that Mr. Ledford's request was *not related at all to price or any contract negotiation, requirement, or term.* (3/17 Tr. 69:8-25, 71:3-8.) It was impossible for Claxton to satisfy because it would "require a monumental shift in [Claxton's] meat block . . . capital expenditures of equipment inside the plant to run a smaller bird." (3/17 Tr. 67:21-23, 68:15-16, 71:20-21.) KFC ultimately abandoned the request. GX-1615, therefore, is irrelevant to any element of the charged offense.

### 4. GX-1427 & GX-6046

Mr. Finch's testimony supports Mr. Brady's previous argument regarding GX-1427. *See* Dkt. 1207 at 13-14. By comparing Claxton's and Pilgrim's period pricing for November 2012, Mr. Finch confirmed a price differential of 3 cents—exactly as Mr. Brady explained to Mr. Fries via text: "I talked to roger and this month he is .03 higher than us on 8 piece . . . ." (3/17 Tr. 6:24–12:18; GX-1427.) Mr. Finch also confirmed, with reference to other texts in GX-1427, that knowing a supplier's dark meat formula is meaningless; to know a supplier's dark meat price, you must also know the 8-piece price, and even then, Claxton has no way to confirm whether an 8-piece price it has is accurate. (3/17 Tr. 50:16–52:10, 162:8-24 (discussing GX-10651).)

Mr. Finch further dispelled that any conspiratorial inference may be drawn from GX-6046, which reflects Claxton's efforts to understand why some suppliers' *current* pricing was changing and whether their contracts allowed for periodic adjustments to freight and basis. (3/17 Tr. 147:8-149:1-18, 176:21–178:1-21.)

---

[10] The government chose not to elicit testimony from Mr. Ledford or anyone else regarding KFC's request for information in 2013 about the possibility of suppliers producing a biologically smaller bird.

**C.     The government failed to prove beyond a reasonable doubt that any conspirator acted in furtherance of the charged conspiracy within the statute of limitations period.**

To satisfy the statute of limitations as to Mr. Brady, the government must prove beyond a reasonable doubt that the charged conspiracy existed on June 2, 2015 or later. Dkt. 1232 at 31. The government failed to do so. As discussed above, Mr. Kronauge's unrebutted testimony proves that none of the suppliers conspired to set Popeyes' promotional discount in March 2015 or the terms of a contractual discount in 2017. Further, Mr. Bryant never testified that he had an agreement with anyone, much less with Mr. Brady, to resist price decreases in 2017; rather, the undisputed evidence is that he received *current* pricing information for some suppliers,[11] he did not know the source, and he unilaterally decided based on that information to reduce Pilgrim's initial bid. Dkt. 1207 at 9-11. Whether anyone else had that pricing or other pricing, how Mr. Austin came to have the current pricing that he provided to Mr. Bryant, or how or when anyone else put together a bid for KFC in 2017, were pure speculation on his part.

Finally, the government chose not to call a single witness to prove its allegation that in 2016, Mr. Lovette and Joe Grendys, Koch Foods' cutthroat outsider from Chicago (3/22 Tr. 221:12-17) who the government nevertheless claims was a co-conspirator, fixed credit terms for Sysco; instead, the government admitted GX-803 without a sponsoring witness. Brenda Ray, however, explained that Sysco's demand was not part of any contractual negotiation. (3/21 Tr. 139:7-12.) Neither Pilgrim's nor Koch ever received a demand for 65-day terms, as discussed in GX-803. (3/21 Tr. 143:4-22, 150:15–151:1; GXs 854, 855.) One week after Pilgrim's received

---

[11]     An analogous example of the government relying on irrefutably inaccurate information to make speculative inferences is GX-1074. Claxton proposed an increase over the prior year of more than 18 cents (*see* GX-1728, GX-1133), not 14 to 16 cents as purportedly gleaned from Mr. Austin's "checking around." There is no support for the inference that Mr. Brady provided any information to Mr. Austin, much less that he provided *incorrect* information *in furtherance of any illegal agreement.*

Sysco's demand and one day after GX-803, Fabio Sandri, Pilgrim's CFO and *not* a co-conspirator, responded to Sysco. (3/21 Tr. 144:24–147:2.) *Mr. Sandri* independently negotiated and agreed to revised terms. (*See* 3/21 Tr. 147:13–150:8, 151:19–153:11.) The terms Sysco reached with Koch's CFO, *not* Mr. Grendys, *several months later* were significantly *different*. (GXs 9700, 9701.)

The government did not allege or prove any other timely conspiratorial conduct occurred. The government undoubtedly will point to testimony from Mr. Bryant about his direction to other Pilgrim's employees, Mr. Stiller and Scott Tucker, to fix the price of boneless breasts sold to US Foods with Mar-Jac. (3/9 Tr. 30-42:1.) Neither this conduct, this product, nor this victim appeared in the indictment, *see* Dkt. 101, and according to Mr. Bryant, *this incident did not have anything to do with any Defendant in this case*. (3/9 Tr. 152:17–153:5; 3/10 Tr. 5:14-19.) Claxton does not even sell boneless breasts to US Foods. (3/9 Tr. 94:3-20.) And Mr. Bryant's story about how *that* conspiracy worked did not add up either. (*See* 3/9 Tr. 153:17–156:9.) To the extent the Court can discern *after two trials* what the object of the single, overarching conspiracy is, Mr. Bryant's interactions with US Foods is not part of it and does not save the government from its failure to satisfy the Sherman Act statute of limitations in this case for Mr. Brady.

