IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  JAYSON JEFFREY PENN,
2.  MIKELL REEVE FRIES,
3.  SCOTT JAMES BRADY,
4.  ROGER BORN AUSTIN, and
8.  WILLIAM WADE LOVETTE,

     Defendants.

---

## ORDER

---

This matter comes before the Court on defendants' motions for judgment of acquittal and supplemental motions for judgment of acquittal.[1]  Docket Nos. 1207, 1210, 1212, 1214-15, 1246-50.  Each defendant moves for judgment of acquittal pursuant to Fed. R. Crim. P. 29.  *See id.*  The government filed a consolidated response.  Docket No. 1265.  Defendant Lovette filed a reply.  Docket No. 1266.

## I. BACKGROUND

Each defendant has been charged with violating 15 U.S.C. § 1 by conspiring to rig bids and fix prices in the broiler chicken industry.  Docket No. 101 at 1-2.  The Court

---

[1] On March 31, 2022, the government filed a motion to dismiss five defendants from this case with prejudice, Docket No. 1238, which the Court granted.  Docket No. 1239.  Accordingly, the Court will deny as moot the motions for judgment of acquittal filed by Timothy Mulrenin, William Kantola, Jimmie Little, Gary Brian Roberts, and Rickie Blake.

conducted a trial of ten defendants, five of whom have now been dismissed from this case, from October 25, 2021 to December 9, 2021.  Docket No. 907 at 3.  On December 16, 2021, the Court declared a mistrial due to the jury's inability to reach a verdict as to any defendant.  Docket No. 920 at 2.  On January 13, 2022, the Court denied each defendants' motion for judgment of acquittal.  Docket No. 932.

On February 22, 2022, the re-trial began.  Docket No. 1095.  On March 15, 2022, the government rested.  Docket No. 1184.  At that time, each defendant orally moved for a judgment of acquittal, with leave to file written Rule 29 motions on or before March 21, 2022.  *Id.* at 3, 5.  On March 21, 2022, each defendant filed a written motion. Docket Nos. 1205, 1207-15.  On March 22, 2022, defendants rested.  Docket No. 1218 at 3.  Defendants renewed their motions for judgments of acquittal at the close of all the evidence, and the Court granted defendants leave to supplement their oral motions with written motions.  *Id.*  The Court took defendants' Rule 29 motions under advisement. *Id.*  On March 24, 2022, the case was submitted to the jury.  Docket No. 1225 at 2.  On March 29, 2022, the Court declared a mistrial due to the jury's inability to reach a verdict as to any defendant.  Docket No. 1231 at 2.

On March 31, 2022, the government filed a motion to dismiss five defendants from this case with prejudice, Docket No. 1238, which the Court granted.  Docket No. 1239.  On April 4, 2022, the five remaining defendants filed written supplemental motions for judgments of acquittal.  Docket Nos. 1246-50.  On April 15, 2022, the government filed a consolidated response to the five remaining defendants' original and supplemental motions.  Docket No. 1265.

2

## II.  LEGAL STANDARD

### A.  Rule 29

Rule 29 states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Rule 29(b) allows a court to reserve ruling on a motion until "after [the jury] returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).

In this case, defendants made Rule 29 motions at the end of the government's case, which the Court reserved ruling on.  Each defendant orally renewed his motion for acquittal at the close of all the evidence and supplemented his oral motion with a written motion.  Docket Nos. 1218 at 3, 1246-50.  Accordingly, the Court may also consider the defendants' evidence.  *United States v. Khanu*, 675 F. Supp. 2d 55, 61 (D.D.C. 2009) (stating that, although a court should consider the evidence at the time ruling was reserved, "because Defendant also renewed his motion for acquittal at the close of all of the evidence and after the jury returned a verdict, the Court shall also separately consider whether, based on the evidence presented by Defendant, the Government has provided sufficient evidence to prove the elements of tax evasion beyond a reasonable doubt.").

