IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **JAYSON JEFFREY PENN,**
2. **MIKELL REEVE FRIES,**
3. **SCOTT JAMES BRADY,**
4. **ROGER BORN AUSTIN,**
5. **WILLIAM WADE LOVETTE,**

    Defendants.

---

**UNITED STATES' NOTICE OF NON-EXPERT REBUTTAL
TESTIMONY OF FBI TACTICAL SPECIALIST REBECCA NELSON**

---

The United States hereby notifies the Court of its intention to call FBI Tactical Specialist Rebecca Nelson to testify as a non-expert rebuttal witness.

During the charged conspiracy, Defendants Roger Austin and Scott Brady called each other hundreds of times using four different phone numbers. Each had one phone number serviced by Verizon and one phone number serviced by AT&T. (*See* GX 90-10 (stipulated list of numbers).) Tactical Specialist (TS) Nelson's role, for the purposes of this trial, was to tally the number of calls between Defendants Austin and Brady. She will offer no opinion, and the steps she took were all aimed towards accurately aggregating the call data provided by Verizon and AT&T. All the materials she relied upon—the underlying phone records—have been admitted at trial and are subject to an

1

agreement between the parties concerning their authenticity.  (*See* Docket No. 1378-1 at 10–11 (summarizing authenticity and admissibility of GXs 8003, 8008, 8035, 8039); 6/14/22 Cert. Tr. at 972:6–13 (admitting exhibits in Docket No. 1378-1).)[1]  TS Nelson relied on simple, commercially available software (namely Microsoft Excel and OmniPage) to de-duplicate call records, aggregate the call information, and create charts displaying the call data.  She will testify to the process she used and what the data show concerning the timing and number of calls between Defendants Austin and Brady.

In this notice, the government summarizes TS Nelson's anticipated testimony, and then explains that: (1) Defendant Brady's opening statement opened the door to TS Nelson's testimony; (2) TS Nelson is a fact witness, not an expert; and (3) her testimony would not unfairly prejudice Defendants.  And pursuant to Federal Rules of Evidence 611(a) and 1006, the government will also seek to admit the charts (and corresponding table) that TS Nelson created.  *See* Attachments A and B.

## SUMMARY OF ANTICIPATED TESTIMONY

Through TS Nelson's testimony, the government will show the jury an accurate call count free of duplicate calls.  TS Nelson prepared a spreadsheet of calls between

---

[1] TS Nelson analyzed call records that correspond to the following four admitted exhibits: GX 8035 (for Defendant Brady's Verizon phone number ending in -1622); GX 8003 (for Defendant Brady's AT&T phone number ending in -6120); GX 8008 (for Defendant Austin's AT&T phone number ending in -1681); and GX 8039 (for Defendant Austin's Verizon phone number ending in -9379).  These call records were produced to Defendants on October 15, 2020—over a year before the first trial.

Defendants Austin and Brady.[2] The spreadsheet's content is straightforward. It comprises (1) a *deduplicated* list of all calls between Defendants Austin and Brady across their four phone numbers; (2) an overall line graph of those deduplicated calls over time (from January 2012 through December 2018) (*see* Attachment A); and (3) a subsidiary line graph for each of the seven years at issue (*see* Attachment B).

The spreadsheet's creation was also straightforward. It took roughly four steps. *First*, TS Nelson transferred AT&T and Verizon call records into Microsoft Excel. Because Verizon records were produced in PDF file format, TS Nelson used the commercially available program OmniPage to convert the PDFs into machine-readable text.[3] *Second*, TS Nelson used Microsoft Excel to identify Defendants Brady and Austin's calls to each other. *Third*, TS Nelson reviewed the data of each Brady-Austin call to identify duplicates. Calls marked as duplicates included those with similar timestamps and durations. When in doubt, TS Nelson would err in favor of marking

---

[2] On October 19, 2021, the government produced to Defendants prior versions of TS Nelson's analysis that had not yet de-duplicated all calls. On June 8, 2022, the government produced the fully de-duplicated version of TS Nelson's analysis. Finally, on June 23, 2022, the government produced a minor update to that same analysis. The update included minor corrections and easier-to-read charts for each year at issue.

