1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLORADO

3 Criminal Action No. 20-CR-00152-PAB
  In Re: Penn II
4 UNITED STATES OF AMERICA,

5   Plaintiff,

6 vs.

7 JAYSON JEFFREY PENN,
  MIKELL REEVE FRIES,
8 SCOTT JAMES BRADY,
  ROGER BORN AUSTIN,
9 TIMOTHY R. MULRENIN,
  WILLIAM VINCENT KANTOLA,
10 JIMMIE LEE LITTLE,
  WILLIAM WADE LOVETTE,
11 GARY BRIAN ROBERTS,
  RICKIE PATTERSON BLAKE,

12
   Defendants
13 _____

14     REPORTER'S TRANSCRIPT
      Trial to Jury, Vol. 2
15 _____

16   Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 2:34 p.m. on the 23rd day of February,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
  Produced via Computer by Janet M. Coppock, 901 19th Street,
25   Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3     Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4     Washington, DC 20530, appearing for Plaintiff.
 5            Anna Tryon Pletcher and Michael Tubach of
 6     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7     San Francisco, CA 94111-3823;
 8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9     N.W., Washington, DC 20006, appearing for Defendant Penn.
10            David Beller, Richard Kornfeld and Kelly Page of
11     Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12     CO 80202, appearing for Defendant Fries.
13            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14     LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15             Laura Kuykendall and Megan Rahman of Troutman Pepper
16     Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17     appearing for Defendant Brady.
18            Michael Felberg of Reichman, Jorgensen, Lehman,
19     Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20     10017;
21
22
23
24
25
```

1        APPEARANCES (Continued)

2            Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5            Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7            Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10            James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12            Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14            Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16            Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19            John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
1                    APPEARANCES (Continued)
2              Craig Allen Gillen and Anthony Charles Lake of
3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
4    Atlanta, GA 30339;
5              Richard L. Tegtmeier of Sherman & Howard, LLC,
6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
7    for Defendant Roberts.
8              Barry J. Pollack of Robbins, Russell, Englert, Orseck
9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10   DC 20006;
11             Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13   for the Defendant Blake.
14
15                         PROCEEDINGS
16       (Jury selection was sealed.)
17         THE COURT:  Thank you.  Please be seated.
18             All right.  Those very, very patient people on the
19   other side, on my right-hand side, then, let me just say real
20   quickly thank you very much.  As you know, if you weren't here,
21   we couldn't have kept going because we had no idea whether we
22   needed to call you next.  So you were critical to the process
23   even though you are not going to be part of the jury.  And I
24   know at least two of you, when you talked to Ms. Grimm last
25   night, indicated you had some issues with your schedules and
```

1    things of that nature, but yet came back today.  I really

2    appreciate all of you doing so.  And at this time you are

3    excused.

4         So what we're going to do now is we're going to move

5    those of you who are in the back, we are going to compress

6    people in the jury box so that you can fit in too, okay?  So

7    Ms. Moore, if you don't mind, could you move one to your right.

8    And Ms. Romero, could you move two to your right.  Mr. Mattos,

9    if you don't mind repositioning yourself and then taking the

10   seat to Ms. Romero's left.  Thank you, Mr. Kane.  If you don't

11   mind repositioning.  Actually, one other, Mr. Mattos, if you

12   don't mind.  And then Mr. Kramer, if you don't mind sitting in

13   the back row there.

14        Then we'll have Ms. Carroll, do you mind taking that

15   first seat in the middle row?  Great.  Mr. Montoya, do you

16   minded repositioning there?  Once we get everybody fitted in,

17   we'll see if we -- if you want to spread out, we can do it, but

18   let's put people in there for now.  Mr. Beckwith, do you mind

19   repositioning?  Ms. Hoffman, why don't you take that seat in

20   the middle row right next to Mr. Beckwith.  Ms. Augdahl, if you

21   don't mind sitting next to Ms. Hoffman.  Mr. Sedan, if you

22   don't mind taking that end chair in the middle.  Mr. Barrett

23   and Mr. Whiteside, you can come up too and sit in the other.

24   So what we will do -- yeah, go all the way down.

25        What we can do, ladies and gentlemen, if you want a

1   little more distance, because there is no point in having the

2   front row kind of wide open or whatever, is we can do one of

3   two things.  Some of you, we can't do very many because it's a

4   crowded courtroom, but if one or two of you wanted to be more

5   socially distanced and sit in a chair kind of over by

6   Ms. Carroll -- Ms. Carroll raise your hand just so everyone

7   knows -- yeah, down there, it's possible we could do that.  We

8   could also spread some people out a little bit in the front

9   row.  So when we have the next break, let me know if you would

10  prefer to do that.  We will reorder you that way, okay?  We

11  have limited room because it's hard to spread people out

12  completely, but let me know if you would like to do that.  We

13  will do that at the next break.

14        Ladies and gentlemen, let me give you a few of the

15  rules of court that are going to apply from this point forward.

16  So as Mr. Sedan has his water which leads perfectly into this,

17  water is good.  Not coffee, not soda or anything else.  You can

18  bring those things in.  And, in fact, Ms. Grimm at the break is

19  going to show you the jury room.  And in the jury room there is

20  a coffee maker.  There is a refrigerator and you can bring

21  soda.  You can make coffee at any point in time.  But in the

22  courtroom bringing water is okay, but not anything else, okay?

23        Also, no gum chewing while we are in here.  Even

24  though you're wearing masks, your jaw activity is still

25  evident, so we won't have that.

1          Make sure your cellphones are off.  You can leave your

2     cellphones back in the jury room.  I don't care if you bring

3     them in here, but you are not going to be answering calls in

4     here.  And it's too likely at some point in time if you have

5     your cellphone in the courtroom, you are going to forget to

6     turn it off or something and have the phone ring, so probably

7     better to leave it back there.  It's in a secure hallway so you

8     your phone would be safe.

9          Once again, now that you're on the jury, really

10    important that you don't look up any information and don't

11    allow people to talk to you about the case.  People are going

12    to be curious, what's going on, what kind of case is it and

13    things of that nature.  And don't do that at all.  Also, ladies

14    and gentlemen, you have to avoid looking at any type of

15    publicity that there could be about this case.  There could be

16    publicity.  So if let's say you are listening to the radio and

17    all of the sudden something comes on the radio and it seems to

18    be about this case, turn the radio off.  Turn the channel real

19    quick.

20         Similarly, if you are looking in the paper and all of

21    the sudden you see something that may be about this case, don't

22    look at it.  And if you happen to be watching television and

23    something came on, don't look at it.  And similarly if you are

24    looking on line, obviously don't try to search on line for

25    anything about this particular case.  But also just

1   happenstance if you saw some headline or something that seemed

2   to be about this case, don't look at it.  You don't want to

3   expose yourself to that type of -- to any type of publicity

4   about this case at all.

5          I mentioned this yesterday, but during the course of

6   the trial you may hear about certain locations.  Don't visit

7   any place either.  You are not investigators.  You are people

8   who are here and the evidence is being presented to you.

9   Similarly, don't try to look up any terms.  You may hear some

10   legal terms, you may hear some industry terms, and maybe you

11   haven't gotten a good explanation of what those are.  Once

12   again, that is not your fault.  The attorneys need to give you

13   the information that you need to be able to figure out the

14   charges and to apply the burden of proof.  So don't do any type

15   of investigation or don't look up things on your own.  You have

16   to get that information from the case itself.

17          During the course of the trial, once again, you'll be

18   coming in and out of the building and there will be witnesses

19   who haven't seen you coming in and out of the building too.  So

20   they are going to have to -- No. 1, hopefully they have been

21   all told don't talk about the case at all, but also they will

22   be looking for those yellow juror buttons, too, because those

23   yellow juror buttons are a good way for people to know, got to

24   be careful to avoid interactions with that person.  So to the

25   extent you can, try to have those yellow juror buttons visible.

1          And similarly as I said before, the attorneys and the

2    defendants are going to be avoiding you too.  They are not

3    being rude.  They are just following my admonitions to avoid

4    any type of appearance of impropriety.

5          Also, ladies and gentlemen, two of you are alternate

6    jurors, but don't draw any assumptions about who those people

7    may be.  They could be any of you, okay?

8          All right.  Let's have a brief side bar at this time.

9    (At the bench:)

10   THE COURT:  Why don't I have Ms. Beller -- since other

11   people can hear me, it doesn't matter, as long as you can hear

12   me.  What I was proposing or asking is whether you would like

13   to take a brief break.  Because what I would do next is read

14   the introductory instruction to them and then we would launch

15   into closings -- I am sorry, to openings, not closings,

16   openings, but this is going to be the natural point where we

17   could take a break.  It sounds like that's a good idea.

18         Would 15 minutes be sufficient for people?  Mr. Tubach

19   is indicating 20.  Okay, we will go 20.  And that way the

20   jurors will have a chance to acquaint themselves with the jury

21   room and also we will get them situated in terms of the

22   seating, okay?  We will go ahead and take a break at this time.

23   Thank you.

24   (In open court:)

25         THE COURT:  Ladies and gentlemen, what we are going to

1    do, we are going to take a break at this time.  When we come

2    back, I am going to read to you an introductory jury

3    instruction.  And I will also then -- and then after that we

4    are going to begin the opening statements in the case, okay?

5              Yeah, sorry, Ms. Augdahl?  What did you want to say?

6              JUROR:  I just have a question.  Are we going to get

7    those pads of paper and pens?

8              THE COURT:  Yes, you are going to get those.  During

9    the break we will get those situated.  Let me get an

10   indication.  We can spread out a little bit.  Did any of you

11   particularly want to be spread out?

12             JUROR:  Can I sit in that seat?

13             THE COURT:  That's all right.  Yeah, you can.

14             Anyone else?  If anyone else wanted to like move into

15   the front row, the middle seat there, you can think about it

16   too.  Great.

17             So ladies and gentlemen, let me explain something

18   else, too, and that is from this point forward every time that

19   you go out of the courtroom or come into the courtroom, we will

20   all stand.  It's out of respect for you.  Once you get to your

21   chair, just go ahead and sit down.  It might be a little

22   strange at first because we are all standing.  It doesn't

23   matter.  You can just go ahead and sit.  And then once all of

24   you are seated, I will then indicate to everyone else in the

25   courtroom that they can go ahead and have a seat as well.

1              When you get back, Ms. Grimm will also give you a

2      security badge that will allow you to access the secure

3      hallway.  So when you come in and out, she will show you the

4      door because there is kind of a serpentine hallway in the back

5      that you will be using when you come in and out.

6              Let me see if I can think of anything else.  You will

7      notice right in front of seat No. 8 there, you see that

8      monitor?  Like Mr. Sedan on his right, you will see that little

9      cabinet in between the seats, Mr. Sedan?  Yeah, on the other

10     side too.  If you open that up, you'll see that between every

11     other chair.  There is a computer monitor in there.  I am not

12     sure whether the attorneys might be -- they will be using that,

13     so why don't you pull those out now and just practice.  It's

14     kind of like on an airline.  And then they will move -- you

15     will get used to that, but then they kind of move forward too.

16             Now, here is the trick, and that is when -- and for

17     instance, we are about ready to do that -- when I excuse you,

18     it's best to move the monitor towards you, move it forward back

19     to where -- you don't necessarily have to put it away, but

20     obviously if you move it all the way forward, it's easier for

21     everyone to get through or you can go ahead and put it back in

22     its little holder too.  But if during the course of the trial

23     you have any difficulty with a monitor, for some reason it's

24     going haywire or not working, let me know that right away.

25             One final bit of information and then I'll get to

1    Ms. Augdahl's question is that during the course of the trial,

2    the witness may be looking at something on the screen at the

3    witness stand and you may be thinking, hey, he is looking at an

4    exhibit.  How come we can't see it?  The answer is probably

5    because it hasn't been admitted yet.  So obviously you can't

6    see something until it's been admitted.  So, you know, if you

7    are wondering, that may be the reason.

8             It may also be the attorneys have to ask permission to

9    show something to you, even for an admitted exhibit, which may

10   be the reason too.  But in any event, just be patient because

11   in all likelihood it's going to be displayed to you in due

12   course, okay?

13            Question?

14            JUROR:  I don't have a question.

15            THE COURT:  Great.  At this point why don't we plan on

16   reconvening at 3:00.  Take a 20-minute break.  And in the

17   future, then, Ms. Grimm will let you out the door and she will

18   come back and get you.  You don't have to worry about coming

19   back in.  The jury is excused.

20            (Jury excused.)

21            Anything before we break?

22            Mr. Tubach?

23            MR. TUBACH:  Just briefly, Your Honor.  We are going

24   to be swapping a few minutes here and there.  Does the Court

25   want to know what those are?

1      THE COURT:  Yes.  Thanks for thinking of that.  Go
2  ahead.

3      MR. TUBACH:  So the first opening will be 23 minutes.
4  The second will be 16.  The third will be 20.  The fourth will
5  be 22.  The fifth will be 20.  The sixth will be 19.  And the
6  remainder will be 20.

7      THE COURT:  Okay.

8      MR. TUBACH:  Thank you.

9      THE COURT:  Thank you, Mr. Tubach.

10     Mr. Beller?

11     MR. BELLER:  Your Honor, my request would be that the
12  Court -- I don't recall exactly what the instruction is prior
13  to openings.  I know the pattern instruction includes what I am
14  particularly concerned about which is the potential transfer of
15  burden.  So if the jury could be advised consistent with the
16  pattern that the defendants are not required to make an opening
17  statement, can choose not to make one or can choose to reserve
18  or something along those lines, simply so the jury is aware as
19  to who has the burden.

20     THE COURT:  Any objection by the government to that
21  instruction?  It's not a formal instruction, but I would inform
22  the jury of that fact.

23     MR. KOENIG:  No objection.

24     THE COURT:  Anything else?  We will be in recess,
25  then, until 3:00.  Thank you.

 1          (Recess at 2:40 p.m.)

 2          (Reconvened at 3:02 p.m.)

 3          THE COURT:  All right.  We are back on the record.

 4   The jury is not present.  We are about ready to begin openings,

 5   but Mr. McLoughlin looks like he --

 6          MR. McLOUGHLIN:  Just a question, Your Honor, for

 7   scheduling.  You had indicated that you might want to discuss

 8   the issue of the agent text messages at the lunch.  Obviously,

 9   other circumstances said no.  I am just asking if there is a

10   time you would want us to be thinking about doing that, today

11   or tomorrow?

12          THE COURT:  I would suggest today after 5:00 or at

13   that point that we let the jury -- excuse the jury.

14          MR. McLOUGHLIN:  Thank you, Your Honor.

15          THE COURT:  Any requests for me to give you a heads-up

16   for those of you giving openings when you have a certain amount

17   of time left?  Five minutes?  Two minutes?  Assuming they are

18   not peace signs, but we have got the two minutes.

19          How about the government?

20          MR. KOENIG:  Two minutes.

21          THE COURT:  Okay.  If you run over, I will obviously

22   be letting you know, but otherwise I won't.  Okay.  Then let's

23   go ahead and bring the jury in.

