1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn II
UNITED STATES OF AMERICA,
4
       Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12     Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14                 Trial to Jury, Vol. 12

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:26 a.m., on the 14th day of March,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4    Washington, DC 20530, appearing for Plaintiff.
 5           Anna Tryon Pletcher and Michael Tubach of
 6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7    San Francisco, CA 94111-3823;
 8           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10           David Beller, Richard Kornfeld and Kelly Page of
11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12    CO 80202, appearing for Defendant Fries.
13           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15            Laura Kuykendall and Megan Rahman of Troutman Pepper
16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17    appearing for Defendant Brady.
18           Michael Felberg of Reichman, Jorgensen, Lehman,
19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20    10017;
21
22
23
24
25
```

1            APPEARANCES (Continued)

2            Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5            Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7            Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1                    APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                      PROCEEDINGS

16         THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.

18         So one of the jurors, Mr. Kramer, is ill.  He

19   contacted Ms. Grimm yesterday and indicated that he was not --

20   that he was very sick, and then he confirmed this morning that

21   there is just no way he can come in.  So, unfortunately, I

22   think we are going to lose him.  And he'll be replaced by

23   Ms. Hoffman who is the first alternate.

24         And I don't -- if we were really short on jurors, we

25   might try to wait, but I don't think we can really wait for him

 1    because we really have no anticipation about when he might be

 2    better, and he is a little bit unlike our juror in the last

 3    trial where he was just not quite good, but he anticipated he

 4    was going to get better.  We don't have that same set of

 5    circumstances here, so -- do we have all of our jurors

 6    otherwise?  Okay.

 7            Why don't we take up the government's motion that was

 8    filed over the weekend, the motion to compel defendants'

 9    summary exhibits.

10            Have the defendants had a chance to look at that?  Are

11    we prepared to deal with that?

12            Mr. Gillen?

13            MR. GILLEN:  Prior to moving away from the jury, would

14    the Court allow the defense to meet for just a few minutes to

15    discuss what potential action we may have to that.  Will you

16    give us a few minutes in the hallway?

17            THE COURT:  Yeah, as to the juror?

18            MR. GILLEN:  Yes.

19            THE COURT:  There is no problem.  You can be excused

20    to do that.

21            (Brief recess.)

22            MR. GILLEN:  Thank you for the time, Your Honor.

23            As it relates to Mr. Kramer, we would -- we don't know

24    the nature of the illness.  I don't know whether he has taken a

25    COVID test or not.

1      THE COURT:  Yeah, I should mention that.  He did, and

2  he is negative.

3      MR. GILLEN:  So what we have is a negative COVID test

4  with, you know, feeling a little bit under the weather today,

5  but thought he might feel better.  We would ask the Court to

6  postpone for one day the evidence so that we can see whether he

7  could then resume without making the substitution based upon

8  his not feeling -- feeling a bit under the weather today.

9      I would also state to the Court that it is the

10  unanimous opinion of the defense that even with one day's

11  continuance for the juror's health, that we feel extremely

12  comfortable that we are going to be -- we are going to make the

13  Court's deadline in terms of closing in the case and in terms

14  of the evidence and the argument.

15      So we would ask that -- the one day, allow him to kind

16  of report back on how he is feeling so that we could

17  potentially get him back in the box, and that is the opinion of

18  all of the defense counsel.

19      THE COURT:  Just to be clear, he is not feeling a

20  little bit under the weather.  His description yesterday was he

21  is really sick, and then today he said can't come in.  So, you

22  know, I am not sure about tomorrow or the next day.  I don't

23  have a good idea.  He may not either, as anyone can imagine,

24  just aren't quite sure about that.

25      MR. GILLEN:  But we do have a lot of -- we believe

1    firmly that there is a lot of play here in terms of the

2    schedule, and one day's continuance we think would certainly

3    accommodate the Court's -- directive of the Court that the case

4    end on March the 29th.  So we would ask the Court postpone the

5    testimony for one day, and we see how he is feeling.  If he is

6    better, he comes in.  If he is not, then that's a different

7    matter.  But one day we think -- is what we would ask.

8              THE COURT:  Thanks, Mr. Gillen.

9              Let's have the reaction from the government.

10             Mr. Koenig?

11             MR. KOENIG:  Your Honor, the government would oppose

12   that.  This is the reason we have alternates.  With COVID

13   numbers going down and so forth, I don't think there is any

14   danger of them dropping like flies.  It sounds like he is

15   unlikely to be here tomorrow.  And, you know, despite

16   defendants' assurances, we still have a witness list that goes

17   almost right up to the end.  So, you know, I don't know how one

18   day -- how things would be that comfortable with losing a day.

19             THE COURT:  Thank you.

20             Anyone else?  Ms. Prewitt?

21             MS. PREWITT:  Your Honor, we expect to be submitting a

22   revised witness list as we did in the course of the last trial.

23             THE COURT:  I got one over the weekend.

24             MS. PREWITT:  We are doing -- we are convening, we are

25   making decisions, and we are very confident that we can reduce

1      it further, Your Honor.

2             THE COURT:  Right.

3             One second.  Let me check with Ms. Grimm.

4             So Ms. Grimm is going to text him, and we'll see what

5      his prediction is for tomorrow.  But if he can't give us

6      some -- if based upon what he has he can't give us a good

7      assurance about tomorrow, then we'll replace him.  But let's

8      check and see what he says, how he is doing.

9             We will be in recess until then, all right?  Thank

10     you.

11        (Recess at 8:36 a.m. until 8:48 a.m.)

12           THE COURT:  Ms. Grimm attempted to reach Mr. Kramer,

13     but she could not, so I am going to replace him.  It's too bad,

14     but we really have no basis at this point to think he is going

15     to feel better tomorrow.  And, of course, all the jurors came

16     in today.

17           MR. GILLEN:  We, for the record, would object to the

18     replacement of Mr. Kramer at this time and to be replaced by

19     the alternate, so we just object to that on the record.

20           THE COURT:  Okay, that's fine.  Let us bring the jury

21     in.

22             What's our game plan, Ms. Call?  You are going to

23     introduce more documents?

24           MS. CALL:  Yes, Your Honor, about six documents before

25     the next witness.

1            (Jury present.)

2            THE COURT:  Good morning, Ladies and Gentlemen.  I

3    hope you had a good weekend.  Looks like we won't get snow

4    until later in the week, so what a deal.

5            As you will recall, Ms. Call was introducing some

6    exhibits when we broke on Thursday, and I will turn it over to

7    Ms. Call at this point.

8            MS. CALL:  Thank you, Your Honor.

9            The first document which I believe is previously

10   admitted is Exhibit 2001.

11           THE COURT:  All right.  Ladies and Gentlemen, this

12   document will be admitted.  However, it has statements from a

13   person named Chad Baker, so Mr. Baker's statements you can

14   consider not for the truth of the matters that Mr. Baker may

15   assert, but rather only for the effect that Mr. Baker's

16   statements have on the listener.

17           You may display that.

18           MS. CALL:  Thank you, Your Honor.

19           Ms. Tellman, if you could please go to the top part of

20   the document.

21           THE COURT:  All right.

22           MS. CALL:  The next document is also previously

23   admitted and also I believe subject to a limiting instruction,

24   and that is Government's Exhibit 2002.

25           THE COURT:  Ladies and Gentlemen, that has been

1    admitted.  And once again, statements from Mr. Baker, same

2    admonition as before, they can be considered only for their

3    effect on the listener, not for the truth of the matters

4    asserted.

5            You may display that.

6            MS. CALL:  Thank you.

7            THE COURT:  All right.

8            MS. CALL:  Could you please scroll up?

9            THE COURT:  All right.

10           MS. CALL:  And one more portion of this document.

11           THE COURT:  All right.

12           MS. CALL:  The next exhibit the government will seek

13   to offer is Government's Exhibit 17.  And this will be subject

14   to a limiting instruction.

15           THE COURT:  All right.  Subject to the previous

16   objections, any objection to the admission of Exhibit 17?

17           17 will be admitted.

18           Ladies and Gentlemen, this is another summary exhibit,

19   so let me remind you, over the objection of the defendants I

20   have admitted those summary exhibits or certain summary

21   exhibits.

22           And as you know from having looked at others, over on

23   the right-hand side is a list of exhibits that have been

24   admitted.  The summaries are admitted into evidence because

25   they may assist you in understanding the evidence that has been

 1   presented, but a summary itself is not evidence of the material

 2   it summarizes.  It is only as valid and reliable as the

 3   underlying material it seeks to summarize.

 4          You may give a summary exhibit entire weight, some

 5   weight, or no weight at all depending on your assessment of the

 6   underlying material and the accuracy of the summary.

 7          You may display that.

 8          MS. CALL:  Thank you, Your Honor.

 9          Ms. Tellman, if you could zoom on the portion above

10   the exhibit sticker, please.

11          THE COURT:  All right.

12          MS. CALL:  Ms. Tellman, could you please turn to the

13   next page of Exhibit 17.

14          THE COURT:  All right.

15          MS. CALL:  The next exhibit the government will seek

16   to offer is Government's Exhibit 1700, and that will be subject

17   to a limiting instruction.

18          THE COURT:  Subject to previous objections, any

19   objection to the admission of Exhibit 1700?

20          MR. LAVINE:  No objection, Your Honor.

21          THE COURT:  Exhibit 1700 will be admitted.

22          Ladies and Gentlemen, when you see this -- and you can

23   go ahead and display it -- that very top e-mail from Mr. Brady

24   is admissible only against Mr. Brady, all right?  All right.

25          MS. CALL:  The government next will offer Government's

 1    Exhibit 1713, which is also subject to a limiting instruction

 2    under 801(d)(2)(A).

 3          THE COURT:  Ms. Call, can you scroll to the very top

 4    of that for just a minute, or is that the top?

 5          MS. CALL:  That is the top, Your Honor.

 6          THE COURT:  Okay.  Subject to previous objections, any

 7    objection to the admission of Exhibit 1713?

 8          1713 will be admitted.

 9          Ladies and Gentlemen, in this particular e-mail, you

10    will see a -- that it contains a statement from Mr. Austin.

11    That statement of Mr. Austin can be considered only against

12    Mr. Austin.

13          You may publish it.

14          MS. CALL:  Thank you.

15          MR. BELLER:  Your Honor, if I may, I believe that

16    Mr. Ledford's e-mail is also subject to a limiting instruction.

17    I believe that that is an effect-on-the-listener instruction.

18          MS. CALL:  I believe, Your Honor, the underlying

19    statement was admitted during the testimony of Mr. Ledford, not

20    subject to a limiting instruction.

21          THE COURT:  I think that Mr. Beller -- I think that

22    Ms. Call is correct as to that, but you can double-check, but I

23    think that she is right.

24          MS. CALL:  For counsel, that was 1713-1 is what was

25    used with Mr. Ledford containing the underlying e-mail.

Robert Lewis - Direct

1          *MR. BELLER:*  I am corrected.  Thank you, Your Honor.

2          *THE COURT:*  No problem.  All right.

3          *MS. CALL:*  Ms. Tellman, if you could please scroll up.

4          *THE COURT:*  All right.

5          *MS. CALL:*  The next that the government will seek to

6    publish that is already in evidence, not subject to a limiting

7    instruction, is Government's Exhibit 1734.

8          *THE COURT:*  And you may publish that.

9          *MS. CALL:*  Thank you, Your Honor.

10         *THE COURT:*  All right.

11         *MS. CALL:*  1734 was the last, so the government will

12   now call its next witness, Bob Lewis.

13         *THE COURT:*  All right.

14       (**Robert Lewis** was sworn.)

15         *THE WITNESS:*  I do.

16         *COURT DEPUTY CLERK:*  Please state your name and spell

17   your first and last name for the record.

18         *THE WITNESS:*  Robert, R-O-B-E-R-T, Burl, L-E-W-I-S,

19   Lewis.

20         *MR. TORZILLI:*  May I approach, Your Honor?

21         *THE COURT:*  You may.

22                        **DIRECT EXAMINATION**

23   *BY MR. TORZILLI:*

24   *Q.*  Good morning, Mr. Lewis.

25   *A.*  Good morning.

2606

Robert Lewis - Direct

1    Q.   What's your current occupation?

2    A.   I am currently retired.

3    Q.   When did you retire, Mr. Lewis?

4    A.   January of 2009.

5    Q.   Where did you retire from?

6    A.   Restaurant Supply Chain Solutions or they are known as

7    RSCS.

8    Q.   How long did you work at RSCS before your retirement in

9    January of 2009?

10   A.   Approximately, 11 years.

11   Q.   And what was your role at RSCS in the 11 years prior to

12   your retirement?

13   A.   I was senior director of poultry.

14   Q.   And what -- just basically what did that job entail in

15   terms of responsibilities?

16   A.   It involved managing the supply chain for poultry for

17   Kentucky Fried Chicken.

18   Q.   Were you involved with negotiating contracts for the supply

19   of chicken for KFC restaurants?

20   A.   Yes.

21   Q.   Did you work at all -- or did there come a time when you

22   returned to work at RSCS?

23   A.   Yes.

24   Q.   What year was that?

25   A.   2014.

2607

Robert Lewis - Direct

1  Q.  When within 2014 did you start?

2  A.  The month of May.

3  Q.  And how long did you stay?

4  A.  Approximately seven months.

5  Q.  Why did you go back to RSCS in May of 2014?

6  A.  Originally I went back, it was supposed to be for two

7  months, to help secure a supply of chicken.  Chicken was in

8  extremely short supply at the time.

9  Q.  And what was the nature of the short supply of chicken in

10  May of 2014?

11  A.  There was a critical shortage is the way I would position

12  it.

13  Q.  And your first assignment, Mr. Lewis, was to address that

14  issue for RSCS?

15  A.  That's correct.

16  Q.  Could you briefly explain what you did to go about

17  addressing the supply issue?

18  A.  Well, I spoke with the folks that were already there about

19  the situation to get a grasp for what was going on and what

20  needed to be done.  And then we secured a demand forecast from

21  Kentucky Fried Chicken so that we could understand the number

22  of loads or the volume of chicken on the bone that would be

23  required for the coming year.

24  Q.  When you were resolving -- so for your first two-month

25  assignment when you were resolving the supply issue that RSCS

Robert Lewis - Direct

1   was facing, how was -- did the supply issue that you were

2   addressing, did it get resolved?

3   A.   Eventually we got it resolved.

4   Q.   Could you explain what the resolution was, please?

5   A.   Well, we approached the suppliers and secured sufficient

6   loads to cover the demand that we had received from KFC.

7   Q.   Approximately how many additional loads did you secure to

8   resolve the supply issue?

9   A.   My recollection was somewhere in the neighborhood of 30 to

10  35 truckloads and in addition to what was already committed

11  for.

12  Q.   Okay.  So 30 to 35 truckloads, so that was -- those were

13  truckloads that were beyond what RSCS had contracted with the

14  chicken suppliers to procure at the time?

15  A.   That's correct.

16  Q.   And can you give us a sense of how many truckloads RSCS had

17  contractually committed to procuring in the approximate

18  May 2014 time frame that you are discussing?

19  A.   The annual requirement was approximately 200 loads.

20  Q.   200 loads for what time period?

21  A.   Per week, I'm sorry.

22  Q.   So 200 loads per week during 2014.  And to address the

23  supply issue that you were confronting when you got to RSCS in

24  May, you procured about 30 truckloads per week or total?

25          MS. HENRY:  Objection, it mischaracterized the earlier

Robert Lewis - Direct

1    testimony.

2            THE COURT:  Overruled.

3    BY MR. TORZILLI:

4    Q.  You can answer, sir.

5    A.  Approximately 30 to 35 truckloads.

6            MR. TUBACH:  Can we have a brief side bar?

7            THE COURT:  Yes.

8        (At the bench:)

9            THE COURT:  Mr. Tubach, go ahead.

10           MR. TUBACH:  Your Honor, as in some prior questioning

11   of the witnesses, Mr. Torzilli is repeating back every answer

12   the witness gives to reinforce the answer when he asks the next

13   question.  I ask he not do that.  I don't believe that's a

14   proper form of the question.

15           THE COURT:  Mr. Torzilli?

16           MR. TORZILLI:  I want to just kind of talk through

17   some of these background issues.  I mean, I am happy to dial

18   back the repetition, but I didn't think it was excessive or

19   argumentative or, you know, in any way inappropriate.

20           THE COURT:  I think on background questions you can

21   probably move a little bit more quickly, but to the extent that

22   there are objections, then you will have to modify the

23   approach.  But I do agree that, as we talked about earlier, the

24   questioner should not be repeating the answers and then asking

25   a new question.  So if there is a need to do a little bit of

Robert Lewis - Direct

1   sign posting, that's acceptable, but not just repeating many of

2   the answers, all right?

3             MR. TORZILLI:  Understood.

4             THE COURT:  Thank you.

5        (In open court:)

6   BY MR. TORZILLI:

7   Q.  Thank you, Mr. Lewis.

8             So the 30 to 35 loads, can you tell us whether that is

9   a total 30 to 35 loads or whether that was a recurring

10  procurement?

11  A.  It was a total.

12  Q.  After you addressed the supply issue that you've been

13  discussing, did you have another assignment at RSCS in 2014?

14  A.  Yes.  Once my initial contract for two months was up, they

15  asked me to stay on and lead the negotiations for the 2015

16  pricing.

17  Q.  Were you working as part of a team that conducted those

18  negotiations for RSCS?

19  A.  Yes, I was.

20  Q.  Was there a team leader?

21  A.  There was.

22  Q.  Who was your team leader?

23  A.  Pete Suerken.

24  Q.  Did you and the team have a process that you went about to

25  conduct the negotiations?

Robert Lewis - Direct

1   A.   Yes.

2   Q.   And what product or products were you negotiating for in

3   2014?

4   A.   Chicken on the bone, which is commonly referred to as

5   eight-piece.

6   Q.   What was the first step in your process of negotiating

7   chicken-on-the-bone supply contracts in 2014?

8   A.   Well, as I mentioned earlier, the first step would be to

9   secure a demand forecast from Kentucky Fried Chicken to let us

10  know by week how many truckloads of chicken on the bone were

11  required for 2015.

12  Q.   Did you obtain that demand forecast from KFC?

13  A.   Yes, we did.

14  Q.   What happened next?

15  A.   After that, there was a review of the existing 2014

16  contracts just to familiarize -- well, mostly me since I hadn't

17  been there for a while -- who the suppliers were, how much they

18  had committed to supplying in 2014, the products and the FOB

19  price for those products.

20  Q.   What relevance did the FOB price in the 2014 contracts have

21  to your work negotiating contracts for the following year?

22  A.   Well, the demand forecast coupled with the information that

23  I just mentioned established the baseline from which we began

24  the 2015 negotiations.

25  Q.   Was the supply of the type of chickens that KFC purchases

Robert Lewis - Direct

1  tight in 2014 around the time that you started your

2  negotiations?

3  *A.*  Yes.

4  *Q.*  What, if any, effect did that fact have on your planning

5  for the prices that you would likely negotiate with suppliers

6  in 2014?

7  *A.*  Well, it created a sense of urgency because we saw that the

8  situation was critical.

9  *Q.*  Were you and the team planning for a price increase?

10  *A.*  Yes.  We knew that because of the pressure that consumer

11  demand had put on the small bird because of the higher demand

12  for further processed products and the use of the bigger bird,

13  that we would see an increase in price.

14  *Q.*  Did you have an estimate or a range that you planned for

15  for a price increase for 2014 chicken-on-the-bone products?

16  *A.*  As I recall, I believe we were looking somewhere in the

17  neighborhood of perhaps 3 to 5 cents per pound.

18  *Q.*  As an FOB price?

19  *A.*  As an FOB price.

20  *Q.*  You mentioned another aspect of reviewing the then current

21  contracts, so the 2014 contracts, was to identify the

22  chicken-on-the-bone suppliers that RSCS was then dealing with?

23  *A.*  Yes.

24  *Q.*  How many chicken suppliers was RSCS dealing with during the

25  negotiation -- yeah, negotiated with in 2014?

Robert Lewis - Direct

1    A.  Well, there was seven all together, but there were six that

2    we considered primary.

3    Q.  And who were the six primary chicken-on-the-bone suppliers

4    for RSCS?

5    A.  Pilgrim's Pride, Claxton Poultry, Koch Foods,

6    Mar-Jac Poultry, Tyson Foods, and George's.

7    Q.  Who -- was there someone at Pilgrim's that was your primary

8    contact for negotiations in 2014?

9    A.  Yes.  It would have been Mr. Roger Austin.

10   Q.  And for Claxton, was there a primary person or persons that

11   you were conducting negotiations with in 2014?

12   A.  It would have been Mr. Scott Brady.

13   Q.  Anyone else?

14   A.  Yes, Mr. Mikell Fries.

15   Q.  And at Tyson, was there a person or persons that were your

16   primary contacts for negotiations?

17   A.  Mr. Brian Roberts.

18   Q.  And for Koch, was there a person that was your primary

19   contact for negotiations?

20   A.  Mr. Bill Kantola.

21   Q.  And how about Mar-Jac?

22   A.  Mr. Greg Tench and Mr. Pete Martin.

23   Q.  What was that last name, sir?

24   A.  Pete Martin.

25   Q.  After you reviewed the contracts, you identified the

2614

Robert Lewis - Direct

1   prices, you identified the suppliers, what was the next step in

2   the process?

3   A.  We got together as a team and tried to -- well, we did

4   determine our approach with suppliers for the 2015

5   negotiations.

6   Q.  Did you formulate an approach to deal with the suppliers?

7   A.  We did.  The primary decision I think we made was to begin

8   negotiations early.  Because of the extreme shortage, we wanted

9   to be first in line, so to speak.

10  Q.  Were there any other major aspects of the approach that you

11  planned to take negotiating contracts with chicken suppliers?

12  A.  Well, because we expected a price increase in the magnitude

13  of volume, even a penny is substantial, we tried to develop

14  some other opportunities to help keep the price down or

15  stabilize the pricing, if you would.

16  Q.  And what were those approaches?

17  A.  A greater use of frozen chicken, which is not desirable,

18  but it is a way to relieve the pressure on the fresh product; a

19  greater use of what we call supplemental dark meat; expanding

20  the specification weight range on the existing product; and

21  looking at a longer shelf life for the product.  All of those

22  we felt like were opportunities to help us with the supply

23  challenge.

24  Q.  What was the next step in the process of negotiating supply

25  in 2014?

Robert Lewis - Direct

1   A.  Once we developed our strategy, then the next step would

2   have been to approach the individual suppliers.

3   Q.  And can you explain what you did to approach the suppliers

4   to begin negotiations with them?

5   A.  Each supplier was contacted individually.  I'm sorry.  And

6   we shared with them the things that we wanted them to address

7   with us, including price, volume, and those other things that I

8   just mentioned, and the negotiation process began.

9   Q.  Did you meet with the chicken suppliers?

10  A.  Yes, we did.

11  Q.  These were face-to-face meetings?

12  A.  They were face-to-face meetings with each individual

13  supplier.

14  Q.  Each individual supplier?  Where did those meetings take

15  place?

16  A.  They took place in a conference room at RSCS headquarters.

17  Q.  Approximately what time did those meetings occur or what

18  time of year did those meetings occur?

19  A.  Those occurred in early August of 2014.

20  Q.  Okay.  If you could turn in the binder in front of you to

21  Tabs 1 through 7 and take a look at the documents behind those

22  tabs.  You should find behind those tabs Government's Exhibit

23  1139, 1137, 1138, 1135, 1134, 1136, and 1221-1.

24  A.  Okay.

25  Q.  Have you had a chance to look at those exhibits, sir?

Robert Lewis - Direct

1   *A.*   Yes.

2   *Q.*   Do you recognize them?

3   *A.*   Yes.

4   *Q.*   What are they?

5   *A.*   Those are all e-mails that were written by myself to the

6   individual suppliers confirming the meeting we had with them in

7   early August of 2014.

8   *Q.*   Are the e-mails that you wrote in the exhibits you just

9   reviewed, are they e-mails that relate to the meetings that you

10   just testified about?

11   *A.*   Yes.

12   *Q.*   And those were meetings -- those were e-mails that were

13   written as part of your work conducting negotiations for

14   chicken on the bone in 2014?

15          *MR. McLOUGHLIN:*   Your Honor, same objection as earlier

16   with respect to repetition.

17          *THE COURT:*   Overruled.

18   *BY MR. TORZILLI:*

19   *Q.*   You can answer.

20   *A.*   Correct.

21          *MR. TORZILLI:*   At this time, the government offers

22   1139, 1137, 1138, 1134, 1135, 1136, and 1221-1.

23          *THE COURT:*   All right.   Any objection to the admission

24   of any of those exhibits?

25          Those exhibits will be admitted.

2617

Robert Lewis - Direct

1          MR. TORZILLI:  Permission to publish Government's

2    Exhibit 1135.

3          THE COURT:  You may.

4    BY MR. TORZILLI:

5    Q.  Sir, on the screen in front of you is Government's Exhibit

6    1135.  And this is one of the e-mails you wrote?

7    A.  Yes.

8    Q.  Who is this e-mail to?

9    A.  This e-mail is to Bill Kantola at Koch Foods.

10   Q.  The first sentence there you write, Bill, thank you for a

11   very productive meeting this morning.  Do you see that?

12   A.  Yes.

13   Q.  So when did you meet with Defendant Bill Kantola?

14   A.  The morning of August 7th, 2014.

15   Q.  When in the morning of August 7th of 2014 did you meet with

16   Defendant Bill Kantola?

17   A.  I believe it was between 9:00 and 11:00.

18   Q.  9:00 a.m. and 11:00 a.m.?

19   A.  Yes.

20   Q.  And in your e-mail, if I can direct your attention to the

21   very last sentence, it says, Please provide the information by

22   Tuesday, August 19.  Do you see that?

23   A.  Yes.

24   Q.  What were you attempting to convey to Defendant Bill

25   Kantola with that sentence?

Robert Lewis - Direct

1    *A.*   That we were expecting his response to all of the requests

2    there by Tuesday, August 19.

3    *Q.*   And what were the -- what did the requests that you were

4    making of Defendant Bill Kantola include?

5    *A.*   All of the bullet points that are in the body of this

6    e-mail.

7    *Q.*   Did that include a pricing proposal?

8    *A.*   Yes, it does.

9    *Q.*   Was the same or similar deadline provided to the other

10   chicken-on-the-bone suppliers that you were negotiating with?

11   *A.*   Yes.

12   *Q.*   So August 19th?

13   *A.*   Correct.

14   *Q.*   And you wanted the same or similar information from all

15   those other chicken suppliers by that date?

16   *A.*   Yes.

17   *Q.*   Including a pricing proposal?

18   *A.*   Correct.

19          *MR. TORZILLI:*   We can take that exhibit down, thank

20   you.

21   *BY MR. TORZILLI:*

22   *Q.*   Okay, sir.  So on or prior to the August 19th deadline that

23   you had set for a response including a pricing proposal, did

24   you receive those proposals?

25   *A.*   Yes.

1   Q.  Did any of the suppliers, to the best of your recollection,

2   submit any proposals significantly in advance of the

3   August 19th deadline?

4   A.  Yes.  I believe Tyson submitted theirs I believe it was

5   August the 11th.

6   Q.  About eight days early?

7   A.  Eight days earlier.

8   Q.  And then how about the rest of them, how did they come in

9   relative to the August 19th deadline that you had set out?

10  A.  I recall a presentation that was submitted by George's, I

11  believe it was August the 12th, but they did their follow-up on

12  these particular bullet points and re-sent that on August the

13  19th.

14  Q.  So there came a time, Mr. Lewis, when all of the proposals

15  came in; is that right?

16  A.  That's correct.

17  Q.  And who did they come in to at RSCS?

18  A.  It seems that the majority of the original proposals came

19  to me, but I believe there might have been one or two that were

20  directed to either Mr. Suerken or Mr. Eddington.

21  Q.  And did -- on the ones that went to them, did they

22  eventually get forwarded to you?

23  A.  Yes.  They generally forwarded to me any documents that

24  pertained to the negotiations.

25  Q.  So once all the proposals came in, what was the next step

Robert Lewis - Direct

1    in your process of negotiations in 2014?

2    A.   Once we had all of the supplier information, then we set

3    about to evaluate their proposals.

4    Q.   Were you personally involved with the evaluation of the

5    proposals that came in?

6    A.   Yes.

7    Q.   Could you describe the process you took for that

8    evaluation?

9    A.   Because the cost models they submitted their proposals

10   through is pretty similar for each supplier, we laid those out,

11   so to speak, on an Excel worksheet.  That way we could look

12   across the line and compare like components and make a decision

13   as to which ones needed to be addressed with the individual

14   suppliers.

15   Q.   Is that what you, in fact, did, the process you just

16   described?

17   A.   Yes.

18   Q.   Did you conduct a comparison of the proposals?

19   A.   Yes.

20   Q.   And what did you determine after you conducted your

21   comparison?

22   A.   Well, first of all, I was surprised at the magnitude of the

23   price increase.  And because of that, I approached the

24   suppliers again and challenged them on their pricing.

25   Q.   Mr. Lewis, what was surprising to you about the magnitude

Robert Lewis - Direct

1    of the price increase you saw when you did the comparison?

2    A.  Well, the average 2014 price was in the neighborhood of

3    92 cents per pound FOB the plant, and the proposed new prices

4    were all in the $1.03 to $1.10, $1.10 a pound range, which

5    represents a significant increase.

6    Q.  How did that compare to what you had planned for in terms

7    of a price increase?

8    A.  It was three to four times what we thought or had hoped the

9    price increase would have been.

10   Q.  Three to four times more than you -- can you say the last

11   part?  Someone was objecting.

12   A.  That we thought the price increase --

13          THE COURT:  Hold on.  Sorry, Mr. Lewis, if there is an

14   objection, you need to wait.

15          Sustained.

16          MR. McLOUGHLIN:  Your Honor, same --

17   BY MR. TORZILLI:

18   Q.  So after you conducted your evaluation, you conducted your

19   comparison, what's the next step in the process that you had in

20   place to negotiate contracts with chicken suppliers?

21   A.  Well, like I said, we challenged the suppliers on their

22   pricing.

23   Q.  And what do you mean by "challenged the suppliers on their

24   pricing"?

25   A.  Well, we wanted to see if we could get them to reduce it

Robert Lewis - Direct

1   from their original proposal.

2   Q.  And how did you go about trying to do that?

3   A.  By contacting each of the individual suppliers and

4   negotiating with them.

5   Q.  And how did you conduct those negotiations?

6   A.  By telephone.

7   Q.  So you had telephone calls with each of the suppliers that

8   you were negotiating with?

9   A.  Each one of them individually, yes.

10  Q.  And could you generally summarize the nature of those

11  telephone communications?

12  A.  Well, virtually all six of the suppliers that were

13  contacted slightly reduced their price.

14  Q.  Did they submit revised proposals?

15  A.  Yes.

16  Q.  If you could look in the binder in front of you at the tabs

17  8 to 15.  And behind those tabs, you should find Government's

18  Exhibits 1007, 1008, 1026, 1028, 1029, 1165, 1166, and 1167.

19  A.  Okay.

20  Q.  Do you recognize those exhibits, Mr. Lewis?

21  A.  Yes, I do.

22  Q.  What do you recognize them to be?

23  A.  Those are the proposals from the suppliers for the 2015

24  contract.

25  Q.  Are those examples of proposals that the chicken suppliers

Robert Lewis - Direct

1    provided to RSCS in 2014?

2    A.  Yes.

3    Q.  Are some of those documents revised proposals that were

4    submitted after you had the telephone discussions you just

5    identified?

6            MR. McLOUGHLIN:  Object to leading.

7            THE COURT:  Overruled.

8    BY MR. TORZILLI:

9    Q.  You can answer, sir.

10   A.  They appeared to be.

11           MR. TORZILLI:  At this time the government offers

12   those exhibits, Your Honor.

13           THE COURT:  All right.  1008 has already been

14   admitted.

15           Any objection to the admission of Exhibit 1007, 1028,

16   1026, 1029, 1165 through 1167?

17           Each of those will be admitted.

18           MR. TORZILLI:  Thank you, Your Honor.

19   BY MR. TORZILLI:

20   Q.  Now, sir, if you could turn to Tab 16 in your binder, and

21   you should find Government's Exhibit 1160.

22   A.  Okay.

23   Q.  Do you recognize this exhibit?

24   A.  Yes.

25   Q.  What is it?

Robert Lewis - Direct

1    *A.*  It's an e-mail from me to all of the chicken supplier

2    contacts concerning COB negotiations.

3    *Q.*  What was the date of the e-mail that you wrote to them?

4    *A.*  August 29th, 2014.

5    *Q.*  And this was an e-mail that you wrote as part of your

6    negotiations with the suppliers?

7    *A.*  Yes.

8         *MR. TORZILLI:*  Your Honor, government offers

9    Government's Exhibit 1160.

10        *THE COURT:*  Any objection to the admission of 1160?

11        *MR. LAVINE:*  No objection, Your Honor.

12        *THE COURT:*  Exhibit 1160 will be admitted.

13        *MR. TORZILLI:*  Thank you, Your Honor, and permission

14   to publish 1160.

15        *THE COURT:*  Yes, you may.

16   *BY MR. TORZILLI:*

17   *Q.*  Mr. Lewis, in Government's Exhibit 1160, what are you

18   trying to accomplish with the message that you sent?

19   *A.*  Some of the suppliers had not submitted their final

20   proposals to us at this point, and the idea was to see if I

21   could spur them, you might say, to respond and provide that

22   information.

23   *Q.*  This e-mail was written on August 29th you said?

24   *A.*  Yes.

25   *Q.*  And did you set a deadline for the recipients to provide

Robert Lewis - Direct

1   their final proposals?

2   A.   Yes.  We wanted the information by the following Tuesday or

3   Wednesday, which would be two or three workdays.

4   Q.   Two or three business days after the date that you sent the

5   e-mail?

6   A.   Yes.

7   Q.   Okay.  And I see that you addressed in the "to" field of

8   this e-mail, you addressed it to all the chicken suppliers and

9   their contacts that you were negotiating with?  Is that right?

10  A.   Yes.  This would have included all seven of the original

11  suppliers.

12  Q.   Why did you include all seven suppliers on the same e-mail

13  in the "to" field?

14  A.   There were probably two reasons.  It was an easy,

15  convenient way to get the information to all of them at one

16  time short of writing an individual note to each person.  And I

17  also felt like if they all saw that some had received -- or,

18  pardon me, had provided their proposals and some others hadn't,

19  then the ones who had not might have felt a little pressure to

20  respond.

21  Q.   Did you, in fact, receive final proposals from suppliers

22  the following Tuesday or Wednesday?

23  A.   Yes, as I recall, we did.

24  Q.   After receipt of those final proposals, what happened next

25  in the process?

Robert Lewis - Direct

1    A.  At that point, we would have started the process of putting

2    together the SBRA addendums, which basically is the contract

3    between RSCS and the supplier for the products involved.

4    Q.  Did you come to contracts with all seven of the suppliers

5    that you were negotiating with?

6    A.  I do not recall preparing one for Case Farms, but for the

7    other six, yes.

8    Q.  And those contracts ultimately were executed between RSCS

9    and those suppliers?

10   A.  Yes.

11   Q.  Sir, so throughout the process you've just walked us

12   through, were each of the -- you identified seven chicken

13   suppliers.  Were each of those chicken suppliers you identified

14   competitors of each other for RSCS's business?

15   A.  Yes.

16   Q.  Could you describe in what ways they were competing against

17   each other for RSCS's business?

18   A.  Well, the whole process of negotiation was done on -- in a

19   confidential way except for the one memo we were looking at

20   just a moment ago.  All other correspondence, all meetings,

21   everything in the process was done one-on-one.  And we, of

22   course, expected that everything be kept confidential between

23   us and the supplier.

24   Q.  Were the chicken suppliers competing against each other for

25   RSCS's business on the basis of the price that they were

Robert Lewis - Direct

1    offering to charge?

2              MR. McLOUGHLIN:  Object to leading.

3              THE COURT:  Overruled.

4    A.  Yes.

5    BY MR. TORZILLI:

6    Q.  Okay.  Could you describe the way in which -- or the

7    aspects of the price competition between the competing

8    suppliers?

9    A.  I'm sorry, I am not sure I understand your question.

10   Q.  Could you describe or detail the way in which the suppliers

11   were competing against each other on the basis of the price

12   they were offering?

13   A.  Could you rephrase that?  I am not sure I am understanding

14   what you're asking.

15   Q.  Sure.  Let me back up and ask you whether or not -- just

16   yes or no, whether the suppliers were competing against each

17   other for RSCS's business on the basis of price.

18              MS. LaBRANCHE:  Asked and answered.

19              THE COURT:  Overruled.

20   A.  Yes.

21   BY MR. TORZILLI:

22   Q.  Could you describe the way in which they were competing

23   against each other on the basis of price?

24   A.  They were submitting individual confidential proposals.

25   Q.  And what were you looking for in terms of the price of the

2628

Robert Lewis - Direct

1    proposals they were submitting to you?

