1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

2

3   Criminal Action No. 20-CR-00152-PAB
    In Re: Penn II
    UNITED STATES OF AMERICA,

4

5        Plaintiff,

6   vs.

7   JAYSON JEFFREY PENN,
    MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,

8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,

9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,

10  WILLIAM WADE LOVETTE,
    GARY BRIAN ROBERTS,

11  RICKIE PATTERSON BLAKE,

12       Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 16

15  _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:35 a.m., on the 21st day of March,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4   Washington, DC 20530, appearing for Plaintiff.
 5          Anna Tryon Pletcher and Michael Tubach of
 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7   San Francisco, CA 94111-3823;
 8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9   N.W., Washington, DC 20006, appearing for Defendant Penn.
10          David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15           Laura Kuykendall and Megan Rahman of Troutman Pepper
16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17   appearing for Defendant Brady.
18          Michael Felberg of Reichman, Jorgensen, Lehman,
19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20   10017;
21
22
23
24
25
```

APPEARANCES (Continued)

1

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1      APPEARANCES (Continued)

2           Craig Allen Gillen and Anthony Charles Lake of

3  Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4  Atlanta, GA 30339;

5           Richard L. Tegtmeier of Sherman & Howard, LLC,

6  633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7  for Defendant Roberts.

8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

9  & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15                          PROCEEDINGS

16           THE COURT:  We are back on the record in 20-CR-152.

17  It looks like we are all set up for the continuation of our

18  testimony via VTC.  Just a heads-up, because of the schedule,

19  we had best talk about jury instructions tonight, so -- or

20  whenever we get to that point at the end of the day, so we will

21  do that.  And then keep this -- think about this as the morning

22  goes on, and that is a number of motions were -- or notices

23  were filed overnight, so we may need to talk about those over

24  the lunch hour.  We'll have to see how the timing of that goes,

25  all right?

Edward Snyder - Direct

1          Anything to take up before we bring the jury in?  All

2     right.  Let's do that.

3               (Jury present.)

4          As you can tell, we have got a new screen in here.

5     That's because of Professor Snyder's schedule, the parties have

6     agreed to allow him to finish his testimony by video

7     teleconference.  You will remember way back at the beginning of

8     the trial we had a witness who testified by video

9     teleconference too.  So the reason that we have the two extra

10    screens is so if a document is being displayed, you can see

11    both the witness on the other screen and the document on the

12    new screen, okay?

13         Mr. Pletcher, go ahead.

14         *MS. PLETCHER:*  Thank you, Your Honor.

15                    **DIRECT EXAMINATION CONTINUED**

16    *BY MS. PLETCHER:*

17    *Q.*  Good morning, Professor Snyder.  Can you hear me?

18    *A.*  Yes, I can.  Good morning.

19    *Q.*  Wonderful.  What we are going to do today is pick up where

20    we left off on Thursday.  And I would like to actually start

21    off with a document that was on the screen just when we broke,

22    which is Exhibit J-210, which I believe was admitted into

23    evidence for purposes of the chart and then the title was for

24    demonstrative purposes only.

25              *MS. PLETCHER:*  If we could publish?

3573

Edward Snyder - Direct

1          THE COURT:  Yes, you may.

2          MS. PLETCHER:  Thank you.

3    BY MS. PLETCHER:

4    Q.  Now, Professor Snyder, when we broke on Thursday, you

5    mentioned that you had reviewed some documents with respect to

6    this chart.  I just wanted to be clear that the documents you

7    reviewed were bids and contracts; is that correct?

8    A.  That's correct.  Counsel, am I supposed to open up the

9    package?

10   Q.  I am sorry, Professor Snyder.  You should have a couple

11   different packages in front of you.  If you could open up the

12   one that is from the defense.

13   A.  It's very well sealed.  Okay.  I have the package opened.

14   Q.  Wonderful.  These documents should look familiar to you.

15   It should be the same exhibit binder that you had when you were

16   testifying in person on Thursday; is that right?

17   A.  Yes.

18   Q.  Great.  And if you could turn to Exhibit J-210.

19   A.  Okay.  Thank you.

20   Q.  Should I ask that question again?

21   A.  Yes, please.

22   Q.  Okay.  So last week when you were talking about this

23   document, you mentioned that you had reviewed some documents in

24   creating this chart.  And I wanted to be clear that the

25   documents that you reviewed were bids and contracts; is that

Edward Snyder - Direct

1   correct?

2   A.   J-210 in my book shows the wholesale price of beef and

3   wholesale price of pork.

4   Q.   That's correct.

5   A.   The price index, and it's comparing it to the Pilgrim's

6   price to KFC for COB starting in 2010.

7   Q.   That's right.  And you told the jury about how this related

8   to demand.  And we are not going to go over all of that again.

9   I just wanted to be clear that the documents you reviewed for

10  this contract were bids -- sorry, that the documents reviewed

11  for this analysis were bids and contracts in addition to

12  others, but you reviewed bids and contracts for this document.

13  A.   I did.

14          MS. PLETCHER:  Okay.  So we can take this document

15  down.

16  BY MS. PLETCHER:

17  Q.   And now let's go to where we were on Thursday when we broke

18  which was talking about supply.  All right, Professor Snyder,

19  are you with me?  We are going to talk about supply.

20  A.   Correct.  I first focused on the number of breeder birds,

21  stock of breeder birds.

22  Q.   So you talked about the stock of breeder birds.  And was

23  there something else that you looked at as well with respect to

24  supply?

25  A.   Yes.  While the stock of breeder birds affects all broiler

Edward Snyder - Direct

1    chickens, I also focused on the second factor which is more

2    relevant to small birds.  And that second factor is the

3    relevant price of large birds, big birds to small birds, and

4    that relative price had increased.

5    Q.  Do you have your chart to show us your analysis for both of

6    these analyses that you did?

7    A.  I do.

8    Q.  Let's start with the first one you mentioned, the supply of

9    breeder birds?  Can you turn in your binder to J-211.

10   A.  Yes.

11   Q.  What is this chart?

12   A.  This is a chart that shows starting in 2008, the number of

13   breeder birds in millions data from the U.S. Department of

14   Agriculture and continuing on through 2017.  And it's a

15   standard bar chart that depicts the stock of birds as a

16   vertical bar.

17   Q.  Okay.  So what data was used to prepare this chart?

18   A.  These are data directly from the U.S. Department of

19   Agriculture.

20   Q.  And did you and your team verify the data to ensure that

21   the chart was accurate?

22   A.  Yes.  The only step there that was required was to make

23   sure that we read the USDA data correctly and then that we

24   correctly displayed it on this chart.

25           MS. PLETCHER:  At this point, Your Honor, I would move

3576

Edward Snyder - Direct

1    to admit J-211 into evidence.

2         *THE COURT:*  Any objection to the admission of J-211?

3         *MR. TORZILLI:*  Yes, Your Honor.  Same objection

4    regarding the title as was posed with the prior exhibit, J-210.

5         *THE COURT:*  Otherwise not?

6         *MR. TORZILLI:*  Otherwise no objection.

7         *THE COURT:*  So Exhibit J-211 will be admitted.

8    However, the title at the very top will be admitted just for

9    demonstrative purposes.  So ladies and gentlemen, the title you

10   will see on the top of the slide, when that goes back to you

11   during deliberations, you won't see that title, but the rest of

12   it is being admitted.

13        *MS. PLETCHER:*  Thank you, Your Honor.  May we publish?

14        *THE COURT:*  You may.

15   *BY MS. PLETCHER:*

16   *Q.*  Professor Snyder, the jury can now see this chart.  Will

17   you please tell them exactly what this chart shows.

18   *A.*  So this shows the stock of breeder birds annually and it

19   shows that during the period of time 2008, the beginning of the

20   chart through 2012 the stock of breeder birds was not

21   increasing.  And then it did start to increase in 2013 and

22   2014.

23        I have shaded 2014 just to remind everyone that that's

24   the period of time when the 2015 contract to KFC was being

25   negotiated and part of 2014.  So what it says to me is that the

3577

Edward Snyder - Direct

1   total stock of breeder birds had not really increased.  Even

2   though it started to increase, it was still lower than in the

3   earlier periods like 2008 and 2010.

4         Now, that to me, as an economist, tells me that the

5   supply of broiler chickens is limited.  And the way I think

6   about it is that, and I am not an expert on growing chickens,

7   but the amount of breeder birds that you have is sort of the

8   top of the pyramid.  And the breeder birds create hens and the

9   hens create broiler chickens.  And if that stock is high, then

10  that pyramid is wide and the supply of breeder birds leads to

11  an ample supply of broiler chickens.  But if that stock of

12  breeder birds is lower, then the pyramid is smaller and the

13  supply of broiler chickens is limited.

14        So going into 2013, 2014, the stock of breeder birds

15  was limited, which to an economist means that there is a

16  limitation on the supply of broiler chickens, in this instance

17  just not for small birds, it's the small birds and big birds.

18  Q.  So Professor Snyder, what does this analysis mean to you in

19  terms of the effect on pricing in the 2014, 2015 time period?

20  A.  Well, recall what I covered last Thursday was the demand

21  for chickens was increasing, and now we have a supply factor

22  that's saying supply is limited.  So we have two factors going

23  in the same direction, meaning expected higher prices of

24  broiler chickens.

25  Q.  Now, let's turn at this point to the other supply factor

3578

Edward Snyder - Direct

1   that you mentioned which was this difference between big birds

2   and small birds.  You said you had an analysis chart for that

3   analysis as well?

4   *A.*   Yes.  It's a very simple chart.  It compares industry-wide

5   big bird prices, how fast they have increased in percentage

6   terms over the period 2008 to 2014, and it compares that to

7   what's happened to Pilgrim's Pride's prices to KFC over that

8   same time period.

9   *Q.*   Okay.  So let's take a look at Exhibit J-212 in your

10  binder.  Are you there?

11  *A.*   Yes.

12  *Q.*   Great.  And is this the chart that you just described?

13  *A.*   Correct.

14  *Q.*   What data was used for this chart?

15  *A.*   For the industry-wide big bird prices over the period 2008

16  to 2014, that comes from U.S. Department of Agriculture.  And

17  then for the Pilgrim's Pride COB prices to KFC, that comes from

18  KFC's contracts.

19  *Q.*   And how did you verify that this chart was accurate?

20  *A.*   Well, again, the USDA data is authoritative, and the only

21  issue there was to make sure I calculated the percentage price

22  increase correctly over that time period.  And then for the

23  Pilgrim's Pride prices, these are the same data that I used for

24  other charts.  Again, those data I verified.  Our team has

25  deemed them to be accurate.  And again, the point was to make

Edward Snyder - Direct

1    sure that the percentage change in the prices over that time

2    period was done correctly.

3           MS. PLETCHER:  Your Honor, at this point I move to

4    admit J-212 into evidence.

5           THE COURT:  Any admission to the admission of J-212?

6           MR. TORZILLI:  I do have an objection.  Request to be

7    heard at side bar?

8           THE COURT:  Yes.

9       (At the bench:)

10          THE COURT:  Go ahead, Mr. Torzilli.

11          MR. TORZILLI:  So two objections.  One objection is to

12   the title as basically for the same reasons as I expressed with

13   J-211 and J-210.  The additional objection is he testified that

14   the industry-wide big bird prices he derived from USDA data,

15   and it's my understanding that USDA data wouldn't have that in

16   and of itself.  It wouldn't have prices over time for so-called

17   big birds relative to other size of birds, so I don't think

18   that the foundation has been laid for this to be admitted into

19   evidence.

20          THE COURT:  Ms. Pletcher?

21          MS. PLETCHER:  Your Honor, it's my understanding that

22   Professor Snyder derived this from USDA data.  And if the

23   government has questions about how he derived it or what the

24   soundness is of it, that they can explore that on

25   cross-examination.

Edward Snyder - Direct

1          THE COURT:  Anything else, Mr. Torzilli?

2          MR. TORZILLI:  No.

3          THE COURT:  Okay.  Yeah, for purposes of this witness

4    with expert testimony, I am going to allow the display of the

5    slide.

6          Ms. Pletcher, I can't remember, you offered it for all

7    purposes?

8          MS. PLETCHER:  I did.

9          THE COURT:  I will allow it at this point in time for

10   demonstrative purposes only.  However, Ms. Pletcher, you can

11   offer for all purposes, but I will allow Mr. Torzilli an

12   opportunity to explore whether or not the USDA data breaks it

13   out by bird size, all right?

14         MS. PLETCHER:  Sure.  Do you mean right now on voir

15   dire or on cross?

16         THE COURT:  On cross.

17         MS. PLETCHER:  Okay, thank you.

18         THE COURT:  I will allow the display of J-212 for

19   demonstrative purposes only at this point, and Ms. Pletcher can

20   offer it for all purposes after the cross-examination.

21         MS. PLETCHER:  Thank you.  May we publish?

22         THE COURT:  Yes, you may.

23   BY MS. PLETCHER:

24   Q.  Professor Snyder, the jury can see this chart now.  Can you

25   explain what it shows?

Edward Snyder - Direct

1    *A.* So for industry-wide big bird prices over this time period,

2    they increased 32 percent according to the U.S. Department of

3    Agriculture. And you ask the question how does that compare to

4    what was happening with the KFC contracts for Pilgrim's Pride

5    supply, and the contract prices increased 14 percent over that

6    time period.

7          So what does that mean to me as an economist? Well,

8    the Pilgrim's Pride COB prices are, of course, for small birds.

9    And Pilgrim's Pride has made investments specific to the

10   production and supply of small birds to KFC, whereas the

11   industry-wide price change is for big birds.

12         So what this shows to me is if you're a supplier, you

13   have an incentive to shift from small-bird production to

14   big-bird production. And that is another supply factor that

15   would lead one to expect that small bird prices would increase,

16   and that's because from the suppliers' point of view, it's more

17   profitable to be in big birds than it is to be in small birds

18   unless prices for small birds go up.

19   *Q.* So Professor Snyder, can I just make sure I understand

20   that? Could you explain how this mismatch in prices creates a

21   profit differential and an incentive to produce more large

22   birds? Can you just explain that a little bit more?

23   *A.* Yes. From the suppliers' point of view, large bird

24   production is more profitable than small-bird production given

25   this comparison. Now, not every small bird supplier will be

3582

Edward Snyder - Direct

1    able to convert its supply to big birds, but that's where the

2    greater profit is, and I would expect conversions in that

3    direction, meaning from small bird to large-bird production and

4    supply.

5    Q.  So what, if any, effect would this industry situation that

6    you have just described here, this mismatch, have on

7    industry-wide capacity for small-bird production?

8    A.  Well, I would expect that there would be conversions of

9    plants to large birds, so industry-wide capacity for small

10   birds would be expected to decrease.

11   Q.  Now, standing back for a moment and looking at what you've

12   discussed in terms of both demand and these two supply factors

13   that you analyzed, how would you expect the combination of

14   these factors to affect the pricing of small birds during the

15   2015 contract negotiation time period?

16   A.  Well, the increased demand and the two supply factors that

17   I have identified, the production of breeder birds relative to

18   earlier time periods and then supply factor that's leading to

19   conversions from small to big birds, all of those are expected

20   to go into the same -- excuse me, they are all expected to go

21   in the same direction, higher prices for small birds.  The only

22   other potential factor to consider is variable costs.  Is there

23   anything that's going on with variable costs, feed costs, labor

24   costs, that could offset the three factors that are expected to

25   be increasing prices for small birds.

Edward Snyder - Direct

1           And the economic analysis in this market context is

2    that even if we did see a reduction in variable costs, it would

3    not offset, counter the three factors that I've identified.

4    And the economic intuition for that is as follows:  If you have

5    increased demand and if you have limited supply, those

6    dominate.  Those are the key factors that will lead to expected

7    higher prices.

8           It's somewhat similar to the situation where if you

9    have -- if you think about a car dealer right now, they have

10   less inventory.  They probably are spending less money on their

11   salespeople, but having lower costs of being a car dealer is

12   not going to counter the demand and supply pressures that are

13   going to drive car prices up.  So dealer costs go down, but the

14   prices still go up.

15          In some sense, the chicken suppliers, even if they did

16   have lower variable costs, would be a lot like the car dealer,

17   lower variable cost, but the key thing is the supply of

18   chickens is limited and demand is growing.

19   *Q.*  Professor Snyder, this analysis that you conducted focused

20   on Pilgrim's, but you are aware that many other suppliers also

21   increased their prices for small birds in the time period of

22   2014?

23          *MR. TORZILLI:*  Objection, leading.

24          *THE COURT:*  Overruled.

25   *A.*  I am aware of that.  It's reflected in the data that I have

3584

Edward Snyder - Direct

1    on 20 different suppliers.

2    BY MS. PLETCHER:

3    Q. So how do you explain the fact that so many suppliers

4    increased their prices at that time?

5    A. Well, this is straightforward economics.  All the suppliers

6    are seeing the same market conditions, stronger demand, limited

7    supply in terms of breeder birds, and an incentive to switch

8    from small to big birds.  Now, they may not respond in

9    precisely the same way at precisely the same time, but they are

10   all seeing common supply and demand market conditions which

11   will lead them to make adjustments upward in price in a similar

12   manner.

13   Q. Are you saying that the market conditions all have a

14   similar effect on the suppliers?  Is that right?

15   A. Yes, they are all common.  You know, the market conditions

16   are market-wide, so all suppliers experience them in some way,

17   and then they will react in a similar fashion, not precisely

18   the same, but in a similar fashion.

19   Q. At this point, Professor Snyder, let's go back to the

20   slide.  It's J-206 which was --

21        MS. PLETCHER:  If we could display for demonstrative

22   purposes only, J-206.

23        THE COURT:  You may.

24        MS. PLETCHER:  Thank you.

25   BY MS. PLETCHER:

3585

Edward Snyder - Direct

1    *Q.* And I would like to ask you, going back to this first

2    question, this is where we started, are there alternative

3    explanations for observed outcomes? What did you conclude on

4    that point?

5    *A.* Well, as I said last Thursday, looking for alternative

6    explanations is sort of the bread and butter of what economists

7    do. And given the government's theory of price-fixing,

8    especially for the 2015 contract which was negotiated in 2014,

9    that's a theory that's a hypothesis. But when I look at supply

10   and demand factors, I find simple, reasonable, alternative

11   explanations that are grounded in economics for why prices

12   would go up.

13   *Q.* Thank you, Professor Snyder. At this point let's keep this

14   slide up because we are going to shift gears now and look at

15   your second question.

16          Can you remind the jury, what was your second question

17   that you sought to analyze?

18   *A.* The second question is do information exchanges indicate

19   bid-rigging or price-fixing.

20   *Q.* We can take that slide down.

21          Professor Snyder, how common is it for economists to

22   see industries where buyers and sellers exchange information?

23   *A.* Well, in economic textbooks the marketplace is sort of

24   theoretical, and it's a place where suppliers and consumers get

25   together and get an equilibrium price that clears the market

Edward Snyder - Direct

1   and that's it and information plays no role.  It's just magic.

2   But in the real world, information is often central to how

3   markets clear and how industries function.

4          So in my experience, what I often see is information

5   exchange around what's happening with the market, what are

6   market conditions, what's happening with costs, what's

7   happening with various cost factors.  You also see information

8   exchange for what if there is oversupply or undersupply and

9   what adjustments need to be made.  And then you also in my

10  experience see industry participants trying to verify

11  information by contacting others.

12         So in the real world information exchange, information

13  sharing is quite common.

14  Q.  Let's dig a little deeper into this topic.  Are there

15  particular -- would you expect to see information exchanged in

16  the broiler chicken industry?

17  A.  Yes.  And I -- one of the things I highlighted last week

18  was that in this market, like other markets, especially

19  agricultural markets, there is a gap between when planning and

20  investment decisions are made and when supply actually comes

21  onto the market.  There is a considerable time difference

22  there.  So those supply decisions may be right, but they may

23  undershoot or they may overshoot leading to undersupply or

24  oversupply, and with either of those conditions you get

25  adjustments made by industry participants.

Edward Snyder - Direct

1          Buyers want their shortfalls covered by other

2   suppliers.  Suppliers who have extra stock, extra supply, want

3   to find a home for that.  So those adjustments when supply

4   actually comes to market are expected and that involves

5   information exchange.

6   Q.  Professor Snyder, do you have a slide that describes your

7   opinions with respect to information exchange in the broiler

8   chicken industry?

9   A.  Yes, I do.

10  Q.  I would like you to turn to in your binder, turn to J-213.

11  A.  Yes.

12  Q.  Is this the slide with respect to your thoughts on the

13  information exchange in the broiler chicken industry?

14  A.  Yes.  I prepared this slide to just identify other industry

15  factors in the broiler chicken industry that I think help

16  explain why we see -- would expect to see information exchange

17  in this industry.

18  Q.  Would this slide assist you in explaining to the jury the

19  relevant features of the chicken industry that you were just

20  about to talk about?

21  A.  Yes.

22          MS. PLETCHER:  Your Honor, I would like to publish

23  this slide only for demonstrative purposes, if I may.

24          THE COURT:  Any objection to the display of J-213 for

25  demonstrative purposes only?

3588

Edward Snyder - Direct

1          MR. TORZILLI:  No objection.

2          THE COURT:  It will be allowed for demonstrative

3    purposes only.

4          MS. PLETCHER:  Thank you.  May we publish, please?

5          THE COURT:  Yes, you may.

6    BY MS. PLETCHER:

7    Q.  Professor Snyder, would you explain to the jury what you

8    are showing on this slide, please?

9    A.  Yes.  And rather than take the items one at a time, let me

10   try to talk them through as a group.  If you look at the

11   objectives of buyers, they want both reliability of supply and

12   flexibility of supply.  You see the flexibility in the

13   contracts.  And the reliability of supply, of course, is

14   fundamental because the product is perishable and supply needs

15   to come on a regular basis.  And flexibility of supply is

16   something that they value because they have to also adjust to

17   market conditions.

18          Those two factors together lead to something that

19   economists call multi-sourcing where an individual buyer will

20   want to have multiple suppliers, so each buyer typically has

21   multiple suppliers.  So in that context we have a situation

22   where suppliers may end up sharing and exchanging information.

23   Suppliers are going to be sharing information up to the buyer

24   and the buyer is going to be sharing information down to the

25   suppliers.  So we are going to get information sharing in

3589

Edward Snyder - Direct

1   multiple directions.

2          So that's one piece of this, and maybe I'll pause, but

3   there are some additional factors that then lead to this

4   concept of relational contracting.

5   Q.  Let's get to those other factors.  So bullet point 3 is

6   buyer sourcing from multiple suppliers, and bullet point 4 is

7   relational contracting.  So can you describe why those two

8   points are relevant to your analysis?

9   A.  What I observed in the data is that individual suppliers

10  have contracts with multiple suppliers, and those contracts get

11  renegotiated while the contracts are in place, and those

12  relationships between suppliers and buyers tend to continue

13  over time.

14         This is exactly what economists studied decades ago.

15  In fact, another Nobel Prize winner, Oliver Williamson, back in

16  the 1980s developed the concept of relational contracting to

17  describe exactly what we see in the broiler chicken industry,

18  individual suppliers with multiple -- I am sorry, individual

19  buyers with multiple suppliers in contracts, and those

20  contracts are embedded in long-term relationships where there

21  is information sharing.

22         And the two most important reasons for the information

23  sharing are, No. 1, suppliers have to make investments in

24  production before they actually are able to supply the product.

25  And two, once they do supply the product, oftentimes they need

Edward Snyder - Direct

1    to make adjustments to actual market conditions.  So this is

2    Professor Williamson's prototypical framework for industries

3    like the broiler chicken industry.

4    Q.  Professor Snyder, when you are talking about the term

5    "information exchange" in relational contracting, what kind of

6    information is flowing back and forth?

7    A.  I would expect based on my experience a lot of different

8    kinds of information; market conditions, what's going on with

9    the market, what are trends, and more granular what's happening

10   to various costs.  And then in some of these situations you see

11   some of these sharing of so-called cost models.  And then when

12   there is negotiation, there is information back and forth.  And

13   often in many industry settings, what a buyer will do is give

14   "supplier feedback," and say here is information about what

15   others are potentially supplying and this is how you need to

16   make adjustments.

17           And then lastly, because of that, oftentimes you get

18   what is commonly referred to as price verification where

19   individual industry participants want to figure out whether

20   information they are getting is accurate or not accurate.

21   Q.  Yes.  Let's pause there, Professor Snyder, because I was

22   just going to ask you about price verification.  So what does

23   that term "price verification" mean to you as an economist?

24   A.  Well, with information sharing, and let's put it in the

25   context of a buyer giving supplier feedback on the bid.  And

3591

Edward Snyder - Direct

1    the buyer may tell the supplier that here's the price you need

2    to match or here's where the market is shaking out.  That

3    information may be accurate.  It may not be accurate, however.

4    And it may be sort of nuanced in the context where the buyer is

5    telling the individual supplier a certain piece of information.

6            Now, from the supplier's point of view, the supplier

7    may want to respond to that, but only after the supplier

8    figures out if that information is accurate.  And that's what

9    leads to the supplier to make attempts to verify whether the

10   information being provided to it is accurate or not.

11   Q.  So in this context of negotiations that we are discussing

12   here, would it surprise you if the buyer wanted to prevent

13   information from being shared?

14   A.  No, it would not.

15   Q.  I am sorry, I think I meant to say the seller.  No, no, a

16   buyer, I was right, if a buyer would want to prevent

17   information from being shared.

18   A.  It would not surprise me.  Again, let's just make sure we

19   have the situation identified.  The buyer has got multiple

20   suppliers.  The buyer would like to control the information.

21   The buyer would in some situations like to be able to say to

22   one supplier here is some feedback for you and here is some

23   selective information for the next supplier and so forth.  And

24   by controlling the information, the buyer's in the position to

25   get an advantage, an information advantage.  So it wouldn't

Edward Snyder - Direct

1    surprise me at all for the buyer to not want to have the

2    selective information provided to individual suppliers kept

3    private.  That sustains their advantage.

4    Q.  To that point, Professor Snyder, in your view as an

5    economist, is there any relationship between control of

6    information and leverage in negotiations?

7    A.  Yes, there is.  That's a general principle in negotiations,

8    and it's very much related to the role of information in

9    different market contexts.  But just to be clear, economics

10   doesn't tell us that the information advantage has to be on the

11   buyer's side.  There is no economic principle that says that.

12   Q.  Could you explain that a little more, Professor Snyder?

13   What do you mean?

14   A.  Well, if the buyer is able to control the information and

15   individually, you know, feed information to supplier by

16   supplier by supplier, that's an information advantage, a

17   so-called information asymmetry that favors the buyer, but

18   there is nothing in economics that requires that information be

19   asymmetric in favor of the buyer.

20   Q.  By that same token, would a seller in a negotiation also

21   want to seek more information and leverage?

22   A.  This is a good point that price verification and

23   information asymmetry can play out differently in different

24   market contexts.  If I want to buy a coffee maker from my local

25   retailer, I could come in and say, you know, I would like to

Edward Snyder - Direct

1   buy it from you, but I can get it on-line for 10 percent less.

2   In that context, it's the seller who might want to do the price

3   verification and find out whether the information I am

4   providing is accurate or not before that local retailer matches

5   the price.

6   Q.   Thank you, Professor Snyder.

7        So let's bring all of this around back to the first

8   question that you started with with respect to information

9   exchange back on J-206.

10       MS. PLETCHER:   If we could but that up again for

11  demonstrative purposes only.

12       THE COURT:   You may.

13  BY MS. PLETCHER:

14  Q.   So we are talking about this second question.

15       Professor Snyder, what did you conclude as to whether

16  information exchanges in the broiler chicken industry indicate

17  bid-rigging or price-fixing?

18  A.   I conclude as follows:  No. 1, information exchanges are

19  expected in many industries based on characteristics of those

20  industries, and in particular, I would expect information

21  exchange in the broiler chicken industry.  It does not,

22  therefore, in my opinion indicate bid-rigging or price-fixing.

23  Q.   Let's shift gears now to the third question that you sought

24  to answer.  Can you remind the jury what that third question

25  was?

Edward Snyder - Direct

1   *A.*   The third question is:   Do economic analyses indicate

2   bid-rigging or price-fixing?

3   *Q.*   Now, I believe at this point, Professor Snyder, on Thursday

4   you told the jury that there were two types of analyses you

5   conducted.   One was an analysis of pricing and bids; is that

6   right?

7   *A.*   Correct, yes, and for particular time periods given what's

8   been highlighted here.

9   *Q.*   And the second was what you called a benchmarking analysis;

10   is that right?

11   *A.*   Correct.

12   *Q.*   Well, let's go through those one by one.   Let's start with

13   your analysis of bids and prices.   What did you do to study

14   bids and prices in this case in addition to what you talked

15   about with the bullet point No. 1, your first question?   So

16   just your third question.

17   *A.*   So I asked a very simple question.   Are bids and final

18   prices identical?   And I explored that question in the context

19   of the 2013 KFC contract and also in the context of the 2015

20   KFC contract.

21   *Q.*   And what did you find?   Let's just start with the 2013

22   contract analysis.

23   *A.*   Well, I identified six different bidders for the contract.

24   And when I looked at the initial bids, I saw that they were

25   different; and when I looked at the final bids, I saw that

Edward Snyder - Direct

1    those were also different, so that's based on straightforward

2    objective economic data.

3    Q.   So do you have a slide that shows your analysis?

4    A.   Yes, I do.

5    Q.   Okay.  And I would ask you to turn to J-215, please.

6    A.   Yes.

7    Q.   Is that the slide you just referenced, Professor Snyder?

8    A.   It is.

9    Q.   What data was used for this chart?

10   A.   Data from six different suppliers.  I can name them if you

11   want, but --

12   Q.   Let's wait until we get through these initial questions

13   first.

14   A.   And then for each -- I am sorry, each of these suppliers I

15   identified the initial bids and the final prices, meaning the

16   final contract prices.

17   Q.   And how did you and your team verify that the chart was

18   accurate?

19   A.   By identifying the initial bids in the documents containing

20   those -- it's a different set of documents that contain those

21   initial bids -- and then also verifying what were the final

22   prices contract by contract.

23        MS. PLETCHER:  Your Honor, at this point I offer J-215

24   into evidence.

25        THE COURT:  Any objection to the admission of J-215?

Edward Snyder - Direct

1          MR. TORZILLI:  Your Honor, other than the title, no

2     objection.

3          THE COURT:  All right.  Then J-215 will be admitted

4     for all purposes except, ladies and gentlemen, that title at

5     the very top will be admitted just for demonstrative purposes.

6          You may display that.

7          MS. PLETCHER:  Thank you.

8     BY MS. PLETCHER:

9     Q.  Professor Snyder, what does this chart show?

10    A.  So first of all, I've got data here on six different

11    suppliers.  Those are along the horizontal axis, Pilgrim's,

12    Claxton, Tyson, Koch, George's, and Marshall Durbin.  And then

13    on the vertical axis which starts at 96 cents I show in blue

14    the initial bids made by these six suppliers to KFC for the

15    small-bird eight-piece COB.  And that's for the 2013 contract.

16    And then the final contract prices are shown in yellow.

17    Q.  And Professor Snyder, I note that those Claxton and

18    Marshall Durbin, their final bids are slightly higher than

19    their initial bids.  Can you explain why that is?

20    A.  Yes.  It looks like they increased their prices from

21    initial bids to final, but that's not the case.  What happened

22    here was that RSCS, the co-op for KFC, imposed a very small

23    administrative fee on top of the contract prices.  And what's

24    happening in the case of Claxton and Marshall Durbin is they

25    actually kept their initial bids constant, but what's being

Edward Snyder - Direct

1   shown there is just the very small increment associated with

2   the administrative fee imposed by RSCS.

3        I should note that the fee was applied across the

4   board, but you don't see it because the other four suppliers

5   reduced their initial bids to lower final contract prices.

6   Q.  Now, Professor Snyder, did you and your team conduct a

7   similar analysis for the 2015 contract?

8   A.  Yes.

9   Q.  And do you have a slide that shows that analysis?

10  A.  Yes, I do.  It's the same set-up, six suppliers, initial

11  bids, final prices, except now I am shifting focus to the 2015

12  KFC contract.

13  Q.  So I would like you to turn to J-216 in your binder.

14  A.  Yes.

15  Q.  And what data was used for this chart?

16  A.  Data on the initial bids of six suppliers.  I should note

17  that one supplier changed because Marshall Durbin, which was

18  included in the previous set, was acquired by Mar-Jac in 2014,

19  so I am substituting here with Mar-Jac the acquirer, but it's

20  the same data.  Here the vertical axis starts at $1.

21        MS. PLETCHER:  I was going to ask you to hold off for

22  a second, Professor Snyder, while I ask the Court if I may

23  admit J-216 into evidence.

24        THE COURT:  Any objection to the admission of J-216?

25        MR. TORZILLI:  Same objection with respect to the

Edward Snyder - Direct

1   title.  Other than that, no objection.

2           THE COURT:  J-216 will be admitted except, once again,

3   ladies and gentlemen, the title will be for demonstrative

4   purposes only.  It may be displayed.

5   BY MS. PLETCHER:

6   Q.  Okay.  Professor Snyder, now the jury can see the chart.

7   Can you explain what this chart shows?

8   A.  This chart shows in blue the initial bids by these six

9   suppliers.  They are not identical.  It shows as well the final

10  contract prices for the six suppliers.  They are not identical.

11  And in passing I will note that each of the six reduced their

12  prices from the initial bid to the final contract price.

13  Q.  And why is it important to you to make that observation

14  about the reduction in prices?

15  A.  Well, in addition to the prices not being identical, in the

16  context of alleged bid-rigging, I am a little bit surprised to

17  see that individual suppliers have decided not to hold their

18  prices.  They haven't said we are going to hold them firm.  And

19  if they had had an agreement on bid-rigging, I would expect at

20  least in some circumstances that they would hold their prices

21  firm.

22  Q.  What do you mean when you say hold prices firm?  What

23  exactly are you talking about?

24  A.  I mean, take Tyson for example.  Tyson initially bids

25  $1.09, but then they lowered their price to about $1.07.  And

Edward Snyder - Direct

1  that's not holding their initial bid firm.

2  *Q.*  Now, Professor Snyder, did you conduct further analyses of

3  the bids and prices beyond just observing whether they were

4  identical or not?

5  *A.*  Yes, I did.  I -- it occurred to me that, okay, prices are

6  not identical.  Is it possible that maybe the price increases

7  were identical?  And I looked at that both in terms of actual

8  dollars and cents increases to see if those increments were

9  identical, and I also checked to see if the price increases

10  were identical on percentage terms.

11  *Q.*  Do you have a slide to show that analysis?

12  *A.*  I do.

13  *Q.*  Okay.  I would ask you to turn to J-217 in your binder.

14  *A.*  Yes.

15  *Q.*  Is that the analysis we just discussed?

16  *A.*  It is.

17  *Q.*  And what data was used for this analysis?

18  *A.*  It was -- it focuses on the change in the contract prices.

19  And I am focusing on individual suppliers such as Pilgrim's,

20  Claxton, Tyson, Koch, George's and Mar-Jac.

21        *MS. PLETCHER:*  Professor Snyder, before we go any

22  further, I will ask the Court if I may admit J-217 into

23  evidence.

24        *THE COURT:*  Any objection to the admission of J-217?

25        *MR. TORZILLI:*  Other than the objection to the title,

Edward Snyder - Direct

1   no objection.

2           THE COURT:  All right.  Exhibit J-217 will be admitted

3   for all purposes except for the title which will be admitted

4   for demonstrative purposes only.

5           MS. PLETCHER:  Thank you.  May I publish, Your Honor?

6           THE COURT:  You may.

7   BY MS. PLETCHER:

8   Q.  Professor Snyder, this slide is up for the jury now.  Could

9   you explain what this slide shows?

10  A.  Well, prices went up from 2014 to 2015 for each of these

11  six by economically significant amounts, but the amount of the

12  increases differed across the individual suppliers and the

13  percentage increases also differed across the individual

14  suppliers.

15  Q.  Now, what does that tell you with respect to the ultimate

16  analysis that you were seeking to conduct in this case?

17  A.  Well, I wanted to just look at it in multiple ways.  Are

18  prices identical?  Are the price increases identical?  And the

19  answer is no.  It doesn't tell you the final word, but it's not

20  consistent with the alleged price-fixing.

21  Q.  Did you look at whether the range of prices narrowed or

22  increased as well?

23  A.  I did.

24  Q.  And do you have a slide that shows that analysis?

25  A.  I did.  My team and I prepared a slide that focused on the

Edward Snyder - Direct

1   range in prices in 2014 and the range of prices in 2015.

2   Q.  Let's turn to J-218, please.

3   A.  Yes.

4   Q.  Is this the analysis that you just discussed?

5   A.  It is.

6          MS. PLETCHER:  Your Honor, may I offer J-218 into

7   evidence?

8          THE COURT:  Any objection to the admission of J-218?

9          MR. TORZILLI:  Other than the title, no objection.

10         THE COURT:  J-218 will be admitted for all purposes

11  except for the title which will be admitted for demonstrative

12  purposes only.

13         MS. PLETCHER:  May I publish?

14         THE COURT:  Yes, you may.

15  BY MS. PLETCHER:

16  Q.  Professor Snyder, the jury can see this chart.  Can you

17  explain what this chart means?

18  A.  Well, we should recognize the same set of suppliers, the

19  six suppliers.  And in the column identified as 2014 prices,

20  those are again the contract prices, the final contract prices

21  for these suppliers supplying eight-piece small-bird COB to

22  KFC.

23         And what I've done simply in that 2014 column is

24  identified the range, the highest to the lowest, and calculated

25  that.  And I see that it's a little bit under 1 cent, .84

Edward Snyder - Direct

1    cents.  And that's in my mind the reference point to look at

2    going into 2015 where there has been so much attention focused

3    on alleged price-fixing in the 2015 KFC contract.

4    Q.  So what does this chart tell you about the ultimate

5    analysis you were seeking to understand here?

6    A.  Well, I had already found 2015 prices were not identical.

7    I had found that the initial bids were not identical.  The

8    final contract prices were not identical.  The price increases

9    were not identical.  But maybe, maybe, just maybe at least we

10   would get convergence among the alleged defendant price-fixers.

11          And what I see in the right-hand column is that we

12   don't even get convergence.  In fact, we get a substantial

13   widening of the range in 2015.  It goes from a little bit under

14   a penny in 2014 to about 5-1/2 cents in 2015.  And that

15   certainly surprised me, and it's objective economic evidence

16   that's not consistent with the alleged price-fixing.

17   Q.  Professor Snyder, I am going to take you back to the chart

18   on J-217.  If we may go back to that chart, please.

19   A.  Counsel, what number again?

20   Q.  J-217.

21   A.  Yes.

22   Q.  Okay.  This is the chart that shows increase in prices in

23   terms of dollar value and percentage.  Are you with me?

24   A.  Yes.

25   Q.  So my question here actually has to do with volume.  I am

3603

Edward Snyder - Direct

1    wondering did you look at all at changes in volume with respect

2    to these contracts that you analyzed for this particular chart?

3    A.  I did.  As I mentioned earlier, the price differences are

4    economically significant.  And what would you expect if in

5    response to economically significant differences in prices?

6    You would expect the buyer in a competitive situation to react

7    and take volume away from the supplier who was charging the

8    highest price and reallocate some of that supply to other

9    suppliers charging lowers prices.  And I checked on those

10   volume changes in the wake of the 2015 final contract prices.

11   Q.  And just describe to the jury what it is that you found

12   with respect to, say, Pilgrim's, which has the highest increase

13   in both numerical value and percentage value.  What did you

14   find with respect to volume?

15   A.  Pilgrim's lost over 20 percent of its business to KFC as a

16   result of being the highest.  Most of that went to, as I

17   recall, Tyson's and Claxton.  They were the gainers because

18   they were lower.  Now, you might ask, well, why didn't KFC wipe

19   out Pilgrim's altogether?  I just go back to the point that

20   buyers still want reliability and they tend to maintain

21   multiple suppliers.

22          But the most important point is KFC took volume away

23   from Pilgrim's.  That's not a successful price-fixing strategy

24   to lose 20-plus percent of your business.  And that volume was

25   reallocated to other suppliers.

3604

Edward Snyder - Direct

1   Q.   So wrapping up this piece of your analysis, Professor

2   Snyder, what did you conclude analyzing price changes and

3   volume that you just described here with the jury?

4   A.   The objective economic evidence don't -- that evidence just

5   doesn't match up with the government's theory.

6   Q.   Professor Snyder, I am just going to shift gears here for

7   one moment quickly before you go any further and just ask you,

8   you've done a lot of slides here.  You've done a lot of work.

9   Do you do this work for free?

10  A.   No.

11  Q.   How much are you being compensated here?

12  A.   My hourly compensation is $1,400 per hour.  And in

13  addition, I receive compensation based on the amount of

14  billings received for the team that I direct.

15  Q.   Is that more than you usually charge?

16  A.   No.

17  Q.   That's your standard rate?

18  A.   It is.

19  Q.   That is quite high.  Why is that?

20  A.   Well, it's -- it's certainly high.  It's not quite high.

21  It's high.  And in terms of why, it's because of, well, I am an

22  economist.  It's supply and demand.  I have limited capacity to

23  do this kind of work.  Just in the last two months I have

24  declined multiple potential assignments.  And the other fact is

25  since I have been doing this for -- I have been working on

Edward Snyder - Direct

1    antitrust matters for well over three decades, there are a lot

2    of people who have come to value the fact that I do reliable

3    work.

4    Q.  Does your compensation here depend in any way on whether

5    your findings are favorable to the defendants or the outcome of

6    this case?

7    A.  No.

8    Q.  How much time did it take you and your team to do the

9    analysis and prepare for your testimony?

10   A.  Well, I put in over 200 hours.  And my team has put in -- I

11   don't know the number of hours, but a substantial number of

12   hours as well.

13   Q.  Thank you, Professor Snyder.

14          We are going to shift back to your analysis and look

15   at the final analysis that you did here.  You looked at

16   pricing, but you didn't stop there, right?  There is another

17   step that you wanted to conduct in your analysis; is that

18   right?

19   A.  Yes.  I mean, the lack -- all the things that I found so

20   far, I still wanted to do more analysis.  And the analysis that

21   I did was called benchmarking, a standard tool used by

22   economists.

23   Q.  What does that mean, benchmarking?

24   A.  Benchmarking is fundamentally a comparison.  And if you

25   have some prices that are alleged to be influenced by

Edward Snyder - Direct

1    bid-rigging or price-fixing, you compare those to some other

2    prices charged by other suppliers where you don't have the same

3    allegation of bid-rigging and price-fixing.  So these other

4    suppliers are in some sense a control group.  And the

5    benchmarking compares the price-fixing -- the prices that you

6    believe are price fixed to these benchmark suppliers and what

7    they're charging.

8         And the idea is that if you have prices that are the

9    result of price-fixing, they are expected to be higher than the

10   prices in the control group.

11   *Q.*  Now, how did you select a control group?

12   *A.*  Well, I wanted to compare the prices charged by Pilgrim's

13   Pride in 2015.  And you will recall Pilgrim's was the one that

14   increased prices the most, got to the highest price level, so I

15   used them as one part of the comparison.  In the control group,

16   I identified a set of non-defendant suppliers who charged

17   prices to buyers for similar products, same period, similar

18   products, and then substantial volumes, but these other

19   suppliers were not identified as part of the alleged

20   price-fixing conspiracy.

21   *Q.*  So do you have a chart that shows the results of your

22   analysis, Professor?

23   *A.*  I do.

24   *Q.*  I would ask you to turn to J-219.

25   *A.*  Yes.

Edward Snyder - Direct

1    *Q.*  Is this the chart with your benchmarking analysis?

2    *A.*  Yes, it is, for the 2015 period.

3    *Q.*  And what data was used for this chart?

4    *A.*  Monthly sales data aggregated to annual averages for

5    Pilgrim's, as well as the five suppliers in the control group,

6    Fieldale, Foster, GnP, Mountaire and Purdue.

7              *MS. PLETCHER:*  I offer J-219 into evidence.

8              *THE COURT:*  Any objection to the admission of J-219?

9              *MR. TORZILLI:*  Yes, Your Honor, both the title and

10   also request for an opportunity on cross-examination to inquire

11   on the underlying information.

12             *THE COURT:*  Response to that?

13             *MS. PLETCHER:*  Your Honor, I am happy to redact the

14   title from the exhibit that's submitted into evidence as long

15   as we can publish it for demonstrative purposes at this point.

16             *THE COURT:*  I think I will allow Mr. Torzilli an

17   opportunity to voir dire at this time as to this particular

18   exhibit just in terms of the numbers shown on the chart.

19             *MS. PLETCHER:*  Sure.  Thank you, Your Honor.

20                     VOIR DIRE EXAMINATION

21   *BY MR. TORZILLI:*

22   *Q.*  Good morning, Professor Snyder.

23   *A.*  Good morning.

24   *Q.*  I am Paul Torzilli I am one of the attorneys for the

25   government in this case.  And I have a few questions for you

Edward Snyder - Direct

1    that Judge Brimmer is allowing me to ask you during direct

2    examination focusing on J-219.

3    A.   Yes.

4    Q.   So first, sir, you mentioned that the comparison that's

5    embodied in J-219 compares, I think you said, comparable

6    products?

7    A.   I said similar products, yes.

8    Q.   Okay, similar products.  What are the products that you

9    compared as part of the analysis that's reflected here?

10   A.   All of the suppliers were selling eight-piece COB in 2015.

11   In the case of Pilgrim's sales to KFC and to others, let me

12   explain that most of Pilgrim's sales, the vast majority of

13   Pilgrim's sales to KFC are small bird.  Pilgrim's sales to all

14   others are also very strong majority small bird.  And in the

15   case of the five control group suppliers, they are mostly small

16   bird, but they vary and include some big birds.

17   Q.   So for purposes of the control group, you included sales

18   both of small-bird eight-piece COB, as well as large-bird

19   eight-piece COB in there?

20   A.   I didn't include them.  These were the data that I had

21   available.  And the five control group suppliers sell mostly

22   small bird, but I couldn't isolate those prices from the prices

23   charged for large birds.

24   Q.   So the prices that are associated with the five control

25   group firms then include sales of all eight-piece COB or

Edward Snyder - Direct

1    chicken on the bone regardless of the size of the bird that was

2    sold as an eight-piece chicken-on-the-bone product, correct?

3    A.   Yes.   The majority are small bird based on the information

4    that I had, but in the case of -- compared to the Pilgrim's

5    sales which -- to KFC, which are almost all small bird, you are

6    going to get some large birds in the control group suppliers.

7    Q.   I would like to ask you now some questions about the data

8    that you used to reflect the five control, the sales for the

9    five firms that you are using as your control groups, okay?

10   A.   Yes.

11   Q.   Did you interact with the actual firms that you're using as

12   control firms for purposes of obtaining sales data from them?

13   A.   No, I did not, nor did I interact with Pilgrim's.

14   Q.   Okay.   So how did you obtain the sales data that you wound

15   up using for your analysis for the five control group firms?

16   A.   As part of the work that I did, I had access to 20

17   different suppliers and the five were included -- are included

18   in that group.

19   Q.   You took five of the 20 firms and you included those as the

20   control firms for this analysis, right?

21   A.   Yes.   They sold similar products in 2015.   The data I had

22   were reliable, and they sold in substantial volumes.

23   Q.   What was your -- what's your basis for saying the data are

24   reliable?

25   A.   I was able to make sure that the monthly data were

Edward Snyder - Direct

1   accurately aggregated up to the annual level.  And in some

2   cases I had the underlying transaction data.

3   Q.  If you didn't personally interact with the firms that

4   you're reflecting as the control group for purposes of

5   obtaining the data, how do you know the data are reliable?

6   A.  The data are reliable insofar as I understand it.  These

7   are data that are used by the suppliers.  They weren't produced

8   for litigation purposes.  And that's common in IO economics to

9   take the available data and check to make sure that they are

10   accurate, but not to go to the step of actually contacting the

11   individual source to verify the data.

12   Q.  So you have no personal knowledge as to whether the data

13   are reliable or not, though, right?  Someone gave these to you

14   other than someone associated with each of the 20 firms,

15   correct?

16   A.  That's correct.  I have no personal knowledge.

17       MR. TORZILLI:  Moment to confer, Your Honor?

18       THE COURT:  You may.

19       MR. TORZILLI:  Nothing further, Your Honor.

20       THE COURT:  Any objection, then, to the admission of

21   J-219?

22       MR. TORZILLI:  I do have an objection.  May I be heard

23   on side bar?

24       THE COURT:  Yes.

25       (At the bench:)

 1          THE COURT:  Mr. Torzilli, go ahead.

 2          MR. TORZILLI:  Your Honor, I first, of course, have

 3     the objection to the title.  But my second objection is to the

 4     reliability of the data for the five firms that are on the

 5     right-hand side of J-219.  There is no indication that this

 6     data is reliable.  I will say unlike the Pilgrim's data which

 7     was produced to the DOJ in connection with our investigation,

 8     these other data were not produced directly to us, but rather

 9     were produced I think through several links in the chain to

10     defendants who then -- the defendants in this litigation and

11     then were produced to us.  So because there are questions about

12     the data reliability and this witness has no personal knowledge

13     about the reliability of the data being used there, we object

14     to the admission of J-219.

15          THE COURT:  Ms. Pletcher, response?

16          MS. PLETCHER:  Thank you, Your Honor.  An expert is

17     not required to have personal knowledge of the data upon which

18     he relies.  And in this case all of this data that Professor

19     Snyder has relied upon has been available in discovery,

20     produced to him, produced to the defendants.  And he has

21     analyzed it.  He has verified it.  And he has determined that

22     it is reliable and accurate.  And for an expert witness that is

23     sufficient.  He has used his own expert determinations as to

24     whether it's reliable and verifiable and he has relied on it.

25     So to that extent, I think there should be no objection to the

Edward Snyder - Direct

1    reliability of this data.  And if the defendant -- if the

2    government has a problem again with the methodology, they can

3    explore that with Professor Snyder on cross-examination.

4            *THE COURT:*  Mr. Torzilli?

5            *MR. TORZILLI:*  My only other point is that his

6    verification, of course, is based on the premise that the data

7    is reliable.  And we've heard no indication that he was -- he

8    was, you know, in essence handed data that was produced to

9    someone else and then through several links in the chain

10   provided to him, so it is a case of potential garbage in,

11   garbage out, as far as the verification is concerned.  So if he

12   is verifying data that's either incomplete or unreliable, that

13   verification is just going to compound the reliability issues

14   that were created by what he received in the first place.

15           *THE COURT:*  All right.  The most important thing that

16   Professor Snyder said is that this is the type of data commonly

17   relied upon by economists in terms of the reliability of the

18   data set.  That allows an expert such as Professor Snyder to

19   testify about that data.  The fact that he doesn't have any

20   personal knowledge is not somehow disqualifying in terms of

21   displaying that particular exhibit to the jury or him

22   testifying about that data.

23           However, because he is testifying about data that was

24   not made available to the government and because this data is

25   essentially a summary of that data, I will only allow this

Edward Snyder - Direct

 1   particular exhibit to be shown to the jury for demonstrative

 2   purposes, all right?  Thank you.

 3       (In open court:)

 4       THE COURT:  The objection will be overruled in part.

 5   Exhibit 219 will be admissible for demonstrative purposes only.

 6       MS. PLETCHER:  Thank you, Your Honor.

 7       May we publish?

 8       THE COURT:  You may.

 9   BY MS. PLETCHER:

10   Q.  Professor Snyder, the jury can now see Exhibit J-219.

11   Could you please explain what this chart shows?

12   A.  Yes.  And counsel, should I talk through the analysis at

13   the same time or just give the presentation?

14   Q.  Please explain to the jury in whatever you think makes the

15   most sense to you what this chart shows.

16   A.  Okay.  So this is 2015.  It's benchmark analysis.  And the

17   first two bars deal with Pilgrim's sales, the first one to KFC

18   and the second one sales to all other buyers.  And on the

19   vertical axis is the price per pound.  And it's important, one

20   thing to note here is that I am switching from contract prices

21   to actual sales prices.  Why did I do that?  In this slide,

22   it's because that's what I have for the control group

23   suppliers, so I wanted to match up the prices.  Here they are

24   actual prices, not contract prices.

25       So on the vertical axis is price per pound.  That axis

3614

Edward Snyder - Direct

1    starts at 60 cents.  And what I see in the two lighter blue

2    bars is that prices to KFC and to the others are pretty close,

3    about a penny apart.  That's economically significant, but they

4    are pretty close.

5            And then to the right are the prices charged by five

6    suppliers in the control group, non-defendant suppliers, for

7    similar products, substantial volumes.  And those five are

8    Fieldale, Foster, GNP, Mountaire and Perdue.  I should mention

9    that for Foster and GNP I can actually get to the individual

10   transactions, but these are annual prices aggregated up from

11   monthly data for the others, and we are comparing annual prices

12   charged across Pilgrim's and this control group.

13           Now, what did I see when I did this?  What I saw was

14   surprising because based on the government's theory, I would

15   have expected that the Pilgrim's prices would be higher than

16   the non-defendant supplier prices.

17   Q.  Let me ask you, Professor Snyder, why is that?  Why would

18   you have expected Pilgrim's prices to be higher?

19   A.  Well, Pilgrim's is alleged to be part of the price-fixing

20   conspiracy.  And if the price-fixing conspiracy raises prices,

21   it allows them to charge higher prices, I would expect those

22   prices to be higher than the prices charged by non-defendant

23   suppliers.  But I didn't find that.

24   Q.  Now, what steps did you take to make sure that this

25   analysis was accurate?

Edward Snyder - Direct

1   A.  Well, several steps.  One is to check the accuracy of the

2   underlying data.  Secondly, I checked to make sure I had a

3   control group that was constructed in a way that held constant,

4   if you will, the most important factors.  Those are same time

5   period, similar products, substantial volume.

6        I should note that no benchmark analysis can hold

7   everything constant.  No benchmark analysis is perfect.  But in

8   my experience, what you need to do is control for the most

9   important factors, the ones I just mentioned.

10       And then the last thing to do is instead of just

11  having one benchmark supplier, there is safety in numbers here.

12  It's good to have multiple benchmarks.  And each of them is

13  charging a higher price than Pilgrim's.  And that's -- that

14  consistency is very important to me.

15       And then there is one last thing that I did which I

16  won't extend this answer, but I checked one other hypothesis

17  concerning so-called umbrella effects.

18  Q.  And what does that mean, an umbrella effect?

19  A.  Well, it might occur to people to say, well, maybe these

20  other suppliers, even though they are not participating in the

21  alleged conspiracy, maybe they're following the price-fixing.

22  And IO economists decades ago developed a theory for this

23  called umbrella effect.  And the idea of an umbrella effect is

24  you've got the price-fixing going on and that raises price.  It

25  opens up an umbrella.  And then others, non-defendants,

3616

Edward Snyder - Direct

1   non-conspirators, can take advantage of that higher price and

2   charge prices that are basically under the umbrella.  That's

3   the theory.

4          But this is where economics to me is, you know, it's

5   exciting and it's interesting because, as I said before,

6   economics is something that where you can actually separate out

7   and consider alternative explanations.  And when I look at this

8   alternative explanation, sort of a modification of what the

9   government might allege, you've got price-fixing plus umbrella

10  and that's why you're getting all these prices to be similar,

11  the way you distinguish that from the non-conspiracy hypothesis

12  is timing.  With the umbrella effect theory, you have got the

13  price-fixing and then you have got the umbrella opening up, and

14  the non-defendant suppliers take advantage of that.

15  Q.  So Professor Snyder, I am just going to ask you quickly,

16  though, you mentioned this umbrella effect, but is it your

17  opinion that's what's happening in this case?

18  A.  Definitely not.  And the way that I see it as a definitely

19  not is by checking the timing.  It turns out that if you look

20  at these non-defendant suppliers, I see that they were raising

21  price before 2015.  In fact, this was in the earlier slide.

22  Let me do it from memory.  Pilgrim's in 2013 increased contract

23  prices to KFC by about 1 percent and then 2014 decreased prices

24  by 6 percent, so Pilgrim's is minus 5 percent before 2015 for

25  those two years.

Edward Snyder - Direct

1          When I checked Fieldale in 2013 and '14, they were up

2    21 percent.  Foster was up 11 percent.  Mountaire was up

3    11 percent.  So instead of having these non-defendant suppliers

4    follow, what you see in the timing is they are making their own

5    decisions in response to the same supply-and-demand factors

6    that I identified earlier contradicting directly as I can ever

7    see data the alleged price-fixing plus umbrella effect theory.

8    Q.  Professor Snyder, I do want to be clear that none of these

9    suppliers are defendants in this case, right?  You're looking

10   at company level data as opposed to the individuals that are

11   sitting here today.  I just want to be clear that that's the

12   case, right?

13   A.  Thank you, yes.

14   Q.  All right.  So let's bring this all back around, Professor

15   Snyder.  Having done the benchmarking analysis, what did you

16   conclude?

17   A.  I found evidence that contradicts squarely the government's

18   theory.  The benchmark suppliers are not charging lower prices.

19   And then when I considered the umbrella effect, I rejected that

20   as well because they weren't waiting for the umbrella to open

21   and following.  They had preceded this price increase with

22   their own price increases that were much higher than Pilgrim's

23   to KFC.

24   Q.  At this point, Professor Snyder, I am going to ask you to

25   go back to J-207 which was displayed for demonstrative purposes

Edward Snyder - Direct

1    previously.

2              *MS. PLETCHER:*  Your Honor, may we display that again?

3              *THE COURT:*  Yes, you may.

4    *BY MS. PLETCHER:*

5    *Q.*  So Professor Snyder, you conducted the benchmark analysis,

6    pricing analysis, information exchange, evaluated alternative

7    explanations.  Can you please tell the jury what you have

8    concluded on the whole with respect to all of your analyses?

9    *A.*  My overall conclusion is that the economics simply don't

10   line up with the government's theory.

11             *MS. PLETCHER:*  Thank you, Professor Snyder.  At this

12   point I have no further questions.

13             *THE COURT:*  All right.  Thank you.

14             Cross-examination?  First of all, let me ask, anyone

15   other than the government?

16             All right.  And Mr. Torzilli, go ahead.

17             *MR. TORZILLI:*  Your Honor, may we have a side bar,

18   please?

19             *THE COURT:*  Yes.

20             *THE WITNESS:*  May I ask, should I now open up the

21   government's box?

22             *MR. TORZILLI:*  May I respond, Your Honor?

23             *THE COURT:*  Yeah, go ahead.

24             *MR. TORZILLI:*  Professor Snyder, if you could just

25   hold on one minute on that.  If you could just maybe get the

Edward Snyder - Direct

 1   package nearby if you don't have it already.

 2           THE WITNESS:  I have it nearby.

 3           MR. TORZILLI:  Wonderful, thank you.

 4       (At the bench:)

 5           THE COURT:  Mr. Torzilli had asked for a side bar

 6   which may not have been audible to too many other people.

 7           Go ahead, Mr. Torzilli.

 8           MR. TORZILLI:  Thank you, Your Honor.  I wanted to

 9   clarify before cross-examination began my belief that Professor

10   Snyder has now opened the door to being cross-examined on

11   communications, including specific communications.  During his

12   direct exam he said something to the effect in connection with

13   discussing information exchanges that they haven't said we are

14   going to hold them firm, and if they had an agreement to rig

15   bids, I would expect at least in some circumstances that they

16   would hold their prices firm.

17           So I think he is drawing upon communications there

18   where he is saying they haven't said we are going to hold them

19   firm and then predicts that if there was a bid-rigging

20   agreement, that he would expect that they would hold their

21   prices firm.  So I think that opens the door to us inquiring of

22   him on cross-examination about communications that he either

23   has or has not relied upon in forming that aspect of his

24   opinion that he has delivered to the jury.

25           THE COURT:  Ms. Pletcher, response?

Edward Snyder - Direct

1          *MS. PLETCHER:*  I disagree.  I definitely disagree,

2     Your Honor.  He was asked a question, a very high-level

3     hypothetical format and he answered it as such.  Holding firm

4     is a general term that he was talking about in terms of a very

5     hypothetical situation.  I intentionally did not ask him about

6     anything specific knowing that he was not prepared for that.

7     And that was not his -- the intention of his testimony, so I

8     don't believe that any door whatsoever was opened.  And if

9     Mr. Torzilli would like to, as Your Honor suggested, inquire at

10    a hypothetical level, he is free to do that, but there is no

11    specific testimony referenced.

12          *THE COURT:*  Well, what happened is that as to J-216 he

13    was not asked a hypothetical question.  All of the sudden he

14    just started talking about his opinion that it was

15    inconsistent -- the fact that the bids and final prices don't

16    match is inconsistent with an agreement among suppliers,

17    especially if they had indicated or he said something to the

18    effect of would hold prices firm.  That does seem to be a

19    direct reference to some of the documents in this particular

20    case.

21          So on that particular exhibit regarding that

22    particular opinion of Professor Snyder, Mr. Torzilli may

23    inquire as to the source of and understanding of Professor

24    Snyder as to something regarding, you know, prices holding

25    firm.

Edward Snyder - Direct

1          However, in terms of before any specific document

2    could be discussed or shown to him, we might have to have

3    another side bar because I think Mr. Torzilli's permitted to

4    inquire into the source of Professor Snyder's knowledge about

5    that, but that doesn't necessarily mean that he's been exposed

6    to those documents.  We'll have to see.

7          *MS. PLETCHER:*  Your Honor, on that point I would note

8    that the DOJ indicators, which we did not discuss specifically

9    in this direct exam based off of the conversations that we had

10   Thursday before Professor Snyder took the stand, it does use

11   the term holding firm.  And that's -- I do believe that it's a

12   term not just coming from documents that would have been used

13   in this case or communications in this case, but it is an

14   economic term as well.

15         *THE COURT:*  Yeah, that very well could be, but

16   Mr. Torzilli can explore that.

17         But Mr. Torzilli, you'll have to phrase your questions

18   carefully because as Ms. Pletcher had mentioned last week,

19   Professor Snyder was exposed to some of the documents just for

20   preparing him for cross-examination.  But the issue here is

21   whether or not he utilized some of the documents to form his

22   opinions on direct.

23         *MR. POLLACK:*  Your Honor, this is Barry Pollack.  I

24   wanted to make an observation if I can.  I did not understand

25   Professor Snyder's testimony in the way that I think

Edward Snyder - Direct

1   Mr. Torzilli understood it.  He was asked the question, Why is

2   it important to you to make the observation about the reduction

3   in prices, talking about the demonstrative.  And he says, well,

4   in addition to prices not being identical in the context of

5   alleged bid-rigging, I am a little bit surprised to see that

6   individual suppliers have decided not to hold their prices.

7   They haven't said we are going to hold them firm.

8           He is clearly reaching that conclusion not based on a

9   review of any communications, but based on his review of the

10  fact that they didn't hold them firm.  So he is positing one

11  would expect if there is price-fixing somebody would have

12  reached an agreement to hold firm and what he is seeing in the

13  data is that they didn't hold firm.  So I did not take his

14  comments to be a comment about any particular communications or

15  any communications at all, simply an observation from the

16  objective data.

17          THE COURT:  Yeah.  And even assuming that

18  Mr. Pollack's interpretation of the testimony is correct,

19  Mr. Torzilli can ask questions about that no matter what.  It's

20  just that Mr. Torzilli is certainly allowed to inquire what the

21  basis for the opinion was.  Thank you.

22      (In open court:)

23          MR. TORZILLI:  May I inquire?

24          THE COURT:  Yes.  We have got four minutes.

25          MR. TORZILLI:  We will try to make the most of it.

Edward Snyder - Cross

1                    **CROSS-EXAMINATION**

2    *BY MR. TORZILLI:*

3    *Q.*  Good morning, Professor Snyder.

4    *A.*  Good morning.

5    *Q.*  I want to pick up, we have a few minutes before we are

6    going to take a break, but I would like to pick up on a couple

7    of issues that were discussed with you on your direct exam

8    before we have time for a break.

9              The first thing is you were talking about your

10   compensation for your testimony and other work on this matter,

11   right?

12   *A.*  Yes.

13   *Q.*  And you testified that your billing rate is $1,400 an hour

14   for this matter, correct?

15   *A.*  Yes.

16   *Q.*  And you said you spent approximately 200 hours working on

17   the matter so far, correct?

18   *A.*  Yes.

19   *Q.*  So that's approximately $280,000 of billings, correct?

20   *A.*  Yes.

21   *Q.*  And you said you had a team that's worked with you to help

22   you put together the analysis including the analysis you've

23   shared with the jury this morning and last week, correct?

24   *A.*  Yes.

25   *Q.*  And how much of billings did your team put into the matter

Edward Snyder - Cross

1    so far?

2    A.  I don't have a precise figure, in part because there is a

3    lag, but I know it's substantial in terms of number of hours.

4    Q.  And how about in terms of dollar billings?

5    A.  It will ultimately be economically significant and

6    substantial for me.

7    Q.  Is it over half a million dollars?

8    A.  You mean for the second part of the compensation?

9    Q.  Yeah, for the billings of your team.

10   A.  I don't know that.  That sounds high, but I don't have a

11   precise figure.

12   Q.  How about the -- and put aside precise figures now.  How

13   about a best estimate, what would your best estimate be for the

14   total bills, your time plus your team's time?

15   A.  Wait a minute.  I am sorry, I may have misunderstood the

16   question.  Did you ask -- was your earlier question about the

17   total billings of the team being the half a million?

18   Q.  No.  My question now for you, sir, is put aside that, and

19   now I am asking you if you were to add up your time plus your

20   team's time, and not precisely, but as an estimate what would

21   that be in terms of total billings?

22   A.  I think you already covered the hourly compensation.  I

23   would think that the second component would be higher, but not

24   double.

25   Q.  So would you all in expect to be around the half million

Edward Snyder - Cross

1   dollar range for total billings so far in this engagement?

2   A.  I think that's a good number.

3         MR. TORZILLI:  Your Honor, now might be a good time to

4   start the mid-morning break.

5         THE COURT:  I agree.  Ladies and gentlemen, we will go

6   ahead and take the mid-morning break at this time.  We will

7   plan on reconvening at 10:30.  Keep the admonitions in mind.

8   The jury is excused.

9         (Jury excused.)

10        THE COURT:  We will be in recess for 15 minutes.

11    (Recess at 10:15 a.m. until 10:33 a.m.)

12        THE COURT:  Let's go ahead and bring the jury in.

13        (Jury present.)

14        THE COURT:  Mr. Torzilli, go ahead.

15        MR. TORZILLI:  Thank you, Your Honor.

16  BY MR. TORZILLI:

17  Q.  Welcome back, Professor Snyder.

18        THE COURT:  Professor Snyder, I am not sure that we

19  can hear you.  Can you try saying something?

20        MR. TORZILLI:  You need to unmute, Professor Snyder.

21        THE WITNESS:  Okay?

22        MR. TORZILLI:  We can hear you.

23  BY MR. TORZILLI:

24  Q.  All right.  Professor Snyder, welcome back.

25        We were talking about your bills on this engagement,

Edward Snyder - Cross

1    and the question I have now is I want to turn to for your time

2    that you spent on this engagement, what you actually relied on

3    to deliver the opinions that you delivered both this morning

4    and last week, okay?

5    *A.*   Okay.

6    *Q.*   So you relied on -- the numbers you relied on were

7    Pilgrim's sales data, correct?

8         *MS. PLETCHER:*   Objection, vague as to his numbers,

9    Your Honor.

10        *THE COURT:*   Overruled.

11   *BY MR. TORZILLI:*

12   *Q.*   The USDA data, correct?

13   *A.*   Yes.   And I should just mention that was interpreted by and

14   presented to the industry by AgriStats and EMI.

15   *Q.*   So you relied on AgriStats and EMI as well?

16   *A.*   When they were presenting USDA data, yes.

17   *Q.*   Did you look at anything else with respect to AgriStats and

18   EMI in relying on your opinions?

19   *A.*   Nothing comes to mind.

20   *Q.*   Okay.   Is there any other data -- well, and you relied on

21   the data that you used for your benchmarking, correct?

22   *A.*   Yes.   Along with Pilgrim's, there were 19 other suppliers,

23   some of them very small, but I had data on average prices

24   charged by those other 19 suppliers.   And in some cases I had

25   underlying transaction data.

Edward Snyder - Cross

1   Q.  Is there any other data that you relied on other than what

2   you've just identified?

3   A.  The initial bids contained in various documents.  I also

4   relied on the contracts that showed final prices.  And in some

5   cases I used those to corroborate and check data on actual

6   transaction prices to make sure they were consistent.

7   Q.  So you relied on contracts between KFC or their purchasing

8   cooperative and chicken suppliers, correct?

9   A.  Yes, and between other suppliers and other buyers.

10  Q.  So you relied on contracts between other suppliers and

11  other customers for the analysis, the opinions that you've

12  delivered in your testimony today and last week?

13  A.  Yes, depending on which -- what analysis.  As I mentioned,

14  in some cases I have to focus on contract prices and in some

15  cases I would focus on average prices based on transactions.

16  Q.  Which contracts other than KFC contracts did you rely on

17  for purposes of your testimony either this morning or last

18  week?

19  A.  Is it okay if I refer to the exhibits?

20  Q.  If you feel the need to to properly answer the question,

21  yes.

22  A.  I do.  So as indicated in Exhibit J-215 and J-216, I relied

23  on contracts between buyers and KFC.

24  Q.  My question, sir, was whether you relied on any contracts

25  other than KFC between customers of broiler chicken products

3628

Edward Snyder - Cross

1    and suppliers of broiler chicken products.

2    A.   I apologize.  You're right.  These are contracts between

3    those -- between KFC and these suppliers.  I just need to check

4    one other exhibit.  So with respect to the benchmarking

5    exhibit, it did not rely on contracts.  It relied on actual

6    transaction prices.

7    Q.   So the answer to my question is no?

8    A.   Correct.

9    Q.   You also relied on bids, correct?

10   A.   Yes.

11   Q.   Bids that chicken suppliers submitted to KFC, correct?

12   A.   Correct.

13   Q.   Other than bids that chicken suppliers submitted to KFC,

14   did you rely on any other bids in forming the opinions that

15   you've shared with the jury either today or last week?

16   A.   Not in terms of what I presented to the Court, no.

17   Q.   And there are materials that you did not rely on in forming

18   opinions that you delivered in your testimony either today or

19   last week, correct?

20        MS. PLETCHER:  Vague.  Objection, vague, Your Honor.

21        THE COURT:  Overruled.

22        MR. TORZILLI:  You can answer, sir.

23   A.   Yes.  I, of course, reviewed a lot of materials, but I

24   didn't use them in terms of my presentation to the Court.

25   BY MR. TORZILLI:

Edward Snyder - Cross

1   Q. And you agree with me, sir, that there are materials in

2   evidence in this case that you did not rely on in forming the

3   opinions that you have given as part of your direct

4   examination, correct?

5        MR. BELLER:  Objection, lack of foundation,

6   speculation.

7        THE COURT:  Well, he can answer the question.

8   Overruled.

9   A. Yes, I am sure that's true.  The materials are voluminous.

10  BY MR. TORZILLI:

11  Q. And that includes -- the materials that you have not relied

12  on that are in evidence include trial testimony from witnesses

13  that the government called in this case, correct?

14  A. That's correct.  My presentation to the Court and my

15  conclusions are based on objective economic evidence.

16  Q. And the objective economic evidence that is the basis of

17  the opinions you've provided, then, are the data you've

18  identified, the contracts you've identified and the bids you've

19  identified, correct?

20  A. As well as the information from the U.S. Department of

21  Agriculture with respect to breeder birds, the wholesale price

22  of pork, the wholesale price of beef, things of that nature.

23  Q. That's data, right?

24  A. Yes.

25  Q. I do want to ask you about that very point.  Sir, if you

Edward Snyder - Cross

1    could have in front of you what's been marked as Defense

2    Exhibit J-210.

3            MR. TORZILLI:  Your Honor, permission to publish J-210

4    for demonstrative purposes?

5            THE COURT:  You may.

6            MR. TORZILLI:  Thank you, Your Honor.

7    BY MR. TORZILLI:

8    Q.  So Professor Snyder, you have Exhibit J-210 up in front of

9    you?

10           MR. TORZILLI:  Moment to confer?

11           THE COURT:  Yes.

12   BY MR. TORZILLI:

13   Q.  Do you have J-210 in front of you, Professor Snyder?

14   A.  Yes.

15   Q.  So J-210 is a slide that you discussed in connection with

16   your opinions about demand, correct?

17   A.  Yes.

18   Q.  Now, the slide itself actually doesn't depict demand.  The

19   slide itself actually depicts prices, correct?

20   A.  Correct.

21   Q.  And prices are a function of not just demand, but also

22   supply, correct?

23   A.  Yes.

24   Q.  And what you're doing here on the chart in 210, if I

25   understand you correctly, is you are tracking prices for

3631

Edward Snyder - Cross

1    products that are, to use an economist's term, substitutes for

2    each other, correct?

3    A.   Yes.

4    Q.   So you say that beef is a substitute for pork, correct?

5    A.   The three meats are substitutes.

6    Q.   They are all substitutes for each other, right, beef, pork

7    and chicken.

8    A.   Yes.  As I mentioned, not for all consumers, but for some.

9    Q.   For some consumers?

10   A.   Yes.

11   Q.   So the beef line, if I understand correctly, this is a

12   wholesale beef index.  So this is sales of all types of beef

13   cuts nationally, correct?

14   A.   As published by the USDA, yes.

15   Q.   So that's for the entire beef industry, correct?

16   A.   That's my understanding, yes.

17   Q.   And is it also your understanding that the pork index is

18   the national prices for the entire pork industry or anything

19   that comes off a pig?

20   A.   That's correct.  And just to make it clear, when you say

21   the entire industry, my understanding is the USDA does

22   sampling, but the basic answer is yes.

23   Q.   And we are talking wholesale prices to be clear, correct?

24   A.   Correct.

25   Q.   And then for chicken, though, that's not the wholesale

3632

Edward Snyder - Cross

1  price for the entire chicken industry.  That is the sales that

2  Pilgrim's Pride made to KFC for the chicken-on-the-bone

3  product, right?

4  A.  Yes, that's for -- yes.

5  Q.  So that's one product from one supplier sold to one

6  customer, correct?

7  A.  Correct.

8  Q.  Now, let's look at the lines on your chart.  And here

9  sometimes the line for pork gets above the line for beef,

10  correct?

11  A.  Yes.

12  Q.  That happened in late 2011, correct?

13  A.  Yes.  The yellow peak in late 2011 is above the wholesale

14  price of beef.

15  Q.  And sometimes the price of beef as reflected on J-210 is

16  beneath the price of chicken, correct, as reflected here?

17  A.  I don't see that.  Maybe you could direct me to that.

18  Q.  I am sorry, I probably used the wrong words.  The price of

19  pork is sometimes beneath the price of chicken as reflected on

20  here as, for example, in 2013 and then 2015 and on.

21  A.  Yes.

22  Q.  Okay.  But you're not telling us, you're not telling the

23  jury that there were actually occasions during this time period

24  where the real price of pork was sometimes lower than the real

25  price of chicken, correct?

Edward Snyder - Cross

1   A.   That's correct.  Just a reminder that this is a price index

2   and it doesn't show actual prices.  It shows relative prices

3   and how they change over time.

4   Q.   So these are just relative price changes.  And you started

5   all the prices at the same dollar value at the same time,

6   right?

7   A.   Yes.

8   Q.   So, in fact, the price of pork is never higher than the

9   price of beef, correct?

10   A.   I certainly wouldn't reach that conclusion based on this

11   chart.  That's not what it's intended to do.  It's not intended

12   to compare actual pork and chicken prices.

13   Q.   And you don't have any --

14   A.   My understanding is that chicken on a per-pound basis is

15   less expensive than the other two.

16   Q.   And you don't have any information to conclude, at least

17   from USDA data, that the price of chicken was ever above the

18   price of pork, right?

19   A.   Correct.

20   Q.   Or that the price of beef was lower than the price of pork,

21   right?

22   A.   Correct.

23   Q.   That would cause a stampede down to the King Soopers?  You

24   would agree with me?

25   A.   Yeah.  Again, not everyone would be in the stampede, but

3634

Edward Snyder - Cross

1    enough people would.

2    Q.  And also to that point, though, sir, is you agree with me

3    that you talked about the substitution between beef, pork and

4    chicken, right?

5    A.  Yes.

6    Q.  Being for some consumers?  I am sorry, for some consumers,

7    correct?

8    A.  Yes.

9    Q.  But just to be clear, KFC cannot view beef or pork as a

10   substitute for chicken, right?

11   A.  Correct.

12   Q.  And that would also be true for another chicken restaurant

13   like Popeye's, correct?

14   A.  Correct.

15   Q.  They wouldn't be able to say the price of pork is

16   decreasing, so let's go out and buy pork, correct?

17   A.  Correct.

18   Q.  And so if they can't buy chicken at competitive prices,

19   they are in jeopardy of losing the restaurant format that they

20   built, correct?

21   A.  The KFC, the C stands for chicken, so they focus on

22   chicken.

23   Q.  And Pollo Tropical, that's the word for chicken as well, so

24   it would stand to reason the same logic would apply, correct?

25   A.  Correct.  They are specialized in terms of which of the

Edward Snyder - Cross

1    three meats they feature.

2    Q.   Thank you, sir.  Now, if you could pull out slide J-211.

3         MR. TORZILLI:  Permission, Your Honor, to publish that

4    as a demonstrative.

5         THE COURT:  This has been admitted for all purposes

6    except for the title which is merely demonstrative.  That may

7    be displayed.

8         MR. TORZILLI:  Thank you, Your Honor.

9    BY MR. TORZILLI:

10   Q.   So Professor Snyder, do you have Exhibit J-211 in front of

11   you?

12   A.   Yes.

13   Q.   So this is a slide that as a title says Explanation No. 2,

14   Reduced Supply, correct?

15   A.   Yes.

16   Q.   Now, you do understand that the charged conspiracy in this

17   case started as early as the year 2012, correct?

18   A.   Yes.

19   Q.   Okay.  So if we look at your chart on Defense Exhibit J-211

20   and we look at the year 2012 and onward, you agree with me that

21   the supply of what's being reported here which is breeder birds

22   is going up, correct?

23   A.   Starting from the trough in 2012, yes.

24   Q.   And that's the year the charged conspiracy commenced,

25   correct?

Edward Snyder - Cross

1    A.   That's my understanding about the government's allegation,

2    yes.

3    Q.   And then it's continuing each and every year through the

4    last year reported here which you have as 2017, correct?

5    A.   Correct.

6    Q.   Okay.  Now, this slide reflects the number of breeder

7    birds.  And I think you said or at least certainly it was

8    implied by your testimony that we don't actually eat breeder

9    birds, right?

10   A.   Correct.

11   Q.   Human beings eat broiler chickens, correct?

12   A.   Yes.

13   Q.   But the breeder birds are the birds that create the hens

14   that create the broiler chickens that we eat, correct?

15   A.   Correct.

16   Q.   Now, and you also I think said on your direct examination

17   that the breeder birds don't necessarily, and correct me if I'm

18   wrong, but the breeder birds don't necessarily dedicate

19   themselves to being bred to produce small-bird broilers versus

20   large-bird broilers, correct?

21   A.   Yes, although I should just mention that my understanding

22   is that there are different types of breeder birds, but they

23   are not simply for large or small birds.  My interpretation is

24   that the limited supply of breeder birds affects both small

25   birds and large birds.

Edward Snyder - Cross

1    Q.  Your understanding is it affects both small and large

2    birds?

3    A.  Yes.

4    Q.  Now, you showed the jury this exhibit.  And just to confirm

5    you have not shown the jury any information showing the actual

6    number of birds supplied or produced, correct?

7    A.  Correct.

8    Q.  And by produced, I mean basically slaughtered for purposes

9    of being sold ultimately to consumers.

10   A.  Correct.

11   Q.  Okay.  Did you know that that information does, in fact,

12   exist?

13   A.  I am aware that there are measures of actual supply and,

14   those, of course, reflect a lag in terms of the process of

15   planning and actually growing the birds.

16   Q.  You are aware that AgriStats, an organization you mentioned

17   a few moments ago, has information about the number of small

18   birds produced on an annual basis?

19   A.  I believe so.

20   Q.  And are you aware that that information shows that the

21   supply of small birds was not decreasing during the time period

22   2012 to 2017?

23            MR. BELLER:  Objection, foundation.

24            THE COURT:  Overruled.

25   A.  I don't recall the trend, and I also don't recall the level

Edward Snyder - Cross

1    compared to prior years like 2008 or 2010.

2    *BY MR. TORZILLI:*

3    *Q.*  You don't recall?

4    *A.*  Correct.

5    *Q.*  If you could -- do you have that box of documents that was

6    shipped to you in your binder?

7    *A.*  Yes.

8    *Q.*  Just one moment.  Let me ask you to access -- it should be

9    the document in envelope No. 4.

10           *MR. TORZILLI:*  Your Honor, permission to display for

11   the Court and the attorneys Government's Exhibit 10637.

12           *THE COURT:*  What was the number again, Mr. Torzilli?

13           *MR. TORZILLI:*  10637.

14           *THE COURT:*  You may.

15           *MR. TORZILLI:*  And permission to approach with

16   binders.

17           *THE COURT:*  You may.

18   *BY MR. TORZILLI:*

19   *Q.*  Do you have that envelope, Professor Snyder?

20   *A.*  I do.

21   *Q.*  Okay.  And have you opened it?

22   *A.*  Yes.  I see a government exhibit.

23           *MS. PLETCHER:*  Your Honor, if defendants can have a

24   copy, please?

25           *THE COURT:*  Yes.

Edward Snyder - Cross

1          MS. PLETCHER:  Thank you.

2    BY MR. TORZILLI:

3    Q.  Professor Snyder, you have Government's Exhibit 10637 in

4    front of you, sir?

5    A.  Yes.

6    Q.  Does this refresh your recollection that the AgriStats data

7    shows the number of small birds produced from 2012 to 2017 was

8    not decreased?

9    A.  I didn't have a specific recollection of all the things

10   that were happening in this slide, but I do see that from 2012

11   there is a dip in 2013, but then it rises from there.  And then

12   I would just -- I also note that, and this is what I was

13   referring to earlier about not just trend but levels, the level

14   in 2014 is below, for example, 2011.

15        MR. TORZILLI:  Your Honor, permission to publish as a

16   demonstrative?

17        THE COURT:  Any objection to the use of Exhibit 10637

18   as a demonstrative?

19        MS. PLETCHER:  Yes, Your Honor, objection to

20   foundation.

21        THE COURT:  Response, Mr. Torzilli?

22        MR. TORZILLI:  May I inquire?

23        THE COURT:  Yes.

24   BY MR. TORZILLI:

25   Q.  Professor Snyder, you said you relied on AgriStats

3640

Edward Snyder - Cross

1  information in forming your opinions, correct?

2  *A.*  For some purposes.

3  *Q.*  Including information that AgriStats communicated to others

4  in the industry?

5  *A.*  Correct.  Typically it was information from the USDA that I

6  focused on.

7  *Q.*  And when I asked you about whether you were aware that the

8  number of small birds actually produced was not declining, you

9  said you couldn't recall, correct?

10  *A.*  I think I said I couldn't recall, and I also couldn't

11  recall with respect to levels in any given year versus earlier

12  years.

13  *Q.*  Does this refresh your recollection about the levels of

14  small birds, information about the levels of small birds

15  produced in the United States during the period we are talking

16  about?

17  *A.*  Yes.

18  *Q.*  And are you familiar with the information that's depicted

19  here?  And I realize it might not necessarily be in the same

20  form, but the information that's depicted on Government's

21  Exhibit 10637?

22  *A.*  In general, yes.

23  *Q.*  Thank you, sir.

24      *MR. TORZILLI:*  Permission to publish as a

25  demonstrative?

Edward Snyder - Cross

1      THE COURT:  Any objection to, once again, the use of

2   10637 for demonstrative purposes?

3      MS. PLETCHER:  Yes, Your Honor.  I still object to

4   foundation.  In particular, the source here is AgriStats

5   statistics reports.  No foundation has been laid for that.  And

6   even the definition of small bird has not been defined.

7      THE COURT:  Response?

8      MR. TORZILLI:  I think an adequate foundation has been

9   laid.

10      THE COURT:  The objection will be sustained.

11   BY MR. TORZILLI:

12   Q.  Sir, you agree with me, though, that the AgriStats

13   information shows the number of small birds was not declining

14   from 2012 to 2017, correct?

15   A.  Except for 2013 where it fell.  From 2012 to 2013 there was

16   a decline.  And then from 2013 through the end of the chart,

17   2017, the number was increasing.

18      MS. PLETCHER:  Your Honor, I object to this testimony

19   to the extent the chart is not in evidence.

20      THE COURT:  I am sorry, what was the last part of

21   that, Ms. Pletcher?

22      MS. PLETCHER:  Based on the chart that's not in

23   evidence.

24      THE COURT:  Overruled.

25      MR. FAGG:  Your Honor, we object on the basis of lack

Edward Snyder - Cross

1    of foundation as well.

2            *THE COURT:*  Overruled.

3    BY MR. TORZILLI:

4    *Q.*  So, sir, you didn't rely on AgriStats small-bird slaughter

5    or production statistics in your opinions about supply that you

6    delivered to this jury during your testimony, correct?

7    *A.*  I did not.  But the data in this chart are overall

8    consistent with my opinion based on breeder birds.

9    *Q.*  And instead you chose to tell the jury about breeder birds

10   which, as you said, include information about both large birds

11   and small birds, correct?

12   *A.*  Yes.  I chose to present first the information on breeder

13   birds.

14   *Q.*  You can put that exhibit aside, sir.

15           I want to now ask you about Exhibit J-212.  And

16   permission to publish that, Your Honor, as a demonstrative.

17           *THE COURT:*  Yes, you may.

18           *MR. TORZILLI:*  Thank you.

19   BY MR. TORZILLI:

20   *Q.*  You have Exhibit J-212 in front of you, sir?

21   *A.*  Yes.

22   *Q.*  Now, this is a comparison you made of prices of small birds

23   versus prices of big birds, correct?

24   *A.*  I think I stated it somewhat differently, but it gets at

25   that comparison, yes.

Edward Snyder - Cross

1   *Q.* So for the big bird price that's reflected here or the

2   percentage increase reflected here, you drew on USDA data,

3   correct?

4   *A.* As interpreted and presented to the industry by EMI.

5   *Q.* So it's AgriStats' presentation of what they purported to

6   be USDA data, correct?

7   *A.* Correct.

8   *Q.* And what USDA data relative to big birds was used by EMI

9   that you're relying on here?

10  *A.* USDA publishes data on big bird parts. As I recall, it's

11  on wings, breasts and quarter legs. And then what EMI did was

12  create an average of those three big-bird parts weighted by

13  volume to come up with their presentation to the industry.

14  *Q.* And then for the other price increase that's reflected

15  here, you're taking that information from Pilgrim's contracts

16  to KFC, correct?

17  *A.* Yes.

18  *Q.* And just to confirm what you've done here, sir, you are not

19  saying the actual price of big-bird products is higher than the

20  actual price of small-bird products, right?

21  *A.* Correct. This is just a percentage increase over this time

22  period from 2008 to 2014.

23  *Q.* So you're just talking about price changes, not price

24  levels, correct?

25  *A.* Correct. That's what this chart is about.

Edward Snyder - Cross

1   Q.  And again, I want to ask you about substitution, product

2   substitution.  So you agree with me that these products,

3   big-bird products that went into the information that you're

4   relating here, are not substitutes for Pilgrim's Pride COB

5   products sold to KFC, correct?

6   A.  Well, substitution, as you mentioned earlier in your

7   questions, it comes at different parts of the broiler chicken

8   industry.  If you think about KFC, they made investments that

9   connect them to small birds.  But if you go further down to

10  consumers, of course, consumers can get chicken through a

11  variety of means.  And small birds and big birds and the parts

12  thereof do substitute for each other in terms of final

13  consumers.

14  Q.  Sir, you do understand this case is about the price-fixing

15  conspiracy directed to KFC and other quick-service restaurants,

16  not a price-fixing conspiracy directed to consumers.  You do

17  understand that, correct?

18  A.  Yes, I do, and that's why I was answering the question,

19  though, about substitution.

20  Q.  And for your small-bird part of J-212, you did not use

21  prices to consumers.  Instead you chose to use the price of COB

22  products sold to KFC, correct?

23  A.  Yes.

24  Q.  So let me ask it again, sir.  You agree with me that the

25  price -- the products that are embodied in the price

Edward Snyder - Cross

1    information you related at the top of your chart, so the big

2    bird, are not substitutes for the product at the bottom,

3    Pilgrim's Pride chicken-on-the-bone products sold to KFC.

4    A.  As I stated earlier, they are not substitutes for KFC, but

5    consumers further down the distribution chain would view big

6    and small as substitutes.  But now I think you have clarified

7    the question.  If you just focus it on KFC, as I mentioned

8    earlier, if KFC has made investments in big birds, they can't

9    easily substitute to anything else.

10          MR. TORZILLI:  We can take that exhibit down.

11   BY MR. TORZILLI:

12   Q.  I would like to now ask you about your benchmark analysis,

13   so if you could refer to Exhibit J-219.

14          MR. TORZILLI:  And if I could display that for

15   demonstrative purposes.

16          THE COURT:  Yes, you may.

17   BY MR. TORZILLI:

18   Q.  Professor Snyder, you have Exhibit J-219 in front of you?

19   A.  Yes.

20   Q.  So first, I would like to talk to you about the data that

21   you used, okay?

22   A.  Yes.

23   Q.  So of you've got five firms over on the right-hand side

24   that are in dark blue from Fieldale over to Perdue, correct?

25   A.  Yes.

3646

Edward Snyder - Cross

1    Q.  Now, those five firms as we talked about this morning when

2    I asked you questions, those five firms didn't actually send

3    their data to you, correct?

4    A.  Well, nobody sent any data to me, but correct.

5    Q.  You and your team, correct?

6    A.  I am not sure --

7           MS. PLETCHER:  Your Honor, may we have a side bar on

8    this?

9           THE COURT:  Yes, you may.

10      (At the bench:)

11          THE COURT:  Ms. Pletcher, go ahead.

12          MS. PLETCHER:  Thank you, Your Honor.  So I am

13   concerned here that we are getting into this area of what was

14   produced and what was not produced.  And I have confirmed that

15   the government received all of the data for this benchmarking

16   slide as part of the production through the civil litigation.

17   It was received to them and then produced on to defendants, so

18   they have this.  Defendants also produced it to the government

19   when we did our disclosure with respect to Professor Snyder

20   back in October, so I am concerned that we are getting into

21   territory here that's irrelevant and prejudicial, so that's my

22   objection.

23          THE COURT:  All right.  Mr. Torzilli?

24          MR. TORZILLI:  The basic point, Your Honor, to draw

25   out here is that the data changed hands a lot.  And I will say

Edward Snyder - Cross

1   these firms did not produce this data directly to us.  It came

2   to us indirectly.  So what I would like to draw out is that he

3   received this in a very indirect way and so he doesn't have the

4   ability to be able to say with certainty what was done to the

5   data to get it into the form that he had it in to be able to

6   conduct the analysis that he has testified about.

7         MS. PLETCHER:  I am very concerned that this is

8   disclosure of the civil litigation because the data came

9   through that process.  And as long as Professor Snyder is able

10  to verify the reliability and accuracy of the data, I don't see

11  how it's relevant whether it came through the civil litigation

12  or through some other process.

13        THE COURT:  Mr. Torzilli?

14        MR. TORZILLI:  I still have not heard the -- other

15  than verifying that the data he used is accurate relative to

16  the data received, I mean, he hasn't verified it in any sense.

17        And I will say the other issue is that it appears this

18  data was as part of the chain from the firms themselves to

19  Professor Snyder went through another economic consulting firm

20  that was retained for -- to conduct litigation, and they worked

21  on the data prior to passing the data along.  So there are

22  significant questions about the provenance data that he relied

23  upon.

24        MR. FAGG:  This is John Fagg.  This goes back to the

25  same issue that we raised earlier when Professor Snyder said

3648

Edward Snyder - Cross

1    this is the type of data that he narrowly relies on in the

2    course of his expert work.  And I agree with Ms. Pletcher that

3    we run the risk here of confusing the issues, especially when

4    we have a witness who is testifying on video conference about

5    the exact source of the data which he has testified repeatedly

6    this is the type of data that he normally relies upon.

7         THE COURT:  Well, Mr. Torzilli can ask him whether

8    some other economic analysts somehow manipulated it or did

9    something with the data, but Mr. Torzilli, you will need to be

10   careful that you don't -- I don't think it's relevant.  I fail

11   to understand the relevancy of it, the data coming from a

12   variety -- going through a variety of different hands.

13        It is true that he has already testified that this

14   data has -- is of the same type that economists typically rely

15   upon, but if some firm outside of his team somehow massaged the

16   data in some way, I think that that is something that you can

17   certainly ask about.

18        MR. TORZILLI:  Thank you, Your Honor.  So it sounds

19   like I could pose a question along the lines of some other

20   economic consulting firm had access to the data prior to you

21   receiving it and could have altered the data prior to you

22   receiving it.

23        THE COURT:  Well, is there any reason to believe that

24   it was "altered"?

25        MR. TORZILLI:  I have no way of knowing one way or the

Edward Snyder - Cross

1    other.

2         THE COURT:  Ms. Pletcher, what do you know about that?

3    Is the data that Professor Snyder used, was it somehow sorted

4    through or otherwise analyzed by some third party before he got

5    it?

6         MS. PLETCHER:  Yes, Your Honor.  So the data came from

7    a company called Edgeworth, who I believe was commissioned by

8    the civil plaintiffs.  And they took the raw economic data and

9    organized it into spreadsheets so that it could be read and

10   manipulated.  And Professor Snyder took that data and worked

11   with that data.  So that's what happened.

12        THE COURT:  Okay.

13        MR. TORZILLI:  Your Honor, if I may, just to correct

14   one point here -- well, actually to correct two points.  It was

15   not produced by the civil plaintiffs.  It was -- Edgeworth has

16   been retained by the civil defendants, including the employers

17   and former employers of some of the individual defendants in

18   this case.  And then secondly, on direct exam, and I don't know

19   whether Professor Snyder is just confused or in the dark about

20   some of this information, but he did testify that this

21   wasn't -- this data wasn't produced for litigation purposes.

22        MS. PLETCHER:  Mr. Torzilli misspoke.  It was the

23   defendants in the civil case that produced this.

24        THE COURT:  Okay.  Well, Mr. Torzilli, you are going

25   to have to ask focused questions so that Professor Snyder does

Edward Snyder - Cross

1    not believe that he needs to answer that the consultant that

2    may have produced the charts or spreadsheets was retained by

3    people in other litigation because that -- we can't have that

4    come out.  But the fact that Professor Snyder and his team got

5    data that had already been put in the form of spreadsheets or

6    sorted is certainly relevant, and Mr. Torzilli has the right to

7    ask about that.

8         MR. TORZILLI:  Your Honor, one final question.

9    Apologies.  So I take it, though, that asking him whether he is

10   aware that that data went through the hands of another economic

11   consulting firm and that they put it in the form that it was

12   ultimately provided to him, that that would be a question you

13   would view as acceptable?

14        THE COURT:  Yes.

15        MR. BELLER:  Your Honor, if I may, quite respectfully

16   understanding what the Court's ruling is, my concern is that

17   the implication, then, is that another consultant was hired

18   retained by the defendants, that we did not like that

19   particular consultant's answer and, therefore, have now

20   provided this information to Dr. Snyder.  So I have concerns

21   that with the Court's being very careful about making sure that

22   this is put forth accurately, that in fact we leave an

23   implication with the jury that is simply more prejudicial than

24   even the civil litigation would be.

25        THE COURT:  Well, Ms. Pletcher has the right on

1    redirect to clean that up.  All right?  Thank you.

2        (In open court:)

3    *BY MR. TORZILLI:*

4    *Q.*  Professor Snyder, we were talking about your benchmarking

5    analysis.  We were talking about exhibit J-219 and we were

6    talking about the data that you used to conduct your analysis,

7    correct?

8    *A.*  Yes.

9    *Q.*  And my question for you is with respect to the data for the

10   five firms reflected on the right-hand side of J-219, whether

11   you received -- well, first of all, did you receive that data,

12   you and/or your team receive that data?

13   *A.*  In the sense of I -- the team had access to the data, yes,

14   to be analyzed.

15   *Q.*  And you had access to the data for purposes of conducting

16   the analysis that you did?

17   *A.*  Yes.

18   *Q.*  Are you aware that that data came from an economic

19   consulting firm that put that data into a form that you and

20   your team ultimately had access to?

21   *A.*  Yes, in part.  My understanding is it did come from an

22   economics consulting firm.  The format of the data --

23   *Q.*  Let me just stop you there, Professor Snyder, and have

24   Ms. Pletcher have an opportunity to ask additional questions on

25   the issue.  I appreciate it.

3652

Edward Snyder - Cross

1          Okay.  So to get back to the benchmarking you did in

2    219, just to confirm what some of the bars are, okay?  So the

3    first bar on the left represents sales of eight-piece chicken

4    on the bone to KFC, correct?

5    A.  Yes, for 2015.

6    Q.  You anticipated my next question.  So for calendar year

7    2015, correct?

8    A.  Correct.

9    Q.  And the second, the second light blue line, then, I

10   understood to be sales of chicken on the bone to every other

11   Pilgrim's customer in calendar year 2015; is that correct?

12   A.  Yes.

13   Q.  Okay.  So just to confirm, that includes sales both to

14   customers that are within the charged price-fixing conspiracy

15   and sales to customers that are outside the charged

16   price-fixing conspiracy, correct?

17   A.  I can't answer that.

18   Q.  Why can't you answer that?

19   A.  First of all, I don't really understand it.  Secondly, I

20   just don't have a basis for answering it.

21   Q.  And the five bars on the right-hand side are sales to all

22   customers of those firms for calendar year 2015 for

23   chicken-on-the-bone products, correct.

24   A.  Eight-piece, yes.

25   Q.  So you didn't present on direct exam as part of your

Edward Snyder - Cross

1  benchmarking any comparison of numbers for any specific

2  customer other than KFC, correct?

3  A.  Correct.  That was the first bar.  All of the others are

4  not specific to a single customer.

5  Q.  And you didn't present any comparison of numbers for any

6  product other than eight-piece chicken on the bone, correct?

7  A.  Correct.

8  Q.  So it doesn't include, for example, dark meat, right?

9  A.  Correct.

10  Q.  Supplemental dark meat or supplemental wings, correct?

11  A.  Those don't isolate it, correct.

12  Q.  Or boneless breast?

13  A.  Correct.

14  Q.  Or NAE, no-antibiotics-ever type chicken meat, correct?

15  A.  I don't -- certainly they are not isolated in the chart.

16  Q.  So there may be NAE meat sales of chicken on the bone on

17  the five firms that are reflected on the right-hand side?

18  A.  I did not try to isolate that either for Pilgrim's sales or

19  the five benchmark suppliers.

20  Q.  So you don't know.

21  A.  I don't know.

22  Q.  Do you know that NAE meat typically has an upcharge

23  associated with it so as a premium or a higher priced product?

24  A.  Typically various features like that do have an upcharge,

25  yes.

3654

Edward Snyder - Cross

1   Q.  So if products of that type, a premium or an upcharge-type

2   product were included in any of the sales reflected in the

3   numbers on the right-hand side, they would need to be adjusted

4   downward in order to have an apples-to-apples comparison,

5   correct?

6   A.  Well, you would want to do it for both the control group on

7   the right-hand side as well as any similar or analogous

8   adjustments on the left-hand side, including in the second bar

9   chart Pilgrim's sales to others.

10  Q.  And you know that KFC, at least at this point in time, was

11  not buying any NAE or other premium types of meat, correct?

12  A.  I don't recall that they were.

13  Q.  So as far as the best of your recollection, they were just

14  buying conventional chicken meat, right?

15  A.  Well, I think that that term probably is one that should

16  give way to an understanding that buyers have various

17  specifications.  I am not disagreeing with your bottom line,

18  but -- in terms of that particular attribute, but I just don't

19  want to say conventional because KFC and others typically have

20  various specifications.

21  Q.  And KFC has a rigorous, very particular specification,

22  correct?

23  A.  I am not going to characterize it as rigorous.  My

24  understanding is that buyers tend to have various

25  specifications.

3655

Edward Snyder - Cross

1   Q.  And the numbers reflected on the right are not

2   necessarily -- are not all products that have the same product

3   attributes or specifications that the KFC product has, correct?

4   A.  Correct.  My expectation is that the various specifications

5   are going to vary across customers.

6   Q.  So it's the -- the comparison being made here is not to the

7   same products, right?  It's not like-to-like products, correct?

8   A.  Well, I think as an economist, they are like to like.  I

9   think they are eight-piece COB and they're sold in the same

10   time period.  That can allow for product differences that are

11   specific to various customers.  That's how I see it.

12   Q.  So your testimony is the products are similar, but not

13   necessarily the same; is that fair?

14   A.  My testimony is that the products are similar, but that

15   various customers will have different specifications, and those

16   will as a result differ across the bars.

17   Q.  Now, let's talk about years.  So the year reflected in this

18   analysis is 2015, correct?

19   A.  Yes.

20   Q.  So you haven't provided any comparison for any other year

21   within the charged conspiracy that runs from 2012 to 2019,

22   correct?

23   A.  Correct.

24   Q.  So just so I understand how the actual benchmarking works,

25   am I correct that what you're saying is that KFC's number on

Edward Snyder - Cross

 1   the left there, on the bar on the very left, is less than the

 2   numbers on the right.  And as a consequence, you conclude KFC

 3   did not pay higher prices in 2015 because of the price-fixing

 4   conspiracy that's been charged, correct?

 5   A.  That was the first conclusion that I reached, yes.

 6   Q.  So it is -- it's important for your analysis, then, that

 7   the numbers on the right are higher than the numbers on the

 8   left, correct?

 9   A.  No.  I think for the first conclusion the point is that you

10   would expect the numbers on the right to be lower.

11   Q.  Right.  And because they are not, you conclude that the

12   numbers that you ran here indicate a lack of price-fixing,

13   correct?

14   A.  Yes.  And then, you know, obviously I did the additional

15   check in terms of the so-called umbrella effect.

16   Q.  So if we were to determine that any of the numbers on the

17   right are actually lower than what's reflected in here, you

18   would agree with me that that would impact the analysis in

19   terms of your bottom line of what you told the jury, correct?

20   A.  No, not if there were any.  One of the things I mentioned

21   is that when you're doing benchmark analysis, there is safety

22   in numbers.  So I would go for the -- I would look to evaluate

23   the whole set.

24   Q.  Sure.  So if -- let me change the question.  So if all of

25   the bars on the right were lower than reflected here, you would

Edward Snyder - Cross

1   agree with me that would at least impact your analysis of what

2   you have told the jury and what your opinion is, correct?

3   A.   Yes.

4   Q.   All right.  You agree with me, sir, that not all

5   eight-piece chicken-on-the-bone products are the same, correct?

6   A.   Correct.

7   Q.   There is variation in size, right?  You are aware of that?

8   A.   Yes.

9   Q.   In terms of small-bird chicken-on-the-bone eight-piece

10  versus big-bird chicken-on-the-bone eight-piece, correct?

11  A.   Yes.  Those are characterizations that cover a range of

12  size.

13  Q.   And you testified on direct exam that the price of big bird

14  was increasing at a rate significantly faster than the price of

15  small bird, correct?

16  A.   Based on the data that I analyzed, yes.

17  Q.   So it's possible that if there are big-bird sales in the

18  five firms that you have on the right-hand side of your

19  analysis here, that that would be -- that would overstate the

20  apples-to-apples comparison you are trying to draw, correct?

21  A.   The short answer is I don't know.  I would have to make

22  that inquiry and I have not done so.

23  Q.   Okay.  So you haven't made an inquiry into the

24  big-bird/small-bird question as it relates to your benchmarking

25  analysis, correct?

Edward Snyder - Cross

1   A.  Well, I paid attention to the fact that they were selling

2   the same eight-piece birds.  And I am aware that there are

3   differences in terms of the percentage of sales that are in the

4   small bird category, but that's as far as I've gone.

5   Q.  And you're also aware that even within small-bird chicken

6   on the bone there is variation in the type of product, correct?

7   A.  Yes, both in terms of where the small bird fits in the size

8   distribution and other customer specific specifications.

9   Q.  And did you control or adjust in any way your comparison

10  based on the difference in the particular type of small-bird

11  eight-piece chicken on the bone that was being sold?

12  A.  No, for the reason that I mentioned earlier.

13  Q.  In addition to the size of the bird, are there other

14  attributes that make not all eight-piece chicken-on-the-bone

15  products the same or similar?

16  A.  The various customer specifications.

17  Q.  And how about the way in which the product is dressed?

18  A.  I am not familiar with that.

19  Q.  Okay.  So did you know that eight-piece chicken on the bone

20  can be sold with or without, for example, marination?

21  A.  That I am familiar with, but it's not something I focused

22  on.

23  Q.  You didn't account for that with or without marination

24  within your benchmarking analysis?

25  A.  Correct, I did not.

Edward Snyder - Cross

1   Q.  Now, these particular product characteristics or attributes

2   can significantly change the price of the product.  You agree

3   with me, right?

4   A.  It's not something I have investigated, so I can't agree or

5   disagree.

6   Q.  So I just want to understand your testimony.  You haven't

7   investigated the possibility that different characteristics or

8   attributes even within small-bird eight-piece chicken on the

9   bone, correct?

10  A.  I think you asked me a different question which was were

11  these differences significant in terms of prices.  And maybe

12  you are changing it, but all I wanted to say is I agree, I have

13  not investigated that.

14  Q.  So because you haven't investigated it, you just don't know

15  what, if any, effect controlling for the different attributes

16  or characteristics even within small-bird eight-piece chicken

17  on the bone would have on your analysis, correct?

18  A.  I have not controlled for it.  Based on my understanding

19  that these specifications vary across customers, I would not

20  expect that controlling for that, even if I could, would affect

21  the bottom line.

22  Q.  But if you could control for it, sir, and I understand you

23  haven't tried, but if you controlled for it, it could reduce

24  the price levels that are reflected on the right-hand side of

25  your benchmarking analysis, correct?

Edward Snyder - Cross

1   *A.* Well, the individual product differences could also reduce,

2   for example, the height of the second bar on the left-hand

3   side. But I agree, I have not controlled for that. And I

4   cannot give you a specific answer because I have not

5   investigated those individual product specifications.

6   *Q.* If you would open up envelope 34 in the shipment that was

7   provided for you.

8        *MR. TORZILLI:* And if we could call up Government's

9   Exhibit 10658 just for the Court and counsel.

10   *BY MR. TORZILLI:*

11   *Q.* Do you have it, sir?

12   *A.* Yes.

13   *Q.* Do you recognize what's depicted in Government's Exhibit

14   10658?

15   *A.* I recognize many of the terms, but I am not familiar with

16   this exhibit.

17   *Q.* Do you understand this exhibit to be an Express -- an

18   excerpt from a Express Market report dated December 17, 2015?

19        *MS. PLETCHER:* Objection, Your Honor, foundation.

20        *THE COURT:* He can answer if he knows. Overruled.

21   *A.* It looks to me like the top block is Express Markets, Inc.

22   presentation. I see the source is Claxton. I am not sure

23   about the bottom.

24        *MS. PLETCHER:* Objection, again, Your Honor.

25   Speculation, lack of foundation.

1          THE COURT:  He hasn't been asked a question yet.

2    Overruled.

3    BY MR. TORZILLI:

4    Q.  Sir, you did rely on information, you relied on information

5    from Express Markets in forming some of the opinions that you

6    have testified to this jury here today and last week, correct?

7    A.  Yes.

8    Q.  So Express Markets, Inc., is an industry service, correct?

9    A.  Yes.

10   Q.  It provides information to the broiler chicken industry

11   among other industries, correct?

12   A.  That's my understanding, yes.

13   Q.  And you know that Express Markets provides a pricing

14   service, correct?

15   A.  I am not -- I am not sure if I understand that term.  I

16   know they provide information about prices.  In that sense, I

17   guess it's a service to the industry, but I do not know the

18   terms of the service.

19   Q.  So are you saying that you don't know that Express Markets

20   provides a pricing service, that it publishes prices to

21   subscribers in the broiler chickens industry?  Is that your

22   testimony?

23   A.  I know that they publish information and, as I mentioned

24   earlier, based on the USDA, and I know that it goes to industry

25   participants.  What I am just simply saying is I don't know the

3662

Edward Snyder - Cross

1   terms of the so-called subscription service.

2   Q.  Are you aware that Express Markets reports on prices of

3   broiler chicken -- the sales of broiler chicken products?

4   A.  Yes.  I think that's consistent with what I presented

5   earlier.

6   Q.  Have you ever reviewed any of that information, information

7   that Express Markets provides on prices for broiler chicken

8   products?

9   A.  Yes.

10  Q.  Have you looked at the prices Express Markets published in

11  the year 2015 for broiler chicken products?

12  A.  Well, I think the chart that I presented earlier on large

13  birds, big birds covering 2015, and those are data published by

14  the USDA and presented to the industry by EMI.

15  Q.  Sir, if you could look back at that exhibit, you'll see

16  that it ends in 2014 rather than 2015 as you just stated.

17          MR. TORZILLI:  If we could call up defense Exhibit

18  J-212.

19          Permission to publish J-212, Your Honor, for

20  demonstrative purposes.

21          THE COURT:  Yes, you may.

22  BY MR. TORZILLI:

23  Q.  So that says 2014, not 2015, correct?

24  A.  Correct.

25  Q.  You can put that aside.

Edward Snyder - Cross

1          Sir, having reviewed Express Market information, you

2    do know that there is multiple different types of eight-piece

3    chicken-on-the-bone products that they report in their pricing

4    service, don't you?

5    A.  Yes, I am aware that there are different chicken parts.

6    And I think I gave earlier how EMI combined the three parts for

7    big birds into a single price.

8    Q.  And they also for eight-piece chicken on the bone, which is

9    the product that you used for your analysis, that there are at

10   least four different -- four different products within

11   eight-piece chicken on the bone that Express Market reports on,

12   correct?

13   A.  I haven't counted them.  There are different products.

14   Q.  So there are product based on the different size of

15   eight-piece chicken on the bone, correct?

16   A.  Yes.

17   Q.  And there is also one for marination, correct?

18   A.  I see that on this exhibit, but I am not -- as to

19   marination, I cannot give you an answer.  I haven't studied it.

20        MS. PLETCHER:  Your Honor, objection on lack of

21   foundation and talking about an exhibit that is not in

22   evidence.

23        MR. TORZILLI:  Actually, may I, Your Honor?

24        THE COURT:  Right.  There is no question pending, so

25   that question is overruled.

Edward Snyder - Cross

1    *BY MR. TORZILLI:*

2    *Q.*  Sir, did you know that there are different reported prices

3    for each of the types of eight-piece chicken on the bone that

4    Express Market reports?

5    *A.*  Yes, I am aware that there are different prices because

6    there is information about different parts.

7    *Q.*  And the prices within those eight-piece chicken on the bone

8    can vary up to 34 cents per pound depending on the product and

9    who's selling the product.  Did you know that?

10   *A.*  It's not something I have studied, so I don't know it.  I

11   can't agree or disagree.

12   *Q.*  So you wouldn't know whether the variation in the prices up

13   to and including 34 cents per pound would in any way affect the

14   analysis that you presented in your benchmarking, correct?

15   *A.*  Those were prices for eight-piece COB, not individual

16   parts.

17   *Q.*  And what I am asking you about in the Express Market is

18   eight-piece COB, not individual parts.

19   *A.*  Could you restate the previous questions?

20   *Q.*  Absolutely, sir; absolutely, sir.  So for the different

21   types of eight-piece chicken-on-the-bone products that are

22   reported in Express Markets, you would agree with me that there

23   are different prices for those products depending on what

24   product it is and who's selling it, correct?

25   *A.*  No, I think you're -- maybe I am mistaken, but I think you

Edward Snyder - Cross

1   are confusing the analysis that I did which was based on actual

2   data from the five suppliers.  And in the case of GNP and

3   Foster, I had not only the monthly averages that I aggregated

4   to years, but I also had transaction data.  It seems like you

5   are confusing that with information published by EMI.

6   Q.  I am not confusing it, sir.  What I am asking you about is

7   whether in the EMI data the prices for eight-piece chicken on

8   the bone vary, yes or no?

9   A.  Yes, but I didn't use those in my benchmarking analysis.

10  Q.  Precisely.  So you did not take into account in any way the

11  variation of prices even within eight-piece chicken on the bone

12  when you told this jury that the prices for those five firms on

13  average were higher on average than the sales Pilgrim's made to

14  KFC for chicken on the bone, correct?

15  A.  I didn't take those variations within eight-piece COB

16  either on the right-hand side or the left-hand side.

17  Q.  Thank you.  Now, I want to ask you about umbrella effects.

18  And your control group shows increased prices, correct?

19  A.  Could you just be a little more specific on your question?

20  Q.  Absolutely.  So I think you testified when you were talking

21  about umbrella effects that the control group, so the five

22  firms that you identified had elevated prices, right, and that

23  the elevated prices occurred earlier in time?

24  A.  Okay.  So yeah, there are two things going on here.  Let me

25  just be clear.  What's shown in Exhibit J-219 is that for

3666

Edward Snyder - Cross

1    calendar year 2015 the control group prices are above the KFC

2    prices.

3    Q.  And the control group -- the control group prices also

4    include large-bird products.  That's what you testified to,

5    correct?

6    A.  As does Pilgrim's to others, the percentage of small

7    varies.  My understanding is that small is the majority for

8    all.

9    Q.  And if you could look at Exhibit J-212 again.

10        MR. TORZILLI:  If we could publish J-212.

11        THE COURT:  You may.

12        MR. TORZILLI:  Thank you, Your Honor.

13   BY MR. TORZILLI:

14   Q.  You have Exhibit J-212 in front of you, Professor?

15   A.  I do.

16   Q.  So on J-212 you testified that the price increase

17   associated with big bird went up 32 percent for the seven-year

18   period 2018 to 2014, correct?

19   A.  Correct.

20   Q.  So you agree with me that you didn't mention that fact that

21   big bird prices were increasing from all the way back from 2008

22   to 2014 when you were explaining your umbrella effect, right?

23   A.  Big bird prices were increasing, that's correct.  When I --

24   there are two parts to the umbrella effect.  I just want to

25   make sure you're asking me about the fact that Fieldale, Foster

Edward Snyder - Cross

1   and Mountaire increased their prices before 2015 by substantial

2   amounts.

3   Q.  Right.  Now I am asking you about Defense Exhibit J-212

4   which was your analysis of industry-wide big-bird price

5   increase trends relative to Pilgrim's Pride COB price to KFC.

6   And you agree with me that for industry-wide big-bird prices,

7   you said that for the seven-year period from 2008 to 2014,

8   big-bird prices went up 32 percent, right?

9   A.  Yes.

10  Q.  And just a yes-or-no question, sir, you did not mention

11  that when you were discussing your umbrella effects.

12  A.  Correct, I did not.

13  Q.  I want to talk to you about margins.

14  A.  Okay.

15  Q.  And first I want to start out by just confirming that you

16  testified you relied on the contracts between KFC and chicken

17  suppliers for chicken-on-the-bone products in rendering your

18  opinions, right?

19  A.  Yes, I did.

20  Q.  And those contracts are sometimes called margin over feed

21  contracts, right?

22  A.  I am not familiar with that term.

23  Q.  Okay.  Are you familiar --

24  A.  I am aware that the contracts specify various lines items.

25  I am aware that the buyers sometimes request cost model and so

Edward Snyder - Cross

1    forth.  I have considered that in my analysis.

2    Q.  Okay.  And you've actually read the contracts, correct?

3    A.  I have.  I requested contracts and I have reviewed them.

4    Q.  And you do understand that the cost-plus model or

5    margin-over-feed model is included in the contract, correct?

6    A.  Well, I think it probably varies by contract and what

7    information the buyer has varies supplier to supplier.  And the

8    information provided by the supplier is not verified, but the

9    bottom line is buyers pay prices, not margins.

10   Q.  My question, sir, is about the KFC contracts.  And is it

11   your testimony that not all of the KFC contracts with suppliers

12   have the margin-over-feed or cost-plus model actually included

13   within the contract?

14   A.  It's a complicated answer.  I think these things need to be

15   understood as line items that are subject to discretion on the

16   part of the suppliers.  I am aware that RSCS has made some

17   efforts to move towards a cost-plus model.  My understanding is

18   that that has not worked.

19   Q.  That's the cost-plus model hasn't worked?  That's your

20   testimony?

21   A.  My understanding is that the necessary conditions for a

22   cost-plus model to work are not met here.

23   Q.  But my question is not about the conditions or -- just

24   strictly in the contracts that you looked at that you said you

25   relied on and that you used for these important analyses.  My

Edward Snyder - Cross

1    question is just simply are the margin-over-feed or cost-plus

2    models actually physically within those contracts, yes or no?

3    A.  Well, those -- they are physically within the contracts is

4    a little bit hard for me to understand.

5              THE COURT:  Let's see if whatever that was --

6    Mr. Torzilli, we are good for the time being.  Go ahead.

7              MR. TORZILLI:  May I proceed?

8              Thank you, Your Honor.

9    BY MR. TORZILLI:

10   Q.  Do you realize, sir, that KFC calls what's in its contract

11   a cost-plus or margin-over-feed model as opposed to an economic

12   definition of those terminologies?

13   A.  I am not answering based on economic definitions.  All I

14   want to point out is whatever the ingredients are that the

15   suppliers are providing for that model, the ingredients move

16   around.  You know, so it's not a meaningful -- yes, but I do

17   see those cost items.  I do see margins.  I see those things in

18   the contract, but the elements change.

19   Q.  Understood.  You do agree with me, though, that the major

20   components of the price that suppliers charge to KFC are their

21   costs, however determined, plus their margin, correct?

22   A.  They can play around with both and they also play around

23   with productivity.  So these are -- I am not sure what else to

24   tell you about this.

25   Q.  But the price is the sum of those two parts, right?  Cost

Edward Snyder - Cross

1    plus margin equals prices, however determined, correct?

2    A.  Correct.  And buyers pay the price.  They don't pay cost

3    nor do they pay margin.

4    Q.  They pay all in, right?

5    A.  They pay a price.  They don't pay margin.  They don't pay

6    cost.

7    Q.  You would agree with me, sir, the biggest cost to produce a

8    broiler chicken is the cost of the feed, right?

9    A.  That's my understanding, yes.

10   Q.  Let's, sir, if you could, if you could open envelope 41,

11   and you should find an exhibit in there.

12   A.  Sorry to delay.  I went to the bottom of the pile and I

13   found 40, but I didn't find 41, so bear with me, please.

14   Q.  You know what?  Let me actually ask you to look at -- how

15   about 37, 37.

16   A.  I do have 37.

17   Q.  You have that?

18   A.  I do.

19        MR. TORZILLI:  Your Honor, permission to display 10668

20   to counsel and the Court.

21        THE COURT:  10668 is the one he doesn't have.  Do you

22   mean 10661?

23        MR. TORZILLI:  He has 10661 which is a duplicate of

24   that in all material respects.

25        THE COURT:  Well, because I don't think he can see

Edward Snyder - Cross

1    10668, he should use 10661.

2        *MR. TORZILLI:*  Then let's display for counsel and the

3    Court 10661.

4        *THE COURT:*  You may.

5    *BY MR. TORZILLI:*

6    *Q.*  Sir, you have 10661 in front of you marked as a

7    government's exhibit?

8    *A.*  I do.

9    *Q.*  This is what we are talking about, right?  We are talking

10   about cost and then a margin or a markup and the price, right?

11   *A.*  Well, I think you've shifted from the cost including many

12   things influenced by productivity, but now you're simplifying

13   it to just grain cost plus margin equals price?  That's what I

14   read here.

15   *Q.*  Yeah.  And the grain cost you agree with me is the No. 1

16   cost associated with producing a broiler chicken, correct?

17   *A.*  That's my understanding, yes.

18   *Q.*  And isn't it also correct that the price of feed, at least

19   for KFC, the price of feed is dictated by KFC to the suppliers,

20   correct?

21   *A.*  I can't answer that yes or no.

22   *Q.*  Were you in the courtroom when Mr. Finch was testifying in

23   this case?

24   *A.*  No.

25   *Q.*  Okay.  So you didn't know that he testified that the QSRs

Edward Snyder - Cross

1    dictate what the feed is?

2            *MR. BELLER:*  Objection, foundation, and lack of

3    personal knowledge.

4            *THE COURT:*  Sustained.

5    *BY MR. TORZILLI:*

6    *Q.*  Sir, if the price --

7            *THE COURT:*  Can you look, Mr. Torzilli, for a breaking

8    point?

9            *MR. TORZILLI:*  This is as good of time as any, Your

10   Honor.

11           *THE COURT:*  Okay.  Ladies and gentlemen, we will go

12   ahead and break for lunch at this time.  We will plan on

13   reconvening at the same time, 1:30.  Keep the admonitions in

14   mind.  Try to keep your yellow juror buttons visible if you

15   can.  The jury is excused for lunch.

16           (Jury excused.)

17           Ms. Grimm, are we going to disconnect Professor Snyder

18   or how are we going to handle that logistical issue?

19           So Professor, I think we are going to break for lunch

20   now.  We are going to do some things in the courtroom that you

21   cannot be a party to, so I am not sure if we are going to

22   disconnect you or what, but somehow we will try to keep you

23   from being able to overhear what we're doing.  So anyway, we

24   will reconvene, then, with you at 1:30 Denver time.  Thank you.

25           *THE WITNESS:*  Thank you, Your Honor.

Edward Snyder - Cross

1            THE COURT:  Okay.  Looks like we have disconnected.

2            I would suggest that we do one of two things:  Either

3    take up the request for notice that I think maybe it was

4    Mr. Penn or Mr. Lovette has filed, and also the notice of

5    exhibit without a testifying witness, which is Docket No. 1197.

6    However, since those were just filed about midnight last night,

7    I am not sure if the government is prepared to talk about

8    those.  If not, I would suggest we reconvene at 1:00 and try to

9    make some progress on those two items.

10           MS. CALL:  I am prepared, Your Honor.

11           THE COURT:  You are prepared?  Does that work for the

12   defendants or do you want to -- do people want to take a quick

13   break?  Mr. Pollack?

14           MR. POLLACK:  I was going to note on behalf of

15   Mr. Blake, I also filed a motion this morning before court that

16   was Docket 1201.  I don't know if the Court wanted to add that

17   to the list.

18           THE COURT:  Well, we have a number of things, and I am

19   just trying to figure out what we might be able to do in half

20   an hour.

21           MR. POLLACK:  I understand.  I just wasn't sure the

22   Court was aware of that filing because it was this morning.

23           THE COURT:  Yes, Docket 1201, thank you.

24           Why don't we take up Mr. Penn's motion for judicial

25   notice.  This is Docket No. 1198.  I will hear from the

Edward Snyder - Cross

1      government first on that one.

2            MS. CALL:  One moment, Your Honor.

3            THE COURT:  Sure.

4            MS. CALL:  Your Honor, I think in Defendant Penn's

5      motion there is just no relevance laid out for why judicial

6      notice of the future trading price is relevant and requires

7      judicial notice.  We would ask for some foundation as to any

8      reason why this is relevant.

9            THE COURT:  Okay.  Mr. Tubach or Ms. Pletcher?

10           MR. TUBACH:  Yes, Your Honor.  The relevance is -- I

11     am not sure relevance is required for judicial notice.  It's

12     properly the subject of judicial notice, but the relevance is

13     this is exactly the number that's reflected on Exhibit 1030

14     which is Mr. Martin's notes where he says, 433 or better to get

15     out, hence the relevance.

16           THE COURT:  Ms. Call?

17           MS. CALL:  The government just generally objects to

18     the use of this information as proper for judicial notice.

19           THE COURT:  And why is that?

20           MS. CALL:  It just seems entirely something that if it

21     wanted to admit evidence of it, they should.  And there is

22     nothing on the record requiring why judicial notice would be

23     required.

24           THE COURT:  Okay.  Objection will be overruled.  This

25     is the type of data that may be subject to judicial notice.

Edward Snyder - Cross

 1   And here the motion provides two different sources of

 2   historical data.  There does not seem to be any dispute

 3   regarding the accuracy of the data itself.  And for that reason

 4   the Court finds it is an appropriate subject matter for

 5   judicial notice.

 6          Next issue is in what form that would be provided to

 7   the jury.  When we were talking about the time conversion,

 8   which I took judicial notice of, I asked Mr. Canty, I believe,

 9   to put that information that I took judicial notice, which I

10   think happened before trial, in the form of an exhibit.  I

11   haven't seen that yet.

12          MR. BYRNE:  Your Honor, may I update you?

13          THE COURT:  Yeah.

14          MR. BYRNE:  I have it as Exhibit J-221, and I was

15   going to ask the Court if it could be introduced when some of

16   the other exhibits without a sponsoring witness are introduced

17   today or tomorrow.

18          THE COURT:  That's fine.

19          MR. TUBACH:  Perhaps the Court will take one quick

20   look at J-221 to see if that's what the Court is expecting

21   because we will do the same thing with judicial notice.

22          THE COURT:  Obviously, I will have to do that.  But

23   then the issue would be for purposes of my taking judicial

24   notice of this particular commodity price in what form, but I

25   think it's preferable to have it in the form of an exhibit.

Edward Snyder - Cross

1          The other thing that I could do in this case -- I

2    wouldn't do it in the case of the time conversion because it's

3    too lengthy and involved -- I could just read that to the jury

4    and, you know, that could be their evidence, but it's -- it

5    could be done either way.

6          MR. TUBACH:  We will do something in writing and it

7    will be very short.

8          THE COURT:  That's fine.  All right.  So that handles

9    that one.

10          Now let me ask the government looking at the

11    attachment to Docket No. 1197, this is defendants' notice of

12    exhibits without a testifying witness.  I wanted to get a feel

13    from the government about which of those exhibits are contested

14    which we need to work through and whether some are not being

15    opposed.

16          MS. CALL:  Yes, Your Honor.  For 1197, I don't believe

17    we need to work through any of the underlying exhibits, but I

18    believe Defendant Penn filed two notices.

19          THE COURT:  Yeah, those are more controversial

20    potentially.

21          MS. CALL:  The remaining ones will be controversial,

22    but not the ones included in 1197.

23          THE COURT:  Okay.  So assuming that one of the defense

24    attorneys moves the admission of the various exhibits listed

25    Attachment A on 1197 other than some limiting instructions that

Edward Snyder - Cross

1   may be appropriate, there will not be objections to this?

2          MS. CALL:  Yes, Your Honor.

3          THE COURT:  I think that the question called for a no

4   answer, but --

5          MS. CALL:  You are correct, there will be no

6   objections.

7          THE COURT:  Okay.  That clarifies that.

8          MS. CALL:  I will note one is duplicative.  I believe

9   A-054 appears to be the same exhibit as Government's Exhibit

10  8000 that is already in evidence, so that would be the only

11  objection.

12         THE COURT:  I am sorry, which exhibit is that?

13         MS. CALL:  A-054, it's the 99,000-page toll record, I

14  believe.

15         THE COURT:  Maybe defendants can check on that one.

16         MS. CALL:  A-054 is the defendants' exhibit number on

17  their filing.  We believe it is a duplicate of Government's

18  Exhibit 8000.

19         THE COURT:  Okay.  Why don't we check on that perhaps.

20         Why don't we next go to Mr. Penn and Mr. Austin's

21  motion to admit exhibits without a sponsoring witness.  That is

22  Docket No. 1199.  And why don't we take up two exhibits that

23  were admitted at the last trial, Exhibits D-240 and F-459.

24         Ms. Call, anything more on those?

25         MS. CALL:  Yes, Your Honor.  I did want to point out a

Edward Snyder - Cross

3678

1    lack of relevance of D-240, particularly based on evidence

2    that's come out in this trial.  First, I believe it's a

3    mischaracterization in the motion that D-240 shows a personal

4    mission relating to Sanderson and Tyson.  The statement of the

5    personal mission in Defendant Penn's e-mail is about Sanderson.

6         The testimony in this trial about Sanderson has solely

7    been about them leaving the small-bird market.  So there is

8    just no relevance to the issues in this case about any conduct

9    of Sanderson's and Defendant Penn's personal opinions about

10   Sanderson Farms.  It's basically the equivalent of Defendant

11   Penn trying to say, well, I didn't rob the bank on Monday, so I

12   like I didn't do it on Friday.  It's saying I competed with

13   Sanderson in this totally other arena, and here that means I am

14   not price-fixing.

15        So I think there is just really a lack of relevance

16   here based on that.  And that's, you know, totally in line --

17   not in line -- I guess totally not in line with your Court's

18   instructions in Instruction 18 where from at least the last

19   trial where Your Honor instructed the jury it's not relevant

20   and it's not a defense that the defendants sometimes competed

21   or they didn't price-fix for every customer.  So a discussion

22   in an e-mail that has some colorful language that I know

23   counsel for Defendant Penn likes, but some discussion about

24   Sanderson is just not relevant to this case, and Defendant

25   Penn's state of mind with respect to that company isn't

Edward Snyder - Cross

1    relevant here.

2         THE COURT:  Thank you.  Why don't we hear from

3    Mr. Tubach.

4         MR. TUBACH:  I could not disagree more.  The

5    government here has charged an eight-year conspiracy to fix the

6    price of broiler chicken products.  Sanderson sells broiler

7    chicken products.  The fact that the government is now claiming

8    they are not actually charging that broad conspiracy, they are

9    doing something different, is all well and good and they can

10   argue that.  But the fact that Mr. Penn stated that he wants to

11   take Sanderson down is absolutely relevant to the question of

12   whether or not he entered into a conspiracy.

13        Moreover, this e-mail is not just about Sanderson

14   despite what Ms. Call seemed to think.  It says -- it's talking

15   about Tyson and Sanderson and says "Foot on the throat, both of

16   these boys will be going down."  There is not even an argument

17   I've heard that somehow as to Tyson it is not relevant.  This

18   is highly relevant directly in the middle of the alleged

19   conspiracy period, and as we indicated last time and the Court

20   agreed, this is evidence that directly negates guilt.

21        I can't honestly believe that Ms. Call is arguing the

22   evidence that defendants competed is not relevant to whether

23   there was a price-fixing competition.  It's not dispositive.

24   They can certainly make their argument.  But the idea that the

25   fact that Mr. Penn has indicated this state of mind in the

Edward Snyder - Cross

1   middle of when the government is arguing there was a conspiracy

2   directly negates his guilt.  And that's why the Court admitted

3   it last time and the Court should admit it again.

4           THE COURT:  Ms. Call, any more?

5           MS. CALL:  Very briefly, with respect to Tyson, I will

6   note the sentence immediately before what Mr. Tubach quoted

7   says, "No need to mess with Tyson," so it doesn't really appear

8   they are actually trying at all to compete with Tyson here

9   because they think, apparently, Tyson is taking its own

10  downward spiral on its own, but still not evidence of

11  competition and this e-mail just isn't relevant here.

12          THE COURT:  The government's objection will be

13  overruled.  There is maybe some dubious relevance as to

14  Sanderson, but it would be difficult to somehow edit out

15  Sanderson from this particular e-mail because there is a joint

16  reference.  Ms. Call is right that there is an allusion to the

17  fact that Tyson has taken its own poison pill, but nonetheless,

18  the next sentence talks about "both of these boys will be going

19  down."  So I find that it is relevant and for the same reason

20  as it was admitted last trial will be -- I will allow its

21  admission in this trial.

22          Anything, Ms. Call on F-459?

23          MS. CALL:  Nothing in addition to our prior arguments

24  at the last trial, just the defendant's statement is not

25  admissible.

Edward Snyder - Cross

1          THE COURT:  And I will overrule those objections as I

2     did last time.  F-459 will be admitted for the same reason as I

3     indicated last time.

4          All right.  Why don't we take up J-229.  Why don't we

5     hear from Mr. Tubach first.

6          MR. TUBACH:  Sure, I am happy to.

7          THE COURT:  For some reason I don't have J-229.  Maybe

8     that one hasn't been supplied yet.

9          MR. TUBACH:  It should be.  Let me just see if I have

10    a copy here.  I do have a copy here, Your Honor, that I can

11    hand up to the Court through Ms. Grimm.  And it's apparently on

12    the screen.  If you prefer a hard copy, I can give you that.

13         THE COURT:  This is fine.

14         MR. TUBACH:  Your Honor, this is just further evidence

15    about why it is that Mr. Martin's handwritten notes would have

16    the number 433 in there.  What this is is an e-mail from RSCS

17    to the various suppliers saying, Please cancel the order that

18    was submitted on August 26 to price soybean meal requirements

19    at 387.30 and replace the order with the following."  And they

20    wanted to do that as of the order for today's trading session

21    basis which is August 28th.

22         So this goes directly to the effect on the listener,

23    which would be Mr. Martin, and why he would then be talking the

24    very next day about the price of soybean meal futures on

25    August 28th, 2014, and why that would be reflected in his

Edward Snyder - Cross

1   notes.

2           And I notice that just to make the Court aware, in the

3   middle there if the Court has found it on the left side,

4   Mr. Martin is a recipient of this e-mail from RSCS.  It's the

5   sixth line down in the To line on the very left side.

6           THE COURT:  Okay.  Ms. Call?

7           MS. CALL:  I see the defendants have now at least

8   accepted that 1030 is Mr. Martin's notes.  It took us a long

9   time.  But for effect on the listener, I don't think the effect

10  is really shown here.  He is saying there is notes the

11  following day and that there is somehow the reason, but it's

12  not really tied together why.  You know, Kurt Collins name

13  isn't on Exhibit 1030.  There is not all that much there

14  connecting the two.

15          THE COURT:  The government's objection will be

16  overruled.  I think this, given the fact that the Martin notes,

17  I am assuming, I didn't look back on them, are dated the next

18  day, that this particular exhibit, J-229, will be admitted for

19  effect on the listener only.

20          Mr. Tubach, on the various cost models and cover

21  e-mails?

22          MR. TUBACH:  Yes, Your Honor.  I am happy to address

23  those as a group.  Basically the purpose for admitting these is

24  not for the truth of whatever is any of those draft bids.  The

25  Court has admitted prior draft bids from other suppliers.  The

Edward Snyder - Cross

1    purpose is to show that these cost models changed and changed

2    continuously up until literally the moment they submitted them

3    to RSCS on August 20th, 2014.  So we are not offering them to

4    show that in fact the grower pay, the grower cost was whatever

5    the number is that's reflected in the cost model.  It's to show

6    that cost model was, in fact, created and was continually

7    revised updated based on the internal workings at Pilgrim's.

8    So it's not being offered for the truth of the matter asserted,

9    but simply for the fact that they were created.

10           It's really important because what it rebuts is this

11   idea that there was this one cost model that the government put

12   into evidence which has some competitor pricing information in

13   it and somehow that's the only cost model that was created.

14   That's simply false.  And there are many, many, many cost

15   models created after that that don't have it in there and

16   others that are created before that didn't have it either, so

17   this simply goes to show the process by which Pilgrim's went

18   about finalizing the bid it eventually submitted on

19   August 20th.

20           *THE COURT:*  All right.

21           *MR. TUBACH:*  I will be happy to go into specific

22   details.  There is effect on the listener because someone is

23   saying, hey, we need to do another one, and then they go create

24   another model.  We could daisy-chain that all the way through,

25   but that's the basic argument.

Edward Snyder - Cross

1              THE COURT:  Ms. Call?

2              MS. CALL:  First, I will take issue with the

3    accusation that the government is creating a false narrative.

4    Mr. Bryant obviously testified to cost models over time.  And

5    he is on about half of these e-mails which defendants certainly

6    could have cross-examined him on or introduced through him if

7    they chose to, but they did not.  These are simply hearsay.

8              I believe the draft cost models that have been

9    admitted have all been admitted with someone on the stand

10   saying, yeah, this is a draft I made.  These are my statements.

11   So trying to admit them now without a witness is just -- there

12   is no rule of hearsay applicable.  And if Defendant Penn or

13   anyone else is trying to show that changes were made over time

14   to those models, that is a truth purpose, and they are not

15   admissible because they are hearsay.  So I just don't see an

16   admissibility to these models or the underlying e-mails.

17             THE COURT:  Mr. Tubach, anything else?

18             MR. TUBACH:  No, Your Honor.  We set it forth in our

19   papers.

20             THE COURT:  So I think that the purpose for which

21   Mr. Lovette and Mr. Penn want to introduce these is appropriate

22   and relevant.  The question -- and also the fact that the price

23   models exist, they are not for the truth, but rather for the

24   fact that they had existed and existed at the particular times.

25             So the cost models themselves, of course, are

Edward Snyder - Cross

1    meaningless because they don't have dates on them and they

2    wouldn't in and of themselves be indicative of the timing, and

3    the timing is what Mr. Penn and Mr. Lovette find to be

4    important.

5           The cover transmittal e-mails provides the date and

6    the time.  Those cover e-mails also contain some statements.

7    And the Court finds that only the following exhibits have

8    issues in terms of extraneous hearsay:  Exhibit D-148, that

9    last sentence on it.  Yeah, that's the only one that, I think,

10   the very last line, but it's really -- I don't know if it would

11   be prejudicial to the government at all on that one.

12          MR. TUBACH:  We are indifferent, Your Honor.  We will

13   be happy to redact that.

14          THE COURT:  Okay.  I will order that last sentence

15   regarding the orange cost and the 4-cent credit to be redacted.

16   Otherwise, I will overrule the government's objections and I

17   will admit -- there is no objection as to authenticity.  There

18   is no objection as to whether or not the cover e-mails link up

19   with the cost models being sent.  So I will allow the

20   introduction of those various cost models and cover e-mails not

21   for the truth of the matter asserted, but rather -- Mr. Tubach,

22   I assume it's for what they may show regarding the date of the

23   cost models -- or the existence and date at which the cost

24   models were being sent out.

25          MR. TUBACH:  Exactly, to show the process at

Edward Snyder - Cross

1    Pilgrim's.

2              THE COURT:  Okay.

3              MS. CALL:  Your Honor, respectfully, if the models are

4    going to be admitted, the government would withdraw its

5    objection and ask that they be admitted for the truth.

6              THE COURT:  Any objection to that, Mr. Tubach?

7              MR. TUBACH:  No, Your Honor.

8              THE COURT:  Then what about the cover e-mails,

9    however?

10             MS. CALL:  Just the models, so cover e-mails still

11   not.

12             THE COURT:  And that's still acceptable to Mr. Penn

13   and Mr. Lovette?

14             MR. TUBACH:  That's fine, Your Honor.  Of course, if

15   they are admitting the models substantively, we would ask the

16   e-mails be admitted substantively also.

17             THE COURT:  I will admit the cost models for the

18   truth, but not the cover e-mails.

19             We will have to take up the rest of these at a later

20   point.  We will see how things play out today.  We will be in

21   recess, then, for lunch between now and 1:30.  Thank you.

22        (Recess at 12:30 p.m. until 1:35 p.m.)

23             THE COURT:  Why don't we get the jury back in.

24             (Jury present.)

25             THE COURT:  Whenever you are ready, Mr. Torzilli.

Edward Snyder - Cross

1              *MR. TORZILLI:*  Thank you, Your Honor.

2              Good afternoon, Professor Snyder.

3              *THE WITNESS:*  Good afternoon.  Good afternoon, can you

4    hear me okay?

5              *MR. TORZILLI:*  We are working on a tech issue that may

6    be resolved.  May I proceed?

7              *THE COURT:*  Yes, go ahead.

8    *BY MR. TORZILLI:*

9    *Q.*  Good afternoon again, Professor Snyder.

10   *A.*  Good afternoon.

11   *Q.*  Before our lunch break we were talking about the

12   margin-over-feed contract and so forth, and I am going to move

13   on from that to a new topic.  If you have any exhibits in front

14   of you that related to the session we were having before the

15   break, feel free to put those aside.

16             What I would like to do now is ask you a hypothetical

17   question, okay?  And the hypothetical question involves three

18   firms.  Those three firms are all selling the same or similar

19   product to the same customer and they are all competing, okay,

20   competing for contracts, okay?

21   *A.*  Okay.

22   *Q.*  Then they agree to charge a price that is at least

23   10 percent higher than their prior year contract price.  Are

24   you with me so far?

25   *A.*  Yes.

Edward Snyder - Cross

1   Q.  So first I want to confirm that you agree with me that in

2   this hypothetical the firms are price-fixing.

3          MS. PLETCHER:  Objection, Your Honor, calls for a

4   legal conclusion.

5          THE COURT:  Overruled.

6          MR. TORZILLI:  You can answer, sir.

7   A.  So I do recognize that price-fixing has legal dimensions to

8   the definition.  I will just tell you as an economist the key

9   is that if you have price-fixing, if you have a price-fixing

10  agreement, then as a result of the agreement, the prices

11  charged are different from what they would have been charged if

12  there were no agreement.  So if, going to your hypothetical, if

13  you can determine that the prices charged are what they are and

14  high because of the agreement, then to me that would fit my

15  economist's definition of price-fixing.

16  BY MR. TORZILLI:

17  Q.  And sticking with that same hypothetical, sir, would you

18  agree with me that the prices that those three firms would be

19  charging after their agreement to raise them, that they would

20  not be identical to each other, right?

21  A.  So I just want to make sure that the meaning of my previous

22  answer was understood.  Just observing the three raising prices

23  to me doesn't tell me that as an economist there is

24  price-fixing.

25  Q.  I am now asking a different question, sir.  I am asking

Edward Snyder - Cross

1   whether those three firms that I just laid out for you in a

2   hypothetical after the raising of the prices that I have

3   provided you as the hypothetical, that they are charging

4   different prices.  You agree with me, right?

5   A.  I am sorry to get into definitional stuff, but are you

6   saying that the higher prices are due to the agreement?

7   Q.  I am merely asking you whether you agree with me that as a

8   matter of arithmetic that if the three firms were charging

9   different prices on day one and then charged 10 percent higher

10  prices on day two, that is as a matter of arithmetic they would

11  be charging different prices.  You don't dispute that, right?

12  A.  I agree.

13  Q.  Okay.  And do you also agree that it is not necessary for

14  price-fixing to occur that all the firms charged the identical

15  price.

16  A.  I agree, it's not necessary.  It is sometimes an indicator

17  of price-fixing, but it's not a necessary indicator.  And it

18  doesn't mean that if -- either way it doesn't mean that there

19  was or was not price-fixing depending on whether prices were

20  identical or not.

21  Q.  Professor Snyder, can you now find Defense Exhibit J-218?

22       MR. TORZILLI:  And permission to publish J-218 as a

23  demonstrative.

24       THE COURT:  It's been admitted for all purpose except

25  for the title which is only for demonstrative purposes.  You

Edward Snyder - Cross

1    may display that.

2    *BY MR. TORZILLI:*

3    Q.  Professor, do you have J-218 in front of you?

4    A.  Yes.

5    Q.  And this is a comparison you made comparing 2014 contract

6    prices and 2015 contract prices for various suppliers under

7    their KFC contracts, correct?

8    A.  Yes.

9    Q.  And if I understood your testimony on your direct

10   examination, part of your point was that the price range

11   associated with the 2014 prices was small or narrow, right?

12   A.  So there are two different charts.  Am I looking at 217 or

13   218?

14   Q.  If you could look at 218, please.

15   A.  Okay, yes.  Yes.

16   Q.  So in 218 you have two columns, one called 2014 prices, one

17   called 2015 prices, correct?

18   A.  Correct.

19   Q.  And on your direct examination you observed that the range

20   associated with the 2014 prices was small, right, or narrow?

21   A.  Correct.

22   Q.  And you observed that the difference or the range of the

23   prices in the 2015 column was wide or wider than the 2014

24   prices, correct?

25   A.  Correct.

Edward Snyder - Cross

1   Q.  That was all part your opinion that there was no indication

2   of price-fixing based on your review of the 2015 prices,

3   correct?

4   A.  Well, that wasn't the only analysis, but I did look at the

5   range given the attention given in the various legal filings to

6   the 2015 contract.

7   Q.  Right.  And my question was just whether this was part of

8   your opinion, not that it was the entirety to be clear.  So you

9   agree with me that this was part of your opinion, right?

10  A.  Yes.

11  Q.  Okay.  Now, you do understand, sir, that the charged

12  conspiracy started in 2012, right?

13  A.  Yes.

14  Q.  And went through --

15  A.  That's my understanding of the government's allegation.

16  Q.  And went through at least 2019, right?

17  A.  As you say it, I am not sure if I have the correct end

18  date, but I believe it's 2019 according to the allegation.  And

19  then the allegation is that at certain points in time prices

20  were elevated associated with particular so-called episodes.

21  Q.  And you do agree with me that the years 2013 and 2014 were

22  included in the conspiracy charged in this case, correct?

23  A.  That's within the -- during the period of the alleged

24  conspiracy, yes.

25          MR. TORZILLI:  I have no further questions.  Thank

Edward Snyder - Redirect

1   you, Professor Snyder.

2           *THE COURT:*  Redirect?

3           *MS. PLETCHER:*   Thank you, Your Honor.

4                   **REDIRECT EXAMINATION**

5   *BY MS. PLETCHER:*

6   *Q.*  Good afternoon again, Professor Snyder.

7           *THE COURT:*  Let's make sure that Mr. Fronzaglia has a

8   chance to switch over.

9           Sorry, Ms. Pletcher, go ahead.

10  *BY MS. PLETCHER:*

11  *Q.*  Good afternoon again, Professor Snyder.

12  *A.*  Good afternoon.

13  *Q.*  I am going to make this fairly short, just ask you some

14  questions about some of the things you were asked about on

15  cross.

16          I would like to start with questions you were asked

17  about J-211.  If you could turn to that exhibit, please.

18          *MS. PLETCHER:*  And if we could also publish this to

19  the jury, Your Honor?

20          *THE COURT:*  Yes, you may.

21          *MS. PLETCHER:*  Thank you.

22  *A.*  Yes.  I have got that in front of me.

23  *BY MS. PLETCHER:*

24  *Q.*  This is the chart with respect to the breeder birds, to

25  make sure we are on the same page?

Edward Snyder - Redirect

1    A.   Yes.

2    Q.   Okay.  Great.  You were asked about the actual number of

3    small birds produced during this time period.  Do you recall

4    that?

5    A.   Yes.

6    Q.   Could you explain what the timing relationship is between

7    the actual number of birds produced and the number of breeder

8    birds as displayed on this chart?

9    A.   Given that there is a lag between planning and investment

10   and growing the chickens, the number of breeder birds will

11   influence actual supply at some point later, whether it's 12

12   months or 16 months, somewhere in that range.

13   Q.   So if the actual number of breeder birds started to

14   increase in the 2015 or 2016 or later time period, would that

15   be inconsistent with the results you have found on your chart?

16   A.   No.  It would be consistent.

17   Q.   One of the questions you were asked by the government with

18   respect to this chart, do any of those questions change your

19   opinion with respect to the effect on supply that is displayed

20   in this chart?

21   A.   No.  This is one of the two factors potentially among

22   others that in my opinion reduced or limited the amount of

23   broiler chickens that would be available on the market.

24   Q.   Thank you, Professor.

25            Now, I am going to ask you to shift gears and look at

Edward Snyder - Redirect

1   a different slide that you were asked about, and that's J-212.

2   If you can turn to J-212.

3   A.  Yes.

4          MS. PLETCHER:  May I display J-212, Your Honor?

5          THE COURT:  You may.

6   BY MS. PLETCHER:

7   Q.  Professor Snyder, in this chart you were asked about the

8   sources of your information.  Do you remember that?

9   A.  Yes.

10  Q.  And if you could clarify that this chart included both USDA

11  data --

12          MR. TORZILLI:  Objection, leading.

13          THE COURT:  I don't think the question was fully asked

14  yet.  Overruled.

15          MS. PLETCHER:  Thank you, Your Honor.  I will finish

16  the question.

17  BY MS. PLETCHER:

18  Q.  If you could clarify that this chart included data sourced

19  from USDA and EMI; is that correct?

20          MR. TORZILLI:  Objection, leading.

21          THE COURT:  Overruled.

22  A.  My recollection is that this chart used USDA data and then

23  the presentation was done by EMI.

24  BY MS. PLETCHER:

25  Q.  The presentation of the USDA data?  I just want to make

Edward Snyder - Redirect

1    sure I understand that correctly.

2    A.   Yes, that's exactly right.

3    Q.   So you used both.

4    A.   EMI didn't create their own data.

5    Q.   I see.  So you used data from USDA and as sourced by EMI.

6    A.   That's my understanding, correct.

7           MS. PLETCHER:  Your Honor, I believe this exhibit has

8    not been accepted into evidence, so I would like to offer it

9    again at this point.  I believe sufficient foundation has been

10   laid.

11          THE COURT:  Any objection, Mr. Torzilli, to the

12   admission of J-212 for all purposes?

13          MR. TORZILLI:  No objection.

14          THE COURT:  Exhibit J-212 will be admitted except for

15   the title which will only be admitted for purposes of

16   demonstrative or demonstration.

17          MS. PLETCHER:  Thank you, Your Honor.

18   BY MS. PLETCHER:

19   Q.   Professor Snyder, now I am going to shift gears one more

20   time and look at one final slide again that you were asked

21   about and that is J-219, J-219.

22   A.   Yes.

23          MS. PLETCHER:  Your Honor, if I may publish J-219.

24          THE COURT:  Yes.

25   BY MS. PLETCHER:

Edward Snyder - Redirect

1   Q.  Professor Snyder, my first question to you on this chart

2   has to do with the underlying data that you were asked about.

3   Do you recall being asked on cross-examination about data that

4   came from another economic consulting firm?

5   A.  I do.

6   Q.  Could you please explain what that data was that came from

7   the economic consulting firm and how you used it?

8   A.  So there were, to my knowledge, 20 different suppliers

9   whose data were analyzed by another consulting firm and one of

10  them was Pilgrim's Pride.  Some of these suppliers provided

11  individual transaction data.  My recollection is that Pilgrim's

12  Pride provided such data.  When I say individual transactions,

13  I mean, like, you know, this particular shipment on this day

14  for this price to that customer at this location.

15          And my recollection is that Tyson's provided such

16  underlying data and so did, I believe, Foster and there is one

17  more, it might be Mountaire.  So the data in some cases went

18  down to that individual transaction level.  For the others they

19  were monthly averages.  And I had access to both sets of data.

20  Q.  So with respect to what the economic consulting firm did,

21  Professor Snyder, was there -- you said that they analyzed the

22  data.  Was that just with respect to formatting or more

23  substantive analysis?

24          MR. TORZILLI:  Objection, foundation, and calls for

25  speculation.

Edward Snyder - Redirect

 1          THE COURT:  Overruled.  He can answer if he knows.

 2   A.  My understanding is that the economics consulting firm did

 3   the step of taking the individual transactions within a given

 4   month and then aggregating them up to a monthly average.

 5   BY MS. PLETCHER:

 6   Q.  Did you have any concerns that after passing through this

 7   averaging process that the economic consulting firm did that

 8   the data was in any way unreliable?

 9   A.  No, and for two reasons.  First of all, IO economists like

10   myself deal with data that has been aggregated up to certain

11   levels and that's common.  And secondly, in this case I was

12   able to check that aggregation for, as I recall, four of the

13   individual suppliers and therefore became confident that the

14   aggregation done by the economics consulting firm for the other

15   16 was done in a reasonable way.

16          MS. PLETCHER:  Your Honor, at this point I would like

17   to offer J-219.  Again I believe a sufficient foundation for

18   the data has now been established.

19          THE COURT:  Any objection to the admission of J-219

20   for all purposes?

21          MR. TORZILLI:  Yes, Your Honor.

22          THE COURT:  Same objection as before?

23          MR. TORZILLI:  I do have an additional objection that

24   I would be happy to pose at an appropriate time.

25          THE COURT:  Do you want a side bar?

Edward Snyder - Redirect

1          MR. TORZILLI:  Yes, please.

2      (At the bench:)

3          THE COURT:  Mr. Torzilli, go ahead.

4          MR. TORZILLI:  So in addition to the data issue and

5   it's our view that none of what's been elicited changes the

6   fact that we weren't provided the information and that he

7   doesn't know what the other economic consulting firm did, and

8   when he was asked questions on redirect, he was providing

9   information based on his understanding rather than his

10  knowledge.

11          But the second issue is the reliability of the work

12  done here.  A benchmarking analysis is supposed to be comparing

13  like products, apples to apples in some form or fashion.  And

14  by taking all the eight-piece chicken on the bone including big

15  bird, which we've heard weeks of litigation about how the

16  prices of big bird and small bird are very, very different and

17  their trends are very, very different, I don't think this is an

18  appropriate way to handle a benchmarking analysis that is

19  trying to zero in on effect, if any, of the sales of small-bird

20  eight-piece chicken on the bone to KFC.  So we would ask that

21  the exhibit be excluded on the basis of it lacking basic

22  reliability.

23          THE COURT:  Ms. Pletcher, response?

24          MS. PLETCHER:  Thank you, Your Honor.  With respect to

25  the first point, this information was fully disclosed to the

Edward Snyder - Redirect

1    government well in advance, so that should not be an issue here

2    in terms of timing of disclosure.

3              THE COURT:  Let me ask you this, Ms. Pletcher.  When

4    you say the data, was the other consulting firm's aggregation

5    data produced to the government?

6              MS. PLETCHER:  Yes, Your Honor.  It's called

7    Edgeworth, from the Edgeworth firm, and this was all produced

8    to the government I believe on October 6 when we disclosed all

9    of this data.

10             THE COURT:  Sorry to interrupt.  Go ahead.

11             MS. PLETCHER:  Thank you.

12             So the question about the reliability, and Professor

13   Snyder was very clear to state that this is the type of data

14   that economists regularly worked with.  I asked him whether he

15   still believed it was reliable even after the aggregation.  He

16   said yes.

17             And with respect to the last point about whether the

18   eight-piece COB, whether there was a question as to the

19   accuracy of the analysis, Professor Snyder was clear that he

20   controlled for certain factors that he could control for.  And

21   he explained that on direct that he can't control for every

22   feature, but he chose what he was going to control for.  And

23   based on the controls, he believed that his analysis was

24   accurate.

25             And I don't think we could -- I think that explains to

Edward Snyder - Redirect

1    the jury what he did.  And if the jury finds that reliable

2    enough, then, you know, that is, you know, that's up to them to

3    determine, but by Professor Snyder's standard he believed he

4    could control for what he believed he could do and that was

5    sufficient.

6            THE COURT:  Mr. Torzilli, anything else?

7            MR. TORZILLI:  Just one other point on the data issue.

8    Our -- just to be clear, our issue is not with the disclosure.

9    It's with the actual quality or reliability of the underlying

10   data.  This is data that passed through many hands from the

11   producing party to this expert and each step in that chain

12   degrades the reliability of the data.  And this is an

13   individual who can't supply sufficient foundation or sufficient

14   knowledge to be able to tell us whether the data he actually

15   received is reliable as opposed to him accurately working with

16   the information that he received, which, of course, takes the

17   quality of the data as a given.

18           THE COURT:  All right.  The government's objection

19   will be overruled.  First of all, on the data, it turns out --

20   I may have misunderstood, but the government had the Edgewater

21   data and therefore had the ability to double-check the figures

22   which are being presented arguably in summary form here, but

23   the government had that opportunity to double-check it.

24           In terms of the comparators data including some

25   products that are not comparable to the KFC product, namely

Edward Snyder - Redirect

1    being a small bird, first of all, Professor Snyder indicated

2    that he considered there to be sufficient correspondence.  Also

3    as Ms. Pletcher noted, he also admitted what the differences

4    were and the fact that some of that data may contain different

5    products.  And so that information is in front of the jury and

6    the jury, of course, is perfectly free to discount the

7    information shown on J-219 as it chooses to do, but that

8    doesn't mean that the information itself given those

9    disclosures is not sufficiently reliable to be admitted.

10          So I will overrule the government's objection and I

11   will admit J-219 for all purposes except for the heading which

12   is only for demonstrative.

13       (In open court:)

14       THE COURT:  All right.  J-219 will be admitted for all

15   purposes except for the title which is admissible only for

16   demonstrative purposes.

17       MS. PLETCHER:  Thank you, Your Honor.  May I have a

18   moment, please?

19          THE COURT:  Yes, you may.

20          MS. PLETCHER:  No further questions, Your Honor.

21          Thank you very much, Professor Snyder.

22       THE COURT:  All right.  Professor Snyder, then you are

23   excused.  Thank you very much.

24       MR. TORZILLI:  Your Honor, may I just make a request

25   of the witness for a moment on exhibits?

Edward Snyder - Redirect

1      MR. McLOUGHLIN:  Your Honor, may we ask counsel to

2   make the request to the Court and you make a determination?

3      THE COURT:  Yeah, that's appropriate.

4      MR. TORZILLI:  What I would like to do --

5      THE COURT:  You can stay there.  It's just as a matter

6   of form.

7      MR. TORZILLI:  Absolutely, Your Honor.  We have

8   shipped to the witness materials in sealed envelopes that have

9   been opened during the course of the examination.  We would

10  like to receive those materials in the state they are presently

11  in sealed, so I would like to inquire of the witness whether he

12  would --

13     THE COURT:  In other words, Professor Snyder, do you

14  have any problem with not necessarily you yourself, but can you

15  ship what you've got back to the government?  They will make

16  the arrangements, if necessary, but without opening any

17  envelopes that Mr. Torzilli has not asked you to open already?

18     THE WITNESS:  Yes, Your Honor, I can arrange for that.

19     THE COURT:  Okay, great.

20     Anything else, Mr. Torzilli?

21     MR. TORZILLI:  No, that's it.

22     THE COURT:  Thank you very much, Professor Snyder.

23  You are excused at this time.

24     Next witness.

25     Ladies and gentlemen, once we get to the mid-afternoon

Brenda Ray - Direct

1    break, we will remove this screen so I can actually see all of

2    you, but we won't go through that process right now.  I think

3    this is our next, witness.  Is it, Mr. Fagg?

4            *MR. FAGG:*  It is, yes.

5        (**Brenda Ray** was sworn.)

6            *THE WITNESS:*  I do.

7            *COURT DEPUTY CLERK:*  Please state your name and spell

8    your first and last name for the record.

9            *THE WITNESS:*  Brenda Ray, B-R-E-N-D-A, R-A-Y.

10           *THE COURT:*  Go ahead, Mr. Fagg.

11                        **DIRECT EXAMINATION**

12   *BY MR. FAGG:*

13   *Q.*  Good afternoon, Ms. Ray.

14   *A.*  Hello.

15   *Q.*  My name is John Fagg and I represent Bill Lovette.  I have

16   a few questions for you today.

17           Where do you currently work, Ms. Ray?

18   *A.*  I work in customer service at Pilgrim's.

19   *Q.*  And how long have you been in that role?

20   *A.*  Two and a half, almost three years.

21   *Q.*  Did you have -- what did you do before that?

22   *A.*  I worked in sales for Pilgrim's.

23   *Q.*  And how long were you in sales at Pilgrim's?

24   *A.*  33 years.

25   *Q.*  So Ms. Ray, I want to start with just some background

Brenda Ray - Direct

1   questions for you based on those 33 years of experience that

2   you've had at Pilgrim's.  Can you give the jury a sense of the

3   number of customers that Pilgrim's has?

4   A.   Currently?

5   Q.   Sure, currently or during the 2012 to 2019 time period when

6   you were in your earlier role.

7   A.   Thousands.

8   Q.   A thousand?

9   A.   Approximately.  I would say many customers.

10  Q.   Do you know approximately how many plants, processing

11  plants that Pilgrim's operated in the, say, 2014 or 2015

12  period?

13  A.   It would be in the twenties, maybe 22 to 25, 26.

14  Q.   And so can you give us a sense of, if you know, how does

15  Pilgrim's fit from a size perspective within the broiler

16  chicken industry compared to other suppliers?

17  A.   They are one of the largest.

18  Q.   And do you know approximately how many birds are processed

19  on an annual basis at just one facility?

20  A.   I can speak to one facility, which would be the Moorefield,

21  West Virginia complex.  And, you know, they kill about

22  2 million chickens a week there, so annually that would be

23  about a hundred million or 300 million pounds, approximately.

24  Q.   Thank you.  I would like to focus in, if we can, on a

25  specific request that Pilgrim's received from a supplier called

Brenda Ray - Direct

1   Sysco, okay?

2   A.  Okay.

3   Q.  When you were in sales for 33 years, what division of sales

4   did you work in?

5   A.  I spent most of my time in broad-line distribution.

6   Q.  And do you recall an instance in 2016 when you were in

7   broad-line distribution that Pilgrim's received a demand from

8   Sysco related to credit terms?

9   A.  Yes, sir.

10  Q.  Do you recall -- how did you find out about that request?

11  A.  I believe that it was a letter that was e-mailed to

12  Pilgrim's by Sysco corporate.  It was an attachment, I believe,

13  to an e-mail.

14  Q.  And at that time were you responsible for -- was Sysco your

15  customer?

16  A.  Yes, Sysco fell under my customers, that's correct.

17  Q.  Ms. Ray, if you could look in your binder at Government's

18  Exhibits 843 and 844.  I would just like to ask you a few

19  questions about those.  And they are also up on the screen, if

20  that is easier for you.

21  A.  Okay.

22  Q.  Do you recognize these documents?

23  A.  Yes.

24  Q.  Can you tell us what they are?

25  A.  This is an e-mail that came from Melissa Swain or Melissa

Brenda Ray - Direct

1    Hoyt at Sysco corporate.  And the document is stating that

2    Sysco wanted to change their credit terms, their payment terms.

3    *Q.*  The payment terms under which they, Sysco, would pay

4    Pilgrim's?

5    *A.*  That is correct.

6    *Q.*  And did you receive this e-mail?

7    *A.*  Yes, I did.

8    *Q.*  And is this the type of correspondence with a customer that

9    Pilgrim's would rely upon in conducting its business with that

10   customer?

11   *A.*  Typically.  I will be honest, as I am, this is the first

12   time I had ever been e-mailed from a customer stating that they

13   wanted to change their credit terms and spelled out what they

14   wanted them to be.

15   *Q.*  And I would like to get to that in just a moment.  But when

16   you received this sort of demand from a customer, is that

17   something that Pilgrim's then maintains in the ordinary course

18   of its business?

19   *A.*  When we receive this type of information, as a sales

20   director, we would push it on up.  I would push it on up to

21   finance.

22   *Q.*  And then do you have an understanding that finance would

23   then maintain this sort of document in the ordinary course of

24   Pilgrim's business?

25   *A.*  Yes.

Brenda Ray - Direct

1   *Q.* And did you, having received this document, feel that there

2   was a need to respond to it?

3   *A.* Yes.

4        *MR. FAGG:* Your Honor, we would offer Government's

5   Exhibit 843 and 844.

6        *THE COURT:* Why don't we take 843, first. Any

7   objection to the admission of 843?

8        *MR. KOENIG:* Hearsay.

9        *THE COURT:* Response?

10       *MR. FAGG:* Sure, Your Honor. I think this is a demand

11   from a customer that then generated a response. This is akin

12   to the bid and offer situation and has independent legal

13   significance. And this is not -- this is also a form e-mail.

14   This isn't an individualized e-mail. This is a form e-mail,

15   and so I don't believe it's hearsay.

16       *THE COURT:* The objection will be sustained. The fact

17   that it's stored, a third-party document is stored does not

18   make it a business record of a company like Pilgrim's Pride.

19   It could possibly fit within an exception of effect on the

20   listener, but we haven't -- that foundation hasn't been

21   established yet, so for the time being it will -- the objection

22   will be sustained.

23       *MR. FAGG:* Can we take up 843 which is the actual -- I

24   am sorry, 844 Your Honor.

25       *THE COURT:* Yeah, 844. Any objection to the admission

Brenda Ray - Direct

1   of 844?

2           *MR. KOENIG:*  Yes, hearsay.

3           *THE COURT:*  Response?

4           *MR. FAGG:*  Sure, Your Honor.  This is pure terms that

5   are proposed by Sysco.  And I don't believe that there are any

6   statements in here that would be hearsay, and this is exactly

7   the type of document that has been admitted elsewhere in the

8   case.

9           *THE COURT:*  Once again, the objection will be

10  sustained as to hearsay.  It might fit within an exception.  We

11  just don't know that yet.

12  *BY MR. FAGG:*

13  *Q.*  So Ms. Ray, you said when you received this letter -- well,

14  tell us, when you received this demand from Sysco, what did you

15  do next?

16  *A.*  I sent it to my direct supervisor and -- I sent it I

17  believe to my direct supervisor, Jayson Penn.

18  *Q.*  And do you have an understanding what happened next?  Did

19  you send it on to anyone else or were you aware it was sent on

20  to anyone else?

21  *A.*  It was sent on to Fabio Sandri.  He was in charge of our

22  finance, financials, credit.

23  *Q.*  And at the time that this came in, was Mr. Sandri the CFO

24  of Pilgrim's?

25  *A.*  Yes.

3709

Brenda Ray - Direct

 1  Q.  I think you indicated earlier that you would expect to send

 2  this sort of response on to finance because it dealt with

 3  credit terms?

 4  A.  Yes.

 5  Q.  And then after you sent that on to Mr. Penn and then to

 6  Mr. Sandri, what happened next?

 7  A.  I waited for a response to whether or not the terms that

 8  Sysco was requesting would be granted.

 9  Q.  So you could then continue with your negotiations with

10  Sysco or your discussions with Sysco?

11  A.  Well, yes, whether we were or were not going to accept

12  their demand.

13          MR. FAGG:  Your Honor, we offer 843 and 844 for effect

14  on the listener.

15          THE COURT:  Any objection to the admission of 843 or

16  844?

17          MR. KOENIG:  No objection.

18          THE COURT:  Exhibits 843 and 844 will be admitted.

19          MR. FAGG:  Thank you.

20  BY MR. FAGG:

21  Q.  So Ms. Ray, can you look at the e-mail from Ms. Hoyt, which

22  is Exhibit 843?  What's the date of that e-mail --

23          MR. FAGG:  I am sorry, Your Honor, may we publish 843

24  and 844?

25          THE COURT:  Yes, you may.

3710

Brenda Ray - Direct

1    *A.*  The date of the e-mail?

2    *BY MR. FAGG:*

3    *Q.*  Yes, ma'am.

4    *A.*  Is Monday, April 25th, 2016.

5    *Q.*  And you recall --

6           *MR. KOENIG:*  Your Honor, I realized I forgot to

7    mention when I said no objection, I was under the assumption

8    that you were admitting it not for the truth, but for the

9    effect on the listener, but I am not sure that that came across

10   when I did that.

11          *THE COURT:*  Well, since you didn't say it, yeah, it

12   did not come across.  But are you making a request differently

13   now?

14          *MR. KOENIG:*  Yeah, I mean, I think that is appropriate

15   because that is the basis upon which it was offered into

16   evidence is effect on the listener.

17          *THE COURT:*  Mr. Fagg?

18          *MR. FAGG:*  Your Honor, there wasn't a contemporaneous

19   objection with it and so we --

20          *THE COURT:*  Okay.  There was a lack of a

21   contemporaneous objection, so it would be admitted for all

22   purposes.

23          Go ahead, Mr. Fagg.

24          *MR. FAGG:*  Thank you.

25   *BY MR. FAGG:*

Brenda Ray - Direct

1    Q.   Ms. Ray, do you remember receiving this e-mail or this

2    demand from Sysco?

3    A.   I remember receiving the demand from Sysco, yes.

4    Q.   And I believe you said earlier that this was very unique;

5    is that correct?

6    A.   Yes.

7    Q.   Can you tell us why it was unique?

8    A.   In my decades of doing business, I had never received a

9    letter from a customer demanding different credit terms.

10   Q.   And different credit terms here mean that Sysco was trying

11   to extend the time period with which they had to pay Pilgrim's?

12   A.   Correct.

13   Q.   And that was something you had never experienced before.

14   A.   No.

15   Q.   When you received this demand, was it part of any bid

16   process with Sysco?

17   A.   No, it wasn't.

18   Q.   Was it part of any contract negotiations for the price of

19   chicken?

20   A.   No, it wasn't.

21   Q.   And did Pilgrim's have any sort of heads-up that this

22   request was going to be coming from Sysco?

23   A.   Not that I'm aware of.

24   Q.   Based on your experience in the industry and your decades

25   of experience, do you have an impression as to whether

Brenda Ray - Direct

1   Pilgrim's had any sort of obligation to renegotiate the credit

2   terms with Sysco at this time?

3           MR. KOENIG:  Objection, leading.

4           THE COURT:  Overruled.

5   A.  In an RFP, during the RFP process, credit terms are

6   discussed and gone over.  And in my experience, that is where

7   if you wanted to make a change or suggest a change, you would

8   do so at that time.  So for me to receive a letter like this

9   from a customer outside of that particular time period, it

10  wasn't customary.

11  BY MR. FAGG:

12  Q.  So what was your reaction when you received this demand?

13  A.  Well, it was -- it was addressed, of course, to my boss and

14  I was over the account, and it was a request.  So as part of

15  servicing the customer, we did send it on to finance.

16  Q.  You sent it on to finance to consider how it should be

17  responded to.

18  A.  That's correct.

19  Q.  And just to be clear, this letter when you received it was

20  not part of any RFP.

21  A.  No, it wasn't.

22  Q.  Did you have any further discussions with Sysco about

23  whether or not this was a request that was only going to

24  Pilgrim's?

25  A.  I didn't directly.

Brenda Ray - Direct

1    *Q.*  Did you ask anyone to do so?

2    *A.*  I did.

3    *Q.*  And who did you ask to do that?

4    *A.*  Janine Nollkamper, who was our sales director that handled

5    the Sysco account specifically.

6    *Q.*  Who did Ms. Nollkamper report to?

7    *A.*  Me.

8    *Q.*  Did you ask Ms. Nollkamper to contact Sysco?

9    *A.*  Yes, I did.

10   *Q.*  And what was your understanding of whether or not Pilgrim's

11   was the only chicken supplier to receive these -- this demand

12   for these revised terms?

13           *MR. KOENIG:*  Objection, hearsay.

14           *THE COURT:*  Sustained.

15   *BY MR. FAGG:*

16   *Q.*  Do you have an understanding as to whether or not Pilgrim's

17   was the only supplier to receive these terms?

18   *A.*  My understanding is that Pilgrim's --

19           *MR. KOENIG:*  Objection.  He only asked a yes or no

20   question, does she have an understanding.

21           *THE COURT:*  Sustained.

22   *BY MR. FAGG:*

23   *Q.*  Do you have an understanding, just yes or no --

24   *A.*  Yes.

25   *Q.*  -- about whether or not Pilgrim's was the only supplier to

Brenda Ray - Direct

1   receive this demand from Sysco?

2   *A.*   Yes, I have an understanding.

3   *Q.*   And did you -- did any of that understanding come from

4   other chicken suppliers?

5   *A.*   It did not.

6   *Q.*   Did you at any time ask Ms. Nollkamper to reach out to any

7   other chicken suppliers about this request?

8   *A.*   I did not.

9   *Q.*   Did you ask Ms. Nollkamper to reach out to anyone outside

10  of Pilgrim's other than Sysco?

11  *A.*   Yes, I did.

12  *Q.*   And once you received that information and you understood

13  this request, did Pilgrim's in fact consider this request from

14  Sysco?

15  *A.*   Yes, they did.

16  *Q.*   And I would like to show you what has been marked as D-989

17  and D-990.

18  *A.*   Okay.

19  *Q.*   Do you see those documents?

20  *A.*   I do.

21           *MR. FAGG:*   Your Honor, we would offer D-989 and D-990

22  based on a stipulation between the parties.

23           *THE COURT:*   Any objection to the admission of D-989

24  and D-990?

25           *MR. KOENIG:*   May we have one moment?

Brenda Ray - Direct

1            THE COURT:  Yes.

2            MR. KOENIG:  No objection.

3            THE COURT:  D-989 and D-990 will be admitted.

4            MR. FAGG:  Thank you.

5    BY MR. FAGG:

6    Q.  So Ms. Ray, you can stay right there, but I would like to

7    put up on the screen if we can and publish to the jury, Your

8    Honor, Exhibits 843 and 844.

9            THE COURT:  You may.

10           MR. FAGG:  Thank you.

11   BY MR. FAGG:

12   Q.  So do you see the ones on your screen, Ms. Ray, 843 and 844

13   that we talked about just a minute ago?

14   A.  Yes.

15   Q.  Is that the demand from Sysco for Pilgrim's to change its

16   credit terms that we talked about?

17   A.  Yes.

18   Q.  And just to make sure that we're tracking with one another,

19   844 which is the one that has the table on the right, those are

20   the new terms that Sysco was proposing?

21   A.  Yes, I believe that to be correct.

22   Q.  And so what they are proposing here, how many days were

23   they seeking for their credit terms in the right-hand column?

24   A.  They were seeking 14 days.

25   Q.  And that was longer than the terms that Pilgrim's then had

Brenda Ray - Direct

1    in place?

2    A.   Correct.

3    Q.   Did Pilgrim's ever receive from Sysco a demand to extend

4    its credit terms out to 65 days?

5    A.   I am not aware of that.

6    Q.   This is the first request that you're aware of that came

7    from Sysco?

8    A.   Yes.

9    Q.   And so if we're looking at 843, the date on that is -- and

10   this is the cover e-mail -- the date on that is May 25th -- I

11   am sorry, April 25th?

12   A.   Correct.

13   Q.   2016?  Okay, great.   Thanks.   And so then if you look at

14   D-989, and if you look at the second page of that, can you tell

15   us what that appears -- what that e-mail appears to be

16   attaching?

17   A.   A response made to Sysco that answers their request for

18   extended credit terms.

19   Q.   And so --

20        MR. KOENIG:   Your Honor, if I may.   I just wanted to

21   make sure our agreement to this document was subject to

22   redactions.   And when they first put it up on the screen,

23   D-989, it appeared without redactions.   I just want to make

24   sure that it is admitted with the redactions.   I am sure it was

25   an error.

Brenda Ray - Direct

1        MR. FAGG:  I didn't even see it.  It will be certainly

2    admitted with the redactions, Your Honor.

3        THE COURT:  Yeah, my copy has the redactions that

4    Mr. Koenig alluded to.

5        Go ahead, Mr. Fagg.

6        MR. FAGG:  Thank you.

7    BY MR. FAGG:

8    Q.  So if you look at D-990, Ms. Ray, does that appear to be

9    Pilgrim's response to the demand from Sysco?

10   A.  It does.

11   Q.  And again that was -- I can't remember if we covered this

12   right before the discussion about the redactions, but this

13   response was sent based on the e-mail on May the 2nd of 2016;

14   is that right?

15   A.  Correct.

16   Q.  So a week after Pilgrim's received the demand from Sysco,

17   it responded in writing?

18   A.  Correct.

19   Q.  And that response came from who at Pilgrim's, if you look

20   at the actual letter?

21   A.  The response came from Fabio Sandri.

22   Q.  The CFO?

23   A.  The CFO, and was sent to Sysco by Karen Schroeder, one of

24   his admins.

25   Q.  And when Mr. Sandri responded on behalf of Pilgrim's, did

Brenda Ray - Direct

1   he say that Pilgrim's was not going to negotiate with Sysco?

2          MR. KOENIG:  Objection, hearsay.

3          THE COURT:  Well, I think we're talking about D-990,

4   so overruled.

5   A.  Yes.  What he states is the credit terms he is going to

6   allow.

7          MR. FAGG:  Let's pull up 990 and take a look at that,

8   if we can.

9          May we publish it, Your Honor?

10          THE COURT:  Yes, you may.

11   BY MR. FAGG:

12   Q.  If you look in the first paragraph, Ms. Ray --

13          THE COURT:  Actually, Mr. Fagg, before we do that, why

14   don't we take a short stretch break.

15          MR. FAGG:  Sure, Your Honor.

16          (Brief recess.)

17          THE COURT:  Go ahead, Mr. Fagg, whenever you are

18   ready.

19   BY MR. FAGG:

20   Q.  So Ms. Ray, we are talking about D-990.  Do you see in the

21   first paragraph of that letter where it says, Pilgrim's

22   respectfully requests the opportunity to discuss your proposal

23   and our ongoing relationship with Sysco?

24   A.  Yes.

25   Q.  So is it fair that Mr. Sandri communicated to Sysco that

Brenda Ray - Direct

 1   Pilgrim's wanted to discuss their --

 2          *MR. KOENIG:*  Objection, she didn't write the document.

 3   It's an objection we had sustained on us many times.

 4          *THE COURT:*  That in and of itself is not a good

 5   reason, but the objection will be sustained, foundation.

 6   *BY MR. FAGG:*

 7   *Q.*  Can you read for us, Ms. Ray, what that first -- what the

 8   last phrase of the first paragraph says?

 9   *A.*  Pilgrim's respectfully requests the opportunity to discuss

10   your proposal and our ongoing relationship with Sysco.

11   *Q.*  And can you also read for us the last sentence of the

12   letter?

13   *A.*  As a valued partner and strategic customer, we look forward

14   to the opportunity to meet with your purchasing team and other

15   Sysco representatives, as appropriate, to discuss how we might

16   strengthen our partnership.

17   *Q.*  At any point in those two sentences is there a phrase that

18   says we're not going to negotiate with you?

19   *A.*  I don't see that it says that.

20   *Q.*  Pilgrim's responded back to Sysco within a week; is that

21   correct?

22   *A.*  Approximately, yes.

23   *Q.*  Did Pilgrim's ultimately agree to revise terms with Sysco?

24   *A.*  I believe so.

25   *Q.*  And if you could look at Exhibit 850 and 851, please,

Brenda Ray - Direct

1    ma'am.  Do you see those two documents?

2    A.  Yes, I do.

3    Q.  And can you tell us what those documents are, please?

4    A.  One is an e-mail to Melissa Swain at Sysco corporate.  And

5    it says that she hopes someone had a great vacation.

6    Q.  Is it attaching something?

7    A.  It attaches the signed payment terms change form.  Please

8    let me know if you have any questions.

9    Q.  Is that an e-mail that you asked Ms. Nollkamper to send?

10   A.  Yes.

11   Q.  And are you copied on that e-mail?

12   A.  Yes.

13   Q.  Take a look at Exhibit 851, the next one, if you can.  Who

14   signed this document on behalf of Pilgrim's?

15   A.  I did.

16   Q.  And do you recognize this document?

17   A.  I do.

18   Q.  And is this the signed version of the contract terms that

19   you sent -- that you asked Ms. Nollkamper to send back to

20   Sysco?

21   A.  Yes, it is.

22        MR. FAGG:  Your Honor, we would offer Exhibits 850 and

23   851.

24        THE COURT:  Any objection to the admission of

25   Exhibit 850 and 851?

Brenda Ray - Direct

1           MR. KOENIG:  Yes, hearsay.

2           THE COURT:  Response, Mr. Fagg?

3           MR. FAGG:  Independent legal significance, Your Honor,

4   of 850 and 851.  This is signed by the witness and transmitted

5   back to the customer.

6           THE COURT:  Anything else, Mr. Koenig?

7           MR. KOENIG:  No.

8           THE COURT:  851 will be admitted.  It is a signed

9   contract.  It has independent legal significance.  850 will be

10  admitted as well.  It's just the cover transmittal of it.  I

11  find that it falls without a hearsay -- or falls within a

12  hearsay exception.  There is a reference to having a great

13  vacation, but that is essentially irrelevant, so I will

14  overrule the objections and admit both exhibits.

15  BY MR. FAGG:

16  Q.  So ultimately, Ms. Ray, was Pilgrim's willing to negotiate

17  with Sysco and accept some sort of revised credit terms?

18  A.  Yes.

19  Q.  And is that what is reflected in Exhibit 851?

20  A.  Yes.

21  Q.  And you see in the right-hand column of 851 where it says

22  new net terms?

23  A.  Yes.

24  Q.  And did Pilgrim's -- did Pilgrim's accept some of the

25  14-day terms that Sysco had demanded?

Brenda Ray - Direct

1    A.   Yes.

2    Q.   And for others you negotiated it down to zero?

3    A.   Yes.

4    Q.   And so just to close the loop, I would ask you to look at

5    Government's Exhibit 9700.  Do you see that?

6    A.   Yes.

7    Q.   And do you recognize this document?

8    A.   I do.

9    Q.   And what is it?

10   A.   It is the signed credit payment -- change of payment terms

11   that has now the Sysco signature accepting the terms.

12   Q.   In addition to your signature.

13   A.   That's correct.

14        MR. FAGG:  Your Honor, we would offer Government's

15   Exhibit 9700.

16        THE COURT:  Any objection to the admission of 9700?

17        MR. KOENIG:  No.

18        THE COURT:  Exhibit 9700 will be admitted.

19        MR. FAGG:  Can we please publish 9700, please?

20        THE COURT:  You may.

21        MR. FAGG:  If we could please display -- one moment --

22   9700 and 844 side by side, please.

23        THE COURT:  You may.

24   BY MR. FAGG:

25   Q.   So you may need to look on your screen for this, Ms. Ray,

Brenda Ray - Direct

1    but 844 I believe you said was the initial proposal that came

2    from Sysco, correct?

3    *A.*   Yes.

4    *Q.*   And then 9700 is the signed contract.

5    *A.*   Yes.

6    *Q.*   And nowhere and anywhere in either of these documents is

7    there a proposal for 65-days terms?

8    *A.*   No.

9    *Q.*   It's your recollection that Pilgrim's never received a

10   demand for 65-day terms?

11   *A.*   No.

12   *Q.*   But Pilgrim's did negotiate with Sysco and ultimately

13   agreed to some revised terms even though it was outside of the

14   normal process.

15           *MR. KOENIG:*   Objection, leading.

16           *THE COURT:*   Sustained.

17   *BY MR. FAGG:*

18   *Q.*   Did Pilgrim's ultimately negotiate with Sysco and agree to

19   revised terms?

20   *A.*   Yes.

21   *Q.*   And almost done, Ms. Ray.  In your opinion, was there any

22   benefit to Pilgrim's to renegotiate these terms?

23   *A.*   My opinion?

24   *Q.*   Yes, ma'am.

25   *A.*   No.

Brenda Ray - Direct

1    Q.   But Pilgrim's did nonetheless negotiate it?

2    A.   Yes.

3    Q.   Who at Pilgrim's approved the revised terms?

4    A.   Fabio Sandri.

5    Q.   Mr. Sandri?

6    A.   That's correct.

7    Q.   The CFO?

8    A.   The CFO.

9    Q.   Was Mr. Lovette involved in the discussions about these

10   revised terms in any way?

11   A.   Not that I'm aware.

12   Q.   But you were involved in the negotiation process, correct?

13   A.   Yes.

14   Q.   Did you ever have a discussion with Mr. Lovette about the

15   Sysco demand?

16   A.   No.

17   Q.   Did anyone -- are you aware that anyone else had a

18   discussion with Mr. Lovette about this?

19   A.   I am not aware.

20   Q.   Did you at any time ever speak to any other chicken

21   suppliers about Sysco's demand?

22   A.   No.

23   Q.   Are you aware that anybody else at Pilgrim's spoke to other

24   suppliers about Sysco's demand?

25   A.   I am not.

Brenda Ray - Direct

1    Q.  Did you ask anybody on your team or anywhere else at

2    Pilgrim's to talk to any other suppliers about Sysco's demand?

3    A.  I did not.

4    Q.  And are you aware of anyone at Pilgrim's receiving any

5    information from other suppliers as it relates to these

6    negotiations?

7    A.  I am not.

8    Q.  Are you aware of anybody at Pilgrim's either seeking or

9    receiving information about any sort of strategy that another

10   supplier was going to take with Sysco?

11   A.  No.

12   Q.  And based on your involvement in these negotiations, are

13   you aware that Pilgrim's coordinated in any way with any other

14   supplier as it relates to these negotiations?

15   A.  No.

16   Q.  Did Pilgrim's make its own independent decision about what

17   it was going to do?

18   A.  Yes.

19   Q.  And that decision was made by who?

20   A.  The CFO, Fabio Sandri.

21   Q.  Last topic for you, Ms. Ray.  Based on your many years at

22   Pilgrim's and the years that Mr. Lovette was the CEO, did you

23   have an opportunity to form an opinion about how Mr. Lovette

24   viewed other chicken suppliers?

25   A.  I have an opinion.

Brenda Ray - Direct

1    *Q.* And what is that?

2              *MR. KOENIG:* Objection, foundation.

3              *THE COURT:* Sustained.

4    *BY MR. FAGG:*

5    *Q.* What is your opinion based on?

6    *A.* Having been around Mr. Lovette.  He viewed other suppliers

7    as --

8              *MR. KOENIG:* Objection, foundation.

9              *THE COURT:* Sustained.

10   *BY MR. FAGG:*

11   *Q.* Let me ask you a couple questions about that.

12   *A.* Sure.

13   *Q.* So when you say having been around Mr. Lovette, is that in

14   meetings with him?

15   *A.* Correct.

16   *Q.* And is that in -- are there other ways in which you were

17   around him when he was CEO?

18   *A.* Yes.

19   *Q.* And is it those -- your direct interactions with him or

20   your direct observations of him, is that what gives you the

21   basis of your opinion as it relates to how he views other

22   chicken suppliers?

23   *A.* Yes.

24   *Q.* And what is your opinion about how he views other chicken

25   suppliers?

Brenda Ray - Cross

1            MR. KOENIG:  Objection.  I believe this is -- calls

2       for hearsay.  It's improper character evidence, and I still

3       think the foundation really hasn't been laid.

4            THE COURT:  Sustained.

5            MR. FAGG:  No further questions for you.

6            THE COURT:  Thank you, Mr. Fagg.

7            Mr. Pollack?

8                         **CROSS-EXAMINATION**

9       BY MR. POLLACK:

10      Q.  Good afternoon, Ms. Ray.  My name is Barry Pollack.  I

11      represent Ric Blake and I just have a couple questions for you.

12           MR. POLLACK:  With the Court's permission I would like

13      to publish Government Exhibit 6198 which was offered and

14      published to the jury on March 10th without a witness, and I

15      believe a limiting instruction was given.

16           THE COURT:  Yes, you may publish that.  And the

17      limiting instruction, ladies and gentlemen, as to that exhibit

18      was that it can only be considered for purposes of determining

19      whether there were -- whether a conspiracy existed.

20      BY MR. POLLACK:

21      Q.  And let's start at the bottom of the page because this is

22      an e-mail chain.  The bottom is the first e-mail in the chain.

23           Ms. Ray, can you see on the screen that bottom e-mail?

24      A.  Yes.

25      Q.  And that is an e-mail from who?

Brenda Ray - Cross

1    A.   From me.

2    Q.   And the other people that you are sending this to, are they

3    all Pilgrim's employees?

4    A.   Yes, they are.

5    Q.   Okay.  And can you go ahead and just read the first

6    sentence that you wrote?

7    A.   Yes.  I received a call today from a friendly competitor

8    telling me it's all over the marketplace that Pilgrim's is

9    taking contract pricing up.

10   Q.   And Ms. Ray, you wanted to pass what you had heard on to

11   others at Pilgrim's?

12   A.   Yes.

13   Q.   And then if we can work our way up the chain, you received

14   a response from a Larry Pate; is that correct?

15   A.   That is correct.

16   Q.   And again, he is another Pilgrim's employee?

17   A.   Yes, he is.

18   Q.   And what did Mr. Pate say in response to your e-mail?

19   A.   Thanks, who would that friendly competitor be?

20   Q.   And then you responded to Mr. Pate and you said, George's,

21   correct?

22   A.   Correct.

23   Q.   You had spoken with someone at George's?

24   A.   Correct.

25   Q.   And who was it at George's that you had spoken to?

Brenda Ray - Cross

1    *A.*  Greg Nelson.

2    *Q.*  Had you spoken to Ric Blake?

3    *A.*  No.

4    *Q.*  Did you even know Ric Blake?

5    *A.*  I do not.

6    *Q.*  Have you been interviewed by prosecutors in this case?

7    *A.*  Yes.

8    *Q.*  And when you were interviewed, did you tell them that it

9    was Mr. Nelson that you had spoken to at George's and that you

10   didn't even know Ric Blake?

11             *MR. KOENIG:*  Objection, leading and outside the scope

12   of direct.

13             *THE COURT:*  Overruled.

14   *A.*  Yes, I did.

15   *BY MR. POLLACK:*

16   *Q.*  You did tell them that?

17   *A.*  I did.

18             *MR. POLLACK:*  Thank you, Ms. Ray.  That's all I have.

19             *THE COURT:*  Thank you.

20             Mr. Tubach?

21             *MR. TUBACH:*  Thank you.  May I approach with some

22   binders?

23             *THE COURT:*  Yes.

24             *MR. TUBACH:*  They are very small.

25                         **CROSS-EXAMINATION**

Brenda Ray - Cross

1 | *BY MR. TUBACH:*

2 | *Q.* Ms. Ray, good afternoon. My name is Michael Tubach. I

3 | represent Jayson Penn. I have some questions for you. I want

4 | to go back to Exhibit 6198, if I could. There should be a hard

5 | copy in your binder or you can also look on the screen.

6 | *MR. TUBACH:* If we can put that up, and I would like

7 | to publish that to the jury, if we could.

8 | *THE COURT:* What was the exhibit number again?

9 | *MR. TUBACH:* 6198, Your Honor.

10 | *THE COURT:* Right. You may.

11 | *MR. TUBACH:* Thank you.

12 | *BY MR. TUBACH:*

13 | *Q.* And this is the e-mail you were just asked about by

14 | Mr. Pollack, correct?

15 | *A.* Correct.

16 | *Q.* And this was an e-mail summarizing a phone call that you

17 | got from Greg Nelson at George's; is that right?

18 | *A.* Correct.

19 | *Q.* And he called you, right?

20 | *A.* That's correct.

21 | *Q.* And your e-mail mentions that Pilgrim's had taken up

22 | contract pricing. To what market or customer did that relate,

23 | if you know?

24 | *A.* The New York Marketplace with nine-piece cut.

25 | *Q.* I am sorry?

Brenda Ray - Cross

1   A.   Nine-piece cut-up chicken.

2   Q.   Was it to any particular segment of the market that it

3   related?

4   A.   Yes.

5   Q.   And which was that?

6   A.   Commodity.

7   Q.   Did it have anything to do with halal meat?

8   A.   Yes.

9   Q.   What is halal meat, just so we have it in the record?

10  A.   It is Muslim-blessed with an Iman so that the Muslim

11  population feels comfortable to consume the meat.

12  Q.   So the contract pricing that Pilgrim's had taken up related

13  to halal meat in the northeast; is that correct?

14  A.   That is correct.

15  Q.   Was Mr. Penn involved in any way in the decision to

16  increase that contract pricing?

17  A.   No.

18  Q.   At the time you had that conversation with Mr. Nelson, had

19  Pilgrim's already taken up its contract prices?

20  A.   Yes.

21  Q.   Was Mr. Nelson telling you basically stuff that was out in

22  the marketplace that he had heard?

23        MR. KOENIG:  Objection, leading.

24        THE COURT:  Sustained.

25  BY MR. TUBACH:

3732

Brenda Ray - Cross

1    Q.   What was Mr. Nelson telling you about what he had heard?

2            MR. KOENIG:   Objection, hearsay.

3            MR. TUBACH:   I am simply laying a foundation for

4    what's reflected in Exhibit 6198 which is in evidence.

5            THE COURT:   Overruled.

6    A.   I am sorry?

7    BY MR. TUBACH:

8    Q.   Do you want me to ask it again?

9    A.   Yes, please.

10   Q.   What was Mr. Nelson relating to you about what he had heard

11   in the marketplace?

12   A.   He had heard that Pilgrim's had taken a price increase in

13   that market.

14   Q.   And did you know at that time whether or not George's at

15   taken up its contract price?

16   A.   I had no idea.

17   Q.   Ms. Ray, was this conversation you had with Mr. Nelson part

18   of any agreement to fix prices?

19   A.   No, sir.

20   Q.   Was it part of any agreement to rig bids?

21   A.   No, sir.

22   Q.   To whom did you send this e-mail?  Let's talk about the

23   first four, the actual recipients of the e-mail, the folks in

24   the To line.  Are those all people who worked basically under

25   you at this time?

3733

Brenda Ray - Cross

1   A.   That's correct.

2   Q.   They were on your team?

3   A.   That's correct.

4   Q.   And you also copied Jayson Penn; is that right?

5   A.   That is correct.

6   Q.   Why did you copy Jayson Penn on the e-mail?

7   A.   Because, No. 1, he is my boss, so at the time he was my

8   boss.  And we were encouraged to take prices up in markets that

9   we could increase pricing.  And we needed to have pricing

10  courage to do that, not be afraid to lose business to increase

11  pricing, and I wanted him to know that the team had responded

12  to what we asked them to do.

13  Q.   You mentioned courage.  Was pricing courage something that

14  Mr. Lovette and Mr. Penn talked about at Pilgrim's?

15  A.   Yes, they did.

16  Q.   And what did that mean to you?

17  A.   That meant that we could go out and price product higher

18  even if it meant we lost the business, but we had to have

19  courage to take a price increase.

20  Q.   Was that Pilgrim's pricing strategy?

21  A.   Yes, it was.

22  Q.   Was that part of any agreement to fix prices with

23  competitors?

24  A.   No.

25  Q.   Or part of any agreement to rig bids with competitors?

3734

Brenda Ray - Cross

1   A.  No, it wasn't.

2   Q.  The time you had this conversation with Mr. Nelson, did you

3   have any concerns whatsoever that there was anything illegal

4   about your conversation with Mr. Nelson?

5   A.  No.

6   Q.  Now, I believe Mr. Pollack asked you, you were interviewed

7   by the government once before and they showed you this

8   document, right?

9   A.  Yes.

10  Q.  And the interview was in July of 2021, I believe.  Does

11  that sound about right?

12  A.  Yes.

13  Q.  And they showed you this document during the interview,

14  right?

15  A.  Yes.

16  Q.  And they asked you questions about it?

17  A.  Yes.

18  Q.  And you were never asked by the government to be

19  interviewed again or to be called as a witness; is that right?

20  A.  No.

21  Q.  I want to switch gears to something else, Ms. Ray.

22        Directing your attention to 2012, did you ever get an

23  inquiry from Mr. Penn about who you considered to be best in

24  class in fresh food service?

25  A.  I believe so, yes.

Brenda Ray - Cross

1    *Q.*  And do you have any idea why Mr. Penn was requesting that

2    information?

3    *A.*  He must have wanted my opinion.

4    *Q.*  Thank you.  Do you know where Mr. Penn had worked prior to

5    joining Pilgrim's?

6    *A.*  Yes.

7    *Q.*  He worked at Case Farms, right?

8    *A.*  Correct.

9    *Q.*  And your knowledge in the industry, did you say 33 years?

10   *A.*  Yes.

11   *Q.*  Is it your understanding that Case Farms doesn't make small

12   birds?

13   *A.*  They do not.

14   *Q.*  They only make big birds?

15   *A.*  Correct.

16   *Q.*  Before responding to Mr. Penn's inquiry, did you ask anyone

17   else's opinion about who they thought was best in class?

18        *MR. KOENIG:*  Objection.  This is a new topic and

19   leading and he is on cross and calls for hearsay as well.

20        *THE COURT:*  Sustained as to leading.

21   *BY MR. TUBACH:*

22   *Q.*  Did you, prior to responding to Mr. Penn, did you seek

23   anyone else's input regarding the question Mr. Penn had asked?

24   *A.*  Yes.

25   *Q.*  And who was that?

Brenda Ray - Cross

1    A.   Rob Alsberg.

2    Q.   Who is he?

3    A.   Rob Alsberg worked directly for me as a regional sales

4    manager.

5    Q.   And did you then provide this input to Mr. Penn?

6    A.   I did.

7    Q.   Why don't you take a look at Exhibit D-930 in your binder.

8    Let me know when you have gotten there.

9    A.   Yes, sir.

10   Q.   Is this the e-mail string we have just been discussing?

11   A.   Yes, sir.

12   Q.   And did you write -- if we start on the second page --

13   well, looking through there, there look to be maybe three or

14   four e-mails from you that have your name on there.  Did you

15   send -- write and send these e-mails?

16   A.   Yes.

17   Q.   And were you responding to the initial inquiry from

18   Mr. Penn about best in class and who in FFS and why?

19          MR. KOENIG:  Objection.  We are getting to the point

20   where we are reading a document that is not in evidence.

21          THE COURT:  Overruled.

22   BY MR. TUBACH:

23   Q.   If you turn the page to the second page, it's the very

24   bottom.

25   A.   And your question again, sir?

Brenda Ray - Cross

1    *Q.* Were you responding -- in these e-mails that you wrote,

2    were you responding to Mr. Penn's inquiry?

3    *A.* Yes.

4              *MR. TUBACH:* I move Exhibit D-930 into evidence.

5              *THE COURT:* Any objection to the admission of D-930?

6              *MR. KOENIG:* Hearsay.

7              *THE COURT:* Response?

8              *MR. TUBACH:* As to the statements by Ms. Ray, she is

9    on the stand and has adopted them and it's not hearsay. As to

10   all the others, we can certainly have that be only for effect

11   on the listener, which would be the reason why Ms. Ray is

12   responding to the e-mails.

13             *THE COURT:* One moment. Let me look at it.

14             *MR. KOENIG:* Of course.

15             *THE COURT:* Mr. Koenig, anything else?

16             *MR. KOENIG:* Well, I guess I am not sure which parts

17   he is alluding to that he --

18             *THE COURT:* I think anything that wasn't a statement

19   of Ms. Ray.

20             *MR. KOENIG:* So it would be effect on the listener for

21   those?

22             *THE COURT:* That was not indicated.

23             *MR. TUBACH:* That's the purpose for which I would be

24   offering the statements not by Ms. Ray.

25             *MR. KOENIG:* Can I just have one moment, please?

3738

                    Brenda Ray - Cross

1           THE COURT:  Yes.

2           MR. KOENIG:  With the limiting instruction, no

3  objection.

4           THE COURT:  All right.  D-930 will be admitted.

5  However, ladies and gentlemen, any statement by anyone other

6  than Ms. Ray cannot be considered for the truth of the matters

7  asserted, but only for the effect on Ms. Ray, all right?  D-930

8  will be admitted.

9           MR. TUBACH:  Thank you, Your Honor.  If we can publish

10 that to the jury, please.

11          THE COURT:  You may.

12 BY MR. TUBACH:

13 Q.  Ms. Ray, I want to turn to the very bottom of the second

14 page, the very first e-mail?

15 A.  Yes.

16 Q.  This is an e-mail from Mr. Penn to you; is that correct?

17 A.  That is correct.

18 Q.  And it's titled Best in Class.  And then it says underneath

19 that, Who in FFS?  Why?

20 A.  Yes.

21 Q.  And what was your response?

22 A.  You lost me.

23 Q.  You didn't know what Mr. Penn was asking you, right?

24 A.  No.

25 Q.  So what was his response to you?

Brenda Ray - Cross

1   A.   Which of our competitors is best in fast-food service?

2   Why?

3   Q.   What did you do after getting that e-mail and understanding

4   what Mr. Penn was asking?

5   A.   I sent an e-mail to my sales manager, Rob Alsberg, who is

6   out in the marketplace working direct with customers and asked

7   him to give me a call about this question.

8   Q.   And if you turn back to the first page going up the chain,

9   on June 18th, 2012, you responded, Yes.  I am thinking Mar-Jac,

10  right?

11  A.   Yes.

12  Q.   And what was Mr. Alsberg's response to you?

13  A.   His response was, Great minds think alike.  I never hear

14  anything bad about them.  Koch has quality issues.  Tyson has

15  personality issues.  George's has shortages.  Fieldale and

16  Gold'n Plump don't even show on the radar.

17  Q.   Did you then forward this e-mail string back to Mr. Penn

18  with your assessment of who was best in class for fresh food

19  service?

20  A.   I did.

21  Q.   And what did you tell Mr. Penn?

22  A.   I told him that I wanted Rob to weigh in with my vote on

23  Mar-Jac for fresh food service broad line.  He agrees.  They

24  have good quality.  They deliver on time.  They always cover

25  their orders.  They have an excellent sales staff with plenty

Brenda Ray - Cross

1  of coverage in the marketplace.  They are willing to produce

2  the small "Taylor Shop" type items that will allow a

3  broad-liner to walk in and to convert the entire chicken line

4  and most likely the restaurants entire line of business.  They

5  work deals outside of programs with distributors to keep them

6  happy or allow them to gain an account.  And they support

7  distributors very well with marketing aids.

8  Q.  Thank you, Ms. Ray.  So at least as of this time, what you

9  are communicating with Mr. Penn is both you and Mr. Alsberg

10  believe that Mar-Jac was best in class in fresh food service;

11  is that right?

12  A.  That's correct.

13  Q.  Changing topics entirely, you have been in this business

14  for 33 years I understand, right?

15  A.  Uh-huh.

16  Q.  You have a lot of experience selling chicken?

17  A.  Yes.

18  Q.  Including the sales of big birds?

19  A.  Yes.

20  Q.  In your entire decades of experience selling big-bird

21  products, have you ever heard of a big-bird eight-piece COB?

22  A.  No.

23  Q.  Does that product even exist?

24  A.  No.

25  Q.  Fair to say that anyone who is talking about a big-bird

Brenda Ray - Cross

1  eight-piece COB product doesn't know much about the chicken

2  business?

3          *MR. KOENIG:*  Objection, relevance.

4          *THE COURT:*  Overruled.

5  *A.*  No.

6  *BY MR. TUBACH:*

7  *Q.*  Sorry, that's a double negative.  Is that fair to say?

8  *A.*  That's correct.

9  *Q.*  Finally, during your time at Pilgrim's Pride, you worked

10  there with Mr. Penn; is that correct?

11  *A.*  That's correct.

12  *Q.*  And you had a fair amount of interaction with him?

13  *A.*  I did.

14  *Q.*  Over e-mail?

15  *A.*  Yes.

16  *Q.*  And by the telephone?

17  *A.*  Yes.

18  *Q.*  And in person?

19  *A.*  Yes.

20  *Q.*  And during all those interactions, did you form an opinion

21  about Mr. Penn's competitive spirit?

22  *A.*  Yes.

23          *MR. KOENIG:*  Objection.

24          *THE COURT:*  Overruled.

25  *BY MR. TUBACH:*

Brenda Ray - Cross

1    Q.  And what is that?

2            MR. KOENIG:  Objection, improper character testimony.

3            THE COURT:  Let's do a side bar.

4        (At the bench:)

5            THE COURT:  Mr. Koenig, go ahead.

6            MR. KOENIG:  Sure.  This is improper character

7    evidence under the rule.  It's -- there is a lack of

8    foundation.  It's the very same thing that Mr. Fagg tried to do

9    with Mr. Lovette and so we object.

10           THE COURT:  All right.  Response?

11           MR. TUBACH:  I am happy to lay additional foundation.

12   They worked together for 10 years almost.  I don't think there

13   is any legitimate basis for a foundation question.  I am simply

14   asking whether she on the basis of her observations has a view

15   about whether Jayson Penn, what his competitive spirit was.

16   That's not character evidence.  That's based on direct

17   observations.

18           MR. KOENIG:  I still think it's vague at best.  And

19   it's again, it's not how character evidence is supposed to come

20   in under Rule 40 -- I am blanking, four, five, whichever one it

21   is.

22           THE COURT:  Well, Mr. Koenig, let me ask you this.

23   When you say how it's supposed to come in, what specifically

24   are you talking about?

25           MR. KOENIG:  Well, generally character evidence is,

Brenda Ray - Cross

1    you know, general reputation for honesty or truthfulness, that

2    kind of thing.  Just reputations of the vague characteristics

3    such as competitive spirit is just not something that is

4    contemplated by the rule of 404(a).

5         THE COURT:  Okay.  So the objection -- is the

6    objection, then, that competitive spirit is not an appropriate

7    character that can be brought out by a defendant?

8         MR. KOENIG:  Yeah.  I think that the rule, Rule

9    404(a), it's not a pertinent character trait under the rule.

10        THE COURT:  Response, Mr. Tubach?

11        MR. TUBACH:  Your Honor, I think it would be directly

12   relevant to get this witness' opinion about Mr. Penn's

13   competitive spirit given that this is a case about competition.

14   I am happy to be more specific, but --

15        THE COURT:  That's all right.  Mr. Koenig, anything

16   else?

17        MR. KOENIG:  Nothing further.

18        THE COURT:  Okay.  I am going to sustain the objection

19   in part.  I think that her -- I think that the question would

20   have to be phrased if she is aware of his reputation for having

21   a competitive spirit, but I do agree with Mr. Tubach that

22   competitive spirit is an appropriate character trait for this

23   trial.  It is a pertinent one because it relates to whether or

24   not he may have been engaged in price-fixing, so I think that's

25   a legitimate character trait.

Brenda Ray - Cross

1    MR. TUBACH:  Thank you, Your Honor.  I will happily

2    rephrase.

3    THE COURT:  Thank you.

4    BY MR. TUBACH:

5    Q.  Thank you, Ms. Ray.  We are back.  During the course of

6    your working with Mr. Penn for about almost 10 years; is that

7    right?

8    A.  Correct.

9    Q.  Did you form an opinion about his reputation for a

10   competitive spirit?

11   A.  Yes.

12   Q.  And was that based on all of your many interactions with

13   him?

14   A.  Yes.

15   Q.  And what is that opinion, ma'am?

16   A.  Jayson had a competitive spirit but a respectful

17   competitive spirit with the industry.  He wanted to be the

18   best, provide the best, be able to support the customer with

19   the best.

20   MR. KOENIG:  Objection, this is not his reputation.

21   This is what she is imagining that he was thinking at the time.

22   THE COURT:  Overruled.

23   BY MR. TUBACH:

24   Q.  Go ahead.

25   A.  And we always needed to represent the best in the

Brenda Ray - Cross

1  marketplace and he respected his competitors.

2           *MR. TUBACH:*  Thank you, I have no further questions.

3           Additional cross-examination?

4           All right.  Cross-examination, then, by the

5  government.

6                    **CROSS-EXAMINATION**

7  *BY MR. KOENIG:*

8  *Q.*  Good afternoon, Ms. Ray.  Now, you have known Defendant

9  Penn for a very long time, haven't you?

10  *A.*  Approximately 10 years, yes.

11  *Q.*  So since 2011, 2012?

12  *A.*  Uh-huh.

13  *Q.*  And so you were colleagues that whole time or most of that

14  time anyway?

15  *A.*  Yes.

16  *Q.*  You worked together.

17  *A.*  Yes.

18  *Q.*  And you were also friends, right?

19  *A.*  Yes.

20  *Q.*  And because of that, you don't want to see Defendant Penn

21  convicted of anything here, right?

22  *A.*  I am here to tell the truth.

23  *Q.*  Understood.  But my question is you don't want to see him

24  get convicted, correct?

25  *A.*  If he is not guilty.

3746

Brenda Ray - Cross

1   Q.  Okay.  And you haven't sat through all the evidence in this

2   case, have you?

3   A.  No.

4   Q.  So you don't have an opinion as to whether or not he is

5   guilty based on the evidence.

6   A.  I do not.

7   Q.  All right.  A few things to touch on from your direct exam.

8   Are you familiar with AgriStats reports?

9   A.  Yes.

10  Q.  And do you recall on direct examination I believe you

11  testified that Case Farms does not make small bird?

12  A.  Well, let me preface that.  Case Farms in the time period

13  of about 2014, which is what I thought we were talking about --

14  Q.  Okay.

15  A.  -- they did not.  But, however, today they do have a small

16  bird complex in Ohio.

17       MR. KOENIG:  Can I -- can we pull up Government's

18  Exhibit 10636?

19       MR. TUBACH:  We would ask for a copy if there is one

20  available.

21       MR. KOENIG:  We just literally -- do we have -- well,

22  Your Honor, this was -- this is in response to something that

23  came up on direct, so we didn't realize we were going to have

24  make copies of this, but we aren't going to do much other than

25  refresh Ms. Ray's recollection.

3747
Brenda Ray - Cross

 1          THE COURT:  Well, we will need to at least show it to

 2   people, if not provide a copy.  Do you have an extra copy that

 3   can be shown?

 4          MR. KOENIG:  I do have one I could pass around.

 5          THE COURT:  It is being displayed right now?

 6          MR. KOENIG:  Yeah, it is being displayed.

 7          THE COURT:  Just one second and allow defense counsel

 8   to take a look at the screen.

 9          MR. FAGG:  Can we just know how many pages this

10   document is?

11          MR. KOENIG:  Three.

12          THE COURT:  Why don't we do this.  Why don't we take

13   the mid-afternoon break five minutes early, and then we can

14   facilitate the copying of it or at least allow people to be

15   able to look at it, okay?

16          MR. KOENIG:  Should I pass to Ms. Grimm, then?  I am

17   sorry, I can just run back over.

18          THE COURT:  We can make copies too, whatever.

19          MR. KOENIG:  We will do it.

20          THE COURT:  Ladies and gentlemen, we will reconvene,

21   then, a little early, 25 minutes after.  The jury is excused.

22          (Jury excused.)

23          If you need any copying help, let Ms. Grimm know.

24   Otherwise, we will be in recess.

25          MR. McLOUGHLIN:  Can we just ask if there are any

Brenda Ray - Cross

1  other exhibits the government is planning to use that we don't

2  have, that they make copies of those as well?

3       THE COURT:  Sure.  Yeah, they heard that.  Thank you.

4  We will be in recess.

5     (Recess at 3:09 p.m. until 3:26 p.m.)

6       THE COURT:  Why don't we go ahead and get Ms. Ray.

7       (Jury present.)

8       Go ahead, Mr. Koenig.

9       MR. KOENIG:  We solved our copies problem.  We had

10  them here the whole time it turned out.

11       If you could just pull up 10636.

12  BY MR. KOENIG:

13  Q.  Ms. Ray, you recall that I was asking you about whether in

14  2014 -- you had testified that Case Farms didn't make small

15  bird?  Do you remember that?

16  A.  I don't recall a date of when Case Farms didn't produce

17  small birds.  I thought the question that I was asked was did I

18  know where Jayson Penn worked prior to coming to Pilgrim's, and

19  I said Case Farms.  And I was asked they produce jumbo birds?

20  And I said yes.  And they didn't produce small birds?  And I

21  said no, they did not, because prior to Jayson Penn coming to

22  Pilgrim's, I don't think Case Farms produced small birds, so

23  that's why I answered the question as such.

24  Q.  Okay.  Because when I asked you about it, you said you

25  thought you were talking about 2014.

Brenda Ray - Cross

1    A.   I said are we talking about 2014 or -- that's why I asked

2    the question as such.

3    Q.   So in 2014 Case Farms did, in fact, produce small birds.

4    A.   Perhaps.  I know that they did buy a plant that produced

5    small birds.

6    Q.   In 2014?

7    A.   Perhaps.  I am not sure what date they purchased the plant.

8    Q.   Fair enough.  You were also asked a question about big-bird

9    eight-piece and how no such thing exists.  Do you recall that?

10   A.   I do.

11   Q.   And so, you know, you have been in the chicken business a

12   long time.  You have got your small birds and your big birds,

13   right?  They are two separate categories, right?

14   A.   Yes.

15   Q.   But then you've seen the bell curve, right, for the small

16   birds?

17   A.   Yes.

18   Q.   And within the bell curve you've got small small birds and

19   bigger small birds, right?  In other words, they go from 2

20   pounds up to like 4 pounds, right?

21   A.   That's correct.

22   Q.   And so if someone were to talk about eight-piece -- a

23   bigger eight-piece small bird, that would be in the 4-pound

24   range probably, correct?

25   A.   Yes.

3750

Brenda Ray - Cross

1    Q.  Okay.  And your KFCs and your QSRs, they don't buy birds

2    that big.  They are more at the lower, 2, 2-1/2 end, right?

3    A.  To my knowledge, yes.

4    Q.  One other thing before we get into a little more meatier

5    topics.  Do you recall Mr. Tubach asking you about the "best in

6    class" e-mail chain?

7    A.  Yes.

8    Q.  And you were talking about fresh food service?

9    A.  Yes.

10   Q.  And so fresh food service is like the fresh chicken, the

11   cut-up eight-piece, right?

12   A.  Not specifically.

13   Q.  Fair.  It's just -- that is one type of fresh, right?

14   A.  That's one type.

15   Q.  You could have your WOGs, other stuff like that, right?

16   A.  Can I clarify something?

17   Q.  Sure, please.

18   A.  So when Mr. Penn, Jayson Penn, asked me about best in

19   class, my sales channel was broad-line distribution, so my

20   answers and my team was relative to broad-line distribution.

21   Q.  You saved us some time because that's exactly where I was

22   going just to clarify whether you were talking about broad-line

23   or QSR.

24   A.  Yes.

25   Q.  All right.  I would like to change gears a little bit and

Brenda Ray - Cross

1   ask you about Sysco.  Do you remember testifying about that?

2   A.  Yes.

3   Q.  Excuse me?

4   A.  Yes.

5   Q.  And I guess at a very simplified level you would agree that

6   Sysco was a customer of Pilgrim's that bought chicken?

7   A.  Correct.

8   Q.  Sysco was a pretty big customer, right?

9   A.  Yes.

10  Q.  And bought a lot of chicken from Pilgrim's.

11  A.  In broad-line distribution, they were probably our second

12  or third largest.

13  Q.  Okay.  So if you sold them a lot of chicken, there is a lot

14  of accounts receivables from them, right?  They owe you a lot

15  of money.

16  A.  Yes.

17  Q.  And so you were asked about the change in credit terms.  Do

18  you remember that?

19  A.  Yes.

20  Q.  And the reason that was an extension of the credit terms

21  meant that -- let me back up.  Scratch that.

22          An extension of credit terms meant money out of

23  Pilgrim's pockets, right, because the longer Sysco has to pay,

24  the longer Pilgrim's has to wait for its money, right?

25  A.  Yes.

Brenda Ray - Cross

1  Q.  In the meantime, Sysco can earn interest on that money, use

2  it to buy other things, that kind of thing, whereas Pilgrim's

3  can't.

4  A.  Yes.

5  Q.  And with a big customer an extension of the credit terms is

6  a bigger deal than it would be with a smaller, right, as far as

7  just dollars and cents wise?

8  A.  Yes.

9  Q.  And so you also mentioned that the incident we are talking

10  about here was -- I believe it was in April of 2016?

11  A.  Yes.

12  Q.  You said that wasn't during an RFP?

13  A.  No.

14  Q.  But you also said that during the request for pricing

15  negotiation with Sysco, whatever time of year that occurs,

16  that's a time when the price term, payment terms could be

17  discussed, right?

18  A.  That is part of the RFP, correct.

19  Q.  And it's basically just another term that's being

20  negotiated, right?

21  A.  In the RFP, correct.

22  Q.  And it has depending on how long of a payment term or I am

23  sure there is other factors that affects, you know, how much

24  money changes hands, right?  In other words, if you negotiate a

25  longer payment term with Sysco, it's money out of Pilgrim's

Brenda Ray - Cross

1    pocket.  If you negotiate a shorter payment term, then it's

2    maybe more money in Sysco's pocket or the other way around.

3    A.  Correct.

4    Q.  Right.  I think that was clear as mud.  Anyway, all right.

5    So when a company like Sysco, a customer like Sysco says I want

6    to lengthen our payment terms, that's a big deal even if it's

7    just a few days, right?

8    A.  Yes.

9    Q.  And so you got the e-mail on April 25th, I believe, of

10   2016.

11   A.  Correct.

12   Q.  And you tell your -- Ms. Nollkamper?

13   A.  Correct.

14   Q.  You ask her to go see if everybody else is getting it or if

15   it's just targeted at Pilgrim's, correct?

16   A.  Correct.

17         MR. KOENIG:  Now, I would like to pull up a document,

18   I would like to pull up Government's Exhibit 10677.  And I have

19   some copies.

20         May I approach with a binder?

21         THE COURT:  Yes, you may.

22         MR. KOENIG:  Ms. Pearce, if we could just make the top

23   half legible.

24   BY MR. KOENIG:

25   Q.  Have you had a chance to look at the exhibit?

                                                                                    3754
                        Brenda Ray - Cross

 1   A.  Yes.  Could you scroll down?

 2   Q.  Sure.

 3   A.  Yes.

 4   Q.  Okay.  Now, do you recognize this as a Pilgrim's Pride

 5   meeting invite?

 6   A.  I do.

 7   Q.  And do you see the date, May 1st, 2016?

 8   A.  I do.

 9   Q.  And that's five days after -- five days after you got that

10   e-mail we talked about trying to extend credit terms, right?

11   A.  Correct.

12   Q.  And the subject line is Sysco Prep Discussion.  Do you see

13   that?

14   A.  I do see that.

15        MR. KOENIG:  Your Honor, the government would at this

16   time offer Government's Exhibit 10677 into evidence.

17        THE COURT:  Any objection to the admission of 10677?

18        MR. FAGG:  No, Your Honor.

19        THE COURT:  10677 will be admitted.

20        MR. KOENIG:  Permission to publish?

21        THE COURT:  You may.

22   BY MR. KOENIG:

23   Q.  Okay.  So I just have some questions about this.

24        In the sent line, it says May 1st, 2016, basically

25   8:00 o'clock p.m.  Do you see that?

Brenda Ray - Cross

1    A.   Yes.

2    Q.   And that's in UTC, which means that you would have to

3    subtract four hours to get to Eastern time.  So if you subtract

4    four hours, you would get 4:00 o'clock Eastern time, right, or

5    2:00 o'clock mountain time or 3:00 o'clock Chicago time.

6    A.   So what -- are you asking me about that?

7    Q.   I am asking you is my math right.  If you subtract four

8    from eight, you get 4:00 p.m.?

9    A.   Well, I mean, since the East Coast is ahead of Mountain

10   time, I would add it to eight since we are ahead of the time

11   that this e-mail was sent on the East Coast?

12   Q.   I made this too complicated.  If I told you this was

13   2:00 o'clock p.m. on that date, Mountain time?

14   A.   Okay.

15   Q.   Would you have any reason to doubt that?

16   A.   No, I would --

17        MR. FAGG:  Your Honor, I object to this line of

18   questioning.  The document says 3:00 p.m. Mountain.

19        MR. KOENIG:  No, I am talking about the date that it

20   was sent, the Sent line.

21        THE COURT:  Okay, go ahead.

22   BY MR. KOENIG:

23   Q.   So let me ask you this.  You got an e-mail invite sent at

24   2:00 p.m. Mountain time for a meeting the same day at 3:00 p.m.

25   Mountain time to talk about Sysco, right?

Brenda Ray - Cross

1          MR. TUBACH:  Lacks foundation.  This witness isn't an

2    expert on conversion to Mountain time.

3          MR. KOENIG:  I think this is a subject of time zones

4    and conversions.

5          THE COURT:  That may be true, but the witness may not

6    be familiar with that.  Sustained.

7    BY MR. KOENIG:

8    Q.  Suffice it to say on the subject line it says Sysco Prep

9    Discussion 3:00 p.m. Mountain time/4:00 p.m. Central, right?

10   A.  Correct.

11   Q.  And there is a lot of Pilgrim's sort of top brass in here,

12   right?  You've got Defendant Penn, Lovette, Mr. McGuire,

13   yourself, Kendra Waldbusser, right, people pretty high up in

14   the company?

15   A.  Correct.

16   Q.  Now, so the Sysco payment terms was kind of a hot issue at

17   the time, right?  This is five days after you got what Mr. Fagg

18   described as the demand letter, right?

19   A.  That's correct.

20         MR. KOENIG:  And if we could then pull up Government's

21   Exhibit 803, which is already in evidence.  Permission to

22   publish?

23         THE COURT:  Yes, you may.

24         MR. KOENIG:  If we can blow it up a little bit.

25   BY MR. KOENIG:

3757

Brenda Ray - Cross

1    Q.  All right.  So do you know someone named Joe Grendys, who

2    is the CEO of Koch Foods?

3            MR. FAGG:  Objection, Your Honor.  We object to

4    showing this witness this exhibit.  It has nothing to do with

5    her.

6            THE COURT:  Overruled.  She can answer the question

7    about whether she knows Mr. Grendys.

8    BY MR. KOENIG:

9    Q.  Do you know Mr. Grendys, CEO of Koch Foods?

10   A.  I don't know him, but I know the name.

11   Q.  And you do know that Koch Foods is a competitor of

12   Pilgrim's, right?

13   A.  Yes.

14   Q.  And obviously you know Defendant Lovette.  He was the CEO

15   of Pilgrim's at the time, right?

16   A.  Yes.

17   Q.  And if you recall, that meeting invite set the meeting up

18   for 3:00 p.m. Mountain time, correct?

19   A.  Correct.

20   Q.  In that last exhibit?  And this e-mail exchange between

21   Mr. Grendys and Defendant Lovette was at 2:00 p.m. Central

22   time, so 1:00 p.m. Mountain time, right?

23   A.  Yes.

24           MR. FAGG:  Objection, foundation.

25           THE COURT:  Sustained.

Brenda Ray - Cross

1    *BY MR. KOENIG:*

2    Q.  Well, you see where it says CDT?  Do you understand that

3    means Central Daylight Time?

4           *MR. FAGG:*  Same objection.

5           *THE COURT:*  Sustained.

6    *BY MR. KOENIG:*

7    Q.  So what happens is -- and you see down here at the bottom

8    they are talking about Sysco and the payment terms?

9           *MR. FAGG:*  Objection, Your Honor, to this witness

10   interpreting an e-mail that she is not on.

11          *THE COURT:*  Sustained.

12   *BY MR. KOENIG:*

13   Q.  You see the word Sysco?

14          *MR. FAGG:*  Same objection.

15          *THE COURT:*  Sustained.

16          *MR. KOENIG:*  So we can take this down.

17   *BY MR. KOENIG:*

18   Q.  I just want to go over the time line to confirm it.  On

19   April 25th of 2016, you get an e-mail from Sysco saying, we

20   would like to extend our payment terms to 14 days, correct?

21   A.  Yes.

22   Q.  And it was not well received, fair to say, within

23   Pilgrim's?

24   A.  I can't say that.

25   Q.  It wasn't well received by you.

Brenda Ray - Cross

1    A.   Not my me, that's correct.

2    Q.   You didn't see anybody jumping up for joy on this thing,

3    did you?

4    A.   No.

5              MR. FAGG:  Objection, form.

6              THE COURT:  Overruled.

7    BY MR. KOENIG:

8    Q.   And so five days later the e-mail 803, that's the date of

9    the e-mail on Government's Exhibit 803, right?

10             MR. FAGG:  Your Honor, asking her about this e-mail.

11             THE COURT:  Sustained.

12   BY MR. KOENIG:

13   Q.   Then May 1st at 3:00 p.m. Mountain, Defendants Lovette,

14   Penn, yourself, other top people have a meeting to discuss

15   Sysco; is that right?

16   A.   Yes.  Can we look at that exhibit again?

17   Q.   On redirect if they want to draw your attention to it, that

18   would be great.

19             MR. FAGG:  I am sorry, I missed that.

20             MR. KOENIG:  I said in redirect if they want to draw

21   your attention to it, basically that's their --

22             THE COURT:  I am not clear what exhibit Ms. Ray wanted

23   to see.

24             MR. KOENIG:  It's 803.  We can just show it to the

25   nonjury screens.

Brenda Ray - Cross

1              *THE WITNESS:*  No, not that one.

2     *BY MR. KOENIG:*

3     *Q.*  Oh, the meeting invite?

4     *A.*  The meeting invite.

5     *Q.*  Sure, we can go back to that.  That's 10677.

6     *A.*  Okay.

7     *Q.*  I would like to move on to a different subject and I think

8     our final subject.  Just before we get going, we were talking

9     about the friendly competitor e-mail.  You were talking about

10    it on direct.  Do you remember that?

11    *A.*  Yes.

12    *Q.*  And you mentioned during that at one point you were talking

13    about price courage, right?

14    *A.*  Yes.

15    *Q.*  And how you were encouraged to raise prices without fear of

16    losing business, right?

17    *A.*  Yes.

18    *Q.*  Who encouraged you to raise prices at Pilgrim's?

19    *A.*  My manager.  It was a strategy.

20    *Q.*  Who was your manager?

21    *A.*  Jayson Penn.

22    *Q.*  Anyone else?

23    *A.*  Well --

24    *Q.*  Defendant Lovette?

25    *A.*  It would have been Jayson and Bill.

3761
Brenda Ray - Cross

1          *MR. KOENIG:*  All right.  So if we could pull up

2     Government's Exhibit 6198, please.  And then let's focus down

3     on the smaller -- or the bottom.

4          Permission to publish?

5          *THE COURT:*  You may.

6     *BY MR. KOENIG:*

7     *Q.*  Okay.  So you considered George's to be a competitor,

8     right?

9     *A.*  Yes.

10    *Q.*  And one of the reasons you considered them competitors is

11    because when you have common customers who you are selling

12    common -- the same products to, you go in and you try to win

13    business from each other, undercut price, whatnot, that kind of

14    thing, right?

15    *A.*  Not so much; not so much.  In this instance -- may I

16    explain?

17    *Q.*  Sure.

18    *A.*  In this instance, we sold into the same marketplaces, but

19    they were different customers, different end user customers.

20    We didn't -- relative to this correspondence, it wasn't -- it

21    was not the same customers.

22    *Q.*  Okay.  And my fault for bringing it up because I brought it

23    up before I meant to.  I was just asking you generally George's

24    was a competitor.  And there are -- you did have common

25    customers who you were selling the same product to, and in

Brenda Ray - Cross

1   those instances you were competing with them, right?

2   A.  Yes.

3        MR. KOENIG:  Let's pull up 6198, which we did.

4   BY MR. KOENIG:

5   Q.  And I just want to make sure I understand what your

6   testimony is here.  So what's going on here in this e-mail is

7   you are reporting to Defendant Penn and other members, other

8   colleagues of yours, that you got a call from a friendly

9   competitor and they told you about them and other competitors

10  of Pilgrim's raising price; is that right?

11  A.  Yes.

12  Q.  Okay.  And you learned that George's and other competitors

13  are raising prices.  And that would be normally a good

14  opportunity to swoop in and steal some business from a

15  competitor, right?

16  A.  Not in this instance.

17  Q.  In general?

18  A.  Perhaps.

19  Q.  Okay.  But you didn't do that here.

20  A.  No.  Pilgrim's had already taken a price increase in

21  advance of this communication from Mr. Nelson.

22       MR. KOENIG:  All right.  If we could now pull up 3037.

23  And permission to publish?

24       THE COURT:  What was the exhibit number again?

25       MR. KOENIG:  3037.

Brenda Ray - Redirect

1            THE COURT:  You may.

2            MR. KOENIG:  And I will zoom in.

3    BY MR. KOENIG:

4    Q.  Now, this bottom e-mail here in 3037, that's the e-mail we

5    were just talking about?

6    A.  Yes.

7    Q.  And you see that Defendant Penn forwarded it to Jason

8    McGuire, correct?

9    A.  Yes.

10   Q.  And Mr. McGuire worked in the QSR line of business at that

11   point; is that right?

12   A.  Yes.

13   Q.  And you see where it says, FYI, do not forward?

14   A.  Yes.

15   Q.  Did Defendant Penn at any point ever tell you that he

16   viewed your conversation as not exactly legal?

17   A.  Not that I recall.

18            MR. KOENIG:  I have no more questions.

19            Thank you.

20            Redirect?

21            MR. FAGG:  May we please pull up Government's Exhibit

22   10677, which is the calendar invite that was shown to Ms. Ray

23   earlier?

24            Your Honor, may we publish that, please?

25                        **REDIRECT EXAMINATION**

Brenda Ray - Redirect

1   *BY MR. FAGG:*

2   *Q.* Do you see that, Ms. Ray?

3   *A.* Yes, I do.

4   *Q.* This is the calendar invite that Mr. Koenig asked you about

5   and was asking so many questions about when it occurred and

6   various people being involved.  Do you recall that?

7   *A.* Yes, I do.

8   *Q.* Kendra Waldbusser is the head of quality assurance at

9   Pilgrim's, correct?

10  *A.* That's correct.

11  *Q.* And Cheri Schneider who is on this invite, she works for

12  Ms. Waldbusser?

13  *A.* That's correct.

14          *MR. KOENIG:*  Leading.

15          *THE COURT:*  Overruled.

16  *BY MR. FAGG:*

17  *Q.* And Mr. Watts who is on this calendar invite, he works for

18  Ms. Waldbusser, correct?

19  *A.* That's correct.

20  *Q.* And you said earlier that Fabio Sandri was in charge of the

21  credit terms negotiation with Pilgrim's, correct?

22  *A.* That's correct.

23  *Q.* And is Mr. Sandri on this invite?

24  *A.* He is not.

25  *Q.* Ms. Ray, do you remember in April of 2016 that Pilgrim's

3765

Brenda Ray - Redirect

1    had some foreign material in one of its processing facilities

2    and as a result had to go through a recall?

3    A.  Yes, I do.

4    Q.  And is this meeting that happened on May the 1st, was it

5    about that recall?

6    A.  I believe that it is.

7    Q.  And does that make sense to you because all of these people

8    from quality assurance are involved?

9    A.  And the gentleman in charge of production of a particular

10   plant facility is also on here, so yes.

11   Q.  And was the recall at that gentleman's facility?

12   A.  Yes.

13   Q.  And if this had been a meeting about the Sysco credit

14   terms, would you expect that Mr. Sandri would have been invited

15   to it?

16        MR. KOENIG:  Objection, leading.

17        THE COURT:  Overruled.

18   A.  Yes.

19   BY MR. FAGG:

20   Q.  And he was not invited, was he?

21   A.  No.

22   Q.  And as you mentioned, Sysco is a large customer of --

23   excuse me.  Let me start that over.

24        Sysco is a large customer of Pilgrim's.

25   A.  Yes.

Brenda Ray - Redirect

1   Q.  And a multi-faceted customer, and there is all kinds of

2   different elements to that relationship.

3   A.  Yes.

4   Q.  So as you sit here today, do you believe this meeting was

5   about that recall?

6   A.  Yes.

7   Q.  And as you sit here today, do you have any recollection

8   whatsoever that Mr. Lovette was involved at any point in the

9   Sysco negotiations?

10  A.  No.

11  Q.  I believe I misspoke earlier when I was responding to one

12  of your questions about how many customers you believe that

13  Pilgrim's had.  Did you say that Pilgrim's had -- you believe

14  Pilgrim's had thousands, plural, of customers?

15  A.  Yes.

16  Q.  Let's talk for just a moment about -- well, scratch that.

17          Mr. Koenig asked you about this strategy about raising

18  prices.  Remember that?

19  A.  Yes.

20  Q.  Did you agree with that strategy?

21  A.  Yes.

22  Q.  And is Pilgrim's in the business of making money?

23  A.  Yes.

24  Q.  And as you understand that strategy, did it have anything

25  to do with any sort of agreement with any customers?

Brenda Ray - Redirect

1              MR. KOENIG:  Objection, leading.

2              THE COURT:  Let's hear the whole question.  Is that a

3      question?

4              MR. FAGG:  That's a question, yes, Your Honor.

5              THE COURT:  Sustained.

6   BY MR. FAGG:

7   Q.  As you understood that strategy, was it an internal

8   Pilgrim's strategy?

9   A.  Yes.

10  Q.  And did it involve in your opinion anything to do with any

11  other customers?

12             MR. KOENIG:  Objection, leading.

13  BY MR. FAGG:

14  Q.  With other competitors, I apologize.

15             THE COURT:  Sustained.

16  BY MR. FAGG:

17  Q.  What did you understand that strategy to be?

18  A.  A lot of the employees at Pilgrim's had been through two

19  bankruptcies because we had no pricing courage.  We did not

20  sell our product for what fair market value was for product.

21  And when Mr. Lovette came onboard, he gave us all the

22  instructions to sell your product with pricing courage.  We can

23  always find another avenue to sell it, but sell it at market

24  value, at fair values.

25  Q.  Sell it for what it's worth?

Brenda Ray - Redirect

1   A.  Sell it for what it's worth.

2   Q.  And Ms. Ray, you had experience in working with Mr. Lovette

3   when he was a CEO; is that right?

4   A.  Yes.

5   Q.  And that was over a period of about nine years?

6   A.  Yes.

7   Q.  And in your experience in working with him, did you have

8   meetings with him?

9   A.  Yes.

10  Q.  And did you otherwise communicate with him as well over

11  e-mail or telephone?

12  A.  Not so much; typically in meetings.

13  Q.  And based on your interactions with Mr. Lovette over those

14  nine years, did you have an opportunity to form an opinion

15  about his reputation as it related to competitiveness?

16       MR. KOENIG:  Objection, once again.

17       THE COURT:  Same objection as before?

18       MR. KOENIG:  Yes.

19       THE COURT:  Overruled, same reason.

20  A.  He was a competitive individual.  Mr. Lovette is

21  competitive.  He believes that anything that our competitors

22  were able to do that we should be able to do.  We should be

23  able to produce product.  We should be able to package product.

24  We should be able to sell product.  We should be able to

25  transport product.

3769

Brenda Ray - Redirect

1          MR. KOENIG:  Objection, also scope of cross.

2          THE COURT:  Sustained.

3          MR. FAGG:  May I respond?

4          THE COURT:  Yes.

5          MR. FAGG:  I believe the government has opened the

6    door on this as it relates to asking about this price courage

7    strategy.  And they elicited from her that it was Mr. Lovette's

8    belief that this should be the price courage strategy of the

9    company, and I think I am entitled to ask her about that issue.

10          THE COURT:  The objection is sustained.

11          MR. FAGG:  No further questions, ma'am.  Thank you

12    very much.

13          THE COURT:  Ms. Ray, you are excused.  Thank you very

14    much.

15          THE WITNESS:  You are welcome.

16          Mr. Kornfeld, go ahead.

17          MR. KORNFELD:  Your Honor, may I approach with some

18    binders while we wait for the witness?

19          THE COURT:  Sure.  It looks like the witness is

20    coming.

21          MR. KORNFELD:  Your Honor, I am for the record calling

22    Kent Kronauge on behalf of Mr. Fries.

23        (**Kent Kronauge** was sworn.)

24          THE WITNESS:  I do.

25          COURT DEPUTY CLERK:  Please state your name and spell

Kent Kronauge - Direct

 1    your first and last name for the record.

 2              THE WITNESS:  Kent Kronauge, K-E-N-T, K-R-O-N-A-U-G-E.

 3                         **DIRECT EXAMINATION**

 4    BY MR. KORNFELD:

 5    Q.  Good afternoon, Mr. Kronauge.  My name is Rick Kornfeld.  I

 6    represent Mikell Fries.  We have not met, have we?

 7    A.  No, sir.

 8    Q.  And we have not spoken with each other.

 9    A.  Correct.

10    Q.  And are you here today pursuant to a defense subpoena?

11    A.  Correct.

12    Q.  I would like to ask you -- start off by getting some basic

13    background information.  Where do you currently work?

14    A.  At SMS Supply Management Services.

15    Q.  And what is SMS?

16    A.  We are the buying co-op for Popeye's.

17    Q.  And how long -- when you say the buying co-op, what type of

18    products do you purchase on behalf of Popeye's?

19    A.  Everything in the back of that -- everything at the

20    restaurant and all the distribution arm getting products to the

21    restaurants.

22    Q.  And would that include broiler chicken?

23    A.  Correct.

24    Q.  And what type of chicken specifically do you purchase on

25    behalf of Popeye's?

Kent Kronauge - Direct

1    A.  Small-bird, bone-in chicken, sandwich filets, strips and

2    nuggets.

3    Q.  How long have you worked at SMS?

4    A.  Since about July 2008.

5    Q.  And your current title?

6    A.  President.

7    Q.  When did you become president of SMS?

8    A.  January 2015.

9    Q.  Can you please explain to the members of the jury just

10   briefly your responsibilities as president?

11   A.  Well, I kind of got a dual role.  I do all the sourcing of

12   fresh and frozen chicken and then I also manage our company, so

13   I am responsible for all products getting to the restaurants

14   and that distribution arm getting them to it.

15   Q.  Prior to becoming president, did you hold any other job

16   titles at SMS?

17   A.  Yes.  I don't remember exactly dates, but I started as the

18   director of protein and then was the COO I think somewhere in

19   '14 and then took on the title as president.

20   Q.  Did your job responsibilities as they related to the

21   procurement of chicken differ in those various roles?

22   A.  No, not at all.

23   Q.  Have you worked anywhere else besides SMS related to the

24   broiler chicken industry?

25   A.  Yes.  I was -- I worked at Gold Kissed and Pilgrim's Pride,

Kent Kronauge - Direct

1   Gold Kissed for about 20 years, Pilgrim's Pride for about a

2   year.

3   Q.  And the jury is well familiar with Pilgrim's.  How about

4   could you just explain what Gold Kissed was?

5   A.  Gold Kissed was a poultry company that was purchased by

6   Pilgrim's back in 2000 -- I think it was '07-ish, '06 or '07.

7   So we were a large broiler, you know, company.  We serviced all

8   areas of the industry.  And I can't remember the number of

9   facilities we had, but we were one of the larger players at the

10  time.

11  Q.  On the supply side?

12  A.  On the supply side.

13  Q.  Could you just briefly describe what your responsibilities

14  were at Gold Kissed and then what your responsibilities were

15  when you were with Pilgrim's Pride?

16  A.  When I finished -- when Pilgrim's bought us, I was the

17  director of big-bird sales, so I was responsible for four or

18  five of our big-bird sales functions operation.  And when

19  Pilgrim's bought us, I remained in big birds, acquired some

20  more facilities, but I had a couple people I was reporting to

21  at Pilgrim's.

22  Q.  And at the risk of asking a pretty obvious question, in

23  your roles that you just described at Gold Kissed and

24  Pilgrim's, were you -- did you gain experience negotiating

25  chicken contracts?

Kent Kronauge - Direct

1    A.   Correct.

2    Q.   Okay.  And in essence or in brief, what was that

3    experience?

4    A.   Well, I mean, I was responsible for all sales of those

5    pounds, so, you know, it was learning to negotiate your price

6    and getting the best price at the time for our products.

7    Q.   If someone wanted to know about the differences between

8    negotiating on the supplier side versus on the customer side,

9    is it fair to say you were a person who could provide a lot of

10   insight on those topics?

11   A.   Yes.

12   Q.   I would like to ask you some questions about the

13   negotiations between the chicken suppliers and SMS,

14   particularly in the years 2012 to 2018, okay?

15   A.   Okay.

16   Q.   And unless you tell me otherwise, when I say -- the chicken

17   I am referring to is bone-in or the COB product, okay?

18   A.   Okay.

19   Q.   Now, approximately how much chicken per year does SMS

20   purchase through the contracts it negotiates with suppliers on

21   behalf of Popeye's?

22   A.   On the bone-in chicken, we were about 300 million pounds a

23   year.

24   Q.   And does Popeye's solely purchase small bird?

25   A.   Correct.

Kent Kronauge - Direct

1  Q.  Do all of the chicken products that Popeye's sells in its

2  stores therefore come from small bird?

3  A.  All of them -- well, on the bone-in chicken, yes.

4  Q.  Do you consider SMS to be a large purchaser of small birds

5  in the QSR space?

6  A.  Yes.

7  Q.  What other customers does Popeye's compete with over the

8  purchase of small birds?

9  A.  I would say our biggest competition is probably KFC because

10  we overlap sizes a little bit.  Bojangles is in our size range,

11  but anybody that's taking birds in our size range would be our

12  competition.

13  Q.  Would that include Church's and Chick-fil-A?

14  A.  Church's is a little bit outside it.  Chick-fil-A doesn't

15  do bone-in, so if we are referring to bone-in, no.  Now, on the

16  boneless side, yes, they would be.

17  Q.  How frequently does SMS typically negotiate contracts with

18  the various suppliers?

19  A.  Typically yearly.

20  Q.  And typically how many suppliers are included in that

21  process, in the contract negotiation process?

22  A.  Nine to 10, but we basically use every small-bird facility

23  that can cut and supply our birds.

24  Q.  Now, directing your attention to the 2012-2018 time frame,

25  who were Popeye's suppliers?

Kent Kronauge - Direct

1   A.  I will have to make sure, I don't know if Marshall Durbin

2   was still around there or not, but the same ones I have today,

3   Tyson, Pilgrim's, George's, Claxton, Case, Mar-Jac, Koch,

4   Holmes, OK Foods.

5   Q.  And did Popeye's in that same time period have a primary

6   supplier or suppliers?

7   A.  We used all of those.

8   Q.  Okay.  Now, I want to ask you about your points of contact

9   at some of these suppliers during this relevant time period.

10  Who was your point of contact at Claxton 2012 to 2018?

11  A.  Scott Brady.

12  Q.  How about Pilgrim's?

13  A.  That time frame was Justin Gay.

14  Q.  Tyson's?

15  A.  Carl Pepper.

16  Q.  And how about Koch?

17  A.  Bill Kantola.

18  Q.  And I want to talk to you a little bit about the

19  negotiations of your contract with the supplier, but before I

20  do, I just kind of want to generally baseline the supply

21  process.  I am assuming that supply, the constant supply that

22  meet your specifications is important to SMS; is that fair?

23  A.  That's probably the most important thing.

24  Q.  Why is that?

25  A.  Well, if Popeye's doesn't have bone-in chicken, we're, you

Kent Kronauge - Direct

 1   know, in trouble, so we're -- supply is first, price second.

 2   That's basically how we look at it.

 3   Q.  And are you familiar with the term or the concept of supply

 4   chain?

 5   A.  Yes.

 6   Q.  And is it fair to say that the producers that Popeye's

 7   contracts with are all in the Popeye's supply chain?

 8   A.  Correct.

 9   Q.  And after executing a contract with a particular producer,

10   do you have an expectation about whether that producer or

11   supplier will work with other suppliers in the Popeye's supply

12   chain?

13   A.  Yes.

14           MR. TORZILLI:  Objection, foundation.

15           THE COURT:  Overruled.  He can answer if he knows.

16   BY MR. KORNFELD:

17   Q.  And what is that expectation?

18   A.  I mean, my main objective is to make sure the Popeye's

19   restaurants have product.  So if one supplier is short to

20   another DC or how they are getting that product, I expect them

21   to work with another supplier to get that load covered and

22   continue that constant supply to the restaurant.  So our end

23   goal is to make sure we never run out of chicken.

24   Q.  You mentioned the term DC.  What is that?

25   A.  Distribution center.

Kent Kronauge - Direct

1    Q.  And how did distribution centers just from the 30,000 foot

2    view factor into ensuring that the chicken gets to your

3    restaurants?

4    A.  For most of our product it goes through a third-party

5    distribution center, either a broad line that carries

6    everything that restaurant uses or a poultry distributor that

7    just handles fresh chicken.  And they distribute to those

8    restaurants two or three days a week depending on the way they

9    are set up.

10   Q.  So let's talk a little bit about the mechanics of your

11   negotiations with the suppliers.  Can you let the jury know

12   your specific role in negotiating contracts on behalf of

13   Popeye's?

14   A.  I do all the fresh and frozen poultry along with seafood.

15   Q.  You personally?

16   A.  I personally do it.

17   Q.  Has that role changed over your time at SMS?

18   A.  No.

19   Q.  Do you have a process for initiating negotiations with

20   suppliers?

21   A.  Basically around September-ish I will send out an RFP

22   requesting a price comparison of where they are and where they

23   want to go, and we start the process that way.  So I'll get

24   their current cost-plus agreements and their new cost-plus

25   agreements, new freight rates, and we'll start negotiations.

Kent Kronauge - Direct

1    Q.   And is that typically, is that process kicked off, the RFP

2    process kicked off -- how is it kicked off mechanically?

3    A.   I mean, usually it's an e-mail.

4    Q.   Now, do you do anything to prevent one supplier from

5    learning that another supplier has been reached out -- that you

6    have reached out to that other supplier in initiating this RFP

7    process?

8    A.   I'm not sure.

9    Q.   That was a terrible question.  Let me try again.

10        Do you do anything to prevent other suppliers from

11   learning who else is bidding?

12   A.   No.  I mean, and I think everybody I deal with knows every

13   single one of the other small-bird suppliers are bidding on our

14   business.

15   Q.   Okay.  It's not a secret?

16   A.   Not at all.

17   Q.   And then you talked briefly about the cost-plus model, but

18   in what format -- you initiate the RFP typically by e-mail,

19   correct?

20   A.   Correct.

21   Q.   Then in what format do the suppliers respond?

22   A.   You know, it varies.  I do ask for another model on their

23   changes.  So I may get a call back or an e-mail back to say

24   someone is going up a half cent or down a half cent, whatever

25   it may be, but then I get it back in the same cost-plus

Kent Kronauge - Direct

1   agreement to see where their changes may be.  So I could get an

2   initial response either by e-mail or a phone call just

3   initially telling me where they are going to be and what

4   direction we're going.

5   Q.  And you mentioned a moment ago you'll see where things

6   within the cost-plus model may have changed?

7   A.  Correct.

8   Q.  And you're talking about the various factors that go into

9   that model, right?

10  A.  Yes, like this year, you know, labor is obviously up for

11  everybody, so that labor component would go up in the

12  cost-plus.

13  Q.  Do you know roughly how many different components there are

14  to the Popeye's cost-plus model?

15  A.  I would say roughly 25.  You know, I haven't counted them,

16  but close to that.

17  Q.  And you have eyes on every one of those, right?

18  A.  Correct.

19  Q.  The jury has heard a lot about the cost-plus model, so I

20  won't try either yours or their patience having you describe

21  it, but I am curious from your perspective what the benefits

22  are to Popeye's of using the cost-plus model.

23  A.  Well, the cost-plus model really started before I started

24  at Popeye's, and I was on the supplier's side.  And it was

25  basically a model used to keep the small-bird facilities

Kent Kronauge - Direct

1   growing and continuing to sell small birds because corn or meal

2   or something would get out of whack and they were locked into a

3   fixed price, and they couldn't compete with the other segments

4   as far as chill pack or big birds.  So the cost-plus initially

5   started to try to keep all of the small-bird players relevant

6   and really keep them from getting hurt, you know, based on

7   market swings.

8   Q.   And does the cost-plus model facilitate your evaluation of

9   the bids by the various suppliers?

10  A.   Yes.

11  Q.   How so?

12  A.   I mean, I use that model to -- for everybody and, you know,

13  that's where we get to our bottom line on what we're going to

14  be the following year.

15  Q.   Now, in terms of the RFP process, do you -- during the RFP

16  process, do you want the suppliers talking to each other?

17  A.   During the RFP process?  I mean, I don't ever care if the

18  suppliers are talking to each other.  I don't want them

19  discussing pricing, you know, trying to collaborate on a price,

20  but I probably encourage the talking more than not just to make

21  sure we're covered.  So I don't know if I answered your

22  question, but...

23  Q.   You did; you did.  When the suppliers are -- kind of this

24  back-and-forth between you and the suppliers, are the suppliers

25  generally communicating back to you via e-mail?

Kent Kronauge - Direct

1   A.  Eventually, but, I mean, there is a lot of phone calls back

2   and forth also.  So I tend to cut straight to the chase more

3   probably than a lot of the other suppliers -- I mean, QSRs, so

4   I think I have a lot more direct communication and will just

5   get to where we think the number is going to be and then get

6   there.

7   Q.  Great.  You anticipated my next question, and that is

8   during this process, do you provide feedback to the suppliers

9   about their proposals kind of throughout this process?

10  A.  Yes.

11  Q.  And how do you do that?

12  A.  I mean, it depends where we are, which way it's going, but,

13  I mean, if someone is way out of whack, I mean, the end goal is

14  to try to get the cheapest price I can, but I also want to keep

15  all the suppliers within a pretty small area of price because

16  I've got -- you know, I've got to satisfy 450 franchisees,

17  3,000 restaurants.  And if someone is able to buy it 5 or 6

18  cents cheaper or someone is going to have to pay 5 or 6 cents

19  higher, I am going to hear about that from those franchisees.

20  So I may say, you know, supplier X, you are out of whack by 3

21  cents.  I need you to pull in or whatever, whichever way I'm

22  going.

23  Q.  And in that process is bluffing one of the negotiation

24  tools that you sometimes utilize during these conversations

25  with suppliers?

Kent Kronauge - Direct

1   A.   Yes.  I would venture to say it's both sides are doing our

2   fair share of that.

3   Q.   And from your perspective, is there anything unusual with

4   bluffing happening on both sides?

5   A.   No, not from me it's not.

6   Q.   Now, after you provide the feedback, what happens next in

7   the negotiation process?

8   A.   I mean, if we get to a price point pretty quick, then, you

9   know, that's where we are.  We will write up the contract, send

10  it out, and we lock that price in for a year.  In some

11  instances we have done two-year contracts, but we always have a

12  two-year contract on volume with an evergreen that we negotiate

13  price every year, so -- except there has been a couple of

14  exceptions we've done two-year deals in the course of my tenure

15  at SMS.

16  Q.   Again, talking about the 2012 to 2018 period, during these

17  negotiations, what were the suppliers competing with each other

18  for or over?

19  A.   Volume on that.  I mean, that's the basic thing.  They are

20  all competing for that size bird, but, I mean, the industry is

21  also tight in that segment.  So at certain times there may be a

22  facility that's at capacity.  They may not want any more

23  volume, but they want to maintain the volume they are at, so...

24  Q.   Is it even possible from -- again the Popeye's perspective,

25  I mean, if you wanted to, could you award all of Popeye's

Kent Kronauge - Direct

1  volume to one supplier?

2  *A.*  No.

3  *Q.*  Why not?

4  *A.*  They couldn't handle it.

5  *Q.*  And is it your -- they couldn't handle it from a production

6  capacity standpoint, I am assuming?

7  *A.*  Correct.

8  *Q.*  Is it your sense that Popeye's size gives it some leverage

9  in these negotiations with the suppliers?

10 *A.*  Well, I think the whole industry is kind of set up that if

11 you're in that segment, yeah, I'm an important part of that

12 piece of the bell curve.  KFC is important for their piece and

13 Church's is important for theirs because you want to have that

14 full mix or whoever that customer is that fits it.  So I only

15 represent a small piece of what these guys can run in their

16 facility, so, you know, I try to capture all the birds I can in

17 that bell curve that they run in my size product.

18 *Q.*  All right.  Let's talk a little more specifically about

19 some of the suppliers.  You've named kind of the usual suspects

20 that supply to SMS.  Would it be fair to say that some of those

21 suppliers are larger producers and some are smaller producers?

22 *A.*  Yes.  So, I mean, we use Pilgrim's and Tyson which

23 obviously are the big two.  And then we use all the way down

24 to -- you know, Case Farms right now has a plant running

25 bone-in chicken for us.  It runs one shift, so...

Kent Kronauge - Direct

1   Q.  And do you have a sense based on your experience dealing

2   with Claxton of Claxton's overall size compared to some of the

3   other suppliers you've talked about?

4   A.  Yes.  I know they are a one-plant operation, but they also,

5   they probably produce out of that one facility more Popeye's

6   product than all but one other facility we use.  So as a

7   facility per se, they do real well for us, but they only have

8   one plant.

9   Q.  Are you aware of their overall market share?

10  A.  For Popeye's or --

11  Q.  No, the QSR market in general.

12  A.  I have seen it.  I would be guessing right now if I told

13  you, but it's small.

14  Q.  I won't ask you to guess.  Does Claxton's size, its

15  relatively small size and its one plant, its one-plant business

16  affect its negotiations with SMS from your perspective?

17  A.  No.

18  Q.  Why not?

19  A.  Like I said, they do a lot of Popeye's volume out of that

20  facility.  They really sew up the southeast for me, so they are

21  an important part of my negotiation -- we need their volume.

22  Q.  You've negotiated with Claxton over a number of years, if I

23  understand your prior testimony.

24  A.  Correct.

25  Q.  Have you become familiar through that experience with

Kent Kronauge - Direct

 1   Claxton's negotiating strategy?

 2   *A.*  Yes.

 3   *Q.*  And are you able to summarize their negotiation strategy

 4   from your perspective?

 5   *A.*  Yeah.  I mean, for the most part, with Claxton, they don't

 6   want to be the highest.  They don't want to be the lowest and,

 7   I mean, they are probably the easiest ones to deal with because

 8   wherever they've got to fit in, they will agree to do it.  They

 9   will stay in that middle ground.  And like I said, up until

10   this year they were probably our largest producing facility,

11   not company, but, you know, at the facility.

12   *Q.*  And based on your years in the chicken industry both on the

13   supply side and the buy side, does this -- does Claxton's

14   strategy of wanting to be somewhere in the middle make sense to

15   you?

16              *MR. TORZILLI:*  Objection, foundation.

17              *THE COURT:*  Overruled.

18   *A.*  It does for that because we try to utilize that facility,

19   and they give -- to not be the highest piece on that and we

20   award volume.  They are a facility that works very close with

21   Popeye's and runs multiple items that we need, so...

22   *BY MR. KORNFELD:*

23   *Q.*  So their desire to be in the middle is not odd to you?

24   *A.*  No.

25   *Q.*  Now, I want to talk to you about some other business

Kent Kronauge - Direct

1    strategies that you used in your negotiations and also just

2    your day-to-day interactions with the suppliers.  We touched on

3    some of the feedback that you provide during negotiations, but

4    I am wondering if you provide feedback to the suppliers during

5    other times of the year.

6    A.  I do.  If someone is getting out of whack, and I am sure

7    everybody here understands this, but, you know, weight is just

8    as an important factor as the price.  So if you have weight

9    that's getting on the upper end of our spec and everybody else

10   is in the middle, on the lower end, accompanied with your price

11   that case price is -- you know, our system buys by the pound

12   and sells by the piece.  So we look at it as whatever that case

13   price is delivered to the store is what we're trying to

14   negotiate down both in weight and in cost.

15            So if someone gets out of the weight range and they

16   are constantly on the higher side, I may send them something

17   saying, you know, we need to work on your weights.  You need to

18   run -- we have two size ranges and try to get more towards the

19   middle.  If someone's out of whack on their feed side, if there

20   is a conversion that's throwing them higher when prices of corn

21   or something gets up there, I will let them know that.

22   Q.  Now, you said price and weight are equally important; is

23   that correct?

24   A.  Well, yeah.  It's both a component --

25   Q.  A combination.

Kent Kronauge - Direct

1   A.   Correct.

2   Q.   We've heard a lot about price, but if you could just expand

3   a little bit on weight.  And when you say weight, what are you

4   specifically referring to in this context?

5   A.   Well, we run a 33-ounce to a 49-ounce.  So if you get --

6   and there are 16 head, so that's basically whatever ounces

7   you're are running, that's your pound of the box.  So if

8   someone is constantly up there at 47 pounds a case and

9   everybody else is running at 41 an average, it's a huge cost to

10  our franchisee.  So we would be constantly asking for them to

11  get that case weight down.

12       And we have two ranges they run between so that, you

13  know, they may try to cheat up -- I shouldn't say cheat up.

14  They may run a higher live weight and just be trying to skim

15  off the top for us and, you know, if someone is really doing us

16  a good job, they are running more in the middle of our range

17  and trying to get a lot more product at a lot smaller case

18  weight.

19  Q.   So just to make sure I understand this and the jury

20  understands this, you're talking about -- you're talking about

21  the case weight, like literally how many pounds of chicken in

22  the case --

23  A.   Yes.

24  Q.   -- that you purchase.  Okay.  If you wanted to try to get a

25  pricing or a weight concession in the middle of the year, so

Kent Kronauge - Direct

1   when the contract is already in effect, what type of process

2   would you go through or what type of strategies would you use

3   to address things that as you said might be out of whack?

4   A.  I probably would show them where they are comparative on

5   weight.  If it's some component -- if they have a yield number

6   that's throwing them off comparatively, I may show them where

7   they are off on their yield and why their price is, you know,

8   inching up.

9        So it would just depend on -- the weight component of

10  our product, it's a three-month trailing average.  So a lot of

11  times I would be saying, hey, your weights are getting big for

12  your next quarter.  When you turn in your weight, we need to

13  get that thing down.  So we may be working for several, a

14  couple months at a time trying to talk about how high their

15  weights are and what it's doing to their piece cost for the

16  franchisee.

17  Q.  During these sort of mid-contract or mid-year negotiations,

18  does bluffing come into play at all during these discussions

19  that you've just testified about?

20  A.  I may bluff it up to just show -- to exaggerate a little

21  bit how far off they are just to get them turning on it, so

22  yeah, I would say that does.

23  Q.  Okay.  And in so doing, from your perspective does that

24  help facilitate a competitive environment?

25  A.  Yes.

Kent Kronauge - Direct

1   *Q.*  How so?

2   *A.*  I want to try to get the franchisees the same price point.

3   And if everybody is locked in pretty close to the same price,

4   and someone has got a 3 or 4-pound case weight difference than

5   everybody else, those franchisees are getting an unfair piece

6   count compared to the rest of the system, so...

7   *Q.*  Okay.  I want to walk through a few e-mails to give the

8   jury an idea about how these strategies and processes that

9   we've been talking about work in practice.  So I am going to

10  direct your attention to Defense Exhibit A-304, and I believe

11  we will put that up on the monitor in front of you.  It also

12  should be in your book.  And the As come after just the

13  numbered exhibits, but if you are more comfortable, it will

14  just be right in front of you on the screen.

15  *A.*  It's up there.  It's fine.

16  *Q.*  Sir, what is A-304?  I don't mean to rush you.  Please take

17  your time to have a look at it.

18  *A.*  Oh, there we go.  So on this particular instance, it looks

19  like Claxton had got high on their -- that could have been

20  after both on this.  They are high on their weight and their

21  cost-plus price.  And based on what we talked about earlier,

22  them liking to be in the middle, I was probably showing them

23  you have gotten out of the middle range here, so we need to

24  bring it back in.  I don't recall if I was after both or not,

25  but both components are high.

Kent Kronauge - Direct

1    Q.  What type of document is A-304?

2    A.  It looks like just an e-mail.

3    Q.  From --

4    A.  From me to Scott.

5    Q.  And what's the date on the e-mail?  I know it's a chain,

6    but the first --

7    A.  Looks like I sent him something May 1st, 2015.

8    Q.  And was this, was e-mail communication a common manner in

9    which you communicated with Mr. Brady as part of your job

10   during this time period in 2015?

11   A.  I mean, I e-mail him and talk to him both, probably

12   multiple times a week, so...

13   Q.  From your testimony a minute ago, fair to say that you have

14   personal knowledge of the issues you were discussing in that

15   e-mail?

16   A.  Yes.

17   Q.  And would the e-mail be information or contain information

18   that you relied upon by you, and in this case Claxton, in

19   conducting your regular business activities?

20   A.  Yes.

21        MR. KORNFELD:  Your Honor, at this time I would move

22   the admission of Defense Exhibit A-304.

23        THE COURT:  Any objection to the admission of A-304?

24        MR. TORZILLI:  Your Honor, objection to the top two

25   e-mails.  No objection to the bottom e-mail.  Although we don't

Kent Kronauge - Direct

1    believe it's a business record, we have no objection to its

2    admission.

3              MR. KORNFELD:  No objection, Your Honor, to redacting

4    the top two e-mails in the chain.

5              THE COURT:  Then the bottom e-mail from Mr. Kronauge

6    will be admitted, A-304 as redacted.

7              MR. KORNFELD:  May we please publish the redacted

8    version of A-304?

9              THE COURT:  You may.

10   BY MR. KORNFELD:

11   Q.  Now, sir, you jumped ahead of me a little bit, which is

12   okay, but I just want to back up now that the jury has this

13   e-mail in front of it.  And why did you send this e-mail?

14   A.  It looks like Claxton was high on both their cost and their

15   weight, so I apologize, I don't recall what I was after at the

16   time, but it could have been one or both, trying to get the

17   weight down or their cost down or both of them.

18   Q.  So was it sometimes your practice to send supplier pricing

19   information to get Claxton to come down whether it's on weight

20   or price?

21   A.  Yes.

22   Q.  Now, Exhibit A-304, you can see where it says Claxton, but

23   the other numbers, do you see there are letters?  For instance,

24   the first bullet point ends in T, the second one ends in P, et

25   cetera?

Kent Kronauge - Direct

1   A.  Yes, sir.

2   Q.  What do those letters signify?

3   A.  Tyson, Pilgrim's, George's, Koch, Claxton, Case and

4   Mar-Jac.

5   Q.  And when you sent this e-mail based on your years of

6   experience with Claxton, did you have an expectation as to what

7   Mr. Brady would do with this information?

8   A.  I was assuming, I was hoping he would lower his price or

9   his weight.

10  Q.  And that was your purpose in sending it.

11  A.  Correct.

12  Q.  Do you recall in this instance if he did or not?

13  A.  I do not.

14  Q.  And in your general experience with Mr. Brady and Claxton,

15  did he generally respond to your direction or your requests

16  about pricing?

17  A.  Yes.

18          MR. KORNFELD:  Okay.  We can take that one down.  And

19  if we could please for the witness, the parties and the Court

20  put up Government's Exhibit 6034.

21  BY MR. KORNFELD:

22  Q.  Is it before you, Mr. Kronauge?

23  A.  Yes, it is.

24  Q.  Go ahead, please, and take a look at that, and tell me when

25  you've had a chance to absorb that.

3793

Kent Kronauge - Direct

1    *A.*  I think this is referring to their weights.  They're

2    producing a lot of the weights, like I was talking about, on

3    the high side of our weight scale.  It looks like I was showing

4    them -- yeah, so I was showing them the last three months how

5    their weights were, you know, out of whack comparative.

6          You can see the other ones are more running in that

7    50/50 range or higher to the small side and they were higher to

8    the large side.  So this may all corresponded with the one I

9    submitted earlier in 2015 but it looks like their weights were

10   probably still high here.

11   *Q.*  And as with the last exhibit I showed you, did you have

12   personal knowledge of the issues you were discussing in this

13   information -- excuse me, in this e-mail?

14   *A.*  Yes.

15   *Q.*  And would that information be relied upon by you and

16   Mr. Brady in the regular business activities you conducted with

17   each other?

18   *A.*  Yes.

19         *MR. KORNFELD:*  Your Honor, at this point I would move

20   for the admission of 6034.  I am happy to redact the top part.

21   I think that's probably appropriate, but I would move, I guess,

22   the bottom e-mail of 6034 into evidence.

23         *THE COURT:*  Any objection to the admission of the

24   bottom e-mail in Exhibit 6034?

25         *MR. TORZILLI:*  No objection to the bottom e-mail being

Kent Kronauge - Direct

 1  admitted.

 2          *THE COURT:*  As redacted, 6034 will be admitted.

 3          *MR. KORNFELD:*  Your Honor, may I publish the redacted

 4  exhibit?

 5          *THE COURT:*  Yes, you may.

 6  *BY MR. KORNFELD:*

 7  *Q.*  Now, Mr. Kronauge, taking a look at this e-mail, did you

 8  think it would help SMS to get a lower, more competitive price

 9  and weight from Claxton by sending Mr. Brady that information?

10  *A.*  It looks like I was strictly after weight here, but yes.

11  *Q.*  And would you have shared this type of information with

12  other suppliers for the same purposes, in other words, if they

13  were out of whack --

14  *A.*  Yes.

15  *Q.*  -- on price or weight?

16  *A.*  Yes.

17  *Q.*  Okay.  And do you recall as to this specific information,

18  do you recall whether you shared it with any other suppliers?

19  *A.*  I don't recall.

20  *Q.*  On the top of the e-mail under Subject, it says, Please

21  don't share except Mikell.

22          I am assuming Mikell refers to Mr. Fries of Claxton?

23  *A.*  Correct.

24  *Q.*  Do you recall why you asked Mr. Brady not to share it

25  except with his colleague, Mr. Fries?

Kent Kronauge - Direct

1   A.  I don't recall why I said it, but I mean, I am sure I was

2   just wanting it to go between those two and try to work to get

3   their weights down.

4   Q.  As you sit here today, does the fact that you said in this

5   e-mail to Mr. Brady "Please don't share except Michael," are

6   you able to say definitively whether you might have still

7   shared this information with another supplier?

8   A.  I don't recall if I did or not.  I mean, I wouldn't have

9   shared it in this format with another supplier.  Now, I may

10  have done something like that if they were out of whack,

11  another supplier.

12  Q.  So similar information, but different format possibly?

13  A.  Correct, or a different time period when someone else was

14  out a --

15  Q.  Fair enough.  We can remove 6034.  And outside of the

16  example we just walked through in that exhibit, when you shared

17  information with suppliers, did you typically place limitations

18  on the supplier regarding the use of the information you were

19  sharing with them?

20  A.  I don't recall, to be honest.  I don't recall if I did that

21  on a regular basis or not.  It's not a practice I did all the

22  time.  It's just if someone was edging out of the, you know,

23  comfort zone.

24  Q.  Were there times -- let me try to ask a better question.

25  Were there times that it suited your purposes to have suppliers

Kent Kronauge - Direct

1    talk to each other?

2    A.   More so around, you know, shorting product and things like

3    that, covering loads, that kind of thing, or there could have

4    been times when yes, but, you know.

5    Q.   And the jury has heard a lot about -- you are talking about

6    what I think at least in this courtroom has been referred to as

7    shorts and covers?

8    A.   Correct.

9    Q.   So if you can briefly, just to make sure you are talking

10   about the same thing that the jury may have heard, just

11   generally why would suppliers need to talk in the context of

12   shorts and covers?

13   A.   Well, if one supplier was short product and they could buy

14   product from another supplier and fill into that certain DC or

15   however it was getting in the market, they could cover it

16   seamlessly.  I'd prefer not even the DC to have to go out

17   looking as well, you know, where we can just cover loads.  And,

18   you know, with our size bird, we are on the smaller side of

19   that bell curve.  If someone's got bigger birds coming in and

20   things like that, they know they are going to be tight on

21   product, they can cover those loads and our system doesn't

22   suffer.

23   Q.   And typically when there was a short/cover situation, would

24   anyone at SMS get involved to resolve the short and cover?

25   A.   Only if someone couldn't find product to get covered, then

Kent Kronauge - Direct

1    usually I would get involved and go to all the suppliers and

2    try to find out who had product or who I needed to short and

3    pull -- it would get to where we are moving product around and

4    not shorting somebody as bad maybe at that point.

5    Q.  But on just a one-off short by a supplier, fair to say you

6    would expect the suppliers in the Popeye supply chain to just

7    deal with it themselves?

8    A.  I would prefer that.

9    Q.  In the course of covering shorts for each other, do you

10   know if the suppliers would learn each other's prices?

11          MR. TORZILLI:  Objection, foundation.

12          THE COURT:  He can answer if he knows.

13   A.  I mean, they would have to because if supplier A was short

14   product, supplier B -- usually they would just fill it in for

15   them because all of our pricing was relatively close, weights

16   were close, so that way the franchisees would not take a hit in

17   the system, you know.  We try to keep our weights and prices

18   consistent throughout the month so you are not going back and

19   forth on the franchisee.  So therefore, one supplier would fill

20   in for the other what that other supplier was going to that DC

21   for.

22   BY MR. KORNFELD:

23   Q.  So in other words, if I am covering for you, what price am

24   I charging?

25   A.  Yeah, you would know what my landed cost was to that DC and

Kent Kronauge - Direct

1   agree to pay that -- ship your product in there at that price

2   and get paid for it.

3   Q.   I want to switch to a different topic and ask you about the

4   2015 Popeye's promotion, okay?  When I say the 2015 Popeye's

5   promotion, can you please explain to the jury what we're

6   talking about when we say a discount or a promotional price?

7   A.   In 2015, we were going to run a bone-in chicken ad.  And I

8   went out to the supplier base trying to get a 2-cent discount

9   so I could pass it on to the franchisees.  And they were

10  running a discounted price on that particular month, so to help

11  ease their burden and run that promotion, we went out and

12  secured a 2-cent-a-pound discount on our negotiated price on

13  our bone-in chicken.

14  Q.   And when you say "we secured," did you request the

15  discount?

16  A.   Yes.

17  Q.   And how about the amount of the discount?

18  A.   Yes.

19  Q.   So the 2 cents, put more simply, the 2-cent discount was

20  your idea, not the suppliers' idea; is that fair?

21  A.   Correct.

22       MR. KORNFELD:  Your Honor, may we have just a brief

23  side bar?

24       THE COURT:  Yes, you may.

25       (At the bench:)

Kent Kronauge - Direct

1          THE COURT:  Go ahead.

2          MR. KORNFELD:  Your Honor, as shocking as this might

3    seem, some of my colleagues have indicated that some of the

4    jurors may need a stretch break, so I won't take it personally,

5    but I would ask the Court maybe to facilitate that as we

6    chitchat on the side bar.

7          THE COURT:  Actually, I think everyone is good now.

8    And since we only have less than 15 minutes left, I think we

9    are probably -- it has accomplished its purpose which is great.

10   How much more do you think you have, Mr. Kornfeld?

11         MR. KORNFELD:  Your Honor, this is just a guess, but I

12   think probably 20, 25 minutes.  I do have a few more exhibits.

13   I don't think that I'll be done before 5:00.

14         THE COURT:  Yeah, it doesn't sound like it.

15         Mr. Torzilli, do you happen to know, will the

16   government be in a position to pretty seamlessly go into its

17   rebuttal case once the defense rests?

18         MR. TORZILLI:  We should be able to seamlessly move to

19   our rebuttal case if the defense rests tomorrow.

20         MR. FAGG:  Your Honor, this is John Fagg.  We do

21   anticipate that we are going to have objections to the

22   witnesses that the government intends to call in their rebuttal

23   case, as well as some of the documents that the government has

24   indicated to us that they intend to introduce in their rebuttal

25   case.  So I just wanted to flag that for you from a planning

Kent Kronauge - Direct

1    perspective.

2            THE COURT:  Right.  And I don't know if the

3    government -- well, the government has submitted some new jury

4    instructions and the defense has submitted some new jury

5    instructions.  So I am trying to figure out what we should tell

6    the jury tomorrow in terms of when it should come back.  One

7    option would be to have the jury come back same time, get the

8    evidence wrapped up.  We could talk about those objections to

9    the government's rebuttal witnesses and exhibits tonight, but

10   we have the looming issue of jury instructions.

11           So one idea would be that we could have the jury come

12   back at, say, 9:00 or 9:30.  The other idea would be to just

13   plow through the -- get the evidence completed, and then the

14   jury would probably be so happy that the evidence was

15   completed, they would not mind having a more extended break

16   which would allow us to try to get our -- the jury instructions

17   shaped up.

18           Any preference on behalf of either side?

19           MR. TORZILLI:  Your Honor, if I may, I haven't

20   consulted my colleagues, but I think I would favor the latter

21   option of just moving the pace with completing the evidence and

22   discharging the jury so that jury instructions can be

23   finalized.

24           THE COURT:  I mean, that would make more sense for the

25   witnesses just because that way they kind of would be on more

Kent Kronauge - Direct

1    of a schedule and would not have to wait around while we are

2    doing other things.  We'll do that.

3              All right.  Mr. Kornfeld, we will end this and then

4    you have about 10 more minutes.

5              MR. KORNFELD:  Thank you, Your Honor.

6         (In open court:)

7    BY MR. KORNFELD:

8    Q.  Thank you for your patience, Mr. Kronauge.

9              Before we broke for the side bar, you had indicated

10   that you had -- the 2 cents essentially was your idea both as

11   to concept and amount, correct?

12   A.  Correct.

13             MR. KORNFELD:  Let me ask that Government's

14   Exhibit 600 be displayed to the witness, the Court and the

15   parties, please.

16   BY MR. KORNFELD:

17   Q.  Sir, what is this document?

18   A.  So I had gone to a couple suppliers and had them agree to

19   the 2-cent thing.  I had some push-back on others, so I sent

20   this -- I don't remember the timing of it, if this was before

21   or after, but it was looking for the promotion.  I had a couple

22   conversations with a couple of companies that did not want to

23   give us the promotion, so I got buy-in from a couple and then

24   just started getting everybody involved or onboard.

25   Q.  Who were some of the companies you got initial buy-in from

Kent Kronauge - Direct

1    on the 2-cent discount?

2    *A.*   I know Claxton was one.  I do not remember the other.  I

3    know I had push-back originally from George's and I think Koch,

4    but I can't swear to that as well.

5    *Q.*   And in looking at Government's Exhibit 600, again you have

6    personal knowledge of the issues you were discussing in this

7    e-mail between you and Mr. Brady?

8    *A.*   Yes.

9    *Q.*   And it accurately reflects the discussions in the e-mail in

10   the course of your regular business activities, in this case

11   the negotiations about the 2-cent promotion?

12   *A.*   Yes.

13        *MR. KORNFELD:*   Your Honor, at this time we would offer

14   Government's Exhibit 600.

15        *THE COURT:*   Any objection to the admission of

16   Exhibit 600?

17        *MR. TORZILLI:*   Not to the bottom e-mail, but the

18   subsequent e-mails contain hearsay.

19        *MR. KORNFELD:*   That's fine, Your Honor.  Your Honor, I

20   would ask -- I think the top e-mail I certainly don't have any

21   problem redacting.  I think the middle one, I would ask the

22   middle one be included.  I think it goes to effect on the

23   listener, and the bottom one.

24        *THE COURT:*   With that proposed redaction, any

25   objection to the admission of Exhibit 600.

Kent Kronauge - Direct

1          MR. TORZILLI:  If the top e-mail is redacted, then no

2     objection.

3          THE COURT:  Then Exhibit 600 as redacted will be

4     admitted.

5          MR. KORNFELD:  May we publish, please?

6          THE COURT:  Yes, you may.

7     BY MR. KORNFELD:

8     Q.  I'd direct your attention to the bottom part of the first

9     page, March 25th, 2015 at 11:13.  Do you see that, sir?

10    A.  Yes, sir.

11    Q.  Now, who did you send that e-mail to, if you recall?

12    A.  I probably sent it to all of the suppliers.

13    Q.  Why did you send it to all of the suppliers?

14    A.  It doesn't do me any good to get a 2-cent discount.  I

15    would be better off to not run the discount than to let a few

16    of our franchisees not get the promotion.  I was doing it to

17    try to speak good will from our office to the franchisees.  And

18    if I didn't have everybody's buy-in, I would have created more

19    ill will towards us and the franchisees than I would have good

20    will, so...

21    Q.  Had Popeye's run a similar promotion in the past?

22    A.  Probably, I don't recall, but not a discount promo.  This

23    is the first time I had gone to try to get a 2-cent promotion,

24    and it took aways to get everybody onboard, so after this I put

25    it in the contract every year.

Kent Kronauge - Direct

1    Q.   Okay.  So this is the only year it kind of came out in the

2    middle of the contract?

3    A.   Yes.

4    Q.   And so subsequent to that, if you could just explain.

5    A.   So now I have it in the contract every year that we have a

6    month period that we run a 3-cent promotion and -- if they run

7    bone-in.  Some years we don't run the bone-in and we don't take

8    advantage of it.  As a matter of fact, I just sent an e-mail

9    blast out last week telling them when we're going to run the

10   promotion this year, so...

11   Q.   Do you recall whether you called the suppliers prior to

12   sending this initial e-mail that is Government's Exhibit 600?

13   A.   I can't remember the timing of everything.  I do remember

14   getting some push-back and then trying -- it was painful

15   getting the 2 cents, so I, you know, it was harder than what I

16   thought.  That's why I just changed the way I was doing it.

17   Q.   Fair to say it took more than one e-mail to get it done?

18   A.   Yes.

19   Q.   Now, let me, if you could scroll up a little bit.  And

20   Mr. Brady's response on March 25th, 2015 at 11:30 a.m., do you

21   see that?

22   A.   Yes, sir.

23   Q.   Do you mind just reading his response out loud?

24   A.   Let me know what everyone tells you and I will get with

25   Michael.

3805

Kent Kronauge - Direct

1   Q.  Based on your years of working with Claxton and Mr. Brady,

2   what did you understand Mr. Brady's response to mean?

3   A.  At that time I know Scott and I had already agreed to the

4   2 cents, so I didn't want him to go to Mikell with it unless we

5   had everybody's buy-in.  So I basically had him in the bank and

6   I was trying to work on others, so I said don't bother Mikell

7   with it until I make sure everybody else is in.

8   Q.  When you say in the bank, in other words, you knew Claxton

9   had agreed to it.

10  A.  They had agreed to it, yes.

11  Q.  Now, going again to your initial e-mail at the bottom, if

12  you could just indicate in the record what time you sent that.

13  A.  At 11:13, and then he replied at 11:30, so we probably even

14  talked in between that.

15  Q.  Okay.  So if my math is right, there is 17 minutes between

16  those e-mails and perhaps a conversation according to your

17  testimony.

18  A.  Possibly, yes.

19  Q.  Is that fair?  Okay.  And do you recall speaking to him

20  outside of this e-mail?

21  A.  Not -- no, I don't, not back then.

22  Q.  Okay.  And if we could just scroll up a little bit more to

23  your e-mail response.  Could you just indicate into the record

24  what time that was at?

25  A.  At 11:38.

1    Q.   Okay.   And what did you tell him?

2    A.   Hold off untiling I get some replies.   If it does not look

3    promising, we won't bring it up.   How is Gram doing?

4    Q.   And why did you tell him to hold off asking Mr. Fries about

5    your request?

6    A.   Just I knew they were in for the 2 cents, but if I didn't

7    get, you know, the rest of them to participate, there was no

8    need in running the promotion.   So I just, you know, if it

9    didn't work, there is no sense taking it up to Mikell trying to

10   get a 2-cent promotion.   I knew I had theirs and then I started

11   working on others.

12   Q.   And in your experience negotiating with multiple suppliers,

13   I am assuming having one or two suppliers agree to something is

14   helpful in terms of your subsequent discussion with other

15   suppliers?

16   A.   Yes.

17   Q.   Okay.

18        MR. KORNFELD:   Your Honor, I know we are a couple

19   minutes early, but this would be an excellent place to stop.

20        THE COURT:   Yeah, that's fine.   Ladies and gentlemen,

21   we will go ahead and break for the day and we will reconvene

22   same time, 8:30.   Keep the admonitions in mind.   Don't look up

23   any terms.   Don't talk to anyone.   Don't deliberate amongst

24   yourselves.   We will see you back tomorrow at 8:30.   The jury

25   is excused.

1          (Jury excused).

2          Mr. Kronauge, you are excused until tomorrow at 8:30.

3    Thank you very much.

4          So here is what we will do.  Why don't we take a

5    recess until 5:15.  That will give me a chance to look at what

6    was filed this afternoon.  We will take up some issues that may

7    involve the government's rebuttal witnesses and exhibits, and

8    then after that we will turn our attention to the jury

9    instruction issues and see how far we can get.  And then we'll

10   decide whether we need to come in early tomorrow or whether we

11   will just wait until the evidence is done and then plow through

12   the remaining jury instruction issues, okay?

13         Mr. Pollack?

14         MR. POLLACK:  Your Honor, I just wanted to flag that

15   there are --

16         THE COURT:  We will take those up to.

17         MR. POLLACK:  -- a couple defense documents we need to

18   resolve by the time the defense rests, so we need to get to

19   that before we get to redirect.

20         THE COURT:  So we will take those issues up first,

21   then we will take up the issues with the rebuttal evidence and

22   then we will do jury instructions.

23         We will be in recess.  Thank you.

24      (Recess at 5:00 p.m.)

25      (Reconvened at  5:17 p.m.)

1          THE COURT:  We are back on the record.  The jury is

2     not present.  And why don't we turn our attention first to

3     Docket No. 1199.  And I think we left off with Exhibit E-543,

4     if I recall.

5          Mr. Tubach, do you want to talk about that first or we

6     can hear from Ms. Call, whatever you prefer.

7          MR. TUBACH:  I would be happy to, Your Honor.

8          I think during the break I asked Ms. Grimm to hand up

9     J-234 to the Court.  I don't know if that's --

10         THE COURT:  I do have that.  I have J-233 as well.

11         MR. TUBACH:  -- suitable for framing a one-sentence

12    judicial notice.  I just wanted to make sure the Court was okay

13    with it.

14         THE COURT:  Ms. Call, have you had a chance to take a

15    look at J-234?

16         MS. CALL:  Yes, Your Honor.  No opposition.

17         THE COURT:  Okay.  So someone will still need to move

18    the introduction of that exhibit, but in terms of its form,

19    that looks fine.

20         MR. TUBACH:  Thank you.  I believe we left off at

21    E-543.

22         THE COURT:  Yes.

23         MR. TUBACH:  That again is admissible -- in light of

24    the admission of the other cost models and e-mails that the

25    Court admitted earlier, it's admissible for the effect on the

1    listener.  You can see the e-mail string where basically they

2    are having to redo the cost models because Mr. Penn is not

3    satisfied with the way they have been done so far.  And this

4    really goes to explain why it is that they are redoing these

5    cost models.

6         So for that reason, and we've got additional detail in

7    the briefing that the Court has at Docket 1199, but it's

8    both -- there are many bases for admission including present

9    sense impression and other things, but primarily we are

10   offering it to explain why it is that the people were

11   continuing to do more versions of the cost model because that's

12   what they had been requested to do and this is long after any

13   competitive information has been exchanged.

14        *THE COURT:*  Ms. Call?

15        *MS. CALL:*  Yes, Your Honor.  I don't think this

16   qualifies as a present senses impression, eight e-mails between

17   individuals at Pilgrim's about changes to their bid submission.

18        As far as -- let me look.  I believe the defendants

19   argued in their filing it describes Defendant Penn's state of

20   mind with respect to changes to the bid that were going on at

21   that time.  I don't think this really does because the top

22   e-mail in the chain says, I am not 100 percent sure what

23   Defendant Penn wants anymore, so this is really curiosity and

24   confusion among his employees about what he is asking for and I

25   don't think -- I think it's all hearsay and doesn't fall under

1    any of the exceptions.

2          *THE COURT:*  Thank you.

3          Mr. Tubach, anything else?

4          *MR. TUBACH:*  No, Your Honor.  Just briefly, that

5    precisely that confusion or lack of clarity and what they are

6    being asked to do and this is the date the bids are due

7    explains and directly refutes the idea there was an agreement

8    in place between anyone because they are still trying to figure

9    it out on the day they are going to be submitting the bid what

10   they are going to do.  This goes to the effect on the listener,

11   which would be the people who received the direction from

12   Mr. Penn to redo the entire analysis on the day that the bids

13   were do.

14         *THE COURT:*  Okay.  The objection will be sustained.

15   This is all just multiple layers of hearsay.  It's not present

16   sense impression.  For one thing, there is just no immediacy in

17   regard to Mr. Penn's decision.

18         And in terms of effect on the listener, the effects

19   are explained in terms of further hearsay statements, all of

20   which don't necessarily even relate to what the effect on the

21   listener was.  So I don't find an exception that would allow in

22   some or all of E-543, so the objection will be sustained.

23         And E-898 is one we took up last time, but go ahead on

24   that one, Mr. Tubach, if you would like.

25         *MR. TUBACH:*  Similar to the prior one, Your Honor,

1    again this is the date the bids are due and Mr. Penn is asking

2    questions about the model.  The questions themselves are

3    obviously not hearsay.  And Mr. Penn's -- Mr. McGuire's

4    response to Mr. Penn is simply suggesting what the answer in

5    the model is.  And this is based on the models that the Court

6    has admitted and they are being run again on the day that the

7    bid is due.

8         THE COURT:  Thank you.

9         Ms. Call?

10        MS. CALL:  Very briefly, same arguments as previously

11   when the Court excluded this exhibit after it was briefed also

12   in the last trial.  I don't believe there is any new arguments

13   that make any of this non-hearsay, so that it's not admissible.

14        THE COURT:  Anything else, Mr. Tubach?

15        MR. TUBACH:  No, Your Honor.

16        THE COURT:  Objection to E-898 will be sustained as

17   well.  The statement from Mr. Penn is hearsay.  It goes beyond

18   just a reaction.  It is substantive and it would be admitted

19   for the truth of the matter, in my opinion, so I will sustain

20   the objection to E-898.

21        So I think that then takes care of that particular

22   motion.  If that's wrong, I stand corrected.  And why don't we

23   now take up Mr. Blake's motion.

24        MR. POLLACK:  Your Honor, actually I had something

25   else on 1199.  Before lunch we had discussed it was A-054 which

3812

1   had remarked Government's Exhibit 8000 as a defense exhibit

2   number.  That was not the intent, so we will withdraw A-054.

3   The intent was to simply mark a single page that was an excerpt

4   from GX-8000 which we've done now as J-233.  I have discussed

5   that with the government.  The government has no objection to

6   J-233.

7            THE COURT:  Yeah, that makes sense.  Thank you for

8   clarifying that.

9            Mr. Pollack while you are up, why don't we take up

10  Mr. Blake's motion to admit an exhibit which is 1201.  Anything

11  else on that one?

12           MR. POLLACK:  It might make sense to hear from the

13  government because we have laid out alternative grounds for

14  admissibility in the motion.

15           Ms. Call?  This is the on vacation.

16           MS. CALL:  I appreciate that.  I think we will just

17  object on hearsay grounds.  There is clearly hearsay within the

18  content down there.  No opposition to the --

19           THE COURT:  Well, actually I don't think -- what's

20  being displayed right now is not what J-203 is.

21           MS. CALL:  I think it was an out-of-office and that

22  does not look like the one.

23           MR. POLLACK:  I think it's on the screen now.

24           MS. CALL:  Yes, Your Honor.  We would say it's still

25  hearsay.  The content of out of office is clearly typed by a

3813

 1  person.  It is a statement within the hearsay rule, so it is

 2  hearsay on that basis.

 3      THE COURT:  I am going to overrule the objection.  It

 4  probably isn't necessarily typed by a person.  Typically the

 5  way these things work is that someone needs to take the time to

 6  enter dates and then indicate that they are on vacation.  So

 7  they are presumably, although we don't exactly know some

 8  inputting of dates from Mr. Blake, but in any event, as

 9  discussed in the motion, there is a very high degree of

10  reliability someone such as Mr. Blake, a person who gets a lot

11  of phone calls by the very nature of his work, has a good

12  reason to make sure that the dates that would be contained on a

13  vacation e-mail of this type would be correct.  And I therefore

14  find that there is an exception to the hearsay rule and will

15  overrule any objection to J-203.

16      MR. POLLACK:  Thank you, Your Honor.

17      THE COURT:  Now why don't we turn our attention to

18  something that we have not talked about yet and that is issues

19  that some or all the defendants anticipate coming up in the

20  government's rebuttal case.

21      Ms. Call?

22      MS. CALL:  If I may propose, I think, so there are

23  three witnesses we have notified the defendants of, and that is

24  somewhat out of an abundance of caution still not knowing the

25  conclusion of the defendants' case.  I think at this time it

3814

1   probably would be ripe to talk about Mr. White, but Mr. Bryant

2   it may make sense to address later because we are not a hundred

3   percent confident we will be calling him yet.

4           THE COURT:  So perhaps tomorrow, then?

5           MS. CALL:  Yes, Your Honor.

6           THE COURT:  Okay.  Why don't we postpone on

7   Mr. Bryant, then.  There may be some issues as to Mr. White.

8           Mr. Feldberg?

9           MR. FELDBERG:  Just out of curiosity, Your Honor,

10  would it be possible to have an offer of proof as to what in

11  the defense case Mr. Bryant might be called to rebut?

12          THE COURT:  Well, you can imagine there are a number

13  of different things, but you can talk to the government about

14  that.

15          MR. FELDBERG:  Thank you, Your Honor.

16          THE COURT:  Mr. Fagg?

17          MR. FAGG:  Thank you, Your Honor.

18          The government listing Mr. White on their rebuttal

19  witness list is simply an effort to have the Court reconsider

20  its earlier ruling that neither Mr. White's testimony nor these

21  draft pop AgriStats policies within Pilgrim's are relevant or

22  admissible.  And the Court --

23          THE COURT:  Actually, I should have had the government

24  stand up first, but let's see if that's it because obviously

25  you're right, in Docket No. 1087, I did address those issues,

1    so let's see if that's the same thing.

2         MS. CALL:  Yes, Your Honor.  I should have noted over

3    the break the government filed ECF-1206 and its attachment

4    ECF-1206-1 specifically regarding the anticipated testimony of

5    Mr. White.  It is that same exhibit.

6         THE COURT:  I haven't seen that.

7         MS. CALL:  It was about 10 minutes ago, so it's not

8    surprising.  We are trying to get paper copies, but it is

9    essentially the same subject matter.  I am happy to argue now

10   if that would be the appropriate time or if Mr. Fagg wanted to

11   be heard.

12        THE COURT:  No, why don't I hear from you first.  Then

13   I will allow Mr. Fagg to respond.

14        MS. CALL:  Yes, Your Honor.  So, I mean, throughout

15   this trial the government has precluded and fairly so based on

16   the Court's rulings that, you know, confidentiality or the

17   customer's expectations I think weren't necessarily a hundred

18   percent on point and relevant to a price-fixing case, but we

19   now have a picture painted in the defendants' case through the

20   testimony of Mr. Eddington, Mr. Finch, I think even Mr. Snyder

21   that information sharing like -- that prices are just floating

22   around in the air in the chicken industry and you can get your

23   competitors' bids kind of out of nowhere.

24        And the government should be able to rebut that

25   picture that, you know, prices are wherever you may find them

1    because that is not what the case was.  The defendants here or

2    two defendants at least created a policy within their company

3    as the highest level executives that current, future, past

4    prices are not to be shared with competitors.  It's compelling

5    to their state of mind, but it's also compelling to the state

6    of play in the industry and what they expected at their

7    company.

8           Almost the entire defense case has been focused on

9    this issue of kind of information sharing and what is common

10   and what is the common practice in the industry, and we do

11   think the government should be able to rebut it with evidence

12   about this policy.

13          Mr. White we anticipate would testify that this is a

14   final policy despite many articulations that it was a draft,

15   and I recognize the policy itself says draft on it, but it was

16   final and Mr. White would say that.  So we think it is entirely

17   relevant and probative and necessary to rebut the kind of

18   picture that's been painted of the industry in this case.

19          And we have in our filing what we suggested was, of

20   course, a Rule 403 analysis to the extent there is any

21   prejudice because this policy references, you know, antitrust

22   laws, we proposed redactions to take out any reference to the

23   antitrust laws.  The main thrust of what we are trying to show

24   is they had this policy of essentially the one sentence where

25   it directs Pilgrim's employees not to share past, current or

1   future prices with competitors.

2          THE COURT:  All right.  Mr. Fagg?

3          MR. FAGG:  Thank you, Your Honor.  So I haven't had a

4   chance to read the government's filing, but I heard Ms. Call's

5   explanation and it was exactly what I thought it was, which is

6   a motion to reconsider the Court's earlier ruling.  The Court

7   previously ruled that Mr. White's testimony and internal

8   policies and procedures are irrelevant and that the admission

9   of those documents would be unfairly prejudicial and risk

10  the -- run the risk of confusion of the jury.

11         Nothing has changed in the course of this trial that

12  would cause the Court to reconsider that decision.  The notion

13  that the defendants opened the door on this issue I think is

14  simply wrong.  The government elicited from Mr. Suerken,

15  Mr. Lewis and other witnesses why they designed their bids in

16  the kind of way that they did and that they wanted it to be

17  confidential.  The defendants are certainly entitled to rebut

18  that evidence to say, well, this information was actually

19  there, was out there in the open.  And what Pilgrim's draft

20  policy may be as it relates to AgriStats, which relates to past

21  pricing, is simply irrelevant to the issues in this case.

22         And the prejudice to not just Mr. Lovette and

23  Mr. Penn, but to all the defendants of having some sort of

24  internal policy that relates to something else is very, very

25  significant.  It runs the risk of confusing the jury and simply

1    excerpting out antitrust provisions of that doesn't solve that

2    prejudice or solve the confusion to the jury.

3         Moreover, as Ms. Call just stated, Mr. White was the

4    general counsel of Pilgrim's.  And to the extent that the

5    government is going to call the general counsel of Pilgrim's,

6    there are a number of documents that have been produced that

7    are redacted to and from Mr. Lovette.  We would argue that

8    there has been a subject matter waiver by the government on

9    this and would seek discovery from the government and Pilgrim's

10   as it relates to this issue.

11        THE COURT:  Thank you, Mr. Fagg.

12        Anyone else from the defense?  Ms. Henry.

13        MS. HENRY:  Your Honor, I would just point out that

14   for those defendants that have nothing to do with this, the

15   prejudice is extreme.

16        THE COURT:  All right.

17        MS. PREWITT:  I would join that as well, Your Honor.

18        MR. BYRNE:  And, Your Honor, on behalf of Mr. Little,

19   there is no date on this, and I don't know if he would testify

20   about a date, but Mr. Little could have been retired.  And even

21   if he wasn't retired, there is nothing to suggest that this was

22   communicated to him, and so there could be a lot of prejudice

23   if the jury thinks that somehow this referred to him too.

24        MR. TUBACH:  Your Honor, just briefly, as the Court

25   may recall, the background for this was an investigation, a

1    civil investigation into the AgriStats and the sharing of

2    information.  And we would not be able to get into any of that

3    in explaining why this policy came to be.  And that would be

4    hugely prejudicial to us.  We can't really challenge it because

5    challenging would be saying, oh, there is other investigation

6    relating to AgriStats the DOJ launched, a civil one back

7    earlier, and that's what led to this policy.  We wouldn't be

8    able to get into any of that.

9         THE COURT:  Mr. Beller, did you have something?  Then

10   I will hear from Mr. Feldberg.

11        MR. BELLER:  Thank you, Your Honor, and I will be

12   brief addressing Ms. Henry's point regarding the prejudice to

13   my particular client.  Your Honor, I am not going to recite the

14   testimony, but suffice it to say I disagree with the notion

15   that the defendants opened the door to that through testimony

16   of the witnesses that were called.

17        For purposes of context, I would also remind the Court

18   that just a few moments ago A-304 and Exhibit 6034 were both

19   introduced into evidence.  Both of them are examples of a

20   customer in this case actually supplying prices and supplying

21   prices of competitors to -- in the case of those two examples

22   directly to my client or rather to Mr. Brady who then forwarded

23   them to my client.

24        He also testified that he would frequently do such

25   things and he would share them with the different suppliers for

1    either the purposes of pushing down case weights and/or pushing

2    down prices.  So arguably to the extent that any of that was

3    shared, it would be in violation of this particular policy.  So

4    we have examples of this actually happening in the marketplace.

5    And, of course, what we have before this jury is not a

6    violation of some sort of internal antitrust policy, but rather

7    a question of whether or not price-fixing occurred.  And I

8    would simply offer these two as examples of arguably being in

9    violation of such a policy.

10         THE COURT:  Thank you.

11         Mr. Feldberg.

12         MR. FELDBERG:  Your Honor, from the perspective of

13   Mr. Austin, a salesman at Pilgrim's, without any evidence that

14   this draft was ever explained to him or shared with him in any

15   way puts him in an impossible position before the jury if it

16   were to come in because whatever limiting instructions might be

17   given, it would be asking too much of the jury to try to

18   separate out the draft policy, who saw it, who was exposed to

19   it, and as a result of that puts enormous prejudice on

20   Mr. Austin.

21         THE COURT:  Ms. Call.

22         MS. CALL:  All right.  I am going to try to address

23   each thing.  First, as a date, there is an underlying e-mail to

24   this.  So the exhibit, and I want to get this right, is 9865 is

25   the policy itself.  And I believe it's 9875, but I am going to

1    double-check.  And we did actually -- you know, I have it here.

2    9875 is correct.  So there is an underlying e-mail transmitting

3    this policy from Mr. White in early 2014, so I think that

4    answers the question as to whether Defendant Little was retired

5    at the time.

6         But I think in terms of who knows who this policy went

7    to, those are all appropriate subjects for cross-examination of

8    Mr. White and the defendants can ask him about that, so I don't

9    believe that creates an insurmountable prejudice for any of the

10   Pilgrim's employees.

11        Second, with respect to the policy itself, I do

12   disagree with Mr. Fagg's characterization of it as, one, one

13   relating to past prices only, because as I believe I quoted, it

14   is extremely clear in the policy where it says:  Discussion or

15   communication by a company officer or employee with a

16   competitor concerning a variety of topics it is prohibited.

17   These topics include past, present or future purchase costs or

18   sale prices, pricing policies, bids, discounts, promotions,

19   terms or conditions of sale, customers, et cetera.  So it is

20   not just past pricing.  It is also not just AgriStats.

21        The scope is a specific to sentences at the beginning

22   of the document which says it applies to all employees who

23   receive or review reports that may contain information about

24   competitors including without limitation AgriStats.  So it is

25   not by its own scope and its own definition limited simply to

1    AgriStats.

2         Regarding waiver, of course, the Department of Justice

3    can't waive privilege for a company and neither has the

4    company.  As Mr. Fagg and counsel have noted in some of their

5    filings, e-mails were produced redacted.  There has never been

6    a waiver of any privilege by the company in producing and the

7    company has never claimed privileged on this policy itself, so

8    there is no waiver issue here.  There is no privilege issue

9    with the actual policy itself.  And, of course, general counsel

10   for a company can wear multiple hats.  And just because you

11   have a conversation with counsel doesn't mean it's privileged.

12   So I think that is kind of being used as a shield here to

13   improperly shield this, you know, probative evidence.

14        With respect to Mr. Kronauge's testimony, he

15   specifically said on the stand he did not want suppliers

16   sharing prices with each other and he didn't want them

17   coordinating their price.  The exhibits that I believe

18   Mr. Beller referenced were him sharing prices with one

19   supplier.  And when probed about whether he may have shared it

20   with other suppliers as well, he said yes, at different times,

21   but not in this specific instance.  He wasn't sharing prices

22   with five of his suppliers at once that would create any

23   inference that, A, this policy is being violated by that

24   sharing which it doesn't apply to because it's not between

25   competitors.  So that's just kind of a red herring here.  It

1   has nothing to do with this policy or any possible violation of

2   it.

3        I think at the end of the day, I mean, part of the

4   relevance here is, A, rebutting kind of the state of play in

5   the industry; but B, it gets to the heart of the case, which is

6   what was the defendants' purpose when they are sharing their

7   prices, their bids, their strategies with their competitors.

8   And, you know, it speaks levels for at least the defendants at

9   Pilgrim's Pride that they did not have a legitimate business

10  purpose in doing it.  We've had had witnesses say that.  We now

11  have a policy that says that.  And it speaks to what their

12  purpose was, that it was to work together with their

13  competitions and not for some business purpose that their

14  bosses specifically told them not to do.

15            THE COURT:  All right.  Mr. Fagg, real quick.

16            MR. LAVINE:  For the record, I think an objection for

17  one is for all, and I want to object on behalf of Mr. Brady

18  because I do think the admission of that would be prejudicial.

19            THE COURT:  Yeah, one for all.

20        Mr. Fagg, go ahead.

21            MR. FAGG:  Just very briefly, I think what Ms. Call

22  just said explains exactly why the government is trying to use

23  this as a sword and a shield as it relates to privilege here.

24  Mr. White wore one hat and that's it, general counsel.  And the

25  government knows that and he told them that in his 302.  So the

1    notion they can somehow or another introduce a draft policy

2    that if you look at the e-mail, it says it's a draft.  The

3    document itself even has his initials in the file name, NMW.

4    It shows it's his initials.  His draft of this document.

5          As Mr. Tubach said, we would be prohibited from

6    cross-examining him based on privilege issues.  We would argue

7    there is a waiver.  They can't use it as a sword and a shield.

8    You also have the whole issue with the DOJ civil investigation.

9    And then finally, what Ms. Call just said is they actually are

10   trying to use this policy to show the standards that should be

11   applied and not the law.  And the Court has previously ruled

12   these sort of documents are not admissible, and we have not

13   seen any reason why the Court should revisit that ruling.

14         *THE COURT:*  Okay.  So Mr. Fagg started off by saying

15   this is really a motion to reconsider and the Court believes

16   that that is indeed what this is.  The only grounds for a court

17   reconsidering a previous ruling, and that previous ruling by

18   the way is in Docket No. 1087, is an intervening change in the

19   controlling law.  I haven't heard anything to that effect.  New

20   evidence previously unavailable, haven't heard anything to that

21   effect, and the need to correct clear error or prevent manifest

22   injustice.

23         Really, the only thing that's maybe a little bit

24   different since I decided in 1087 is that there has been some

25   additional testimony from people such as Mr. Ledford,

1    Mr. Suerken, and even today to some extent from Mr. Kronauge

2    about how they wouldn't want people sharing prices.  So the

3    government's argument that there is this atmosphere or a story

4    that is completely unrebutted is really not true.

5          There is evidence on the other side of it that even

6    the -- sorry, even the customers were sharing prices of other

7    suppliers in various contexts.  And, of course, Mr. Kronauge

8    testified about that as well.  But there is no change in

9    circumstances in terms of anything related to the White

10   documents or the White testimony which is, as I ruled

11   previously, would set up a standard that really was an internal

12   standard of a company and run a real risk that the jury might

13   confuse that with the law regarding price-fixing.  So the

14   motion to reconsider -- the grounds have not been demonstrated

15   and that will be denied.

16         All right.  Other -- so we've got -- we just handled

17   White.  We are going to defer issues related to Mr. Bryant.

18         Any other rebuttal either exhibits or the remaining

19   witness that we should bring up at this time?  Mr. Beller?

20         MR. BELLER:  Thank you, Your Honor.  Your Honor, the

21   government last night notified us of a Mr. Darin Hahn,

22   D-A-R-I-N, H-A-H-N, as well as some exhibits that they plan on

23   introducing either through Mr. Hahn or exhibits that they are

24   offering without a witness.

25         Since Ms. Call did not address those this afternoon, I

1    have no need to do so if there has been a change in the

2    government's position.  On the other hand, if there has not,

3    then I would like to address him and those exhibits.

4         THE COURT:  Ms. Call, what about the government still

5    intend to call Mr. Hahn and, if so, use the same exhibits?

6         MS. CALL:  Yes, Your Honor.

7         THE COURT:  So let's look like that is an issue.

8         Did you want to go ahead, then, Mr. Beller?

9         MR. BELLER:  If I can, and I will be relatively brief,

10   Your Honor, until we have more information from the government.

11        My understanding is that Mr. Hahn is a Tyson's

12   custodian.  The Court may recall that we have twice had lengthy

13   argument over Government's Exhibit 9782.  Your Honor, the Court

14   will recall that that's the Ritz Carlton poolside

15   bar/restaurant receipt that was found in Mr. Roberts' I believe

16   expense report.  It shows a lunch that he paid for at the Ritz

17   Carlton.  The Court has twice found that document to not be

18   relevant for a number of different reasons.

19        However, my understanding is that the government is

20   now planning on introducing that document without a witness and

21   is also planning on introducing what is now labeled

22   Government's Exhibit 10659.  Your Honor, 10659 are, as best as

23   I can tell, all of Mr. Roberts' expense reports regarding his

24   attendance at the Ritz for this particular conference.

25   Contained within those documents are 9782 again.

3827

1          And so for those reasons, Your Honor, I don't believe

2     at this point that the door has been opened nor will it be

3     opened.  I believe that the Court's ruling stands.  And so to

4     the extent the government disagrees, I am happy to sit down and

5     see if the government can articulate the reason why.  And

6     obviously if we need to have additional arguments on these

7     receipts that have already been ruled to twice, I will be happy

8     to do so.

9          THE COURT:  I don't quite remember.  What was the

10    basis of the Court's ruling on 9782?

11         MR. BELLER:  Your Honor, the Court found both on

12    November the 23rd of 2021 and also on March the 7th of 2022

13    that chicken "suppliers or representatives" getting together at

14    a conference and having dinner or drinks or in this case lunch

15    is simply not relevant, and that the Court finds that it is --

16    and I am paraphrasing of course, Your Honor.  I have

17    transcripts if the Court wishes -- but the Court found that it

18    was conjecture to argue that that would have given them an

19    opportunity to plot or plan some kind of a price increase, and

20    that these types of meetings are very routine and for that

21    reason it's not relevant.

22         THE COURT:  What conference was that?  Was this the --

23    I forget the name of it.

24         MR. BELLER:  The National Chicken Conference, Your

25    Honor.  Specifically I would note that the National Chicken

3828

1   Conference began the following day.  I don't believe there was

2   any testimony in the defendants' case regarding any sort of

3   meetings or opportunities for meetings that occurred on the day

4   before.  9782 is a meeting that happened on the day before.

5   Your Honor, the receipt notes Gabby's Restaurant.  Gabby's

6   restaurant is the poolside restaurant.  I would note that the

7   attendee list for this particular document -- well, for the

8   conference itself also shows that both my client, and I believe

9   Mr. Roberts as well, brought their wives with them.  And in my

10  client's case, he also brought his sons with him.

11          So these appear to be a -- this appears to be a

12  receipt from this poolside restaurant where the families were

13  all together on the day before the NCC meeting.  Again, I am

14  providing the Court more detail than what has been provided in

15  the past regarding this particular receipt, but again noting

16  that this has been both argued as well as decided on two

17  occasions.

18          I would also note, Your Honor, that the government

19  argued for the introduction of 9782 on March the 7th of 2022,

20  and that was following Docket No. 1125 that the government

21  filed again trying to get this particular receipt into

22  evidence.

23          THE COURT:  Right.  Yeah, I think this is the

24  government's attempt to now have a witness who could lay the

25  foundation for its admission because I had ruled on March 7th

1      that there were problems on that front.

2              MR. BELLER:  Your Honor, if I may, excuse me for

3      interrupting the Court.

4              THE COURT:  No, that's okay.

5              MR. BELLER:  The Court also found that the e-mails

6      themselves were also hearsay and at no point did Mr. Roberts

7      ever adopt any of the statements in those particular documents.

8      So it's not simply one of relevance.  There was also that

9      additional notation made by the Court.

10             THE COURT:  Thank you, Mr. Beller.

11             Mr. Gillen?

12             MR. GILLEN:  Very briefly, Your Honor.  This is the

13     third time, the third go-around for this particular document.

14     And what the Court ruled the first go-around is you said, I am

15     going to exclude the exhibit.  I just don't find the relevance

16     of it.  It's just a reference back into a meeting in July that

17     involved the National Chicken Council meeting, and that's the

18     type of meeting that competitors would be at.  It's just way

19     too much of a stretch in the inference to suggest any relevance

20     in a particular document, so I am going to exclude it.

21             In addition, of course, they brought it back up again

22     this trial, and the Court what we consider to be a motion for

23     reconsideration again denied it.  And now they are back at it

24     again.  The initial ruling by the Court that it wasn't relevant

25     and the reasons why the Court found it not relevant, you know,

1    we believe are still valid.  And the criteria set by the Court

2    a few moments ago for finding of a reconsideration of an order

3    simply do not apply here and the standards should be applied to

4    their request to get this document in or these documents.

5    There are really two.

6         There is the -- now they have 10659 in addition to

7    9782.  Parenthetically I will state on the face of 9782 in the

8    e-mail from Mr. Roberts, he mentioned that part of the -- part

9    of the breakfast should be redacted because he was with his

10   family there.  So it's a family outing, as Mr. Beller had

11   indicated.  So more importantly, it's a motion for -- second

12   motion for reconsideration which should be denied.

13        And in addition, Your Honor, this is a situation --

14   this is a rebuttal case.  There is nothing that has occurred in

15   the defense case which would allow for the government to argue

16   that this should be admitted as some sort of rebuttal evidence.

17   They are just trying to, for the third time, trying to drag it

18   into evidence, and so we would certainly object as to that and

19   would ask the Court to stay with the ruling that the Court has

20   made before the first time and the second time and again find,

21   No. 1, it's not relevant; and No. 2, that the grounds for

22   motion for reconsideration have not been met and that you will

23   sustain our objection.

24        Thank you.

25        THE COURT:  Thank you Mr. Gillen.

1              Ms. Call?

2              *MS. CALL:*  Yes, Your Honor.

3              So first, I will address the kind of appropriateness

4    in the rebuttal case and then I will address relevance.  First

5    off, Defendant Roberts and others have put into issue, and

6    perhaps it already was, put into issue the precise timing of

7    the suppliers' decision of when to seek price increases in

8    2014, including obviously the fact that Tyson was considering

9    these price increases in July and even June to some extent.

10   But on top of that, so there is the testimony of Mr. Campbell

11   and Mr. Bowlin regarding the timing of the price increases.

12             The defendants, of course, also called Mike Brown, the

13   president of the National Chicken Council, who testified about

14   the council and its activities including a reference to the

15   fact that he didn't think there was any free time for

16   competitors to meet on their own or barely any, I think was

17   some of the subject for his testimony, and for good reason

18   because, of course, industry meetings like this are an

19   opportunity for competitors to meet and that often does cause

20   antitrust issues, which I think probably every defendant in

21   this room knows, because anyone who knows the history of the

22   chicken industry would know that the predecessor entity to the

23   National Chicken Council got dissolved because of price-fixing

24   allegations and that's why the National Chicken Council has

25   antitrust lawyers at every meeting and does not allow a lot of

1    time for competitors to meet.

2         That said, that did happen here, and that is what is

3    portrayed in Government's Exhibit 10659, which is one Your

4    Honor has not previously ruled on.  These are the underlying

5    receipts that are the subject matter of the e-mail in 9782,

6    which Your Honor did rule on and looks like we got both side by

7    side, and we have Page 3, which is really the relevant page of

8    10659 pulled up.  I do have paper copies if any counsel need

9    it.  And I may have said receipts.  I meant expense reports for

10   10659, so it is clearly a business record so any sort of

11   hearsay issue will be resolved particularly with the foundation

12   laid by the witness.

13        And what this shows, I know several counsel have

14   referred to family breakfast, I think, but the relevant page

15   here is this lunch that occurred on July 19, 2014 between

16   Defendant Fries, Defendant Roberts, whose expense report this

17   is, Mr. Tommy Francis of Mar-Jac and Mitch Mitchell of Case

18   Farms.

19        Some particular relevance of these particular names is

20   that almost all of these names appear on Government's Exhibit

21   1030 a month later regarding the price increases in 2014.  So

22   it is particularly relevant showing the relationships between

23   these individuals, that they met in July, and we already know

24   from 1030 they were discussing these price increases together

25   among competitors.  So we think the timing and opportunities

1   that these individual had to meet is entirely relevant and

2   probative in the same way that a phone call would be probative

3   or another meeting between competitors as an opportunity for

4   these price increases to be discussed.

5         And it specific says business purpose of this meal is

6   a lunch to discuss small-bird marketing, so --

7         THE COURT:  But it says marketing.  It doesn't say

8   pricing.

9         MS. CALL:  Well, they are nearly one and the same for

10  a salesperson in July as they are preparing their price

11  increases for their customers, and I don't believe there is any

12  evidence I am aware of joint marketing efforts between these

13  four competitors in the industry.

14        THE COURT:  And why would the next entry be relevant

15  if it's a meeting with Church's?

16        MS. CALL:  Those are separate entries.  The prime

17  relevance is that first one between the four competitors.  I

18  believe one is a lunch and one is a dinner.  We, of course,

19  know at the time because of Mr. Campbell and Bowlin's testimony

20  that Defendant Roberts was at this time already aware of

21  Tyson's decision to increase prices, so this certainly would be

22  an opportunity for Defendant Roberts to put out within the

23  industry Tyson's price increase, which we then know that other

24  competitors followed suit the following month.

25        THE COURT:  And Ms. Call, so Mr. Hahn, what is he

1    going to testify in regard to Exhibit 10659?

2         MS. CALL:  He will lay the business records foundation

3    for this.  He actually, I think, designed the expense report

4    form at Tyson Foods, so he has a lot of knowledge about how

5    these are stored and maintained and kept in the regular course

6    of business there.

7         THE COURT:  Okay.  And this particular exhibit is --

8    is it from Mr. Roberts submitting it or how do we know what it

9    actually is?

10         MS. CALL:  Yeah, I believe Mr. Hahn would testify that

11   the individual employees submitting an expense report were the

12   ones responsible for filling this out.  Defendant Roberts' name

13   is on the first page of this expense report, so I believe

14   Mr. Hahn would testify that he would have been the person who

15   completed this report and then, of course, provided the

16   receipts that he would have had from his own trip.

17         MR. KOENIG:  To be clear, may I just add?

18         THE COURT:  Sure.

19         MR. KOENIG:  I think what Mr. Hahn, just to put a

20   little finer point on it, would be that even though an

21   administrative aide could fill out each form, that the person

22   whose expense report it is did have to review it, did have to

23   sign it, and so I just wanted to make sure because that would

24   be, you know, just a minor point.

25         THE COURT:  Sure, but is there a signed expense

1    account report by Mr. Roberts, because I can't remember.

2         *MS. CALL:*  There is a signature on this document on

3    the second page, I believe, not the most legible of signatures.

4    Then there is, of course, the follow-up e-mail, Government's

5    Exhibit 9782, showing he was involved in the review and

6    providing additional information relating to this expense

7    report.

8         *THE COURT:*  Okay.  Mr. Beller, did you have anything

9    else?

10        *MR. BELLER:*  Just briefly, Your Honor.  Your Honor, I

11   would note for the Court that the arguments that were made by

12   the government were also made by the government in Docket No.

13   1125.  And those particular arguments, of course, were that

14   this relates to Exhibit 1030 which happened some 40-some odd

15   days later.  The government argued in 1125 that this particular

16   luncheon may have given the opportunities an opportunity to

17   actually discuss specific pricing.

18        Your Honor, I would note for the Court

19   *United States v. Jones*, 44 F.3d 860.  That's a 10th Circuit

20   case from 1995.  Your Honor, in that particular case, which I

21   would note is a drug case, however the principle behind it I

22   think holds firm for this particular case.  In the *Jones*

23   matter, Jones was a passenger in a vehicle.  And the 10th

24   Circuit in that case said that mere presence is not enough to

25   draw a reasonable information, that in this case a passenger of

1    the vehicle knew that there were drugs in the trunk.  The Court

2    goes through a relatively lengthy, for the 10th Circuit,

3    analysis talking about speculation and conjecture and how

4    speculation and conjecture is different than inference.

5         The arguments that have been made by the government is

6    truly one of speculation and conjecture.  There is absolutely

7    zero evidence whatsoever that there was any sort of discussion

8    regarding specific pricing that happened at this poolside

9    restaurant with families, but rather the government is saying

10   that that could have been and may have been an opportunity for

11   them to actually talk.

12        Your Honor, I believe that the questions by the

13   witness were specific to the actual agenda for the conference

14   and whether there was much time in that particular conference

15   to be able to meet.  The answer from the witness was no.  And

16   the witness was then impeached by showing that on the agenda it

17   specifically said "dinner on your own" that started at

18   6:00 o'clock.

19        And so the point that the government wished to make

20   has already been made, Your Honor, and at this point asking

21   that a day earlier, that being July 19th prior to starting of

22   the conference, was somehow an opportunity for these

23   individuals to talk about pricing again is simply one of

24   speculation and conjecture and according to the court in *Jones*

25   is not something that is admissible.

1            So here we have at best what I believe is a

2    confrontation issue regarding being able to actually confront

3    Mr. Roberts on the underlying documents and whether or not

4    Mr. Fries was even present, No. 1; but No. 2, at best, in

5    taking Mr. Roberts at face value in these particular documents,

6    and that is one of mere presence.

7            Your Honor, I would also note that while the

8    conference happened at the Ritz, there is no indication that

9    the individuals actually stayed at the Ritz.  And so I believe

10   that the receipts, not just in 9782, but rather 10659 that

11   includes the prices paid for the hotel rooms, are both not

12   relevant, but perhaps consistent with that are actually

13   prejudicial.

14           THE COURT:  Thank you.

15           Mr. Gillen, real quick.

16           MR. GILLEN:  Your Honor, in addition, the government

17   argues that this rebuts the defense testimony that the Tyson

18   cost model was structured before, and that's the argument they

19   made.  That's the same testimony that they elicited in their

20   case in chief.  They had Carl Pepper testify that in June of

21   2014 that the Tyson cost model had been created.  He testified

22   extensively about that.  So to argue to this Court somewhat I

23   think disingenuously that suddenly that this document is

24   necessary in order to rebut the defense testimony that the

25   Tyson model had been created earlier than August is

3838

1    disappointing because every single witness, the government

2    witness, the government witnesses and Pepper and the defense

3    witnesses have all stated that.  So this isn't a rebuttal of

4    that.  They are not rebutting whether or not Tyson did or did

5    not have the early cost model because they did.

6            In addition, simply because now they have a custodian

7    of the records doesn't allow it to come in in rebuttal.  If

8    they had chosen to, they could have tried to bring in the

9    custodian of the records in their case in chief as they should

10   have and then argued.  Of course, their problem, then, would

11   have been, as it is now, that the Court had already found that

12   this testimony or this document and the inferences drawn from

13   it are not relevant.

14           And again, as Mr. Beller states, the mere

15   speculation -- this is how dangerous it is, the sort of trial

16   we've had to endure with the government leaping in speculation

17   and conjecture.  What they have done, and this we argued before

18   in this trial, what they did is they say now that we have 1030

19   in, we think that we should be able to get in these exhibits

20   because we then want to link up in a 40-some-odd-day span the

21   fact that this record shows a Tommy Francis at a dinner or

22   with -- or breakfast with Mr. Fries and Mr. Roberts and

23   Mr. Francis, that suddenly they leapfrog into August the 29th

24   and claim that they should be able to argue to a jury this

25   shows they are in a conspiracy.

1          There is no rebuttal case here.  There is no basis for

2     granting a reconsideration motion.  And with all the arguments

3     we articulated, we would ask the Court stay with its ruling.

4          *THE COURT:*  So in terms of Exhibit 9782, which is the

5     e-mail, that I regard as simply asking for reconsideration, and

6     I have heard no grounds for that and will deny that.

7          In terms of Exhibit 10659, which is the expense

8     report, that is a -- the relevant part of that is the lunch.

9     That lunch occurs on July 19th of 2014.  That's the day before

10    the conference.  And I do agree with Mr. Gillen, it doesn't

11    rebut anything because there wasn't any testimony that at the

12    actual conference, whatever happened at the actual conference

13    whether it might have been time for people to get together

14    doesn't relate to whether you could get together the day

15    before.  Obviously, there is no invitations whatsoever on

16    people being able to get together the day before the

17    conference, so I don't find any purpose for a rebuttal case on

18    that; and as a result, I will not allow that document to be

19    admitted.

20         A couple of real quick things.  We have got to get out

21    of the courthouse because it's past 6:00.  Government's Exhibit

22    955 was admitted, but it hasn't ever been published, so the

23    jury hasn't ever received a limiting instruction on that

24    particular exhibit.  So that's something that may require some

25    clean-up so the Court can give a limiting instruction on that

1    one.

2              Another thing to take a look at, and that is I believe

3    that Government's Exhibit 4, which, of course, is a summary,

4    makes a reference to Exhibit 410-2 which my records do not show

5    as having been admitted, so double-check on that.  I am

6    flagging some issues for everyone to take a look at them.

7              And, Mr. Byrne, did you give the time one to someone,

8    the exhibit?

9         *MR. BYRNE:*  I did to the government.  And I do not

10   have a hard copy of it, but I can get one and bring it

11   tomorrow.

12        *THE COURT:*  That would be fine.  I am just trying to

13   make sure we clean up some loose ends.

14        *MR. BYRNE:*  We would want to, then, I guess, have it

15   published to the jury at some point during our case or maybe on

16   their rebuttal case.

17        *THE COURT:*  Yeah, I think that that would probably be

18   appropriate.  There has been a reference to it.

19              Mr. Tubach?

20        *MR. TUBACH:*  Very briefly, we don't have to finalize

21   it now, but in terms of the length of closings?

22        *THE COURT:*  Yes.  Should we go with the same breakdown

23   as before?

24        *MR. TUBACH:*  I think they should get 30 minutes and we

25   should each get 45.

1      THE COURT:  That was not quite the same breakdown.  As

2  you recall, it was two and a half, 55, and the rest 45.

3      MR. TUBACH:  I am sorry, it was which?

4      THE COURT:  The government had two and a half, as I

5  recall, cumulatively.  The first closing was 55 minutes and the

6  remaining closings were 45.

7      MR. TUBACH:  I think that's right, Your Honor.

8      THE COURT:  That's what I propose that we do for this

9  trial as well.

10      MS. PREWITT:  You meant one and a half, correct, for

11  the government?

12      THE COURT:  No, I thought that the government's was

13  two and a half, yeah.  That includes both of their arguments.

14      MR. KOENIG:  One thing on that issue.  Learning from

15  our experience, it was, I think, in doing rebuttal against 10

16  closings, we would ask for just an additional 10 minutes.  It

17  was pretty tight and I felt like I was an auctioneer.

18      THE COURT:  Well, that just means that your first

19  argument should be shorter by 10 minutes.

20      MR. KOENIG:  I was afraid you were going to say that.

21      THE COURT:  Well, it could have been.

22      MR. KOENIG:  Anyway, could not hurt to try.

23      THE COURT:  Ms. Johnson?

24      MS. JOHNSON:  I am happy to take this up tomorrow, but

25  it involves one of the documents that the government has listed

1    for their rebuttal case.  It's Document 10667.

2         THE COURT:  We won't be able to take that up tonight.

3    I can't get into any substantive things because we really have

4    to leave, but if it's something that needs to come up quick, we

5    could plan on meeting at 8:15 tomorrow.

6         MS. JOHNSON:  I don't want anybody to yell at me,

7    but...

8         THE COURT:  They will.

9         MS. JOHNSON:  That would be fine.  It shouldn't take

10   long at all.  I don't expect it to, but it is on the list for

11   their rebuttal case.

12        THE COURT:  Mr. McLoughlin?

13        MR. McLOUGHLIN:  The government has listed three

14   witnesses, as you know.  Last night they told us those would

15   be -- at 9:00 o'clock those would be the three witnesses.  This

16   morning's witness list, however, has a footnote saying while

17   the government doesn't plan to call any additional witnesses,

18   it reserves the right to to do so, including, but apparently

19   not limited to, Professor Wolak.  So the government has also

20   taken the view that the 48-hour agreement that we get and

21   exchange exhibits 48 hours in advance does not apply to their

22   rebuttal case.  So we are a little blind here, and we would ask

23   the Court, A, to let the --

24        THE COURT:  Let's see if the government intends on

25   calling Professor Wolak.

1          MR. McLOUGHLIN:  Or anybody else.

2          MR. KOENIG:  We do not.  But the other reason for that

3  disclaimer is we don't know if the defendants are going to

4  testify.  And if they do, then maybe we'd have more documents

5  and rebuttal witnesses.  So I don't know if the Court could

6  inquire about that because it seems like about decision time.

7          THE COURT:  I am not going to inquire as to that, but

8  I understand your point.  And obviously, if one or more of the

9  defendants were to testify, that could change things

10  considerably in terms of the government's rebuttal, expected

11  rebuttal case.

12          MR. McLOUGHLIN:  Thank you, Your Honor.

13          MS. CALL:  If I may refer the Court and the parties to

14  a case, because I know they are all working on their closing

15  arguments.  I did want to raise the attacks on the government's

16  investigation that have come up.  And very briefly, I did want

17  to cite the Court to *United States v. McVeigh* in the 10th

18  Circuit, 153 F.3d 1166.  And it kind of provides the standards

19  in the Circuit with respect to when the government's table is

20  even relevant in a case.  And you have to be able to connect a

21  shoddy investigation to the strength of the government's

22  evidence, which, of course, we've heard throughout this trial

23  attacks on the prosecutors, how they pronounce words, whatever

24  it is.  And I just think none of that is going to be proper for

25  closing arguments, including when witnesses were interviewed.

1    And I wanted to cite the parties to that case so they had an

2    opportunity to review it as they are finalizing their

3    arguments.

4         THE COURT:  Okay.  We will be in recess, then, until

5    8:20 because Ms. Johnson's issue is not -- won't take that

6    long, 8:20.  Thank you.

7         (Recess at 6:16 p.m.)

8                               INDEX

9    WITNESSES

10     Edward Snyder

11          Direct Examination Continued By Ms. Pletcher      3572

12          Cross-examination By Mr. Torzilli                 3623

13          Redirect Examination By Ms. Pletcher              3692

14     Brenda Ray

15          Direct Examination By Mr. Fagg                    3703

16          Cross-examination By Mr. Pollack                  3727

17          Cross-examination By Mr. Tubach                   3730

18          Cross-examination By Mr. Koenig                   3745

19          Redirect Examination By Mr. Fagg                  3764

20     Kent Kronauge

21          Direct Examination By Mr. Kornfeld                3770

22

23

24

25

1                           INDEX (Continued)

2                              EXHIBITS

3    Exhibit       Offered    Received   Refused   Reserved   Withdrawn

4    J-211                    3576

5    J-212                    3695

6    J-215                    3596

7    216                      3598

8    J-217                    3600

9    J-218                    3601

10   J-219                    3701

11   A-304                    3791

12   600                      3803

13   843                      3709

14   844                      3709

15   850                      3721

16   851                      3721

17   D-930                    3738

18   D-989                    3715

19   D-990                    3715

20   6034                     3794

21   9700                     3722

22   10677                    3754

23

24

25

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 3rd day of June, 2022.


                        S/Janet M. Coppock