1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

3    Criminal Action No. 20-CR-00152-PAB
     In Re: Penn II
     UNITED STATES OF AMERICA,

4

          Plaintiff,

5

     vs.

6

     JAYSON JEFFREY PENN,

7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,

8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,

9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,

10   WILLIAM WADE LOVETTE,
     GARY BRIAN ROBERTS,

11   RICKIE PATTERSON BLAKE,

12        Defendants

13   _____

              REPORTER'S TRANSCRIPT

14             Trial to Jury, Vol. 17

15   _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:23 a.m., on the 22nd day of March,

19   2022, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | Michael Koenig, Carolyn Sweeney, Heather Call and Paul |
| 3 | Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W., |
| 4 | Washington, DC 20530, appearing for Plaintiff. |
| 5 | Anna Tryon Pletcher and Michael Tubach of |
| 6 | O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, |
| 7 | San Francisco, CA 94111-3823; |
| 8 | Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street |
| 9 | N.W., Washington, DC 20006, appearing for Defendant Penn. |
| 10 | David Beller, Richard Kornfeld and Kelly Page of |
| 11 | Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, |
| 12 | CO 80202, appearing for Defendant Fries. |
| 13 | Bryan B. Lavine of Troutman Pepper Hamilton Sanders, |
| 14 | LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308; |
| 15 | Laura Kuykendall and Megan Rahman of Troutman Pepper |
| 16 | Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219, |
| 17 | appearing for Defendant Brady. |
| 18 | Michael Felberg of Reichman, Jorgensen, Lehman, |
| 19 | Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY |
| 20 | 10017; |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1              APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4   Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7   for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15              PROCEEDINGS

16         *THE COURT:*  20-CR-152.  Jury is not present.  We are

17  going to take up an issue or two.  One thing that I do need as

18  soon as possible are the defendants' statements jury

19  instructions because the government and the Court have to be

20  able to look through those, have enough time to look through

21  those, so that's an important part of being able to get through

22  the jury instruction process expeditiously.

23         Ms. Johnson, go ahead.

24         *MS. JOHNSON:*  Thank you, Your Honor.  I want to

25  apologize to all of my colleagues for having them come early.

1    I have suffered a lot of heat because of that.

2         I briefly wanted to tell the Court in the rebuttal

3    case, the government has given us several exhibits they want to

4    introduce, one of which is 10667.  Your Honor, that's the exact

5    same exhibit as I-337 that has been introduced in redacted form

6    both at the first trial and now at this trial.  Your Honor, it

7    was redacted in the first trial because the government objected

8    to hearsay at the top of the e-mail and it was redacted

9    pursuant to that objection.  In this trial we did the same

10   thing in light of -- in keeping with the previous exhibits

11   looking the same.

12        Now, Your Honor, after the witness has long since left

13   the trial, the government wants to introduce 10667 in its

14   complete form.  To me, Your Honor, we would object to that and

15   ask that they not be allowed to do that mainly because we were

16   prevented from discussing the entire e-mail with the witness

17   while they were on the stand.  If the government did not want

18   it redacted, they certainly could have spoken up at that time.

19   Furthermore they could have cross-examined the witness about

20   that upper part.  So for those reasons, Your Honor, the lack

21   of -- the inability to confront the witness about the entire

22   e-mail, we would ask that it stay in redacted form.

23        *THE COURT:*  Who was the witness?

24        *MS. JOHNSON:*  Rhonda Warble.  And I can cite to the

25   transcripts if need be.

1          *THE COURT:*  Not needed right now.

2          Ms. Call?

3          *MS. CALL:*  Yes, Your Honor.  It's fairly simple.  So

4    this exhibit was used during the testimony of Ms. Warble from

5    George's to discuss a shortage.  The e-mail that was introduced

6    during her testimony was the lower e-mail in the chain from

7    her.  Defendants, of course, cannot, A, introduce their own

8    statements unless it's non-hearsay, so the government objected

9    to the introduction of the top e-mail which Ms. Warble is not

10   on, so there is no necessary need to even cross-examine her

11   about statements by Defendant Brady that were internal at

12   Claxton.

13          Ms. Warble testified generally about shortages going

14   on at this time in 2012, but did not note what customer they

15   were for.  And then upon examining the redacted portion later,

16   the government determined that it was not a Tyson shortage and

17   it was for Popeye's, as Mr. Brady's e-mail at the top makes

18   clear both in the subject line and in the content.

19          This is important to rebut because Ms. Warble was

20   brought on to discuss a shortage occurring in November 14,

21   2012, or I think the day before to rebut the government's

22   evidence about coordination for KFC and text messages regarding

23   KFC pricing and perhaps create the implication that the pricing

24   was discovered through this shortage when, in fact, it could

25   not be because it was a Popeye's shortage, not a KFC shortage,

1    so we think it is an important point to rebut.  Defendant

2    Brady's own statements make that clear, and there is no need to

3    possibly cross-examine Ms. Warble on Mr. Brady's statements.

4         *MS. JOHNSON:*  Your Honor, that's exactly the point.

5    There are three different transactions discussed in this

6    e-mail.  As the Court will note at the very bottom of the first

7    page, the No. 2, it talks about a load that was booked this

8    morning isn't here yet, and then it also talks about a load

9    that they may need to cancel for Thursday.

10        The point of it is there are multiple transactions.

11   The government could have asked Ms. Warble about those multiple

12   transactions.  They are now trying to introduce the top part so

13   as to confront and rebut the witness' testimony that there were

14   other transactions going on the day before, November 13.

15        The government has placed in a call and a text that

16   does involve KFC.  The fact that they did not cross-examine

17   this witness to elicit that testimony, that door has been

18   closed.  And in keeping with the exhibit the way it was

19   introduced in the first and now the second trial, it seems that

20   our case, we are unable to confront and explore even in more

21   detail this e-mail and what Ms. Warble's testimony would have

22   been not about one transaction, but about three, Your Honor.

23        *THE COURT:*  All right.  During the testimony of

24   Ms. Warble, it is true that the defendant couldn't have gotten

25   in Mr. Brady's top e-mail unless it came in through some

1    hearsay exception.  That was not done by anyone.  And the

2    government has the right to introduce the top part of the

3    e-mail because that's a statement of the defendant.  I am not

4    aware of any principle that would keep the prosecution from

5    being able to introduce the top e-mail, so the objection that

6    is being made will be overruled.

7         All right.  How are we looking in terms of our juror

8    numbers?  Do we know?

9         *COURT DEPUTY CLERK:*  We are missing one.

10        *THE COURT:*  Mr. Pollack.

11        *MR. POLLACK:*  I also have an issue with one of the

12   documents the government wants to introduce in the rebuttal

13   case.

14        *THE COURT:*  We can.  We have the time.

15        *MR. POLLACK:*  The government has marked as 10672 an

16   excerpt from the phone records for August 15, 2014.  On

17   Government's Exhibit 10, their summary chart, they have a phone

18   call between Mr. Austin and Mr. Blake on the 18th.  They do not

19   have this call on the 15th because apparently they thought this

20   call was insignificant enough that it didn't belong on their

21   chart.  What they wanted the jury to do is infer that that call

22   on the 18th was about an exchange of bid information even

23   though there was no evidentiary basis for that.  We've now

24   proven that Mr. Blake was on vacation on that day, and

25   Mr. Austin could not possibly have reached Ric Blake at

1    George's main number on the 18th.

2         So what the government wants to do now is they found a

3    44-second call, who knows whether it was an actual call or a

4    voicemail, on the 15th.  And they want to introduce this

5    excerpt and argue it must have been on the 15th they changed

6    pricing information or bid information.  They are simply

7    inviting the jury to speculate in the same way they were

8    inviting the jury to speculate about the 18th and have now been

9    proven wrong.

10        Your Honor, I think both this blow-up of that

11   particular date is irrelevant, it's prejudicial.  It's under

12   401 and 403 it should be excluded.  And the government should

13   not be allowed to argue to the jury to invite them to speculate

14   without any evidentiary basis whatsoever that bid information

15   was exchanged on this 44-second call on the 15th that up until

16   now the government itself hasn't believed has any significance

17   whatsoever.

18        THE COURT:  So Mr. Pollack, I see what's 10672, but

19   what you're displaying right now to the Court on the right, is

20   that one of the summary exhibits?

21        MR. POLLACK:  I don't know, Your Honor.  I am assuming

22   it's 10.  It's Exhibit 10.  And if we go to the next page,

23   there is no entry for a Blake/Austin call on the 15th.  And

24   then if we go to the 18th, we see that call between Roger

25   Austin and George's main number on the 18th when we know

 1   Mr. Blake was on vacation.

 2         *THE COURT:*  Okay.  So what you're objecting to is just

 3   that Exhibit 10672.

 4         *MR. POLLACK:*  At the moment, I am objecting to the

 5   exhibit because I think it's not relevant and it's prejudicial

 6   because the only reason the government wants it is to make an

 7   argument that itself should not be permissible.  Obviously, I

 8   am going to ask that the government -- preclude the government

 9   from making that argument.

10         *THE COURT:*  Okay.  Ms. Call?

11         *MS. CALL:*  So I think Mr. Pollack raised two points,

12   kind of the evidence and the argument.  For the evidence, first

13   off, the phone records are already in evidence in a larger

14   form.  This is a new excerpt pointing to that date.  So as to

15   relevance of the evidence, A, it's already in evidence.  B,

16   there has never been a question that both August 15 and

17   August 18th are very relevant time periods in this round one of

18   bidding for KFC.  Both dates have always been on the

19   government's summary charts.  There has always been calls

20   discussed on those dates.

21         You know, it's been the government's position, I don't

22   think this has changed, that when Defendant Austin did his

23   checking around on August 18, that Defendant Blake is who he

24   was trying to reach at the George's phone line.  So nothing has

25   changed about that, and we introduced Defendant Austin's

1    contact list showing that Defendant Blake is who is in his

2    phone for that number he was calling.

3          What we are now trying to show is he, in fact, did

4    reach Defendant Blake just two days before.  Like I said, I

5    think the argument is entirely proper.  There is nothing

6    prohibiting the government from arguing inferences from the

7    evidence, so I don't think Mr. Pollack's point about

8    prohibiting the government from arguing that Defendant Blake

9    and Austin actually reached each other in that time frame has

10   any law behind it.

11         As to the propriety of introducing this excerpt, I

12   think it will be helpful to the jury.  It rebuts the point that

13   is made in the defendant case about Defendant Blake being on

14   vacation so he couldn't have possibly reached Defendant Austin

15   when they, in fact, spoke the day before Defendant Blake was on

16   vacation.

17         *THE COURT:*  Thank you.

18         Mr. Pollack, anything else?

19         *MR. POLLACK:*  On the first point that all the phone

20   records are already in evidence, I agree, and that's why this

21   excerpt is unnecessary and is prejudicial.  Though the point is

22   to excise this to out to make a particular argument about a

23   particular call, that's not necessary.  It doesn't add anything

24   as an evidentiary basis.  It's simply a vehicle to make an

25   argument.

1          In terms of the permissibility of the argument, the

2    government can argue, of course, reasonable inferences.  What

3    they cannot do is invite the jury to speculate.  And this is

4    exactly that.  This is a 44-second call.  Yes, the government

5    had other calls from August 15 on its chart which emphasizes

6    the point, even the government did not believe that this 15th

7    call had any significance whatsoever.  They don't have any

8    evidentiary basis do say it has any significance, which is why

9    they didn't put it on the chart.  And now, nonetheless, they

10   want to invite the jury to speculate that the purpose of that

11   call was that Roger was checking around three days before he

12   said he was going to check around.  There is simply no basis

13   for it.  It's an invitation to speculate.

14          THE COURT:  So that objection will be overruled.  It

15   is in evidence.  It's appropriate to use an excerpt such as

16   Exhibit 10672 because that's a very, very voluminous document.

17   And while Mr. Pollack is quite right about the reasonable

18   inferences, I think that this is a permissible argument by the

19   government.  It could be that the document showing that the

20   defendant was on vacation is persuasive, but it's not

21   conclusive.  And, you know, all of the arguments that

22   Mr. Pollack just made, you know, once again, those may be

23   persuasive too, but I think that there is at least a reasonable

24   inference that the government can argue, and therefore I will

25   overrule the objection.

1          Ms. Grimm, how are we going?

2          Ms. Call, quickly.

3          *MS. CALL:*  Two logistics points.  First, for closing,

4    we do plan on using boards again like we did last time.  We

5    will have those in the government's witness room by the

6    mid-morning break, and we can bring them out if defense counsel

7    wants to inspect them.

8          *THE COURT:*  Are they different?

9          *MS. CALL:*  They are the summaries that are in evidence

10   this trial.  There is one more that is a kind of time line,

11   which I know Your Honor loves from previously discussing time

12   lines, but there is a time line board as well, so it's

13   summaries and time line.

14         The other thing I did want to inquire about for citing

15   portions of testimony in closing, given that we do not yet have

16   certified transcripts, is it fine to use -- blow up words on a

17   screen, but just without quotation marks?

18         *THE COURT:*  Yes.

19         *MS. CALL:*  That is all I had.  Thank you.

20         *THE COURT:*  Mr. Pollack?

21         *MR. POLLACK:*  I guess can we use it as a quote and

22   argue that's what we recall the testimony being and it's up to

23   the jury without putting in a transcript cite at all?

24         *THE COURT:*  Yeah, you do need to indicate that, you

25   know, that this is your recollection, not official -- you don't

1    have to say it's official, but it's your recollection and it's

2    up to the jury, obviously, to use its own recollection.  But

3    that's okay.  The quote marks I think make it more clear what

4    you're arguing is indeed what was said, so that's okay, but it

5    can't -- you obviously can't suggest, you know, that this is

6    the transcript or something.

7            MR. POLLACK:  Thank you, Your Honor.

8            Mr. Feldberg?

9            MR. FELDBERG:  One short issue.

10           THE COURT:  Go ahead.

11           MR. FELDBERG:  We had attempted to reach a stipulation

12   with counsel for the government on the Verizon phone records to

13   the effect that on the Verizon records the elapsed time shown

14   for a call has been rounded up to the nearest minute and any

15   call less than a minute is listed as a 1-minute call.  At one

16   point, I believe it was docket 1071, we had an agreement on

17   that point.  I think the government may have changed its view

18   and no longer is prepared to stipulate, in which case we will

19   ask the Court to take judicial notice of that fact.

20           THE COURT:  Well, I would need a basis for it.  I have

21   no idea, but let's find out from Ms. Call real quick.

22           MS. CALL:  Yes, Your Honor.  So docket 1071 was an

23   agreement regarding authenticity and 803(6) foundation.  It was

24   brought to our attention and we realized that there were --

25   there was a sentence put in there that interpreted records

1    about Verizon that we hadn't had the opportunity to go back and

2    confirm was correct.  So if we're going to agree to this

3    interpretation of Verizon records, we similarly kind of need a

4    basis, and that just hasn't been given to us, so we can't agree

5    with what has been proposed.

6              THE COURT:  Ms. Henry?

7              MS. HENRY:  The fact of the matter is that docket 1071

8    is an agreement between the defendants and the government, and

9    it explicitly says that they stipulate to this exact language.

10   So there is no issue that there was, and, in fact, I think the

11   Court already took notice of this in its pointing out of it,

12   that there is this, in fact, complete agreement that's on the

13   record, filed, and it is exactly that sentence that is being

14   discussed here, just that one sentence that is in the

15   agreement.

16             THE COURT:  Well, I don't recall that.  You know, a

17   stipulation between the parties that hasn't been presented to

18   the Court would present all sorts of difficult issues about

19   whether or not it really was a stipulation.  Is there an

20   agreement?  That would be a whole side show.  If it's presented

21   to the Court as a stipulation, that may be a different issue.

22   I don't recall.

23             MS. HENRY:  It did specifically say in the filing that

24   was made to the Court stipulates that this is true.

25             THE COURT:  Well, I don't know how to resolve that at

1    this time, but looking to that, if it was presented to the

2    Court as a stipulation, then it sounds like it probably was a

3    stipulation.

4            All right.  Let's bring our witness in and let us

5    bring the jury back in too.

6            We may ask the jury if they want to stay late tonight

7    and tomorrow night.  We won't stay until 6:00, but we might go

8    a little past 5:00.

9            Good morning, ladies and gentlemen.  So I don't know

10   what the schedule is necessarily for today or for tomorrow, but

11   I want you to think about this.  See if there is a possibility,

12   and I tell people we end at 5:00, so if you have plans already,

13   I understand, but if possible, we may -- I would like to know

14   whether you can stay late tonight, not too late, not past

15   6:00 or anything, but maybe a little bit late tonight, same for

16   tomorrow night.  So think about that and --

17           *JUROR:*  Then we get Friday off?

18           *THE COURT:*  Probably not, probably not.  But think

19   about that, all right?  Great.

20           Mr. Kornfeld.

21           *MR. KORNFELD:*  Thank you, Your Honor.

22                    **DIRECT EXAMINATION CONTINUED**

23   *BY MR. KORNFELD:*

24   *Q.*  Mr. Kronauge, good morning.  Welcome back.

25   *A.*  Good morning.

3863

Kent Kronauge - Direct

1   *Q.*  We left off yesterday with you talking about the 2-cent

2   promotion, and I want to revisit that briefly.  But before I

3   do, I just wanted to clean up a couple things I neglected to

4   ask you yesterday.

5           Earlier in your testimony, I asked you various points

6   of contacts at the various companies, and I forgot to ask you

7   who your point of contact was at George's.

8   *A.*  Ric Blake.

9   *Q.*  And did Mr. Blake have pricing authority in your

10  experience?

11          *MR. TORZILLI:*  Objection, foundation.

12          *THE COURT:*  He can answer if he knows.

13  *A.*  He usually pushed it up.  He was involved, but he didn't

14  have the authority.

15  *BY MR. KORNFELD:*

16  *Q.*  Okay.  And I think you testified that Mr. Kantola was your

17  point of contact at Koch.  And same question, in your

18  experience, did Mr. Kantola have pricing authority?

19          *MR. TORZILLI:*  Same objection.

20          *THE COURT:*  Overruled.  He can answer if he knows.

21  *A.*  Same thing.  He usually has to push it up.

22  *BY MR. KORNFELD:*

23  *Q.*  Okay.  Meaning it had to be approved by somebody up the

24  chain?

25  *A.*  Correct.

3864

Kent Kronauge - Direct

1   *Q.*  Now, directing your attention back to the 2-cent promotion,

2   you testified yesterday that that was you, you know, asking the

3   various suppliers to do that and you came up with the 2 cents.

4       If you could please look at Exhibit 609 -- let's do

5   them one at a time since they are on the screen.

6       *MR. KORNFELD:*  So first can we show, please,

7   Exhibit 609 just to -- not to the jury?

8   *BY MR. KORNFELD:*

9   *Q.*  And, sir, please let me know, take your time, but please

10  let me know after you've had a chance to review that document.

11  *A.*  I recognize -- well, the bottom of the e-mail I see is

12  mine.

13  *Q.*  Okay.  And let me ask you to take a look, please, at E-471.

14  *A.*  That's the e-mail from myself.

15  *Q.*  Okay.  And then if you could please look at G-059.

16  *A.*  Another e-mail from myself.

17  *Q.*  Now, do these e-mails from you pertain to the 2-cent

18  promotion?

19  *A.*  Yes, sir.

20  *Q.*  Okay.  How so?

21  *A.*  I had gotten most of the suppliers to agree to the 2 cents,

22  and I was going after the last few companies that still had not

23  agreed to give it to us.

24  *Q.*  Okay.  So let's start, if we could please go back to

25  Government's Exhibit 609 and put that before the witness and

Kent Kronauge - Direct

1    the parties.

2            Sir, what is the date of this e-mail?

3    A.  My e-mail is not on here yet that I can see.

4            MR. TORZILLI:  Objection.  The question is ambiguous.

5    BY MR. KORNFELD:

6    Q.  Well, let me direct your attention to the second page at

7    the bottom.

8    A.  I initiated the e-mail at March 27 at 3:04.

9    Q.  And who did you send the e-mail to?

10   A.  Justin Gay.

11   Q.  And did this pertain to the 2-cent discount?

12   A.  Yes, sir.

13   Q.  And if I understood your testimony from yesterday,

14   e-mailing was among the common ways in which you communicated

15   as part of your job in 2015; is that fair?

16   A.  That's correct.

17   Q.  Do you have personal knowledge, and I am again directing

18   your attention to the bottom part of the e-mail, do you have

19   personal knowledge of the issues you were discussing in the

20   e-mail?

21   A.  I do.

22   Q.  And was that information relied upon you and in this case

23   by Mr. Gay in conducting your regular business activities?

24   A.  Yes.

25           MR. TORZILLI:  Objection to foundation regarding

Kent Kronauge - Direct

1    whether Gay relied on the information.

2            THE COURT:  Overruled.  He can answer if he knows.

3    A.   I mean, yes, we were after the 2-cent discount and we were

4    talking and e-mailing about it.

5            MR. KORNFELD:  Your Honor, at this time I would offer

6    Government's Exhibit 609 into evidence.  I am most focused on

7    the beginning of the e-mail on the second page.  I don't --

8    well, let's see what the government's response is.

9            THE COURT:  Response?

10           MR. TORZILLI:  Objection to all the e-mails in this

11   exhibit coming into evidence except for the very first one, the

12   one that Mr. Kronauge wrote.

13           THE COURT:  Mr. Kornfeld?

14           MR. KORNFELD:  That's fine, Your Honor.

15           THE COURT:  Then you are moving the admission of just

16   that portion of Exhibit 609 that has Mr. Kronauge's initial

17   e-mail?

18           MR. KORNFELD:  Yes, please, Your Honor.

19           THE COURT:  As redacted, any objection by the United

20   States?

21           MR. TORZILLI:  No objection with those redactions.

22           THE COURT:  Then Exhibit 609 as redacted will be

23   admitted.

24           MR. KORNFELD:  May we publish, Your Honor?

25           THE COURT:  You may.

Kent Kronauge - Direct

1    *BY MR. KORNFELD:*

2    *Q.*  Now, sir, could you please read just the body of the

3    e-mail?

4    *A.*  Tyson, George's, Case and Claxton all 2 cents.  I'm waiting

5    on you, Koch and Mar-Jac.

6    *Q.*  Now, who is Mr. Gay, the recipient of this e-mail?

7    *A.*  Justin was my point of contact at Pilgrim's Pride.

8    *Q.*  And what was your purpose in sending this e-mail to Mr. Gay

9    at Pilgrim's?

10   *A.*  I was trying to get all the suppliers onboard with the

11   2-cent discount for our promotion.

12   *Q.*  Did you expect that your e-mail would cause Pilgrim's to

13   act or respond?

14   *A.*  Yes.

15   *Q.*  And did they, in fact, respond to this request?

16   *A.*  Eventually, yes.

17   *Q.*  When you say eventually, did they ultimately offer the

18   2-cent discount?

19   *A.*  Correct.

20        *MR. KORNFELD:*  Now -- you can take that down, thank

21   you.  Now let's look at E-471.

22   *BY MR. KORNFELD:*

23   *Q.*  And let me direct your attention, please, to the top of

24   that e-mail in particular.  What's the date of this e-mail?

25   *A.*  The top one is April 1st at 1:22.

Kent Kronauge - Direct

1    *Q.*   Okay.  And how about your original e-mail below it?

2    *A.*   March 25th at 11:21.

3    *Q.*   And what does this e-mail pertain to?

4    *A.*   The 2-cent discount in September.

5    *Q.*   Okay.  Now, the bottom part is -- who is it from?

6    *A.*   Myself.

7    *Q.*   And are you able to tell who it's to?

8    *A.*   I probably blind-copied all of the suppliers.

9    *Q.*   And why do you say that?

10   *A.*   It was just common practice for me and still is today just

11   so I don't have to write nine or 10 different e-mails.  I will

12   just do one in blank if I'm after the same thing, just send it

13   to all of them.

14   *Q.*   And without testifying about the body of that e-mail, does

15   your review of what you were talking about in that bottom

16   e-mail support your thinking that you sent it to all the

17   suppliers?

18   *A.*   Yes, it is.

19   *Q.*   And again, I am assuming e-mail was a common manner in

20   which you were communicating with your suppliers at this time?

21            *MR. TORZILLI:*  Objection, leading.

22            *THE COURT:*  Sustained.

23   *BY MR. KORNFELD:*

24   *Q.*   What were the various forms that you would communicate with

25   your suppliers in or around March 25th, 2015 about a promotion

1   that you were hoping to get for Popeye's?

2   A.  I would both e-mail and phone call.

3   Q.  Okay.  Do you have personal knowledge of the issues in this

4   Exhibit E-471?

5   A.  Yes, I do.

6   Q.  Was that information relied upon by you and, to your

7   knowledge, by the recipients of this e-mail in conducting your

8   regular business activities?

9   A.  Yes, it was.

10          MR. KORNFELD:  Your Honor, at this time we would offer

11  E-471 into evidence.

12          THE COURT:  Any objection to the admission of E-471?

13          MR. TORZILLI:  No objection.

14          THE COURT:  E-471 will be admitted.

15          MR. KORNFELD:  May we please publish?

16          THE COURT:  Yes.

17  BY MR. KORNFELD:

18  Q.  Now, sir, now that this is before the jury, let me direct

19  your attention to the bottom which is the first e-mail.  And if

20  you could just explain to the jury what was going on here and

21  your purpose in sending this e-mail?

22  A.  We were going to run a discounted bone-in chicken promotion

23  in September.  I had reached out to all the poultry suppliers

24  trying to get a 2-cent discount to help offset the cost to the

25  franchisees.  And I needed all the buy-in from the suppliers in

Kent Kronauge - Direct

1    order to collectively use the promotion so I would not

2    basically have a few franchisees that didn't have the

3    promotion.

4    Q.  Okay.  And how about the top part of the e-mail, who is

5    that to?

6    A.  That was to Pilgrim's Pride, Justin Gay, telling him I had

7    everybody back but them and Koch.

8    Q.  So you are again waiting to hear back if they'll fall in

9    line, so to speak?

10   A.  Correct.

11   Q.  And they did, correct?

12   A.  Yes, sir.

13   Q.  We can take that one down.

14          Let me ask you, please, to look at Exhibit G-059

15   again.  Is the bottom part that same e-mail that you testified

16   a moment ago with blind copying the suppliers?

17   A.  It is.

18   Q.  Okay.  Let me ask you then to look at the part just above

19   it.  What is the date of that e-mail?

20   A.  Both -- the one right above mine is April 1st at 9:17.

21   Q.  And who was that to?

22   A.  Bill Kantola.

23   Q.  And then the one above that?

24   A.  Was Bill's response back on April 1st at 12:22.

25   Q.  Okay.  Again, sir, did you have personal knowledge of the

3871

Kent Kronauge - Direct

1   issues in this e-mail, G-059?

2   *A.*  I did.

3   *Q.*  And would that information be relied upon by both you and

4   in this case Mr. Kantola in the regular course of conducting

5   your business activities with Koch Foods?

6           *MR. TORZILLI:*  Objection, foundation.

7           *THE COURT:*  He can answer if he knows.  Overruled.

8   *A.*  Yes.

9           *MR. KORNFELD:*  Your Honor, at this time I would offer

10  Exhibit G-059 into evidence.

11          *THE COURT:*  Any objection to the admission of G-059?

12          *MR. TORZILLI:*  Yes, Your Honor.  The top e-mail is a

13  hearsay statement by defendant with no hearsay exception.

14          *THE COURT:*  All right.  Response?

15          *MR. KORNFELD:*  Well, Your Honor, I think it has

16  independent legal significance, that top e-mail in response to

17  the middle one.

18          *THE COURT:*  All right.  The objection will be

19  sustained as to the top e-mail.

20          *MR. KORNFELD:*  Okay.  May we publish -- with that

21  redaction, Your Honor, may we publish the rest of the e-mail?

22          *THE COURT:*  Well, let's see whether the government

23  objects to a redacted version of this.

24          *MR. KORNFELD:*  Thank you, Your Honor.

25          *MR. TORZILLI:*  With the redaction to the top e-mail,

Kent Kronauge - Direct

1    the government has no objection to the admission of this

2    exhibit.

3           THE COURT:  Then Exhibit G-059 as redacted will be

4    admitted and that may be published.

5           MR. KORNFELD:  Thank you.

6    BY MR. KORNFELD:

7    Q.  Sir, I will direct your attention to that top e-mail since

8    you have already talked about the bottom e-mail.  What was your

9    purpose in sending that e-mail to Mr. Kantola?

10   A.  I was trying to get him to support our 2-cent discount for

11   September.

12   Q.  And did you expect that this e-mail would cause Koch to act

13   or to respond?

14   A.  I did.

15   Q.  And did Koch Foods ultimately act or respond to your

16   e-mail?

17   A.  Yes.  They responded they would do the discount and did.

18   Q.  Ultimately, did all of the suppliers give you the 2-cent

19   discount that you asked for?

20   A.  They did.

21   Q.  Were you able to run the big box promotion in September of

22   2015?

23   A.  We were.

24   Q.  Do you know approximately how much money -- or this

25   discount saved SMS?

3873

Kent Kronauge - Direct

1    A.  Based roughly on where we are volume-wise, it was probably

2    around $420,000.

3    Q.  Okay.  And now the discount is baked into your contracts?

4    A.  Correct.

5    Q.  I want to pivot and go back to the year 2014 and the

6    negotiations for the 2015 contract, okay?  Let me ask you this.

7    Are you aware or were you aware at the time of the state of the

8    small-bird market during the time frame you were negotiating

9    this contract?

10   A.  Yes, I was.

11   Q.  And can you explain to the jury briefly what the state of

12   the small-bird market was at that time?

13   A.  Basically the small-bird segment, anybody running around a

14   4-pound live weight was underperforming as far as a

15   profitability standpoint compared to the rest of the birds in

16   their industry, anybody running a tray-pack operation or a

17   big-bird operation, so the industry was lagging for those

18   small-bird suppliers comparative to what the rest of the

19   industry was doing.

20   Q.  Did these market conditions impact your expectation of

21   price during these negotiations?

22   A.  It did.

23   Q.  How so?

24   A.  I knew we were going to make some kind of adjustment to try

25   to get the markets more comparable.  You know, we wanted to --

3874

Kent Kronauge - Direct

1    we were losing small-bird facilities that were producing our

2    size bird.  And we knew with our growth and where we needed to

3    be, we needed to, you know, incentivize people to stay in our

4    industry or make it profitable for them to grow our size birds

5    as well.

6    Q.  And how were you going to do that?

7    A.  Well, I mean, we tried to do it with as little financial

8    impact as possible, but we knew we were going to have to pay

9    more for chicken than we were.

10   Q.  Do you recall the initial proposed price increase by the

11   suppliers, the range?

12   A.  I had a couple suppliers we had talked to really probably

13   before the RFP process just trying to gauge it, and originally

14   it was closer to a 20-cent mark increase.

15   Q.  And was that 20-cent increase acceptable to Popeye's?

16   A.  No.

17   Q.  Where did the increase end up?

18   A.  We ended up about 14 cents.

19   Q.  And did you communicate this increase to the various

20   suppliers?

21   A.  So what I ended up doing was going at the suppliers, and we

22   tried to be the first one in and take a stance that, look, we

23   are willing to give a substantial increase, but we wanted

24   across the board everybody at 14.  And, you know, we were

25   trying not to get anywhere up in that 19, 20-cent range, so we

3875

Kent Kronauge - Direct

1    tried -- we decided to take it, you know, the initial hit and

2    try to be in first and let them try to get more from everybody

3    else.

4    Q.   Best defense is a good offense strategy?

5    A.   In this point, yes.

6    Q.   What suppliers did these communications about the 14 cents

7    include?

8    A.   Can you ask that again?

9    Q.   Yeah.  Who did you talk to about the 14-cent increase,

10   which suppliers?

11   A.   It would have been everybody, all of the suppliers that I

12   used at the time.

13   Q.   Okay.  Do you recall communicating this 14-cent increase to

14   Mr. Roberts at Tyson's?

15   A.   I don't have recollection of individual conversations, but

16   it would have been, yes, with Brian for sure while he was at

17   Tyson.

18   Q.   And all of your other points of contacts at the various

19   suppliers that you testified about first thing this morning and

20   yesterday?

21   A.   Yes, probably my points of contact and their -- the people

22   that they reported up to.

23   Q.   May I ask you, please, to look at Government's Exhibit 997

24   and have that displayed for the parties, the witness and the

25   Court?

1          Mr. Kronauge, what is this document?

2    *A.*  Basically had gone back to Tim and asked them to send in

3    the model with the 14-cent increase.

4    *Q.*  And when you say Tim, who are you referring to?

5    *A.*  Tim Mulrenin.

6    *Q.*  And the e-mail at the bottom --

7    *A.*  I am sorry, I just saw Tim's name.  So it looked like I

8    blind-copied everybody in my e-mail saying send in -- after we

9    had made the agreement upon 14-cent increase, I was telling --

10   looks like I blind-copied everybody to do the increase.

11   *Q.*  So if I understand your testimony, you are telling the

12   suppliers bake this 14-cent increase into your models?

13   *A.*  Correct.

14          *MR. TORZILLI:*  Objection, leading.

15          *THE COURT:*  Sustained.

16   *BY MR. KORNFELD:*

17   *Q.*  What was your intention in sending this e-mail to the

18   suppliers without reading the actual -- without quoting to the

19   jury the actual e-mail?

20   *A.*  So we, like I had stated a minute ago, we had heard enough

21   on the supply base to know the increases were substantial.  I

22   probably had verbal agreement with all the suppliers by this

23   that we were going to go with a 14-cent increase, try to be

24   ahead of everybody else and without -- from our point of view,

25   I wanted them to take a higher increase from KFC or whoever

Kent Kronauge - Direct

1   else they needed to to get it.  So I had gone back to the

2   suppliers and said, please submit your 2015 cost plus with your

3   14-cent increase baked into it.

4   Q.  Okay.  And so you have personal knowledge of the issues

5   that you're discussing in this e-mail?

6   A.  I do.

7   Q.  And that information would be relied upon by you and the

8   suppliers in conducting your regular business activities during

9   this time frame?

10  A.  It would.

11          MR. KORNFELD:  Your Honor, at this time I would offer

12  Government's Exhibit 997 into evidence.

13          THE COURT:  Any objection to the admission of

14  Exhibit 997?

15          MR. TORZILLI:  Yes, Your Honor, objection to admission

16  of the top e-mail as hearsay with no exception.

17          MR. KORNFELD:  Your Honor, I don't have any problem

18  with redacting that top e-mail.

19          THE COURT:  Okay.  Mr. Torzilli, with the redaction of

20  the top e-mail, any objection to the admission of Exhibit 997?

21          MR. TORZILLI:  No objection.

22          THE COURT:  Then Exhibit 997 as redacted will be

23  admitted and may be published.

24          MR. KORNFELD:  Thank you, Your Honor.

25  BY MR. KORNFELD:

Kent Kronauge - Direct

1    Q.  Sir, now would you just go ahead and read the body of that

2    e-mail to the jury?

3    A.  Please send me your cost-plus model for 2015 with the

4    14-cent increase.

5    Q.  So just so this is clear, fair to say that you are

6    directing that the 14-cent increase, that that's the amount of

7    increase that all the suppliers should be using?

8    A.  Correct.

9         MR. KORNFELD:  We can take that down, thank you.

10   BY MR. KORNFELD:

11   Q.  Now, when you communicated the 14-cent increase to the

12   suppliers, did any supplier push back?

13   A.  I don't have total recollection back in '14.  I believe

14   there was a couple that were still a little higher.

15   Q.  Okay.  Let me ask you, do you think there would be a

16   document that would refresh your recollection?

17   A.  There could be.

18   Q.  Let me to ask you to take a look, please, at Defense

19   Exhibit I-742.

20        MR. KORNFELD:  If that can please be displayed to the

21   parties, the Court and the witness.

22   BY MR. KORNFELD:

23   Q.  And I will direct your attention -- of course, take your

24   time reading the whole thing, but I will direct your attention

25   to the top of the first page.

Kent Kronauge - Direct

1   A.   I mean, I believe this is part of the back-and-forth with

2   us and Pilgrim's.

3          MR. TORZILLI:   Objection.   The witness was asked

4   whether the document refreshes his recollection and now he is

5   repeating information in the document.

6          THE COURT:   Sustained.

7   BY MR. KORNFELD:

8   Q.   Fair enough.   Sir, I will ask that -- this is one of the

9   quirks of the formalities of the court.   So let me first ask

10  you, does that looking at that document, I-742, refresh your

11  recollection?

12  A.   It does.

13  Q.   And, well, tell me how it refreshes your recollection

14  regarding the communication about the 14-cent increase.

15  A.   It's taken down from here, but from what I read, originally

16  Pilgrim's was one of the ones pushing back on the 14 cents.   I

17  believe they are one of the ones that came in line.   I know

18  they were on the dark-meat piece of it.   So they were just

19  pushing back trying to get a little bit more than the 14 cents

20  and more money on dark meat at the time.

21  Q.   Okay.   Do you recall who at Pilgrim's you were

22  communicating with in that e-mail?

23  A.   Should have been Justin Gay.

24  Q.   And when you received the e-mail from Mr. Gay, did it have

25  an effect on you or cause you to act?

Kent Kronauge - Direct

1   A.   Yeah, I pushed back to get what we were after.

2        MR. KORNFELD:  May we please put that exhibit I-742

3   back in front of the witness, the parties and the Court?

4   BY MR. KORNFELD:

5   Q.   Sir, you have personal knowledge of the issues you are

6   discussing with Mr. Gay and Mr. Gay is discussing with you in

7   that e-mail?

8   A.   I do.

9   Q.   Was that information relied upon you and in this case

10  Mr. Gay of Pilgrim's in conducting your regular business

11  activities in or around September of 2014?

12  A.   It is.

13  Q.   Okay.

14       MR. KORNFELD:  At this time, Your Honor, I would offer

15  into evidence Exhibit I-742.

16       THE COURT:  Any objection to the admission of I-742?

17       MR. TORZILLI:  Objection to the initial e-mail in this

18  chain as hearsay.

