1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn II
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GARY BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14                 Trial to Jury, Vol. 19

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:32 a.m., on the 24th day of March,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                         APPEARANCES

 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3   Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,

 4   Washington, DC 20530, appearing for Plaintiff.

 5          Anna Tryon Pletcher and Michael Tubach of

 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 7   San Francisco, CA 94111-3823;

 8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

 9   N.W., Washington, DC 20006, appearing for Defendant Penn.

10          David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

15           Laura Kuykendall and Megan Rahman of Troutman Pepper

16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

17   appearing for Defendant Brady.

18          Michael Felberg of Reichman, Jorgensen, Lehman,

19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

20   10017;

21

22

23

24

25
```

```
 1              APPEARANCES (Continued)
 2         Laura F. Carwile of Reichman, Jorgensen, Lehman,
 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
 4    CA 94065; appearing for Defendant Austin.
 5         Elizabeth B. Prewitt of Latham & Watkins, LLP,
 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;
 7         Marci Gilligan LaBranche of Stimson, Stancil,
 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO
 9    80218, appearing for Defendant Mulrenin.
10         James A. Backstrom, Counselor at Law, 1515 Market
11    Street, Suite 1200, Philadelphia, PA 19102-1932;
12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,
13    Bethesda, MD 20814, appearing for Defendant Kantola.
14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth
15    Street, Suite 1100, Los Angeles, CA 90017;
16         Dennis J. Canty, Canty Law Corporation,
17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,
18    appearing for Defendant Little.
19         John Anderson Fagg, Jr. and James McLoughlin of
20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.
22
23
24
25
```

1              APPEARANCES (Continued)

2         Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5         Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8         Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11        Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                        PROCEEDINGS

16        *THE COURT:*  All right.  So we will do our last two

17   closings.  I realize this morning, then, instead of giving

18   Mr. Gillen his requested four minutes, I only gave him two, but

19   he seemed to be able to roll with that punch.  However,

20   Mr. Pollack has requested five, so I will keep that in mind.

21        Mr. Koenig, assuming you are doing the rebuttal

22   closing.  I haven't asked you what time you would like.  Do you

23   have a request?

24        *MR. KOENIG:*  Well, I think we have 45 minutes in

25   reserve, and I don't believe I will need all that.

1          THE COURT:  Okay, 44 minutes to be precise.

2          MR. KOENIG:  Oh, if I get to that 5-minute point.

3          THE COURT:  All right.  Anything else we should

4    discuss before we bring the jury back in?

5          All right.  Let's go ahead and get the jury.  I also

6    will be dismissing the alternate too.  That's Mr. Barrett so

7    just so we are all in agreement.

8          (Jury present.)

9          THE COURT:  Good morning, ladies and gentlemen.  We

10   will now commence with the last of the closings.

11         And Mr. Pollack, go ahead.

                        **CLOSING ARGUMENT**

13         MR. POLLACK:  Finally, finally, as you know by now, I

14   am Barry Pollack, and along with Wendy Johnson I have the

15   privilege of representing Ric Blake.  And now after a month of

16   testimony and 10 closing arguments, we finally have the

17   opportunity to talk directly to you about the evidence as it

18   relates to Ric Blake, evidence that the government somehow

19   thinks is sufficient to show that Mr. Blake committed a serious

20   federal felony and should get all the consequences that flow

21   from that, evidence that in fact shows that Mr. Blake is not

22   guilty.

23         We all know by now what it is the government is

24   alleging.  They are alleging a conspiracy, a lengthy conspiracy

25   involving many people in many different companies to raise and

1    maintain prices at an artificially high level and to do so

2    without the suppliers competing with each other for volume.

3           You've heard the Court's instructions.  The government

4    must prove beyond a reasonable doubt that such a conspiracy

5    existed and that Mr. Blake knowingly joined it with the intent

6    to advance those goals or objectives.  And the Court told you,

7    you may consider what the defendant actually did or said, the

8    bids that were actually submitted, and the prices that were

9    actually charged.  And, of course, that makes absolute sense.

10   We are trying to figure out did this agreement that the

11   government says exist, did Mr. Blake participate in it?  Let's

12   look at what actually happened.

13          There is a song from the 1960s call the Boxer.  I

14   don't know if any of you know it.  It has a line in it that

15   says, "A man hears what he wants to hear and he disregards the

16   rest."  Ladies and gentlemen, throughout this trial the

17   government has heard what it wants to hear and it has

18   disregarded the rest.  They particularly did that in closing

19   argument.  And probably the biggest thing that the government

20   wants to disregard and wants you to disregard is what actually

21   happened.

22          So if this conspiracy actually existed and if

23   Mr. Blake actually participated in it, what would you expect

24   would actually happen?  He would exchange bid amounts with his

25   competitors, and then rather than allowing his company to

1    decide on its own what to bid, he would make sure that his

2    company coordinated its bids with the other suppliers under an

3    agreement with them to set his company's bids and final

4    contract prices to be similar to those of the other supplier.

5         Now, you've heard repeatedly that simply exchanging

6    bid information is not illegal, but if this conspiracy existed

7    and Mr. Blake participated in it, you would expect he would do

8    both things.  And the problem for the government is that they

9    have proven neither.

10        Let's start with the first.  Mr. Blake did not

11   exchange bids with his competitors, period.  And period prices

12   are not bids.  Ms. Johnson told you in opening statement that

13   the entire reason Mr. Blake is here is because the government

14   had evidence that he kept track of current period prices and

15   talked with other suppliers about current period prices.  And

16   the government simply refused to recognize the difference

17   between current period prices and bids.

18        Finally, finally, on the last day of trial in the

19   government's closing argument the government conceded to you

20   that this trial is not about period prices.  And, of course,

21   they had to make that concession, however belatedly they made

22   it.

23        Their own witness said, Question:  You have told the

24   government multiple times that period pricing has nothing to do

25   with bids or contracts for future business, right?

1        Yes, ma'am.

2        That is crystal clear in your mind.

3        Yes, ma'am.

4        This is Mr. Ledford, another government witness:
Simply knowing another supplier's period pricing does not have
an impact on the competitiveness of the bid process, correct?

7        That is correct.

8        It certainly doesn't tell you what another supplier's
bid is going to be.

10       No, it does not.

11       While some customers did not want the suppliers
exchanging bid information with each other, bid information was
not secret.  We have seen this time and time again.  Constantly
the different suppliers were covering each other's shorts, and
when they did so, they would learn the others' current period
prices.  So why am I still talking about period prices after
the government has conceded that this trial is not about period
prices?  Because you'll see when we walk through the evidence,
the government continues to ask you to convict Mr. Blake and
others based on current period prices.

21       So let's talk about the so-called conspiracy insiders.
You heard an awful lot yesterday about Mr. Bryant and
Mr. Pepper and whether you should believe anything that either
of them has to say.  I am going to leave that entirely up to
you, ladies and gentlemen.  You decide how believable

1    Mr. Bryant are and Mr. Pepper are because let me tell you this.

2    If you believe that every word that came out of Mr. Bryant's

3    mouth and Mr. Pepper's mouth with the gospel truth, you still

4    must acquit Mr. Blake.

5         Let's start with Mr. Bryant.  Mr. Bryant didn't know

6    Ric Blake, had absolutely nothing to say about him.  Mr. Bryant

7    in February 2017 notes listed a bunch of numbers that he said

8    were bids for various suppliers including for George's.  He did

9    not testify that Ric Blake was the source of this information.

10   More importantly, these were bids -- these were not bids of the

11   other suppliers.  These were the other suppliers' current

12   period prices, the very thing that the government says that

13   this trial is not about.

14        You will note that I have the Exhibit No. 1919 in red.

15   That's because when Ms. Call put up that long list of exhibits

16   that supposedly showed Mr. Blake was guilty, 1919 was on it.

17   And they are current period prices.  Every time you see in this

18   closing an exhibit in red, it's one of the exhibits Ms. Call

19   says demonstrates Mr. Blake's guilt.  And I invite you when you

20   go back in that jury room to look at every exhibit whether I

21   covered it or not because it is not evidence that Ric Blake

22   participated in any conspiracy.  Mr. Bryant testified that he

23   made those notes before the deadline of Pilgrim's bid

24   submission of February 3rd, 2017.  George's didn't even have

25   its prebid meeting until 10 days later, February 13, 2017.

1   There is no evidence that George's had even formulated its bid

2   at the time that Mr. Bryant took those notes.

3        We know those notes are period pricing.  Compare

4   column 1 to column 2.  Other counsel have covered this.  There

5   is no doubt that it's period 2 pricing.  When faced with that,

6   what did the government do?  It pivoted.  It said, oh, but

7   everybody put in their bids the same as their period 2 price,

8   so knowing the period 2 price told everybody what the bids were

9   going to be.  It's absolutely not true.

10        Compare the bid pricing -- the bids in column 3 with

11   the period pricing in column 2.  They absolutely are not the

12   same.  There is no question that what was in Mr. Bryant's notes

13   were not bids, they were current period pricing, what the

14   government says this trial is not about.

15        So let's talk about -- that wraps up -- let's talk

16   about Mr. Pepper.  We have talked about Mr. Bryant.  Mr. Bryant

17   absolutely does not establish that Ric Blake exchanged bid

18   information.  Mr. Pepper, Mr. Pepper testified that Ric Blake

19   obtained current period prices for a number of suppliers from a

20   distributor named Kelly Foods.  And he shared that information,

21   those current period prices, with Mr. Pepper.  And in return

22   Mr. Pepper told Mr. Blake Tyson's current period prices.  Why

23   did the government elicit that testimony?  The government now

24   concedes period prices are not bid information and period

25   prices do not allow suppliers to align bids.

1          So what else did Mr. Pepper say?  He said he learned

2   from Mr. Blake that Church's was going to .28 back, that Pepper

3   and Blake agreed or understood that both Tyson's and George's

4   would seek a substantial price increase in 2014, and that he

5   and Mr. Blake did not share bid amounts.  Let's talk about each

6   of those.

7          In red Government's Exhibit 9743, September 7, 2011,

8   Blake tells Pepper that he is going to call Church's and tell

9   Church's that George's is not going to bid on Church's

10  business.  Going forward, George's is not interested in

11  Church's business.  He tells Pepper he will talk to Church's

12  and tell Pepper how the call goes.  He later tells Pepper that

13  everyone is going to .28 back.  It's pretty clear that he got

14  that information when he talked to Church's.  He didn't get

15  that information from the other suppliers.

16         More importantly, the whole point of this

17  communication is that George's is not going to be bidding for

18  Church's business.  The other suppliers that were going to .28

19  back for the 2012 contract year would not be competing with

20  George's for that business.  In this e-mail Blake could not be

21  providing bid information with competitors to align George's

22  bids with the other suppliers because George's was not bidding.

23         So what's the next thing that Mr. Pepper says?  He

24  says he had a series of calls with Mr. Blake between June and

25  early August where he talked about the fact there is going to

1    be a substantial price increase.  We know that George's first

2    round bid wasn't finalized in August 19th.  Mr. Pepper admits

3    he did not give any bid information, he did not tell Mr. Blake

4    what Tyson's was going to bid, and he didn't receive bid

5    information from Mr. Blake or any of the other suppliers.  They

6    simply talked about the fact there was going to be a

7    substantial price increase.

8          Everybody knew that.  Market conditions had changed.

9    Everybody knew there was going to be a substantial price

10   increase.  They might not have known exactly how much, but

11   everybody knew there was going to be a substantial price

12   increase.  Mr. Lewis of KFC knew that.  Mr. Bryant said

13   everybody in the industry should have known that.

14   Mr. Eddington knew it.  He was expecting a 5 to 10 cent

15   increase in margin from the prior contract year.  Mr. Kronauge,

16   he knew it.  They were going to give a substantial price

17   increase.

18          So what Mr. Pepper says he and Mr. Blake understood or

19   agreed was about nothing more than what everybody in the

20   industry understood.  This would be like me saying I agree with

21   Judge Brimmer that the sun is going to rise tomorrow.

22   Mr. Pepper -- it's meaningless.  It's meaningless.  Mr. Pepper

23   conceded that what he talked to Mr. Blake about was nothing

24   more than shop talk, water cooler talk, rumors.  It certainly

25   was not the kind of information that would allow Tyson and

 1    George's to align their bids.  He didn't say what the bids were

 2    going to be.

 3            And, of course, Mr. Blake couldn't cause George's to

 4    ask for a substantial price increase.  And when the government

 5    put up on its chart all these people that are supposed to be in

 6    this conspiracy, the only person from George's who is listed is

 7    Mr. Blake, Mr. Blake, a person who doesn't negotiate prices who

 8    can't set prices.  So how is he magically going to cause

 9    George's to have a substantial price increase because he

10    supposedly agreed with Carl Pepper to do so?  Carl Pepper, the

11    government's star witness, an insider who is in an eight-year

12    conspiracy not to compete.  What did Mr. Pepper say?  I'm

13    always competing with other competitors.

14            So those are the conspiracy insiders, Bryant and

15    Blake -- Bryant and Pepper.  If you believe every word they

16    say, no evidence that Mr. Blake exchanged bid information.