**D.    No rational jury could find Mr. Brady guilty based on the straggling remainder of the government's circumstantial evidence.**

The government's evidence of Mr. Brady's participation in the charged conspiracy vis-a-vis Mr. Pepper and Mr. Bryant was nonexistent. Regardless of what their unsupported, inarticulable personal views were about the government's alleged conspiracy, tellingly, neither admitted to agreeing with any Defendant to do anything.[12] Neither had knowledge of Claxton's

---

[12] Five Defendants now have been dismissed with prejudice. Dkt. 1236, 1237. Mr. Pepper's and Mr. Bryant's testimony about the now-dismissed Defendants is materially indistinguishable from their testimony about Mr. Brady. *See* Dkt. 1207 at 4-11. Mr. Pepper *may* have had the same

13

future bids or negotiation strategy. Neither had knowledge of actual participation by Mr. Brady or even recollection of any firsthand communications with Mr. Brady. Defendants' evidence—the unrebutted testimony of Messrs. Finch, Eddington, and Kronauge—addressed what the government's insiders and outsiders could not: Claxton independently priced its chicken through its CFO and implemented an independent negotiation strategy *dependent upon the customer*, and Mr. Brady had no authority, actual or apparent, in that process.

Whatever circumstantial evidence is left lacks the essential substance to find a conspiracy, and the Court should decline to pile up adverse inferences to get there. *See United States v. Valadez-Gallegos,* 162 F.3d 1256, 1262 (10th Cir. 1998) (citation omitted). It is impermissible to infer a price-fixing or bid-rigging conspiracy from sporadic phone calls, stray texts, and standalone emails if the "conduct is consistent with other, equally plausible explanations," such as ordinary business behavior, including, *e.g.*, buying and selling chicken to cover orders for common customers. (3/1 Tr. 94:19-22, 97:17–98:19, 164:12–165:1, 165:18–167:1.) *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596 (1986); *Kleen Prods. LLC v. Georgia-Pacific LLC,* 910 F.3d 927, 938-939 (7th Cir. 2018); *United States v. Carnagie,* 533 F.3d 1231, 1239 n.5 (10th Cir. 2008) ("[B]ecause the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way . . . [as] a drug conspiracy. Instead, interdependence must

---

"water cooler" call about a "substantial price increase" with Messrs. Blake and Little as he allegedly did with Mr. Brady, *see* Dkt. 1207 at 5, but he never exchanged future pricing information with anyone. (3/2 Tr. 250:10-22, 254:6–255:24; 3/3 Tr. 49:20-25, 192:19–193:13; 3/7 Tr. 143:1-11, 154:19-25, 171:12-20, 178:25–179:1, 257:6-19, 263:10-23, 264:11-13.) Mr. Blake and Mr. Little no longer face prosecution. Mr. Roberts—a "ring leader"—and Mr. Mulrenin, both managers who allegedly directed Mr. Pepper to communicate with competitors about pricing (3/3 Tr. 38:38:9–41:9; 3/24 Tr. 39:14-22), also no longer face prosecution. As discussed in Dkt. 1207, on a single day in 2014, Mr. Bryant purportedly "overheard" identical fragments of one call with Mr. Brady and one call with Mr. Kantola. (3/8 Tr. 217:20–218:21; 3/9 Tr. 87:23–93:20.) Mr. Kantola too no longer faces prosecution.

be proved more precisely."); *In re Baby Food*, 166 F.3d at 133 (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994)).

Even if the straggling evidence relates to pricing in some way—which in many instances the government conceded it has no idea (*see, e.g.*, 3/17 Tr. 153:7–154:11, 155:11-13)[13]—the Court should not sustain a conspiracy prosecution or conviction "if the evidence does no more than create a suspicion of guilt." *United States v. Funez*, No. 13-CR-00160, 2014 WL 3707991, at *12 (D. Colo. July 25, 2014) (citation omitted). Mr. Brady is permitted to have, obtain, and rely upon pricing intel. Dkt, 1207 at 12-13; Dkt. 1232 at 25-26. Only where the government proves beyond a reasonable doubt that an *agreement* existed to fix prices and rig bids is such information-sharing problematic, and the government has not done so here.

## CONCLUSION

The government failed to produce sufficient evidence that Scott Brady knowingly and intentionally entered into an agreement with anyone with the objective of fixing prices and rigging bids. No reasonable jury could find Mr. Brady guilty of Count One and no reasonable jury has after two attempts. Mr. Brady respectfully requests that a judgment of acquittal be entered.

| | |
|---|---|
| Dated: April 4, 2022 | Respectfully submitted, |
| s/ *Bryan B. Lavine* | |
| Bryan B. Lavine | Megan Conway Rahman |
| Tiffany Nichols Bracewell | Laura Anne Kuykendall |
| TROUTMAN PEPPER HAMILTON SANDERS LLP | TROUTMAN PEPPER HAMILTON SANDERS LLP |
| 600 Peachtree Street, N. E., Suite 3000 | 1001 Haxall Point, Suite 1500 |
| Atlanta, Georgia 30308 | Richmond, Virginia 23219 |
| 404-885-3000 | 804-697-1200 |
| Email: bryan.lavine@troutman.com | Email: megan.rahman@troutman.com |
| Email: tiffany.bracewell@troutman.com | Email: la.kuykendall@troutman.com |

---

[13] A jury should "not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such [an inference] is infirm because it is not based on the evidence." *United States v. Hill*, 786 F.3d 1254, 1261-62 (10th Cir. 2015) (citation omitted).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April, 2022, I electronically filed the foregoing **DEFENDANTS SCOTT BRADY'S SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*/s/ Bryan Lavine*
Bryan Lavine