In evaluating a Rule 29 motion, a court "ask[s] if, 'viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'"  *United States v. Tennison*, 13 F.4th

3

1049, 1059 (10th Cir. 2021) (quoting *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012)).  The court "consider[s] both circumstantial and direct evidence, 'but [] do[es] not weigh the evidence or consider the credibility of witnesses.'"  *United States v. Otuonye*, 995 F.3d 1191, 1209 (10th Cir. 2021) (quoting *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019)).  A court evaluates the sufficiency of the evidence by "considering the collective inferences to be drawn from the evidence as a whole," rather than examining the evidence in "bits and pieces."  *Tennison*, 13 F.4th at 1059 (quoting *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004)).  A court may enter a judgment of acquittal "only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (citation omitted).  The sufficiency of the evidence standard is the same regardless of whether the jury returns a conviction or the court declares a mistrial due to the jury's inability to reach a verdict.  *See United States v. Nimapoo*, 2008 WL 11384038, at *1 (N.D. Ga. Apr. 11, 2008) (collecting cases).

The Court considers the evidence in the light most favorable to the government.  *See United States v. Sedillo*, 509 F. App'x 676, 680 (10th Cir. 2013) (unpublished) (stating that, in viewing the evidence in the light most favorable to the government, the court should credit the testimony tending to support the conviction rather than the testimony to the contrary); *United States v. Williamson*, 53 F.3d 1500, 1516 (10th Cir. 1995) ("By viewing the evidence in the light most favorable to the government, we necessarily resolve any conflicts in the evidence in favor of the government and we assume the trier of fact found that evidence credible."); *United States v. Cervantes*, 920

F.2d 937, 1990 WL 200238, at *2 (9th Cir. 1990) (unpublished) (stating that the court could consider both the government and defendant's evidence, but finding that "there was sufficient evidence presented in the Government's case-in-chief to uphold the verdict"); 2A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 467 (4th ed.) ("The court must look to all of the evidence, but must take the view of the evidence and the inferences therefrom in the light most favorable to the government.  That the testimony is in conflict is not in itself enough to require judgment of acquittal.").

### B.  Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints of trade."  *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (internal quotations marks omitted).  Certain restraints are unreasonable per se "because they 'always or almost always tend to restrict competition and decrease output.'"  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).  One such restraint is a price-fixing agreement.  *See United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150, 218 (1940).  Such restraints are "horizontal restraints" in that they are "imposed by agreement between competitors" and, as a result, are per se unreasonable.  *See Sharp*, 485 U.S. at 730.

5

The jury in this case was instructed that, in order to find a defendant guilty, it

must be convinced that the government has proved each of the following
elements against him beyond a reasonable doubt:
    *First*: that the charged price-fixing and bid-rigging conspiracy
existed at or about the times alleged;
    *Second*: that the defendant knowingly—that is, voluntarily and
intentionally—became a member of the conspiracy charged in the
indictment, knowing of its goal and intending to help accomplish it; and,
    *Third*: that the conspiracy affected interstate commerce.

Docket No. 1232 at 19.

As to the first element, "[a] conspiracy is a combination of two or more persons

acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose

by unlawful means." *United States v. Metropolitan Enters., Inc.*, 728 F.2d 444, 450

(10th Cir. 1984). Co-conspirators "need not know of the existence or identity of the

other members" and the agreement to join a conspiracy "need not be shown to have

been explicit." *Id.* at 451 (citations omitted). No formal agreement or words or writing is

necessary – there are no magic words that demonstrate a conspiracy. *See United*

*States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990). Rather, "[i]t is

sufficient to show that [co-conspirators] tacitly came to a mutual understanding." *Id.*

The second element "[is] satisfied by showing that [a defendant] knowingly joined and

participated in a conspiracy to rig bids." *Metropolitan*, 728 F.2d at 449-50. The third

element is satisfied by proof that "the conspiracy charged in the indictment either

occurred in the flow of interstate commerce or had a substantial effect on interstate

commerce."[2] Docket No. 1232 at 29.

---

[2] No defendant argues that this element was not proven.

6

The act of conspiring is itself the illegal conduct; there is no requirement that defendants engaged in an overt act to further the conspiracy. *See Nash v. United States*, 229 U.S. 373, 378 (1913) ("Coming next to the objection that no overt act is laid, the answer is that the Sherman act punishes the conspiracies at which it is aimed on the common-law footing,[–]that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability."); *United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011) (noting that conspiracy statutes modeled after the Sherman Act, 15 U.S.C. § 1, do not require proof of an overt act to obtain a conviction); *United States v. Miller*, 771 F.2d 1219, 1226 (9th Cir. 1985) ("Because the Sherman Act punishes the mere act of conspiring, overt acts in furtherance of the conspiracy need not be alleged.").