[3] OmniPage is a commercially available software that performs optical character recognition (OCR) on images of text. *See* Kofax OmniPage, https://www.kofax.com/products/omnipage (last visited June 23, 2022). The software has existed since 1988. *See, e.g.*, John Markoff, *Business Technology; Now, PC's that Read a Page and Store It*, N.Y. Times (Aug. 17, 1988), https://www.nytimes.com/1988/08/17/business/business-technology-now-pc-s-that-read-a-page-and-store-it.html. In discussing TS Nelson previously, the Court recognized "there is nothing wrong with the government converting a PDF into -- you know, using something to convert it into a[n] Excel-readable format." (6/8/22 Cert. Tr. at 308:19–23.)

calls as duplicates.  *Last*, TS Nelson used Microsoft Excel to graph Scott Brady and Roger Austin's calls to each other over time.

Because the exact number of calls was not obvious from the face of the Defendants' call records, a simple sum of calls between all four phone numbers would *overstate* the number of calls between Defendants Austin and Brady.  Accordingly, step three of TS Nelson's process was aimed at ensuring the data aggregation was accurate.  The call records contain duplicate calls for at least two reasons.  To start, any given call between Defendants Austin and Brady likely appears *twice*: once in Defendant Austin's records and again in Defendant Brady's records.  In addition, due to nuances in how AT&T responds to subpoenas, a call from Roger Austin's or Scott Brady's AT&T lines may appear more than once if it (1) went straight to voicemail; or (2) called another AT&T number.  Put simply, there are duplicate calls in Defendants Austin and Brady's call records.  TS Nelson was careful to eliminate these duplicates, and will explain to the jury how she did so.[4]

In terms of substance and relevance, TS Nelson's testimony and the charts she created show the incriminating timing of calls.  Specifically, Defendants Austin and Brady called each other about 401 times between January 2012 and December 2018.  Their calls would spike shortly before and during confidential bid negotiations.  For

---

[4] TS Nelson will explain, among other things, that the deduplication process deleted only superfluous calls.  For example, where several call records corresponded to the same call, the deduplication process still retained one record of the call.  This testimony may address Defendants' concern that the deduplication process somehow led to "some undercounting of calls in non-bidding months."  (6/8/22 Cert. Tr. at 302:18.)

4

instance, between May and September 2014, Defendants Austin and Brady called each other about 102 times. During that time, the conspirators were manipulating the outcome of bids to Kentucky Fried Chicken, Chick-Fil-A, and Golden Corral. (*See, e.g.*, GX 56 (Golden Corral), 57 (Chick-Fil-A), 58-60 (KFC).) By contrast, Defendants Austin and Brady rarely spoke in the months without customer negotiations. Attached as Attachments A and B are the graphs displaying call data spanning 2012 through 2018.

## DISCUSSION

Below, the government first details why TS Nelson should be allowed to testify during its rebuttal case. The government then explains why her charts are admissible as summary exhibits.

### I. TS Nelson should be allowed to testify on rebuttal for three reasons.

The government respectfully submits that TS Nelson should be allowed to testify for three reasons. *First*, Defendant Brady's reserved opening statement opened the door to TS Nelson's testimony. *See, e.g.*, *United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) ("It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party."). Namely, after the government rested its case-in-chief, Defendant Brady's counsel argued to the jury that Defendant Brady "talk[ed] on the phone with competitors a lot" simply because he was "a salesman doing his job." (6/15/22 Cert. Tr. at 1427:15–18.) Going a step further, Defendant Brady's counsel stated that the "charts the government has with Scott [Brady]'s phone calls" fail to show bids "manipulated by competitor agreement." (*Id.* at 1427:10–15.) Unabridged, counsel for Defendant Brady

5

made the following argument against the government's call analysis in his reserved opening statement:

> [Greg Finch (Claxton's CFO)] and the pricing team come up with Claxton's initial bids without reliance on any future pricing from any competitor and without an agreement with anyone to fix prices and rig bids.  Claxton's pricing is the result of independent business decisions.  It is not the result of any understanding or agreement with competitors.
>
> Claxton's bids *are not manipulated by competitor agreement*.  And Mr. Finch will tell you that Scott Brady is not involved in determining the initial bid and that Scott Brady does not have pricing authority.  Scott is a salesman for Claxton.  He sells chicken.  He doesn't price it.  *Scott talks on the phone with competitors a lot*.  You will see *charts the government has with Scott's phone calls*.  He is *on the phone all the time with competitors*, customers, distributors.  He is a salesman doing his job.

(*Id.* at 1427:4–18 (emphasis added).)

The Defense has therefore placed the timing and number of calls squarely before the jury—and so has raised the issue such that it may properly be addressed by the government.  The government should be allowed to show the incriminating timing of Defendant Brady's calls—and, just as important, the absence of calls in certain months.  As noted above, calls between Defendants Austin and Brady would spike shortly before and during confidential bid negotiations.  And in the months without customer negotiations, Defendants Austin and Brady rarely spoke.  This pattern of calls rebuts Defendants' argument that Scott Brady is "on the phone all the time with competitors"

because "[he] is a salesman doing his job"—not a conspirator reaching "any understanding or agreement with competitors."  (*Id.* at 1427:4–18.)[5]

*Second*, TS Nelson will offer straightforward *non-expert* testimony.  As summarized above, TS Nelson will explain how she (1) counted the number of calls between Defendants Austin and Brady; and (2) ensured that she did not count any call more than once.  In short, TS Nelson will explain "just a quantification of calls."  (6/8/22 Cert. Tr. at 173:18–19.)

So her testimony, as the Court noted, would *not* "shade more into a type of expert analysis."  (*Id.* at 173:22–23, 308:19–23); *accord, e.g.*, United States v. Mota, 279 F. App'x 87, 88 (2d Cir. 2008) (allowing lay testimony on charts that summarized "hundreds of telephone calls made among the individuals involved in the [criminal] conspiracy").  Even if TS Nelson planned to characterize the pattern of calls as outright conspiratorial (which she does not), she would not necessarily be offering expert testimony.  *See, e.g.*, United States v. Bell, 911 F.2d 725 (4th Cir. 1990) (unpublished)

---

[5] A week before Defendant Brady's reserved opening statement, the Court excluded TS Nelson as a witness for the government's case-in-chief.  (*See* 6/8/22 Cert. Tr. at 308:15–309:20.)  The Court reasoned that TS Nelson was untimely disclosed.  But the Court did not discuss rebuttal witnesses.  The government thus believes that proffering TS Nelson as a rebuttal witness does not require the Court to reconsider any ruling.  If reconsideration is in fact needed, however, the government respectfully submits that Defendant Brady's opening statement changed circumstances to allow TS Nelson's testimony.

(allowing lay law enforcement testimony that, based on the calls' timing and duration, they "involv[ed] drug deals").  TS Nelson is thus a fact witness.[6]

*Last*, allowing TS Nelson's testimony during the government's rebuttal case would not unfairly prejudice Defendants.  To the contrary, Defendants have received ample notice of TS Nelson's testimony in several ways.  For one, the government now (re)discloses TS Nelson—and again telegraphs her testimony—even though "[i]t is well settled in this circuit that in non-capital cases an accused is not entitled to be furnished a list of the names of government witnesses."  *United States v. Gleeson*, 411 F.2d 1091, 1094 (10th Cir. 1969); *accord, e.g.*, *United States v. Davis*, 306 F.3d 398, 420 (6th Cir. 2002); *United States v. Garrison*, 147 F. Supp. 3d 1173, 1185 (D. Colo. 2015) (collecting cases).  For another, by arguing to the jury that it was innocuous to "talk[] on the phone with competitors a lot," Defendants have themselves opened the door to TS Nelson's testimony.  (6/15/22 Cert. Tr. at 1427:15–18.)  The government now makes plain its intent to call TS Nelson on rebuttal—before Defendants have called even a single witness.