24          One other thing.

25          Hold on one second, Ms. Grimm.

1          So the jurors have changed places a little bit, but

2    please keep in mind that the alternates are Ms. Hoffman and

3    Mr. Barrett.  So Ms. Hoffman, first alternate, and Mr. Barrett,

4    second alternate, okay?

5          All right.

6          (Jury present.)

7          *THE COURT:*  So Mr. Beckwith, given the fact that

8    Ms. Hoffman moved up, if you want, you can move one over.

9    Okay.  Great.  Ladies and gentlemen, I indicated to you -- and

10   it looks like you each have a pad of paper and something to

11   write with too, so that's good.

12         All right.  Let me, ladies and gentlemen, read to you

13   a preliminary instruction.  Members of the jury, at the end of

14   the trial, I will give you detailed guidance on the law and on

15   how you are to go about reaching your decision, but now I

16   simply want to generally explain how the trial will proceed.

17         This criminal case has been brought by the United

18   States Government.  I will sometimes refer to the government as

19   the prosecution.  The government is represented by Michael

20   Koenig, Heather Call, Carolyn Sweeney, Paul Torzilli, Laura

21   Butte and Jill Rogowski.

22         Defendant Jayson Penn is represented by Michael

23   Tubach, Anna Pletcher and Brian Quinn.  Defendant Mikell Fries

24   is represented by Richard Kornfeld, David Beller and Kelly

25   Page.  Defendant Scott Brady is represented by Bryan Lavine,

1    Megan Rahman and Tiffany Bracewell.  Defendant Roger Austin is

2    represented by Michael Feldberg, Laura Carwile and Julie

3    Withers.  Defendant Timothy Mulrenin is represented by

4    Elizabeth Prewitt, Marci LaBranche and Caroline Rivera.

5         Defendant William Kantola is represented by Roxann

6    Henry and James Backstrom.  Defendant Jimmie Little is

7    represented by Mark Byrne and Dennis Canty.  Defendant William

8    Lovette is represented by John Fagg, Dru Nielsen, James

9    McLoughlin and Kaitlin Price.  Defendant Gary Roberts is

10   represented by Craig Gillen, Anthony Lake and Richard

11   Tegtmeier.  Defendant Ric Blake is represented by Barry

12   Pollack, Wendy Johnson and Christopher Plumlee.

13        The Indictment charges each defendant with a

14   conspiracy to suppress and eliminate competition by rigging

15   bids and fixing prices and other price-related terms for

16   broiler chicken products sold in the United States.  The

17   Indictment is simply the description of the charges made by the

18   government against the defendants.  It is not evidence of guilt

19   or anything else.  Each defendant has pleaded not guilty and is

20   presumed innocent.

21        A defendant may not be found guilty by you unless all

22   12 of you unanimously find that the government has proved his

23   guilt beyond a reasonable doubt.  There are multiple defendants

24   in this case and you will have to give separate consideration

25   to the case against each defendant.

1          The first step in the trial will be the opening

2     statements.  The government in its opening statement will tell

3     you about the evidence which it intends to put before you.

4     Just as the Indictment is not evidence, neither is the opening

5     statement.  Its purpose is only to help you understand what the

6     evidence will be.  It is a road map to show you what is ahead.

7          After the government's opening statement, each

8     defendant may make an opening statement.  The defendants, if

9     they choose to, don't have to make an opening statement or a

10    defendant could defer his opening statement until after the

11    close of the government's case.

12         Evidence will be presented from which you will have to

13    determine the facts.  The evidence will consist of the

14    testimony of the witnesses, documents and other things received

15    into the record as exhibits and any facts about which the

16    lawyers agree or to which they stipulate.

17         The government will offer its evidence.  After the

18    government's evidence, each defendant may present evidence, but

19    no defendant is required to do so.  I remind you that each

20    defendant is presumed innocent, and it is the government that

21    must prove each defendant's guilt beyond a reasonable doubt.

22    If the defendants submit evidence, the government may introduce

23    rebuttal evidence.

24         At times during the trial, a lawyer may make an

25    objection to a question asked by another lawyer or to an answer

1    by a witness.  This simply means that the lawyer is requesting

2    that I make a decision on a particular rule of law.  Do not

3    draw any conclusion from such objections or from my rulings on

4    the objections.  If I sustain an objection to a question, the

5    witness may not answer it.  Do not attempt to guess what answer

6    might have been given if I had allowed the answer.

7            If I overrule the objection, treat the answer as any

8    other.  If I tell you not to consider a particular statement,

9    you may not refer to that statement in your later

10   deliberations.  Similarly, if I tell you to consider a

11   particular piece of evidence for a specific purpose, you may

12   consider it only for that purpose.

13           During the course of the trial, I may have to

14   interrupt the proceedings to confer with the attorneys about

15   the rules of law that should apply.  Some of these conferences

16   may take more time, so I will excuse you from the courtroom.  I

17   will try to avoid such interruptions whenever possible, but

18   please be patient even if the trial seems to be moving slowly

19   because conferences often actually save time in the end.

20           You are to consider all the evidence received in this

21   trial.  It will be up to you to decide what evidence to believe

22   and how much of any witness' testimony to accept or to reject.

23   After you have heard all the evidence, I will instruct you on

24   the rules of law which you are to use in reaching your verdict.

25   The government and each defendant will then each be given time

 1    for their final arguments.

 2          Let me give you some information about whether or not

 3    you choose to take notes.  If you would like to take notes

 4    during the trial, you may.  On the other hand, you are not

 5    required to take notes.  If you do decide to take notes, be

 6    careful not to get so involved in note-taking that you become

 7    distracted.  And remember that your notes will not necessarily

 8    reflect exactly what was said, so your notes should be used

 9    only as memory aids.  Therefore, you should not give your notes

10    precedent over your independent recollection of the evidence.

11    You should also not be unduly influenced by the notes of other

12    jurors.  If you do take notes, leave them in the jury room at

13    night and do not discuss the contents of your notes until you

14    begin deliberations.

15          I do not permit jurors to ask questions of witnesses

16    or of the lawyers.  If you are unable to hear a witness or a

17    lawyer, please raise your hand immediately and I will see that

18    that is corrected.

19          Each defendant is charged in the Indictment with a

20    violation of 15, United States Code, Section 1 of the Sherman

21    Act.  This law makes it a crime to unreasonably restrain trade.

22    The Indictment charges the defendants with conspiring to rig

23    bids and fix prices for broiler chicken products beginning at

24    least as early as 2012 and continuing through at least early

25    2019.

1    To find a defendant guilty of this crime, you must be

2    convinced that the government has proved each of the following

3    elements against him beyond a reasonable doubt:

4    First, that the charged price-fixing conspiracy

5    existed at or about the times alleged.

6    Second, that the defendant knowingly, that is

7    voluntarily and intentionally, became a member of the

8    conspiracy charged in the Indictment knowing of its goals and

9    intending to help accomplish it.

10    And third, that the conspiracy affected interstate

11    commerce.

12    During the course of the trial, you should not talk

13    with any witness or with any of the defendants or with any of

14    the lawyers at all.  In addition, during the course of the

15    trial, you should not talk about the trial with anyone else

16    whether in person or on a podcast, on the web or on any social

17    media platform.  Also, you should not discuss this case among

18    yourselves until I have instructed you on the law and you have

19    gone to make your decision at the end of the trial.  It is

20    important that you wait until all the evidence is received and

21    you have heard my instructions on the controlling rules of law

22    before you deliberate among yourselves.

23    Let me add that during the course of the trial, you

24    will receive all the evidence you properly may consider to

25    decide the case.  Because of this, you should not attempt to

1    gather any information on your own that you think might be

2    helpful.  Do not engage in any outside reading or research on

3    this case, including through the use of the internet,

4    cellphones, smart phones or paper resources.  Do not attempt to

5    visit any places mentioned in the case and do not in any other

6    way try to learn about the case outside the courtroom.

7           Now that the trial has begun, you must not listen to

8    or read about it in the media.  The reason for this is that

9    your decision in this case must be made solely on the evidence

10   presented at the trial.

11          The court reporter is making stenographic notes of

12   everything that is said.  This is basically to assist in any

13   appeals.  However, a typewritten copy of the testimony will not

14   be available for your use during deliberations.  On the other

15   hand, any exhibits will be available to you during your

16   deliberations.

17          And with that introduction, then the United States may

18   present its opening statement.

19          *MR. KOENIG:*  I am sorry, can we have --

20          *THE COURT:*  We can.  So ladies and gentlemen, if you

21   don't have your monitors out, you may want to do that because I

22   think that Mr. Koenig is going to use some slides. Yes?

23          *THE JURY:*  I have a question.  I have a blurry screen.

24          *MR. KOENIG:*  It needs to be published to the jury.

25   There you go.

1        THE COURT:  How does the screen look now, Ms. Augdahl?

2        JUROR:  It's still fuzzy.

3        THE COURT:  We have a big screen up here if you can't

4   see it.  Mr. Beckwith, do you have that problem too?

5        JUROR:  I don't have it on the monitor.  I can see it

6   there, but not here.

7        THE COURT:  Anyone else have a problem with their

8   screens?

9        JUROR:  Fuzzy as well, but I can see it there.

10       JUROR:  We turned it off and then back on and it

11  worked.

12       THE COURT:  Maybe we can try that just so we know

13  whether IT -- okay, great.

14       Sorry about that, Mr. Koenig.  Go ahead whenever you

15  are ready.

16       MR. KOENIG:  Thank you.

17                      **OPENING STATEMENT**

18       MR. KOENIG:  Ladies and gentlemen, all 10 defendants

19  in this courtroom are charged with a crime, 10 defendants from

20  five competing chicken suppliers.  They are charged with the

21  crime of having an illegal agreement for conspiring to rig bids

22  and fix the price of chicken, a household staple.  You will see

23  in the evidence that the defendants conspired for years to

24  raise the price of chicken to its customers, household names

25  like KFC, Boston Market, Chick-fil-A, Popeye's, others.

1          The defendants and their companies were supposed to be

2     competing.  Now, why does that matter?  Competition drives

3     prices down.  Bid-rigging, price-fixing drive prices up.  The

4     evidence uncovered by the FBI and other agencies, evidence you

5     will see in this trial shows that the defendants weren't

6     competing.  They were cheating.  They were members of a

7     conspiracy, an exclusive club, an exclusive price-fixing club.

8          And as you'll see, membership in that including had

9     its privileges.  Access to each other's future bids, prices,

10    plans, access they weren't meant to have.  And what was the

11    price of admission to the price-fixing club, to the conspiracy?

12    The agreement I mentioned at the outset, not a written

13    agreement, but a mutual understanding that members would not

14    use their privileged access to compete, but would instead use

15    it to cheat.

16         Membership meant the defendants could bypass the

17    competitive process.  They didn't always have to duke it out

18    with each other, with their competitors, by lowering price to

19    win business.  You will learn they used their privileged access

20    to conspire, to work with a pack mentality, to form a united

21    front against their customers to raise prices together.  That,

22    ladies and gentlemen, is called bid-rigging.  It's called

23    price-fixing.  And the defendants are charged with the crime of

24    conspiring to do exactly that.

25         So why did they do it?  Why did they coordinate with

1    their competitors to raise prices together?  Well, you're going

2    to see in the evidence that just like a rising tide lifts all

3    boats, rising prices lifts all competitors.  And just to give

4    you a sense of the magnitude, in 2014, and that's a year you

5    are going to hear a lot about in this case, KFC entered into

6    contracts with various suppliers, including the defendants'

7    companies, to buy somewhere between eight and 9 million pounds

8    of chicken on the bone, but that was not for the year and that

9    was not for a month.  That was for every single week, eight to

10   9 million pounds per week.  With those kind of numbers, even

11   small changes, fractions of pennies could make a difference.

12   The defendant knew that and that's -- that's what drove them.

13        So I would like to take a minute to give you some

14   background on the chicken industry and how it was supposed to

15   work.  And in this case you are mostly going to hear about

16   customers that are fast food restaurants, okay?  Fast-food

17   companies use a very specific size chicken and it's referred to

18   simply as small bird.  And generally speaking, when fast-food

19   companies negotiate their prices for the following year, they

20   do it toward the end of the year.

21        So what they do is they send out requests for bids to

22   the competing suppliers in order to compete -- send out

23   requests for bids to competing suppliers all at once.  Some of

24   the bigger customers, your KFCs, your Popeye's, Boston Market,

25   they do a multi round -- what's sometimes called a blind

1    bidding system where one supplier can't see what any other

2    supplier is bidding.  And the customers will tell you that they

3    did that to create a competitive environment, to get the best

4    deals possible.

5         But you will also hear from conspiracy insiders,

6    members of that price-fixing club who will tell you that's not

7    what they delivered.  They will tell you that the conspiracy

8    was about using their privileged access to each other's future

9    bids, plans, prices to take the blind out of blind bidding.

10   They showed their cards to each other with the understanding

11   that they wouldn't use that information to compete and instead

12   they would use it to cheat, to raise prices together.  The

13   insiders will also tell you that the conspiracy was about

14   secrecy.  The customers knew nothing about it, and that's

15   exactly how the defendants wanted it.

16        So I would like to take a moment to direct your

17   attention to the screens and talk about the defendants.  At the

18   top left, you have Pilgrim's Pride, a chicken supplier.

19   Defendant Bill Lovette who is sitting right here and Jayson

20   Penn, Bill Lovette was the CEO for the majority of the time of

21   the charged conspiracy.  Jayson Penn was his successor and

22   right-hand man.  Behind me at this table, Defendant Roger

23   Austin and Jimmie Little, salesmen, sales executives at

24   Pilgrim's, the boots on the ground.

25        Over at this table from Tyson Foods, Defendant Brian

56

1    Roberts and Tim Mulrenin, executives, managers in charge of a

2    big portion of Tyson sales to fast-food restaurants.  Over

3    here, Defendant Mikell Fries and Scott Brady, they worked at

4    Claxton Foods, executives.  And finally, at competitor Koch and

5    George's we have Defendant Bill Kantola and Defendant Ric

6    Blake.  Those are the defendants.

7         Each defendant that I just introduced you to was a

8    member of the conspiracy for years.  And you'll see that they

9    were -- they participated in the conspiracy in 2012, 2013,

10   2014, 2015, so on.  You will also see that like any other club,

11   some members were more active than others, but they all had

12   access to the conspiracy's privileges whenever they wanted.

13        And here is how it worked.  In a normal competitive

14   environment -- may I approach the screen?

15        THE COURT:  You may.

16        MR. KOENIG:  In a normal competitive environment,

17   there is kind of three stages to this negotiation, this bidding

18   process.  A customer, like a KFC or a Popeye's, sends out a bid

19   request to competing chicken suppliers.  Each one goes back to

20   their respective companies, meet to talk with their colleagues,

21   their bosses, formulate a bid, and then independently submit

22   their bids to the customer.  But what you're going to see is

23   that in the conspiracy it worked differently.