2    A.   We were looking for their price per pound FOB their plant.

3    Q.   And what were you looking for in terms of the FOB per pound

4    price?

5    A.   Their lowest price.

6    Q.   Lowest on an FOB basis?

7    A.   On an FOB basis.

8    Q.   And is that reflected in the pricing proposals that are

9    submitted?

10   A.   Again, I'm not -- I'm not sure I understand your question.

11   Q.   What's the -- is there a document that the chicken

12   suppliers submitted to you reflecting their proposal?

13   A.   Yes.  It was an updated cost-plus model.

14   Q.   And what is a cost-plus model?

15   A.   A cost-plus model is the method we use for determining with

16   the supplier their FOB plant cost.

17   Q.   And is there a last line in the cost-plus model?

18   A.   Yes.

19   Q.   What's the very last line in a cost-plus model called?

20   A.   FOB plant cost.

21   Q.   And what is that?

22   A.   It is the cost per pound loaded on a truck at their dock.

23   Q.   Just a couple more questions, sir.

24        First, you identified Defendants Austin, Brady, Fries,

25   Kantola, Roberts as people you negotiated with in 2014.  My

Robert Lewis - Direct

1   question to you, just a yes-or-no question, whether you ever

2   asked any of them to have phone calls or text messages or

3   e-mails with any of their competitors about their pricing

4   proposals or negotiations with RSCS in 2014?

5   A.   No.

6   Q.   And, again, sir, a yes-or-no question, did you ask any of

7   the competing chicken suppliers to have phone calls or texts or

8   e-mails with any of their competitors about bids or

9   negotiations with RSCS?

10  A.   No.

11  Q.   Again, yes-or-no question, do you have any personal

12  knowledge back in 2014 about any defendant rigging bids or

13  fixing prices to RSCS?

14  A.   No.

15  Q.   Mr. Lewis, yes or no, did you ever provide one chicken

16  supplier's bid information that you had to one of their

17  competitors?

18  A.   No.

19  Q.   Do you have any personal knowledge of anyone else at RSCS

20  providing one competitor's bid information to another

21  competitor?

22  A.   No.

23  Q.   And last yes-or-no question, Mr. Lewis, did anyone at any

24  of the competing chicken suppliers you were dealing with in

25  2014 ever inform you that they were communicating with their

Robert Lewis - Cross

1    competitors about bids or negotiations with RSCS?

2              *MS. HENRY:*  Objection, lack of foundation.

3              *THE COURT:*  Overruled.

4              *MR. TORZILLI:*  You can answer that, sir.

5    *A.*  No.

6              *MR. TORZILLI:*  No further questions.

7              *THE COURT:*  Thank you.

8              Cross-examination?  Mr. Lavine.

9                        **CROSS-EXAMINATION**

10   *BY MR. LAVINE:*

11   *Q.*  Good morning, Mr. Lewis.  How are you?

12   *A.*  Fine, thank you.

13   *Q.*  Great.

14             If you recall, you and I have met once before at a

15   prior hearing; is that correct, sir?

16   *A.*  That's correct.

17   *Q.*  So what I would like to do this morning is I would like to

18   go through some of the aspects of the 2014 negotiations into

19   the 2015 contract.  And I am not going to go through each one

20   of the contracts, but I want to go through what really happened

21   during that process.  And if I at any time state a question

22   that you don't understand, just please tell me, okay?

23   *A.*  Yes.

24   *Q.*  Now, when you were at RSCS, and I am going to say in the

25   2008, 2009 time frame before you retired, there was more supply

Robert Lewis - Cross

1    than demand for the small bird, was there not?

2    A.  Supply was not an issue in 2008 or '09.

3    Q.  Right.  And in 2014 when you came back, when you returned

4    to RSCS, there was more demand than there was for the supply of

5    the small bird.

6    A.  I know that supplies were very, very tight.  I don't know

7    that demand outweighed supply.

8    Q.  Well, you -- as you testified on direct, you were asking

9    for additional loads during that Mother's Day period, were you

10   not?

11   A.  Yes, we were, but I am not so sure that indicates that

12   there was a shortage.  It just meant that we were taking some

13   unusual steps to obtain supply at that point.

14   Q.  All right.  Let me ask you this.  Over time the number of

15   companies producing small birds reduced; is that correct?

16          MR. TORZILLI:  Objection, foundation.

17          THE COURT:  Overruled.  He can answer if he knows.

18   A.  There was a move in the industry to consolidate, so, yes,

19   there are fewer companies that own the plants today than there

20   were before.

21   BY MR. LAVINE:

22   Q.  Correct.  And several chicken companies have filed for

23   bankruptcy?

24   A.  I am only aware of one, I believe, that had filed for

25   bankruptcy.

2632

Robert Lewis - Cross

1   Q.   Okay.  And you recall that Sanderson Farms had been the

2   largest small-bird supplier for KFC at one point in time?

3   A.   Yes.

4   Q.   And they moved to large birds?

5   A.   They did.

6   Q.   And they stopped supplying KFC?

7   A.   They did.

8   Q.   And I believe that this was an indication to you that there

9   was a problem with the small-bird market, correct, sir?

10   A.   No, sir.  What that indicated to me was that the demand for

11   chicken on the bone was decreasing, and the demand for further

12   processed products which require to a great extent bigger birds

13   was shifting.

14   Q.   Okay.  Were you aware, sir, that suppliers were considering

15   converting their small-bird plants to big-bird plants?

16   A.   Yes, some of them were.

17   Q.   When a supplier converted a plant from a small-bird to a

18   big-bird plant, it wasn't going to be converted back again, was

19   it, sir?

20           MR. TORZILLI:  Objection, foundation.

21           THE COURT:  Overruled.  He can answer if he knows.

22   A.   My understanding of that is once you convert a small-bird

23   plant to a big-bird plant, it is next to impossible to convert

24   it back.

25   BY MR. LAVINE:

2633

Robert Lewis - Cross

1   *Q.*  So the answer to the question is yes?

2   *A.*  Yes.

3   *Q.*  Thank you.

4        Now, you were also aware, sir, that at the time that

5   the industry was shifting to a bigger bird size, correct?

6   *A.*  Correct.

7   *Q.*  And as a result, the small bird size that KFC used was

8   becoming less readily available.

9   *A.*  Yes.

10  *Q.*  So you knew that there was an extreme shortage of supply of

11  small bird in 2014 when you returned to RSCS.

12  *A.*  Yes.

13  *Q.*  And that demand for chicken was much greater -- I am going

14  to go back to the demand issue, but the demand was much greater

15  than supply in 2014.

16  *A.*  Yes.

17  *Q.*  Would it also be fair to say, sir, that -- or safe to say

18  that RSCS was aware that the big bird issue, which we've just

19  talked about, changed the industry dramatically?

20  *A.*  Yes.

21  *Q.*  And that RSCS would have to pay a price.

22  *A.*  Yes.

23  *Q.*  And that was because of the market conditions?

24  *A.*  Yes.

25  *Q.*  All right.  Now, Mr. Lewis, I want to focus a little bit

2634

Robert Lewis - Cross

1   here about your retirement.  I realize you retired in 2009 and

2   then came back in 2014.

3        Now, Mr. Lewis, I want to ask you a couple of

4   questions about the industry.  And when I talk about the

5   industry, the industry is -- in the context is the chicken --

6   I'm sorry, that's a terrible question.  Let me restate this.

7        What I want to talk to you about is the industry in

8   the context that the industry would include buyers, suppliers,

9   distributors, producers, growers, all the participants in the

10  field.  Would that be true, sir?

11  A.   Yes.

12  Q.   And after you retired, you no longer kept up with any

13  aspect of the chicken industry, did you, sir?

14  A.   No, sir.

15  Q.   And good for you.  Enjoy retirement.

16       And you didn't keep up with prices?

17  A.   No.

18  Q.   And you didn't keep up with the market changes that might

19  have impacted the industry.

20  A.   I could see the shift from personal experience of more

21  demand for further processed hand-held items than chicken on

22  the bone.

23  Q.   And this is what you followed after you retired?

24  A.   Well, I didn't follow it.  You know, I eat at other

25  fast-food restaurants, so you could see the transition taking

Robert Lewis - Cross

1   place.

2   Q.   Fair enough.

3           Now, I want to turn to the supply shortage in 2014.

4   Now, when RSCS asks you to return from retirement, that's when

5   KFC was in the middle of the Mother's Day period, correct?

6   A.   That's correct.

7   Q.   And Mother's Day is without question KFC's busiest period

8   of the year.

9   A.   At that time, it was, yes.

10  Q.   And when I say "busiest," I mean it's the highest demand

11  period for KFC for chicken.

12  A.   Correct.

13  Q.   And the supply shortage in May of 2014, that was a national

14  issue, was it not, sir?

15  A.   It was.

16  Q.   And you -- if I am correct, sir, you described the chicken

17  market as in a state of near panic.

18  A.   I described the shortage of KFC product as near panic.

19  Q.   All right.  And KFC operators viewed the supply shortage

20  with a great deal of anxiety and concern?

21  A.   Absolutely.

22  Q.   And they felt the situation was at a near crisis?

23  A.   Yes.

24  Q.   And some stores ran out of fresh chicken and had to use

25  frozen chicken?

Robert Lewis - Cross

1    A.   I'm not going to deny that some restaurants ran out of

2    chicken, but I don't recall receiving any direct reports to

3    that effect.

4    Q.   And is it fair to say, sir, that KFC stores were facing

5    store closures due to tight supply?

6    A.   Yes.

7    Q.   And is it appropriate to say, sir, that RSCS also viewed

8    the supply shortage as a crisis situation?

9    A.   Yes.

10   Q.   And with a great deal of anxiety.

11   A.   Yes.

12   Q.   Now, these same issues with the supply that we just

13   discussed also existed in July; is that correct?

14   A.   Yes.

15   Q.   In fact, you were about to leave when the July 4th holiday

16   arrived.

17   A.   Yes.  My original contract was for two months.

18   Q.   Correct.  And you came in -- if I am correct, you came in

19   as a consultant for the two-month period?

20   A.   Yes.

21   Q.   And RSCS had the same supply issues for the July 4th

22   holiday that it had for Mother's Day.

23   A.   Yes.

24   Q.   And as a result, RSCS asked you to stay longer than that

25   initial two-year period.

Robert Lewis - Cross

1   A.  Two-month period.

2   Q.  Two-month period, yes, I am sorry, sir.

3   A.  Yes.

4   Q.  So you ended up staying until about the end of 2014.

5   A.  Yes.

6   Q.  All right.  And in August when you received the 2014

7   contract proposals, the supply still remained very tight and

8   short.

9   A.  At that point in time, we were beginning to feel a little

10  more at ease, and we had things under control, so I would say

11  at that point it was not as critical as it had been in prior

12  months.

13  Q.  Would it be fair to say, sir, that the market conditions

14  continued to exist at the time of these negotiations?

15  A.  Yes.

16  Q.  Okay.  Now, what I want to turn to now is you testified on

17  direct that you purchased some additional loads during this

18  difficult period of Mother's Day and over the July 4th weekend,

19  correct?

20  A.  Correct.

21  Q.  So you went out and you purchased additional loads at a

22  premium from suppliers.

23  A.  Yes.

24  Q.  All right.

25          MR. LAVINE:  If I can have one moment, please, Your

2638

Robert Lewis - Cross

 1   Honor.

 2              *THE COURT:*  Sure.

 3              *MR. LAVINE:*  If I may approach Ms. Grimm, please.

 4              *THE COURT:*  You may.

 5              *MR. LAVINE:*  Thank you.

 6   *BY MR. LAVINE:*

 7   *Q.*  Now, Mr. Lewis, I have given you a binder of documents, and

 8   I would like to go through some of these documents.  If you can

 9   turn to tab 35, please.

10              Now, in June of 2014, you asked the suppliers to call

11   you daily about their COB production plan and their production

12   activity; is that correct, sir?

13   *A.*  Yes.

14   *Q.*  So if you would look at tab 35, and this is an e-mail from

15   you; is that correct?

16   *A.*  That's correct.

17   *Q.*  And you would have sent it to the suppliers?

18   *A.*  Yes.

19   *Q.*  And that e-mail address is your e-mail address at RSCS?

20   *A.*  Yes.

21   *Q.*  And this was sent by you on June 16, 2014?

22   *A.*  Yes.

23   *Q.*  And it would have been sent in the ordinary course of

24   business while you were at RSCS?

25   *A.*  Yes.

Robert Lewis - Cross

1  *Q.* And this would have been maintained in the ordinary,

2  necessary course of business at RSCS?

3  *A.* Yes.

4          *MR. LAVINE:* I am sorry, this is Exhibit No. 1244,

5  Your Honor.

6          *THE COURT:* Yes.

7          *MR. LAVINE:* I would move for its admission, please.

8          *THE COURT:* Any objection to the admission of

9  Exhibit 1244?

10          *MR. TORZILLI:* No objection, Your Honor.

11          *THE COURT:* Exhibit 1244 will be admitted.

12          *MR. LAVINE:* May I publish, Your Honor?

13          *THE COURT:* You may.

14  *BY MR. LAVINE:*

15  *Q.* Now, if you would just take a look at this exhibit, please.

16          Now, this is in the June time frame. This is after

17  Mother's Day. And you are asking for an update on a daily

18  basis from each one of the suppliers; is that correct?

19  *A.* That's correct.

20  *Q.* Now, if you would go down, please, to the second

21  sentence -- third sentence of the first paragraph. It starts

22  with "everyone." Would you read that out loud, please.

23  *A.* Everyone still remembers the Mother's Day crisis, and we

24  are anxious about the upcoming July 4 holiday and $5 fill-up

25  promotion.

Robert Lewis - Cross

1   Q.  So you still had concerns at this time after Mother's Day

2   that there were going to potentially be more supply issues?

3   A.  Yes.

4   Q.  And as a result, you wanted a daily update from all the

5   suppliers as to what was going on.

6   A.  Yes.

7   Q.  All right.  If you would read the next sentence, please.

8        MR. LAVINE:  And, Mr. Brian, if you would highlight

9   that, please.

10  A.  The information you provide will enable us to provide a

11  general summary to the RSCS management as to how demand and

12  supply are matching up and whether there are any concerns.

13  BY MR. LAVINE:

14  Q.  All right.  And if we could go to the third paragraph,

15  which starts with "we are."  Would you read that paragraph,

16  please.

17  A.  We are also continuing to request that you produce as much

18  frozen product as possible, particularly Purple label.  This

19  will help all of us as we move into the high demand period.

20  Q.  Go ahead and finish the paragraph, please.

21  A.  It would be very helpful if all of you had a back-up frozen

22  inventory.

23  Q.  So during this period of time, which is after Mother's Day,

24  you were anticipating additional problems, and what you were

25  trying to do is to communicate with the suppliers to avoid any

2641

Robert Lewis - Cross

1   further supply issues; is that correct?

2   A.  That's correct.

3   Q.  All right.  Now, you also wanted to keep management updated

4   about the demand and supply issues, correct?

5   A.  Yes.

6   Q.  And so as this e-mail shows, you were concerned about the

7   upcoming July 4th holiday?

8   A.  Yes.

9   Q.  And you were also concerned about the upcoming promotions.

10  A.  Yes.

11  Q.  And the concern was whether RSCS would have enough supply

12  for these two events, correct?

13  A.  Correct.

14  Q.  And as a result and because of the extreme shortage of

15  small birds, this is when RSCS was willing to pay a premium for

16  extra loads.

17  A.  That's correct.

18  Q.  And this is what you testified to on direct when government

19  counsel asked you about going out and buying loads.

20  A.  Yes.

21  Q.  All right.  So what I want to do now, sir, I want to see if

22  I can put a little more detail with that.  If you would turn to

23  tab 1, please.  And it's going to be Defense Exhibit F-660.

24          Now, Mr. Lewis --

25          MR. LAVINE:  Do not publish this.  It has not been

Robert Lewis - Cross

1  admitted.  I'm sorry.  I apologize, Your Honor.

2  *BY MR. LAVINE:*

3  *Q.*  Let's look at the e-mail at the bottom, and that is from

4  you, is it not, sir?

5  *A.*  Yes.

6  *Q.*  And it's to a Mr. Roger Austin?

7  *A.*  Yes.

8  *Q.*  And it's dated June 25th, 2014.

9  *A.*  Yes.

10  *Q.*  And this is an e-mail that you would have sent while you

11  were working at RSCS?

12  *A.*  Yes.

13  *Q.*  And it was used in the business that you were involved in

14  with RSCS?

15  *A.*  Yes.

16  *Q.*  And this e-mail would have been sent in the ordinary and

17  necessary course of business?

18  *A.*  Yes.

19  *Q.*  And it would have been maintained in the ordinary and

20  necessary course of business; is that correct, sir?

21  *A.*  That's correct.

22  *Q.*  Now, if you would look at the top e-mail, it is also from

23  you.

24  *A.*  Yes.

25  *Q.*  And it is from your e-mail address at RSCS.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   It's to Roger Austin?

3    A.   Yes.

4    Q.   Dated June 27th, 2014?

5    A.   Yes.

6    Q.   And this is -- you would have sent this while you were

7    working at RSCS?

8    A.   Yes.

9    Q.   And you would have relied on this document in your business

10   with RSCS?

11   A.   Yes.

12   Q.   And this would have been sent in the ordinary, necessary

13   course of business at RSCS?

14   A.   Yes.

15   Q.   And it would have been -- the document would have been

16   maintained in the ordinary and necessary course of business at

17   RSCS, true?

18   A.   True.

19          MR. LAVINE:   Your Honor, I would move for the

20   admission of F-660.

21          THE COURT:   Any objection to the admission of F-660?

22          MR. TORZILLI:   Your Honor, I don't believe that this

23   is a business record, but we don't object to the admission of

24   F-660.

25          THE COURT:   All right.   F-660 will be admitted.

Robert Lewis - Cross

1            *MR. LAVINE:*  Thank you, Your Honor.

2            May we publish?

3            *THE COURT:*  You may.

4     *BY MR. LAVINE:*

5     *Q.*  So in June of 2014, you bought additional extra loads from

6     Pilgrim's; is that correct?

7     *A.*  That's correct.

8     *Q.*  And that's because Roger Austin works for Pilgrim's.

9     *A.*  Yes.

10    *Q.*  And according to this, if we go down to the first e-mail --

11           *MR. LAVINE:*  If you would highlight the third

12    paragraph.

13    *BY MR. LAVINE:*

14    *Q.*  You paid $1.30 a pound for that chicken; is that correct?

15    *A.*  That's correct.

16    *Q.*  And it was for 12 extra loads.

17    *A.*  Yes.

18    *Q.*  During a three-week period?

19    *A.*  Yes.

20    *Q.*  And one load, sir, if I am correct, is about 33,500 pounds?

21    *A.*  Depending on trailer size, yes, 32- to 33,000.

22    *Q.*  It's close?

23    *A.*  Yes.

24    *Q.*  So if I were to take 12 loads times the 33,500, I would end

25    up with roughly 400,000 pounds of chicken you're buying at

Robert Lewis - Cross

1    $1.30 a pound, correct, sir?

2    A.   Correct.

3    Q.   In this e-mail with Mr. Austin, you also --

4         MR. LAVINE:   If you will go back to the top portion of

5    the e-mail and highlight the second paragraph.

6    BY MR. LAVINE:

7    Q.   And would you read that, please.   It starts with "finally."

8    A.   Yes.   Finally, we will appreciate having the first right of

9    refusal on any and all loads of Purple label (or dark meat) in

10   the weeks to come.

11   Q.   And the purpose of this was you wanted to make sure that

12   you had supply for the upcoming weeks, correct?

13   A.   We wanted Mr. Austin to let us know if he had additional

14   products so that we would be first in line to say yes or no.

15   Q.   Precisely.

16        Now, I believe that you also purchased additional

17   chicken from Mar-Jac in 2014.

18   A.   That's correct.

19   Q.   And I believe you purchased about 10 loads?

20   A.   10 loads.

21   Q.   And you paid a very high price for those 10 loads, did you

22   not, sir?

23   A.   Yes.

24   Q.   Now, if you could turn to tab 2 in your book, please, and

25   this would be Exhibit J-016.

Robert Lewis - Cross

1        Now, Mr. Lewis, this is an e-mail from you to Scott

2   Brady; is that correct?

3   A.   Yes.

4   Q.   This is dated June 23rd, 2014?

5   A.   Yes.

6   Q.   And this is an e-mail that you would have sent?

7   A.   Yes.

8   Q.   And does this e-mail accurately reflect the communication

9   that you had with Mr. Brady at that time?

10  A.   I don't remember this e-mail, but yes.

11  Q.   But you have no reason to question the accuracy of this

12  e-mail since it came from you, do you, sir?

13  A.   I do not.

14  Q.   Right.  And this would have been sent in your business at

15  RSCS, correct, sir?

16  A.   Yes.

17        MR. LAVINE:  Your Honor, I move the admission of

18  Exhibit J-016.

19        THE COURT:  Any objection to the admission of J-016?

20        MR. TORZILLI:  No, Your Honor.

21        THE COURT:  J-016 will be admitted.

22  BY MR. LAVINE:

23  Q.   And with this e-mail, sir, you are paying Claxton a premium

24  equal to about an extra 30 cents a pound over and above the

25  current FOB price, correct?

Robert Lewis - Cross

1    A.   Correct.

2    Q.   And that FOB price would be for the -- what was under

3    contract in 2014.

4    A.   Yes.

5    Q.   And you're asking --

6             MR. LAVINE:   Could we publish, Your Honor?

7             THE COURT:   Yes, you may.

8             MR. LAVINE:   I have a difficult time remembering

9    numbers and publishing.   I apologize, Your Honor.

10   BY MR. LAVINE:

11   Q.   What this e-mail reflects is you are purchasing

12   two truckloads per week for six weeks.

13   A.   Yes.

14   Q.   And, again, if I use my math the best I can, if I do 33,500

15   by two, by six weeks, it's a little over 400,000 pounds.

16   A.   Yes.

17   Q.   All right.   Now, do you recall what the price of chicken

18   was from Claxton in 2014?

19   A.   No, not exactly.

20   Q.   Is there possibly a document I could show you that would

21   possibly refresh your memory?

22   A.   Yes.

23   Q.   All right.   If you would turn to tab 27, please.   That

24   would be Exhibit 1728.   Now, I ask you just to look at this

25   document and see whether or not this refreshes your memory as

Robert Lewis - Cross

1   to what the FOB plant cost or the COB cost would be for Claxton

2   for 2014.

3   A.   Yes.

4   Q.   And if you would look at that and then close that tab over

5   and just -- does that refresh your memory, sir?

6   A.   Yes.

7   Q.   And what is that price?

8   A.   Approximately 92 cents.

9   Q.   So if I do my math correctly, sir, at 92, let's say

10  93 cents, and I add on 30 cents, that means you're paying about

11  $1.23 a pound for chicken from Claxton in that 2014 time frame.

12  A.   Yes.

13  Q.   And that's in addition to what they are contractually

14  obligated to sell to you under their 2014 contract at 9275,

15  correct, sir?

16  A.   Correct.

17  Q.   Now, if we could turn to --

18          MR. LAVINE:   Your Honor, I apologize.  Did I move the

19  admission of J-016?  I did?

20          THE COURT:   You did.

21          MR. LAVINE:   Thank you, Your Honor.

22          THE COURT:   Mr. Lavine, because it's just about

23  10:15 --

24          MR. LAVINE:   Perfect time, Your Honor.

25          THE COURT:   Okay.  Ladies and Gentlemen, we will go

Robert Lewis - Cross

1    ahead and take our mid-morning break.  We will plan on

2    reconvening at 10:30.  Keep the admonitions in mind.  The jury

3    is excused.  Thank you.

4            (Jury excused.)

5        THE COURT:  We will be in recess.  Thank you.

6      (Recess at 10:15 a.m. until 10:32 a.m.)

7        THE COURT:  Let's go ahead and bring the jury back in

8    and Mr. Lewis as well.

9            (Jury present.)

10       THE COURT:  Mr. Lavine, whenever you are ready.

11       MR. LAVINE:  Thank you, Your Honor.

12   BY MR. LAVINE:

13   Q.  Mr. Lewis, before we took the break, we were talking about

14   the additional loads that you purchased for RSCS -- you didn't

15   purchase, but RSCS purchased from Claxton during this June 23rd

16   time frame.  And if I do my math correctly, the COB price for

17   Claxton in 2014 was .9275 and plus the 30 cents you're paying,

18   so in a sense, what you were paying is $1.23 a pound for those

19   extra loads for Claxton; is that correct, sir?

20   A.  Yes.

21   Q.  All right.  Would you turn to tab 7 in your book, please,

22   and that's going to be Exhibit I-074.

23           Now, RSCS also purchased an additional 64,000 or

24   two truckloads a week from George's for a period of time; is

25   that correct, sir?

Robert Lewis - Cross

1    A.   That's correct.

2    Q.   And if you would look at tab 7, and this is an e-mail from

3    you, sir, to Darrel Keck; is that correct, sir?

4    A.   Yes, correct.   I'm sorry.

5    Q.   And this is dated June 4, 2014?

6    A.   Yes.

7    Q.   And who is Darrel Keck?

8    A.   Darrel Keck was the point of contact for George's.

9    Q.   And this is an e-mail that you sent while working at RSCS.

10   A.   Yes.

11   Q.   On June 4th, 2014.

12   A.   Yes.

13   Q.   And does this e-mail accurately reflect the communication

14   that you had with Mr. Keck at George's?

15   A.   Yes.

16        MR. LAVINE:   Your Honor, I would move for the

17   admission of I-074.

18        THE COURT:   Any objection to the admission of I-074?

19        MR. TORZILLI:   No, Your Honor.

20        THE COURT:   I-074 will be admitted.

21        MR. LAVINE:   And, Your Honor, I request to publish.

22        THE COURT:   You may.

23        MR. LAVINE:   And, Your Honor, I think I did that one

24   correctly.

25   BY MR. LAVINE:

Robert Lewis - Cross

1   Q.  So if we look at this exhibit, sir, you are offering to

2   buy, the agreed price was $1.30 a pound for chicken; is that

3   correct, sir?

4   A.  That's correct.

5   Q.  And what you're asking to buy from George's is over and

6   above what they were obligated to supply to RSCS in their 2014

7   contract, correct, sir?

8   A.  That's correct.

9   Q.  And I believe you said this was $1.30 a pound?

10  A.  Yes.

11  Q.  And this would be, I believe, two truckloads a week for six

12  weeks.

13  A.  Correct.

14  Q.  All right.  If you would turn now, sir, to tab 8, and

15  that's going to be Exhibit J-015.

16          Now, this is an e-mail that you would have received.

17  If you look at this, this is an e-mail received from a

18  Tim Mulrenin?

19  A.  Yes.

20  Q.  And he is with Tyson?

21  A.  Yes.

22  Q.  And this is dated July 23rd, 2014?

23  A.  Yes.

24  Q.  And do you recall receiving this e-mail?

25  A.  No, sir.

Robert Lewis - Cross

1   Q.  Do you doubt that you received this e-mail?

2   A.  I do not doubt it.

3   Q.  And this has -- well, I will stop right there.  And this

4   e-mail references -- I am going to back up a second.  And you

5   would have received this while you were working at RSCS?

6   A.  Yes.

7   Q.  And you would have relied on this e-mail in your business

8   at RSCS, would you not, sir?

9   A.  Yes.

10      MR. LAVINE:  Your Honor, I would move for the

11  admission of J-015.

12      THE COURT:  Any objection to the admission of J-015?

13      MR. TORZILLI:  Yes, Your Honor.  It's hearsay.

14      THE COURT:  Response?

15      MR. LAVINE:  Your Honor, I think this is -- he

16  acknowledges he received it.  He was using it in his business,

17  and he relied upon it in his business.

18      THE COURT:  Response, anything else, Mr. Torzilli?

19      MR. TORZILLI:  Just that he testified he didn't recall

20  receiving it.  He doesn't doubt that he did, and any 803(6)

21  foundation is not established by knowledge of the witness.

22      THE COURT:  I will admit it over objection.  It's just

23  a transmittal e-mail, and for that reason, I don't -- I believe

24  it does fall within a hearsay exception.  I will admit J-015.

25      MR. LAVINE:  May I publish, Your Honor?

Robert Lewis - Cross

1          *THE COURT:*  You may.

2     *BY MR. LAVINE:*

3     *Q.*  Mr. Lewis, in this e-mail -- this is an e-mail from

4     Mr. Mulrenin at Tyson's?

5     *A.*  Yes.

6     *Q.*  And he is attaching an invoice to support the incremental

7     loads that you had requested from Tyson's; is that correct,

8     sir?

9     *A.*  Yes.

10    *Q.*  Now, if you look at the attachment reference, it's KFC

11    invoice -- do you see that number?

12          *MR. LAVINE:*  Would you highlight that, please,

13    Mr. Brian?

14    *A.*  Yes.

15    *BY MR. LAVINE:*

16    *Q.*  Now, if you would turn to tab 9, please.  And it is tab --

17    it is document J-014.  Now, do you recognize this document,

18    sir?

19    *A.*  No.

20    *Q.*  Would you look at the invoice number at the top of that,

21    please, sir?

22    *A.*  Okay.

23    *Q.*  And would you then turn back to Exhibit J-015?  Is the

24    invoice number on J-014 the same referenced in J-015?

25    *A.*  Yes.

Robert Lewis - Cross

1  Q.  So, Mr. Lewis, that would be the invoice that you would

2  have received with this e-mail from Mr. Mulrenin at Tyson's, is

3  it not, sir?

4  A.  Yes.

5       MR. LAVINE:  Your Honor, I would move for the

6  admission of J-014.

7       THE COURT:  Any objection to the admission of J-014?

8       MR. TORZILLI:  No objection.

9       THE COURT:  J-014 will be admitted.

10       MR. LAVINE:  May we publish, Your Honor?

11       THE COURT:  You may.

12  BY MR. LAVINE:

13  Q.  In particular, if we could turn to the second page of that

14  exhibit, please.

15       MR. LAVINE:  Mr. Brian, if you would highlight the top

16  line with the date July 12, 2014, the next line down, please.

17  BY MR. LAVINE:

18  Q.  Now, Mr. Lewis, this shows that RSCS is paying Tyson's

19  $1.45 for this chicken, is it not, sir?

20  A.  Yes.

21  Q.  Now, just so we're clear, you bought six additional loads

22  from Tyson's at $1.45 a pound; is that correct, sir?

23  A.  That's correct.

24  Q.  And the date of the initial e-mail was July 23rd, 2014.

25  You can see it on Exhibit J-015.

Robert Lewis - Cross

1    A.   Yes.

2         MR. LAVINE:  All right.  You can take that down,

3    Mr. Brian.

4    BY MR. LAVINE:

5    Q.   Now, Mr. Lewis, finally, separate and apart from these

6    prices that you paid to the suppliers, KFC management

7    instructed you to go ahead and offer $1.40 a pound in the

8    summer to buy additional chicken; is that correct, sir?

9    A.   You mentioned the 10 loads from Mar-Jac earlier.  Those

10   were the 10 loads we bought at one --

11   Q.   At $1.40?

12   A.   At the direction of senior management, yes.

13   Q.   So you paid Mar-Jac $1.40 a pound for chicken during this

14   period of time.

15   A.   Yes.

16   Q.   So if I'm correct, sir, if I add up the different loads, on

17   direct you had said it was about 30 to 35.  My math comes out

18   to 52 loads.  Do you have any reason to question that, sir?

19   A.   I have no reason to question that.

20   Q.   So RSCS is purchasing about 50 to 52 loads of chicken from

21   five or six suppliers between $1.23 and $1.45 a pound in the

22   summer of 2014 leading up to the 2015 negotiations; is that

23   correct, sir?

24   A.   Those 52 incremental loads had nothing to do with the 2015

25   price negotiations.

Robert Lewis - Cross

1   Q.  That's correct, sir.  My point is, would you agree with me

2   that you bought 52 loads for a price between $1.23 and $1.45

3   during the period leading up to the negotiations of the 2015

4   contract.  It's separate and apart from that contract.

5   A.  Yes.

6   Q.  But that's what you purchased leading up to these

7   negotiations.

8   A.  Yes.

9   Q.  And in purchasing, that's what you tried to do was get as

10  much chicken as you possibly could at that time, correct?

11  A.  Correct.

12  Q.  All right.  So RSCS, so I understand this, is buying

13  chicken at 30 to 50 cents above current 2014 prices.

14  A.  Correct.

15  Q.  Mr. Lewis, would you agree with me that the prices that

16  RSCS paid, these premium prices, are pretty substantial price

17  increases over and above the 2014 contract prices?

18  A.  Yes.

19  Q.  And that's because of the market conditions, is it not,

20  sir?

21  A.  This is because of the critical situation we were in, and

22  we were quite willing to pay a premium price for a small

23  percentage of our total volume.

24  Q.  Correct.  I understand that, and I accept it, and I

25  appreciate that explanation.  But this has to do partly with

Robert Lewis - Cross

1   the market conditions, does it not?

2   *A.*   I am sorry?

3   *Q.*   It has partly to do with the market conditions.

4   *A.*   Yes.

5   *Q.*   And these market conditions didn't change in July of 2014.

6   *A.*   No.

7   *Q.*   And these market conditions didn't change in August of

8   2014, did they, sir?

9   *A.*   No.

10  *Q.*   And they didn't really change during the negotiation period

11  for the 2015 contract, did they, sir?  I am talking about the

12  market conditions.

13  *A.*   No.

14  *Q.*   All right.  Now, Mr. Lewis, I want to turn a little bit

15  here to the supply chain to try and understand that a little

16  bit more.  Now, RSCS negotiates the price of chicken for KFC,

17  correct?

18  *A.*   Correct.

19  *Q.*   And RSCS negotiates for KFC the volume of chicken that is

20  going to be allocated to the KFC suppliers.

21  *A.*   Yes.

22  *Q.*   And RSCS wants to make sure there is enough chicken to

23  supply all of the KFC stores all year round.

24  *A.*   Yes.

25  *Q.*   And RSCS also focuses on trying to get the best price

Robert Lewis - Cross

1    possible.

2    *A.*  Yes.

3    *Q.*  And several suppliers provide the chicken that RSCS

4    acquires for the KFC franchisees.  You have listed about six or

5    seven of them, correct?

6    *A.*  Yes.

7    *Q.*  And each supplier has to be approved by KFC.

8    *A.*  That's correct.

9    *Q.*  And each supplier has to produce chicken according to the

10   specifications demanded by KFC.

11   *A.*  Yes.

12   *Q.*  And every plant a supplier uses must be approved by KFC.

13   *A.*  Yes.

14   *Q.*  And as part of this supply chain, Mr. Lewis, if one

15   supplier cannot supply the chicken for KFC for whatever reason,

16   one of the other approved suppliers can step in and deliver

17   that chicken.

18   *A.*  Yes.

19   *Q.*  And that's because they both meet the specifications as

20   demanded and set forth by KFC.

21   *A.*  Yes.

22   *Q.*  All right.  So I want to turn a little bit now and talk

23   about the suppliers and the knowledge that RSCS and you would

24   have in dealing with these suppliers.  Now, many of these

25   suppliers have been supplying chicken to KFC for many years.

Robert Lewis - Cross

1   A.   Yes.

2   Q.   And unless there is a problem with a supplier, the same

3   suppliers typically will negotiate with RSCS every year.

4   A.   Yes.

5   Q.   You're familiar with many of them.

6   A.   Yes.

7   Q.   And you have dealt with many of them even before you

8   retired in 2009.

9   A.   That's correct.

10  Q.   Now, Pilgrim's had many plants supplying a full range of

11  chicken sizes and products, correct, sir?

12  A.   Yes.

13  Q.   And Pilgrim's supplied small birds to KFC from several

14  plants.

15  A.   Yes.

16  Q.   But KFC was only a small part of Pilgrim's overall

17  business, wouldn't that be fair, sir?

18  A.   KFC is a significant account.  I am not qualified to answer

19  whether it was a small or large percentage of their business.

20  Q.   That's fair enough.  I appreciate that.

21          Pilgrim's was always on the high end of prices?

22  A.   They were in '14 and '15.  I can't speak for previous

23  years.

24  Q.   And were they aggressive in their pricing?

25  A.   Generally, yes.

Robert Lewis - Cross

1   Q.  All right.  And it would be fair to say, sir, that they

2   were aggressive because they had other customers that were

3   ready to take KFC supply if KFC didn't want it or need it?

4   A.  Yes.  All the suppliers had other potential customers.

5   Q.  And George's, another supplier, they were pretty much

6   always on the low end, weren't they, sir?

7   A.  Yes.

8   Q.  And Tyson's was sometimes on the high end?

9   A.  Sometimes, yes.

10  Q.  All right.  And in your time in 2014, Koch was adding

11  capacity to supply small birds to RSCS; isn't that true, sir?

12  A.  That's true.

13  Q.  And Claxton was willing to negotiate.

14  A.  Yes.

15  Q.  Claxton never threatened to take their business elsewhere.

16  A.  No.

17  Q.  And Claxton's approach was not a take-it-or-leave-it type

18  of approach, was it, sir?

19  A.  I don't recall them saying that, no.

20  Q.  Okay.  Now, up until the 2015 contract, it was an annual

21  contract, was it not, sir?

22  A.  Yes.

23  Q.  And RSCS had costs and margin for all of these suppliers --

24  A.  Yes.

25  Q.  -- for each contract year.

Robert Lewis - Cross

1   *A.*  Yes.

2   *Q.*  Going back as long as the supplier had been submitting cost

3   models -- I am sorry, submitting cost models to RSCS.

4   *A.*  Yes.

5   *Q.*  So RSCS contracts the cost from year to year.

6   *A.*  Yes.

7   *Q.*  And that can be, for example, labor costs?

8   *A.*  Through the model, yes.

9   *Q.*  I am talking --

10   *A.*  Yeah.

11   *Q.*  So I am clear, Mr. Lewis, I am talking about the cost model

12   submitted every year, except for '15 they went to a three-year

13   basis?

14   *A.*  The answer is yes.

15   *Q.*  So you can pretty much track everything that's in that cost

16   model.

17   *A.*  Yes.

18   *Q.*  And that's because you have all this information from these

19   suppliers.

20   *A.*  Yes.

21   *Q.*  Now, in addition to the historical data you have on each

22   supplier, RSCS also has access to costs and prices from other

23   outside sources.

24   *A.*  That's incorrect.

25   *Q.*  All right.  So you don't -- RSCS doesn't go outside the

Robert Lewis - Cross

1  cost model or outside what the suppliers have said to look at

2  any costs or any data relating to chicken or chicken prices?

3  A.   The only outside markets that were used were the commodity

4  markets for corn and soybean meal.  All the other components in

5  the cost model were the suppliers' prices, and we never looked

6  at any market prices to compare those.

7  Q.   So you never looked at any of the outside data as far as

8  the costs of producing a chicken?

9  A.   No.  Aside from what the suppliers provided us, there was

10  no reliable market for that information, and that's why we

11  developed a cost-plus model in the first place.

12  Q.   All right.  Thank you, sir.

13       Now let's talk about the negotiation process.  Now,

14  negotiating with suppliers was a process, was it not, sir?

15  A.   Yes.

16  Q.   They were not a take-it-or-leave-it type of negotiations.

17  A.   No.

18  Q.   And a lot of times they would start, for example, with a

19  call from you to a supplier.

20  A.   Yes.

21  Q.   And actually, that's what happened in 2014.

22  A.   Yes.

23  Q.   That's how the negotiations started, with you reaching out

24  to individuals at each supplier; is that correct, sir?

25  A.   That's correct.

Robert Lewis - Cross

1  Q.  And you tell them you're going to be following up with

2  questions and eventually asking them to submit a proposal.

3  A.  Yes.

4  Q.  And after that, there may have been e-mail exchanges.

5  A.  Yes.

6  Q.  Bid proposals were many times e-mailed to you and at --

7  others at RSCS?

8  A.  Yes.

9  Q.  And the proposals followed.  The cost model first, if I am

10  correct, was developed by you, was it not, sir?

11  A.  Yes, in conjunction with one of our suppliers that no

12  longer exists.

13  Q.  And once the proposals were submitted, there may be

14  follow-up calls by you in 2014?

15  A.  Correct.

16  Q.  Could be by a gentleman by the name of Mr. Eddington?

17  A.  Yes.

18  Q.  Could be Mr. Suerken?

19  A.  Yes.

20  Q.  Potentially Mr. Campisano?

21  A.  Yes.

22  Q.  All right.  And there may have been meetings, follow-up

23  meetings as you talked about on direct examination, correct?

24  A.  Yes.

25  Q.  You would have sent out e-mails with calendar invites to

Robert Lewis - Cross