19       THE COURT:  I can't see the whole document at the

20  moment.  Mr. Torzilli, you are referring to the e-mail from

21  Mr. Gay?

22       MR. TORZILLI:  Yes.

23       THE COURT:  Response?

24       MR. KORNFELD:  Your Honor, it's not being offered for

25  the truth.  It is being offered for the effect on the listener,

Kent Kronauge - Direct

1   in this case Mr. Kronauge.  Mr. Kronauge just testified that it

2   had an effect on him and caused him to act.

3           THE COURT:  Mr. Torzilli, response?

4           MR. TORZILLI:  We have no objection to Mr. Gay's

5   e-mail coming into evidence for that limited purpose.

6           THE COURT:  Okay.  Then Exhibit I-742 will be

7   admitted.

8           However, ladies and gentlemen, the statement from

9   Mr. Gay can only be considered for the effect on Mr. Kronauge,

10  not for the truth of any matters asserted by Mr. Gay.  I-742

11  will be admitted and may be published.

12          MR. KORNFELD:  Thank you, Your Honor.

13  BY MR. KORNFELD:

14  Q.  Mr. Kronauge, let me first direct your attention to the

15  bottom half of the e-mail.  That is the e-mail from Mr. Gay of

16  Pilgrim's Pride to you.  And there is a lot of numbers in

17  there, but let me try to simplify things by asking you how did

18  you interpret what Mr. Gay was telling you in this e-mail on

19  September 15?

20  A.  I mean, we had agreed to increasing our size range to help

21  put more birds in our availability to pull from, and Justin was

22  saying that they were agreeing to do that.  But then on the

23  other hand, they were trying to go a little bit higher than

24  what we had agreed to on the cost-plus and trying to increase

25  our dark meat by a cent a pound.

Kent Kronauge - Direct

1   Q.  And then let's now take a look at the top part.  I think

2   there is a typo in there, but it starts with, "I'm a little

3   disappointed."  What were you disappointed by?

4   A.  That he was trying to get beyond the 14-cent increase that

5   we had agreed to and the increase in dark meat.

6   Q.  And the bottom of the first paragraph, please read that

7   sentence.

8   A.  I also don't agree with the dark meat.  We keep our

9   percentages lower than the competition and our current price is

10  more than fair based on the new overage.  I don't have all my

11  numbers with me, so I will call you Thursday when I get back to

12  the office.

13  Q.  And let me ask you to also take a look at the last sentence

14  of the first paragraph that begins, "The whole system has

15  agreed."  You see that?

16  A.  The last of the first paragraph?

17  Q.  Yeah, could you read that, please?

18  A.  The whole system has agreed to the flat 14-cent increase

19  and you guys have waited until the end and are going for more.

20  Q.  So at this point in time in September 15, 16, 2014,

21  Pilgrim's wasn't onboard for the 14-cent increase?

22          MR. TORZILLI:  Objection, leading.

23          THE COURT:  Sustained.

24  BY MR. KORNFELD:

25  Q.  Was Pilgrim's onboard for the 14-cent increase on

Kent Kronauge - Direct

1    September 16, 2014?

2    A.   At this point in time, they were not.

3    Q.   And why was it important for you to get them onboard, if it

4    was?

5    A.   Well, we had pretty much had a verbal agreement that that's

6    what the number was going to be.  I wanted the system to try to

7    get everybody what we thought was a fair increase, so we were

8    trying to negotiate to that 14 cents.

9    Q.   And ultimately did all the suppliers, including Pilgrim's,

10   agree to the 14-cent increase you proposed?

11   A.   I want to say not all of them did.  The majority of them

12   did.  Pilgrim's did.

13        MR. KORNFELD:  Okay.  We can take that down.  Thank

14   you very much.

15   BY MR. KORNFELD:

16   Q.   Did the small-bird market change by the time you next

17   negotiated with the suppliers a year later?

18   A.   There was -- we kept trying to nip away at that 14 cents,

19   so I think we definitely helped them get in line with where it

20   needed to be.  I don't have recollection exactly where they

21   were.

22   Q.   Okay.  Fair enough.  Let's fast-forward to talk a little

23   bit more about your negotiations with the suppliers now in 2017

24   for the 2018 contract.  Were you negotiating on behalf of SMS

25   in '17 for the 2018 contract?

Kent Kronauge - Direct

1    *A.*  I was.

2    *Q.*  And how did you kick off these negotiations?

3    *A.*  Probably with an e-mail.

4    *Q.*  Okay.  Let me ask you please to take a look at Government's

5    Exhibit 701 and ask that that be displayed to everybody but the

6    jury, please.

7              Sir, take a look at that e-mail and let me know if you

8    have had a chance to review it.

9    *A.*  That was definitely me sending out the RFP for 2018.

10   *Q.*  And to whom were you sending the RFP?

11   *A.*  To the supply base, all of our suppliers.

12   *Q.*  What's the date of that e-mail?

13   *A.*  8/16 -- October -- I mean, August 16 at 8:16 in the

14   evening.

15             *MR. KORNFELD:*  Your Honor, at this time I would offer

16   Government's Exhibit 701.

17             *THE COURT:*  Any objection to the admission of

18   Exhibit 701?

19             *MR. TORZILLI:*  Your Honor, this e-mail is already in

20   evidence as part of Government's Exhibit 744, so I would object

21   on cumulative grounds.

22             *MR. KORNFELD:*  Your Honor, my apologies.  I wasn't

23   aware of that.  I guess first let's confirm that.

24             *THE COURT:*  That is true.  It is in evidence.  Why

25   don't we pull it up just so you can see what it looks like.

Kent Kronauge - Direct

1          MR. KORNFELD:  Sure.  May I just have a second, Your

2     Honor?

3          THE COURT:  Sure, and just for the attorneys and the

4     Court.

5          MR. KORNFELD:  Your Honor, I think the government is

6     right that 744 subsumes 701, but it also has additional

7     materials.  And for my purposes, all I am really interested in

8     is 701, the "kickoff e-mail." So I would still ask that it be

9     entered into evidence.

10         THE COURT:  All right.  Anything more on that issue,

11    Mr. Torzilli?

12         MR. TORZILLI:  Nothing further.

13         THE COURT:  It is a little bit different.  701 will be

14    admitted.

15         MR. KORNFELD:  Thank you, Your Honor.  May we publish

16    that?

17         THE COURT:  You may.

18    BY MR. KORNFELD:

19    Q.  Now, sir, I want to focus in on one line of this e-mail

20    which is the second sentence of the first paragraph.  If you

21    could please read that out loud.

22    A.  I am aware of what went on with brand X and the fact that

23    the change took place during the current agreement year.

24    Q.  Do you recall who you were -- who brand X is, who you were

25    referring to as brand X?

Kent Kronauge - Direct

1    *A.*   KFC.

2    *Q.*   And what exactly were you aware of as reflected in this

3    e-mail?

4    *A.*   I had heard from a couple different suppliers during that

5    year that Tyson had done a discount to get more volume into

6    KFC, so I didn't know the amount or how much, but I had enough

7    to go on that I was trying to just plant the bug.

8    *Q.*   And why did you reference what you learned about KFC in

9    your e-mail to everybody else or to all of the suppliers?

10   *A.*   Well, I knew there was somebody without volume that Tyson

11   had taken.  And then I wanted also Tyson to know that I knew

12   that they had gone out and lowered their contract with KFC.

13   *Q.*   Did you expect suppliers to provide you with a discount

14   based on them offering a discount to KFC?

15   *A.*   Not solely on that, but at the timing of this contract, I

16   knew I was going to get a discount.

17   *Q.*   And how or why did you know that?

18   *A.*   There was just volume available in that -- leading into

19   that period.  And from my recollection, you know, there was --

20   it was -- the timing was right to get some of that back.

21   *Q.*   And what was the -- when you say some of that back, I'm

22   sorry, what do you mean?

23   *A.*   Just to reduce the price of our bone-in chicken.

24   *Q.*   What was the result of your negotiations in 2017 for the

25   2018, 2019 contract years?

3887

Kent Kronauge - Direct

1   A.  We were able to get a fairly decent discount in price on

2   both '18 and '19.

3        MR. KORNFELD:  We can take down the exhibit.  Thank

4   you very much.

5   BY MR. KORNFELD:

6   Q.  Mr. Kronauge, I just want to just wrap up briefly by

7   talking about your involvement in this investigation.

8        When did you learn about the Indictment in this case?

9   A.  I was called by somebody that had told -- I didn't see the

10  Indictment itself.  I heard that a couple people that I knew

11  were indicted.

12  Q.  And did you learn that some of the allegations related to

13  Popeye's?

14  A.  Later I did, yes.

15  Q.  Did the Department of Justice interview you before the

16  Indictment was handed up by the Grand Jury?

17  A.  No.

18  Q.  Did the Department of Justice interview you prior to your

19  testimony today?

20  A.  Yes.

21  Q.  How many times were you interviewed by DOJ?

22  A.  Just once.

23  Q.  Do you recall when that interview occurred?

24  A.  Not exactly.  It was over a year ago.  I don't recall how

25  long ago.

Kent Kronauge - Direct

1   Q.   Okay.  Where did that interview occur?

2   A.   It was a Zoom meeting.

3   Q.   Do you recall how many folks were there on the Zoom on

4   behalf of the United States?

5          MR. TORZILLI:  Objection, relevance.

6          THE COURT:  Sustained as to vague.  If you could

7   define on behalf.

8   BY MR. KORNFELD:

9   Q.   Okay.  Sir, do you recall how many -- well, do you recall

10  if there were any federal prosecutors on that call?

11  A.   I believe there were.  I don't know how many.

12  Q.   Do you recall whether there were any federal law

13  enforcement agents on that call?

14  A.   There was, but I don't remember how many.

15  Q.   Do you recall whether there were any paralegals or other

16  DOJ personnel on that call?

17  A.   I don't recall.  There was a lot of people.

18  Q.   Okay.  When you say a lot, can you ball park that?

19  A.   No.  I would say somewhere 10ish, you know.

20  Q.   After that interview on November 3rd, 2020, did the

21  government ever interview you again?

22  A.   No, sir.

23  Q.   Okay.  Sir, do you have any personal knowledge of any of

24  the 10 men sitting in this courtroom as defendants being part

25  of an illegal agreement to fix bids or rig prices?

Kent Kronauge - Cross

1   *A.*   What was the first part of that question?

2   *Q.*   Do you have any personal knowledge of any of these 10

3   defendants being part of an illegal agreement to fix bids or

4   rig prices?

5   *A.*   I do not have any personal knowledge of that, no.

6           *MR. KORNFELD:*  Mr. Kronauge, thank you very much.

7           Nothing more, Your Honor.

8           *THE COURT:*  Additional questions?  Ms. Henry?  Or

9   Mr. Pollack?

10                          **CROSS-EXAMINATION**

11   *BY MR. POLLACK:*

12   *Q.*   Good morning, Mr. Kronauge.  My name is Barry Pollack and I

13   represent Ric Blake.  Just a very few questions for you.

14           In your time negotiating with the company George's,

15   did you negotiate with a gentleman named Darrel Keck?

16   *A.*   I did.

17   *Q.*   And when you needed to, did you also talk to Charles

18   George?

19   *A.*   I did.

20   *Q.*   And in later years, did you negotiate with a gentleman

21   named Dean Bradley?

22   *A.*   Yes, somewhat.  I usually went above Dean to Brian.

23   *Q.*   And Brian would be Brian Coan?

24   *A.*   Yes.

25   *Q.*   And that's who you primarily negotiated with in the later

Kent Kronauge - Cross

1    years?

2    A.   Yes.

3         MR. POLLACK:   Thank you.

4         THE COURT:   Thank you, Mr. Pollack.

5         Ms. Henry?

6                        **CROSS-EXAMINATION**

7    BY MS. HENRY:

8    Q.   Good morning.   My name is Roxann Henry and I represent

9    Mr. Bill Kantola.

10        Could you pull up in your binder J-205?

11   A.   J, what was that?

12   Q.   205.

13   A.   Okay.

14   Q.   If you could look through that document, sir.

15   A.   Okay.

16   Q.   Is this an e-mail chain that you relied on in conducting

17   your business activities?

18   A.   Yes, ma'am.

19   Q.   And you would have received this in the ordinary course?

20   A.   Sometimes I would, sometimes I wouldn't.   A lot of times

21   the DC, the distribution centers, would do this around me.

22   This particular DC liked to involve me when they were short.

23   Q.   Understood.   And do you have personal knowledge that you

24   talked about in this e-mail chain?

25   A.   Yes, ma'am.

Kent Kronauge - Cross

1        MS. HENRY:  Your Honor, we would move to admit J-205.

2        THE COURT:  Any objection to the admission of Exhibit

3    J-205?

4        MR. TORZILLI:  Yes.  It's hearsay.

5        THE COURT:  Response?

6        MS. HENRY:  Let me establish a little bit more of a

7    foundation there.

8    BY MS. HENRY:

9    Q.  Was the information that was conveyed to you in this e-mail

10   something that you relied on to take further action?

11   A.  Yes, ma'am.  I was trying to get shortages covered.

12       MS. HENRY:  Your Honor, again I would move to admit

13   J-205.

14       THE COURT:  Response?

15       MR. TORZILLI:  Same objection.

16       THE COURT:  Sustained.

17   BY MS. HENRY:

18   Q.  Mr. Kronauge, were you informed in August of -- 19, 2014 of

19   covers and shorts problems?

20       MR. TORZILLI:  Objection.  The witness is reviewing a

21   document while answering a question, the document not in

22   evidence.

23       THE COURT:  All right.  If we could take the document

24   down.  Otherwise, he can be asked that question.

25   A.  I was -- I am constantly being aware of shortages, so I

3892

Kent Kronauge - Cross

1    don't have a recollection of the exact time and place, but that

2    would be something that would happen quite regularly.

3    BY MS. HENRY:

4    Q.   And in this particular instance in August, did it involve

5    both George's and Koch?

6    A.   It often would involve two suppliers, yes.

7    Q.   And did you, in fact, get in contact with both Mr. Kantola

8    and Mr. Blake regarding the short?

9    A.   If it was involving Koch and George's, I would have gotten

10   both involved, yes.

11   Q.   And you asked them both to try to work it out?

12        MR. TORZILLI:   Objection, leading.

13        THE COURT:   Sustained.

14   BY MS. HENRY:

15   Q.   Would you have contacted both of them?

16        MR. TORZILLI:   Objection, calls for speculation.

17        THE COURT:   He can answer based on his course of

18   conduct.   Overruled.

19   A.   In a big ad or something that was going on, oftentimes I

20   would ask them to work out with themselves what they were going

21   to help cover, you know.   Especially if one of them had

22   something coming up within their system that they knew they

23   were going to be short, I would ask them to work out those

24   shortages among themselves.

25   BY MS. HENRY:

Kent Kronauge - Cross

1    Q.  And in the summer of 2014, supplies were tight, weren't

2    they?

3            MR. TORZILLI:  Objection, leading.

4            THE COURT:  Overruled.

5    A.  Supplies were tight.

6            MS. HENRY:  Thank you very much, sir.  No further

7    questions.

8            Additional questions?

9            Cross-examination, Mr. Torzilli.

10           MR. TORZILLI:  Thank you, Your Honor.

11           May I approach?

12           THE COURT:  Yes, you may.

13           MR. TORZILLI:  A moment to confer, Your Honor?

14           THE COURT:  Sure.

15                          **CROSS-EXAMINATION**

16   BY MR. TORZILLI:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  A few questions for you following up on your direct

20   examination.  First, just a couple of basic points to go back.

21   SMS is a purchasing cooperative, right?

22   A.  Correct.

23   Q.  And you are the president?

24   A.  Yes, sir.

25   Q.  And you serve the operators of the Popeye's restaurants,

Kent Kronauge - Cross

1  right?

2  A.  Yes, sir.

3  Q.  That includes both.  You have corporate-owned stores?

4  A.  We have a few, yes.

5  Q.  And you have franchisees.

6  A.  Correct.

7  Q.  And you serve all of them, correct?

8  A.  Correct.

9  Q.  And it's your job to get them competitively priced

10 products; isn't that right?

11 A.  That's right.

12 Q.  And it's the mission, in fact, of SMS to get competitively

13 priced products, right?

14 A.  Correct.

15 Q.  That includes, of course, competitively priced chicken?

16 A.  Correct.

17 Q.  Which is the most important product to procure for Popeye's

18 restaurants?

19 A.  It's one of the most -- all of them are important, quite

20 frankly, so yes.

21 Q.  Popeye's is basically a chicken format restaurant, correct?

22 A.  That's correct.

23 Q.  And your compensation is tied to delivering cost savings to

24 the operators?

25 A.  My bonus is, yes.

Kent Kronauge - Cross

1    *Q.*  And that includes savings on procuring chicken, right?

2         *MR. KORNFELD:*  Your Honor, I am going to object.  This

3    is beyond the scope.  We didn't go into his cost and bonus

4    structure.

5         *THE COURT:*  Overruled.

6    *BY MR. TORZILLI:*

7    *Q.*  You can answer.

8    *A.*  Yes.

9    *Q.*  Okay.  You were shown some e-mails yesterday afternoon that

10   you wrote to Defendant Brady, and those e-mails included

11   information about the prices of chicken suppliers other than

12   Claxton, right?

13   *A.*  Correct.

14   *Q.*  But in those e-mails you were not providing bids or

15   requests for pricing or negotiation strategy information about

16   those competitors, right?

17   *A.*  That's correct.

18   *Q.*  Rather, you were sharing current or past pricing, right?

19   *A.*  Yeah, I think all of it was current pricing, yes.

20   *Q.*  Current pricing?

21   *A.*  Yes.

22   *Q.*  And there is a difference between current or past pricing

23   and bid or RFP information, correct?

24   *A.*  Correct.

25   *Q.*  Current and past prices are part of contracts that have

Kent Kronauge - Cross

1    already been negotiated, right?

2    A.   Correct.

3    Q.   And the prices have already been agreed to?

4    A.   Yes.

5    Q.   And there are price changes that occur on approximately a

6    monthly basis, right?

7    A.   Price -- yes, they do change monthly.

8    Q.   But that's because the price of feed changes, right?

9    A.   That's correct.

10   Q.   There isn't a separate negotiation between you and the

11   suppliers each and every month, right?

12   A.   No, there is not.

13   Q.   So that's already baked into the contract, right?

14   A.   That's correct.

15   Q.   But RFP information and bid information, that's about a

16   process that hasn't yet led to an agreement or a contract,

17   right?

18   A.   Correct.

19   Q.   So those contract terms are still being negotiated, right?

20   A.   Correct.

21   Q.   So the price is still being negotiated?

22   A.   During an RFP, that's correct.

23   Q.   And volume is still being negotiated, right?

24   A.   That is correct.

25   Q.   And volume is an important aspect of your negotiations with

Kent Kronauge - Cross

1  chicken suppliers, right?

2  A.  Yes.

3  Q.  And prices too?

4  A.  Correct.

5  Q.  When it comes to bids and requests for pricing or RFP, you

6  did not want suppliers calling each other about their bids or

7  RFPs, right?

8  A.  Not about the pricing component of those bids, no.

9          MR. TORZILLI:  If we could call up Government's

10  Exhibit 6034.  This has been received into evidence.

11  Permission to publish, Your Honor.

12  BY MR. TORZILLI:

13  Q.  This is an e-mail you were asked about yesterday afternoon

14  when you were being asked questions on direct exam, correct?

15  A.  Correct.

16          THE COURT:  You may publish it.

17          MR. TORZILLI:  Thank you, Your Honor.

18  BY MR. TORZILLI:

19  Q.  And these are monthly prices, right?

20  A.  Correct.

21  Q.  So a chart -- the first chart is prices for July --

22          MR. KORNFELD:  Your Honor, may we quickly go to side

23  bar?

24          THE COURT:  Yeah.

25      (At the bench:)

Kent Kronauge - Cross

1      THE COURT:  Mr. Kornfeld, go ahead.

2      MR. KORNFELD:  Your Honor, I apologize for

3  interrupting Mr. Torzilli right in the middle of the question.

4  The top part of that exhibit was redacted and it had been

5  displayed.  By the time I popped up, that had been corrected.

6  But I am wondering -- I just want to make the Court aware of

7  that, and I didn't want the jury to see the part that had been

8  redacted.  To the extent that an instruction from the Court

9  would be appropriate here, I would ask for one.

10      THE COURT:  Mr. Torzilli?

11      MR. TORZILLI:  I didn't see the top e-mail be

12  displayed.  I just, when I looked up, I saw the bottom e-mail

13  being displayed, so I am not in a good position to know what,

14  if any, inadvertent disclosure occurred.

15      MR. KORNFELD:  Your Honor, frankly I didn't see it

16  either but some of my colleagues did.  So again by the time I

17  popped up the issue had been corrected, but it was in front of

18  the jury.

19      THE COURT:  Yeah, I saw it briefly too.  Let's not for

20  purposes of the jury, but just so I can see it, can you display

21  the top portion?  Yes, so Mr. Kornfeld, you were talking about

22  that e-mail from Mr. Brady that was not admitted?

23      MR. KORNFELD:  That's right, Your Honor.  And it was

24  the government's request that it be redacted, so I just wanted,

25  obviously, for it to be shown consistent with the Court's

Kent Kronauge - Cross

1 order.

2          THE COURT:  Are you requesting, Mr. Kornfeld, that the

3 jury be instructed to disregard the top e-mail from Mr. Brady

4 to the extent that they saw it?

5          MR. KORNFELD:  Yes, I am, Your Honor.

6          THE COURT:  Mr. Torzilli?

7          MR. TORZILLI:  You know what, Your Honor?  Actually,

8 if we go off side bar, I will just move to admit it, and

9 assuming there is no objection, that might just clear up the

10 issue.

11          THE COURT:  Mr. Kornfeld?

12          MR. KORNFELD:  That's fine on behalf of Mr. Fries,

13 Your Honor.

14          THE COURT:  Then --

15          MR. TUBACH:  This would be limited to 801(d)(2)(A), I

16 suppose.

17          THE COURT:  That's a good point.

18          Mr. Torzilli?

19          MR. TORZILLI:  Sure.  We would be happy to have it

20 admitted as a party admission against Defendant Brady.

21          THE COURT:  Only.  Anyone else?  Thank you.

22      (In open court:)

23          MR. TORZILLI:  I will withdraw the question and at

24 this time offer the top e-mail that appears in Government's

25 Exhibit 6034 as a party admission.

3900

Kent Kronauge - Cross

1          THE COURT:  Okay.  As against Mr. Brady only?

2          MR. TORZILLI:  Yes, sir.

3          THE COURT:  Any objection to the admission of -- in

4    addition to the rest of 6034 which has already been admitted

5    the top portion and e-mail from Mr. Brady?

6          Then the top portion of 6034, that e-mail from

7    Mr. Brady, will be admissible only against Mr. Brady and 6034

8    may be displayed to the jury.

9          MR. TORZILLI:  If we could go down to the original

10   e-mail from Mr. Kronauge.

11   BY MR. TORZILLI:

12   Q.  So Mr. Kronauge, the first chart here reflects prices from

13   July of 2015, correct?

14   A.  Correct.

15   Q.  And next chart is from August -- reflects prices from

16   August 2015, correct?

17   A.  Correct.

18   Q.  And the last chart at the bottom reflects prices that were

19   then current, so September of 2015, correct?

20   A.  Correct.

21   Q.  So in your e-mail there is no bid information, right?

22   A.  Not for an RFP, no.

23   Q.  And no future pricing information.

24   A.  That's correct.

25   Q.  And no information about negotiations, right?

Kent Kronauge - Cross

1   A.   That's correct.

2   Q.   Now, your purpose for sending this e-mail to Defendant

3   Brady was to get him and others in Claxton to lower their

4   price, right?

5   A.   I believe on this point it was more about weight.

6   Q.   To get their weight to be in a more competitive range?

7   A.   Correct.

8   Q.   And so Claxton's weight range was not competitive?

9   A.   It looks like they're higher for those three months.

10  Q.   The subject of the e-mail says "Please don't share except

11  Mikell," and that's a reference to Defendant Fries, right?

12  A.   Yeah.  I was asking Scott not to share except with Mikell.

13  Q.   And you are family friends with Defendant Fries, right?

14  A.   Yes.

15  Q.   And you trusted Defendant Fries and Defendant Brady,

16  correct?

17  A.   Yes.

18  Q.   And didn't think they would share the information contained

19  in Government's Exhibit 6034, correct?

20  A.   Yes.

21  Q.   And you have testified that Defendant Fries wanted Claxton

22  as part of a negotiation strategy typically to be somewhere in

23  the middle on prices, right?

24  A.   That's correct.

25  Q.   And you would give him guidance on where his prices needed

Kent Kronauge - Cross

1  to be in order to be in the middle, correct?

2  A.  Correct.

3  Q.  And as far as you know, he trusted your guidance to get

4  Claxton's prices in the middle, right?

5  A.  I am sure trust, but verify, yes.

6  Q.  But he followed your guidance typically, correct?

7  A.  Yes.

8  Q.  And as far as you know, he didn't think you were ever

9  bluffing when you provided him information to get him in the

10  middle, right?

11  A.  I don't know what he thought.

12       MR. KORNFELD:  Objection, foundation Your Honor

13  foundation as to what Mr. Fries thought.

14       THE COURT:  He indicated he didn't know.  Overruled.

15  A.  I don't know what he thought.

16  BY MR. TORZILLI:

17  Q.  And one last thing before we move off this exhibit, if you

18  can look at the chart for July.

19  A.  Okay.

20  Q.  And for the Claxton row in the first column of numbers it

21  says percentage of volume and then it says 11.59 percent?

22  A.  Yes, sir.

23  Q.  That means Claxton accounted for 11.59 percent of Popeye's

24  volume of chicken?

25  A.  Correct.

Kent Kronauge - Cross

1   *Q.*  So Claxton had an 11.59 percent share of Popeye's

2   purchases?

3   *A.*  Or close to that.  We didn't get those numbers correct

4   every month, but yeah, they were real close to that percent.

5   *Q.*  Okay.  It's accurate as an approximation, though?

6   *A.*  Correct.

7   *Q.*  So they had an 11.59 percent market share of Popeye's

8   business, correct?

9   *A.*  That's correct.

10        *MR. TORZILLI:*  We can put this exhibit aside and go to

11   Defense Exhibit A-304.

12        Permission to publish just the bottom e-mail in this

13   exhibit.

14        *THE COURT:*  You may.

15        *MR. TORZILLI:*  Thank you, Your Honor.

16   BY MR. TORZILLI:

17   *Q.*  You discussed this e-mail with counsel in your direct

18   examination yesterday?

19   *A.*  Yes.

20   *Q.*  And this is an e-mail you wrote to Defendant Brady?

21   *A.*  Correct.

22   *Q.*  And these are current prices as well, right?

23   *A.*  Correct.

24   *Q.*  And current case weights?

25   *A.*  Correct.

3904

1    Q.  And there are no bids here?

2    A.  That's correct.

3    Q.  And no requests for pricing information.

4    A.  That's correct.

5    Q.  Or other RFP information, correct?

6    A.  That's correct.

7         MR. TORZILLI:  All right.  We can take that down.

8    BY MR. TORZILLI:

9    Q.  In the last two e-mails we looked at, you had information

10   about, as we discussed, current prices and current case

11   weights.  Was all that information accurate?

12   A.  I don't recall.  I mean, I could have bluffed at times too,

13   so I don't remember from one time to the other what's accurate

14   or not.

15   Q.  And bluffing is a way to provide inaccurate information,

16   correct?

17   A.  Correct.

18   Q.  And that's something you would do on occasion?

19   A.  If I was trying to drive home a point.  It may not have

20   been in that e-mail, but on something I could have said, you

21   know -- I wasn't beyond not doing that.

22   Q.  So you would sometimes bluff.  And by bluffing sometimes

23   that would mean exaggerate numbers to make a point that you

24   were trying to get across, correct?

25   A.  Correct.

3905

Kent Kronauge - Cross

1  *Q.* All right.  You were asked some questions on direct

2  examination about the bone-in promotion back in 2015, right?

3  *A.* Yes.

4      *MR. TORZILLI:*  If we could call up Government's

5  Exhibit 617 and permission to publish the bottom e-mail.

6      *THE COURT:*  You may.

7  *BY MR. TORZILLI:*

8  *Q.* So up on your screen, Mr. Kronauge, is an e-mail you wrote

9  back on March 25th of 2015, right?

10 *A.* Correct.

11 *Q.* And you blind-copied all the suppliers that you were

12 dealing with at that time, right?

13 *A.* Correct.

14 *Q.* And you were asking them for a discount, right?

15 *A.* Yes.

16 *Q.* Now, in this e-mail you didn't ask for a specific number

17 associated with the discount, right?

18 *A.* Correct.

19 *Q.* But you wanted a discount.

20 *A.* Yes.

21 *Q.* And you wanted the discount in part because of the high

22 prices that Popeye's restaurant operators were paying as a

23 result of the previous annual negotiations, right?

24 *A.* Well, that's what I put in the -- as part of -- I was

25 trying to show some good faith to the franchisees.

3906

Kent Kronauge - Cross

1    Q.  And you are referring to the third sentence in your e-mail

2    that we're looking at here, correct?

3    A.  Correct.

4    Q.  The one that begins on the third line there, "Due to the"?

5    A.  That's correct.

6    Q.  Will you read that sentence for the jury, please.

7    A.  Due to the increase we incurred this year, they are looking

8    at some type of discount to collectively run the promotion in

9    September.

10   Q.  Suppliers weren't contractually obligated at this time to

11   offer a discount.

12   A.  They were not.

13   Q.  You wanted one though, right?  You wanted one?

14   A.  Excuse me?

15   Q.  You wanted a discount though, correct?

16   A.  Correct.

17   Q.  And you wanted that discount to be uniform, right?

18   A.  Yes.

19   Q.  And you talked to -- you said you talked to a few suppliers

20   before sending out this e-mail to gauge what discount level

21   might be reasonable to request?

22   A.  That's correct.

23   Q.  And when you conducted those discussions, they were all

24   with suppliers one on one, correct?

25   A.  That's correct.

Kent Kronauge - Cross

1    *Q.*  To discuss whether they would agree to a discount and the

2    amount of the discount they might agree to, right?

3    *A.*  I am pretty sure I went at them with 2 cents, the ones I

4    talked to ahead of time.

5    *Q.*  So you landed on 2 cents after those discussions?

6    *A.*  Well, no.  I just went at them at 2 cents, trying to get

7    them to do a 2-cent discount.

8    *Q.*  So you started out with 2 cents, and then you tried to

9    gauge whether that would be an acceptable thing.

10   *A.*  Correct.

11        *MR. TORZILLI:*  Let's take a look at Government's

12   Exhibit 609.  If we could look at -- permission to publish only

13   the very first e-mail at 609?

14        *THE COURT:*  You may.

15        *MR. TORZILLI:*  Thank you.

16   BY MR. TORZILLI:

17   *Q.*  You have the very first e-mail of Government's Exhibit 609

18   displayed in front of you, sir?

19   *A.*  Yes, sir.

20   *Q.*  And this is one of the e-mails you were asked about this

21   morning on direct examination, right?

22   *A.*  Correct.

23   *Q.*  And this is an e-mail you wrote to Mr. Gay of Pilgrim's on

24   March 27, 2015?

25   *A.*  That's correct.

Kent Kronauge - Cross

1    Q.  And your purpose for this e-mail was to try to get

2    Pilgrim's to agree to the discount, the 2-cent discount that

3    you wanted, right?

4    A.  That's correct.

5    Q.  And at this point in time Pilgrim's had not yet agreed,

6    correct?

7    A.  That is correct.

8    Q.  But you wanted -- because you wanted the discount and you

9    wanted it to be uniform across all suppliers, you felt the need

10   to send this e-mail to help encourage Mr. Gay to agree to the

11   2 cents, right?

12   A.  That's correct.

13         MR. TORZILLI:  Okay.  We can take this exhibit down.

14   BY MR. TORZILLI:

15   Q.  Sir, I want to ask you about -- you were asked about

16   Popeye's negotiations in -- for annual contracts in both 2014

17   and then in 2017, correct?

18   A.  Correct.

19   Q.  Now, focusing on the 2014 negotiations, you said you

20   ultimately wound up agreeing with suppliers somewhere in the

21   neighborhood of a 14-cent increase, correct?

22   A.  That's correct.

23   Q.  And not necessarily all the suppliers were exactly at 14

24   cents.  You thought maybe there were some that were a little

25   different?

Kent Kronauge - Cross

1    *A.*   I don't have full recollection on where we landed, but I

2    believe there was a couple that were outside that range.

3    *Q.*   No matter where they landed, though, throughout that

4    process you never wanted the suppliers to be collaborating with

5    each other on their prices or their RFPs, right?

6    *A.*   I mean, on that particular proposal would be a one-off is

7    where I was wanting everybody to be at 14, so I think that

8    would be a circumstance where I wouldn't care if they did or

9    not.

10   *Q.*   And you didn't ask them to collaborate, correct?

11   *A.*   Correct.

12   *Q.*   Now, going to 2017, you had a similar situation where you

13   were going into an RFP, right?

14   *A.*   Correct.

15   *Q.*   And the RFP as it turns out turned into a two-year contract

16   situation, right?

17   *A.*   That is correct.

18   *Q.*   And that was atypical for SMS because typically SMS did

19   one-year contracts; is that right?

20   *A.*   We had done two-year contracts before.  It's just if the

21   market was advantageous to do it.  Typically it was a one-year

22   pricing contract, yes.

23   *Q.*   Typically one year, but sometimes you would do two

24   depending on the market conditions?

25   *A.*   Yes.

Kent Kronauge - Cross

1          MR. TORZILLI:  If we could call up Government's

2    Exhibit 7 which has been admitted into evidence.

3          Permission to publish Government's Exhibit 7?

4          THE COURT:  You may.

5          MR. TORZILLI:  Thank you, Your Honor.

6    BY MR. TORZILLI:

7    Q.  The very first entry here is an excerpt of an e-mail we

8    looked at this morning, right?

9    A.  Yes.

10   Q.  And an e-mail you wrote?

11   A.  Correct.

12   Q.  And an e-mail you wrote in the middle of August of 2017,

13   right?

14   A.  Yes.

15   Q.  And this is the e-mail that kicked off the RFP that

16   resulted in a two-year deal that would apply to calendar years

17   2018 and 2019, correct?

18   A.  That is correct.

19   Q.  And I think you testified earlier this morning that by

20   brand X you meant KFC or Kentucky Fried Chicken, right?

21   A.  That is correct.

22   Q.  And had you used that term, brand X, before to convey that

23   you meant KFC?

24   A.  To be honest with you, I don't know.  I don't know why I

25   chose it then.

Kent Kronauge - Cross

1    Q.  You were communicating to your suppliers in this e-mail,

2    right?

3    A.  Correct.

4    Q.  And how did you expect them to know that you meant KFC when

5    you wrote brand X?

6    A.  You know, I just assumed, I guess.  I don't recall.

7    Q.  And you said you had heard from suppliers what had

8    happened --

9    A.  Yes.

10   Q.  -- with KFC.

11   A.  Yes.

12   Q.  And by suppliers, did you mean chicken suppliers that you

13   were dealing with in your capacity at SMS?

14   A.  That's correct.

15   Q.  So suppliers that were dealing with both you and KFC gave

16   word back to you what they had done with KFC?

17   A.  What they had heard had happened with KFC.  I can't

18   remember who I was talking to.  And then I confirmed it with

19   someone else that they had thought they had given a discount to

20   get volume, so that was during the course of that previous

21   year.

22   Q.  But you were providing accurate information as best you

23   knew it about what had happened with KFC, right?

24   A.  Well, I didn't know the amounts or volumes associated with

25   it, but yeah, I thought there was a discount given.

Kent Kronauge - Cross

1   Q.  You thought it was accurate information, correct?

2   A.  Correct.

3   Q.  And then you wrote, I would also like for you to keep that

4   in mind.

5   A.  About the discount?  Yes.

6   Q.  About the discount that you had heard KFC received, and you

7   wanted the suppliers to keep that in mind when submitting their

8   bids or their pricing proposals to you, correct?

9   A.  Correct.

10  Q.  And you asked the suppliers to consider either a -- that

11  they could consider spreading the discount over the course of

12  two years rather than doing it all in one year, correct?

13  A.  Yes.

14  Q.  And you set a deadline for when the proposals needed to

15  come in, correct?

16  A.  Yes, I usually do.

17  Q.  And the deadline you set here was September 5th of 2017,

18  correct?

19  A.  Correct.

20  Q.  Did you know that Mr. Gay and Mr. Pepper and Defendant

21  Brady on that day, the deadline, had calls with each other?

22          MR. KORNFELD:  Objection, Your Honor, foundation.

23          THE COURT:  Sustained.

24  BY MR. TORZILLI:

25  Q.  Did you know?

Kent Kronauge - Cross

1          MR. KORNFELD:  Same objection, same question.

2          THE COURT:  Sustained.

3    BY MR. TORZILLI:

4    Q.  Did you ask Mr. Gay, Mr. Pepper and/or Defendant Brady to

5    have calls on September 5th, 2017, the deadline for when bids

6    were due?

7          MR. KORNFELD:  Objection.

8          THE COURT:  Sustained.

9    BY MR. TORZILLI:

10   Q.  Claxton, George's and Pilgrim's submitted their pricing

11   proposal on the date of the deadline?

12   A.  I don't recall.

13   Q.  Correct?

14   A.  I have no idea.

15   Q.  Tyson didn't, though, right?

16   A.  I have no idea.

17   Q.  Let's look at page 2 of Exhibit 7.

18          And do you see the very first entry on Page 2 of

19   Exhibit 7, Mr. Kronauge?

20   A.  I did not receive your bid?

21   Q.  Yeah.  And you wrote that e-mail to Mr. Pepper, right?

22   A.  Correct.

23   Q.  And that was September 6th of 2017, correct?

24          MR. KORNFELD:  Your Honor, I am going to object.

25   Mr. Torzilli is asking about an e-mail.  This is a summary of

Kent Kronauge - Cross

1    an e-mail in a summary exhibit.  So if he wants to ask the

2    witness about the e-mail, I would ask that the e-mail be put

3    before him rather than the summary of the e-mail that's in a

4    summary.