17            So let's talk about the government's summary charts

18    because let's face it, other than the supposed insiders, that

19    is the government's case.  Summary charts are fine.  I use

20    summary charts, but how did I do it?  I showed you the

21    evidence.  I showed a witness the evidence, and we verified

22    that everything that was going onto that summary chart was

23    complete and accurate.

24            What did the government do?  The government created

25    its own charts.  It decided what it wanted to see.  It decided

1    what it wanted to disregard.  And more importantly, it decided

2    what it wanted you to see and what it wanted you to disregard.

3    They put up a paralegal who said the charts are accurate.  What

4    that meant was they accurately reflect what the government

5    wants you to see and they disregard the rest.  The government

6    says there is such a mountain of evidence of this vast

7    conspiracy that all 10 of these men were involved in that we

8    don't want you to have to go through that evidence yourself.

9    Don't you worry your pretty little heads about the actual

10   evidence.  We'll put on a chart what you need to know.

11          Think about that.  Think about how arrogant that is.

12   Think about how insulting that is to you, the jury, in your

13   role.  But the fact of the matter is it is worse than that.

14   The government wants you to focus on their charts and not on

15   the actual evidence, not because the government is worried that

16   you are not smart enough to evaluate the evidence.  They want

17   you to focus on their charts and not the evidence because they

18   are worried that you are smart enough to evaluate the actual

19   evidence.  And when you do, you will find it does not fit their

20   narrative, the narrative they tell on these charts.

21          Let's look at the charts, the ones that relate to

22   Mr. Blake.  Government Exhibit 15, the two lines that are

23   highlighted at the bottom are the only lines that are on the

24   government's chart.  Brady talks to Blake.  Brady texts Fries.

25   George's is .30 back on dark meat.  What's not on the chart,

1    all these other calls.  Ms. Warble of George's saw this e-mail.

2    There were two items on the e-mail.  The second item related to

3    a sale from the day before.  She saw these phone calls.  She

4    testified that absolutely, that's what happens.  You have to

5    have this series of phone calls.  And yes, the salespeople talk

6    to each other when there is a cover or short.  So Mr. Brady and

7    Mr. Blake are discussing current prices because George's was

8    buying chicken.

9            Regardless of whether or not it was related to a cover

10   or short, what we do know is they were discussing current

11   prices.  George's first round bid was .28 back.  George's

12   current contract price was .30 back.  Blake told Brady .30

13   back.  He was giving the current contract price, not the

14   current bid.  In fact, George's didn't submit its next round

15   bid until the following afternoon.  And there was no evidence

16   that Mr. Blake knew on the day he is having the conversation

17   with Mr. Brady what that bid was going to be.

18           Mr. Ledford:  As of November 14 at 2:22 p.m., at that

19   point Mr. Blake knows what George's is bidding in the second

20   round, correct?

21           Yes.

22           But you don't have any reason to believe that he knew

23   anytime prior to that what George's was going to bid.

24           No, I don't know that.

25           Let's look at Government Summary Exhibit 16.  On

1    November 8, 2012, Roger Austin e-mails Justin Gay and Scott

2    Tucker.  He says, The next after us is 54 below us (I think

3    that is George's.)  This is not evidence that Mr. Blake shared

4    bid information with Roger Austin.  It's evidence that he

5    didn't.  Mr. Austin doesn't know what George's bid.  He is

6    saying I think this is what they bid.

7         The next day Scott Tucker e-mails Austin with what

8    appears to be actual bid information.  There is zero evidence

9    that Mr. Tucker got that information from Ric Blake.  The

10   government just wants you to guess.  They state it as fact, it

11   came from Ric Blake.  It's simply the government's guess.

12   Well, what we don't be have to guess about and what we do know

13   is George's was not setting its bids or prices based on what

14   the other competitors were doing.  They put in their

15   first-round bid.  Mr. Ledford, the customer, asked them to go

16   down by 63 points.  Second round bid is 62 points lower.

17        After the second-round bid, Mr. Ledford asks them to

18   go down another 15 points.  George's goes down exactly another

19   15 points.  George's is not setting its bids based on what its

20   competitors are doing.  It's setting its bids based on what the

21   customer is demanding.

22        Let's look at 2014, Summary Exhibit 10.  1:52 p.m. on

23   August 18, 2014, Roger Austin calls George's main number.

24   Later that day you see that Pilgrim's seems to know that the

25   new margin for George's is going to be a 15- to 18-cent

1    increase.  Roger did some checking around today on August 18th.

2    The government has that on Summary Exhibit 10 because they want

3    you to conclude, to guess that that information came from Ric

4    Blake.  In fact, in closing argument Ms. Call said as a matter

5    of fact, it came from Ric Blake.  She just asserted that that

6    information came from Ric Blake.  It was accurate and so it had

7    to have come from Ric Blake.

8          Ms. Call is wrong in both respects.  First of all, it

9    is not accurate.  They did not increase their margin between 15

10   and 18.  Let's look what they bid the next day on August 19.

11   They increased their margin by 11 cents.  More importantly, the

12   information did not come from Ric Blake.  Ric Blake was on

13   vacation on August 18, 2014.  The guess that Mr. Austin called

14   the main number, talked to Ric Blake and got pricing

15   information is dead wrong.  Mr. Austin did not speak to

16   Mr. Blake.  He could not have reached him at George's because

17   he wasn't at George's that day.  And we have the phone records.

18   He didn't call him by cell.  The government's guess is flat

19   wrong.

20         Now, you would think the government would be a little

21   embarrassed by that.  You would think the government would be

22   horrified by that.  We were about to ask the jury to convict

23   Ric Blake on a guess that is flat wrong.  We shouldn't be

24   asking the jury to convict Ric Blake or any of these men based

25   on guesses.  You would expect at a minimum after they

1    apologized to Mr. Blake they would withdraw Government's

2    Exhibit 10.  They would certainly take off Government's Exhibit

3    10, this phone call to George's main number, or at least in

4    fairness they would put onto Exhibit 10 that Mr. Blake was on

5    vacation that day.  They did none of those things.  Instead, in

6    closing argument Ms. Call disregards the fact that Mr. Blake

7    was on vacation.  You didn't hear her mention it at all.

8         Ladies and gentlemen, these 10 men deserve better than

9    that from the United States Department of Justice.  Ric Blake

10   certainly deserves better than that from the United States

11   Department of Justice.  You, as a jury in a federal criminal

12   case, should demand more than that from the United States

13   Department of Justice.

14        But it gets worse.  We got to the end of the defense

15   case.  The government gets to have a rebuttal.  They could have

16   called any witness they want.  What do they do?  They put in a

17   handful of documents.  One of those documents is a phone record

18   from August 15, 2014 that shows Roger Austin in a 44-second

19   call to Ric Blake, 44 seconds.  We don't even know if he

20   reached Ric Blake or he got voicemail.  Why did the government

21   put that in?  So now you can guess, well, maybe he got pricing

22   information from Ric Blake on the 15th even though he says he

23   was checking around on the 18th.  They just don't learn.

24   Having proven -- they asked you to guess, but the guess is

25   wrong.  What do they do?  They invite you to guess again.  They

1    just don't learn or maybe, as Mr. Gillen said, they have lost

2    their way.  This information could not have come from Ric

3    Blake.

4         Government's Exhibit 12, Ric Blake calls Roger Austin.

5    Roger Austin calls Scott Brady.  Scott Brady texts Mikell

6    Fries.  Tell Bob -- that's Robert Lewis -- we would go down 2

7    cents.  He said someone moved down 4 cents.  It has to be

8    George's or he is bluffing.  Mr. Brady does not know whether

9    the 4 cents is actually -- what George's is doing or if

10   Mr. Lewis is bluffing.  He does not know George's bid.  This

11   summary chart is not evidence that Ric Blake exchanged bid

12   information.  It is evidence that Ric Blake did not exchange

13   bid information.

14        Summary Exhibit 18, February 2nd, 2017, Ric Blake

15   talks to Roger Austin.  As we talked about before, George's

16   didn't even have its prebid meeting until February 13.  There

17   is zero evidence that on February 2nd Mr. Blake knew what

18   George's would bid much less that he shared that amount with

19   Roger Austin.  There is no evidence that Roger Austin told

20   Mr. Blake what Pilgrim's or what anybody else would do.  The

21   government is just inviting you to guess.

22        And, of course they put in as many phone calls on the

23   charts as they can including lots of calls from Carl Pepper,

24   but Carl Pepper told us he didn't share any bid information

25   with Ric Blake or vice versa.  It's simply not evidence that

1    Mr. Blake shared bid information.

2          Let's look at Government's Exhibit 7.  Government's

3    Exhibit 7, 9:37 a.m., Pepper calls Ric Blake.  11:34 Pepper

4    texts, Got a general idea of what George's is doing.  They have

5    it at 9:34, but the actual time is 3:34.  Tim Mulrenin texts

6    Pepper, Okay, call Cullen.  Pepper texts Mulrenin, Called

7    Cullen and told him I heard what George's was doing.  Kent

8    Kronauge of Popeye's calls Pepper.  Pepper texts Mulrenin, I

9    got some information from Popeye's.  Everyone seems to be doing

10   two years and spreading it out.

11         These are not on the left -- what is on the left is

12   what was on Government Summary 7 but these are not the actual

13   times.  The actual times are 3:34, 3:34, 3:44, and 5:49.  So

14   why did the government change the times?  Why did they move

15   them up four hours?  They moved them up four hours because the

16   custodian, Mr. Gresch, said that I collected Pepper's texts

17   from his iPad and I collected UTC time, so the government

18   thought we have to move everything up four hours.

19         But here is the problem.  At 11:44 according to the

20   government, according to Government's Exhibit 7, Mulrenin text,

21   Called Cullen and I told him what I heard what George's is

22   doing.  What's not on Government's Exhibit 7 is that the only

23   phone call between Cullen and Pepper that day didn't occur

24   until 3:36 p.m.  Mr. Pepper couldn't have said to Mr. Mulrenin,

25   Called Cullen and told him what I heard what George's was doing

1    four hours before that call took place.  So the government just

2    disregards that call.  It's not on their chart.

3           What happens if we actually put these in the sequence

4    in which they occurred?  9:37 Pepper calls Blake.  1:41 p.m.

5    Kronauge calls Pepper.  3:34 p.m. Pepper texts, Got a general

6    idea of what George's is doing.  3:34 p.m. Mulrenin texts,

7    Okay, call Cullen.  3:36, two minutes later, is the only call

8    between Cullen and Pepper.  That makes a lot more sense,

9    doesn't it?

10          3:44 still on the phone with Cullen.  Pepper texts,

11   Called Cullen and told him I heard what George's was doing.

12   55:43, something else the government disregards, Pepper calls

13   Kronauge.  5:49, six minutes, Pepper texts Mulrenin, Just got

14   some information from Popeye's, Mr. Kronauge.  Everyone seems

15   to be doing two years and is spreading it out.  Pepper does not

16   have any information about what anybody else is doing until

17   after he talks to Kent Kronauge of Popeye's.  And that's not

18   surprising.  Mr. Kronauge came in here and he told you that he

19   would share information with customers.  It wasn't a secret who

20   was bidding and he would try to play his suppliers off with

21   each other.

22          Now, Mr. Pepper does not claim that Mr. Blake shared

23   bid information with him.

24          You never discussed specifics.  You never discussed

25   price.  You never discussed volume; is that right?

1          Answer:  Correct.

2          He admits that it was his customer, Kent Kronauge that

3     told him that the suppliers were all doing a two-year deal.

4          Do you recall telling the government that Kent

5     Kronauge told you all the suppliers were doing the two years?

6          He told me that.  He eventually told me that.

7          Eventually?

8          Government's Exhibit 7, according to their own chart,

9     Got some information from Popeye's.  Everybody is doing two

10    years.  It happened on the very same day.  The only information

11    that Mr. Pepper says he got from Blake was not bid information.

12    It was the kind of information that he could get and, in fact,

13    did get from the customer, from Kent Kronauge of Popeye's that

14    very same day.

15          So we've now been through it.  We've been through the

16    government's evidence.  We have been through both insiders.  We

17    have been through the summary charts.  The government has not

18    proven even the first step that Mr. Blake shared bid amounts

19    with competitors.

20          So let's look at what would be the necessary second

21    step.  Have they proved that?  Well, of course, you can't do

22    the second step if you haven't done the first, but let's look.

23    Rather than allowing his company to decide on its own what to

24    bid, he would make sure that his company coordinated its bids

25    with the other suppliers under an agreement with them to set

1  his company's bids and final contract prices to be similar to

2  those of the other suppliers.

3         Well, this one is easy.  There is no evidence that

4  Mr. Blake decided what George's would bid.  There is no

5  evidence that Mr. Blake negotiated with customers.  There is no

6  evidence that Mr. Blake had pricing authority.  There is no

7  evidence that Mr. Blake could enter into contracts for

8  George's.  There is no evidence that Mr. Blake knew what his

9  competitors were bidding.  There is no evidence that Mr. Blake

10  shared competitor information with his superiors at George's or

11  attempted to cause them to set bids or prices to be aligned

12  with those of George's competitors.

13         Mr. Ledford said he didn't negotiate with Mr. Blake.

14  He negotiated with Mr. Keck and Mr. George himself.  Mr. Lewis

15  said he didn't negotiate with Blake.  He negotiated with

16  Mr. Keck and with Charles George.  And Mr. Kronauge at Popeye's

17  said he negotiated with Keck and then in later years negotiated

18  with a gentleman from George's named Brian Coan, C-O-A-N.

19         Mr. Blake could not align George's bids and contract

20  prices with other suppliers even if he wanted to.  He didn't

21  have the ability to do that.  And there is nobody else at

22  George's that even the government contends participated in the

23  conspiracy, so how could he possibly have done it?  The answer

24  is he couldn't and he didn't.

25         Let's return to period prices for a second because not

 1   only did he not use bid information for that purpose; we know

 2   he didn't use period prices for that purpose.  He learned of

 3   period prices, but period prices aren't future bid information.