## III.  ANALYSIS

Each defendant argues that there is insufficient evidence to sustain a conviction as to him.  Docket Nos. 1207, 1210, 1212, 1214-15, 1246-50.  The Court will first determine whether there is sufficient evidence for a reasonable jury to find that the charged conspiracy existed and then determine whether there is sufficient evidence for a reasonable jury to conclude that each defendant knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it.

### A.  Existence of the Charged Conspiracy

The testimony of government witness Robert Bryant, a Pilgrim's Pride ("Pilgrim's") employee, is sufficient to support a finding beyond a reasonable doubt that a conspiracy existed between Pilgrim's, Koch Foods ("Koch"), Claxton Poultry ("Claxton"), Tyson Foods ("Tyson"), Mar-Jac Poultry ("Mar-Jac"), and George's Inc.

("George's") to rig bids and fix prices.[3]  Mr. Bryant stated that he was at trial to testify about cooperating with competitors to formulate bids and about sharing information among competitors in order to increase prices or limit a decrease in pricing.  Unofficial Transcript, Mar. 8, 2022 at 152.  Mr. Bryant testified that he participated in this conduct with other Pilgrim's employees, as well as with persons outside of Pilgrim's who worked for Tyson, Claxton, and Koch.  *Id.* at 152-53.  Mr. Bryant stated that when Pilgrim's formulated a bid in the quick-service restaurant ("QSR") segment, Pilgrim's would get bid information from competitors and use that information to decide on the bid Pilgrim's would submit to its QSR customers.  *Id.* at 156.  He testified that Roger Austin, Jimmie Little, Scott Tucker, and Jason Gay, Pilgrim's employees, reached out to their contacts at Tyson, Koch, and Claxton to discuss bid pricing in order for the competitors to either increase prices or limit a decrease in prices.  *Id.* at 162-64.  Mr. Bryant understood that, in the same way that Pilgrim's learned its competitor's bid information, Pilgrim's bid information was shared with competitors.  *Id.* at 169-70.

Mr. Bryant also witnessed Jason McGuire, a Pilgrim's employee, instructing Mr. Austin to inform competitors that Pilgrim's was seeking a price increase in its 2014 negotiations with customers.  *Id.* at 195-97.  When Mr. Bryant first learned that Pilgrim's was seeking a price increase in the range of $0.15 to $0.20 per pound in the 2014 negotiations with its QSR customers, he was worried that Pilgrim's would lose business because an increase of that size was a historically high increase.  *Id.* at 202-04.  A

---

[3] Mr. Bryant testified from March 8 to March 10, 2022.  At the time of this order, the official transcript was not yet available.  The Court will cite portions of the unofficial transcript for reference.

typical increase would have been a few cents. *Id*. at 202. Pilgrim's strategy was to obtain the price increases in the Restaurant Supply Chain Solutions ("RSCS") negotiations first (RSCS was Pilgrim's largest QSR customer at the time) and then use that to obtain a price increase with Pilgrim's other QSR customers. *Id.* at 204.

In the 2014 RSCS negotiations,[4] Mr. Bryant received an email from Mr. McGuire and Mr. Austin containing competitor bid information. *Id.* at 209-10. Mr. Bryant believed that Mr. McGuire forwarded the email to him in order to reassure Mr. Bryant that Pilgrim's competitors were raising prices along with Pilgrim's. *Id.* at 213-14. This information gave Mr. Bryant and the Pilgrim's negotiation team confidence going into their meeting with RSCS the next day that they did not need to give RSCS price concessions because Pilgrim's competitors were increasing prices along with Pilgrim's. *Id.* at 215-16, 219. After this meeting, Mr. Bryant overheard phone conversations Mr. Austin had with William Kantola of Koch and Scott Brady of Claxton wherein Mr. Austin informed them that Pilgrim's was not giving RSCS price concessions. *Id.* at 218. Pilgrim's competitors in the 2014 RSCS negotiations included Tyson, Koch, Claxton, Mar-Jac, and George's. *Id.* at 223.