What's more, Defendants have long had TS Nelson's call analysis in their possession.  On October 19, 2021, the government produced prior versions of TS Nelson's analysis that merely had not yet de-duplicated all calls.  On June 8, 2022, the government produced the fully de-duplicated version of TS Nelson's analysis.  And then

---

[6] Even if TS Nelson were an expert witness, the government submits that this notice would be a sufficient expert disclosure under Federal Rule of Criminal Procedure 16(a)(1)(G).

on June 23, the government produced a minor update to that same analysis—an update which included a few corrections and easier-to-read charts for each year at issue. So Defendants will have had weeks, if not months, to vet TS Nelson's work and to prepare for cross-examination. Her testimony will not surprise Defendants.

## II. The charts that TS Nelson created are admissible.

The government will also seek to admit the charts that TS Nelson created. These charts, which are reproduced in Attachments A and B, are admissible under the precedents that the Court set forth in Docket No. 741 at 2–3 (applying *United States v. Brooks*, 736 F.3d 921, 931 (10th Cir. 2013), and *United States v. Renteria*, 720 F.3d 1245, 1252 (10th Cir. 2013)). Specifically, TS Nelson created paradigmatic "chart[s]" or "summar[ies]" under Federal Rules of Evidence 1006 and 611(a). (*See, e.g.*, Docket No. 741 at 7–8 (allowing call charts in proposed exhibit A9, filed at Docket No. 723-9).) The charts summarize "voluminous writings" that "cannot be conveniently examined in court." Fed. R. Evid. 1006. Namely, the charts summarize thousands of pages of toll records for four phone numbers, for two Defendants, across seven years and tens of thousands of calls. (*See* GXs 8003, 8008, 8035, 8039 (phone records at issue).) The charts "prove the content" of the records: that Defendants Austin and Brady often called each other before and during confidential bid negotiations, but hardly at all otherwise. Fed. R. Evid. 1006. TS Nelson's charts are thus admissible.

The Court's order at Docket No. 741 is on point. There, the Courts denied Defendants' motion to exclude "chart[s] showing the number of phone calls between Jimmie Little and various individuals" between 2012 and 2020. (Docket No. 741 at 2–4,

9

7 (ruling on proposed exhibit A9, filed at Docket No. 723-9.)  Those charts, like the ones at issue here, graphed the number of calls between certain co-conspirators over time.  The Court rejected Defendants' arguments.  The charts did not need to show calls' durations and timestamps.  (*Id.* at 7.)  Nor were the charts otherwise unfairly prejudicial.  (*See id.* at 7–8.)  Rather, they were admissible because they analyzed "voluminous toll records that cannot be examined conveniently in Court."  (*Id.* at 8).

So too here.  Indeed, even charts that summarize less voluminous calls are admissible.  *See, e.g., United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (holding charts were "well within the purview of Rule 1006" because, among other reasons, they "showed the pattern and timing of [over 100] telephone calls among the co-conspirators on the three crucial days of the charged conspiracy"); *United States v. Drougas*, 748 F.2d 8, 26 (1st Cir. 1984) (holding that "pictoral[] summar[ies] [of] over one hundred calls placed during the period of the conspiracy [] were properly received under Rule 1006").  The charts that TS Nelson created are admissible.

## CONCLUSION

The United States intends to call FBI Tactical Specialist Rebecca Nelson to testify as a non-expert rebuttal witness. And pursuant to Federal Rules of Evidence 611(a) and 1006, the United States will also seek to admit the charts (and corresponding table) that TS Nelson created. *See* Attachments A and B.

Dated: June 24, 2022

Respectfully submitted,

/s/ Matthew Chou
KEVIN B. HART
LESLIE A. WULFF
PAUL J. TORZILLI
DANIEL A. LOVELAND, JR.
MATTHEW CHOU
AIDAN D. MCCARTHY
KAITLYN E. BARRY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 598-8242
Email: matthew.chou@usdoj.gov
*Attorneys for the United States*