24        The first step is the same.  Customers send out bids

25   to competitors.  But here is where it gets different and you

1    will see this in the evidence.  When that happens, the members

2    of the conspiracy, the defendants, got together on the phone,

3    text, e-mail, discussed, formulated a plan, and that affected

4    the remaining steps.  Instead of going back to independently

5    discuss with their teams, they went back with the plan in hand

6    so that they could put together a bid that would have higher

7    prices because of the coordination and then submit that higher

8    bid to the competitor -- or the customer.

9         Now, some of the evidence you'll see is that the

10   customer in some cases was asking for pricing for something

11   like freezing or storage.  It wasn't always an annual bid,

12   sometimes the cost to buy now and pay later.  And some of the

13   evidence is going to show the close relationship between

14   competitors.  And, in fact, you'll see evidence that sometimes

15   competitors did compete, but by and large that's how it worked.

16   You will see that.  The pattern, the four stages will come

17   through the evidence loud and clear.

18        So, for example, in 2012 and in 2013, you'll see those

19   four stages when KFC negotiated its prices for the following

20   year.  In 2014 KFC decided to switch to a three-year contract

21   and they did the same thing in 2017.  You'll see those four

22   stages there as well.  You're also going to see it with other

23   customers in other years.  But I want to stop and talk a little

24   bit about those three-year deals and in particular 2014.

25        And it began with Mother's Day in 2014.  Mother's Day

 1   is traditionally the biggest day of the year for KFC.  Leading

 2   up to Mother's Day in 2014, it was generally known that the

 3   chicken supply of small bird was tight.  There wasn't quite

 4   enough to go around.  And on Mother's Day of 2014, the

 5   unthinkable happened.  KFC ran out of chicken.  Kentucky Fried

 6   Chicken ran out of its flagship product on the biggest day of

 7   the year.  And KFC's predicament reverberated in the industry.

 8   Chicken customers got nervous.  It was a crisis.

 9           But for members of the conspiracy you will see it was

10   an opportunity.  You are going to hear from a conspiracy

11   insider, a man named Robbie Bryant who was part of Defendant

12   Lovette's crew over the Pilgrim's.  First, he will tell you he

13   didn't know about the conspiracy, but in the summer of 2014 he

14   was brought into the fold.  He will tell you about a plan among

15   the conspirators to play on customers' fears of running out of

16   chicken in order to get historically high price increases,

17   north of 15 cents a pound starting with KFC, and the others

18   would fall like dominos.

19           And the defendants' conspiracy was at the center of

20   it.  Mr. Bryant will tell you they planned to what he will say

21   is blitz the customers, playing on their fears of running out

22   of chicken, saying that supplies were short and about to become

23   even shorter because Pilgrim's was going to convert a plant to

24   make more profitable to different size birds.  And to be fair,

25   there was some truth to that.  I mean, KFC had just run out of

1    chicken after all.

2           But Mr. Bryant will also tell you that the short apply

3    could really only support maybe an increase of 5 cents a pound.

4    He will also tell he was afraid that if they went after 15

5    cents a pound, triple the amount he thought, he was afraid the

6    customers, the competition would swoop in, steal Pilgrim's

7    business just like any competitor should if there is actual

8    competition.

9           But Mr. Bryant will tell you that subsequently he was

10   in Defendant Austin's office and he witnessed Defendant Austin

11   on the phone with his competitor, Defendant Brady, at Claxton.

12   He witnessed Defendant Austin on the phone with Defendant

13   Kantola at Koch, another competitor, assuring them that he was

14   holding firm on the price increase.

15          You will also hear from another conspiracy insider, a

16   man name Carl Pepper.  He was part of Defendant Roberts' crew

17   over at Tyson.  Mr. Pepper was also concerned about the

18   historically high price increase.  He thought competitors would

19   swoop in just like Mr. Bryant did.  But at the direction of his

20   superior, Defendant Mulrenin, Mr. Pepper worked the phones,

21   called other members of the conspiracy.  He called Defendant

22   Blake at George's, Defendant Little at Pilgrim's, Defendant

23   Brady at Claxton, all competitors, to make sure they were on

24   the same page, that they would go -- also go for historic price

25   increases.

1          And so I would like to show you how it worked.  You

2     will see this evidence with the four stages again.  Right here,

3     this is just one bid request sent from KFC to Roger Austin at

4     Pilgrim's.  They were sent out to a bunch of different

5     competitors.  Stage two, you see the calls from the time --

6     from the date the very first bid was submitted all the way

7     almost to the last, call after call after call between

8     defendants and other competitors, getting the plan shored up.

9          And then what you will see in stage three, using,

10    having had a plan in hand with the other customers or

11    competitors being on the same page, you will see an e-mail to

12    Jayson Penn of Pilgrim's.  It says, "Roger" -- Roger Austin --

13    "did some checking around today.  Total increases folks are

14    going in with," and then it lists competitors before they ever

15    submitted their price increases to KFC.  And you'll see the

16    price increases are all very, very close.  And what was

17    Defendant Penn's response?  Was it what are you doing?  Don't

18    do that?  He said, "I am good.  Will review with Bill" --

19    Defendant Bill Lovette -- "in the a.m.  Will advise."

20         You are going to see something similar in these

21    negotiations where Defendant Brady reported to Defendant Fries

22    who instead of telling him to stop, picked up the phone and

23    called competitors of his own.  Now, there were subsequent

24    rounds of bids.  And you'll see that after the mass initial

25    hike, some suppliers gave little ground.  But the point is they

1   went from here to here together.

2        And in 2017 for the next three-year deal when chicken

3   costs were going down, you will see the defendants conspired to

4   keep the prices from going down with them.

5        I want to take a quick minute to explain to you how

6   the evidence will be presented in this case.  First, you are

7   going to hear from -- or up front you will hear from Special

8   Agent LaNard Taylor from the Federal Bureau of Investigation

9   who is sitting right here at the government's table.  He is

10  going to explain to you how the investigation evolved, the

11  different steps that were taken, subpoenas, interviews, phone

12  records, search warrants, that type of thing.  He is going to

13  explain the thoroughness of the investigation and the type of

14  evidence he gathered.

15       We are also going to bring in witnesses to talk about

16  some technical aspects of documents like how they are stored

17  and that type of thing.  And I will pause here to just tell you

18  that some will be shown to you with a witness on the stand

19  walking through it essentially.  Other documents may just be

20  put up on the screen for you to read on your own.  There will

21  be short ones and there will be some that are a little longer.

22  And I urge you to read them carefully.  Look at all the words.

23  And then some you may not even see until closing arguments, but

24  that's how the documents will be presented.

25       You are going to hear from the two conspiracy insiders

1    I mentioned, Mr. Bryant, Mr. Pepper.  You are going to hear as

2    you might imagine several witnesses from KFC and maybe another

3    customer or two.  They were outsiders, not members of the club,

4    not members of the conspiracy.  They will tell you they set up

5    these competitive bidding systems to foster competition, to get

6    the best deal possible.  What you are going to see in the

7    evidence that vigorous competition was not what they got.

8         Ladies and gentlemen, at its core this case is about

9    these 10 defendants, all members of an exclusive price-fixing

10   club conspiring for years to cheat their customers out of

11   money, lots and lots of money.  At the beginning I mentioned

12   that eight to 9 million pounds per week.  If you do the math, a

13   15-cent per pound increase translates into somewhere between 60

14   and $70 million per year.  And that's just one customer, one

15   negotiation in one year.

16        THE COURT:  One minute, Mr. Koenig.

17        MR. KOENIG:  Ladies and gentlemen, I thank you for

18   your time.  I urge you to review the evidence fairly and

19   evenly.  And at the end of this trial, you are sure to find the

20   defendants guilty as charged.

21        Thank you.

22        THE COURT:  Thank you, Mr. Koenig.

23        Any of the defendants wish to present an opening at

24   this time?

25        Mr. Kornfeld, go ahead.

1          **OPENING STATEMENT**

2          MR. KORNFELD:  I have no knowledge of Mikell Fries of

3     Claxton Poultry agreeing with anyone to raise the prices of

4     broiler chicken, fix prices, maintain prices.  I have no

5     knowledge of any of the 10 defendants charged in this courtroom

6     entering into an agreement to raise, fix or maintain the price

7     of broiler chicken.  Members of the jury, those are the words

8     of Mike Ledford, a key government witness, a former buyer for

9     KFC, a buyer for Chick-fil-A.

10         You will hear from Mr. Ledford.  And Mr. Ledford is

11    right, he has no knowledge of an illegal agreement, not

12    involving my client Mr. Fries, not involving any of these other

13    nine innocent men.  He has no knowledge of an illegal agreement

14    for this very simple reason.  There was no illegal agreement.

15    There was no illegal conspiracy.  That did not happen.

16         Over the course of the next several weeks, you will

17    hear the evidence and you will see a lot of documents.  You

18    will see that the government made up its mind in June 2020 of

19    the existence of an illegal price-fixing conspiracy in the

20    broiler chicken industry and then went about proving it,

21    working backwards, utilizing the full force of the Department

22    of Justice, the FBI and other federal law enforcement agencies.

23         You will see that the government ignored evidence and

24    documents that didn't support its theory.  And you will learn

25    that several witnesses, the so-called insiders, were

1    interviewed more than 15 times each until they finally told the

2    government what it wanted to hear, what supported its theory of

3    an illegal agreement.

4        Had the government investigated first and come up with

5    the theory second rather than the other way around, it would

6    have learned a key reality of the broiler chicken industry, and

7    that is this.  Suppliers talked.  They talked.  They covered

8    sales for each other.  And sometimes they even bluffed with

9    each other in order to influence the other's price and gain

10   market share, gain volume by bluffing their competitors.  But

11   the sharing of pricing information is not why we are here

12   because it's not illegal.  The sharing of pricing information

13   is not illegal.  It is not a conspiracy.

14       Communication does not equal coordination.  And

15   communication about price information among competitors who

16   work with each other in the same supply chain for the same

17   customers is not illegal.  Suppliers obtained information.

18   They acted on information.  They used that information.  But

19   they never ever did it because of an illegal price-fixing

20   agreement.

21       In 2011 to 2016, my client Mikell Fries was working at

22   Claxton Poultry in sales.  And at the end of that time period,

23   '15, '16, '14, '15, '16, he was working with the most important

24   customers of Claxton, the big fast-food restaurants, Popeye's,

25   Chick-fil-A, KFC.  And he worked with customers like Mike

1    Ledford every single day.

2            He knew every nook and cranny of Claxton's single

3    processing plant.  He understood the value of the small bird

4    that Claxton solely produced, solely meaning that's the only

5    thing they produced at their plant.  He understood the volume

6    that Claxton could handle for each of its fast-food customers.

7    And most importantly, he understood Claxton's niche as a small

8    regional supplier with less than 1 percent market share, less

9    than 1 percent.  And it was this niche and this understanding

10   that allowed Claxton to compete with the large producers, the

11   Tyson's, the Pilgrim's.

12           Mikell Fries had worked at Claxton for decades, mostly

13   on site at the plant.  His work happened on the phone, it

14   happened via e-mail, and sometimes it happened via text

15   message.  And the government will take bits and pieces of these

16   legitimate and legal business communications, cut them up,

17   paste them back together, and argue to you, put them in front

18   of you and argue this is evidence of his participation in an

19   illegal price-fixing conspiracy because in his work he

20   sometimes learned the prices of other suppliers.  But no amount

21   of cutting, no amount of pasting, text messages or e-mails or

22   anything else, will show an agreement, not just as to

23   Mr. Fries, but as to all of these 10 defendants sitting in this

24   courtroom today.

25           Now, one such out-of-context message that you are

1   going to hear about is a text message between Mr. Brady, a

2   salesman at Claxton, and Mr. Austin, a salesman at Pilgrim's.

3   And in the text message there was a conversation between

4   Mr. Austin and Mr. Brady.  And Mr. Brady texts Mr. Fries and

5   says, you know, they would like us to raise our prices.  And

6   the bottom line is Mr. Fries' response is, "Well, tell him

7   we're trying.  Tell him we're trying."

8          The Federal Government almost nine years after that

9   four-word text message is sent, pulls it out of numerous text

10   messages, millions of documents, and says aha.  There was an

11   agreement and Mikell Fries participated in that agreement.  But

12   the evidence will show that the government utterly ignores what

13   happened right after that text message, right after, "Tell him

14   we're trying," and they are going to ask you to ignore that

15   too.

16         The evidence will show there were no phone calls

17   between Mr. Brady and Mr. Austin, Mr. Fries, Mr. Austin, anyone

18   at Claxton and Mr. Austin right after that text message.  There

19   wasn't an e-mail to Roger from someone at Claxton saying, hey,

20   we're going to raise our prices.  There were no text messages

21   in response to Roger Austin.

22         But most importantly, the very next day Claxton

23   lowered the price of its chicken, the very next day.  And in

24   the process they undercut Pilgrim's and took away Pilgrim's

25   business.  Actions speak louder than words.  This is the

1    opposite of a price-fixing agreement.  It's cut-throat

2    competition.  When one competitor undercuts another to steal

3    business from that competitor, that is the essence of

4    competition.

5         Now, let's talk about Mother's Day.  You heard about

6    the Mother's Day fiasco.  And Mr. Koenig is exactly right.  If

7    you are in the chicken business, running out of chicken is not

8    a good business plan.  It's not a good look.  The franchisees

9    were upset.  Stores closed early.  Customers were livid.  And

10   the folks at KFC, also known as RSCS, you will hear about this,

11   their goal was to ensure a consistent supply of small birds to

12   KFC franchisees across the country.  Obviously, Mother's Day

13   2014 they failed in that goal.

14        In prior years RSCS was able to beat the suppliers

15   down on price.  And by the time Mother's Day 2014 rolled

16   around, the evidence will show, as Mr. Koenig talked about,

17   that small birds were not as profitable as they used to be.

18   And they certainly were not as profitable as what are known as

19   the big birds, the birds you see on the rotisseries in the

20   grocery store.  They are just larger chickens.  Those are the

21   ones that are much more profitable.

22        So the suppliers either -- they had a choice.  It's

23   not very difficult to figure out the two choices:  Either, one,

24   charge more money for small birds; or two, get out of the small

25   bird business and get into the much more lucrative big bird

1  business.  And with the short supply of small birds in 2014

2  going into 2015, the balance of power in the negotiations

3  between the suppliers and the buyers pretty much turned

4  180 degrees overnight.  With a lower supply obviously the

5  suppliers were in a position to charge more for their product.

6  And in the words of one government witness you will

7  hear from, if you were in the broiler chicken industry at that

8  time and you didn't know if the price of small birds was going

9  to increase significantly, then you did not belong in the

10  chicken industry.  And make no mistake, prior to 2014 the

11  customers were not shy about threatening to take volume away

12  from the suppliers if the suppliers didn't lower their prices.