1    the suppliers to attend these meetings?

2    *A.*   Yes.

3    *Q.*   And there could be follow-up e-mails to the meetings?

4    *A.*   Yes.

5    *Q.*   The point is that this is a very fluid process, is it not,

6    sir, over an extended period of time?

7    *A.*   It is.

8    *Q.*   RSCS doesn't come in and look at the first number and say,

9    We're done; negotiations are over; go home.

10   *A.*   No.

11   *Q.*   It's not a winner-take-all type of negotiation, is it?

12   *A.*   No.

13   *Q.*   Because all of the suppliers are receiving an allocation of

14   volume, correct?

15   *A.*   The volumes are based to a great extent on what the

16   supplier offers us in their proposal.

17   *Q.*   But the ultimate -- RSCS is the ultimate as far as

18   determining what the allocation of volume is to the supplier;

19   is that correct, sir?

20   *A.*   That's correct.

21   *Q.*   In a sense, what you've done is you've asked the suppliers

22   to submit to you what they may be able to provide as far as

23   volume, but you and RSCS make the ultimate determination of the

24   allocation of volume to the suppliers.

25   *A.*   That's correct.

2665

Robert Lewis - Cross

1   *Q.*   Now, RSCS doesn't just take the first offer it receives

2   from one of the suppliers, does it?

3   *A.*   No.

4   *Q.*   And during the negotiation process, the supplier doesn't

5   put a number in an envelope, seal it, and slide it across the

6   table to you, do they, sir?

7   *A.*   No.

8   *Q.*   Because as we said, that's a process.

9   *A.*   Correct.

10   *Q.*   There is multiple rounds of negotiations?

11   *A.*   Depending on the supplier, yes.

12   *Q.*   All right.  And you're negotiating with each supplier

13   trying to push that supplier's price down.

14   *A.*   Yes.

15   *Q.*   Because you're trying to get the best possible price you

16   can for KFC.

17   *A.*   Yes.

18   *Q.*   And if there's a cost or a line item or an input in the

19   cost model that you or RSCS thinks is too high, you're going to

20   address those line items with the supplier and try and get them

21   to reduce it, are you not, sir?

22   *A.*   Yes.

23   *Q.*   Because you wanted the lowest possible price you could get

24   for RSCS.

25   *A.*   Yes.

Robert Lewis - Cross

1   Q.  And RSCS's strategy, while you wanted the lowest possible

2   price, was to try and keep the prices as close as possible

3   together.

4   A.  We were -- our main goal was the lowest cost, but if they

5   were close together, that was a bonus, yes.

6   Q.  All right.  Let's follow up on that.  When I ask about the

7   tight range, and I realize your primary purpose or your primary

8   focus is the lowest price possible, but one of the reasons for

9   the tight range was because RSCS has multiple KFC customers

10  across the country.

11  A.  Multiple KFC restaurants.

12  Q.  Franchisees, restaurants, yes, across the country.

13  A.  Yes.

14  Q.  And you didn't want KFC franchisees complaining because one

15  supplier has a lower price versus another.

16  A.  The primary reason for narrow pricing was so that we could

17  better manage the landed cost to the markets.  If they were

18  close together, again, that was -- that was a good thing.

19  Q.  That was an added plus.

20  A.  It was.

21  Q.  But you don't want a franchisee in Denver paying 5 or 6 or

22  7 cents more than a franchisee in Atlanta, do you, sir?

23  A.  No.

24  Q.  Because if you did, you would hear about it from the

25  franchisees.

Robert Lewis - Cross

1    *A.*  Yes.

2    *Q.*  So that's another reason why you tried -- and I respect it,

3    your comment that lowest price is the most important thing --

4    but there was a basis of reason for trying to have the prices

5    in as narrow a range as possible.

6    *A.*  Several reasons, yes.

7    *Q.*  Thank you, sir.

8         Now, RSCS gave guidance to suppliers to try to get

9    them to a specific price or a range; is that correct, sir?

10   *A.*  RSCS would give the supplier direction or directional

11   guidance to get them to the lowest possible cost.

12   *Q.*  Right.  Thank you, sir.

13        In fact, many times RSCS will try and direct the

14   supplier prices toward the price of the lowest priced supplier.

15   *A.*  Yes.

16   *Q.*  All right.  And when you're negotiating with these

17   suppliers, you're not going to tell them what RSCS's bottom

18   line number is, are you, sir?

19   *A.*  No.

20   *Q.*  And RSCS's focus was on the bottom-line number.  It was the

21   COB price.  That was your ultimate focus, was it not, sir?

22   *A.*  That is the ultimate focus.

23   *Q.*  Right.

24        Now, the cost proposal includes suppliers' forecasts

25   of what expenses and what the margin may be over the contract

2668

Robert Lewis - Cross

1    period.  Is that fair to say, sir?

2    A.  I am sorry, would you repeat that?

3    Q.  The cost proposals from the suppliers would include the

4    suppliers' forecasts of their expenses and margin that they

5    thought would have occurred during the contract period.

6    A.  We assumed that that was the case.

7    Q.  Right.  It was a forecast.

8    A.  Yes.

9    Q.  Right.  But as the suppliers' year progressed, if a

10   supplier's plant costs go up, margin is going to come down, is

11   it not, sir?

12   A.  Yes.  And conversely, if their costs go down, their margin

13   goes up.

14   Q.  Absolutely, sir.  But the supplier doesn't get to

15   renegotiate that margin, does it?

16   A.  The supplier has the opportunity to renegotiate the margin

17   at the end of each contract year.

18   Q.  Thank you for that correction.  You're right.

19           But during that contract year, they don't have a right

20   to come back to RSCS and say, Well, my costs are going this

21   high, and therefore I want an adjustment to margin.

22   A.  They have agreed to lock that in for the duration of the

23   contract.

24   Q.  Absolutely, sir.  So as was just said, if the suppliers'

25   prices go up or costs go up, it can't come in and renegotiate

Robert Lewis - Cross

1   that contract during the contract period.

2   A.   That's correct.

3   Q.   The supplier has to absorb those cost increases.

4   A.   Yes.

5   Q.   And that, sir, would come out of margin.

6   A.   Well, again, if it went the other direction, RSCS would

7   absorb the difference.

8   Q.   No question.  But what I am talking about is if there is an

9   increase in costs, and let's face it, today costs keep

10  continuing to go up, so chances are costs are going up, they

11  have to absorb those costs.

12  A.   Yes.

13  Q.   Thank you, sir.

14          Now, when you came in in 2014, you were able to go

15  back and look and see what happened in 2014, and you talked to

16  various people at RSCS, correct?

17          MR. TORZILLI:   Objection to the dual use of 2014.

18          THE COURT:   I am sorry, didn't hear that.

19          MR. TORZILLI:   Object to form using 2014 comparing to

20  2014.  I think counsel misspoke in terms of the years that he

21  is trying to relate.

22          MR. LAVINE:   I apologize.  I will rephrase.

23          THE COURT:   Go ahead.

24  BY MR. LAVINE:

25  Q.   Going into negotiations for the 2015 contract, RSCS was

Robert Lewis - Cross

 1    taking a different approach in terms of those negotiations,

 2    were they not, sir?

 3    A.   Yes.

 4    Q.   And a different approach in terms of communications with

 5    suppliers.

 6    A.   Yes.

 7    Q.   And you tried to improve supplier communications during

 8    that negotiation process.

 9    A.   We had -- or I had the impression after reviewing things

10    from 2014 that the relationships were somewhat strained with

11    suppliers.  So, yes, we were attempting to develop a less

12    adversarial relationship with suppliers.

13    Q.   I appreciate that explanation, and that is true.  So, in

14    fact, sir, going into those negotiations, the relationship

15    between the suppliers and RSCS was not that great as you've

16    just mentioned.  It was strained.

17    A.   That was my impression.

18    Q.   All right.  And KFC was not viewed as a very good customer

19    by the suppliers.

20    A.   I cannot speak for that, but I would -- I would think that

21    given the fact that KFC had about 4,000 units, they were one of

22    the largest consumers of bone-in chicken and further-processed

23    products, and given that the suppliers had long-standing

24    experience with the account, that it would have been a choice

25    account for suppliers.

Robert Lewis - Cross

1   Q.   Okay.  RSCS was not a good listener in the past, was it?

2   A.   I am not qualified to answer that.

3   Q.   RSCS didn't -- previously RSCS didn't address prior issues

4   raised by the suppliers; isn't that correct, sir?

5            MR. TORZILLI:  The question calls for hearsay.

6            THE COURT:  Overruled.

7   A.   I -- I had the feeling that some of the issues that were in

8   place when I was there as a permanent employee in 2008 and 2009

9   were still issues.

10  BY MR. LAVINE:

11  Q.   Issues like specifications?

12  A.   Issues like the use of frozen chicken, the demand for

13  additional dark meat, extended shelf life, and things of that

14  nature.

15  Q.   And these are issues that would have been with the

16  suppliers; is that correct, sir?

17  A.   They would have been issues that both RSCS and KFC along

18  with the supplier were experiencing.

19  Q.   And I want to focus on the 2014 time frame when you came

20  in.  Did you also learn that there were issues regarding

21  specifications in the 2014 time frame?

22  A.   No, I don't recall that.

23  Q.   Okay.  How about quality assurance issues?

24  A.   The charges that the supplier incurred that went into the

25  cost model for quality assurance had been a controversial

Robert Lewis - Cross

1    issue.

2    Q.  And how about there wasn't a lot of transparency between

3    RSCS and the suppliers?

4    A.  I am sorry, would you repeat?

5    Q.  There wasn't a lot of transparency between the suppliers

6    and RSCS?

7    A.  I guess that would be true in some matters, yes.

8    Q.  And the relationship with the suppliers was suffering, was

9    it not, sir?

10   A.  As I said earlier, I felt as though the relationships were

11   strained.

12   Q.  All right.  So your idea was to be a friendlier RSCS with

13   the suppliers.  You wanted to share more information with them.

14   A.  Yeah, I think all of that, share more information, be more

15   transparent, practice give-and-take, things of that nature.

16   Q.  It was basically a complete -- it was a change of approach

17   in these negotiations, was it not, sir?

18   A.  I felt like it was, yes.

19   Q.  And part of the change included moving from a one-year

20   contract to a three-year contract?

21   A.  Correct.

22   Q.  And part of that decision was motivated because of the

23   supply crisis that RSCS had experienced on Mother's Day and in

24   certain parts of 2014.

25   A.  Yes.

Robert Lewis - Cross

1   Q.   And it was RSCS's idea and suggestion to move to a

2   three-year contract?

3   A.   Yes.

4   Q.   And the idea behind the three-year contract was to help

5   guarantee supply on behalf of KFC.

6   A.   It was that, but it was also to send a signal to the

7   suppliers that we were in this for the long-term and that we

8   felt like giving them direction on three-year volume would help

9   them.

10  Q.   All right.  And, Mr. Lewis, would you have expected a price

11  premium to guarantee supply to RSCS for a three-year period,

12  especially considering where the market was and the big bird

13  issue?

14  A.   Yes.

15  Q.   Thank you, sir.

16        Now, you mentioned on direct some of the people that

17  were involved in the negotiations on behalf of RSCS.  Now, you

18  recruited an individual by the name of Rich Eddington during

19  the negotiation process, did you not?

20  A.   Yes.

21  Q.   And Mr. Eddington was brought in to replace a Mike Ledford

22  who left in May of 2014.

23  A.   That's correct.

24  Q.   And Mr. Eddington was brought in -- on to be the poultry

25  expert, was he not?

Robert Lewis - Cross

1   A.   Yes.

2   Q.   He had been hired for his specialization in the chicken

3   industry?

4   A.   Yes.

5   Q.   Hired to be the hands-on guy for RSCS.

6   A.   Eventually, yes.

7   Q.   And he was knowledgeable in the chicken business, was he

8   not, sir?

9   A.   Mr. Eddington came out of the chicken business, yes.

10  Q.   And he was -- but my question is, he was knowledgeable in

11  the chicken business?

12  A.   Yes.

13  Q.   And he worked at Mar-Jac before coming over to RSCS/KFC,

14  correct?

15  A.   That's correct.

16  Q.   And eventually Mr. Eddington took over the day-to-day

17  negotiations, negotiation activities on behalf of RSCS?

18  A.   There was a point in time where Mr. Eddington became

19  acclimated, you might say, to the process, and he began to take

20  on more and more of the responsibility, yes.

21  Q.   Yeah.  And he took on an active role in the negotiations,

22  did he not, sir?

23  A.   He did at some point after he joined the company.  It

24  wasn't right away.

25  Q.   Right.  And he ended up signing the 2015 contract addendums

Robert Lewis - Cross

1    for the suppliers and RSCS; is that true, sir?

2    A.   That's true.

3    Q.   So I would like to turn now, sir, to the actual 2015

4    negotiations.  When you came back to RSCS in May of 2014, one

5    of the things you did was to review the 2014 contract between

6    RSCS and the suppliers.

7    A.   Yes.

8    Q.   And you did this to see who the existing suppliers were?

9    A.   Yes.

10   Q.   And how much each supplier was committed to supplying to

11   RSCS.

12   A.   Yes.

13   Q.   And as I think you said, during the 2015 negotiation

14   process, your primary consideration aside from price was

15   supply.

16   A.   Yes.

17   Q.   Now, negotiations for the 2015 contract started by reaching

18   out to suppliers with a phone call.

19   A.   Yes.

20   Q.   You called the suppliers to discuss the upcoming contract.

21   A.   Yes.

22   Q.   And that RSCS would be looking at the margin needed to

23   compare to the big-bird profitability.

24   A.   We needed direction from each supplier as to what they felt

25   like they might need in terms of profit margin for the small

Robert Lewis - Cross

1   bird given the situation on the big bird.

2   Q.   Right.  Because you became aware that there was a large

3   margin difference between the big birds and the small birds.

4   A.   I had no idea what that margin difference was.

5   Q.   Did you look at all, sir?

6   A.   As I said earlier, there are no reliable markets for

7   chicken that we use.  That's the reason we had the cost-plus

8   model.  I don't know.

9   Q.   And it would be fair to say, sir, that the big birds were

10   more profitable than the small birds?

11   A.   The suppliers were telling us that.  I don't know for

12   certain if that's the case.

13   Q.   So you don't have any idea even in 2014 whether or not the

14   big birds had a better margin than the small birds.

15   A.   My assumption was that there was perhaps more attractive

16   margins in the big bird because of the shifting demand to the

17   further processed products away from chicken on the bone.

18   Q.   And not away from the small bird because of the low margin

19   of the small bird?

20   A.   That may have been part of the reason the change was made,

21   but, again, I don't know the details around that.

22   Q.   So you're not aware in 2014 that suppliers were moving away

23   from the small birds to the more profitable big birds?

24   A.   In 2014, I knew that suppliers were shifting away from

25   small birds toward big birds.  There may have been a number of

1   reasons, but, again, I can't speak intelligently about what

2   they are.

3   Q.  As you sit here today, do you recall the reasons?  I

4   realize it's eight years ago.

5   A.  The reason the big bird margin was supposedly larger?

6   Q.  Yeah.

7   A.  I guess it would be a supply and demand thing.

8   Q.  Now, if I understand what you're saying, you realize that

9   suppliers were moving away from the small bird, and there was a

10  distinction between the big bird and the small bird, that RSCS

11  had to address that margin difference; isn't that correct, sir?

12  A.  Again, I understand the shift away from small birds.  I

13  don't know the details around the profitability or the cost.

14  Q.  Is it you don't know or you don't remember, sir?

15        MR. TORZILLI:  Your Honor, can we have a brief side

16  bar?

17        THE COURT:  Yes.

18     (At the bench:)

19        THE COURT:  Mr. Torzilli, go ahead.

20        MR. TORZILLI:  Your Honor, now might be a good time

21  for a two-minute stretch break.

22        THE COURT:  Yes.  Why don't we do that, and we'll be

23  talking away here.  Hold on.

24     (In open court:)

25        THE COURT:  Ladies and Gentlemen, why don't we go

Robert Lewis - Cross

1    ahead and take a stretch break now while we are on the bench

2    conference, so anyone in the courtroom can stand up and

3    stretch.

4        (At the bench:)

5            THE COURT:  We will go on for just another minute

6    here, and then hopefully we have the temperature regulated,

7    since tomorrow I think will be a little bit warm, but after

8    that it will get chillier.  Okay.  I think we are good.  Thanks

9    a lot.

10       (In open court:)

11           THE COURT:  Go ahead, Mr. Lavine.

12           MR. LAVINE:  Thank you, Your Honor.

13   BY MR. LAVINE:

14   Q.  I believe we were talking about the small-bird versus the

15   big-bird margin at the time.  I want you to turn your attention

16   to tab 14 in the notebook, if you would, please, sir.  And

17   that's Exhibit A-644.

18           Now, government counsel on direct in a sense started

19   that -- the negotiations were started by you reaching out to

20   suppliers; is that correct, sir?

21   A.  That's correct.

22   Q.  And then they kind of advanced to the August 7th e-mails,

23   which they admitted, about setting the meetings to meet with

24   the suppliers; is that correct, sir?

25   A.  I believe the e-mails from around August the 7th were

Robert Lewis - Cross

1   confirmations of those meetings, if I recall.

2   Q.   And told, I believe, when the bid was supposed to be

3   produced, by August the 19th; is that correct, sir?

4   A.   That's correct.

5   Q.   In reality, there was actions between you and the suppliers

6   that occurred before that August 7th meeting or that August 7th

7   e-mail; is that correct, sir?

8   A.   I am sorry, I don't understand.

9   Q.   In other words, it didn't just start with that August 7th

10   e-mail.  There were discussions between you and suppliers in

11   July of 2014.

12   A.   Yes.

13   Q.   And, in fact, sir, after I believe you testified earlier

14   that you would have called the suppliers initially in July to

15   talk about the upcoming negotiations for the 2015 contract.

16   A.   Yes.

17   Q.   And that was followed up with an e-mail.  So if you would

18   look at tab 14.  Now, this is an e-mail from you, sir, to

19   Mr. Scott Brady at Claxton.

20   A.   Yes.

21   Q.   Dated July 10, 2014?

22   A.   Yes.

23   Q.   And this is an e-mail that you would have sent to him in

24   your business at RSCS?

25   A.   Yes.

Robert Lewis - Cross

1   *Q.*  And you would have relied on this e-mail that you sent?

2   *A.*  Yes.

3   *Q.*  And if you would look at this, sir, does this e-mail

4   accurately reflect what you had transmitted to Mr. Brady in

5   this e-mail?

6   *A.*  Yes.

7          *MR. LAVINE:*  Your Honor, I would move for the

8   admission of A-644.

9          *THE COURT:*  Any objection to the admission of A-644?

10          *MR. TORZILLI:*  No objection.

11          *THE COURT:*  All right.  A-644 will be admitted.

12          *MR. LAVINE:*  And if we could publish, Your Honor?

13          *THE COURT:*  You may.

14  *BY MR. LAVINE:*

15  *Q.*  Now, Mr. Lewis, if we look at this e-mail, this is what you

16  have sent to Mr. Brady confirming the telephone conversation

17  that you had with him in the early part of July.

18  *A.*  Yes.

19  *Q.*  And you went through various things that you were looking

20  for him to discuss with RSCS.  When I say "him," Claxton, to

21  discuss with RSCS in the next couple of weeks.

22  *A.*  Yes.

23  *Q.*  And if we look at the first bullet point, it's what you

24  talked about before, that's the number of loads of eight-piece

25  that you can supply beginning in January of 2015.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   Because what RSCS wanted to know was, all right, Claxton,

3    how much can you give us in 2015.

4    A.   Yes.

5    Q.   And then the next one was number of dark meat loads you can

6    make available beginning in January of 2015.

7    A.   Yes.

8    Q.   And then if you would read the next bullet point, please.

9    A.   What are your top four or five concerns about your dealings

10   with RSCS/KFC; examples are case weights, consistent

11   production, QA requirements, et cetera.

12   Q.   And these are the points that you and I were discussing

13   previously that had been an issue between the suppliers and

14   RSCS before you started the negotiations.

15   A.   Yes.

16   Q.   And you wanted to make sure they were addressed.

17   A.   Yes.

18   Q.   And this was the different approach that you were taking to

19   have more open communication with the suppliers.

20   A.   Yes.

21   Q.   And to be more transparent.

22   A.   Yes.

23   Q.   Right.  Now, the next one is, Update your margin over feed

24   model to reflect current cost.  Now, that's what you are asking

25   for is you want the cost model to be submitted through RSCS

Robert Lewis - Cross

1   which would set forth what the COB price is.  It will be the

2   bid price, correct?

3   A.  This would be their bid price.  The reason that we asked

4   for this adjustment is that over the course of time individual

5   components had been increased or decreased to stay competitive.

6   And I knew at this point that some of the price components were

7   not accurate in the model.

8   Q.  So you wanted an up-to-date cost model.

9   A.  Yes.  It wasn't asking for a price increase; it was just,

10  Let's make this correct while we're at it.

11  Q.  I am sorry, I may have misspoke if you didn't understand my

12  question.  What you are asking for -- I am not talking about a

13  price increase here; I am talking about you're asking for an

14  updated cost model which will include their proposed COB price

15  at that time.

16  A.  Yes.

17  Q.  All right.  And would you read the next bullet point,

18  please?

19  A.  Profit margin needed and how that compares to big-bird

20  profitability.

21  Q.  And this, sir, is what we have been talking about as far as

22  the big-bird profitability or the big-bird margin as compared

23  to the small-bird, correct?

24  A.  Correct.

25  Q.  Because you needed this information in order to assess

Robert Lewis - Cross

1    their pricing, yes?

2    A.  Yes.

3    Q.  And to begin to address the discrepancy or the difference

4    between the big-bird margin and the small-bird margin.

5    A.  Yes.

6    Q.  Thank you.

7            Now, the next thing is the top five things that could

8    cause price variability.  Now, that would go also, sir,

9    wouldn't it, to the supply.  You wanted to make sure that the

10   supply was going to be covered over the next three years.

11   A.  That particular component deals with price, not supply.

12   Q.  Okay.  And finally, their thoughts about a three-year

13   contract.

14   A.  Yes.

15   Q.  And the three-year contract was a proposal by RSCS.

16   A.  Yes.

17   Q.  All right.  If you would turn to tab 15, which is Exhibit

18   G-504, and also look at tab 16, which is --

19           MR. LAVINE:  I am sorry, Your Honor, if I could have

20   that published?  Not that one.  Hold on.

21           THE COURT:  The previous exhibit?

22           MR. LAVINE:  Yeah, I didn't publish the other one.  I

23   will publish another one, Your Honor.

24           THE COURT:  Go ahead.

25           MR. LAVINE:  Let me go through this.  Tab 15, which is

Robert Lewis - Cross

1    G-504; tab 16, which is C-451; tab 17, which is C-872; and

2    tab 18, which is F-384.

3    BY MR. LAVINE:

4    Q.  Now, sir, if you would look at these e-mails, they are to

5    different suppliers, correct?

6    A.  That's correct.

7    Q.  But it's pretty much the same e-mail that you sent to

8    Mr. Brady you also sent to Mr. Brian Roberts at Tyson's,

9    Mr. Bill Kantola at Koch?

10   A.  They are similar, yes.

11   Q.  And you also sent one to Greg Tench at George's?

12   A.  There is no name on Exhibit 17.

13   Q.  Is that C-782?

14   A.  C-782, yes, sir.  I am sorry, I see the cover page.  It is

15   to Greg Tench at Mar-Jac.  I'm sorry.

16   Q.  All right.  And then there is also one from you to

17   Roger Austin?

18   A.  Yes.

19   Q.  Now, Mr. Lewis, these are all very similar, if not

20   identical, to the one that you sent to Mr. Brady; is that

21   correct, sir?

22   A.  They are similar, yes.

23   Q.  And you would have sent these?

24   A.  Yes.

25   Q.  And you would have sent them in your ordinary business at

Robert Lewis - Cross

1  RSCS?

2  *A.*  Yes.

3  *Q.*  And they accurately reflect the communication to each of

4  the recipients --

5  *A.*  Yes.

6  *Q.*  -- that you sent at the time?

7  *A.*  Yes.

8         *MR. LAVINE:*  Your Honor, I would move the admission of

9  G-504, C-541, C-872, and F-834.

10        *THE COURT:*  Any objection to those exhibits?

11        *MR. TORZILLI:*  No, Your Honor.

12        *THE COURT:*  Each of those exhibits will be admitted.

13 *BY MR. LAVINE:*

14 *Q.*  If we can just look at --

15        *MR. LAVINE:*  Let's bring up F-384 and publish, please.

16        *THE COURT:*  You may.

17 *BY MR. LAVINE:*

18 *Q.*  Now, this is very similar to the one that you sent to

19 Mr. Brady at Claxton.  And it goes through, for example, the

20 top four or five concerns that you had or you wanted to

21 address, which is case weights, consistent production, and QA

22 requirements, correct?

23 *A.*  Yes.

24        *MR. LAVINE:*  And if you would highlight the -- not the

25 margin over feed model, but the next one, the profit margin

Robert Lewis - Cross

1    line, please, Mr. Brian.

2    BY MR. LAVINE:

3    Q.  Again, here you are asking each one of these suppliers to

4    provide you the profit margin needed and how that compares to

5    big-bird profitability; isn't that true, sir?

6    A.  Yes.

7         MR. LAVINE:  You can take that down now, Mr. Brian.

8    BY MR. LAVINE:

9    Q.  Sir, with these e-mails, it's clear that there was an issue

10   you wanted addressed, and that is that big-bird margin versus

11   the small-bird margin; isn't that true, sir?

12   A.  Yes, one of several issues.

13   Q.  I realize there are many issues because you had taken a new

14   approach, but that is clearly one of them that had to be

15   addressed.

16   A.  Yes.

17   Q.  All right.  Now, I want to just turn your attention, if I

18   could, please, to Claxton in particular, please, sir.

19        MR. LAVINE:  And if we can go to Exhibit 1137.  I

20   believe this has been admitted, Your Honor.

21        THE COURT:  Yes, it has been, and it may be published.

22        MR. LAVINE:  Thank you, Your Honor.

23   BY MR. LAVINE:

24   Q.  Now, this is an e-mail from you to Mikell Fries and

25   Scott Brady at Claxton.

Robert Lewis - Cross

 1   *A.*   Yes.

 2   *Q.*   And Pete Suerken is copied on it?

 3   *A.*   Yes.

 4   *Q.*   And this is August the 7th, 2014.

 5   *A.*   Yes.

 6   *Q.*   And Rich Eddington who just came in is also copied on it.

 7   *A.*   Yes.

 8   *Q.*   And Mary Hester.

 9   *A.*   Yes.

10   *Q.*   And would you tell the members of the jury, who is

11   Mary Hester?

12   *A.*   Mary Hester is an employee of RSCS and was part of the

13   poultry team.

14   *Q.*   All right.  And this e-mail you basically -- you confirm it

15   was a productive meeting on August the 5th?

16   *A.*   Yes.

17   *Q.*   And this is the type of meeting that you would have had

18   with all of the suppliers?

19   *A.*   Yes.

20   *Q.*   And it goes through additional information that you are

21   requesting from Claxton in its -- when it submits its proposal

22   or its first bid response; is that correct, sir?

23   *A.*   That's correct.

24   *Q.*   Now, in this e-mail you asked Claxton to submit a realistic

25   cost model.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And I believe that you asked that the information be

3    provided by August the 19th.

4    A.   Yes.

5    Q.   And, in fact, Claxton submitted the cost model and answered

6    those questions on August 19th as you requested.  Do you recall

7    that, sir?

8    A.   I believe I recall they did respond on the 19th of August.

9    Q.   Why don't we turn to tab 19.  If you will look at tab 19 --

10        MR. LAVINE:  If I may have just one moment, please,

11   Your Honor?

12        THE COURT:  Yes.

13   BY MR. LAVINE:

14   Q.   Now, if you look at the bottom part of this e-mail --

15        MR. LAVINE:  I am sorry, it's 1132, Mr. Brian.

16   BY MR. LAVINE:

17   Q.   Now, the bottom part of the e-mail is the e-mail from you

18   to Mr. Fries and Mr. Brady on August 7th, correct?

19   A.   Yes.

20   Q.   If you look at the top portion of that e-mail, now, this is

21   an e-mail from Scott Brady to you at RSCS.

22   A.   Yes.

23   Q.   Including Mr. Eddington.

24   A.   Yes.

25   Q.   And including Mary Hester; is that correct?

Robert Lewis - Cross

 1    *A.*   Yes.

 2    *Q.*   And it attaches the KFC cost model for 2015.

 3    *A.*   Yes.  It indicates that there is a model attached.

 4    *Q.*   Right.  And this is a document that you would have received

 5    in the ordinary course of business?

 6    *A.*   Yes.

 7    *Q.*   And this would have been the bid proposal from

 8    Claxton Poultry, is the first bid proposal for the 2015

 9    contract.

10    *A.*   Yes.

11    *Q.*   And in this e-mail it attaches the 2015 cost model, does it

12    not?

13    *A.*   That's the indication, yes.

14    *Q.*   Right.  And if you look at the attachment -- I mean, not

15    the attachment, if you look at what it says, attachment, it

16    references KFC cost 2015 proposal; is that correct, sir?

17    *A.*   That is correct.

18    *Q.*   Now, I would like you to look at tab 20, and that's

19    Exhibit 1133.  Now, this would be the cost model that was

20    attached to the e-mail that you received from Mr. Brady, is it

21    not, sir?

22    *A.*   I would assume that it is.

23    *Q.*   Do you have any reason to doubt that?

24    *A.*   No, sir.

25    *Q.*   And this is a document that you would have received in the

Robert Lewis - Cross

1    ordinary course of business at RSCS?

2    A.   Yes.

3    Q.   And one that you would have relied on while in business at

4    RSCS.

5    A.   Yes.

6          MR. LAVINE:   Your Honor, I would move for the

7    admission of 1132 and 1133.   I don't know whether it's already

8    in.

9          THE COURT:   Both of them have been admitted.

10         MR. LAVINE:   Thank you.

11         May I publish, Your Honor?

12         THE COURT:   You may.

13   BY MR. LAVINE:

14   Q.   If we can start with 1132, please.

15         Now, Mr. Lewis, the top portion of this e-mail, it

16   shows that -- from Mr. Brady that they responded to your

17   questions, and they have attached a 2015 pricing model; is that

18   correct?

19   A.   Yes.

20   Q.   All right.   Now, if you would turn to the next tab, 1133.

21   A.   Okay.

22   Q.   And would you please tell us what the FOB price is for

23   their proposal.

24   A.   For Purple label, it's $1.1099.

25   Q.   And if you would turn to the second page.

Robert Lewis - Cross

1          MR. LAVINE:  And, Mr. Brian, if you would go down to

2     the bottom part where it has supplier margin and big-bird

3     profitability.  Now go back one page, Mr. Brian.  Down,

4     supplier margin.  I think it's line 50 and line 52.

5     BY MR. LAVINE:

6     Q.  Now, Mr. Lewis, looking at this cost model, Claxton has

7     broken out the margin between the supplier margin and the

8     big-bird profitability; is that correct?

9     A.  That's correct.

10    Q.  And the supplier margin is listed at .10 and the big-bird

11    profitability is .12.

12    A.  Yes.

13    Q.  All right.  Now, there was a follow-up meeting after the

14    submission of this bid, was there not, sir, if you recall?

15    A.  I believe so.

16    Q.  And that would have been a meeting that would have been

17    attended by Mr. Fries and Mr. Brady?

18    A.  Yes.

19    Q.  And Mr. Suerken?

20    A.  Yes.

21    Q.  And Mr. Eddington?

22    A.  Yes.

23    Q.  And that would have been for the purpose of discussing this

24    cost model.

25    A.  Yes.

Robert Lewis - Cross

1   *Q.*  All right.  And if you recall, sir, Claxton's approach

2   wasn't to threaten to take away any business.

3   *A.*  No.  I don't recall that.

4   *Q.*  And it wasn't a take-it-or-leave-it situation?

5   *A.*  No.

6   *Q.*  And it would be accurate to say that Mr. Fries and

7   Mr. Brady responded to your pricing guidance during the

8   negotiations?

9   *A.*  Yes.

10  *Q.*  And after that meeting, if you recall, sir, you had a call

11  with Mr. Brady about the price, did you not, sir?

12  *A.*  I don't recall that.

13  *Q.*  All right.  If you would turn to tab 29.  It's

14  Exhibit 1005.  And I would just ask you to look at this to see

15  if this possibly refreshes your memory.  And once you've looked

16  at it, please then close the notebook.

17  *A.*  I don't recall it, but it's got my name on it, so it

18  obviously happened.

19  *Q.*  Does this refresh your recollection, refresh your memory

20  that you had a call and Claxton came down 2 cents?

21  *A.*  I don't remember it.

22  *Q.*  All right.  That's fine.

23          If you would please turn to tab 21.  And it's going to

24  be Exhibit 1119.

25          *MR. LAVINE:*  And I believe this has been admitted,

Robert Lewis - Cross

1  Your Honor.

2          THE COURT:  Yes, it has been.

3          MR. LAVINE:  If I may publish, Your Honor?

4          THE COURT:  You may.

5  BY MR. LAVINE:

6  Q.  Now, Mr. Lewis, Exhibit 1119 is the final contract for

7  Claxton Poultry.

8  A.  Yes, it is.

9  Q.  And if you look at the first page, do you recall who signed

10  this contract on behalf of RSCS?

11  A.  Mr. Fries.

12  Q.  No, on behalf of RSCS.

13  A.  Oh, I'm sorry, that would have been -- I am not sure whose

14  signature that is.

15  Q.  Is it Mr. Eddington's signature?

16  A.  It doesn't look like it, but it should have been him

17  signing, yes.

18  Q.  And who signed on behalf of Claxton Poultry?

19  A.  Mr. Fries.

20  Q.  Now, if you could please turn to the second page and tell

21  me what the COB price is.

22  A.  $1.0669.

23  Q.  And so if I go from the bid proposal that you saw which

24  is -- hold on.

25          MR. LAVINE:  May I just have one moment, Your Honor?

Robert Lewis - Cross

1          *THE COURT:*  Sure.

2          *MR. LAVINE:*  If I may have just one moment, please.

3          *THE COURT:*  Sure.

4   *BY MR. LAVINE:*

5   *Q.*  The bid proposal as we went through on Exhibit 1133 was a

6   price of $1.1099.  Do you recall that, sir?

7   *A.*  Yes.

8   *Q.*  So the final bid price is $1.0669.  So Claxton came down

9   over 4 cents during the negotiation process; is that correct,

10  sir?

11  *A.*  Yes.

12  *Q.*  And if you go back to the final contract and turn to

13  page -- the second page of the contract, right above the COB

14  price of $1.0669, the supplier margin is listed at 10 cents?

15  Do you see it on the second page, sir?

16  *A.*  Yes.

17  *Q.*  And the big bird adjustment is now listed as .0940.

18  *A.*  Yes.

19  *Q.*  And that was a reduction from the bid proposal that was

20  submitted for the first bid because it was at 12 cents, was it

21  not, sir?

22  *A.*  Yes.

23  *Q.*  All right.  So in a sense -- not in a sense, basically

24  Claxton came down according do my math, sir, .0430 cents.

25  *A.*  Yes.

Robert Lewis - Cross

1  Q.  All right.  Now, Mr. Lewis, considering your experience,

2  would you agree that if the prices for the 2015 KFC contract

3  had been set by an agreement among the suppliers, you would

4  have expected the contract prices to be closer together.

5          MR. TORZILLI:  Objection, foundation.

6          THE COURT:  Sustained.

7          MR. LAVINE:  Your Honor, may I request a side bar?

8          THE COURT:  Yes.

9     (At the bench:)

10         THE COURT:  Go ahead, Mr. Torzilli.

11         MR. TORZILLI:  I think Mr. Lavine requested the side

12  bar.

13         THE COURT:  Oh, yes, you're right.  He did.

14         Mr. Lavine, go ahead.

15         MR. LAVINE:  Yes, Your Honor.  I think considering his

16  experience and going through all the contracts -- did you hear

17  me, Your Honor?

18         THE COURT:  You are kind of going in and out a little

19  bit.

20         MR. LAVINE:  Considering his experience --

21         THE COURT:  And you can talk more softly, Mr. Lavine.

22         MR. LAVINE:  Considering his experience and the years

23  in the business and his review of these contracts and he

24  testified to this in the first trial, Your Honor.

25         THE COURT:  I don't recall that.

2696
Robert Lewis - Cross

1          Mr. Torzilli?

2          MR. TORZILLI:  Yeah, I would object to that.  I think

3     that that's beyond the scope of his knowledge and wouldn't have

4     foundation to provide testimony on what he would expect if

5     there was an agreement to fix prices.

6          THE COURT:  Mr. Lavine?

7          MR. LAVINE:  Well, I think, Your Honor, considering

8     the questions that Mr. Torzilli asked and the fact that his

9     experience as far as what he thinks as far as the closeness of

10    the prices and the fact that he testified to this during the

11    first trial, I think clearly he is in a position to be able to

12    articulate that position again.

13         THE COURT:  Yeah, I do not think so.  Maybe Mr. Beller

14    may have printed out a question from the first trial, but I

15    don't think that he -- unless he's got some prior experience

16    with detecting or being subjected to some type of price fixing,

17    it would not seem like he would have a foundation to know what

18    to expect in the event that there was collusion.  So I am going

19    to maintain the -- sustain the objection.

20         MR. LAVINE:  Thank you, Your Honor.

21         MR. TUBACH:  Can we go back on side bar briefly?

22         THE COURT:  Mr. Tubach, go ahead.

23         MR. TUBACH:  Your Honor, the fact that he testified in

24    the previous trial -- Question:  Do you agree that if the

25    prices for the 2015 KFC contract had been set by agreement you

2697

Robert Lewis - Cross

1    would expect the contract prices to be closer?  Answer:  Yes.

2    We should be -- at least be able to impeach him that that was

3    his belief previously.  The government didn't even object to

4    that question in the last trial.  And he also made the same

5    statement to the FBI in his earlier interview.  I believe we

6    should be entitled to impeach him with the fact if he doesn't

7    agree with that, the fact he said that previously, so he

8    thought he had a basis previously, but he made that statement.

9         THE COURT:  That in and of itself does not entitle

10   anyone to impeach someone.  If he didn't have a foundation to

11   answer a question once upon a time but still has no known

12   foundation now, then it's still an objectionable question.  So,

13   you know, I am unaware of any foundation that he has.  I mean,

14   someone may have an uninformed opinion about the subject, but,

15   once again, that doesn't mean that they can opine about

16   something that they don't know anything about.

17        MR. LAVINE:  Your Honor, if I may respond, the

18   question to him was based on his experience and his knowledge.

19   As far as contract negotiations, then I would say -- and as far

20   as the bidding process, he had been at RSCS for many years and

21   had handled the negotiations prior to that, and I think that

22   would be a basis for him to determine whether or not there was

23   any problems with this bidding considering these contract

24   prices were not very close together.

25        THE COURT:  All right.  But the relevant experience

2698
Robert Lewis - Cross