5        THE COURT:  The objection will be overruled.  He can

6    be asked about e-mails that are summarized on the chart; but,

7    of course, the witness can ask to look at the actual one if he

8    doesn't recall.

9    A.  I don't have recollection of it.  By this, I am assuming I

10   did not receive his bid.

11   BY MR. TORZILLI:

12   Q.  But does looking at this refresh your recollection that you

13   wrote an e-mail to Mr. Pepper on September 6 saying, "I did not

14   receive your bid," right?

15   A.  It doesn't re --

16       MR. TORZILLI:  Okay.  We can take this exhibit down.

17   BY MR. TORZILLI:

18   Q.  Did you ask Mr. Pepper to call Defendant Ric Blake on

19   September 6, 2017 after you wrote an e-mail to Carl Pepper?

20   A.  I do not recall.

21   Q.  And did either of them ever tell you that they had a call

22   on September 6th after you wrote an e-mail to Mr. Pepper about

23   the bid?

24   A.  I don't recall.

25   Q.  You said you eventually arrived at contracts with all of

Kent Kronauge - Cross

1   your suppliers, correct?

2   *A.*   That is correct.

3   *Q.*   And they were all two-year contracts?

4   *A.*   Correct.

5   *Q.*   And they were all with discounts, correct?

6   *A.*   That is correct.

7   *Q.*   And throughout the process of the 2017 bidding and RFP, you

8   did not want the competitors collaborating with each other on

9   their bids or on their pricing proposals, correct?

10  *A.*   That would be correct.

11  *Q.*   And you testified yesterday in response to a question about

12  the RFP process, you said:  I didn't want them discussing

13  pricing, you know, trying to collaborate on a price.

14          Do you remember that testimony that you gave

15  yesterday?

16  *A.*   Yes.

17  *Q.*   Why did you not want competitors discussing pricing and

18  trying to collaborate on a price?

19          *MR. KORNFELD:*  Objection, Your Honor.

20          *THE COURT:*  Overruled.

21  *A.*   I mean, I -- you know, I wouldn't want them to come in as a

22  one solid price.  I would rather have one-on-one conversations

23  trying to bid the price to where it needed to be.

24  *BY MR. TORZILLI:*

25  *Q.*   Because that's better for competition, correct?

Kent Kronauge - Redirect

1    A.  Correct.

2    Q.  And getting competitively-priced products is part of the

3    mission of SMS, correct?

4    A.  Well, yeah, get the product we need at a competitive price,

5    that's correct.

6    Q.  Competitively-priced-products, that's in your mission

7    statement, correct, Mr. Kronauge?

8    A.  Yes.

9          MR. TORZILLI:  Minute to confer?

10        THE COURT:  Yes.

11        MR. TORZILLI:  Nothing further, Your Honor.

12        THE COURT:  Redirect?

13        MR. KORNFELD:  Yes.  May I have a minute, please?

14        THE COURT:  You may.

15                **REDIRECT EXAMINATION**

16    BY MR. KORNFELD:

17    Q.  Mr. Kronauge, I am going to bounce around a little bit

18    because I want to ask you questions to respond to questions on

19    cross-examination, okay?

20         First, you were asked a moment ago about the numbers

21    that suppliers came in on I think -- well, both the

22    '14 contract and the subsequent contract.  Did the suppliers

23    ever come in at one solid price absent your direction?

24    A.  No.

25    Q.  All right.  You were asked a question or you testified that

3917

Kent Kronauge - Redirect

1   you are family friends with Mr. Fries.  Does that change --

2   that personal relationship change your testimony that you gave

3   under oath in this courtroom?

4   A.  Not at all.

5   Q.  Would you -- you still work for SMS, correct?

6   A.  Correct.

7   Q.  I think you were asked the percentage of business that --

8   or the percentage of chicken that Claxton supplies.  Do you

9   recall that on cross-examination?

10  A.  Yes.

11  Q.  Does the fact that Claxton supplies almost 12 percent of

12  the chicken at least in the year that you looked at, does that

13  compromise or change your testimony in this courtroom in any

14  way?

15  A.  No.

16  Q.  You were asked about bluffing.  And is bluffing just

17  something that's part of the industry in your experience?

18  A.  I think both sides do it to get to where they need to be on

19  whatever point -- you know, I don't think it's common everyday

20  practice, but yeah, during certain periods, yes.

21  Q.  And so sometimes, if I understand your testimony, sometimes

22  you were the bluffer, correct?

23  A.  Correct.

24  Q.  Sometimes the bluffee?

25  A.  Yes.

Kent Kronauge - Redirect

1          MR. TORZILLI:  Objection, leading.

2          THE COURT:  Overruled.

3    BY MR. KORNFELD:

4    Q.  I want to ask you about the 2-cent promotion.  Are you

5    aware that the government is accusing these 10 defendants of

6    coming up with the 2-cent increase -- or excuse me, the 2-cent

7    number?

8          MR. TORZILLI:  Objection, relevance and leading.

9          THE COURT:  Sustained.

10   BY MR. KORNFELD:

11   Q.  Sir, at the risk of asking you a question you have already

12   answered, who came up with the amount of the promotional

13   discount?

14         MR. TORZILLI:  Asked and answered.

15         THE COURT:  Overruled.

16   A.  I did.

17   BY MR. KORNFELD:

18   Q.  And what was that amount that you came up with?

19   A.  2 cents.

20   Q.  In terms of the 14 percent increase in the 2014 time frame,

21   who came up with that number?

22         MR. TORZILLI:  Objection to form.  I think counsel

23   means 14 cents rather than 14 percent.

24         MR. KORNFELD:  I do mean that.  Thank you,

25   Mr. Torzilli.

Kent Kronauge - Redirect

1          *THE COURT:*  You can rephrase.

2     *BY MR. KORNFELD:*

3     Q.  The 14-cent increase that you testified about, who came up

4     with that number?

5     A.  I mean, SMS eventually came up with the number to go back

6     at the suppliers at.

7     Q.  And who communicated that 14-cent number to all of the

8     suppliers?

9     A.  I did.

10    Q.  Okay.  You were asked a moment ago about going into a

11    two-year contract term rather than a one-year contract term.

12    Whose idea was it to start contracting for two years rather

13    than one year?

14    A.  I just thought instead of getting a one lump sum one year

15    and then having them come back off the next, I thought I would

16    be better to have two years in a row of a discounted price, so

17    I came up with that.

18    Q.  You were asked about phone calls that occurred on

19    September 5th, 2017.  Do you have knowledge of a cover or short

20    between Claxton and Tyson's on that very day?

21    A.  There is covers, shorts all the time, so I don't have

22    recollection of it.  I wouldn't doubt that there was

23    cover-shorts that day.

24    Q.  Do you have recollection of a cover-short that day between

25    Claxton and Pilgrim's?

1    *A.*  I don't have recollection of it.

2    *Q.*  Okay.  Sir, how many years have you known Mr. Fries?

3    *A.*  Since 2008.

4    *Q.*  And do you have knowledge of his character and his

5    character traits?

6    *A.*  Yes.

7    *Q.*  And what is the basis of that knowledge?

8            *MR. TORZILLI:*  Objection, outside the scope.

9            *THE COURT:*  Response?

10           *MR. KORNFELD:*  Your Honor, I think when the question

11   about the family relationship and the inferences suggested in

12   that question, I think this is fair game under 404(a)(2)(A).

13           *THE COURT:*  Sustained.

14           *MR. KORNFELD:*  Your Honor, may I have one minute?

15           *THE COURT:*  Yes.

16   *BY MR. KORNFELD:*

17   *Q.*  Sir, did any of the questions that you were asked on

18   cross-examination effectively make you rethink your testimony

19   in this case?

20   *A.*  No.

21   *Q.*  Or question what you testified to on direct examination?

22   *A.*  No, sir.

23           *MR. KORNFELD:*  Thank you very much, Mr. Kronauge, for

24   your time and your patience.

25           Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Kornfeld.

2          Mr. Kronauge, you are excused.  Thank you very much.

3          THE WITNESS:  Thank you.

4          MR. BELLER:  Your Honor, if we can side bar, please,

5    for just a moment.

6          THE COURT:  Yes.

7      (At the bench:)

8          MR. BELLER:  Your Honor, I am not anticipating any

9    additional witnesses and I am looking around.  I know that

10   there is some documents that need to be published.  Obviously,

11   the defendants also need to be advised.

12         THE COURT:  What do you mean by defendants need to be

13   advised?

14         MR. BELLER:  Your Honor, regarding the right to

15   testify or not to testify.

16         THE COURT:  Don't do that in federal court.

17         MR. BELLER:  I understand that.  I was talking about

18   the defendants need just a moment.

19         THE COURT:  Like we did last time?  Yes.  Why don't we

20   do this, because we do have a number of documents that -- I

21   think defense exhibits that need to be moved into evidence and

22   then perhaps displayed, and then we've got the break coming up

23   in 10 minutes.  Would perhaps the best way to deal with that is

24   that assuming there are no further witnesses, that we proceed

25   with the introduction of some of those exhibits and then at the

1    break we take maybe half an hour instead of 15 minutes?  Would

2    that work for people?

3         MR. BELLER:  Your Honor, I think that's fine, and I am

4    seeing head nodding.

5         THE COURT:  Mr. Torzilli, any comment on that?

6         MR. TORZILLI:  That's acceptable to the government.

7         THE COURT:  And then after the break we will deal with

8    any more exhibits that we may have, and then presumably the

9    defendants will each rest and then we'll proceed with the

10   rebuttal case, okay?

11        Thank you.

12     (In open court:)

13        THE COURT:  And additional evidence or additional

14   witnesses?

15        Mr. Tubach?

16        MR. TUBACH:  Yes, Your Honor.  I am happy to go

17   through this.  We have a number of documents that we intend to

18   introduce into evidence at this time, and I can go through

19   those documents now.

20        THE COURT:  All right.  One moment, please.

21        Go ahead, Mr. Tubach.

22        MR. TUBACH:  Your Honor, first I will start with

23   Exhibit J-234.  This is the document formalizing the judicial

24   notice regarding soybean meal prices.

25        THE COURT:  Any objection to the admission of Exhibit

1  J-234?

2          MS. CALL:  No, Your Honor.

3          THE COURT:  Exhibit J-234 will be admitted.

4          MR. TUBACH:  We would ask that be published to the

5  jury at this time.

6          THE COURT:  You may.  Okay.

7          MR. TUBACH:  Next, Your Honor, is Exhibit J-229.

8          THE COURT:  Any objection to the admission of Exhibit

9  J-229?

10          MS. CALL:  Can that be displayed, Your Honor?

11          THE COURT:  Yes.

12          MS. CALL:  No, Your Honor.

13          THE COURT:  Exhibit J-229 will be admitted.

14          MR. TUBACH:  Thank you, Your Honor.  If we could

15  publish the top portion of that -- or the e-mail to the jury.

16          THE COURT:  That's fine.

17          MS. CALL:  Your Honor, if the entire e-mail could be

18  shown to the jury.  It's the argumentative portion, the top

19  portion.

20          MR. TUBACH:  I am only interested in publishing the

21  top portion, but I have no objection to the display of the

22  bottom portion if the government wants.

23          THE COURT:  I think we are okay on the top.  We can go

24  to the remainder of the exhibit.

25          MR. TUBACH:  Next we have a series of e-mails and cost

 1   models that we will seek to introduce at this time, but not

 2   publish to the jury.

 3          THE COURT:  Okay, go ahead.

 4          MR. TUBACH:  I will read the list of exhibit numbers

 5   to the Court:  D-137, D-138, D-407, D-408, D-409, D-410, D-146,

 6   D-147, D-148, D-149, D-150, D-151, D-152, D-154, D-157, D-158,

 7   D-159, D-160, D-161, D-162, D-164, D-165, E-545 and E-546.

 8          THE COURT:  Any objection by the government to those

 9   exhibits?

10          MS. CALL:  I believe for the e-mails there is either a

11   limiting instruction or redactions?

12          THE COURT:  Let me double-check on that.

13          MS. CALL:  D-148.

14          THE COURT:  I am sorry, what was that, Ms. Call?

15          MS. CALL:  I believe D-148 had a redaction, and the

16   other e-mails had a limiting instruction not for the truth.

17          THE COURT:  D-148, I am assuming you are moving that

18   as redacted?

19          MR. TUBACH:  Yes, Your Honor, thank you.  I apologize

20   for not mentioning that sooner.  I apologize.  I don't recall

21   the limiting instruction for all of these.

22          THE COURT:  For the two E exhibits, Ms. Call, I am not

23   aware of one.  Maybe you can refresh my memory if there was a

24   limiting instruction associated with them.

25          MS. CALL:  Yes, Your Honor.  I believe 113 of the

 1    transcript at the bottom you have the order on that.

 2         MR. TUBACH:  Your Honor, perhaps what we could do is

 3    resolve this over the break.

 4         THE COURT:  Yeah, I think that there was a limiting

 5    instruction regarding the so-called cover e-mails.  Was that

 6    what you are referring to?

 7         MS. CALL:  Exactly, Your Honor.

 8         THE COURT:  But otherwise no objection by the

 9    government?

10         MS. CALL:  No objection, thank you.

11         THE COURT:  So ladies and gentlemen, the series of

12    exhibits that Mr. Tubach just read off consist of a number of

13    cost models, but also some e-mails transmitting the cost

14    models.  So the e-mails that are transmitting the cost models

15    are to be considered both for the time and the fact of the

16    transmission, but not otherwise for the truth of the matter

17    asserted, all right?

18         MR. TUBACH:  Thank you, Your Honor.  Just two more

19    exhibits.

20         THE COURT:  And let me just rule.  So each of those

21    exhibits will be admitted.

22         MR. TUBACH:  Thank you very much, Your Honor.

23         THE COURT:  Go ahead.

24         MR. TUBACH:  Next up is Defense Exhibit F-459.

25         THE COURT:  Any objection to the admission of F-459?

1           MS. CALL:  One moment, Your Honor.

2           No, Your Honor.

3           THE COURT:  F-459 will be admitted.

4           MR. TUBACH:  Can we publish that to the jury, please?

5           THE COURT:  You may.  And then we'll take the break.

6           MR. TUBACH:  Thank you, Your Honor.  And we can start

7    at the bottom and then scroll up.

8           THE COURT:  All right.

9           MR. TUBACH:  Your Honor, if we could unpublish this

10   for a moment.  Perhaps we could have a side bar.

11      (At the bench:)

12           MR. TUBACH:  Your Honor, I apologize.  I believe the

13   Court had ruled previously that top e-mail from Mr. Sandri was

14   not admissible and should have been redacted, but now I

15   honestly can't remember the end outcome of what that was.

16           THE COURT:  Ms. Call, do you recall?

17           MS. CALL:  I do recall that from the last trial

18   actually.  I am not certain whether it came up yesterday, but I

19   am checking.

20           THE COURT:  Yeah, that last trial it was not, but I am

21   not sure -- I can't recall the ruling yesterday, if any.

22           MR. TUBACH:  And, frankly, whether Mr. Sandri hated

23   Wayne more than Mr. Penn hated Sanderson isn't relevant in any

24   way, so I don't think there is any prejudice in admitting it.

25   I just didn't want to publish something for the jury that

1    hadn't been admitted.

2         *MS. CALL:*  I am looking at the record from yesterday.

3    You indicated F-459 would be admitted for the same reason you

4    indicated last time, so...

5         *THE COURT:*  And Ms. Call, would you then like for the

6    top e-mail to be covered up as it's being displayed to the

7    jury?  And do you want any type of limiting instruction as to

8    the jury having already potentially seen the top e-mail?

9         *MS. CALL:*  Yes, Your Honor, I think that would be

10   appropriate.

11        *THE COURT:*  Okay.  Mr. Tubach?

12        *MR. TUBACH:*  That's fine.  I am happy to redact that

13   top portion.

14        *THE COURT:*  Okay.  Let's redact it and then I will

15   explain that to the jury.  Thank you.

16      (In open court:)

17        Ladies and gentlemen, so the top of that e-mail is now

18   being displayed to you, but as you may notice that the e-mail

19   at the very top is being redacted.  To the extent that you read

20   that e-mail, you should disregard that e-mail.  Otherwise, you

21   can consider the top portion of this particular exhibit.

22        All right.  Ladies and gentlemen, we are going to take

23   the mid-morning break a little bit different in that we are

24   going to reconvene at 10 minutes to 11:00, all right?  So we

25   are going to take half an hour because we have a few other

1    things that we need to do, not that you necessarily need that

2    time, but plan on reconvening 10 minutes to 11:00, all right?

3              The jury will be excused.  Thank you.

4              (Jury excused.)

5              Anything to take up?  We will be in recess.  Thank

6    you.

7         (Recess at 10:21 a.m. until 10:50 a.m.)

8              THE COURT:  Are we ready for the jury?

9              Mr. Feldberg?

10             MR. FELDBERG:  Your Honor, at a time of the Court's

11   convenience, we can clear up this Verizon situation.

12             THE COURT:  I haven't had a chance to look into that.

13   Did you have a chance to look into that, Ms. Call?

14             MS. CALL:  I did not have the opportunity to contact

15   Verizon and confirm the accuracy.

16             THE COURT:  No, here is the deal.  In Docket 1073, I

17   ordered that all parties were governed by that agreement which

18   was Docket No. 1071-1, I think was the agreement, so it does

19   appear that the government stipulated to that.

20             MS. CALL:  Yes, Your Honor.  And the point I was

21   trying to make is it was an agreement on authenticity and

22   803(6).  We obviously have been working diligently during the

23   government's case in chief to have agreed to authenticity of

24   records that the defendants were trying to admit.  I don't

25   think we recognized at the time that they put in

1    interpretations of records into the stipulation.  I understand

2    it's in writing, but I think we still disagree it may not be an

3    accurate statement of fact as to how they interpret the

4    records.

5         THE COURT:  Mr. Feldberg?

6         MR. FELDBERG:  Your Honor, in Docket 1073 Your Honor

7    ordered that all parties to the agreement are governed by

8    1071-1 and 1071-1, which is a stipulation signed by all the

9    parties, provides in pertinent part that phone records are

10   admitted subject to the further stipulation that for all

11   records produced by Verizon the elapsed time shown for a call

12   record has been rounded up to the nearest minute, including

13   that any call less than a minute is listed as a 1-minute call.

14        So that was the stipulation.  Your Honor so ordered

15   it.  That's the state of play.

16        THE COURT:  Right.  I think it was more than just

17   admissibility -- sorry, authentication too, but it was also I

18   think the government stipulated to it being a business record.

19        MS. CALL:  Yes, Your Honor.  Let me state my only

20   concern, and I don't know if any defendants plan on doing this,

21   is that they would argue that a 1-minute call was, in fact, a

22   zero-second call that was never answered because that's what I

23   don't think is correct because the language is a bit broad.

24        THE COURT:  Well, I don't know.  I mean, that's the

25   stipulation.  I think that's been stipulated to, so that should

1    resolve that issue.

2         *MR. FELDBERG:*  As a matter of form, Your Honor, would

3    Your Honor like us to submit something that you could take

4    judicial notice of similar to the soybean meal judicial notice

5    point?  We would like to have something to show to the jury.

6    We are getting it printed right now.

7         *THE COURT:*  Yes, there should be something like that.

8    My practice standards indicate that that is the appropriate way

9    to have a stipulation be placed in front of the jury.

10        *MR. FELDBERG:*  We will send a copy to the government

11   and hopefully get their consent to the form of judicial notice.

12        *THE COURT:*  Right.  Obviously, we'll have to do that

13   pretty quick.  The other thing that could possibly take place

14   is that the admission of it could be moved.  It could come into

15   evidence, and we may not have time to display it, or maybe we

16   have something like Ms. Carwile has where even that could be

17   displayed.  There should be a way to figure this one out.

18        *MR. FELDBERG:*  I am wondering since we are trying to

19   get it printed right now, but it isn't here yet, could we send

20   this by e-mail to the Court and to counsel and see if that

21   would be satisfactory?

22        *THE COURT:*  Yes.  That's fine.

23        *MR. FELDBERG:*  Mr. Brian, may you display, please.  If

24   you could put an exhibit tab on it, please.  I apologize for

25   the delay, Your Honor.

1          THE COURT:  That's all right.

2          MS. CALL:  It may be easier, Mr. Feldberg, I believe

3     Ms. Henry did put an exhibit on it already and that is J-232.

4          MR. FELDBERG:  J-232, thank you.  May I hand up a copy

5     to Ms. Grimm, Your Honor?

6          THE COURT:  Yes.

7          Mr. Tubach.

8          MR. TUBACH:  While we are doing that, I thought we

9     might do something else also.  The government indicated we

10    could look at the charts they had prepared in the back of the

11    room there, in the back of the courtroom.  I was going to

12    suggest that perhaps someone from the government team allow

13    some members of our team to maybe take them into the hall or

14    somewhere to just look at them to see if they are, in fact,

15    accurate.

16         THE COURT:  That's a great idea.  That would be a good

17    way to have a look at those.

18         Mr. Koenig, have you had a chance to look at J-232

19    which is the proposed stipulation?

20         MR. FELDBERG:  Your Honor, we are putting up, I think,

21    the form of judicial notice that we prepared, and here is a

22    copy for counsel, J-232, Your Honor.

23         THE COURT:  If there is a stipulation, we don't need

24    judicial notice.

25         MR. FELDBERG:  Fine.

1        THE COURT:  Mr. Koenig, if you could focus on J-232.

2   Is that in acceptable form?

3        MR. KOENIG:  Yes.

4        THE COURT:  Okay.  And do you want to execute it on

5   behalf of the government?

6        MR. KOENIG:  Sure.  I should change the date to the

7   22nd, I suppose.

8        THE COURT:  Yes.  If you don't mind handing that to

9   Mr. Feldberg and we'll see if that is acceptable.  And then

10  that way we can -- Mr. Fronzaglia can display it.  The only

11  difference would be that Mr. Koenig has signed the original.

12       MR. FELDBERG:  Thank you, Your Honor.  Thank you,

13  counsel.

14       THE COURT:  Okay, great.  Are we ready at this time to

15  bring the jury back in?

16       Mr. Koenig?

17       MR. KOENIG:

18       Before the jury enters, may the Court inquire whether

19  we have more witnesses or --

20       THE COURT:  Well, any witnesses other than the

21  defendants.  I am not going to require the defendants to show

22  their cards at this time, but I don't think so.  I think the

23  reason Mr. Tubach is going through the exhibits is that other

24  than potentially the defendants, so we'll see.

25       Let's bring the jury back in.

1          (Jury present.)

2          THE COURT:  Mr. Tubach, go ahead.

3          MR. TUBACH:  Thank you, Your Honor.  I have just one

4   more exhibit we would like to introduce into evidence and that

5   is Exhibit D-240.

6          THE COURT:  D-240 was it?

7          MR. TUBACH:  Yes, Your Honor.

8          THE COURT:  Any objection to the admission of D-240?

9          MS. CALL:  No, Your Honor.

10         THE COURT:  D-240 will be admitted.

11         MR. TUBACH:  And may we publish?

12         THE COURT:  You may.

13         MR. TUBACH:  Starting at the very bottom, please.

14         Thank you, Your Honor.  Those are all the documents

15  that I had.

16         THE COURT:  Ms. Carwile?

17         MS. CARWILE:  Yes, Your Honor.  Your Honor, may we

18  first move for the admission -- Laura Carwile representing

19  Roger Austin.  On behalf of all the clients, may we first move

20  for the admission of J-232?

21         THE COURT:  Any objection to J-232?

22         MS. CALL:  No.

23         THE COURT:  J-232 will be admitted.

24         MS. CARWILE:  Thank you, Your Honor.  May we publish

25  the pertinent part of the stipulation for the jury?

1           THE COURT:  Yes, you may.  All right.

2           MS. CARWILE:  Next, Your Honor, again on behalf of all

3    clients, I would ask for the admission of the documents listed

4    in Document 1217 filed this morning.  We have provided

5    government counsel with the list which I believe there is no

6    objection, and the pertinent documents are listed on Attachment

7    A, also 1217-1.

8           THE COURT:  I don't have that list, so I don't know --

9           MS. CARWILE:  Would the Court like me to approach with

10   the list?

11          THE COURT:  Yes.  Ms. Grimm can hand that up.

12          MS. CARWILE:  And if the government would like a copy

13   as well, I am happy to provide.

14          MS. CALL:  Sure.

15          THE COURT:  Ms. Carwile, I am not sure how that

16   compares to Docket No. 1197 and also whether or not there are

17   certain documents here that, for instance, Mr. Tubach already

18   moved the admission of.

19          MS. CARWILE:  I can speak to the first point, Your

20   Honor, which is that this list I believe reflects almost

21   identically the list in 1197 except for three documents, I

22   believe, which were the subject -- one was the subject of a

23   discussion yesterday which was edited and I believe --

24          THE COURT:  Which exhibit was that?

25          MS. CARWILE:  It was originally A-054.  Thank you very

1   much, Ms. Call.  The change -- the previous exhibit was listed

2   as A-054.  It is now J-233.  And I have just been informed

3   there is no overlap between the documents on 1217 and

4   Mr. Tubach's admissions.

5           THE COURT:  Okay.  And then it looks like A-187 has a

6   limiting instruction associated with it.

7           MS. CARWILE:  Your Honor, I believe that's true.  And

8   I would note for the Court and counsel that in the right-hand

9   column we've indicated redactions or limiting instructions.  I

10  believe that -- I am just confirming this -- that Your Honor is

11  correct.  The document listed as A-187 is the only one with an

12  actual limiting instruction.

13          THE COURT:  Okay.  And then what about on page 6,

14  Exhibit 1105-1?

15          MS. CARWILE:  I will check that.  My understanding is

16  that's been agreed to, but I can confer briefly with Ms. Call

17  if Your Honor is all right with that.

18          THE COURT:  Right.  We'll find out whether there is an

19  objection to it, but okay.

20          Ms. Call, do you have a copy of the attachment which

21  is the attachment to Docket No. 1217?

22          MS. CALL:  I do, Your Honor.

23          THE COURT:  Okay.  Any objection to the exhibits that

24  are listed in the attachment?

25          MS. CALL:  No, so long as the redaction to the

1    specific pages as indicated on the attachment is what they are.

2        *MS. CARWILE:*  That's our intent, Your Honor.

3        *THE COURT:*  To make the record, I am going to have to

4    read these out.  And also, Ms. Carwile, did you intend to

5    display A-187?

6        *MS. CARWILE:*  Given that it has a limiting

7    instruction, I am happy to do that, Your Honor.

8        *THE COURT:*  Then we should.  We will go back to that.

9        So ladies and gentlemen, bear with me for just a bit

10   because I need to make a record of what's been admitted.  So

11   the Court will admit the following exhibits:  A-114, A-187,

12   A-298, A-299, A-574, A-579, A-580, B-881, B-910, B-950, B-951,

13   B-961, B-980, B-981, C-019, C-460, C-461, C-477, C-481, C-483,

14   C-484, C-862, D-186, D-324, D-325, D-326, D-341, D-530, D-531,

15   D-543 through D-545, D-568, D-568 through D-574, D-580, D-581,

16   D-788, D-835, E-280, E-568 and 569, F-745, F-746, F-751, F-759

17   and 760, F-763, F-777, F-781 and 782, F-786, F-790, F-794,

18   F-798, F-821, F-848, F849, F-881 and 882, F-888 and 889, F-969,

19   F-970, G-424, Exhibit 407, Exhibit 408, Exhibit 413,

20   Exhibit 468, Exhibit 472, Exhibit 4 -- sorry, Exhibit 514,

21   Exhibit 711, Exhibit 749, Exhibit 854, Exhibit 855,

22   Exhibit 1025, Exhibit 1027, Exhibit 1053, Exhibit 1105-1,

23   Exhibit 1129, Exhibit 1243, Exhibit 1402, Exhibit 1590,

24   Exhibit 3053, Exhibit 9701, also H-357 and Exhibit 557, Exhibit

25   H-895, Exhibit H-940, Exhibit H-976, Exhibit I-007 through 009,

1    Exhibit I-229, Exhibit I-712, Exhibit I-713, Exhibit J-039 and

2    40, J-233.

3         So Ms. Carwile, let's go ahead and display at this

4    time that one with a limiting instruction so I can read that

5    limiting instruction to the jury.  That I believe is Exhibit

6    A-187.

7         MS. CARWILE:  Yes, Your Honor.  I believe it is being

8    displayed.  If it may be published.

9         THE COURT:  So ladies and gentlemen, this exhibit may

10   be considered by you only for the purpose of showing the date

11   on which Pilgrim's responded, okay, the date on which Pilgrim's

12   responded.  All right.

13        MS. CARWILE:  That's all, Your Honor.  Thank you.

14        THE COURT:  Thank you.

15        Mr. Byrne.

16        MR. BYRNE:  Thank you, Your Honor.  Your Honor, on

17   behalf of Defendant Little and all of the defendants, I would

18   like to admit or introduce into evidence J-221 which is the

19   subject of an agreement with the government.  It relates to the

20   judicial notice Re: The Coordinated Universal Time or UTC time.

21        THE COURT:  Any objection to the admission of J-221?

22        MS. CALL:  No, Your Honor.

23        THE COURT:  J-221 will be admitted.

24        MR. BYRNE:  Thank you, Your Honor.  Can we have that

25   displayed to the jury?

1          THE COURT:  You may.

2          MR. BYRNE:  And if they can take a little time to

3     review it, that would be great.

4          THE COURT:  Certainly.  Okay.

5          MR. BYRNE:  Thank you very much, Your Honor.  That's

6     it.

7          THE COURT:  Mr. Pollack?

8          MR. POLLACK:  Thank you, Your Honor.  Pursuant to an

9     earlier ruling of the Court, Mr. Blake seeks to admit J-203.

10          THE COURT:  Any objection to the admission of J-203?

11          MS. CALL:  No, Your Honor.

12          THE COURT:  J-203 will be admitted and may be

13     published.

14          MR. POLLACK:  Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Pollack.

16          Additional evidence or witnesses on behalf of any of

17     the defendants?

18          Do the defendants at this time individually rest?

19          MR. BELLER:  Yes, Your Honor.

20          MR. TUBACH:  Yes, Your Honor.

21          THE COURT:  So ladies and gentlemen, what that means

22     is that each of the defendants rests.  So as you may recall

23     from way back at the beginning of the trial, at this time the

24     United States has the opportunity to present rebuttal evidence.

25          Any rebuttal evidence on behalf of the United States,

 1    Ms. Call?

 2              MS. CALL:  Yes, Your Honor, just several documents to

 3    introduce at this time.  The first is Government's Exhibit

 4    10667.

 5              THE COURT:  Any objection to the admission of

 6    Exhibit 10667?  Ms. Johnson?

 7              MS. JOHNSON:  Only Your Honor it's a two-page document

 8    which includes Ms. Warble's signature line.  I don't see that

 9    on 10667.  My bad.

10              THE COURT:  Double-sided copy.

11              MS. JOHNSON:  Double-sided.  Thank you.

12              THE COURT:  Exhibit 10667 will be admitted.  Do you

13    want that displayed?

14              MS. CALL:  Yes, Your Honor.

15              THE COURT:  It may be.  Okay.

16              MS. CALL:  The next is Government's Exhibit 10665.

17              THE COURT:  Do you want to have the jury look at the

18    rest of the --

19              MS. CALL:  I am sorry, Your Honor.  Yes, please.

20              THE COURT:  All right.

21              MS. CALL:  Thank you.  The next exhibit is 10665.

22              THE COURT:  Any objection to the admission of 10665?

23    Exhibit 10665 will be admitted.

24              MS. CALL:  Thank you.  We won't seek to publish that

25    at this time.

1          THE COURT:  All right.

2          MS. CALL:  The next is Government's Exhibit 10666.

3          THE COURT:  Any objection to the admission of

4     Exhibit 10666?

5          MR. LAVINE:  No objection, Your Honor.

6          THE COURT:  That exhibit will be admitted.

7          MS. CALL:  Next is Government's Exhibit 10672.

8          THE COURT:  10672?

9          MS. CALL:  Yes.

10         THE COURT:  Any objection to the admission of

11    Exhibit 10672?  That exhibit will be admitted.

12         MS. CALL:  And I believe the last we are seeking to

13    admit at this time is Government's Exhibit 410-2.

14         THE COURT:  Any objection to the admission of Exhibit

15    410-2?  All right.  410-2 will be admitted.

16         MS. CALL:  And, Your Honor, I believe there is one

17    last document we would seek permission to publish which is

18    Exhibit 955, and I believe it has a limiting instruction.

19         THE COURT:  Yes.  So ladies and gentlemen, on

20    Exhibit 955 there is an e-mail from a person, Lonnie Justice.

21    Mr. Justice's statements may not be considered for their truth,

22    but only for their effect on the listener.  You may display

23    955.

24         MS. CALL:  Thank you.

25         THE COURT:  All right.

1          MS. CALL:  Ms. Pearce, if you could please zoom up in

2     the document.  Thank you.

3          THE COURT:  All right.

4          MS. CALL:  Ms. Pearce, could you please -- thank you,

5     move up.

6          THE COURT:  All right.

7          MS. CALL:  With that, the government will rest its

8     rebuttal.

9          THE COURT:  Thank you.  Then ladies and gentlemen, the

10    evidence in the case has now been completed.  So what will

11    remain, then, is that I am going to read you jury instructions

12    and then after that you'll hear the closing arguments.  The

13    jury instructions, however, we have to finalize.  I can't

14    really finalize them before the evidence has been finalized.

15    And I know that jurors usually think, well, how many

16    instructions can there be?  Actually, a few more than you

17    probably think.  And in any event, we need to all meet

18    together, go over them, then copy them, then give them back to

19    the attorneys, have everyone double-check the changes and then

20    duplicate that entire set again.

21         That physical process, once again, it takes longer

22    than you think, so what I am going to do, I know this is going

23    to be a bit of a long break, but I am going to have you take a

24    very long lunch, come back at 2:30, 2:30 ladies and gentlemen.

25    I can't guarantee that we'll be ready, but just in case, I

1   think we can better use the day then.  So if you come back at

2   2:30 and we, you know, we are not ready until 3:00 or

3   something, you'll understand, but we are getting closer.

4        But closer is not there yet, so even though we are

5   getting closer, keep your yellow juror buttons visible.

6   Remember, you can't deliberate about the case until such time

7   as I have excused you to commence your deliberations.  And also

8   just otherwise don't look up any information.  Your

9   deliberations are based upon the evidence in the case.

10       All the admitted exhibits are going to go back with

11   you to the jury room when it is -- once you commence your

12   deliberations so you'll have that information available for

13   your deliberations, all right?  So we'll be in recess -- well,

14   I will have you come back at 2:30 and hopefully we will be

15   ready as soon as possible after that.  Ladies and gentlemen,

16   you are excused.

17       (Jury excused.)

18       While I think of it, let me just mention the

19   following, and that is as we did last time, Ms. Grimm is going

20   to print out a list of all the exhibits that we show as having

21   been admitted, so she is not going to have that right away, but

22   at some point she will.  And if you don't mind looking that

23   over so we can make the record that way as opposed to me

24   reading out a very long list of things for you to double-check.

25       Mr. Gillen?

1          MR. GILLEN:  Would it be the appropriate time to renew

2     our Rule 29 motions?

3          THE COURT:  That's our next order of business, but I

4     did want to mention that one thing while I thought of it.

5          Okay.  So yes, now is the time, then.  Whatever record

6     the defendants want to make about renewing their Rule 29

7     motions, we can do that.  Why don't we go in order.

8          On behalf of Mr. Penn?

9          MR. TUBACH:  Yes, Your Honor, Mr. Penn renews his

10    Rule 29 motion and believes that the evidence taken in the

11    light most favorable to the government fails to establish that

12    Mr. Penn committed the crime with which he is charged.

13         THE COURT:  Thank you.

14         On behalf of Mr. Fries?

15         MR. BELLER:  Thank you, Your Honor.  And Judge, I

16    won't make a lengthy record other than to say Mr. Fries also

17    renews its earlier request for the Court to grant a Rule 29

18    motion at this time.

19         Your Honor, I would also ask considering that we filed

20    Rule 29s last night, that to the extent the Court will allow us

21    to supplement that Rule 29 with additional information that

22    came out of the defense case, but nonetheless, we would ask for

23    the 29 to be granted.  Thank you.

24         THE COURT:  Yes, and the request to supplement will be

25    granted as to each of the defendants if that defendant wishes

1    the opportunity to do so.  Maybe we should talk about a

2    deadline by which that would occur.

3            How soon do people think they may be able to file any

4    supplements?  I realize that may take a little bit of

5    discussion.

6            MR. BELLER:  Your Honor, would the Court allow this

7    coming Monday?

8            THE COURT:  Any objection by the United States?  The

9    question would then be whether the government can respond to

10   both in one and, if so, how much extra time the government

11   needs.  But as long as the government doesn't have an objection

12   to that, Monday sounds fine since we have a few other things to

13   take care of.

14           MS. CALL:  Yes, Your Honor.  If the defense are

15   supplementing Monday the 28th, I think the government would

16   seek the following Monday, March 4th, to file a response to

17   both the initial and the supplemental.

18           THE COURT:  Any objection to that?

19           MR. BELLER:  Your Honor, I certainly don't have a

20   problem with that, and I am seeing anyone else jump up.

21           THE COURT:  That will be our revised schedule, then.

22           MS. CALL:  Just to clarify the record, I believe I

23   said March 4th which is obviously in the past.  I meant

24   April 4th.

25           THE COURT:  Yes, good clarification.  I lost track of

 1  time, but yes, April 4th, okay.

 2       On behalf of Mr. Brady?

 3       *MR. LAVINE:*  Yes, Your Honor.  On behalf of Mr. Brady,

 4  we renew our motion for Rule 29 as previously filed.

 5       *THE COURT:*  Thank you.

 6       *MR. LAVINE:*  Thank you.