 4   They can't be used to predict future bids.  There is no

 5   evidence that anyone at George's used period prices to set

 6   George's bids.

 7          Carl Pepper, here is what he said about the period

 8   price information that he gave to Blake and what Blake did with

 9   that information.  I don't think he ever mentioned giving the

10   information to anyone else.  There is no evidence that George's

11   under an agreement with George's competitors used period prices

12   to align George's bids with the bids of George's competitors.

13          Apparently now even the government agrees with that,

14   but what does the government do?  On one occasion Blake

15   communicated period prices to Darrel Keck, not during a time

16   that there was any outstanding RFP.  Those are Exhibits 6088

17   and 6089.  Exhibit 6047 shows Mr. Brady knowing George's KFC

18   period price for June 2013.  It does not say that he got this

19   period price from Blake and there is no RFP at this time.  All

20   three of those exhibits, all three of those exhibits that

21   relate to current period prices and not RFPs, the very thing

22   the government says this case is not about, all three of them

23   are in red.  They are all three on the list that the government

24   says these are exhibits that you should use to convict Ric

25   Blake.

1          So let's look at the actual prices.  Did Ric Blake

2     somehow magically do the thing that he had no ability to do and

3     align George's actual prices with those of the competitors

4     under some agreement?  The 2012 negotiation George's came down

5     two and a half times the average amount the other suppliers

6     came down.  In the 2012 KFC negotiation, Mr. Ledford said

7     George's did not take the position the price is the price.

8     Didn't say anything like that.

9          Why is that important?  The so-called conspiracy

10     insider, Mr. Bryant, said here was the conspiracy.  Pilgrim's

11     goes in with a price.  Everyone else sticks with that price.

12     We don't have to worry about another supplier undercutting us

13     on price.  With all get the same price.  And because we all get

14     the same high price, nobody takes volume from each other

15     because the customer has got no reason to reallocate volume

16     because we all had the same price.

17          You don't have to negotiate.  You don't have to come

18     down on price.  You can just say the price is the price.  Why

19     would you go down on price when you know that none of your

20     competitors are going to undercut you?  You wouldn't.  But this

21     conspiracy to say the price is the price, George's isn't part

22     of that conspiracy in the 2012 negotiation.  They are not part

23     of that conspiracy in the 2014 negotiation.  What was the

24     difference between George's initial bid and the contract price

25     they ultimately negotiated?  More than 6 cents.  That's

4372

1  Mr. Eddington who negotiated the contract.

2           It wasn't the price is the price.  They went down more

3  than 6 cents.  And I showed you a chart that where you could

4  easily see that.  They went down more than 6 cents.  All the

5  competitors went down, but George's went down more than anybody

6  else.  The government didn't like this chart because you can

7  easily see that George's went down 6 cents.

8           So what did they do?  They presented you a chart with

9  the same information that made it harder to see that George's

10  went down 6 cents.  They went down 6 cents regardless of which

11  chart you look at.  And even a single cent is significant.

12  Mr. Lewis testified to that.  A single cent can be millions of

13  dollars.  George's position was not the price is the price in

14  this 2014 negotiation, the centerpiece of the government's

15  conspiracy.

16           It is certainly fair to say, is it not, Mr. Lewis,

17  that Mr. Keck and George's did not take the position the price

18  is it the price; take it or leave it?

19           That's correct.

20           There is a lot of talk about how big the price

21  increase is.  Yes, the government said everybody knew there was

22  going to be a price increase, but the customers were shocked at

23  how big the price increase was.  Let me be very clear.  The

24  fact that some suppliers might have increased their price more

25  than the customers had hoped or expected the price would

 1   increase is not evidence that those suppliers were in a

 2   price-fixing conspiracy.

 3        But the government worked very hard to convince you

 4   that all of the suppliers went up 15 to 20 cents, all of the

 5   suppliers went up more than what was anticipated.  The market

 6   conditions had plainly changed since the year earlier when the

 7   last contract was negotiated.  Everybody knew prices were going

 8   to go up, but the government says everybody went up more than

 9   was expected based on that change in market conditions.

10        But that's simply not true with respect to George's.

11   George's went up less than 11 cents, not between 15 and 20

12   cents.  Mr. Lewis said that George's went up by 11 cents

13   because their costs had gone up 3 cents, and so they actually

14   only increased their margin 8 cents.

15        We saw that George's overall price went up by 11

16   cents, not 8 cents.  Is that because their other costs had gone

17   up 3 cents?

18        Yes.

19        So their actual profit margin between 2014 and 2015

20   only went up 8 cents?

21        Yes.

22        8 cents is exactly, exactly what the customers

23   anticipated based on the change of market conditions.

24        Eddington:  I had an expectation that the pricing

25   given the landscape was going to go up in both supply and

1    demand, that we were going to see approximately a 5 to 10-cent

2    per-pound profit increase.

3           Question:  Your answer is that an 8-cent increase

4    would be appropriate based on your expectations given the

5    market conditions?

6           Answer:  That's correct.

7           Mr. Kronauge of Popeye's, he expected that the prices

8    were actually going to go up more than that.

9           We were willing to give a substantial increase, but we

10   wanted across the board everybody at 14 cents.  We thought 14

11   cents was a fair increase.

12          George's only went up eight.

13          The 2017 negotiation, Roger says, Need to tell the

14   industry we, Pilgrim's, are going to hold.  Does George's have

15   an agreement with Pilgrim's to hold?  No.  George's doesn't

16   hold.  They lowered their price from the prior contract price

17   and they agreed to start the new lower price early in 2017 even

18   though they had a contract that went through the entire year of

19   2017 at a higher price.  Their 2017 price was the lowest price

20   of all of the suppliers that year and they decreased their

21   price again in 2018 and for the years 2019 and '20.

22          This shows all of the contract prices.  Did Mr. Blake

23   even though he didn't have the ability to do it align George's

24   contract prices with those of his competitors?  George's not

25   only has the lowest price in 2017, they had the lowest price

1    most of the years of this supposed conspiracy.  They start in

2    2012 at the beginning of the supposed conspiracy with a price

3    of .9686.  By the evidence of the conspiracy they are at .9412,

4    lower than they were at the beginning of the conspiracy.

5            Mr. Koenig told you in the opening, you're going to

6    see it's like a rising tide, lifts all boats.  This rising tide

7    didn't lift George's boat.  George's boat is in shallower water

8    at the end of this supposed conspiracy than it was at the

9    beginning of the conspiracy.  And the prices are all different

10   with George's often being at the very bottom.  Mr. Blake did

11   not align George's prices with those of the other suppliers.

12           So the first thing that you would expect would

13   actually happen didn't happen.  Mr. Blake did not exchange bid

14   information.  And the second thing that you would expect to

15   happen did not happen, Mr. Blake did not align the prices of

16   George's with those competitors.

17           What about the two goals of this supposed conspiracy?

18   Maintain artificially high prices, didn't happen.  Not compete

19   for volume?  We know that the suppliers did compete for volume.

20   I won't spend a lot of time on this because it's been covered

21   by other counsel.  George's took volume in 2012.  George's took

22   volume in 2014.  The heart of this very conspiracy everybody

23   was taking volume from each other.  They are competing for

24   volume, the very thing the customers tell you that competition

25   is about.

1          So now, ladies and gentlemen, let's summarize the

2    evidence.  In her closing argument, Ms. Call said the way that

3    you're going to know that each defendant participated in this

4    conspiracy is to look at their own words.  Mr. Kornfeld on

5    behalf of Mr. Fries pointed out in eight years they only found

6    56 words of Mr. Fries to look at.  How many words of Ric Blake

7    are there for you to look at that are evidence that he

8    participated in this conspiracy?  Zero, zero.

9          There is no text or e-mail from Ric Blake in which Ric

10   Blake was sharing or receiving bid information.  There is no

11   text or e-mail from a competitor saying that that competitor

12   had shared bid information with Ric Blake or received bid

13   information from Ric Blake.  There is no text or e-mail which

14   Ric Blake was providing a competitor bid, competitor bid

15   information to his superiors at George's who are the ones who

16   would need that information in order to align George's bids or

17   final price.  The evidence in Mr. Blake's own words, the thing

18   that Ms. Call says you should look at, is non-existent.

19         Now, there was no witness from any customer who came

20   into this courtroom and told you that he or she had knowledge

21   of any of the suppliers being in a conspiracy to align bids or

22   fix prices.  There was no witness from any customer who said

23   that any supplier was acting in bad faith.  But let's look

24   specifically at what they said about George's.

25         Mr. Eddington said, in the case of George's, I believe

1    they were negotiating in good faith.  Mr. Suerken, Mr. Suerken,

2    the person that was so upset with how the 2014 RFP process has

3    gone.  He has done RFPs for everything from paper plates to

4    chicken, and he has never had a worse RFP in his life.

5    Ms. Call told you that in closing argument.  What does that man

6    say about George's?  I think they conducted themselves above

7    board.

8              Question:  So the testimony about the price is the

9    price, we're not moving, did that apply to George's?

10             Charles George never uttered those words to me.

11             Could they have charged higher prices?

12             Probably.  I can tell you I thought George's did a

13   wonderful job for us and they were absolutely amazing at what

14   they did.

15             That is the government's witness.

16             THE COURT:  Five minutes, Mr. Pollack.

17             MR. POLLACK:  Thank you, Your Honor.

18             So let's talk about the government's rebuttal closing

19   argument and your deliberations.  The government's rebuttal

20   argument frankly scares me.  Why?  There are millions of

21   documents in this case.  You have heard that over and over.

22   And in their rebuttal they may trot out some phone call, some

23   e-mail, some document, maybe one that no witness has ever been

24   asked about, maybe one of us that none of us have ever seen so

25   far in trial that they just dumped into evidence, and they are

1    going to ask you to say that that is evidence that Mr. Blake or

2    some other defendant participated in a conspiracy.  And I am

3    not going to be able to get back up and answer that.  I am not

4    going to be able to tell you what that piece of evidence means.

5            So what I want you to do when you get back in the

6    deliberation room before you start your deliberations in

7    earnest, start with any evidence that the government points to

8    for the first time in that rebuttal close.  And ask yourself

9    what would Mr. Pollack have said about that piece of evidence?

10   What would Ms. Johnson have said?  What would the other defense

11   counsel have said?  And then only after you consider both sides

12   of the story of that piece of evidence, start your

13   deliberations.

14           And when you are looking at that evidence or any

15   evidence in this case that the government claims implicates Ric

16   Blake, ask yourself, does that evidence relate to current

17   period pricing which the government says is irrelevant or to

18   bid information?  Is it evidence of what some suppliers did,

19   what George's did or what Mr. Blake did?  Every time George's

20   appears in a document, the government says, well, that must

21   mean the information came from Ric Blake.

22           The only time in this trial that we learned how

23   information came from George's to a competitor was when Ms. Ray

24   testified she got information from George's from a gentleman

25   named Greg Nelson, not from Ric Blake.  She didn't even know

4379

1    Mr. Blake.  Does the evidence that the government is pointing

2    to showed that Mr. Blake caused George's not to make its own

3    pricing decisions, but rather to coordinate its bids and prices

4    with its competitor under some agreement that Mr. Blake made?

5    After you answer those questions, you will know that the

6    evidence is not evidence that Ric Blake knowingly joined an

7    agreement to align bids or fix prices with the intent to

8    advance those goals.

9         The verdict, the verdict must be unanimous.  If any

10   one of you believes that the government has not proven its case

11   against Ric Blake beyond a reasonable doubt, hold on to that

12   belief.  Listen to your fellow jurors.  But if you are not

13   convinced, you cannot vote to acquit.  And the same is true for

14   every other defendant here.  You must base your verdict on

15   evidence and reasonable inferences from evidence, not based on

16   guesses or speculation.  And ladies and gentlemen, this

17   government's case is based largely, if not entirely, on guesses

18   and speculation.

19        Beyond a reasonable doubt; we hold the government to a

20   very high standard and with good reason.  You may not convict

21   any defendant if you are not convinced beyond a reasonable

22   doubt.  Remember, this is like 10 trials.  You have to make 10

23   decisions and for all 10 defendants there is reasonable doubt.

24   The fact of the matter is the government in this case has not

25   done its job.

1          You, as members of the jury, you have a job to do now.

2   And your job, the job that is entrusted to you as jurors is to

3   make sure that no one is convicted unless they have been proven

4   guilty beyond a reasonable doubt.  Your job is the most

5   important job that a democracy gives to its citizens.  You are

6   the ones who decide whether or not the government has proven a

7   case beyond a reasonable doubt, and if it has not, you must

8   acquit.

9          There is every reason to doubt the evidence against

10  Ric Blake.  Ric Blake must be found not guilty.  Ric Blake is

11  not guilty.  Render that verdict.  Send Mr. Blake home to

12  Arkansas.  Send him home to his family.  Send him home to where

13  he belongs.  Thank you.

14          THE COURT:  Thank you, Mr. Pollack.

15          Ladies and gentlemen, we will now have the rebuttal

16  argument of the United States.

17          Mr. Koenig?

18          MR. KOENIG:  Still having technical difficulties.

19          THE COURT:  Mr. Koenig, you've undoubtedly been

20  practicing using the document viewer for your rebuttal