These same suppliers entered into contract negotiations with RSCS in 2017. *Id.* at 244. Mr. Bryant's observations from the 2014 RSCS negotiations informed his actions in the 2017 RSCS negotiations. *Id.* at 249; Unofficial Transcript, Mar. 9, 2022 at

---

[4] References to the 2014 RSCS negotiations are to the negotiations between chicken suppliers and RSCS that took place in 2014 for the three-year contracts that covered 2015, 2016, and 2017. The 2017 RSCS negotiations similarly refer to the negotiations that took place in 2017 for the three-year contracts covering 2018, 2019, and 2020.

12.  Mr. Bryant asked Mr. Austin to obtain competitor bid information in 2017 so that Pilgrim's could submit a bid that was the second highest in the negotiations, Unofficial Transcript, Mar. 8, 2022 at 249, which Mr. Austin eventually provided to him.  Unofficial Transcript, Mar. 9, 2022 at 6-7.  Mr. Bryant believed that this price sharing was a "two-way-street" and was not concerned that a competitor would use Pilgrim's information to undercut Pilgrim's bid.  *Id.* at 43.  Mr. Bryant sought this information in order to limit the expected price decrease in the 2017 RSCS negotiations.  *Id.* at 21.

Mr. Bryant testified that Pilgrim's, Tyson, George's, Koch, Claxton, and Mar-Jac shared prices in order either to raise the price on RSCS in 2014 or to reduce the expected decrease in the 2017 contract with RSCS.  Because the Court "do[es] not weigh the evidence or consider the credibility of witnesses," *Otuonye*, 995 F.3d at 1209, the Court considers Mr. Bryant's testimony in the light most favorable to the government and finds that a reasonable jury could believe it to be credible.  Accordingly, the Court finds Mr. Bryant's testimony sufficient to support a finding that the charged conspiracy existed between Pilgrim's, Koch, Claxton, Tyson, Mar-Jac, and George's to fix prices and rig bids.  Accordingly, the Court considers each defendants' motion within the context that the charged conspiracy existed.

### B.  Jayson Penn

Mr. Penn argues that there is insufficient evidence against him to support a finding that he knowingly and intentionally agreed to conspire to fix prices in the broiler chicken industry.  Docket No. 1214 at 1; Docket No. 1250 at 1.  Mr. Penn argues that the trial testimony of Mr. Bryant and Carl Pepper, the toll records, the emails and texts, and the government's summary exhibits are all insufficient for a reasonable jury to base

a conviction on.  Docket No. 1214 at 4-15.  Mr. Penn goes through each of the pieces of evidence the Court relied on in denying his motion for a judgment of acquittal after the first trial and argues that they cannot sustain a conviction.  *Id.* at 7-10.  Mr. Penn's renewed motion additionally argues that no rational jury could find that the charged conspiracy existed.  *See* Docket No. 1250 at 11-15.  A reasonable jury could find that the charged conspiracy existed based on Mr. Bryant's testimony, *see supra* Section III.A, and the Court accordingly rejects this argument.

The government submitted evidence that, in August 2012, Mr. Penn forwarded an email to Mr. McGuire at Pilgrim's from a subordinate, Brenda Ray, indicating that she had received a call from a friendly competitor that it was "all over the market that Pilgrim's is taking contract pricing up."  GX-3037.  Mr. Penn's email to Mr. McGuire states, "FYI.  Do not fwd.  [N]ot exactly a legal conversation."  *Id.*[5]  Mr. Penn argues that Ms. Ray's testimony made clear that this email exchange concerned halal meat in the Northeastern market.[6]  Docket No. 1250 at 6.  However, the Court views the evidence in the light most favorable to the government.

A reasonable jury could conclude that Mr. Penn conspired to fix prices for the 2014 RSCS negotiations.  The negotiations took place in August 2014.  *See* GX-1139.

---

[5] When GX-3037 was admitted on March 10, 2022, the Court instructed the jury that Ms. Ray's email was admissible to prove the existence of the conspiracy, but not as to whether any defendant was a member of the conspiracy.  Unofficial Transcript, Mar. 10, 2022 at 81.  However, Mr. Penn's email to Mr. McGuire did not have a limiting instruction.