13  Just like suppliers bluffed with each other throughout

14  negotiations, customers bluffed the suppliers.

15  And this is important.  The customers provided pricing

16  direction to the suppliers down to the fourth decimal point,

17  all to get the suppliers to lower their prices.  And it worked.

18  In the race to gain more business, the lucky suppliers made

19  money by the thinnest of margins and the unlucky suppliers went

20  bankrupt.  And then Mother's Day 2014 rolls around and the

21  suppliers' constant direction to lower prices, lower prices,

22  lower prices, finally came back to haunt KFC because there

23  wasn't enough chicken to meet demand.

24  In the case of Claxton, you're going to hear a lot

25  about the bidding process.  And in the case of Claxton, you

1    will hear about multiple rounds of negotiation.  And it boiled

2    down to a fairly simple reality.  There would be an initial

3    round.  Mr. Fries, Mr. Brady would quote a price.  The customer

4    would say, we're not paying that.  That is too high.  You need

5    to go lower.  And Claxton subsequently lowered its price.  This

6    happened every single time.

7         In past years -- well, in all the time we're talking

8    about, in order to determine a fair price for the chicken that

9    it sold, the small birds that it sold, the folks at Claxton,

10   Mr. Fries, the salespeople, the chief financial officer,

11   compiled and considered a number of factors to come up with a

12   fair price for its humanely raised antibiotic-free chickens.

13   They looked at the current year pricing.  They looked at

14   economic variables like demand.  They looked at cost like the

15   cost to feed the chicken, the cost of corn, the cost of soy.

16        They also considered the prices of other suppliers.

17   And they also gambled on whether the other -- whether their

18   customers and the other suppliers were bluffing.  And after

19   assessing all of these factors, they independently came up with

20   a price that they quoted to their customer.  Did Claxton want

21   to make money?  Of course.  Did Claxton want to take volume

22   away from its competitors?  Absolutely.  Did the suppliers take

23   into account their competitors' prices?  Yes.  But Claxton

24   acted independently.  It never entered into an illegal

25   price-fixing agreement, not in 2014, not ever.

1           What occurred after what the government talks about as

2     being a historic price increase in 2014, 2015, takes us back to

3     economics 101.  Prices were low.  Some suppliers, as I said,

4     went out of business and consequently the supply of small birds

5     plummeted.  As a result, prices went up.  Eventually prices

6     stabilized -- or supply stabilized and then prices stabilized.

7     Prices then went down, then the supply stabilized.  This isn't

8     evidence of a federal criminal act.  This is evidence of the

9     basic economic principle of supply and demand.

10          But the government didn't bother to look into basic

11    economics or to learn the ins and outs of the broiler chicken

12    industry.  Rather than investigating first and then proceeding

13    with the theory, the evidence will show that the Department of

14    Justice decided on a theory, decided that there was some grand

15    eight-year conspiracy involving these 10 men from different

16    size companies, different places, and then and only then went

17    out to prove that theory.

18          And in their quest to find evidence of an illegal

19    agreement that didn't exist and ignoring witnesses and evidence

20    that told them that, the government finally found the two

21    so-called industry insiders, two salesmen with everything to

22    lose if they didn't tell the government what it wanted to hear,

23    Carl Pepper from Tyson's, Robbie Bryant from Pilgrim's.  These

24    are the two people the government will ask you to trust.

25          After almost a dozen grueling interviews with FBI

1    agents, federal prosecutors where they held the threat or the

2    possibility of criminal charges over his head, time and time

3    again Carl Pepper would not tell the government what it wanted

4    to hear, would not say there was an illegal agreement.  What

5    happens next?  The Department of Justice yanks his immunity

6    agreement, yanks his promise that they won't prosecute him

7    because he wasn't in their mind cooperating.  He wasn't telling

8    them what they needed to hear.  He wasn't using the magic word

9    agreement.

10          Every day since that fateful day Mr. Pepper has

11   worried that he is going to end up in one of these defendants'

12   chairs.  There is not that much room in this courtroom, but

13   there is probably room for one more defendant.  And last week

14   for the very first time -- your jury summons was probably taped

15   to your refrigerator at that point -- Mr. Pepper finally

16   succumbs to the fear, finally says the magic word agreement.

17   And that was after another seven interviews with federal

18   prosecutors, federal agents.  He was interviewed 19 separate

19   times and he finally says agreement.  And lo and behold, just

20   last week the Department of Justice agrees not to prosecute

21   him.  And yet, and this is important, even though he says --

22   talks about some illegal agreement, he never mentions Mikell

23   Fries as being part of any illegal agreement.

24          What about the other so-called insider, Robbie Bryant,

25   that Mr. Koenig talked about?  The government found him a year

1    after trying to get Mr. Pepper to say agreement, way after it

2    came up with its own theory, months after Mr. Pepper, they had

3    interviewed Mr. Pepper, and more than six years after the

4    Mother's Day debacle.  They interviewed him 18 times.  Eighteen

5    separate times they interviewed Mr. Bryant.

6           And the first and most important thing you need to

7    know about Mr. Bryant, members of the jury, he is a liar.  It's

8    not me saying that either.  He is going to get up on that stand

9    and he is going to admit to you that he looked these federal

10   prosecutors in the eye, this FBI agent and others, and he lied

11   to them.  He lied to them early.  He lied to them often.  He

12   lied to them repeatedly.  And most importantly, he lied to them

13   while he was cooperating with them.  And you will hear that

14   when someone is interviewed by a federal agent, they are

15   advised that it is a separate crime to lie to a federal agent.

16          So now he is under threat of prosecution both for

17   lying and his participation in some conspiracy that he talks

18   about, but the point is this.  They are going to ask you to

19   trust the very same person that lied to them repeatedly and

20   they are going to ask you now to believe his testimony.

21          Just like Mr. Pepper, as I said, after numerous

22   interviews with rooms full of agents and prosecutors, he

23   finally says there is an agreement.  But this is also important

24   because what he doesn't provide is any detail about this

25   agreement.  He doesn't provide any insights about this

1    agreement.  He doesn't provide any confirmatory facts about

2    this agreement.  He basically says, yeah, there's an agreement.

3           And again, like Mr. Pepper, he doesn't even mention my

4    client, Mr. Fries, as being a member of this supposed

5    agreement.  The most he can say about Mr. Fries is, I think I

6    met him once or twice on a fishing trip, but I certainly never

7    talked price, business, competition, anything business related

8    with him.

9           These are the two people the government is relying on.

10   They are going to be portrayed by the government, Mr. Bryant

11   and Mr. Pepper, as credible insiders whose stories are

12   supported by a thorough investigation and interviews with

13   customers like Mike Ledford.  And all the while, and Mr. Koenig

14   told you to expect it, they are going to put a bunch of

15   documents in front of you without a witness to get up on that

16   stand to explain what's in the documents or to contextualize

17   what's in the documents.  Just going to throw a bunch of

18   documents in front of you and ask you to figure it out.

19          It's not your job, members of the jury, to play the

20   role of prosecutors.  That's not your burden.  It's certainly

21   not the defense's burden.  It's the government's burden.  It's

22   the government's burden to prove this case to you beyond a

23   reasonable doubt.  During this case the government must explain

24   a bunch of things to you and answer a lot of questions.  The

25   government's got to explain why you should trust an admitted

74

1    liar like Robbie Bryant who has everything to lose if he

2    doesn't tell the government what it wants to hear.

3         The government must prove to you beyond a reasonable

4    doubt that Mr. Fries participated in this alleged illegal

5    conspiracy to raise prices when the evidence will show that

6    Claxton consistently lowered its price at the direction of its

7    customers.  The government must explain to you why Mr. Fries,

8    the man who works for a small regional producer with less than

9    1 percent market share, would enter into a conspiracy with

10   these giant national producers like Pilgrim's and Tyson's.

11        The government must prove to you how suppliers

12   bluffing with each other is somehow consistent with an

13   agreement to raise prices, how taking business away from each

14   other and volume away from each other is somehow consistent

15   with an agreement to fix prices.

16        Mr. Koenig a moment ago said, well, everybody ran in a

17   pack mentality.  There was a pack mentality.  The government is

18   going to need to explain to you that in this alleged agreement

19   where the goal is to fix a price higher than what it is right

20   now, but the price is never actually aligned, who decided to be

21   the lowest bidder and make less money?  Who got to be the

22   highest bidder and make more money?  And who got to be the

23   loser, the company that lost business and in the process lost

24   money all in the interest of this alleged agreement?

25        Members of the jury, the government won't be able to

1    answer those and many other questions.  Instead, it will spend

2    the next several weeks trying to convince you that the sharing

3    of prices instantaneously equals a conspiracy to rig bids and

4    fix prices.  But as I said before, supplier communications do

5    not equal an illegal agreement.  For Claxton supplier

6    communications created competition because they allowed Claxton

7    to lower its prices and in the process to undercut its

8    competitors and to take volume away from its competitors, the

9    polar opposite of a price-fixing conspiracy.

10            THE COURT:  Two minutes, Mr. Kornfeld.

11            MR. KORNFELD:  Thank you, Your Honor.

12            The single most important question you will need

13   answered is the one that the government won't be able to prove

14   to you beyond a reasonable doubt, and that is whether Mr. Fries

15   and these nine other men sitting here in the defendants' chairs

16   entered into an agreement to fix bids and rig the prices of

17   broiler chicken.  The answer is and will be a resounding no.

18            The evidence will be clear that Mikell Fries never

19   entered into an illegal price-fixing agreement or a so-called

20   conspiracy, that he never asked Scott Brady or anybody else at

21   Claxton to enter into an illegal price-fixing agreement, and he

22   wasn't even aware of the existence of an illegal price-fixing

23   agreement because no such agreement existed.

24            The truth of this case, members of the jury, the truth

25   of this industry is that suppliers talked.  Sometimes they

1    covered sales for each other.  Sometimes they bluffed each

2    other in order to influence each other's prices and gain market

3    share.  Sharing pricing information is not a conspiracy.

4    Communication is not coordination.  It is competition.

5          Mikell Fries is not guilty, members of the jury, and

6    you will not be firmly convinced otherwise.

7          Thank you.

8          *THE COURT:*  Thank you, Mr. Kornfeld.

9          Other openings?

10         Ms. Rahman, go ahead.

11                    **OPENING STATEMENT**

12       *MS. RAHMAN:*  Ladies and gentlemen, I am here to remind

13    you that we're talking about real people, not corporations, not

14    big companies, but 10 men.  And I am here to talk to you about

15    one man in particular, Scott Brady.  Let me tell you about who

16    Scott Brady is.

17          Scott Brady is a salesman at Claxton Poultry.  He

18    sells chicken.  He is not an executive or an officer or a

19    director.  He lives in Alabama, has a son and a daughter, and

20    he is 62 years old.  Scott Brady sells chicken to Kentucky

21    Fried Chicken, Chick-fil-A and Popeye's, fast-food restaurants

22    we all know.  Claxton has a team of four salespeople and Scott

23    is one of them.  He has been working at Claxton for almost 10

24    years, since August of 2012.

25          And here is how Scott Brady does his job.  Scott has a

1   home office in Alabama, but he also works from the plant in

2   Claxton, Georgia.  So almost every week he gets in his car and

3   he makes the six-and-a-half-hour drive from Alabama to Claxton,

4   Georgia.  He also travels throughout the southeast visiting

5   Claxton's customers' corporate offices.  Scott lives the life

6   of a salesman.  As you can imagine, Scott spends a lot of time

7   in his car and on his phone in order to do his job.

8           Now, selling chicken isn't as easy as you might think.

9   Humanely raised chicken is a fresh product.  And if a fast-food

10  restaurant gets chicken that isn't fresh, well, no one is

11  happy.  Chicken has to meet quality standards.  Chicken has to

12  get to the restaurants.  Trucks break down.  Plants have

13  mechanical failures.  Bad weather causes delays.  Accidents

14  cause traffic pile-ups.  But the chicken still has to get

15  there.

16          Sometimes the suppliers don't have enough chicken to

17  cover their orders and they have to find another supplier

18  willing to sell them that chicken.  Being a salesman at Claxton

19  means making sure that the fast-food restaurants get enough

20  chicken so the stores can open every day.

21          Let me make something clear.  You heard the government

22  talk a lot about pricing.  Scott Brady is not the one setting

23  pricing.  That's just not his job.  He doesn't have that

24  authority.  He gets the pricing.  He talks to customers.  He

25  figures out the loads.  But he doesn't have pricing authority.

1    Scott prides himself on being an excellent salesman and he is,

2    but he also prides himself on making sure that the chickens get

3    to the stores on time.  That's Scott Brady's job.

4        Good afternoon.  Members of the jury, my name is Megan

5    Rahman, and along with Bryan Lavine and Tiffany Bracewell we

6    have the privilege of representing Scott Brady.  You just heard

7    the government stand up and tell you that Scott Brady was part

8    of a huge price-fixing conspiracy.  That couldn't be farther

9    from the truth.  Scott Brady never fixed prices with anyone.

10   And remember, as Judge Brimmer just told you, Scott Brady is

11   innocent unless proven otherwise.

12       And it is the government's burden and it is the

13   highest, most difficult burden in law to prove to you that

14   Scott Brady knowingly entered into an agreement to fix prices.

15   And you will hear during the course of this trial that's a

16   burden the government cannot meet because it simply is not

17   true.  The government is going to tell you that Scott talked on

18   the phone with competitors all the time, so that means he

19   entered into a price-fixing agreement.  That's not true.

20       Yes, he talked on the phone a lot.  That's part of his

21   job.  Did he talk to competitors?  Yes.  And the evidence will

22   show there were lots of things for them to talk about, product

23   specifications, complaints from customers, best practices,

24   product shortages, production issues, pricing, purchasing of

25   ingredients, quality decisions, product consistency, customer

1    specifications.

2           Now, I want to explain one of these topics in a little

3    more detail because you're going to hear a lot about it during

4    the trial.  When a supplier doesn't have enough chicken to

5    cover its order for a customer, it's called a short.  And the

6    supplier who is able to sell excess chicken to help out is

7    covering the short.  So you're going to hear about covers and

8    shorts.  When suppliers are short and can't cover their order,

9    that's bad.  It means the restaurant isn't going to get their

10   chicken.  And you just heard from Mr. Kornfeld and the

11   government about the Mother's Day fiasco when there wasn't

12   enough chicken to go around to all the restaurants.

13          Claxton often has extra loads of chicken available and

14   can cover shorts for other suppliers.  Because this is a fresh

15   product, when there are extra loads, Scott has to sell their

16   product as quickly as possible.  He will reach out to customers

17   and other suppliers to see whether anyone has a need for this

18   extra supply.  Scott reaches out by phone and e-mail and text

19   until he can sell the chicken.  He makes a lot of calls to

20   customers and suppliers over the course of several hours in a

21   single day until he is able to sell the chicken.