```
 1   would be whether he has any experience in bids that were

 2   collusive or fixed, and there has been no foundation laid for

 3   that.  Thank you.

 4            (In open court:)

 5   BY MR. LAVINE:

 6   Q.  Now, Mr. Lewis, you were able to review all of the

 7   contracts that were finalized during the negotiation process

 8   for 2015, were you not, sir?

 9   A.  Yes.

10   Q.  And during the negotiation process, many of the suppliers,

11   for example, Claxton, came down.  They came down over 4 cents

12   during that period of time.

13   A.  Yes.

14   Q.  And are you aware whether or not Claxton came down again in

15   2015 with regard to that contract?

16   A.  No.

17            MR. TORZILLI:  Objection, foundation.

18            THE COURT:  Overruled.  He can answer if he recalls.

19   A.  No, I don't recall.

20   BY MR. LAVINE:

21   Q.  When you looked at the contracts between suppliers, each

22   supplier had a different price.

23   A.  Each supplier had a different final cost versus their

24   proposed cost.

25   Q.  Correct.  I am talking about the final contract price.
```

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And the contract prices between the suppliers was not

3    close, correct, sir?  Let me put it this way.  There was a wide

4    disparity between the pricing between the suppliers.

5    A.   For the final proposal, I believe it was just over 5 cents

6    per pound.

7    Q.   The price range was over 5 cents?

8    A.   Yes.

9    Q.   And that would be a substantial difference, would you say,

10   sir?

11   A.   Given the volume KFC consumes, yes.

12            MR. LAVINE:  Thank you.

13            If I may take one moment, please, Your Honor.

14            THE COURT:  Sure.

15            MR. LAVINE:  Mr. Lewis, thank you very much.

16            Your Honor, I tender the witness.

17            THE COURT:  Thank you, Mr. Lavine.

18            Additional cross-examination, Mr. Tubach?

19                          **CROSS-EXAMINATION**

20   BY MR. TUBACH:

21   Q.   Good afternoon, Mr. Lewis.  My name is Michael Tubach.  I

22   represent Jayson Penn.  You have never met Jayson Penn, have

23   you, sir?

24   A.   I have met Jayson -- I am sorry, Mr. Penn maybe on two or

25   three occasions.

Robert Lewis - Cross

1   *Q.*  And was that before you retired in 2009?

2   *A.*  Yes.

3   *Q.*  So in the context of your coming back in 2014, you had no

4   contact at all with Mr. Penn; is that correct?

5   *A.*  That's correct.

6   *Q.*  And you never had any contact with Mr. Penn while he was

7   working at Pilgrim's Pride, correct?

8   *A.*  Yes.

9   *Q.*  Because he worked at a different company prior to your

10  retirement, right?

11  *A.*  Yes.

12  *Q.*  Now, I wanted to ask you, you gave some testimony earlier

13  about how the bids were due on August 19th, 2014, right?

14  *A.*  Yes.

15  *Q.*  And one of those companies didn't submit the bid on

16  August 19th, did they?

17  *A.*  As I recall, Tyson came -- Tyson's proposal came in on the

18  11th of August.

19  *Q.*  Tyson came in early, and George's came in early too, right?

20  *A.*  That's correct.  George's came in on August the 12th.

21  *Q.*  And then one company actually came in late, didn't they?

22  *A.*  I don't recall that.

23  *Q.*  Sure.  Take a look at Government's Exhibit 1104.

24          *MR. TUBACH:*  If we could pull that up for the witness.

25

2701
Robert Lewis - Cross

1    *BY MR. TUBACH:*

2    *Q.*  I actually believe it's in your binder that Mr. Lavine

3    handed you.

4          *MR. TUBACH:*  I believe, Your Honor, this is in

5    evidence.  I ask it be published to the jury.

6    *A.*  Tab number again?

7    *BY MR. TUBACH:*

8    *Q.*  That, I don't have for you.  Perhaps Mr. Lavine can help

9    me.

10         Mr. Lewis, I am mistaken.  It's in the government's

11   binder, not in Mr. Lavine's binder, but I still don't know the

12   tab number.

13         *THE COURT:*  Mr. Tubach, I do not show that as having

14   been admitted.

15         *MR. TUBACH:*  I apologize.  Our records show they have

16   been admitted.

17         *COURT DEPUTY CLERK:*  It's in.

18         *THE COURT:*  I stand corrected.  You can publish it.

19         *MR. TUBACH:*  Thank you, Your Honor.

20   *BY MR. TUBACH:*

21   *Q.*  Do you have that in front of you, sir?

22   *A.*  No.  What tab number?

23   *Q.*  Perhaps the government could help identify the tab number.

24   Look at it on the screen, sir.  It will be short.

25   *A.*  Okay.

2702

Robert Lewis - Cross

1    Q.  This document is already in evidence, an e-mail string

2    between you and Mr. Austin at Pilgrim's and Mr. Eddington at

3    RSCS, right?

4    A.  I don't recall ever seeing this.

5    Q.  Well, you're on this e-mail string, right?

6    A.  Yes.

7    Q.  Okay.  And Mr. Austin says in the lowest e-mail on

8    August 20th -- that was the day after the bids were due, right?

9    A.  Yes.

10   Q.  He says, You will have it by 10:00.  Everybody traveling

11   yesterday and hard to pin down.

12          Do you see that?

13   A.  Yes.

14   Q.  And Mr. Eddington responded at 10:48 with a question mark

15   and says, Any update?  Right?

16   A.  Yes.

17   Q.  And then Mr. Austin responded at 3:15 that afternoon

18   saying, Sorry it took so long.  Just everybody traveling.

19          And he attaches the cost model; is that right?

20   A.  Yes.

21   Q.  Does that refresh your recollection that, in fact,

22   Pilgrim's submitted its bid a day later than it was supposed

23   to?

24   A.  Yes, that's what it appears.

25   Q.  Okay.  Now, you mentioned on direct examination that one

Robert Lewis - Cross

1   company went bankrupt, that a chicken supplier went bankrupt

2   that you recalled.

3           MR. TORZILLI:  Objection, misstates the testimony.

4           THE COURT:  Overruled.  He can answer.

5   A.  Yes, Pilgrim's Pride went into bankruptcy.

6   BY MR. TUBACH:

7   Q.  They went into bankruptcy in about December of 2008, give

8   or take, right?

9   A.  I don't remember the date, but I remember it happened, yes.

10  Q.  It happened before you retired.

11  A.  Yes.

12  Q.  And you retired in 2009.

13  A.  Yes.

14  Q.  Now, Pilgrim's wasn't the only chicken supplier that went

15  bankrupt, was it?

16  A.  I don't know.

17  Q.  Well, Sylvest, you remember a company called Sylvest?

18  A.  I remember the name, but I never had any dealings with

19  Sylvest, so I was not aware.

20  Q.  You weren't aware they went bankrupt in 2006?

21  A.  No, sir.

22  Q.  What about a company called Townsend, do you recall a

23  chicken supplier named Townsend?

24  A.  The name is familiar, but again I never dealt with them.

25  Q.  You weren't familiar with them going bankrupt in 2010.

Robert Lewis - Cross

1    A.   I didn't know that, no.

2    Q.   What about a company called Allen?  Have you ever heard of

3    them, chicken supplier?

4              MR. TORZILLI:  Objection, scope and relevance.

5              THE COURT:  Overruled.

6    A.   I don't remember.

7    BY MR. TUBACH:

8    Q.   You don't recall any chicken supplier named Allen?

9    A.   No.

10   Q.   Okay.  So you weren't aware of them going bankrupt in 2011,

11   I guess.

12   A.   No, I don't.

13   Q.   What about a company called Koegel's.  Have you heard of a

14   company called Koegel's?

15   A.   Yes.

16   Q.   They went bankrupt in 2011, right?

17   A.   I don't know.

18   Q.   What about Zacky Farms?  You heard of Zacky Farms?

19   A.   I don't recall them.

20   Q.   You don't recall them going bankrupt in 2013.

21   A.   I did not keep up with things like that, no, sir.

22   Q.   Understood.

23            You were retired as of 2009, right?

24   A.   As of 2009.

25   Q.   And basically from 2009 until 2014, you really weren't

Robert Lewis - Cross

1    paying attention to what was happening in the chicken industry,

2    right?

3    A.  No, sir.

4    Q.  Except going to Chick-fil-A and realizing people like to

5    eat chicken without bones now.

6    A.  Yes.

7    Q.  When you came back in 2014, did you sort of refamiliarize

8    yourself with the industry and discover that a number of

9    chicken suppliers had gone bankrupt?

10   A.  No.  That wasn't on our radar screen.

11   Q.  You did mention there was some what you call consolidation

12   in the industry over the time period, including when you were

13   retired and then came back; is that right?

14   A.  I don't know what occurred between '09 and '14, but, yes,

15   there was lots of consolidation prior to my leaving as a

16   permanent employee.

17   Q.  But more than consolidation, sir.  The actual number of

18   small-bird plants in the country had been decreasing over time;

19   isn't that right?

20           MR. TORZILLI:  Objection, foundation.

21           THE COURT:  He can answer if he knows.

22   A.  Yes.

23   BY MR. TUBACH:

24   Q.  And that's because I think you spent some time talking

25   about the wide view in the industry was big birds were more

Robert Lewis - Cross

1    profitable than small birds, right?

2    A.  The demand for big bird products was greater than that for

3    small bird products.

4    Q.  So --

5    A.  There was a shift in demand -- I am sorry.  There was a

6    shift in demand from small bird to big bird.

7    Q.  So chicken suppliers are naturally following that demand

8    and shifting their plants from small bird over to big bird,

9    right?

10   A.  Right.

11   Q.  You mentioned that it was RSCS's idea in 2014 to negotiate

12   a three-year contract rather than a one-year contract, right?

13   A.  Right.

14   Q.  And that's because RSCS wanted to lock in supply for those

15   three years, right?

16   A.  That was part of the reason, yes.

17   Q.  That was the main reason, wasn't it?  You were very

18   concerned that you wouldn't have enough supply, and you wanted

19   to make sure that you wouldn't have another Mother's Day crisis

20   or Fourth of July crisis where you are running around trying to

21   buy extra chicken, right?

22   A.  Well, I think that's a two-way street.  We wanted not only

23   to protect supply for ourselves, but we wanted to send a signal

24   to the supplier that we were in it for the long-term, and we

25   wanted them to be a partner.

Robert Lewis - Cross

1    Q.  Because you didn't want them to switch away from selling

2    small birds to big birds, right?

3    A.  That's correct.

4    Q.  And in order to do that, you wanted to lock in the supply.

5    A.  Yes.

6    Q.  Okay.  But you were also trying to lock in the price,

7    weren't you?

8    A.  No.  The three-year contracts were subject to renegotiation

9    at the end of every calendar year.

10   Q.  Absolutely, but you were trying to lock in a three-year

11   deal, weren't you, sir?

12   A.  No, sir.  We had hopes over that three-year period, of

13   course I was going to be gone, but the team had hopes that with

14   the three-year contract we could actually negotiate the prices

15   down over the course of time.

16   Q.  So you understood prices were going to go up in 2015, but

17   you hoped that you could then renegotiate them back down over

18   time?

19   A.  Correct.

20   Q.  And do you know whether that happened, sir?

21   A.  No, sir, I don't.

22        THE COURT:  Mr. Tubach, could you look for a

23   convenient breaking spot?

24        MR. TUBACH:  I have no further questions.

25        THE COURT:  Well, that is a very convenient breaking

Robert Lewis - Cross

1    spot.

2          Ladies and Gentlemen, we will go ahead and take the

3    lunch recess now.  Why don't we plan on reconvening at 1:30.

4    Keep the admonitions in mind and yellow juror buttons visible,

5    if you would.  The jury is excused.  Thank you.

6       (Jury excused.)

7          THE COURT:  Mr. Lewis, you may be excused for lunch.

8    Thank you very much.

9          I am prepared to rule on the defendants' motion to

10   compel disclosure of *Brady* materials, Docket No. 1130, unless

11   the defendants had something to add real quick in terms of the

12   government responded over the weekend, I think it was over the

13   weekend.  Anything more on that?

14         MS. JOHNSON:  Your Honor, I will rely on the substance

15   of our brief.  Thank you.

16         THE COURT:  The matter before the Court is the

17   defendants' motion to compel disclosure of all *Brady* materials

18   regarding witness interviews and for other appropriate relief,

19   Docket No. 1130.  The government has filed a response to that.

20         I will deny the motion based on two reasons:  No. 1,

21   as the government pointed out in its response, a lot of the

22   information or very, very similar information to what was

23   allegedly not included in the final interview memos that

24   Special Agent Koppenhaver prepared is information that was

25   available through other sources and available to the defendants

Robert Lewis - Cross

1    before either of the trials.  And for that reason, I don't find

2    that there has been any type of a *Brady* violation.

3         The second reason is that even if there was some -- if

4    the final interview memos left out some of the statements that

5    are found in Special Agent Koppenhaver's notes, I do not find

6    that there has been any prejudice to the defendants.

7         A couple of observations in that regard.  One is that

8    Special Agent Koppenhaver has very legible handwriting.  His

9    notes were produced, I believe that they were, on the Thursday,

10   March 3rd, at around 7:00 p.m. according to the government.

11        Mr. Gillen had been cross-examining Mr. Pepper for, I

12   think, about two-and-a-half hours or so, it wasn't too long,

13   but had not completed or at least it wasn't clear that he had

14   completed his cross-examination of Mr. Pepper by the time that

15   we recessed.  There is no court on Friday, and then the

16   cross-examination resumed on Monday.  That gave the defendants

17   three days to review Special Agent Koppenhaver's notes and to

18   assimilate or adapt in any way they believed was appropriate

19   based upon the notes of Special Agent Koppenhaver.

20        There is a claim in the motion that the defendants had

21   somehow adopted a particular strategy.  That strategy is really

22   nowhere apparent.  And as a matter of fact, there were several

23   questions, as the government notes in its response, that

24   actually assimilated some of that information from the notes

25   assuming that that was known to the defendants for the first

Robert Lewis - Cross

1    time, which, the first basis of my ruling, namely that that

2    information had previously been produced, would indicate.  So I

3    don't show any -- I don't find that there has been any

4    prejudice to the defendants because of that.

5            And for that reason and the lack of a *Brady* violation

6    to begin with, I will deny that particular motion.

7            Let us take up something that we mentioned at the very

8    beginning of the day, the government's motion to compel

9    defendants' summary exhibits.  This is Docket No. 1177.

10           Have the defendants had a chance to think about that

11   one; and if so, does anyone care to respond to that?

12           *MS. LaBRANCHE:*  Your Honor, I can respond in regard to

13   some of the summary charts.

14           *THE COURT:*  Go ahead.

15           *MS. LaBRANCHE:*  I talked to Ms. Call on the morning

16   break, and it is my intention to give her -- I just have a

17   regular lay witness summary, a lay witness person who will be

18   coming in to do summary charts.  As I explained to her, I am

19   hoping to have them to her tomorrow night.  We don't anticipate

20   that that witness will be coming up until next week, but, you

21   know, just in case she gets up early on Thursday, that's what I

22   am trying to do.

23           *THE COURT:*  Okay.  Thank you, Ms. LaBranche.

24           Any problem with that one, Ms. Call?

25           *MS. CALL:*  I will note, of course, we just found out

Robert Lewis - Cross

1    about this this morning.  I think there are some difficulties

2    inherent in this.

3           As I understand from Ms. LaBranche, they intend to

4    introduce summaries similar to the government's summaries, so

5    potentially tens of pages summarizing dozens or hundreds of

6    e-mails and text messages.  So I do think there may be an issue

7    with the government's ability to review the underlying

8    materials, check for accuracy, check for misleading nature,

9    file a motion to exclude if we need to, particularly if the

10   defendants' schedule does move up like we think it may, with

11   one full day really to review these materials.

12         *THE COURT:*  Here is what seems to be the principal

13   issue.  If we talk about summaries like, for instance,

14   Mr. Pollack did with a witness and they are contracts and we

15   have got to do them in court, that doesn't seem to be too much

16   of a disclosure issue because it's kind of done before one's

17   eyes, and the accuracy is being kind of checked as the witness

18   goes through them.

19         On the other hand, an attempt to admit a summary

20   exhibit that is like the government's that has lots of exhibits

21   that are referred to, that is something that the government, as

22   would any party, needs to have the time to double-check.  And

23   that process, as we know from the pain of the first trial, can

24   take a while, because not only do you check the -- have to

25   check the exhibits, take a look at them, but then you compare

Robert Lewis - Cross

1   whatever notations.  I don't know what they would look like,

2   but that is necessarily a time-consuming process.

3          So not knowing exactly what these may look like, if

4   they look anything like the government's summary charts with

5   lots of cross-reference to exhibits, they are going to need to

6   be produced to the government as soon as possible, because

7   otherwise we are just going to bog down, we are going to have

8   deja vu of the first trial where we have to send the jury home

9   for a day or something, which, believe me, I want to avoid.  So

10  that's just a general comment.

11         So if you can, please talk to the government sometime

12  over the lunch hour.  I will revisit this at 5:00 o'clock, and

13  we'll see if there is some progress that we've made or some

14  indications on that front.

15         Anything else that we should talk about at this time?

16         MR. TORZILLI:  Thank you, Your Honor.

17         Also as part of that motion, we asked for four days'

18  advance notice of any summary exhibits and the like that would

19  be used with the defendants' economic expert.

20         THE COURT:  Is there an anticipation that he is going

21  to have some type of exhibit that would -- a summary exhibit,

22  Mr. Snyder, that would involve a lot of cross-references and

23  things?  He could, but maybe he doesn't.

24         MS. PLETCHER:  Thank you.

25         We do anticipate that Professor Snyder will be

Robert Lewis - Cross

1    testifying, and he will have some summary charts to summarize

2    his analysis.  It's a very different thing than what we have

3    seen in the previous summary charts from the government.  It's

4    going to be a more math-based analysis, and we'll talk with the

5    government about providing it to them in advance.

6          THE COURT:  Okay.  Right.  Once again, if it involves

7    some type of chart that does a cross-reference or something of

8    that nature, then obviously there needs to be some advance

9    notice so the government has the opportunity to be able to

10   double-check that.

11         MS. PLETCHER:  Yes, Your Honor, thank you.

12         Mr. Torzilli?

13         MR. TORZILLI:  The defendants have another expert, I

14   think it's Mr. Pochron.  I am sure I am mispronouncing that.

15   My apologies.  And it seems based on the disclosures that he is

16   someone who may be doing an analysis of telephone records and

17   the like.

18         So to the extent there are summary exhibits associated

19   with that work, we would similarly ask for disclosure ahead of

20   time, and our motion asks for four days in advance.

21         THE COURT:  Does Mr. Pochron have -- he is a telephone

22   records guy, I think.  Is there going to be a summary exhibit

23   used with him, once again, one that contains lots of

24   cross-references?

25         MR. TUBACH:  Your Honor, I can tell the Court, if we

2714

Robert Lewis - Cross

1   end up calling Mr. Pochron, we will provide advance notice of

2   exhibits to the government.

3        THE COURT:  Okay.  Once again, if you don't mind

4   talking to Mr. Torzilli so we can tell how far in advance that

5   would be.

6        MR. TUBACH:  Yes, absolutely.

7        THE COURT:  That's great.

8        Anything else?

9        We will be in recess until 1:30.  Thank you.

10      (Recess at 12:11 p.m. until 1:32 p.m.)

11       THE COURT:  Let me bring up one thing, and that is

12  when the government does rest, should we do the same procedure

13  that we did for the last trial, which is have a -- I will

14  explain to the jury what it means when a party rests.  Then we

15  will have a bench conference, allow each defendant to

16  articulate what we call a placeholder Rule 29 motion, not then,

17  but we will talk then about when those should be due.  Is that

18  acceptable to each of the defendants?

19       MR. KORNFELD:  Sure, Your Honor.  We had talked and

20  sort of assumed that would probably be the procedure, and we

21  are certainly prepared to handle it that way, unless the Court

22  wants to do it a different way.

23       THE COURT:  That's fine with me.

24       Anything from the government on that point,

25  Mr. Koenig?

Robert Lewis - Cross

1           MR. KOENIG:  No.

2           THE COURT:  And then Mr. Mulrenin reserved his

3    opening, so then I assume that we'll have an opening for

4    Mr. Mulrenin at that time?

5           MS. PREWITT:  Yes, Your Honor.

6           THE COURT:  Standard time, was it 20 minutes?

7           MS. PREWITT:  20 minutes, Your Honor.

8           THE COURT:  That sounds good.

9           Why don't we get Mr. Lewis and also get the jury.

10          (Jury present.)

11          THE COURT:  All right.  Mr. Gillen, go ahead.

12          MR. GILLEN:  Thank you, Your Honor.

13                        **CROSS-EXAMINATION**

14   BY MR. GILLEN:

15   Q.  Good afternoon, Mr. Lewis.  I am Craig Gillen.  I represent

16   Brian Roberts.  Not going to be terribly long on my end of

17   things, but there are some things I want to go over with you

18   very quickly.

19          Setting the stage, summer 2014, you have been in

20   retirement for five years, correct?

21   A.  Yes.

22   Q.  You have done no studying of the market to keep up to speed

23   about the market trends in the chicken business, correct?

24   A.  That's correct.

25   Q.  You had not studied the difference between the profits per

Robert Lewis - Cross

1    pound for big bird or small bird prior to your coming back into

2    the breach in the summer of 2014, correct?

3    A.   Correct.

4    Q.   And so what happens is that, I guess, somewhat unexpectedly

5    Mr. Ledford leaves RSCS, and then your services are necessary

6    again, correct?

7    A.   Yes.

8    Q.   And so what you do, you come back in, and at that time, the

9    team really comprised of you, and you were working as a

10   consultant, correct?

11   A.   Correct.

12   Q.   And Mr. Pete Suerken, correct?

13   A.   Correct.

14   Q.   He is kind of the quarterback of the team?

15   A.   Yes, team leader.

16   Q.   And Mr. Suerken, he was not what we would call a chicken

17   specialist at that period of time either, was he?  He had a

18   broad range of protein that he did for RSCS, correct?

19   A.   That's correct.

20   Q.   So you're coming back out of five years of not studying the

21   market, and Mr. Suerken is coming in as a generalist to deal

22   with the crisis that was taking place with KFC in the summer of

23   2014, right?

24   A.   Right.

25   Q.   Okay.  So you come back in.  We've gone over in some detail

Robert Lewis - Cross

1    the fact that Mother's Day was a disaster, and you are

2    initially brought in to handle that specific problem, right?

3    A.   That's correct.

4    Q.   So you weren't brought in to handle the negotiations for

5    the RFP.  You were brought in to handle the supply problem and

6    see what you could do there, right?

7    A.   Yes.

8    Q.   That's the reason why you had a two-year deal -- a

9    two-month deal rather than a seven or eight-month, correct?

10   A.   Correct.

11   Q.   So you were brought in.  Your job is to say, Hey, we've got

12   a disaster, go out and find chicken, and let's see what we can

13   do, right?

14   A.   Right.

15   Q.   So what you do is -- we've seen the charts.  We're not

16   going to go revisit those.  But to summarize, you're out making

17   calls to try to buy chicken at between $1.30 and $1 -- up to

18   $1.45, correct, per pound?

19   A.   Correct.

20   Q.   And so that's all happening in July.  And some of those

21   contracts were extended through production through -- for six

22   weeks, which would have gone into August of 2014, right?

23   A.   Correct.

24   Q.   So at the same time that you're out in the marketplace

25   calling people and, may I use a term literally, begging for

Robert Lewis - Cross

1    chicken at that price?

2    A.  Yes.

3    Q.  So you are begging for chicken at $1.45.  And at the same

4    time, a decision is made to put out the RFP early in the

5    bidding cycle, correct?

6    A.  Correct.

7    Q.  Because what usually happens is that, you know, you're not

8    going to be getting an RFP out for the bidding process to be in

9    August.  It's going to be towards the end of the year, right?

10   A.  More in the fall, yes.

11   Q.  Or in the fall.  But in any event, in the middle of this

12   crisis someone makes a decision that we should go ahead and try

13   to get it out early and see if we can't get ahead of the game,

14   right?

15   A.  Yes.

16   Q.  To beat out your competitors that you would be competing

17   with in the small-bird market, right?

18   A.  I am sorry, would you repeat?

19   Q.  Well, you've got folks out there that are going to be

20   trying to buy those scarce rare small birds, right?

21   A.  Yes.

22   Q.  So what you want to do is you want to get out there early,

23   ahead of the game, and try to lock down a market share for KFC

24   for a three-year deal, correct?

25   A.  Correct.

Robert Lewis - Cross

1  Q.  For some security for KFC, right?

2  A.  Right.

3  Q.  Even in the midst of a crisis where you're buying chicken

4  at $1.45 a pound, correct?

5  A.  Correct.

6  Q.  Okay.  So then what happens is that you then decide or

7  someone decides that we're going to call up and engage the

8  suppliers early, right?

9  A.  Yes.

10  Q.  You don't wait until August of 2014 to do it.  You begin

11  that process in July, correct?

12  A.  Correct.

13  Q.  We've seen some e-mails where you were reaching out to the

14  suppliers, and you were trying to get them to kind of commit to

15  you and get this handled for you -- just one moment -- as early

16  as July the 10th you're reaching out, right?

17  A.  Yes, approximately.  I don't remember the specific date.

18        MR. GILLEN:  Let's just throw up real fast -- entered

19  into evidence is G-504.  I believe that's already entered into

20  evidence, Your Honor.  I would ask permission to publish it,

21  admitted during the cross-examination by Mr. Lavine.

22        THE COURT:  It has been.  You may publish it.

23  BY MR. GILLEN:

24  Q.  Now, here -- what we have here is -- and this is something

25  you basically sent out to everybody; isn't that right?

Robert Lewis - Cross

1   A.   Yes.

2   Q.   And what we have here is -- this one here happens to be to

3   Brian Roberts, right?  Of Tyson, correct?

4   A.   Correct.

5   Q.   Now, you're asking -- I am not going to go through all of

6   this, but, you know, the same thing you asked other people.

7   You wanted to know about -- one of the bullets down -- profit

8   margin needed, on how that compares to big-bird profitability.

9   Do you remember that?

10  A.   Yes.

11  Q.   We have gone over that.

12          And then down at the bottom, you say, Send the

13  information for us to review.

14          And so what you want is you want information sent to

15  you prior to the meetings that you're going to have in August,

16  correct?

17  A.   Correct.

18  Q.   So that way you're going to be able to study what is

19  happening or what people are thinking, and you'll be able to

20  then formulate a plan with Mr. Suerken and ultimately with

21  Mr. Eddington when he comes, right?

22  A.   Right.

23  Q.   And Tyson accommodated you and sent in a cost model in

24  July, did they not?

25  A.   I don't remember the specific time period, but, yes, they

Robert Lewis - Cross

1    did submit a proposal.

2    Q.  Okay.  Well before the meeting that you had with them in

3    August, correct?

4    A.  Yes, as I recall.

5    Q.  Okay.  So now Tyson has sent you a cost model prior to the

6    meeting that you're going to have with them.  And then, of

7    course, I assume that you and Mr. Suerken are analyzing that

8    and trying to make decisions about what to do concerning your

9    strategy for KFC, correct?

10   A.  Correct.

11   Q.  And what happens is that -- now, is Tyson the only one that

12   sent in a cost model early, or did the other ones send in cost

13   models as well?

14   A.  My recollection is that Tyson's proposal was the first one

15   submitted.

16   Q.  Okay.  We're talking about two different things now.  We've

17   got the bid, which came in on August the 11th, but they sent in

18   a model prior to that you testified, correct?

19           MR. TORZILLI:  Objection, misstates the testimony.

20           THE COURT:  He can answer if he understands.

21   Overruled.

22   A.  Yes, I believe they did, because Mr. Roberts and

23   Mr. Suerken had been discussing a couple of issues, and the

24   models were submitted taking those two issues into

25   consideration.

Robert Lewis - Cross

1  *BY MR. GILLEN:*

2  Q.  And this was your recollection probably back in July that

3  these discussions were going on?

4  A.  Yes, I believe it was.

5  Q.  Okay.  So back in July there are discussions back about the

6  Tyson's model.  And the Tyson model that was submitted,

7  ultimately submitted on August the 11th was different than all

8  the other cost models from the other suppliers, wasn't it?

9  A.  It was different in that I believe it had an additional

10  line item that covered the marination.

11  Q.  I am going to ask you some questions about whether -- now,

12  you mentioned "marination."  And is it correct that when you

13  mentioned "marination," what Tyson wanted, they wanted two

14  different things in their cost model?  One, marination wherein

15  they wanted to weigh the bird after the bird had been

16  marinated, correct?

17  A.  They wanted to bill us for the marinated weight rather than

18  the drained weight.

19  Q.  Which is -- so you got a bird and it's marinated.  And

20  Tyson wanted to weigh it after the marination had been put into

21  the bird, right?

22  A.  Yes, but after the marination had drained from the bird.

23  Q.  Okay.  And then you've got another component that is the

24  tare weight.  Do you remember that being the other unique

25  aspect of the Tyson model?

Robert Lewis - Cross

1    *A.*  If you're talking about the fixed case weight program that

2    we had, yes.

3    *Q.*  I am referring to the 48-hour tare weight drain where what

4    KFC would do is they would -- if the bird goes through and gets

5    frozen and water drips out of it, and KFC didn't want to pay

6    for the liquid that was in the box after that process, right?

7    *A.*  We didn't want to pay for the liquid that was in the bird

8    at the time of billing.

9    *Q.*  And that was different -- those two components asked for by

10   Tyson, that was different than -- nobody else asked for that,

11   right?

12   *A.*  I don't recall anyone else asking for it.

13   *Q.*  And does that stick out in your mind as something that was

14   unique to the Tyson bid?

15   *A.*  Yes.

16   *Q.*  Okay.  Then another unique thing about the Tyson bid is

17   that we saw an e-mail from you the other -- before lunch

18   wherein you send out an e-mail thanking everyone for meeting

19   and asking them to submit on or before August the 19th.  You

20   remember that?

21   *A.*  Yes.

22   *Q.*  Now, so that's when you are expecting everybody to kind of

23   get in their proposals to you so that you can -- it can be

24   evaluated along with Mr. Suerken and then get back with the

25   suppliers and engage in discussions, right?

Robert Lewis - Cross

1    A.   Right.

2    Q.   Okay.  Now, what happens here is that on August the 11th,

3    before anybody else had submitted a bid, Tyson submitted their

4    bid to RSCS via Mr. Eddington, correct?

5    A.   I don't recall whether it was Mr. Eddington or Mr. Suerken,

6    but, yes, they submitted a proposal on August the 11th.

7    Q.   Okay.

8         MR. GILLEN:  Your Honor, I believe 1190 is in

9    evidence.

10        THE COURT:  Let me check.  Yes, it is.

11        MR. GILLEN:  May we publish that, please?

12        THE COURT:  Yes.

13   BY MR. GILLEN:

14   Q.   And 1190, Mr. Lewis, says to Mr. Roberts, to Mr. Eddington,

15   I think this is a model you need for comparison; what do you

16   think the possibility is that we can get some level of

17   commitment on what you want to do by the end of the week?

18        Do you see that?