 7       *THE COURT:*  On behalf of Mr. Austin?

 8       *MR. FELDBERG:*  Thank you, Your Honor.  On behalf of

 9  Mr. Austin, we renew our motion under Rule 29 of the Federal

10  Rules of Criminal Procedure for judgment of acquittal.

11       *THE COURT:*  Thank you.

12       On behalf of Mr. Mulrenin?

13       *MS. PREWITT:*  Thank you, Your Honor.  On behalf of

14  Mr. Mulrenin, we would like to renew our motion pursuant to

15  Rule 29.

16       *THE COURT:*  Thank you.

17       On behalf of Mr. Kantola?  Ms. Henry, unless you want

18  the exercise, you can do it from there.

19       *MS. HENRY:*  Thank you, Your Honor.  On behalf of

20  Defendant Kantola, we renew our motion under Rule 29 for a

21  judgment of acquittal.  Thank you.

22       *THE COURT:*  Thank you.

23       On behalf of Mr. Little?

24       *MR. BYRNE:*  Yes, Your Honor.  On behalf of Mr. Little,

25  we also renew our motion for Rule 29, thank you.

1          THE COURT:  Thank you.

2          On behalf of Mr. Lovette?

3          MR. FAGG:  Thank you, Your Honor.  On behalf of

4    Mr. Lovette, we renew our motion for a judgment of acquittal

5    under Rule 29.

6          THE COURT:  Thank you.  On behalf of Mr. Roberts?

7          MR. GILLEN:  Your Honor, on behalf of Mr. Roberts we

8    would renew our Rule 29 motion and we'll file a supplemental

9    brief with the Court's permission on Monday.

10          THE COURT:  Thank you.

11          And on behalf of Mr. Blake?

12          MR. POLLACK:  Thank you, Your Honor.  Mr. Blake with

13    the close of all evidence renews his Rule 29 motion for a

14    judgment of acquittal, and we will supplement in writing

15    according to the Court's schedule.

16          THE COURT:  Thank you.

17          Then any other issues that we need to take up at this

18    time before we talk about jury instructions?

19          Mr. Byrne?

20          MR. BYRNE:  Not before we talk about jury

21    instructions.  I was going to say if we were going to talk

22    about jury instructions, can the clients leave if they want to?

23          THE COURT:  Yes, because this -- we are going to

24    obviously have to talk about the jury instructions again once I

25    have an opportunity to print out the changes, but I will give

1    permission to the defendants if they do not wish to be here for

2    this part of it, that they are excused.  They can, of course,

3    stay if they wish.

4         MR. BYRNE:  Thank you very much.

5         MR. GILLEN:  Your Honor, in terms of the defendants'

6    theory of the case --

7         THE COURT:  Yes.

8         MR. GILLEN:  -- we had previously filed a theory of

9    the case, obviously, in the last case.  We have slightly -- for

10   the Roberts team, we have slightly altered our theory of the

11   defense and we should be filing that, if it's not already

12   filed, it should be filed very shortly.  We have already

13   written it and Mr. Lake will be filing it on the record so the

14   Court can have that prior to the discussions about jury

15   instructions.

16        THE COURT:  Right.  That, as I said before at the

17   beginning of the day, that's very important because I think

18   that that -- that's the one thing we don't really have yet, but

19   which I will need take a look at, but that can hold us up a

20   little bit.

21        Mr. Tubach?

22        MR. TUBACH:  Just in terms of logistics, does the

23   Court wish us to file the theory of the case?  We have files

24   here we can circulate.

25        THE COURT:  They don't have to be filed at all.  As

1    long as there is enough copies to circulate so the government

2    has a copy, the Court has a copy.

3         Ms. Prewitt, did you have anything else?

4         *MS. PREWITT:*  No, Your Honor.  I was just saying we

5    made some slight changes as well, thank you.

6         *THE COURT:*  And I assume that.  I am assuming that

7    that may be true for each defendant, but we'll -- because I am

8    assuming that, I also am not assuming that the previous theory

9    of the case is going to be used; so as a result, we will need

10   to take a look at that.

11        Okay.  Yes, Mr. Koenig?

12        *MR. KOENIG:*  Can I just get a little clarification on

13   the supplements to the Rule 29?  Are the briefs going to be

14   refiled and supplemented or is it just here is three pages to

15   tack on and will it be limited to evidence that came in today

16   only?

17        *THE COURT:*  Well, I assume the latter.  The supplement

18   would be for evidence that came in after the close of the

19   government's case.

20        *MR. KOENIG:*  It wouldn't be another 30-page brief or

21   whatever it is.

22        *THE COURT:*  Well, I don't know, but once again, the

23   only thing that would be relevant to a supplement would be

24   evidence that came in after the close of the government's case.

25        *MR. KOENIG:*  So we may rely on the filed briefs

1    yesterday and they won't be rewritten to include the supplement

2    or something.

3              THE COURT:  Well, I don't know, but we'll see.

4              MR. KOENIG:  All right.  Thank you.

5              THE COURT:  Mr. Pollack?

6              MR. POLLACK:  I will just note the Court will have two

7    different decisions in front of it, one based on the

8    government's case in chief, which is the motion that's already

9    been filed, and then two, based on the totality of the

10   evidence.  And those motions have to be considered at those

11   points in time so we may reference issues from the government's

12   case as they relate to things that came in after the close of

13   the government's case, but obviously the supplement is geared

14   towards why given the totality of the evidence the conviction

15   can't stand as opposed to the earlier motion which was purely

16   based on evidence introduced in the government's case in chief.

17             THE COURT:  That's exactly right.  The Court was

18   considering two different standards in a sense.  There may be

19   references back.  There may be reiterations, I don't know, but

20   because of the different standard and different evidence, the

21   supplements will presumably take all of that into account.

22             Ms. Call?

23             MS. CALL:  If I may, Your Honor, I think understanding

24   perhaps now the potential length of the supplements, that the

25   government may be responding to 300 pages of briefing, could we

1    request perhaps until March 8th, the end of that following

2    week?

3            THE COURT:  April 8th?

4            MS. CALL:  April 8th, thank you.

5            THE COURT:  Any objection to that?  Okay.  Yes, the

6    government may have that.

7            MS. CALL:  Thank you.

8            THE COURT:  And I am obviously going to take the Rule

9    29 motions that were filed yesterday, I am going to take those

10   under advisement.

11           Okay.  Let us -- we have essentially two sets of

12   proposed changes putting aside the fact that we don't have the

13   theories of the case instructions yet.  So first of all, let us

14   take up Docket No. 1204.  These are the government's proposed

15   changes to certain instructions.  And first of all, I want to

16   keep this efficient.  So first proposed change is to

17   instruction No. 10.  The defendants have proposed a change to

18   this instruction as well to include Mr. Pepper.  I think that

19   the defendants' proposed change in terms of referring to their,

20   the plural, is a better change.

21           The government also suggests adding a sentence that

22   talks about their testimony alone, if believed by the jury, may

23   be of sufficient weight to sustain that a conspiracy existed

24   even though it is not corroborated or supported by the other

25   evidence.  I am going to reject that particular revision to the

3951

1    instruction, so that sentence I just read I am not going to

2    include, partly because Mr. Bryant, of course, his testimony

3    didn't include information about each of the defendants.  And

4    in terms of Mr. Pepper, there is going to be a lot of argument

5    my guess is as to whether Mr. Pepper actually testified about

6    the existence of an agreement if all.

7        So I don't believe -- I think that that is potentially

8    misleading.  I will not include that.  But any objections to a

9    revision to instruction No. 10 that includes the way the

10   defendants have proposed phrasing the instruction?

11       Ms. Cheng?

12       MS. CHENG:  Your Honor, we don't oppose the way that

13   the defendants have edited instead of using "each" using

14   "their."  I only wanted to point out and I understand Your

15   Honor has ruled on this, but the reason we specified a

16   conspiracy existed is that it really goes just to the first

17   element of whether there was, in fact, a conspiracy precisely

18   to address the Court's concerns that perhaps there is no

19   testimony about knowing joinder as to every single defendant

20   from these two co-conspirators.  And for that reason and based

21   on the Court's ruling and order on the Rule 29 motions, we

22   wanted to focus in particular on the first element so that

23   there is no confusion about it.  I just wanted to clarify that

24   for the Court.

25       THE COURT:  All right.  Anything else on instruction

1    No. 10?

2         Let's go to the government's proposed amendment to

3    instruction No. 15.  These numbers, by the way, all refer to

4    the numbers in the instructions that were given in the last

5    trial.  Why don't I hear from the defendants on that if there

6    is a response on that one, first of all.

7         Ms. Henry -- or Ms. Pletcher?

8         MS. PLETCHER:  Thank you, Your Honor.  We would oppose

9    any revision to this instruction.  The Court declined to adopt

10   a similar instruction to the language the government now

11   proposes in the first trial.  And in fact, in the first trial

12   the government actually conceded that it was comfortable with

13   the instruction as written.  So I don't believe they provided

14   any justification for a change in circumstances that would

15   support changing this instruction.

16        The 10th Circuit pattern instruction is very clear,

17   and again I don't see that there is any change in circumstances

18   that would merit adding additional language that could

19   potentially be confusing.

20        THE COURT:  All right.

21        Ms. Cheng?

22        MS. CHENG:  Thanks, Your Honor.  I can point to

23   several changed circumstances.  The first is that we received a

24   jury note asking whether the conspiracy had to, quote, occur

25   throughout the entire time frame.  They asked this in response

3953

1    to existing instructions which I think caused some confusion

2    about whether a narrower conspiracy found within the time frame

3    needed to span the entirety of the period from 2012 to 2019.

4        Our concern is that as written, it leaves no jury to

5    find a conspiracy found in, say, 2014 to 2018.  And we also saw

6    a lot of attorney argument during the last trial and during

7    closing statements that the government needed to prove

8    precisely an eight-year conspiracy, but we know that that is

9    not the case from a lot of the case law.

10       And I will give just one example, and we have briefed

11   this also in ECF-1030, but in *United States v. Ailsworth*,

12   138 F.3d 843, the government charged a conspiracy spanning one

13   year and the jury found the defendant participated in the

14   conspiracy on only a single day within that one year time

15   frame.  And the Court held that there was -- the Court upheld

16   the conviction because the defendant had sufficient notice and

17   the conspiracy was still fully included within the Indictment.

18       So we are on sound ground to include this additional

19   sentence here.  And this sentence just clarifies that there is

20   no requirement that the conspiracy needs to span the entire

21   time period as long as it's fully contained within the time

22   frame that's specified.  So as long as the jury finds something

23   within 2014 to 2019 or 2015 to 2016, that would be sufficient

24   because that is narrowly contained and that's very clear under

25   existing 10th Circuit precedent.

1          THE COURT:  Thank you.

2          Ms. Pletcher, anything else?  And then I will hear

3     from Ms. Henry.

4          MS. PLETCHER:  Thank you, Your Honor, yes.

5          First of all, the jury note that came out at the last

6     trial was with respect to venue, which is an entirely different

7     instruction.  And it's just pure speculation that a different

8     jury in a different trial would be confused about a different

9     instruction.

10         Secondly, the government has chosen to charge a

11    conspiracy from 2012 to 2019.  That is a conspiracy that they

12    must prove in order to gain a conviction.  If the government

13    fails to prove the conspiracy as charged, it cannot gain a

14    conviction.  So what the government is trying to do by

15    inserting this language here is actually changing their burden

16    to prove what was charged.  And the law is clear that they

17    cannot do that.

18         It may be the case, it's true, that the government

19    can -- or that the jury can find that a smaller conspiracy

20    contained within the larger charged conspiracy was proven, but

21    to put that into an instruction saying that the jury can

22    actively do that is not correct.  The law shows that if that

23    happens and there is no -- there is no variance, then a

24    conviction could be sustained, but that is not the law with

25    respect to what the jury -- what the government must prove at

1    the outset.   What the government must prove is the conspiracy

2    as charged.

3              *THE COURT:*   Thank you.

4              Ms. Henry?

5              *MS. HENRY:*   Your Honor, this is an instruction that

6    says the Indictment charges.   There is no basis for a

7    constructive amendment of the Indictment and the government has

8    not offered any.   The concept that there was a juror note at

9    the past trial does not suggest any basis for a constructive

10   amendment of the Indictment.

11             And as with regard to the law, the *Ailsworth* case,

12   which I will be happy to hand up a copy if you would like,

13   basically did find a variance, but then it went on to discuss

14   whether or not there was prejudice from that variance.   Again,

15   *Portela* case, they found evidence to sustain the single

16   conspiracy conviction.   *Coughlin* and *Hindman* are both mail

17   fraud cases and they stand for the proposition that when an

18   Indictment charges counts of mail fraud, the appropriate

19   element that has to be decided is whether or not there was a

20   scheme to defraud at the time of the mailings.   And that's

21   what's critical in a mail fraud case.   The *Urethane* case, it's

22   a civil case.   It really doesn't say anything about what an

23   Indictment charges or doesn't charge.   We would be happy to

24   address anything further.

25             *THE COURT:*   Thank you.

1          Ms. Cheng?

2          Mr. McLoughlin had a point.  Go ahead.

3          *MR. McLOUGHLIN:*  Your Honor, to Ms. Henry's point*,*
4    *Ailsworth* is irrelevant and not on point for a variety of
5    reasons.  The Court there, as Ms. Henry noted, found a
6    variance, but found that it was not fatal for a complex set of
7    reasons, including the fact that the defendant had been
8    convicted by the jury of several underlying substantive
9    offenses in connection with the sale of cocaine, the alleged
10   conspiracy, including three separate conspiracy counts over a
11   lengthy period of time with respect to that.

12         So the argument that *Ailsworth* with respect to --
13   permits a jury instruction given the particular facts of that
14   case simply does not work.  So we would respectfully suggest
15   *Ailsworth* is irrelevant.

16         *THE COURT:*  All right.  Ms. Cheng?

17         *MS. CHENG:*  Thank you, Your Honor.

18         I wanted to address first the point on the jury note.
19   It's true that they asked it specific to the venue instruction,
20   but the defendants then took the position when we were in
21   colloquy about this particular instruction that it applies to
22   all instructions throughout all of the jury instructions packet
23   anytime there was a mention of this time duration.  And you can
24   see, too, from the way that the jury asked the question, it was
25   not specific to venue.  It was a question about the time frame.

1    And therefore, we do think that that is a changed circumstance

2    that warrants our clarifying it this round so that there is not

3    a chance that this confusion can be repeated.

4         With regard to the case law, the defendants are trying

5    to differentiate *Ailsworth* here, but I want to first point

6    perhaps to *United States v. Coughlin*, which is a D.C. Circuit

7    case from 2010 that's a 610 F.3d 89, collecting cases including

8    *Ailsworth* for this proposition, which is that the fact that the

9    Indictment charged a scheme lasting from 2003 through 2004 did

10   not prevent the government from attempting to prove narrower

11   schemes of different temporal durations during that period.  So

12   *Ailsworth* itself was cited in a string cite along with three

13   other circuits for the very proposition that the defendants say

14   that it doesn't stand for now.

15        And I will point the Court as well to one more case

16   from the First Circuit which is *United States v. Portela*, and

17   that's at 167 F.3d 687.  And there the defendants argued that

18   the district court has somehow worked a constructive amendment

19   by changing the jury instruction that the government had

20   proposed to shorten the period, so the government had initially

21   charged a conspiracy spanning through 1996, and the Court

22   itself decided to reduce the period in the instruction that

23   went to the jury by one year so that it ended in 1995.

24        And the First Circuit was very unequivocal when it

25   rejected the defendants' argument that this were some type of

1    constructive amendment.  The First Circuit said, while the

2    Court's limitation effectively altered language in Count One,

3    it narrowed the offense charged rather than broadening it.  The

4    instruction limited the conspiracy to a scheme narrower than

5    though included within the scheme alleged, and therefore that

6    instruction was upheld as it should be here.

7              THE COURT:  All right.  Mr. McLoughlin?

8              MR. McLOUGHLIN:  Yes, Your Honor.  Pointedly, *Coughlin*

9    is a double jeopardy case which really should have no

10   application to the jury instructions here.

11             I would just note if the jury instruction proposed by

12   the government is read literally to the extent it says that as

13   long as it is fully contained within the period charged, it is

14   sufficient, a claim by the government that the conspiracy

15   instead of lasting eight years lasted a single day is

16   sufficient as written because it is so long as fully contained

17   within the time period charged which is 2012 to 2019.  A single

18   day is fully contained within that period.

19             So under the government's language, I think there can

20   be no doubt that a conspiracy that is within the text of this

21   language that lasted a day would be a substantial and fatal

22   variance versus the Indictment, and so the language is not

23   supportable.

24             THE COURT:  Ms. Pletcher, real quick?

25             MS. PLETCHER:  Your Honor, with respect to *Portela*,

1    the First Circuit in *Portela* expressly approved of an

2    instruction informing the jury that they must acquit if they

3    found a conspiracy or conspiracies different than the single

4    one charged.   *Portela* again involved a variance.   So my final

5    point here is that while a variance might not always require

6    reversal, it does not mean that a jury should be proactively

7    instructed to disregard the specific contours of the charged

8    offense.   Thank you.

9         THE COURT:  So in the last trial it is true, although

10   the jury did reference instruction No. 22, a venue instruction,

11   I agree with the government that the focus of the question was

12   on confusion regarding whether the conspiracy had to occur

13   throughout the entire time frame.   That's precisely what the

14   jury asked in that particular note.   I think it's highly likely

15   that that same confusion is going to exist in this particular

16   case.

17        I do not find *Ailsworth* to be distinguishable.   I

18   think that that correctly expresses the law.   The government's

19   proposed additional sentence also I believe correctly expresses

20   the law.   And I will adopt the government's proposed revisions

21   to instruction No. 15 and overrule the objections to it.

22        Instruction No. 17, the government has a proposal to

23   add an indication as well.   It's from their course of dealing.

24        Quickly on that, Ms. Cheng?

25        MS. CHENG:  Yes, Your Honor, I will be brief since a

1    lot of the case law that supports this addition is cited in

2    footnote 4.  We have seen it from at least two 10th Circuit

3    cases in this jurisdiction, and we have seen it also from the

4    supreme court.  It's very, very common to use the term long

5    course of conduct or course of dealing or a general course of

6    conduct to describe the type of evidence from which a jury can

7    properly infer -- can properly infer a conspiracy.

8         The reason this is especially important in this case

9    is that in defendant closing in the last trial, the defendants

10   often focused on or picked apart particular calls or individual

11   pieces of evidence and refused to engage with evidence as a

12   course of conduct, as an overall pattern.  This pattern of

13   conduct is how the jury can determine whether there were

14   conspiratorial acts or bids occurring at various times aligning

15   with when certain due dates were happening or the first or

16   second round bids.

17        And for that reason, a course of dealing is important

18   for the government's case to show, especially in a case like

19   this where inferences might sometimes need to be drawn to

20   determine conspiracy, we think that it is very clear law.  It

21   is approved by the 10th Circuit and Supreme Court, and it's

22   needed in this case to counteract some of the arguments that we

23   heard both in the last trial and in this trial.

24        *THE COURT:*  All right.  I am going to reject the

25   government's proposed amendments to that instruction.  It

1    already says in the instruction, of course, from what you find

2    the parties actually did.  I think that that is, of course, an

3    appropriate instruction.  It focuses on the facts of the case.

4         I know that there are a couple of cases cited in

5    footnote 3 of the government's submission that talk about the

6    phrase "course of dealing," but I don't think that's a

7    necessary clarification and I will reject that.

8         In terms of the shift of the paragraph around, I also

9    don't think that that's necessary for the particular

10   instruction to be more easily understood, so I will reject that

11   one as well.

12        Moving on to the proposed revision to instruction

13   No. 18, the government cites cases that are directly on point

14   as to that issue.  Response by any of the defendants on that

15   one?

16        Ms. Pletcher?

17        *MS. PLETCHER:*  Thank you, Your Honor.  The government

18   proposed the language that it now seeks to change.  They

19   proposed it in the first trial, so I believe they waived any

20   objection to it that they now seek.  There is no explanation

21   again that they provide for why this language needs to be

22   changed.  There has been no change in circumstances.  The law

23   was the same then as it is now.

24        But the other substantive problem here is that

25   changing this language actually obscures requirements in a

1    circumstantial Section 1 case, which this case largely is.  The

2    reason why that is is because if you reword it to say prices do

3    not have to be the same or identical to be fixed, it takes away

4    this concept that the previous language had, which was that

5    price-fixing conspiracy commonly thought of as an agreement to

6    establish the price.  And that change in language does

7    meaningfully shift for the jury the importance of a

8    circumstantial case and what needs to be proven there.

9         And I don't think that it's necessary and I think it's

10   confusing and there is -- the government has also actually

11   waived that since they proposed the original language.

12        *THE COURT:*  Mr. McLoughlin?

13        *MR. McLOUGHLIN:*  Yes, Your Honor.  There are, I

14   believe, important nuances with respect to the cases the

15   government cites that indicate that they are not, in fact, on

16   point with respect to the facts or the issues here.  *Catalano*

17   most particularly is a case that is a boycott case where the

18   Supreme Court addressed the issue there of an agreement among

19   wholesalers to refuse to sell to the retailer.  And so the

20   government ruled that that was a per se violation where you

21   have a boycott.

22        This case is much more similar to *Cement*

23   *Manufacturers' Protective Association v. United States,* 268

24   U.S. 588, most particularly around Page 600 where the Supreme

25   Court indicates that discussions or communications regarding

1    credit terms are not sufficient in themselves to state a

2    violation, and in that circumstance reject the notion that a

3    discussion of credit terms is the equivalent of price.

4           But the most relevant case is *Burtch v. Milberg*

5    *Factors Inc.,* 662 F.3d 212, which is a Third Circuit case in

6    2011, which rejects the argument that sharing of information

7    regarding the credit worthiness or credit information of a

8    third party should be treated the same as a discussion

9    concerning price and should be treated the same as an agreement

10   to boycott, and it specifically relies upon *Catalano* to reject

11   what is essentially the position taken by the government here.

12          Where here if one looks at the text of the e-mail,

13   there is no credible argument that Mr. Lovette and Mr. Grendys

14   in discussing a 65-day term that neither company was ever

15   offered in which at most one can say if your negotiating

16   position changes, let me know at the very most.  One cannot

17   infer or imply in any way, shape or form an agreement with

18   respect to specific terms of credit or to boycott any buyer who

19   does that, and so again *Catalano* is inapposite.

20          What the Court -- what the risk here is significant

21   jury confusion that a mere discussion of the credit worthiness

22   or the credit terms that are requested winds up being the

23   equivalent of an agreement not to compete, and that is not what

24   the law is, particularly in *Cement Manufacturers*.

25          And there is also no change in circumstances in the

1    last trial.  The government has not complained that there was

2    any argument that was made by the defense that was somehow

3    confusing that had to be cleared up.  That was, in fact, not

4    the case.  Even if the government is going to make that

5    argument, that is for the jury to decide, and the government is

6    free to argue on rebuttal whatever it likes.  But given that

7    there is no change in the controlling law, no change in the

8    facts and no material change, we respectfully suggest there is

9    no change that's required here.

10            THE COURT:  Thank you.

11            Ms. Henry?

12            MS. HENRY:  I just wanted to point out that as we go

13   through this, do we need to repeat objections we made prior at

14   the prior time when we went through them?

15            THE COURT:  No, you do not.

16            Ms. Cheng?

17            MS. CHENG:  Thanks, Your Honor.  I will begin by

18   addressing Ms. Pletcher's arguments related to prices not being

19   the same and then switch to talking about Catalano and the

20   credit terms.  With regard to pricing not being the same, this

21   is a point that I think is very confusing with the jury and it

22   has been even more confused this trial with Professor Snyder's

23   testimony.  He had numerous slides focused on nonidentical

24   prices indicating that simply because the prices were

25   nonidentical, that this somehow means that there is no

1    conspiracy.

2         But as Your Honor pointed out, the Supreme Court has

3    been very clear that identical prices are not necessary.  And

4    even Professor Snyder, I believe, agreed that prices don't need

5    to be identical for there to be price-fixing, and that is an

6    important legal point.

7         Now, the reason that we have proposed changing the

8    phrasing of this is I think that the original construction with

9    a semicolon and a "however" is not very clear.  It's not in

10   layman's terms.  Right now the instruction reads, you know,

11   this is how you typically think of price-fixing.  However,

12   prices can be fixed in other ways.  In layman's terms, what

13   this really means is prices do not have to be the same or

14   identical for it to be fixed.  And this rephrasing I think

15   changes nothing about the government's burden.  It merely makes

16   it clear to the jury and puts it in much clearer terms exactly

17   what -- exactly what is required and what is not.

18        And this language has been -- sorry, not this

19   language, but this point, the prices somehow need to be

20   identical, was a huge feature of this second retrial.  It was

21   mentioned in at least two opening statements by Defendant

22   Austin and Defendant Little.  For example, Defendant Austin

23   said the allegation is price-fixing, but the prices were all

24   different implying that merely because the prices were

25   nonidentical, there cannot be price-fixing.

3966

1          Likewise, Defendant Little's opening said that you

2    will see behavior that is entirely inconsistent with

3    price-fixing.  Some companies submitted different bids.  This,

4    I think, inevitably links in the jurors minds this idea that if

5    prices are the same, well, somehow there can be no

6    price-fixing.  And we just want to make sure that is very clear

7    in the instruction because I think right now it is not.  As

8    written, I think with the semicolon and the "however," it is a

9    little more confusing and it has become especially important to

10   point out in this trial because of some of the arguments that

11   have been made and Professor Snyder's testimony, of course.

12         With that now I will switch to the credit terms

13   argument.  So first, just to clarify, the government's argument

14   is not that merely sharing credit terms is the illegal part of

15   it, right?  And I think a lot of what Mr. McLoughlin was

16   arguing was maybe conflating what the government's argument is

17   with respect to price-fixing and sharing information.  As we

18   have mentioned multiple times, this is a price-fixing case and

19   fixing of credit terms counts as a type of price-fixing.

20         And Mr. McLoughlin talks about *Catalano* as a boycott

21   case, but if I can, Your Honor, let me just read the holding

22   from the case which talks about price-fixing, not boycotts.  So

23   on Page 1928, or I think in the U.S. Reporter it is maybe

24   Page 648, the Court's holding is an agreement -- sorry.  I will

25   start a little bit earlier:  "It is virtually self-evident that

1    extending interest-free credit for a period of time is

2    equivalent to giving a discount equal to the value of the use

3    of the purchase price for that period of time. Thus, credit

4    terms must be characterized as an inseparable part of the

5    price. An agreement to terminate the practice of giving credit

6    is thus tantamount to an agreement to eliminate discounts, and

7    thus falls squarely within the traditional per se rule against

8    price fixing."

9         This is a price-fixing case, not necessarily -- I

10   think it's about price-fixing, and it's made very clear that an

11   agreement to eliminate, and this is again quoting from the

12   opinion, an agreement to eliminate credit sales is one form of

13   extinguishing competition among the sellers.  And crucially the

14   Court also explained, "Since it is merely one form of price

15   fixing, and since price-fixing agreements have been adjudged to

16   lack any "redeeming virtue," it is conclusively presumed

17   illegal." So fixing of credit terms is not to be evaluated any

18   differently from fixing of any other type of price-related

19   terms like discounts, et cetera.

20        And then one final point on that is whether there is a

21   factual predicate for this, and I will just give one example.

22   In Defendant Lovette's closing from the last trial, Defendant

23   Lovette said that the Sysco credit terms has -- it's absolutely

24   ridiculous and, quote, has nothing to do whatsoever with the

25   alleged objective of the charged conspiracy to rig bids and fix

1    prices of broiler chicken products.  And Your Honor has already

2    found that this type of evidence is relevant to the charged

3    conspiracy and it is not only relevant, but an indication of

4    the -- it's not only relevant, but a key part of the

5    government's case.

6            And to the extent that Mr. McLoughlin wanted to make

7    additional arguments about why it does not amount to

8    price-fixing, that's certainly something that can be done

9    before the jury, but it would be a correct statement of the law

10   the way the government has proposed it to include credit terms

11   in the list of discounts, et cetera, especially because they

12   are at issue in this case.

13           THE COURT:  All right.  Mr. Feldberg?

14           MR. FELDBERG:  Briefly, Your Honor, to the extent that

15   counsel bases her argument for changing this on an argument

16   that we made on behalf of Mr. Austin that the prices are not

17   identical, we made the exact same argument in the first trial.

18   There are no changed circumstances in that regard.

19           THE COURT:  Remind me of that.  I am not directly

20   talking to you, Mr. Feldberg, but just throwing this open, but

21   when it comes to jury instructions, I am not sure we had a rule

22   that you had to stick to unless there was a change of

23   circumstance.  I am not sure.

24           Now, as Ms. Henry said, all previous objections are

25   carrying over, but I am not sure the government would

1    necessarily be estopped to submit something of this nature, but

2    maybe I'm wrong.  Maybe I am forgetting about some

3    understanding that has existed.

4            Mr. Tubach?

5            *MR. TUBACH:*  I thought the Court stated at the end of

6    the last trial that it was not inclined to change any of its

7    rulings or what it was planning to do absent a change in

8    circumstances.

9            *THE COURT:*  That is true; that is true.  To the extent

10   that people took that into account, relied upon that, and, of

11   course, Ms. Cheng didn't put up any argument to that effect.

12           Mr. McLoughlin, on the substance of it, anything else

13   real quick from you?

14           *MR. McLOUGHLIN:*  Yes, Your Honor.

15           *THE COURT:*  Go ahead.

16           *MR. McLOUGHLIN:*  First, the government misremembers

17   the argument we made in closing.  It's not relevant to this

18   issue.  The argument made in closing was, in fact, the

19   communication between Mr. Grendys and Mr. Lovette had nothing

20   to do with fixing the prices for broiler chickens and it was

21   simply a one-off discussion unrelated to the conspiracy

22   charged.  It had nothing to do with the fact that it was a

23   credit term as opposed to something else.

24           The other issue we have here, Your Honor, with respect

25   to Professor Snyder and the substance is the government is

 1    really trying to put into jury instructions argument that it is

 2    free to make and has made.  With respect to Snyder, the

 3    government acknowledges that while Professor Snyder said the

 4    prices are not identical and therefore that's indicative that

 5    there is not a conspiracy, which is a fact, the government can

 6    argue, quite frankly, well, that's not necessary.  And

 7    Professor Snyder acknowledged that even if they are not

 8    identical, there may be a price-fixing conspiracy.

 9         So Professor Snyder in essence said both things.  And

10    the question of the jury's finding of fact based on the

11    conclusion of whether there was a conspiracy based on

12    particular facts of whether they are identical or close enough

13    and the rest is not a subject that the government should try to

14    get predetermined in a jury instruction.

15         Thank you.

16         *THE COURT:*  Mr. Fagg, quickly?

17         *MR. McLOUGHLIN:*  One more point, Your Honor.  The

18    government talking about unfair prejudice and everything else,

19    we would note that unlike the last trial, the government did

20    not put up a witness.  It just has this single piece of paper.

21    It avoided putting up the witness we would respectfully

22    suggest --

23         *THE COURT:*  Is this to credit terms?

24         *MR. McLOUGHLIN:*  Yes, Your Honor.  Ms. Hoyt,

25    respectfully, was fatal to the government's claim that this

3971

1    was, in fact, an issue and, in fact, part of the conspiracy.

2    So as a result, the government didn't call a Sysco witness.

3    And simply their only evidence with respect to this is this

4    single piece of paper.  And that, Your Honor, tells the Court

5    that this is -- the argument of the government is not really a

6    serious one.

7              THE COURT:  Real quick, Ms. Cheng.

8              MS. CHENG:  I will be very brief, Your Honor.

9              So with respect to calling Ms. Hoyt and the witnesses

10   and the inferences to be drawn from that, the government

11   obviously disagrees with that characterization of the

12   testimony.  But I think more importantly here whether this

13   was -- whether the defendants' view of the evidence disagrees

14   from ours does not change the clear law in this case.  The law

15   is that credit terms are a part of price.  They are a form of

16   price.  They are a type of discount.  And whether the evidence

17   in this case and how it comes in and the particular arguments

18   about the weight to be given to it, that has no bearing on the

19   law.  So that really to my mind does not bear on this

20   instruction.

21             And then with regard to price-fixing itself, I think

22   we have put -- without making the change that we've proposed

23   here, I think we have put the jury in sort of an untenable

24   position because counsel has implied through opening statements

25   and Professor Snyder's testimony that somehow because prices

1    are different, there is or cannot be price-fixing.  But the

2    jury doesn't know really what the law is.  And because the law

3    is very clear that prices don't have to be the same, I think

4    that this type of clarification is very important, and absent

5    it, I think there is some ambiguity now about what the law

6    really is.  Do prices need to be the same for there to be

7    price-fixing.

8         THE COURT:  All right.  I am going to rule.  As to the

9    first proposed change in instruction No. 18, first of all, I

10   find that there has been a change of circumstances, namely

11   Professor Snyder has testified.  It is true that on

12   cross-examination he admitted to Mr. Torzilli that the mere

13   fact of identical prices is -- that there could be a conspiracy

14   without prices being identical.  He correctly stated the law

15   there.  However, a number of his slides shown to the jury were

16   based upon the lack of any identical prices.

17        So I am going to adopt the government's proposed

18   change because I think that not only does it state the law, but

19   it is an appropriate and, in my opinion, necessary

20   clarification.

21        I will not include the government's proposed change

22   regarding credit terms because there hasn't been any change of

23   circumstances.  As Mr. McLoughlin points out, the evidence has

24   substantially decreased on that subject, not increased on that

25   subject, and I will not include that.

1          Moving on to the next proposed change which is on

2     instruction No. 19, I will hear first of all from the

3     defendants.

4          MS. CALL:  Very briefly, Your Honor, may I be excused?

5          THE COURT:  Yes, absolutely.  Yeah, not everyone has

6     to be present.  You may have a few other things to do.

7          Comments, Ms. Pletcher?  Go ahead.

8          MS. PLETCHER:  The defendants oppose this modification

9     to the instruction for several reasons.  First, the Court

10    rejected this exact same edition in the first trial, and we

11    don't believe that there have been any circumstances that would

12    warrant changing the instruction from the first trial.

13         Secondly, this concept of a common objective, again

14    the Court rejected the government's attempts to put this

15    language in the first time.  And the problem with it is the

16    proposed revision incorrectly suggests that the government need

17    only prove a, quote, common objective.  And that's just wrong.

18    The essence of the Sherman Act claim is the illegal agreement.

19    It's not the so-called common objective.

20         And the government's reliance on *Beachner* is misplaced

21    here.  *Beachner* had nothing to do with jury instructions or the

22    evidence necessary to prove the existence of the conspiracy.

23    The question there was whether the district court properly

24    dismissed the Indictment on double jeopardy grounds.  And the

25    fact that the two Indictments in *Beachner*, one which resulted

1    in acquittal, the other in dismissal, have enough commonalities

2    to constitute the same offense does not at all establish the

3    government's burden in proving a Sherman Act offense or the

4    factors that the Court needs to instruct the jury.  So we would

5    strongly disagree.

6         THE COURT:  Let's hear from Ms. Cheng at this point,

7    and then I will get back to Ms. Henry if she has additional

8    points.

9         MS. CHENG:  Thanks, Your Honor.

10         I disagree that this somehow changes the government's

11    burden.  The fact of whether there is an agreement, which is a

12    central part of this case as we all acknowledge, is clear in

13    multiple instructions throughout the jury instructions packet.

14    This instruction is specifically about single -- one single

15    overarching conspiracy versus multiple conspiracies and is

16    meant to give guidance to the jury to determine how they can

17    make that finding.

18         So with respect to whether there is a changed burden,

19    I just don't think this is -- this is an instruction that

20    really isn't about whether there is an agreement or not.  This

21    is not about one of those three primary elements.  This is

22    really about whether there is an overarching conspiracy, so I

23    think that concern is not as grave as counsel has represented.

24         With regard to the question of why we need it now, so

25    first, Your Honor, we did not propose the particular *Beachner*

1    factors in the last trial.  And part of why we are proposing it

2    now is in the last trial you may recall, the Court may recall

3    that the jury had asked about or had sent a note saying that

4    there was disagreement and could not reach agreement about

5    whether there was an overarching conspiracy and needed guidance

6    on that question.

7            Without -- I think part of why it can be difficult to

8    agree on this question is that, the question of whether there

9    is an overarching conspiracy, is that as written as it was in

10   the last trial, instruction No. 19 really doesn't provide much

11   guidance.  It just tells the jury here is what you must find,

12   either one single conspiracy or a narrow one fully contained or

13   you can find several conspiracies, but there is no dividing

14   line between these various types of conspiracies.

15           What we have proposed here is taken straight from the

16   case law.  There are two cases, both in *Beachner* and *Mobile*

17   *Materials*, both assessing this concept of interdependence.  We

18   haven't used the term "interdependence" here because it is a

19   legal term which again raises the question to the jury what

20   does it mean, but really the case law has defined what

21   interdependence means.  And what *Beachner* has held is that you

22   can find interdependence based on whether there was a single

23   common and continuing objective.  And this includes an

24   objective to, quote, eliminate price competition and ensure

25   high individual profits.

1          Likewise, in *Mobile Materials* which is another 10th

2     Circuit antitrust case, the Court held that there was ample

3     existence of a single conspiracy where the shared purpose was,

4     quote, to circumvent price competition and enhance

5     profitability.  So both of those common objectives are

6     precisely the type of objective that can help the jury find

7     whether there was a single overarching conspiracy or not.

8          And then with regard to the *Beachner* factors, that's

9     taken directly from the case.  These are factors that the jury

10    can easily use to help guide whether there was price-fixing or

11    bid-rigging.  It's easily understandable.  And I think a big

12    part of why these particular factors were mentioned in *Beachner*

13    *Construction* was that this is an important way for the jury to

14    decide an otherwise confusing question for which they really

15    have no guidance.

16         And I will say, too, other courts have used these

17    factors in deciding whether there was a single antitrust

18    conspiracy.  And I believe the Sixth Circuit in another case

19    has referred to these factors as the *Beachner* factors and used

20    them in deciding whether there was one conspiracy or not.