21  argument?  Let's see if we can get this one fixed.

22          MR. KOENIG:  I mean, I can if that's --

23          THE COURT:  My guess is that we can fix it.  We still

24  have the blinking problem that we had once upon a time.

25          Ladies and gentlemen, why don't we do this.  Why don't

1    we take a 10-minute break and let's try to get IT up here so we

2    can get this problem fixed, all right?

3           We will be in recess for 10 minutes.  Thank you.

4       (Recess at 9:40 a.m. until 9:50 a.m.)

5           THE COURT:  Laptop working, Mr. Koenig?

6           MR. KOENIG:  I am told that it is.

7           THE COURT:  All right.  Let's bring the jury in.

8           (Jury present.)

9           THE COURT:  Ladies and gentlemen, I think we have the

10   technical problems solved.  Mr. Koenig.  Go ahead.

**REBUTTAL ARGUMENT**

12          MR. KOENIG:  Thank you.

13          Ladies and gentlemen, back in February I stood here at

14   this podium and said the evidence would show the defendants

15   were in an exclusive price-fixing club, an illegal price-fixing

16   and bid-rigging conspiracy.  You have now seen the evidence.

17   You have seen the documents.  You have heard the testimony, two

18   conspiracy insiders, customers, the lead investigator.  You

19   heard Ms. Call summarize the evidence.  You can see that we

20   embraced our responsibility to prove this case beyond a

21   reasonable doubt because that's exactly what we did.

22          You also heard 10 closing arguments by the defendants'

23   lawyers with some pretty colorful accusations about the

24   government and its investigation.  I am not going to dignify

25   them with a response other than to say this.  Special Agent

1   Taylor, the lead case agent, was the government's very first

2   witness.  If the defendants wanted you to hear more facts about

3   the investigation, you think they would have done more than

4   just a cursory cross-examination, but they didn't do that

5   because they wanted to invent problems with the investigation

6   to distract you throughout the trial.  The government is not on

7   trial.  The investigation is not on trial.  The defendants are

8   on trial.  So we are going to focus on the evidence.

9          Now, you have heard a lot about shortages, current

10  prices, collecting market intelligence, defendants saying

11  nothing to see here, that all the calls and texts and e-mails

12  and patterns are just about smart business.  This case is not

13  about shortages, current prices, collecting market

14  intelligence.  This case is about competitors collaborating,

15  cooperating, conspiring on bids and future prices.

16         You have seen the nature of the relationships, the

17  closeness, the trust among the defendants and their

18  co-conspirators, their shared goal of raising prices together

19  or resisting price increases together as a united front.  And

20  if you have any lingering doubt about whether this was

21  perfectly a legitimate business practice or an illegal

22  conspiracy, Defendant Penn's words seal the deal.

23         If we could look at Government's Exhibit 3037.  And I

24  would suggest you write down that exhibit number because it's

25  not in the summaries.  And you will recall that this was in

1    response to an e-mail that Brenda Ray who testified, she sent

2    an e-mail saying she got a call from a friendly competitor.

3    Don't worry, everybody is taking prices up no matter what you

4    might hear.  And Mr. Penn sent that e-mail in response.

5         You heard from Ms. Ray, a long-time Pilgrim's employee

6    loyal to Defendant Penn, she tried to explain away the workings

7    of the conspiracy as she had outlined them in her e-mail.  But

8    what is more believable?  The testimony of a long-time

9    Pilgrim's employee who herself was a co-conspirator and has

10   every reason to protect Defendant Penn or his words and

11   actions, his state of mind at the time as shown in Government's

12   Exhibit 3037?  Defendant Penn saw Ms. Ray's e-mail and what did

13   he do?  Did he tell her, Stop, that's illegal?  No.  He

14   forwarded it to another co-conspirator, Jason McGuire, to let

15   him know, FYI, the plan was working, and warned him, Do not

16   forward.  Why?  Because it's not exactly a legal conversation.

17        It was an illegal conspiracy.  And let's look at

18   Government's Exhibit 441, more evidence of Defendant Penn's

19   state of mind at the time.  If they is illegal, don't tell me

20   on this text in writing.  He didn't want to leave a trail.  It

21   was an illegal conspiracy.

22        Let's talk about 2014.  You heard from Carl Pepper.

23   He worked for Defendant Mulrenin and Roberts at Tyson.  And

24   Ms. Call summarized what Mr. Pepper said.  He told you about

25   that he coordinated bids with Defendants Brady, Little, Blake,

1    about the large increase in 2014.  And he told you why he did

2    it.  It was not idle curiosity.  He did it because that's what

3    he was told to do by Defendant Mulrenin, to make sure the

4    competition was on the same page.  The competition, Claxton,

5    Pilgrim's, George's, agreed with Tyson to raise their prices

6    with Tyson to historically high levels.

7            Now, Defendant Brady's lawyer said many times that

8    Mr. Pepper was lying because the calls with Defendants Brady,

9    Blake and Little didn't line up with a meeting in Mr. Cullen's

10   office.  The Judge told you in Instruction 7, and I urge you to

11   read it, that innocent misrecollection is not uncommon.  Maybe

12   Mr. Pepper misremembered the exact timing of the calls in the

13   meeting, but if you look at this next slide, you will see he

14   was rock solid on the calls and who told him to do it.

15           May I approach over here?

16           THE COURT:  You may.

17           MR. KOENIG:  This was his testimony, August 15, right

18   in the prime time period of the 2014 conspiracy.  Tim Mulrenin

19   calls him.  Right away, call to Jimmie Little, call to Scott

20   Brady, call to Ric Blake, call again to Scott Brady, and then

21   reporting back to Tim Mulrenin all within about a 45-minute

22   span.  There is no lie.  He was telling the truth.

23           You heard from Robbie Bryant.  He told you that

24   Defendant Austin under the supervision of Defendants Lovette

25   and Penn blitzed the customers, scared them with running out of

1   chicken.  He told you that he witnessed Defendant Austin on the

2   phone with Defendants Brady and Kantola getting them on the

3   same page, ensuring that Claxton and Koch would hold strong on

4   the historic price increases they had just submitted.  And when

5   the defendants accused him of lying about phone calls he

6   witnessed between Austin and Kantola, Austin and Brady, you saw

7   the records.

8           Here is what Mr. Bryant saw for the first time.  And

9   you can look this up on Exhibit 9010 if you want to see the

10  phone records, a call to Kantola, a call to Brady.  And they

11  made a lot about the fact that these are short calls.  Well,

12  the one to Mr. Brady happened again a few minutes later and

13  that was for five minutes.  And by the way, look up on 9010

14  whose numbers these are here.  These are Defendant Jimmie

15  Little's.  So when Mr. Byrne tells you that Jimmie Little

16  wasn't involved in the 2014 negotiations, look at this, told

17  them the price is the price, how many loads do you want, calls

18  Jimmie Little to update him, calls Jimmie Little to update him.

19          Robbie Bryant had his facts straight.  And even if

20  Mr. Bryant or Mr. Pepper hadn't even testified, you also saw

21  the documents, the defendants in their own words.  That's all

22  you need.  You saw the August 11th conference call down here in

23  the bottom circled in red, Defendants Roberts and Mulrenin of

24  Tyson conferring with Defendant Brady of Claxton to get on the

25  same page when Tyson submitted its historically high price

1  increase to KFC.

2          You saw the August 15th call, Rich Eddington, a

3  defense witness, setting up a call with Tyson, Defendant

4  Mulrenin, to talk about that historically high price increase.

5  And then you saw at the bottom of the page Defendant Penn

6  called Defendant Roberts for 15 minutes that same day.

7          Now, remember, only Tyson had submitted its bid early

8  by then, but internal Pilgrim's documents introduced by the

9  defendants showed that they were busy finalizing their numbers

10  at Pilgrim's.

11          Now, if we look at the next slide, up to that point

12  you can see here Pilgrim's hadn't yet decided how much it was

13  going to increase its margin and that is August 15.

14          Next slide, please.  Now, August 16, suddenly they

15  jump up to a 12-cent increase in margin.  What could have

16  caused such a seismic shift in the cost model?

17          Next slide.  The call from Penn to Roberts, 0 to 12

18  cents overnight.  And let's also look at this.  He was to get

19  on the same page.  You remember Mr. Gillen talking about 19

20  cents, don't forget 19 cents, the increase?  .1858, pretty darn

21  close.  Mr. Gillen is right, 19 cents is an important number,

22  and you see why right there.

23          Now, defendants tried to explain away this phone call

24  saying it was the first time Defendants Roberts and Penn had

25  talked on the phone during the conspiracy period.  Really.  The

1    first time they talk on the phone in the course of a nearly

2    decade-long conspiracy, and it just so happened to be on the

3    day that Defendants Roberts and Mulrenin were scheduled to

4    justify their price increase to Rich Eddington at RSCS.  It

5    just so happened to be on the day defendants decided to

6    increase their prices by 19 cents.  That is a fantastic

7    coincidence or it's a conspiracy.  I suggest to you it's the

8    latter.

9          And I want you to make note of that call for one other

10   reason.  You heard defendants asking why Tyson numbers weren't

11   included in the "Roger did some checking around" e-mail,

12   Government's Exhibit 1074?  That call answers it.  Defendant

13   Penn already had Tyson's numbers.  He didn't need to get them

14   from Defendant Austin.

15         You also saw the blizzard of phone calls on

16   August 18th, the day before the bids were due, all culminating

17   with the call from Jason McGuire to Roger Austin and ending

18   with the "Roger did some checking around" e-mail which told

19   Defendant Penn that the plan was working.  The competition

20   agreed with Pilgrim's to submit huge price increases to KFC.

21         And then you saw a little higher up in that same

22   e-mail, Defendant Penn telling Defendant Lovette, neither of

23   whom would approve these bid submissions without knowing the

24   status of the plan with the competition, the plan was working.

25   The competition agreed with Pilgrim's to submit huge price

1   increases.

2          And in the second round of negotiations, you saw the

3   phone calls followed by the text messages on August 26 and 27

4   right before the second-round bids were due.  You saw the

5   texts, Brady and Fries reassuring each other that the plan was

6   working.  They were about to pull off a historic price increase

7   with their competitors.  And then you saw Exhibit 1030.  I ask

8   you or urge you to write that down because that's also not in

9   the summaries.

10          These are the handwritten notes of the defendants'

11   co-conspirator, Pete Martin at Mar-Jac.  And you will recall

12   Ms. Flo Becker by video at the beginning of the trial

13   identifying those handwritten notes as those of Pete Martin.

14   Now, those notes August 29th, just two days after the frenzy of

15   calls and texts we just looked at and a few days before the

16   second round bids are due.  So we've got at the top some

17   information on grain.  Then at the bottom we have bid

18   submissions that hadn't been submitted yet.  And where did

19   Mr. Martin get that information?  Before I get into that,

20   though, let's discuss Mr. Martin and Mar-Jac.

21          Mr. Martin was a high-ranking executive at Mar-Jac, a

22   chicken supplier that agreed with Pilgrim's not to compete for

23   customers' business, in fact, causing Defendant Penn to say

24   Mar-Jac is a solid competitor.  And who did Mr. Martin work

25   with at Mar-Jac?  Two people you have heard about, Rich

1    Eddington and Tommy Francis.  Mr. Eddington, you saw him on the

2    stand, and he told you that he and Tommy Francis were both

3    close friends with Defendant Roberts.

4           So going back to Exhibit 1030, where did he get the

5    competitors' bids and negotiating strategies?  Well, you've

6    seen the calls.  That day, the same day that the notes are

7    dated, 20-minute call with Jayson Penn, 20-minute call with

8    Mikell Fries.  So when Defendant Penn's lawyer stood up here

9    and said talked to Jayson Penn on Exhibit 1030, there is -- we

10   don't know what that means.  You can say yes, we do.

11   Mr. Martin also talked to Tommy Francis.  He worked at Mar-Jac.

12   So you know where that price increase came from, Defendant

13   Roberts, right here, Tyson 1.0976 per Tommy.

14          Now, you heard Defendant Roberts' lawyer talk about

15   the importance of 19 cents and how Tyson made up its mind on 19

16   cents and it was Defendant Roberts' and Mulrenin's job to

17   implement it.  You also know that he -- both Defendant Roberts

18   and Mulrenin, they had bonuses that were tied to volume, and

19   that's important because if the price goes up, generally

20   speaking, in a competitive environment, volume goes down.  You

21   raise your price; customer takes some business away.  That is

22   motivation for them to get everyone on the same page, get the

23   competition on the same page so you don't lose as much volume.

24   You keep your bonus.

25          And let's look at the numbers.  Remember, 19 cents, it

1    is important.  Mitch Mitchell of Case Farms, 19 cents; Tyson,

2    it says 1976, but as we know, Tyson had decided on 19 cents.

3    It's 19 cents up; Jayson Penn, plus 8 on cost, plus 11 on

4    margin, 19 cents; Claxton, 11099 up, .1835, pretty close to 19

5    cents.  So all Mr. Gillen's argument proves is that Defendant

6    Roberts was a ring leader in the conspiracy.

7         In spite of all that evidence, and that's just a slice

8    of it, defendants tried to explain it all away by slapping the

9    label collecting market intelligence on top of it.  They think

10   they can confuse you, that you won't peel that label back.  But

11   ladies and gentlemen, you know what the defendants were really

12   doing.  They were coordinating, colluding, conspiring, agreeing

13   to raise prices together.  That is a conspiracy.

14        Now, the defendants have also tried to sway you by

15   distorting and contorting the evidence.  Don't be fooled.  It

16   is a distraction.  According to the defendants, and you heard

17   Mr. Pollack just talking about this, they should be applauded

18   because they proposed a 15 to 20-cent price increase and then

19   came back down and they called it savings.  That is

20   nonsensical.  You can't jack up the price with your competitors

21   and give a little ground and call it savings.

22        In fact, you heard Pete Suerken from RSCS say it was

23   the worst negotiation from produce to beef to paper cups.  He

24   has never had such a huge price increase driven by profits that

25   went straight to the bottom line of the suppliers.  And you

1   also heard Mr. Pollack say Mr. Suerken was pleased with

2   George's prices.  Not true.  When Ms. Johnson asked him if he

3   was satisfied with those prices, he said, No, I wasn't

4   satisfied with any of the prices.  Right into the suppliers'

5   pockets.

6          You also saw Greg Finch take the stand, Claxton's

7   chief financial officer, a close friend of the Fries family, a

8   man who's got family members on the Claxton board.  He was

9   clearly a plant, a witness put on the stand to try to explain