[6] Ms. Ray testified that halal meat is meat that has been blessed in order to be fit for consumption by the Muslim population.  Unofficial Transcript, Mar. 21, 2022 at 158-59.  Halal is defined as "sanctioned by Islamic law" or "selling or serving food ritually fit according to Islamic law."  *Halal*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/halal (last visited May 31, 2022).

On August 15, 2014, Mr. Penn spoke with Brian Roberts, a Tyson employee, for 15 minutes. GX-1231 at 3; GX-90-10 at 3. On August 18, 2014, Mr. Penn spoke with Mr. Austin for six minutes. GX-1249 at 2; GX-90-10 at 1, 3. Also on August 18, 2014, Mr. McGuire emailed Mr. Penn a spreadsheet of the KFC Pricing Model with additional rows added for the current margin and new margin of Koch, Case Farms, Claxton, George's, and Mar-Jac. GX-1036-1. Later that same day, Mr. McGuire emailed Mr. Penn the price range increases for Koch, Case Farms, Claxton, George's, and Mar-Jac. GX-9744. Mr. McGuire's email stated that "Roger did some checking around today and [Mr. McGuire] included the [competitor information] regarding the range of the total increases[ ](margin and costs) folks are going in with." *Id.* Mr. Penn replied, stating that he "[w]ill review with Bill[7] in am" and "[w]ill advise." GX-1074. The next day, Mr. McGuire emailed Mr. Penn to ask whether he was "good with [the] data provided" or if he wanted to talk that morning. GX-1058. Mr. Penn replied by instructing Mr. McGuire to "[g]et a call together." *Id.*

Mr. Penn argues that this evidence is insufficient because "[t]he source of the information is unattributed and the record nowhere suggests that Mr. Penn was aware of its provenance, requested it, instructed anyone to gather it, or took any subsequent action, much less reached an agreement with a competitor about prices." Docket No. 1214 at 9. Additionally, Mr. Penn agues that mere possession of a competitor's pricing information is lawful and insufficient evidence of a conspiracy. *Id.*

---

[7] A reasonable jury could conclude that Mr. Lovette is the "Bill" Mr. Penn refers to, as Mr. Lovette was his boss and goes by Bill.

The Court, however, has already found that there is sufficient evidence for a reasonable jury to conclude that the charged conspiracy existed and that Pilgrim's was a member of it.  *See supra* Section III.A.  Moreover, Mr. Bryant testified that Mr. Austin spoke to competitors to obtain their bid information in order to raise prices together in the 2014 RSCS negotiations.  A reasonable jury could find that Mr. Penn possessed competitor bid information that Mr. Penn knew came from Mr. Austin "checking around" with competitors during the 2014 RSCS negotiations, which Mr. Penn then discussed with Mr. Lovette before submitting Pilgrim's bid.  Taking the "collective inferences to be drawn from the evidence as a whole," *Tennison*, 13 F.4th at 1059 (quoting *Nelson*, 383 F.3d at 1229), and in the light most favorable to the government, the evidence is sufficient to support a finding that Mr. Penn knowingly joined the conspiracy by August 2012 to rig bids and fix prices in the broiler chicken industry, knowing of its goals and intending to advance them.  Accordingly, the Court will deny Mr. Penn's motions for judgment of acquittal.

### C.  Mikell Fries

Mr. Fries argues that no reasonable jury could find that the evidence is sufficient to convict him of violating § 1 of the Sherman Act.  Docket No. 1212 at 1; Docket No. 1247 at 1.  Mr. Fries argues that none of the witnesses' testimony implicated him, the government's circumstantial evidence requires impermissible inferences to be drawn from legal conduct, and the government relies on guilt by association.  Docket No. 1212 at 12-14.  Mr. Fries' supplemental motion summarizes the testimony of defense witnesses Richard Eddington, Gregory Finch, and Professor Edward Snyder, argues

that no conspiracy existed, and maintains that Mr. Fries did not enter into a conspiracy.

Docket No. 1247 at 7-15.