22          Now, while the government will show you phone calls

23   plucked from thousands of pages of phone records and tell you

24   that pricing was discussed on those calls, it's because the

25   government has refused to recognize the possibility that these

1   men could be talking about anything else, like selling extra

2   loads.  Did they talk about pricing?  Yes.  And there is

3   nothing wrong with talking about pricing as long as it's not

4   part of a price-fixing agreement.

5            For example, suppliers have to talk about price when

6   selling chicken to one another.  How else do they know what to

7   pay for the chicken?  The exchange of pricing information

8   standing alone does not amount to an agreement to rig bids and

9   fix prices.  The evidence will show there are other reasons for

10  competitors to exchange pricing information that do not include

11  fixing prices and rigging bids.

12           Now, let me take a step back and talk with you about

13  the supply chain, another thing the government doesn't really

14  understand and probably won't explain to you, but we will.

15  Fast-food restaurants have hundreds of franchisees across the

16  country.  When you walk into a Popeye's in Denver, you want to

17  buy a chicken sandwich that tastes the same and looks the same

18  as the chicken sandwich you buy at a Popeye's in, say, Atlanta.

19  It's a brand.  That's how brands work.  To make sure the

20  chicken sandwiches are the same, the fast-food restaurants have

21  specific requirements and pricing guidelines.  The franchisee

22  in Denver does not want to pay more for its chicken than the

23  franchisee in Atlanta.

24           To make that happen, customers push suppliers into

25  narrow price ranges.  And the suppliers have to talk to make

1    sure the orders are filled with identical products.  The

2    customers expect the suppliers to communicate because to have a

3    quality product available across the country, there has to be

4    that communication.  And Scott is one of the people who makes

5    the supply chain work.

6          Now, we all know Claxton doesn't give away its chicken

7    for free.  Selling chicken is a process.  It requires

8    negotiation between the customer and the supplier.  You heard

9    the government refer to this as a sealed or a blind bid, but

10   it's really the government that has their blinders on.  When

11   you actually learn about the process, and you will from the

12   customers who actually run the process, you will hear the

13   government's version is not exactly right.  You will hear how

14   it actually happens.  It's a negotiation.

15         Once a year the customers and the suppliers sit down

16   and they negotiate price and they negotiate volume.  Claxton is

17   trying to sell the chicken at the price that's right for them.

18   And the customer is trying to buy the chicken at the price

19   that's right for the customer.  And the customer uses volume as

20   a negotiating tool.  You want more volume?  Then you need to

21   lower your price.  You like all the loads you're currently

22   selling us?  Then lower your price if you want to keep selling

23   us those loads.

24         This is a back and forth process that takes months,

25   phone calls, e-mails, in person meetings, multiple rounds of

1    back-and-forth until a final contract is reached.  No one is

2    writing a price on a piece of paper and putting it in a sealed

3    envelope.  And the customer doesn't have all these sealed

4    envelopes in front of them and they open it on the same day and

5    they pick the lowest price.  That's just not how this works.

6         And the evidence will show that Claxton, when

7    negotiating on behalf -- the evidence will show that when

8    negotiating on behalf of Claxton, Scott Brady, as he always

9    did, followed the directional guidance of his customers and

10   lowered Claxton's prices during the negotiations.  Claxton

11   didn't refuse to negotiate or change its numbers or not come to

12   the table.  Claxton didn't raise prices to make more money.

13   Claxton didn't raise prices to match any of its competitors.

14   Claxton lowered prices.  And in lowering prices, Claxton

15   undercut its competitors and took their volume so Claxton would

16   have more loads of chicken to sell.  That is how Claxton makes

17   money; and that, ladies and gentlemen, is competition.

18        So what else are you going to hear?  Carl Pepper and

19   Robbie Bryant.  You will have plenty of reasons to question

20   their credibility, but know this for sure.  Scott Brady did not

21   have an agreement with Carl Pepper to fix prices and rig bids.

22   And nothing you hear from that witness stand from Carl Pepper

23   changes that fact.  Tyson will have a lot of chicken from

24   Claxton because it couldn't cover its loads.  And Scott for

25   more than 10 years sold Tyson that chicken on behalf of

1    Claxton.  And Mr. Pepper, he bought that chicken on behalf of

2    Tyson.  But Carl Pepper and Scott Brady did not have an

3    agreement to fix prices.  And Carl Pepper has no knowledge that

4    Scott Brady had an agreement with anyone else to fix prices

5    either.

6          Robbie Bryant, no better.  Scott Brady did not have an

7    agreement with Robbie Bryant to fix prices.  And nothing you

8    hear from that witness stand from Robbie Bryant changes that

9    fact.  Scott hasn't even spoken to Mr. Bryant in over 10 years.

10   And Mr. Bryant has no knowledge that Scott Brady entered into

11   an agreement with anyone to fix prices and rig bids either.

12         The government will show you some text messages

13   between Scott and Mikell Fries.  And with their blinders on

14   they are going to tell you that these messages are evidence of

15   an agreement with other suppliers because Scott shared some

16   pricing information with Mr. Fries.  But that's just wrong.

17   Obtaining and using market intelligence is not a crime.  Scott

18   Brady sharing pricing information with his co-worker is not a

19   crime.  And the agreement to rig bids and fix prices is the

20   crime Scott Brady is charged with and the crime the government

21   has the burden to prove.

22         As I said before and as you heard Judge Brimmer say,

23   Scott Brady is innocent until proven otherwise.  And it is the

24   government's burden and it is a high burden to prove to you

25   that Scott Brady entered into an agreement to fix prices.

1          THE COURT:  Two minutes, Ms. Rahman.

2          MS. RAHMAN:  Thank you.

3          And you will hear during the course of this trial,

4    that is a burden the government simply cannot meet because it

5    is not true.  None of these 10 men fixed prices with anyone.

6    The burden is high for a reason.  Hold the government to its

7    burden of proof beyond a reasonable doubt.  They will fail.

8          There is one question for you to decide.  Can the

9    government prove beyond a reasonable doubt that Scott Brady

10   conspired with anyone to fix prices and rig bids?  The answer

11   is no.  The question isn't whether prices were shared with

12   competitors because we just discussed they were.  And the

13   question isn't whether competitors talked to one another

14   because, as I just said, they did.  The question is whether

15   there was an agreement to fix prices and rig bids and the

16   evidence will show there was not.

17         Scott Brady is not guilty.

18         THE COURT:  Thank you, Ms. Rahman.

19         Additional openings?

20         Mr. Fagg, go ahead.

21                        **OPENING STATEMENT**

22         MR. FAGG:  Bill Lovette never agreed with any

23   competitor to rig a bid or fix a price ever.  It did not happen

24   and he is not guilty.

25         Mr. Lovette worked his way up the chicken industry

1    from catching chickens on family farms to become the CEO of

2    Pilgrim's Pride nearly 40 years later.  He didn't get to that

3    position by cooperating with his competitors.  He got to that

4    position because he wanted the companies that he worked for to

5    be better than the competition.  He wanted his companies to be

6    the best and he wanted to beat his competitors, not work with

7    them.

8         You will see in this case that in 2014 when Pilgrim's'

9    archrival, Tyson, had overpromised its supply to a particular

10   customer and then couldn't deliver on that promise that it had

11   made to its customer, Tyson wanted Pilgrim's to bail them out.

12   And what did Mr. Lovette say?  We should not help them

13   1 micron.  The evidence will show you that he thought Pilgrim's

14   should pounce on the competition.  He should take the business

15   away from their archrival, Tyson, and use it to their own

16   strategic advantage.

17        Look, Bill Lovette was the CEO of Pilgrim's Pride.

18   Identifying opportunities to take business away from his

19   competitors, that was his job.  It was his responsibility to

20   Pilgrim's employees, to its board of directors, to its

21   shareholders.  His job was to figure out how to turn

22   competitors' missteps into Pilgrim's own strategic advantage.

23   And the government wants you to believe that somehow or another

24   this rough and tumble business, this competition, is evidence

25   of an illegal agreement.

1        No.  What the evidence will show is fierce

2    competition.  And the government says that Mr. Lovette entered

3    into an illegal agreement with competitors to fix prices and

4    rig bids.  The actual evidence in this case will show you he

5    did not do that.

6        Mr. Koenig got up here and talked to you a little bit

7    about the evidence and what it was going to show.  What he did

8    not tell you is that you will not hear from a single witness

9    who will say they have any personal knowledge that Bill Lovette

10   entered into an agreement with any competitor to rig a bid or

11   fix a price ever, and that includes these two so-called

12   cooperator witnesses who are going to get up here.  No one is

13   going to say that.

14       And no witness will get on that stand and tell you

15   that they have any knowledge that Bill Lovette instructed

16   anybody to enter into an illegal agreement to fix prices or rig

17   bids because he absolutely did not do that.  And equally as

18   important and what the government also didn't tell you is that

19   you will not see a single document that shows Bill Lovette

20   agreeing with or instructing anyone to rig a bid or fix a price

21   for chicken.  That's what this case is about.  And you are not

22   going to see a single document where Bill Lovette is agreeing

23   to fix a price or rig a bid for chicken or instructing anybody

24   to do that, nothing.

25       Now, because the government is not going to have any

87

1    testimony and they are not going to have any documents to show

2    you this, they are going to -- they use scary words, and you

3    saw it earlier this afternoon, like cheat and exclusive club.

4    Bill Lovette did not cheat anyone.  That's not who he is.  Was

5    he a tough businessman?  Yes.  He was the CEO of a public

6    company with 40,000 employees.

7            And the evidence is going to show that at times

8    Pilgrim's, they drove a hard bargain, but look, Pilgrim's had

9    an obligation to its employees and to its shareholders to be a

10   profitable company.  And you heard from Mr. Koenig about some

11   of these other -- these customers of the chicken suppliers like

12   KFC.  They too wanted to drive a hard bargain.  They wanted to

13   drive a hard bargain to keep their prices down so that their

14   profits could be up.

15           And sometimes the market forces give the suppliers the

16   upper hand in those negotiations.  And at other times,

17   particularly when supply is tight and demand is high, the

18   suppliers have the upper hand in those negotiations.  That is

19   the market.  That's business.  That's the law of supply and

20   demand.

21           So when you hear the government talk about historic

22   price increases or use other phrases like pack mentality, don't

23   be fooled by these dramatic words.  The evidence, the evidence

24   in this case will show that that is just the government's

25   theories.  I ask you listen to the testimony and review the

1    documents.  When you do that, I want you to do something in

2    particular.  Ask yourself, where is the agreement to fix prices

3    or rig bids for chicken?  Where is it?  And ask yourself when,

4    where and with whom did Bill Lovette supposedly enter into this

5    agreement?  The evidence will not be there because he did not

6    do it.

7           So that's the first key point I ask you to remember

8    throughout this trial.  There is no evidence that Bill Lovette

9    entered into an illegal agreement with a competitor.

10          Point No. 2, and you saw this in the government's

11   opening, job title does not equal criminal responsibility.

12   Just because Bill was the CEO, it does not make him criminally

13   responsible or somehow or another interchangeable with

14   Pilgrim's Pride, the company, nor is he responsible for

15   anything that happens at Pilgrim's Pride.  And some of you

16   might be thinking to yourself, you know, he is the CEO.  The

17   buck stops with him.  He is the captain of the ship.  That is

18   not how things work in a criminal case in this country when it

19   comes to determining whether a person committed a crime.

20          This isn't a case about corporate liability.

21   Pilgrim's Pride is not on trial here.  And look, this isn't

22   even a civil case where one party is suing another for money

23   where maybe you could say the CEO should have known about

24   something.  This is a criminal trial where Judge Brimmer has

25   told you, and he will tell you again, the government, the

89

1    prosecution must prove to you beyond a reasonable doubt that

2    each one of these men entered into an illegal agreement.  And

3    as you do that, as you think about that issue, you will see

4    that the government cannot prove that to you.  The evidence

5    will not be there because it didn't happen.

6           The third thing, my colleagues have touched on this,

7    information sharing in and of itself is not illegal.  There has

8    to be an actual agreement to fix a price or rig a bid for it to

9    be illegal.  There was no agreement here.  And there certainly

10   is no evidence that Bill Lovette entered into an agreement with

11   a competitor to rig a bid or fix a price for chicken.

12          And as you have heard, yes, you will hear that over

13   these years some of the employees of some of these companies

14   that these men worked for talked to each other, including about

15   price, including about negotiations with the suppliers.  But

16   the evidence will show you that they were gathering market

17   intelligence.  The evidence will show you that's what

18   businesses do.

19          And the companies then use that information to make

20   their own decisions, their own independent decisions.  And so

21   as long as Bill Lovette didn't enter into an agreement with a

22   competitor to fix a price or rig a bid, he can and he should

23   consider as much information as he has available to make the

24   decisions that he made.

25          Another key point that you'll see in this trial, and

1   as you've heard about it a little bit this afternoon, an

2   important part of pricing is a very basic economic concept, the

3   law of supply and demand.  We've all seen it in action.  Supply

4   is high.  Demand is low.  Prices go down.  On the other hand,

5   supply is low and demand is high, prices go up.  So how does

6   this apply to this broiler chicken market that we are going to

7   be talking about in this case?

8        You heard a little bit about the difference sized

9   birds.  You are going to hear more about that.  What you will

10  particularly hear about are large birds and small birds.  And

11  you will hear that KFC and these other fast-food restaurants,

12  they relied on the small birds that would fit in their fryers

13  and that would generate the product of the right size that they

14  sell in their stores.

15       But for the chicken suppliers, they determined over

16  this time that it was more profitable to sell big birds.  The

17  suppliers can only produce so many chickens.  So when they

18  started shifting their production away from small birds and

19  towards big birds, that meant the supply of the small birds was

20  decreasing and it decreased year over year.  And by 2014, the

21  time period that you heard a lot about in the prosecution's

22  opening, the supply was down enough that it gave the chicken

23  companies the natural market power to raise their prices on

24  small birds.

25       And at this exact same time, some of these fast-food

1   companies like Chick-fil-A, for example, they were growing like

2   crazy.  And at the same time you had grocery stores, like

3   Costco and King Soopers, and they were selling more and more of

4   the small birds in their deli as the rotisserie chicken that

5   you see in the grocery store.  And the evidence will show that

6   these customers who were growing, they wanted to buy more and

7   more small birds at a time when there was fewer and fewer small

8   birds.

9        So again, you get these customers like Chick-fil-A,

10   Costco, King Soopers, they want more of the small birds.  And

11   it presented an opportunity for the chicken suppliers to be

12   more profitable in selling those small birds.  Again, it's

13   simple, supply and demand.

14        And another important factor for these growing

15   customers, the ones that were just growing and growing and

16   growing, they understood the value of taking a long-term

17   relationship with their chicken suppliers.  They didn't focus

18   just on price.

19        You see, the evidence is going to show you that

20   Pilgrim's had a model for working with these key customers and

21   that model was structured around building these long-term

22   relationships.  And those long-term relationships had mutual

23   benefit for both Pilgrim's and the customers.  What it meant

24   for the customers is that they had ensured supply, no Mother's

25   Day fiasco.  They know they have the supply of these small

1    birds which in turn meant that they could sell more of their

2    product to their customers.