19   A.   Yes.

20   Q.   So Tyson not only submitted early on August the 11th, but

21   Tyson wanted to close the deal by the end of the week with you

22   all, right?

23   A.   It would appear that to be the case, yes.

24   Q.   Okay.  Now, to sort of round out here, we've got

25   Mr. Eddington -- let's talk a little bit about him just to go

Robert Lewis - Cross

 1   back over that.  Mr. Eddington had been working at Mar-Jac,

 2   correct?

 3   A.  Correct.

 4   Q.  Now, Mr. Eddington had been at -- Mar-Jac was a supplier,

 5   correct?

 6   A.  Correct.

 7   Q.  Now, Mr. Eddington was hired to then come in and sort of

 8   use his chicken expertise to help out RSCS in these

 9   negotiations because Mr. Ledford left, right?

10   A.  Yes.

11   Q.  And so Mr. Eddington is hired.  Did you hire Mr. Eddington

12   or was he hired by someone else at RSCS?

13   A.  I did not hire Mr. Eddington.

14   Q.  In he comes.  And at that time before he arrives, then it's

15   you and Mr. Suerken, you with a five-year layoff from the

16   industry, and Mr. Suerken as a generalist but not a specific

17   chicken expert, right?

18   A.  Yes.

19   Q.  But we do know that Mr. Eddington is a chicken expert,

20   correct?

21   A.  Yes.

22   Q.  Which is why he got hired, right?

23   A.  Correct.

24   Q.  Your job and other jobs there was to educate Mr. Eddington

25   and get him up-to-speed so that Mr. Eddington could then use

Robert Lewis - Cross

 1   his knowledge and expertise of the industry and of the

 2   marketplace to try to get the best deal possible for RSCS,

 3   right?

 4   A.  Right.

 5   Q.  And here Mr. Eddington is obviously onboard because

 6   Mr. Roberts has sent him the Tyson bid on August the 11th,

 7   correct?

 8   A.  Correct.

 9   Q.  And so now how did it work?  I don't see you cc'd on here.

10   Was Mr. Eddington the point where he would get that information

11   and give it to you, or how did that work?

12   A.  All of the information that came in through either

13   Mr. Eddington or Mr. Suerken that had to do with price

14   negotiations eventually ended up with me, I am pretty certain

15   of that, because I was the point person for RSCS.

16   Q.  And you were consulting, right?

17   A.  Yes, sir.

18   Q.  And so now we have --

19            MR. GILLEN:  And let's see if we can put up 1191,

20   which I believe is also in evidence, Your Honor.

21            THE COURT:  Yes, it is.

22            MR. GILLEN:  Can we publish that, please?

23            THE COURT:  You may.

24   BY MR. GILLEN:

25   Q.  Now, 1191 is the attachment that was sent to 1190,

Robert Lewis - Cross

1    Mr. Lewis.  Do you see that?

2    A.  I see it.  I was unaware it was an attachment.

3    Q.  Okay.  Have you ever seen this document before?

4    A.  I don't recall ever seeing this document.

5    Q.  All right.  And do you remember discussions with

6    Mr. Eddington or Mr. Roberts about any of the items that are

7    listed here?

8           MR. TORZILLI:  Objection, calls for hearsay.

9           THE COURT:  Overruled.

10   BY MR. GILLEN:

11   Q.  Do you remember having discussions with Mr. Eddington or

12   Mr. Roberts about any of the items that are listed here?

13   A.  Most of the items that are listed here were discussed in a

14   general nature with everyone involved, so I would assume that

15   at least most of these were discussed, yes.

16   Q.  But, again, for example, the marination pick-up in price,

17   that was unique to Tyson, correct?

18   A.  Yes, it was.

19   Q.  Okay.  So that's one thing that's unique to Tyson.  And

20   then it has the remove the 48-hour drain tare weights.  Do you

21   see that?

22   A.  Yes.

23   Q.  That was also unique to Tyson, correct?

24   A.  Yes.

25   Q.  And do you remember internal discussions about those topics

Robert Lewis - Cross

1   with Mr. Eddington and Mr. Suerken about what to do about that?

2   A.  I recall -- I believe I recall a discussion with

3   Mr. Suerken about that.  I don't recall having any discussions

4   with Mr. Eddington.

5   Q.  Okay.  Let's go to the next page.  Do you remember seeing

6   this as -- the August the 11th submission by Tyson eight days

7   early?  Is any of this ringing a bell with you?

8   A.  It rings a bell.  I have seen, I think, some version of

9   this somewhere in the documents, but I do not recall this

10  specific document.

11  Q.  Okay.  So you do remember specifically that Tyson sent it

12  in early with these unique features.  You do remember that,

13  though, correct?

14  A.  Yes, I do.

15  Q.  But as to the specifics of this particular exhibit, 1191,

16  you may have seen it, but you don't have a specific

17  recollection of it; is that fair?

18  A.  It's been eight years ago.  Yes, that's fair.

19  Q.  And then did you respond to Mr. Roberts or did

20  Mr. Eddington?  Who was in charge of responding back to Tyson?

21  A.  I feel like I would have been responsible, but I don't

22  remember it, and I don't remember a lot of detail around what

23  you've just shown me.

24  Q.  Okay.  Now, at this stage Mr. Eddington has come in right

25  around the 1st of August, right?

Robert Lewis - Cross

1   A.  Right.

2   Q.  So he has hit the ground running with his chicken

3   expertise, correct?

4   A.  Even though Mr. Eddington came with poultry experience, it

5   was mostly on the sales side and some production side of the

6   business.  He had to learn about the procurement side, and, of

7   course, he had to get acclimated to KFC and RSCS's way of doing

8   things.

9   Q.  Exactly.  But he knew the marketplace.  He was in the

10  marketplace with Mar-Jac, correct?

11  A.  I would assume he did understand the market.

12  Q.  Okay.  And so what happens is then you testified on direct

13  that there was additional communications back with the various

14  suppliers, and ultimately RSCS, as it relates to Tyson, agreed

15  to a specific model or -- strike that.  I apologize.  Strike

16  that.

17        Is it your recollection that RSCS told Tyson, We're

18  not going to do the marination, and we're not going to do the

19  tare weight, 48-hour tare weight?  Do you remember that?

20  A.  No, I don't remember that.

21  Q.  So your recollection of how the specifics and the details

22  of the response back to Tyson, you know, given the time and

23  everything, you just don't have a specific recollection; is

24  that fair?

25  A.  I do recall seeing the marination yield indicated or

Robert Lewis - Cross

1    entered into the cost model.

2    Q.  But at the end of the day, did KFC or RSCS refuse to follow

3    the model suggested by Tyson and not do the marination weight

4    that Tyson wanted or the 48-hour tare weight?

5    A.  I do not recall the specific action on the marinated case

6    weight, but I do recall seeing the marination yield indicated

7    in the model, which is different than any other model.

8    Q.  Now, ultimately in a very short period of time, in

9    September, there is discussion with the various suppliers, and

10   agreements are reached, correct?

11   A.  Yes, that sounds right.

12   Q.  As a matter of fact, after the submission by Tyson, isn't

13   it a fact that RSCS said, Hey, if I hit your number, in other

14   words, if I get your -- what your ask is, Tyson, can you get me

15   to 31, in other words, six more additional loads a week from

16   Tyson based upon their pricing?

17   A.  I recall trying to encourage Mr. Roberts to come up with

18   some additional loads over and above the 25 that he had

19   supplied the previous year.  I do not remember any details

20   around what was reasonable other than we were just short.

21        MR. GILLEN:  Your Honor, I believe we have G-508

22   admitted, and I would ask that be published at this time, 508,

23   G-508.

24        THE COURT:  One second.  Yes, it has been admitted,

25   and you may publish it.

Robert Lewis - Cross

1          MR. GILLEN:  Thank you.

2     BY MR. GILLEN:

3     Q.  Now, on or about September the 4th, 2014, do you remember

4     that RSCS through Mr. Suerken sent an e-mail to Tyson, Re:

5     Could you stretch 25 loads a week, and saying, I need an

6     additional 11 loads?  If I hit your number, can you get me to

7     31?

8          Do you see that?

9     A.  I see that.

10    Q.  And so does that refresh your recollection about whether

11    RSCS after seeing what the final Tyson number was wanted them,

12    you know, can -- if we hit your number, can I get an additional

13    11 loads a week from you, right?

14         MR. TORZILLI:  Objection.  He is not a sender or

15    recipient of this document, so there is no foundation.

16         THE COURT:  He can answer if he recalls.

17    BY MR. GILLEN:

18    Q.  Do you recall that?

19    A.  I do not recall this e-mail, and in all due respect, this

20    is kind of why the job could have been frustrating a little bit

21    for me at times, because I think I had been talking separately

22    to Mr. Roberts about adding a few loads, and at the end of the

23    day we ended up being at 25, just as we were the year before.

24    Q.  Well, your recollection is that no loads were added to

25    Tyson during this negotiation?

Robert Lewis - Cross

1    *A.*  No loads were -- no, sir.

2    *Q.*  That's your recollection.  Okay.  We'll -- that's your

3    testimony.

4         And do you remember where -- having discussions with

5    Mr. Suerken where Mr. Suerken was talking to you about trying

6    to get Tyson to get 11 additional loads?

7         *MR. TORZILLI:*  Objection, calls for hearsay.

8         *THE COURT:*  Overruled.

9    *A.*  I do not recall Mr. Suerken approaching me about this.

10        *MR. GILLEN:*  One moment, Your Honor.

11        *THE COURT:*  Sure.

12        *MR. GILLEN:*  That's all I have.  Thank you.  Thank

13   you, Mr. Lewis.

14        *THE COURT:*  Thank you, Mr. Gillen.

15        Additional cross?

16        Mr. McLoughlin.

17        *MR. McLOUGHLIN:*  If I may, Your Honor, provide a

18   binder for the witness and for the Court.

19        *THE COURT:*  Yes.

20                    **CROSS-EXAMINATION**

21   *BY MR. McLOUGHLIN:*

22   *Q.*  Good afternoon, Mr. Lewis.  My name is Jim McLoughlin, and

23   I represent Bill Lovette.

24   *A.*  Good afternoon.

25   *Q.*  Good afternoon.

Robert Lewis - Cross

 1          So I have just a few questions for you.  And in that

 2   binder there are some exhibits.  And first I would ask you to

 3   go to an exhibit numbered H-635.

 4          MR. TORZILLI:  Your Honor, may I request a copy for

 5   counsel?

 6          MR. McLOUGHLIN:  We are pulling it right now.  We have

 7   copies of each one.  I apologize, Your Honor, I should not have

 8   spoken to Mr. Torzilli.

 9          THE COURT:  That's all right.  Let's get him a copy.

10   A.  I am sorry, did you say DX-H-635?

11   BY MR. McLOUGHLIN:

12   Q.  Yes, so DX-H-635.  Thank you.

13          Sir, do you recall meeting with representatives of the

14   government during your course of engagement with respect to

15   this case?

16   A.  Yes.

17   Q.  And do you recall meeting with them about a dozen times?

18   A.  Over the course of a couple of years, that's probably a

19   reasonable number.

20   Q.  Now, do you recall on the specific occasion that we're

21   talking about that is referenced in D-H-635 -- and just to get

22   a few precursors out of the way, when you were interviewed or

23   met with the government, you answered their questions to the

24   best of your ability, correct?

25   A.  Correct.

2734

Robert Lewis - Cross

1   Q.  And you tried to be as truthful and forthcoming as you

2   could, correct?

3   A.  Correct.

4   Q.  And you knew people might rely upon your answers, so it was

5   important to be accurate and complete.

6   A.  Yes.

7   Q.  So first with respect to Mr. Lovette, if you could look at

8   page 2 of 2, middle of the page there, and do you see where it

9   says "Bill Lovette" in the middle there?

10          MR. TORZILLI:  I will object.  This is a document

11  that's not in evidence, and it's not his statements, so I

12  object to him asking questions about it.

13          THE COURT:  I guess I am not quite sure what the

14  purpose of it is, but I will let another question be asked.  Go

15  ahead.

16          MR. McLOUGHLIN:  Thank you.

17  BY MR. McLOUGHLIN:

18  Q.  Mr. Lewis, isn't it true that you told the government on

19  that occasion that you had worked with Mr. Lovette over a

20  number of years, you had great respect for him, but you had not

21  spoken to him in many years?

22  A.  Yes.

23  Q.  Thank you, sir.

24          Now, and in the course of these negotiations for the

25  2015 contract year, you did not communicate with Mr. Lovette,

Robert Lewis - Cross

1    correct?

2    A.   I am sorry, would you repeat that?

3    Q.   Sure.  During the course of the 2015 contract negotiations,

4    you did not communicate with Mr. Lovette, correct?

5    A.   Correct.

6    Q.   Okay.  So, sir, we previously talked a little bit about

7    Pilgrim's.  And you can flip to H-637 if you would like, and I

8    am going to -- you may recall your information without it, but

9    I am going to ask you, do you recall telling the government

10   that Pilgrim's was always aggressive because they had other

11   customers ready to take supply if KFC didn't want to buy it?

12        MR. TORZILLI:  Your Honor, I object to the improper

13   impeachment technique.

14        MR. McLOUGHLIN:  Your Honor, I would respectfully

15   disagree that it is an improper technique.

16        THE COURT:  He has already testified to something very

17   similar, so it's really not impeachment.  Sustained.

18   BY MR. McLOUGHLIN:

19   Q.   Do you remember, does this refresh your recollection that

20   that's what you said?

21   A.   I remember saying that.

22   Q.   Great.

23   A.   Aggressive in that they were very attentive to our business

24   and the KFC business.

25   Q.   Now, sir, I just want to make sure I understand the folks

Robert Lewis - Cross

1   who are in the poultry group at KFC or at RSCS.  So that was

2   Mr. Suerken, who you have described just a few moments ago,

3   correct?

4   A.  Correct.

5   Q.  And Mr. Campisano, was he also in the poultry group?

6   A.  Yes.

7   Q.  And what was his role?

8   A.  Mr. Campisano worked more in the further processed side of

9   the business, and he was also a distribution expert.

10  Q.  Great.

11          And then there was Mr. Eddington who joined the group.

12  A.  Yes.

13  Q.  And there was Ms. Fisher.  What was her role?

14  A.  When I was there in '14, Ms. Fisher was a program manager.

15  She did not work in the poultry area at that time.

16  Q.  She came later?

17  A.  Yes.

18  Q.  Okay.  And what was Mary Hester's role?

19  A.  Mary also was in the further processed side of the

20  business, as I recall.

21  Q.  And she worked with Mr. Campisano.

22  A.  Yes.

23  Q.  Okay.  And then there was yourself as a consultant.

24  A.  Yes.

25  Q.  Okay.  Now, in the course of the work that the poultry

Robert Lewis - Cross

1    group did, it was important for members of the group to

2    understand what the strategy was and to share information so

3    that everyone was well informed in the course of the

4    negotiations; is that fair?

5    A.   That's fair.

6    Q.   And as I think you just said, you were the point person for

7    the negotiations with respect to the COB suppliers; is that

8    fair?

9    A.   That's fair, yes.

10   Q.   And it is your belief that all price information basically

11   wound up with you because you were the one who had to use it?

12   A.   That's my belief.

13   Q.   Okay.  And also you had strategy discussions with

14   Mr. Suerken as the quarterback during the course of the

15   negotiations, did you not?

16   A.   Yes.

17   Q.   And Mr. Suerken provided you with strategic guidance; is

18   that correct?

19   A.   Mr. Suerken was in effect my boss, and everything I did was

20   approved by him or disapproved.

21   Q.   Okay.  And when he either approved or disapproved, he

22   explained to you generally what the rationale was, did he not?

23   A.   Yes, you could say that, yes.

24   Q.   Okay.  So, sir, let me ask you to turn in the binder to

25   Exhibit DX-C-602.  And if you would take a look at that, I am

Robert Lewis - Cross

1   going to ask you some questions about it.

2   A.  DX-C-602?

3   Q.  Yes, sir.

4   A.  Thank you.  Okay.

5   Q.  So, sir, was it the practice both in 2009 and prior and

6   while you were back in the poultry group in 2014 for that group

7   to provide updates and reports on strategy and developments for

8   the senior management at RSCS?

9   A.  It was a common practice.

10  Q.  Yeah.  And among the executives who would have received

11  those would be Mr. McCormick who was the CEO, correct?

12  A.  Yes.

13  Q.  And Mr. Imhoff who was the second-in-command?

14  A.  Yes.

15  Q.  Who else would have received these strategy reports and

16  updates?

17  A.  This is an assumption, I am not certain about this, maybe

18  the board and perhaps certain individuals at KFC Corporation.

19  Q.  Okay.  So senior executives at the pure restaurant side of

20  the business.

21  A.  Yes, sir.

22  Q.  Now, sir, in preparing reports and strategy summaries

23  within the poultry group for distribution to senior management

24  at RSCS, possibly to the board and to senior executives at KFC,

25  it was the objective of the poultry group to be as accurate as

Robert Lewis - Cross

1   possible; isn't that fair and correct?

2   A.  That's fair.

3   Q.  And people put time and effort into being accurate and

4   correct, yes?

5   A.  Yes.

6   Q.  And you intended that the reader or the proverbial listener

7   who received these documents would and could rely on them in

8   making decisions about RSCS strategy, KFC strategy, and related

9   matters, correct?

10  A.  Yes.

11  Q.  And these were ultimately kept in the ordinary course of

12  business at RSCS as they were produced, as you said, in the

13  ordinary course of business.

14  A.  I would say certainly the writer and the recipients would

15  have retained that information.

16  Q.  And these were prepared, sir, if I am correct, to have an

17  effect so that people could make good business decisions,

18  correct?

19  A.  To make good business decisions and perhaps also be

20  informed.

21  Q.  Okay.

22      MR. McLOUGHLIN:  At this time, Your Honor, I would

23  move the admission of C-602.

24      THE COURT:  Any objection to the admission of C-602?

25      MR. TORZILLI:  May I inquire?

Robert Lewis - Cross

1           THE COURT:  Yes, you may.

2           MR. TORZILLI:  Thank you.

3           MR. McLOUGHLIN:  I am sorry, I didn't hear.

4           THE COURT:  I am allowing voir dire on this.

5           MR. McLOUGHLIN:  Oh, yes.

6           THE COURT:  Mr. Torzilli, you can do it from -- well,

7    he has cleared the podium.  Go ahead.

8           MR. TORZILLI:  With thanks to counsel for clearing

9    out.

10                       VOIR DIRE EXAMINATION

11   BY MR. TORZILLI:

12   Q.  Mr. Lewis, just a couple questions on the document that

13   Mr. McLoughlin has been asking you about.  It's Defense Exhibit

14   C-602.  My first question is, do you know whether the document

15   that's in Exhibit C-602 was used and relied on in RSCS's

16   business?

17   A.  I do not recognize this presentation.

18   Q.  So I take it that you did not write the document?

19   A.  If I did, I don't recall it, no, sir.

20   Q.  And could you go to the very, very first page of the

21   printout, so the one that actually has the sticker in the lower

22   right-hand corner that says C-602?

23   A.  Just the cover page?

24   Q.  And right above, do you see where the sticker is where it

25   says in blue "C-602"?

Robert Lewis - Cross

1    *A.*   Yes.

2    *Q.*   Right above it, do you see a sequence of letters and

3    numbers?

4    *A.*   Yes.

5    *Q.*   Could you read those out, please?

6    *A.*   MCK-YUM, dash, and then a number.

7    *Q.*   And none of those letters are RSCS, correct?

8    *A.*   That's correct.

9             *MR. TORZILLI:*   No further questions, Your Honor.   The

10   objection to the admission of this is on hearsay grounds.

11            *THE COURT:*   All right.   Response, Mr. McLoughlin?

12            *MR. McLOUGHLIN:*   Yes, Your Honor.   First, the document

13   is admissible because of its independent legal significance.

14   It doesn't matter whether the statements in the document are

15   true or not.   What matters is that they were communicated

16   within RSCS and to its consultants.   Also, this witness has

17   established that this kind of report was prepared for, kept,

18   and meets all of the other requirements of a business record.

19            Further, if it doesn't have independent legal

20   significance, if it isn't an ordinary business record, it is

21   also admissible because it was prepared for the purpose of

22   having an effect on the listener.   And, again, it doesn't

23   matter whether the information in it was right or wrong,

24   correct or incorrect.   What matters is that it was information

25   that was communicated to have an effect on the recipient.

Robert Lewis - Cross

1          So I think for all of those grounds, Your Honor, it is

2     admissible.

3          THE COURT:  I reject the exhibit for each of those

4     grounds.  It does not have any independent legal significance.

5     It's not a business record, doesn't meet any of the exceptions.

6     And whereas every document is intended presumably to have a

7     purpose of an effect on the listener, this particular document

8     does not meet the hearsay exception, so will be rejected.

9          MR. McLOUGHLIN:  Okay, Your Honor.  Thank you.

10    BY MR. McLOUGHLIN:

11    Q.  Mr. Lewis, let me ask you to look at the last page of

12    C-602.

13    A.  Okay.

14    Q.  Does that refresh your recollection, sir, that as part of

15    its strategy for the 2014 contract negotiations for 2015 RSCS

16    decided to retain a consultant?

17    A.  I am aware that there was a consultant involved about the

18    time I was there, yes.

19    Q.  Okay.  And was that -- do you recall the consultant was

20    McKinsey & Company?

21    A.  That was the McKinsey Company, yes.

22    Q.  Now, we'll get back to that in a moment.

23          Let me ask you to take a look at what's marked in that

24    tab as Government's Exhibit 9991.  And this has not been

25    admitted, so we are not going to publish it to the jury.  I am

Robert Lewis - Cross

1    just going to ask you to read it and see if -- I will wait

2    until you pull that up.

3           Do you recall having a discussion with Mr. Suerken or

4    Mr. McCormick that it would be a good strategic move for

5    Mr. McCormick, as the CEO of RSCS, to contact Pilgrim's

6    directly to ask for additional loads for the remainder of the

7    2014 contract year?

8    A.   I do remember that.

9    Q.   Okay.  And do you remember that, in fact, Mr. McCormick did

10   reach out and had a discussion with Mr. Lovette about trying to

11   acquire 30 to 40 additional loads for the remainder of the 2014

12   contract year?

13          MR. TORZILLI:  Objection, calls for hearsay.

14          THE COURT:  The question was whether he recalled that.

15   He can answer.

16   BY MR. McLOUGHLIN:

17   Q.   Do you recall that, sir?

18   A.   I was not on that phone call that I recall, so there is

19   nothing that I remember about it other than that it happened.

20   Q.   Okay.  And if you look at that document, sir, does

21   reviewing it refresh your recollection that the ask from RSCS

22   was 30 to 40 loads per week above the base for the rest of the

23   contract year?

24   A.   Again, I don't recall specifics about the conversation.

25   Q.   Okay.  But does it refresh your recollection that your

Robert Lewis - Cross

1    objective at the poultry group was to obtain at least another

2    30 to 40 loads per week for the remainder of the contract year?

3         MR. TORZILLI:  Objection.  The witness is reviewing

4    the document while answering a question about refreshing

5    recollection.

6         THE COURT:  It should be taken down.

7    A.  Answer?  No, I don't know.

8    BY MR. McLOUGHLIN:

9    Q.  Do you recall any discussion later with Mr. Suerken or any

10   others that Mr. McCormick had reached out and what the outcome

11   of the discussion was?

12   A.  Yes.

13   Q.  Okay.  And do you recall that discussion being in early

14   May -- or mid May, I should say?

15   A.  I do not remember when.

16   Q.  And do you recall what Mr. Suerken told you about that

17   discussion between Mr. Lovette and Mr. McCormick?

18   A.  My recollection is that Mr. McCormick called us together,

19   and, again it's recollection, said that no, that it was not

20   going to work.

21        MR. TORZILLI:  Objection, eliciting hearsay.

22        THE COURT:  Sustained.

23   BY MR. McLOUGHLIN:

24   Q.  After you had this discussion, did you take further steps

25   to secure additional loads of chicken for the remainder of the

2745

Robert Lewis - Cross

1  2014 contract year?

2  *A.*  I would say based on the date that that call was made, yes,

3  I likely did continue to pursue additional loads.

4  *Q.*  And do you recall earlier being asked about the various

5  communications that you had confirming supply for the 2014

6  contract year from Pilgrim's and from other suppliers?

7  *A.*  Yes.

8  *Q.*  And all of that was part of the process that includes the

9  call that Mr. McCormick made to Mr. Lovette; is that correct?

10  *A.*  Those five transactions that we discussed earlier today had

11  nothing to do with the call that Mr. McCormick made.  That

12  was -- I mean, it was related to supply, but it had nothing

13  specifically to do with the five deals, if you will, we made

14  with the suppliers.

15  *Q.*  But it was all part of the same process of acquiring

16  additional chicken for the 2014 contract year, correct?

17  *A.*  Yes.

18  *Q.*  Okay.  Sir, do you recall having discussions with various

19  people at Pilgrim's to get information for the consultants?

20  *A.*  No.

21  *Q.*  Let me ask you to look at Exhibit H-655 and H-656, please.

22  *A.*  Okay.

23  *Q.*  Actually, let me go back for a minute.  In your experience

24  in your prior 11 years with RSCS and its predecessor, do you

25  recall a circumstance where the CEO had to call around to a

Robert Lewis - Cross

1    supplier like Pilgrim's Pride to ask to buy chicken?

2    A.   No.

3    Q.   That's pretty unique, wasn't it?

4    A.   It was.

5    Q.   And Mr. McCormick was very focused on solving that problem,

6    wasn't he?

7    A.   Yes.

8    Q.   And to avoid understatement, that made Mr. Suerken and in

9    turn you very focused on solving that problem, didn't it?

10   A.   Yes.

11   Q.   And also in your experience in your career at RSCS and its

12   predecessor, had RSCS ever felt the need to hire an outside

13   consultant like McKinsey to analyze the market and advise on a

14   strategy with respect to supplying chicken?

15           MR. TORZILLI:  Objection to foundation.

16           THE COURT:  Overruled.  He can answer if he knows.

17   A.   I am not aware of any circumstances like that, no.

18   BY MR. McLOUGHLIN:

19   Q.   Again, this is pretty unique, wasn't it?

20   A.   Well, not knowing what they were actually doing there, I

21   guess to have a consultant in was a pretty unique situation for

22   us, yes.

23   Q.   Now, let me ask you to look at, as we said, H-655 and 656.

24           MR. TORZILLI:  Your Honor, if I may, our monitor at

25   the table is not working at this point.

Robert Lewis - Cross

2747

1     THE COURT:  Well, we'll have to address that at the

2  next break.  Thank you for letting me know, Mr. Torzilli.

3  BY MR. McLOUGHLIN:

4  Q.  Now, Mr. Lewis, H-655 is an e-mail that you sent on June 24

5  at 12:42 p.m. to Roger Austin of Pilgrim's with the subject

6  4-pound Bell Curve PowerPoint.  Do you see that?

7  A.  Yes.

8  Q.  And did you tell him you wanted to discuss that PowerPoint

9  with him again?

10  A.  Yes.

11  Q.  And H-656 is the attachment to that e-mail, which is the

12  4-pound live weight PowerPoint, which shows a distribution of

13  various companies and how they take various sizes of birds?

14  A.  Yes.

15     MR. McLOUGHLIN:  Your Honor, we would move the

16  admission of H-655 and H-656.

17     THE COURT:  Any objection to the admission of those

18  two exhibits?

19     MR. TORZILLI:  No objection to the cover e-mail, but

20  objection on hearsay grounds to the attachment.

21     MR. McLOUGHLIN:  Your Honor, we don't offer it for the

22  truth of the matter asserted, but for the fact that Mr. Lewis

23  inquired about it from Mr. Austin.  So it is not only for the

24  truth, but to put context into the request for information, so

25  it's not hearsay.

Robert Lewis - Cross

1     *THE COURT:*  Both exhibits will be admitted, the second

2     one, H-656, only for the -- not for the truth of the matter

3     asserted, but only for the effect on the listener, and both may

4     be published if you wish to.

5          *MR. McLOUGHLIN:*  Yes, please.  Can we first quickly --

6     can we publish that to the jury?

7          *THE COURT:*  Both of them can be published

8     simultaneously.

9     *BY MR. McLOUGHLIN:*

10    *Q.*  Now, sir, do you recall a discussion and information around

11    the characteristics of the market for live birds, including the

12    distribution of what companies buy those birds to make

13    assessments about the supply and demand?

14    *A.*  I don't recall the discussion specifically, but I'm not --

15    I don't doubt that it happened.

16    *Q.*  Okay.  And at this point in time, sir, McKinsey & Company

17    had been retained by RSCS; is that correct?

18    *A.*  I am sorry, what was the date?  I'm sorry, please repeat.

19    *Q.*  By the date of your e-mail, sir, June 24, RSCS had retained

20    McKinsey to evaluate the market.

21    *A.*  I cannot remember that for certain, so, no, I don't know.

22    *Q.*  I can show you an exhibit to refresh your recollection, but

23    if I told you that the kickoff presentation is dated June 12,

24    2014, and you can turn to the tab if you like, would that

25    refresh your recollection that at that point McKinsey had

Robert Lewis - Cross

1    already been retained?

2            *MR. TORZILLI:*  Objection.

3    *A.*  Which tab?  I am sorry.

4    *BY MR. McLOUGHLIN:*

5    *Q.*  It would be DX-C-576.

6    *A.*  I am sorry, here it is.  I don't recall ever seeing this

7    presentation.

8    *Q.*  Does the date, though, refresh your recollection that by

9    2012 the project had started -- by June 12, 2014, the project

10   had begun?

11           *MR. TORZILLI:*  Objection, request that the witness not

12   refer to the document when answering to refresh recollection.

13           *THE COURT:*  Then take it down.  He can answer.

14   *A.*  It would appear that was the kickoff of their involvement,

15   but, again, I don't remember it.  I am just going by the date

16   that's indicated.

17   *BY MR. McLOUGHLIN:*

18   *Q.*  Okay.  Now, sir, I am going to ask you to skim through that

19   exhibit and tell me if there are any of the individual pages

20   that look familiar to you.

21   *A.*  A couple of the graphs that are on page 14 are familiar.

22   Those are things that we've used in our day-to-day work before.

23   *Q.*  Are there any others, sir?

24   *A.*  I don't recognize any of the other pages.

25   *Q.*  And do the graphs on page 14 remind you of the various

Robert Lewis - Cross

1    themes we have been talking about throughout today?  The

2    chicken consumption has been rising during the period, and it

3    is closely related to pork and beef prices which continued to

4    rise?

5    A.  Yeah, again, that's information that we would have looked

6    at from time to time in the regular course of business.

7    Q.  Now, if you will turn to page 16.  Does that refresh your

8    recollection that a cost breakdown was done that showed the

9    differential in the supplier margin between a large bird, a

10   6.6-pound bird, and a small bird, a 2.8-pound bird, for

11   purposes of your analysis?

12        MR. TORZILLI:  I am going to object.  He testified he

13   doesn't recall ever seeing this document.

14        THE COURT:  Sustained.  He indicated that he didn't

15   recognize this page, among others.

16   BY MR. McLOUGHLIN:

17   Q.  Sir, if RSCS had retained a consultant at a significant sum

18   to advise it on the market strategy and to help develop a

19   market strategy, would you have expected that you, as the point

20   person for the negotiation of that strategy, would have been

21   kept well informed about that effort?

22        MR. TORZILLI:  Objection to lack of foundation and

23   speculation.

24        THE COURT:  Overruled.  He can answer if he knows.

25   A.  You used some words that would indicate to me that's a

Robert Lewis - Cross

1   hypothetical question.  I don't feel I am equipped to answer

2   it.

3   BY MR. McLOUGHLIN:

4   Q.  It's not hypothetical, sir.  It's asking for your opinion

5   about a fact.  You testified you have never seen this document

6   before, correct?

7   A.  Correct.

8   Q.  It is labeled a kickoff meeting for a very expensive

9   consultant that RSCS hired to advise about market strategy for

10  purchasing chicken; isn't that correct?

11        MR. TORZILLI:  Objection, assumes facts not in

12  evidence.

13        THE COURT:  He can answer if he knows.

14  A.  My focus during this time, sir, was on supply and pricing

15  contracts.

16  BY MR. McLOUGHLIN:

17  Q.  Sir, I didn't ask you about your focus.

18  A.  I took very little interest, sir, in what McKinsey was