21         *THE COURT:*  All right.  Ms. Henry?

22         *MS. HENRY:*  Your Honor has already put into the

23    instruction the last time around everything that could be

24    relevant and needed for the jury so have an indication of what

25    they need to do here.  In *Twombly*, the Supreme Court ruled that

1    unknown communications followed by conduct that was similar but

2    that had a common objective was insufficient to even state a

3    plausible claim, and it dismissed the Indictment.

4          A common objective is not the issue here.  And this

5    language confuses that entirely.  What the government has done

6    is they have taken two cases that have a lot of very detailed

7    factual information in the opinions about why.  They have then

8    cherry-picked out of those cases some very specific little

9    things that are really very circumstance specific to those

10   cases and then tried to put them here where they have no

11   application.

12         There has been nothing here that's been talked about

13   common jargon.  There is nothing here that talks about these

14   types of things and they don't belong in this particular jury

15   instruction.  Obviously, *Twombly* was not an Indictment.  It was

16   a much different and easier burden of proof.

17         *THE COURT:*  Mr. McLoughlin?

18         *MR. McLOUGHLIN:*  A few points, Your Honor.

19         First, with respect to the specific language that the

20   government proposes, there are a number of problems with the

21   language.  So, for example, in the third line, it says

22   "continuing objective among defendants, including to suppress

23   or eliminate competition," not to suppress or eliminate

24   competition, including, which invites, of course, jury

25   confusion as to what else might be included in addition to

1    suppress or eliminate competition.

2         Also, the last element talks about "the existence of a

3    tacit mutual understanding," which again is a loaded term with

4    no definition and, as Ms. Henry just noted, understanding is

5    insufficient.  *Beachner* was, of course, a double jeopardy case.

6    The factors that the government is calling the *Beachner*

7    factors, if one reads the case carefully, is a list of some of

8    the things that the district court relied upon in finding that,

9    in fact, there was a double jeopardy violation.  It's

10   noteworthy that in that case the government's argument was a

11   formal agreement was required and they were not barred by

12   double jeopardy because it was all informal.  They now take

13   somewhat the opposite view.

14        But the list of factors was never adopted by the

15   circuit court.  This is simply the circuit court's recitation

16   of some of the factors that the district court relied upon in

17   finding that it was a single conspiracy which, as Ms. Henry

18   noted, was a very fact specific determination by the district

19   court with respect to double jeopardy.  To expand this into an

20   argument that this is an appropriate jury instruction, an

21   additional problem there is that as written it invites the jury

22   to rely on a single one of these factors to make the

23   determination that there was a conspiracy as opposed to all of

24   them.

25        The district court in *Beachner* found that all the

1    factors were present, not just one.  And as written by the

2    government, the jury could find, quote, the common

3    understanding, this use of jargon is, in fact, a sufficient

4    factor standing alone to prove this conspiracy which is clearly

5    not the law.  Thank you.

6         THE COURT:  I am going to reject the government's

7    proposed instruction.  The predicate of Ms. Cheng is that there

8    is this danger of jury confusion, that the jury couldn't figure

9    it out.  I don't think that that is a fair inference.

10   Obviously, the jury last time couldn't reach a verdict, but

11   it's not clear that this instruction was the source of

12   confusion at all.

13        I think that the instruction No. 19 as written clearly

14   states the law.  I don't believe that it's subject to

15   confusion, so I am not going to include the government's

16   proposed language.

17        As to the government's proposal for instruction

18   No. 21, that phrase "substantially and directly" comes right

19   out of *Suntar Roofing* and I am going to stick with that

20   particular phrasing from *Suntar*.  I don't think that it's

21   subject to confusion or misstates the law.

22        Why don't we talk about instruction No. 22.

23   Instruction No. 22 is a proposed change that would be

24   consistent with the revision to instruction No. 15.

25        Ms. Henry?

1          *MS. HENRY:*  Your Honor, on behalf of Defendant

2     Kantola, we would stipulate to venue and say there is no need

3     for instruction.

4          *MR. FELDBERG:*  Mr. Austin would agree with that, Your

5     Honor.

6          *MR. BYRNE:*  And Mr. Little too, Your Honor.

7          *THE COURT:*  Mr. Beller?

8          *MR. BELLER:*  Thank you, Your Honor.  If I could just

9     supplement the record quite briefly, and that is during the

10    last jury trial due to the different standards for how the

11    government has to establish venue versus how the government has

12    to establish the underlying conspiracy, there was some concern

13    that it may offer some confusion.  And that is the strategy

14    behind, I think, the position the defendants are taking in

15    terms of the agreeing to stipulation.

16         *THE COURT:*  Do each of the defendants agree?  Are each

17    of them stipulating?

18         *MS. PREWITT:*  Yes, Your Honor.

19         *MR. TUBACH:*  On behalf of Mr. Penn, yes.

20         *MS. RAHMAN:*  On behalf of Mr. Brady, yes, Your Honor.

21         *MR. GILLEN:*  On behalf of Mr. Roberts, yes, Your

22    Honor.

23         *MR. McLOUGHLIN:*  On behalf of Mr. Lovette, yes, Your

24    Honor.

25         *MS. JOHNSON:*  On behalf of Mr. Blake, yes, Your Honor.

3981

1          MS. PREWITT:  And on behalf of Mr. Mulrenin, yes, Your

2     Honor.

3          THE COURT:  I think in light of the stipulation, then,

4     the proposal is that instruction No. 22 is unnecessary and

5     should be omitted.  That seems to be the head nodding

6     agreement.

7          Ms. Cheng?

8          MS. CHENG:  May I just clarify for the record, Your

9     Honor, are all 10 defendants stipulating to it?  I am not sure

10    if Mr. Fries is as well?

11         MS. PAGE:  We are.

12         MR. BELLER:  Yes, Your Honor.

13         MS. CHENG:  In that case, since all 10 defendants

14    stipulated to this, we are comfortable removing the

15    instruction.

16         THE COURT:  Okay.  So then the issue would be whether

17    that stipulation is communicated to the jury in some fashion

18    because otherwise the jury wouldn't know that.

19         Mr. Tubach?

20         MR. TUBACH:  I am not sure the jury needs to be told

21    about that.  If they are never told that venue --

22         THE COURT:  Right.  I haven't thought that through,

23    but let's let Ms. Cheng weigh in on that.

24         MR. TUBACH:  Otherwise, they are going to be told here

25    is this thing, but you don't have to decide.

1          MS. HENRY:  Your Honor, I believe we are entitled to

2     waive that issue, so the stipulation is in essence really a

3     waiver.

4          THE COURT:  Ms. Cheng?

5          MS. CHENG:  We would prefer either for the instruction

6     simply to reflect that the defendants have stipulated that all

7     the requirements have been met for venue and then just list it

8     or, in the alternative, if we could have a written stipulation

9     entered into the record, that would be something we would be

10    more comfortable with.

11         THE COURT:  Well, everyone agreed to it on the record,

12    so that's sufficient.  But I think the defendants are right,

13    there is no reason to put up the argument that the jury doesn't

14    otherwise have to decide and then say they don't have to decide

15    it.

16         Mr. Koenig?

17         MR. KOENIG:  Can we before the Court rules just ask

18    for a little time to just look through the transcript?

19         THE COURT:  Yeah -- the transcript?  I don't think

20    there is any question about each of the 10 stipulated to.

21         MR. KOENIG:  I meant just to look and see what

22    mentions of venue there have been.

23         THE COURT:  Well, I don't think that any -- I think

24    the point is that no juror could be expected to have, if they

25    heard any evidence about venue, known the purpose of it.  And

1    therefore, given the stipulations to venue, why would it even

2    need to be brought up since the jurors would be oblivious to

3    its significance?

4         MR. KOENIG:  I just couldn't remember if it was

5    brought up in opening statements or not.  The word "venue" is

6    all I was looking for.

7         THE COURT:  I seriously doubt it.  I don't think that

8    that would have been a very -- worth anyone's breath, but you

9    can think about it.  I think that -- why don't we assume that

10   we are going to take out instruction No. 22, but this is not

11   the final set, so think about that once you get an opportunity

12   to have lunch once we get through all these changes.

13        Ms. Henry?

14        MS. HENRY:  Your Honor, I would like to revisit on the

15   instruction No. 15.  In regard to the very first sentence, the

16   Indictment charges that the crime was committed beginning at

17   least as early as 2012, and the Indictment explicitly says

18   continuing through at least early 2019, and we would request

19   that that language remain in place because that is what the

20   Grand Jury indicted.

21        THE COURT:  Ms. Cheng?

22        MS. CHENG:  Your Honor, really briefly on venue, to

23   the extent that the defendants have raised the point or

24   disputed venue in the Rule 29s, which I don't think that

25   perhaps it is, but to the extent that's the case, it would be

3984

 1   helpful if in their supplemental Rule 29 briefs they could make

 2   a note that it has now since been stipulated to.

 3        With regard to Ms. Henry's comment about the term

 4   continuing, it is the term continuing which is precisely what

 5   caused the confusion with the jury in the first trial.  And the

 6   juror note was asking, you know, did it need to occur

 7   throughout the entire time frame because of this particular

 8   phrase.  And we just had an extended colloquy about whether the

 9   government needs to prove exactly from early and continuing

10   through at least 2019.  I don't think the fact that it was in

11   the Indictment changes much because the time frames are, of

12   course, going to be what is taken from the Indictment.  But

13   again, all of those cases show that merely because it's alleged

14   in the Indictment does not prevent the government from proving

15   a narrower case.

16        THE COURT:  Well, true, but using the term used in the

17   Indictment is always a good idea, so I will on Ms. Henry's

18   point, we'll add back in the word "continuing" in the first

19   sentence, but will -- I will keep the -- I am keeping the

20   second sentence, the sentence that the government proposed

21   added.

22        So now let's switch over to instruction No. 22.  Let

23   me -- so 22 we are going to take out.  24.

24        Ms. Cheng, briefly on that one?  Wasn't similar

25   language proposed last time on that?  I think so, which I

1    rejected.

2         *MS. CHENG:*  Yes, it was, Your Honor, but last time we

3    did not have a factual basis for the acceptance of payments and

4    this round we do.  Now the government has admitted

5    Exhibit 9816, which is an invoice at Tyson reflecting

6    payment -- reflecting transactions that occurred during the

7    conspiracy period in the relevant portion for the statute of

8    limitations.  And Mr. Pepper testified extensively on it.

9         Since that's now in the record for this trial, we

10   think that this is appropriate because absent an explanation of

11   what counts as an act, the jury might believe that somehow an

12   overt act such as calling a competitor, handshaking, et cetera,

13   would be required to meet the statute of limitations, but that

14   is not the case.

15        *THE COURT:*  Ms. Henry?

16        *MS. HENRY:*  Your Honor, the language that's being

17   inserted is not actually the case law.  The case law is very

18   explicit that the continuing conspiracy, to have a continuing

19   conspiracy argument, you have to have actually something that

20   has been inflated, that the payments would have had to have

21   been inflated in some manner because the whole concept of this

22   continuing conspiracy -- and the Supreme Court has said the

23   crime is done.  It is -- the continuation of it is only if

24   there is acts in furtherance.  The acts in furtherance cannot

25   be just a regular business transaction.  They have to be, and

1    this is where this whole concept comes from of everybody has

2    done something where they have inflated the profits and then

3    they come back and basically divide it up.  That's the basic

4    common law concept that this comes from.

5            Where there is a price-fixed contract, there is case

6    law out there that it does not, in fact, trigger the continuing

7    conspiracy unless it is actually proven; in addition, that the

8    prices were deliberately inflated as a result of the

9    conspiracy, which, of course, is not part of what you need to

10   actually show a violation of the law.

11           THE COURT:  Let's hear from Ms. Pletcher first, then

12   Ms. Cheng.

13           MS. PLETCHER:  Thank you, Your Honor.

14           One of the reasons why the Court previously rejected

15   this language is because any payments would have been received

16   by the corporations, not the defendants themselves.  And the

17   way the proposed language is written is that this act can be

18   any co-conspirator receiving payments on a price-fixed

19   contract.  So regardless of whether the corporations could be

20   considered a co-conspirator in any sense, their receipt of

21   payment would not be sufficient as to the individual

22   defendants.  So this language is very confusing and the same

23   grounds that the Court used to reject it previously still hold.

24           THE COURT:  Ms. Cheng?

25           MS. CHENG:  Your Honor, I do believe that in *Evans*

1   itself -- sorry, in *Kemp* itself and in *Evans*, in both of those

2   cases who was charged was the corporation and one of the

3   executives from that corporation.  But what the court used to

4   toll the statute of limitations was receipt of payment by a

5   co-conspirator who was not indicted in that case.

6          Similarly here, we've made it very clear throughout

7   our case that Tyson is one of the co-conspirators.  We have

8   employees of Tyson.  We had a co-conspirator from Tyson testify

9   about this.  So it's clear just like in *Kemp* and in *Evans* that

10  when a co-conspirator receives payments from a rigged contract,

11  that is sufficient to toll the statute of limitations.

12         With regard to Ms. Henry's point that somehow the

13  prices have to be inflated, that is simply -- this idea of

14  inflation kind of reads into the per se case, the requirement

15  that prices somehow need to go up or down.  And as we have had

16  extended discussions about, that is simply not the case in a

17  per se litigation.  The question is really whether there was a

18  price-fixed contract and if any receipt from that contract --

19  and if any payment from that contract can qualify -- any

20  payment from that contract can qualify as the type of act that

21  would toll the statute of limitations.  And that's fairly clear

22  from *Kemp* itself and from *Evans*.

23         The question is whether or not anybody, any

24  co-conspirator, receives payments on an unlawfully obtained

25  contract.  Unlawfully obtained contract was the term that was

1    used in *United States v. Kemp*.  And in this case certainly the

2    defendants might disagree with us of whether the contract

3    itself was rigged or fixed on its own, but that is certainly

4    the case that the contract was -- at least the government's

5    position is the contract itself was unlawfully obtained.

6         THE COURT:  One moment, Ms. Henry.  Mr. Koenig is

7    conferring.  Then I will hear from you.  But if you want to

8    walk up to the podium or near it, feel free.

9         MS. CHENG:  And one additional point is Mr. Bryant

10   also testified about the very fact that these 2017 through 2019

11   contracts were themselves part of the price-fixing that's

12   alleged in this case.

13        THE COURT:  Ms. Henry, you first, then I will hear

14   from Mr. Gillen.

15        MS. HENRY:  Your Honor, there is no legal concept of

16   tolling in a criminal case the statute of limitations.  The

17   statute of limitations is what it is.  There is no case law

18   that I am certainly aware of and none that has been cited by

19   the government for a concept that the per se presumption now

20   has something to do with extending a statute of limitations.

21        In the *Kemp* case, the *Kemp* decision explicitly noted

22   that in that situation there had been proof that the contracts

23   were inflated.

24        THE COURT:  Okay.  Mr. Gillen?

25        MR. GILLEN:  Apparently in order to save their legal

3989

1   argument on this matter, the government has stated that Tyson

2   is a co-conspirator in this case.  My reading of the Indictment

3   does not list Tyson, the entity, as a co-conspirator named in

4   this case.  We did not hear -- this might be the first time

5   that we've heard this from the government after the many

6   iterations and transformations of their prosecutorial theory.

7         We all know, hopefully, that individuals, simply

8   because individuals are indicted who happen to be employed by

9   an entity at that time, that does not therefore mean that the

10  entity itself is a co-conspirator of those individuals.  The

11  standard of criminal liability for an entity is different than

12  it would be for the individuals.  So to make the argument that

13  Tyson is a co-conspirator, I haven't read the Indictment in a

14  while, but I don't remember seeing that listed nor did I hear

15  it at all at the *James* hearing.  As a matter of fact, I think

16  this the first time that we've heard it.

17         *THE COURT:*  All right.  Ms. Cheng?

18         *MS. CHENG:*  Your Honor, with regard to whether it's

19  the first time that we heard it, I think it's no secret that

20  Tyson was one of the leniency applicants in this case, and I

21  believe that the defendants all at least had notice of that.

22         Now, I think there is some conflation here with the

23  standard of proof of whether Tyson and somehow that because the

24  government did not charge Tyson in this particular case, that

25  we must also somehow first show that Tyson is a co-conspirator

1    beyond a reasonable doubt before it can qualify as a

2    co-conspirator for the purposes of the statute of limitations.

3    But as mentioned in both *Kemp* and *Evans*, none of the competing

4    firms that participated in the conspiracy was charged along

5    with the executive and his employer.  There is no real

6    distinction between the two cases.  So I don't really see that

7    as a basis for rejecting the proposal here.

8         With regard -- if I can make one more point on that is

9    basically this -- defendants' argument basically makes it so

10   that the government can really take advantage of this one

11   avenue to show statute of limitations only if the government

12   charges the corporation at all times with the employers.

13   Otherwise, in cases like these where no one is going to be

14   individually profiting -- or that's not necessarily true, Your

15   Honor.  I take that back.  Where people are not going to be

16   necessarily receiving themselves the money from the contracts,

17   then this avenue just effectively becomes not useable for the

18   government.  And it just takes off the entire -- it takes off

19   from the government's repertoire the ability to use the receipt

20   of payments in antitrust cases, period.

21        With regard to something Ms. Henry said about this

22   concept of tolling, that is taken and I was quoting directly

23   from *United States v. Kemp*.  And I will just read that holding

24   again which is, "Instead the statute of limitations is tolled

25   as long as the firm that ultimately received the rigged bids

1    receives payment on the unlawfully obtained contract.  So the

2    crucial question is the scope of the agreement," et cetera, and

3    as long as it's been relied on, and this was part of the

4    conspiracy, it can be used to toll the statute of limitations.

5              THE COURT:  All right.  I am going to reject the

6    government's proposed language.  Even the government's proposed

7    language talks about it has to be a co-conspirator.  Tyson is

8    not a co-conspirator in this case.  But the paragraph refers to

9    some act, and I think that that is sufficiently clear.  So as a

10   result, I don't think that the government's proposed sentence

11   is necessary for the instruction to be understandable by the

12   jury.

13             Let me ask about instruction No. 25.  The government

14   is proposing that we omit it.  That would be fine if we were

15   sure that the "confidential" markings are not on any of the

16   admitted exhibits and I just -- I don't know if that's really

17   true.

18             Mr. Tubach?

19             MR. TUBACH:  We are certainly going to make every

20   effort to make that happen, but I can't guarantee either we

21   will have 100 percent success.

22             THE COURT:  The question is really whether there was

23   any prejudice to including it.  I don't see it.  Ms. Cheng?

24             MS. CHENG:  Well, perhaps should we change it from

25   many of the documents admitted to something else to say some of

1    the documents may be marked since we aren't sure?

2         THE COURT:  Well, we could say some of the documents

3    admitted in the trial may be marked as confidential.  We'll

4    make that change.

5         All right.  Let's switch over.  Actually --

6         MR. POLLACK:  Your Honor, if I might, before we leave

7    government's proposed instructions, and I apologize for going

8    out of order, but I did have one small issue with Government's

9    Exhibit 17.  In the second sentence, the instruction reads:  A

10   conspiracy is often described as a partnership in crime, in

11   which each person found to be a member of the conspiracy is

12   liable for all reasonably foreseeable acts of the other members

13   during the existence of and in furtherance of the conspiracy.

14        That language seems to be a *Pinkerton* concept that

15   certainly would be applicable if there were substantive

16   offenses that were being charged independent of the conspiracy

17   offense, but since that's not the case here, I think this

18   language is wholly inapplicable and has no meaning.  It says,

19   "in which each person found to be a member of the conspiracy."

20   Well, once you have been found to be a member of the

21   conspiracy, the jury has decided everything it needs to decide.

22   There is no reason to go on to talk about liability for acts of

23   co-conspirators.  That would only come into play if there were

24   also substantive offenses being charged.  So what I would ask

25   is the sentence simply be ended after "partnership in crime."

1          THE COURT:  Ms. Cheng?

2          MS. CHENG:  Your Honor, may I have a moment briefly to

3     confer, please?

4          THE COURT:  Yes, you may.

5          MS. CHENG:  Your Honor, we would oppose removing that

6     portion of the instruction.  Nothing has really changed to

7     warrant its removal and I believe that this is a very standard

8     instruction.  It's true that a conspiracy is described as a

9     partnership in crime and that if each person is found to be

10    part of the conspiracy, then they are reasonably responsible

11    for the reasonably foreseeable acts of other co-conspirators.

12    In fact, this partnership in crime, this first portion of the

13    instruction is taken verbatim from the ABA model criminal jury

14    instructions, Subsection D conspiracy explained, and there is

15    no reason to deviate from it now.

16         THE COURT:  I am going to reject the proposed change.

17    Liable to an attorney may create some different associations

18    than to a layperson.  The jury consists of all laypersons.

19    There has been no change in circumstance here and I will reject

20    that proposed change.

21         All right.  Let's take a look at the last proposed

22    instruction by the government, namely as to the witness

23    preparation.  I rejected a similar instruction last time.  And

24    there has also been evidence of defense witnesses who have been

25    prepared, and I just don't think that it's -- the fact of

1    witness preparation necessitates a jury instruction, so I won't

2    include that one.

3            Let's turn to the defendants' proposed instructions to

4    the jury.  Any objection by the government to including an

5    expert instruction as proposed by the defense in Docket No.

6    1203?

7            MS. CHENG:  Your Honor, we have a few modifications of

8    this instruction is to be included.  It looks like there are

9    some changes compared to what is actually in the 10th Circuit

10   pattern.  For example, and maybe it -- does it make more sense

11   for the Court if I just went through sort of line by line and

12   talked about the particular phrases that the government

13   disagrees with?

14           THE COURT:  Yes, go ahead.

15           MS. CHENG:  So first is referring to Mr. Snyder as

16   Professor Edward Snyder.  Our position is that giving his title

17   and including it here is unduly prejudicial and puts

18   unnecessary emphasis on his position, especially because later

19   on the instruction already tells the jury to consider

20   education, training, et cetera.  So I think referring to

21   Mr. Edward Snyder instead of Professor Edward Snyder is more

22   appropriate.

23           Now, with the clause that follows "who testified as an

24   expert," this does not appear in the 10th Circuit pattern and

25   we believe should be excluded.  Under the Rules of Evidence,

1    witnesses do not testify necessarily as an expert or as a

2    layperson, but rather gives testimony that would qualify under

3    the rules as being expert or as being lay opinion testimony.

4    So we would again ask that that be removed because calling him

5    an expert sort of puts additional weight behind what he is

6    saying when really he is giving simply opinions about the case.

7          With regard to the following sentence, "in some cases

8    such as this one," the government would like to remove the

9    phrase "such as this one" because our position at least is that

10   in a per se case, it is precisely the type of case in which

11   economic knowledge cannot assist the jury in understanding the

12   evidence.  The real question is whether there was ultimately a

13   conspiracy or an agreement.  And the government's position

14   remains that in a per se case like this one, expert evidence is

15   not the type to shed light on the ultimate issue compared to,

16   say, a rule of reason case or other types of cases.  So I think

17   that affirmatively saying "such as this one" tells the jury

18   that this is the type of case where an economic expert can help

19   lead you to the right answer when that is not at least the

20   government's view of how his opinions should be considered.

21         And then finally, I think in the last paragraph again

22   instead of the word -- the words "opinion testimony," the

23   defendants have substituted it to read "expert testimony" which

24   again is not in the pattern instruction.  The pattern

25   instruction always refers to the expert witness' opinion as

1   opinion testimony and never as expert testimony.

2        And I believe that serves an important function, which
3   is just to remind the jury that simply because he is here as an
4   expert witness or giving expert testimony, he is not entitled
5   to more weight than anybody else.  He is entitled to whatever
6   weight the jury decides to give him based on his training,
7   education, et cetera, but it is not the type where
8   specifying -- our view is that including expert would be
9   prejudicial to the government.

10        And then finally, one additional point is in that last
11   sentence, it lists "considering the education, training and
12   experience of the witness."  "Training" does not appear in the
13   pattern instruction and we would be inclined to stick with what
14   the pattern specifies which is to remove the word training as
15   well.

16        THE COURT:  Response?

17        Ms. Pletcher, go ahead.

18        MS. PLETCHER:  Thank you, Your Honor.

19        Defendants believe this instruction is warranted given
20   that Professor Snyder did testify as an expert, which is a
21   unique type of witness, and he is the only witness who
22   testified in that manner.  And the jury should be informed
23   about the unique nature of his testimony, and that's the whole
24   purpose of the pattern instruction 1.17 which we did follow
25   closely in this case.

1          In fact, the word "training" that Ms. Cheng pointed

2    out actually is in the pattern instruction, the clause "such as

3    this one" also in the pattern instruction, and also worthy in

4    this case because the Court did permit such testimony because

5    in part it was helpful to the jury.

6          And finally the use note to pattern instruction 1.17

7    says, where expert opinions are at issue, the names of the

8    experts and a description of their opinion might be inserted.

9    Defendants are not asking to insert a description of Professor

10   Snyder's opinions, but to name him with his title or, in the

11   alternative, Ph.D. at the end makes sense because, again, he

12   was testifying as an expert, was a unique type of witness the

13   jury hasn't seen, and identifying him as such is not

14   prejudicial at all.  And the jury listened to him testify for

15   quite a while.  His CV is, in fact, in evidence.  And it would

16   just help the jury understand that he is a unique type of

17   expert.

18          THE COURT:  All right.  I will revise the instruction

19   as follows.  I am going to strike the word "professor" from it

20   because I don't believe that his title is necessary.  The jury

21   will know who he is.  I will leave in, even though it's not

22   part of the pattern, the next clause "who testified as an

23   expert."  I think that's appropriate.  Ms. Pletcher is right,

24   he did testify as a different sort of witness, so I think the

25   use the term "expert" there is fine.

1          The phrase "such as this one" is part of the pattern.

2     I will leave that in.  I will replace the other two references

3     to the word "expert" in the next -- in the second and third

4     sentences of the second paragraph because those are deviations

5     from the pattern.  And I will leave the word "training" in

6     which is appropriate.  He did -- Professor Snyder did talk

7     about some of his training and I think it's an appropriate

8     reference.

9          Let's focus now on the defendants' proposed

10    instruction regarding law enforcement agent testimony.  I will

11    reject that instruction.  The sources cited for it are from

12    other circuits.  I have never used such a thing and I don't

13    regard testimony in a criminal case by a law enforcement agent

14    as anything that would deserve some type of particular

15    instruction on it.

16         Let's talk about the character instructions now.  One

17    question would be why both?  Why not just the first and why not

18    give the pattern?  Anyone want to address -- take that up?

19         Mr. Feldberg, go ahead.

20         *MR. FELDBERG:*  I will address both, Your Honor.  I

21    think we are entitled to both.  There are actually two forms of

22    character evidence.  One is the witness' opinion and --

23    personal opinion, and second is the witness' opinion of the

24    defendants' reputation.  And we've tried to address both of

25    those points.  The proposed instructions as drafted are drawn

 1    from I think it's 1.09 and 1.09.1 of the pattern instructions,

 2    and we've attempted to present those to the Court.

 3         THE COURT:  Mr. Feldberg, let me ask you this.  In the

 4    instruction regarding honesty and integrity which is the one

 5    based on pattern instruction 1.09.1, it says, "Some defendants

 6    offered evidence."  What multiple defendants were those?

 7         MR. FELDBERG:  Certainly, Your Honor, Mr. Austin did.

 8    I recall that some evidence to that effect was I believe

 9    presented on behalf of Mr. Penn.  I may not have a complete

10    list in my head.  Other counsel may want to speak up on that.

11         THE COURT:  Sure.  That's fine.

12         MR. TUBACH:  I believe there certainly was testimony

13    about the character of Mr. Penn's --

14         THE COURT:  Character, but not honesty and integrity,

15    which this one was focused on.

16         MR. TUBACH:  Not honesty and integrity.

17         THE COURT:  Ms. Henry?

18         MS. HENRY:  Your Honor, I believe there was testimony

19    with regard to Mr. Kantola with regard to fair dealing and that

20    also would count.

21         THE COURT:  That to me is character evidence.  It

22    probably would fall within the first instruction it would seem.

23    The second instruction is specific I think to Mr. Austin.

24    That's the only person that I could find where there was

25    testimony about his honesty and integrity, which there was.  I

4000

1    would propose that we make that specific to Mr. Austin.

2              Ms. Cheng, go ahead.

3          *MS. CHENG:*  Thank you, Your Honor.  We would not

4    object to making the evidence on -- the reputation for

5    honesty -- the honesty specific instruction, to making that

6    specific to Defendant Austin.

7              I think also with regard to the good character

8    evidence instruction, instead of saying some defendants, I

9    think we should specify the particular defendants, so in this

10   case perhaps Defendants Austin, Penn or Kantola.  And the

11   reason for that is I believe Your Honor said at the last charge

12   conference anytime we say some defendants, it leaves the jury

13   to speculate which defendants, not all of them?  And to avoid

14   that type of improper questioning, it might make more sense

15   just to specify the defendants to whom this instruction

16   applies.

17         *THE COURT:*  All right.  And any other objections by

18   the United States to these two instructions?

19         *MS. CHENG:*  Yes, Your Honor.  So I think our primary

20   objection here is that the insertion of the term "standing

21   alone" which was inserted, I think, to the second paragraph of

22   both of these instructions.  Standing alone is something that

23   is contemplated by the use notes of the pattern, but is not in

24   the pattern itself.

25             And the reason for that is if you look at the *McMurray*

1    case that is cited in the pattern for when to include the

2    standing alone instruction, that quote -- that case recognized

3    that "the circumstances of a particular case" determine whether

4    the standing alone instruction should be given.  And these

5    circumstances can include whether the defendant presented

6    evidence -- only presented evidence of good character and then

7    subsequently rested the defense.  That is not the case we have

8    here.

9              The defendants each presented a rigorous defense.  It

10   was not limited to reputation testimony.  So we think that

11   standing alone would be inappropriate for that reason.

12             Another reason is that some of the reputational

13   testimony we saw was not from personal friends necessarily, but

14   from those who knew them at work.  I believe Mr. Bagshaw

15   testified that he saw Mr. Austin three times a year.  That type

16   of evidence we believe standing alone is not the type that is

17   sufficient to raise a reasonable doubt as to whether a

18   particular defendant is guilty.  So with that, I will rest.

19             THE COURT:  Mr. Feldberg, go ahead.

20             MR. FELDBERG:  Your Honor, we did take a look at the

21   case law before submitting these proposed instructions.  And as

22   we understand it, we agree with counsel for the government that

23   whether the "standing alone" phrase should be included depends

24   on the circumstances in the case, of the case.  Here we have a

25   trial that today is celebrating its one-month anniversary with

1    multiple witnesses, hundreds, if not thousands of exhibits, a

2    mass of evidence, and we think this is exactly the type of case

3    in which the standing alone instruction is warranted.

4         THE COURT:  All right.  So I am going to strike the

5    standing alone.  I don't think that this is the appropriate

6    case.  I am not sure what the appropriate case would be, but I

7    don't think that this is one.  That's not required language and

8    I am going to remove that.

9         I will modify -- I will give both instructions and I

10   will modify the instruction regarding honesty and integrity to

11   make it specific to Mr. Austin.

12        And now why don't we focus on instruction --

13   defendants' proposed instruction -- oh, the addition yeah, we

14   already talked about No. 10 earlier.

15        Ms. Cheng?

16        MS. CHENG:  Just to confirm, Your Honor, the standing

17   alone phrase also appears in the reputation for honesty

18   instruction that is now --

19        THE COURT:  Yeah, in both instructions.

20        MS. CHENG:  Perfect.  Thank you.

21        THE COURT:  All right.  So any additional instructions

22   to tender?  We are not going to do our final jury instruction

23   conference now, but here is my proposal.  And why don't I back

24   off that for just a second.  What I propose doing is the

25   following, and that is Ms. Butler has been dutifully trying to

4003

1    make all those changes as we talk about them.  As soon as I

2    have a chance to look over the instructions and double-check we

3    have made the changes that I have ruled upon, I can do one of

4    two things.  I would propose we e-mail a PDF of the revisions

5    to you and that way you can disperse.  I could, if you really

6    wanted, print something out, but that takes longer and you

7    would have to have someone hang around to get it.

8         Then we should meet back here, it depends on how long

9    you would like for lunch, but I would say maybe -- what time

10   did I inadvisedly tell the jury to come back?

11        *MR. TUBACH:*  2:30, Your Honor.

12        *THE COURT:*  Okay.  I would say that we should come

13   back in an hour, and then at that time we would have our final

14   jury instruction conference, but I'll need to get those

15   theories of the case so that I can look at those over the lunch

16   hour.

17        Mr. Tubach?

18        *MR. TUBACH:*  Your Honor, while this all has been going

19   on, we have been compiling them, and we have them all now in

20   one document.  So the question is how would the Court like to

21   receive that.  We could simply e-mail that.

22        *THE COURT:*  That's fine.

23        *MR. TUBACH:*  We will e-mail it to the government at

24   the same time.  We will have that done right away.

25        *THE COURT:*  Okay.  So then when we reconvene, we'll go

4004

1    over that packet and we'll finalize the instructions.  Then we

2    will need to do that laborious -- we have got -- we are working

3    on the redundancy, so I think we have four printers lined up so

4    we can manufacture those as soon as we can.  As you will recall

5    from the first trial, the jurors will each get a copy of the

6    instructions, but if anyone wants to use the document viewer to

7    display things, that's fine.

8         Do you know the results of the viewing of the

9    government's posters?  Any issues there?

10        MR. TUBACH:  I don't.  I apologize, Your Honor.  We

11   will find that out before we come back.

12        THE COURT:  So we will see how much time we have.  I

13   hope to be able to at least read the instructions.

14        Mr. Koenig, what is your -- what's the latest minute

15   count on your opening, assuming -- sorry, your closing,

16   assuming you are giving the closing.

17        MR. KOENIG:  I believe, although Ms. Call is preparing

18   it, finalizing it, but I believe it is two hours pretty much

19   exactly.

20        THE COURT:  Okay.  So I don't think we are going -- we

21   are obviously not going to be able to get that in, but what I

22   would hope to be able to do is read the instructions to the

23   jury today and then we'll start in tomorrow.

24        MR. KOENIG:  You said you don't think we would be able

25   to get it in today?  I just could not hear it.

1          THE COURT:  Right.  I think it may be tricky.  If we

2     can, we will.  It somewhat depends on whether or not the jury

3     can stay late.  Once again, we will look at the clock.  If we

4     can get the government's opening in, I would very much like to

5     do that.  And then if you work on -- if you take a look at the

6     math, even assuming that, tomorrow is a little bit tricky, but

7     it depends on the jury being able to, A, come in at 8:00; and

8     B, have a short lunch; and C, stay a little bit later too, all

9     of which I think we should try to accomplish if the jury is

10    amenable to that, okay?

11         All right.  So we don't further cut into your lunch

12    hour, we will plan on reconvening, then, at 2:10.  Thank you.

13         (Recess at 1:13 p.m. until 2:14 p.m.)

14         THE COURT:  We are back on the record in 20-CR152.

15    And I have e-mailed to everyone a copy of the revised jury

16    instructions.  And the defendants have e-mailed to chambers the

17    various theories of the case.  Let's focus on theories of the

18    case now.  Has the government had an opportunity to review the

19    theories?

20         MS. CHENG:  We have, Your Honor, and we have some

21    objections.

22         THE COURT:  Go ahead.

23         MS. CHENG:  So I have a couple points to make on this.

24    So I will begin first by noting that the government's position

25    is that there is no need for these defense theories to go back

1    with the jury at all because the Indictment is not being

2    returned with the jury, and so just on that basis there is not

3    really a purpose for the refutation here and the defendants

4    will have an opportunity to make whatever arguments they wish

5    during closing argument.  So having an additional piece of

6    paper written with a theory on it is not necessary, especially

7    where there is no Indictment for the jury to reference.

8         The second point is if I could point the Court to two

9    10th Circuit cases about what is appropriate to include in

10   defense theories of the case.  The first is *United States v.*

11   *Grissom*, 44 F.3d 1507.  And there the district court rejected

12   an instruction which basically laid out facts in a way that was

13   most favorable to the defendant.  And the 10th Circuit held

14   that this exclusion was proper and ruled, quote, "The

15   instruction inappropriately details the evidence defendant

16   wished the jury to emphasize."

17        Instructions must -- then it continues to say, "The

18   instruction if given could have led the jury to believe that

19   the district court was putting its imprimatur on defendant's

20   actual theory of the case."  It quotes another 10th Circuit

21   case to say, "Summaries of the evidence in the light most

22   favorable to the defense are more appropriate for closing

23   argument."  And likewise, in other 10th Circuit case, this is

24   *United States v. Chadwick*, it's at 554 F. Appx. 721, the

25   district court there rejected this defense theory of the case.

1    If the Court will indulge me, I will just read the instruction

2    that was rejected.

3         THE COURT:  You have to be quick because we don't have

4    much time today.

5         MS. CHENG:  Understood, Your Honor.  It just said it

6    is defendants' theory of the case that he did not know that

7    Palmer was a prohibited person.  Moreover, he did not have

8    reason to believe that Palmer was a prohibited person, et

9    cetera.  And the district court rejected the proposed

10   construction characterizing them as essentially just summaries

11   of the evidence in the light most favorable to the defense.

12        The 10th Circuit agreed and said that -- the 10th

13   Circuit basically agreed and said that this was not an

14   appropriate defense instruction because all it does is it calls

15   attention to certain types of evidence and summarizes it.

16        Now, with that said, the types of theories of the case

17   that we're seeing here follows the pattern that is

18   inappropriate.  We have sentences instead of beginning with "He

19   contends that," and although I do see that in some of the

20   summaries, many of the sentences begin with, "The evidence

21   shows" X, Y, Z.  Defendant Kantola's instruction, for example,

22   characterizes the evidence as the evidence mostly did not

23   pertain to him.