10  away the overwhelming evidence.  You saw how articulate he was

11  on direct examination, then you saw his body language on cross.

12  You saw his refusal to acknowledge basic facts, his refusal to

13  acknowledge that words on the page were what they appeared to

14  be.

15         But let's just put aside who Mr. Finch works for.

16  Let's put aside that his paycheck comes from Claxton.  Let's

17  put aside that his boss was sitting right here in the courtroom

18  when he testified.  Let's just take him at face value.  He said

19  two things.  He said the customers lie or bluff and he said the

20  customers are honest and can be trusted.

21         He said the customers lie to justify talking to

22  competitors to verify what the customers had said.  But he said

23  customers can be trusted because of the weird negotiation

24  strategy, this just put me somewhere in the middle.  And that

25  strategy does not make any sense unless Defendants Brady and

1     Fries had a plan with their competitors.  They already knew

2     exactly where the middle would be because they knew where

3     everybody else was bidding.

4           And don't be fooled by the defendants' claims that

5     there was competition in 2014 because KFC took business away

6     from Pilgrim's.  Losing volume, that was part of the plan all

7     along.  If you're planning with your competitors to be the

8     highest, you're going to lose some volume, and you make up that

9     money from the lost volume with increased prices.  The fact is

10    the defendants had been conspiring to rig bids and fix prices

11    for years, and with the short supply conditions in 2014, they

12    finally struck gold.

13          Now, let's talk a minute about jury instructions.

14    First, several of the defendants have told you that they could

15    not be involved in a price-fixing conspiracy because they did

16    not have pricing authority.  I urge you to scour the jury

17    instructions for those words, pricing authority, and you will

18    not find them except in the defendants' theories of the case.

19    And that's instructions 32 to 41.  Let me be 100 percent clear,

20    those are not coming from the Court.

21          MR. KORNFELD:  Objection, Your Honor.  Those are

22    coming from the Court.

23          THE COURT:  Ladies and gentlemen, if you look at the

24    instruction right before those series of instructions, you will

25    see there is an instruction on what they actually are.

1           Go ahead.  Overruled.

2           MR. KOENIG:  Those are the defendants' words.  They

3    are theories and theories alone.  You are free to read through

4    them, consider them, but they don't pan out.  And what you

5    should focus on are the law as the Judge instructed and the

6    facts in evidence.

7           And on the pricing authority point, while you won't

8    find those words in the other instructions outside of the

9    defendants' theories of the case, what you will find is Jury

10   Instruction 17, what is required to enter a conspiracy.  Two or

11   more persons must enter into an agreement or mutual

12   understanding.  It does not say two or more persons with

13   pricing authority must enter into an agreement or mutual

14   understanding.  So what does that mean?  It means that if

15   someone doesn't have pricing authority, that does not matter.

16   If they agreed, if they conspired, if they came to a mutual

17   understanding, that's the crime.  That's the law.

18          I urge you to spend some time reading Instruction 17.

19   It also tells you about what evidence you can consider to find

20   the defendant entered into an agreement, came to a mutual

21   understanding.  It says the agreement itself may have been

22   entirely unspoken.  That means you don't need a contract signed

23   in blood or ink or even an e-mail saying yes, I agree.  I'm in

24   the conspiracy.  Look at their actions.

25          Defendants also talked a lot about speculation.  What

 1   kind of inferences can be drawn?  Let's look at Instruction 6:

 2   Reasonable inferences, conclusions that reason and common sense

 3   lead you to draw from the facts.  And that's what you need to

 4   do here.  Look at the evidence, draw on your common sense and

 5   conclude that there was a conspiracy.  I am also -- I am not

 6   going to put them up on the screen, but let's look -- I urge

 7   you to look at Instructions 18 and 22.  Those instructions tell

 8   you that all you need to convict is KFC 2014 alone.  That's

 9   what they tell you.

10       Now, the defendants at times have at least implied

11   that what the customers think doesn't matter.  Ladies and

12   gentlemen, this case is about competition.  And who decides

13   what competition looks like?  It is not the competitors.  The

14   customers are the ones that set up the terms of competition.

15   You heard about blind bidding and other measures to get the

16   most competitive prices.

17       Even Mr. Kronauge, one of the defense's star

18   witnesses, said he did not want competitors coordinating on

19   bids.  The defendants would have you ignore the blind bidding

20   processes and have you believe that they innocently exchanged

21   future bids and prices.

22       Let's look at jury Instruction No. 21.  Now, the

23   defendants have paraded around No. 21 as if it's a free pass,

24   anything goes, excuses anything they've done.  They want you to

25   think the government's theory is only about sharing pricing

1    information, and so therefore Instruction 21 frees them of all

2    responsibility.  Getting prices from distributors from covering

3    shortages, seeing current prices in invoices, that is not what

4    the government's case is about.  It's about agreeing to give

5    each other future pricing strategies they need to raise prices

6    together.  And once that understanding is in place, the crime

7    is complete whether or not they act on it.  But we've shown

8    time and time again that they did act on it.

9         And as you know from Instruction 20, you may infer the

10   existence of a conspiracy from what you find the parties

11   actually did, and they did.  It was a conspiracy.  You've also

12   been told by a number of the defendants prices aren't

13   identical.  You should conclude that there was no price-fixing

14   or bid-rigging.  Not so.  Let's look at Instruction No. 21.

15        The judge told you prices do not have to be the same

16   or identical to be fixed.  And read through the rest of the

17   instruction, I urge you.  Even Professor Snyder, the

18   defendants' expert, finally understood that on

19   cross-examination.

20        So let's talk about Professor Snyder for a minute, the

21   defendants' half-million-dollar expert.  He analyzed -- he

22   analyzed what happened in 2014, looked at numbers, concluded

23   there was no price-fixing.  He talked about supply and demand

24   leading up to 2014, but there is no real dispute in this case

25   that supply was low and demand was high.  And let's take a

1  minute to look -- or not to look at, but to talk about the bar

2  graph where he told you about KFC prices compared to other

3  prices.  And what you saw, though, was not apples to apples.

4  It was apples to something else.  Regardless, the most

5  important thing to understand about that bar graph is it

6  doesn't matter.  That's because he was only trying to show how

7  much harm there was to KFC; and that, if you look through the

8  jury instructions, is not an element.

9       Instruction 21.  You heard it from Judge Brimmer, you

10 can see it for yourself, the fact the defendants may not have

11 been successful in achieving their objective is no defense.

12 There is more about harm in Instruction 19 which you can also

13 read.  Now, defendants also said that the government should

14 have called an expert of our own to counter Professor Snyder.

15 Is that what you want, another economist?  You don't need a

16 calculator to figure this out.  The evidence before you, the

17 e-mails, the texts, the calls, the patterns, the defendants'

18 own words squarely establish the conspiracy.

19       One last topic.  You heard Mr. Lovette's counsel

20 claiming that there was no evidence against him, trying to wipe

21 away each piece of evidence like it's written on a white board.

22 Defendant Lovette would have you believe this conspiracy was

23 going on right under his nose and he knew nothing about it, but

24 let's look at the actual evidence.  In 2014 KFC negotiations,

25 he oversaw the negotiations.  We are looking here at the "Roger

1    did some checking around" e-mail, 1074.  And you see Defendant

2    Penn saying he would review with Bill in the a.m.

3          You know exactly what he was reviewing with Defendant

4    Lovette, the plan with the conspirators and the competitors to

5    raise prices, because you saw that he did the same thing in

6    2012.  If we look at Exhibits 1522 and 23, all the competitors'

7    bids except for Tyson sent from Jayson Penn to Bill Lovette.

8    And it was even more important in 2014 that the conspirators

9    were onboard given the historic size of the price increases, so

10   you know that Defendant Penn reviewed the conspirators' plan

11   with Defendant Lovette to get his sign-off.

12         MS. NIELSEN:  Your Honor, I am going to object.  He is

13   inviting the jury to speculate.

14         THE COURT:  Overruled.  Ladies and gentlemen, the

15   evidence in the case is what you determine it to be.  The

16   arguments are not evidence.

17         Go ahead, Mr. Koenig.

18         MR. KOENIG:  You also heard from Mr. Suerken, and you

19   will remember he was in charge at RSCS of 2014 negotiations.

20   And what did Mr. Suerken tell you?  Defendant Lovette said he

21   wasn't budging on price.  And who else did Defendant Lovette

22   make sure got that message?  Defendants Brady and Fries, and he

23   did it through Defendant Austin.  Look at the series of calls

24   here.  RSCS with Roger Austin talks to Jayson Penn, Bill

25   Lovette.  Austin calls Brady.  Brady texts Fries.  I talked to

1    Roger about KFC and Greeley.  Defendants Lovette and Penn told

2    him not to come down on price.  And Defendant Austin's lawyer

3    asked why in the world would Roger Austin do that?  He had no

4    motivation.  This is why.  Greeley told him not to come down on

5    price, period.

6         Ladies and gentlemen, you've seen the way the

7    defendants tried to explain away the evidence in this case.

8    They have a one-off call here and a one-off invoice there,

9    isolated explanations for isolated evidence.  But they did not

10   and cannot address the overall pattern, what you saw over and

11   over again, a customer request for pricing, the calls,

12   coordinating the plan between conspirators, the reporting back

13   on the plan, the submission of fixed prices and rigged bids.

14        And some of the episodes like quality assurance and

15   freezing costs, they are getting on the same page, but the

16   important thing to see in those smaller episodes is that when a

17   customer calls, the knee-jerk reaction, the routine is to pick

18   up the phone, call each other, call your competitors, call your

19   conspirators.  It's the same pattern you see in the bigger

20   episodes.

21        But ladies and gentlemen, in order to believe the

22   defendants' story, you would need to disbelieve the witnesses,

23   the e-mails, the texts, the timing of the phone calls, and you

24   would have to remove all common sense.  Everyone is wrong

25   except for them.  The simplest explanation rather than the

1   defendants convoluted explanation is the truth, and that is

2   that there was a conspiracy to fix prices and rig bids.  And

3   when it all comes down to it, all you need is KFC 2014 to

4   convict all 10 defendants.  And you know that from Instructions

5   18 and 20.  You have seen the evidence for the entire

6   conspiracy period and it supports only one conclusion.  All

7   defendants, all 10 of them are guilty as charged.

8          Thank you.

9          *MS. PREWITT:*  Your Honor, I would like a side bar.

10          *THE COURT:*  Thank you, Mr. Koenig.

11     (At the bench:)

12          *THE COURT:*  Go ahead, Ms. Prewitt.

13          *MS. PREWITT:*  I want to go to the point on pricing

14   authority that was argued where Mr. Koenig was arguing the jury

15   instructions.  He said, And on the pricing authority point,

16   while you won't find those words in the other instructions

17   outside of the defendants' theories of the case, what you will

18   find is jury Instruction 17, what is required to enter a

19   conspiracy.  Two or more persons must enter into an agreement

20   or mutual understanding.  It does not say two or more persons

21   with pricing authority must enter into an agreement or mutual

22   understanding.  So what does that mean?  It means that if

23   someone doesn't have pricing authority, that does not matter.

24   If they agreed, if they conspired, if they came to a mutual

25   understanding, that's the crime.  That's the law.

1        That is, in fact, not the law, Your Honor.

2        I will cite to Rule 29 motion where it says that

3   conduct by an individual employee without the requisite

4   authority to fix prices of its employer forms no basis for a

5   legitimate inference of participation in a price-fixing

6   conspiracy.  That is *In Re: Baby Food* litigation, Third Circuit

7   case 166 F.3d 112, pin cite 137.  We also have *Pevely Dairy*

8   *Company v. United States*, 178 F.2d 363, pin cite 369, Eighth

9   Circuit 1949 finding insufficient evidence to sustain a

10  conspiracy conviction where neither of the employees had any

11  power of authority to fix prices and the information given was

12  not with reference to any purpose to fix prices.

13       In addition, Your Honor, *U.S. v. Ward Baking Company*,

14  249 F.Supp. 713, pin cite 715, Eastern District of

15  Pennsylvania, no finding of conspiracy where alleged

16  co-conspirator was clearly not an employee with sufficient

17  authority to make defendant liable for any conspiracy he aided,

18  abetted or joined.  This is something that the prosecutor knows

19  well is the law and he implied to the jury that is, in fact,

20  not the law.  I would like to have a curative instruction, Your

21  Honor.

22       *THE COURT:*  Mr. Koenig, response?

23       *MR. KOENIG:*  I went right from the jury instructions.

24  Counsel has had opportunity to make those arguments.  They are

25  not in the jury instructions.  And I would submit that that is

1    not the law.  There may be a case or two that seems to support

2    that, but that's not the law.  It was straight from the jury

3    instructions.

4         *THE COURT:*  Anything else, Ms. Prewitt?

5         *MS. PREWITT:*  Your Honor, he implied that there was

6    missing language in the jury instructions and so the jury

7    should infer something that was not written there.  In fact, it

8    intentionally excluded that, intentionally excluded that.  That

9    is not in fact the case, Your Honor.  So we would like that to

10   be corrected.

11        *THE COURT:*  All right.  I refuse the request to

12   correct it.  I think the instructions state the law and the

13   jury will -- has been instructed to use the instructions as the

14   law in this case, not anything that Mr. Koenig said.  I don't

15   find that his argument was so misleading as to somehow mislead

16   the jury, so I will deny that request.  Thank you.

17        (In open court:)

18            Ladies and gentlemen, I am about ready to dismiss you

19   to go commence your deliberations.  Let me give you a few bits

20   of information to assist in your deliberations.  You may recall

21   a couple of days ago when I read the instructions to you, I

22   mentioned in the last instruction a court security officer.  I

23   am going to post a court security officer outside of the

24   deliberation room when you are deliberating.  That is not to