A reasonable jury could find that the charged conspiracy existed, *see supra*

Section III.A, and the Court accordingly rejects this argument. The Court additionally

rejects Mr. Fries' argument that the evidence against him is insufficient.

Exhibit 1427 is a text message conversation between Mr. Fries and Mr. Brady

from November 13, 2012. GX-1427. The conversation states:

> Mr. Brady: George's is .30 back on dark meat
> Mr. Brady: Pilgrim's is .30 back and Tyson is 31 back
> Mr. Fries: OI [M]ike [Ledford]![8] He bluffing hard!
> Mr. Brady: I talked to [R]oger [Austin] and this month he is .03 higher than us on 8 piece and his case weight is 50.5
> Mr. Fries: Hmmm
> Mr. Brady: He said to raise our prices, on wings he is market and market plus .10
> Mr. Fries: Tell him we are trying!
> Mr. Brady: Will do

GX-1427. Mr. Fries argues that the fact that Claxton reduced its prices the next day

shows that Mr. Fries was not part of any agreement. Docket No. 1247 at 13. However,

success of the conspiracy is not a requirement; the mere agreement to conspire is the

illegal conduct. *See Miller*, 771 F.2d at 1226 ("Because the Sherman Act punishes the

mere act of conspiring, overt acts in furtherance of the conspiracy need not be

alleged."). Mr. Fries acknowledges that success of the conspiracy is not required, but

argues that the reduction in price shows that there was no agreement. Docket No.

1247 at 13. However, the Court must view the evidence in the light most favorable to

the government. The evidence is sufficient for a reasonable jury to find that Claxton

_____

[8] Mr. Ledford was the senior director of protein purchasing at RSCS at this time. Unofficial Transcript, Feb. 28, 2022 at 250.

was part of the conspiracy and that Mr. Fries instructed Mr. Brady to let Mr. Austin know that Claxton was attempting to increase prices, as Mr. Austin wanted.  A reasonable jury could find that Exhibit 1427 proves that Mr. Fries had knowingly joined the conspiracy by November 13, 2012, being aware of the conspiracy's goal and intending to help accomplish it.  Moreover, the testimony of the defense witnesses does not overcome this conclusion.  *See Williamson*, 53 F.3d at 1516 ("By viewing the evidence in the light most favorable to the government, we necessarily resolve any conflicts in the evidence in favor of the government and we assume the trier of fact found that evidence credible.").  Accordingly, the Court will deny Mr. Fries' motions.

### D.  Scott Brady

Mr. Brady argues that there is insufficient evidence against him to sustain a conviction.  *See generally* Docket Nos. 1207, 1248.  Based on the testimony of Mr. Bryant, combined with the evidence in the record, the Court rejects this argument.

Mr. Brady argues that Mr. Bryant's testimony does not establish the existence of the conspiracy or Mr. Brady's involvement.  Docket No. 1207 at 7-11.  Mr. Brady also argues that none of the other witnesses had any knowledge of Mr. Brady's involvement in the conspiracy and the government's circumstantial evidence requires a jury to make impermissible inferences.  *Id.* at 11-15.  Mr. Brady's supplemental motion argues that the testimony of Mr. Finch, Mr. Eddington, and Kent Kronauge showed that Claxton was not a member of the conspiracy.  Docket No. 1248 at 2-7.  As noted above with respect to Mr. Fries, a reasonable jury could credit the testimony of Mr. Bryant that Claxton was a member of the conspiracy.  The Court accordingly rejects this argument.

Mr. Bryant testified that Mr. Brady cooperated with competitors to formulate bids and to share those prices in order to either increase prices or limit a decrease in pricing for the group.  Unofficial Transcript, Mar. 8, 2022 at 152, 164, 186.  Mr. Bryant based his understanding on a phone call he overheard between Mr. Austin and Mr. Brady and numerous phone calls Mr. Bryant had with Mr. Austin.  *Id.* at 186.  In addition, a reasonable jury could interpret Exhibit 1427 to support an inference that Mr. Brady was in contact with competitors for the purpose of raising prices.  Accordingly, the Court finds that the evidence, viewed in a light most favorable to the government, is sufficient for a reasonable jury to find that Mr. Brady knowingly joined the alleged conspiracy by November 2012, knowing of its goal and intending to help accomplish it.  The Court will deny Mr. Brady's motions.