3            And what it meant for Pilgrim's is that they could do

4    long-term supply chain management knowing they were going to

5    have a long-term relationship with this customer and they

6    weren't going to have to keep haggling and negotiating over

7    price penny after penny every year.  And it also meant that

8    Pilgrim's could get the price that it deserved for its

9    products.

10           And in contrast to these growing customers like

11   Chick-fil-A and Costco, you had KFC.  And KFC continued to

12   focus solely on price.  And in 2014 KFC found itself

13   scrambling, trying to get chicken in a market where the supply

14   was scarce.  But because this market had shifted, they couldn't

15   get the chicken at these cheaper prices that they were

16   accustomed to.  And they got angry and they got angry at the

17   chicken suppliers.  And you might see some of that anger in

18   this trial, but I want you to remember that angry customers are

19   not evidence of a crime.

20           So let's wrap up.  Bill Lovette does not have to prove

21   anything, anything at all.  Judge Brimmer told you that at the

22   beginning of this trial.  It's his right and the right of every

23   one of these 10 men under the United States Constitution that

24   they don't have to prove anything.  You must presume that they

25   are innocent.  When a person is charged with committing a

1    crime, whether that person is a CEO or a salesperson or some

2    brand new hire just out of school, they are presumed innocent.

3    And they keep that presumption unless and until the government

4    proves beyond a reasonable doubt that they committed the crime

5    that they're charged with.  And beyond a reasonable doubt, that

6    is the absolute highest standard that we have in any court in

7    this great country.

8            Yes, Bill Lovette was the CEO of Pilgrim's Pride, but

9    in this courtroom he is just like everybody else.  He has the

10   absolute right to be judged based on his own conduct.  The

11   government must prove to you beyond a reasonable doubt that he

12   knowingly agreed to rig a bid and fix a price for chicken.  The

13   government cannot gloss over the charges that it's brought

14   against this man by talking about Pilgrim's did this or

15   Pilgrim's did that.

16           *THE COURT:*  Two minutes, Mr. Fagg.

17           *MR. FAGG:*  Thank you, Your Honor.

18           So again, I want you to ask yourself throughout this

19   trial, when did Bill Lovette supposedly enter into this

20   agreement?  Where did he do it?  And with whom he did enter

21   into this agreement?  The government will not have answers to

22   these questions for you and they must answer these questions

23   for you.  They can't and they won't.  So at the end of this

24   case, we are going to come back to you and we're going to ask

25   you to return the only verdict that speaks the truth, that Bill

1    Lovette is not guilty.

2            Thank you.

3            THE COURT:  Thank you, Mr. Fagg.

4            Mr. Tubach, go ahead.

5                        **OPENING STATEMENT**

6            MR. TUBACH:  Last one of the day.

7            Two phone calls, a handful of documents and no

8    witnesses.  That's the government's entire case against Jayson

9    Penn, and that's after combing through 16 million documents and

10   conducting over 200 witness interviews.  Two phone calls and a

11   handful of documents, no witnesses.

12           Without any real evidence that Jayson Penn agreed with

13   anyone to fix prices or rig bids, the government's case against

14   Jayson Penn is going to consist of sound bites, cherry-picked

15   documents and not much else.  It will be like a jigsaw puzzle,

16   but with all the important pieces missing.  What we are going

17   to do in this trial is show you those missing pieces, not in a

18   vacuum, not in a sound bite presented in some misleading way to

19   make you think there is something there or not.  We will show

20   you the whole story, what's Pilgrim's bid, how it came up with

21   that bid, what Jayson Penn's involvement was and what the

22   result was, because the whole story is very different from what

23   the government wants you to believe.

24           And once you have heard the whole story, a few things

25   will be crystal clear.  Jayson Penn never fixed prices with

1    anyone.  Jayson Penn never told anyone to fix prices.  Jayson

2    Penn didn't know of anyone fixing prices.  The evidence will

3    show that every decision Jayson made, and he made thousands,

4    was his own decision about what he thought was in Pilgrim's own

5    best interest.  That's competition, not price-fixing.

6         The evidence will show that Jayson Penn is no price

7    fixer.  He is intensely data driven and analytical.  Data

8    analysis is what drove every decision he made, is what made him

9    successful.  It is his north star.  And as you will see, he was

10   very good at it.  No shortcuts, no easy way out, just hard work

11   day in and day out.

12        So the whole idea that Jayson would take a shortcut

13   like fixing a price with a competitor rather than making his

14   own decisions about pricing is contrary to how he has worked

15   his entire life.  And that's why even though the government has

16   brought the full resources of the Federal Bureau of

17   Investigation, the Federal Government to bear here, they do not

18   have a single witness who will get on that witness stand and

19   tell you that Jayson Penn fixed a price or rigged a bid with

20   anyone or that he told anyone to do so, not one.  And they

21   don't have a single document that will show that Jayson Penn

22   fixed prices or rigged bids with anyone.

23        Jayson Penn gave his heart and soul to a vital food

24   industry in this country, and he did so for decades.  And he

25   never fixed prices with anyone.

1              My name is Michael Tubach, and along with my colleague

2      Anna Pletcher and I, we are honored to represent Jayson Penn.

3              Before I get into the details of this case, I want to

4      give you a critical distinction for you to keep in mind as you

5      hear the evidence.  And you have heard this before.  It's

6      actually quite simple.  Information sharing does not equal

7      price-fixing.  In its opening statement, the government talked

8      a lot about individuals at chicken suppliers talking to each

9      other and sometimes sharing information including pricing

10     information.  And the government wants you to believe that

11     that's a crime.  It's not.

12             It's 100 percent legal for competitors to share

13     information, including pricing information, as long as there is

14     no agreement to fix a price or rig a bid.  And you will hear

15     that people in this industry shared all kinds of information

16     all the time and they had lots of resources.  There were

17     research companies.  There were industry analysts, public data,

18     the rumor mill, customers, distributors, and yes, sometimes

19     competitors.  And Jayson was entitled to use all that

20     information wherever it came from to help him decide what he

21     thought was in Pilgrim's best interests.

22             As you will hear, that's what good companies do.  In

23     fact, they would be foolish not to gather as much information

24     as they can.  In that sense, they are not any different than

25     you and me.  If you want to try and sell your car, what's one

1    of the first things you need to know?  What are other people

2    selling that car for?  It just makes sense.  The more

3    information you have about the market, the better decision you

4    can make.  That's how a properly functioning market works.  And

5    that's exactly what the evidence will show Jayson Penn did.

6          On some occasions between 2012 and 2019, as the

7    government will show you, employees at Pilgrim's sent Jayson

8    pricing information about competing suppliers.  It was a

9    hundred percent legal for him to use that information and

10   whatever other information he had to make his own decision.

11   Sometimes that meant reducing the price to win business.

12   Sometimes it meant increasing the price.  But at all times it

13   meant making his own decision.  That's competition, not

14   price-fixing.

15         Let me tell you just a little bit about Mr. Penn

16   himself before I get into the evidence.  You heard the

17   government talk about Mr. Penn as though they know him.  They

18   don't know him at all.  They have never met him.  They have

19   never spoken to him.  These days corporate executives are

20   almost like stereotypes.  But Mr. Penn is no stereotype.  He is

21   a real human being facing one of the most serious moments of

22   his life and he is sitting right over there.  Mr. Penn, would

23   you please stand up.  Thank you.

24         Jayson Penn is 53 years old.  He has worked in the

25   chicken business his entire life.  Most of his career has been

1    spent on the operations side of the business making sure the

2    company is being run as efficiently as possible.  He is a

3    champion of what we have come to call chicken math.  It turns

4    out that selling chickens is pretty complicated.  Pilgrim's

5    Pride where Mr. Penn worked alone processes 7 million chickens

6    every day, most of which are sold fresh to customers to be used

7    right away.  At that scale it takes sophisticated analysis to

8    run a chicken business properly.  And that has always been

9    Mr. Penn's strength, to crunch the data and figure out how a

10   chicken company can be run more efficiently.

11           So when Bill Lovette became the CEO of Pilgrim's Pride

12   in 2011, he asked Mr. Penn to join him.  At the time Pilgrim's

13   had just emerged from bankruptcy and was struggling.  Pilgrim's

14   was literally the laughingstock of the industry.  Turning

15   around the company was not going to be easy, but it was the

16   perfect challenge for Mr. Penn.  So he took the job.  He and

17   his family moved out to Colorado.  His family is sitting right

18   out there.  And then Mr. Lovette and he took on the challenge

19   of rebuilding this public company.

20           So what did they do to turn this company around?  They

21   took it down to the studs and rebuilt it from the ground up and

22   formed a whole new strategy to become the best company in the

23   industry.  They turned Pilgrim's around through long hours,

24   tough choices and hard-nosed competition.

25           Let me give you just one example of what a tough

1    competitor Jayson Penn was.  In 2014 an e-mail he wrote, he

2    sent it to his boss, Bill Lovette, forwarding the weekly

3    financial results.  And here is what Jayson Penn had to say in

4    the middle of what the government says was a price-fixing

5    agreement about his two biggest competitors.  "Best week as a

6    company as we have ever had and we have much, much more to get.

7    Personal mission is to send Sanderson Farms into a tailspin.

8    No need to mess with Tyson because they have taken their own

9    poison pill with their new structure.  Foot on the throat.

10   Both of these boys will be going down.  Our team is far from

11   being good.  Teams need to commit to being the best in our

12   industry or hit the door."

13           Tough language?  You bet.  But this is the chicken

14   business, not high tea.  This e-mail is competition, not

15   price-fixing.

16           Now, let's talk about the facts here.  The government

17   is going to spend a lot of time in this trial talking about the

18   pricing to KFC for 2015, so let me address that head on.  The

19   prices to KFC in 2015 went up and they went up quite a bit.

20   But it was market forces that drove up those prices, not

21   price-fixing.  Long before the negotiations for 2015 pricing

22   ever started, the supply of small birds was shrinking.  You

23   see, big birds had become much more profitable to produce than

24   small birds.  So not surprisingly, chicken suppliers switched

25   to making big birds and stopped making small birds.

1          Here you have a chart.  It shows you that from 2005 to

2    2014, 25 percent of the small bird chicken plants in the U.S.

3    switched over to making other birds.  That's on the supply

4    side.  At the same time demand for small bird was going up.

5    Consumers started buying more rotisserie chickens.  You have

6    heard about that.  Popeye's and Chick-fil-A -- Chick-fil-A was

7    going like crazy as many of you probably know, and they were

8    buying more small birds too.  So the supply was going down, but

9    demand was going up.

10          You don't need a degree in economics to know what's

11   going to happen.  Prices are going to go up.  Everyone in the

12   industry, including KFC and its negotiating arm, RSCS, saw this

13   coming a mile away.  And it left KFC in a difficult position

14   because if the price of small bird -- if the small birds, if

15   they ran out of small birds, they would be in deep trouble.

16   You will be hearing a lot of evidence in this trial about what

17   the market for small birds was like when they were negotiating

18   in 2014 for this 2015 contract.

19          Now, you have already heard about the Mother's Day

20   fiasco.  I am not going to go into more detail about that.  But

21   when KFC runs out of chicken, that's pretty much Defcon 5 for

22   KFC.  So they immediately went out and started trying to buy

23   more chicken.  They really couldn't get it at all at times, and

24   when they could get it, they had to pay a 50 percent premium

25   over the contract price just to get it.

1          They were, in fact, so worried that they hired a

2    high-end consulting company called McKinsey to come in and

3    analyze the problem.  And after doing their own deep dive into

4    the chicken business, McKinsey confirmed RSCS's worst fears.

5    They confirmed that big birds were much more profitable than

6    small birds, that chicken suppliers are moving away from small

7    birds to produce big birds and that if this continued, KFC was

8    in big trouble.

9          So RSCS got the message.  Before they even sent out

10   the bids for KFC pricing for 2015, they met with their

11   suppliers and they asked them, what profit margin do you need

12   to keep selling us small chickens?  Here is an e-mail from Bob

13   Lewis at RSCS to Roger Austin at Pilgrim's.  And he says,

14   "Roger, as mentioned, we will schedule a conference call

15   sometime within the next two weeks to discuss the following:"

16   And I have highlighted just one of these here.  "Profit margin

17   needed and how that compares to big bird profitability."

18         So here is the customer asking the supplier, what

19   profit margin do you need?  And during that meeting that took

20   place, Pilgrim's employees, not Jayson Penn, but others told

21   RSCS that they should expect a 10-cent per pound margin

22   increase, 10 cents per pound.

23         In August, a month later when it was time to submit

24   the bid, the financial professionals at Pilgrim's worked up a

25   draft bid using this specific format that RSCS required.  And

1    that draft bid included recommendation that the profit be

2    increased by 10 cents.  They sent that recommendation to Jayson

3    Penn and backed it up with charts and data.  Jayson looked at

4    it, spoke to those who made the recommendation, and he agreed

5    with the recommendation to increase the profit margin by 10

6    cents.  That was the margin increase they had told KFC to

7    expect before the bids were even submitted and that's what they

8    concluded they needed for their chicken.

9           As one of the financial professionals who put this

10   together and sent it to Jayson wrote, "I believe we should do

11   the 10 cents per pound because we have been prepping them for

12   that for the last few meetings." So that was the bid that

13   Pilgrim's submitted to RSCS.  They had done their homework and

14   they knew what they needed for their chicken.  If RSCS wanted

15   to go buy its chicken elsewhere, that's fine.  They could just

16   decide how much they wanted to buy at the price that Pilgrim's

17   was willing to sell.  And that's the contract they ended up

18   signing.

19          Now, did Pilgrim's look at what other companies were

20   doing in trying to decide what was right for them?  Of course,

21   they did.  That's just smart business.  You always want to know

22   what your competition is doing because the more information you

23   have, the better decision you can make.  That's competition,

24   not price-fixing.

25          So where did the suppliers all end up?  This is a

1    price-fixing case supposedly, so you would expect the prices to

2    be the same.  Well, let's look at this.  Here the supplier is

3    on the left and the contract price is on the right.  And you

4    can see the contract prices range from a low of $1.03 per pound

5    to a high of $1.08 and a half a pound.  Now, that may not look

6    like a lot as you are sitting there.  But as you will learn in

7    this case, when you are selling hundreds of millions of pounds

8    of chicken and you are calculating the price out to a hundredth

9    of a penny, five and a half cents is huge.  The prices weren't

10   the same.  In fact, you are going to learn that they were even

11   farther apart in 2015 than they had been the year before.

12        Now, the government also talked about getting profit

13   margins.  Maybe the government's claim is that suppliers all

14   agreed that they should charge the same margin even if the

15   price wasn't the same.  Well, let's look at that.  Here the

16   suppliers, and you can see the margins are not close.  They are

17   definitely not the same.  In fact, they are quite far apart.