19  doing.  In fact, I had forgotten they were there until I was

20  prompted by an attorney a few weeks ago, so I remember nothing

21  about them being there or any interaction I might have had with

22  them.

23  Q.  And that's -- thank you for that, but that doesn't answer

24  my question.

25        MR. McLOUGHLIN:  So I am going to ask, if I may, Your

2752

Robert Lewis - Cross

1    Honor, to have the court reporter read my question back so that

2    the witness can answer it.

3         THE COURT:  Yes, you may.

4    BY MR. McLOUGHLIN:

5    Q.  I am going to ask you to listen carefully to my question

6    and answer that one.

7         (The record was read by the court reporter.)

8    A.  Could you rephrase the question for me?  I am not sure I

9    can answer it.

10   BY MR. McLOUGHLIN:

11   Q.  All right.  We will try this way.  As the point person

12   responsible for negotiating the contracts to acquire chicken

13   for the 2015 year, would you have expected that as this

14   consulting work was done, you would have been kept informed

15   about the information that was provided about the markets and

16   the strategy that was developed?  Yes or no?

17   A.  No.

18   Q.  And you didn't feel at the time that it was important.  You

19   said you ignored McKinsey.  You didn't feel at the time that

20   this expensive consultant studying supply and demand and the

21   market would be useful information for you?  Is that your

22   testimony?

23        MR. TORZILLI:  Objection as to what he felt at the

24   time being relevant.

25        THE COURT:  Overruled.  He can answer.

Robert Lewis - Cross

1    *A.*  I was a temporary employee focusing on supply and pricing,

2    and I was not the main point guy for the business.  That would

3    have been a permanent employee by the name of Peter Suerken,

4    Pete Suerken.  So I would expect and anticipate that anything

5    regarding what McKinsey would have been doing would have been

6    directed toward him, not me as a temporary employee.

7    *BY MR. McLOUGHLIN:*

8    *Q.*  But didn't you earlier say that you were the point person

9    on the negotiations and that all price-related information

10   wound up with you and that you and Mr. Suerken discussed the

11   strategy?  Didn't you say all of those things?

12   *A.*  I did say that.

13   *Q.*  Okay.  And wasn't this very expensive consultant integral

14   to the formation of the strategy?

15         *MR. TORZILLI:*  Objection, assumes facts that are not

16   in evidence.

17         *THE COURT:*  Overruled.  He can answer.

18   *A.*  The strategy that you are referring to had nothing to do

19   with 2015 negotiations on my part.  We had already met as a

20   team and developed our strategy, and it was already beginning

21   to develop.  And I do not recall anything out of the McKinsey

22   study that was used in the 2015 negotiations.

23   *BY MR. McLOUGHLIN:*

24   *Q.*  Did you see the McKinsey final report that came about six

25   weeks after this kickoff meeting?

Robert Lewis - Cross

1   *A.*  I don't recall seeing a final report.

2   *Q.*  Did you discuss a final report with Mr. Suerken?

3   *A.*  I don't recall discussing the final report with

4   Mr. Suerken.

5   *Q.*  Isn't it true that some of the recommendations from the

6   McKinsey report were, in fact, incorporated into the 2015

7   negotiating strategy, including having a three-year contract?

8           *MR. TORZILLI:*  Objection, lack of foundation.

9           *THE COURT:*  He can answer if he knows.  Overruled.

10  *A.*  I don't recall that.

11  *BY MR. McLOUGHLIN:*

12  *Q.*  You don't recall one way or the other?

13  *A.*  No, I don't.

14  *Q.*  Okay.  Let me ask you to look at Exhibit I-829.  And I-829,

15  sir, is a meeting invitation from Pete Suerken to a number of

16  people at Pilgrim's, including Roger Austin, with the subject

17  Pilgrim's Pride Small Bird Discussion with McKinsey, to be held

18  at the Bell Grande conference room at RSCS on June 27th at

19  noon.  Do you see that?

20  *A.*  Yes.

21          *MR. McLOUGHLIN:*  Your Honor, we would move the

22  admission of I-829.

23          *THE COURT:*  Any objection to the admission of I-829?

24          *MR. TORZILLI:*  It's hearsay.

25          *MR. McLOUGHLIN:*  Your Honor, the calendar invitation

Robert Lewis - Cross

1    would not be hearsay, Your Honor.  It would be an ordinary

2    business record.

3         THE COURT:  Mr. Torzilli, go ahead.

4         MR. TORZILLI:  At a minimum, the subject that is

5    there, those words, Pilgrim's Pride and then the subsequent

6    words, would be hearsay written by someone for their truth, and

7    it's a business record exception to hearsay.  803(6) hasn't

8    been established.

9         MR. McLOUGHLIN:  Your Honor, these calendar

10   invitations, which are ordinary business records, are kept in

11   the ordinary course of business.

12        THE COURT:  The objection to I-829 will be overruled.

13   It's a calendar invitation, and it does not constitute hearsay,

14   and I will overrule the objection as to the subject line.

15        I-829 will be admitted.

16   BY MR. McLOUGHLIN:

17   Q.  And do you recall, sir, that there was actually a meeting

18   set up for Pilgrim's Pride to meet with McKinsey to give them

19   Pilgrim's Pride's perspective on the condition of the chicken

20   market in 2014 going into 2015?

21   A.  I do not recall that.

22   Q.  And do you recall there was also such a meeting with other

23   chicken suppliers -- or such meetings, plural, with other

24   chicken suppliers?

25   A.  I recall meeting with George's about their August 12

Robert Lewis - Cross

1    proposal which contained a lot of information.  That's the only

2    one I recall.

3    Q.  So you don't recall attending any of the meetings between

4    McKinsey and any of the suppliers that were set up?

5    A.  I don't.  My focus was in a total different direction, sir.

6    I don't recall.

7    Q.  Let me ask you to look at Exhibit D-445, please.

8         MR. McLOUGHLIN:  Your Honor, while the witness is

9    reviewing that, can we publish the exhibit, please?

10        THE COURT:  Which one?

11        MR. McLOUGHLIN:  The calendar invite, I-829.

12        THE COURT:  I-829?

13        MR. McLOUGHLIN:  Yes, sir.

14        THE COURT:  Yes, you may.

15        MR. McLOUGHLIN:  Thank you.

16   A.  I don't recall this.

17   BY MR. McLOUGHLIN:

18   Q.  I am going to ask you to just look through it and see if

19   there are any individual pages that you recall having seen.

20   A.  Some of these pages look familiar.

21   Q.  Which pages look familiar, sir?

22   A.  I can give you examples, unless you want me to go back

23   through every page again.

24   Q.  You can give examples.  That will be fine.

25   A.  Looks like 166.

Robert Lewis - Cross

1   Q.   What's the title of 166, sir?

2   A.   Annual Production Derived From One Pedigree Female.

3   Q.   I really couldn't hear you.  Can you repeat that, please?

4   A.   I am looking at the number at the bottom, ends with 166.

5   Q.   Yes, sir.  What is the title of the chart?

6   A.   Annual Production Derived From One Pedigree Female.

7   Q.   So there was information provided to you about the time lag

8   to get from breeders and eggs to final production of small

9   birds to appreciate the fact that it took a long time to

10  increase supply; is that correct?

11  A.   Yes.  If you start from scratch, certainly it does.

12  Q.   What other charts there do you recognize as examples?

13  A.   The charts that appear in pages 170, 171.

14  Q.   And 170 is titled Pullet Placements.  Is that also a chart

15  related to supply, sir?

16  A.   Pullet Placements, yes.

17       MR. TORZILLI:  I am going to object to continued

18  questions about a document that's not in evidence.

19       MR. McLOUGHLIN:  Your Honor, if this refreshes his

20  recollection, he has seen it, and I believe I am entitled to

21  ask him about the subject.

22       THE COURT:  You can.  He should identify them just by

23  page number and not by title.  They are not in evidence.

24       MR. McLOUGHLIN:  Yes, sir.

25  BY MR. McLOUGHLIN:

Robert Lewis - Cross

1    Q.   And what's the next page you recall, sir?

2    A.   Page 171.

3    Q.   And does page 171 refresh your recollection that you were

4    informed that over the past several years that the pullet or

5    young chicken placements had been dropping which had restricted

6    supply?

7             MR. TORZILLI:   Objection.   The witness is reviewing

8    the document while being asked the question as to whether it

9    refreshes his recollection.

10            THE COURT:   He can answer now.

11   A.   The ones that I am pointing out primarily are those that

12   were from Express Markets.   Express Markets was a subscription

13   service that we were part of, were a member of for a period of

14   time, and this kind of information was often in the reports

15   that they sent us.

16   BY MR. McLOUGHLIN:

17   Q.   Okay.   And in the course of the negotiations, did you

18   review information from Express Markets?

19   A.   No.   I don't recall doing that.

20   Q.   So if I understand you correctly, there was a market

21   information resource available, but you don't recall ever

22   looking at it.

23   A.   Not during the negotiations, no.

24   Q.   Okay.   Now, sir, do you recall I asked you earlier about

25   your e-mails to Mr. Austin asking him for a follow-up

Robert Lewis - Cross

1    discussion with respect to the distribution of chicken by

2    weight by supplier?  Do you recall having a discussion with

3    Mr. Austin about that?

4    A.   I do not recall, but I don't doubt that it happened.

5    Q.   Okay.  And was Mr. Austin and Pilgrim's generally very

6    responsive to your request for information?

7    A.   Yes, he was.

8    Q.   Now, sir, I am going to ask you to take a look at I-492.

9    And you can look at whatever pages you like, but I am going to

10   specifically ask you to read page 3 of that document.

11   A.   Okay.

12   Q.   Now, sir, RSCS had a board of directors, did it not?

13   A.   Yes.

14   Q.   And that board of directors met periodically?

15   A.   Yes.

16   Q.   And that board of directors kept minutes of its board

17   meetings in the ordinary course of its business, did it not?

18   A.   I would have to assume that.  I don't know that for

19   certain.

20   Q.   Okay.  And, sir, Exhibit 492 you will see has a number down

21   there at the bottom below the label that begins RSCS030070.  Do

22   you see that?

23   A.   3-0-0 --

24   Q.   The very first page of the document right below the blue

25   label.

2760

Robert Lewis - Cross

1   A.  It's redacted here.  It doesn't have a number.

2   Q.  Okay.

3          MR. McLOUGHLIN:  Your Honor, if I may just hand the

4   witness my copy for 30 seconds?

5          THE COURT:  You may.

6   BY MR. McLOUGHLIN:

7   Q.  You see that number down there?

8   A.  Yes, sir.

9   Q.  I will represent to you that that indicates that it was a

10  document produced by RSCS to the government which was in turn

11  produced to the defendants.

12         Now, sir, I am going to ask you to go to page 3 and

13  look at the fourth paragraph.

14  A.  Okay.

15  Q.  And read the fourth paragraph, the fifth paragraph, and the

16  sixth paragraph to yourself.

17         MR. TORZILLI:  Object to questions on a document

18  that's not in evidence.

19         THE COURT:  He is just asking him to read it so far.

20  We'll see what the question is.  Overruled.

21         MR. McLOUGHLIN:  Your Honor, while the witness is

22  reading, can we have a side bar?

23         THE COURT:  Yes, you may.

24     (At the bench:)

25         THE COURT:  Go ahead.

Robert Lewis - Cross

1        MR. McLOUGHLIN:  Your Honor, at this point while

2    everyone is taking their stretch, we would move the admission

3    of the board minutes.  In support of that request, this is a

4    document kept in the ordinary course of business by RSCS.  It

5    was produced by RSCS to the government.  And we are moving it

6    because also of its independent legal significance with respect

7    to RSCS adopting the recommendations of McKinsey regardless of

8    the truth of the matter asserted with respect to what those

9    recommendations were, but that fact of adopting those

10   recommendations has independent legal significance, but also as

11   an ordinary business record we believe it is admissible.

12        THE COURT:  Mr. Torzilli?

13        MR. TORZILLI:  Your Honor, I believe, and we are going

14   to check, this was already refused, I believe, when offered by

15   the defendants.  But it's our position that this document is,

16   of course, hearsay and that in order for it to be -- meet the

17   requirements of 803(6), the requirements that are provided for

18   in the rule need to be established.  I don't believe they have

19   been established, and I would request that I have the

20   opportunity to inquire of the witness additional information

21   that I think would clarify that he doesn't have knowledge to be

22   able to lay 803(6) foundation for this document.

23        In terms of independent legal significance -- and I

24   have just been handed a note that says that it was refused on

25   the prior occasion that defendants tried to offer it, and I

2762

Robert Lewis - Cross

1    will note that the witness through which it was intended to be

2    offered actually attended the meeting.  I believe it was

3    Mr. Suerken.  And Mr. Lewis didn't attend the meeting, and I

4    can establish that through voir dire, if necessary.

5           But there is no independent legal significance here in

6    any way.  This isn't a contract or a bid which are types of

7    contracts that Your Honor has during the course of this trial

8    viewed as documents with independent legal significance, so it

9    wouldn't qualify on that basis.  And because it doesn't qualify

10   on that basis or as a business record of RSCS, we would object

11   and ask that it continue to be refused.

12          *THE COURT:*  Mr. McLoughlin?

13          *MR. McLOUGHLIN:*  Your Honor, I am not specific as to

14   the prior occasion, but I believe it might have been at the

15   first trial, but these kind of documents, board of directors

16   minutes, we believe are generally held to be ordinary-course

17   business records that are admissible as a hearsay exception.

18   And Your Honor can take notice of the fact that such board

19   minutes are ordinary-course documents that are maintained where

20   there is a high interest of the organization in accuracy and

21   that they, therefore, meet the requirements of the rule.

22          *THE COURT:*  All right.  The admission will be refused.

23   As you will recall, the Pilgrim's board minutes came in because

24   Mr. Sangalis was able to testify about the fact that those

25   meetings were checked for accuracy and were an accurate

Robert Lewis - Cross

1    reflection of what occurred at the business meeting, and he,

2    otherwise, established the business record exception.

3           We've had no testimony from anyone that these board

4    minute meetings are accurate, that there was an attempt to make

5    sure that they were accurate.  And as a result, we have had no

6    foundation for them being business records.

7           Moreover, I agree with Mr. Torzilli about their

8    independent legal significance.  They are simply some board

9    meeting minutes, and in itself they don't have any independent

10   legal significance.  They are unlike, for instance, a contract

11   or something that does, but these are just board minutes, so we

12   don't have any foundation for that either.

13      (In open court:)

14   *BY MR. McLOUGHLIN:*

15   *Q.*  Mr. Lewis, did Mr. Suerken ever tell you that the board of

16   directors had adopted the recommendations of McKinsey?

17           *MR. TORZILLI:*  Objection, calls for hearsay.

18           *THE COURT:*  Sustained.

19   *BY MR. McLOUGHLIN:*

20   *Q.*  Do you recall, sir, that the board of directors of RSCS

21   adopted the recommendations of McKinsey?

22   *A.*  I do not.

23   *Q.*  You have no recollection whatsoever?

24   *A.*  No, sir.

25   *Q.*  Do you have a recollection that anybody told you that you

Robert Lewis - Cross

1   should pursue a particular strategy and provide you with any

2   McKinsey reports?

3   *A.*  I have no recollection.

4   *Q.*  Let me ask you, sir, to look at Exhibit F-816.  Actually,

5   first, sir, if you could look at Exhibit F-811.

6          *MR. TORZILLI:*  Your Honor, may we have a brief side

7   bar?

8          *THE COURT:*  Yes.

9       (At the bench:)

10          *THE COURT:*  Mr. Torzilli?

11          *MR. TORZILLI:*  Just very briefly, Your Honor, I

12   noticed with the front page of this document being displayed on

13   the screen that there is a redaction.  There are two

14   redactions.  And it appears the redactions are both for the

15   confidentiality designation in the lower right-hand corner, but

16   also the confidentiality marking that was placed on it in the

17   ordinary course of business.  And I recognize Your Honor's

18   direction to redact the confidentiality designations, so the

19   designations made as part of the litigation or the

20   investigation, but to leave the confidentiality stickers or

21   footers that are emblazoned in the ordinary course.  So I

22   wanted to raise the issue obviously outside the presence of the

23   jury to ensure that the distinction continues to hold.

24          *THE COURT:*  I know that the exception was those RSCS

25   cover pages which we talked about at great length.  This is

Robert Lewis - Cross

1    something different.

2            Response, Mr. McLoughlin?

3            *MR. McLOUGHLIN:*  Your Honor, if the document has to be

4    modified after the examination to conform with the Court's

5    instructions, we can do that.  We can show any portion that's

6    published to the jury without the lower section, and I am sure

7    they will not appreciate at all that that is missing, and then

8    we will provide it to them.

9            *THE COURT:*  Is that acceptable to you, Mr. Torzilli?

10           *MR. TORZILLI:*  Yes, it is.

11           *THE COURT:*  In other words, something that was added,

12   a confidentiality indication that was added during litigation

13   may be redacted.  Something that was added contemporaneous with

14   the creation of the document should not be.

15           *MR. McLOUGHLIN:*  Your Honor, I am informed it's

16   already been corrected.

17           *THE COURT:*  That is the power of Mr. Fronzaglia.

18   Thank you.

19       (In open court:)

20   *BY MR. McLOUGHLIN:*

21   *Q.*  Mr. Lewis, F-811 is titled COB Negotiations Update,

22   September 15, 2014, correct?

23   *A.*  Correct.

24   *Q.*  And that was a document that was prepared by the poultry

25   group, was it not, to provide an update to the senior

2766

Robert Lewis - Cross

1    management of RSCS, its board and senior executives of KFC; is

2    that correct?

3    A.  I am not certain who prepared it, but it is focused on

4    chicken on the bone or poultry, so I would assume that the

5    poultry team put it together.

6    Q.  Okay.  And in preparing this -- with the poultry team

7    preparing it, the poultry team would have made it as accurate

8    as possible knowing that senior management at RSCS, the board

9    and the KFC senior management were going to rely upon it,

10   correct?

11        MR. TORZILLI:  Objection, assumes facts not in

12   evidence.

13        THE COURT:  He can answer if he understands.

14   A.  I assume that would be the case, yes.

15   BY MR. McLOUGHLIN:

16   Q.  And I believe you testified earlier that these kind of

17   updates were prepared in the ordinary course of business to

18   keep senior executives and others informed about the progress

19   of negotiations and the poultry group's work?

20   A.  Yes.

21   Q.  And the poultry group tried to make them as accurate as

22   possible.

23   A.  Yes.

24   Q.  And you yourself as the point person in the ordinary course

25   of business, you would have been provided this report before it

Robert Lewis - Cross

1    was published to check it or at least be sure that your portion

2    was accurate.

3            MR. TORZILLI:  Objection, foundation, calls for

4    speculation.

5            THE COURT:  Overruled.  He can answer if he knows.

6    A.  I would assume, given my experience and the involvement in

7    what was going on there, they would have approached me with

8    this, yes.

9    BY MR. McLOUGHLIN:

10   Q.  And you would have made any corrections you felt necessary,

11   right, because you wanted it to be accurate.

12   A.  Yes.

13           MR. McLOUGHLIN:  Your Honor, we would move the

14   admission of Exhibit F-811.

15           THE COURT:  Any objection to the admission of F-811?

16           MR. TORZILLI:  It's hearsay.  The witness has used in

17   his previous answers the word "assumed," so he has not --

18   doesn't have the requisite knowledge to establish the 803(6)

19   requirements for it to be an exception to hearsay.

20           THE COURT:  Anything else, Mr. McLoughlin?

21           MR. McLOUGHLIN:  No, Your Honor.

22           THE COURT:  All right.  The exhibit will be refused.

23   I find it does not fall within the business record exception.

24   BY MR. McLOUGHLIN:

25   Q.  Mr. Lewis, take a look at page No. 5 and the chart there.

Robert Lewis - Cross                                                 2768

 1   You've testified that there was a significant profit margin

 2   differential between big birds and small birds that RSCS had to

 3   try to accommodate or correct in order to maintain small-bird

 4   supply; is that right?

 5   A.   Would you mind asking that again, please?

 6   Q.   Sure.  You've testified that you and RSCS understood that

 7   there was a differential between the profitability of small

 8   birds and large birds, large birds being more profitable, and

 9   you had to address that small-bird deficit in order to ensure

10   small-bird supply; isn't that right?

11   A.   Yes.

12   Q.   And does page 5 of this report refresh your recollection

13   that the poultry group calculated or estimated what that

14   differential was in September of 2014 at the time this was

15   prepared and that that differential was somewhere around

16   76 cents per bird?

17        MR. TORZILLI:  Objection to the question asked about

18   refreshing recollection of the witness while he is reviewing

19   the document.

20        MR. McLOUGHLIN:  He is entitled to review the

21   document, Your Honor, to refresh his recollection.

22        THE COURT:  Let's take the exhibit down and see if his

23   recollection has been refreshed.

24        If you could rephrase the question, Mr. McLoughlin.

25   BY MR. McLOUGHLIN:

Robert Lewis - Cross

1    Q.  Mr. Lewis, does looking at page 5 refresh your recollection

2    that in analyzing this differential between small bird and

3    large bird, the poultry group looked at data and came to the

4    estimation that the differential was about 76 cents per bird?

5    A.  I don't recall this, and I don't know what the source of

6    this information was.

7    Q.  Okay.  So you have no recollection of any discussion?

8    A.  No.

9    Q.  Okay.  We are about finished, sir.

10          The thing that I would ask you is we've gone over the

11   fact that RSCS hired a consultant.  We have gone over these

12   market documents.  You have testified, if I am summarizing

13   fairly, that you have no recollection of any of them.  But you

14   testified earlier that you were hoping for a price increase of

15   3 to 5 cents for the 2015 contract year; is that fair?

16   A.  That was kind of the maximum goal that we established.  I

17   don't know that that's in writing anywhere.  It was just a

18   discussion.  But, yes, that's in the range.

19   Q.  And that goal was based on your -- in large part on your

20   review of the 2014 contracts, correct?

21   A.  Yes.

22   Q.  And you knew at the time that the 2014 contracts were at

23   below-market rates, didn't you?

24   A.  No, I didn't know that.

25   Q.  You believed them to be market rates.

Robert Lewis - Cross

1    *A.* I believed the 2014 prices were generated off the 2013

2    prices.  And as a general rule, even going back to when I was a

3    permanent employee, changes amounted to just pennies, like 1 or

4    2 cents, so 3 to 5 we felt was a pretty aggressive number.

5    *Q.* Okay.  So you based your projection of what the increase

6    would be based on the past history of 2014 to 2013 and your

7    projection that the same kind of rules would hold; is that

8    fair?

9    *A.* That's fair.

10   *Q.* And so, in fact, your opinion based on those isolated

11   contracts did not in any way, shape, or form take into account

12   any of the market forces and the supply and demand forces that

13   RSCS hired McKinsey to evaluate and that other people were

14   analyzing but apparently didn't tell you; isn't that correct?

15           *MR. TORZILLI:* Objection to form and foundation.

16           *THE COURT:* Overruled.

17   *A.* When you consider the magnitude of the volume that KFC

18   consumes --

19   *BY MR. McLOUGHLIN:*

20   *Q.* Sir, the answer to my question is yes or no.

21   *A.* No.

22   *Q.* Didn't you testify that you didn't do any market analysis

23   in response to a question from Mr. Gillen?

24   *A.* I did.

25   *Q.* Okay.  So if you didn't do any market analysis and nobody

Robert Lewis - Cross

1   told you about the McKinsey analysis, then when you came up

2   with 3 to 5 cents based on the 2013 and the 2014 contract

3   alone, you didn't do any market analysis for the upcoming 2015

4   year and current market conditions in 2014 to reach that

5   3 cents to 5 cents; isn't that true?

6   A.  If you put in the word "extensive" review of the market,

7   that would be true, but we were obviously aware that there was

8   a shortage of small birds and that the suppliers claimed that

9   there was a much larger margin for the big birds, so we took

10  that into consideration.

11  Q.  But you didn't measure it or go looking for measurements.

12  At least you, Mr. Lewis, didn't, right?

13  A.  The reason we have cost-plus models is that there is no

14  reliable market out there that would feed information to us

15  about poultry.

16  Q.  You hired an expensive consultant to try to figure it out,

17  didn't you?

18        MR. TORZILLI:  Objection, misstates testimony.

19  A.  That was not my decision, sir.

20  BY MR. McLOUGHLIN:

21  Q.  So RSCS did it, and it sounds like you didn't much agree

22  with it, did you?

23  A.  To be honest, I did not agree with it to the extent that I

24  thought they were in there to question what we might be doing.

25  I don't know.

Robert Lewis - Cross

1   Q.  And that's one of the reasons you just didn't take any

2   pains to educate yourself about what they were doing and what

3   outcomes that came out of that analysis, right?  You just

4   didn't agree with hiring them.

5   A.  I knew that I was going back into retirement, and, you're

6   right, I didn't much care what the outcome of that was.

7   Q.  Perfectly fair.  But that also means, sir, that when you

8   were hoping for 3 to 5 cents, it wasn't based on any market

9   analysis of current conditions because you just didn't look

10  except for those 2013 and 2014 contracts; isn't that true?

11  A.  No, I'm not going to say yes to that answer.  I know you

12  are trying to get me to yes, but I'm not going to say yes.

13  Q.  You knew there was a problem.  Let's just leave it at this.

14  You knew there was a problem with the lack of supply of small

15  birds, right?

16  A.  Yes.

17  Q.  And you knew it was absolutely unique, because you had just

18  offered to spend $1.45 a pound to buy birds on the spot market,

19  and you couldn't buy all that you wanted; isn't that also true?

20  A.  Those four or five transactions for that incremental

21  product had nothing to do with the 2015 negotiations.

22  Q.  Isn't it true that the conditions in the spot market are

23  one factor that is indicative of what the overall market for

24  eight-piece COB was in the fall of 2014?

25  A.  Yes.

Robert Lewis - Cross

1   *Q.* And you had never before in the past had a problem buying

2   chicken on the spot market if you needed it at a price that was

3   a heck of a lot closer to your contract price; isn't that true?

4   *A.* Before that, yes.

5   *Q.* But all of the sudden for the first time in your career,

6   you're offering to pay virtually a 50-percent premium over your

7   contract price, and you couldn't get all that you wanted.

8   Didn't that tell you something about the market?

9   *A.* We did get all that we needed.

10  *Q.* At a buck 45, right?

11  *A.* Yes, sir. And if you put that in perspective, $1.30 --

12  well, $1.23 to $1.45, that was on less than 1 percent of our

13  total annual consumption. So to me, that was a very small

14  commitment at a premium price that saved KFC from closing

15  restaurants.

16  *Q.* I am not asking about saving KFC from closing restaurants,

17  sir. I am asking what that would have told a reasonable person

18  in your position about the conditions of pricing and demand and

19  supply in the market.

20        And isn't it true, sir, that you knew that you were

21  looking at a mountain, but you just didn't know how high it

22  was, and you decided not to go and try to figure out how to

23  measure it? That's why you were shocked.

24        *MR. TORZILLI:* Objection, argumentative. Objection to

25  a reasonable person in his position. Objection to foundation.

Robert Lewis - Cross

1          THE COURT:  Overruled.

2     A.  I guess all of us would do things differently sometimes or

3     do them better if we knew, if we had 20/20 vision.  I am not

4     going to say did everything happen perfectly, but we did the

5     best we can.  We covered the supply that was needed.  Yes, we

6     paid a premium, but we felt like it was certainly justified

7     when you're talking about less than 1 percent of the total

8     annual volume.

9     BY MR. McLOUGHLIN:

10    Q.  And as you sit here today, sir, based on conditions in the

11    market in the fall of 2014, you have no knowledge that there

12    was chicken sitting around unspoken for that you could have or

13    should have bought at a lower price than the price that you

14    paid.

15    A.  True.

16         MR. McLOUGHLIN:  Thank you, sir.

17         THE COURT:  All right.  Ladies and Gentlemen, let's

18    take our mid-afternoon break.  Plan on reconvening at 3:30.

19    The jury is excused for the mid-afternoon break.

20         (Jury excused.)

21         THE COURT:  We will be in recess.  Thank you.

22    3:30 p.m.

23         (Recess at 3:15 p.m. until 3:30 p.m.)

24         THE COURT:  Let's get Mr. Lewis.

25         (Jury present.)

2775

Robert Lewis - Cross

1          THE COURT:  Mr. Pollack, go ahead.

2                          **CROSS-EXAMINATION**

3     *BY MR. POLLACK:*

4     *Q.*  Mr. Lewis, my name is Barry Pollack, and along with my

5     colleague, Wendy Johnson, we represent Ric Blake.

6          Mr. Lewis, you have been talking about the period in

7     2014 where RSCS was accepting bids for a contract that would

8     begin in 2015; is that correct?

9     *A.*  Correct.

10    *Q.*  And the process is generally you request pricing.  There is

11    some dialogue.  Bids are made.  There is further dialogue,

12    feedback, negotiation.  There is subsequent rounds of bids, and

13    then ultimately you negotiate an actual contract, correct?

14    *A.*  Correct.

15    *Q.*  And each bid is essentially a proposal from a supplier for

16    a future contract; is that correct?

17    *A.*  That's correct.

18    *Q.*  And once the contract is entered into, then throughout that

19    contract term there are different pricing periods, correct?

20    *A.*  That's correct.

21    *Q.*  And a period price or the current price is a price that's

22    already locked in under an existing contract, correct?

23    *A.*  I am sorry, repeat that, please.

24    *Q.*  Sure.  A period price is a price that's already locked in

25    by an existing contract.

2776

Robert Lewis - Cross

 1    *A.*  A period price is different from a contract price.  A

 2    contract price is a firm agreement between the supplier and

 3    RSCS.  A period price is the contract price that has been

 4    adjusted for feed cost.

 5    *Q.*  Correct.  But there is no new RFP, no new negotiation over

 6    that period price.  The period price is set by the existing

 7    contract and the current cost of grain, correct?

 8    *A.*  That's correct.

 9    *Q.*  And so throughout the year, each supplier in any given

10    period has a period price, correct?

11    *A.*  That's correct.

12    *Q.*  And that's their current price, correct?

13    *A.*  That's their current price for that four-week period, yes.

14    *Q.*  So, for example, in August of 2014 at the same time that

15    RSCS is accepting bids for a contract to begin in 2015, each

16    supplier has a current period price that is in existence that's

17    based on the 2014 contract, correct?

18    *A.*  That's correct.

19    *Q.*  And if a supplier does not know what the other suppliers

20    are bidding, doesn't know the amount that they are going to

21    bid, but knows their period -- their current period prices,

22    would knowing the current period prices allow them to figure

23    out what their competitors were bidding for the upcoming

24    contract?

25              *MR. TORZILLI:*  Objection, lack of foundation, calls

Robert Lewis - Cross

1    for speculation.

2         THE COURT: Overruled.  He can answer.