24        There are other types of sentences which begin with,

25   "He is not aware of."  This is really just defendants being

1    able to testify in these theories of the case without having to

2    actually take the stand.  Anything about their state of mind at

3    the time, the government just simply doesn't have a chance to

4    cross them on it, to -- and the jury is going to have this

5    information back there with them when the jury has no

6    Indictment.  It's basically a closing statement that goes back

7    with them.

8            And then finally, another point I wanted to make is

9    specific -- well, I have two points on the substantive law

10   here.  One is related to characterizing what witnesses have

11   said.  So Defendant Penn's and Defendant Lovette's instructions

12   both talk about what Mr. Pepper and Mr. Roberts -- sorry,

13   Mr. Bryant testified to.  They say, for example, if you look at

14   Defendant Lovette's theory of the defense, it says Mr. Lovette

15   maintains that Carl Pepper did not even mention his name, et

16   cetera.  Your Honor has told us in the last trial at least that

17   read-backs from the transcript are not allowed.  So

18   characterizing the testimony in this way when we have no chance

19   to refute it is simply inappropriate and violates some of the

20   10th Circuit cases that I read on closing instructions.

21           And then finally, this final point on the substantive

22   law is if you look at the statute of limitations, there is a

23   mention of that in Mr. Fries' instruction.  Mr. Fries in

24   particular, for example, says that in the second -- sorry, in

25   the sentence somewhere in the middle it says, "The government

1  has not alleged nor proven that within the five-year statute of

2  limitations Mr. Fries discussed pricing with anyone, directed

3  anyone else to share pricing information or agreed with anyone

4  to share pricing information."  This simply is not the law.

5         The government does not need to allege that he

6  discussed pricing or that he directed anyone or agreed with

7  within that time period.  There is no overt act requirement of

8  the Sherman Act.  And as long as the conspiracy continued to

9  remain in place during that time frame, that qualifies.  So

10  that is an extremely misleading statement of law, and we would

11  request at minimum that that be excised from the instruction.

12         And then finally, one more quick point is that several

13  of the defendants' statements here, theories of the defense

14  talk about a lack of pricing authority often stating it as a

15  purely factual issue, not even that it's their theory they have

16  no pricing authority, but merely stating in general there is no

17  pricing authority.

18         Of course, pricing authority is not a required element

19  for the government to prove, and it is not an element because

20  factual impossibility is not a defense to conspiracy.  And

21  that's true regardless of the Sherman Act cases and it applies

22  generally to conspiracy law.  Even if they could not affect

23  pricing, which is, of course, not the government's position

24  since many of the defendants did have pricing authority or

25  influence, even if they could not affect pricing, that is not

1    at all a defense to the Sherman Act, and including it in these

2    instructions is extremely misleading.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.

5          I am going to overrule each of those objections.

6    First of all, if I excluded each of the theories of the case, I

7    perhaps could, but that doesn't mean that giving them is some

8    type of legal error.  And in this case, I think it's

9    appropriate that we give them.  The 10th Circuit has said on

10   many different occasions that a defendant is entitled to a

11   theory of the case.

12         It is true that in various -- there are factual --

13   claims of factual statements and things of that nature, but

14   what I am going to do is before I read the various -- get to

15   the various theories of the case, I am going to read the

16   following instruction.  And we can talk about the wording of it

17   in just a minute, but it's going to say -- it will be a

18   separate instruction and it will say as follows.

19         The next 10 instructions are the defendants' various

20   theories or statements of their defense.  These instructions

21   were submitted by each individual defendant.

22         I think that that solves a lot of the complaints that

23   the government has, so that the jury will not believe that the

24   statements of fact are ones that the Court is finding or

25   something of that nature, but rather these are statements -- or

1    instructions prepared by each individual defendant, and for

2    that reason they wouldn't get confused with some view of the

3    Court.  And for that reason the so-called factual statements I

4    think are fine.  They are not problematic.

5         On Mr. Fries' theory of the case, the part of it, the

6    sentence that Ms. Cheng complained about, it's not a statement

7    of the law.  It's just a statement of fact.  And the

8    government, of course, has the ability to argue the law to the

9    contrary, so I don't find that that is problematic.  Similar

10   with pricing authority, that may not be a defense, but it's --

11   I think it's relevant.  It's certainly something that the

12   defendants can argue and make factual statements concerning,

13   and so I don't find that that is problematic.

14        I will ask Mr. Fries in the third sentence, it says,

15   "Mr. Fries was not the president of Claxton Poultry during the

16   period in the government alleges."  I think the word "in"

17   either needs to be struck or after the word "in," the word

18   "which" needs to be added. That's just my suggestion.

19        Mr. Beller?

20        MR. BELLER:  Thank you, Your Honor.  And I believe

21   that that's a typo.  I will simply take out the word "in."

22   Would the Court like me to --

23        THE COURT:  We can make that on the fly.

24        MR. BELLER:  I assumed so.  Thank you, Judge.

25        THE COURT:  Then let's go back to the -- okay.  So

1   let's go back to that instruction that I am going to put in

2   right before the theories of the defense.  Let me read that to

3   you again, and then I will see if you have any objections to

4   that phrasing.

5         The next 10 instructions are the defendants' various

6   theories or statements of their defense.  These instructions

7   were submitted by each individual defendant.

8         Any problem with that?

9         *MR. POLLACK:*  Your Honor, I would ask at the beginning

10  when you say the defendants, I would just say each defendant.

11        *THE COURT:*  That's fine.  That's consistent.

12        *MR. POLLACK:*  Thank you, Your Honor.

13        Ms. Cheng?

14        *MS. CHENG:*  Just for additional clarification, would

15  the Court be willing to add at the end "and not prepared by the

16  Court" just to make it very clear --

17        *THE COURT:*  Well, I think that might be a bit.  I

18  don't think it's necessary.

19        *MS. CHENG:*  Understood.

20        *THE COURT:*  I think once the jury hears this

21  instruction, I don't think that the confusion --

22        Mr. Beller?

23        *MR. BELLER:*  Thank you, Your Honor.  And I hope the

24  Court will forgive me for my lack of articulation in this.  It

25  strikes me, I believe, Your Honor, as something that I should

1    be objecting to.  And I would note that I believe that the

2    Court's instruction encourages and/or gives the jury permission

3    to ignore certain instructions as given by the Court.  I

4    believe that jury instructions are, in fact, the Court's

5    instructions.  I don't believe that the theories -- and I have

6    had a brief time to review all of them -- otherwise implies

7    that the Court has made any particular finding on those issues.

8    And for those grounds, I would simply object to the Court

9    giving of that instruction.

10        THE COURT:  That objection will be overruled.

11   Otherwise, I might not give any of the theories of the defense

12   because I think that they could have the potential for being

13   misleading or else we would have to go through and reword a

14   substantial number of them to make almost every sentence say it

15   is Mr. So and So's theory that -- so I think this is a better

16   way to do something very, very similar.

17        Mr. Fagg?

18        MR. FAGG:  Your Honor, I think just a point of perhaps

19   clarification.  If the Court is going to say "each defendant"

20   there in the beginning, I think the word "various" is then

21   superfluous.  It would be "each defendant's theories or

22   statements of their defense."

23        THE COURT:  Yeah, I don't have any problem with that.

24   Various is a little bit of a strange term anyway.  We will do

25   that.

1          Okay.  Let's then focus on whether the PDF version of

2    the instructions as we talked about them earlier this afternoon

3    or around noon were correctly incorporated into the draft sent

4    around.  Anyone have any issues with that?

5          Ms. Henry?

6          *MS. HENRY:*  Your Honor, I don't have an issue with

7    that, but I do have one other issue I need to raise.

8          *THE COURT:*  Okay.  Go ahead.  Well, here is what we're

9    going to do.  Assuming that the instructions as I sent out are

10   what reflect the Court's rulings on the various jury

11   instruction issues, then my proposal is that we'll move into

12   the final jury instruction conference, at which time I will ask

13   whether there are any objections or additional instructions,

14   whether everyone agrees with the verdict form.

15          During that particular final jury instruction

16   conference, people can incorporate previous objections that

17   were made.  You don't have to articulate that unless I ask you

18   to and that's how we'll proceed.  So is this an objection that

19   you had made before?

20          *MS. HENRY:*  No, Your Honor.

21          *THE COURT:*  This is a new objection?

22          *MS. HENRY:*  I didn't have time before lunch to go

23   through the additional objections.

24          *THE COURT:*  What's that?

25          *MS. HENRY:*  We just didn't have time before lunch to

1    go through the additional objections.

2         THE COURT:  I think we did.  We went through each and

3    every thing that was raised by both sides.

4         MS. HENRY:  We had another point that we had wanted to

5    raise.

6         THE COURT:  I will let you do that quickly.  It has to

7    be very quick.

8         I just want to let everyone know we have to break at

9    5:45 today because one of the jurors has got to leave by then,

10   so we need to move expeditiously.

11        MS. HENRY:  It is a very short issue.  It is on

12   instruction No. 28, which is the summary exhibit instruction.

13   And the proposal is that in the second paragraph it should read

14   "In connection with your consideration of all of the evidence,"

15   and then it would say, "you may give a summary exhibit entire

16   weight, some weight or no weight at all," period.  The concern

17   that we have is that the rest of that sentence in essence is an

18   instruction to the jury that limits how they may consider the

19   summary exhibits, and we do not believe that that is

20   appropriate.

21        The changed issue here is that we saw really the last

22   time in the closings how these summary exhibits were being used

23   really as argument and as a summary not of the exhibits, but as

24   a summary of the argument.  And in that instance we also have

25   issues with completeness.  We have issues of whether things are

 1   tied together properly.  And we do not believe that it is

 2   appropriate to limit how the jury looks at and decides what

 3   weight to give.

 4         So the proposal is -- and these are not -- they are

 5   not, as we know, from all of our debates traditional Rule 1006

 6   summaries.  They also are being brought in under 611, et

 7   cetera, et cetera.  So the proposal is really very small.  It

 8   is, as I said, "In connection with your consideration of all of

 9   the evidence, you may give a summary exhibit entire weight,

10   some weight or no weight at all," period, and that's what we

11   would propose.

12         THE COURT:  Okay.  I am going to reject that request.

13   I think that -- I don't think that the concern that Mr. Kantola

14   has about that instruction is valid.  I don't think that it

15   could be read to limit it the way it would be used in any

16   particular way.

17         MR. TEGTMEIER:  I consulted with the government about

18   this, but I haven't gotten a response.  I want to raise it

19   before closings and instructions.  We have asked that the

20   government not display or refer to sections of the contracts or

21   in any other way to warranties and/or confidential information.

22   I just haven't got a response.  I wanted to make sure that that

23   was clear that they were not going to do that before we open --

24   or before we close.  I got a little ahead of myself there.

25         THE COURT:  Sorry, I don't quite understand that

1    point, but maybe Ms. Call.

2         *MS. CALL:*  I believe Mr. Tegtmeier is referring to

3    certain contracts containing independent price determination

4    clauses which are actually meant to deter price-fixing.  We

5    actually did not plan to refer to them, so I think it's a

6    nonissue.

7         *THE COURT:*  Back to the instructions, then.  Have the

8    United States received a PDF of the revised instruction packet?

9         *MS. CHENG:*  We have, Your Honor.  We have no

10   objections to them other than --

11        *THE COURT:*  Previously articulated ones?

12        Any additional instructions we haven't talked about

13   already that the government wishes to tender?

14        *MS. CHENG:*  No, Your Honor.

15        *THE COURT:*  Thank you.

16        On behalf of the defendants, have each of the

17   defendants received a copy of the revised packet?  If anyone

18   didn't, raise a hand.  No hands raised.

19        And then other than the objections that the Court has

20   already addressed, any additional objections at this time?

21        *MS. HENRY:*  Your Honor, I just want to clarify when

22   you say objections that have been addressed, we are referring

23   to objections that were made prior proceeding as well as here.

24        *THE COURT:*  Right.  As I indicated before, it includes

25   prior trial.

4018

1           All right.  And other than instructions that I have

2    addressed either at the last trial or rejected today, any

3    additional instructions to tender on behalf of the defendants?

4           MR. FAGG:  Your Honor, can we just have one moment to

5    confer about one change?

6           THE COURT:  Yes.

7           MR. FAGG:  Thank you.  Sorry, Your Honor.  Nothing to

8    raise.

9           THE COURT:  Okay.  Thank you.  Then any objection by

10   the government to the verdict form?  I believe the government

11   has indicated that there is none, correct?

12          MS. CHENG:  No objection, Your Honor.

13          THE COURT:  Any objections to the verdict form by any

14   of the defendants?

15          All right.

16          MR. POLLACK:  I don't think we have seen one, Your

17   Honor.

18          THE COURT:  Well, it's exactly the same as the last

19   time, but we can pass one out to you, if you would like, just

20   to double-check it, but it's exactly the same as last time.

21          MR. TUBACH:  We will take the Court's representation.

22          THE COURT:  Very generous of you.

23          All right.  Then what we will do right now is as

24   follows:  We will quickly print out the jury instructions.  We

25   will have one per -- well, we will try -- I don't know how many

1    we will print, but we will try to print out at least one, but

2    maybe multiple copies for each defendant and also for the

3    government as well.  As soon as we get that done, then we will

4    commence with the reading of the instructions.  And then I am

5    hopeful that we will still have time to still get in the

6    government's close.  Like I said, one of the jurors has to

7    leave at 5:45, so that's our time limitation, all right?

8            We will be in recess.  Thank you.

9        (Recess at 2:34 p.m. until 2:51 p.m.)

10       THE COURT:  All right.  Let's bring the jury back in.

11   Let's wait for Mr. Koenig.

12       MR. FAGG:  Can I bring up one issue before we bring in

13   the jury?  Your Honor, I was doing the math on the closings and

14   where we may end up, and I don't intend to speak for all of the

15   defendants on this at all, but at least on behalf of

16   Mr. Lovette, we would propose I think we are going to go into

17   Thursday anyway with the closings.  I don't think there is

18   enough time to finish them tomorrow.

19       THE COURT:  I think we may be able to finish them

20   tomorrow.

21       MR. FAGG:  Okay.  I was just going to propose that we

22   wait and start the government's close tomorrow.

23       THE COURT:  We will go forward right now.

24           Let's bring the jury in.

25           (Jury present.)

1        THE COURT:  Ladies and gentlemen, what I am going to

2    do now is I am going to read the jury instructions to you.  As

3    you will note, you each have a copy of the instructions.  And

4    what I would like you to do is one of two things while I read

5    the instructions.  Either look at me while I read the

6    instructions to you or follow along as I read the jury

7    instructions to you.  What I don't want you to do is read ahead

8    while I am reading the jury instructions to you because

9    obviously you wouldn't be paying attention to my reading of the

10    jury instructions, okay?

11        All right.  Let me begin then with instruction No. 1.

12    Members of the jury, in any trial there are in effect two --

13        Oh, let me ask the parties.  Do you waive the

14    recording of my reading of the instructions?

15        MR. TUBACH:  Yes, Your Honor.

16        MS. CALL:  Yes, Your Honor.

17        THE COURT:  Thank you.

18        Ladies and gentlemen, that simply means that

19    Ms. Coppock doesn't have to record my reading of the

20    instructions because the instructions themselves are the record

21    of that.

22        (Jury instructions were read by the Court.)

23        Ladies and gentlemen, why don't we now take a brief

24    break.  I know one of you has a time commitment.  The issue

25    would be I anticipate the government's initial closing argument

1    will probably last two hours, probably two hours.  So the

2    question would be if we start that 4:00 whether -- and end then

3    presumably at 6:00, whether that's enough for that one juror to

4    meet the jury's commitment.  So why don't we take a 10-minute

5    break at this point in time and you can let Ms. Grimm know the

6    answer to that time commitment question, all right?

7           We will be in recess and the jury is excused.  Keep

8    the admonitions in mind, however.

9           (Jury excused.)

10          THE COURT:  Anything to take up?

11          MR. BELLER:  Briefly.

12          THE COURT:  Go ahead.  Everyone may be seated.

13          Mr. Beller, go ahead.

14          MR. BELLER:  Thank you so much, Your Honor.  Your

15   Honor, when the Court read Instruction No. 3, which is the

16   reasonable doubt instruction, if I may direct the Court's

17   attention to the very last paragraph, the Court I think

18   misspoke and interlineated the word "find" in place of the word

19   "think."  The concern I have with that, of course, is I believe

20   that that lowers the government's burden because doubt, of

21   course, is something that can naturally exist if the government

22   fails to prove their case as opposed to find being an actual

23   affirmative finding of the jury.

24          THE COURT:  I would agree.  If my misspoke, I think I

25   should correct that.  Anyone disagree?  Okay.  So when the jury

1    comes back in, assuming that -- well, regardless of whether

2    they can stay, I will direct their attention to that and

3    re-read that sentence correctly.

4         MR. BELLER:  Thank you, Your Honor.

5         THE COURT:  All right.  We will be in recess, then,

6    until 4:00 o'clock.  Thank you.

7       (Recess at 3:54 p.m. until 4:05 p.m.)

8         THE COURT:  The jury can stay late.  The jury can

9    stay.  So we will proceed.

10        Ms. Call, you will be up to bat.

11        Let's go ahead and bring the jury in.

12        And you've got your posters.  Is Mr. Koenig going to

13   be the designated poster mover?

14        MR. KOENIG:  Yes, Your Honor.

15        MS. CALL:  And, Your Honor, permission to approach the

16   screen from time to time?

17        THE COURT:  Yes, you may.

18        MR. KOENIG:  Then like last time once the jury comes

19   in, we will have to move the easel in so they can see.

20   Remember, we had to move it just like over --

21        THE COURT:  Yeah, whatever we did last time, that's

22   fine.

23        (Jury present.)

24        THE COURT:  Ladies and gentlemen, it was called to my

25   attention that I may have misread the last sentence on

4023

1    Instruction No. 3, so if you have your packet handy, I am going

2    to re-read that last sentence to you.

3         If, on the other hand, you think there is a real

4    possibility that he is not guilty, you must give him the

5    benefit of the doubt and find him not guilty, okay?

6         Now, ladies and gentlemen, we are going to start the

7    closing arguments in the case.  The United States has the

8    burden of proof, so it will go first.  After that each of the

9    defendants will give a closing argument.  And then the United

10   States can present a rebuttal closing argument.

11        Ms. Call will go first.

12        Ms. Call, go ahead.

13                        **OPENING STATEMENT**

14        *MS. CALL:*  Thank you, Your Honor.

15        Ladies and gentlemen, over the past several weeks

16   you've seen and heard the mountains of evidence showing you the

17   cheating, the coordination, the conspiracy involving all 10

18   defendants in this courtroom.  You have seen the dozens of text

19   messages showing you the conspiracy in action.  You have seen

20   the summary exhibits that put the text messages, the e-mails in

21   context with the phone calls at the time.  And you've heard

22   from two insiders who participated in this very conspiracy,

23   Carl Pepper and Robbie Bryant.  And what all this evidence has

24   shown is that these defendants chose to cheat and not to

25   compete.

1        And now, ladies and gentlemen, now is the time that I

2   get to talk to you about what all this evidence has shown.  And

3   it's very simple.

4        Mr. Koenig, if you could please put up our first

5   chart.

6        Year after year, customer after customer, these 10

7   defendants conspired to fix prices and to rig bids on some of

8   the most important fast-food contracts that their companies

9   were negotiating, KFC, Chick-fil-A, Popeye's.  They conspired.

10  They chose to work together as a united front and that is the

11  charged conspiracy at its core.

12       These defendants, these competitors, simply did not

13  compete.  You see, what all this evidence has shown is that

14  instead of submitting blind bids, instead of making independent

15  business decisions, instead of undercutting each other, instead

16  of hard-nosed competition, what did these defendants and their

17  conspirators do?  They worked together as a united front

18  against their customers.  They robbed their customers of

19  competition.

20       And ladies and gentlemen, let me tell you a couple of

21  things that this case is not about.  This case is not about

22  shortages.  This case is not about current prices.  This case

23  is not about information that the defendants got from their

24  customers.  This is a conspiracy to coordinate bids and future

25  pricing, to coordinate the pricing that the defendants were

1    about to charge to their customers.  And all you need to do to

2    see this conspiracy for what it really was is to look at the

3    defendants' own words and remember the testimony that you heard

4    from their conspirators.

5         So let's talk about what really happened here.  These

6    defendants gave their competitors their bids.  These defendants

7    gave their competitors their negotiation strategies.  These

8    defendants told their competitors when they were holding on

9    price in their negotiations, and they did this all over and

10   over again.

11        Now, ladies and gentlemen, you heard it is never smart

12   business to give your competitor your bid.  It is never smart

13   business to tell your competitor that you are holding on price.

14   It's never good business for a salesman to do those things

15   unless you are a member of this conspiracy, unless you have an

16   agreement, unless you have an understanding to work together

17   with your competitors to form a united front to hold strong

18   together on price or raise prices together.  It's only good

19   business to give away that information when you are a member of

20   this conspiracy.

21        Now, Robbie Bryant, one of the insiders, he told you

22   about that.  He told you how competition was supposed to work

23   in the chicken industry when he talked about Wal-Mart

24   negotiations.  He said for Wal-Mart he would never give a

25   competitor a bid.  And he said what would happen if you gave

1    them their bid is they would use that information to undercut

2    you.  They would use the information to compete.  That was a

3    risk, and so they didn't share bids for Wal-Mart business.

4         But that's not what happened here, ladies and

5    gentlemen.  Year after year these defendants gave their

6    competitors their bids and their negotiating positions for

7    their mutual benefit.  And it's common sense, ladies and

8    gentlemen, that defendants and salesmen in this industry, you

9    would not give your competitor the information that they could

10   use to undercut you.  You wouldn't give them the tools to

11   compete with you.  You wouldn't give your competitor the tools

12   to stab you in the back if that's what was really happening

13   here.  And they did it over and over again.

14        This was not competition.  This was not good business.

15   This was a conspiracy.  The defendants worked together as a

16   united front against their customers to make millions for their

17   companies.  That is the conspiracy and that is the united

18   front.

19        Now, we are going to walk through the evidence today,

20   ladies and gentlemen, but I want to give you kind of a road map

21   for our time together first.  And it's going to be just under

22   two hours.  We are going to start talking about the law.  And

23   then we are going to walk through some key evidence basically

24   in chronological order, and then after that we'll review each

25   of these 10 defendants' participation in this conspiracy, and

1    after that we'll conclude.

2           Now, as we go today, I am going to point you to key

3    exhibits.  You are free to write it down as we go along.  But

4    at the end when we start talking about each defendant's

5    participation, I am going to show you charts on the screen that

6    show you negotiations that defendant was involved in and some

7    of the key exhibits.  So if you want to write things down, you

8    can till the end.  And let me show you what that chart is going

9    to look like.

10           So here is an example of one of those charts.  You see

11   a defendant, negotiation, and then the next line over will

12   point you to the summaries relating to that negotiation.  And

13   over on the right-hand side it will point you to some of the

14   underlying exhibits, which for the most part are actually

15   contained in those summaries, and if not, they are bolded and

16   underlined, but that's what we'll get to at the end.  So if you

17   want to save your hands a little, you can wait.

18           So let's go and start with the law.  Now, Judge

19   Brimmer just instructed you, but I wanted to review a couple

20   things.  The charged conspiracy has three main elements:

21   First, the existence of the conspiracy; second, each

22   defendant's knowing participation, and third, interstate

23   commerce.  I want to talk about those first two right now.  So

24   that first element is the existence of a conspiracy.  All 10

25   defendants are charged with being members of this same

4028

1    conspiracy.  And Judge Brimmer told you what a conspiracy

2    means.  He said it's a partnership in crime.

3         He told you that to find a conspiracy, there needs to

4    be a kind of agreement or mutual understanding that the

5    conspirators came together for some unlawful purpose.  He told

6    you it is that agreement that constitutes the crime.  Now, that

7    agreement, that mutual understanding to fix prices or rig bids,

8    it's simple, ladies and gentlemen, and what it is is that

9    prices are fixed.  Bids are rigged simply because they are

10   agreed to in some way.

11        Now, you may ask yourselves, ladies and gentlemen, do

12   you have to agree to a specific price?  Do the prices all need

13   to be the same for this to be price-fixing?  And that is not

14   the case.  And I want to talk about the prices and the numbers

15   because you saw a lot of numbers, a lot of charts during this

16   case, and you heard the testimony of an economic expert.

17        And ladies and gentlemen, you are the judges of

18   credibility and you judge the weight of the evidence, but you

19   heard from an economic expert who was paid half a million

20   dollars to tell you an economic story about supply and demand

21   that really is not in issue in this case and whose economist

22   definition of price-fixing didn't really line up with the law

23   that Judge Brimmer instructed you, so consider that when you

24   consider his testimony.

25        But at the end of the day, those numbers you saw, the

1  charts that were put in front of you and were put into

2  evidence, they were put there to tell you a picture that just

3  because prices changed, just because volume shifted, just

4  because the defendants sometimes budged in their negotiations

5  with customers, that that means that they were competing, that

6  that means that there was no conspiracy.  But that's not what

7  happened here.

8      I want to talk about the law again on the agreement

9  and price-fixing because prices are fixed simply if you agree

10  to raise prices.  They are also fixed if you just agree to

11  withstand a decrease together with your competitors.  They are

12  also fixed if you agree to fall within a range or if you agree

13  whether or not to charge a new cost or to give a discount or to

14  accept different payment terms.  The specific numbers are not

15  the crime, ladies and gentlemen, and the prices are fixed just

16  simply because they are agreed to in some way.

17      And, of course, the prices were not all the same.

18  Robbie Bryant on the stand, he told you that would be obvious

19  to the customer if you fixed prices to the exact same price.

20  So let's talk about the nature of this agreement that you saw

21  from the evidence in this case.  Now, Robbie Bryant, he put it

22  in one sentence for you, and we are going to put this up on the

23  screen.

24      Ladies and gentlemen, you will see some words like

25  this on your screen while we are talking today.  It's your

1    recollection that controls what the witness has said.  He said

2    something along the lines of this.  He said that he and his

3    conspirators were cooperating with competitors to formulate

4    bids and sharing their prices to either increase or limit a

5    decrease in pricing.

6           Now, on the next slide you have something similar from

7    Mr. Carl Pepper.  He told you that he worked with his

8    competitors to see if they were doing the same thing, if they

9    were all going to agree on a substantial pricing increase.  And

10   he put it in a little more eloquent words on the next slide as

11   to each of the three defendants he was speaking to during the

12   summer of 2014.  He described to you calls with Defendant

13   Little, Defendant Brady and Defendant Blake during the summer

14   of 2014.  And I should note you've heard a lot about 2014 in

15   this trial.  We are going to get to most of the evidence there

16   in about probably 30 minutes.  But here is what Carl Pepper

17   told you about the nature of his understanding, his agreement

18   that he and his competitors were raising prices together at

19   that time.

20          Now, the bottom line is for this agreement, this

21   conspiracy, sometimes the defendants agreed to raise prices

22   together and sometimes they agreed to withstand a decrease

23   together.  Other times -- and it wasn't just for KFC certainly

24   and it wasn't just for these year-long or multi-year contracts.

25   This coordination was a constant.  They did it for the littlest

1    things.  You saw it for costs, for payment terms.  At the end

2    of the day, the first reaction of many of these defendants when

3    they got a call from their customer was to call their

4    competitors.

5         Now, that's the agreement.  That's the first element.

6    I want to move on to the second, the knowing participation in

7    the conspiracy.  Judge Brimmer told you that knowing

8    participation just means voluntarily and intentionally joining

9    a conspiracy.  And he told you that it doesn't need to be a

10   formal agreement, this conspiracy the defendants were a part

11   of.  They don't have to write a contract or have a handshake

12   agreement as to what happened or what they were going to do.

13   The agreement itself may be entirely unspoken.

14        Now, instead you can find the defendants'

15   participation from the defendants' actual words, the words of

16   them and their co-conspirators and then their course every

17   dealing over the years.  And what you see in the evidence is

18   each and every one of these defendants directly reaching out to

19   their competitors sharing their bids or their prices or their

20   negotiation strategies.  You see each of them doing that with

21   an understanding they were working together.

22        Now, what's simple is to convict all 10 of these

23   defendants, 2014 is all the evidence you need because in that

24   year you see each of these 10 defendants' participation in this

25   conspiracy.

4032

1          Now, we're going to turn to the evidence now and we're

2   going to walk through a fair amount of documents and we are

3   going to go chronological, like I said, but first let me kind

4   of orient you with some images you will see on your screen.

5   Some of this you already saw.  It's a time line of the

6   conspiracy.  You see different contracts, different customers.

7   Color coding does not mean anything here I will tell you.

8          What you see for each time is it starts with when the

9   defendants were reaching out to their competitors, when the

10  coordination happened, and that's that block for that

11  negotiation that continues throughout the term of the contract.

12  You see for KFC, for example, 2012, 2013 and then those

13  negotiations in 2014 for contracts that ran all the way to the

14  end of 2018.  So that's it.  And what we will do is when we

15  switch negotiation, we will show you this again and kind of

16  orient you in time for our discussion.

17          Let's go to another image.  This is just some of the

18  participants in this conspiracy.  It's color coded by company,

19  so you have Tyson, Mar-Jac, Perdue, Koch, Pilgrim's, George's

20  and Claxton.  And then you see the defendants' names all have

21  D's next to them so you can see them on this.  As we wrap up

22  each negotiation that was affected by this conspiracy, you will

23  see lines form on this showing you some of the coordination,

24  some of the interactions between competitors or the reporting

25  up that you saw in the documents or you saw in the phone calls.

4033

1   And you will see over time it builds to show you the picture of

2   this conspiracy, the overlap of participants and the actions at

3   the time.

4          One more thing you will see before we get into the

5   documents, this is one of the government's summary exhibits.

6   The last two things we talked about, those aren't going to be

7   in evidence when you deliberate.  These will.  The Judge

8   instructed you about these summaries, that they are only as

9   reliable as the underlying evidence.

10          Here is a summary.  I want to describe it for you.

11   You heard from Ms. Evans.  At the beginning of this trial she

12   described the color coding.  We are going to walk through it

13   now and I want to mention one thing.  My colleague, Mr. Koenig,

14   in opening statement he told you once the evidence came in, you

15   would see a pattern in the evidence and that it would come

16   together strong and clear.  And that's what you see in these

17   summaries.

18          And I am going to point it out for you now.  So this

19   bluish white color at the top, that color coding is just a

20   communication between a supplier and a customer.  And what that

21   is, it's usually kind of the spark that lights the fire here.

22   So what you see happening after those communications is the

23   orange.  The orange is communications between competitors.  So

24   here, for example, you see phone calls between three different

25   competitors.

1          And then you have this reddish salmon color which is

2     communications internal to a given chicken supplier, and that's

3     usually the communications that are going to show you what was

4     happening on those phone calls.  So that's the pattern and

5     that's the color coding in these.  These will be very easy to

6     find when you are deliberating.  They are the first 19 exhibits

7     you will have from the government.  But I wanted to walk

8     through that before we get into them.

9          You will see here there is just a couple calls, a

10    little flurry after a reach-out from a customer, but sometimes

11    you will see that flurry was a little bit more of a frenzy.

12    This is Government's Exhibit 10, page 3.  This is just two days

13    during the 2014 negotiations for KFC showing you call after

14    call after call between competitors before the first round bids

15    were due.

16         I want to show you one more thing which is just an

17    organizational thing.  When you go back and deliberate, the

18    exhibits are going to be somewhat organized.  You have the

19    different negotiations that are part of this conspiracy, the

20    different summaries numbered consecutively, and then the

21    underlying exhibits that are for the most part key to the

22    summary.

23         So, for example, the Church's freezing cost you heard

24    about, summary Exhibit 1, and then the exhibit starting with

25    100.  You don't have to write this down right now because you

4035

1   will kind of see that same pattern in the charts I described at

2   the end.

3           So now let's get started with the document and we are

4   going to start back in 2012 with KFC.  For these negotiations

5   you have three summary exhibits, 14, 15 and 16.  And if

6   Mr. Koenig could please put 14 up.  He's my Vanna White for

7   this afternoon's presentation.  We are going to put these up

8   here and just orient you in time.

9           So we will be going through the underlying documents,

10  and you will see the summaries on your screen here, but you

11  will see the underlying summary as we move along.  So beginning

12  of negotiations in 2012 from the get-go you can already see

13  this conspiracy in full force.  You see a request for pricing

14  from KFC followed by call after call between competitors in the

15  days before the bid, the first round bid was due.

16          Now, let's look at the actual underlying evidence.

17  This is the kind of image you are going to see throughout our

18  time today.  You are going to see documents that are actually

19  in evidence with you.  And then to help orient you on phone

20  calls, we have defendants' picture so you can see the

21  participants, the order of calls, kind of the flow of

22  information.  This image won't be back with you when you

23  deliberate, but you will have the summaries for the most part

24  which have all these calls in them.  If there is something that

25  is not in a summary, I will try to point it out so you can

1   write it down if you like.

2          This is that first round bid.  So on the day the first

3   round bid is due, you have Defendant Kantola raising his

4   dark-meat price just before submitting his bid to see if he can

5   pull it off.  Here you see on the left before he sent that, he

6   had been on the line with four of his competitors, Defendant

7   Blake at George's, Defendant Austin at Pilgrim's, Defendant

8   Little at Pilgrim's and Defendant Brady at Claxton.

9          Now, let's see kind of how those bids came in.  So he

10  knew that he could pull off raising his dark-meat price because

11  the price he landed at, .30 back, was exactly where two of his

12  competitors were.  And if he had been at 30 and a half back

13  like where he started, he would be at the very bottom of this

14  range right along with Claxton here.  And he knew he didn't

15  have to do that because he had been in touch with his

16  competitors.

17         And here you see there is actually a couple of

18  additional calls.  Defendant Roberts was also in touch with

19  Blake, and this is like in just two or three days before that

20  first round bid was due.  So let's move on because this is just

21  the start of those negotiations.  And I would like to move to

22  Exhibit 15 and the second round.

23         So here you have at the very top Exhibit 1526 and

24  1528, an e-mail from Defendant Austin.  And he is saying that

25  the buyer for KFC, Mike Ledford, who you heard from at the

1    beginning of this trial, he was asking all to go to .31 back,

2    so he is asking his suppliers to come down on dark meat

3    pricing.  That's the dark meat that we just saw that was being

4    coordinated.  And the defendants, once again, are reaching out

5    to their competitors figuring out how to react together.  You

6    see Defendant Kantola calling Defendant Austin and calling

7    Defendant Blake and Defendant Brady all within one day.

8            Now, here in the middle you see another customer

9    request.  You see a request for bids to be due on Wednesday,

10   and following that, once again, call after call after call

11   between competitors.  Ladies and gentlemen, you know what

12   happened on these calls because you have text messages in

13   evidence telling you.  So let's see what happened on these

14   calls.

15           This is November 13th.  You have Carl Pepper calling

16   Defendant Blake, Defendant Fries calling Defendant Brady.  Just

17   as the two of them hang up -- so Defendant Fries was the

18   supervisor of Defendant Brady.  Just as they hang up, Defendant

19   Brady reaches out to his competitor, Defendant Blake.  That's

20   4:17 p.m.  Now, they are on the phone.  Right when he hangs up,

21   he go and texts his boss, Fries, to report back an update.  He

22   says George's where Defendant Blake works is .30 back on dark

23   meat.

24           Then he gets a call from Defendant Austin and they are

25   on the phone for 13 minutes.  So while he is still on the phone

4038

1    with Defendant Austin, he then starts texting his boss again.

2    And you have what he said right here.  It says Pilgrim's is .30

3    back.  So Defendant Austin, who is on the phone with, he is

4    reporting his bid price and Tyson is .31 back.

5            The response here is, Oh, Mike, be bluffing hard, Mike

6    being the customer, KFC.  He says, I talked to Roger and this

7    must be 3 cents higher than us on eight-piece and his case

8    weight is 50 and a half.  So this is current pricing.  This is

9    talking about this month.  You heard this about the testimony

10   of Mr. Finch.  He said, yeah, that's current pricing.

11           What he didn't tell you about was the next line where

12   he said, He said to raise our prices.  On wings he is market

13   and market plus 10.  So this is Defendant Brady telling his

14   boss Defendant Fries that Defendant Austin at Pilgrim's, his

15   competitor, said to raise our prices.  And the response from

16   his supervisor is not don't do it, not don't coordinate with

17   your competitors.  It's, Tell him we are trying.  Tell him we

18   are trying.

19           Now, I want to move on to the next round of these same

20   negotiations in 2012 for KFC.  You see, Defendant Austin

21   reaches out, once again, to his conspirators at Pilgrim's.  He

22   summarizes some of the feedback he has been getting from KFC

23   and the status of negotiations.  And then he says in that

24   e-mail something you see right here, I will also be having some

25   other discussions today to get the pulse.

1          And let's see what Defendant Austin did.  His getting

2     the pulse was getting a call from Defendant Blake and then

3     calling Defendant Brady, Defendant Kantola and a conspirator

4     named Eric Oare from Marshall Durbin all in the same afternoon,

5     calling four different competitors.

6          Now, once again, you know what happened on these calls

7     because you have that in evidence too.  That's Government's

8     Exhibit 1522 and 1523 on the right-hand side of the screen

9     here.  You see Defendant Austin called his conspirator, Scott

10    Tucker, at Pilgrim's again.  And Mr. Tucker made this

11    spreadsheet.  What he put in this spreadsheet was kind of an

12    analysis on the Pilgrim's side and then the bid for five

13    Pilgrim's competitors, the good guys, meaning Pilgrim's,

14    Marshall Durbin where Mr. Oare worked, George's where Defendant

15    Blake worked who Defendant Austin had just been on the phone

16    with that afternoon, Claxton where Defendant Brady and Fries

17    worked and Koch where Defendant Kantola worked.

18          He puts it all in a spreadsheet that gets sent up to

19    his boss, Defendant Penn.  How does Defendant Penn respond when

20    he gets his competitors' bids in the middle of negotiation?

21    Does he say don't do it?  Does he say stop?  No.  He says, You

22    missed one.  Do we have a Tyson price idea?  He wants more.