25   keep you in.  That is to keep you from being inadvertently

1    interrupted during the course of your deliberations.  At any

2    point in time if you want, one or more of you want to take a

3    break, you can do so.  So the court security officer is not

4    going to keep you in.

5         The court security officer will, however, collect your

6    cellphones while you are deliberating.  Once again, the purpose

7    of that is to prevent you from being interrupted by phone calls

8    or other things of that nature.  If any of you wish to make a

9    phone call, all you have to do is, you know, suspend your

10   deliberations, the person can go outside, get his or her

11   cellphone, make the call, okay?

12        You can set your own schedule except I am going to

13   bring you back in at 5:00 o'clock to dismiss you and I will

14   give you some more admonitions at the end of the day, all

15   right?  But otherwise if you want to take breaks or take lunch

16   exactly when you want to, that's now completely up to you.

17        You have to be careful, though, you can't deliberate

18   unless all of you are present.  So if one of you wanted to make

19   a phone call, you would have to stop deliberating, wait for

20   that person to rejoin you.  Once you are all together, then you

21   can start deliberating again.

22        Other than my admonition to you not to deliberate

23   among yourselves, which I am lifting, all those other

24   admonitions still apply.  So in the course of your

25   deliberations, you can't decide to research something or look

1    something up in a dictionary or do anything other than rely

2    upon the evidence in the case, so the testimony, the exhibits,

3    and as I said before, we will bring those exhibits back to you.

4    It may not happen instantaneously, but the exhibits will be

5    brought back.

6         You will recall during the course of the case that

7    there were various spreadsheets and things of that nature and

8    they may have been referred to as being in so-called native

9    format.  Many of those will be on a thumb drive that will be

10   given to you; and as a result, if you wish to look at them in

11   native format, we have what I think we call it an evidence

12   cart.  It's a machine basically that will allow you to plug the

13   thumb drive in and review those documents in native format on a

14   computer screen.

15        If you have any trouble working that, and I am sure

16   that 12 people will collectively be able to figure that out, I

17   don't think it's very complicated, but if you have any problem

18   with it, if it's not working or something, let us know.

19        One thing I would ask you not to do, and that is don't

20   bring in your own device to review those documents, okay, even

21   if you have something that's a lot better because the evidence

22   cart is clean in the sense that it doesn't have any extraneous

23   information.  It's not internet connected.  And anything that

24   you would bring in would not be those things, so don't do that.

25   Just manage with what we provide to you.

1         And then if you do reach a verdict, give a note to

2   that effect to the court security officer who will bring it to

3   me, in other words, just that you have reached a verdict.

4   Otherwise, any note that you provide should not, as I indicated

5   in the instructions, indicate any numerical split or anything

6   of that nature, okay?

7         At this time, then, let's have our court security

8   officer come forward and Ms. Grimm will administer the oath to

9   the court security officer.

10         (Court security officer was sworn.)

11         *COURT SECURITY OFFICER:*  I do.

12         *THE COURT:*  All right.  Ladies and gentlemen, one

13   other thing, and that is as you know, there are 13 of you.  One

14   of you is an alternate.  Mr. Barrett, you are the alternate.

15   So Mr. Barrett, do you have any personal belongings in the jury

16   room?

17         *JUROR:*  I do.

18         *THE COURT:*  So here is what's going to happen.  I am

19   going to, with the assistance of Ms. Grimm, after I talk to you

20   a bit, I am going to have the rest of the jurors be excused to

21   commence their deliberations, but I want to talk to you a

22   little bit after that, and then with Ms. Grimm's help I will

23   have you collect your belongings, okay?

24         All right.  The rest of you, then, ladies and

25   gentlemen, may be excused to commence your deliberations.

1          (Jury excused to deliberate.)

2          So Mr. Barrett, a couple of things.  First of all, we

3    weren't picking on you.  Just randomly you happened to be

4    sitting in a chair that long before the trial started we

5    designated as being one of the chairs for an alternate.  And as

6    you know when Mr. Kramer was excused, if you don't have

7    alternates, especially in a long trial, you're in trouble

8    because someone could get sick and you just never know.

9          We got lucky because no one else got sick, but as I

10   have been watching you dutifully take notes over the many weeks

11   of this trial, it pained me to be thinking about right now

12   because for someone to be, you know, in a trial that lasts this

13   long and be paying such careful attention as you and then for

14   me to have to say, you are the alternate, have a good day, is

15   bad.  But I hope you do appreciate the fact that we had to have

16   alternate jurors.  And I so very much appreciate all of your --

17   you know, the sacrifice you have made in terms of your time and

18   attention.

19         I would ask a favor of you, Mr. Barrett, if you are

20   willing to do so.  It is still possible that one of the jurors

21   could get sick; and if that's the case, it is possible to

22   substitute you in and have the jury start all over in terms of

23   its deliberations.  That would require you, Mr. Barrett, too,

24   despite the fact that all of the sudden you are going home and

25   for all practical purposes your service is over, keeping all

1    those admonitions that we've been talking about during the

2    entire trial which may be a little bit odd, but that would

3    require you to, despite the fact that you're going home, tell

4    people, no, I can't talk to you about the case.  No, don't tell

5    me anything about the case.  And you would have to not look up

6    any information about the case or expose yourself to any

7    information about the case.

8          But in the event that unfortunately one of the other

9    jurors got sick, we could then give you a call and, assuming

10   that you followed all those admonitions, bring you back in.

11   Would you be willing to do that, Mr. Barrett?

12         *JUROR:*  Yes, sure.

13         *THE COURT:*  I very much appreciate that.  We will, of

14   course, upon the jury reaching a verdict notify you immediately

15   so you know the situation and know at what point in time you

16   don't have to follow those admonitions.

17         Let me tell you one other thing, Mr. Barrett, and that

18   is that no one from the parties and no person working for the

19   parties will contact you in any way about this particular case

20   to ask you about your service on the case because I am ordering

21   them not to do that.  That doesn't mean that other people not

22   connected with the parties might not attempt to contact you.

23         Whether you talk to anyone who contacts you is totally

24   up to you.  Obviously, don't talk to them before you understand

25   that the jury in this particular case has been excused for all

1    purposes, but after that whether you talk to people or not is

2    completely up to you, all right?

3           Thank you very much, Mr. Barrett, for your service.

4    At this time I am going to have Ms. Grimm accompany you back to

5    the jury room to collect your belongings, and then at that

6    point in time you are free to go home, all right?  All right.

7           (Alternate juror excused.)

8           It's interesting.  Oftentimes when the alternate is

9    identified, the rest of the jurors kind of are secretly

10   thinking glad it wasn't me, but obviously they all feel very

11   empathetic towards Mr. Barrett.

12          Okay.  It's my understanding, then, that each side has

13   had an opportunity to review the list of admitted exhibits that

14   Ms. Grimm has passed out to you marked, as I understand, Court

15   Exhibit 4 being the Government's Exhibit list, Court Exhibit 5

16   being the defendants' exhibit list.  Let me confirm that that's

17   the case.

18          Mr. Torzilli, on behalf of the United States, is that

19   true as to both Court Exhibits 4 and Court Exhibit 5?

20          MR. TORZILLI:  We have had an opportunity to review

21   and comment on those lists.

22          THE COURT:  Okay.  And as far as -- do you agree that

23   those two court exhibits are accurate?

24          MR. TORZILLI:  We agree that they are accurate, yes,

25   Your Honor.

1        *THE COURT:*  Thank you.

2            And perhaps there may be a spokesperson on behalf of

3    the defendants who have also -- would know whether the

4    defendants have had a chance to look over Court Exhibits 4 and

5    5 and whether those two lists are both accurate.

6            Mr. Tubach?

7        *MR. TUBACH:*  Yes, Your Honor.  I believe we have

8    reviewed those lists and my understanding is they are accurate.

9        *THE COURT:*  Thank you very much.

10           If you would make sure that Ms. Grimm has a telephone

11   number for at least one member of each team in the event of a

12   question or a verdict, we will call that number so that we can

13   reassemble.  I would like you to be, as you know from the last

14   trial, within 10 or 15 minutes away so that in the event there

15   is a question or a verdict, we can assemble relatively rapidly.

16           Anything else that we should talk about before we are

17   in recess until we either get a question or until -- or a

18   verdict or until 5:00 p.m.?

19           Silence will be construed as nothing, so we will be in

20   recess until such occasion.  Thank you.

21       (Recess at 10:45 a.m. until 2:12 p.m.)

22       *THE COURT:*  We are back on the record in 20-CR-152.

23   The jury has sent out a question.  Has the government received

24   a copy of the question?

25       *MS. CALL:*  Yes, Your Honor.

1          THE COURT:  Have both the defendants received a copy?

2     Everyone is nodding in the affirmative.  So the question reads:

3     Clarification on instruction #26 (last paragraph), "performed"

4     some act, does that include signing of contracts prior to 2015?

5     Can evidence prior to 2015 be considered.

6              Proposed response on behalf of the United States?

7          MS. CALL:  Yes, Your Honor.  The United States would

8     propose a simple yes to those questions.

9          THE COURT:  Okay.  And proposed on behalf of the

10    defense?  Mr. Tubach?

11         MR. TUBACH:  I will start, Your Honor, and then let

12    others speak up.  I think the clear answer to this is no as to

13    both questions.

14         THE COURT:  And that's all you say is no?

15         MR. TUBACH:  No.  For purposes of Instruction 26, the

16    answer is no because the Instruction No. 26 is a statute of

17    limitations instruction, and for purposes of answering the

18    statute of limitations instruction, they cannot look at

19    contracts signed prior to 2015 and they can't look at evidence

20    prior to 2015 to be considered.  I think it's pretty clear as

21    to that instruction the answer is no.  They can consider the

22    evidence for other purposes, but that is not the question the

23    jury has asked.

24         THE COURT:  Anyone else for the defense on responses?

25              Mr. McLoughlin?

1          *MR. McLOUGHLIN:*  Your Honor, agreeing with Mr. Tubach,

2    I think if you look at the plain language of the instruction in

3    the last paragraph where it says the government must prove

4    beyond a reasonable doubt that one or more of the members

5    performed some act after June 2015 with respect to or after

6    October 2015 with respect to, the plain language of the

7    instruction which is to say performed some act after is

8    irreconcilable with the government's position which is exactly

9    the opposite of the instruction.  The only answer that I think

10   is reasonably within the scope of the instruction itself is no.

11         *THE COURT:*  Okay.  Thank you.

12         Ms. Call?

13         *MS. CALL:*  To put it simply by means of an example,

14   there are contracts signed in December of 2014 that led to the

15   sale and seat of payments in 2015 through 2017.  The acts or

16   acts performed by defendants include the receipt of those

17   payments, those actions, but there is nothing in the statute of

18   limitations that says the jury can't consider acts before that

19   that may have an effect and performed acts within the

20   limitations period.  I think there is a very restrictive view,

21   like if December 31st, 2014, I say I am going to go do this two

22   weeks from now and I then go do it, the jury could still

23   consider the fact that I said it just before the statute of

24   limitations period.  So I think this is an overly restrictive

25   view that the defendants are taking to the jury's consideration

4411

1    of the evidence.

2         THE COURT:  Here is what I would propose.  For the

3    first question I think that we should say:  No.  The act of

4    signing a contract before the dates noted in instruction No. 26

5    does not constitute performance.

6         You will note that the question is unclear about -- it

7    just says prior to 2015, so that's not what the instruction

8    says.  The instruction actually -- things that were performed

9    in 2015, we can't just say 2015 because there are acts in 2015

10   that can and should be performed, just after the dates that are

11   mentioned in that paragraph.

12        As to question No. 2, I would propose as follows:

13   Question No. 2:  No.  Acts performed before the dates noted in

14   Instruction No. 26 cannot be considered, because that's exactly

15   what the instruction says.

16        Now, it's true that maybe the jury in the first

17   question is not really focusing on the act of signing a

18   contract, but that's what the question says, and I just don't

19   think that we can really speculate beyond that.  That's why I

20   think that by using the language that I have proposed, the act

21   of signing cannot be considered because it's outside the period

22   will at least focus the jury on that aspect of it.  If they

23   have a follow-up question, fine, but Mr. Tubach?

24        MR. TUBACH:  After brief looking around, I believe the

25   instruction the Court proposes to give is acceptable to the

1    defendants.

2         *THE COURT:*  Ms. Call?

3         *MS. CALL:*  I will just note there do seem to be three

4    questions in the question because it's -- or maybe it's two.

5    Clarification, some act, does that includes signing of

6    contracts prior to 2015, but then the last one says can

7    evidence prior to 2015 be considered.  And I think the answer

8    to that is yes.  Evidence prior to 2015 can be considered

9    because it may relate to acts performed 2015 or later.

10        And that's kind of the exact point I was trying to

11   make, that there may be evidence that exists in the 2014 time

12   period, for example, that relates to acts that were performed

13   in 2015 and after.  So I think we are overly restrictively

14   reviewing what is a broad question when they were asked if they

15   can consider evidence prior to 2015.

16        *THE COURT:*  Yeah, I see your point, but that would

17   require probably a long explanation, and I am not quite sure

18   that the jury is asking that.  That's why in the language that

19   I propose, once again, it does say no, but it focuses the jury

20   on acts performed and that's what the paragraph says.  So it