### E.  Roger Austin

Mr. Austin argues that the government failed to prove that he knowingly entered into an agreement to fix prices and rig bids with the knowledge of the goal and intent to advance it.  *See generally* Docket Nos. 1210, 1246.

Mr. Bryant testified that Mr. Austin cooperated with competitors to formulate bids and to share those prices in order to either increase prices or limit a decrease in pricing for the group.  Unofficial Transcript, Mar. 8, 2022 at 152, 164, 173.  Mr. Bryant testified that he overheard phone calls between Mr. Austin and competitors and also received competitor pricing information from Mr. Austin.  *Id.* at 173.  Mr. Bryant believed that Mr. Austin called competitors in order to share price information and for Pilgrim's to be able to formulate its bids to either increase prices or limit a price decrease.  *Id.* at 174.

A reasonable jury could find that the government's exhibits bolster this conclusion.  Exhibit 1427, discussed above with respect to Mr. Brady and Mr. Fries, indicates that Mr. Austin attempted to get Claxton to raise its prices and provided Claxton with his pricing.  *See* GX-1427.  Mr. Bryant also testified that he asked Mr. Austin if he could find out what price would make Pilgrim's the second highest bid in the 2017 RSCS negotiations, which Mr. Bryant presumed Mr. Austin would contact competitors in order to do.  Unofficial Transcript, Mar. 8, 2022 at 249; GX-1882 ("I would like to know where we need to be #2 in price if you can find out.").  Mr. Bryant testified that this was the first time he recalled asking someone to obtain this information, was unsure how to go about doing it, and was uncomfortable with what he was asking Mr. Austin to do.  Unofficial Transcript, Mar. 8, 2022 at 249.  The arguments Mr. Austin makes with respect to the testimony of defendants' witnesses require the Court to make credibility determinations, which is improper.  The testimony of Mr. Bryant, in combination with the exhibits, is sufficient, viewed in the light most favorable to the government, for a reasonable jury to conclude that Mr. Austin joined the charged conspiracy by the 2014 RSCS negotiations and participated in the conspiracy through the 2017 RSCS negotiations.

### F.  William Lovette

Mr. Lovette argues that there is insufficient evidence to sustain a conviction against him.  *See generally* Docket Nos. 1215, 1249.

The Court has previously discussed Exhibit 1074 and found that it supports that Mr. Penn knowingly joined the conspiracy.  *See supra* Section III.B.  In that exhibit, Mr. McGuire sends an email to Mr. Penn reporting that "Roger did some checking around"

17

and listing the ranges of increases that competitors were "going in with" for the 2014 RSCS negotiations.  GX-1074.  Mr. Penn responded, "I am good.  Will review with Bill in am.  Will advise."  *Id.*  A reasonable jury could infer that Mr. Lovette is the "Bill" Mr. Penn refers to, as Mr. Lovette was his boss and goes by Bill.  Mr. Lovette argues that the number ranges suggest that they are "self-generated estimates" and there is no evidence that Mr. Penn did discuss the numbers with Mr. Lovette.  Docket No. 1215 at 6-7.  However, a reasonable jury could infer that Mr. Penn reviewed the competitor price ranges with Mr. Lovette because Mr. Penn told a co-conspirator he would do so and Mr. Lovette was the Pilgrim's CEO.  Additionally, Mr. McGuire's statement that the numbers came from "Roger [doing] some checking around," *see* GX-1074, leads to a reasonable inference that the competitor price ranges came from Mr. Austin talking with competitors.  Mr. McGuire's email indicated that Pilgrim's "wanted to be the leader."  *Id.* In order to be the leader, Pilgrim's would need to know competitor information and Mr. Penn would need to discuss it with Mr. Lovette.  A reasonable jury could conclude that Mr. Penn discussed the competitor price information with Mr. Lovette in order to obtain Mr. Lovette's approval for Pilgrim's bid, and that Mr. Lovette therefore had joined the conspiracy.