18        Now, the government pointed out that all of the prices

19   went up from 2014 to 2015, but the prices went up because the

20   suppliers are all in the same small bird market facing the same

21   market forces.  The market was like the wind.  It blew all of

22   the prices in the same direction.  They didn't all land in the

23   same place.  In fact, they are farther apart than they had been

24   before, but they are all blown in that direction by the market,

25   the law of supply and demand.

1          Now, finally you might ask, did the chicken suppliers

2    each sell the same amount of chicken to KFC in 2015 as they

3    sold in 2014?  One sure fire sign that there is no collusion,

4    no agreement, is when competitors are taking business away from

5    each other.  And that makes sense, right?  Because why would

6    anybody enter into a conspiracy to fix prices where one of

7    those deals is you're going to take business away from me.

8    Well, let's look at that.

9          Here is a comparison of the 2014 and 2015 contract

10   volumes for the different customers, different suppliers.  What

11   this chart tells you is that Pilgrim's in 2015 price contract

12   lost over 500,000 pounds of chicken every week.  That's a

13   price-fixing agreement?  That's the bid-rigging?  The

14   bid-rigging is, hey, guess what?  We will lose a ton of

15   business and why don't you all just take it.  So while the

16   government wants you to believe that the prices for KFC for

17   2015 were fixed, the prices are different, the margins were

18   different, and suppliers took business away from Pilgrim's.

19   Those are the objective facts.  That's competition, not

20   price-fixing.

21         So what is the evidence DOJ is going to introduce to

22   try to show that Jayson joined some price-fixing agreement?  As

23   I said at the outset, a handful of documents and two phone

24   calls and that's it.  You will see that evidence for yourself.

25   And you will be able to see for yourself that in no way does

1    that little tiny smattering of evidence support any kind of

2    price-fixing charge.

3         For example, in the course of deciding what Pilgrim's

4    should bid in 2015, one of the Pilgrim's employees who worked

5    up the draft bid sent Jayson market intelligence on what he

6    thought others were going to bid.  That's what the government

7    showed you, right?  Jayson was absolutely entitled to rely on

8    the information in making his own decision and that's what he

9    did.  That's competition, not price-fixing.

10        What about the witnesses?  You will hear from two

11   types of witness in this case who worked in the chicken

12   business.  First are the customers, the chicken buyers, right?

13   They are on the other side of the negotiating table.  Those

14   witnesses as you will learn, they barely know Jayson Penn, if

15   they know him at all.  And they have no information whatsoever

16   about Jayson Penn or any of these other men entering into a

17   price-fixing agreement.

18        The second type of witness you are going to hear from

19   is what the government has called conspiracy insiders.  They

20   claim to have two, Robbie Bryant and Carl Pepper.  Carl Pepper

21   doesn't even know Jayson Penn, doesn't know him at all.  He

22   will have nothing to say about Jayson Penn.

23        Robbie Bryant, you will hear lots of reasons why

24   Robbie Bryant's testimony cannot be believed.  And you heard

25   one already.  He is a liar.  He is an admitted liar.  He

1  admitted that he lied repeatedly to the DOJ and the FBI agents

2  when they were interviewing him about things that have nothing

3  to do with this case.  He lied to them even after he told

4  them -- after the agents told him it was a crime to lie to

5  them.

6       But whatever you end up concluding about Robbie

7  Bryant's believability as a witness, he will tell you that even

8  though he worked right alongside Jayson Penn for the entire

9  time the supposed price-fixing agreement was going on, he has

10  no knowledge whatsoever of Jayson Penn fixing prices or rigging

11  bids or telling anyone else to do so, no information

12  whatsoever.  So these supposed conspiracy insiders are a big

13  zero as far as Jayson Penn goes.

14       THE COURT:  Two minutes, Mr. Tubach.

15       MR. TUBACH:  Thank you, Your Honor.

16       The government bears the burden to prove beyond a

17  reasonable doubt that Jayson Penn committed the crime with

18  which he has been charged.  This is, as you have heard, the

19  highest burden in our country.  Mr. Penn is presumed innocent.

20  In fact, as he sits here, he is innocent.  And he remains

21  innocent unless the government can convince each of you beyond

22  a reasonable doubt that he committed the crime with which the

23  government has charged him.

24       So after you've heard all the evidence if you have any

25  reasonable doubt about whether Mr. Penn committed that crime,

1    you must find him not guilty.  The evidence in this case will

2    give you many reasons to doubt the government's case.  The

3    government will show you some cherry-picked e-mails and quotes

4    taken out of context, but they won't call any witnesses to

5    explain what those actually mean.  And the government brought

6    these charges against Mr. Penn.  They filed charges against him

7    without having a single witness who would say that he had done

8    anything wrong.

9         And even after filing these charges against Mr. Penn

10   almost two years ago, they have searched high.  They have

11   searched low.  They have not found one witness who will come in

12   and tell you that Mr. Penn committed this crime because the

13   evidence will show that Jayson Penn never fixed prices with

14   anyone, period.

15        At the end of this case after you have heard and seen

16   all the evidence, I am going to have an opportunity to come

17   back and speak with you one more time.  And at that time I am

18   going to ask you to return the only verdict that those facts

19   and evidence will support, and that's a verdict of not guilty

20   as to Jayson Penn.

21        Thank you very much.

22        *THE COURT:*  Thank you, Mr. Tubach.

23        Ladies and gentlemen, that is the last opening.  We

24   will hear the rest of the openings tomorrow.  I am going to

25   dismiss you for the day, but I want to share with you some

1    additional information.

2         So one thing is that when you get home, your employers

3    or persons at home or your friends are going to be asking you

4    about this case.  Here is what you can tell them.  You can tell

5    them that you are a juror, that it is a criminal trial, that

6    the trial is expected to last at least -- or through at its

7    latest March 29th, but that deliberations could go longer than

8    that, but don't tell them anything else about the case.

9         It's really important as I mentioned to you earlier,

10   don't get dragged into conversations.  Don't let people talk to

11   you about things.  Don't let people say, hey, you know, I saw

12   this thing in the newspaper, blah, blah, blah.  Just cut it

13   off.  It's so much better if you cut that off right away than

14   let it go on for another sentence or even another word.  Just

15   cut it off.  Once the trial is all over with, then if you want

16   to write a novel about the case or never think about it again,

17   that is totally fine.  But up until that point you have to be

18   really careful about that, okay?

19        Also for the schedule, so we will not be having trial

20   this Friday and we won't have trial on Fridays all the way up

21   to -- if we need to, we will have trial on Friday, March 25th,

22   but we won't have trial the other Fridays, so you can note that

23   for purposes of your schedule.  But we will, unlike this Monday

24   which is a holiday, we will be having trial on Mondays.

25        Make sure that you leave in the morning in a

 1    sufficient amount of time so that you get here on time.  Today

 2    was a bad day because the roads were bad.  But if you have --

 3    if there is a day with bad weather, just try to leave extra

 4    early because we can't start until everyone is here.  And so

 5    one person, if that person is not here, it's going to hold

 6    everything up.  So try to do that to the best of your ability,

 7    leave early if you have to.  The jury room will be open, I am

 8    not sure exactly how early, but it's open fairly early.  If you

 9    want to come here and hang out in the jury room before we begin

10    in the morning, you can do that.

11            I would urge you, ladies and gentlemen, to wear your

12    masks in the jury room.  There is something about a dynamic

13    that after you know each other for 24 hours, people feel

14    comfortable taking off their masks in the jury room.  Leave

15    them on because even though the case numbers are going down,

16    even though, you know, a lot of people now have either been

17    exposed to COVID or they've had -- they are fully vaccinated,

18    nonetheless, it doesn't mean you can't get Omicron even though

19    you are fully vaccinated.  You can.

20            So having those masks on really is protective of you.

21    The better the mask, the better the protection.  Especially

22    when you are in close quarters back in the jury room, I would

23    recommend it.  Not that you can't, if we are not having court,

24    go outside of the jury suite area, go down the hallway, take

25    off your mask if that's more comfortable, go outside.  You have

```
 1   to have your mask on actually within the courthouse I should
 2   say, but you can go outside if you have the time to do that and
 3   that all is perfectly fine.
 4         One other tiny little rule that Ms. Augdahl has
 5   indicated, no hats in the courtroom.  I know that you were just
 6   getting ready for the cold weather and that's perfectly fine,
 7   but yeah, actually we don't have hats.  I just wanted to let
 8   you know that one up front.
 9         All right.  Ladies and gentlemen, I hope you have a
10   good evening.  We are going to start at 8:30 tomorrow, so if
11   you can make sure that you are here so we can start on time.
12   And the jury at this time is excused.  Thank you.
13         (Jury excused.)
14         Before we talk about the text messages, anything else
15   anyone would like to bring up at this time?
16         Mr. Koenig?
17         MR. KOENIG:  This is tangential to the text messages,
18   but we do anticipate that given the timing, that we will get to
19   call Special Agent Taylor tomorrow.  Our second witness that we
20   were planning to call is Mr. Barela.  He is a very short
21   witness, a custodian.  The problem is that he is unavailable
22   after tomorrow.  We don't know how long the cross is going to
23   go.  The direct for Agent Taylor won't be terribly long.  And
24   we'd just ask if it looks like cross isn't going to be done
25   before the day runs out, if we could maybe like 4:00 o'clock or
```

 1    something call Mr. Barela before cross is finished on Agent

 2    Taylor.

 3          THE COURT:  Any problem with that?  I think we should

 4    try to accommodate Mr. Barela.

 5          MR. TUBACH:  I have no problem accommodating

 6    Mr. Barela, but why don't they just call him first.

 7          THE COURT:  Well, once again, your first witness, you

 8    probably don't want a custodian of records.

 9          MR. TUBACH:  There are a few things more exciting,

10    Your Honor.

11          THE COURT:  Yeah.  I think we should accommodate that.

12    The question would be when.  For instance, we could have

13    Mr. Barela called after Special Agent Taylor finishes or we

14    could take him up at 4:00 o'clock.

15          MR. TUBACH:  I would just hate to break up -- there is

16    a sort of continuity momentum of a direct and cross-examination

17    that's going to get completely broken up by having --

18          THE COURT:  The other thing is -- how long do you

19    anticipate Mr. Barela will be?

20          MR. KOENIG:  15 minutes on direct.

21          THE COURT:  Any idea how long cross might be?  We

22    could stop the cross of Special Agent Taylor, assuming it's

23    going on, at, say, 4:30 and take Mr. Barela up then or

24    something.

25          MR. KOENIG:  I guess alternatively maybe we could do

 1   it between direct and cross.  Would that be less disruptive?

 2        THE COURT:  Well, Mr. Tubach kind of wanted to be able

 3   to start the cross right after, and I can understand that too,

 4   but that's what I would suggest.

 5        Ms. Prewitt?

 6        MR. TUBACH:  So we can also confer and make a

 7   suggestion to the Court.

 8        THE COURT:  We don't need to decide that now, but I do

 9   think if he has got a scheduling problem and is a very brief

10   witness, that we should try to accommodate that.

11        Ms. Prewitt, go ahead.

12        MS. PREWITT:  Thank you, Your Honor.

13        As you heard from some of the openings that have been

14   mentioned in court, we observed a marked change in Mr. Pepper's

15   statements aligning with the time of his non-prosecution

16   arrangement with the government.  I will say that we have been

17   asking for notes that reflect that change in statements.  We

18   have gotten basically illegible notes from the government.  And

19   we have made multiple requests to say can we please have at

20   least a typewritten version or an agent report.  And, you know,

21   at this point it's critical information for the defense.  And I

22   just want to let Your Honor know this is something we have

23   asked for, we are waiting for, and it is something we need.

24        THE COURT:  Yeah, I have never heard of any duty on

25   behalf of the government to produce transcriptions of special

1    agent notes.  They don't even have to take notes if they don't

2    want to.  So if that's the issue, then I will deny that

3    request.

4             MS. PREWITT:  Your Honor, they are illegible.  Some of

5    the notes are illegible.

6             THE COURT:  Once again, they may be, but you might get

7    the notes, but you don't necessarily get legible notes.  You

8    know, an agent doesn't have to write legibly if he or she

9    decides to take notes.

10            MS. PREWITT:  Thank you, Your Honor.

11            THE COURT:  Anything else before we take up the issue

12   of the text messages?

13            Mr. Beller, go ahead.

14            MR. BELLER:  Thank you.  I think this will be quick.

15   I am hoping the Court may be amenable to simply once an hour or

16   so asking the jurors to stand up and stretch.

17            THE COURT:  I think I will play it by ear, but if we

18   notice people getting tired, I will suggest something to that

19   effect.

20            MR. BELLER:  Thank you, Your Honor.  And I would note

21   for the Court that's already proving to be an issue.  It's

22   difficult to sort of interject and bring that to the Court's

23   attention, but I do want to make the Court aware it is already

24   an issue with at least three jurors.

25            THE COURT:  Yeah.  I will ask Ms. Butler and Ms. Grimm

1    to let me know too to try to highlight that.  But as we talked

2    about at the trial preparation conference, if you want to call

3    that issue to my attention if there seems to be an issue like

4    that, but I think that's a good idea just to keep people awake

5    and not -- sometimes especially when you have 10 openings in a

6    row or 11 openings in a row, it may cause a little bit of a

7    lapse in concentration.

8            Mr. Koenig?

9            *MR. KOENIG:*  One other issue, and I want to raise this

10   in the context ahead of tomorrow's openings.  One thing that

11   Mr. Kornfeld said that I am sure this was a mistake, but he

12   said that Carl Pepper's immunity agreement was yanked and that

13   is not true.  He has only had one immunity agreement and it has

14   never been taken away from him.  And so I would ask that in

15   openings that people don't say that because it's just not true.

16           *THE COURT:*  Okay.  I don't know what the facts are, so

17   I can't comment on that one way or the other.

18           Anything we should take up before we take up text

19   messages?  Let me mention one thing, and that is once the

20   openings are finished, would that be an appropriate time for me

21   to mention what we had talked about at the trial preparation

22   conference, which is that the defendants have -- that we've

23   agreed that one objection would stand for all the defendants?

24   Okay.  I think I am seeing head nodding in the affirmative by

25   defense counsel.

1          Speaking of head nodding, defense counsel, just

2     because -- it goes for everyone -- be careful about head

3     nodding during other people's openings.  I know it's

4     inadvertent.  But you have to be careful not to be signaling to

5     the jury, that type of thing, through body movements, all

6     right?

7          Let's take up text messages.  It's been briefed quite

8     a bit.  So Mr. McLoughlin, I will give you a brief amount of

9     time, and then we will hear a response from the government.

10         Go ahead.

11         MR. McLOUGHLIN:  Thank you, Your Honor.  I am going

12    to -- I promise to turn it around.

13         THE COURT:  That's fine, whatever you want to do.

14         MR. McLOUGHLIN:  Your Honor, the government's request

15    should be denied for five reasons.  First of which is that they

16    missed the deadline for filing a motion *in limine*, and this is

17    the case of a repeat offender.  Second and most important, I

18    think, the government's argument that the text messages have

19    previously been ruled to be inadmissible is incorrect because

20    Your Honor's ruling was with respect to *Brady*.  And as Your

21    Honor well knows, the standard under *Brady* is that the

22    information to be Brady must be material.

23         The 10th Circuit's materiality test is that the

24    information must be such that it would change the outcome of

25    the trial.  That was the standard Your Honor was applying

1     expressly in your order.  In contrast now what we are talking

2     about is Rule 401 for impeachment.  And as Your Honor well

3     knows, the standard for 401 is far, far different.

4          The *Brashier* case in the Ninth Circuit, which is I

5     think a great practical assessment, which is at 548 F.2d 1315,

6     says, "A rule of thumb is to inquire whether a reasonable man

7     might believe the probability of the truth of the consequential

8     fact to be different if he knew of the proffered evidence." So

9     that standard, Your Honor, is simply not comparable to the

10    previously applied test.

11         Now, if one then looks to 401, the cases are quite

12    clear in the 10th Circuit and elsewhere, some of which we cited

13    in our brief, but the basic test is the quality or bias of the

14    government's investigation that produces evidence that is

15    submitted to the jury may affect the reliability and therefore

16    would be relevant information, which is to say the text

17    messages, and not all of them -- we have a list of the

18    exhibits, about a half dozen, not all of the text messages --

19    raise the question with respect to a number of issues, with

20    respect to the thoroughness of the investigation, with respect

21    to bias, with respect to the roles of the agents.

22         And I would note for the Court that the government has

23    represented to the jury in its opening that the FBI gathered

24    the evidence that is the proof of the crime.  Meanwhile, we

25    have text messages in which these FBI agents and Department of

1   Commerce agents are saying they are sidelined.  That goes to

2   the credibility of Mr. Taylor, Special Agent Taylor when he

3   testifies, the credibility of the government when it makes that

4   representation, and to the theme we have announced as a defense

5   group from the beginning of the first trial, which is as

6   Mr. Kornfeld so aptly stated, that they reached a conclusion

7   first and then went looking.

8        And if you look at the text messages, we have the ones

9   that we believe are relevant.  An investigating agent acting in

10  the course and scope of the investigation making a comment to

11  another agent about the quality and practices of the

12  investigation.  If you look at the *Perrault* test, if you look

13  at the test that is set out in the other cases that the 10th

14  Circuit has applied, *Walker* and others, what you see is the

15  people in that jury could read those text messages and conclude

16  that the quality and thoroughness of the government's witnesses

17  and their agents are not quite what they seem to be, which

18  meets the 401 test.

19       It is particularly important here because the rights

20  of the defendants with respect to evidence and the rights of

21  the government are asymmetrical.  And the reason they are

22  asymmetrical is the Sixth Amendment.  If Your Honor looks at

23  the cases, *U.S. v. Montelongo*, 10th Circuit, 420 F.3d 1169,

24  *United States v. Woodard*, 699 F.3d 1188, you will see that the

25  10th Circuit is very, very clear that the failure of the

1    defendants to be able to bring in cross-examination evidence

2    and cross-examine on that is a confrontation clause violation.

3    In fact, when that is the issue, the review on appeal is

4    *de novo*.  And I raise that because it demonstrates how far that

5    is from the issue of pure discretion on an average evidentiary

6    ruling.

7        And what we have here with respect to these messages

8    and with respect to the issue of whether these individuals have

9    the right to cross-examine these agents, we get to the issue

10   again of the nation's best.  We get to issues in the text

11   messages, and we can talk about particular messages in which

12   agents again say they are cut out.  They say the investigation

13   is bizarre.  They make reference to preparing a witness for a

14   scheduled five hours.

15       Now, where we are talking about witnesses like

16   Mr. Bryant and Pepper, being able to demonstrate to the jury

17   that these agents thought five hours was a really long time to

18   be prepping is exactly the kind of information that we should

19   be entitled to establish supports the theory that the

20   government here put pressure on people.

21       What we also have is we understand, although we really

22   don't have any visibility into it, and it's an issue, I think,

23   for tomorrow, that Special Agent Taylor will testify in some

24   way, shape or form referencing the summary exhibits.  The

25   government gave us notice just in the last 24 hours that

1    Special Agent Taylor will be testifying about those exhibits in

2    some way, we don't know what it is, but they will not show the

3    exhibits to the jury.

4         So what we have here is the government making an

5    effort to have this FBI agent attest to and validate these

6    summary charts in some way.  Meanwhile, our ability to

7    cross-examine him about his belief about the investigation and

8    his own assessment that it was bizarre in his experience is

9    such that it is a significant again confrontation clause issue.

10        If this were not -- and I want to be clear.  This is

11   not an effort to personally impugn anyone.  This is not what

12   this is.  This is again a series of text messages directly

13   related to the conduct of the investigation and the evaluation

14   by Special Agent Taylor and Special Agent Koppenhaver about the

15   roles that they were being forced into playing, about such

16   issues as the duration of interviews, about the quality of the

17   work that was done and the roles that they were playing in

18   gathering the facts when, in fact, what they say is we're being

19   cut out after the government has said the FBI gathered this

20   evidence.

21        So, Your Honor, if you look at cases like *Perrault*, if

22   you look at cases like *Woodard*, you see that there really isn't

23   a great question here.  Because the government says -- and I

24   will finish with this -- the government says this is Rule 403.

25   Well, under the 10th Circuit test, we can't challenge the

1    investigation's quality based on mere speculation.  We have to

2    have evidence.

3            Here we have a situation where we are challenging

4    that.  We have evidence that means we're not speculating, but

5    the government is trying to keep us from using it, which then

6    forces us to speculation, which means we can't cross-examine

7    under the 10th Circuit's rules, and we have the *Woodard*

8    confrontation problem.  So there is this circular trap in the

9    way the government has set this up for us.

10           The other thing is they say it's 403, but they don't

11   say what the prejudice is under 403.  And, of course, it has to

12   be an unfair prejudice.  This is why I note, this is not

13   personal to them.  This is not calling somebody a liar.  This

14   is saying course and scope statements about the quality of the

15   investigation.  That is not 403.  That is 401 and 402.

16           Thank you.

17           *THE COURT:*  Thank you, Mr. McLoughlin.

18           Mr. Koenig?

19           *MR. KOENIG:*  Thank you.  I guess it's not a

20   substantive point, but, you know, to sarcastically refer to the

21   nation's finest and then say we are not trying to impugn

22   anybody speaks for itself.  But what I would like to say is

23   that this is a complete side show.  Your Honor has looked at

24   these, seen them.  They are irrelevant.  They are out of

25   context.  There is an LOL behind some of them or a laugh face

1    emoji.  The probative value of these is nil, if that.  And so

2    it's going to be not only unfairly prejudicial because it

3    suggests something that wasn't meant to be expressed; it's also

4    a complete waste of time.

5         What I think the other implication is of what

6    Mr. McLoughlin is saying is if they want to get into things

7    like what did you do, you didn't really prepare for this

8    interview, you didn't really search the documents, then we

9    should be able to get into, what did you do to prepare?  What

10   documents did you look at?  It opens a door to a whole lot of

11   stuff I am sure they don't want to get into.

12        So, you know, this to me is just -- they've spent the

13   whole last trial and now this trial talking about how, you

14   know, oh, gosh, they didn't put the agent on.  They didn't put

15   the agent on.  They haven't investigated.  They charged first,

16   investigated later.  So what are we doing?  We are adapting.

17   We are putting the agent on.  And now a half dozen text

18   messages are suddenly the most important constitutional

19   violation ever.

20        You know, it just -- and this has been litigated.  I

21   realize it was in *Brady* before, but it's been litigated.  So,

22   you know, I really don't think that this is worth spending a

23   whole lot of the Court's time on.  It's just of very marginal

24   relevance, if at all, and I think it's just a distraction.

25             THE COURT:  Mr. McLoughlin, anything more from you?

1          *MR. McLOUGHLIN:*  Yes, Your Honor.

2          I would like to have back the number of hours that the

3   defense group has spent analyzing the *Brooks* issue.  And so

4   when the government says that if we introduce text messages or

5   ask them -- ask about text messages, then automatically that

6   opens the door under *Brooks* is a misreading of *Brooks*.  We

7   could, for example, simply introduce the text messages, not ask

8   what they didn't do, not ask about the evidence.  And let us

9   remember that in *Brooks* the questions that opened the door were

10  about the evidence, not about the quality of the investigation.

11  In no way it opens the door under *Brooks*.

12         Moreover, as the 10th Circuit mentioned, the

13  defendants in that case did not object which put the redirect

14  into plain error territory.  I can assure Your Honor if the

15  government goes past *Brooks*, this will not be plain error.

16  There will be all the objections that will be required.  But

17  that *Brooks* issue is really a very critical one.  And these

18  text messages and asking about the quality of that

19  investigation do not implicate *Brooks*.  We don't have to ask

20  this agent anything more than did you write, sign and send this

21  on or about the date it bears?  That does not open the door.

22         Thank you.

23         *THE COURT:*  Thank you, Mr. McLoughlin.

24         So Mr. McLoughlin is right that when the Court in

25  Docket No. 842 ruled on Mr. Lovette's motion to compel the

1    production of certain *Brady* material and the text messages were

2    a part of that, that it wasn't ruling on the issue that we have

3    before us now.  However, the Court in that order did rule as

4    follows:  "The Court finds that the text messages are not

5    relevant to the guilt of any defendants, to the credibility of

6    the case agents, or to punishment, and are therefore not *Brady*

7    material."

8           The Court's opinion about these text messages is the

9    same now.  They are just simply not relevant to anything.

10   Those text messages are a banter between the case agents about

11   their -- about the fact that certain decisions that are

12   apparently being made by the attorneys are not to their liking.

13   That is not relevant to any issue in the case.  The case agents

14   can be asked about investigations that they did, but it is a

15   natural part of the prosecution where the U.S. attorneys are

16   running the case.  The case agents are assisting in it.

17          And the case agents, of course, may bring a case to

18   the U.S. Attorney's Office for prosecution, but interactions

19   between the case agents and the U.S. attorneys after the fact

20   once the case is being investigated towards the final end of it

21   is not relevant material.

22          The question and this banter between the case agents

23   all are implications of decisions that are being made by the

24   AUSAs.  That's what they are mad about.  They don't think that

25   they've -- they are being cut off from certain things or

1  certain things are taking place and they are not hearing about

2  it.  That's not relevant to anything.

3          But even if it was, even if it was relevant, the

4  relevance of that is significantly outweighed by the

5  prejudicial effect because it would then focus the jury's

6  attention on something that is utterly irrelevant, and that is

7  decisions made by the government in terms of strategy and

8  conducting interviews, what interviews to conduct, things of

9  that nature, maybe interviewing witnesses again, things of that

10  nature.  Not that the witnesses can't be asked about how many

11  times they were interviewed that's perfectly appropriate and

12  that type of impeachment can go on, but these particular text

13  messages, I do agree with Mr. Koenig they really are a side

14  show and they are not relevant.  And as a result, I am not

15  going to permit the case agents to be asked about it.

16          However, we don't know exactly how -- you know, what

17  questions are going to be asked of Special Agent Taylor.  And

18  as Mr. McLoughlin says, maybe the summary exhibits will come

19  up.  In the event that something -- that Special Agent Taylor

20  goes into some line of questioning and maybe it seems like the

21  text messages could potentially be relevant, then I would ask

22  that who is ever conducting the cross-examination or who would

23  want to ask questions ask to have a bench conference and then

24  we'll take it up at that time just in case because, once again,

25  we don't quite know what Special Agent Taylor is going to say.

1          Mr. McLoughlin?

2          *MR. McLOUGHLIN:*  Two small points, Your Honor.

3          *THE COURT:*  Yes, go ahead.

4          *MR. McLOUGHLIN:*  First, with respect to the summary

5    charts, it's late in the day, but possibly tomorrow morning

6    before court or at some point before Special Agent Taylor

7    testifies, maybe during the lunch break, if we could have 10

8    minutes to discuss the issue of the summary charts because

9    there are some significant questions about confrontation there

10   and overview with the agents.

11         *THE COURT:*  I am sorry to interrupt, Mr. McLoughlin,

12   but right.  And if maybe you can ask the government, if the

13   government can help out with this and provide some information

14   about what Special Agent Taylor may be asked about those, that

15   might be helpful because I know that there is some issues

16   swirling and the Court hasn't ruled on one of the objections

17   regarding the summary exhibits.

18         Go ahead, Mr. McLoughlin.

19         *MR. McLOUGHLIN:*  And the second, just a record point,

20   is at some point between now and close of trial, we will

21   proffer the defendants' exhibit numbers of the relevant text

22   messages so that they are in the record should that be needed.

23         *THE COURT:*  Right.  Of course, they are already part

24   of certain docket numbers, but you, of course, have the ability

25   to label them separately to make that record.

1          MR. McLOUGHLIN:  It would be more convenient, I think.

2     Thank you.

3          THE COURT:  Sure.  You certainly may.

4          Let me ask the government what you think the Court

5     should do about two pending motions for authentication, Docket

6     Nos. 992 and 1075.  When we ended the day yesterday,

7     Mr. Torzilli, you mentioned that you thought it might be handy

8     for the Court to hold off.  What's the status of perhaps some

9     further agreements?

10          MR. TORZILLI:  Thank you, Your Honor.  For those two

11    motions, if they can still be held where they are, so I would

12    say they are not ready for adjudication.  We are still working

13    with the defendants on additional stipulations.  These

14    stipulations are more likely in the category of 803(6)

15    exceptions to hearsay rather than authenticity 901, which has

16    been the focus of some of the previous day's work, but I would

17    ask the Court hold off on ruling on those two.

18          THE COURT:  I can do that.  Anyone disagree?

19          Ms. Johnson?

20          MS. JOHNSON:  Since everybody has been in court today,

21    we have obviously not been able to look at the final list, but

22    I think we are very close.  And should all the teams have just

23    a little bit of time, we can get final and get back to the

24    government.

25          THE COURT:  That's no problem.  Once again, I very

1    much appreciate people working on trying to reach some

2    stipulations on that front.

3              Anything else that we should take up tonight?

4              All right.  Then we will be in recess until

5    8:30 tomorrow.  Thank you very much.

6         (Recess at 5:33 p.m.)

7                            INDEX

8    OPENING STATEMENT

9    Item                                              Page

10        By Mr. Koenig                                52

11        By Mr. Kornfeld                              63

12        By Ms. Rahman                                76

13        By Mr. Fagg                                  84

14        By Mr. Tubach                                94

15                  REPORTER'S CERTIFICATE

16        I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.  Dated

18   at Denver, Colorado, this 15th day of May, 2022.

19

20                            S/Janet M. Coppock

21

22

23

24

25