3    A.  The period price is confidential information and should not

4    be shared with anyone outside the suppliers' offices, and RSCS

5    offices, which means they are not to be shared with another

6    supplier.

7    BY MR. POLLACK:

8    Q.  I understand that you did not want the suppliers to know

9    each other's period prices, but I am asking a slightly

10   different question.  If a supplier did know their competitors'

11   period pricing, would that alone allow them to figure out what

12   the competitors were going to bid in response to the pending

13   RFP?

14   A.  I think it would perhaps provide some direction on what

15   price to bid.

16   Q.  Would it allow them to figure out what the others were

17   going to bid, the actual amount of the bids?

18   A.  Because RSCS instructed the suppliers to book the grains,

19   those prices would be about the same by supplier, so those

20   prices are going to be -- the change in those prices is going

21   to be similar from period to period.

22   Q.  And do you recall me asking you at a previous proceeding:

23   Let's say I learned what all the suppliers' period prices were

24   for that period.  I knew what their current prices are.  Would

25   that alone allow me -- I am sorry, would that alone tell me

Robert Lewis - Cross

1  what they are going to bid in response to an RFP for next

2  year's contract?

3            And your answer was:  No.

4            Do you recall that?

5  A.  I would still say no.

6  Q.  Okay.  Now, during your direct exam with Mr. Torzilli, he

7  asked you who the suppliers were that were participating in the

8  bidding process for the 2015 contract.  Do you recall that?

9  A.  Yes.

10 Q.  And you listed the various suppliers, correct?

11 A.  Correct.

12 Q.  One of which was George's, correct?

13 A.  Correct.

14 Q.  He then asked you who your counterpart was at each of the

15 suppliers against whom you were negotiating.  Do you recall

16 that?

17 A.  Yes.

18 Q.  Except there was one supplier he did not ask you that

19 question about.  He didn't ask you who at George's you

20 negotiated with.

21 A.  Actually, I don't recall.

22 Q.  Okay.  Well, the fact of the matter is at George's you

23 negotiated with a gentleman named Darrel Keck; is that correct?

24 A.  That's correct.

25 Q.  And in addition to negotiating with Mr. Keck,

Robert Lewis - Cross

1    Charles George, who was one of the twin brothers who ran

2    George's, would also become involved with respect to final

3    price decisions; is that correct?

4    A.  Yes, he would.

5    Q.  Mr. Torzilli also asked you about a series of e-mails that

6    you sent out on August 7th asking for the suppliers to submit a

7    bid by August 19th.  Do you remember that?

8    A.  Yes.

9    Q.  He did not show you 1221-1, although I believe he did move

10   it into evidence.

11       MR. POLLACK:  If the Court could confirm that, I would

12   like to publish that to the jury.

13       THE COURT:  It has been admitted.

14       MR. TORZILLI:  If I may, Your Honor, it's 1221-1 that

15   was admitted into evidence.

16       THE COURT:  Yeah, I think that's what Mr. Pollack

17   said.  1221-1 has been admitted and may be published.

18       MR. POLLACK:  Thank you, Your Honor.

19   BY MR. POLLACK:

20   Q.  Mr. Lewis, this is the e-mail that you sent to Darrel Keck

21   at George's; is that correct?

22   A.  That's correct.

23   Q.  And unlike the e-mails to Case, Koch, Mar-Jac, Claxton,

24   Tyson, and Pilgrim's that were all on August 7, this e-mail is

25   on August 12th; is that correct?

Robert Lewis - Cross

1   *A.*  This has a date of August the 12th, 2014, yes.

2   *Q.*  And in this e-mail, you express the fact that you've

3   already had -- I am sorry, I am looking at the wrong document.

4   Give me a second here.

5         In the e-mail, you expressed you had a meeting with

6   Mr. Keck or a discussion with Mr. Keck?

7   *A.*  Yes.

8   *Q.*  And you ask him for similar information to the information

9   that you had asked the other suppliers for August 7th; is that

10  correct?

11  *A.*  Yes.

12  *Q.*  And you indicated, I believe, tell me if I'm wrong, that

13  Mr. Keck provided you some preliminary information on

14  August 12, the date of this e-mail, but then implemented it on

15  August 19th; is that correct?

16  *A.*  That's correct.

17        *MR. POLLACK:*  And if we could look at 1007, which I

18  also believe is in evidence, and publish that.

19        *THE COURT:*  Yes, you may.

20  *BY MR. POLLACK:*

21  *Q.*  1007 should be on the screen, Mr. Lewis.  That is the

22  e-mail back from Mr. Keck, and this is dated August 19,

23  correct?

24  *A.*  Yes.

25        *MR. POLLACK:*  And if we can go to 1008, which is the

Robert Lewis - Cross

1    attachment to that e-mail.

2    *BY MR. POLLACK:*

3    *Q.*  You'll see that the first page is dated August 12th.

4           And then if you can go to the page that has the Bates

5    number at the bottom 6620.

6           He then at the end of it adds an additional section

7    that's called Follow-up August 19.  Do you see that?

8    *A.*  Yes.

9    *Q.*  And so what he did is he re-sent you the presentation from

10   the 12th, but then kind of as an addendum to it gave you

11   additional information, correct?

12   *A.*  Correct.

13   *Q.*  And that additional information not only constituted

14   George's bid, but it was also a very detailed presentation

15   addressing a number of the items that you had requested him to

16   address; is that correct?

17   *A.*  That's correct.

18   *Q.*  And on the page, the next page that ends with 6621, he

19   discusses an option 1, and then a couple pages later at 6623 he

20   discusses an option 2, correct?

21   *A.*  Correct.

22   *Q.*  So he was actually providing RSCS more than one option,

23   correct?

24   *A.*  Yes.

25   *Q.*  And, in fact, George's was unique in that regard.  The

Robert Lewis - Cross

1    other suppliers didn't offer multiple options for RSCS's

2    consideration.

3    A.  Not to this degree, no.

4         MR. POLLACK:  And if we can go to the page that ends

5    in 6628.  And you might have to blow that up.

6    BY MR. POLLACK:

7    Q.  Let's start with the title, entitled Realistic Cost Model,

8    correct?

9    A.  Correct.

10   Q.  Mr. Lewis, you had asked Mr. Keck to provide you a

11   realistic cost model, correct?

12   A.  Correct.

13   Q.  And in this cost model, if you look at the column that

14   says -- there is a column that says Current, and then there is

15   a column that says Proposed for Purple, which is the

16   eight-piece COB product, correct?

17   A.  Yes.

18   Q.  And what price is Mr. Keck offering in this bid?

19   A.  1.0913.

20   Q.  $1.0913, correct?

21   A.  Correct.

22   Q.  And Mr. Torzilli I believe had shown you and introduced

23   into evidence 1160.

24        MR. POLLACK:  If the Court can confirm that and allow

25   me to publish that for the jury.

2783

Robert Lewis - Cross

1           THE COURT:  Yes, you may.

2     BY MR. POLLACK:

3     Q.  And this is the e-mail, Mr. Lewis, this is on August 29, so

4     this is 10 days after what we were just looking at, correct?

5     A.  Correct.

6     Q.  Okay.  And here you say, We're making good progress.  And

7     you're addressing that to all of the suppliers, correct?

8     A.  Correct.

9     Q.  And with respect to George's, the only person you're

10    addressing this communication to at George's is Darrel Keck; is

11    that correct?

12    A.  That's correct.

13    Q.  And that's because Mr. Keck is the one that you were

14    negotiating prices with, correct, or bids?

15    A.  He was the main contact.

16          MR. POLLACK:  You can go ahead and take that down.

17          I would like to pull up J-008, which is in evidence,

18    but I am only going to be focusing on the first column and the

19    third column.  So if there is a way, Brian, for you to focus on

20    those.

21          Mr. Torzilli, do you need a copy of this?

22          MR. TORZILLI:  Yes, please.

23          MR. POLLACK:  Your Honor, if you can confirm that

24    J-008 is in evidence, I would like to publish that.

25          THE COURT:  Yes, it has been, and it may be published.

Robert Lewis - Cross

1   *BY MR. POLLACK:*

2   *Q.* This lists the 2014 contract prices and the 2015 contract

3   prices.  Do you see that?

4   *A.* Yes.

5   *Q.* Is it fair to say that each of the suppliers ultimately

6   negotiated a different contract price for the 2015 contract?

7   *A.* Yes.

8   *Q.* In 2014, they also had had different prices, correct, under

9   the 2014 contract?

10   *A.* Correct.

11   *Q.* And what was the spread in 2014 between the lowest contract

12   price that RSCS was able to negotiate and the highest contract

13   price they negotiated?

14   *A.* 84 points, which is less than a penny.

15   *Q.* And in 2015, I think you already testified to this, the

16   spread was substantially larger, about 5-1/2 cents, correct?

17   *A.* Correct.

18   *Q.* Now, if you look at George's in particular in the 2014

19   contract, they were .9215, right?

20   *A.* Yes.

21   *Q.* And the 2015 contract, they are at $1.0307.  So that's an

22   increase of about 11 cents, just a little shy of 11 cents?

23   *A.* Yes.

24   *Q.* And the difference between the margin in George's 2014

25   contract and its 2015 contract, do you recall, Mr. Lewis, was

Robert Lewis - Cross

1   that Mr. Keck was able to negotiate about an 8-cent big-bird

2   margin difference or -- I don't know what we would call that,

3   but you had talked before about the fact that the suppliers,

4   because there was more demand for big bird and big birds sold

5   for more, if they were going to sell small birds, they wanted

6   some additional margin to reflect that; is that correct?

7   A.   That's correct.

8   Q.   And in George's case, that was about 8 cents or .0831 to be

9   specific.  Do you recall that?

10   A.   That sounds correct, but I don't see it on this chart.

11   Q.   I understand.

12        MR. POLLACK:  Why don't we call up for Mr. Lewis 1121,

13   which should be in evidence.

14   BY MR. POLLACK:

15   Q.   That is the contract that George's and RSCS entered into in

16   October of 2014 for the 2015 year.

17        First of all, if you look at the bottom, that's the

18   contract between George's and RSCS, correct?

19   A.   That's correct.

20   Q.   And Charles George signs that on behalf of George's?

21   A.   Yes, he did.

22   Q.   Okay.  And then on the next page, you see there is a

23   supplier margin of .0967, and then there is what they call

24   big-bird adjustment of .0831?

25   A.   Yes.

Robert Lewis - Cross

1    *Q.* Now, if you look at 1120, which is also in evidence --

2        *MR. POLLACK:* And if I may publish that.

3    *BY MR. POLLACK:*

4    *Q.* -- that was the 2014 George's contract.

5        *THE COURT:* 1120 is in. You may publish it.

6    *BY MR. POLLACK:*

7    *Q.* And if we go to the second page there, you see again for

8    the Purple label the margin was .0967, the exact margin that

9    they had in 2015. The only difference in 2015 there was that

10   .0831 big-bird adjustment, correct?

11   *A.* Correct.

12   *Q.* So Mr. Keck negotiates an additional .0831 to reflect the

13   fact that George's is agreeing to keep its capacity to supply

14   small birds to KFC for the next three years rather than

15   converting that capacity to the more profitable big birds,

16   correct?

17   *A.* Yes, you could say that, yes.

18   *Q.* But we saw that George's overall price went up about

19   11 cents, not 8 cents. Is that because their other costs had

20   gone up about 3 cents?

21   *A.* Yes.

22   *Q.* So their actual profit margin between 2014, 2015 only went

23   up 8 cents?

24   *A.* Yes.

25       *THE COURT:* Mr. Pollack, if you don't mind, why don't

Robert Lewis - Cross

1  we take a stretch break right now just for a short period of

2  time.

3         Anyone who wants to stand up and stretch a bit, please

4  feel free.  All right.  I think we are good.

5         Go ahead, Mr. Pollack.

6      MR. POLLACK:  Thank you, Your Honor.

7  BY MR. POLLACK:

8  Q.  If we can return, then, to J-008.  Again, I am looking at

9  the two columns that give me the 2014 contract prices and the

10  2015 contract prices.

11      MR. POLLACK:  If I may publish that to the jury.

12      THE COURT:  Yes, you may.

13      MR. POLLACK:  Thank you.

14  BY MR. POLLACK:

15  Q.  So for under the 2014 contract, am I correct, Mr. Lewis,

16  that George's had the second lowest price of any of the

17  suppliers?

18  A.  That's correct.

19  Q.  Only Case Farms was lower.

20  A.  Yes.

21  Q.  In the 2015 contract, George's had the lowest price of all

22  of the suppliers; is that correct?

23  A.  That's correct.

24      MR. POLLACK:  Your Honor, with the Court's permission,

25  I would like to provide to Mr. Lewis a set of documents.

Robert Lewis - Cross

1          THE COURT:  Certainly.

2     BY MR. POLLACK:

3     Q.  You should have there, Mr. Lewis, a folder for each of the

4     suppliers.  And I am going to start with Claxton.

5     A.  Okay.

6     Q.  And in the Claxton folder, you should find 1132, which is a

7     cover e-mail; and 1133, which is Claxton's first round bid; and

8     then also 1119, which is the Claxton 2015 contract.  Do you see

9     those?

10    A.  Yes.

11    Q.  What was Claxton's first round bid for the eight-piece COB?

12    A.  For the Purple label product, it's $1.1099.

13    Q.  And what was Claxton's final contract price that was agreed

14    to for the 2015 contract?

15    A.  $1.0669.

16          MR. POLLACK:  Your Honor, what I would like to do is

17    publish a demonstrative, H-684, which I have provided the

18    government, and at this point would only like to publish the

19    first page which reflects Claxton's initial bid and then

20    Claxton's ultimate contract price.

21          THE COURT:  Any objection to the display -- did you

22    say, Mr. Pollack, the first page?

23          MR. POLLACK:  Correct, Your Honor.

24          THE COURT:  The first page of H-684?

25          MR. TORZILLI:  Your Honor, no objection.  I will say

Robert Lewis - Cross

1     that defense counsel, like defense counsel just indicated,

2     provided us the complete exhibit earlier today.  We verified

3     the accuracy of all the numbers on all the pages and agree to

4     the accuracy, so going through it with the witness is

5     unnecessary from the government's perspective.

6            THE COURT:  All right.  Mr. Pollack's request to

7     display what is on the screen at the present time is granted.

8            MR. POLLACK:  Thank you, Your Honor.

9     BY MR. POLLACK:

10    Q.  Mr. Lewis, does that reflect what we just talked about, the

11    difference between Claxton's initial bid and its ultimate

12    contract price?

13    A.  Yes.

14           MR. POLLACK:  And given the government's position,

15    Your Honor, I would like to publish page 2 of H-684.

16           THE COURT:  All right.  Any objection to that,

17    Mr. Torzilli?

18           MR. TORZILLI:  No objection.

19           THE COURT:  Page 2 may be displayed.

20    BY MR. POLLACK:

21    Q.  Mr. Lewis, the government has agreed that this accurately

22    reflects Pilgrim's first round bid and Pilgrim's contract

23    price.  Do you see that?

24    A.  Yes.

25    Q.  And then let's go to page 3.

Robert Lewis - Cross

1          *THE COURT:*  You may display that.

2              Mr. Torzilli, let me know if you object.  I assume

3      not.

4          *MR. TORZILLI:*  No objection, Your Honor.

5      *BY MR. POLLACK:*

6      *Q.*  This reflects Mar-Jac's initial bid and Mar-Jac's contract

7      price, correct?

8      *A.*  Yes.

9      *Q.*  And page 4?

10          *THE COURT:*  You can display that, yes.

11     *BY MR. POLLACK:*

12     *Q.*  This reflects Tyson's first round bid and Tyson's final

13     contract price, correct?

14     *A.*  Correct.

15     *Q.*  Page 5?

16          *THE COURT:*  You may display it.

17     *BY MR. POLLACK:*

18     *Q.*  Mr. Lewis, this reflects George's first round bid, which we

19     talked about earlier, $1.0913, correct?

20     *A.*  Yes.

21     *Q.*  And its final contract, which you also looked at, $1.0307,

22     correct?

23     *A.*  Correct.

24     *Q.*  And then finally, if we can look at page 6.

25          *THE COURT:*  You may display that.

Robert Lewis - Cross

1    *BY MR. POLLACK:*

2    *Q.*   This reflects Koch Foods' initial bid and Koch Foods' final

3    contract price, correct?

4    *A.*   Correct.

5    *Q.*   So is it fair to say, Mr. Lewis, that each one of the

6    suppliers started out at a different point?  Their first round

7    bids are not identical, correct?

8    *A.*   Correct.

9    *Q.*   None of them are identical with any of the others, correct?

10   *A.*   Correct.

11   *Q.*   And each of them reduced their price by the time of the

12   final contract, correct?

13   *A.*   Correct.

14   *Q.*   There was nobody, not a single supplier, who took the

15   position, Here's our first round bid.  The price is the price.

16   We will not move it; is that correct?

17   *A.*   Correct.

18   *Q.*   And with respect to George's in particular, they came down

19   a little more than 6 cents from their initial bid to their

20   final contract price; is that correct?

21   *A.*   That's correct.

22   *Q.*   And that is the largest reduction that any of the suppliers

23   made; is that correct?

24   *A.*   That's correct.

25   *Q.*   And that's 6 cents.  I think you said earlier in response

Robert Lewis - Cross

1    to a question by Mr. Torzilli that even a single cent, even one

2    penny in the poultry business is significant, correct?

3    A.   Yes.

4    Q.   It is certainly fair to say, is it not, Mr. Lewis, that

5    Mr. Keck and George's did not take the position the price is

6    the price; take it or leave it?

7    A.   That's correct.

8         MR. POLLACK:  I have nothing further.  Thank you.

9         THE COURT:  Thank you, Mr. Pollack.

10        Mr. Feldberg.

11                    **CROSS-EXAMINATION**

12   BY MR. FELDBERG:

13   Q.   Mr. Lewis, good afternoon.  I am Michael Feldberg.  I am

14   Roger Austin's lawyer.  I have just a few questions for you.

15   A.   Good.

16   Q.   No binder.

17        Do you recall, sir, that in the summer of 2014 you had

18   a couple of meetings with Pilgrim's?

19   A.   Yes, yes.

20   Q.   And you participated in some meetings with Pilgrim's,

21   correct?

22   A.   Yes.

23   Q.   And Mr. Austin participated in some meetings, correct?

24   A.   Yes.

25   Q.   And you knew, did you not, that Mr. Austin was not the

Robert Lewis - Cross

1    decision-maker on price or bidding for Pilgrim's, correct?

2    A.   I am sorry, would you go --

3    Q.   Sorry, my apologies.

4         You knew, did you not, that Mr. Austin was not the

5    decision-maker on price or bids for Pilgrim's, correct?

6    A.   All I know is he was my main contact.  Whether he put the

7    prices together or not, I don't know.

8    Q.   You don't know one way or the other?

9    A.   No, sir, I don't.

10   Q.   You know he took directional guidance from RSCS, correct?

11   A.   Yes.

12   Q.   But you don't know whether he had to report that

13   directional guidance up the chain at Pilgrim's and get

14   direction back from his superiors, right?

15   A.   Most suppliers had people in place that did the financials

16   for them.  I would assume that Pilgrim's had the same.

17   Q.   Fair enough.

18        MR. FELDBERG:  Now, could we call up, please, not for

19   the jury, Exhibit J-081.

20   BY MR. FELDBERG:

21   Q.   Mr. Lewis, do you see Exhibit J-081 on the screen before

22   you?

23   A.   Yes.

24   Q.   And what is it?

25   A.   It appears to be the formation of a meeting with Pilgrim's,

Robert Lewis - Cross

 1    Pilgrim's Pride, and RSCS.

 2    Q.  And is this a calendar invite?

 3    A.  I would assume it is.

 4    Q.  And you were a recipient of this calendar invite, correct?

 5    A.  Yes.

 6    Q.  And the calendar invite was kept in the regular course of

 7    RSCS's business and helped you make decisions about where to be

 8    at any given time, correct?

 9    A.  Correct.

10          MR. FELDBERG:  We offer J-081, Your Honor.

11          THE COURT:  Any objection to the admission of J-081?

12          MR. TORZILLI:  No objection, Your Honor.

13          THE COURT:  J-081 will be admitted.

14    BY MR. FELDBERG:

15    Q.  Now, Mr. Lewis, the bottom half --

16          MR. FELDBERG:  May we display, Your Honor?

17          THE COURT:  You may.

18    BY MR. FELDBERG:

19    Q.  Mr. Lewis, the bottom half of J-081 is from Mr. Suerken to

20    you and Mr. Austin and others at Pilgrim's and RSCS, correct?

21    A.  Correct.

22    Q.  And it says that the meeting is scheduled for Friday,

23    August 22nd, 11:00 to 1:00 p.m. Eastern time, and then it has

24    in parenthesis GMT.  Do you see that?

25    A.  Yes.

Robert Lewis - Cross

1   *Q.*   The meeting was in Louisville, correct?

2   *A.*   Yes.

3   *Q.*   Louisville is in the Eastern time zone, correct?

4   *A.*   Yes.

5   *Q.*   Do you know what GMT refers to?

6   *A.*   Mountain time, I guess.

7   *Q.*   Is it Greenwich Mean Time?

8   *A.*   I am sorry?

9   *Q.*   Is it Greenwich Mean Time, Mr. Lewis?

10  *A.*   I don't know.

11  *Q.*   Don't know one way or the other.

12          Now, the top half of the e-mail sets the e-mail at

13  3:00 p.m. to 5:00 p.m., correct?

14  *A.*   Yes.

15  *Q.*   Do you know whether that's in the Universal Time Code zone,

16  which is four hours ahead of Eastern time?

17  *A.*   No, I don't know.  I don't know if the time is Eastern,

18  Mountain, or what.

19  *Q.*   Fair enough.

20          Let me ask it this way.  Do you recall what time the

21  meeting took place?

22  *A.*   I do not recall.

23  *Q.*   Was it typical for meetings between RSCS and its suppliers

24  to be in the morning or late in the afternoon?

25  *A.*   I would think the majority would have been in the morning.

Robert Lewis - Cross

1    *Q.*  Fair enough.

2            People had to travel?

3    *A.*  Yes.  It was actually more convenient for most everyone.

4    *Q.*  Fair enough.

5            So if you had to pick 11:00 to 1:00 or 3:00 to 5:00,

6    do you think 11:00 to 1:00 made more sense?

7            *MR. TORZILLI:*  Objection, calls for speculation.

8            *THE COURT:*  Sustained.

9            *MR. FELDBERG:*  Fair enough.  I will move on, Your

10   Honor.

11   *BY MR. FELDBERG:*

12   *Q.*  Now, Mr. Lewis, RSCS was a buying co-op for KFC

13   franchisees, correct?

14   *A.*  Correct.

15   *Q.*  Who actually owned the KFC franchises?

16   *A.*  The individual franchisees.

17   *Q.*  So in the relationship between RSCS and the franchisees,

18   who worked for whom?

19   *A.*  Well, technically, RSCS worked for the franchisees.

20   *Q.*  Because the franchisees were the owners of the business,

21   correct?

22   *A.*  That's correct.

23           *MR. FELDBERG:*  Nothing further, Your Honor.

24           *MR. POLLACK:*  Your Honor, may I have a brief side bar?

25   I didn't want to interrupt.

2797

Robert Lewis - Cross

1        THE COURT:  Yes, we may.

2     (At the bench:)

3        THE COURT:  Mr. Pollack, go ahead.

4        MR. POLLACK:  Thank you, Your Honor.

5        Just a housekeeping issue.  I had shown H-684 as a

6  demonstrative.  I think I neglected to move its admission once

7  we had completed it, and I would like to move its admission as

8  a summary.

9        THE COURT:  Why don't we do this, Mr. Pollack, just so

10  the jury knows the difference between the two.  Do you mind

11  doing that, I will let you go out of turn to move the admission

12  of that, and then we will make sure the jury is aware of what

13  its status is.

14        MR. POLLACK:  Thank you, Your Honor.

15        THE COURT:  All right.  Thank you.

16     (In open court:)

17        MR. POLLACK:  Thank you, Your Honor.  I had shown

18  Mr. Lewis what was designated as H-684 as a demonstrative

19  exhibit.  I would like at this time to move its admission as a

20  summary exhibit.

21        THE COURT:  Okay.  And, Mr. Pollack, you had talked

22  about it in terms of pages.  As a complete -- once all the

23  different bars are shown on it, is it now just one page?

24        MR. POLLACK:  Your Honor, that's fine.  We could move

25  just the admission of page 6.

Robert Lewis - Cross

1          THE COURT:  Any objection to the admission of page 6

2     of H-684, not just for demonstrative purposes but for all

3     purposes?

4          MR. TORZILLI:  We object to that.

5          THE COURT:  Okay.  H-684 will be admitted over

6     objection, page 6.

7          MR. POLLACK:  Thank you, Your Honor.

8          THE COURT:  Ms. Henry.

9                        **CROSS-EXAMINATION**

10    BY MS. HENRY:

11    Q.  Good afternoon, Mr. Lewis.  My name is Roxann Henry, and I

12    represent Mr. Bill Kantola, and I will keep this short.  And I

13    think we are getting really to the very end here.

14         MS. HENRY:  Can we pull up 1224 and just for the

15    lawyers and the Court first?  And I am just going to focus on

16    that first block.  And let me -- and I think this can be

17    admitted pursuant to stipulation.

18         THE COURT:  Are we talking about Exhibit 1244?

19         MS. HENRY:  Yes.

20         THE COURT:  It has been admitted.

21         MS. HENRY:  May we publish it to the jury?

22         THE COURT:  Yes.

23    BY MS. HENRY:

24    Q.  Mr. Lewis, this is the type of document that was regularly

25    prepared at RSCS, isn't it?

Robert Lewis - Cross

1  *A.*  Yes.

2  *Q.*  And a bunch of folks at RSCS had access to this

3  information.  I think you mentioned a lot of the folks in the

4  office and your poultry team?

5  *A.*  The poultry team has access to the information, yes.

6  *Q.*  And clerical support personnel?

7  *A.*  Yes, who are part of the poultry team.

8          *MS. HENRY:*  And can we please publish it?

9          *THE COURT:*  Yes.

10         *COURT DEPUTY CLERK:*  Is this Exhibit 1224 or 1244?

11         *THE COURT:*  Hold on.  I thought you said 1244.  1224

12  has not been admitted.  Do you want to offer it now?

13         *MS. HENRY:*  Yes, please.

14         *THE COURT:*  Any objection to the admission of 1224?

15         *MR. TORZILLI:*  One moment, Your Honor.

16         No objection.

17         *THE COURT:*  All right.  Exhibit 1224 will be admitted,

18  and it may be displayed.

19  *BY MS. HENRY:*

20  *Q.*  Again, Mr. Lewis, these were the type of documents that

21  were regularly prepared at RSCS, right?

22  *A.*  Yes.

23  *Q.*  And there were various people at RSCS who had access to

24  this information.

25  *A.*  It was primarily for the poultry team.

Robert Lewis - Cross

1   Q.  And clerical support personnel also would have had access,

2   correct?

3   A.  Within the poultry team, yes.

4   Q.  Correct.

5        And the distributors would not have this actual

6   document, correct?

7   A.  That's correct.

8   Q.  But they would have had the information, the pricing

9   information on it that was relevant to their distribution?

10  A.  No.  The distributors would have received a landed cost

11  number, not -- this is an FOB price.

12  Q.  You would call this a period pricing chart, wouldn't you,

13  Mr. Lewis?

14  A.  I am sorry?

15  Q.  You would call this a period pricing chart?

16  A.  Yes.

17  Q.  Okay.  Do you recall that you testified at an earlier

18  proceeding under oath?

19  A.  Yes.

20  Q.  And do you remember being asked about these period pricing

21  charts:

22        And they were available to numerous people at RSCS,

23  weren't they?

24        Yes.

25        And they were also available to folks outside of RSCS,

Robert Lewis - Cross

1    weren't they, the distributors, for example?

2            And you stated:  Not these reports.  The prices they

3    knew because they were directly involved, but not these

4    reports.

5            Do you remember that testimony, sir?

6    A.  I missed part of what you said, ma'am, I am sorry, because

7    you weren't speaking in the microphone, and I can't hear you.

8    Q.  I am a little bit shorter than other folks, so I need to

9    adjust it.

10   A.  I am sorry.

11   Q.  I am sorry about that.

12           Do you recall being asked whether -- these types of

13   reports were also available to folks outside of RSCS, weren't

14   they, the distributors, for example?

15           Not these reports.  The prices they knew because they

16   were directly involved, but not these reports.

17   A.  I do not remember that, no.

18   Q.  You don't remember that, but that was your testimony, sir.

19           These were not bid submission numbers, were they?

20   A.  They were not?

21   Q.  These are not bid submission numbers.  These were the

22   current prices?

23   A.  They were current prices, yes.

24   Q.  I would like to focus a little bit on Mr. Bill Kantola and

25   some of your interactions with him.  I believe you know

Robert Lewis - Cross

1    Mr. Kantola and have characterized him as a good friend?

2    A.   Yes.

3    Q.   You've talked together about church, cars, a variety of

4    subjects other than business.

5    A.   Yes.

6    Q.   And when you came back in 2014, one of the first things

7    that you discussed with him was to work on a win-win

8    proposition to give Koch an immediate price and case weight

9    adjustment that was not only to help Koch, but also to help fix

10   the supply problem that you had at KFC?

11   A.   I don't recall that specifically.

12        MS. HENRY:  All right.  Could we pull up for you

13   C-454?  We will move to admit this per the stipulation.

14        THE COURT:  Any objection to the admission of C-454?

15        MR. TORZILLI:  No objection.

16        MS. HENRY:  We would like to publish it then too,

17   please.

18        THE COURT:  One moment.

19        All right.  C-454 will be admitted, and it may be

20   published.

21   BY MS. HENRY:

22   Q.   Do you remember that this is where you confirmed that

23   agreement on the win-win proposition?

24   A.   I do remember this now, yes.

25   Q.   And, again, after you came back in 2014 as a consultant,

Robert Lewis - Cross

 1    you had a number of discussions with Mr. Kantola about how

 2    concerned RSCS was about the sustainable supply problem,

 3    correct?

 4    A.  Correct.

 5    Q.  And that the big-bird/small-bird profitability difference

 6    was of great concern at RSCS.  Everyone was in a panic about it

 7    a little bit?

 8    A.  At that point we were more in a panic about the supply,

 9    but, yes, we had concerns about the differential between the

10    small-bird and big-bird margin.

11         MS. HENRY:  And can we pull up C-451?  And I believe

12    that's been admitted.  If we may please publish that.

13         THE COURT:  Yes, you may publish that.

14    BY MS. HENRY:

15    Q.  And this is -- I think we have seen this document before.

16    This is the kickoff of the negotiation process.  And in this,

17    again, this is where you are telling Mr. Kantola about the

18    profit margin needed and how that compares to big-bird

19    profitability.  Do you see that?

20    A.  Yes.

21    Q.  And that's something that he would have heard and -- as you

22    are discussing these issues with him, correct?

23    A.  Yes.

24    Q.  And Mr. Kantola talked to you about a mutually beneficial

25    long-term relationship with Koch Foods, didn't he?

Robert Lewis - Cross

1          MR. TORZILLI:  Objection, calls for hearsay.

2          THE COURT:  Sustained.

3    BY MS. HENRY:

4    Q.  Do you recall the discussions about having Koch be a

5    mutually beneficial -- let me start that again.

6          Do you remember discussions about having Koch in a

7    mutually beneficial long-term relationship with Koch Foods?

8          MR. TORZILLI:  Objection, calls for hearsay.

9          THE COURT:  Overruled.

10   A.  Yes, I do.

11   BY MS. HENRY:

12   Q.  And about Koch making investments in small-bird, fast-food

13   production to create supply expansion?

14   A.  Yes.

15   Q.  Do you remember that one of those expansions was at the

16   Gadsden facility?

17   A.  I do not recall that.

18   Q.  You remember, though, that there was an expansion that was

19   in process.  And then do you recall also that you were working

20   with Mr. Kantola to try and do a further expansion at the

21   Chattanooga facility for dark meat?

22   A.  I distinctly remember working with Mr. Kantola on the

23   Chattanooga facility to produce dark meat, but it seemed to me

24   that that was a few years before 2014.  I --

25   Q.  You weren't -- well, let me --

Robert Lewis - Cross

1    A.  I am sorry, ma'am.  That would have required me to travel

2    to the plant, I believe, and I did not travel while I was there

3    in 2014.

4    Q.  KFC sent engineers to the plant, didn't they?

5    A.  When it was being evaluated for dark-meat production, KFC's

6    quality assurance people were sent there because it would have

7    to be approved like all the other plants.

8         MS. HENRY:  Can we pull up for the witness C-372?  Can

9    we focus for the witness the very bottom of that page?  Could

10   you scroll up?

11   BY MS. HENRY:

12   Q.  Can you review the bottom paragraph there?

13   A.  Well, I stand corrected.  Eight years ago is a long time.

14   I do distinctly remember work with Mr. Kantola on the

15   Chattanooga facility.  I had it in my mind it had occurred

16   earlier.

17   Q.  But it did, in fact, occur in the context of the

18   negotiations in 2014; isn't that correct?

19   A.  It is correct, yes.

20        MS. HENRY:  Can we also pull up 1135?  And I believe

21   this has also been admitted, if we could please publish that.

22        THE COURT:  You may.

23   BY MS. HENRY:

24   Q.  This is again from Mr. Kantola's perspective.  You have

25   told him about the supply issues.  He's received the letter

Robert Lewis - Cross

1    about the big-bird profitability.  And here you have now

2    started the negotiations.  And here you're telling him that

3    we're making good progress and about how RSCS has a very

4    different mindset, correct?

5    A.  Correct.

6         MS. HENRY:  And then if we could pull up GX-1160, and,

7    again, I believe this has been admitted, if we could please

8    publish it.

9    BY MS. HENRY:

10   Q.  Now, this comes after the receipt of the proposals.  And

11   here, though, you are also telling Mr. Kantola about making

12   good progress, right?  He would have received this as well,

13   correct?

14        THE COURT:  It may be published.

15   BY MS. HENRY:

16   Q.  We are making good progress?

17   A.  I am sorry, are you looking for an answer?

18   Q.  Correct.

19   A.  Yes, yes.

20   Q.  Thank you, sir.

21        MS. HENRY:  So that can come down.

22   BY MS. HENRY:

23   Q.  I would like to now just turn really quickly to the actual

24   results, and I think we have probably gone over a lot of them,

25   but Koch was one of the lowest prices for the 2015 contract,

Robert Lewis - Cross

1    wasn't it?

2    *A.*   Yes.

3    *Q.*   And Koch gained almost 500,000 pounds per week volume in

4    the negotiations, correct?

5    *A.*   That sounds about right, yes.

6    *Q.*   And that was the most significant increase in volume of any

7    supplier.

8    *A.*   Yes.

9    *Q.*   The higher priced suppliers lost volume, correct, or the

10   highest price which was Pilgrim's?

11   *A.*   Yes.

12   *Q.*   And I want to turn back to Mr. Bill Kantola.  Is it fair to

13   say that you were not only friends but felt that you had a good

14   working relationship?

15   *A.*   Yes.

16   *Q.*   He always dealt with you respectfully?

17   *A.*   Yes.

18   *Q.*   He consistently was eager to secure additional volume in

19   the negotiations?

20   *A.*   Yes.

21   *Q.*   You tried to be fair with him and believed he had been fair

22   with you.

23   *A.*   Yes.

24   *Q.*   And ultimately RSCS awarded a significant increase in

25   volume to Koch Foods, correct?

Robert Lewis - Redirect

1   A.  Yes, yes, we did.

2          MS. HENRY:  Thank you, sir.  I have no further

3   questions.

4          THE COURT:  Thank you, Ms. Henry.

5          Additional cross-examination?

6          All right.  Redirect.

7          MR. TORZILLI:  Thank you, Your Honor.

8                   **REDIRECT EXAMINATION**

9   BY MR. TORZILLI:

10  Q.  Good afternoon, Mr. Lewis.

11  A.  Good afternoon.

12  Q.  I just have a couple of follow-up questions on some of the

13  things that were covered during your cross-examination.

14         So first going back to the morning, you were asked a

15  number of questions about loads that you had bought that were

16  not contracted for, but that you had bought in the summer of

17  2014 at prices that were above the contract prices.  Do you

18  remember that?

19  A.  Yes.

20  Q.  And I think at some point in that discussion you said

21  something to the effect of it didn't have anything to do with

22  the negotiations for the calendar year 2015 contract; is that

23  fair?

24  A.  That's correct.

25  Q.  Could you explain what you meant when you said that?

2809
Robert Lewis - Redirect

1   A.  The incremental loads that we were buying at the time were

2   to cover near-term demand, and it had nothing to do with the

3   2015 contract negotiations that were taking place basically a

4   little later than when some of those loads were purchased.

5   Q.  And you were also asked on cross-examination, I think both

6   in the morning session but also in the afternoon, about the

7   market conditions for broiler chickens in calendar year 2014.

8   Do you remember those questions --

9   A.  Yes.

10  Q.  -- and your answers?

11          When did the contract that you negotiated in calendar

12  year 2014 when you were there, when did that go into effect?

13  A.  January the 1st of 2015.

14  Q.  So is it fair to say that any purchases, the actual

15  purchases of chicken made under that contract started on

16  January 1st, 2015?

17  A.  Yes.

18  Q.  How long was that contract?

19  A.  That contract was for three years.

20  Q.  Okay.  So it went until December 31st, 2017?

21  A.  Yes.

22  Q.  Is it fair to say that the market conditions on, say,

23  December 31st, 2017 are likely to be very different than the

24  market conditions that you faced in the summer of 2014?

25          MR. KORNFELD:  Objection, Your Honor, 701 and 702.

2810

Robert Lewis - Redirect

1    This witness is not qualified to answer this question.

2              THE COURT:  Mr. Feldberg.

3              MR. FELDBERG:  Leading.

4              THE COURT:  Sustained, leading.  You can -- if you can

5    rephrase it, Mr. Torzilli.  The objection as to 701, 702,

6    overruled.

7    BY MR. TORZILLI:

8    Q.  Mr. Lewis, can you explain the extent to which market

9    conditions on December 31st, 2017 may differ from the market

10   conditions that you faced in the summer of 2014 when you

11   purchased the chicken, the noncontractual chicken?

12             MR. TUBACH:  Object on lack of foundation.  The

13   witness testified he retired at the end of 2015.  He would have

14   no foundation to testify about 2017 at all.

15             THE COURT:  Sustained.

16   BY MR. TORZILLI:

17   Q.  When was your last day at RSCS, sir, in 2014?

18   A.  I don't remember the specific date, but it was just before

19   Christmas in December 2014.

20   Q.  So approximately a week before January 1st, 2015?

21   A.  Approximately.

22   Q.  Did market conditions in your experience in the broiler

23   chicken industry change from time to time?

24   A.  Yes.

25   Q.  Is it fair to say that the market conditions that existed

Robert Lewis - Redirect

1    in the chicken markets when you left RSCS at the end of

2    calendar year 2014 were different than the market conditions

3    you faced in the summer of 2014 when you conducted the

4    transactions where you purchased the chicken above contractual

5    prices?

6             *MR. FELDBERG:*  Leading.

7             *MR. McLOUGHLIN:*  Objection, lack of foundation and

8    personal knowledge.  The earlier examinations established the

9    witness did not look at the market data that was available.  He

10   can't render an opinion.

11            *THE COURT:*  It calls for speculation.  Sustained.

12   *BY MR. TORZILLI:*

13   *Q.*  You were asked a lot about McKinsey this afternoon, right?

14   *A.*  Yes.

15   *Q.*  What was your job when you got to RSCS in 2014?

16   *A.*  Secure supply.

17   *Q.*  From?

18   *A.*  I am sorry?

19   *Q.*  From whom?

20   *A.*  From approved suppliers.

21   *Q.*  Chicken suppliers?

22   *A.*  Chicken suppliers.

23   *Q.*  McKinsey is not a chicken supplier, right?

24   *A.*  No.

25   *Q.*  So you didn't have any -- as part of your job, you didn't

Robert Lewis - Redirect

1   have any dealings with McKinsey at least as part of your

2   principal responsibilities, right?

3           MR. McLOUGHLIN:  Objection, Your Honor, lack of

4   foundation.

5           THE COURT:  He can answer, overruled.

6   A.  No.

7   BY MR. TORZILLI:

8   Q.  You were asked about transparency.  Do you remember that?

9   A.  Yes.

10  Q.  Transparency in 2014, transparency with the chicken

11  suppliers you were dealing with?

12  A.  Yes.

13  Q.  And what were your goals with respect to transparency

14  towards chicken suppliers in 2014?

15  A.  That prices would be confidential and that only RSCS and

16  the supplier would know what prices had been proposed and what

17  prices had been agreed to.

18  Q.  Did any -- did you make changes to the way that RSCS was

19  doing business in its dealings with chicken suppliers in order

20  to have more transparency into the process?

21  A.  No.  It's always been a confidential process.

22  Q.  So you weren't looking to change the process in any way in

23  2014.

24  A.  No.

25  Q.  You were asked about cost changes during the course of a

Robert Lewis - Redirect

1    contract.  Do you remember that?

2    A.  Yes.

3    Q.  Okay.  Do you know -- first let me ask you, do you know

4    what the No. 1 cost to produce a broiler chicken is?

5    A.  Feed cost.

6    Q.  Just as a yes-or-no question, do you, yes or no, know what

7    the No. 1 cost to produce a broiler chicken is?

8    A.  Yes.

9    Q.  And how do you know that?

10   A.  From experience.

11   Q.  How much experience?

12   A.  Well, I had worked at KFC for 36 years prior to my

13   retirement.

14   Q.  Based on that, what's the No. 1 cost to produce a broiler

15   chicken?

16   A.  Feed cost.

17   Q.  How -- does the RSCS contracts that you're familiar with,

18   the contracts with the chicken suppliers, account in any way

19   for changes in feed cost during the term of the contract?

20   A.  Yes.

21   Q.  Could you explain how that process works?

22   A.  Yes.  We talked earlier about period pricing.  KFC has an

23   accounting system that calls for 13 periods at four weeks each.

24   And a couple weeks prior to the beginning of each period the

25   supplier under agreement has the right to recalculate their

Robert Lewis - Redirect

1  feed cost and adjust their contract price accordingly.

2  *Q.*  So if feed costs go down from one period to the next, what

3  happens to the price of the chicken that -- RSCS's restaurants

4  or the KFC restaurants purchasing chicken?

5  *A.*  The price would drop -- I am sorry, decrease.

6  *Q.*  And by the same token, if the price of feed goes up from

7  one period to another, what happens to the price that the

8  restaurants pay for the chicken?

9  *A.*  It will increase.

10  *Q.*  You have been asked a number of questions about

11  Mr. Eddington.  Do you recall those?

12  *A.*  Yes.

13  *Q.*  Who was Mr. Eddington's boss in 2014?

14  *A.*  Pete Suerken.

15  *Q.*  You were asked about -- questions about big-bird

16  profitability or -- I think big-bird profitability or big-bird

17  adjustment.  Do you remember that?

18  *A.*  Yes.

19  *Q.*  And you were asked about e-mails you wrote where you used

20  some of that so-called terminology in July of 2014.  Do you

21  remember that?

22  *A.*  Yes.

23        *MR. TORZILLI:*  If we could call up G-504.  I believe

24  this has been received into evidence.

25        *THE COURT:*  Yes, it has, and may be displayed.

Robert Lewis - Redirect

1      MR. TORZILLI:  Thank you, Your Honor.

2    BY MR. TORZILLI:

3    Q.  So, Mr. Lewis, on the screen is Defense Exhibit G-504.  And

4    that's an e-mail that you wrote, correct?

5    A.  Correct.

6    Q.  And this one you wrote to Defendant Brian Roberts on

7    July 10th of 2014, right?

8    A.  Yes.

9    Q.  Did you write the same or similar e-mails to the other

10   chicken suppliers at or around this same time?

11   A.  Yes.

12   Q.  I would like to direct your attention to the bullet point

13   that's the third from the last one.  It begins with Profit

14   Margin.  Do you see that, Mr. Lewis?

15   A.  Yes.

16   Q.  That entry says:  Profit margin needed and how that

17   compares to big-bird profitability.  Do you see that?

18   A.  Yes.

19   Q.  Now, my question for you with respect to that bullet point

20   is whether it was your idea or the idea of anyone else to have

21   big-bird profitability or big-bird adjustment be part of the

22   discussion that you were having with the chicken suppliers in

23   2014.

24   A.  That idea came out of our strategy meeting with the poultry

25   team.

Robert Lewis - Redirect

1    Q.  And that got rolled out to the suppliers?

2    A.  I'm sorry?

3    Q.  Was it communicated to the suppliers?

4    A.  Yes.

5    Q.  Okay.  And they communicated back to you what?

6           MR. TUBACH:  Vague and ambiguous and compound.

7           THE COURT:  Overruled.

8           MS. HENRY:  Calls for hearsay.  Objection, calls for

9    hearsay.

10          THE COURT:  Response, Mr. Torzilli?

11          MR. TORZILLI:  The effect on Mr. Lewis and his team,

12   so it's offered for a non-hearsay purpose.

13          THE COURT:  Sustained until that effect has been

14   described.

15   BY MR. TORZILLI:

16   Q.  Without getting into the details of what might have been

17   said to you by the suppliers, did you receive information from

18   them about the topic of so-called big-bird profitability or

19   big-bird adjustment?

20   A.  Yes, we did, in the form of the cost model.

21   Q.  And that was the effect that it had on you and the team at

22   RSCS was that it was included in the cost model?

23   A.  Yes.

24          MR. TORZILLI:  It's offered for that non-hearsay

25   purpose.

2817

Robert Lewis - Redirect

1          MR. McLOUGHLIN:  Objection, Your Honor.  I think the

2     witness just said the information was provided in the cost

3     model, not that there was some other connection that led to

4     some effect that it was in the cost model.

5          THE COURT:  Mr. McLoughlin may be correct.  Could you

6     reask the question, Mr. Torzilli?

7          MR. TORZILLI:  Sure.

8     BY MR. TORZILLI:

9     Q.  What, if any, effect without getting into what was

10    communicated to you by the chicken supplier --

11         THE COURT:  No, not the effect, but just the original

12    question that was objected to on hearsay grounds.

13         MR. TORZILLI:  Sure.

14    BY MR. TORZILLI:

15    Q.  What was the nature of the discussions that the chicken

16    suppliers had with you about big-bird profitability or big-bird

17    adjustment?

18         MR. McLOUGHLIN:  Objection, Your Honor, hearsay, lack

19    of foundation.

20         THE COURT:  Mr. Torzilli, could you clarify if that

21    discussion was simply incorporated into the profit model or

22    whether it was a separate discussion.

23         MR. TORZILLI:  You know what, Your Honor, maybe I will

24    move on to another topic and potentially come back to it.

25         THE COURT:  Okay.  Go ahead.

2818

Robert Lewis - Redirect

1    *BY MR. TORZILLI:*

2    *Q.* Mr. Lewis, do you know whether in the year 2014 grain

3    prices were going up, down, or staying the same?

4         *MR. McLOUGHLIN:* Objection, lack of foundation. He

5    doesn't have any personal knowledge.

6         *THE COURT:* Overruled.

7    *BY MR. TORZILLI:*

8    *Q.* The question, sir, is just do you know whether grain prices

9    were going up, down, or staying the same?

10   *A.* I remember looking at it, but I don't recall for sure, so I

11   don't know.

12   *Q.* You don't recall one way or the other?

13   *A.* No.

14   *Q.* Might I show you a document that might refresh your

15   recollection?

16   *A.* Yes.

17        *MR. TORZILLI:* If we could call up for the witness,

18   counsel and the Court Defense Exhibit F-811 and page 5 of that

19   document.

20        *MR. McLOUGHLIN:* Before this is published to the

21   witness, can we have a side bar?

22        *THE COURT:* Yes.

23      (At the bench:)

24        *THE COURT:* Mr. McLoughlin, go ahead.

25        *MR. McLOUGHLIN:* Your Honor, you will recall I showed

Robert Lewis - Redirect

1   this exhibit to the -- this document to the witness.  The

2   government objected to using it to refresh his recollection as

3   well as it's hearsay, and there is no foundation for it.  The

4   witness then testified that he didn't remember the document.

5   It didn't refresh his recollection and he didn't know where the

6   information came from.

7           So having had both the government's objection and the

8   witness' testimony that demonstrates that it couldn't and

9   didn't refresh his recollection or otherwise be usable, the

10  government cannot now ignore all of that and seek to get him to

11  read the document and do exactly what they objected to earlier.

12          *THE COURT:*  Mr. Torzilli?

13          *MR. TORZILLI:*  I think the objection at the time was

14  to the improper technique of refreshing that involved the

15  witness looking at the document while he was being asked

16  whether it refreshed his recollection and so forth.  I want to

17  use the technique of having him review this and having the

18  screen shut off and asking has reviewing that document

19  refreshed his recollection, yes or no, and if the answer is

20  yes, then with his recollection refreshed to ask the question.

21          *THE COURT:*  He was shown a number of different

22  PowerPoints, and as to one of them he thought maybe a few

23  looked familiar; as for another, he said that none did.  I

24  can't recall whether F-811 is one of them, but were you going

25  to show him a particular page, Mr. Torzilli?

1       *MR. TORZILLI:*  It's the page that was being shown to

2   him.  Let me -- if you don't mind.

3       *MR. McLOUGHLIN:*  Your Honor, it was this specific page

4   that I showed the witness on F-811 that the government objected

5   to and that he said he didn't recognize, and he didn't

6   recognize the source.  It's not generally the exhibit; it's

7   this page.

8       *THE COURT:*  Let's see what page that was.

9   Mr. Torzilli, do you have that?

10      *MR. TORZILLI:*  It's slide 5 of this.

11      *THE COURT:*  Was that the page, Mr. McLoughlin, that

12  you recall?

13      *MR. McLOUGHLIN:*  It was, Your Honor.

14      *THE COURT:*  Mr. McLoughlin, what do you recall as to

15  the -- when you showed him this page, that he did not remember

16  it?

17      *MR. McLOUGHLIN:*  He said it did not refresh his

18  recollection.  He did not recall having seen it before, and he

19  did not know what this -- the source of the information was, so

20  he could not or would not say anything about it.  And so he has

21  already established it didn't refresh his recollection or that

22  is otherwise unusable.  And the government objected again on

23  hearsay and other grounds.

24      *THE COURT:*  Mr. Torzilli?

25      *MR. TORZILLI:*  Yeah, that's not entirely right.  He

Robert Lewis - Redirect

1   was asked whether this slide refreshed his recollection on

2   whether computations of various sorts were done, which focuses

3   more, frankly, on the bottom half of the slide.  And I just

4   want to ask him about, frankly, the title and the first bullet

5   point and ask him whether that refreshes his recollection as to

6   whether grain markets were increasing, decreasing, or staying

7   the same.

8        And, of course, to refresh recollection he doesn't

9   need to necessarily remember the document or have seen the

10  document at all for purposes of refreshing his recollection.

11       THE COURT:  I will allow him to take a look at it.  I

12  think that Mr. McLoughlin is right about the specific question

13  refreshed by anything, and you can ask the question.  The

14  objection will be overruled.

15       MR. McLOUGHLIN:  Your Honor, with respect, if this

16  witness is going to be permitted to use this to refresh his

17  recollection and now he claims it is refreshed, we would ask

18  for the right to do additional cross with this witness now that

19  he claims his recollection is newly refreshed if he does so.

20       THE COURT:  Well, that will be denied.  Once again, a

21  given document may refresh recollection on a number of

22  different topics, and we'll see whether it refreshes as to this

23  topic.

24     (In open court:)

25       MR. TORZILLI:  If we can call up for the witness,

Robert Lewis - Redirect

1    counsel, and the Court defense Exhibit F-811 and page or

2    slide 5 of that document.

3    BY MR. TORZILLI:

4    Q.  Mr. Lewis, I would like to ask you to review that document

5    and let me know when you're done -- or review that page, the

6    slide that's being displayed to you, and let me know when

7    you're done.

8    A.  Okay.

9         MR. TORZILLI:  If we can remove the display from the

10   witness' view.

11   BY MR. TORZILLI:

12   Q.  Mr. Lewis, does reviewing slide 5 of Defense Exhibit F-811

13   refresh your recollection as to whether grain prices in the

14   summer of 2014 were increasing, decreasing, or staying the

15   same?

16   A.  They were decreasing.

17        MR. McLOUGHLIN:  Objection, Your Honor, if we can be

18   heard.

19        THE COURT:  Yes.

20     (At the bench:)

21        THE COURT:  Go ahead, Mr. McLoughlin.

22        MR. McLOUGHLIN:  Your Honor, if you are looking at the

23   chart, you will see that the chart does not distinguish between

24   2014 months or seasons.  It is impossible for the chart to have

25   refreshed his recollection about what the prices were doing in

Robert Lewis - Redirect

1   the summer of 2014 because the chart only covers a single bar

2   for the entire year.

3         So the question with respect to this exhibit doesn't

4   make any logical sense because it does not point the direction

5   to a particular time in 2014.  In fact, it demonstrates, if you

6   are going to look at it literally, the price is flat for the

7   entire year.  It doesn't change.

8         So object to the question and object to the attempt to

9   refresh recollection on a document that can't do it.

10      THE COURT:  Okay.  Objection will be overruled.  The

11  fact that a particular document doesn't have the precise

12  information or precise answer does not necessarily mean it

13  can't refresh recollection, so the objection will be overruled.

14    (In open court:)

15      MR. TORZILLI:  We can take that exhibit down.  Thank

16  you.

17  BY MR. TORZILLI:

18  Q.  I would like to now show you what was shown to you this

19  afternoon and was admitted into evidence as Defense Exhibit

20  H-684.

21      MR. TORZILLI:  And may that be published?

22      THE COURT:  It may be.  Actually, only page 6 was

23  admitted.

24      MR. TORZILLI:  If we can enlist the assistance of --

25  thank you.  If that can be published to the jury.

Robert Lewis - Redirect

1          *THE COURT:*  It may be.

2          *MR. TORZILLI:*  Thank you, Your Honor.

3    *BY MR. TORZILLI:*

4    *Q.*  Mr. Lewis, on your screen is page 6 of Defense Exhibit

5    H-684.  Do you see that on your screen?

6    *A.*  Yes.

7    *Q.*  And I want to direct your attention to the -- so first just

8    to reorient ourselves, the bars on the left-hand side represent

9    the first round bids that were submitted to RSCS by the

10   competing chicken suppliers in 2014?

11   *A.*  Yes.

12   *Q.*  And what are the numbers in bars on the right-hand side

13   representing?

14   *A.*  The green bars represent the final contract price.

15   *Q.*  And they all indicate a decrease from the first round bid

16   to the final contract price; is that right?

17   *A.*  That's right.

18   *Q.*  Now, if we look at the entries for George's, that's the set

19   of bars that's second to the right.  Do you see that?

20   *A.*  Yes.

21   *Q.*  Approximately how much of a decrease in terms of cents, of

22   pennies did the price go down from first round bid to the final

23   contract price?

24   *A.*  A little over 6 cents.

25   *Q.*  6 cents?  And so in percentage terms, approximately how

Robert Lewis - Redirect

1   much of a decrease would that be, approximately?

2   *A.* 5 percent.

3   *Q.* Can you say that again?

4   *A.* 5 percent.

5   *Q.* Okay.  And in terms of the bars, the difference in bars,

6   how different are the bars from each other?  Are they within

7   5 percent of each other?

8           *MR. KORNFELD:* Objection, Your Honor.

9           *THE COURT:* He can answer if he can estimate or if he

10  knows.

11  *A.* Are we speaking of the blue bars?

12  *BY MR. TORZILLI:*

13  *Q.* Yeah, the two George's bars, the bar that has 1.0913 on it

14  and then the bar that has 1.0307 on it.

15  *A.* Okay.

16  *Q.* Is it fair to say that the one bar is twice the length of

17  the other?

18  *A.* Yes.

19  *Q.* Even though it's only about a 5 or so percent decrease in

20  the price?

21  *A.* Yes.

22  *Q.* Was this a portrayal that maybe is an incorrect reflection

23  of how much the prices -- the price went down from the first

24  round bid to the final price?

25          *MR. KORNFELD:* Objection, Your Honor, leading.

1        MR. POLLACK:  I object also.  It may not be to scale,

2   but these numbers are correct.  In fact, the government has

3   stipulated to that.

4        THE COURT:  I will sustain the objection, the first

5   objection.

6        MR. TORZILLI:  I will withdraw the question.

7        I would like to approach, Your Honor, with copies of

8   what has been marked as Government's Exhibit 10023.

9        THE COURT:  You may.

10       MR. TORZILLI:  Permission to switch control over to

11   the document viewer, Your Honor?

12       THE COURT:  Yes, you may.

13       MR. McLOUGHLIN:  Your Honor, objection.  Can we be

14   heard on side bar?

15       THE COURT:  Yes.

16     (At the bench:)

17       THE COURT:  Mr. McLoughlin, go ahead.

18       MR. McLOUGHLIN:  Your Honor, if I am correct, this

19   exhibit has not previously been disclosed to the defendants and

20   was not disclosed in advance on the 48-hour rule and is not, to

21   my knowledge, on the Government's exhibit list.  And this is

22   the government's witness, and I object on the grounds that it's

23   not on the exhibit list.  It has not been provided to us in

24   48 hours, and we have had no opportunity to go through this.

25   And the exhibit is offered for whatever purpose in violation of

1    the Court's orders and the 48-hour rule that the government

2    has, you know, brought a motion to compel on in the last couple

3    of days.

4         THE COURT:  Mr. Torzilli?

5         MR. TORZILLI:  Your Honor, first I am going to need to

6    correct the record, so I am sorry that I need to take a moment

7    to do that, but there is no such thing as a 48-hour rule.  We

8    do have a commitment, both sides do bilaterally, to provide

9    documents to be used on direct examination.  Of course, this is

10   redirect examination, but direct examination two days in

11   advance of calling a witness.  That's first.

12        Second is this is an exhibit we created over the

13   course of the afternoon in response to the exhibit, Defense

14   Exhibit H-684, I believe it is -- I don't have it in front of

15   me -- that Mr. Pollack used on cross-examination with

16   Mr. Lewis, so we are responding to that.

17        In terms of the accuracy of this, I can pretty

18   confidently say that the numbers that appear on this exhibit

19   are the same numbers that appear on Defense Exhibit H-684.  And

20   we have verified those and agree with the defendants that they

21   are accurate in terms of the numbers, but we disagree with the

22   portrayal of the bars on that -- on their exhibit.

23        So this exhibit is in response to that, and it's a

24   more accurate portrayal of the relative magnitude of the

25   decrease as reflected by the bars.

2828

1          MR. McLOUGHLIN:  Your Honor, two points:  First, the

2     exhibit to which Mr. Torzilli refers is not an exhibit offered

3     by Mr. Lovette, so this cannot be admitted with respect to

4     Mr. Lovette.  Second -- and the other defendants I think did

5     not offer it.

6          But more importantly, what Mr. Torzilli is describing

7     is that the government thinks that the exhibit offered earlier

8     doesn't have the right proportion.  And so what it demonstrates

9     is this exhibit, because numbers are factually correct in both,

10    they apparently admit, is no more than argument.  This is

11    simply, We don't like the visual from your exhibit.  We think

12    it's out of proportion, so we are going to make argument to the

13    jury by creating another exhibit where we've done the scale

14    where we absolutely, positively minimize the difference even

15    though there is no scale that is right or wrong.

16         So given the other grounds, and this is no more than

17    argument, it's not related to the facts of what this witness

18    testified, so it's outside the scope of what this witness

19    testified and these other grounds, we would object to any use

20    of this document.

21         THE COURT:  The objection is going to be overruled.

22    Mr. Torzilli through this particular exhibit is showing the

23    mountain as opposed to a molehill, and that's totally

24    legitimate for this type of chart that this particular exhibit

25    is a more accurate representation because it shows things in

1   better perspective, not that the other one isn't, but this is

2   just a simple graphic display.  It's not argument any more than

3   Mr. Pollack's exhibit was by only showing part of it.

4          So next question is -- it's after 5:00, we are not

5   going to go anymore.  Mr. Torzilli, can you take this up first

6   thing in the morning?

7          *MR. TORZILLI:*  We can take it up first thing in the

8   morning.

9          *THE COURT:*  All right.  I will go ahead and let the

10   jury go, then, all right?  Thank you.

11      (In open court:)

12          *THE COURT:*  We are going to let you go.  It's after

13   5:00.  Sorry we went a little bit after.  Tomorrow, 8:30.  We

14   will reconvene then.  Keep those admonitions in mind.  Keep

15   your vigilance up.  If you hear anything about the case, avert

16   your eyes, ears, whatever you need to do, all right?

17          The jury is excused for the day.  Thank you.

18          (Jury excused.)

19          *THE COURT:*  Mr. Lewis, you are excused for the day.

20   Thank you very much.

21          Anything to take up before we break for the day?

22   Ms. Call?

23          *MS. CALL:*  It feels like an opportune time, it may be

24   a good time to discuss the summary motion again.  The

25   government has not heard any updates from counsel over the

1    course of the day, and we are still hoping to receive summaries

2    from their case in chief.

3              THE COURT:  Thank you for reminding me.

4              Ms. LaBranche, go ahead.

5              MS. LaBRANCHE:  That's not accurate.  Ms. Call and I

6    had a conversation at one of the breaks where I explained to

7    her that we were meeting this evening.  We would try to get her

8    some charts as early as this evening, but it's not an easy

9    process to get 10 teams all on the same page.  So she knows

10   that, and she knows that if I can get her anything tonight, I

11   will.  Otherwise, we will do it tomorrow, which will be the

12   48 hours in advance.  And, frankly, at the rate we are going

13   right now, I don't see how our summary witness gets on before

14   next week anyways, so they will have them well in advance.

15             THE COURT:  Anything else, Ms. Call?

16             MS. CALL:  No, Your Honor.  That firm commitment is

17   what I was hoping for.  Thank you.  The experts are still in

18   question, I believe.

19             THE COURT:  Well, once again, perhaps that's a subject

20   of discussion too, so I think we need to wait for some further

21   discussion, but we can take that up first thing in the morning.

22             MS. CALL:  Yes, Your Honor.  Thank you.

23             THE COURT:  Anything else to take up?  All right.  We

24   will be in recess.  Thank you.

25          (Recess at 5:06 p.m.)

1                                  INDEX

2     WITNESSES

3        Robert Lewis

4             Direct Examination By Mr. Torzilli          2605

5             Cross-examination By Mr. Lavine             2630

6             Cross-examination By Mr. Tubach             2699

7             Cross-examination By Mr. Gillen             2715

8             Cross-examination By Mr. McLoughlin         2732

9             Cross-examination By Mr. Pollack            2775

10            Cross-examination By Mr. Feldberg           2792

11            Cross-examination By Ms. Henry              2798

12            Redirect Examination By Mr. Torzilli        2808

13                               EXHIBITS

14    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

15    J-014                   2654

16    J-015                   2652

17    J-016                   2646

18    I-074                   2650

19    J-081                   2794

20    172                     2602

21    C-454                   2802

22    G-504                   2685

23    C-541                   2685

24    A-644                   2680

25    H-655                   2748

| | | INDEX | | | | |

EXHIBITS

| | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---------|---------|----------|---------|----------|-----------|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
| 4 | H-656 | | 2748 | | | |
| 5 | F-660 | | 2644 | | | |
| 6 | H-684 | | 2798 | | | |
| 7 | I-829 | | 2755 | | | |
| 8 | F-834 | | 2685 | | | |
| 9 | C-872 | | 2685 | | | |
| 10 | 1007 | | 2623 | | | |
| 11 | 1026 | | 2623 | | | |
| 12 | 1028 | | 2623 | | | |
| 13 | 1029 | | 2623 | | | |
| 14 | 1134 | | 2617 | | | |
| 15 | 1135 | | 2617 | | | |
| 16 | 1136 | | 2617 | | | |
| 17 | 1137 | | 2617 | | | |
| 18 | 1138 | | 2617 | | | |
| 19 | 1139 | | 2617 | | | |
| 20 | 1160 | | 2624 | | | |
| 21 | 1165 | | 2623 | | | |
| 22 | 1166 | | 2623 | | | |
| 23 | 1167 | | 2623 | | | |
| 24 | 1221-1 | | 2617 | | | |
| 25 | 1224 | | 2799 | | | |

1                        INDEX (Continued)

2                          EXHIBITS

3    Exhibit      Offered  Received  Refused  Reserved  Withdrawn

4    1244                  2639

5    1700                  2603

6    1713                  2604

7                    REPORTER'S CERTIFICATE

8        I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.  Dated

10   at Denver, Colorado, this 30th day of May, 2022.

11

12                              S/Janet M. Coppock

13

14

15

16

17

18

19

20

21

22

23

24

25