23    And that's not all Defendant Penn does.  You see, he forwards

24    it on to his boss, Defendant Lovette, because they are using

25    and receiving their competitors' bids, their competitors'

4040

1    information to work together, to work together to withstand

2    KFC's attempt to negotiate a lower price.

3            And I should note you heard about this third round, I

4    think it was the third round of bidding from Mr. Ledford.  He

5    told you he didn't think he got competitive enough negotiations

6    in the first two rounds that year, so he did another round and

7    that's when this happened.  So that's KFC in 2012.  Like I

8    said, as we go along, you'll see some of the different contacts

9    that we just talked about built in here.

10           So these solid lines are contacts between competitors

11   we just talked about, and the bottom lines, dotted lines, are

12   reporting up between conspirators in one company, reporting up

13   to their other supervisors and other conspirators.  As we move

14   along, these will gray out and these are new ones while we move

15   on to another negotiation.  We were just covering 2012.  Let's

16   move to 2013, KFC negotiations, once again, and let's see what

17   happened.

18           And Mr. Koenig, if you could put up Exhibit 17.

19           So for these 2013 negotiations, you have one summary

20   exhibit and that's Government's Exhibit 17.  It shows you two

21   different rounds in one summary.  And what you see here is that

22   same pattern that you have seen in the evidence repeat itself

23   two times over.  Let's see what happened.

24           First here at the top Mark Oechsli, one of the buyers

25   for KFC, he reaches out to Scott Brady with feedback from the

1    first round bid.  Now, you heard from Mr. Finch from Claxton

2    who told you there was a shortage around this time.  He told

3    you he believed these calls related to that shortage.  What he

4    didn't show you on direct examination was what Scott Brady said

5    that day.

6          Scott Brady, Defendant Brady, got that feedback from

7    KFC for his boss, Defendant Fries, and says, FYI, I will make

8    some calls.  And ladies and gentlemen, Exhibit 1700 you can

9    only consider against Defendant Brady, but you can consider the

10   act he took after that against other defendants.  Let's see

11   what he did.

12         After getting that feedback, Defendant Brady reached

13   out to Defendant Kantola, Defendant Little and Defendant

14   Mulrenin.  That's this pattern, the immediate response reaching

15   out to your competitors to resist the feedback you get from

16   your customers.

17         Let's see the second round in these 2013 negotiations.

18   Same thing happened again.  Feedback from KFC, this time to

19   Defendant Austin.  And let's see what he said.  So the buyer

20   from KFC reached out and said, I was disappointed in your final

21   pricing.  I am afraid you'll be asking for us to move volume.

22   It seems as if the feedback was ignored.

23         Well, the feedback was ignored because you just saw

24   what was happening in that previous round when they resisted

25   feedback together by reaching out to each other, but Defendant

1    Austin has that same response Defendant Brady had.  He says, We

2    can talk in the morning after I do some scouting.  That's not

3    to KFC he sent that.  That's to his conspirators within

4    Pilgrim's.

5          Now, let's see how Defendant Austin does some

6    scouting.  Here is what Defendant Austin does the next day.  He

7    speaks to Defendant Brady four times over the course of one

8    day.  This is just the Pilgrim's side and Defendant Austin

9    reaching out to Brady.  Let's see what happened on the Claxton

10   side that very same day.

11         The first thing in the morning Defendant Fries, he

12   called Defendant Brady at Claxton at 8:18 in the morning.

13   Almost immediately after that call and these calls, ladies and

14   gentlemen, these are not in the summary, I should tell you, and

15   neither are Government's Exhibit 1700 or 1713 that I just went

16   through because you can only consider 1700 against Defendant

17   Brady, 1713 against Defendant Austin.  But Defendant Brady here

18   reaches out to Defendant Austin, Carl Pepper, Defendant Kantola

19   and Defendant Roberts all in one day.

20         And once again, you know what happened on these calls

21   because you have that in evidence too.  You have Government's

22   Exhibit 10651, which is another series of text messages between

23   Defendant Brady and Defendant Fries.  Here is what happens.

24   12:46 he reaches out, Scott Brady reaches out to his boss,

25   Fries, and says Ledford, meaning the buyer for KFC, Ledford

1   told Roger to be at .9250.  Now, that's the buyer for KFC told

2   our competitor, Defendant Austin, to be at X price for the

3   eight-piece product.  Then he reaches out again and says, Call

4   me.

5           So first off, you know this is what Defendant Brady

6   learned from Defendant Austin in their calls earlier that day.

7   And he says, Call me.  Defendant Fries calls him right away.

8   And as the two of them hang up, Defendant Brady reaches out to

9   Defendant Austin again.  So you know he is getting a directive

10  from his boss to go find out more information from his

11  competitor.

12          And here is what he found out.  Roger is at .30 back

13  and not moving.  Now, what that means is he found out from

14  Defendant Austin that their dark-meat price is at .30 back and

15  that he is not going to budge.  And like I said at the

16  beginning, ladies and gentlemen, you don't tell your competitor

17  you are not moving.  They are going to use it to undercut you.

18  You tell your competitor you are not moving if you have an

19  understanding that you are not going to move together.

20          But let's look at that full text message string

21  because you can really see what the state of mind is of

22  Defendant Fries in this.  So this is the full string or part of

23  the full string that afternoon.  Defendant Brady reaches out to

24  Defendant Fries first and says, Just FYI, last year we were at

25  32 back on dark meat and this year we are at 30 and a half.  I

1   know the substraction is a little hard to conceptualize

2   sometimes, but last year they were at a lower dark-meat price

3   and now they are higher.

4        These two texts are at the exact same time, so what

5   happened here is Defendant Fries reads this, starts writing a

6   response.  He said, okay, we can lower our price.  This year we

7   are higher than last year.  Let's go down.  He sends that and

8   he sees this.  Roger is at .30 back and not moving.  Then he

9   changes his response.  Stay 30 and a half then.  Don't use this

10  information to undercut Defendant Austin.  Let's use it to

11  raise our price.  Keep it as high as you can.

12       So that's the two rounds for KFC in 2013, once again,

13  multiple defendants coordinating, resisting together the

14  attempts of KFC to negotiate prices downward.  So we have been

15  through KFC in 2012, KFC in 2013.  Let's move on to another

16  kind of contract.

17       I will let Mr. Koenig put this up.

18       So we just talked about two year-long -- not year-long

19  negotiations, year-long contracts with a big customer, KFC, but

20  this coordination between these defendants, their competitors,

21  it wasn't just for these large contracts.  It also happened for

22  little almost trivial things, for cost, for payment terms, for

23  discounts, things that were worth less money, but it shows you

24  the relationships of the defendants and their competitors.  The

25  fact when these things came up, their response was to reach out

1    to each other.

2         I am going to start by talking about Church's.  So

3    Government's Exhibit 1 is the summary you have for the Church's

4    freezing charge.  It's that one we just looked at earlier today

5    showing you the pattern.  But let's get into the documents and

6    talk about what happened.  So here you have Government's

7    Exhibit 108 and 120.  These are requests from Church's that

8    came to Defendant Little at Pilgrim's and Carl Pepper at Tyson.

9         And what you see is he describes in his e-mail, we

10   have the top here, he describes here kind of what's happening.

11   He says, hey, Church's, we are looking to get more frozen

12   product.  We want to have kind of frozen chicken always on hand

13   in case a truck is late or a snowstorm comes.  I want to start

14   buying it pretty regularly from you guys.  And his first

15   question is, What are you thinking in terms of pricing?

16        He tells Defendant Little, What are you thinking in

17   terms of pricing, because Pilgrim's was actually already

18   supplying frozen product, but they weren't charging for it, so

19   he says, Are you still going to not charge for this frozen

20   product?  And let's see how they respond.

21        Here you have Exhibits 109 and 113.  And this would be

22   what you would expect to happen.  They reach out to their

23   pricing teams.  So Carl Pepper tells the buyer for Church's,

24   Mr. Bradley, says, I'll get with our pricing group.  Defendant

25   Little, he reaches out to Tommy Lane, someone at Pilgrim's.  He

1    says, Tommy, when will we have pricing?  Mr. Lane responds, We

2    will have something Monday.  So right now we are on a Friday.

3    They just got their price from Church's.  And he says, I will

4    get it to you Monday, but let's see what happens on Friday

5    before they ever get pricing from their pricing groups.

6         So Carl Pepper, and he told you about this, he gets

7    this request.  He calls Defendant Little and Defendant Kantola,

8    who both work on the Church's account.  It's an immediate

9    response when he gets this request from the customer to find

10   out what they were going to do.  You know what was said on

11   these calls.  Once again, you have it in evidence.  You have

12   Exhibit 120 where Carl Pepper writes to his supervisors,

13   Defendant Mulrenin and Defendant Roberts, telling them exactly

14   what was said.

15        He says, Pilgrim's, meaning Defendant Little who he

16   was on the phone with, told me they would be around 2-1/2 to 3

17   cents, and Koch told me they would be 2-1/2.  So when they were

18   on the phone, Defendant Little, Defendant Kantola and Carl

19   Pepper, they were discussing whether or not they would

20   charge -- how much they were planning on charging for this

21   frozen product.

22        Now, how is this information used?  You heard about

23   cost pass-throughs and sometimes it's actually just a

24   legitimate cost that's passed and there is no negotiation.  You

25   still have to make a decision about whether they are going to

1    charge that cost to the customer and they made that decision

2    together.  And you see that here in the next exhibit,

3    Exhibit 108.

4         On that Friday before he ever heard from his pricing

5    team, Defendant Little responds to Church's saying, I'll have

6    pricing for you Monday.  There will need to be a freezing

7    charge for both.  You just heard Pilgrim's, they were already

8    supplying frozen product, but they were not charging for it, so

9    he makes the decision to change his mind and charge based on

10   those discussions with Carl Pepper and Defendant Kantola.

11        Now, that's the Church's frozen product.  This is in

12   early 2013.  Let's see what happens again later that year once

13   again to Church's when they tried to make another change.  You

14   have another summary exhibit for these negotiations.  That's

15   summary Exhibit 2.  Now, what happens here and you see in the

16   underlying documents you have Exhibit 224 where Church's

17   reaches out and says, hey, we're changing our quality

18   assurance, and that's kind of a fancy word for specs or how you

19   are going to make and dress the chicken, which I know you all

20   know at this point, but Church's says they are going to change

21   their specs.  And this was done after the negotiations and

22   people are mad.

23        People at Tyson reach out and they are like, I don't

24   know why this was done after the negotiations ended.  And Carl

25   Pepper responds to Defendant Mulrenin saying, you know what, I

1    wonder how other suppliers are going to react.  I might call a

2    couple of them and ask.  He then does that.  Carl Pepper calls

3    Defendant Little and Defendant Little calls Defendant Kantola,

4    the same trio you just saw for the freezing charge, once again,

5    reaching out to each other immediately after getting a request

6    from a customer.

7              Now, you know what happened on these calls because you

8    have it in e-mails from all three of them.  You have

9    Government's Exhibit 6134 from Defendant Kantola reporting what

10   he learned.  He is talking about the next month's pricing for

11   Tyson and Pilgrim's, so you know they were talking about

12   pricing.  Defendant Little, the same, reports Tyson's price for

13   the next month.  Then you know they were talking about the

14   quality assurance and whether they would charge because he

15   says, Carl Pepper says talked to Jimmie Little and he said they

16   were planning on adding to their cost to do this.  So this is

17   Carl Pepper reporting to his bosses, once again, Defendant

18   Mulrenin, Defendant Roberts, I talked to our competitor.  We

19   are talking about this cost, and here is what our competitor is

20   going to do.  We are making this decision together.

21             I am going to talk about one more cost before we move

22   on to a few contracts and that's Chick-fil-A in early 2014.

23   And then we are going to get to KFC 2014.  We are almost there.

24   Here is a summary you have for the Chick-fil-A conversion that

25   started in early 2014 to antibiotic-free chicken.  But let's

1    look just to orient ourselves with the press release that

2    Chick-fil-A issued, and that's 356.  So early in 2014

3    Chick-fil-A releases its press release saying, hey, we are

4    going to convert all our chicken to antibiotic-free.  Our

5    suppliers are committed and they pledge to have it done within

6    five years.

7           Let's look at the response within the suppliers.  You

8    have the summary, but let's move forward.  So this is Defendant

9    Mulrenin sending the press release on within Tyson,

10   Exhibit 9714, and this can only be considered against Defendant

11   Mulrenin.  So he sends it on.  He sends the press release and

12   he says, Our conversation with Chick-fil-A are, of course,

13   confidential.  Now, ladies and gentlemen, do you think that his

14   conversations with Chick-fil-A were confidential?  No.

15          You have in the evidence, you have a call between

16   Defendant Mulrenin, Scott Brady in April, followed by a text

17   message that afternoon where Defendant Brady reports up once

18   again to his boss Fries.  I talked to Tim today at Tyson,

19   meaning defendant Tim Mulrenin, and for ABF, that's

20   antibiotic-free chicken, they are at 2 cents per live weight.

21   He said, They are supposed to give a number, meaning a price,

22   to Chick-fil-A today, an added cost.  I told him where we were.

23          Defendant Fries responds once again, not don't do it,

24   not don't coordinate cost with your competitors.  Did he say

25   what their finished increase would be?  What's their number?

4050

1    Defendant Brady responds, Work in progress, but I told him what

2    we were doing, Perdue and Pilgrim's.  Defendant Brady here told

3    Defendant Mulrenin three different chicken suppliers' price

4    increases that they were planning for Chick-fil-A at that time.

5    So that's some of the conversation around that Chick-fil-A

6    conversion and the coordination on the increase that they were

7    going to seek for Chick-fil-A.

8          Now I am going to move on to KFC in 2014.  Now, as I

9    said earlier, ladies and gentlemen, the supply prices in 2014

10   is not in dispute.  It is not in dispute that KFC ran out of

11   chicken on Mother's Day in 2014.  But a question for you all,

12   ladies and gentlemen, is was this really a supply crisis for

13   the defendants?  Were they scrambling around trying to find a

14   home for their chicken?

15         Well, what 2014 was for these defendants and their

16   companies, it was an opportunity.  You see, they had been

17   coordinating with each other for years and years just resisting

18   these price changes, and now they had an opportunity to go up.

19   And they gripped that opportunity and took the market up

20   together.  So 2014, it wasn't a crisis for these defendants.

21   And you have Defendant Penn's own words about what 2014 was.

22   He says 2014 was chicken nirvana, chicken nirvana because of

23   the price increases that they could negotiate together that

24   year.

25         Let's go to the next slide.

1          Now, it was chicken nirvana.  They were going to take

2     these prices up and they had a plan.  You heard from Robbie

3     Bryant about how they were taking prices up across the

4     fast-food industry.

5          Now, let's look at some of the conspirators' words

6     from around that time.  These are four conspirators just from

7     Pilgrim's Pride, Scott Tucker saying Everybody will be paying

8     through the nose.  Jason McGuire, who you heard about, We are

9     going to change the small-bird industry this year no doubt.

10    Defendant Penn in that same conversation, in 2013, I had some

11    owners of small-bird companies, meaning other chicken

12    suppliers, thank us via me for getting our act together.  I

13    guess it will happen again.  Defendant Little, I hear everyone

14    is going up significantly.

15         Now, you also heard at Pilgrim's how they had a plan.

16    They had a plan for how they were going to get these price

17    increases done.  The first part of it was KFC first, let's lock

18    that business down with our big customers and the rest will go

19    down like dominos.  And you see that in the documents.  You

20    heard it from Robbie Bryant.  And you see it in documents from

21    that time.  Once KFC is in, we will be hitting these others

22    starting next week.  One at a time.  Got KFC and BM, meaning

23    Boston Market.  Rest still to come.  Everybody is getting that

24    price increase.  You saw that document this morning.

25         And last, Defendant Austin, it's him instructing

1    Defendant Little on Pollo Tropical, Don't give out any numbers

2    to Pollo Tropical until we get this KFC done because that's

3    going to let them get price increases across the industry.  So

4    that's the first part of the plan, KFC first.  Second part is

5    getting it out to the industry, the industry meaning Pilgrim's

6    competitors, get them onboard with this price increase.

7         You heard about that from Robbie Bryant and Carl

8    Pepper.  Robbie Bryant told you how he was at a meeting in the

9    summer of 2014 with a customer.  He was alone in the room with

10   his conspirators from Pilgrim's, how he heard Jason McGuire

11   tell Defendant Austin, I need you to put this out to the

12   industry.  I need you to put this out to the industry, meaning

13   reach out to our competitors and tell them that Pilgrim's is

14   taking prices up.  Tell them that Pilgrim's is taking prices up

15   so they do it too and all get the price increases together.

16        And Carl Pepper told you the same thing that's

17   happening at Tyson.  He told you how Defendant Mulrenin

18   directed them to reach out to Tyson's competitors and confirmed

19   that they would be doing substantial price increases too.  You

20   also have it from a document at the time from Defendant Fries.

21        You have some board minute meeting minutes from

22   Claxton where he is talking about sales in 2014, talking about

23   the customers and the supply shortage.  And he said big birds

24   were a fad, those big birds you heard about who could make more

25   money.  Defendant Fries didn't make them.  He said big birds

4053

 1   were a fad.  He said fast-food companies are prepared to take

 2   10, meaning a 10 cent increase, but the industry is saying we

 3   want 20.  The industry is saying we want 20, meaning our

 4   competitors are saying we want a 20-cent increase and they are

 5   saying it together.

 6          So that's the plan in 2014 to get industry-wide price

 7   increases.  But now let's look through some of the documents

 8   from that time and we are going to start with KFC.  Now let's

 9   move to the summaries.  You have three summaries for KFC 2014.

10   That's Government's Exhibit 10, 11 and 12.  Let's start with

11   Exhibit 10.

12          Now, we talked about 2012, talked about 2013.  In 2014

13   do you think once again for KFC that these defendants were

14   coordinating with their competition?  Well, let's go through

15   the documents from the very beginning of these KFC

16   negotiations.  You can see from the get-go this coordination

17   that you heard about from Robbie Bryant and Carl Pepper.

18          Morning of August 7 -- these phone calls are in your

19   summary.  The morning of August 7 is when Defendant Kantola was

20   having his meeting with KFC.  They were meeting one by one with

21   their suppliers at the beginning of the month.  What you see

22   here is that morning Defendant Kantola is on the phone with

23   Defendant Little for about 18 minutes, almost right up until he

24   walks in the door at KFC.  So he is on the phone with his

25   competitor, walks in the door, gets out of the meeting, and

1   right after they are back on the phone telling each other how

2   the meeting is going, that they were delivering that same

3   message for the price increase, but that's not all ladies and

4   gentlemen.

5          Let's go back.  So we just covered the beginning of

6   August 7.  Then you have Mr. Lewis who you heard from from KFC.

7   He gave them a first round bidding deadline.  He said, I want

8   your first bid by August 19.  Now, you heard how Tyson, Tyson

9   was the first to submit their bid.  They submitted on

10  August 11th.  But let's see what else happened on August 11th.

11         First, early afternoon you have Carl Pepper reaching

12  out to both Defendant Blake -- sorry, just Defendant Blake and

13  then reporting back to Defendant Mulrenin about the

14  conversations he was having.  But that's not all.  Later that

15  afternoon Defendant Roberts and Mulrenin take it into their own

16  hands.  This is the day they were about to submit their

17  significant price increase to KFC.  Here is what they do.

18         Defendant Roberts has a call with KFC before they ever

19  submit their bid.  Defendant Mulrenin and Roberts then call

20  each other in the afternoon.  While they are on the phone,

21  Defendant Roberts and Mulrenin both at Tyson, while they are on

22  the phone, Defendant Mulrenin takes his other line and calls

23  Defendant Brady at Claxton.  And then -- and you have these

24  underlying phone records, they are in 8004 and 8005, they

25  are -- they conference call with Defendant Brady and they are

1   on the line together with him just before they submit their

2   first round bid to KFC.

3           Now, you heard from a lot of the KFC buyers during

4   this trial.  How does KFC react when they get that first price

5   increase from Tyson?  Here you have it from Mr. Eddington who

6   you heard from.  He e-mails Defendant Roberts and says, Are you

7   trying to get me fired before I even move here?  Because he

8   just started at about the same week.  And then on Thursday of

9   that week, so still before other suppliers have submitted their

10  bids, Mr. Eddington reaches out to Defendant Mulrenin saying,

11  Please call me tomorrow to discuss the model you guys

12  submitted.

13          So the week Tyson submits its bid KFC reaches out,

14  wants to talk to Friday, and this is the Friday before those

15  first round bids are still due.  And they are expecting some

16  negative feedback from that price increase.  Well, let's see

17  what happens on that Friday.

18          So Carl Pepper told you, he told you how Defendant

19  Mulrenin had directed them to reach out to other suppliers.  He

20  told you how he would get a call from Mulrenin, reach out,

21  report back.  And you see that exact pattern happening here on

22  August 15 when Tyson's first to get their feedback.

23          You see Defendant Mulrenin calling Carl Pepper and him

24  immediately afterwards having call after call basically as he

25  hangs up with one competitor calling the other, Defendant

1    Little, Defendant Brady, Defendant Blake, Defendant Brady

2    again, and then at the end reporting back to Defendant Brady.

3         Now, you have most of these calls in summary

4    Exhibit 10 which is up here, but page 3 shows you just the

5    frenzy of calls between competitors during that Friday on the

6    page before and then the following Monday because this

7    following Monday, that's the day before the bids were due for

8    everyone else, and they are calling each other to make sure

9    they are all going to come in with that price increase.

10        Now, I want to show you something about the pattern of

11   calls here because you have a lot of people on the line here.

12   At the bottom you have Jason McGuire and Defendant Austin.  You

13   heard about Jason McGuire.  He is the one that says put this

14   out to the industry to Defendant Austin when they are meeting

15   with the customer.

16        Now, I want to show you another thing you have in

17   evidence from Mr. McGuire just after this phone call with

18   Defendant Austin.  This is Exhibit 1035 and 1036.  This is an

19   e-mail Mr. McGuire sent about 30 minutes after getting off the

20   line with Defendant Austin.  It's an e-mail and attachment.

21   And if you can see the underlying document here, it looks like

22   a KFC cost model if you were just to look at the top.

23        Then you have what's in the bottom left here, just

24   like in 2012 when you see that spreadsheet with bids, you have

25   a spreadsheet with the margins, meaning the profit line of five

1    of Pilgrim's competitors, Koch where Defendant Kantola worked,

2    Case, Claxton where Defendant Brady and Fries were, George's

3    where Defendant Blake was, and Mar-Jac.  You see their current

4    margin and new margin, new margin meaning the margin they are

5    about to submit in their bids due the next day.

6           So these numbers, these aren't shortages.  These

7    didn't come from the customer because they don't have the bids

8    yet.  These are the numbers they got from their competitors

9    during those calls.

10          But you have another e-mail from Mr. McGuire just

11   minutes after this one, and that's Government's Exhibit 1074.

12   And he tells you what's going on here.  He said, Roger did some

13   checking around today, Roger meaning Defendant Austin, and I

14   included the below regarding the range of the total increases,

15   margin and costs that folks are going in with.  And then once

16   again, now he has the price increases for Koch, Case, Claxton,

17   George's and Mar-Jac.  So this is Jason McGuire sending the

18   price increases for the bids due the next day that Defendant

19   Austin got from five of his competitors.

20          And how are they using this information, ladies and

21   gentlemen, because that's kind of the question in this case.

22   Why is this getting used?  Is this just data gathering?  Well,

23   he tells you right here.  He says considering the numbers above

24   and the fact that we wanted to be the leader, this would put us

25   in at a 16-cent increase.  So this isn't Pilgrim's using

4058

1    information to compete.  This is them using it to fall at the

2    top with their competitors knowing that their competitors are

3    going in with these increases they told them.

4            And one thing I should have noted, when you see a

5    document like this, it's obviously written by one person, and

6    it's evidence of their partnering in the conspiracy, Defendant

7    Austin's participation.  But you can think of it for the others

8    too because what you see here is Defendant Kantola, Defendant

9    Brady, Defendant Blake, they are the ones giving their price

10   increases to their competitors.  They are the one right before

11   they submit a bid telling their competitor that they are doing

12   historic price increases.  If they were competing, you don't

13   tell your competitor you are about to do a 20 percent increase.

14   They would just undercut you.

15           Let's see the calls again to show you where this

16   information came from because in this August 15 and August 18,

17   you have the calls on the summary, Defendant Austin reaching

18   out to Defendant Brady, Defendant Austin reaching out to

19   Defendant Blake, Defendant Kantola speaking to Defendant

20   Little, who then reported up to his boss, Defendant Austin.  So

21   on these calls you know they are reaching out to each other

22   telling each other how much of a price increase they are going

23   to see and margin line, that profit line there that they are

24   going to be putting in their bids.  Defendant Austin relayed it

25   on to Mr. McGuire who then put it in an e-mail once again up to

1    Defendant Penn.

2         Now, here, how does the supervisor, Defendant Penn,

3    react when he gets the upcoming price increases and the bids

4    from his competitors?  Does he say, What are you doing?  We are

5    independently seeking this price increase?  No, he doesn't.

6    First, he confirms the amount of money this is going to be.

7    This is 1058 where he says 2-1/2 million pounds times a 16-cent

8    increase, that's 400,000 per week, right?  400,000 per week in

9    added revenue.

10        And you have another e-mail, Exhibit 1074, at the top.

11   Defendant Penn responds saying, I am good.  Will review with

12   Bill in a.m.  Will advise.  So in 2012 you saw Defendant Penn

13   forwarding that spreadsheet he got to Defendant Lovette.  Here

14   you have him say, I am going to review this with Bill Lovette

15   in the morning, Defendant Lovette, meaning I am going to review

16   with Defendant Lovette what the plan is to get these price

17   increases.

18        You heard from Pete Suerken.  Bill Lovette was

19   involved.  He was meeting with the KFC buyer.  He was the CEO

20   of the company.  And he needed to know what the plan was for

21   how these 10 to 20 percent increases were going to get

22   achieved.  And this was the plan.  It was coordinating with the

23   competitors to make sure they could get the price increases

24   together.

25        And the information they got, this wasn't bluffing,

4060

1    ladies and gentlemen.  This is reliable.  You see the

2    information that Defendant Austin got, this was the numbers in

3    1036, the margin and the price increases.  It lines up with

4    what those competitors submitted the very next day.

5         I have the exhibit numbers for the actual bid, but

6    22-cent margin exactly what Koch submitted, 22-cent what

7    Claxton submitted, 23 what Mar-Jac submitted.  And Defendant

8    Blake, he had given a price increase that fell right in line

9    with what he had told his competitors.

10        Now, you may notice Tyson's price isn't in here.  So

11   what happened there?  Let's go to the next slide.  In 2012, you

12   saw Defendant Penn respond, Do we have any price idea?  So by

13   this time in 2014 he knew to get that information himself.

14        So the morning of August 15, he had called Defendant

15   Roberts.  So that's just the first round bid for 2014 for KFC

16   and there is more.  Let's first see how KFC reacted.  You saw

17   from Robbie Bryant this e-mail about KFC crapping their pants

18   when they saw that price increase, and you heard Carl Pepper's

19   testimony saying how they were shocked.  So at this point the

20   competitors together had followed the plan, had submitted their

21   first round bid, but there were rounds of negotiations to go

22   still.  So let's see what happened.

23        First you heard from Mr. Suerken about a meeting

24   following those first round bids with Defendant Austin.  He

25   told you he was shocked how irrational and emotional Defendant

 1   Austin was because KFC started threatening Pilgrim's volume.

 2   And you see that in the documents too.  You have Exhibit 1051

 3   where Defendant Austin reports up to his bosses about that

 4   meeting.  And he says, Pete told me stores would close if they

 5   paid what we propose, and I told him I thought we would stand

 6   firm on our number.  And he didn't believe KFC's threat about

 7   taking volume.

 8         Well, let's see what happened following that meeting.

 9   First you have another summary now, Exhibit 11, Exhibit 11.

10   But before we get into the documents, you also heard what's

11   going on at this time from Robbie Bryant.  He told you about a

12   trip to Louisville to meet with KFC on August 22nd, so that's

13   just a couple days after those first round bids.  He told you

14   how he was in Roger Austin's office when he overheard a call

15   with Defendant Brady and Defendant Kantola and heard him tell

16   him exactly the message that Pilgrim's was now delivering to

17   KFC, so they proposed those increases and now their job was to

18   get those increases to stick.

19         So he tells his competitors, The price is the price.

20   I just need to know how many loads you want it at.  And you

21   watched here in court as Mr. Bryant for the first time saw the

22   phone records showing those August 22nd calls, back to back

23   calls with Defendant Kantola and Defendant Brady, so this is

24   Defendant Austin reporting back to his conspirators telling

25   them we are going to make this work.  I am delivering that

1    message.  The price is the price because we are going to get

2    those price increases and hold strong together.

3            Now, let's look at how else that message was conveyed.

4    Here you have August 26, just a couple days later, another call

5    from KFC.  And I should note those last calls, I don't think

6    they are on the summary exhibits, the August 22nd call that you

7    heard about from Mr. Bryant.  These ones are.  So August 26 you

8    have him here 11, a call from KFC, and you see the reaction

9    that flows once again.  Mr. Austin reaches out to Defendant

10   Penn, his boss this time.  Then Defendant Lovette, CEO, calls

11   Defendant Austin, the sales guy, to make sure they are going to

12   get that price increase.  Defendant Austin reaches out to

13   Defendant Brady and there is another text message here.

14           Defendant Brady now texts his boss, Fries, saying, I

15   talked to Roger about KFC and Greeley told him not to come down

16   on price.  So this is Defendant Brady saying, I talked to

17   Defendant Austin about KFC.  And his boss is in Greeley,

18   Colorado, which is Defendant Penn and Defendant Lovette.

19   Greeley told him not to come down on price.  This time

20   Defendant Fries responds, Wow.

21           Now, you know it's not wow, what are you doing?  I

22   can't believe I am hearing about my competitor because he has

23   been seeing that year after year at this point.  This is wow,

24   what an opportunity.  The plan is working.  He has proposed

25   these price increases and we are going to stick there together.

1           Now, then you see Defendant Fries take action into his

2    own hands.  The next morning he calls Greg Tench, a competitor

3    at Mar-Jac, and Scott Brady calls Defendant Kantola.  And you

4    know what happened on those calls because you have it here in

5    text messages as well, and that's Exhibit 1230, I think, the

6    text message.

7           Defendant Brady reports just after getting off the

8    phone with Defendant Kantola, Koch is not moving either.  So

9    Defendant Kantola told Defendant Brady, we are going to hold on

10   that price increase too.  And Defendant Fries reports to Brady,

11   Tench is at 11.  And you heard that was just a meeting time,

12   but you know on the phone they were coordinating the price

13   increases as well.

14          Now, we are getting towards the end of those KFC 2014

15   negotiations.  They are this close to sealing the deal with

16   those historic price increases and that was when the bosses get

17   involved.  They are the ones now to make sure that their

18   companies are going to get those increases.  So here you just

19   have -- and if we could put up Exhibit 12.

20          Here is the first page of the last summary exhibit for

21   those KFC 2014 negotiations and it starts with a request of the

22   buyer for their final bid.  It says, hey on September 3rd, the

23   Tuesday or Wednesday of next week, can you get me those final

24   bids?  We are going to finish this process.  And you think the

25   conspirators reached out to each other as that September 3rd

4064

 1    date came?  You see it all over this summary.  But let me show

 2    you something that's not in the summary.

 3           Here you have Government's Exhibit 1030.  You heard

 4    from Ms. Flo Becker at the very beginning of this trial.  She

 5    was the first person up on that VTC screen talking to you guys.

 6    She told you she believed this was written by her boss, Pete

 7    Martin, at Mar-Jac.  He was an executive over at Mar-Jac,

 8    another competitor of these defendants.

 9           And you got his handwritten notes.  They are from

10    August 29, so just a couple days before that bid is due.  And

11    it has the name of the KFC buyer on the top, some information

12    about corn futures, and then this that we have blown up right

13    here.  Talked to Mitch.  They were up 19 cents and holding.

14    Tyson $1.0976 per Tommy.  Talked to Jayson Penn plus 8,

15    cost-plus, 11 margin, and down here Claxton, 1.1099 up 18.35

16    cents.  So this is Mr. Martin having the price increases of his

17    competitors now at this point at the very end of those KFC

18    negotiations.

19           Mitch Mitchell from Case, you heard about Tommy

20    Francis.  He worked with Pete Martin, but he heard -- he has a

21    close relationship with Defendant Roberts at Tyson.  It says

22    talked to Defendant Penn.  Here is Pilgrim's price increase.

23    Claxton up .1099, which was their first round bid and holding.

24    Let's see how we got some of that information here.

25           You see that same day of those notes, Pete Martin made

1    phone calls to both Defendant Penn and Defendant Fries.  This

2    is where I said the bosses got involved.  So Pete Martin talked

3    to Jayson Penn as he literally wrote in his notes, Talked to

4    Defendant Fries, and they shared the price increases that they

5    were going to be holding with for KFC.  And this isn't the only

6    calls as that final bid came due.

7         Let's look at just that final day, that September 3rd

8    when the final bids were due.  How many calls there were?  I am

9    not going to count them, but let's just look through some of

10   the participants.  Defendant Brady, Defendant Kantola,

11   Defendant Austin, Defendant Fries, and let's go to the middle

12   of that day, Defendant Brady, Defendant Mulrenin, Defendant

13   Austin, Defendant Blake, and then later that afternoon

14   Defendant Brady, Defendant Kantola, Defendant Fries, Defendant

15   Austin, all syncing up throughout the day to make sure they

16   were all holding strong together.

17        You will see they budged a little on prices.  Here you

18   have a text from Defendant Brady at the end of the day to

19   Defendant Fries.  That's Exhibit 1248.  It says, Talked to Bob,

20   meaning Bob Lewis, the KFC buyer.  We said we would go down 2

21   cents.  He said someone moved down 4 cents, or it has to be

22   George's.  And he ends with, Roger and Bill are not moving.

23        So once again, you have Defendant Brady who just spoke

24   to Roger Austin and Defendant Bill Kantola that afternoon.

25   Roger and Bill are not moving.  We know we are holding strong

1    together to get this price increase.  So at the end of those

2    2014 negotiations and how did KFC feel at the end?  We heard it

3    from the buyers and you see it in the documents.

4         You saw Mr. Suerken who wrote this somewhat of a joke

5    call agenda to Defendant Roberts and he writes kind of exactly

6    how those negotiations went.  One, Tyson wants a ridiculous

7    price.  Two, RSCS says no.  Three, RSCS shamefully tells Tyson

8    that we have bought poultry at ridiculous prices from others.

9    Four, Tyson informs RSCS, really, you are screwed.

10        You heard that same segment from Mr. Suerken when he

11   was on the stand.  When counsel for Defendant Blake asked him,

12   weren't you satisfied at the end of those negotiations?

13   Weren't you satisfied when George's came down a little on

14   price?  Here is how he responded.

15        He says:  No, I wasn't satisfied.  That is the worst

16   RFP I have ever had in my career from produce to beef to paper

17   cups.  I have never had that much price inflation driven off of

18   margin, meaning I have never had prices go up that much in my

19   career based on numbers that were going straight to the

20   company's pockets.  That's how RSCS, meaning KFC felt at the

21   end of those negotiations.  They didn't feel like supply and

22   demand merited that price increase.

23        Now, let's move on to just one more customer in 2014.

24   Let's talk about Pollo Tropical.  And you've heard from their

25   buyer, Mr. Brink, during this trial.  Now, Pollo Tropical was

4067

1   another fast-food customer, another one of those targets for

2   those historic price increases.  You saw in the evidence and

3   you have right at the top here how it was one of the ones where

4   Defendant Austin told Defendant Little, wait until we finalize

5   KFC and we are going to go after them next.

6           You see that pattern we have been talking about over

7   and over again throughout this exhibit.  You see how Defendant

8   Little, nearly every time he spoke to Joe Brink, the Pollo

9   Tropical buyer, during those negotiations, immediately before

10  or immediately after he is on the phone with his competitor

11  Walter Cooper, who is another salesman at Claxton.  You see

12  time and time again, and I am just going to go through a couple

13  of the details here.

14          You heard about a meeting from Mr. Brink.  He told you

15  how he met with Defendant Little at the beginning of the

16  negotiation.  They had lunch at a Pollo Tropical and it was in

17  Addison, Texas.  And he told you how that's where Defendant

18  Little delivered the price increase to him.  He said it was

19  going to begin with a two, meaning a price increase of at least

20  20 cents.  Mr. Brink told you he got up and left the restaurant

21  after he heard that, left Defendant Little sitting alone at the

22  table.

23          But he didn't tell you -- what Mr. Brink didn't know

24  was immediately before and immediately after that lunch,

25  Defendant Little was on the phone with his competitor, Walter

1    Cooper, to tell him exactly the message he was going to

2    deliver, the amount of the increase, and report back on how

3    that meeting went.

4         You see the same thing down toward the bottom of the

5    first page of Exhibit 5.  Mr. Brink told you about a conference

6    call he had with Defendant Little, how in that conference call

7    Defendant Little delivered a price increase, gave him an

8    ultimatum.  And then you see, once again, right after that call

9    Defendant Little calling Walter Cooper at Claxton.

10        Nobody is telling Walter Cooper that that ultimatum he

11   gave Joe Brink, the price was the price mentality he was giving

12   for this contract, that he delivered that because Walter Cooper

13   follows up with an e-mail to Mr. Brink, Government's Exhibit

14   9740.  In that document Walter Cooper reaches out to the buyer.

15   He says, Hey, I bet Pilgrim's has told you or will tell you the

16   price is the price, no negotiation.

17        Now, Walter Cooper when he sent that e-mail knew that

18   was the message that Defendant Little was delivering because

19   they just had a phone call.  They just talked about that

20   message too.  You have more in Government's Exhibit 5, that

21   same pattern, requesting from customer, call, request from

22   customer, call.  It just repeats itself.  This is just the way

23   they were doing business here.  Then you have here at the end

24   kind of how those negotiations ended.

25        You have two folks within Pilgrim's, two conspirators,

4069

1   saying pricing finalized.  We got a 17-cent increase for Pollo

2   Tropical and then the response.  And this is in Exhibit 519,

3   Damnation.  Did you tell them you were in the mafia?  People

4   don't have options.  People don't have options is exactly the

5   state of the industry in 2014 because all of these suppliers

6   were seeking historic price increases together.  The buyers

7   didn't have options.  That's Pollo Tropical in 2014.

8         So we're not going to go through other customers in

9   2014, but you see this pattern.  You heard about it, about

10   other customers, Popeye's, 14 cents, others the same.  And they

11   went across the industry.  We have a couple documents just

12   showing you that here.  Pollo Tropical, 17 cents.  Church's,

13   Defendant Little saying everyone is going up significantly.

14   Popeye's, 14 cents.  Then Defendant Penn here at the bottom

15   talked to Jason McGuire, Jason McGuire who made the direction

16   to put this out to the industry that summer saying, I called

17   you out in a board meeting.  Leading the industry, the industry

18   meaning the different suppliers, the defendants, leading the

19   industry to higher prices, $75 million year over year.

20         Ladies and gentlemen, money was the driver in 2014 and

21   you see in the documents how much.  This is Defendant Kantola,

22   and this document can only be considered against him.

23   Exhibit 901, he is bragging to his boss, Joe Grendys, about the

24   price increases they achieved for that year.  Church's,

25   $25 million; Popeye's $5 million; KFC, $15 million.  That is

4070

1    just price increases to Koch, Defendant Kantola's company, that

2    they got in 2014.

3           Now, you have a lot of the contracts in evidence.  You

4    can do this math for others.  George's made at least $7 million

5    in 2015 just off of these price increases.  Money was the

6    driver.

7           Now, you heard about some companies losing volume.

8    You heard about Pilgrim's losing some KFC business after they

9    sought these price increases because they were the leader.

10   They sought the highest price.  They knew they were going to

11   lose volume being the highest in price.  And you saw this

12   document, Exhibit 979.  Robbie Bryant told you about this.  He

13   told you this showed the loss in volume and he said he didn't

14   even remember Pilgrim's losing volume because it was kind of a

15   nothing.  It was kind of a nothing because you see here for all

16   the business they lost, they gained business at those higher

17   prices because everyone was getting that price increase.

18          He did the math here, told you that losing business

19   for KFC meant gaining $12 million for Pilgrim's by losing

20   business.  That is how everyone profited together in 2014.  The

21   volume shifted around, but all their customers got those price

22   increases.  So that's 2014.

23          Now, we've talked about KFC 2012, talked about KFC

24   2013, talked about KFC 2014 negotiations.  When those three

25   contracts that were negotiated in 2014 came up due, do you

1    think these defendants and their conspirators reached out to

2    each other again?  Let's look at those negotiations that

3    started in 2017 for KFC.

4            For these negotiations you have two summary exhibits,

5    Exhibit 18 and 19.  And here is Exhibit 18.  And Robbie Bryant

6    told you about this negotiation, about the coordination that

7    happened, and you see it here.  He told you about Exhibit 1882

8    where he reached out to Defendant Austin, how Robbie Bryant, he

9    would come up to more of a management role at this time.  So he

10   didn't know how to make these orders, but he said, Can you let

11   me know where we need to be to be No. 2 in price?  He told you

12   he was asking Defendant Austin to reach out to his competitors,

13   get their bids so that Pilgrim's could figure out where they

14   would fall in the pack this time and that range that they were

15   going to fall within.

16           Then you see it.  In the summer you see exactly what

17   Robbie Bryant described to you happening.  Let's look at some

18   text messages too that Mr. Bryant wasn't on.  He told you how

19   he first didn't hear back from Defendant Austin, didn't get the

20   bid, and he got yelled at by his boss, Tim Stiller.  Tim

21   Stiller told him -- or he got a call from Defendant Austin

22   saying, yeah, I got the same message from Tim Stiller too, mad

23   that we didn't have our competitor's bid.

24           Here you have that in the text message.  So here is

25   Tim Stiller, Roger Austin.  This is February 1st, two days

1    before the first bid is due saying, hey, is KFC expecting NHA,

2    which is a new product they were doing, no hormone added

3    chicken, at no cost?  Roger Austin saying, My thoughts would be

4    yes unless everyone asks to be paid which seldom happens.

5            I want to pause on this because you heard a lot about

6    cost and cost pass-throughs and how you can't possibly fix a

7    price that's in a cost.  Here is how you can fix a price in a

8    cost.  He is saying, Is KFC going to expect to be charged?

9    Defendant Austin said, Yeah, they are probably going to expect

10   not to pay unless everyone else does.  Then he says, Can you

11   find out about the others?

12           So this is Tim Stiller directing Roger Austin to reach

13   out to competitors, find out if they are going to charge for

14   this NHA.  He says, I will do some scouting and see what the

15   pulse is.  We are going to see Defendant Austin say in another

16   exhibit -- let's see how he does some scouting.  The next

17   morning Defendant Austin reaches out to Defendant Kantola,

18   Defendant Brady, Defendant Blake and Greg Tench at Mar-Jac.

19   And this is all on -- this is all on February 2nd.

20           Exhibit 1919, this is not on the summary.  These calls

21   are.  But these are Robbie Bryant's notes he showed you from

22   the call he got from Roger Austin following these calls telling

23   him the competitors' bid.  Let's blow it up a little more.

24   Here you have prices for Koch, Claxton, Mar-Jac, Tyson,

25   George's.  They are eight-piece prices and the dark-meat

 1    prices.

 2         Now, you heard some insinuation on cross-examination

 3    of Mr. Bryant that these were current prices and not bids.

 4    Let's see what they were.  Let's think about the purpose

 5    Mr. Bryant told you about the conspiracy.  You saw how they

 6    raised prices in 2014.  KFC was now trying to push them down.

 7    Mr. Bryant was asked, if you are a hundred percent effective in

 8    trying to resist a price increase, what would your price be?

 9    It would be the current price.  The bids here were the current

10    prices and you see that in some of the documents.

11         You see Defendant Mulrenin submit his bid saying our

12    pricing model remained the same, meaning our pricing model is

13    going to stay the same as it currently is.  The same thing from

14    Defendant Brady.  Reduced our profit so that we can keep the

15    same costs we currently have in place.  Then you see his bid

16    was actually the number that Mr. Bryant wrote down.

17         So this is the first round bids.  One more bid I want

18    you to look at which is Pilgrim's Mr. Bryant told you about.

19    In that bid when Defendant Austin submitted it, he said, We

20    promised you that we would be competitive and we hope you find

21    this to be just that.  This is 2017 Roger Austin submitting his

22    bid to KFC after he had been coordinating with his competitors

23    in 2012, 2013, 2014, and 2017.  We promised you we would be

24    competitive.  Are you kidding me?  He was not being

25    competitive.  You have seen through the years how he was

4074

1  coordinating with his competitors on these bids.

2       Let's move on to the next round because this

3  continues.  Exhibit 19, the last of the summaries which goes

4  through that next round of bidding.  Robbie Bryant told you

5  about a call he got from Tim Stiller as these negotiations were

6  going on, how Tim Stiller called him, I talked to Defendant

7  Austin, and I told him to tell the industry we are going to

8  hold.  Now, at this point, ladies and gentlemen, you are

9  familiar with these terms.  He is telling Defendant Austin to

10  tell the industry, meaning Pilgrim's competitors, that

11  Pilgrim's is going to hold firm on price.

12       And you see it happening the next day.  If we could go

13  to the next one, here is actually the text message that Robbie

14  Bryant wasn't on that Tim Stiller sent to Defendant Austin

15  saying, Need you tell industry we are going to hold.  Defendant

16  Austin says, Will do.

17       And he got some time to do his due diligence.  Here is

18  what he does.  Defendant Austin calls Defendant Kantola,

19  Defendant Brady and Defendant Blake to tell them Pilgrim's is

20  holding on price so they could do it together.  That's 2017

21  KFC.

22       All right.  So here is the text messages.  Here is the

23  call that followed just like other years you see it reported

24  up.  So if you look at the calls on summary 19, you see

25  Defendant Austin calling his competitors, him calling Robbie

1    Bryant, Robbie Bryant having a call with Tim Stiller, his boss,

2    so sort of going up the chain, and Defendant Penn texting Tim

3    Stiller, Let's come to BL office.  Let's discuss KFC.  That's

4    Defendant Penn saying come to Bill Lovette's office.  We are

5    going to talk about KFC.

6         And just like you saw in the other years where the

7    information is passed on to Lovette in e-mail, in

8    conversations, here it is again, Defendant Lovette is getting

9    updated by the minute on how they are securing their prices

10   with KFC which is through this coordination with the

11   competitors.  So that's KFC 2017, and here is some of those

12   contacts with competitors and reporting up.

13        Now, we talked about nine of the defendants at this

14   point directly reaching out to their competitors.  We haven't

15   reached Defendant Lovette.  Let's talk about Sysco in 2016.

16   You have in evidence Exhibit 803.  This is an e-mail between

17   Defendant Lovette and Joe Grendys, who is the president of

18   Koch.  Let's talk about payment terms.  Joe Grendys reaches

19   out, Have you heard that Sysco is going to 65-day terms?  And

20   Carl Pepper told you the payment terms are a part of price.

21        Defendant Lovette responds, Yes, we told them no.  Joe

22   Grendys says, I am 100 percent onboard.  If that changes,

23   please tell me.  Defendant Lovette says, Will do.  So this is

24   Defendant Lovette trying to get ahead of his competitor, Joe

25   Grendys, agreeing that they are not going to offer these

1    payment terms to Sysco.  And they are reaching out to each

2    other, just as we've seen for years, in the way of doing things

3    in this conspiracy and this industry.

4         So that's all the negotiations we are going to walk

5    through today. We are going to get to each of the defendants,

6    those charts I told you about in the beginning in a moment, but

7    let's see kind of what's been put together during the course of

8    our time today because it shows you the participants in this

9    conspiracy.  These are just some of the connections in the

10   industry.  These are the calls, the e-mails, the text messages

11   we have talked about today.

12        Now, participants in a conspiracy, they have different

13   roles, and that's kind of what you see here.  You see the

14   salesmen, Defendant Kantola, Defendant Brady, Carl Pepper,

15   Defendant Little, they are the ones working the phone lines

16   reaching out to others, and that's why you see these lines

17   emanating from them, from the coordination they were doing.

18   But then you see the reporting up to bosses that was happening

19   all along.  You see this overlap.  You see this participation

20   over time.  And this common purpose we have gone through,

21   increasing prices, resisting a decrease, that's the purpose of

22   this conspiracy.

23        Ladies and gentlemen, if you have any question about

24   what these acts were and what they meant, you can go to

25   Defendant Penn's own words at the time because he knew exactly

1    what this was.  Here you have Exhibit 6198 and 3037.  This is

2    an e-mail written by Brenda Ray, who you heard from I believe

3    it was yesterday in this trial.  She told you how she got a

4    call from a friendly competitor telling her Pilgrim's was

5    taking contract pricing up and that competitor thanked

6    Pilgrim's Pride, thanked their competitor, and promised her

7    they were following.

8            Now, you heard Ms. Ray's testimony, and you can be the

9    judge of her credibility, but you knew what Defendant Penn, her

10   supervisor, thought was going on because he forwards it on in

11   exhibit -- I think it's 3037 to his subordinate and conspirator

12   Jason McGuire and says, FYI, do not forward.  Not exactly a

13   legal conversation.  This is back in 2012 Defendant Penn's

14   state of mind about what his subordinates were doing.

15           Let's fast-forward to 2014 and look at some other text

16   messages we have in evidence also from Defendant Penn.  This is

17   a conversation with Tim Stiller and Defendant Penn about Golden

18   Corral.  They are talking about the negotiation, talking about

19   Golden Corral.  Tim Stiller tells Defendant Penn, Mar-Jac you

20   have heard about where Mr. Pete Martin worked, they are 2 cents

21   higher and they are not going to negotiate.  This is in 2014

22   Golden Corral, another one of those suppliers that got the

23   historic increases.

24           Defendant Penn says, Good deal.  Last time they did

25   cave.  And then Mr. Stiller says, They are listening to my

4078

1    direction.  They are listening to my direction.  Defendant Penn

2    says, Who is they?  Then he stops himself.  He is talking about

3    Mar-Jac, our competitor, saying they are not going to

4    negotiate.  He responds, If they is illegal, don't tell me.  If

5    they is illegal, don't tell me, not don't do it.  If you are

6    coordinating with our competitor Mar-Jac, not don't do it, not

7    stop, just don't tell me.  This is 2014 his state of mind.

8         And you'll see more in the conversation.  Mr. Stiller

9    corrects himself, says, Oh, I was actually referring to Scott

10   and Roger.  You can be the judge.  Who knows whether he is just

11   correcting himself in writing because this is Tim Stiller the,

12   same person who wrote, No comp names in e-mail.  You heard that

13   from Robbie Bryant.  So who knows what the end is, but the

14   point of this is Defendant Penn's state of mind is if they is

15   illegal, don't tell me.

16        So that's the evidence I wanted to walk through.  So

17   now I am going to get to those charts.  So if you want to find

18   evidence for each defendant when you deliberate, you can look

19   to see that kind of participation.  We are going to put that up

20   now and we are going to start with Defendant Brady and

21   Defendant Fries.  I am going to finally return back to the

22   podium for a minute.

23        So we have gone through the existence of the

24   conspiracy and each defendant's participation while walking

25   through the evidence.  I want to talk about one more thing and

4079

1    that's interstate commerce, that third element, because it's

2    quick and it's pretty simple.

3          Judge Brimmer told you to find interstate commerce,

4    you basically need to find the products that were sold by these

5    suppliers traveled across state lines.  It's really simple, but

6    let me give you a couple examples.  So multiple witnesses,

7    Mr. Little -- not Mr. Little, sorry, Mr. Ledford from KFC, Carl

8    Pepper from Tyson, they all testified that the chicken products

9    that were sold, they went from, you know, the growers, the

10   suppliers to the distributors to the customers and they

11   traveled state lines in that process.  It's pretty simple.

12   It's the chicken is sold pursuant to these contractors we have

13   been talk about today.

14         One more thing, statute of limitations, before we get

15   to those charts.  So you need to find that at the latest this

16   conspiracy continued until October 6 of 2015, and that's

17   another one, ladies and gentlemen, that's pretty simple.  So

18   the 2014 negotiations we just talked about, those contracts

19   went in effect through 2017.  And you heard from Mr. Bryant

20   that Pilgrim's actually sold chicken pursuant to those

21   contracts, so that's 2017, well past 2015.  But then we just

22   talked about coordination in early 2017 well within the statute

23   of limitations.  It pretty simple.  You don't need to find each

24   defendant took at an act within five years, just that the

25   conspiracy continued.  It's that simple.

4080

1              Now we can get to those charts.  I will give you a

2      moment to write these down if you want.  What I'll recommend if

3      you want to safe your hands, you have the negotiations.  You

4      have the summaries.  Most of those underlying exhibits will

5      actually be in the summaries or be referenced in them and ones

6      that aren't are bolded and underlined.  So if you want for each

7      defendant, if you want to write things down, do the summaries

8      and then the bolded and underlying exhibits and that should get

9      you just about everything.

10             But I want to tell you kind of what you will find in

11     these documents while you are writing things down.  So some

12     things will be the defendants' own words showing you their

13     participation in the conspiracy.  So for Defendant Brady and

14     Fries, you have seen a bunch of text messages between the two.

15     You have Exhibit 355, 982, 1238, 1427 and more.  And those show

16     you kind of their participation in their own words, the Roger

17     and Bill are not moving.  Roger said to raise our prices.  And

18     you'll see those in some of these exhibits that are mentioned

19     here.

20             Other things you will see are kind of a window into

21     their participation at another company, so things like

22     Exhibit 1074 which was the "Roger did some checking around

23     today" and then has competitors' bids.  And that shows you

24     these defendants' participation because it's the numbers they

25     gave Roger, so it's going to be just another way of seeing that

4081

1    same defendant's participation in the conspiracy.

2         On top of the documentary evidence you have here, for

3    Defendant Brady you also have testimony from both Carl Pepper

4    and Robbie Bryant.  Carl Pepper told you Defendant Brady was

5    one of the norms, one of the people he heard about this

6    coordination with our competitors kind of just all the time

7    within that QSR group.  He also told you about the call he

8    overheard in Roger Austin's office's where Defendant Austin

9    called Defendant Brady to deliver that message that the price

10   is the price, the message we are giving to KFC.

11        You also heard from Carl Pepper about Scott Brady.  He

12   told you that Scott Brady was one of the people he spoke to in

13   the summer of 2014 to confirm that Claxton would be seeking a

14   substantial price increase just like Tyson was.

15        So you have these documents and the testimony for

16   Defendant Brady and Defendant Fries.  And you saw in those text

17   messages, in the phone calls, that the two of them were just in

18   sync throughout their negotiations, throughout their

19   coordination with competitors updating each other on the status

20   of the conspiracy.  And that is all Defendant Brady and Fries's

21   participation.

22        And ladies and gentlemen, I will call it active and

23   enthusiastic incorporation because that's what you will see in

24   the documents.  The standard is just knowing, but that's their

25   active and enthusiastic participation.

 1          Now, let's move on to Defendant Kantola.  And I will

 2     talk while you write things down again.  Defendant Kantola was

 3     a salesman at Koch, so just like Defendant Brady, just like

 4     some of the other defendants, he is one of the ones you see

 5     working the phone lines, calling his competitors, sharing his

 6     negotiating position, sharing his prices with the understanding

 7     that it will not be used to compete.  You have some of his own

 8     words like Government's Exhibit 6134 you saw when he spoke

 9     about Church's at the beginning today.  And you have his phone

10     calls and the text messages showing what was discussed.

11     Bill -- Roger and Bill are not moving.

12          For Defendant Kantola you also have testimony.  You

13     have Carl Pepper who told you about his coordination with

14     Defendant Kantola with respect to the Church's conduct.  And

15     you have Robbie Bryant who told you about the phone call he

16     overheard between Defendant Austin and Defendant Kantola that

17     same day, August 22nd, in Louisville, that same price is the

18     price message delivered to both Defendant Brady and Defendant

19     Kantola.  So this evidence and the testimony that you heard

20     shows Defendant Kantola's active participation.

21          We are going to move real quickly through this because

22     I know everyone is trying get home today.  So Scott Brady,

23     Defendant Fries, Defendant Kantola.  Let's move on to Tyson

24     Foods, Defendant Mulrenin and Defendant Roberts.  I will give

25     you a little longer to write this one down.

1          Defendant Mulrenin and Defendant Roberts were both

2     supervisors on the sales team at Tyson.  You heard from their

3     subordinate, Carl Pepper, and he told you about his

4     participation in the conspiracy, his coordination with other

5     suppliers and his reporting up to Defendant Roberts and

6     Defendant Mulrenin what he was doing.  You see it in the

7     documents, reports up, like Exhibit 114, 221, 224, 617.  And

8     you can look at the documents and ask yourselves if you ever

9     see Mr. Pepper's supervisors tell him to stop and they don't.

10          Mr. Pepper told you, Defendant Roberts never told me

11     to stop what I told him what I was doing.  He also told you

12     Defendant Mulrenin directed him to reach out to competitors to

13     make sure they were going to go along with these price

14     increases too, to make sure they were doing the same thing.

15          It is not just Carl Pepper reporting up to Defendant

16     Mulrenin and Roberts because you have both of them reaching out

17     to competitors directly themselves too.  You have them both

18     working those phone lines as Tyson submitted its first round

19     bid August 11 and August 15 for KFC in 2014, and you have it in

20     the documents.  You have Exhibit 355, another of those text

21     messages, Talked to Tim today at Tyson and I told him what

22     Purdue, Pilgrim's and we were doing.

23          And you have it for Defendant Roberts too.  You have

24     him on the line with Defendant Penn on August 15 right before

25     those bids were due for KFC, and you had that information

1    Exhibit 1030, Tyson's price per Tommy, Defendant Roberts'

2    friend.

3           So that's Defendant Mulrenin and Roberts'

4    participation.  They both got information reported up to them

5    on the workings of the conspiracy from their subordinate and

6    they both personally reached out to competitors as well.

7    That's the tone they set in the top of their sales group at

8    Tyson.

9           Let's move on to Defendant Blake at George's, another

10   salesman.  So you see his participation, once again, working

11   the phone lines just like some of the other salesmen.  You have

12   Government's Exhibit 1427 when Defendant Brady -- we talked

13   about that at the beginning today -- hangs up the phone with

14   Defendant Blake, right away texts his boss, George's is .30

15   back on dark meat.

16          You have Defendant Blake's pricing being reported up

17   in Exhibit 1523, 1074, 1036, those Pilgrim's spreadsheets with

18   the competitors' pricing, their future pricing, their bids all

19   over them just after calls involving Defendant Blake.  And you

20   also have testimony from Carl Pepper about his calls with

21   Defendant Blake in 2014 and the understanding that George's

22   would be doing that substantial price increase too.  That is

23   Defendant Blake's active participation in this conspiracy.

24          Now, we have talked about four of the five companies

25   that these defendants worked at, Claxton, Koch, George's,

1    Tyson.  We are going to move on now to Pilgrim's and we'll

2    start with Defendant Little.  Defendant Little was another

3    salesperson with decades of experience in the industry, and

4    just like the others, you see his participation on the phone

5    lines directly speaking with his competitors and the documents

6    showing what was said.

7        You have his own words in Government's Exhibit 2019

8    and Exhibit 5016 that Mr. Pepper told you about, but just like

9    others you have e-mails and text messages from others showing

10   you his participation, Exhibits 120, 9740, 6134.  221 is one

11   where it says, Talked to Jimmie Little and he said they are

12   planning to add to their costs to do this.  That's for the

13   Church's negotiations we discussed.

14       And you have 9740, The price is the price that his

15   competitor, Walter Cooper, got.  You also have testimony from

16   Robbie Bryant and Carl Pepper about Defendant Little's

17   involvement in this conspiracy.  That's all direct and active

18   participation by Defendant Little.  Now, Defendant Little, he

19   was in the QSR group at Pilgrim's you heard about, the QSR

20   channel.  His supervisor was Defendant Austin.

21       So let's move on to Defendant Austin.  Year after year

22   you see Defendant Austin coordinating with his competitors

23   about that KFC pricing, and he was the owner of that account at

24   Pilgrim's.  You have his own words, Government's Exhibit 1544

25   and 1546, and you have those windows from the words of others

4086

 1   like, Roger did some checking around, Exhibit 1074, Roger and

 2   Bill are not moving.

 3          Like I said earlier, ladies and gentlemen, it's not

 4   just taking -- getting information from your competitors.  It's

 5   a two-way street.  And you see that in the documents.  You have

 6   Exhibit 1615, I talked to Roger about the KFC sizes and he is

 7   in agreement with us.  That's from Defendant Brady.  1427,

 8   Roger said to raise our prices.

 9          You have Defendant Austin's competitors having his

10   information, his strategies with the understanding that they

11   are doing it together, that they are holding on price together.

12   For Defendant Austin you also have the testimony of Robbie

13   Bryant who told you about his coordination, about the directive

14   to put it out to the industry, about "The price is the price"

15   call and a number of other things.

16          He told you about US Foods negotiations in 2017.  He

17   said how when he wanted to coordinate a price increase for US

18   Foods, which wasn't even Defendant Austin's group, that QSR

19   channel, how when they wanted to coordinate that price

20   increase, he looked to a subordinate of Roger Austin's because

21   he knew those were the people to go to when you wanted to

22   coordinate with your competition.  He went to Scott Tucker, who

23   was another subordinate of Defendant Austin's.  These

24   documents, that testimony is all active enthusiastic

25   participation by Defendant Austin who led that QSR channel.

1          We will go one more step up to Defendant Penn.  He

2   oversaw some of those KFC negotiations you heard about.  And

3   you have the documents we have discussed today where all that

4   coordination of competitors, giving each other price increases,

5   giving each other margins.  It's all reported up to him in

6   spreadsheets, Exhibits 1523, 1074, 1036, how he, as a

7   supervisor, is receiving his competitors' bids, his

8   competitors' price increases before they were ever submitted in

9   the middle of negotiations, knowing where that information was

10  coming from and knowing to use it to be the leader on price

11  like you saw in 2014.

12          Then you saw his state of mind in those documents we

13  just reviewed.  If they is illegal, don't tell me.  Not a legal

14  conversation.  And it's not just reporting up.  You saw

15  Defendant Penn reaching out to competitors himself as well.

16  You saw his call with Defendant Roberts and you saw

17  Exhibit 1030, Talked to Jayson Penn, plus 8 cost, plus 11

18  margin.  Defendant Penn knew that when his subordinates were

19  giving and taking price increases, margin, negotiating

20  positions with their competitors, that they were doing it with

21  the understanding that they were increasing or holding on price

22  together.

23          Then you saw in the documents what Defendant Penn did

24  with that information because he reported it up to the next

25  level to Defendant Lovette.  Here is Defendant Lovette.  So you

1    know that Defendant Lovette participated in this conspiracy for

2    all the same reasons you know Defendant Penn did.  He received

3    his competitors' pricing in the middle of negotiations and he

4    himself reached out to competitors too.

5         You have those same documents we just talked about for

6    Defendant Penn, 1077 1523, 1036, all containing the

7    confidential bid information of Pilgrim's competitors, and you

8    have him having discussions talking with subordinates about,

9    Come to BL office.  Will review with Bill.  He knew the plan

10   for getting those prices.

11        And the source was clearly, ladies and gentlemen, to

12   someone like Defendant Lovette.  It's clear to you all seeing

13   those competitors prices in the documents today.  It says

14   coming from competitors.  And it was clear to experienced

15   businessmen in the industry then.  He knew that this

16   information was coming from Pilgrim's competitors and that they

17   were only getting it because there was an understanding they

18   were working together.

19        And you have Exhibit 803 which we talked about a

20   moment ago about Sysco, him personally reaching out to

21   competitors as well.  That's the tone that Defendant Lovette

22   set as the CEO of Pilgrim's.  So the bottom line, Defendant

23   Lovette supervised Defendant Lovette, Defendant Austin,

24   Defendant Penn.  He knew what they were doing.  He did it

25   himself.  He was an active participant in this conspiracy.

4089

1              Now, before we end of our time together, I want to

2     talk about one more thing.  I told you at the beginning, this

3     case is not about shortages.  It's not about current prices.

4     And I urge you to look at the evidence when you are

5     deliberating because it will show you that.

6              I am going to run through just a couple documents here

7     showing you these are bids, not current prices, and it's some

8     of the ones you saw today, 1074, total increases.  These are

9     bids.  Let's go to another.  1036, that's the margin.  This is

10    a bid due the next day.  Let's go to another.  1523, 1522, this

11    is that good guy spreadsheet with the quotes in it.  Quotes are

12    bids, clearly about a bid.  Let's go to another.  1238, the

13    text message, Greeley told Defendant Austin not to come down on

14    price.  Koch is not moving.  Currently not a current price, not

15    a shortage.  This is about a bid.

16             Go to another, Told Bob we would go down.  Roger and

17    Bill are not moving.  That's a negotiating position in the

18    middle of negotiation.  Do another, 1427, Pilgrim's is .30

19    back.  This is Roger Austin.  He said to raise our prices.

20    That's clearly about future prices.  Go to one more.  That's --

21    I think three more.  Ledford told Roger to be at .9250.  Roger

22    is at .30 back and not moving.  Once again, this is about a

23    bid.

24             Let's go on.  Exhibit 6235 is KFC expecting NHA no

25    cost.  Can you find out about others?  I'll do some scouting,

1    clearly about the bidding process.  One more, Need you to tell

2    the industry we are going to hold.  That is holding on your bid

3    prices.  That is the information that's being shared here.

4         Now it's almost -- we are almost done for today.

5    That's the evidence showing you the existence of this

6    conspiracy and each of the 10 defendants' active participation.

7    Before we end, I want to go back to kind of the core question

8    in this case, which is were these 10 defendants part of a

9    conspiracy, an agreement, a mutual understanding to fix prices

10   and to rig bids?  The answer is absolutely yes.  Each and every

11   one of these defendants knew that when they were sharing their

12   bids, sharing their margins, sharing their negotiating

13   positions with their competitors that they were doing it to

14   raise prices or hold strong together.  They had an

15   understanding to work together as a united front.

16        And it's simple, ladies and gentlemen, and you may

17   hear from others the defendants do not have to put on a case.

18   That is the government's burden, but there is a lot that isn't

19   in dispute here.  You can accept that there was a supply

20   shortage in 2014.  You can accept that the prices agreed on

21   were not the same.  You can accept that the defendants lost

22   volume sometimes, and you can accept that the defendants sold

23   chicken to each other.

24        There was a plan, a plan by which these defendants

25   profited together.  You saw even in 2014 when Pilgrim's lost

1   volume, they made $12 million.  And you heard it from the

2   witnesses.  It is not good business to share bids, to share

3   negotiating positions, to share your strategy.  It's not good

4   business unless you have an understanding, an agreement with

5   your competitors.  You just don't give your competitors your

6   prices, your bids, the tools by which they can undercut you,

7   the tools by which they can compete, the tools that they could

8   use to stab you in the back if that's really what was happening

9   here.  If these defendants were undercutting each other, they

10  would not keep giving this information to each other over and

11  over again.

12         These defendants seized the opportunity every time to

13  work together to make more money.  They did it over and over.

14  That is price-fixing.  That is bid-rigging.  These defendants

15  fixed the prices of chicken for years.  The government has

16  proven every element of this case beyond a reasonable doubt,

17  and we ask that you check every box of that verdict form guilty

18  when you deliberate.  And I thank each of you for staying very

19  late today.  Thank you.

20         THE COURT:  Thank you, Ms. Call.

21         Ladies and gentlemen, once again, thanks for staying

22  late.  Tomorrow we might have a shorter lunch hour than we

23  usually are.  We may also stay late, but I will have you come

24  back at the same time, 8:30, okay?  And also as you can hear,

25  you can hear the wind outside apparently quite windy, be

4092

1    careful when you are driving.  Be careful going back to your

2    car.  Keep the admonitions in mind.  The jury is excused for

3    the evening.  Thank you.

4              (Jury excused.)

5              For the arguments tomorrow, if you want a heads-up

6    when you have used a certain amount of time, anyone?

7              MR. TUBACH:  I would like a two-minute warning, but

8    maybe others would want five?  Two I think is fine.

9              MR. GILLEN:  Four for me, Your Honor.

10             THE COURT:  Let me note that.

11             MR. FELDBERG:  Two for me.

12             MR. POLLACK:  I will take five.

13             THE COURT:  Okay.  Anyone else other than two?  I will

14   do two minutes for everyone other than those who indicated

15   otherwise.

16             Anything else that we should talk about?  Mr. Koenig?

17             MR. KOENIG:  Sure.  Just to confirm, by our clock the

18   government should have somewhere in the 44, 45-minute range?

19             THE COURT:  Well, Ms. Call's closing started at 4:07

20   and ended at 5:53.

21             MR. KOENIG:  Yeah, that's about 46.

22             THE COURT:  Well, I am too tired to do the math, but

23   you can do the math.

24             MR. KOENIG:  And then just in terms of scheduling,

25   Your Honor, do you anticipate that we'll get all the way

1    through?

2         *THE COURT:*  We'll have to see how it goes.  We might

3    be able to or Mr. Fagg may be right and we don't quite, but in

4    which case we will have to do one or two on Thursday.  Okay.

5    Anything else?

6         We will be in recess until tomorrow at 8:30.  Thank

7    you.

8       (Recess at 5:56 p.m.)

9

10                              **INDEX**

11   CLOSING ARGUMENT

12      By Ms. Call                                          4023

13   WITNESSES

14      Kent Kronauge

15           Direct Examination Continued By Mr. Kornfeld   3862

16           Cross-examination By Mr. Pollack                3889

17           Cross-examination By Ms. Henry                  3890

18           Cross-examination By Mr. Torzilli              3893

19           Redirect Examination By Mr. Kornfeld            3916

20                             EXHIBITS

21   Exhibit    Offered  Received  Refused  Reserved  Withdrawn

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| I-007   |         | 3937     |         |          |           |
| I-008   |         | 3937     |         |          |           |
| I-009   |         | 3937     |         |          |           |
| C-019   |         | 3937     |         |          |           |

1         **INDEX (Continued)**

2          EXHIBITS

| 3 Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|-----------|---------|----------|---------|----------|-----------|
| 4 J-039 | | | 3937 | | |
| 5 J-040 | | | 3937 | | |
| 6 G-059 | | | 3872 | | |
| 7 A-114 | | | 3937 | | |
| 8 D-137 | | | 3925 | | |
| 9 D-138 | | | 3925 | | |
| 10 D-146 | | | 3925 | | |
| 11 D-147 | | | 3925 | | |
| 12 D-148 | | | 3925 | | |
| 13 D-149 | | | 3925 | | |
| 14 D-150 | | | 3925 | | |
| 15 D-151 | | | 3925 | | |
| 16 D-152 | | | 3925 | | |
| 17 D-154 | | | 3925 | | |
| 18 D-157 | | | 3925 | | |
| 19 D-158 | | | 3925 | | |
| 20 D-159 | | | 3925 | | |
| 21 D-160 | | | 3925 | | |
| 22 D-161 | | | 3925 | | |
| 23 D-162 | | | 3925 | | |
| 24 D-164 | | | 3925 | | |
| 25 D-165 | | | 3925 | | |

1                                **INDEX (Continued)**

2                                        EXHIBITS

3     Exhibit     Offered  Received  Refused  Reserved  Withdrawn

4     D-186                          3937

5     A-187                          3937

6     J-203                          3938

7     J-221                          3937

8     J-229                          3923

9     I-229                          3937

10    J-232                          3933

11    J-233                          3937

12    J-234                          3923

13    D-240                          3933

14    E-280                          3937

15    A-298                          3937

16    A-299                          3937

17    D-324                          3937

18    D-325                          3937

19    D-326                          3937

20    D-341                          3937

21    H-357                          3937

22    D-407                          3925

23    407                            3937

24    D-408                          3925

25

1                          INDEX (Continued)

2                              EXHIBITS

3   Exhibit     Offered  Received  Refused  Reserved  Withdrawn

4   408                            3937

5   D-409                          3925

6   D-410                          3925

7   410-2                          3940

8   413                            3937

9   G-424                          3937

10  F-459                          3926

11  C-460                          3937

12  C-461                          3937

13  468                            3937

14  E-471                          3869

15  472                            3937

16  C-477                          3937

17  C-481                          3937

18  C-483                          3937

19  C-484                          3937

20  514                            3937

21  D-530                          3937

22  D-531                          3937

23  D-543                          3937

24  D-544                          3937

25  E-545                          3925

1          **INDEX (Continued)**

2                              EXHIBITS

3   Exhibit     Offered   Received   Refused   Reserved   Withdrawn

4   D-545                            3937

5   E-546                            3925

6   557                              3937

7   D-568                            3937

8   E-568                            3937

9   D-569                            3937

10  E-569                            3937

11  D-570                            3937

12  D-571                            3937

13  D-572                            3937

14  D-573                            3937

15  A-574                            3937

16  D-574                            3937

17  A-579                            3937

18  A-580                            3937

19  D-580                            3937

20  D-581                            3937

21  609                              3866

22  701                              3885

23  711                              3937

24  I-712                            3937

25

| | **INDEX (Continued)** |
|---|---|

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| I-713 | | | 3937 | | |
| I-742 | | | 3881 | | |
| F-745 | | | 3937 | | |
| F-746 | | | 3937 | | |
| 749 | | | 3937 | | |
| F-751 | | | 3937 | | |
| F-759 | | | 3937 | | |
| F-760 | | | 3937 | | |
| F-763 | | | 3937 | | |
| F-777 | | | 3937 | | |
| F-781 | | | 3937 | | |
| F-782 | | | 3937 | | |
| F-786 | | | 3937 | | |
| D-788 | | | 3937 | | |
| F-790 | | | 3937 | | |
| F-794 | | | 3937 | | |
| F-798 | | | 3937 | | |
| F-821 | | | 3937 | | |
| D-835 | | | 3937 | | |
| F-848 | | | 3937 | | |
| F-849 | | | 3937 | | |
| 854 | | | 3937 | | |

1        **INDEX (Continued)**

2                     EXHIBITS

3    Exhibit    Offered   Received   Refused   Reserved   Withdrawn

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 855 | | | 3937 | | |
| C-862 | | | 3937 | | |
| B-881 | | | 3937 | | |
| F-881 | | | 3937 | | |
| F-882 | | | 3937 | | |
| F-888 | | | 3937 | | |
| F-889 | | | 3937 | | |
| H-895 | | | 3937 | | |
| B-910 | | | 3937 | | |
| H-940 | | | 3937 | | |
| B-950 | | | 3937 | | |
| B-951 | | | 3937 | | |
| B-961 | | | 3937 | | |
| F-969 | | | 3937 | | |
| F-970 | | | 3937 | | |
| H-976 | | | 3937 | | |
| B-980 | | | 3937 | | |
| B-981 | | | 3937 | | |
| 997 | | | 3877 | | |
| 1025 | | | 3937 | | |
| 1027 | | | 3937 | | |
| 1053 | | | 3937 | | |

1    **INDEX (Continued)**

2                                    EXHIBITS

3    Exhibit     Offered  Received  Refused  Reserved  Withdrawn

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 1105-1  |         |          | 3937    |          |           |
| 1129    |         |          | 3937    |          |           |
| 1243    |         |          | 3937    |          |           |
| 1402    |         |          | 3937    |          |           |
| 1590    |         |          | 3937    |          |           |
| 3053    |         |          | 3937    |          |           |
| 9701    |         |          | 3937    |          |           |
| 10665   |         |          | 3939    |          |           |
| 10666   |         |          | 3940    |          |           |
| 10667   |         |          | 3939    |          |           |
| 10672   |         |          | 3940    |          |           |

15                            REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.   Dated

18   at Denver, Colorado, this 5th day of June, 2022.

19

20                                    S/Janet M. Coppock

21

22

23

24

25