21   would be acts performed the dates noted cannot be considered,

22   which I think is true.  If the jury comes back with a further

23   question, that would be fine.  It's just that I don't know if

24   you can assume your broad reading of the term evidence based

25   upon the first question.

4413

1              MS. CALL:  I do have one concern, Your Honor, based on

2      the fact that the Indictment is not back with the jury, and

3      they are not aware of the fact that the allegations include the

4      sale and receipt of payments for chicken products which can be

5      considered for the statute of limitations purposes under 10th

6      Circuit law.  So I do think some clarification in the

7      instruction now that they've asked this question would be

8      helpful including, you know, acts performed including the sale

9      or receipt of chicken products affected by the conspiracy may

10     be considered.

11             THE COURT:  Mr. McLoughlin?

12             MR. McLOUGHLIN:  The request from the government is

13     nothing less than a request to rewrite the instruction.  The

14     receipt of funds or the sale of chicken that occurs after the

15     dates in 2015 is, in fact, an act, if receipt can be deemed an

16     act, and I would argue that it cannot, but the sale of chicken

17     products, for example, that occurs in 2016 is an act after the

18     relevant date.  The fact that it is pursuant to a contract that

19     was signed, the act, prior to the relevant date does not permit

20     the conflation of those dates.  It is actually a quite simple

21     exercise and the government's request for clarification I think

22     does exactly the opposite.  Thank you.

23             MR. BYRNE:  I was just going to say that if the

24     government was concerned about this, they could have argued it

25     in their closing.

1          *MS. CALL:*  We did.

2          *MR. BYRNE:*  They didn't accept it.

3          *THE COURT:*  Well, we are not quite at that point.  But

4     what we are trying to do is answer the question.  So Ms. Call,

5     I will let you have another point.

6          *MS. CALL:*  Do you mind re-reading the proposed

7     instruction?

8          *THE COURT:*  No problem.  So I would propose saying:

9     Question No. 1 - No.  The act of signing a contract before the

10    dates noted in Instruction No. 26 does not constitute

11    performance.

12          The second one would be:  Question No. 2 - No.  Acts

13    performed before the dates noted in Instruction No. 26 cannot

14    be considered.

15          *MS. CALL:*  I am concerned that that could be read very

16    broadly to the jury that they cannot consider any evidence at

17    all as of evidence of guilt prior to 2015 because it's not

18    clear that these two sentences or these two questions are even

19    related to each other, that they ask for clarification for 26

20    and the term act and then they ask this other broad question,

21    can evidence prior to 2015 be considered.  So I would just ask

22    that that second answer be cabined to make clear that for

23    purposes of Instruction 26 and the statute of limitations, no,

24    and then go on from there.

25          *MR. TUBACH:*  We don't think that's necessary.  At

1    least on behalf of Mr. Penn, we don't think that's necessary.

2    The question is very specifically focused on Instruction

3    No. 26.  And the vast majority of evidence that was put in in

4    this trial predates 2015.  It's not a reasonable inference to

5    think that three-fourths of the evidence they heard is

6    something they are not allowed to consider for any purpose.

7    That's just not a reasonable reading that note.  This note is

8    focused on Jury Instruction No. 26.

9         THE COURT:  Yeah, this is a question about No. 26.  I

10   think that Mr. Tubach is right.  I don't know why the jury

11   would infer that, you know, a statement about -- from the Court

12   answering a question about Instruction No. 26 would be then,

13   you know, used by the jury to apply to all the instructions

14   when the whole case was -- not the whole case, but so much of

15   the case was focused on acts before then.

16        MR. KOENIG:  Can I just add a thought?  I realize that

17   the two questions are written on two separate lines, but it is,

18   in fact, not clear whether they are two different concepts.  I

19   mean, it is -- we are inferring that because that's maybe how

20   we would write it, but it very well could be two separate

21   questions.  And so I don't see any prejudice in saying we are

22   assuming that your Question No. 2 relates to Instruction 26, so

23   here is the answer to Question 26.

24        THE COURT:  I will add for purposes of Instruction

25   No. 26 to the second answer just so we are sure.

1          Okay.  Anything else on that?  I will write that into

2     the form and Ms. Grimm will provide copies of that to you.  And

3     then we'll be in recess until we either get another question or

4     until 5:00 o'clock.

5          Mr. Fagg?

6          MR. FAGG:  One point of clarification, Your Honor.

7     Where you said you were going to add in that language, could

8     you please let us know where you were going to add it in?

9          THE COURT:  Yes.  Let me read it to you again:

10         The answer to question No. 1, the same.

11         Question No. 2:  No.  Acts performed before the dates

12    noted in Instruction No. 26 cannot be considered for purposes

13    of instruction No. 26.

14         MR. FAGG:  Thank you.

15         MR. TUBACH:  Does that say Instruction 26 twice?

16    Maybe I misheard that.

17         THE COURT:  It does, so now it would.  But I wanted to

18    focus on the dates noted in Instruction 26.  That's the same

19    language that I used in the answer to the first question.  So

20    it is a little bit redundant, but arguably it's an effort to be

21    real clear.

22         MR. TUBACH:  I guess our request would be to have it

23    appear only once, but it's fine.

24         THE COURT:  We will be in recess.  Thank you.

25         (Recess at 2:25 p.m until 4:15 p.m.)

1          THE COURT:  We are back on the record in 20-CR-152.

2     The jury has several more questions, two more notes.

3          MR. FAGG:  Your Honor, sorry to interrupt, but can we

4     wait for just one moment?  Thank you.

5          THE COURT:  We absolutely can.  All present and

6     accounted for?  I was just saying that we've received two more

7     notes from the jury all related to Instruction No. 26.  It

8     would appear that the jury instead of being helped by the last

9     answer is now further confused.  It seems like they are

10    confused as to the date range in Instruction 17 through 18 as

11    compared to Instruction No. 26.

12          Suggested response on behalf of the United States?

13          MS. CALL:  Yes, Your Honor.  The jury has clearly

14    asked for some elaboration, so the suggested response from the

15    government does contain that.  For the first question we would

16    suggest --

17          THE COURT:  And by that you mean what?

18          MS. CALL:  Elaboration?

19          THE COURT:  No.  Which note are you talking about?

20          MS. CALL:  Oh, thank you.

21          THE COURT:  Are you proposing we send back one

22    response to both?  And if you are saying which question, you

23    have to just clarify which one you are talking about.

24          MS. CALL:  Yes, Your Honor.  We have two responses.

25    But I think I guess before I say what our proposed response is,

 1   I think it's somewhat unsurprising that there is some confusion

 2   here, particularly given Defendant Fries' theory of the case

 3   which was Instruction No. 34 which included the statement that

 4   the government has not alleged nor proven that within five

 5   years of the statute of limitations Mr. Fries discussed pricing

 6   with anyone outside of his own co-workers, directed anyone else

 7   to share pricing information or agreed with anyone to share

 8   pricing information which certainly indicated to the jury that

 9   they had to find specific to each individual and act within the

10   statute, which is, of course, not what the rest of the Court

11   instructions say.  So that's as to what I will call the second

12   question which is the one beginning with, If evidence shows

13   actions.

14        But I'll kind of propose what our two responses are.

15   So for the first question which would be the first page with

16   about three bullets and an asterisk on it including what date

17   ranges does Jury Instruction 26 exclude from our consideration

18   of evidence due to statute of limitations, our proposed

19   response would be:  The Indictment charges the defendants with

20   conspiring to fix prices and rig bids for broiler chicken

21   products beginning at least as early as 2012 and continuing

22   through at least early 2019.  You may consider evidence from

23   any time, including prior to 2015, as to the guilt of each

24   defendant.  No evidence is excluded from your consideration.

25        For the government to satisfy its burden on the

1    statute of limitations as set forth in Instruction 26, you must

2    fine that the conspiracy continued to exist after the dates set

3    forth in Instruction 26.

4         The government's proposed response to the second

5    question kind of really follows from that, but the response

6    would be:  No.  As stated in Instruction 26, the government

7    must prove that any member of the conspiracy, not any

8    defendant, performed some act in furtherance of the conspiracy

9    after the dates laid out in that instruction.

10        *THE COURT:*  What was the very last part?

11        *MS. CALL:*  Beginning with not -- after any defendant?

12        *THE COURT:*  Uh-huh.

13        *MS. CALL:*  Performed some act in furtherance of the

14   conspiracy after the dates laid out in that instruction.

15        And just to note some law that's, of course,

16   consistent with the law including 10th Circuit United States --

17        *THE COURT:*  I think before we do that, I think we

18   better kind of boil down and try to figure out what the

19   questions ask.

20        Proposed response on behalf of defendants?  Any

21   thoughts, Mr. Tubach?

22        *MR. TUBACH:*  Your Honor, I will just speak for

23   Mr. Penn.  We have not really had an opportunity to confer, but

24   I think the answer to the question, I don't know which number

25   we are doing, If evidence shows actions, the one that starts in

1    that way, I think the answer to that is yes, because what they

2    are saying is if there are acts of collusion by an individual

3    prior to 2014 but there is no future evidence within the

4    statute of limitations, then does that warrant a verdict of not

5    guilty?  The answer is yes, it does.  That's, I think, exactly

6    what the law is.

7            With respect to what Ms. Call just said, the problem

8    we have here is that the government has now in closing

9    basically atomized its conspiracy.  It's the single conspiracy

10   that it alleged and asked the Court to give an instruction

11   saying basically, hey, you can find any sub-conspiracy there.

12   And the problem is you can't -- if the jury is considering

13   little sub-conspiracies, then that's not going to be something

14   that we're going to find out at all unless we know that.  She

15   is saying, well, they have charged a single conspiracy, but

16   then there is also jury instructions that say what if they

17   think there is just a little mini conspiracy in 2013 and there

18   is a little mini conspiracy about freezer charges or whatever

19   it might be.  I think the problem is -- the answer is for that

20   purpose is there has to be -- that's not -- that's not really

21   contained within this at all.

22           *THE COURT:*  Mr. Beller?

23           *MR. BELLER:*  I think for purposes of Mr. Fries'

24   position, I think I am -- we are considering both of these

25   notes as one for all intents and purposes.

4421

1           Your Honor, what concerns me here before we get

2    started on the statute of limitations issue is that the jury

3    seems to be distilling the element down to one of collusion.

4    And the jury is asking about collusion.  Collusion, of course,

5    is not an element of the crime.  And so I would ask the Court

6    to correct the jury on that piece with a response that says:

7    First, collusion is not an element of the crime charged.  See

8    Instruction 22.

9           Instruction 22, of course, Your Honor, is the

10   conspiracy definition instruction.  And as to No. 2, the answer

11   would be:  Yes.  The statute of limitations applies unless you

12   find beyond a reasonable doubt a conspiracy or the conspiracy

13   extended beyond the dates in instruction 26 and all other

14   elements have been proven beyond a reasonable doubt as to the

15   individual in question.

16        *THE COURT:*  Do you mind reading that, the last one,

17   one more time, Mr. Beller?

18        *MR. BELLER:*  I am happy to, Your Honor.

19           Yes.  The statute of limitations applies unless you

20   find beyond a reasonable doubt the conspiracy extended beyond

21   the dates in Instruction 26 and all other elements have been

22   proven beyond a reasonable doubt as to the individual in

23   question.

24           Your Honor, I believe that such a response also

25   addresses Ms. Call's concern.  The problem that Mr. Fries has

 1    with Ms. Call's response is that it does not encourage

 2    individual considerations and it also does not discuss the

 3    other elements.  And my concern, of course, is that the jury is

 4    simply looking for collusion and leaving the question and

 5    trying to place the question of collusion into a calendar,

 6    which, of course, we know is not an element of the offense and

 7    is also not encouraging individual considerations.

 8            Thank you, Your Honor.

 9            THE COURT:  Thank you, Mr. Beller.

10            Mr. Fagg?

11            MR. FAGG:  Thank you, Your Honor.

12            I agree -- on behalf of Mr. Lovette, we agree with

13    Mr. Beller's points about collusion not being an element of the

14    crime and that the jury needs to be clarified on that.  But if

15    we look at -- sort of aside from that, if we look at what the

16    questions are here, there are just two questions that are

17    actually not very broad.  And the first question, by the first

18    question, I mean the one that begins, If evidence shows, If

19    evidence shows actions of collusion for individual occurred in

20    2014 but no future evidence within the statute of limitations,

21    then does that warrant a not guilty verdict for that

22    individual?

23            Because no future evidence is not tied to that

24    individual, we think that that is an easy question to answer

25    and the answer is yes.  And that's the precise question that

1    was asked by the jury.

2         And then for the other question, the only question

3    that's asked is:  What date ranges does Instruction 26 exclude

4    from our consideration of evidence due to the statute of

5    limitations?

6         And we think that the Court can simply respond that

7    for purposes of the statute of limitations, the dates provided

8    in Instruction 26 control.  And we are talking about providing

9    a very long narrative and perhaps giving one response in

10   response to two questions.  There are just two questions that

11   were asked here.  I think it can be answered fairly

12   straightforward.  And obviously we spent a great deal of time

13   going through the jury instructions and I propose we point them

14   back to that.

15        *THE COURT:*  Thank you.

16        Any other defendants wish to chime in?

17        *MR. FELDBERG:*  I think what Mr. Fagg just articulated

18   seems reasonable to us in the answer to the jury's questions.

19        *THE COURT:*  Okay.  I don't think any of those

20   responses get to the point.

21        The problem is that the jury doesn't know what to make

22   of instruction No. 26.  They don't know what a statute of

23   limitations is.  They don't know why the dates are different.

24   They don't know how 26 relates to all those other instructions

25   that just came before it.  They are completely baffled.  They

1    just don't understand why are there two separate dates?  So I

2    think what we need to do, and this is appropriate to help them

3    be clarified, is that we need to basically explain what a

4    statute of limitations is.

5         Now, it's interesting in the first trial we didn't

6    really have that issue.  The instruction that we've used,

7    Instruction 26, is very similar to the one that's the ABA model

8    instruction.  It's very similar to the one that was given in

9    the Northern District of California case.  And I guess they

10   didn't have this problem.  I haven't heard about it.  But I can

11   understand why the jury is having this problem.  I really can.

12   And if I had thought about that before, I think we would have

13   tried to be a little bit more explanatory.

14        My suggestion is along these lines, and then we can

15   talk it over.  I think it should -- and this really does not

16   get at the instruction.  Why don't we just -- I am just going

17   to randomly number these.  They both, by the way, have a time

18   of 3:30 on them, but why don't we number -- I will consider the

19   one that starts out "We're stumped" as question -- or note

20   No. 2., and the next one, "If evidence," as note No. 3.  So I

21   would suggest -- and my -- what I am about to say really does

22   not address note No. 3.

23        But I would suggest we say something along these

24   lines:  The dates in Instruction Nos. 17-18 are separate from

25   the dates in Instruction No. 26.  The subject of Instruction

1    No. 26 is the statute of limitations.

2         This is, by the way, I am now going to -- I am looking

3    at an instruction from O'Malley, and this is an explanation of

4    the statute of limitations.  These are civil instructions, but

5    this is just an explanation to what the statute of limitations

6    is.  We may need to modify this a little bit.  This is

7    Instruction No. 156:53.

8         Continuing on:  Statutes of limitation are laws

9    providing that a suit is prohibited if a plaintiff does not

10   bring it within a prescribed period of time.

11        So we may need to modify that for a criminal case.

12        New paragraph:  Under the statute of limitations in

13   Section 1 of the Sherman Act as explained in Instruction

14   No. 26, the government must prove beyond a reasonable doubt

15   that the alleged conspiracy existed at some point within the

16   period of the statute of limitations, period.  As a result,

17   even if the jury would find a defendant guilty of the charged

18   offense by applying the instructions other than Instruction

19   No. 26, the jury could not convict that defendant if the jury

20   finds that the government has failed to carry its burden of

21   proof under the Sherman Act's statute of limitations, that

22   is -- and then, quote, from the last paragraph of Instruction

23   No. 26 which actually mentions the dates.

24        I think that that would help the jury distinguish

25   between Instruction No. 26, the statute of limitations, and all

1    of the rest of the instructions because, you know, that

2    question starts off by the mix-up on the dates.  The jury can't

3    figure out why there are two sets of dates.  So I think that

4    that may help them.  So let me throw that suggestion open.

5           Ms. Henry?

6           MS. HENRY:  I just want to throw out that maybe it

7    might be easier if the response here was just to say the

8    statute of limitations as described in Instruction No. 26

9    imposes a separate requirement that must be fulfilled before

10   you can convict any individual.  And that may get at this whole

11   issue a lot cleaner, precisely.

12          THE COURT:  A lot more concise than my verbose one?

13   Yeah, that's another perfectly good way to do it.  I thought

14   that it might be helpful within the response to suggest that,

15   you know, the dates in the instructions that the jury

16   references.  It doesn't have to be the first sentence, but

17   you're right, that might be a good way to sign post it, hey,

18   this is different than the rest of those instructions.

19          Ms. Call?

20          MS. CALL:  I do think what you are proposing would be

21   helpful given that they are clearly confused between dates and

22   different instructions, and they seem to think a statute of

23   limitations excludes evidence from their consideration for

24   other purposes.  It's clearly within their question.  The only

25   modification I would suggest to Your Honor's is the part in the

1    middle where it said the government must prove beyond a

2    reasonable doubt that the alleged conspiracy existed at some

3    point within the statute of limitations.  I would just modify

4    existed to continue to exist since they are obviously confused

5    with that 2012 to 2019 time frame which goes further back.

6         THE COURT:  Well, I am quoting from the instruction,

7    so that's why I said existed.  I don't think that that's the

8    issue.  I think that the issue is really they are not

9    distinguishing between the statute of limitations instruction

10   and the other instructions, so that's why they are confused

11   about that date range.

12        Mr. Beller?

13        MR. BELLER:  I am wondering if the Court may be

14   willing to print a few copies of that and let us read it of

15   what the Court has proposed and perhaps wordsmith from that and

16   just take a few minutes to do that.  I will tell you from my

17   perspective that doesn't strike me as too far off of what I

18   would think would be an appropriate answer.  I do respectfully

19   continue to object to not addressing the collusion issue, but

20   that aside, just dealing with the statute of limitations, if we

21   could just look at that in writing, I think that would be

22   helpful.

23        THE COURT:  Well, I agree with you completely.  Here

24   is the deal.  It is now 25 minutes to 5:00.  As a practical

25   matter, I don't think we are necessarily going to have our

1    answer before then.  And it may benefit us to think this one

2    through and come up with some better language.  And for that

3    reason why don't -- I can do that, although frankly because I

4    just scribbled it on a legal pad, by the time I got it typed

5    up, you could probably all have my reading of it -- I will read

6    it again to you -- typed up before that.

7         So one idea would be to come up with responses or a

8    combined response to both notes, think about it overnight, we

9    reconvene -- I hate to tell you, but I think we should come

10   back at 8:00.  I am going to have the jury -- you will remember

11   last time I told them you can pick the time you come back.  I

12   am going to have them come back at 8:30.  And then let's talk

13   about it at 8:00 and see if we can come up with something that

14   is succinct but which should clarify the questions that they

15   asked.

16        Anyone have any problem with that concept?

17        Mr. Fagg?

18        *MR. FAGG:*  No problem, Your Honor.  I was just hoping

19   that, as you said it, I think I missed it on the O'Malley case,

20   the case number for that or a cite.

21        *THE COURT:*  Yes.  Let me read that to you again.  So

22   anyway, this is just something I pulled together.  And I

23   couldn't offhand find anything about the statute of limitations

24   in an instruction that was more helpful, so by analogy I turned

25   to a civil instruction.  You may be able overnight to come up

 1     with something that's more adapted to a criminal case.

 2             This is from a Jones Act instruction civil case.  It's

 3     from O'Malley in the section on maritime claims and it is

 4     instruction -- I don't know how they delineate them, but

 5     Section 156:53.  The only reason I looked to that is just to

 6     explain to the jury what a statute of limitations is because I

 7     think that that would be helpful to the jury.  Statute of

 8     limitations, they may have heard the term, but they are not

 9     lawyers.  They don't know.  So that's why I thought it might be

10     helpful just to explain the concept to them so that, oh, okay,

11     and that might help them better delineate.

12             Now let me read at the risk of Ms. Henry thinking this

13     is even more verbose than she thought what I had originally

14     proposed:  The dates in Instruction Nos. 17 to 18 are separate

15     from the dates in Instruction No. 26.  The subject of

16     Instruction No. 26 is the statute of limitations.  Statutes of

17     limitation -- and then we put in an explanation from either the

18     Jones Act instruction or something.

19             New paragraph:  Under the statute of limitations in

20     Section 1 of the Sherman Act as explained in Instruction

21     No. 26, the government must prove -- and then it goes to a

22     quote from Instruction 26 -- beyond a reasonable doubt that the

23     alleged conspiracy existed at some point within the period of

24     the statute of limitations, period.

25             As a result, even if the jury would find a defendant

1    guilty of the charged offense, and I say -- you'll note that I

2    am saying if it would because the instruction says you can't

3    find someone guilty unless the government satisfies its burden

4    on the statute of limitations.

5         By applying the instructions other than Instruction

6    No. 26, the jury could not convict that defendant if the jury

7    finds that the government has failed to carry its burden of

8    proof under the Sherman Act statute of limitations.

9         And then I would propose that we could then quote from

10   the second paragraph, but maybe that's too long and convoluted,

11   but that's what I am thinking in terms of being able to explain

12   to the jury what a statute of limitations is.

13        Let me provide some observations.  Let me take a look

14   at what I am calling Note No. 3, the one that starts off by,

15   "If evidence shows."  I would say two things.  First of all, on

16   the point about collusion, I think the jury is not using that

17   in some lawyerly way.  I think that's just a term that the jury

18   is using for acts in support of a conspiracy.  I would be a

19   little bit careful, not that I'm trying to suggest we do

20   otherwise, but be a little bit careful about reading too much

21   into that.  I am not sure what definition they are applying to

22   the word "collusion," but I don't think that's the focus of

23   what they're doing.  They are just using that as I think

24   referring to looking for acts of conspiratorial agreement.

25        And then note that it's talking about an individual,

1   so it's focusing in one person, and then no future evidence

2   within the statute of limitations, then does that warrant a not

3   guilty verdict for that individual?  And I do think that

4   reading that question just as it is, the answer is probably

5   yes.

6          There could be, and this is something to think about,

7   there could be some misunderstanding about what that evidence

8   would consist of, in other words, whether it's just evidence as

9   to that person or whether it could be evidence about other

10  people.  I haven't really looked over the instructions to get a

11  better sense of that, but that's something that we should think

12  about too.

13         Anything else to talk about on this particular

14  instruction before we recess and wait until 5:00?  I don't have

15  any problem talking more about it.

16         MS. CALL:  Is there a particular time you would like

17  the briefings by?

18         THE COURT:  Well, what I am most interested in are

19  proposed responses.  If we can get those, the earlier the

20  better.  If I can look at them tonight, that's better than my

21  looking at them at 8:00 just because we are more likely to have

22  an answer before the jury.  The jury is back there now

23  deliberating.  At 8:30 the jury would be back there

24  deliberating too.  I am not going to bring them into the

25  courtroom at 8:30.  We just want to have an answer for them in

 1    a reasonable time after they start deliberating.  The sooner

 2    the better, but we will talk over the proposals at 8:00 a.m.

 3    tomorrow.

 4         MS. CALL:  And you would like them filed on the

 5    docket, the proposals?

 6         THE COURT:  You might as well.  I don't know if there

 7    is a reason not to.

 8         MS. CALL:  The government will focus on the response,

 9    but we likely will brief some law because I think the answer to

10    No. 3 is no.

11         THE COURT:  That's fine.  Providing law is perfectly

12    fine and providing other jury instructions is good.  Whatever

13    material you think is pertinent to the Court's response is

14    appropriate.

15         Anyone want to bring up some other thoughts about this

16    one?

17         Okay.  Then we will be in recess until 5:00 o'clock,

18    at which point we will bring the jury in and dismiss the jury

19    for the day.  Thank you.

20         (Recess at 4:40 until 5:01 p.m.)

21         THE COURT:  All right.  Let's bring the jury in.

22         (Jury present.)

23         THE COURT:  Ladies and gentlemen, I am going to go

24    ahead and dismiss you.  I know that you have given us a couple

25    of notes.  We are working on the response to those.  And as

 1   soon as we get one prepared, that will be delivered back to

 2   you.

 3          Please return tomorrow at 8:30, same time, to commence

 4   your deliberations.  And you won't be brought into court

 5   tomorrow morning.  Once you are all there, start deliberating,

 6   okay?  Like I said, we will try to get you an answer to your

 7   questions as soon as we can.

 8          Otherwise, ladies and gentlemen, keep all the

 9   admonitions in mind.  You're deliberating now, but that's even

10   more reason to be super careful.  Don't let people -- don't

11   tell them anything more than you have already told them.  And

12   be careful of the media.  You know, if you see anything that

13   you think may be about the case, don't look at it.  Avert your

14   eyes.  Change the channel.  Otherwise, I hope you have a good

15   evening.  The weather is a little bit better.

16          The jury is excused for the evening.  Thank you.

17          (Jury excused.)

18          *THE COURT:*  We will be in recess.  Thank you.

19          Mr. Tubach?

20          *MR. TUBACH:*  Just one very quick issue.  In thinking

21   about the schedule further, given that the jury is now

22   deliberating, we were wondering if the Court would be amenable

23   to us postponing our Rule 29 motions a little further?  It

24   doesn't seem to make a lot of sense to brief this -- work on

25   this now through Monday.  We would ask for some additional time

1    to do that, if that's okay.

2         THE COURT:  Let's take that up as soon as we work on

3    our jury question and let the government think about that a

4    little bit more, but I am open-minded to that suggestion, but

5    let's let the government have a chance to think about that.

6         We will be in recess.  Thank you.

7        (Recess at 5:05 p.m.)

8                               INDEX

9    CLOSING ARGUMENT

10      By Mr. Pollack                                    4351

11      Rebuttal Argument By Mr. Koenig                   4381

12                       REPORTER'S CERTIFICATE

13      I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.  Dated

15   at Denver, Colorado, this 21st day of June, 2022.

16

17                            S/Janet M. Coppock

18

19

20

21

22

23

24

25