Exhibit 1051 additionally supports this conclusion.  On August 26, 2014, Mr. Austin emailed Mr. Penn a detailed recap of his meeting with RSCS the week before. GX-1051.  Mr. Austin indicates that Pilgrim's will be "hold[ing] firm" on the price in the negotiations.  *Id.*  Mr. Penn forwarded the email to Mr. Lovette saying, "I told Roger to proceed."  *Id.*  A little over two hours after Mr. Penn forwarded the email to Mr. Lovette, Mr. Lovette called Mr. Austin and they had a fifteen minute conversation.  GX-11; GX-

1237 at 2; GX-90-10 at 2.  Later that day, Mr. Brady texted Mr. Fries that he "talked to [R]oger [Austin] about KFC and Greeley told him not to come down on price."  GX-1238.  Mr. Lovette argues that this series of events cannot support his participation in the conspiracy because Mr. Lovette's phone call with Mr. Austin took place after Mr. Austin had spoken to RSCS.  Docket No. 1215 at 9-10.  However, Mr. Lovette's involvement in the negotiations up to that point supports the inference that Mr. Austin was holding firm in the negotiations at Mr. Lovette's direction.  Moreover, Mr. Lovette's supplemental motion relies on the Court crediting the testimony of defendants' witnesses and discrediting Mr. Bryant's testimony, which is inappropriate for the Court to do when considering a motion for a judgment of acquittal.

"[C]onsider[ing] both direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom" and "the collective inferences to be drawn from the evidence as a whole," *Tennison*, 13 F.4th at 1059 (citation omitted), a reasonable jury could conclude that Mr. Lovette knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it.  Accordingly, the Court will deny Mr. Lovette's motions for judgment of acquittal.

## IV.  CONCLUSION

The Court finds that the evidence is sufficient for a reasonable jury to find that the charged conspiracy existed and that each of the defendants knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it.  *See, e.g.*, *Metropolitan*, 728 F.3d at 451 ("Our examination of the evidence, with a view most favorable to the government, leads us to conclude that there is substantial proof, direct or circumstantial, together with reasonable inferences to be drawn therefrom, to sustain

the burden of proving that the appellants were guilty of intentionally participating in a conspiracy to rig bids beyond a reasonable doubt."). For the foregoing reasons, it is

ORDERED that Jayson Jeffrey Penn's Motion for Judgment of Acquittal [Docket No. 1214] is **DENIED**. It is further

ORDERED that Jayson Penn's Renewed Motion for Judgment of Acquittal [Docket No. 1250] is **DENIED**. It is further

ORDERED that Defendant Mikell R. Fries' Motion for Judgment of Acquittal [Docket No. 1212] is **DENIED**. It is further

ORDERED that Defendant Mikell R. Fries' Renewed Motion for Judgment of Acquittal [Docket No. 1247] is **DENIED**. It is further

ORDERED that Defendant Scott Brady's Motion for Judgment of Acquittal [Docket No. 1207] is **DENIED**. It is further

ORDERED that Defendant Scott Brady's Supplemental Motion for Judgment of Acquittal [Docket No. 1248] is **DENIED**. It is further

ORDERED that Defendant Roger Austin's Rule 29 Motion for Acquittal [Docket No. 1210] is **DENIED**. It is further

ORDERED that Defendant Roger Austin's Supplemental Rule 29 Motion for Acquittal [Docket No. 1246] is **DENIED**. It is further

ORDERED that Defendant Timothy Mulrenin's Motion for Judgment of Acquittal [Docket No. 1209] is **DENIED as moot**. It is further

ORDERED that Defendant William Kantola's Motion for Judgment of Acquittal [Docket No. 1208] is **DENIED as moot**. It is further

**ORDERED** that Defendant Jimmie Little's Motion for Judgment of Acquittal [Docket No. 1211] is **DENIED as moot**.  It is further

**ORDERED** that William Lovette's Motion for Judgment of Acquittal [Docket No. 1215] is **DENIED**.  It is further

**ORDERED** that William Lovette's Renewed Motion for Judgment of Acquittal [Docket No. 1249] is **DENIED**.  It is further

**ORDERED** that Defendant Roberts' Motion for Judgment of Acquittal [Docket No. 1213] is **DENIED as moot**.  It is further

**ORDERED** that Mr. Blake's Motion for Judgment of Acquittal [Docket No. 1205] is **DENIED as moot**.

DATED June 1, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge